# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 1: 20-cv-03142-DDD-KLM.

**Midlab, Inc., a Tennessee Corporation,**

Plaintiff,

v.

**Merrie Pisano Wycoff individually and as trustee of The Wycoff Family Trust; Wycoff Financial, LLC, a Colorado Limited Liability Company; Magnus Veritas LLC, a Colorado Limited Liability Company; and GCS452, LLC, a Colorado Limited Liability Company,**

Defendants.

## DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Defendants, by and through undersigned counsel, submit this Motion for Summary Judgment pursuant to Fed. R. Civ. P. 56 and state as follows:

## I.  INTRODUCTION

On March 31, 2018, Jeffrey Wycoff ("Jeff") took his own life. Jeff had become a successful businessman developing environmentally safe home cleaning products. His final venture, ZAP! Products, Inc. ("ZAP!"), entered into a contract with Midlab, Inc. ("Midlab") in 2015. Midlab is one of many companies owned by the Keller Group. Unfortunately, unlike Jeff's prior ventures, ZAP! never found a road to profitability despite his relentless efforts. Determined not to fail, Jeff borrowed money to keep ZAP! afloat while infomercials, a staple of prior successes, were recorded and audience tested, but never approved.

Jeff left behind his widow, Merrie Wycoff ("Merrie"), and two young adult daughters, Azuraye Wycoff ("Azuraye") and Devon Wycoff ("Devon"). Merrie found herself suddenly saddled with approximately $10 million of debt from an adverse tax ruling, as well as millions of

dollars owed to various lenders and vendors such as Midlab, and responsible for significant financial decisions. ZAP!'s indebtedness and the personal indebtedness owed by the Wycoffs totaled almost $20 million at the time of Jeff's death.

Merrie and her daughters were woefully unprepared to pick up the pieces of ZAP!'s failure. Jeff maintained several term life insurance policies obtained when his finances were stronger. The insurance policies paid Merrie $3,450,000, much of which she used to pay her individual obligations and those debts owed by ZAP!. Her daughters too were beneficiaries of their father's term life insurance policies, each receiving more than $4 million.

Even before Jeff's death, none of the Wycoffs desired to retain the family Farm, which had been for sale intermittently for multiple years. Despite price reductions, the Farm garnered only a single purchase contract, later terminated by the buyer shortly after Jeff's death. In May 2018, BC24, LLC ("BC24"), a lender with a deed of trust on the Farm, sent Merrie a Notice of Default and Demand. Facing pressure related to outstanding debt and the risk of foreclosure on the properties, Azuraye and Devon decided to purchase the Farm and their family home for the family to live in. In separate transactions in August 2018, Azuraye and Devon paid a total of $3,775,000 for the two properties using the proceeds from their father's life insurance policies. Today, the Wycoffs reside full-time in the family home, while Azuraye manages the Farm as a regenerative and sustainable agricultural demonstration farm. Merrie paid rent as a tenant of the Residence through June 2020, but then COVID struck and hindered her efforts to get a job. Her efforts were also impacted by Devon's need for care following a debilitating motorcycle accident. Azuraye and Devon have since then waived Merrie's rent in exchange for her assistance in managing the household's maintenance and upkeep.

Merrie struggled with the business decisions thrust upon her. Creditors of ZAP! of whom

2

she had no prior knowledge descended upon her. As best she could, she settled the debts for $0.10 on the dollar to split the funds amongst many creditors, utilizing her insurance proceeds even though she was not personally obligated. She also paid back friends and family for personal loans Jeff solicited, unbeknownst to her, to sustain ZAP!. Most of Merrie's insurance monies were expended, yet she was aware that with almost $10 million in indebtedness owed to the IRS and State of California, the IRS could attach a lien to her remaining assets.

What Merrie did not anticipate was that Midlab would file a suit which mischaracterizes most everything she has done. After all, she did not owe Midlab anything and had never communicated with anyone from Midlab other than exchanging polite greetings with one individual. Midlab's Amended Complaint is nothing but an artifice to create personal liability for Merrie where it never previously existed, and attempts to penalize family members relying on each other for guidance and counsel during traumatic and overwhelming times. The Statement of Financial Condition upon which Midlab relies was never signed by Merrie, she had no role in preparing it, and she was never aware of its existence until this suit was filed. Midlab could not have reasonably relied upon it because there was a clear disclaimer in the cover letter, only one person at Midlab ever saw it, and Midlab failed to do basic due diligence regarding its contents. Midlab's interest in the document seemingly first commenced when the Complaint was filed, which itself was not reviewed by key executives until before their depositions.

## II.   STATEMENT OF UNDISPUTED MATERIAL FACTS

For purposes of summary judgment only, the following facts are undisputed:

### A.   Background

1.   Jeff and Merrie were married from 1990 until Jeff's death. (Ex. A, Merrie Wycoff Declaration, ¶ 2.)

2.   Jeff and Merrie had two daughters—Azuraye, born in 1991, and Devon, born in

3

1993.  (*Id.* ¶ 4.)

3. Jeff and Merrie purchased 3018 S. Lakeridge Trail, Boulder, Colorado (the "Residence") for $517,500 in 1998.  (Ex. B, MIDLAB 000326.)

4. Jeff and Merrie purchased 9417 N. Foothills Hwy, Longmont, Colorado (the "Farm") for $2,275,000 in 2001.  (Ex. C, MIDLAB 000219.)

5. Jeff handled all of the family's finances, investments, insurance and other related matters, as well as legal affairs.  (Ex. A, ¶ 23.)

6. ZAP! was founded by Jeff.  (*Id.* ¶ 12.)

7. On March 31, 2018, Jeff died by suicide.  (*Id.* ¶¶ 2, 3.)

8. Jeff's death was sudden and tragic.  (*Id.* ¶ 3).

9. Upon Jeff's death, Azuraye and Devon were each beneficiaries of approximately $4 million in insurance policies on Jeff's life.  (Ex. D, Azuraye Wycoff Declaration, ¶¶ 11-12.)

10. Merrie received approximately $3,450,000 from life insurance policies on Jeff's life.  (Ex. A, ¶ 26.)

   **B.     The Farm.**

11. Jeff and Merrie intermittently listed the Farm for sale beginning in 2012, with Jeff believing the Farm to be worth approximately $6 million based on sales of nearby properties and input from other landowners in the area.  (*Id.* ¶ 6.)

12. On June 13, 2016, Jeff and Merrie entered an Exclusive Right-to-Sell Listing Contract with Karen Bernardi and the listing price set at $5,850,000.  (*Id.* ¶ 7; Ex. E, BERNARDI WYCOFF 000001, at -0001, -0004.)

13. On August 8, 2017, Jeff and Merrie entered an Agreement to Amend/Extend Contract with Broker that reduced the listing price to $3,789,000.  (Ex. F, BERNARDI WYCOFF 000011.)

4

14. In March 2018, Jeff and Merrie and Caerleon LLC ("Caerleon") entered a contract whereby Caerleon agreed to purchase the Farm for $3,300,000. (Ex. G, WYCOFF000005, at -0005, -0008.)

15. On April 26, 2018, Caerleon unilaterally terminated the contract to purchase the Farm. (Ex. H, WYCOFF 002312; Ex. A, ¶ 9.)

16. After Jeff's death, Merrie wanted to sell the Farm. (Ex. A, ¶ 11.)

17. On August 22, 2018, the Farm was sold to Magnus Veritas LLC ("Magnus Veritas") for $2,500,000. (Ex. I, WYCOFF 00067.)

18. Magnus Veritas is owned through trusts controlled by Azuraye and Devon. (Ex. D, ¶ 20.)

19. The purchase of the Farm was funded with life insurance proceeds Azuraye and Devon obtained upon their father's death. (*Id.* ¶¶ 18-19; Ex. J, Azuraye Wycoff Dep. ("A. Wycoff Dep.") 120:19-121:20; 122:23-123:22.)

**C.  The Residence.**

20. On July 26, 2018, the Residence was sold to GCS452, LLC ("GCS452") for $1,275,000. (Ex. K, WYCOFF 000066.)

21. GCS452 is owned through trusts controlled by Azuraye and Devon. (Ex. D, ¶ 20.)

22. The purchase of the Residence was funded with life insurance proceeds Azuraye and Devon obtained upon their father's death. (*Id.* ¶¶ 19-20)

23. Azuraye and Devon live fulltime at the Residence. (*Id.* ¶ 7.)

24. Merrie has lived at the Residence continuously. (Ex. A, ¶ 33.)

25. Commencing with the sale of the Residence in 2018, Merrie paid rent to GCS452 through up to and including June 2020. (Ex. L, Merrie Wycoff Dep. ("M. Wycoff Dep.") 233:11-17; 234:4-6; Ex. D, ¶ 21.)

26. Merrie has not paid rent since 2019 because COVID impacted her efforts to get a job and because she cares for Devon during her recovery from cumulative injuries, including a motorcycle accident in 2019; accordingly, her daughters have since waived rent in exchange for Merrie's assistance with property maintenance and upkeep. (Ex. L, M. Wycoff Dep. 233:18-234:3; Ex. A, ¶ 34; Ex. D, ¶ 22.)

### D. Wycoff Family; Insurance Policies.

27. At Jeff's direction, in November 2017, Merrie, as owner, changed the beneficiary designation of Jeff's term life insurance policies from herself to Azuraye and Devon. (Ex. A, ¶ 25; Ex. M, Ed Certisimo Dep. ("Certisimo Dep.") 58:19-59:15, 61:23-64:14, 91:10-92:12.)

28. Jeff determined who would be the owner or beneficiary of his life insurance policies. (Ex. A, ¶ 25; Ex. M, Certisimo Dep. 58:8-13.)

29. Upon Jeff's death, Merrie paid millions of dollars obtained from the life insurance proceeds to legitimate creditors. (Ex. A, ¶¶ 26-27.)

30. Merrie received advice from probate lawyers that she believed to be legitimate and reliable that Jeff's estate did not have assets sufficient to warrant opening a probate estate and/or that because Jeff had a will his assets did not require probate administration. (*Id.* ¶ 29.)

### E. Tax Court Ruling.

31. On October 16, 2017, the United States Tax Court ("Tax Court") issued an adverse ruling, assessing accuracy-related penalties and deficiencies. (Ex. N, Opinion.)

32. If the IRS were to attach a lien to her assets, Merrie understood that other creditors would go unpaid. (Ex. A, ¶ 28.)

### F. ZAP!.

33. Jeff handled ZAP!'s business operations, finances, and legal matters, and made all business decisions without input from Merrie. (*Id*. ¶¶ 13-16.)

6

34. Merrie had limited involvement with ZAP! because she was focused on raising her two daughters, taking care of her household, managing the equestrian center at the Farm, pursuing a Ph.D., and authoring multiple novels. (*Id.* ¶¶ 16-18.)

**G.     BC24 Loan.**

35. On May 12, 2015, BC24 closed on a loan (the "BC24 Loan") to Wycoff Financial, LLC ("Wycoff Financial") in the original principal amount of $3,707,287.60. (Ex. O, Brandon Kling Declaration, ¶ 2.)

36. The BC24 Loan was secured by a deed of trust on the Farm. (*Id.* ¶ 5.)

37. As a requirement of the BC24 Loan, and to protect BC24's interest in its collateral, BC24 required the Farm be transferred to a single purpose entity named Wycoff Financial, owned by the Wycoffs. (*Id.* ¶ 6.)

38. The BC24 Loan was guaranteed by ZAP!, Jeff, Merrie, each individually and as a trustee to Jeffrey and Merrie 2003 Insurance Trust u/a/d December 11, 2003, and as trustee of the Wycoff Family Trust u/a/d June 12, 1998. (*Id.* ¶ 8.)

39. After Wycoff Financial was unable to service the debt owed to BC24, BC24 worked with Jeff through numerous loan extensions. (*Id.* ¶ 9.)

40. The BC24 Loan matured on March 31, 2018. (*Id.* ¶ 12.)

41. On May 15, 2018, counsel for BC24 sent Wycoff Financial a Notice of Default and Demand. (*Id.* ¶ 14.)

42. Azuraye and Devon decided to use the insurance proceeds they obtained upon their father's death to purchase the Farm and Residence to avoid foreclosure on the properties and pay down the outstanding debt. (Ex. D, ¶¶ 18-19.)

43. On June 27, 2018, counsel for Merrie sent BC24 a settlement proposal predicated upon Azuraye and Devon using the insurance proceeds to purchase the Farm for $2,500,000 and

7

the Residence for $1,275,000, with all net proceeds plus $400,000 from Merrie to be paid to BC24. (Ex. O, ¶ 15; Ex. A, ¶¶ 30-31.)

44. In the alternative, Merrie offered to convey the Farm to BC24. (Ex. O, ¶ 15.)

45. BC24 chose to accept $2,500,000 rather than own the Farm. (*Id.* ¶ 16.)

46. BC24 accepted a total discounted payoff of $3,230,000—more than $1.5 million less than the indebtedness of $4,814,328.33. (*Id.*)

**H.     Midlab.**

47. Midlab is owned by Keller Group. (Ex. P, Steven Miller Dep. ("Miller Dep.") 11:8-11:13; Ex. Q, Vince Keller Dep. ("Keller Dep.") 13:24-14:25.)

48. Keller Group is a holding company for several companies, including car dealerships, a rent-to-own home goods store, a shredding business, and a military vendor located in Switzerland. (Ex. P, Miller Dep. 11:8-12:1; Ex. Q, Keller Dep. 15:1-16:7; Ex. R, Colman Hoffman Dep. ("Hoffman Dep.") 10:15-12:6.)

49. Midlab has a process it follows to evaluate potential new customers to protect Midlab. (Ex. P, Miller Dep. 16:9-17:3.)

50. Steve Miller, Vice President of Finance at Midlab, worked with Jeff to evaluate his business plan and projections. (*Id.* at 9:2-7; 28:14-30:3.)

51. Along with Miller, Vince Keller (CEO of Keller Group), Matt Schenk (President of Midlab), and Colman Hoffman (General Counsel of Midlab) evaluated ZAP!. (*Id.* at 31:24-32:6; Ex. R, Hoffman Dep. 10:15-11:13; Ex. S, Matt Schenk Dep. ("Schenk Dep.") 8:9-14; Ex. Q, Keller Dep. 11:20-25.)

52. ZAP! was an atypical customer of Midlab. (Ex. R, Hoffman Dep. 30:2-31:19.)

53. The approval of ZAP! was a bigger approval—there were more risks associated with it because Midlab would have to carry special product components specifically for ZAP!.

(Ex. P, Miller Dep. 32:7-33:5.)

54. On September 16, 2015, ZAP! executed a Manufacturing and Supply Agreement (the "Agreement") with Midlab. (Ex. T, Agreement, MIDLAB_000019.)

55. The Agreement is signed by Jeff Wycoff. (*Id.* at -0025; Ex. P, Miller Dep. 28:6-13; Ex. S, Schenk Dep. 15:11-16:4; Ex. Q, Keller Dep. 33:20-34:16; Ex. R, Hoffman Dep. 32:8-33:5.)

56. Merrie was not involved in negotiations with Midlab. (Ex. A, ¶ 18.)

57. Jeff Wycoff executed a Limited Continuing Guaranty (the "Guaranty') dated November 11, 2015, guaranteeing the past, present and future obligations of ZAP!. (Ex. U, Guaranty, MIDLAB_000009 at -0009, -0011; Ex. P, Miller Dep. 122:25-124:16; Ex. S, Schenk Dep. 20:24-22:6; Ex. Q, Keller Dep. 34:19-35:12; Ex. R, Hoffman Dep. 33:16-35:7.)

58. Midlab did not request a guaranty from Merrie, nor did she execute one. (Ex. Q, Keller Dep. 38:5-9; Ex. S, Schenk Dep. 22:7-10; Ex. A, ¶ 22.)

59. It was not normal for Midlab to request personal guaranties. (Ex. R, Hoffman Dep. 30:2-31:19.)

60. Robert Henke, CPA, prepared a Statement of Financial Condition (the "Statement") as of October 31, 2015 for Jeff and Merrie, at the request of Jeff. (Ex. V, MIDLAB_000012, at -0013; Ex. W, Robert Henke Dep. ("Henke Dep.") 18:8-10.)

61. Henke never spoke to Merrie about the Statement; all information contained on the Statement was obtained from Jeff. (Ex. W, Henke Dep. 61:10-62:23; 65:11-68:12; 87:21-88:5.)

62. Merrie did not request that Henke prepare the Statement, she did not assist in its preparation, she never reviewed it, and she never delivered it to any employee of Keller Group or Midlab. (Ex. A, ¶ 20.)

63. Merrie never saw the Statement until after Midlab filed this lawsuit. (Ex. L, M. Wycoff Dep. 96:8-18; 102:3-9; Ex. A, ¶ 19.)

64. The Statement includes a cover letter from Henke stating:

> "Jeff and Merrie Wycoff have elected to omit substantially all of the disclosures required by accounting principles generally accepted in the United States of America and that if the omitted disclosures were included in the statement of financial condition, they might influence the user's conclusions about the financial condition of Jeffrey and Merrie."

(Ex. V, MIDLAB_000012; Ex. W, Henke Dep. 177:21-178:18.)

65. The language in the cover letter is intended to convey to a recipient of the Statement that they should not rely on the contents to make significant decisions. (Ex. W, Henke Dep. 177:8-178:18.)

66. Hoffman received the Statement in 2015 and did not share it with any persons. (Ex. R, Hoffman Dep. 68:8-24.)

67. Miller had never seen the Statement before his deposition. (Ex. P, Miller Dep. 124:17-125:11.)

68. Schenk had not seen the Statement until a week before his deposition. (Ex. S, Schenk Dep. 25:11-26:10.)

69. Keller had not seen the Statement until before his deposition. (Ex. Q, Keller Dep. 42:12-21.)

70. Midlab never sought title work or obtained any kind of appraisal on the real estate. (Ex. R, Hoffman Dep. 58:10-17; 59:22-60:12; Ex. U, Schenk Dep. 30:18-25.)

71. The only action taken by Midlab with respect to verifying the financial condition of Jeff was a visit by Schenk to the Farm. (Ex. Q, Keller Dep. 61:22-62:21.)

72. Merrie did not make any commitment to pay anything to Midlab in 2015. (*Id.* at 42:7-10.)

10

73. Jeff Wycoff requested and signed the First and Second Amendments to the Agreement. (Ex. X, First Amendment, MIDLAB_000031, at -0032 ; Ex. P, Miller Dep. 38:10-14; 42:4-44:6; 121:11-122:3; Ex. Y, Second Amendment, MIDLAB_000034, at -0035.)

74. Prior to Jeff's death, Midlab had never communicated with Merrie, except Schenk and Merrie exchanged brief greetings during his visit to the Farm. (Ex. S, Schenk Dep. 29:17-30:9; 32:9-14; Ex. Q, Keller Dep. 60:22-61:21.)

75. After Jeff's death, Merrie never warranted to Midlab that the value of the Farm would be sufficient to both pay off BC24 in full and pay Midlab. (Ex. A, ¶ 36.)

76. Neither Keller nor Schenk saw the Complaint filed on October 20, 2021 and amended on July 21, 2021 until shortly before their depositions. (Dkt. Nos. 1 (Complaint) and 40 (Amended Complaint); Ex. Q, Keller Dep. 137:3-19; Ex. R, Hoffman Dep. 61:7-62:6.)

### III.   LAW AND ARGUMENT

#### A.   Standard of Review.

Summary judgment is appropriate if the movant demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "[A] movant who does not bear the ultimate burden of persuasion at trial . . . need simply point out to the court a lack of evidence for the other party on an essential element of that party's claim." *Angell v. Fairmount Fire Prot. Dist.*, 907 F. Supp. 2d 1242, 1249 (D. Colo. 2012).

#### B.   Merrie is Entitled to Summary Judgment on Midlab's Fraud Claim.

"A plaintiff seeking to prevail on a claim of fraud must establish: (1) that the defendant made a false representation of material fact; (2) that the one making the representation knew that it was false; (3) that the person to whom the representation was made was ignorant of the falsity; (4) that the representation was made with the intention that it be acted upon; and (5) that the reliance resulted in damage to the plaintiff." *Vinton v. Virzi*, 269 P.3d 1242, 1247 (Colo. 2012).

11

The reliance element "require[es] the plaintiff to prove separately actual reliance, the reasonableness of that reliance, and that the plaintiff's reliance caused its damages." *Bristol Bay Prod., LLC v. Lampack*, 312 P.3d 1155, 1160 (Colo. 2013). Midlab's fraud claim fails as a matter of law for numerous reasons.

### 1. Merrie made no representation to Midlab, let alone any knowing misrepresentation.

A false representation is "any words or conduct that creates an untrue or misleading impression of the actual past or present fact in the mind of another." *Rocky Mt. Expl., Inc. v. Graham*, 420 P.3d 223, 233 (Colo. 2018). "[T]he means used must be of a definite and specific character because a party has no right to rely on circumstances, conduct, or words that are equivocal, such that they comport equally with innocence and good faith as with bad motivation." *Id*. (internal quotation marks omitted). It is incontrovertible that prior to Jeff's death there were no substantive communications between Midlab and Merrie. Consequently, there are no representations to Midlab.

Midlab's fraud claim hinges on the Statement, *i.e.* claimed deficiencies and inaccuracies. CPA Henke's deposition testimony made clear, however, that Merrie had no involvement in the Statement. Henke testified that he prepared it at Jeff's request and that he never spoke to Merrie about the Statement. (Statement of Undisputed Material Facts ("SUMF") ¶¶ 60-61.) Merrie did not see the Statement until after this lawsuit was filed—she did not request that Henke prepare it, she did not assist in its preparation, she never reviewed it, and she never delivered it to any employee of Keller Group or Midlab. (*Id.* ¶¶ 62-63.) Nor can Midlab point to any interactions between principals and Merrie that would lead to an inference of her involvement. Of the four Keller Group or Midlab principals involved with the ZAP! contract, only Matt Schenk spoke with Merrie before Jeff's suicide. (*Id.* ¶ 74.) Schenk admitted that during their interaction Merrie only

12

really said hello.  (*Id.*)

To the extent Midlab tries to rely on the Statement's title and how it purports to summarize the overall financial condition of the Wycoffs, Midlab's argument fails.  Such words are not sufficiently definite or specific, and comport equally with innocence and good faith.

Even if Midlab could show that Merrie made a representation to Midlab and that the Statement included false representations, the undisputed facts establish that Merrie did not make such misrepresentations knowingly or recklessly.  In a fraud case, "the gravamen of the tort is the defendant's conscious knowledge of the falsity of the representation or such recklessness as amounts to a conscious indifference to the truth."  *Ebrahimi v. E.F. Hutton & Co.*, 794 P.2d 1015, 1017 (Colo. App. 1989).  Merrie was not knowledgeable about her family's finances or ZAP!'s operations, finances, or legal matters, as Jeff handled such responsibilities.  (SUMF ¶¶ 5, 33-34.)  Therefore, she could not have made any misrepresentation involving the Statement knowingly or recklessly.  To the extent Midlab tries to rely on an alleged misrepresentation Merrie made about Jeff's assets not being sufficient to warrant opening a probate estate, its claim must fail because Merrie's belief was based on advice from probate counsel.  (*Id.* ¶ 30.)

### 2. Midlab cannot prove reliance.

The evidence also indisputably demonstrates that Midlab did not rely on the Statement, that any reliance on the Statement was not justified, and that any reliance did not cause damages. *See Smith v. Colo. Interstate Gas Co.*, 794 F. Supp. 1035, 1043 (D. Colo. 1992); *Greene v. Thomas*, 662 P.2d 491, 495 (Colo. App. 1982).  First, only one of the four Keller Group or Midlab principals saw the Statement before Jeff died.  (SUMF ¶ 66.)  Given this, Midlab has failed to demonstrate how Midlab relied on the Statement in deciding whether to enter the Agreement with ZAP!.

Second, Midlab cannot establish that its reliance on the Statement was justified.  To begin with, Keller Group is sophisticated—it is a holding company of multiple companies, including

13

international companies, spanning different industries. (*Id.* ¶ 48.) Midlab follows a process to evaluate new customers. (*Id.* ¶ 49.) The approval process for ZAP!, however, was not typical because there were more risks associated with it. (*Id.* ¶ 53.) Nor was it typical for Midlab to get personal guaranties from customers, yet they requested one from Jeff. (*Id.* ¶ 59.) The Statement included a cover letter containing a substantial disclaimer clearly designed to limit a reviewer's reliance upon specific items contained therein. (*Id.* ¶ 65.) In particular, the cover letter states:

> "Jeff and Merrie have elected to omit substantially all of the disclosures required by accounting principles generally accepted in the United States of America and that if the omitted disclosures were included in the statement of financial condition, they might influence the user's conclusions about the financial condition of Jeffrey and Merrie."

(*Id.* ¶ 64.) This disclaimer language put Midlab on notice that the Statement should not have been relied upon without additional context. *See Rocky Mt. Expl., Inc.*, 420 P.2d at 234 ("A party's reliance on a purported misrepresentation is not justified when the party is aware of or on inquiry notice of the falsity of the representation."). Yet, despite the Keller Group's sophistication, the fact that the approval process and guaranty were atypical, and the clear disclaimer, Midlab did not perform basic due diligence. *See Nielson v. Scott*, 53 P.3d 777, 780 (Colo. App. 2002) ("If the circumstances surrounding a transaction would arouse a reasonable person's suspicion, then equity will not relieve a party from the consequences of inattention and negligence in failing to pursue an investigation."). Midlab complains it was misled by how the Farm was titled as well as the value of the Farm. But any sophisticated party relying on the value of the Farm for a guaranty would have obtained title work or some form of appraisal, or conducted similar investigation. Midlab did none of the foregoing, nor did it request a deed of trust. (SUMF ¶ 70.) As a result, Midlab's claim cannot pass muster of reasonable reliance.

Lastly, Midlab cannot establish that its reliance on the Statement caused damages. *See Master Palletizer Sys., Inc. v. T.S. Ragsdale Co.*, 725 F. Supp. 1525, 1533 (D. Colo. 1989). Here,

where only one employee viewed the Statement and Midlab conducted other analysis evaluating ZAP!, Midlab cannot establish that its alleged reliance on the Statement resulted in any damages. (SUMF ¶¶ 49-51, 66-69.)

### C. Defendants are Entitled to Summary Judgment on Midlab's Fraudulent Transfer Claim.

Under the Uniform Fraudulent Transfer Act as adopted in Colorado ("CUFTA"), a transfer by a debtor can be found to be fraudulent as to a creditor if the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor. C.R.S. § 38-8-105(1)(a); *Schempp v. Lucre Mgmt. Grp., LLC*, 75 P.3d 1157, 1161 (Colo. App. 2003). Section C.R.S. 38-8-105(2) lists factors to be considered in determining actual intent. In its zeal to create liability against Merrie where no indebtedness previously existed, Midlab retrofits CUFTA in a fashion unsupportable in law. Simply put, Midlab cannot demonstrate that a fraudulent transfer occurred.

#### 1. Merrie was not a debtor of Midlab.

Midlab's Amended Complaint contorts CUFTA by creating liability where none previously existed. Merrie never executed the Agreement with Midlab, nor did she guarantee indebtedness ZAP! owed to Midlab. (SUMF ¶¶ 55-58.) This case is derived from Midlab's disingenuous theory that it was damaged by Merrie's conduct, which included paying millions of dollars to legitimate creditors. (*Id.* ¶ 29.)

A claim under CUFTA cannot arise unless a debtor of the creditor transfers property in which the debtor has an interest. *See* C.R.S. § 38-8-105(1). A debtor is "a person who is liable on a claim." C.R.S. § 38-8-102(7). Here, Midlab has failed to demonstrate that Merrie was a debtor of Midlab. The Agreement and subsequent amendments were signed by Jeff Wycoff. (SUMF ¶¶ 55, 73.) The Guaranty was signed and executed by Jeff Wycoff. (*Id.* ¶ 57.) Midlab never asked for nor received a guaranty from Merrie. (*Id.* ¶ 58.)

15

The record is devoid of any evidence to support a veil piercing/alter ego theory according to which Merrie could potentially be considered a debtor to Midlab. *See Newport Steel Corp. v. Thompson*, 757 F. Supp. 1152, 1156-57 (D. Colo. 1990) (explaining when the corporate form should be disregarded). Brandon Kling's Affdavit makes plain that as a requirement of the BC24 Loan, and to protect BC24's interest in its collateral, BC24 required the Farm be transferred to a single purpose entity. (SUMF ¶ 37.) In addition, Merrie had limited involvement in ZAP!; Jeff handled the business decisions while she raised her daughters, took care of her household and pursued her own interests. (*Id.* ¶ 34.) Given this evidence, it is undisputed that Wycoff Financial and ZAP! were not alter egos of Merrie. Therefore, because Merrie was not a debtor to Midlab, CUFTA does not apply.

### 2. There is no evidence that Merrie's conduct was motivated by a desire to hinder, delay or defraud Midlab.

Even if CUFTA applies to Merrie, Midlab has failed to demonstrate that her conduct was motivated by a desire to hinder, delay, or defraud Midlab. Transfers which result in millions of dollars of legitimate creditors being paid do not constitute fraudulent conveyances. Nor can it be inferred from the circumstances that Merrie was motivated by actual intent, as she used her money to pay various creditors to whom she was not personally obligated. (*Id.* ¶ 29.)

After reviewing the history of the beneficiary designations, it is indisputable that intent cannot be reasonably inferred. The designations were changed at the request of Jeff in November 2017; this was after the Tax Court ruling, but well before Midlab declared default. (SUMF ¶¶ 27, 31.) Merrie was not involved with ZAP!'s contract with Midlab at the time she changed the designations. (*Id.* ¶ 56.) In November 2017, Jeff was still alive, and therefore the benefit of the term life policies did not yet exist (i.e., they had no cash value). Public policy supports individuals providing for their family members through life insurance policies.

16

Moreover, the history of the transfers of the Residence and Farm demonstrate that no fraudulent intent can be inferred. Jeff and Merrie tried to sell the Farm starting in 2012. (*Id.* ¶ 11.) The Farm's listing price eventually had to be reduced below what Jeff originally thought the Farm was worth. (*Id.* ¶¶ 11-13.) Changes in market conditions for a unique property do not meet the requisite intent.

After Caerleon terminated the contract for the Farm and BC24 declared a default, Azuraye and Devon used their insurance proceeds to purchase the Farm and Residence so that the debt secured by the Farm could be paid. (*Id.* ¶ 42.) Notably, Merrie offered the Farm to BC24, but BC24 declined. (*Id.* ¶ 44.) It is implausible that Midlab will be able to demonstrate fraudulent intent when the evidence makes clear that all the proceeds from the transfers were paid to a legitimate creditor—BC24.

### D. Defendants are Entitled to Summary Judgment on Midlab's Civil Conspiracy Claim.

To recover for civil conspiracy, "there must be (1) two or more persons, (2) an object to be accomplished, (3) an agreement on the object or course of action, (4) one or more unlawful overt acts, and (5) damages as the proximate result thereof." *Fine v. Tumpkin*, 330 F. Supp. 3d 1246, 1257 (D. Colo. 2018). Midlab's claim fails because there were no unlawful overt acts. As described above, Merrie did not make any misrepresentation to Midlab and Defendants did not engage in any transfers for the purpose of hindering, delaying, or defrauding Midlab.

### E. Merrie is Entitled to Summary Judgment on Midlab's Claim for Promissory Estoppel.

Promissory estoppel requires "(1) the promisor made a promise to the promisee; (2) the promisor should reasonably have expected that promise would induce action or forbearance by the promisee; (3) the promisee in fact reasonably relied on the promise to the promisee's detriment; and (4) the promise must be enforced to prevent injustice." *Alvariza v. Home Depot*, 506 F. Supp.

17

2d 451, 461 (D. Colo. 2007). The promise must be "specific" and "definite [in] nature". *Gill-Mulson v. Eagle River Fire Prot. Dist.*, 2014 WL 420435, at *5 (D. Colo. Feb. 4, 2014).

Summary judgment is appropriate because BC24, not Midlab, was secured by the Farm. (SUMF ¶ 36.) The sales proceeds from the Farm, plus an additional $400,000 from Merrie, went towards reducing the secured debt of BC24. (*Id.* ¶¶ 42-43.) BC24 ultimately accepted a loss of approximately $1,584,000, even though both Jeff and Merrie were personally obligated. (*Id.* ¶¶ 45-46.) Merrie never warranted to Midlab that the value of the Farm would be sufficient to both pay off BC24 in full and pay Midlab. (*Id.* ¶ 75.)

### F. Defendants are Entitled to Summary Judgment on Midlab's Claim for Unjust Enrichment.

"[A] plaintiff seeking recovery for unjust enrichment must prove: (1) at the plaintiff's expense (2) the defendant received a benefit (3) under circumstances that would make it unjust for the defendant to retain the benefit without paying." *Mandelbaum v. Fiserv, Inc.*, 787 F. Supp. 2d 1226, 1244 (D. Colo. 2011). Summary judgment is appropriate because the evidence fails to demonstrate that Merrie induced Midlab to extend credit to ZAP! for the reasons described above (*i.e.*, her lack of involvement whatsoever with ZAP!'s contract with Midlab). Furthermore, there are no circumstances that would make it unjust for GSC452 or Magnus Veritas to retain ownership of the Residence and Farm. GSC452 and Magnus Veritas purchased the Residence and Farm with insurance proceeds Azuraye and Devon obtained upon their father's death. (SUMF ¶ 42.) They were made the beneficiaries of such policies before Midlab declared default. (*Id.* ¶¶ 27, 41.) The proceeds from the sale of the Farm and Residence, along with some additional funds, were then provided to BC24 as a full and complete payment of indebtedness. (*Id.* ¶¶ 42-43, 45.) It "would stretch the definition of what constitutes 'unjust' circumstances beyond recognition to suggest that" Azuraye and Devon were not entitled to use the proceeds from the life insurance proceeds as

18

they saw fit, particularly where they used the proceeds to pay off a legitimate creditor such as BC24.  *Abercrombie v. Aetna Health, Inc*., 176 F. Supp. 3d 1202, 1216 (D. Colo. 2016).  Even with those sales, there were insufficient funds to pay off the BC24 debt (by in excess of $1.5 million).  (*Id.* ¶¶ 44-46.)   There are no facts supporting Midlab's claim.

## IV. CONCLUSION

For the reasons set forth above, Defendants respectfully request that the Court grant Defendants' summary judgment motion.

Dated this 1st day of November, 2021.

*/s/ Steven E. Abelman*
Steven E. Abelman
Brownstein Hyatt Farber Schreck
410 Seventeenth Street
Suite 2200
Denver, CO 80202
303.223.1100
sabelman@bhfs.com

*Counsel for Defendants*

I hereby certify that the foregoing pleading complies with the type-volume limitation set forth in Judge Domenico's Practice Standard III(A)(2).

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on this 1st day of November, 2021, a true and correct copy of the foregoing **Defendants' Motion for Summary Judgment** was electronically filed with the Court using the CM/ECF system which will send notification of such filing to all counsel of record:

Ross W. Pulkrabek
Aaron D. Goldhamer
Keating Wagner Polidori Free, PC
1290 Broadway, Suite 600
Denver, Colorado 80203
rpulkrabek@keatingwagner.com
agoldhamer@keatingwagner.com

*s/ Steven E. Abelman*
Steven E. Abelman