**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

**Civil Action No.: 1:20-cv-03142-KLM**

MIDLAB, INC., a Tennessee Corporation,

    Plaintiff,

v.

MERRIE PISANO WYCOFF individually and as trustee of The Wycoff Family Trust;
WYCOFF FINANCIAL, LLC, a Colorado limited liability company;
MAGNUS VERITAS LLC, a Colorado limited liability company; and
GCS452, LLC, a Colorado limited liability company,

    Defendants.

**DECLARATION OF MERRIE P. WYCOFF**

I, Merrie P. Wycoff, hereby declare, under penalty of perjury, as follows:

1. I am over the age of 18 years. I have personal knowledge of the facts set forth below, and if called upon to do so, I could and would competently testify thereto.

2. I was married to Jeffrey Wycoff ("Jeff") from 1990 until his death on March 31, 2018.

3. Jeff's death by suicide was sudden and tragic, and left us mired in business debts and responsible for significant financial decisions.

4. Jeff and I had two children: Azuraye Wycoff, born August 16, 1991, currently age 30, and Devon Wycoff, born October 3, 1993, currently age 28.

5. Jeff and I formerly owned the two properties known as 3018 S. Lakeridge Trail, Boulder, Colorado (the "Residence"), and 9417 N. Foothills Hwy, Longmont, Colorado (the "Farm").

6. From 2012 onward, Jeff and I intermittently listed the Farm for sale after our two daughters both chose to stop riding horses. Jeff had been led to believe that the property value was approximately $6 million based on comparable sales of nearby properties and input from other landowners in the area.

7. In June of 2016, Jeff and I engaged a real estate agent, Karen Bernardi, to help sell the Farm.

8. Karen Bernardi suggested to us at various times that we lower the listing price for the Farm. We followed her advice and lowered the listing price.

9. At the time that Jeff died, there was a purchase contract from Caerleon LLC to purchase the Farm. However, shortly after Jeff's death, Caerleon LLC terminated the purchase contract unilaterally and without explanation.

10. After the contract for the Farm fell through, I reached out to additional brokers about selling the Farm in order to pay down the loan from BC24, a lender who was seeking immediate payback with daily accumulating interest.

11. I did not want to or plan to continue to own the Farm after Jeff's death; I still wanted to sell it as the burden of caretaking the property had fallen to me, and my children were living out of state.

12. Throughout our marriage, Jeff founded and operated multiple businesses, including ZAP! Products, Inc. ("ZAP!"), which sold cleaning products through direct-response.

13. Jeff handled all of the operations, finances, and legal affairs for his businesses.

14. Jeff did not keep me up-to-date, or consult with me, on decisions he made on behalf of his businesses.

15. My involvement in all of Jeff's businesses was very limited because I was focused on raising my two daughters, taking care of our household, managing the equestrian center at the Farm, pursuing a Ph.D., and authoring multiple novels.

16. My involvement in ZAP! Products, Inc. was limited to ad hoc tasks as requested by Jeff.

17. I had very little knowledge about ZAP! Products, Inc.'s business affairs while Jeff was alive.

18. I was not involved in any way in ZAP!'s or Jeff's relationship with Midlab, Inc., including in any negotiations or conversations relating to the Manufacturing and Supply Agreement or Limited Continuing Guaranty and never signed these documents.

19. I did not see the Statement of Financial Condition (the "Statement of Financial Condition") prepared by an accountant, Robert Henke, until after this lawsuit was filed.

20. I did not request that Henke prepare the Statement of Financial Condition, did not assist in its preparation, never reviewed it, and did not deliver or provide it to any employee of Keller Group or Midlab.

21. I was not aware until after Jeff's death that he had provided a personal guaranty to Midlab.

22. Midlab never requested a personal guaranty from me, nor did I ever execute one.

23. Jeff handled all of our family's finances, investments, insurance and other related matters, as well as legal affairs, during our marriage.

24. I am aware that in October 2017, the United States Tax Court made an adverse ruling against me and Jeff.

25. In November 2017, Jeff requested my assistance in updating the beneficiaries to Azuraye and Devon on certain term life insurance policies because he had previously made me the owner. Jeff handled all of the insurance matters and determined who would be the owner and/or beneficiary of his various policies.

26. After Jeff died, I used most of the $3,450,000 in insurance funds that he left to me to pay off Jeff's and my personal creditors and Jeff's business creditors,

27. I settled many of these debts for $.10 on the dollar in order to split my funds amongst many creditors.

28. I believed that if the IRS attached a lien to my assets, certain legitimate creditors would go unpaid. Therefore I set aside with my tax attorney $200,000 as an offer and compromise to the IRS.

29. I received advice from two probate lawyers that Jeff's estate did not have assets sufficient to warrant opening a probate estate and/or that because Jeff had a will his assets did not require a probate estate. I believed this advice was legitimate and reliable.

30. In May 2018, I received a Notice of Default and Demand and Reservation of Rights from BC24, LLC ("BC24"). I was never involved in any negotiations or business discussions with BC24. After BC24 contacted me, I worked with legal counsel to come up with potential settlement proposals for BC24. I offered to transfer the title to the Farm to BC24, but they declined the opportunity.

31. Our family discussed all possible options, and my daughters used the life insurance proceeds from their father's policies to purchase the Farm and Residence, with the net proceeds, plus additional payment from my remaining insurance funds, going to BC24.

32. Though our family discussed the options available to us, I did not direct my daughters to purchase the Farm or Residence. Our legal counsel assisted us in determining that this was the best available option to our family.

33. I have lived at the Residence since Jeff's death, including after my daughters purchased it. I paid rent in 2018 and 2019 to GC452 for up to and including June 2020.

34. My daughters waived the rent requirement once COVID started, as all my efforts to secure stable income were hindered. We renegotiated the lease for my tenancy to be a work-trade instead, whereby I managed the property maintenance and upkeep. I am also occupied taking care of Devon after a debilitating motorcycle accident in 2019.

35. In October 2020, Azuraye moved back to Colorado to live at the Residence and to manage the Farm.

36. After Jeff's death, I never warranted to Midlab that the value of the Farm would be sufficient to both pay off BC24 in full and pay Midlab.

Dated: Nov 1, 21

By: _____
     Merrie P. Wycoff

23288289.3       5       EXHIBIT A