Azuraye Wycoff
June 23, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03242-KLM

_____

VIDEOTAPE DEPOSITION OF:
AZURAYE WYCOFF - June 23, 2021
(via RemoteDepo)

_____

MIDLAB, INC., a Tennessee Corporation,

Plaintiff,

v.

ZAP! PRODUCTS, INC., a Colorado Corporation;
MERRIE PISANO WYCOFF, individually and as trustee of
The Wycoff Family Trust; WYCOFF FINANCIAL, LLC, a
Colorado Limited Liability Company; MAGNUS VERITAS
LLC, a Colorado Limited Liability Company; and
GCS452, LLC, a Colorado Limited Liability Company,

Defendants.

_____

       PURSUANT TO NOTICE, the videotape
deposition of AZURAYE WYCOFF was taken on behalf of the
Plaintiff in Denver County, Colorado, by remote means,
on June 23, 2021, at 9:03 a.m. MDT, before Gail
Obermeyer, Registered Professional Reporter and Notary
Public within Colorado, appearing remotely from Douglas
County, Colorado.

EXHIBIT J

Azuraye Wycoff
June 23, 2021

---

Page 2

```
 1                 REMOTE APPEARANCES
 2  For the Plaintiff:
 3          AARON D. GOLDHAMER, ESQ.
            ROSS PULKRABEK, ESQ.
 4          Keating Wagner Polidori Free, P.C.
            1290 Broadway, Suite 600
 5          Denver, Colorado 80203
            Email:  agoldhamer@keatingwagner.com
 6                  rpulkrabek@keatingwagner.com
 7
    For the Defendants:
 8
            STEVEN ABELMAN, ESQ.
 9          Brownstein Hyatt Farber Schreck, LLP
            410 17th Street, Suite 2200
10          Denver, Colorado 80202
            Email:  sabelman@bhfs.com
11
12  Also Present:
13          Cole Bartelt, Remote Video Technician
            Rachel Levine
14          Genie Passow
15
16
17
18
19
20
21
22
23
24
25
```

---

Page 3

```
 1                 I N D E X
 2  EXAMINATION OF AZURAYE WYCOFF:            PAGE
    June 23, 2021
 3
    By Mr. Goldhamer                              6
 4
    By Mr. Abelman                               --
 5
 6                                          INITIAL
    DEPOSITION EXHIBITS:                    REFERENCE
 7
    (Exhibits provided electronically to the
 8  reporter.)
 9  Exhibit 1  Instagram photograph             64
               pertaining to Azuraye Wycoff,
10             10/28/17, with attachments
11  Exhibit 2  Instagram photographs            64
               pertaining to Azuraye Wycoff,
12             5/17/18, with attachments
13  Exhibit 3  Signature pages of Azuraye        67
               Wycoff
14
    Exhibit 4  Transamerica Life Insurance      104
15             Company, Claimant's Statement
               pertaining to Azuraye Wycoff,
16             4/16/18
17  Exhibit 5  Transamerica Life Insurance      109
               Company, 07266368, record of
18             check to Azuraye J. Wycoff,
               5/7/18, with attachment
19
    Exhibit 6  Transamerica Life Insurance      112
20             Company, 07266012, record of
               check to Azuraye J. Wycoff,
21             5/3/18
22
23
24
25
```

---

Page 4

```
 1             WHEREUPON, the following proceedings
 2  were taken pursuant to the Federal Rules of Civil
 3  Procedure.
 4             *     *     *     *     *     *
 5             THE VIDEOGRAPHER:  We are now on the
 6  record.  Participants should be aware that this
 7  proceeding is being recorded, and as such, all
 8  conversations held will be recorded, unless there is a
 9  request and agreement to go off the record.  Private
10  conversations and/or attorney-client interactions
11  should be held outside the presence of the remote
12  interface.
13             For the purpose of creating a witness-only
14  video recording, the witness is being spotlighted or
15  locked on all video screens while in speaker view.  We
16  ask that the witness not remove the spotlight setting
17  during the deposition, as it may cause other
18  participants to appear on the final video, rather than
19  just the witness.  For anyone who doesn't want the
20  witness's video to take up the large part of your
21  screen, you may click the gallery view button in the
22  upper-right corner of the RemoteDepo interface.
23             This is the remote video-recorded
24  deposition of Azuraye Wycoff, being taken by counsel
25  for the plaintiff.  Today is Wednesday, June 23, 2021.
```

---

Page 5

```
 1  The time is now 3:03 p.m. in the UTC time zone, or
 2  9:03 a.m. Mountain Time.  We are here in the matter of
 3  Midlab, Inc. versus ZAP! Products, Inc., et al.
 4             My name is Cole Bartelt, remote video
 5  technician on behalf of U.S. Legal Support, located in
 6  Denver, Colorado.  I am not related to any party in
 7  this action, nor am I financially interested in the
 8  outcome.  At this time will the reporter, Gail
 9  Obermeyer, on behalf of U.S. Legal Support, please
10  enter the statement for remote proceedings into the
11  record.
12             THE REPORTER:  The attorneys participating
13  in this deposition acknowledge that I am not physically
14  present in the deposition room and that I will be
15  reporting this deposition remotely.  They further
16  acknowledge that, in lieu of an oath administered in
17  person, the witness will verbally declare her testimony
18  in this matter is under penalty of perjury.  The
19  parties and their counsel consent to this arrangement
20  and waive any objections to this manner of reporting.
21  Please indicate your agreement by stating your name and
22  your agreement on the record.
23             MR. GOLDHAMER:  This is Aaron Goldhamer
24  for the plaintiff, and I so agree.
25             MR. ABELMAN:  Steve Abelman on behalf of
```

---

Azuraye Wycoff
June 23, 2021

Page 6

1  defendants.  I consent.
2           THE REPORTER:  And, Ms. Wycoff, do you
3  declare your testimony in this matter is under penalty
4  of perjury?
5           THE DEPONENT:  I consent.
6           MR. GOLDHAMER:  So you do declare that
7  you're testifying under the penalty of perjury today;
8  is that right?
9           THE DEPONENT:  Yes, I understand.
10          MR. GOLDHAMER:  Okay.  Great.
11                  AZURAYE WYCOFF,
12  having verbally declared her testimony in this matter
13  is under penalty of perjury, testified as follows:
14                  EXAMINATION
15  BY MR. GOLDHAMER:
16      Q.   Good morning, Ms. Wycoff.  My name is
17  Aaron Goldhamer, and I'm counsel for Midlab, Inc.  I
18  just wanted to sort of give you a couple ground rules
19  for today.  Have you ever had your deposition taken
20  before?
21      A.   No, I have not.
22          MR. ABELMAN:  Aaron, we have a problem
23  here.  The video that we're getting is of Gail and not
24  of you.
25          THE REPORTER:  Cole, did you want to go

Page 7

1  off for a minute?
2           THE VIDEOGRAPHER:  Yeah.  Did you want me
3  to go off the record?
4           MR. GOLDHAMER:  Sure.
5           THE VIDEOGRAPHER:  We're going off the
6  record at 9:06 a.m.
7           (Discussion off the record.)
8           (Pause in the proceedings.)
9           THE VIDEOGRAPHER:  We're going back on the
10  record at 3:15 p.m. UTC time or 9:15 a.m. Mountain
11  Time.
12          MR. GOLDHAMER:  Okay.  So we're back on
13  the record.
14      Q.   (BY MR. GOLDHAMER)  Ms. Wycoff, have you
15  ever given a deposition before?
16      A.   No, I have not.
17      Q.   Have you ever testified in court before?
18      A.   No, I have not.
19      Q.   Have you ever testified for any purpose?
20      A.   No, I have not.
21      Q.   Okay.  I just want to set out a couple
22  ground rules to help things go smoothly today.  We have
23  a court reporter, and she's writing down everything
24  that we say.  To make her job easier, I'd like to ask
25  that you try to not start answering a question until

Page 8

1  I'm done asking it.  And, in turn, I'll try to make
2  sure that you're done with your answer before I ask
3  another question, so we don't talk over each other.  Is
4  that fair?
5       A.   Yes.
6       Q.   And because everything is being written
7  down, we do want to have audible responses.  So we do
8  have video, but to get a good record, we'd like to have
9  yeses and nos, rather than nodding a head or shaking a
10  head or saying uh-huh or huh-uh.  Does that sound fair
11  to you?
12      A.   Yes, it does.
13      Q.   Great.  Now, there may be points where I
14  ask a question that's a little confusing.  If you need
15  clarification, please do feel free to ask.  But if you
16  answer the question, I'll understand that you
17  understood the question.  Is that fair?
18      A.   Yes.
19      Q.   We can take breaks today -- this is not an
20  endurance contest -- but I'd ask that we try to space
21  them out, hopefully so that we're moving forward --
22  there's not a break during a question, while a question
23  is pending.  And hopefully we can wrap up any given
24  topic before we take a break.  So I'm happy to talk
25  about breaks, so just let me know if you need a break.

Page 9

1  Is that fair?
2       A.   Yes.
3       Q.   Great.  So in the room today with you is
4  Steve Abelman; is that correct?
5       A.   Yes.
6       Q.   Anybody else?
7           MS. PASSOW:  Genie Passow.  I'm Steve's
8  assistant.  I'm just here for IT help in case something
9  goes wrong.  I'll probably leave here shortly.
10          MR. GOLDHAMER:  Great.  Well, thank you so
11  much.
12      Q.   (BY MR. GOLDHAMER)  So, Ms. Wycoff, what
13  have you done to prepare for today?
14      A.   I have consulted with my advisors, and I
15  have read the Complaint from Midlabs (sic).
16      Q.   Now, when you say, "advisors," what do you
17  mean?  Who do you mean?
18      A.   Steve Abelman.
19      Q.   Anyone else?
20      A.   No.
21      Q.   Did you talk with your mother?
22      A.   Yes, I did speak with my mother.
23      Q.   How long did you talk with your mother
24  for?
25      A.   Probably about two to three hours, in sum.

Azuraye Wycoff
June 23, 2021

1    Q.    Do you remember what you talked about?
2    A.    The overview of the Complaint.
3    Q.    And do you remember when you spoke with
4  your mother?
5    A.    It has been over the course of the last
6  two weeks.
7    Q.    Did she tell you how she wanted you to
8  testify?
9    A.    No.
10    Q.    Did she tell you what would be helpful for
11  you to testify about?
12    A.    No.
13    Q.    And did you read the original Complaint or
14  the Amended Complaint?
15    A.    I'm uncertain.  I believe it was the
16  Amended Complaint.
17    Q.    So what -- what did you discuss with your
18  mother?  Do you recall the substance, beyond just the
19  Complaint?
20    A.    We went over the -- the Complaint itself
21  and discussing mostly the setup of -- we discussed the
22  overview of the companies and the structures and why
23  this Complaint was filed, so I could better understand
24  the context.
25    Q.    So which companies did you talk about?

1    A.    Magnus Veritas and GCS452.
2    Q.    Were those the only companies you talked
3  about?
4    A.    Yes.
5    Q.    Did you talk about ZAP!?
6    A.    No.
7    Q.    Did you talk about Wycoff Financial?
8    A.    No.
9    Q.    Did you talk about Wycoff Holdings?
10    A.    No.
11    Q.    So what did you understand, before that
12  conversation with your mother, about GCS452 and Magnus
13  Veritas?
14    A.    Can you clarify?
15    Q.    Well, you -- you had a conversation with
16  your mother about the companies involved.  And you said
17  that was GCS452 and Magnus Veritas, correct?
18    A.    Correct.
19    Q.    And you said you talked about the
20  structure of the companies and why they were set up,
21  correct?
22    A.    Correct.
23    Q.    And you talked about how they figure in to
24  the Complaint; is that right?
25    A.    Can you clarify that question a little

1  more?
2    Q.    Well, did you talk about how GCS452 and
3  Magnus Veritas related to the issues raised in the
4  Complaint?
5    A.    Yes.
6    Q.    So did you learn something from that
7  conversation?
8    A.    Did I learn something?  I don't fully
9  understand what you mean.
10    Q.    Well, I guess I'm trying to get at what
11  you knew about GCS452 before the conversation with your
12  mother versus after the conversation with your mother,
13  and the same thing with Magnus Veritas.  Did you know
14  anything about GCS452 and Magnus Veritas before the
15  conversation with your mother?
16    A.    Yes.  I helped set up the companies.
17    Q.    Okay.  So what did you -- did you learn
18  any new information about those companies from the
19  conversation with your mother, or the various
20  conversations with your mother, in preparation for
21  today?
22    A.    No.  I would not say that I learned
23  anything new or additional that I did not already know.
24        MR. ABELMAN:  Aaron, would you mind moving
25  a little bit to your right?  The reason I'm asking for

1  that is because on our screen Azuraye is to the side,
2  and so not -- now that's much better.  So you're sort
3  of darting in and out behind her.  So thank you.
4        MR. GOLDHAMER:  Sure.
5    Q.    (BY MR. GOLDHAMER)  Was your sister,
6  Devon, involved with these conversations with your
7  mother in preparation for today?
8    A.    No.
9    Q.    Just you?
10    A.    Yes.  I'm the one that's primarily
11  responsible.
12    Q.    And was there anyone else involved in
13  these conversations with your mother in preparation for
14  today?
15    A.    No.
16    Q.    So what did you understand from your
17  mother that -- about the structure of GCS452 and Magnus
18  Veritas from this conversation?
19    A.    Can you be a little more specific with
20  that question?
21    Q.    Well, you said you talked for about two or
22  three hours, right?
23    A.    As an overview of the entire Complaint,
24  not specifically on the structures.
25    Q.    Okay.  How long do you think you talked

Azuraye Wycoff
June 23, 2021

Page 14

1  about the structures?
2        A.   That would be very hard to get that time.
3        Q.   Well, do you recall what you talked about
4  with respect to the companies' structures?
5        A.   Can you be just a little more specific
6  about what you are looking for in this answer?
7        Q.   Well, I don't know what you talked about,
8  so I'm trying to understand what you talked about with
9  respect to GCS452 and Magnus Veritas.  So can you tell
10 me what you talked about with respect to those two
11 companies?
12       A.   Yes; that Magnus Veritas was formed to --
13 in order to facilitate the purchase of the farm, and
14 GCS452 was for the purchase of the house, the
15 residence.
16       Q.   And I've got plenty of questions about
17 those purchases, but can you tell me what else you
18 talked about besides that they were formed to
19 facilitate those purchases?  Anything else that you can
20 remember?
21       A.   Nothing else that I can remember that
22 might be able to answer your question more
23 specifically.
24       Q.   Whose idea was it to form Magnus Veritas
25 to facilitate the purchase of the farm?

Page 15

1        A.   It was a combination.  We did not expect
2  to have to make this decision.  My mother and I
3  consulted our advisors in order to better understand
4  what the best course of action would be after my father
5  died.
6        Q.   So which advisors are you talking about
7  here?
8        A.   Brownstein Hyatt and -- well, that was it.
9        Q.   So did -- were you a client of Brownstein
10 Hyatt at the time?
11       A.   Yes.
12       Q.   Did you sign a written fee agreement with
13 Brownstein Hyatt?
14       A.   That, I don't remember.
15       Q.   Did you pay Brownstein Hyatt's legal
16 bills?
17       A.   That, I do not remember specifically.
18       Q.   How did the contact with Brownstein Hyatt
19 first arrive?
20       A.   I'm uncertain of that.
21       Q.   Well, you can't recall how you started
22 talking to Brownstein?
23       A.   I know that they have been advisors of my
24 family for a long time.
25       Q.   When did your attorney-client relationship

Page 16

1  with Brownstein commence?
2        A.   That, I don't recall.
3             MR. ABELMAN:  Calls for a legal
4  conclusion.
5        Q.   (BY MR. GOLDHAMER)  And I may have --
6  maybe I did not cover this in my ground rules, but
7  occasionally you might hear some objections from
8  Mr. Abelman.  He can object on form, he can object on
9  foundation, but that's about it.  Unless he instructs
10 you not to answer the question, the objection is not
11 ruled on, and you still have to answer the question.
12 Do you understand that?
13       A.   Yes.
14             MR. ABELMAN:  And I would just caution the
15 witness -- you haven't asked any questions that, so
16 far, would interpose on attorney-client privilege or
17 work product -- but to the extent that you're answering
18 questions, you should not be disclosing the
19 conversations that you and I have had or that your mom
20 has had with me or anything -- or with regard to the
21 other attorneys that -- that represented Magnus Veritas
22 and GCS452.
23             MR. GOLDHAMER:  Well, Steve, I'm trying to
24 get a sense of, you know, where a privilege might
25 apply.

Page 17

1        Q.   (BY MR. GOLDHAMER)  So, Ms. Wycoff, can
2  you tell me when the first time that you spoke with
3  Brownstein or an agent of Brownstein, like
4  Mr. Abelman -- do you recall when the first time you
5  spoke to them was?
6        A.   I would be guessing if I tried to recall
7  exactly when.
8        Q.   Do you think it was immediately after your
9  father's death?  Was it before your father's death?
10 Was it a couple weeks after your father's death?  Can
11 you tell me anything along those lines?
12       A.   When we were in the midst of setting up
13 everything, the new structures, it was around that
14 time.  So probably a month after his death.
15       Q.   If Brownstein was already representing
16 your mother, why did you need to be involved at all?
17       A.   Because I was part of the structure of
18 these companies.  I needed to be involved.
19       Q.   So was -- did you have the idea, "You know
20 what?  I'm going to -- let's create a new company, and
21 I'm going to be a part of its structure, so this --
22 these new companies can buy the farm and house.  I need
23 a lawyer for that"?  Was that the thought process on
24 your end?
25       A.   This decision was made because we had a

Azuraye Wycoff
June 23, 2021

Page 18

1 buyer for the farm who was ready to move, and then my
2 father passed and he walked away.  And we had
3 absolutely no idea what happened.  So my mother and I,
4 when all this responsibility suddenly fell on us, we
5 were scrambling to find another solution.  And we
6 consulted anyone who we felt would be able to inform us
7 of a better solution.  And it was at that time that we
8 consulted with Brownstein Hyatt, to better understand
9 what our options would be and to make sure that we
10 would do everything in compliance.
11        Q.   In compliance with what?
12        A.   Any potential legal repercussions, being
13 extremely cautious.
14        Q.   The responsibility fell on you.  What do
15 you mean by that?
16        A.   That the primary decision-maker in my
17 family, my father, died.  And suddenly there were many
18 legal structures, businesses, and responsibilities that
19 I had to take over.
20        Q.   Why did you have to take those over?
21        A.   Because my mother did not know how to run
22 any of these.  And as I was the oldest daughter, it was
23 now up to us to make a lot of these decisions together.
24        Q.   In the best interest of your family -- you
25 had to make the decisions in the best interest of your

Page 19

1 family?
2        A.   Yes, that's correct.
3        Q.   Your family as a whole; is that right?
4        A.   Yes.
5        Q.   Who else did you consult besides
6 Brownstein?
7        A.   In terms of?
8        Q.   In terms of the decision to form GCS452
9 and/or Magnus Veritas and their respective purchases?
10        MR. ABELMAN:  I -- I'm confused here.  So
11 you're jumping around a little bit.  Are you asking
12 about forming these particular companies, or are you
13 asking about the decision to acquire the properties?
14        MR. GOLDHAMER:  Well, let's -- let's take
15 it from the beginning.
16        Q.   (BY MR. GOLDHAMER)  How about forming
17 Magnus Veritas?  Who -- did you consult regarding
18 that decision?
19        A.   Beyond Brownstein Hyatt, that was the
20 primary counsel for the formation of the entities.
21        Q.   Both Magnus Veritas and GCS452?  Is that
22 what you're saying?
23        A.   Yes.
24        Q.   Okay.  Who spoke with Brownstein about
25 that -- those entity formations?  Was that mostly you

Page 20

1 or mostly your mother?
2        A.   I'd say primarily my mother, but I was
3 involved in the calls.  I was trying to wrap my head
4 around everything at that time with everything we had
5 going on.
6        Q.   So is it fair to say that your mother kind
7 of took the lead on that communication and consultation
8 with Brownstein?
9        A.   With the communication and coordination of
10 the meetings, but I was involved.
11        Q.   So it is fair that she took the lead on
12 the communication with Brownstein?
13        A.   Yes.  She already had established a
14 relationship with them.
15        Q.   And so that was with respect to both
16 Magnus Veritas and GCS452, correct?
17        A.   Yes.
18        Q.   And the purpose of forming those entities
19 was what, to purchase the farm and the residence?
20        A.   Yes.
21        Q.   And whose idea was it that these -- you
22 needed to form entities to purchase the farm and the
23 residence?
24        MR. ABELMAN:  Again, I'm going to caution
25 you not to reveal conversations or information that

Page 21

1 falls within the attorney-client privilege, which would
2 be conversations or strategies developed by your
3 counsel or counsel for your mom.
4        Q.   (BY MR. GOLDHAMER)  Can you answer the
5 question?
6        A.   Can you restate the question?
7        Q.   Well, let's -- let's try to at least pin
8 down when the idea of buying the farm and the residence
9 with Magnus Veritas and GCS452 first arose.  Do you
10 know when that idea first arose?
11        A.   That would have been -- my father passed
12 at the end of March.  The deal fell through to buy the
13 farm about two weeks after that, so very shortly right
14 after that.  I'd say probably about a month after my
15 dad passed.
16        Q.   And that idea came from whom?
17        A.   I don't think it was one specific person.
18 It was all of us sitting down and discussing with
19 counsel.
20        Q.   Why did you need new entities to buy the
21 farm and the residence?
22        MR. ABELMAN:  Again, I'm going to caution
23 you not to reveal any attorney-client privilege.  If
24 you know the answer, you can provide it.
25        MR. GOLDHAMER:  Mr. Abelman, I think we're

Page 22
1 getting close to some sort of coaching here.  I -- I
2 know that -- I mean, I think there's a standing
3 admonition on this fact.
4        Q.   (BY MR. GOLDHAMER)  And I don't want to
5 know anything that you discussed with your attorneys
6 when they were actually your attorneys.  I want to know
7 why it was necessary to have these new entities buy the
8 farm and the residence?
9        MR. ABELMAN:  You're asking her to reveal
10 a -- legal conclusions.  That's -- that's why I'm
11 concerned about it.
12        MR. GOLDHAMER:  Okay.
13        Q.   (BY MR. GOLDHAMER)  Well, then, with that
14 admonition, can you answer the question, Ms. Wycoff?
15        A.   Can you ask the question once more?
16        Q.   Why did you need new entities to buy the
17 farm and the residence?
18        A.   I think I would be speculating if I fully
19 understood every aspect of it.
20        Q.   So did you just sort of defer to your mom
21 with respect to why that was necessary?
22        A.   No.
23        Q.   Well, your family already owned the
24 residence and the farm, right?
25        A.   Yes.

Page 23
1        Q.   So why did you form new entities to buy
2 those, buy the farm and the residence, when your family
3 already owned them?
4        A.   That was our legal counsel.
5        Q.   Do you have any other understanding at
6 all, beyond your legal counsel, as to why you needed to
7 form new entities to buy the farm and the residence
8 when your family already owned them?
9        A.   No.  I don't know.
10        Q.   Can you tell me what your understanding of
11 this lawsuit is, what this lawsuit is about?
12        A.   Yes; that my dad -- my dad was an
13 entrepreneur and a good man at that.  And he was
14 working with Tristar and was ready to launch ZAP! to
15 market again.  And Midlabs was the manufacturer making
16 the products for ZAP!, and that Midlabs had produced
17 all the products in order to be launched with a line of
18 credit that had been guaranteed by my dad's net worth.
19 And after Tristar failed to uphold their end of the
20 deal, that kind of created a domino effect downline
21 that ended up causing -- causing a lot of the promises
22 that my dad had wanted to uphold, to be able to be
23 unfulfilled.  That's the primary aspect I see.
24        And that Midlabs is looking to call in
25 that amount that was due.  And that there is a

Page 24
1 complaint that the assets and the wealth that my dad
2 had were transferred out of arm's length and that we,
3 being my sister and myself, were used as straw persons
4 to form these companies that were used to purchase the
5 assets that we had.  And that it sounds like there is
6 deep frustration that these loans are not being paid
7 back.
8        Q.   Is there anything else?
9        A.   It sounds like there is a belief that I
10 have no idea what I'm doing and that I am being used as
11 a pawn in a much larger game in order to protect my
12 family's wealth.
13        MR. ABELMAN:  Is there another question?
14        MR. GOLDHAMER:  Well, I wasn't sure if she
15 was done answering.
16        Q.   (BY MR. GOLDHAMER)  Are you done
17 answering?
18        A.   Let me think.  There is a desire from
19 Midlabs to have the loan fully repaid with interest, or
20 have the assets transferred into a trust, or go to
21 trial in order to settle this.  And I'm truly hoping
22 that it does not come to that and that we can find a
23 middle ground.  That was my understanding of the
24 Complaint.
25        Q.   So I think you said that your dad was an

Page 25
1 entrepreneur and a good one.  Is that what you said?
2        A.   An entrepreneur and a good man.
3        Q.   I don't disagree he -- that he seemed like
4 a very good man, and I am sorry for your loss.
5        A.   Thank you.
6        Q.   I want to understand what you knew about
7 his business.  You stated that Tri- -- it was your
8 understanding that Tristar had not fulfilled some of
9 its promises to your dad or his businesses; is that
10 right?
11        A.   To the best of my understanding.  But I
12 will not pretend like I fully understood everything
13 that my dad was working on.
14        Q.   Can you tell me what the basis for that
15 understanding is?
16        A.   I don't think I can tell you more than
17 that.  That was really just the overview and the
18 understanding that I had.
19        Q.   Well, was that from conversations with
20 your dad, with your mom, from independent research, or
21 talking with other people at ZAP!?  Can you -- can you
22 tell me what the basis was?
23        A.   Yeah.  The observation of my dad's entire
24 career and watching him put his faith and his trust
25 into the people closest to him and, rather

Azuraye Wycoff
June 23, 2021

Page 26

1  consistently, being let down.  But that was just my
2  inside perspective.
3      Q.   And that came from conversations with your
4  dad?
5      A.   Conversations, observations, hearing bits
6  and pieces.
7      Q.   Do you know if your mother made any
8  representations about her net worth in connection with
9  this lawsuit?
10     A.   In connection with this lawsuit?  Can you
11  specify?
12     Q.   Do you -- do you know if your mother made
13  any representations about her net worth to Midlab?
14     A.   No.
15     Q.   You don't know, either way?
16     A.   No, I don't know.
17     Q.   Where did you get the idea that there's an
18  understanding that you're being used as a straw person
19  or a pawn?
20     A.   It was written in the Complaint.
21     Q.   When did you learn about the lawsuit?
22     A.   This specific lawsuit?
23     Q.   That's right.
24     A.   I think in December.
25     Q.   December of 2020?

Page 27

1      A.   Yes.
2      Q.   How did you learn about the lawsuit?
3      A.   Honestly, I don't remember.  I think it
4  was through my mother or we were served at the door.
5      Q.   You can't remember whether it was through
6  your mother or someone handed you papers?  You can't
7  remember?  That's the question.
8      A.   No.  I'm sorry.  I can't remember.
9      Q.   How did you get a copy of the Complaint?
10     A.   I think Steve emailed it to me.
11     Q.   So I want to ask you about your background
12  a little bit more generally.  And hopefully these
13  questions won't be as hard.
14     A.   Thanks.
15     Q.   Can you tell me about where you went to
16  college?
17     A.   Yes.  I went to Colorado University in
18  Boulder.
19     Q.   When did you graduate?
20     A.   2015.
21     Q.   What was your major?
22     A.   International affairs and Chinese.
23     Q.   And after you graduated, what did you do?
24  What was the -- what was the first thing you did after
25  you graduated, as far as where you were living, where

Page 28

1  you were working, that sort of thing?
2      A.   After I graduated, I moved to Broomfield,
3  Colorado to still stay instate.  I had a job working at
4  a China-focused education touring agency, and I visited
5  home probably every weekend.
6      Q.   Do you remember what the address was in
7  Broomfield?
8      A.   Can you say that again?
9      Q.   Do you remember what the address was that
10  you lived in Broomfield?
11     A.   Oh, geez.  No, I don't remember that.
12     Q.   Do you remember who owned the place you
13  lived in in Broomfield?
14     A.   It was an apartment complex.  I think it
15  was called Rockland Apartments, something like that, by
16  Flatirons Mall.
17     Q.   Did you pay the rent there?
18     A.   Yes, I did.
19     Q.   And did you pay the rent that you made --
20  or the rent from the money that you made from the
21  China-focused education touring agency?
22     A.   Yes.  I paid my rent with my own income.
23     Q.   What was your approximate income at the
24  time?
25     A.   Oh, it varied.  I was on commission.  I

Page 29

1  was probably making about 4- to 5,000 a month, give or
2  take.
3      Q.   Okay.  Then did you change jobs first or
4  did you move first, after being in Broomfield working
5  for the touring agency?
6      A.   I moved first.  I moved to Hampton,
7  Virginia, and I continued working with the touring
8  agency for about another year.
9      Q.   Okay.  Do you remember what the address
10  was in Virginia?
11     A.   No.  I think it was 2077 Cunningham Drive,
12  something along those lines.
13     Q.   And then you were still paying for that
14  out of your own income?
15     A.   Yes.
16     Q.   Were you still making about 4- to 5,000 a
17  month?
18     A.   Yes.  Rent was about half in Virginia.
19     Q.   Do you remember when you moved to
20  Virginia?
21     A.   Yeah.  February; February, maybe, 2016.
22     Q.   Then did you move next, or did you change
23  jobs next?
24     A.   Oh, I was offered a job in Boston working
25  for a Chinese-based tech agency, and I accepted that

Azuraye Wycoff
June 23, 2021

Page 30

1  offer.  And then I moved in March of 2017, I believe.
2      Q.   Was that Full-Circle Talent?
3      A.   Yes, it was.
4      Q.   Can you describe, generally, what that
5  involved?
6      A.   Yeah.  I was doing project management,
7  marketing, and interviewing for U.S.-based teachers who
8  were looking to go teach in China.
9      Q.   And do you remember what your approximate
10 income was there?
11     A.   I think I was making 55,000 a year.
12     Q.   And do you remember the address where you
13 were living?
14     A.   I moved around a lot.  I had a sublet in
15 Brighton, and then I moved to Somerville.
16     Q.   Do you remember who owned those places?
17     A.   No.  I never knew the landlords there.  I
18 knew the landlord at the second place in Somerville,
19 18 Magnus Ave. in Somerville.
20     Q.   How long did you live at 18 Magnus Ave. in
21 Somerville?
22     A.   I think for -- I think I probably had that
23 lease for about a year and a half to two years.
24     Q.   So that Magnus address, do you recall when
25 you were living there?

Page 31

1      A.   I must have moved in -- oh, geez.  I think
2  I moved in there around September of 2017.  I don't
3  know.  The years get a little foggy.  But then I moved
4  out around, yeah, October of 2018, I think; yeah,
5  around that time.
6      Q.   So where did you move to in October 2018?
7      A.   I bought a conversion van after --
8  actually, no, I hadn't done that yet.  I was living
9  with a friend temporarily as I tried to figure out if I
10 would be moving back to Colorado or where I was going
11 to be.  Life was kind of in flux at that time.
12     Q.   (Inaudible.)
13     A.   Say that again.
14     Q.   What was your friend's name?
15     Q.   Do I have to disclose that information?
16     Q.   Yeah.
17          THE DEPONENT:  Do I really have to
18 disclose that information?  I'm really not quite
19 comfortable bringing his name into this.
20          MR. ABELMAN:  Then we can discuss that at
21 some later point in time.  I don't know why this is
22 relevant, but apparently it -- it's uncomfortable.  So
23 I'd be happy to discuss it with you off the record
24 thereafter.
25          MR. GOLDHAMER:  Well, let me ask more

Page 32

1  questions.
2      Q.   (BY MR. GOLDHAMER)  Can you tell me why
3  it's uncomfortable to disclose this friend's name?
4      A.   Because I guess, personally, I just don't
5  see how it's relevant.  And I would like to protect
6  their identity.
7      Q.   Why do you want to protect their identity?
8      A.   Because I don't feel like they have
9  anything to do with this.
10     Q.   Where was -- where were you living with
11 this friend, like what geographic area?
12     A.   In Boston.
13     Q.   And for how long?
14     A.   Probably about five months.
15     Q.   So that would put you into maybe March of
16 2019.  Does that sound right?
17     A.   Oh, gosh.  Sorry.  I'm just trying to
18 remember my dates.  No.  I think I was still living at
19 Magnus Ave. at that time.  All through 2019 I had that
20 apartment.
21     Q.   So you moved out of Magnus Ave. in 2019?
22     A.   Yeah.  I bought a conversion van in
23 February of 2020.  And it was this transition time
24 between October and February that I was kind of --
25 didn't have, like, a totally stationary place.  I still

Page 33

1  had the lease on Magnus Ave., but was kind of bouncing
2  around, and ultimately had the van and was living out
3  of the van.
4      Q.   So you had the lease on Magnus Ave., but
5  you weren't living there.  Is that what you're saying?
6      A.   Yeah.
7      Q.   Were you subletting it to someone else?
8      A.   No.  I was still paying for the lease.  I
9  was there.  It was mostly being used as storage.  I was
10 just very, very busy starting with a new job.
11     Q.   And you were living elsewhere with your
12 friend?
13     A.   Yeah, splitting time between that
14 apartment and their place.
15     Q.   Was your friend Charlie?
16     A.   Why is that relevant?  I just have to ask.
17     Q.   I actually have some questions here.  Are
18 you -- you don't want to answer that?
19     A.   Yes, it was with Charles.
20     Q.   And so in between October 2019 and
21 February 2020 was when you were living with Charles in
22 Boston?
23     A.   Yes, that is correct.
24     Q.   Okay.  And then you bought a van in
25 February 2020 and lived in the van and moved around in

Azuraye Wycoff
June 23, 2021

Page 34

1 the van?
2       A.   Yes, correct.
3       Q.   Where did you drive the van?
4       A.   I primarily stayed in South Boston.
5       Q.   So during this time, were you still just
6 working for -- I guess, where were you working during
7 the -- so let me back up.  You moved to Boston in March
8 of 2017 to work for the Chinese-based tech agency; is
9 that correct?
10      A.   Yeah, Full-Circle Talent.
11      Q.   Full-Circle Talent.  And then how long did
12 you work for Full-Circle Talent?
13      A.   Oh, up until, I think, August of that same
14 year.
15      Q.   And then where did you start working?
16      A.   Then I started working for Magna Lucrum.
17      Q.   What did you do for Magna Lucrum?
18      A.   Oh, boy.  I was learning how to do project
19 management.  They had a consulting firm that they were
20 trying to get up and running.  We had a construction
21 company, and we were building a house.  And I was
22 learning how to be project management in that field.
23 And we were looking at creating, like, a real estate
24 company as well.
25      Q.   What was your position there?  Did you

Page 35

1 have a title?
2       A.   Not really.  I honestly just filled in the
3 gaps.  I was really like an understudy, learning from
4 the two co-founders, I guess they would be called.
5       Q.   Do you recall about how much your salary
6 was there?
7       A.   I actually didn't have a salary.  It was
8 all pegged to the gross revenue.  And the first year,
9 year and a half while I worked there, we were not
10 making any money, so I was kind of subsisting off
11 savings.
12      Q.   So did you have an ownership interest in
13 Magna Lucrum?
14      A.   No.
15      Q.   How many hours a week did you work for
16 Magna Lucrum, do you think?
17      A.   It varied.  Probably around 60 to
18 80 hours.
19      Q.   And you didn't get paid for any of that?
20      A.   No, I did not.
21      Q.   And you were living on savings at the
22 time?
23      A.   Yes.
24      Q.   Can you tell me who owned the Magnus Ave.
25 address?

Page 36

1       A.   I don't remember her last name.  I think
2 her first name was Maria, and she lived on the first
3 floor.
4       Q.   And was Maria of any relationship to you
5 or your family?
6       A.   No.
7       Q.   Did you just find her on Craigslist or
8 something?
9       A.   I found the roommate on -- yeah, on
10 Craigslist.
11      Q.   So how long did you work for Magna Lucrum?
12      A.   That would have been, I think, August of
13 2017 to August of 2018.
14      Q.   And how much money do you think you ever
15 actually got from your work at Magna Lucrum?
16      A.   I didn't make any money from Magna Lucrum.
17      Q.   You never got paid any money, despite the
18 fact you were working there 60 to 80 hours a week?
19      A.   Yeah.  That was the agreement.  I know.
20 Tell me about it.  It was not ideal.
21      Q.   It doesn't sound ideal to me.
22      A.   No.  That's, ultimately, why I left.
23      Q.   So when -- were you working anywhere else?
24 I mean, I know that 60 to 80 hours a week is a lot.
25 Were you working anywhere else during this time,

Page 37

1 besides Magna Lucrum?
2       A.   Yes.  I was working part-time at a rock
3 climbing gym.
4       Q.   What was that called?
5       A.   Central Rock Gym.
6       Q.   And do you recall the dates of employment
7 there?
8       A.   Oh, I think that would have been January
9 2018 through -- I don't know.  It kind of started
10 fading off around August, when I started working at
11 Small Haul.
12      Q.   Okay.  Did you work anywhere else when you
13 were also working for Magna Lucrum?
14      A.   No.
15      Q.   What is Skythorn Real Estate?
16      A.   That was part of Magna Lucrum.
17      Q.   What's Harvard Advisors?
18      A.   Also under Magna Lucrum and Patagonia
19 Construction.
20      Q.   So tell me about Small Haul Movers.
21      A.   What would you like to know?
22      Q.   Well, who started it?  What does it do?
23 Can you tell me what your involvement was, stuff like
24 that?
25      A.   Yeah.  Small Haul has been around for

Azuraye Wycoff
June 23, 2021

Page 38

1  about 13 years.  Charles Conigliaro bought it, I think,
2  about five or six years ago now.  I think that was
3  2016, maybe.  And --
4      Q.   It was a preexisting -- I'm sorry to
5  interrupt you.
6      A.   Yeah, that's okay.
7      Q.   -- preexisting business that Charles
8  bought?
9      A.   Yes, correct.
10     Q.   Okay.
11     A.   A very small business.  It was mostly just
12 a truck and a trailer and an email list.  And when I
13 first moved to Boston, Charles was one of the only
14 people I knew.  And we would occasionally get together
15 and talk about Small Haul and talk about operations and
16 strategy.  And ultimately in 2018, in the summer, at
17 the end of the peak of the moving season, he needed
18 some additional help.
19          I thought I was going to come in for, you
20 know, a week or two and help answer emails and help
21 hiring and stuff, while I was in transition between
22 Magna Lucrum and trying to find something else, and
23 just got really sucked into the company and just really
24 fell in love with the idea of being able to kind of be
25 an entrepreneur and really design the company in the

Page 39

1  ways that we saw fit; and really looking at creating a
2  company that could be run by the people who were doing
3  the moves.
4          So I was on the truck all the time.  I was
5  doing a lot of the physical labor.  I was doing all the
6  estimates.  I was organizing the internal structures,
7  hiring, answering emails, dealing with conflict
8  resolution.  It was just like a gauntlet that kind of
9  kicked my butt for a good chunk of time.
10     Q.   Sounds like a lot of work.
11     A.   It was a lot of work.
12     Q.   Were you an employee?  Were you part of
13 ownership?  How did that work?
14     A.   I was a W-2 employee for the hiring
15 internal fixed aspects of it.  I was a 1099 contractor
16 for the labor aspect of it, and I was a growth
17 consultant for helping design and develop the software
18 around it.
19     Q.   So the growth consultant piece, was that
20 just sort of another independent contractor
21 relationship?
22     A.   Yes.
23     Q.   So how long did you serve those roles?
24     A.   I am still serving those roles.
25     Q.   So is -- where is the business based now?

Page 40

1      A.   In Boston.  And I now run an operation
2  here out in Boulder, Colorado.
3      Q.   So it's got a Boulder branch and a Boston
4  branch; is that right?
5      A.   Yes, correct.
6      Q.   And are you still a W-2 employee, as well
7  as a 1099 contractor?
8      A.   No.  I stopped being a W-2 employee in, I
9  think, March, as we had another assistant manager come
10 in for training and take over my position.
11     Q.   So March of 2021?
12     A.   Yes.
13     Q.   And so now you're just an independent
14 contractor with Small Haul Movers or Moving?
15     A.   Yes.
16     Q.   What's your approximate sort of salary
17 and/or 1099 payments been over time with Small Haul?
18     A.   The first year I think, in gross, I think
19 I made probably around $90,000, between the W-2 income,
20 1099 income, and growth consulting income.
21     Q.   So that was for the first year you were
22 involved.  And that was in the middle of 2018 through
23 the middle of 2019.  Does that sound about right?
24     A.   Yeah.  August 2018 through -- yeah, yeah,
25 yeah, that full cycle.

Page 41

1      Q.   Then after that first year, what was your
2  approximate take-home -- not take-home, but I guess the
3  overall wages and 1099 income that you received
4  between, say, August 2019 and August 2020?
5      A.   Oh, man.  It was a lot less than the first
6  year, because I wasn't in the truck as much.  I think
7  somewhere between 60- and 80-.  I can't fully remember.
8      Q.   And then between 2019 -- the middle of
9  2019 and the middle of 2020, what would you say the
10 number would be for W-2 and 1099?
11     A.   I think probably around the same, because
12 I was always transitioning back here.  I started moving
13 back to Colorado in October of 2020.  So probably
14 around the same amount.
15     Q.   60- to $80,000 a year?
16     A.   Yeah.  It was kind of a whirlwind.  I
17 wasn't paying as much attention to income.
18     Q.   So it wasn't until October 2020 that you
19 moved back to Boulder full-time?
20     A.   Yeah, full-time.  I had been coming home
21 probably at least once or twice a month over the
22 previous two years.  And each time I came home, I would
23 help my family with tech-related stuff; setting up new
24 systems, just kind of helping them get efficient, kind
25 of transferring the knowledge that I'd learned.  And,

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 42

1  yes, I officially made plans was able to kind of cinch
2  up my life in Boston to be able to come home and help
3  my mom manage everything here.
4       Q.   (Inaudible.)
5       A.   Can you say that again?
6       Q.   What do you mean by cinch up your life?
7       A.   Yeah.  My whole life in Boston, I think
8  just as the pandemic hit and everything was just kind
9  of in flux, I really knew that I needed to come home
10  and was making preparations throughout the year.  Small
11  Haul really relied on me.  I was kind of the central
12  focal point for a long time, so I never really knew if
13  I was going to be able to work myself out of the
14  company.
15       So I started making preparations, knowing
16  everything that was going on at home, to be able to
17  come home.  And by about the end of August of 2020, I
18  hired two new people to take over my role in Small
19  Haul, trained them, and started packing up my life and
20  made plans to move back.
21       MR. ABELMAN:  Aaron, I sense a transition,
22  possibly.  I'd just like to have a bathroom break in
23  the near future.  You can choose when.
24       MR. GOLDHAMER:  Sounds good.  I've got a
25  couple more sort of work background questions, and then

Page 43

1  I think we can take a break.
2       THE DEPONENT:  Yeah.
3       Q.   (BY MR. GOLDHAMER)  Between August 2018
4  and August 2019, do you have a recollection of how much
5  time you spent in the truck doing manual labor and
6  moving, sort of approximately how many hours a week?
7       A.   Probably somewhere between 20 and 30.
8       Q.   And then how much time did you spend with
9  the administrative W-2 types of work?
10       A.   W-2 work was probably -- probably around
11  30 hours, I'd say, on average, a week.
12       Q.   And besides the jobs that we've talked
13  about, between your college graduation and now, do you
14  have any other W-2 or 1099 jobs or income between then
15  and the present?
16       A.   Yes.  I worked for ZAP! Products.
17       Q.   When did you work for ZAP! Products?
18       A.   Over the last few years, I've helped with
19  tech setup, system design, and general upkeep that my
20  family needed assistance with.
21       Q.   How many hours a week do you think you
22  worked?
23       A.   It fluctuated, depending on their needs
24  and whenever I was able to come home and actually do
25  the on-ground.  I'd say anywhere between maybe 2 to

Page 44

1  20 hours, just depending on what they needed help with
2  and when I was available.
3       Q.   Would you only do that work when you came
4  home to Boulder?
5       A.   It depended.  A lot of it could be done
6  over the phone and guiding them.  But when I came home,
7  it was more of the hands-on stuff.
8       Q.   Do you remember what year that started?
9       A.   No, I don't.
10       Q.   But you think it was over the past few
11  years, you said?
12       A.   Yeah; I think, like, officially we made
13  it.  But I think I've always helped my family with that
14  kind of stuff.
15       Q.   So do you think you've been doing that
16  since 2017?
17       A.   Oh, I don't recall an exact date.
18       Q.   How much -- were you an employee or a 1099
19  contractor?
20       A.   I was a W-2.
21       Q.   What was your salary?
22       A.   $500 a month.  It was pretty nominal.
23       Q.   And that would just occur every month,
24  regardless of how much you worked?
25       A.   Yes.

Page 45

1       MR. GOLDHAMER:  Okay.  I think we can take
2  a brief break.  Do you need about five -- five minutes?
3  I know that you've got an afternoon engagement,
4  Ms. Wycoff.  But, Steve, how does five minutes sound,
5  ten minutes?
6       THE DEPONENT:  I'm good with five.
7       MR. ABELMAN:  Five minutes.
8       MR. GOLDHAMER:  Sounds good.
9       THE VIDEOGRAPHER:  We're going off --
10  we're going off the record at 4:20 p.m. UTC time or
11  10:20 a.m. Mountain Time.
12       (Recess, 10:20 a.m. to 10:31 a.m. MDT.)
13       THE VIDEOGRAPHER:  We're going back on the
14  record at 10:31 -- 4:31 p.m. UTC or 10:31 a.m. Mountain
15  Time.
16       Q.   (BY MR. GOLDHAMER)  Ms. Wycoff, we're back
17  from a break.  We tried to get your driver's license on
18  the video, but it was a little too blurry.  Can you
19  tell me what the address says on your driver's license?
20       A.   Yes.  It is 18 Magnus Ave., Somerville,
21  Massachusetts 02143.
22       Q.   So that's a Massachusetts driver's
23  license?
24       A.   Uh-huh.
25       THE REPORTER:  Is that a yes?

Azuraye Wycoff
June 23, 2021

Page 46

1    Q.   (BY MR. GOLDHAMER)  That's a yes?
2    A.   Yes.  Sorry.  Yes.
3    Q.   And where do you actually live now?
4    A.   I live at the residence at -- in Boulder
5  County; 3018 South Lakeridge Trail, Boulder, Colorado
6  80302.
7    Q.   And we've been referring to the residence
8  in this deposition.  And that's what you understand us
9  to be referring to, correct?
10    A.   Correct.
11    Q.   So it sounded like you were going back and
12  forth between Boston and Denver one to two times a
13  month for a while; is that correct?
14    A.   That's correct.
15    Q.   And when was that span of time?  The whole
16  time that you were in Boston?
17    A.   Yeah.  That was pretty much -- pretty much
18  the entire time from when I left Colorado, I pretty
19  frequently came back to Colorado to visit.
20    Q.   Would you drive or fly?
21    A.   I would fly.
22    Q.   And who paid for those flights?
23    A.   I paid for these flights.
24    Q.   So wouldn't that get kind of pricey when
25  you weren't getting any salary from Magna Lucrum?

Page 47

1    A.   Yeah, could be.
2    Q.   Did you live in Miami, ever?
3    A.   No.
4    Q.   Never lived in Miami?
5    A.   No.
6    Q.   I want to talk to you about your travel,
7  generally speaking.  You know, to share something about
8  me, after one of my good friends died, I took an Amtrak
9  trip around the country.  I took some time off from
10  work -- from school, took an Amtrak trip around the
11  country.  So I know how travel can be valuable for your
12  life, generally.  And so I'm interested in your travel,
13  beyond just going back to Boulder.  Did you -- did you
14  have any travel in -- can you basically tell me, if we
15  saw all your passports, what countries have you been to
16  and when?
17    A.   Sure.  I studied abroad in Spain for six
18  months when I was 16.  I lived abroad in China for an
19  entire year when I was in college.
20    Q.   Okay.
21    A.   That was 2013 through 2014.  I had done a
22  volunteer program in Guatemala my sophomore year of
23  college, which must have been 2011 or '12.  That was
24  for a month.  And I have done a decent amount of
25  traveling while I was living abroad.  And after my

Page 48

1  father died, my sister and I took a one-month trip
2  through Europe, I think about maybe mid-June or late
3  July, for about a month.
4    Q.   So you said there was decent travel when
5  you were living abroad.  Can you -- can you tell -- is
6  that when you were in Spain, China, and Guatemala?
7    A.   Primarily when I was living in China.  I
8  went to Thailand, the Philippines, Taiwan.  I traveled
9  all throughout China, Hong Kong; just tried to see as
10  much of the country as I possibly could and practice my
11  Chinese language skills.
12    Q.   Who, generally, paid for that travel, the
13  Asian travel?
14    A.   The Asian trip, I think at that time that
15  was part of what would have been my tuition for
16  college, so my parents paid for that.
17    Q.   And you said the one-month trip through
18  Europe, that was in July and August of 2018?
19    A.   Yes.
20    Q.   Do you remember when you left?
21    A.   No, not exactly.
22    Q.   Do you remember when you came back?
23    A.   Not exactly.
24    Q.   When you came back from Europe, where did
25  you fly into?

Page 49

1    A.   I believe I flew back into Denver.
2    Q.   Where did you fly out from when you left
3  for Europe?
4    A.   Out of -- I don't remember, honestly.
5    Q.   Do you think it was JFK?
6    A.   I don't remember.
7    Q.   Okay.  Well, we'll see if we can jog your
8  memory with some other information.  Have you been to
9  any other countries?
10    A.   Australia and New Zealand.
11    Q.   When did you go there?
12    A.   20- -- December of 20- -- I think 2018.
13    Q.   How long were you there for?
14    A.   About a month.
15    Q.   Who paid for the Europe travel?
16    A.   I did, personally.
17    Q.   Who paid for the Australia and New Zealand
18  travel?
19    A.   I'm not certain who paid for that.
20    Q.   But was it you?
21    A.   No, not out of my own personal bank
22  account.
23    Q.   When you refer to your personal bank
24  account, is there just one account that you're talking
25  about?

Azuraye Wycoff
June 23, 2021

Page 50

```
1        A.   I have a few personal accounts.
2        Q.   Where are those accounts?
3        A.   What do you mean?
4        Q.   Which banks?
5        A.   Allied and Vectra.
6        Q.   And those are the only banks where you
7   have accounts?
8        A.   With personal funds, yes.
9        Q.   Do you have -- are there other accounts
10  that you have some access to?
11       A.   I have my own business bank accounts, and
12  the Magnus Veritas account, and the GCS account.
13       Q.   So the business bank account is for which
14  business?
15       A.   For my business, Blue Sky Consulting.
16       Q.   And then there's GCS452 and Magnus
17  Veritas?
18       A.   Yes.
19       Q.   And where are those accounts, which banks?
20       A.   Bank of America.
21       Q.   For both GCS452 and Magnus Veritas?
22       A.   Yes.
23       Q.   Did you set those up?
24       A.   Yes, I did.
25       Q.   And is the Blue Sky Consulting account at
```

Page 51

```
1   Bank of America as well?
2        A.   Yes, it is.
3        Q.   We haven't really talked about Blue Sky
4   Consulting.  Can you describe what that is?
5        A.   Yeah.  That is my LLC.  I created that as
6   a way to be able to take more contract work for more of
7   the growth consulting for small and for other projects.
8   I do a lot of small team development and organizational
9   work for other groups.
10       Q.   And is that pro bono consulting, or is
11  that paid consulting?
12       A.   It depends.  I usually just try to meet
13  people wherever they're at financially.
14       Q.   So sometimes it's pro bono?
15       A.   Yeah.
16       Q.   And sometimes it's pay; is that right?
17       A.   Yeah.  For the pro bono I usually do an a
18  exchange of equal value with whatever they can offer.
19       Q.   Like what?
20       A.   I currently have a trade set up with one
21  of the regenerative designers for the farm; that I meet
22  with them once a week, I help them with their business
23  processes, setting up their website and systems design,
24  and they cook food for me.
25       Q.   What other things have you traded work
```

Page 52

```
1   for, besides food?
2        A.   I have another, what I call an energetic
3   exchange, with another person who does massage
4   bodywork.  And I also help her with her website design
5   and business processes.
6        Q.   So you get massages from her?
7        A.   Say that again.
8        Q.   So you get massages in exchange for work?
9        A.   Yup.
10       Q.   What, if any, paying customers do you have
11  right now for Blue Sky Consulting?
12       A.   Small Haul pays me for growth management,
13  if we hit over a certain revenue target.  And Drylands
14  Agroecology Research, their regenerative designers are
15  currently paying me for their website design.  And we
16  do a portion of that through trade.
17       Q.   So how much is Blue Sky paid for its
18  work -- for its paying component on the one you just
19  described?
20       A.   It's not a lot.  I'd say probably, I don't
21  know, maybe a total of, like, 50,000 a year between all
22  those things.
23       Q.   So do you recall in November and December
24  of 2017 you were living in Boston, correct?
25       A.   Correct.
```

Page 53

```
1        Q.   And were you -- did you make any trips
2   back to Boulder around that time?
3        A.   2017?  I don't recall specifically around
4   that specific time.
5        Q.   Okay.
6        A.   I probably would have for the holidays.
7        Q.   But you think it would have been around
8   Christmas?
9        A.   Yes.  I've come home for Christmas every
10  year.
11       Q.   You think you would have come home for
12  Thanksgiving in 2017?
13       A.   Oh, probably.  I don't really remember.
14       Q.   Okay.  I've got a couple questions just
15  about some personal details.  Can you tell me what your
16  email address is that you use?
17       A.   Yeah.  I have a lot.  I have a lot of
18  emails.
19       Q.   What emails addresses do you have?
20       A.   Like, all my email addresses?
21       Q.   Well, can you tell me what email addresses
22  you've used since 2017?
23       A.   Azuraye@gmail.com,
24  azurayewycoff@gmail.com.  Geez, I don't know.  I think
25  there was probably a couple that are not in use there.
```

Azuraye Wycoff
June 23, 2021

Page 54

1 I'm not totally sure.  I have a lot of emails.
2      Q.   Well, you named two.  Can you think of any
3 others?  Do you have an email address associated with
4 Blue Sky?
5      A.   Yeah.  Azuraye@blueskyconsulting.group.
6 There's a Small Haul address, which would have been
7 azuraye@mysmallhaul.com.  That wouldn't have been in
8 2017.
9      Q.   I was asking since 2017.
10     A.   Okay.  Yeah, since then.
11     Q.   Any others that you can think of?
12     A.   I don't think so.  I think those are the
13 primary ones.
14     Q.   What email address do you use to
15 communicate with your mom or Devon?
16     A.   Probably the azuraye@gmail email.
17     Q.   Can you tell me what phone numbers you've
18 used that belong to you?
19     A.   Really only my cellphone number, which is
20 818-399-2000.
21     Q.   Any others you can think of?
22     A.   No.
23     Q.   All right.  Well, we're going to -- I'm
24 going to try to pin down the dates on this Europe
25 travel, if I can.  Well, before we go there, do you use

Page 55

1 that 818-399-2000 number pretty regularly?
2      A.   Yes, I do.  It's my primary cell number.
3      Q.   What's the carrier for that number?
4      A.   T-Mobile.
5      Q.   And do you send text messages to your mom
6 and Azuraye (sic) with that number?
7      A.   To Devon?  Yes, I do.
8      Q.   I'm sorry.  To -- you send text messages
9 to your mom and Devon with that number, correct?
10     A.   Yes.
11     Q.   And what's your -- do you keep your text
12 messages?  Do you delete them?  What's your practice
13 with your text messages?
14     A.   I think my phone automatically deletes
15 messages older than six months.
16     Q.   Okay.  Can you make a commitment to
17 preserve text messages going forward and turn off the
18 automatic deletion feature?
19     A.   I could, but storage on my phone is pretty
20 limited.
21     Q.   Can you make a commitment to not deleting
22 any communications that might relate to this case?
23     A.   Yes, I think I can make a commitment to
24 that.
25          MR. ABELMAN:  I'm not going to agree to

Page 56

1 that.  We can discuss that offline.
2      Q.   (BY MR. GOLDHAMER)  So have you looked
3 through any of your emails or text messages that might
4 pertain to this case to determine whether or not they
5 should be provided or logged on a privilege log?
6      A.   I'm sorry.  I don't think I understand the
7 question fully.
8      Q.   Have you looked through your text messages
9 or emails to see if there's anything that relates to
10 this case?
11     A.   No, I have not specifically looked through
12 to see if there are emails or texts related to this
13 case.
14     Q.   Why not?
15     A.   I don't think I've had any communications
16 via text message about this case.
17     Q.   How about email?
18     A.   Not that I'm aware of, but I also have not
19 looked.
20     Q.   So no one has asked you to look for emails
21 or text messages that might relate to this case?
22     A.   No.  This is the first.
23     Q.   Okay.  So that's correct, no one has asked
24 you to look for communications related to this case,
25 correct?

Page 57

1      A.   That is correct.
2      Q.   Do you think there are emails regarding
3 GCS, or Magnus Veritas, or buying the farm or the house
4 that you've sent or received?
5      A.   Yes.
6      Q.   And the text messages would be on the
7 818-399-2000 number, correct?
8      A.   Yes; but I don't think there are really
9 many pieces of communication that were sent through
10 texts.
11     Q.   Okay.  And then emails would be primarily
12 at Azuraye -- azuraye@gmail.com; is that correct?
13     A.   I believe so, yes.
14     Q.   Would you have used any other emails in
15 connection with GCS or Magnus Veritas or buying the
16 farm or the house?
17     A.   Not that I'm aware of.
18     Q.   And so no one has asked you to get those
19 emails until now, correct?
20     A.   Correct.
21     Q.   With respect to your Gmail, do you
22 generally archive emails, or do you delete them?
23     A.   Oh, I'm not certain.  I'd probably have to
24 look at the settings.
25     Q.   You don't know what your standard practice

Azuraye Wycoff
June 23, 2021

Page 58

1  is?
2      A.   No.
3      Q.   Okay.  Can you commit to not deleting any
4  emails related to this case?
5      A.   I mean, I'm fine with that.
6      Q.   Can you tell me what your Instagram handle
7  is?
8      A.   Azuraye72.
9      Q.   Do you have any other Instagram handles
10  that you use or manage?
11      A.   Yellowbarn.farm and the Small Haul Boston
12  account.
13      Q.   How about any other social media?  Do you
14  have any other social media accounts?
15      A.   Just the -- just Facebook.
16      Q.   Okay.  And as far as other ways that you
17  might communicate, do you have any other apps that you
18  use, like WhatsApp?
19      A.   Yes, I have WhatsApp.
20      Q.   Have you done any communication about this
21  case, or GCS452, or Magnus Veritas, or the farm, or the
22  residence using WhatsApp?
23      A.   Not that I'm aware of.
24      Q.   How about Facebook Messenger?  Do you use
25  Facebook Messenger?

Page 59

1      A.   No.
2      Q.   Do you use any other apps to
3  electronically communicate?
4      A.   It's primarily text message and WhatsApp.
5      Q.   Okay.  I'm going to -- do you do any
6  podcasts?
7      A.   No, I don't.
8      Q.   Have you appeared on any podcasts?
9      A.   Nope, not yet.
10      Q.   Have you done any interviews about the
11  farm?
12      A.   Yes -- well, sort of about the farm and
13  about other practices, yeah.
14      Q.   Can you describe that?
15      A.   The interview itself.
16      Q.   Yeah.  What were the circumstances and
17  what did you say about the farm?
18      A.   I was talking about new ways that we could
19  all collaborate and work together.  I took over
20  management of the farm, like full-on being here present
21  to facilitate everything officially, as of October.
22  And I've been working with a lot of people about
23  raising awareness about regenerative farming, about new
24  practices and organization in team management, and how
25  we can save the world.

Page 60

1      Q.   So you mentioned taking over management of
2  the farm in October.  That was October 2020?
3      A.   Yes.  We had kind of left the farm in a
4  state of homeostasis as we tried to figure out what to
5  do with it.  And I had been traveling back and forth to
6  organize events.  We had a group of investors come last
7  August to see if anyone was interested in either taking
8  over leasing the land or just doing something with the
9  property.  And then, ultimately, I decided to move back
10  in order to actually bring the land back to life.  So
11  I'm currently managing that project.
12      Q.   And how many hours a week does that take?
13      A.   A lot.  I'd say I probably work on the
14  farm about 50 hours a week.  And then I'm still
15  managing Small Haul in Boston remotely, which is
16  probably another 20 hours a week.  Then I'm also
17  getting Small Haul Boulder up and running, which is
18  probably an additional 5 to 10 hours a week.
19      Q.   Are you getting paid for your work on the
20  farm?
21      A.   Can you say that one more time?
22      Q.   Are you getting paid for your work on the
23  farm?
24      A.   I would just be paying myself; so, no.
25      Q.   So you're not getting paid in any way for

Page 61

1  your work on the farm.  Is that what you're saying?
2      A.   No.  Because I'm the owner of the farm, it
3  wouldn't necessarily make sense for me to take a salary
4  from it.  I would just be draining resources that the
5  farm needs.
6      Q.   And you gave an interview about the farm
7  to a Waldorf school; is that right?
8      A.   I did, yeah.
9      Q.   Have you given interviews about the farm
10  to anyone else?
11      A.   I give a lot of tours, yeah.  I probably
12  give, I don't know, probably somewhere around five to
13  six tours a week.
14      Q.   And who are the attendees for these tours?
15      A.   Active members in the community that are
16  really interested in regenerative design, permaculture,
17  home studying, line of action, health and wellness.
18  And I give them tours of the facility, showing them
19  what we have accomplished thus far and the systems we
20  have in place.  And I'm working with a number of other
21  farms in the local area to help them kind of build
22  awareness of what's going on.
23      Q.   All right.  I'm going to try to provide a
24  little more context for some documents that might help
25  you remember when and where you were, where and when.

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 62

1 I'm going to screen-share here. And hopefully you see
2 a screen with my charming baby. And now do you see
3 your Instagram?
4        A.  Yes, I do.
5        Q.  Okay.  You see that at the bottom it says
6 October 28, 2017?
7        A.  Yup.  This was Halloween.
8        Q.  And do you know where you were when you
9 took this picture?
10       A.  Yes; at my uncle and aunt's house in
11 Belmont, Massachusetts.
12       Q.  Okay.  So you got some family out on the
13 East Coast?
14       A.  Yeah.
15       Q.  And then this next page is November 19th,
16 2017.  Do you see that?
17       A.  Yup.
18       Q.  And it says that you're at the
19 Massachusetts Institute of Technology.  Do you see
20 that?
21       A.  Yes.  This is an MIT outing club.  This
22 was a first aid survival training.
23       Q.  Okay.  And do you think you went home in
24 between these two pictures --
25       A.  I think --

Page 63

1        Q.  -- home to Boulder, that is.
2        A.  I'm honestly not certain.
3        Q.  Okay.  And then December 17th, 2017,
4 you're in Cambridge, correct?
5        A.  Yes.
6        Q.  Do you think you went home in between this
7 picture and the previous picture that we looked at
8 November 19th, 2017?
9        A.  I just don't remember.  I was traveling
10 around.  I had just fallen and I had broken my -- well,
11 I tore my ACL and dislocated my elbow.
12       Q.  Ouch.
13       A.  And I don't think I -- I don't think I
14 went home for Thanksgiving that year.  I can't -- I
15 honestly can't remember.
16       Q.  Do you remember when you fell?
17       A.  Yeah.  That was in -- I think that was,
18 like, September 3rd of that year.
19       Q.  So maybe you didn't go home for a little
20 while because you were kind of hurt?
21       A.  Yeah.
22       Q.  So you don't recall being home with that
23 injury before Christmas?
24       A.  Yeah.  I don't think so.
25            MR. GOLDHAMER:  Okay.  And I'll let you

Page 64

1 know -- this is for the court reporter, but we'll mark
2 this as Exhibit 1.
3            THE REPORTER:  Thank you.
4            (Deposition Exhibit 1, remotely introduced
5 and provided electronically to the court reporter.)
6            MR. GOLDHAMER:  So we'll mark this next
7 set of Instagram posts as Exhibit 2.
8            (Deposition Exhibit 2, remotely introduced
9 and provided electronically to the court reporter.)
10       Q.  (BY MR. GOLDHAMER)  Do you see this post
11 from May 17, 2018?
12       A.  Yes.
13       Q.  It says you're at the Massachusetts
14 Institute of Technology?
15       A.  Uh-huh.
16       Q.  That's a yes?
17       A.  Yes.
18       Q.  So you were in Boston, at least as of
19 May 17, 2018, correct?
20       A.  Yes.
21       Q.  And then May 27, 2018, you were in
22 Rockport, Massachusetts; is that right?
23       A.  Correct.
24            MR. ABELMAN:  Aaron, where are we going
25 with this?  This is getting kind of creepy.

Page 65

1            MR. GOLDHAMER:  We're trying to litigate
2 the case, Steve.
3            MR. ABELMAN:  Yeah.  Well, let's litigate
4 the case and not spend time going over posts on
5 Instagram that have nothing to do with the controversy.
6            MR. GOLDHAMER:  We think they do,
7 Mr. Abelman.
8        Q.  (BY MR. GOLDHAMER)  So in between
9 May 17th, 2018 and May 27th, 2018, do you think you
10 went home to Boulder?
11       A.  No.  My mom had come out to Boston at that
12 time.  She was -- she took that photo.
13       Q.  Then the next page is June 23, 2018.  And
14 that's suggests you were in Portland, Maine around that
15 time; is that right?
16       A.  Yes.
17       Q.  So between May 27th and June 23rd, do you
18 think you went home to Boulder?
19       A.  I don't believe so.
20       Q.  Okay.  Then the next page is July 2nd,
21 2018.  It suggests you were at Cannon Mountain.  Where
22 is Cannon Mountain?
23       A.  I think it's in New Hampshire.
24       Q.  Okay.  Between June 23rd and July 22nd, do
25 you think you went back to Boulder -- sorry, July 2nd?

Azuraye Wycoff
June 23, 2021

Page 66

1     A.   I don't remember.
2     Q.   Okay.  Then the next page, July 5th, you
3 were by the Charles River in Boston; is that right?
4     A.   Yes.
5     Q.   Do you think -- you probably didn't go
6 home over the 4th of July weekend in those -- or the
7 4th of July break in between those two pictures, did
8 you?
9     A.   No.
10    Q.   And then the next page is July 8, and
11 you're at John F. Kennedy Airport; is that right?
12    A.   Yeah.
13    Q.   With your sister, about to leave for
14 Europe; is that right?
15    A.   Yup, that's right.
16    Q.   And so you go to Europe for a while and
17 then you fly back, correct?
18    A.   Correct.
19    Q.   So next page, August 7th, 2018, you're
20 still in Europe.  You're in Madrid, right?
21    A.   Uh-huh, yes.
22    Q.   Then August 8th, 2018, you're in Lisbon
23 wrapping up your trip; is that right?
24    A.   Yes.
25    Q.   And then August 20th, 2018, you're back in

Page 67

1 Boston, correct?
2     A.   Correct.
3     Q.   So does that jog your memory at all as to
4 whether or not you flew back to Boston after you were
5 in Europe?
6     A.   It looks like I went back to Boston.
7     Q.   And do you know if you went back to
8 Denver -- Denver International Airport or Boulder in
9 between?
10    A.   No, I don't believe so.
11    Q.   And I'm sorry if that seems creepy; but,
12 you know, these pictures are public.  Is that right,
13 Ms. Wycoff?
14    A.   Yes.
15    Q.   And you were either in Boston or in Europe
16 when GCS452 and Magnus Veritas purchased the residence
17 and the farm, correct?
18    A.   Correct.  I was in constant communication
19 with all our counsel.  I was mailing documents back
20 from Europe.
21    Q.   Do you think you'd recognize your
22 signature if you saw it?
23    A.   Yes.
24         MR. GOLDHAMER:  This will be Exhibit 3.
25         (Deposition Exhibit 3, remotely introduced

Page 68

1 and provided electronically to the court reporter.)
2     Q.   (BY MR. GOLDHAMER)  There's four cursive
3 statements of your name on this first page.  Are these
4 all your signatures?
5     A.   Yes.
6     Q.   I see that the fourth signature is -- has
7 a middle initial in the middle; is that right?  Is that
8 your middle initial?
9     A.   "J" for Jean.
10    Q.   So you sometimes sign with your middle
11 initial and sometimes you don't?
12    A.   Yes, occasionally.
13    Q.   I just want to make sure no one is forging
14 your signature or something.
15         MR. ABELMAN:  Please identify what --
16 what -- what document those signatures are appended
17 to.
18         MR. GOLDHAMER:  I'd be happy to give you
19 the list.  We're going to be going through all of them.
20    Q.   (BY MR. GOLDHAMER)  On the second page,
21 are these all your signatures as well?
22    A.   Yes.
23    Q.   Okay.  And that was Exhibit 3.  We're
24 going to be using that -- calling that one Exhibit 3.
25 Can you tell me, generally, about your relationship

Page 69

1 with your mother?
2     A.   Can you be a little more specific?
3     Q.   Well, can you tell me how you characterize
4 your relationship with your mother?
5         MR. ABELMAN:  You know what?  You're
6 going -- you're going to have to do better than that,
7 Aaron.
8     Q.   (BY MR. GOLDHAMER)  So you can't --
9         MR. ABELMAN:  This is not a psychological
10 examination.  You're going to have to be more specific
11 about what you're seeking.
12         MR. GOLDHAMER:  Mr. Abelman, you can make
13 an objection to form if you don't like the form of the
14 question.
15         MR. ABELMAN:  I'm objecting to the form,
16 and I'm objecting to the subject matter.
17    Q.   (BY MR. GOLDHAMER)  Would you say that you
18 have a good relationship with your mother?
19    A.   Yes.
20    Q.   Why would you say that?
21    A.   Because we get along.  She's been a mentor
22 and a guide my entire life.  She's a very strong woman.
23 She's taught me a lot of what I know about how to be a
24 person.
25    Q.   Do you trust her?

Azuraye Wycoff
June 23, 2021

Page 70

```
 1        A.   Do I trust her?
 2        Q.   Yeah.
 3        A.   Of course.
 4        Q.   How often do you talk with your mother?  I
 5   mean, let -- let me back up.  When you were living in
 6   Boston, how often would you talk with your mother?
 7        A.   Before or after my dad died?
 8        Q.   Well, let's start with before.
 9        A.   So I was in contact with my family
10   probably every other day, every two to three days.
11        Q.   With phone calls, with emails, with text
12   messages?  How -- how would you be in contact?  Just a
13   mix of those?
14        A.   A lot of FaceTime video calls.
15        Q.   Okay.  Then after your dad died, did that
16   change?
17        A.   Yeah.  My mom and I had to be in a lot
18   more constant communication.  We called a lot.  We
19   talked on the phone a lot, trying to figure out what to
20   do, especially after the deal for the farm fell
21   through.
22        Q.   Why -- why would that be important?  Why
23   does that stand out?  Why was that something that you
24   had anything to do with?
25        A.   Can you specify what, exactly?
```

Page 71

```
 1        Q.   Well, why were you engaged with, you know,
 2   the previous deal on the farm?  The deal that fell
 3   through, why were you involved with that?
 4        A.   I wasn't involved in that.
 5        Q.   Okay.  So then the deal fell through, and
 6   how did you start getting involved?
 7        A.   Because suddenly we had to completely
 8   switch gears.  My dad had just died, my mom was a
 9   wreck, and I suddenly had to be an adult, which I
10   wasn't expecting.  So we had to be in communication
11   about what the next steps would be, knowing that there
12   was a big loan for Bloomfield that had to be paid.  And
13   we were scrambling to figure out what the next best
14   steps might be.
15        Q.   When was that loan due?
16        A.   Say that again.
17        Q.   Do you know when that loan from Bloomfield
18   was due to be paid?
19        A.   No, not specifically, I don't.
20        Q.   So was the idea that the farm had to be
21   sold to pay Bloomfield?
22        A.   From my understanding, the proceeds from
23   that original deal would go towards paying Bloomfield.
24        Q.   Do you know if your dad had promised to
25   sell the farm to pay any other creditors besides
```

Page 72

```
 1   Bloomfield?
 2        A.   I don't know.  I wasn't privy to that
 3   information.
 4        Q.   When did you first learn about the loan
 5   from Bloomfield?
 6        A.   When I had to be an adult and deal with
 7   all this.
 8        Q.   So shortly after your dad's death?
 9        A.   Yeah, I think around that time, yeah.
10        Q.   Who told you about the loan from
11   Bloomfield?
12        A.   I don't remember.
13        Q.   Well, was it Devon, do you think?
14        A.   No, but I don't remember who specifically
15   told me anything about it.
16        Q.   Do you think it was your mom?
17        A.   Again, I -- I'm sorry, I don't remember.
18        Q.   And when we're talking about the loan from
19   Bloomfield, we're sort of also referring simultaneously
20   to the loan with BC24, LLC, correct?
21        A.   Is that the same -- is that the entity
22   name of Bloomfield?
23        Q.   Well, do you know if BC24 is a subsidiary
24   of Bloomfield?
25        A.   I don't know.
```

Page 73

```
 1        Q.   So do you know how you learned about
 2   the -- the bloomfield loan at all?
 3        A.   Not that I recall.
 4        Q.   What do you think you learned about the
 5   Bloomfield loan when you first heard about it?
 6        A.   That there was money owed, and we were
 7   doing everything we could to pay off that loan.
 8        Q.   Do you know who owed the money?
 9        A.   Honestly, that's kind of the limit of my
10   knowledge about it.  I don't fully know what agreements
11   were going on.
12        Q.   Do you know what assets were pledged to
13   secure that loan with Bloomfield?
14        A.   It would be an assumption if I said that I
15   did.
16        Q.   Well, so do you have any actual knowledge
17   that's not an assumption?
18        A.   No, I don't think so.
19        Q.   Well, what do you assume was pledged to
20   secure that loan from Bloomfield?
21        A.   I don't know, exactly.  I don't know that
22   I can answer that wisely.
23        Q.   Were you involved with trying to pay other
24   debts that weren't yours?
25        A.   No.
```

Azuraye Wycoff
June 23, 2021

---

Page 74

1    Q.   It was just the Bloomfield loan that you
2 were concerned about or that you knew about?
3    A.   That I knew about that came to my
4 attention.
5    Q.   Did you know about any other debts
6 involving your family that were in existence?
7    A.   No, I did not.
8    Q.   Did you know about any debts involving
9 your family and other family members?
10   A.   No, I did not.
11   Q.   Were there any debts owed to you?
12   A.   I loaned my family money, but that was
13 ultimately repaid.
14   Q.   When did you loan your family money?
15   A.   Oh, that was when I was working for Magna
16 Lucrum.
17   Q.   So you had no income from Magna Lucrum,
18 but you loaned your family money?
19   A.   Yes, from my savings.
20   Q.   And who did you make the loan to?
21   A.   I don't remember that.
22   Q.   What -- do you know if it was to a
23 business or a person?
24   A.   I don't know.
25   Q.   Was there any documentation for this loan?

Page 75

1    A.   Very likely.
2    Q.   Do you remember signing a loan agreement
3 or getting your family to sign a loan agreement?
4    A.   I don't think it was that formal, but I'm
5 not positive.
6    Q.   Do you remember what the terms of the loan
7 were?
8    A.   No.  I just knew that my family needed the
9 money, and I had it.
10   Q.   Do you know if there was interest charged
11 on the loan?
12   A.   I do not.
13   Q.   Do you remember how the loan was made?
14 Did you write a check?  Did you send cash?  What did
15 you do?
16   A.   I don't remember at this time.
17   Q.   Do you remember how much the loan was for?
18   A.   No, I don't remember at this time.
19   Q.   Do you remember how it was repaid?
20   A.   I don't remember.
21   Q.   Do you remember why your family would turn
22 to you -- well, let me back up.  Do you remember why
23 your family needed money?
24   A.   No.  I didn't ask.  I mean, I trust my
25 family.  I knew that eventually it would come back.

Page 76

1 And if they didn't pay it back, I would make it back.
2    Q.   Is it fair to say that with financial
3 affairs, generally, you would just trust your parents?
4        MR. ABELMAN:  During what period of time
5 are you asking this question?
6    Q.   (BY MR. GOLDHAMER)  Well, before your
7 father's death, would you just trust your parents with
8 respect to financial matters?
9    A.   I was making a lot of my own decisions
10 financially at that time.  There wasn't much that was
11 going on between me and my family.  But if they needed
12 something, we would sit down and we would discuss it.
13 But you're asking questions that were years ago, and I
14 don't fully remember all the details at this time.
15   Q.   So if your mom and dad told you they
16 needed something or they wanted you to do something,
17 would you generally defer to them and go ahead and do
18 it or give them what they needed, with respect to
19 financial matters?
20   A.   After a discussion, so I would understand
21 the context.
22   Q.   Okay.  So after your dad died, would you
23 have to basically rely on your mom to make decisions
24 and inform decision-making regarding financial matters,
25 and would you do what she asked?

Page 77

1    A.   I think something that should be said is
2 that my mom really didn't help my dad with the business
3 side of everything.  And when he died, she suddenly had
4 to take on everything that he had been responsible for.
5 And she was drowning in a lot of information that she
6 didn't understand, and I helped her wade through a lot
7 of that and try to make the best decisions we could
8 with the counsel that we had.
9    Q.   So was it Merrie's idea, your mom's idea,
10 to create new entities to buy the residence and the
11 farm?
12   A.   No.  I don't think it was any one specific
13 person's idea.  It was a collective decision that was
14 made through our legal counsel.
15   Q.   So concerted action between a number of
16 people.  Is that what you're saying?
17   A.   Yes, including myself.
18   Q.   And so it was a common agreement between
19 you, your mom, and perhaps others, to form these new
20 entities and have them take the farm and residence; is
21 that right?
22   A.   Can you summarize that question once more?
23   Q.   So it was a collective action to pursue
24 the plan to have the farm and residence go to the new
25 entities, correct?

Azuraye Wycoff
June 23, 2021

1      MR. ABELMAN:  Object to form of the
2  question.  You're conflating two things there.
3      MR. GOLDHAMER:  Thank -- thank you, Steve.
4  Your objection is noted.
5      Q.  (BY MR. GOLDHAMER)  Can you answer the
6  question?
7      A.  Yes.  I would say that it was an agreement
8  that we all came to, after much discussion, of trying
9  to make sure that we could make the right decision to
10 make sure that we were being cautious.
11     Q.  Did you know about any other debts owed by
12 your parents or their companies, besides the Bloomfield
13 Capital -- or the Bloomfield loan that we've been
14 talking about, and this Midlab debt that we've been
15 talking about?
16     A.  I wasn't privy to any of that information.
17     Q.  Did you know about any issues that your
18 parents or companies had with the IRS?
19     A.  Vaguely, but not enough to say anything
20 competently about it.
21     Q.  Well, what did you vaguely understand?
22     A.  Nothing that I would feel comfortable
23 saying out loud.
24     Q.  Well, you must have heard something about
25 it from someone, right?

1      A.  Yes, but not in enough detail to be able
2  to speak on it competently without misrepresenting what
3  might have actually been the truth.
4      Q.  Well, I'm not asking you about the actual
5  truth with the IRS.  I'm asking you what you heard
6  about the IRS debt.
7      MR. ABELMAN:  Please provide a time frame.
8      Q.  (BY MR. GOLDHAMER)  At any time.
9      A.  Again, I don't think I have enough
10 information to even form an answer.
11     Q.  So did your parents tell you anything
12 about the IRS debt?
13     A.  No.  They mostly kept me and my sister out
14 of that discussion.
15     Q.  But what did they tell you, if they only
16 mostly kept you out?
17     A.  Mostly to inform us when they were flying
18 to deal with court cases and things like that, but it
19 wasn't really any information.
20     Q.  (Inaudible.)
21     THE REPORTER:  I'm sorry.  I can't --
22     Q.  Can you say that again?
23     Q.  (BY MR. GOLDHAMER)  You knew at some point
24 that there was a court case with the IRS?
25     A.  Yes.

1      Q.  Did you know anything else about that?
2      A.  No.
3      Q.  They didn't tell you anything else about
4  that?
5      A.  No.
6      Q.  Sitting here today, do you know anything
7  about the IRS debts owed by your parents or their
8  companies?
9      A.  Not enough to give an answer to any of
10 these questions.
11     Q.  Well, what -- what do you know, sitting
12 here today, about the IRS debt?
13     A.  Very, very little, truly.
14     Q.  Can you describe it, what you do know?
15     A.  I think all I know is that there is a debt
16 and that they went to court about it.  But they really
17 did not give me any additional information beyond that.
18     Q.  Do you know how much the debt is for?
19     A.  I do not.
20     Q.  Do you know if they won or lost the court
21 case?
22     A.  I do not.
23     Q.  When did you first become aware that there
24 was a debt owed to the IRS?
25     A.  I don't remember right now.

1      Q.  Was it before your dad died or after?
2      A.  I don't remember.
3      MR. ABELMAN:  Aaron, point of order.
4  Who -- who is -- who else is present in your office,
5  may I ask?
6      MR. GOLDHAMER:  Ross Pulkrabek and our
7  intern, Rachel.
8      MR. ABELMAN:  Thank you.
9      Q.  (BY MR. GOLDHAMER)  I'd like to ask you
10 about your relationship with Devon, your sister.  Would
11 you describe your relationship as close?
12     A.  Yes.
13     Q.  How often do you talk with Devon?
14     A.  I live with her now.  I live with my mom
15 and my sister daily.
16     Q.  So pretty frequently?
17     A.  Uh-huh.
18     Q.  And when you were living in Boston, how
19 often would you communicate with Devon?
20     A.  Probably once or twice a week.
21     Q.  Okay.  Does Devon have a job now?
22     A.  Devon got in a very bad motorcycle
23 accident about two years ago and has been recuperating
24 from that.
25     Q.  Where did that occur?

Azuraye Wycoff
June 23, 2021

Page 82

1      A.    In New Zealand.
2      Q.    And you said two years ago, so that would
3  be the middle of 2019 or so?
4      A.    Yeah, sounds right.
5      Q.    Do -- and she's been recuperating from her
6  injuries since then?
7      A.    Yes.
8      Q.    Do you know what the nature of her
9  injuries are?
10      A.    Yeah.  She had a traumatic brain injury, I
11  think she had surgery on her hip, and she may have a CF
12  leak in her spine.
13      Q.    So do you know when she moved back from
14  New Zealand?
15      A.    I'm not sure of the exact date; but once
16  they finally were able to put her on a plane, which I
17  think was maybe six weeks after the injury, she flew
18  back to Denver.  And she has been at home since, and my
19  mom has been taking care of her.
20      Q.    And is she -- when you talk with her now,
21  is she able to understand you?
22      A.    Yes.
23      Q.    And what is she doing right now besides
24  recovering?  Anything?
25      A.    She's helping us with photography on the

Page 83

1  farm.
2      Q.    Does she have her own photography website?
3      A.    Yes, she does.
4      Q.    Does she have -- I mean, do you know if
5  it's a -- paying gig at all?
6      A.    She'll occasionally do paid gigs, but not
7  very frequently.  It takes a lot of brain power.
8      Q.    Okay.  Does she do any modeling?
9      A.    Not really, no.
10      Q.    Did she used to do modeling?
11      A.    Not formal modeling.  It was her own
12  thing.
13      Q.    Do you know if she ever got paid for
14  modeling?
15      A.    No, I don't think so.
16      Q.    Do you know if she's ever had a job?
17      A.    Yes, she has.
18      Q.    What jobs has she had?  Do you know?
19      A.    She used to be the costume quick change on
20  a number of Broadway shows when she was living in
21  New York.
22      Q.    Okay.  Anything else?
23      A.    Not that I can think of off the top of my
24  head.  The thing on Broadway was a primary income
25  source for quite a while.

Page 84

1      Q.    How long was that?
2      A.    I don't know.
3      Q.    More than a year?
4      A.    Yes.
5      Q.    More than two years?
6      A.    I don't know the exact dates.
7      Q.    And do you know -- she went to college,
8  correct?
9      A.    Yes.  She went to CU Boulder.
10      Q.    She graduated?
11      A.    No, I don't think she graduated.
12      Q.    Do you know what happened?
13      A.    I don't.
14      Q.    I've been seeing a lot of this Sweet Tooth
15  Netflix show being talked about these days.  Did she
16  work on Sweet Tooth?
17      A.    Yes, she did.
18      Q.    Do you know what she did?
19      A.    I don't really remember.  I think she
20  might have done the BTS, the -- whatever that means,
21  the behind-the-scenes photography.
22      Q.    Do you know if she got paid for that?
23      A.    I think so.  I think she's done a few gigs
24  just helping out with, like, behind-the-scene
25  photography and general, I don't know, admin assistant-

Page 85

1  type stuff.
2      Q.    Sweet Tooth was filmed in New Zealand,
3  right?  Was -- was Sweet Tooth filmed in New Zealand?
4      A.    I don't know.  I'm not sure.
5      Q.    Do you know where she was when she was
6  working on Sweet Tooth?
7      A.    No.
8      Q.    Do you know when she was working on Sweet
9  Tooth?
10      A.    No.
11      Q.    So when you talk with Devon, is she able
12  to carry on a conversation with you now?
13      A.    Yes.
14      Q.    And is she able to live independently?
15      A.    No.
16      Q.    How so?
17      A.    She doesn't really have a lot of energy
18  for a lot of stuff.  She's still living at home.  She
19  definitely suffered some short-term memory loss and has
20  had a really tough time getting back on her feet.  This
21  was her eighth concussion.
22      Q.    Is she going to the doctor to get
23  treatment?
24      A.    Yes.  She probably goes to the doctor at
25  least one to two times, I don't know, maybe every other

Azuraye Wycoff
June 23, 2021

Page 86

1 week or so.
2      Q.   Did she travel with you to New Zealand and
3 Australia?
4      A.   Yes, and then she stayed after.
5      Q.   And she traveled to New Zealand and
6 Australia with you in December of 2019, correct?
7      A.   Correct.
8      Q.   That was after her accident, correct?
9      A.   That was before the accident.  And then
10 she stayed in New Zealand and had the accident a few
11 months later.
12      Q.   Okay.  So the accident was sometime in
13 2020, not 2019, right?
14      A.   No, no.  The New Zealand trip would have
15 been in 2018 and the accident in 2019.
16      Q.   Okay.  Do you know where she was living in
17 November of 2017?
18      A.   I believe New York.
19      Q.   And do you know how long she stayed in New
20 York for?  Basically, until she went to New Zealand?
21      A.   Yeah, pretty much.
22      Q.   So she was in Europe with you during the
23 closing of -- for the farm and the residence as well,
24 correct?
25      A.   Yes.

Page 87

1      Q.   How do you mostly have communications,
2 besides face-to-face communications, with Devon?  Do
3 you text?  Do you email?
4      A.   Text, mostly.
5      Q.   Do you do WhatsApp?
6      A.   Yes.
7      Q.   How often, do you think?
8      A.   Oh, I don't know.  Maybe every couple of
9 days or so.
10      Q.   And do you think you communicated with
11 Devon about the sale of the farm or the residence?
12      A.   Via a specific mode of communication, or
13 just in general?
14      Q.   Yeah.  Well, tell me, you know, if you did
15 communicate, what that mode was.
16      A.   It would have primarily been face to face
17 as we were dealing with that at that time.  And I don't
18 think we would have discussed any of this via text
19 message.
20      Q.   So how would you have dealt with it face
21 to face if you were in Boston and she was in New York?
22      A.   Because after my dad died, there was a
23 period of time that I was working with my sister and my
24 mom to set up all the entities and the banks.  And we
25 had to arrange for appointments at Bank of America

Page 88

1 independently.  When I was traveling down to New York
2 with the moving company, I frequently was going down to
3 New York for jobs there, and I would meet with Devon in
4 person.
5      Q.   And did you talk with Devon about the
6 situation with the farm and the residence?
7      A.   Yeah, a lot of just trying to figure out
8 what to do.  We were both really overwhelmed with the
9 fact that we now suddenly had to be adults, and we were
10 making very large decisions that had really big
11 consequences.  So, yes, there was a lot of consoling
12 each other, of trying to work through this grief of our
13 dad leaving, and having to take ownership of something
14 that was a really big decision, a really big
15 responsibility.
16      Q.   Was Devon part of the decision to acquire
17 the farm and the residence in GCS452 and Magnus
18 Veritas's names?
19      A.   Yes.  All of us were consulted.  All of us
20 discussed all the options available to us and, with our
21 legal counsel, tried to make the best possible
22 decisions with the information we had at the time.
23      Q.   Can you tell me your date of birth?
24      A.   August 16, 1991.
25      Q.   Do you know Devon's date of birth?

Page 89

1      A.   October 3rd, 1993.
2      Q.   With respect to Devon's injuries in
3 New Zealand, do you know if she made any claims against
4 anyone else for causing them?
5      A.   Causing the accident?
6      Q.   Yes.
7      A.   No.  It was not caused by anyone else.
8      Q.   It was just a single-person wreck?
9      A.   Yes, yes.
10      MR. ABELMAN:  Aaron, I need about a
11 45-second bathroom break.
12      MR. GOLDHAMER:  Well, let's not do
13 anything drastic here.  How about you call it five
14 minutes?
15      MR. ABELMAN:  I don't need five minutes,
16 but . . .
17      MR. GOLDHAMER:  Okay.  Well, I'll time you
18 on the 45 seconds, then.
19      MR. ABELMAN:  Okay.  Thanks.
20      THE VIDEOGRAPHER:  We are going off the
21 record at 11:41 a.m. Mountain Time or 5:41 p.m. UTC
22 time.
23      (Recess, 11:41 a.m. to 11:44 a.m. MDT.)
24      THE VIDEOGRAPHER:  We're going back on the
25 record at 5:44 p.m. UTC time or 11:44 a.m. Mountain

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 90

1  Time.
2      Q.  (BY MR. GOLDHAMER)  Ms. Wycoff, how long
3  have you been living at the Lakeridge Trail residence
4  with your mom?
5      A.  I officially moved back on October 15th.
6      Q.  Okay.  How do you remember that date
7  with -- with such clarity?
8      A.  My mom insisted that I be back in Colorado
9  by October 15th, because she just had a feeling
10  something was up in the air.  And on October 17th, the
11  CalWood Fire happened and nearly destroyed the farm, so
12  it kind of sticks in my brain.
13      Q.  Okay.  Do you store all of your personal
14  belongings at the residence there?
15      A.  Yeah.
16      Q.  Do you spend basically every night there?
17      A.  Yes, I do.
18      Q.  And that's been the case since
19  October 15th, 2020; is that right?
20      A.  Yes.
21      Q.  Okay.  I want to ask you about a man named
22  Ed Certisimo.  Do you know Ed Certisimo?
23      A.  Yes, but not extraordinarily well.  I know
24  he was my dad's cousin.  That's about it.
25      Q.  So your -- your dad's cousin.  Can you

Page 91

1  clarify any of the family relationships there?
2      A.  Not super well.
3      Q.  Do you know if he was a cousin by blood or
4  by marriage?
5      A.  I don't know.
6      Q.  Have you ever met him?
7      A.  Yeah.
8      Q.  When did you first meet him, do you think?
9      A.  Oh, geez.  I don't know.  I was probably a
10  little kid.
11      Q.  Have you seen him or communicated with him
12  since 2017?
13      A.  Not that I recall.
14      Q.  When is the last time you've seen him?
15      A.  He gave me a ride back from New Jersey to
16  Boston once, and I don't remember when that was.
17      Q.  So that was sometime between 2017 and
18  2020?
19      A.  Yeah, sometime in there.
20      Q.  Do you know if it was before or after your
21  dad died?
22      A.  I believe it was before.
23      Q.  Do you remember if it was hot out, or cold
24  out, or what season it was?
25      A.  I don't remember.

Page 92

1      Q.  Did Ed Certisimo ever talk to you about
2  your dad's business?
3      A.  No.
4      Q.  Did he ever talk about any assets related
5  to your dad's business?
6      A.  No, not to me.
7      Q.  Did he ever talk to you about any
8  insurance policies?
9      A.  Not to me.
10      Q.  Did he ever talk to you about any trusts?
11      A.  No.
12      Q.  Do you know if he was involved with any
13  trusts?
14      A.  Not -- not that I -- I don't know his
15  involvement with the trusts.
16      Q.  Well, which trust are you talking about?
17      A.  I'm not specifically talking about any
18  trust.
19      Q.  Okay.  Do you know how he's involved with
20  this case at all?
21      A.  No, not really.
22      Q.  Do you know if your parents ever talked to
23  him about insurance policies?
24      A.  I would be assuming, but I would guess
25  yes.

Page 93

1      Q.  Why do you make that assumption?
2      A.  Because I know that he was a trusted
3  advisor of my father.
4      Q.  What was the nature of their relationship?
5      A.  I don't know.
6      Q.  Have you ever heard of any life insurance
7  trusts related to your family?
8      A.  Only after my dad died.
9      Q.  So what did you hear about any life
10  insurance trusts after your dad died?
11      A.  Can you be a little more specific?
12      Q.  Well, I don't know how you know about life
13  insurance trusts, so can you tell me how you know about
14  that?
15      A.  I know that after my dad died, he wanted
16  to make sure that my sister and I were set up that we
17  could have a future, and that there was money that was
18  paid out.  And, yeah, that's kind of the extent of what
19  I know.
20      Q.  So after your dad died, you learned that
21  he had insurance -- life insurance policies that named
22  you as a beneficiary?
23      A.  Yes, after he died.
24      Q.  Did you know anything about any life
25  insurance policies before he died?

Azuraye Wycoff
June 23, 2021

Page 94

1    A.   No, I did not.
2    Q.   Were you the owner of any life insurance
3  policies before your dad died?
4    A.   I don't know.
5    Q.   Do you know if you were the beneficiary of
6  any life insurance policies before your dad died?
7    A.   I don't know.  I wasn't part of that
8  conversation.
9    Q.   So you weren't involved at all with
10 insurance discussions before your dad died?
11   A.   No.
12   Q.   That's correct, you were not involved?
13   A.   That is correct.  I was not involved.
14   Q.   Can you explain or do you know what being
15 an owner of a life insurance policy means?
16   A.   I cannot explain that to you.
17   Q.   Do you know or could you explain what
18 being a beneficiary on a life insurance policy means?
19   A.   I could not explain that to you.
20   Q.   So do you -- you said that life insurance
21 money was paid out after your dad died, correct?
22   A.   Correct.
23   Q.   Was it paid to you?
24   A.   I believe it was put into a trust.
25   Q.   Well, I'm asking where it first went.  Do

Page 95

1  you know if money, life insurance money, was first paid
2  to you and then it was moved into a trust, or do you
3  not know where it was first paid?
4    A.   I don't know.
5    Q.   Okay.  I apologize in advance for these
6  being hard questions, but I want to know where -- were
7  you in Boston when your dad died?
8    A.   Yes.
9    Q.   How did you find out?
10   A.   I got a phone call from my mom and the
11 chief of the fire department, who was his best friend.
12 And I heard my mom screaming in the background, and I
13 felt myself split in two.  And I think it was just the
14 reality that a parent was gone, just finally really hit
15 me, like, in that moment.
16   Q.   So when did you go to -- did you travel
17 back to Boulder for the funeral?
18   A.   Yeah, immediately the next day.  My sister
19 came up from New York, and we flew back together.
20   Q.   How long did you stay in Boulder, do you
21 think?
22   A.   It's kind of all a blur.  I think was
23 there for maybe a week to two weeks.
24   Q.   Do you know if there was any obituary
25 published for your dad?

Page 96

1    A.   I wrote one myself.  I had to handle
2  everything.  My mom and my sister were absolutely
3  shattered.  And I had to go pick up his belongings.  I
4  was the one that had to go pick up his cremation.  I
5  had to deal with the process of organizing everything
6  and having the ceremony and inviting all the people.
7         MR. GOLDHAMER:  Well, I think we can
8  probably take a brief lunch break.  Steve, how long do
9  you need?
10        THE DEPONENT:  Honestly, like 15 minutes.
11 I'm not even hungry.  It's up to you guys.
12        MR. ABELMAN:  Can we do 30?
13        MR. GOLDHAMER:  Let's -- let's do 30 --
14 we'll do a 30-minute break, and we'll come back right
15 around 12:25.
16        MR. ABELMAN:  Sounds good.
17        THE VIDEOGRAPHER:  We're going off the
18 record at 5:55 p.m. UTC time or 11:55 Mountain Time.
19        (Recess, 11:55 a.m. to 12:30 p.m. MDT.)
20        THE VIDEOGRAPHER:  We are going back on
21 the record at 6:30 p.m. UTC time or 12:30 p.m. Mountain
22 Time.
23        Q.   (BY MR. GOLDHAMER) Ms. Wycoff, can you
24 clarify for me if you've been to Miami, ever?
25        A.   Yes, I have.

Page 97

1    Q.   When were you last to Miami?
2    A.   I went there -- oh, I went fairly recently
3  in -- oh, I went fairly recently.  I think like two
4  months ago, maybe; two or three months ago.
5    Q.   How long were you down there for?
6    A.   About a week.
7    Q.   Was it taking a vacation or what?
8    A.   Yes.  What was I even doing there?  Yeah.
9  We went down to go visit some friends.  Oh, yeah, it
10 was around spring break.
11   Q.   Have you done any other domestic travel in
12 the past year, go to San Francisco or anything?
13   A.   No.  I didn't really travel all that much
14 during the pandemic.  I went to Miami once when the
15 pandemic was first starting and then recently for that
16 spring break period.
17   Q.   I want to ask you about the names of these
18 new companies.  GCS452, is that -- what does that mean?
19 What's the nature of that name?
20   A.   It's kind of an inside joke with my
21 family.  GCS means Great Central Sun, and 452 are some
22 of the houses that are, like, on the Zodiac chart.
23 It's meant for health, wealth, and family.
24   Q.   What is the -- what's the Great Central
25 Sun?  Is that -- is that a Zodiac thing?

Azuraye Wycoff
June 23, 2021

Page 98

1    A.   It's kind of a Wu thing, just -- it --
2  it's more of like a spiritual thing.
3    Q.   Does the spirituality have anything to do
4  with Sanctuary of the ON?
5    A.   Yeah, I think that's probably a good way
6  to summarize it.
7    Q.   What is Sanctuary of the ON?
8    A.   I don't know.  It doesn't meaning anything
9  directly to me.
10   Q.   Have you heard of it before?
11   A.   No.
12   Q.   So you were just kind of agreeing with me?
13   A.   I mean, sanctuary sounds right.
14   Q.   Okay.  Did you know that your mom arranged
15 for $550,000 of life insurance to be distributed to
16 Sanctuary of the ON?
17   A.   Do you mean GCS?
18   Q.   No.  I'm talking about an organization
19 called Sanctuary of the ON.
20   A.   No, I don't.  I'm not aware of.
21   Q.   You've never heard of that before?
22   A.   No, I have not heard of that before.
23   Q.   Have you ever heard -- did you ever your
24 parents talk about SIRIUS?
25   A.   Yes.

Page 99

1    Q.   What -- in what context did you hear your
2  parents talk about SIRIUS?
3    A.   I think it was like the parent company to
4  ZAP!, or that's kind of an assumption.  I'm not
5  positive.
6    Q.   And do you know where that name came from?
7    A.   Yeah.  Sirius is the dog star.  My parents
8  are definitely into astrology.
9    Q.   Okay.  Have you heard of a guy named Bill
10 Torvund?
11   A.   Yeah.  He's a friend of my mom's.
12   Q.   How do they know each other?  Do you know?
13   A.   I don't know.
14   Q.   Did you meet Bill Torvund?
15   A.   Yeah, I met him a few times.
16   Q.   And he came out.  Was that in Boulder?
17   A.   Yeah.
18   Q.   And I'll represent to you that Bill
19 Torvund runs Sanctuary of the ON.  And you've never
20 heard of that organization?
21   A.   No, not of that organization.
22   Q.   Did your mom ever tell you why over half a
23 million dollars in life insurance proceeds were
24 directed towards Bill Torvund's organization?
25   A.   No.

Page 100

1    Q.   When did you meet Bill Torvund?
2    A.   I don't know.  He was around for a period
3  of time prior to my dad's death, but a lot of that time
4  I was in Boston.  I didn't see too much of him.
5    Q.   Well, was he just seeing your parents on
6  social occasions or something or --
7    A.   I'm not sure.
8    Q.   All right.  So we talked about the GCS452
9  name.  Can you tell me about the origin of the name
10 Magnus Veritas?
11   A.   Yeah.  I came up with that one.  I was
12 living on Magnus Ave., and Magnus means great and
13 Veritas means truth.
14   Q.   So you wanted to name the company great
15 truth in Latin, basically?
16   A.   Yes.
17   Q.   Okay.  Did you think about any other
18 names?
19   A.   I mean, in all honestly, it just needs to
20 to have a name.  We didn't want it to be a cryptic code
21 of some sort.  At least these had meanings to us.
22   Q.   Okay.  And you don't think that GCS452 is
23 a cryptic code?
24   A.   To the outside it might be; but to us, no.
25   Q.   Okay.  And so why did you choose Magnus

Page 101

1  Veritas?
2    A.   Because it felt like a solid name.
3    Q.   Is that latin for serious or something?
4    A.   I mean, it's Latin for just great truth;
5  like, having -- I don't know.  There wasn't that much
6  deep thought put into it.  It was something that
7  resonated with me.  I had the opportunity to come up
8  with the name.  I was living on Magnus Ave.  Magna
9  Lucrum, I mean, all these things kind of came together,
10 and it just felt like it did a good job representing
11 what we wanted the LLC to be about.
12   Q.   Okay.  Was there any other reason?
13   A.   No.
14   Q.   Okay.  Did you consider having the Wycoff
15 name in it at all?
16   A.   No.
17   Q.   Any reason why a farm that was held with
18 Wycoff Financial couldn't be transferred to some entity
19 with also the name Wycoff in it?
20   A.   Yeah, it could have been, it just wasn't.
21 No particular reason.
22   Q.   So back to some insurance matters.  At
23 some point did you submit an insurance claim form to
24 the life insurance companies after your dad died?
25   A.   Yes.  There was that whole process right

Azuraye Wycoff
June 23, 2021

Page 102

1  after he died that -- it was kind of a flurry.  Yes, I
2  worked directly with them for that.
3       Q.   So did you request the claim forms?
4       A.   Yes, I did.
5       Q.   With Transamerica?
6       A.   Yeah.  I think it was Transamerica and
7  Voya.
8       Q.   Voya was also involved?
9       A.   I think that was the other insurance
10  agency.
11       Q.   Do you recall how big the Voya life
12  insurance policy was?
13       A.   No, not exact numbers, no.
14       Q.   So did someone tell you to make a claim on
15  the insurance?
16       A.   I was given counsel.  It's a very
17  complicated process.  I wouldn't have known how to
18  navigate myself.
19       Q.   So who gave you that counsel?
20       A.   We had legal counsel in that regard.
21       Q.   So it was Brownstein?
22       A.   I believe so, yes.  There was kind of a
23  lot going on at that time.
24       Q.   Do you remember who it was at Brownstein?
25       A.   No, I don't recall.

Page 103

1       Q.   Do you know Kevin Cudney?
2       A.   Yes, uh-huh.
3       Q.   Was he the one who told you to make a
4  claim on the insurance?
5       A.   I would be speculating.  I can't exactly
6  remember.
7       Q.   And it's your testimony that you contacted
8  Transamerica, and maybe Voya, to get the claim forms;
9  is that right?
10       A.   Honestly, I can't remember the fine
11  details of that.  There was definitely a whole process
12  of having to submit the claims.  And I spent a lot of
13  time on the phone and dealing with paperwork.
14       Q.   So did you fill out the claim form?
15       A.   Yes, I did.
16       Q.   Do you know where you were when you filled
17  it out?
18       A.   In Boulder.
19       Q.   Okay.  Did you discuss claims on the
20  insurance with your mom at all?
21       A.   Yes, of course.
22       Q.   What did you two talk about?
23       A.   I couldn't tell you exact details, but I
24  definitely needed guidance.  It was a very complicated
25  process.

Page 104

1       Q.   Okay.  Did you talk about the claim forms
2  with Devon?
3       A.   Yes.  All three of us were involved with
4  our legal counsel to guide us through the process.
5            MR. GOLDHAMER:  Okay.  Let's see.  I think
6  this will be Exhibit 4.
7            (Deposition Exhibit 4, remotely introduced
8  and provided electronically to the court reporter.)
9       Q.   (BY MR. GOLDHAMER)  So there's the whole
10  Exhibit 4.  And do you see at the top it's a
11  Transamerica Claimant's Statement form, right?
12       A.   Yes.
13       Q.   And there's claims on two policies, right?
14  Do you see that?
15       A.   Yes, I do see that.
16       Q.   Okay.  Do you think you typed this in,
17  this information in?
18       A.   I can't remember.
19       Q.   Okay.  So then we're just scrolling down
20  here.  And that's your signature?
21       A.   Yes, that is my signature.
22       Q.   For claimant?
23       A.   Yup.
24       Q.   And you list your address as the -- as the
25  residence on Lakeridge Trail, right?

Page 105

1       A.   Yeah.
2       Q.   Why did you do that?
3       A.   Because I tend to keep that as my primary
4  address; as I have traveled a lot throughout my life,
5  and it is has always been my main residence that I
6  continue to keep coming back to.  Most of my stuff is
7  stored there.
8       Q.   Do you see that the witness is something
9  Gandhi?
10       A.   Unmesh Gandhi.  He was one of the
11  co-partners in Magna Lucrum --
12       Q.   Okay.
13       A.   -- my employer at the time.
14       Q.   And he actually witnessed you filling out
15  this form?
16       A.   Yes.
17       Q.   So do you think you were in Cambridge,
18  Massachusetts or Boston when you filled out this form?
19       A.   Yes.  I must have been in Boston at that
20  time and mailed everything back.
21       Q.   But just to clarify, as of the date of
22  this form, 4/16/2018, you were still really living in
23  Boston?
24       A.   Yes.  I was primarily living in Boston,
25  traveling back and forth.  And, yes, I was currently

Azuraye Wycoff
June 23, 2021

Page 106

1  working with Magna Lucrum at that time.
2      Q.   So after you submitted this claim form,
3  what happened?  Did you get money?
4      A.   Yeah.  I mean, there was definitely a
5  process.  It took some time; but, yes, everything did
6  transfer through.
7      Q.   So do you know how much in life insurance
8  proceeds you received from Transamerica at least?
9      A.   Not exactly, not exact numbers.
10     Q.   Well, was it more than $10,000?
11     A.   I believe so, yes.
12     Q.   Was it more than $50,000?
13     A.   Oh, I think that -- no.  I -- I can't
14  remember exact numbers.  I think it was around -- no, I
15  don't know.  I would be speculating if I knew exactly
16  which one was for each amount.
17     Q.   Well, what's your best recollection of how
18  much you received in life insurance proceeds from
19  Transamerica?
20     A.   From Transamerica, specifically, I don't
21  know.  I'm sorry.
22     Q.   Do you know if it was more than a million
23  dollars?
24     A.   I think it was something around there.
25     Q.   It was around a million dollars from

Page 107

1  Transamerica?
2      A.   I think.  But again, I think -- I don't
3  have exact numbers.
4      Q.   You also mentioned Voya.  Do you know how
5  much life insurance you got from Voya?
6      A.   Same deal.  Something around there.  I'm
7  not sure exact numbers.
8      Q.   You think you got around a million dollars
9  from Voya?
10     A.   I think somewhere around there.
11     Q.   Okay.  Was there any other life insurance
12  proceeds that you received, personally?
13     A.   No, not that I'm aware of.
14     Q.   So where did you put these life insurance
15  proceeds?
16     A.   Into an irrevocable trust.
17     Q.   Well, first, let's -- let's just back up.
18  The -- do you think the total amount of money that you
19  received for life insurance proceeds was around
20  $2 million, maybe; the 1 million from Transamerica and
21  the 1 million from Voya?
22     A.   I'm uncertain of the exact numbers.
23     Q.   Well, do you have any recollection?  I
24  mean, this is a lot of money we're talking about.  You
25  don't remember even an approximate total?

Page 108

1      A.   I think -- approximately, I think the
2  total came in around $3 million.
3      Q.   Okay.  So did you receive life insurance
4  proceeds from anywhere else besides Transamerica and
5  Voya?
6      A.   No, not that I'm aware of.
7      Q.   Okay.  Did you receive any life insurance
8  proceeds from your sister, that she received?
9      A.   No, I don't believe so.
10     Q.   Okay.  So the -- do you remember how you
11  got this money?  It probably wasn't a big pile of cash,
12  right?
13     A.   Yeah.  No, it was not.
14     Q.   Did you get checks from Transamerica?
15     A.   I'm not totally certain how all the back
16  end worked, to be honest.
17     Q.   Well, what do you mean by back-end?  Were
18  you not handling it?
19     A.   Yes, I was handling it, but with the
20  counsel of legal help to set up something rather larger
21  than anything I'd handled before.  So same with going
22  to a mechanic for your car, I have to rely on the
23  people around me to help me make these these kinds of
24  decisions.
25     Q.   So do you know where the check went from

Page 109

1  Transamerica or the checks went from Transamerica?
2      A.   I believe they went into the irrevocable
3  trust.
4      Q.   Were they made out to the irrevocable
5  trust, or were they made out to you?
6      A.   I'm not certain.
7      Q.   Okay.  All right.  We'll look at
8  Exhibit 5.
9           (Deposition Exhibit 5, remotely introduced
10  and provided electronically to the court reporter.)
11     Q.   I'm showing you what's marked as
12  Exhibit 5, what we will mark as Exhibit 5.  And it's a
13  check -- or at least a record of a check from
14  Transamerica Life Insurance Company, to you, at the
15  residence address on Lakeridge Trail, for $250,599.41.
16  Do you see that?
17     A.   Not well.  Could you zoom in a little?
18     Q.   Sure.
19     A.   Okay.
20     Q.   And it looks like the date was around
21  May 7, 2018.
22     A.   Uh-huh.
23     Q.   And do you -- I mean, you weren't living
24  at -- on Lakeridge Trail at the time, but did you
25  recall maybe your mother saying, "Well, the insurance

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 110

1  check in your name showed up"?
2      A.   Yes, she would have advised me if that had
3  shown up.
4      Q.   Do you specifically remember her telling
5  you about it?
6      A.   Vaguely.
7      Q.   Do you remember, you know, what -- what
8  she did with it after that?
9      A.   I probably would have asked her to deposit
10  it.
11      Q.   Okay.  In what bank account?
12      A.   That, I'm uncertain.
13      Q.   How do you think that she could have
14  deposited it if it was made out to you?
15      A.   Because I would have given her my
16  permission to do so.
17      Q.   Did you have any written power of attorney
18  or written authority for her that she could take to the
19  bank and use?
20      A.   Uncertain, but likely some sort of written
21  documentation about that.  I'm uncertain.
22      Q.   Do you know which bank it went to?
23      A.   No, I do not.
24      Q.   So you had a bank -- okay.  Do you think
25  it went to any of your accounts at Vectra Bank?

Page 111

1      A.   No, I don't think so.
2      Q.   Or any of the other accounts you've
3  mentioned already?
4      A.   No, I don't think so.
5      Q.   Where -- where was the other place you
6  banked?  Bank of America?
7      A.   Yes, but we also had -- BNY Mellon was
8  managing a lot of the wealth, so my guess is that it
9  would go there.
10      Q.   So how did that come about?  How did --
11  how did they -- how did BNY Mellon come into the
12  picture?
13      A.   Because we needed advisors.
14      Q.   So when did they come into the picture?
15      A.   Around the time that this whole process
16  started taking place submitting the claims.  We needed
17  wealth advisors of how to manage this.
18      Q.   So who contacted them?
19      A.   I'm not certain who contacted them.  I
20  know that I was on one of the calls with them, though,
21  as we set up the whole process.
22      Q.   Okay.  Who did you talk to at BNY Mellon?
23  Do you remember anybody's name?
24      A.   Oh, I can't remember the name now, but I
25  met with someone in New York on one of my trips down

Page 112

1  there to meet her in person.
2      Q.   Do you think this check got deposited
3  right away?
4      A.   I'm not positive.
5      Q.   Because you weren't handling it; is that
6  right?
7      A.   Anything like that that was addressed to
8  me, I would have known about and would have had a
9  discussion before it was deposited.
10      Q.   Okay.  I want to show you -- the second
11  page of this exhibit is a check to Devon at the same
12  Lakeridge Trail address for the same amount, just so
13  you can see the whole exhibit.
14          MR. GOLDHAMER:  So I'll mark Exhibit 6,
15  show that to you in a second.
16          (Deposition Exhibit 6, remotely introduced
17  and provided electronically to the court reporter.)
18      Q.   (BY MR. GOLDHAMER)  Here is Exhibit 6.
19  Here's a whole page.  And I'll zoom in for you.  Do you
20  see it's a check -- or a record of a check for a little
21  over a million dollars to you at the Lakeridge Trail
22  address, dated 5/3/2018?  Do you see all that?
23      A.   Yes, I do.
24      Q.   Do you recall this check at all?
25      A.   Similar situation.  I think most of my

Page 113

1  answers will be the same for this as well.
2      Q.   That it went to the Lakeridge Trail
3  residence and you heard something from your mom about
4  it.  Is that what the story is?
5      A.   Yes.
6      Q.   And then it was deposited somewhere, but
7  you're not sure?
8      A.   Yes.
9      Q.   And it may have been deposited in a
10  personal account for you or some account for a trust?
11      A.   I believe it would have been deposited
12  into the irrevocable trust that was then managed by our
13  wealth advisors.
14      Q.   Do you think it was deposited around the
15  time that it was made out, this May 3rd, 2018?
16      A.   I'm uncertain.
17      Q.   Okay.  Did you know if any of the life
18  insurance policies had been pledged as collateral for
19  any of your family's obligations or their businesses'
20  obligations?
21      A.   Not that I know of.  I wasn't involved in
22  a lot of those discussions.
23      Q.   If you would have -- let's say you had
24  known that these insurance policies were collateral for
25  other obligations, would you still have made a claim on

Azuraye Wycoff
June 23, 2021

1 them?

2      MR. ABELMAN:  Objection, form and
3 foundation.

4      A.   Can you rephrase that question?

5      Q.   (BY MR. GOLDHAMER)  If you had known that
6 the life insurance policies were pledged as collateral
7 for other obligations of your parents or their
8 businesses, would you still have made a claim on the
9 insurance policies?

10     A.   I feel like that's a very subjective
11 question, and I don't feel like I have enough context
12 to fully answer.

13     Q.   Well, if you knew that someone else was
14 claiming an interest in these insurance policy
15 proceeds, would you just have claimed them anyways?

16     MR. ABELMAN:  Objection; form, foundation.

17     A.   I think there's a lot more context that's
18 needed.  That question feels a little bit too simple to
19 understand the full context behind the scenes.

20     Q.   (BY MR. GOLDHAMER)  Well, let's say in
21 general.  If you know that something else belongs to
22 someone else, do you try to take it, or do you think
23 that's wrong?

24     A.   Are you asking me a question on my own
25 ethics?

1      Q.   Yeah.

2      A.   I think every single decision needs to
3 understand every piece of the story.  And I don't feel
4 like that question has enough context to fully answer.
5 It's just not that simple.

6      Q.   So you don't feel like you can answer that
7 question?

8      A.   I don't feel like there's enough context
9 to be able to answer that question the way it's framed.

10     Q.   In general, do you think it's right to
11 take things that belong to other people?

12     A.   I feel like this question is trying to pit
13 me in a way that I don't feel like is accurately going
14 to represent the questions that are being asked right
15 now.

16     MR. ABELMAN:  Aaron, I'm going to ask you
17 to move on.  It's a false premise to begin with.

18     MR. GOLDHAMER:  If she can't answer the
19 question, I understand.  We'll take the answer.

20     Q.   (BY MR. GOLDHAMER)  Is breaching a
21 contract wrong?

22     MR. ABELMAN:  Objection to the form, calls
23 for a legal conclusion.

24     Q.   (BY MR. GOLDHAMER)  Go ahead.

25     A.   This is a contract that was made between

1 my father and other parties.  I can't answer that on
2 his behalf.

3      Q.   What about contracts, generally?  Is it
4 wrong to breach a contract?

5      MR. ABELMAN:  Objection to form and
6 foundation.  What contract are you talking about, by
7 the way?

8      MR. GOLDHAMER:  I'm asking a general
9 question.

10     Q.   (BY MR. GOLDHAMER)  If you think breaching
11 contracts is just fine, then you can say that.

12     A.   I feel like this is a trick question.

13     MR. ABELMAN:  It is.

14     Q.   (BY MR. GOLDHAMER)  You can't answer the
15 question?

16     A.   Because I feel like whatever I say, you
17 will use against me in some way and falsely represent
18 what I actually believe.

19     Q.   What do you actually believe?

20     MR. ABELMAN:  Objection to the form of the
21 question.  This is getting to harassment, Aaron.
22 Please move on.

23     MR. GOLDHAMER:  I disagree, Steve.

24     MR. ABELMAN:  You disagree, because you're
25 starting with false premises.

1      Q.   (BY MR. GOLDHAMER)  If you can't answer
2 the question, just say so.

3      MR. ABELMAN:  She's given you an answer.
4 It may not be to your satisfaction, but she's given --
5 given you an answer.

6      Q.   (BY MR. GOLDHAMER)  Do people keep their
7 promises?

8      A.   Again, I feel like this is a trick
9 question to pit me into something that is not accurate.

10     Q.   If that's the answer, and that's what you
11 believe, I understand.  If you can't answer the
12 question, I understand.

13     A.   I'm choosing not to answer this question
14 in the way that you have framed it.

15     Q.   Is transferring assets to hinder creditors
16 wrong?

17     MR. ABELMAN:  Objection to foundation.

18     Q.   (BY MR. GOLDHAMER)  You can answer.

19     A.   Would you like to restate the question?

20     Q.   (BY MR. GOLDHAMER)  Is transferring assets
21 to hinder creditors wrong?

22     MR. ABELMAN:  Objection to foundation.

23     Q.   (BY MR. GOLDHAMER)  Go ahead.  Can you
24 answer that question?

25     (Pause.)

Azuraye Wycoff
June 23, 2021

Page 118

1     Q.   Are you intending to answer the question,
2  or are you just going to ignore that question?
3     A.   I'm just really thinking about the best
4  way to answer that question.  That feels like it's
5  about to pit me into something that is not going to be
6  a fair setup.
7     Q.   Okay.  I'll give you the opportunity to
8  answer the question, if you want.
9     A.   If you have another question lined up, I'm
10 ready for that one.
11    Q.   Okay.  Well, so you're not -- you're
12 declining to answer that question?
13    A.   I don't think it's a fair question to ask.
14    Q.   Why not?
15    A.   Because I think you are trying to set me
16 up to answer a question and set me up for failure.
17    Q.   I'm just trying to get information.
18         MR. ABELMAN:  We can't hear you.  We can't
19 hear you.
20         MR. GOLDHAMER:  Can you hear me now?
21         THE DEPONENT:  Yes.
22    Q.   (BY MR. GOLDHAMER)  Okay.  I'm just trying
23 to get information.  That's what this is about.  So if
24 you can't answer the question, I understand.  Is that
25 what you're saying, you cannot answer that question?

Page 119

1     A.   I'm -- I'm choosing not to answer that
2  question in the way that you have phrased it, because
3  it doesn't feel like a legitimate, objective question.
4  You're looking for a very subjective response that I
5  feel I could absolutely be reframed and repurposed
6  against me.
7     Q.   So -- so you can't answer the question.
8  And that's the bottom line?
9          MR. ABELMAN:  Aaron, this is getting
10 repetitive.  You've -- you've -- you've stated the same
11 thing about five different ways.  You've been given
12 five different answers.
13         MR. GOLDHAMER:  I'm just trying to get
14 her --
15         MR. ABELMAN:  Asking the same question
16 over and over again is not going to change it.
17    Q.   (BY MR. GOLDHAMER)  If (inaudible) you
18 can't answer the question.  Is that fair?
19    A.   It doesn't feel fair.  But if that's how
20 you'd like me to frame it, sure.
21    Q.   So after the checks from Transamerica were
22 deposited in some account, and you're not sure which,
23 what happened to that money?
24    A.   What do you mean?
25    Q.   Well, money was deposited into some

Page 120

1  account, right, from Transamerica?
2     A.   Correct.
3     Q.   And you're not sure whether or not that
4  was a personal account for you or an account that was a
5  trust, right?
6     A.   I am pretty certain it was transferred
7  into a trust that we had access to and decision-making
8  power over, but we consulted wealth advisors and our
9  legal counsel to make sure that everything was handled
10 correctly.
11    Q.   So it was deposited into some sort of
12 account, either a personal account or a trust account.
13 From there, how -- how was the Transamerica money used,
14 or how was -- what money flowed out of that account, if
15 any, and where did it go?
16    A.   Funds were transferred to Magnus Veritas
17 and GCS in order to buy the farm and the residence in
18 order to pay off the Bloomfield loan.
19    Q.   Why weren't the funds just used directly
20 to pay off the Bloomfield loan?
21    A.   Because we had a deal that had been set up
22 to sell the farm, and my parents were looking to sell
23 the farm in order to pay back that loan.  And once that
24 deal fell through, there was not enough time to get it
25 back on the market and go through the entire due

Page 121

1  diligence process with a new buyer before -- that loan
2  was accruing interest daily, and there needed to be a
3  resolution as quickly as possible.
4          So I, and my mother, and my sister sought
5  legal counsel.  We decided that purchasing the farm
6  ourselves, with our own insurance money, would be the
7  quickest way and be able to sell it or purchase it at a
8  fair market value so that we could pay off that loan,
9  with our own inheritance, on a debt that was not
10 actually ours.
11    Q.   Well, was it inheritance?  What are you
12 talking about here?  That's the first time I've heard
13 about inheritance.
14    A.   Insurance.
15    Q.   Okay.  So why wasn't the money just used
16 to directly pay off Bloomfield?
17    A.   Because we knew that we could purchase the
18 farm and have those proceeds go directly to Bloomfield
19 and be able to still hold onto the farm with the
20 intention of being able to sell it in the future.
21    Q.   Was there also an inheritance?
22    A.   Say that again.
23    Q.   Did you get a separate inheritance from
24 your dad's death?
25    A.   No, not financial inheritance; just a few

EXHIBIT J

Azuraye Wycoff
June 23, 2021

1  possessions.
2      Q.   Like what?
3      A.   The ring that I wear around my neck.
4      Q.   Okay.  Anything else?
5      A.   Nothing truly significant.  We didn't have
6  any artwork or any valuables that were really worth
7  anything.
8      Q.   Okay.  Was there any other property that
9  you can think of that you received as an inheritance?
10     A.   Not at this time, I can't.
11     Q.   Did you get any of your dad's property --
12 or, I'm sorry, did your sister get any of your dad's
13 property?
14     A.   Possessions, you mean?
15     Q.   Yeah, or anything he owns; shares in
16 companies, anything like that.
17     A.   Not that I'm aware of.
18     Q.   Did you receive any shares in companies?
19     A.   Not that I'm aware of.
20     Q.   Do you know if your mom received any
21 property that belonged to your father?
22     A.   I don't know.
23     Q.   So you said you could sell the farm down
24 the line.  Is that what you had said?  Is that -- as
25 for a reason for why the insurance money wasn't

1  directly paid to Bloomfield to pay them off?
2      A.   The reason that we purchased the farm was,
3  with the consultation of our legal counsel, we truly
4  tried to make the best possible decision.  There was
5  really no intention of fraud, really.  We're not bad
6  people.  We needed to make a call, after a time of
7  insane duress, where my entire family was kind of blown
8  apart.  And the plan that was in place, to sell the
9  farm to the buyer, when that fell through, we were
10 scrambling.
11      And trust me, I had been an advocate for
12 selling the farm for many years.  I didn't really have
13 a deep attachment to it.  But when everything fell
14 through and I really became the primary person
15 responsible for a lot of these massive assets, I really
16 had to think about what this was going to look like in
17 our family going forward and who was going to be
18 responsible for it.  And I went to extreme lengths to
19 try to find other people who could either support us in
20 this endeavor, to potentially lease the property from
21 us or even potentially buy it, and every single time
22 something has always fallen through.
23     Q.   So couldn't the insurance proceeds have
24 been used to pay off Bloomfield?  There was nothing
25 that prevented that, right?

1      A.   What do you mean?
2      Q.   Well, the insurance proceeds were
3  available.  And rather than using them to buy the farm
4  and then having that payment then go to Bloomfield, the
5  money could have just gone directly to Bloomfield and
6  the farm could have stayed where it was, right?
7          MR. ABELMAN:  Aaron, would you stop
8  badgering her.  This question has been asked time and
9  time again.  You know, you don't pay bills for someone
10 else, do you?
11         MR. GOLDHAMER:  Mr. Abelman, please calm
12 down.
13         MR. ABELMAN:  I was calm the first four
14 times you asked the question.
15         MR. GOLDHAMER:  Well, I haven't gotten an
16 answer to this question, Steve.  I'm not going to argue
17 with you.  If you're going to instruct her not to
18 answer, you can instruct her not to answer, and then we
19 can bring it up with the court.
20     Q.   (BY MR. GOLDHAMER)  The question is, the
21 money, the insurance money, could have gone directly to
22 Bloomfield to pay them off, correct?
23         MR. ABELMAN:  The question has been
24 answered a multiplicity of times.  It doesn't need to
25 be answered again, and that's -- that's it on it, on

1  that point.
2          MR. GOLDHAMER:  Are you instructing the
3  witness not to answer, Mr. Abelman?
4          MR. ABELMAN:  I'm not instructing the
5  witness not to answer.  I'm instructing you that we
6  don't want to be badgered by the same question over and
7  over again.  You cannot ask the same question and
8  expect a different answer.
9          MR. GOLDHAMER:  I'm --
10         MR. ABELMAN:  And you're taking advantage
11 of the situation.
12         MR. GOLDHAMER:  Are you done, Mr. Abelman?
13         MR. ABELMAN:  Depends -- it depends if
14 you're -- if you move on and stop asking the same
15 question over and over again.
16         MR. GOLDHAMER:  I'm going to ask you to
17 calm down a little bit, Mr. Abelman.  You're raising
18 your voice.  The question is very simple.  And all I'm
19 looking for is a yes or no answer.
20     Q.   (BY MR. GOLDHAMER)  Could the money have
21 gone directly to -- we're talking about the life
22 insurance proceeds.  Could that money have been used to
23 pay Bloomfield Capital or its subsidiaries directly?
24         MR. ABELMAN:  You're -- you're being
25 argumentative.  The question has been asked and

Azuraye Wycoff
June 23, 2021

Page 126

```
1  answered --
2          MR. GOLDHAMER:  Mr. Abelman --
3          MR. ABELMAN:  -- a multiplicity of times.
4  And I'm asking you not to be -- you're -- you're
5  belaboring a point, and it's -- it's reached a point
6  of -- of harassment.
7          MR. GOLDHAMER:  Mr. Abelman, I'd ask you
8  to either make your objections or instruct the witness
9  not to answer.  You can limit your objections to form
10 and foundation.  And the answer (sic) is a very simple
11 question that --
12         MR. ABELMAN:  Then -- then let's take it
13 up with the judge.
14         MR. GOLDHAMER:  Okay.  So you're
15 instructing the witness not to answer?
16         MR. ABELMAN:  I'm not instructing --
17 you're not going to put words in my mouth.
18     A.  Look, I think it's a good question,
19 honestly.  But we went through a lot of lengths and
20 talked to a lot of our advisors about what to do.  And
21 I won't tell you that I understand every single facet
22 of this decision, because it's a complicated one.  And
23 it's a lot of stuff that didn't actually involve me.
24 It was between my father and Midlabs and my father and
25 other parties.
```

Page 127

```
1          I'm doing the best I can right now with
2  the information that I have, at the age I am, and with
3  the responsibility I now have put on me.  And much of
4  what I had to make decisions on I had to do through
5  legal counsel.  It was done the way it was, and this is
6  what Bloomfield accepted, and they settled with us on
7  this.  They felt like it was a reasonable amount and
8  structured the right way.  We even offered them the
9  farm, and they didn't want it.
10     Q.  (BY MR. GOLDHAMER)  Have you seen the
11 settlement agreement with Bloomfield?
12     A.  Say that again.
13     Q.  Have you seen the settlement agreement
14 with Bloomfield?
15     A.  No, I did not read through it.
16     Q.  Did you know that in the settlement
17 agreement with Bloomfield your mother agreed that it
18 was a breach of the agreement with Bloomfield to
19 distribute the life insurance money to the
20 beneficiaries?
21         MR. ABELMAN:  Object to foundation.
22 That's a mischaracterization.
23     Q.  (BY MR. GOLDHAMER)  Did you know that?
24     A.  No, I did not.
25     Q.  So what happened after apparently the farm
```

Page 128

```
1  was offered to Bloomfield?
2      A.  They rejected it.  They didn't want it.
3      Q.  What did they say?
4      A.  To my knowledge, they agreed with the
5  purchase through GCS and Magnus Veritas and to take the
6  proceeds from those sales.
7      Q.  Because they preferred cash rather than
8  property?
9      A.  I don't know.  I don't know what their
10 decision process was with that.
11     Q.  Okay.  Was it your decision to set up
12 irrevocable trusts for you and Devon?
13     A.  It was a decision that was guided by legal
14 counsel.
15     Q.  Was your mother involved in that decision?
16     A.  We were all involved in this decision.
17     Q.  Okay.  To set up the Devon Wycoff
18 Irrevocable Trust and the Azuraye Wycoff Irrevocable
19 Trust?
20     A.  What's the full question?
21     Q.  That everyone was involved in the decision
22 to create those trusts; you, your mother, Devon, and
23 your legal counsel?
24     A.  Yes, I would say that's accurate.
25     Q.  And then what do these trusts own?
```

Page 129

```
1      A.  I'm uncertain.
2      Q.  You're not sure what the trusts own?
3      A.  No, I'm not positive what they own.
4      Q.  Aren't you a trustee of one of these
5  trusts?
6      A.  Yes.
7      Q.  So do you know why these trusts were
8  created?  I mean, what is the point?
9      A.  That's a good question for my legal
10 counsel.
11     Q.  Okay.  Well, do you know who the owners of
12 GCS452 and Magnus Veritas are?
13     A.  I believe it's my sister and I, 50-50.
14     Q.  Just as individuals?  You're the members
15 of those companies?
16     A.  Yes.
17     Q.  That's your understanding?
18     A.  Yes.
19     Q.  So who engaged -- I'm sorry.  Who actually
20 set up the trusts?
21     A.  I don't remember.  It was probably a
22 combination of me, my sister, my mom, and our counsel.
23     Q.  Do you know how to set up a trust?
24     A.  I think most people would not know how to
25 do that without guidance.
```

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 130

1    Q.   So do you know who drafted the trust
2  instruments?
3    A.   No, uncertain.
4    Q.   Do you know when the trusts were set up?
5    A.   No, I do not; not exact dates.
6    Q.   Do you know if it was before or after the
7  life insurance proceeds were deposited at BNY Mellon?
8    A.   I'm not certain.
9    Q.   Who would know?
10   A.   Legal counsel would know.
11   Q.   Is that Mr. Abelman or Mr. Cudney?
12   A.   Likely.
13   Q.   Who decided that you'd be the trustee of
14 Devon's trust?
15   A.   We were advised that.
16   Q.   So your lawyer told you to do that?
17        MR. ABELMAN:  I'm going to instruct you
18 not to disclose contents of communications you've had
19 with your counsel.
20        THE DEPONENT:  Okay.
21        MR. ABELMAN:  But, you know, you -- you
22 can -- you can answer the question to the best you can,
23 without getting into the substance of any advice
24 given.
25        THE DEPONENT:  Yeah.

Page 131

1    A.   It seemed like a really good idea to have
2  redundancy in the system; that if something happened to
3  me or happened to my sister, that we'd still be able to
4  make decisions.
5    Q.   (BY MR. GOLDHAMER)  What do you mean by
6  that?
7    A.   Is there a specific part you'd like me to
8  rephrase?
9    Q.   Well, redun- -- redundancy in -- in what
10 system?
11   A.   Here is an example.  Any time when we were
12 kids and we would travel, my dad and my mom would
13 travel separately; in case something happened to one of
14 them, we'd still have one parent left.  Similar to
15 that.
16   Q.   So what does that have to do with a
17 trustee and trusts?
18   A.   To be able to make decisions if something
19 happened to the other person.
20   Q.   Decisions about the assets in the trust?
21   A.   Anything that has to do with the trust.
22   Q.   Whose idea was it that your mom would be
23 the co-trustee of both of the trusts?
24   A.   All of us agreed on this; same thing,
25 redundancies in the system.

Page 132

1    Q.   What decisions have you made as trustee of
2  Devon's trust?
3    A.   I make decisions on where those funds need
4  to be allocated and how much.
5    Q.   So what have you done with that
6  decision-making power?
7    A.   I have taken over responsibility for the
8  house and for the farm.  I now run the farm and make
9  all the decisions on the farm.  All the financial
10 decisions that have to be made about the construction
11 of the hoop house, of the electrical, of the water
12 systems, all the contracts that need to be negotiated,
13 I handle all those decisions now.
14   Q.   Is that in your capacity as manager of
15 Magnus Veritas or GCS452, or as trustee, or all of the
16 above, or what?
17        MR. ABELMAN:  Objection to form and
18 foundation.  Maybe you could take it one at a time.
19   Q.   (BY MR. GOLDHAMER)  Well, let's go back to
20 you and making decisions as a trustee of Devon's trust.
21 Did you make the decision to put over a
22 million-and-a-half dollars into entities to buy the
23 residence and farm?
24   A.   To fund them?
25   Q.   Yes.

Page 133

1    A.   Yes.
2    Q.   What other decisions have you made with
3  the trust assets?
4    A.   I believe that there were some decisions
5  that had to be made about allocations of funds in our
6  overall portfolio of where money needed to be allocated
7  in order to do maintenance and repairs on the house,
8  utilities, things of that nature.
9    Q.   So is it -- are the trusts -- with the
10 remaining funds from the trusts, are those invested in
11 a bank account, savings account?  Where are those
12   A.   We have diversified our portfolio, based
13 on the legal counsel and the wealth financial counsel
14 that we've received.
15   Q.   Is there -- are they with Charles Schwab?
16 Are they with some other broker?  Where are those
17 funds?
18   A.   I think a good portion is with BNY Mellon.
19 And the majority, I think, is still in each of the
20 trusts.  No one is touching the trusts besides me and
21 my sister.
22   Q.   So your sister is dealing with your trust?
23   A.   I'm primarily making decisions and
24 consulting my sister, and my mom, and our counsel each
25 time a decision needs to be made.

Azuraye Wycoff
June 23, 2021

Page 134

1    Q.   Who makes the decisions with respect to
2  your trust (inaudible)?
3         MR. ABELMAN:  We couldn't hear you.
4    Q.   (BY MR. GOLDHAMER)  Who makes decisions
5  with respect to your trust?  Is that your sister in her
6  capacity as trustee of your trust?
7    A.   It depends on what the decision is and how
8  much money needs to be allocated.
9    Q.   Now, if not her, then who else is making a
10 decision with respect to the money in your trust?
11   A.   When you say, "decision," what exactly are
12 you asking?
13   Q.   Well, what do you do as a trustee?  Do you
14 know?  I mean, you make decisions with respect to trust
15 assets, right?
16   A.   Yes.
17   Q.   So who is making decisions with respect to
18 trust assets for your trust?
19   A.   Ultimately, I have to make those
20 decisions.  But I ask for counsel on anything that
21 needs to be a large decision; in regards to what stocks
22 to invest in, where to pull out money, where to put
23 money, what projects need to be funded.
24   Q.   So you're making the decisions with
25 respect to your own trust?

Page 135

1    A.   Yes.
2    Q.   The trust of which you're a beneficiary?
3    A.   Yes.
4    Q.   And you're also making decisions with
5  respect to the Devon Wycoff Irrevocable Trust?
6    A.   I assist with that.
7    Q.   Who else makes decisions with respect to
8  the Devon Wycoff Irrevocable Trust?
9    A.   Devon would ultimately have to make the
10 decision, but she consults with us.
11   Q.   So isn't she the beneficiary of the trust,
12 of her trust, the Devon Wycoff Irrevocable Trust?
13        MR. ABELMAN:  Objection, foundation --
14 actually, objection to form.
15   Q.   (BY MR. GOLDHAMER)  You said, "us."  Who
16 is "us"?
17   A.   Me, my mom, and my sister, and the counsel
18 of people that are relevant to that decision.
19   Q.   And does your mother make decisions with
20 respect to the Devon Wycoff Irrevocable Trust and the
21 Azuraye Wycoff Irrevocable Trust?
22   A.   Decisions in what capacity?
23   Q.   Well, she's a co-trustee of both trusts,
24 right?
25   A.   Yes.

Page 136

1    Q.   So does she make decisions about how the
2  trust assets should be used?
3    A.   Only after consulting us.
4    Q.   Okay.  Have the trustees of the Devon
5  Wycoff Irrevocable Trust and the Azuraye Wycoff
6  Irrevocable Trust ever disagreed about what should
7  happen with the trust assets?
8    A.   Sure, naturally, as in any family.
9    Q.   So how -- what happens then?
10   A.   We sit down and we talk about it.  And we
11 get counsel, and we take in all the possible facts and
12 advice and try to make the best decision every time.
13   Q.   Have there been situations where despite
14 all that consultation, there's still a disagreement
15 between the trustees of these trusts as to what should
16 happen with the trust assets?
17   A.   No, nothing that couldn't be overcome.
18   Q.   Do the trusts have bank statements that
19 get produced?
20   A.   I don't know.
21   Q.   Do you write checks from any trust
22 accounts?
23   A.   I think those are managed by BNY.  And if
24 we have a request for a transfer, that gets approved
25 and then sent to the account that we requested it be

Page 137

1  sent to.
2    Q.   And so who makes that decision, the
3  trustee of the trusts or the beneficiary of the trusts?
4    A.   We consult with each other.  There's only
5  three of us.
6    Q.   Have you, personally, ever authorized BNY
7  Mellon to send trust assets anywhere?
8    A.   Yes.
9    Q.   Can you describe what the circumstances of
10 those authorizations were?
11   A.   Yes.  I needed to fund my start-up with
12 Small Haul to be able to purchase a vehicle recently.
13 And so that process is usually conducted through email,
14 or we request the funds be transferred to a specific
15 account.  And after our approval process, those are
16 funded, and then we can do as we need to do with the
17 funds that are transferred.
18   Q.   Who deposits money in the trust accounts?
19 Have there been any deposits into these trust accounts?
20   A.   No, not -- no, I don't think so.
21   Q.   So there haven't been any distributions
22 from Magnus Veritas or GCS452 to the trusts?
23   A.   Not that I'm aware of.  I don't think we
24 would have transferred it back into the trust.
25   Q.   Who is manager of Magnus Veritas?

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 138

1    A.    I believe I am.
2    Q.    Have you always been a manager?
3    A.    Yes.
4    Q.    Who are the officers of Magnus Veritas?
5    A.    I believe my sister and my mom.
6    Q.    Do you know if --
7    A.    I'll have to look it up again.  I don't
8  remember.  It was about two years ago that we formed
9  everything.
10    Q.    Who has authority to make decisions on
11  behalf of Magnus Veritas?
12    A.    I do, primarily, and my sister and my
13  mother.
14    Q.    So has that changed over time at all?
15    A.    No, not really.
16    Q.    There hasn't been any grant of additional
17  decision-making authority or other authority to your
18  mother over time for Magnus Veritas?
19    A.    No, not that I'm aware of.  If she needs
20  to do something with the farm, for example, or with the
21  house -- maintenance, repairs, paying utilities -- she
22  consults me, and I give her permission to pay those.
23    Q.    So she does have some banking authority?
24    A.    Yeah.  She's a signatory on the banks.
25    Q.    How did that come about?

Page 139

1    A.    We made that decision collectively.
2    Q.    Why?
3    A.    Again, redundancy in the system; in case
4  anything ever happened to one of us, we'd still be able
5  to manage everything.
6    Q.    Do you know who gets the bank statements
7  for Magnus Veritas?
8    A.    I believe they come to the house and are
9  addressed to Magnus Veritas, not to one specific
10  person.
11    Q.    Do you know who else might be a bank
12  signatory for Magnus Veritas?
13    A.    No one else, besides me, my mom, and my
14  sister.
15    Q.    So can all three of you write checks from
16  the Magnus Veritas account?
17    A.    I believe so, with approval from the
18  others.
19    Q.    So are there two lines on the checks for
20  multiple signatures?
21    A.    No, I don't think so.
22    Q.    If we get the bank records and actually
23  look at the checks, who are we going to see signing the
24  checks?
25    A.    Primarily me.  There are some occasions

Page 140

1  where, if I couldn't physically be present, I asked my
2  mom to be able to assist with that.
3    Q.    Did -- who made the decision to engage
4  Brownstein for Magnus Veritas?
5    A.    I think we'd had a long-standing
6  relationship with Brownstein Hyatt.  It made sense to
7  consult them first.
8    Q.    Do you know if there was a written
9  engagement agreement?
10    A.    I don't know.
11    MR. ABELMAN:  Objection to foundation.
12    Q.    (BY MR. GOLDHAMER)  Have you made any
13  other real estate purchases over the course of your
14  life, besides the residence and the farm?
15    A.    No.
16    Q.    You mentioned, with respect to the farm,
17  that interest was continuing to accrue on the
18  Bloomfield loan, and that was some reason why you
19  thought that your new entity had to buy it; is that
20  right?
21    MR. ABELMAN:  Object to the form and
22  foundation.
23    A.    The structures were set up this way,
24  because that was the counsel that we received.
25    Q.    (BY MR. GOLDHAMER)  Was there any rush to

Page 141

1  get the farm sold for any reason?
2    A.    Because it's what made the most sense at
3  that time.  We offered it to Bloomfield, they didn't
4  want it.  In order to pay that debt, it made sense to
5  be able to retain ownership of the farm in our names
6  and be able to pay off the loan at the same time.
7    Q.    Was there any consideration given to maybe
8  trying to get these transactions done after you got
9  back from Europe, so you could actually be there?
10    A.    There was massive amounts of pressure from
11  Bloomfield to make a decision quickly.
12    Q.    So the pressure was from Bloomfield?
13    A.    My understanding.
14    Q.    Was there any pressure from the IRS?
15    A.    Not that I'm aware of.
16    Q.    Do you know who Kim Lord is?
17    A.    Yes.
18    Q.    Who is she?
19    A.    She represented me in the purchase of the
20  house.
21    Q.    Did she represent you individually?
22    A.    Yes.  I had my own legal counsel so that I
23  could actually make that transaction on my own.
24    Q.    Was she the lawyer for the house and the
25  farm transfers?

Azuraye Wycoff
June 23, 2021

Page 142

1      A.    Yes.
2      Q.    Was she representing GCS452 and Magnus
3  Veritas?
4      A.    Yes.
5      Q.    And you, personally?
6      A.    I believe so.
7      Q.    And Devon, personally?
8      A.    Yeah, I believe so.
9      Q.    Was she representing the trusts?
10     A.    I don't know the answer to that.
11     Q.    How -- how did you first hear Kim Lord's
12  name?
13     A.    She had been highly recommended; by whom,
14  I don't remember.
15     Q.    So was she recommended to you?
16     A.    Yes.
17     Q.    Why didn't you just use Brownstein for the
18  farm and residence transaction as counsel?
19     A.    Honestly, I don't know.  It was a very
20  complicated setup.  And we were definitely dealing with
21  the loss of my dad, and I needed advice.  And we were
22  advised to have separate representation to represent me
23  and to represent the sale.  I guess my mother, I guess
24  she was -- yeah.
25     Q.    So it was different lawyers for the buyer

Page 143

1  and seller; is that right?
2      A.    Yes.
3      Q.    Why was that necessary?
4      A.    So that it would -- that way it would be
5  accurate.  That way we had someone who was negotiating
6  for me, on my behalf, to be able to make sure that I
7  got a good deal; that it was priced at fair market
8  value, and that I was represented independently.
9      Q.    And Kim Lord did that for you?
10     A.    Yes.
11     Q.    Did your mother just tell Kim Lord how
12  this transaction was going to be?
13     A.    No.
14     Q.    You mentioned fair market value a couple
15  times.  How -- how did you establish the fair market
16  value for the farm?
17     A.    Sure.  So we had an appraisal.  For the
18  farm, it was one thing; for the house was Kim Bernardi.
19  She came and appraised the house, assessed the actual
20  value of it.  That's all in written documentation
21  through email.  The --
22     Q.    Okay.  How about the farm?
23     A.    The farm was -- the market value at that
24  time, after that deal fell through, 3.3 million, we
25  tried to sell it, and we realized that there was

Page 144

1  someone else who had come forward who was looking to
2  buy a farm estate for horseback riding.  And they had
3  found a comparable down the street for 2.5-.  And we --
4  they came back to us making an offer for that, "We're
5  willing to purchase it at that cost," but found out
6  from another assessor, from an independent party for
7  them, that it would be an initial 500- to 700,000 to
8  repair it to be a stable again.
9           So the actual value for what it was zoned
10  as was way less than what the guy originally had
11  offered at that 3.3- mark.  So 2.5- is what it came in
12  at.  We couldn't sell it for anything more than that.
13     Q.    Who was this other offeror?
14     A.    What do you mean?
15     Q.    Who made this other offer, or what is this
16  comparable property?
17     A.    Yeah.  I don't know enough of those
18  details to tell you that information.
19     Q.    Who would know?
20     A.    My mother.
21     Q.    So who decided the price?
22     A.    Who set the price?
23     Q.    That's right.
24     A.    I'm not totally certain who set the price,
25  but that was what the comparables were.  The 3.3 was a

Page 145

1  pretty high offer that we -- the guy ultimately walked
2  away, because he found another comparable property for
3  less.
4      Q.    Your mom set the price for the farm,
5  didn't she?
6      A.    I don't know.
7      Q.    Your mom initially tried to pay the
8  retainer check for Kim Lord, right?  Retainer, she
9  tried to pay for your lawyer?
10     A.    I don't know.
11     Q.    Did you pay for your lawyer?
12     A.    I don't know.  I'm sure there's records of
13  it.  I'm not sure off the top of my head.
14     Q.    How often did you communicate with Kim
15  Lord?
16     A.    I'm not certain at this point.  It's been
17  a while.  But we were talking via phone and via email
18  in the midst of all this.
19     Q.    How often do you think?  Can you estimate?
20     A.    I don't know.
21     Q.    Were there times when Kim Lord was simply
22  communicating with your mom, but not you or Devon?
23     A.    Not that I'm aware of.
24     Q.    In the sale of the house and the residence
25  or -- and the farm, were there additional inclusions in

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 146

1 that sale?
2     A.   The furniture was included, and all the
3 tools and equipment on the farm were included.
4     Q.   Anything else?
5     A.   Not that I'm aware of.
6     Q.   How about water rights?
7     A.   Yes.
8     Q.   Did you evaluate the value of the water
9 rights for the sale of the farm?
10    A.   I think those were assessed by someone who
11 would be more knowledgeable about that.
12    Q.   Do you know who?
13    A.   No, I don't, not right now.
14    Q.   So who makes -- I'm sorry.  I'll back up.
15 What was the value of the furniture in the house?
16    A.   Not that much.  It was all pretty old.
17    Q.   How do you know it wasn't worth much?
18    A.   Because the house is 20 years old.
19    Q.   So there wasn't a separate appraisal of
20 furniture or anything?
21    A.   I don't know.  I'm sure there might have
22 been.  But I knew that we were purchasing our own
23 family home and wanted that to be included.  And my
24 sister and I had grown up here, and keeping everything
25 intact was incredibly important to me; especially

Page 147

1 because after my dad died, it was really the last
2 memory we had of him.
3     Q.   Was everything in the house included as an
4 inclusion (inaudible)?
5     THE REPORTER:  I'm sorry.  I couldn't hear
6 you.  I couldn't hear you, Mr. Goldhamer.
7     MR. ABELMAN:  Sorry.
8     Q.   (BY MR. GOLDHAMER)  Was everything in the
9 house included an inclusion in the sale?
10    A.   What do you mean?
11    Q.   Art on the walls, spice in the pantry.
12    A.   Yeah.
13    Q.   And has there been any effort to value,
14 beyond the appraisal that you think might have
15 happened, the inclusions?
16    A.   I don't know.  I don't think it was worth
17 all that much.  Most of the art on the walls are art
18 that my mom has painted.  Nothing -- my dad, my mom,
19 weren't really into antiques or any valuables.  This
20 house has been really just a home.  It was not worth
21 all that much on the inside.
22    Q.   Do you, as manager of GSC452 (sic), make
23 the decisions on how to insure the residence?
24    A.   With guidance, yes.  It wasn't something
25 that I could know to do completely by myself.

Page 148

1     Q.   And do you figure out -- I mean, how did
2 you figure out how much to insure the house for?
3     A.   I think a lot of that had already been set
4 up over previous years.  It was just continuing on with
5 that.
6     Q.   And so you deferred to the previous
7 insurance policy terms and just kept those in place?
8     A.   I'm uncertain.
9     Q.   Did you do any independent investigation
10 of how the house or its contents should be insured?
11    A.   I don't know.
12    Q.   Do you know of any material misstatements
13 in the insurance policy as to the value of the house or
14 the contents, as compared to their actual value?
15    A.   No, I don't know.
16    Q.   How about for the farm?  Did you just
17 defer to what had been previously set up for insurance
18 on the farm?
19    A.   We left that in place, but I am currently
20 in the process of hiring my own insurance agent to come
21 and reevaluate everything.
22    Q.   Have you picked somebody out yet?
23    A.   What?
24    Q.   Have you picked an insurance agent out
25 yet?

Page 149

1     A.   Yes, I have.
2     Q.   Who is that?
3     A.   Todd Riley (phonetic).
4     Q.   What is his agency?
5     A.   I can't recall off the top of my head.
6     Q.   How did you find him?
7     A.   He was a referral through our real
8 estate -- or our insurance agent we worked with for
9 most of our life through State Farm.
10    MR. ABELMAN:  Aaron, can we -- can we
11 approach another break sometime soon?
12    MR. GOLDHAMER:  Yes.  Do you still need to
13 leave at 3:00 p.m.?
14    THE DEPONENT:  I do, unfortunately.
15    MR. GOLDHAMER:  Okay.  Well, then let's
16 try and take a five- to ten-minute break.  And we'll
17 have one last session before you need to go.
18    THE DEPONENT:  Okay.
19    THE VIDEOGRAPHER:  We're going off the
20 record at 7:54 p.m. UTC time or 1:54 p.m. Mountain
21 Time.
22    (Recess, 1:54 p.m. to 2:15 p.m. MDT.)
23    THE VIDEOGRAPHER:  We are going back on
24 the record at 8:15 p.m. UTC time or 2:15 p.m. Mountain
25 Time.

Azuraye Wycoff
June 23, 2021

Page 150

1    Q.   (BY MR. GOLDHAMER) Ms. Wycoff, we talked
2  about some of the issues with writing checks for the
3  Magnus Veritas account.  I want to ask you similar
4  questions about the GCS452 account.  Who has authority
5  to write checks from that account?
6    A.   Me, my sister, and my mother, being
7  signatory.
8    Q.   And you, your sister, and your mother all
9  have the ability to make withdrawals from that account
10 as well?
11   A.   Only with approval from me and my sister.
12   Q.   And so who has written the majority of the
13 checks from GCS452?
14   A.   I believe I have.
15   Q.   What kind of things have you written
16 checks for?
17   A.   General maintenance on the house,
18 utilities, upkeep.
19   Q.   Did you pay for the insurance premiums on
20 the house from that account as well?
21   A.   I believe so.
22   Q.   Going back to Bill Torvund, do you recall
23 when you first met him?
24   A.   No, I don't.
25   Q.   But it was before your father died?

Page 151

1    A.   Yeah.
2    Q.   Have you seen him since your father died?
3    A.   No, I haven't.
4    Q.   Did he stay in the house with you guys at
5  all?  Did he stay at the residence?
6    A.   I think he stayed once in the back house
7  when he was traveling through town.
8    Q.   Do you know what he does at all?
9    A.   I think he does a lot of energetic healing
10 work.
11   Q.   What is that?
12   A.   Reiki.  I don't know.  Not really my area
13 of expertise.
14   Q.   Is that something that your mom is really
15 into?
16   A.   Yeah.
17   Q.   Earlier, you said that your mom wasn't
18 very involved in ZAP!; is that right?
19   A.   Yeah.
20   Q.   That was before your father's death?
21   A.   Yeah.  She primarily made him food, ran
22 errands, helped with really basic administrative tasks.
23 But she was not really a primary decision-maker in the
24 company.
25   Q.   Didn't she write a book about ZAP!?

Page 152

1    A.   Yeah, with my father's help.
2    Q.   Do you know what your first bank account
3  was?  Did you have a youth savings account?
4    A.   Yes, I did.
5    Q.   Where was that?  In Vectra?
6    A.   In Vectra.
7    Q.   And do you remember when that was set up?
8    A.   I don't know.  I was really young,
9  obviously, a youth.
10   Q.   And was that kind of a joint account with
11 you and one or more of your parents?
12   A.   I don't remember.  I think it was just a
13 really simple savings account, and I put baby-sitting
14 money in.
15   Q.   And then when you were no longer a youth,
16 what happened with that account?
17   A.   I think we still have that account.  And I
18 opened a checking account at Vectra.
19   Q.   So you still have a joint account with
20 your mother at Vectra?
21   A.   I think it's more of a joint account with
22 me and my sister.
23   Q.   So you think your sister and you have a
24 joint account.  Do you have a joint account with your
25 mother?

Page 153

1    A.   I'm not certain, actually.  I think
2  because she opened that account originally, she can
3  access it.  But she doesn't really do anything with
4  that, unless I've asked her to help me with something.
5    Q.   What sort of funds go into that joint
6  account?
7    A.   We had a withdrawal from the trust in
8  order to fund some of the operations.  What did we do
9  with that?  I know there was one time that we
10 transferred it, and it landed in there.  Mostly, that's
11 been used to fund my own businesses; that I've moved to
12 other accounts in order to help get Small Haul up and
13 running.  I'm pretty much the only person who accesses
14 that account.
15   Q.   When do you think the last time you have
16 accessed that account was?
17   A.   I don't know.  I check it fairly
18 frequently.  I've got an app on my phone.
19   Q.   Do you know what Gusto is?
20   A.   Yes.  It was a payroll service for ZAP!
21 Products.
22   Q.   So who would get paid through the Gusto
23 Payroll Service for ZAP! Products?
24   A.   The employees in ZAP!.
25   Q.   Did you get paid through the Gusto Payroll

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 154

1  Service --
2      A.   Yes.
3      Q.   -- when you were working for ZAP!?
4      A.   Yes, I did.
5      Q.   Do you know if your mom was paid anything
6  through the Gusto?
7      A.   I'm not sure about that.
8      Q.   Did you get your Gusto payments from ZAP!
9  into the joint youth savings account?
10     A.   I'm not positive.  I think they may have
11 gone into the checking account.
12     Q.   Do you know if your dad got paid anything
13 through Gusto?
14     A.   I don't know.
15     Q.   Did you have any joint accounts with your
16 dad?
17     A.   No.
18     Q.   So can you tell me what the purpose of
19 maintaining a joint account with your mother is?
20     A.   I mean, we're a tight-knit family.  If
21 someone needed something, it was a lot easier to help
22 with that way.
23     Q.   And so you'd be willing to help your
24 family out through the joint account, right?
25     A.   If there was an explicit request.  My mom

Page 155

1  does not go in there and just withdraw funds.
2      Q.   In what other ways have you helped your
3  family financially?
4      A.   Really, it was just that loan.  That was
5  about the only time they've ever asked me for money.
6      Q.   You don't think it helped your family to
7  buy the farm?
8      A.   Yes, of course.
9      Q.   Do you think it helped your family to buy
10 the residence?
11     A.   The intention of buying the farm and the
12 residence was so that the money from the insurance,
13 instead of paying that directly to Bloomfield, we got
14 something for that allotment of money.  Otherwise, it
15 would have just been money that me and my sister had
16 been given, going straight towards paying off a debt
17 that was my father's responsibility.  So in order to
18 make that a fair exchange, we wanted to purchase the
19 farm and the house so that we could have that as part
20 of our legacy.
21     Q.   Does Mom pay rent at the residence?
22     A.   Yes, she did, initially.  When we first
23 purchased the property, she was paying 2500 a month.
24 And once my sister moved back, I worked out more of a
25 work exchange with her that she would do the upkeep and

Page 156

1  the maintenance, manage the daily tasks, do the grocery
2  shopping, and take care of Devon.  That was mostly when
3  the pandemic hit and everything started shutting down,
4  and she didn't have a way to make any kind of income.
5      Q.   So now your mother does not pay any rent
6  to the residence; is that right?
7      A.   No; because I'm living there and my
8  sister, are both living there.
9      Q.   And your mother hasn't paid rent to the
10 residence since March of 2020; is that right?
11     A.   Yes, give or take.
12     Q.   So going back to the loan that you said
13 you made to your family -- and you weren't sure if it
14 was to your mom, or dad, or their businesses -- but can
15 you describe whether it was a one-time loan, or was it
16 a -- did you make ongoing payments?
17     A.   Honestly, I don't remember.  It was a long
18 time ago.  I was pretty wrapped up in my work, and they
19 needed help.  And of course I would say yes to that.
20 But no, I didn't really, like, ask for real deep
21 specifics.  And all of it was paid back.
22     Q.   Talking, you know, in connection with the
23 farm, I mean, a $2.5 million purchase is pretty
24 substantial, wouldn't you say?
25     A.   Yes.

Page 157

1      Q.   Can you describe what sort of due
2  diligence you did in connection with that purchase?
3      A.   What exactly are you asking?
4      Q.   Well, do you know what due diligence is --
5      A.   Yes, I do.
6      Q.   -- in a real estate transaction?  Well,
7  what's your understanding of due diligence in a real
8  estate transaction?
9      A.   Understanding the risks and value of a
10 property, what I was getting into, what was included in
11 that purchase, and what I would have rights to.
12     Q.   Okay.  So what due diligence did you do in
13 connection with the farm purchase?
14     A.   I was guided by legal counsel to
15 understand all the components of what we were
16 purchasing with the farm; understanding the water
17 rights, understanding the amount of acreage, the tools
18 and the equipment on the property, the maintenance and
19 the upkeep that was required, what was taken down and
20 what was the zoning, what the risks were, what we could
21 and could not do.
22          There was a lot that was tried to happen
23 on the farm, and a lot of that failed.  So I was really
24 assessing the entire value of the property, what I
25 actually could turn it into, and it was actually pretty

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 158

1  limited for what we could do.  We couldn't do hemp, we
2  couldn't do horses, we couldn't do commercial activity.
3  So I really needed to understand what we were
4  purchasing.
5       Q.    Why couldn't you do horses on the farm?
6       A.    Because all the stalls had been ripped
7  out, and it would have cost about an additional
8  $500,000 to re-put in all the stalls and get it up and
9  running to an equestrian level again.
10      Q.    When was the last time the farm had
11 functioned as an equestrian center?
12      A.    I don't remember the exact year, but I
13 think about five years ago.
14      Q.    Do you know why the stalls were ripped
15 down?
16      A.    I don't know.
17      Q.    Was there any environmental review with
18 respect to the farm?
19      A.    What do you mean?
20      Q.    Was anyone hired to do, say, a Phase 1
21 environmental review of the property?
22      A.    I'm not certain.  I know my parents were
23 doing a lot of assessments and potential projects, so
24 I'm sure something was done prior to me actually
25 purchasing it.  But no, I did not have that conducted

Page 159

1  before the purchase of the farm.
2       Q.    Why not?
3       A.    Because I did not feel like it was totally
4  necessary.  I knew a lot of the components of the farm.
5  I knew that there was a conservation easement on it.  I
6  knew what we could and could not do.  I did not feel
7  like it was totally required.
8       Q.    What does it mean to have a conservation
9  easement on the property?
10      A.    There is a neighborhood above the farm
11 that has their septic systems on the property, and that
12 Xcel needs access to some of the electrical lines on
13 the property.
14      Q.    So that's what the conservation easement
15 means?
16      A.    Yes.
17      Q.    Does -- is there a conservation easement
18 envelope on the property?  Do you know?
19      A.    Yes, there's some documentation.
20      Q.    What does that mean?  What does a
21 conservation easement building envelope mean?  Do you
22 know?
23      A.    No, I don't know.  I read it.  It's pretty
24 bothering.  Yes, it exists.
25      Q.    But you don't know what that means, do

Page 160

1  you?
2       A.    Not to the exact science.  I just know
3  that it means that we are -- we have to work with
4  certain other parties before we do any kind of big
5  building or construction; that there are just other
6  parties involved that have a say what we do on the
7  property, and that they have access to it.
8       Q.    Do you understand the conservation
9  easement means that there are certain rights of other
10 parties concerning septic and Xcel utilities?  Is that
11 your understanding?
12      A.    It's my understanding, but I know that
13 there's probably more to it.  It gets very much into
14 the technical weeds.
15      Q.    Did you do any due diligence with respect
16 to these septic issues you're talking about?
17      A.    I wouldn't call them issues; but no, there
18 was no chance that we would ever get the conservation
19 easement removed.
20      Q.    So what does that have to do with due
21 diligence on septic issues?
22      A.    I don't think I said anything about septic
23 issues.  There wasn't anything about that.
24      Q.    Did you do any due diligence on septic
25 issues?

Page 161

1       A.    Specifically?
2       Q.    Yes.
3       A.    I mean, I'm not certain, honestly.
4       Q.    What due diligence was there with respect
5  to the Left Hand Ditch Company, if any?
6       A.    What do you mean, specifically?
7       Q.    Well, did the Left Hand Ditch Company
8  impact the property in any way?
9       A.    The farm does not own the ditch.  The
10 ditch is owned 15 feet, of either side, by the Left
11 Hand Ditch Company.  They control all the water that
12 flows in and out of the property.  We have to request
13 it.  So it's not like there's a full running ditch all
14 year long that we have unlimited access to.
15      Q.    So did you research the water rights
16 issues with respect to the property?
17      A.    Yeah.  I think we had a water attorney
18 give us an assessment on that.  But yeah, I mean, I
19 definitely had to learn a lot about the water rights
20 and what that actually meant; how many shares we
21 actually had, what was allotted to us, yeah.
22      Q.    Do you know what tenant estoppel is?
23      A.    No.  I don't know what that last word
24 means.
25      Q.    Can you tell me about whether there are

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 162

1 any tenants at the farm?
2     A.   Yes.  There -- well, when I took over the
3 farm, there were three tenants.  There's a house
4 with -- it's a duplex, and then a small cottage.  And
5 all of them are full of tenants.
6     Q.   Who are they?
7     A.   I don't remember their names, because
8 they've all moved out at this point.  Those were kind
9 of the remnants of my family's ownership.  I have now
10 had new tenants come in.  I've restructured all the
11 leases, and I'm now managing all the rental income.
12     Q.   Who are the tenants now?
13     A.   Do I need to say their names?
14     Q.   Yes.
15          THE DEPONENT:  Do I really have to do
16 that?
17          MR. ABELMAN:  Say their last names, if you
18 know them.
19     A.   Lustig, and Runion, and Garten.  And then
20 one of the units is empty.
21     Q.   (BY MR. GOLDHAMER)  (Inaudible.)
22          THE REPORTER:  I couldn't hear you,
23 Mr. Goldhamer.
24     Q.   (BY MR. GOLDHAMER)  Do you know their
25 first names?

Page 163

1     A.   Can I ask, why do I need to say their
2 names?
3     Q.   No.  Do you know their first names?
4          MR. ABELMAN:  Well, let me put it this
5 way.  If they contact these tenants without our
6 permission, that will give us a good cause of action
7 against them.  So I'm sure they'll behave themselves
8 and act with -- act accordingly.  So I -- I don't have
9 any problem with that.
10     Q.   (BY MR. GOLDHAMER)  Go ahead.
11     A.   Yes, I know their first names.  I do not
12 feel comfortable giving out that information.
13     Q.   So you're declining to answer the
14 question?
15     A.   I'm declining to answer that question.
16     Q.   So tenant Garten, how do you know her?
17     A.   She used to be our insurance agent.  She's
18 been on the property for seven years.
19     Q.   So she actually was a tenant before Magnus
20 Veritas bought the property; is that right?
21     A.   Yes.  And I just renewed her lease with
22 her, with my signature, and worked with her to
23 establish what the lease terms would be.
24     Q.   What are the lease terms?
25     A.   That she will be there until January on a

Page 164

1 six-month lease, and then it will be month to month
2 until she finds a new place to occupy.  We intend to
3 have a farm manager move into that unit.
4     Q.   How much does Dina Garten pay for rent?
5          THE REPORTER:  Mr. Goldhamer, we're not --
6 I'm not hearing you at all.
7     Q.   (BY MR. GOLDHAMER)  How much does Dina
8 Garten pay in rent?
9     A.   1030 a month.
10     Q.   Does she pay utilities as well?
11     A.   She pays her own utilities.  Everything
12 else that is in that base rent is covered by us.
13     Q.   When Magnus Veritas acquired the farm, was
14 there any discussion with the existing tenants that
15 there was a new owner?
16     A.   I don't know that it was relevant to them.
17 Nothing was going to change in their current situation.
18     Q.   So how did they know where to write the
19 checks to?
20     A.   I'm pretty sure they still make them out
21 to Allen's Farm.  I'm not certain.
22     Q.   So now -- and so now those checks are
23 deposited with Magnus Veritas, instead of Wycoff
24 Financial?
25     A.   Yes.

Page 165

1     Q.   But was there any effort to hide the fact
2 that there had been a transfer of ownership for the
3 farm, from the tenants?
4     A.   Not that I'm aware of.  There wouldn't be
5 a reason to.
6     Q.   Can you tell me more about your
7 relationship with Dina Garten?  Is she a friend of
8 yours?
9     A.   She no longer handles our insurance.  She
10 is a tenant.  She is probably ten years older than I
11 am.  She's not really a friend, but I do seek her out
12 for advice on how to manage the property, make sure
13 that I'm communicating with the tenants appropriately.
14     Q.   Does she ride horses?
15     A.   No, not that I'm aware of.
16     Q.   How long have you known her for?
17     A.   Off and on for probably all of seven
18 years.  I mean, she used to help me get my vehicle
19 insurance and advise me on that kind of stuff.
20     Q.   Did she ever notarize your signature on
21 documents for you?
22     A.   Oh, I -- I can't recall right now.
23     Q.   You can't recall if you'd ever gone to her
24 to ask her to notarize your signature on a document?
25     A.   I mean, no.  I can't really recall

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 166

1 something like that right now.
2      Q.   Who do you use when you need a notary?
3      A.   Usually, I go to Bank of America.  They
4 usually have a notary on staff there.
5      Q.   Okay.  Do you know if Dina Garten is a
6 notary?
7      A.   I don't know.
8      Q.   So this person with the last name Lustig,
9 how long have they been a tenant at the farm?
10     A.   Since June.
11     Q.   June of this year?
12     A.   Yes.
13     Q.   How much rent do they pay?
14     A.   They pay 1500.
15     Q.   Is that one person, or is there a family
16 there?
17     A.   It's two people.
18     Q.   So that's Lustig and Renig, you said?
19     A.   Runion.
20     Q.   Runion.  Okay.  So between the two of
21 them, they're on the hook for 1500 a month?
22     A.   "On the hook" is a bit aggressive; but
23 sure, if you want to say it like that.
24     Q.   They have a lease for 1500 a month?
25     A.   Yes, they do.

Page 167

1      Q.   How long is their lease for?
2      A.   It's a year term.
3      Q.   And how do these rent amounts compare to
4 what was being charged prior to Magnus Veritas buying
5 or acquiring the farm?
6      A.   Very similar.  We have not changed Dina's
7 amount due.  The yellow house, where there was a
8 tenant, is now empty.  And Lustig is paying actually
9 the last and the previous tenant's.
10     Q.   Why is Lustig and Runion -- why are they
11 paying less?
12     A.   Because it's all they could afford, and I
13 wanted to meet them where they were at.
14     Q.   What's your relationship with them?  Did
15 you know them --
16     A.   They were --
17     Q.   -- prior to them becoming tenants?  Sorry.
18     A.   Say it again.
19     Q.   Did you know them prior to them being
20 tenants of the farm?
21     A.   No, I don't.  They came through a
22 recommended referral source from a friend.
23     Q.   What was the previous tenant paying a
24 month?
25     A.   We had one tenant that I set up at 1750,

Page 168

1 from August until June, and then they could no longer
2 afford it and chose to find somewhere else to live.
3      Q.   Who is that?
4      A.   Oh, Tyler and Ash.
5      Q.   Those were their first names?
6      A.   I choose not to answer that, please.
7      Q.   So that -- were you giving the first names
8 or were you giving the last names?
9      A.   Giving the last names.
10     Q.   So would you have done anything
11 differently in the farm transaction if you weren't
12 buying the property from your mom?
13     A.   No, I don't think so.  I think we really
14 did it by the book, to be aboveboard for this exact
15 purpose.
16     Q.   So you were anticipating a fraudulent
17 transfer suit?
18     A.   No.  I was being extra cautious to make
19 sure that no one could come after us for anything,
20 because we were doing everything absolutely legally.
21     Q.   Do you know that ZAP! had previously been
22 sued for fraudulent transfer?
23     A.   No, I did not.
24     Q.   Have you heard of Blue R Media?
25     A.   No, I have not.

Page 169

1      Q.   Did you get a home inspection in
2 connection with the residential purchase?
3      A.   I believe so.
4      Q.   And you think that you or GCS452
5 contracted for them?
6      A.   I don't recall right now.
7      Q.   Would you have done anything differently
8 in the residence transaction if you weren't buying it
9 from your mom?
10     A.   No.  We did our due diligence.  We paid
11 slightly above the market value for the house.
12     Q.   How did you determine what the market
13 value was?
14     A.   Kim Bernardi gave us her estimation.
15     Q.   And you just relied on that?
16     A.   We looked at comparables in the area.  We
17 recognized that the house is 20 years old.  Yeah, I
18 really don't think I would change anything else about
19 it.
20     Q.   Are there any title issues with the house
21 or the farm?
22     A.   What do you mean?
23     Q.   Do you know what a title issue is?
24     A.   Maybe not in this context.
25     Q.   Do you know what title insurance is?

Azuraye Wycoff
June 23, 2021

Page 170

1        A.   I could guess what that means.
2        Q.   Can you explain what your understanding of
3   title insurance is?
4        A.   No.  I'd rather you just explain it.
5        Q.   So you don't have an understanding of what
6   title insurance is for, do you?
7        A.   I would rather just have you explain it,
8   instead of making me feel like a silly child.
9        Q.   This actually isn't how depositions work.
10  You answer questions.  And if your answer is, "I don't
11  know what title insurance is," that's fine.  You can
12  just say that.
13       A.   Okay.  I don't know.
14       Q.   Okay.  Are you a board member at ZAP!?
15       A.   No, I don't believe so.
16       Q.   You're not a member of the board of
17  directors of ZAP!?
18       A.   No, I don't believe so.
19       Q.   Do you know who is on the board of
20  directors at ZAP!?
21       A.   I don't know.
22       Q.   Is there any property in Alaska that your
23  family has been involved with or owned at any point?
24       A.   Yes.
25       Q.   Can you describe what that is?

Page 171

1        A.   I don't really know that much about it.  I
2   think it's, like, 3 acres out in the middle of nowhere.
3        Q.   Do you know why it was purchased?
4        A.   No.
5        Q.   Do you know what's on it?
6        A.   No.
7        Q.   Do you know who owns it now?
8        A.   I'm not sure.
9        Q.   Do you know if that property was ever
10  sold?
11       A.   I don't know.
12       Q.   Do you know if that property was ever
13  transferred to Magnus Veritas, or GCS452, or either of
14  the trusts?
15       A.   I don't know off the top of my head.
16       Q.   Have you ever been there?
17       A.   No.
18       Q.   Do you know how taxes were paid on that
19  property?
20       A.   No, I don't.
21       Q.   Do you know if there was any insurance on
22  that property?
23       A.   I don't know anything about the property.
24       Q.   Okay.  Is there any other real estate that
25  was ever owned by your mother, father, or their

Page 172

1   businesses?
2        A.   I don't know.
3        Q.   Do you know if there was any other
4   personal property, that we haven't talked about yet,
5   that was owned by your mother, father, or their
6   businesses?
7        A.   I don't know.
8        Q.   Any other businesses owned -- well,
9   let's -- let's back up.  Do you know what businesses
10  your mother and father had an interest in?
11       A.   No, I don't.
12       Q.   We talked about SIRIUS, right?
13       A.   Uh-huh.
14       Q.   And that's -- and what was SIRIUS'S
15  relationship to ZAP!?
16       A.   I don't know.
17       Q.   What does GCS452 own?
18       A.   The residence.
19       Q.   How about the contents?
20       A.   The what?
21       Q.   How about the contents of the residence?
22       A.   Yes, included in the residence.
23       Q.   Anything else?
24       A.   I don't know.
25       Q.   You don't know -- you don't know what it

Page 173

1   owns?
2        A.   At this moment in time, no, I don't.
3        Q.   Who would know?
4        A.   I'm not sure.
5        Q.   You don't think it's part of your duties
6   as manager to know what GCS452 owns?
7        A.   I just can't recall at this time.
8        Q.   Has GCS452 sold any of the contents of the
9   house?
10       A.   No, not that I'm aware of.  It would have
11  gone through me.
12       Q.   Has GCS452 sold anything?
13       A.   Not that I'm aware of.
14       Q.   Has -- can you tell me what Magnus Veritas
15  owns?
16       A.   The farm, and the equipment, and the water
17  rights.
18       Q.   Anything else?
19       A.   I don't know.
20       Q.   Who would know?
21       A.   I don't know.
22       Q.   You're not sure who would know the full
23  extent of its property?
24       A.   Our legal counsel would likely know.
25       Q.   Who does taxes for GCS452?

EXHIBIT J

Azuraye Wycoff
June 23, 2021

Page 174

```
1       A.   Moss Adams.
2       Q.   Who decided to engage Moss Adams?
3       A.   I think they have been our tax accountants
4  for a few years.  It just made sense to keep working
5  with them.
6       Q.   And they were tax accountants for whom
7  when you say "we"?
8       A.   My family.
9       Q.   So was Robert Henke involved in any tax
10 preparation?
11      A.   Yes, I believe so.
12      Q.   So who did the taxes; Moss Adams, or
13 Robert Henke, or both?
14      A.   I'm not certain of those finer details.
15      Q.   So did you make the decision to keep both
16 Robert Henke and Moss Adams involved in your family's
17 tax affairs?
18           MR. ABELMAN:  Object to foundation.
19      A.   It was a collective agreement, my family,
20 through guidance.
21      Q.   (BY MR. GOLDHAMER)  How about taxes for
22 Magnus Veritas?
23      A.   Same.
24      Q.   It's Moss Adams and Robert Henke?  Is that
25 a yes?
```

Page 175

```
1       A.   I'm not totally certain who does which.
2       Q.   Do you have a personal accountant?
3       A.   Yeah.  Tim Beyl, through Moss Adams.
4       Q.   And he helps prepare your personal tax
5  returns?
6       A.   Yes.
7       Q.   Who does taxes for the trusts?
8       A.   Oh, I'm pretty sure that's also Moss
9  Adams.
10      Q.   Okay.  Did you make that decision, or was
11 that a collective decision between you, your mom,
12 Devon, and your legal counsel?
13      A.   Yes, a collective decision.
14           MR. GOLDHAMER:  Okay.  Well, I've got some
15 more questions, but I know that you made an appointment
16 at 4:00 in Boulder; is that right?
17           THE DEPONENT:  It's a farm event.  It's at
18 5:00.  I would really like to be able to get back there
19 by 4:00, so I can set up and prepare and greet
20 people.
21           MR. GOLDHAMER:  Okay.  So that was -- that
22 was my understanding from your counsel, that you needed
23 to leave at 3:00.  Can we get a total runtime on the
24 depo so far?  That's a question for the videographer
25 and/or court reporter.
```

Page 176

```
1           THE VIDEOGRAPHER:  Oh, I can.  We would
2  just need to go off the record for me to calculate it.
3           MR. GOLDHAMER:  Okay.
4           THE VIDEOGRAPHER:  Is that okay if I -- we
5  go off?
6           MR. GOLDHAMER:  Yes.
7           THE VIDEOGRAPHER:  Okay.  We're going off
8  the record at 8:53 p.m. UTC time or 2:54 p.m. Mountain
9  Time.
10          (Discussion off the record.)
11          THE VIDEOGRAPHER:  We are back on the
12 record at 8:58 p.m. UTC time or 2:58 Mountain Time.
13          MR. GOLDHAMER:  Ms. Wycoff, we just had a
14 break, and we were talking off the record.  And as we
15 discussed earlier, you have an engagement up in Boulder
16 that you'd like to get to.  So we are not going to
17 conclude this deposition today.  We're going to keep it
18 open, and we'll be in touch about scheduling the
19 remainder of your deposition at another date.  Steve,
20 do you want to -- and we're hoping to get that done in
21 the next couple weeks.  Steve, do you have anything to
22 add to that?
23          MR. ABELMAN:  I do not.
24          MR. GOLDHAMER:  Ms. Wycoff, I want to
25 thank you for patience today.  And we'll conclude for
```

Page 177

```
1  today, but keep the deposition open.
2           THE REPORTER:  And, Mr. --
3           THE VIDEOGRAPHER:  This concludes --
4           THE REPORTER:  Go ahead, Cole.
5           THE VIDEOGRAPHER:  This concludes part 1
6  of the videotaped deposition of Azuraye Wycoff.  We are
7  going off the record at 8:59 p.m. UTC time or 2:59 p.m.
8  Mountain Time.
9           (The following proceedings were held
10 outside the videotaped deposition.)
11          THE REPORTER:  Mr. Abelman, would you like
12 the witness to read and sign her transcript?
13          MR. ABELMAN:  Yes.
14          THE REPORTER:  Would you like an etran and
15 a copy of the exhibits scanned to you?
16          MR. ABELMAN:  Please.
17          THE REPORTER:  Mr. Goldhamer, would you
18 like an etran and another copy of the exhibits scanned
19 to you?
20          MR. GOLDHAMER:  I would like an etran.  I
21 don't think we're going to need -- well, we may want an
22 official copy of the exhibits.  I'm going to be
23 emailing you and Mr. Abelman copies of the exhibits I
24 used today.  I believe it was 1 through 6.  And
25 hopefully that will take care of that.
```

## Page 178

1    THE VIDEOGRAPHER:  And then did either of
2  you want a copy of the video?
3    MR. GOLDHAMER:  Sorry.  What was that?
4    THE VIDEOGRAPHER:  Sorry.  Did either of
5  you want a copy of the video?
6    MR. GOLDHAMER:  We are going to want a
7  copy of the video.
8    THE VIDEOGRAPHER:  And then is email
9  delivery fine?
10    MR. GOLDHAMER:  Yes.
11    WHEREUPON, the within proceedings were
12  adjourned at the approximate hour of 3:01 p.m. MDT on
13  the 23rd day of June, 2021.
14        *     *     *     *     *
15
16
17
18
19
20
21
22
23
24
25

## Page 180

1            REPORTER'S CERTIFICATE
2  STATE OF COLORADO      )
                         )  ss.
3  CITY AND COUNTY OF DENVER )
4        I, GAIL OBERMEYER, Registered Professional
5  Reporter and Notary Public ID 19994012647, State of
   Colorado, do hereby certify that previous to the
6  commencement of the examination, the said AZURAYE
   WYCOFF verbally declared her testimony in this matter
7  is under penalty of perjury; that the said deposition
   was taken in machine shorthand by me at the time and
8  place aforesaid and was thereafter reduced to
   typewritten form; that the foregoing is a true
9  transcript of the questions asked, testimony given, and
   proceedings had.
10    I further certify that I am not employed
   by, related to, nor of counsel for any of the parties
11  herein, nor otherwise interested in the outcome of this
   litigation.
12
        IN WITNESS WHEREOF, I have affixed my
13  signature this 1st day of July, 2021.
14    My commission expires May 20, 2023.
15
          _____
16    Gail Obermeyer, RPR
      Registered Professional Reporter
17    Notary Public, State of Colorado
18
19
20  __X__ Reading and Signing was requested.
21  _____ Reading and Signing was waived.
22  _____ Reading and Signing is not required.
23
24
25

## Page 179

1        I, AZURAYE WYCOFF, do hereby certify that
2  I have read the above and foregoing deposition and that
3  the same is a true and accurate transcription of my
4  testimony, except for attached amendments, if any.
5        Amendments attached    ( ) Yes   ( ) No
6
7
8
9    _____
        AZURAYE WYCOFF
10
11
12    The signature above of AZURAYE WYCOFF was
13  subscribed and sworn to or affirmed before me in the
14  county of _____, state of Colorado, this _____
15  day of _____, 2021.
16
17
18
19    _____
        Notary Public
20    My commission expires
21
22
23
24
25  Midlab, Inc., 6/23/21 (go)

## Page 181

1  Errata Sheet
2
3  NAME OF CASE: MIDLAB vs ZAP! PRODUCTS, INC., a Colorado Corporation
4  DATE OF DEPOSITION: 06/23/2021
5  NAME OF WITNESS: Azuraye Wycoff
6  Reason Codes:
7     1. To clarify the record.
8     2. To conform to the facts.
9     3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25    _____

Azuraye Wycoff
June 23, 2021

---

### Exhibits

EX 0001 Azuraye Wycoff 062321
   3:9 64:2,4
EX 0002 Azuraye Wycoff 062321
   3:11 64:7,8
EX 0003 Azuraye Wycoff 062321
   3:13 67:24, 25 68:23,24
EX 0004 Azuraye Wycoff 062321
   3:14 104:6, 7,10
EX 0005 Azuraye Wycoff 062321
   3:17 109:8, 9,12
EX 0006 Azuraye Wycoff 062321
   3:19 112:14, 16,18

---

### $

$10,000
   106:10
$2
   107:20
$2.5
   156:23
$250,599.41
   109:15
$3
   108:2
$50,000
   106:12

$500
   44:22
$500,000
   158:8
$550,000
   98:15
$80,000
   41:15
$90,000
   40:19

---

### 0

02143
   45:21

---

### 1

1
   64:2,4
   107:20,21
   158:20
   177:5,24
10
   60:18
1030
   164:9
1099
   39:15 40:7,
   17,20 41:3,
   10 43:14
   44:18
10:20
   45:11,12
10:31
   45:12,14
11:41
   89:21,23
11:44
   89:23,25
11:55
   96:18,19
12
   47:23
12:25
   96:15

12:30
   96:19,21
13
   38:1
15
   96:10 161:10
1500
   166:14,21,24
15th
   90:5,9,19
16
   47:18 88:24
17
   64:11,19
1750
   167:25
17th
   63:3 65:9
   90:10
18
   30:19,20
   45:20
1991
   88:24
1993
   89:1
19th
   62:15 63:8
1:54
   149:20,22

---

### 2

2
   43:25 64:7,8
2.5-
   144:3,11
20
   43:7 44:1
   60:16 146:18
   169:17
20-
   49:12
2011
   47:23

2013
   47:21
2014
   47:21
2015
   27:20
2016
   29:21 38:3
2017
   30:1 31:2
   34:8 36:13
   44:16 52:24
   53:3,12,22
   54:8,9 62:6,
   16 63:3,8
   86:17 91:12,
   17
2018
   31:4,6 36:13
   37:9 38:16
   40:22,24
   43:3 48:18
   49:12 64:11,
   19,21 65:9,
   13,21 66:19,
   22,25 86:15
   109:21
   113:15
2019
   32:16,19,21
   33:20 40:23
   41:4,8,9
   43:4 82:3
   86:6,13,15
2020
   26:25 32:23
   33:21,25
   41:4,9,13,18
   42:17 60:2
   86:13 90:19
   91:18 156:10
2021
   4:25 40:11
2077
   29:11
20th
   66:25

---

Azuraye Wycoff
June 23, 2021

**22nd**
  65:24
**23**
  4:25 65:13
**23rd**
  65:17,24
**2500**
  155:23
**27**
  64:21
**27th**
  65:9,17
**28**
  62:6
**2:15**
  149:22,24
**2:54**
  176:8
**2:58**
  176:12
**2:59**
  177:7
**2nd**
  65:20,25

――――――――――
         **3**
――――――――――

**3**
  67:24,25
  68:23,24
  171:2
**3.3**
  143:24
  144:25
**3.3-**
  144:11
**30**
  43:7,11
  96:12,13
**30-minute**
  96:14
**3018**
  46:5
**3:00**
  149:13
  175:23

**3:03**
  5:1
**3:15**
  7:10
**3rd**
  63:18 89:1
  113:15

――――――――――
         **4**
――――――――――

**4**
  104:6,7,10
**4-**
  29:1,16
**4/16/2018**
  105:22
**45**
  89:18
**45-second**
  89:11
**452**
  97:21
**4:00**
  175:16,19
**4:20**
  45:10
**4:31**
  45:14
**4th**
  66:6,7

――――――――――
         **5**
――――――――――

**5**
  60:18 109:8,
  9,12
**5,000**
  29:1,16
**5/3/2018**
  112:22
**50**
  60:14
**50,000**
  52:21
**50-50**
  129:13

**500-**
  144:7
**55,000**
  30:11
**5:00**
  175:18
**5:41**
  89:21
**5:44**
  89:25
**5:55**
  96:18
**5th**
  66:2

――――――――――
         **6**
――――――――――

**6**
  112:14,16,18
  177:24
**60**
  35:17 36:18,
  24
**60-**
  41:7,15
**6:30**
  96:21

――――――――――
         **7**
――――――――――

**7**
  109:21
**700,000**
  144:7
**7:54**
  149:20
**7th**
  66:19

――――――――――
         **8**
――――――――――

**8**
  66:10
**80**
  35:18 36:18,
  24

**80-**
  41:7
**80302**
  46:6
**818-399-2000**
  54:20 55:1
  57:7
**8:15**
  149:24
**8:53**
  176:8
**8:58**
  176:12
**8:59**
  177:7
**8th**
  66:22

――――――――――
         **9**
――――――――――

**9:03**
  5:2
**9:06**
  7:6
**9:15**
  7:10

――――――――――
         **A**
――――――――――

**a.m.**
  5:2 7:6,10
  45:11,12,14
  89:21,23,25
  96:19
**Aaron**
  5:23 6:17,22
  12:24 42:21
  64:24 69:7
  81:3 89:10
  115:16
  116:21 119:9
  124:7 149:10
**Abelman**
  5:25 6:22
  9:4,18 12:24
  16:3,8,14
  17:4 19:10

20:24 21:22,
25 22:9
24:13 31:20
42:21 45:7
55:25 64:24
65:3,7 68:15
69:5,9,12,15
76:4 78:1
79:7 81:3,8
89:10,15,19
96:12,16
114:2,16
115:16,22
116:5,13,20,
24 117:3,17,
22 118:18
119:9,15
124:7,11,13,
23 125:3,4,
10,12,13,17,
24 126:2,3,
7,12,16
127:21
130:11,17,21
132:17 134:3
135:13
140:11,21
147:7 149:10
162:17 163:4
174:18
176:23
177:11,13,
16,23
**ability**
150:9
**aboveboard**
168:14
**abroad**
47:17,18,25
48:5
**absolutely**
18:3 96:2
119:5 168:20
**accepted**
29:25 127:6
**access**
50:10 120:7
153:3 159:12

160:7 161:14
**accessed**
153:16
**accesses**
153:13
**accident**
81:23 86:8,
9,10,12,15
89:5
**accomplished**
61:19
**account**
49:22,24
50:12,13,25
58:12 110:11
113:10
119:22
120:1,4,12,
14 133:11
136:25
137:15
139:16
150:3,4,5,9,
20 152:2,3,
10,13,16,17,
18,19,21,24
153:2,6,14,
16 154:9,11,
19,24
**accountant**
175:2
**accountants**
174:3,6
**accounts**
50:1,2,7,9,
11,19 58:14
110:25 111:2
136:22
137:18,19
153:12
154:15
**accrue**
140:17
**accruing**
121:2
**accurate**
117:9 128:24

143:5
**accurately**
115:13
**acknowledge**
5:13,16
**ACL**
63:11
**acquire**
19:13 88:16
**acquired**
164:13
**acquiring**
167:5
**acreage**
157:17
**acres**
171:2
**act**
163:8
**action**
5:7 15:4
61:17 77:15,
23 163:6
**Active**
61:15
**activity**
158:2
**actual**
73:16 79:4
143:19 144:9
148:14
**Adams**
174:1,2,12,
16,24 175:3,
9
**add**
176:22
**additional**
12:23 38:18
60:18 80:17
138:16
145:25 158:7
**address**
28:6,9 29:9
30:12,24
35:25 45:19
53:16 54:3,

6,14 104:24
105:4 109:15
112:12,22
**addressed**
112:7 139:9
**addresses**
53:19,20,21
**admin**
84:25
**administered**
5:16
**administrative**
43:9 151:22
**admonition**
22:3,14
**adult**
71:9 72:6
**adults**
88:9
**advance**
95:5
**advantage**
125:10
**advice**
130:23
136:12
142:21
165:12
**advise**
165:19
**advised**
110:2 130:15
142:22
**advisor**
93:3
**advisors**
9:14,16
15:3,6,23
37:17
111:13,17
113:13 120:8
126:20
**advocate**
123:11
**affairs**
27:22 76:3

Azuraye Wycoff
June 23, 2021

174:17
**afford**
167:12 168:2
**afternoon**
45:3
**age**
127:2
**agency**
28:4,21
29:5,8,25
34:8 102:10
149:4
**agent**
17:3 148:20,
24 149:8
163:17
**aggressive**
166:22
**agree**
5:24 55:25
**agreed**
127:17 128:4
131:24
**agreeing**
98:12
**agreement**
4:9 5:21,22
15:12 36:19
75:2,3 77:18
78:7 127:11,
13,17,18
140:9 174:19
**agreements**
73:10
**Agroecology**
52:14
**ahead**
76:17 115:24
117:23
163:10 177:4
**aid**
62:22
**air**
90:10
**Airport**
66:11 67:8

**Alaska**
170:22
**Allen's**
164:21
**Allied**
50:5
**allocated**
132:4 133:6
134:8
**allocations**
133:5
**allotment**
155:14
**allotted**
161:21
**Amended**
10:14,16
**America**
50:20 51:1
87:25 111:6
166:3
**amount**
23:25 41:14
47:24 106:16
107:18
112:12 127:7
157:17 167:7
**amounts**
141:10 167:3
**Amtrak**
47:8,10
**and/or**
4:10 19:9
40:17 175:25
**answering**
7:25 16:17
24:15,17
39:7
**answers**
113:1 119:12
**anticipating**
168:16
**antiques**
147:19
**anybody's**
111:23

**apartment**
28:14 32:20
33:14
**Apartments**
28:15
**apologize**
95:5
**app**
153:18
**apparently**
31:22 127:25
**appeared**
59:8
**appended**
68:16
**apply**
16:25
**appointment**
175:15
**appointments**
87:25
**appraisal**
143:17
146:19
147:14
**appraised**
143:19
**approach**
149:11
**appropriately**
165:13
**approval**
137:15
139:17
150:11
**approved**
136:24
**approximate**
28:23 30:9
40:16 41:2
107:25
**approximately**
43:6 108:1
**apps**
58:17 59:2
**archive**
57:22

**area**
32:11 61:21
151:12
169:16
**argue**
124:16
**argumentative**
125:25
**arm's**
24:2
**arose**
21:9,10
**arrange**
87:25
**arranged**
98:14
**arrangement**
5:19
**arrive**
15:19
**art**
147:11,17
**artwork**
122:6
**Ash**
168:4
**Asian**
48:13,14
**aspect**
22:19 23:23
39:16
**aspects**
39:15
**assessed**
143:19
146:10
**assessing**
157:24
**assessment**
161:18
**assessments**
158:23
**assessor**
144:6
**assets**
24:1,5,20
73:12 92:4

117:15,20
123:15
131:20 133:3
134:15,18
136:2,7,16
137:7
**assist**
135:6 140:2
**assistance**
43:20
**assistant**
9:8 40:9
**assistant-**
84:25
**assume**
73:19
**assuming**
92:24
**assumption**
73:14,17
93:1 99:4
**astrology**
99:8
**attachment**
123:13
**attendees**
61:14
**attention**
41:17 74:4
**attorney**
110:17
161:17
**attorney-**
**client**
4:10 15:25
16:16 21:1,
23
**attorneys**
5:12 16:21
22:5,6
**audible**
8:7
**August**
34:13 36:12,
13 37:10
40:24 41:4
42:17 43:3,4

48:18 60:7
66:19,22,25
88:24 168:1
**aunt's**
62:10
**Australia**
49:10,17
86:3,6
**authority**
110:18
138:10,17,23
150:4
**authorization
s**
137:10
**authorized**
137:6
**automatic**
55:18
**automatically**
55:14
**Ave**
30:19,20
32:19,21
33:1,4 35:24
45:20 100:12
101:8
**average**
43:11
**aware**
4:6 56:18
57:17 58:23
80:23 98:20
107:13 108:6
122:17,19
137:23
138:19
141:15
145:23 146:5
165:4,15
173:10,13
**awareness**
59:23 61:22
**Azuraye**
4:24 6:11
13:1 55:6
57:12 128:18

135:21 136:5
177:6
**Azuraye72**
58:8
**Azuraye@
blueskyconsul
ting.group.**
54:5
**azuraye@gmail**
54:16
**azuraye@
gmail.com**
53:23 57:12
**azuraye@
mysmallhaul.
com.**
54:7
**azurayewycoff
@gmail.com.**
53:24

**B**

**baby**
62:2
**baby-sitting**
152:13
**back**
7:9,12 24:7
31:10 34:7
41:12,13,19
42:20 45:13,
16 46:11,19
47:13 48:22,
24 49:1 53:2
60:5,9,10
65:25 66:17,
25 67:4,6,7,
19 70:5
75:22,25
76:1 82:13,
18 85:20
89:24 90:5,8
91:15 95:17,
19 96:14,20
101:22
105:6,20,25

107:17
108:15
120:23,25
132:19
137:24 141:9
144:4 146:14
149:23
150:22 151:6
155:24
156:12,21
172:9 175:18
176:11
**back-end**
108:17
**background**
27:11 42:25
95:12
**bad**
81:22 123:5
**badgered**
125:6
**badgering**
124:8
**bank**
49:21,23
50:11,13,20
51:1 87:25
110:11,19,
22,24,25
111:6 133:11
136:18
139:6,11,22
152:2 166:3
**banked**
111:6
**banking**
138:23
**banks**
50:4,6,19
87:24 138:24
**Bartelt**
5:4
**base**
164:12
**based**
39:25 133:12

basic
   151:22
basically
   47:14 76:23
   86:20 90:16
   100:15
basis
   25:14,22
bathroom
   42:22 89:11
BC24
   72:20,23
begin
   115:17
beginning
   19:15
behalf
   5:5,9,25
   116:2 138:11
   143:6
behave
   163:7
behind-the-
   scene
   84:24
behind-the-
   scenes
   84:21
belaboring
   126:5
belief
   24:9
Belmont
   62:11
belong
   54:18 115:11
belonged
   122:21
belongings
   90:14 96:3
belongs
   114:21
beneficiaries
   127:20
beneficiary
   93:22 94:5,
   18 135:2,11

137:3
Bernardi
   143:18
   169:14
Beyl
   175:3
big
   71:12 88:10,
   14 102:11
   108:11 160:4
Bill
   99:9,14,18,
   24 100:1
   150:22
bills
   15:16 124:9
birth
   88:23,25
bit
   12:25 19:11
   27:12 114:18
   125:17
   166:22
bits
   26:5
blood
   91:3
bloomfield
   71:12,17,21,
   23 72:1,5,
   11,19,22,24
   73:2,5,13,20
   74:1 78:12,
   13 120:18,20
   121:16,18
   123:1,24
   124:4,5,22
   125:23
   127:6,11,14,
   17,18 128:1
   140:18
   141:3,11,12
   155:13
blown
   123:7
Blue
   50:15,25

51:3 52:11,
   17 54:4
   168:24
blur
   95:22
blurry
   45:18
BNY
   111:7,11,22
   130:7 133:18
   136:23 137:6
board
   170:14,16,19
bodywork
   52:4
bono
   51:10,14,17
book
   151:25
   168:14
Boston
   29:24 32:12
   33:22 34:4,7
   38:13 40:1,3
   42:2,7
   46:12,16
   52:24 58:11
   60:15 64:18
   65:11 66:3
   67:1,4,6,15
   70:6 81:18
   87:21 91:16
   95:7 100:4
   105:18,19,
   23,24
bothering
   159:24
bottom
   62:5 119:8
bought
   31:7 32:22
   33:24 38:1,8
   163:20
Boulder
   27:18 40:2,3
   41:19 44:4
   46:4,5 47:13

53:2 60:17
   63:1 65:10,
   18,25 67:8
   84:9 95:17,
   20 99:16
   103:18
   175:16
   176:15
bouncing
   33:1
boy
   34:18
brain
   82:10 83:7
   90:12
branch
   40:3,4
breach
   116:4 127:18
breaching
   115:20
   116:10
break
   8:22,24,25
   42:22 43:1
   45:2,17 66:7
   89:11 96:8,
   14 97:10,16
   149:11,16
   176:14
breaks
   8:19,25
Brighton
   30:15
bring
   60:10 124:19
bringing
   31:19
Broadway
   83:20,24
broken
   63:10
broker
   133:16
Broomfield
   28:2,7,10,13
   29:4

Azuraye Wycoff
June 23, 2021

**Brownstein**
  15:8,9,13,
  15,18,22
  16:1 17:3,15
  18:8 19:6,
  19,24 20:8,
  12 102:21,24
  140:4,6
  142:17
**BTS**
  84:20
**build**
  61:21
**building**
  34:21 159:21
  160:5
**business**
  25:7 38:7,11
  39:25 50:11,
  13,14,15
  51:22 52:5
  74:23 77:2
  92:2,5
**businesses**
  18:18 25:9
  114:8 153:11
  156:14
  172:1,6,8,9
**businesses'**
  113:19
**busy**
  33:10
**butt**
  39:9
**button**
  4:21
**buy**
  17:22 21:12,
  20 22:7,16
  23:1,2,7
  77:10 120:17
  123:21 124:3
  132:22
  140:19 144:2
  155:7,9
**buyer**
  18:1 121:1

  123:9 142:25
**buying**
  21:8 57:3,15
  155:11 167:4
  168:12 169:8

---

### C

**calculate**
  176:2
**call**
  23:24 52:2
  89:13 95:10
  123:6 160:17
**called**
  28:15 35:4
  37:4 70:18
  98:19
**calling**
  68:24
**calls**
  16:3 20:3
  70:11,14
  111:20
  115:22
**calm**
  124:11,13
  125:17
**Calwood**
  90:11
**Cambridge**
  63:4 105:17
**Cannon**
  65:21,22
**capacity**
  132:14 134:6
  135:22
**Capital**
  78:13 125:23
**car**
  108:22
**care**
  82:19 156:2
  177:25
**career**
  25:24

**carrier**
  55:3
**carry**
  85:12
**case**
  9:8 55:22
  56:4,10,13,
  16,21,24
  58:4,21
  65:2,4 79:24
  80:21 90:18
  92:20 131:13
  139:3
**cases**
  79:18
**cash**
  75:14 108:11
  128:7
**caused**
  89:7
**causing**
  23:21 89:4,5
**caution**
  16:14 20:24
  21:22
**cautious**
  18:13 78:10
  168:18
**cell**
  55:2
**cellphone**
  54:19
**center**
  158:11
**central**
  37:5 42:11
  97:21,24
**ceremony**
  96:6
**Certisimo**
  90:22 92:1
**CF**
  82:11
**chance**
  160:18
**change**
  29:3,22

  70:16 83:19
  119:16
  164:17
  169:18
**changed**
  138:14 167:6
**characterize**
  69:3
**charged**
  75:10 167:4
**Charles**
  33:19,21
  38:1,7,13
  66:3 133:15
**Charlie**
  33:15
**charming**
  62:2
**chart**
  97:22
**check**
  75:14 108:25
  109:13 110:1
  112:2,11,20,
  24 145:8
  153:17
**checking**
  152:18
  154:11
**checks**
  108:14 109:1
  119:21
  136:21
  139:15,19,
  23,24 150:2,
  5,13,16
  164:19,22
**chief**
  95:11
**child**
  170:8
**China**
  30:8 47:18
  48:6,7,9
**China-focused**
  28:4,21

Azuraye Wycoff
June 23, 2021

Chinese
27:22 48:11
Chinese-based
29:25 34:8
choose
42:23 100:25
168:6
choosing
117:13 119:1
chose
168:2
Christmas
53:8,9 63:23
chunk
39:9
cinch
42:1,6
circumstances
59:16 137:9
Civil
4:2
claim
101:23
102:3,14
103:4,8,14
104:1 106:2
113:25 114:8
claimant
104:22
Claimant's
104:11
claimed
114:15
claiming
114:14
claims
89:3 103:12,
19 104:13
111:16
clarification
8:15
clarify
11:14,25
91:1 96:24
105:21
clarity
90:7

click
4:21
client
15:9
climbing
37:3
close
22:1 81:11
closest
25:25
closing
86:23
club
62:21
co-founders
35:4
co-partners
105:11
co-trustee
131:23
135:23
coaching
22:1
Coast
62:13
code
100:20,23
cold
91:23
Cole
5:4 6:25
177:4
collaborate
59:19
collateral
113:18,24
114:6
collective
77:13,23
174:19
175:11,13
collectively
139:1
college
27:16 43:13
47:19,23
48:16 84:7

Colorado
5:6 27:17
28:3 31:10
40:2 41:13
46:5,18,19
90:8
combination
15:1 129:22
comfortable
31:19 78:22
163:12
commence
16:1
commercial
158:2
commission
28:25
commit
58:3
commitment
55:16,21,23
common
77:18
communicate
54:15 58:17
59:3 81:19
87:15 145:14
communicated
87:10 91:11
communicating
145:22
165:13
communication
20:7,9,12
57:9 58:20
67:18 70:18
71:10 87:12
communications
55:22 56:15,
24 87:1,2
130:18
community
61:15
companies
10:22,25
11:2,16,20

12:16,18
14:11 17:18,
22 19:12
24:4 78:12,
18 80:8
97:18 101:24
122:16,18
129:15
companies'
14:4
company
17:20 34:21,
24 38:23,25
39:2 42:14
88:2 99:3
100:14
109:14
151:24
161:5,7,11
comparable
144:3,16
145:2
comparables
144:25
169:16
compare
167:3
compared
148:14
competently
78:20 79:2
complaint
9:15 10:2,
13,14,16,19,
20,23 11:24
12:4 13:23
24:1,24
26:20 27:9
completely
71:7 147:25
complex
28:14
compliance
18:10,11
complicated
102:17
103:24

Azuraye Wycoff
June 23, 2021

126:22
142:20
**component**
52:18
**components**
157:15 159:4
**concerned**
22:11 74:2
**concerted**
77:15
**conclude**
176:17,25
**concludes**
177:3,5
**conclusion**
16:4 115:23
**conclusions**
22:10
**concussion**
85:21
**conducted**
137:13
158:25
**conflating**
78:2
**conflict**
39:7
**confused**
19:10
**confusing**
8:14
**Conigliaro**
38:1
**connection**
26:8,10
57:15 156:22
157:2,13
169:2
**consent**
5:19 6:1,5
**consequences**
88:11
**conservation**
159:5,8,14,
17,21 160:8,
18

**consideration**
141:7
**consistently**
26:1
**consoling**
88:11
**constant**
67:18 70:18
**construction**
34:20 37:19
132:10 160:5
**consult**
19:5,17
137:4 140:7
**consultant**
39:17,19
**consultation**
20:7 123:3
136:14
**consulted**
9:14 15:3
18:6,8 88:19
120:8
**consulting**
34:19 40:20
50:15,25
51:4,7,10,11
52:11 133:24
136:3
**consults**
135:10
138:22
**contact**
15:18 70:9,
12 163:5
**contacted**
103:7
111:18,19
**contents**
130:18
148:10,14
172:19,21
173:8
**contest**
8:20
**context**
10:24 61:24

76:21 99:1
114:11,17,19
115:4,8
169:24
**continue**
105:6
**continued**
29:7
**continuing**
140:17 148:4
**contract**
51:6 115:21,
25 116:4,6
**contracted**
169:5
**contractor**
39:15,20
40:7,14
44:19
**contracts**
116:3,11
132:12
**control**
161:11
**controversy**
65:5
**conversation**
11:12,15
12:7,11,12,
15,19 13:18
85:12 94:8
**conversations**
4:8,10 12:20
13:6,13
16:19 20:25
21:2 25:19
26:3,5
**conversion**
31:7 32:22
**cook**
51:24
**coordination**
20:9
**copies**
177:23
**copy**
27:9 177:15,

18,22
**corner**
4:22
**correct**
9:4 11:17,
18,21,22
19:2 20:16
33:23 34:2,9
38:9 40:5
46:9,10,13,
14 52:24,25
55:9 56:23,
25 57:1,7,
12,19,20
63:4 64:19,
23 66:17,18
67:1,2,17,18
72:20 77:25
84:8 86:6,7,
8,24 94:12,
13,21,22
120:2 124:22
**correctly**
120:10
**cost**
144:5 158:7
**costume**
83:19
**cottage**
162:4
**counsel**
4:24 5:19
6:17 19:20
21:3,19
23:4,6 67:19
77:8,14
88:21
102:16,19,20
104:4 108:20
120:9 121:5
123:3 127:5
128:14,23
129:10,22
130:10,19
133:13,24
134:20
135:17
136:11

Azuraye Wycoff
June 23, 2021

140:24
141:22
142:18
157:14
173:24
175:12,22
**countries**
47:15 49:9
**country**
47:9,11
48:10
**County**
46:5
**couple**
6:18 7:21
17:10 42:25
53:14,25
87:8 143:14
176:21
**court**
7:17,23
64:1,5,9
68:1 79:18,
24 80:16,20
104:8 109:10
112:17
124:19
175:25
**cousin**
90:24,25
91:3
**cover**
16:6
**covered**
164:12
**Craigslist**
36:7,10
**create**
17:20 77:10
128:22
**created**
23:20 51:5
129:8
**creating**
4:13 34:23
39:1

**credit**
23:18
**creditors**
71:25
117:15,21
**creepy**
64:25 67:11
**cremation**
96:4
**cryptic**
100:20,23
**CU**
84:9
**Cudney**
103:1 130:11
**Cunningham**
29:11
**current**
164:17
**cursive**
68:2
**customers**
52:10
**cycle**
40:25

---

**D**

---

**dad**
21:15 23:12,
22 24:1,25
25:9,13,20
26:4 70:7,15
71:8,24
76:15,22
77:2 81:1
87:22 88:13
91:21 93:8,
10,15,20
94:3,6,10,21
95:7,25
101:24
131:12
142:21
147:1,18
154:12,16
156:14

**dad's**
23:18 25:23
72:8 90:24,
25 92:2,5
100:3 121:24
122:11,12
**daily**
81:15 121:2
156:1
**darting**
13:3
**date**
44:17 82:15
88:23,25
90:6 105:21
109:20
176:19
**dated**
112:22
**dates**
32:18 37:6
54:24 84:6
130:5
**daughter**
18:22
**day**
70:10 95:18
**days**
70:10 84:15
87:9
**deal**
21:12 23:20
70:20 71:2,
5,23 72:6
79:18 96:5
107:6
120:21,24
143:7,24
**dealing**
39:7 87:17
103:13
133:22
142:20
**dealt**
87:20
**death**
17:9,10,14

72:8 76:7
100:3 121:24
151:20
**debt**
78:14 79:6,
12 80:12,15,
18,24 121:9
141:4 155:16
**debts**
73:24 74:5,
8,11 78:11
80:7
**December**
26:24,25
49:12 52:23
63:3 86:6
**decent**
47:24 48:4
**decided**
60:9 121:5
130:13
144:21 174:2
**decision**
15:2 17:25
19:8,13,18
77:13 78:9
88:14,16
115:2 123:4
126:22
128:10,11,
13,15,16,21
132:21
133:25
134:7,10,11,
21 135:10,18
136:12 137:2
139:1 140:3
141:11
174:15
175:10,11,13
**decision-maker**
18:16 151:23
**decision-making**
76:24 120:7
132:6 138:17

Exhibit J

Azuraye Wycoff
June 23, 2021

decisions
  18:23,25
  76:9,23 77:7
  88:10,22
  108:24 127:4
  131:4,18,20
  132:1,3,9,
  10,13,20
  133:2,4,23
  134:1,4,14,
  17,20,24
  135:4,7,19,
  22 136:1
  138:10
  147:23
declare
  5:17 6:3,6
declared
  6:12
declining
  118:12
  163:13,15
deep
  24:6 101:6
  123:13
  156:20
defendants
  6:1
defer
  22:20 76:17
  148:17
deferred
  148:6
delete
  55:12 57:22
deletes
  55:14
deleting
  55:21 58:3
deletion
  55:18
Denver
  5:6 46:12
  49:1 67:8
  82:18
department
  95:11

depended
  44:5
depending
  43:23 44:1
depends
  51:12 125:13
  134:7
depo
  175:24
DEPONENT
  6:5,9 31:17
  43:2 45:6
  96:10 118:21
  130:20,25
  149:14,18
  162:15
  175:17
deposit
  110:9
deposited
  110:14
  112:2,9
  113:6,9,11,
  14 119:22,25
  120:11 130:7
  164:23
deposition
  4:17,24
  5:13,14,15
  6:19 7:15
  46:8 64:4,8
  67:25 104:7
  109:9 112:16
  176:17,19
  177:1,6,10
depositions
  170:9
deposits
  137:18,19
describe
  30:4 51:4
  59:14 80:14
  81:11 137:9
  156:15 157:1
  170:25
design
  38:25 39:17

43:19 51:23
  52:4,15
  61:16
designers
  51:21 52:14
desire
  24:18
destroyed
  90:11
detail
  79:1
details
  53:15 76:14
  103:11,23
  144:18
  174:14
determine
  56:4 169:12
develop
  39:17
developed
  21:2
development
  51:8
Devon
  13:6 54:15
  55:7,9 72:13
  81:10,13,19,
  21,22 85:11
  87:2,11
  88:3,5,16
  104:2 112:11
  128:12,17,22
  135:5,8,9,
  12,20 136:4
  142:7 145:22
  156:2 175:12
Devon's
  88:25 89:2
  130:14
  132:2,20
died
  15:5 18:17
  47:8 48:1
  70:7,15 71:8
  76:22 77:3
  81:1 87:22

91:21 93:8,
  10,15,20,23,
  25 94:3,6,
  10,21 95:7
  101:24 102:1
  147:1 150:25
  151:2
differently
  168:11 169:7
diligence
  121:1 157:2,
  4,7,12
  160:15,21,24
  161:4 169:10
Dina
  164:4,7
  165:7 166:5
Dina's
  167:6
directed
  99:24
directly
  98:9 102:2
  120:19
  121:16,18
  123:1 124:5,
  21 125:21,23
  155:13
directors
  170:17,20
disagree
  25:3 116:23,
  24
disagreed
  136:6
disagreement
  136:14
disclose
  31:15,18
  32:3 130:18
disclosing
  16:18
discuss
  10:17 31:20,
  23 56:1
  76:12 103:19

EXHIBIT J

Azuraye Wycoff
June 23, 2021

| | | | |
|---|---|---|---|
| **discussed** | **domino** | **East** | **employees** |
| 10:21 22:5 | 23:20 | 62:13 | 153:24 |
| 87:18 88:20 | **door** | **Ed** | **employer** |
| 176:15 | 27:4 | 90:22 92:1 | 105:13 |
| **discussing** | **downline** | **education** | **employment** |
| 10:21 21:18 | 23:20 | 28:4,21 | 37:6 |
| **discussion** | **drafted** | **effect** | **empty** |
| 7:7 76:20 | 130:1 | 23:20 | 162:20 167:8 |
| 78:8 79:14 | **draining** | **efficient** | **end** |
| 112:9 164:14 | 61:4 | 41:24 | 17:24 21:12 |
| 176:10 | **drastic** | **effort** | 23:19 38:17 |
| **discussions** | 89:13 | 147:13 165:1 | 42:17 108:16 |
| 94:10 113:22 | **drive** | **eighth** | **endeavor** |
| **dislocated** | 29:11 34:3 | 85:21 | 123:20 |
| 63:11 | 46:20 | **elbow** | **ended** |
| **distribute** | **driver's** | 63:11 | 23:21 |
| 127:19 | 45:17,19,22 | **electrical** | **endurance** |
| **distributed** | **drowning** | 132:11 | 8:20 |
| 98:15 | 77:5 | 159:12 | **energetic** |
| **distributions** | **Drylands** | **electronicall** | 52:2 151:9 |
| 137:21 | 52:13 | **y** | **energy** |
| **ditch** | **due** | 59:3 64:5,9 | 85:17 |
| 161:5,7,9, | 23:25 71:15, | 68:1 104:8 | **engage** |
| 10,11,13 | 18 120:25 | 109:10 | 140:3 174:2 |
| **diversified** | 157:1,4,7,12 | 112:17 | **engaged** |
| 133:12 | 160:15,20,24 | **email** | 71:1 129:19 |
| **doctor** | 161:4 167:7 | 38:12 53:16, | **engagement** |
| 85:22,24 | 169:10 | 20,21 54:3, | 45:3 140:9 |
| **document** | **duplex** | 14,16 56:17 | 176:15 |
| 68:16 165:24 | 162:4 | 87:3 137:13 | **enter** |
| **documentation** | **duress** | 143:21 | 5:10 |
| 74:25 110:21 | 123:7 | 145:17 | **entire** |
| 143:20 | **duties** | **emailed** | 13:23 25:23 |
| 159:19 | 173:5 | 27:10 | 46:18 47:19 |
| **documents** | | **emailing** | 69:22 120:25 |
| 61:24 67:19 | | 177:23 | 123:7 157:24 |
| 165:21 | **E** | **emails** | **entities** |
| **dog** | | 38:20 39:7 | 19:20 20:18, |
| 99:7 | **earlier** | 53:18,19 | 22 21:20 |
| **dollars** | 151:17 | 54:1 56:3,9, | 22:7,16 |
| 99:23 | 176:15 | 12,20 57:2, | 23:1,7 |
| 106:23,25 | **easement** | 11,14,19,22 | 77:10,20,25 |
| 107:8 112:21 | 159:5,9,14, | 58:4 70:11 | 87:24 132:22 |
| 132:22 | 17,21 160:9, | **employee** | **entity** |
| **domestic** | 19 | 39:12,14 | 19:25 72:21 |
| 97:11 | **easier** | 40:6,8 44:18 | 101:18 |
| | 7:24 154:21 | | 140:19 |

Exhibit J

Azuraye Wycoff
June 23, 2021

entrepreneur
  23:13 25:1,2
  38:25
envelope
  159:18,21
environmental
  158:17,21
equal
  51:18
equestrian
  158:9,11
equipment
  146:3 157:18
  173:16
errands
  151:22
establish
  143:15
  163:23
established
  20:13
estate
  34:23 37:15
  140:13 144:2
  149:8 157:6,
  8 171:24
estimate
  145:19
estimates
  39:6
estimation
  169:14
estoppel
  161:22
et al
  5:3
ethics
  114:25
etran
  177:14,18,20
Europe
  48:2,18,24
  49:3,15
  54:24 66:14,
  16,20 67:5,
  15,20 86:22
  141:9

evaluate
  146:8
event
  175:17
events
  60:6
eventually
  75:25
exact
  44:17 82:15
  84:6 102:13
  103:23
  106:9,14
  107:3,7,22
  130:5 158:12
  160:2 168:14
examination
  6:14 69:10
exchange
  51:18 52:3,8
  155:18,25
exhibit
  64:2,4,7,8
  67:24,25
  68:23,24
  104:6,7,10
  109:8,9,12
  112:11,13,
  14,16,18
exhibits
  177:15,18,
  22,23
existence
  74:6
existing
  164:14
exists
  159:24
expect
  15:1 125:8
expecting
  71:10
expertise
  151:13
explain
  94:14,16,17,
  19 170:2,4,7

explicit
  154:25
extent
  16:17 93:18
  173:23
extra
  168:18
extraordinari
ly
  90:23
extreme
  123:18
extremely
  18:13

---

## F

face
  87:16,20,21
face-to-face
  87:2
Facebook
  58:15,24,25
facet
  126:21
Facetime
  70:14
facilitate
  14:13,19,25
  59:21
facility
  61:18
fact
  22:3 36:18
  88:9 165:1
facts
  136:11
fading
  37:10
failed
  23:19 157:23
failure
  118:16
fair
  8:4,10,17
  9:1 20:6,11

76:2 118:6,
  13 119:18,19
  121:8 143:7,
  14,15 155:18
fairly
  97:2,3
  153:17
faith
  25:24
fallen
  63:10 123:22
falls
  21:1
false
  115:17
  116:25
falsely
  116:17
family
  15:24 18:17,
  24 19:1,3
  22:23 23:2,8
  36:5 41:23
  43:20 44:13
  62:12 70:9
  74:6,9,12,
  14,18 75:3,
  8,21,23,25
  76:11 91:1
  93:7 97:21,
  23 123:7,17
  136:8 146:23
  154:20,24
  155:3,6,9
  156:13
  166:15
  170:23
  174:8,19
family's
  24:12 113:19
  162:9 174:16
farm
  14:13,25
  17:22 18:1
  20:19,22
  21:8,13,21
  22:8,17,24
  23:2,7 51:21

Exhibit J

57:3,16
58:21 59:11,
12,17,20
60:2,3,14,
20,23 61:1,
2,5,6,9
67:17 70:20
71:2,20,25
77:11,20,24
83:1 86:23
87:11 88:6,
17 90:11
101:17
120:17,22,23
121:5,18,19
122:23
123:2,9,12
124:3,6
127:9,25
132:8,9,23
138:20
140:14,16
141:1,5,25
142:18
143:16,18,
22,23 144:2
145:4,25
146:3,9
148:16,18
149:9 155:7,
11,19 156:23
157:13,16,23
158:5,10,18
159:1,4,10
161:9 162:1,
3 164:3,13,
21 165:3
166:9 167:5,
20 168:11
169:21
173:16
175:17

**farming**
59:23

**farms**
61:21

**father**
15:4 18:2,17

21:11 48:1
93:3 116:1
122:21
126:24
150:25 151:2
171:25
172:5,10

**father's**
17:9,10 76:7
151:20 152:1
155:17

**feature**
55:18

**February**
29:21 32:23,
24 33:21,25

**Federal**
4:2

**fee**
15:12

**feel**
8:15 32:8
78:22
114:10,11
115:3,6,8,
12,13
116:12,16
117:8 119:3,
5,19 159:3,6
163:12 170:8

**feeling**
90:9

**feels**
114:18 118:4

**feet**
85:20 161:10

**fell**
18:4,14
21:12 38:24
63:16 70:20
71:2,5
120:24
123:9,13
143:24

**felt**
18:6 95:13
101:2,10

127:7

**field**
34:22

**figure**
11:23 31:9
60:4 70:19
71:13 88:7
148:1,2

**filed**
10:23

**fill**
103:14

**filled**
35:2 103:16
105:18

**filling**
105:14

**filmed**
85:2,3

**final**
4:18

**finally**
82:16 95:14

**financial**
11:7 76:2,8,
19,24 101:18
121:25 132:9
133:13
164:24

**financially**
5:7 51:13
76:10 155:3

**find**
18:5 24:22
36:7 38:22
95:9 123:19
149:6 168:2

**finds**
164:2

**fine**
58:5 103:10
116:11
170:11

**finer**
174:14

**fire**
90:11 95:11

**firm**
34:19

**fit**
39:1

**five-**
149:16

**fixed**
39:15

**Flatirons**
28:16

**flew**
49:1 67:4
82:17 95:19

**flights**
46:22,23

**floor**
36:3

**flowed**
120:14

**flows**
161:12

**fluctuated**
43:23

**flurry**
102:1

**flux**
31:11 42:9

**fly**
46:20,21
48:25 49:2
66:17

**flying**
79:17

**focal**
42:12

**foggy**
31:3

**food**
51:24 52:1
151:21

**forging**
68:13

**form**
14:24 16:8
19:8 20:22
23:1,7 24:4
69:13,15

Azuraye Wycoff
June 23, 2021

77:19 78:1
79:10 101:23
103:14
104:11
105:15,18,22
106:2 114:2,
16 115:22
116:5,20
126:9 132:17
135:14
140:21
**formal**
75:4 83:11
**formation**
19:20
**formations**
19:25
**formed**
14:12,18
138:8
**forming**
19:12,16
20:18
**forms**
102:3 103:8
104:1
**forward**
8:21 55:17
123:17 144:1
**found**
36:9 144:3,5
145:2
**foundation**
16:9 114:3,
16 116:6
117:17,22
126:10
127:21
132:18
135:13
140:11,22
174:18
**fourth**
68:6
**frame**
79:7 119:20

**framed**
115:9 117:14
**Francisco**
97:12
**fraud**
123:5
**fraudulent**
168:16,22
**free**
8:15
**frequently**
46:19 81:16
83:7 88:2
153:18
**friend**
31:9 32:11
33:12,15
95:11 99:11
165:7,11
167:22
**friend's**
31:14 32:3
**friends**
47:8 97:9
**frustration**
24:6
**fulfilled**
25:8
**full**
40:25 114:19
128:20
161:13 162:5
173:22
**Full-circle**
30:2 34:10,
11,12
**full-on**
59:20
**full-time**
41:19,20
**fully**
12:8 22:18
24:19 25:12
41:7 56:7
73:10 76:14
114:12 115:4

**functioned**
158:11
**fund**
132:24
137:11
153:8,11
**funded**
134:23
137:16
**funds**
50:8 120:16,
19 132:3
133:5,10,17
137:14,17
153:5 155:1
**funeral**
95:17
**furniture**
146:2,15,20
**future**
42:23 93:17
121:20

———————

**G**

———————

**Gail**
5:8 6:23
**gallery**
4:21
**game**
24:11
**Gandhi**
105:9,10
**gaps**
35:3
**Garten**
162:19
163:16
164:4,8
165:7 166:5
**gauntlet**
39:8
**gave**
61:6 91:15
102:19
169:14

**GCS**
50:12 57:3,
15 97:21
98:17 120:17
128:5
**GCS452**
11:1,12,17
12:2,11,14
13:17 14:9,
14 16:22
19:8,21
20:16 21:9
50:16,21
58:21 67:16
88:17 97:18
100:8,22
129:12
132:15
137:22 142:2
150:4,13
169:4 171:13
172:17
173:6,8,12,
25
**gears**
71:8
**geez**
28:11 31:1
53:24 91:9
**general**
43:19 84:25
87:13 114:21
115:10 116:8
150:17
**generally**
27:12 30:4
47:7,12
48:12 57:22
68:25 76:3,
17 116:3
**Genie**
9:7
**geographic**
32:11
**get along**
69:21
**gig**
83:5

Exhibit J

Azuraye Wycoff
June 23, 2021

gigs
  83:6 84:23
give
  6:18 29:1
  61:11,12,18
  68:18 76:18
  80:9,17
  118:7 138:22
  156:11
  161:18 163:6
giving
  163:12
  168:7,8,9
Gmail
  57:21
Goldhamer
  5:23 6:6,10,
  15,17 7:4,
  12,14 9:10,
  12 13:4,5
  16:5,23 17:1
  19:14,16
  21:4,25
  22:4,12,13
  24:14,16
  31:25 32:2
  42:24 43:3
  45:1,8,16
  46:1 56:2
  63:25 64:6,
  10 65:1,6,8
  67:24 68:2,
  18,20 69:8,
  12,17 76:6
  78:3,5 79:8,
  23 81:6,9
  89:12,17
  90:2 96:7,
  13,23 104:5,
  9 112:14,18
  114:5,20
  115:18,20,24
  116:8,10,14,
  23 117:1,6,
  18,20,23
  118:20,22
  119:13,17
  124:11,15,20

125:2,9,12,
  16,20 126:2,
  7,14 127:10,
  23 131:5
  132:19 134:4
  135:15
  140:12,25
  147:6,8
  149:12,15
  150:1
  162:21,23,24
  163:10
  164:5,7
  174:21
  175:14,21
  176:3,6,13,
  24 177:17,20
good
  6:16 8:8
  23:13 25:1,
  2,4 39:9
  42:24 45:6,8
  47:8 69:18
  96:16 98:5
  101:10
  126:18 129:9
  131:1 133:18
  143:7 163:6
gosh
  32:17
graduate
  27:19
graduated
  27:23,25
  28:2 84:10,
  11
graduation
  43:13
grant
  138:16
great
  6:10 8:13
  9:3,10
  97:21,24
  100:12,14
  101:4
greet
  175:19

grief
  88:12
grocery
  156:1
gross
  35:8 40:18
ground
  6:18 7:22
  16:6 24:23
group
  60:6
groups
  51:9
grown
  146:24
growth
  39:16,19
  40:20 51:7
  52:12
GSC452
  147:22
guaranteed
  23:18
Guatemala
  47:22 48:6
guess
  12:10 32:4
  34:6 35:4
  41:2 92:24
  111:8 142:23
  170:1
guessing
  17:6
guidance
  103:24
  129:25
  147:24
  174:20
guide
  69:22 104:4
guided
  128:13
  157:14
guiding
  44:6
Gusto
  153:19,22,25

154:6,8,13
guy
  99:9 144:10
  145:1
guys
  96:11 151:4
gym
  37:3,5

_____

H

half
  29:18 30:23
  35:9 99:22
Halloween
  62:7
Hampshire
  65:23
Hampton
  29:6
Hand
  161:5,7,11
handed
  27:6
handle
  58:6 96:1
  132:13
handled
  108:21 120:9
handles
  58:9 165:9
handling
  108:18,19
  112:5
hands-on
  44:7
happen
  136:7,16
  157:22
happened
  18:3 84:12
  90:11 106:3
  119:23
  127:25
  131:2,3,13,
  19 139:4
  147:15

Exhibit J

Azuraye Wycoff
June 23, 2021

152:16

**happy**
8:24 31:23
68:18

**harassment**
116:21 126:6

**hard**
14:2 27:13
95:6

**Harvard**
37:17

**Haul**
37:11,20,25
38:15 40:14,
17 42:11,19
52:12 54:6
58:11 60:15,
17 137:12
153:12

**head**
8:9,10 20:3
83:24 145:13
149:5 171:15

**healing**
151:9

**health**
61:17 97:23

**hear**
16:7 93:9
99:1 118:18,
19,20 134:3
142:11
147:5,6
162:22

**heard**
73:5 78:24
79:5 93:6
95:12 98:10,
21,22,23
99:9,20
113:3 121:12
168:24

**hearing**
26:5 164:6

**held**
4:8,11
101:17 177:9

**helped**
12:16 43:18
44:13 77:6
151:22
155:2,6,9

**helpful**
10:10

**helping**
39:17 41:24
82:25 84:24

**helps**
175:4

**hemp**
158:1

**Henke**
174:9,13,16,
24

**hide**
165:1

**high**
145:1

**highly**
142:13

**hinder**
117:15,21

**hip**
82:11

**hired**
42:18 158:20

**hiring**
38:21 39:7,
14 148:20

**hit**
42:8 52:13
95:14 156:3

**hold**
121:19

**Holdings**
11:9

**holidays**
53:6

**home**
28:5 41:20,
22 42:2,9,
16,17 43:24
44:4,6 53:9,
11 61:17

62:23 63:1,
6,14,19,22
65:10,18
66:6 82:18
85:18 146:23
147:20 169:1

**homeostasis**
60:4

**honest**
108:16

**honestly**
27:3 35:2
49:4 63:2,15
73:9 96:10
100:19
103:10
126:19
142:19
156:17 161:3

**Hong**
48:9

**hook**
166:21,22

**hoop**
132:11

**hoping**
24:21 176:20

**horseback**
144:2

**horses**
158:2,5
165:14

**hot**
91:23

**hours**
9:25 13:22
35:15,18
36:18,24
43:6,11,21
44:1 60:12,
14,16,18

**house**
14:14 17:22
34:21 57:3,
16 62:10
132:8,11
133:7 138:21

139:8
141:20,24
143:18,19
145:24
146:15,18
147:3,9,20
148:2,10,13
150:17,20
151:4,6
155:19 162:3
167:7
169:11,17,20
173:9

**houses**
97:22

**huh-uh**
8:10

**hungry**
96:11

**hurt**
63:20

**Hyatt**
15:8,10,13,
18 18:8
19:19 140:6

**Hyatt's**
15:15

_____

**I**

**idea**
14:24 17:19
18:3 20:21
21:8,10,16
24:10 26:17
38:24 71:20
77:9,13
131:1,22

**ideal**
36:20,21

**identify**
68:15

**identity**
32:6,7

**ignore**
118:2

Azuraye Wycoff
June 23, 2021

| | | | |
|---|---|---|---|
| **immediately**<br>17:8 95:18<br>**impact**<br>161:8<br>**important**<br>70:22 146:25<br>**inaudible**<br>31:12 42:4<br>79:20 119:17<br>134:2 147:4<br>162:21<br>**included**<br>146:2,3,23<br>147:3,9<br>157:10<br>172:22<br>**including**<br>77:17<br>**inclusion**<br>147:4,9<br>**inclusions**<br>145:25<br>147:15<br>**income**<br>28:22,23<br>29:14 30:10<br>40:19,20<br>41:3,17<br>43:14 74:17<br>83:24 156:4<br>162:11<br>**incredibly**<br>146:25<br>**independent**<br>25:20 39:20<br>40:13 144:6<br>148:9<br>**independently**<br>85:14 88:1<br>143:8<br>**individually**<br>141:21<br>**individuals**<br>129:14<br>**inform**<br>18:6 76:24<br>79:17 | **information**<br>12:18 20:25<br>31:15,18<br>49:8 72:3<br>77:5 78:16<br>79:10,19<br>80:17 88:22<br>104:17<br>118:17,23<br>127:2 144:18<br>163:12<br>**inheritance**<br>121:9,11,13,<br>21,23,25<br>122:9<br>**initial**<br>68:7,8,11<br>144:7<br>**initially**<br>145:7 155:22<br>**injuries**<br>82:6,9 89:2<br>**injury**<br>63:23 82:10,<br>17<br>**insane**<br>123:7<br>**inside**<br>26:2 97:20<br>147:21<br>**insisted**<br>90:8<br>**inspection**<br>169:1<br>**Instagram**<br>58:6,9 62:3<br>64:7 65:5<br>**instate**<br>28:3<br>**Institute**<br>62:19 64:14<br>**instruct**<br>124:17,18<br>126:8 130:17<br>**instructing**<br>125:2,4,5<br>126:15,16 | **instructs**<br>16:9<br>**instruments**<br>130:2<br>**insurance**<br>92:8,23<br>93:6,10,13,<br>21,25 94:2,<br>6,10,15,18,<br>20 95:1<br>98:15 99:23<br>101:22,23,24<br>102:9,12,15<br>103:4,20<br>106:7,18<br>107:5,11,14,<br>19 108:3,7<br>109:14,25<br>113:18,24<br>114:6,9,14<br>121:6,14<br>122:25<br>123:23<br>124:2,21<br>125:22<br>127:19 130:7<br>148:7,13,17,<br>20,24 149:8<br>150:19<br>155:12<br>163:17<br>165:9,19<br>169:25<br>170:3,6,11<br>171:21<br>**insure**<br>147:23 148:2<br>**insured**<br>148:10<br>**intact**<br>146:25<br>**intend**<br>164:2<br>**intending**<br>118:1<br>**intention**<br>121:20 123:5<br>155:11 | **interactions**<br>4:10<br>**interest**<br>18:24,25<br>24:19 35:12<br>75:10 114:14<br>121:2 140:17<br>172:10<br>**interested**<br>5:7 47:12<br>60:7 61:16<br>**interface**<br>4:12,22<br>**intern**<br>81:7<br>**internal**<br>39:6,15<br>**International**<br>27:22 67:8<br>**interpose**<br>16:16<br>**interrupt**<br>38:5<br>**interview**<br>59:15 61:6<br>**interviewing**<br>30:7<br>**interviews**<br>59:10 61:9<br>**introduced**<br>64:4,8 67:25<br>104:7 109:9<br>112:16<br>**invest**<br>134:22<br>**invested**<br>133:10<br>**investigation**<br>148:9<br>**investors**<br>60:6<br>**inviting**<br>96:6<br>**involve**<br>126:23<br>**involved**<br>11:16 13:6, |

Exhibit J

12 17:16,18
20:3,10 30:5
40:22 71:3,
4,6 73:23
92:12,19
94:9,12,13
102:8 104:3
113:21
128:15,16,21
151:18 160:6
170:23
174:9,16
**involvement**
37:23 92:15
**involving**
74:6,8
**irrevocable**
107:16
109:2,4
113:12
128:12,18
135:5,8,12,
20,21 136:5,
6
**IRS**
78:18 79:5,
6,12,24
80:7,12,24
141:14
**issue**
169:23
**issues**
12:3 78:17
150:2
160:16,17,
21,23,25
161:16
169:20

---

**J**

**January**
37:8 163:25
**Jean**
68:9
**Jersey**
91:15

**JFK**
49:5
**job**
7:24 28:3
29:24 33:10
81:21 83:16
101:10
**jobs**
29:3,23
43:12,14
83:18 88:3
**jog**
49:7 67:3
**John**
66:11
**joint**
152:10,19,
21,24 153:5
154:9,15,19,
24
**joke**
97:20
**judge**
126:13
**July**
48:3,18
65:20,24,25
66:2,6,7,10
**jumping**
19:11
**June**
4:25 65:13,
17,24
166:10,11
168:1

---

**K**

**keeping**
146:24
**Kennedy**
66:11
**Kevin**
103:1
**kicked**
39:9

**kid**
91:10
**kids**
131:12
**Kim**
141:16
142:11
143:9,11,18
145:8,14,21
169:14
**kind**
20:6 23:20
31:11 32:24
33:1 35:10
37:9 38:24
39:8 41:16,
24 42:1,8,11
44:14 46:24
60:3 61:21
63:20 64:25
73:9 90:12
93:18 95:22
97:20 98:1,
12 99:4
101:9 102:1,
22 123:7
150:15
152:10 156:4
160:4 162:8
165:19
**kinds**
108:23
**knew**
12:11 25:6
30:17,18
38:14 42:9,
12 74:2,3
75:8,25
79:23 106:15
114:13
121:17
146:22
159:4,5,6
**knowing**
42:15 71:11
**knowledge**
41:25 73:10,
16 128:4

**knowledgeable**
146:11
**Kong**
48:9

---

**L**

**labor**
39:5,16 43:5
**Lakeridge**
46:5 90:3
104:25
109:15,24
112:12,21
113:2
**land**
60:8,10
**landed**
153:10
**landlord**
30:18
**landlords**
30:17
**language**
48:11
**large**
4:20 88:10
134:21
**larger**
24:11 108:20
**late**
48:2
**latin**
100:15
101:3,4
**launch**
23:14
**launched**
23:17
**lawsuit**
23:11 26:9,
10,21,22
27:2
**lawyer**
17:23 130:16
141:24
145:9,11

Azuraye Wycoff
June 23, 2021

lawyers
  142:25
lead
  20:7,11
leak
  82:12
learn
  12:6,8,17
  26:21 27:2
  72:4 161:19
learned
  12:22 41:25
  73:1,4 93:20
learning
  34:18,22
  35:3
lease
  30:23 33:1,
  4,8 123:20
  163:21,23,24
  164:1 166:24
  167:1
leases
  162:11
leasing
  60:8
leave
  9:9 66:13
  149:11
  175:23
leaving
  88:13
left
  36:22 46:18
  48:20 49:2
  60:3 131:14
  148:19
  161:5,7,10
legacy
  155:20
legal
  5:5,9 15:15
  16:3 18:12,
  18 22:10
  23:4,6 77:14
  88:21 102:20
  104:4 108:20

115:23 120:9
121:5 123:3
127:5
128:13,23
129:9 130:10
133:13
141:22
157:14
173:24
175:12
legally
  168:20
legitimate
  119:3
length
  24:2
lengths
  123:18
  126:19
level
  158:9
license
  45:17,19,23
lieu
  5:16
life
  31:11 42:2,
  6,7,19 47:12
  60:10 69:22
  93:6,9,12,
  21,24 94:2,
  6,15,18,20
  95:1 98:15
  99:23 101:24
  102:11 105:4
  106:7,18
  107:5,11,14,
  19 108:3,7
  109:14
  113:17 114:6
  125:21
  127:19 130:7
  140:14 149:9
limit
  73:9 126:9
limited
  55:20 158:1

lined
  118:9
lines
  17:11 29:12
  139:19
  159:12
Lisbon
  66:22
list
  38:12 68:19
  104:24
litigate
  65:1,3
live
  30:20 46:3,4
  47:2 81:14
  85:14 168:2
lived
  28:10,13
  33:25 36:2
  47:4,18
living
  27:25 30:13,
  25 31:8
  32:10,18
  33:2,5,11,21
  35:21 47:25
  48:5,7 52:24
  70:5 81:18
  83:20 85:18
  86:16 90:3
  100:12 101:8
  105:22,24
  109:23
  156:7,8
LLC
  51:5 72:20
  101:11
loan
  24:19 71:12,
  15,17 72:4,
  10,18,20
  73:2,5,7,13,
  20 74:1,14,
  20,25 75:2,
  3,6,11,13,17
  78:13
  120:18,20,23

121:1,8
140:18 141:6
155:4
156:12,15
loaned
  74:12,18
loans
  24:6
local
  61:21
located
  5:5
locked
  4:15
log
  56:5
logged
  56:5
long
  9:23 13:25
  15:24 30:20
  32:13 34:11
  36:11 39:23
  42:12 49:13
  84:1 86:19
  90:2 95:20
  96:8 97:5
  156:17
  161:14
  165:16 166:9
  167:1
long-standing
  140:5
longer
  152:15 165:9
  168:1
looked
  56:2,8,11,19
  63:7 169:16
Lord
  141:16
  143:9,11
  145:8,15,21
Lord's
  142:11
loss
  25:4 85:19

Azuraye Wycoff
June 23, 2021

142:21

**lost**
80:20

**lot**
18:23 23:21
30:14 36:24
39:5,10,11
41:5 44:5
51:8 52:20
53:17 54:1
59:22 60:13
61:11 69:23
70:14,17,18,
19 76:9
77:5,6 83:7
84:14 85:17,
18 88:7,11
100:3 102:23
103:12 105:4
107:24 111:8
113:22
114:17
123:15
126:19,20,23
148:3 151:9
154:21
157:22,23
158:23 159:4
161:19

**loud**
78:23

**love**
38:24

**Lucrum**
34:16,17
35:13,16
36:11,15,16
37:1,13,16,
18 38:22
46:25 74:16,
17 101:9
105:11 106:1

**lunch**
96:8

**Lustig**
162:19
166:8,18
167:8,10

---

**M**

---

**made**
17:25 26:7,
12 28:19,20
40:19 42:1,
20 44:12
75:13 77:14
89:3 109:4,5
110:14
113:15,25
114:8 115:25
132:1,10
133:2,5,25
139:1 140:3,
6,12 141:2,4
144:15
151:21
156:13 174:4
175:15

**Madrid**
66:20

**Magna**
34:16,17
35:13,16
36:11,15,16
37:1,13,16,
18 38:22
46:25 74:15,
17 101:8
105:11 106:1

**Magnus**
11:1,12,17
12:3,13,14
13:17 14:9,
12,24 16:21
19:9,17,21
20:16 21:9
30:19,20,24
32:19,21
33:1,4 35:24
45:20 50:12,
16,21 57:3,
15 58:21
67:16 88:17
100:10,12,25
101:8 120:16

128:5 129:12
132:15
137:22,25
138:4,11,18
139:7,9,12,
16 140:4
142:2 150:3
163:19
164:13,23
167:4 171:13
173:14
174:22

**mailed**
105:20

**mailing**
67:19

**main**
105:5

**Maine**
65:14

**maintaining**
154:19

**maintenance**
133:7 138:21
150:17 156:1
157:18

**major**
27:21

**majority**
133:19
150:12

**make**
7:24 8:1
15:2 18:9,
23,25 36:16
53:1 55:16,
21,23 61:3
68:13 69:12
74:20 76:1,
23 77:7
78:9,10
88:21 93:1,
16 102:14
103:3 108:23
120:9 123:4,
6 126:8
127:4 131:4,
18 132:3,8,

21 134:14,19
135:9,19
136:1,12
138:10
141:11,23
143:6 147:22
150:9 155:18
156:4,16
164:20
165:12
168:18
174:15
175:10

**makes**
134:1,4
135:7 137:2
146:14

**making**
23:15 29:1,
16 30:11
35:10 42:10,
15 76:9
88:10 132:20
133:23
134:9,17,24
135:4 144:4
170:8

**Mall**
28:16

**man**
23:13 25:2,4
41:5 90:21

**manage**
42:3 58:10
111:17 139:5
156:1 165:12

**managed**
113:12
136:23

**management**
30:6 34:19,
22 52:12
59:20,24
60:1

**manager**
40:9 132:14
137:25 138:2
147:22 164:3

Exhibit J

Azuraye Wycoff
June 23, 2021

173:6
managing
  60:11,15
  111:8 162:11
manner
  5:20
manual
  43:5
manufacturer
  23:15
March
  21:12 30:1
  32:15 34:7
  40:9,11
  156:10
Maria
  36:2,4
mark
  64:1,6
  109:12
  112:14
  144:11
marked
  109:11
market
  23:15 120:25
  121:8 143:7,
  14,15,23
  169:11,12
marketing
  30:7
marriage
  91:4
Massachusetts
  45:21,22
  62:11,19
  64:13,22
  105:18
massage
  52:3
massages
  52:6,8
massive
  123:15
  141:10
material
  148:12

matter
  5:2,18 6:3,
  12 69:16
matters
  76:8,19,24
  101:22
MDT
  45:12 89:23
  96:19 149:22
meaning
  98:8
meanings
  100:21
means
  84:20 94:15,
  18 97:21
  100:12,13
  159:15,25
  160:3,9
  161:24 170:1
meant
  97:23 161:20
mechanic
  108:22
media
  58:13,14
  168:24
meet
  51:12,21
  88:3 91:8
  99:14 100:1
  112:1 167:13
meetings
  20:10
Mellon
  111:7,11,22
  130:7 133:18
  137:7
member
  170:14,16
members
  61:15 74:9
  129:14
memory
  49:8 67:3
  85:19 147:2

mentioned
  60:1 107:4
  111:3 140:16
  143:14
mentor
  69:21
Merrie's
  77:9
message
  56:16 59:4
  87:19
messages
  55:5,8,12,
  13,15,17
  56:3,8,21
  57:6 70:12
Messenger
  58:24,25
met
  91:6 99:15
  111:25
  150:23
Miami
  47:2,4 96:24
  97:1,14
mid-june
  48:2
middle
  24:23 40:22,
  23 41:8,9
  68:7,8,10
  82:3 171:2
Midlab
  5:3 6:17
  26:13 78:14
Midlabs
  9:15 23:15,
  16,24 24:19
  126:24
midst
  17:12 145:18
million
  99:23
  106:22,25
  107:8,20,21
  108:2 112:21
  143:24

156:23
million-and-
a-half
  132:22
mind
  12:24
minute
  7:1
minutes
  45:2,4,5,7
  89:14,15
  96:10
mischaracteri
zation
  127:22
misrepresenti
ng
  79:2
misstatements
  148:12
MIT
  62:21
mix
  70:13
mode
  87:12,15
modeling
  83:8,10,11,
  14
mom
  16:19 21:3
  22:20 25:20
  42:3 54:15
  55:5,9 65:11
  70:17 71:8
  72:16 76:15,
  23 77:2,19
  81:14 82:19
  87:24 90:4,8
  95:10,12
  96:2 98:14
  99:22 103:20
  113:3 122:20
  129:22
  131:12,22
  133:24
  135:17 138:5

Azuraye Wycoff
June 23, 2021

139:13 140:2
145:4,7,22
147:18
151:14,17
154:5,25
155:21
156:14
168:12 169:9
175:11
**mom's**
77:9 99:11
**moment**
95:15 173:2
**money**
28:20 35:10
36:14,16,17
73:6,8
74:12,14,18
75:9,23
93:17 94:21
95:1 106:3
107:18,24
108:11
119:23,25
120:13,14
121:6,15
122:25
124:5,21
125:20,22
127:19 133:6
134:8,10,22,
23 137:18
152:14
155:5,12,14,
15
**month**
17:14 21:14
29:1,17
41:21 44:22,
23 46:13
47:24 48:3
49:14 155:23
164:1,9
166:21,24
167:24
**months**
32:14 47:18
55:15 86:11

97:4
**morning**
6:16
**Moss**
174:1,2,12,
16,24 175:3,
8
**mother**
9:21,22,23
10:4,18
11:12,16
12:12,15,19,
20 13:7,13,
17 15:2
17:16 18:3,
21 20:1,2,6
26:7,12
27:4,6 69:1,
4,18 70:4,6
109:25 121:4
127:17
128:15,22
135:19
138:13,18
142:23
143:11
144:20
150:6,8
152:20,25
154:19
156:5,9
171:25
172:5,10
**motorcycle**
81:22
**Mountain**
5:2 7:10
45:11,14
65:21,22
89:21,25
96:18,21
149:20,24
176:8,12
177:8
**mouth**
126:17
**move**
18:1 29:4,22

31:6 42:20
60:9 115:17
116:22
125:14 164:3
**moved**
28:2 29:6,19
30:1,14,15
31:1,2,3
32:21 33:25
34:7 38:13
41:19 82:13
90:5 95:2
153:11
155:24 162:8
**Movers**
37:20 40:14
**moves**
39:3
**moving**
8:21 12:24
31:10 38:17
40:14 41:12
43:6 88:2
**multiple**
139:20
**multiplicity**
124:24 126:3

---

**N**

---

**named**
54:2 90:21
93:21 99:9
**names**
88:18 97:17
100:18 141:5
162:7,13,17,
25 163:2,3,
11 168:5,7,
8,9
**naturally**
136:8
**nature**
82:8 93:4
97:19 133:8
**navigate**
102:18

**necessarily**
61:3
**neck**
122:3
**needed**
17:18 20:22
23:6 38:17
42:9 43:20
44:1 75:8,23
76:11,16,18
103:24
111:13,16
114:18 121:2
123:6 133:6
137:11
142:21
154:21
156:19 158:3
175:22
**negotiated**
132:12
**negotiating**
143:5
**neighborhood**
159:10
**net**
23:18 26:8,
13
**Netflix**
84:15
**night**
90:16
**nodding**
8:9
**nominal**
44:22
**nos**
8:9
**notarize**
165:20,24
**notary**
166:2,4,6
**noted**
78:4
**November**
52:23 62:15
63:8 86:17

Azuraye Wycoff
June 23, 2021

number
  41:10 54:19
  55:1,2,3,6,9
  57:7 61:20
  77:15 83:20
numbers
  54:17 102:13
  106:9,14
  107:3,7,22

─────────────

O

oath
  5:16
Obermeyer
  5:9
obituary
  95:24
object
  16:8 78:1
  127:21
  140:21
  174:18
objecting
  69:15,16
objection
  16:10 69:13
  78:4 114:2,
  16 115:22
  116:5,20
  117:17,22
  132:17
  135:13,14
  140:11
objections
  5:20 16:7
  126:8,9
objective
  119:3
obligations
  113:19,20,25
  114:7
observation
  25:23
observations
  26:5

occasionally
  16:7 38:14
  68:12 83:6
occasions
  100:6 139:25
occupy
  164:2
occur
  44:23 81:25
October
  31:4,6 32:24
  33:20 41:13,
  18 59:21
  60:2 62:6
  89:1 90:5,9,
  10,19
offer
  30:1 51:18
  144:4,15
  145:1
offered
  29:24 127:8
  128:1 141:3
  144:11
offeror
  144:13
office
  81:4
officers
  138:4
official
  177:22
officially
  42:1 44:12
  59:21 90:5
offline
  56:1
older
  55:15 165:10
oldest
  18:22
on-ground
  43:25
one-month
  48:1,17
one-time
  156:15

ongoing
  156:16
open
  176:18 177:1
opened
  152:18 153:2
operation
  40:1
operations
  38:15 153:8
opportunity
  101:7 118:7
options
  18:9 88:20
order
  14:13 15:3
  23:17 24:11,
  21 60:10
  81:3 120:17,
  18,23 133:7
  141:4 153:8,
  12 155:17
organization
  59:24 98:18
  99:20,21,24
organizational
  51:8
organize
  60:6
organizing
  39:6 96:5
origin
  100:9
original
  10:13 71:23
originally
  144:10 153:2
Ouch
  63:12
outcome
  5:8
outing
  62:21
overcome
  136:17

overview
  10:2,22
  13:23 25:17
overwhelmed
  88:8
owed
  73:6,8 74:11
  78:11 80:7,
  24
owned
  22:23 23:3,8
  28:12 30:16
  35:24 161:10
  170:23
  171:25
  172:5,8
owner
  61:2 94:2,15
  164:15
owners
  129:11
ownership
  35:12 39:13
  88:13 141:5
  162:9 165:2
owns
  122:15 171:7
  173:1,6,15

─────────────

P

p.m.
  5:1 7:10
  45:10,14
  89:21,25
  96:18,19,21
  149:13,20,
  22,24 176:8,
  12 177:7
packing
  42:19
paid
  24:6 28:22
  35:19 36:17
  46:22,23
  48:12,16
  49:15,17,19

Exhibit J

Azuraye Wycoff
June 23, 2021

51:11 52:17
60:19,22,25
71:12,18
83:6,13
84:22 93:18
94:21,23
95:1,3 123:1
153:22,25
154:5,12
156:9,21
169:10
171:18
**painted**
147:18
**pandemic**
42:8 97:14,
15 156:3
**pantry**
147:11
**papers**
27:6
**paperwork**
103:13
**parent**
95:14 99:3
131:14
**parents**
48:16 76:3,7
78:12,18
79:11 80:7
92:22 98:24
99:2,7 100:5
114:7 120:22
152:11
158:22
**part**
4:20 17:17,
21 37:16
39:12 48:15
88:16 94:7
131:7 155:19
173:5 177:5
**part-time**
37:2
**participants**
4:6,18
**participating**

5:12
**parties**
5:19 116:1
126:25
160:4,6,10
**party**
5:6 144:6
**passed**
18:2 21:11,
15
**Passow**
9:7
**passports**
47:15
**past**
44:10 97:12
**Patagonia**
37:18
**patience**
176:25
**pause**
7:8 117:25
**pawn**
24:11 26:19
**pay**
15:15 28:17,
19 51:16
71:21,25
73:7,23 76:1
120:18,20,23
121:8,16
123:1,24
124:9,22
125:23
138:22
141:4,6
145:7,9,11
150:19
155:21 156:5
164:4,8,10
166:13,14
**paying**
29:13 33:8
41:17 52:10,
15,18 60:24
71:23 83:5
138:21

155:13,16,23
167:8,11,23
**payment**
124:4
**payments**
40:17 154:8
156:16
**payroll**
153:20,23,25
**pays**
52:12 164:11
**peak**
38:17
**pegged**
35:8
**penalty**
5:18 6:3,7,
13
**pending**
8:23
**people**
25:21,25
38:14 39:2
42:18 51:13
59:22 77:16
96:6 108:23
115:11 117:6
123:6,19
129:24
135:18
166:17
175:20
**period**
76:4 87:23
97:16 100:2
**perjury**
5:18 6:4,7,
13
**permaculture**
61:16
**permission**
110:16
138:22 163:6
**person**
5:17 21:17
26:18 52:3
69:24 74:23

88:4 112:1
123:14
131:19
139:10
153:13
166:8,15
**person's**
77:13
**personal**
49:21,23
50:1,8 53:15
90:13 113:10
120:4,12
172:4 175:2,
4
**personally**
32:4 49:16
107:12 137:6
142:5,7
**persons**
24:3
**perspective**
26:2
**pertain**
56:4
**Phase**
158:20
**Philippines**
48:8
**phone**
44:6 54:17
55:14,19
70:11,19
95:10 103:13
145:17
153:18
**phonetic**
149:3
**photo**
65:12
**photography**
82:25 83:2
84:21,25
**phrased**
119:2
**physical**
39:5

Exhibit J

Azuraye Wycoff
June 23, 2021

physically
  5:13 140:1
pick
  96:3,4
picked
  148:22,24
picture
  62:9 63:7
  111:12,14
pictures
  62:24 66:7
  67:12
piece
  39:19 115:3
pieces
  26:6 57:9
pile
  108:11
pin
  21:7 54:24
pit
  115:12 117:9
  118:5
place
  28:12 30:18
  32:25 33:14
  61:20 111:5,
  16 123:8
  148:7,19
  164:2
places
  30:16
plaintiff
  4:25 5:24
plan
  77:24 123:8
plane
  82:16
plans
  42:1,20
pledged
  73:12,19
  113:18 114:6
plenty
  14:16
podcasts
  59:6,8

point
  31:21 42:12
  79:23 81:3
  101:23 125:1
  126:5 129:8
  145:16 162:8
  170:23
points
  8:13
policies
  92:8,23
  93:21,25
  94:3,6
  104:13
  113:18,24
  114:6,9
policy
  94:15,18
  102:12
  114:14
  148:7,13
portfolio
  133:6,12
portion
  52:16 133:18
Portland
  65:14
position
  34:25 40:10
positive
  75:5 99:5
  112:4 129:3
  154:10
possessions
  122:1,14
possibly
  42:22 48:10
post
  64:10
posts
  64:7 65:4
potential
  18:12 158:23
potentially
  123:20,21
power
  83:7 110:17

  120:8 132:6
practice
  48:10 55:12
  57:25
practices
  59:13,24
preexisting
  38:4,7
preferred
  128:7
premise
  115:17
premises
  116:25
premiums
  150:19
preparation
  12:20 13:7,
  13 174:10
preparations
  42:10,15
prepare
  9:13 175:4,
  19
presence
  4:11
present
  5:14 43:15
  59:20 81:4
  140:1
preserve
  55:17
pressure
  141:10,12,14
pretend
  25:12
pretty
  44:22 46:17,
  18 55:1,19
  81:16 86:21
  120:6 145:1
  146:16
  153:13
  156:18,23
  157:25
  159:23
  164:20 175:8

prevented
  123:25
previous
  41:22 63:7
  71:2 148:4,6
  167:9,23
previously
  148:17
  168:21
price
  144:21,22,24
  145:4
priced
  143:7
pricey
  46:24
primarily
  13:10 20:2
  34:4 48:7
  57:11 59:4
  87:16 105:24
  133:23
  138:12
  139:25
  151:21
primary
  18:16 19:20
  23:23 54:13
  55:2 83:24
  105:3 123:14
  151:23
prior
  100:3 158:24
  167:4,17,19
Private
  4:9
privilege
  16:16,24
  21:1,23 56:5
privy
  72:2 78:16
pro
  51:10,14,17
problem
  6:22 163:9
Procedure
  4:3

Azuraye Wycoff
June 23, 2021

proceeding
4:7
proceedings
4:1 5:10 7:8
177:9
proceeds
71:22 99:23
106:8,18
107:12,15,19
108:4,8
114:15
121:18
123:23 124:2
125:22 128:6
130:7
process
17:23 96:5
101:25
102:17
103:11,25
104:4 106:5
111:15,21
121:1 128:10
137:13,15
148:20
processes
51:23 52:5
produced
23:16 136:19
product
16:17
products
5:3 23:16,17
43:16,17
153:21,23
program
47:22
project
30:6 34:18,
22 60:11
projects
51:7 134:23
158:23
promised
71:24
promises
23:21 25:9

117:7
properties
19:13
property
60:9 122:8,
11,13,21
123:20 128:8
144:16 145:2
155:23
157:10,18,24
158:21
159:9,11,13,
18 160:7
161:8,12,16
163:18,20
165:12
168:12
170:22
171:9,12,19,
22,23 172:4
173:23
protect
24:11 32:5,7
provide
21:24 61:23
79:7
provided
56:5 64:5,9
68:1 104:8
109:10
112:17
psychological
69:9
public
67:12
published
95:25
Pulkrabek
81:6
pull
134:22
purchase
14:13,14,25
20:19,22
24:4 121:7,
17 128:5
137:12

141:19 144:5
155:18
156:23
157:2,11,13
159:1 169:2
purchased
67:16 123:2
155:23 171:3
purchases
14:17,19
19:9 140:13
purchasing
121:5 146:22
157:16
158:4,25
purpose
4:13 7:19
20:18 154:18
168:15
pursuant
4:2
pursue
77:23
put
25:24 32:15
82:16 94:24
101:6 107:14
126:17 127:3
132:21
134:22
152:13 163:4

---

**Q**

question
7:25 8:3,14,
16,17,22
11:25 13:20
14:22 16:10,
11 21:5,6
22:14,15
24:13 27:7
56:7 69:14
76:5 77:22
78:2,6
114:4,11,18,
24 115:4,7,

9,12,19
116:9,12,15,
21 117:2,9,
12,13,19,24
118:1,2,4,8,
9,12,13,16,
24,25 119:2,
3,7,15,18
124:8,14,16,
20,23 125:6,
7,15,18,25
126:11,18
128:20 129:9
130:22
163:14,15
175:24
questions
14:16 16:15,
18 27:13
32:1 33:17
42:25 53:14
76:13 80:10
95:6 115:14
150:4 170:10
175:15
quick
83:19
quickest
121:7
quickly
121:3 141:11

---

**R**

Rachel
81:7
raised
12:3
raising
59:23 125:17
ran
151:21
re-put
158:8
reached
126:5

Azuraye Wycoff
June 23, 2021

read
  9:15 10:13
  127:15
  159:23
  177:12
ready
  18:1 23:14
  118:10
real
  34:23 37:15
  140:13 149:7
  156:20
  157:6,7
  171:24
reality
  95:14
realized
  143:25
reason
  12:25
  101:12,17,21
  122:25 123:2
  140:18 141:1
  165:5
reasonable
  127:7
recall
  10:18 14:3
  15:21 16:2
  17:4,6 30:24
  35:5 37:6
  44:17 52:23
  53:3 63:22
  73:3 91:13
  102:11,25
  109:25
  112:24 149:5
  150:22
  165:22,23,25
  169:6 173:7
receive
  108:3,7
  122:18
received
  41:3 57:4
  106:8,18
  107:12,19
  108:8 122:9,

20 133:14
  140:24
recently
  97:2,3,15
  137:12
recess
  45:12 89:23
  96:19 149:22
recognize
  67:21
recognized
  169:17
recollection
  43:4 106:17
  107:23
recommended
  142:13,15
  167:22
record
  4:6,9 5:11,
  22 7:3,6,7,
  10,13 8:8
  31:23 45:10,
  14 89:21,25
  96:18,21
  109:13
  112:20
  149:20,24
  176:2,8,10,
  12,14 177:7
recorded
  4:7,8
recording
  4:14
records
  139:22
  145:12
recovering
  82:24
recuperating
  81:23 82:5
redun-
  131:9
redundancies
  131:25
redundancy
  131:2,9

139:3
reevaluate
  148:21
refer
  49:23
referral
  149:7 167:22
referring
  46:7,9 72:19
reframed
  119:5
regard
  16:20 102:20
regenerative
  51:21 52:14
  59:23 61:16
regularly
  55:1
Reiki
  151:12
rejected
  128:2
relate
  55:22 56:21
related
  5:6 12:3
  56:12,24
  58:4 92:4
  93:7
relates
  56:9
relationship
  15:25 20:14
  36:4 39:21
  68:25 69:4,
  18 81:10,11
  93:4 140:6
  165:7 167:14
  172:15
relationships
  91:1
relevant
  31:22 32:5
  33:16 135:18
  164:16
relied
  42:11 169:15

rely
  76:23 108:22
remainder
  176:19
remaining
  133:10
remember
  10:1,3
  14:20,21
  15:14,17
  27:3,5,7,8
  28:6,9,11,12
  29:9,19
  30:9,12,16
  32:18 36:1
  41:7 44:8
  48:20,22
  49:4,6 53:13
  61:25 63:9,
  15,16 66:1
  72:12,14,17
  74:21 75:2,
  6,13,16,17,
  18,19,20,21,
  22 76:14
  80:25 81:2
  84:19 90:6
  91:16,23,25
  102:24
  103:6,10
  104:18
  106:14
  107:25
  108:10
  110:4,7
  111:23,24
  129:21 138:8
  142:14
  152:7,12
  156:17
  158:12 162:7
remnants
  162:9
remote
  4:11,23 5:4,
  10
Remotedepo
  4:22

Exhibit J

Azuraye Wycoff
June 23, 2021

**remotely**
5:15 60:15
64:4,8 67:25
104:7 109:9
112:16
**remove**
4:16
**removed**
160:19
**renewed**
163:21
**Renig**
166:18
**rent**
28:17,19,20,
22 29:18
155:21
156:5,9
164:4,8,12
166:13 167:3
**rental**
162:11
**repaid**
24:19 74:13
75:19
**repair**
144:8
**repairs**
133:7 138:21
**repercussions**
18:12
**repetitive**
119:10
**rephrase**
114:4 131:8
**reporter**
5:8,12 6:2,
25 7:23
45:25 64:1,
3,5,9 68:1
79:21 104:8
109:10
112:17 147:5
162:22 164:5
175:25
177:2,4,11,
14,17

**reporting**
5:15,20
**represent**
99:18 115:14
116:17
141:21
142:22,23
**representatio
n**
142:22
**representatio
ns**
26:8,13
**represented**
16:21 141:19
143:8
**representing**
17:15 101:10
142:2,9
**repurposed**
119:5
**request**
4:9 102:3
136:24
137:14
154:25
161:12
**requested**
136:25
**required**
157:19 159:7
**research**
25:20 52:14
161:15
**residence**
14:15 20:19,
23 21:8,21
22:8,17,24
23:2,7 46:4,
7 58:22
67:16 77:10,
20,24 86:23
87:11 88:6,
17 90:3,14
104:25 105:5
109:15 113:3
120:17

132:23
140:14
142:18
145:24
147:23 151:5
155:10,12,21
156:6,10
169:8
172:18,21,22
**residential**
169:2
**resolution**
39:8 121:3
**resonated**
101:7
**resources**
61:4
**respect**
14:4,9,10
20:15 22:21
57:21 76:8,
18 89:2
134:1,5,10,
14,17,25
135:5,7,20
140:16
158:18
160:15
161:4,16
**respective**
19:9
**response**
119:4
**responses**
8:7
**responsibilit
ies**
18:18
**responsibilit
y**
18:4,14
88:15 127:3
132:7 155:17
**responsible**
13:11 77:4
123:15,18

**restate**
21:6 117:19
**restructured**
162:10
**retain**
141:5
**retainer**
145:8
**returns**
175:5
**reveal**
20:25 21:23
22:9
**revenue**
35:8 52:13
**review**
158:17,21
**ride**
91:15 165:14
**riding**
144:2
**rights**
146:6,9
157:11,17
160:9
161:15,19
173:17
**Riley**
149:3
**ring**
122:3
**ripped**
158:6,14
**risks**
157:9,20
**River**
66:3
**Robert**
174:9,13,16,
24
**rock**
37:2,5
**Rockland**
28:15
**Rockport**
64:22

Azuraye Wycoff
June 23, 2021

role
    42:18
roles
    39:23,24
room
    5:14 9:3
roommate
    36:9
Ross
    81:6
ruled
    16:11
rules
    4:2 6:18
    7:22 16:6
run
    18:21 39:2
    40:1 132:8
Runion
    162:19
    166:19,20
    167:10
running
    34:20 60:17
    153:13 158:9
    161:13
runs
    99:19
runtime
    175:23
rush
    140:25

————————

        S

————————

salary
    35:5,7 40:16
    44:21 46:25
    61:3
sale
    87:11 142:23
    145:24
    146:1,9
    147:9
sales
    128:6

San
    97:12
sanctuary
    98:4,7,13,
    16,19 99:19
satisfaction
    117:4
save
    59:25
savings
    35:11,21
    74:19 133:11
    152:3,13
    154:9
scanned
    177:15,18
scenes
    114:19
scheduling
    176:18
school
    47:10 61:7
Schwab
    133:15
science
    160:2
scrambling
    18:5 71:13
    123:10
screaming
    95:12
screen
    4:21 13:1
    62:2
screen-share
    62:1
screens
    4:15
scrolling
    104:19
season
    38:17 91:24
seconds
    89:18
secure
    73:13,20

seek
    165:11
seeking
    69:11
sell
    71:25 120:22
    121:7,20
    122:23 123:8
    143:25
    144:12
seller
    143:1
selling
    123:12
send
    55:5,8 75:14
    137:7
sense
    16:24 42:21
    61:3 140:6
    141:2,4
    174:4
separate
    121:23
    142:22
    146:19
separately
    131:13
September
    31:2 63:18
septic
    159:11
    160:10,16,
    21,22,24
serve
    39:23
served
    27:4
service
    153:20,23
    154:1
serving
    39:24
session
    149:17
set
    7:21 11:20

12:16 50:23
51:20 64:7
87:24 93:16
108:20
111:21
118:15,16
120:21
128:11,17
129:20,23
130:4 140:23
144:22,24
145:4 148:3,
17 152:7
167:25
175:19
setting
    4:16 17:12
    41:23 51:23
settings
    57:24
settle
    24:21
settled
    127:6
settlement
    127:11,13,16
setup
    10:21 43:19
    118:6 142:20
shaking
    8:9
share
    47:7
shares
    122:15,18
    161:20
shattered
    96:3
She'll
    83:6
shopping
    156:2
short-term
    85:19
shortly
    9:9 21:13
    72:8

Exhibit J

Azuraye Wycoff
June 23, 2021

show
  84:15
  112:10,15
showed
  110:1
showing
  61:18 109:11
shown
  110:3
shows
  83:20
shutting
  156:3
sic
  9:15 55:6
  126:10
  147:22
side
  13:1 77:3
  161:10
sign
  15:12 68:10
  75:3 177:12
signatory
  138:24
  139:12 150:7
signature
  67:22 68:6,
  14 104:20,21
  163:22
  165:20,24
signatures
  68:4,16,21
  139:20
significant
  122:5
signing
  75:2 139:23
silly
  170:8
similar
  112:25
  131:14 150:3
  167:6
simple
  114:18 115:5
  125:18

126:10
  152:13
simply
  145:21
simultaneously
  72:19
single
  115:2 123:21
  126:21
single-person
  89:8
Sirius
  98:24 99:2,7
  172:12
SIRIUS'S
  172:14
sister
  13:5 24:3
  48:1 66:13
  79:13 81:10,
  15 87:23
  93:16 95:18
  96:2 108:8
  121:4 122:12
  129:13,22
  131:3
  133:21,22,24
  134:5 135:17
  138:5,12
  139:14
  146:24
  150:6,8,11
  152:22,23
  155:15,24
  156:8
sit
  76:12 136:10
sitting
  21:18 80:6,
  11
situation
  88:6 112:25
  125:11
  164:17
situations
  136:13

six-month
  164:1
skills
  48:11
Sky
  50:15,25
  51:3 52:11,
  17 54:4
Skythorn
  37:15
slightly
  169:11
small
  37:11,20,25
  38:11,15
  40:14,17
  42:10,18
  51:7,8 52:12
  54:6 58:11
  60:15,17
  137:12
  153:12 162:4
smoothly
  7:22
social
  58:13,14
  100:6
software
  39:17
sold
  71:21 141:1
  171:10
  173:8,12
solid
  101:2
solution
  18:5,7
Somerville
  30:15,18,19,
  21 45:20
sophomore
  47:22
sort
  6:18 13:2
  22:1,20 28:1
  39:20 40:16
  42:25 43:6

59:12 72:19
  100:21
  110:20
  120:11 153:5
  157:1
sought
  121:4
sound
  8:10 32:16
  36:21 40:23
  45:4
sounded
  46:11
sounds
  24:5,9 39:10
  42:24 45:8
  82:4 96:16
  98:13
source
  83:25 167:22
South
  34:4 46:5
space
  8:20
Spain
  47:17 48:6
span
  46:15
speak
  9:22 79:2
speaker
  4:15
speaking
  47:7
specific
  13:19 14:5
  21:17 26:22
  53:4 69:2,10
  77:12 87:12
  93:11 131:7
  137:14 139:9
specifically
  13:24 14:23
  15:17 53:3
  56:11 71:19
  72:14 92:17
  106:20 110:4

Azuraye Wycoff
June 23, 2021

161:1,6
**specifics**
 156:21
**speculating**
 22:18 103:5
 106:15
**spend**
 43:8 65:4
 90:16
**spent**
 43:5 103:12
**spice**
 147:11
**spine**
 82:12
**spiritual**
 98:2
**spirituality**
 98:3
**split**
 95:13
**splitting**
 33:13
**spoke**
 10:3 17:2,5
 19:24
**spotlight**
 4:16
**spotlighted**
 4:14
**spring**
 97:10,16
**stable**
 144:8
**staff**
 166:4
**stalls**
 158:6,8,14
**stand**
 70:23
**standard**
 57:25
**standing**
 22:2
**star**
 99:7

**start**
 7:25 34:15
 70:8 71:6
**start-up**
 137:11
**started**
 15:21 34:16
 37:9,10,22
 41:12 42:15,
 19 44:8
 111:16 156:3
**starting**
 33:10 97:15
 116:25
**state**
 60:4 149:9
**stated**
 25:7 119:10
**statement**
 5:10 104:11
**statements**
 68:3 136:18
 139:6
**stating**
 5:21
**stationary**
 32:25
**stay**
 28:3 95:20
 151:4,5
**stayed**
 34:4 86:4,
 10,19 124:6
 151:6
**steps**
 71:11,14
**Steve**
 5:25 9:4,18
 16:23 27:10
 45:4 65:2
 78:3 96:8
 116:23
 124:16
 176:19,21
**Steve's**
 9:7

**sticks**
 90:12
**stocks**
 134:21
**stop**
 124:7 125:14
**stopped**
 40:8
**storage**
 33:9 55:19
**store**
 90:13
**stored**
 105:7
**story**
 113:4 115:3
**straight**
 155:16
**strategies**
 21:2
**strategy**
 38:16
**straw**
 24:3 26:18
**street**
 144:3
**strong**
 69:22
**structure**
 11:20 13:17
 17:17,21
**structured**
 127:8
**structures**
 10:22 13:24
 14:1,4 17:13
 18:18 39:6
 140:23
**studied**
 47:17
**studying**
 61:17
**stuff**
 37:23 38:21
 41:23 44:7,
 14 85:1,18
 105:6 126:23

165:19
**subject**
 69:16
**subjective**
 114:10 119:4
**sublet**
 30:14
**subletting**
 33:7
**submit**
 101:23
 103:12
**submitted**
 106:2
**submitting**
 111:16
**subsidiaries**
 125:23
**subsidiary**
 72:23
**subsisting**
 35:10
**substance**
 10:18 130:23
**substantial**
 156:24
**sucked**
 38:23
**suddenly**
 18:4,17
 71:7,9 77:3
 88:9
**sued**
 168:22
**suffered**
 85:19
**suggests**
 65:14,21
**suit**
 168:17
**sum**
 9:25
**summarize**
 77:22 98:6
**summer**
 38:16

Azuraye Wycoff
June 23, 2021

Sun
  97:21,25
super
  91:2
support
  5:5,9 123:19
surgery
  82:11
survival
  62:22
Sweet
  84:14,16
  85:2,3,6,8
switch
  71:8
system
  43:19 131:2,
  10,25 139:3
systems
  41:24 51:23
  61:19 132:12
  159:11

————————
    T
————————

T-MOBILE
  55:4
Taiwan
  48:8
take-home
  41:2
takes
  83:7
taking
  60:1,7 82:19
  97:7 111:16
  125:10
Talent
  30:2 34:10,
  11,12
talk
  8:3,24 9:21,
  23 10:25
  11:5,7,9
  12:2 38:15
  47:6 70:4,6
  81:13 82:20

85:11 88:5
92:1,4,7,10
98:24 99:2
103:22 104:1
111:22
136:10
talked
  10:1 11:2,
  19,23 13:21,
  25 14:3,7,8,
  10,18 43:12
  51:3 70:19
  84:15 92:22
  100:8 126:20
  150:1 172:4,
  12
talking
  15:6,22
  25:21 49:24
  59:18 72:18
  78:14,15
  92:16,17
  98:18 107:24
  116:6 121:12
  125:21
  145:17
  156:22
  160:16
  176:14
target
  52:13
tasks
  151:22 156:1
taught
  69:23
tax
  174:3,6,9,17
  175:4
taxes
  171:18
  173:25
  174:12,21
  175:7
teach
  30:8
teachers
  30:7

team
  51:8 59:24
tech
  29:25 34:8
  43:19
tech-related
  41:23
technical
  160:14
technician
  5:5
Technology
  62:19 64:14
telling
  110:4
temporarily
  31:9
ten
  45:5 165:10
ten-minute
  149:16
tenant
  161:22
  163:16,19
  165:10 166:9
  167:8,23,25
tenant's
  167:9
tenants
  162:1,3,5,
  10,12 163:5
  164:14
  165:3,13
  167:17,20
tend
  105:3
term
  167:2
terms
  19:7,8 75:6
  148:7
  163:23,24
testified
  6:13 7:17,19
testify
  10:8,11

testifying
  6:7
testimony
  5:17 6:3,12
  103:7
text
  55:5,8,11,
  13,17 56:3,
  8,16,21 57:6
  59:4 70:11
  87:3,4,18
texts
  56:12 57:10
Thailand
  48:8
Thanksgiving
  53:12 63:14
thing
  12:13 27:24
  28:1 83:12,
  24 97:25
  98:1,2
  119:11
  131:24
  143:18
things
  7:22 51:25
  52:22 78:2
  79:18 101:9
  115:11 133:8
  150:15
thinking
  118:3
thought
  17:23 38:19
  101:6 140:19
tight-knit
  154:20
Tim
  175:3
time
  5:1,2,8
  7:10,11 14:2
  15:10,24
  17:2,4,14
  18:7 20:4
  28:24 31:5,

11,21 32:19,
23 33:13
34:5 35:22
36:25 39:4,9
40:17 41:22
42:12 43:5,8
45:10,11,15
46:15,16,18
47:9 48:14
53:2,4 60:21
65:4,12,15
72:9 75:16,
18 76:4,10,
14 79:7,8
85:20 87:17,
23 88:22
89:17,21,22,
25 90:1
91:14 96:18,
21,22 100:3
102:23
103:13
105:13,20
106:1,5
109:24
111:15
113:15
120:24
121:12
122:10
123:6,21
124:8,9
131:11
132:18
133:25
136:12
138:14,18
141:3,6
143:24
149:20,21,
24,25 153:9,
15 155:5
156:18
158:10
173:2,7
176:8,9,12
177:7,8
**times**
46:12 85:25

99:15
124:14,24
126:3 143:15
145:21
**title**
35:1 169:20,
23,25 170:3,
6,11
**today**
4:25 6:7,19
7:22 8:19
9:3,13 12:21
13:7,14
80:6,12
176:17,25
177:1,24
**Todd**
149:3
**told**
72:10,15
76:15 103:3
130:16
**tools**
146:3 157:17
**Tooth**
84:14,16
85:2,3,6,9
**top**
83:23 104:10
145:13 149:5
171:15
**topic**
8:24
**tore**
63:11
**Torvund**
99:10,14,19
100:1 150:22
**Torvund's**
99:24
**total**
52:21
107:18,25
108:2 175:23
**totally**
32:25 54:1
108:15

144:24
159:3,7
175:1
**touch**
176:18
**touching**
133:20
**tough**
85:20
**touring**
28:4,21
29:5,7
**tours**
61:11,13,14,
18
**town**
151:7
**trade**
51:20 52:16
**traded**
51:25
**Trail**
46:5 90:3
104:25
109:15,24
112:12,21
113:2
**trailer**
38:12
**trained**
42:19
**training**
40:10 62:22
**transaction**
141:23
142:18
143:12
157:6,8
168:11 169:8
**transactions**
141:8
**Transamerica**
102:5,6
103:8 104:11
106:8,19,20
107:1,20
108:4,14

109:1,14
119:21
120:1,13
**transcript**
177:12
**transfer**
106:6 136:24
165:2
168:17,22
**transferred**
24:2,20
101:18
120:6,16
137:14,17,24
153:10
171:13
**transferring**
41:25
117:15,20
**transfers**
141:25
**transition**
32:23 38:21
42:21
**transitioning**
41:12
**traumatic**
82:10
**travel**
47:6,11,12,
14 48:4,12,
13 49:15,18
54:25 86:2
95:16 97:11,
13 131:12,13
**traveled**
48:8 86:5
105:4
**traveling**
47:25 60:5
63:9 88:1
105:25 151:7
**treatment**
85:23
**Tri-**
25:7

Azuraye Wycoff
June 23, 2021

trial
  24:21
trick
  116:12 117:8
trip
  47:9,10
  48:1,14,17
  66:23 86:14
trips
  53:1 111:25
Tristar
  23:14,19
  25:8
truck
  38:12 39:4
  41:6 43:5
trust
  24:20 25:24
  69:25 70:1
  75:24 76:3,7
  92:16,18
  94:24 95:2
  107:16
  109:3,5
  113:10,12
  120:5,7,12
  123:11
  128:18,19
  129:23
  130:1,14
  131:20,21
  132:2,20
  133:3,22
  134:2,5,6,
  10,14,18,25
  135:2,5,8,
  11,12,20,21
  136:2,5,6,7,
  16,21 137:7,
  18,19,24
  153:7
trusted
  93:2
trustee
  129:4 130:13
  131:17
  132:1,15,20
  134:6,13

137:3
trustees
  136:4,15
trusts
  92:10,13,15
  93:7,10,13
  128:12,22,25
  129:2,5,7,20
  130:4
  131:17,23
  133:9,10,20
  135:23
  136:15,18
  137:3,22
  142:9 171:14
  175:7
truth
  79:3,5
  100:13,15
  101:4
tuition
  48:15
turn
  8:1 55:17
  75:21 157:25
Tyler
  168:4
type
  85:1
typed
  104:16
types
  43:9

_____

U

U.S.
  5:5,9
U.s.-based
  30:7
uh-huh
  8:10 45:24
  64:15 66:21
  81:17 103:2
  109:22
  172:13

ultimately
  33:2 36:22
  38:16 60:9
  74:13 134:19
  135:9 145:1
uncertain
  10:15 15:20
  107:22
  110:12,20,21
  113:16 129:1
  130:3 148:8
uncle
  62:10
uncomfortable
  31:22 32:3
understand
  6:9 8:16
  10:23 11:11
  12:9 13:16
  14:8 15:3
  16:12 18:8
  25:6 46:8
  56:6 76:20
  77:6 78:21
  82:21 114:19
  115:3,19
  117:11,12
  118:24
  126:21
  157:15 158:3
  160:8
understanding
  23:5,10
  24:23 25:8,
  11,15,18
  26:18 71:22
  129:17
  141:13
  157:7,9,16,
  17 160:11,12
  170:2,5
  175:22
understood
  8:17 22:19
  25:12
understudy
  35:3

unfulfilled
  23:23
unit
  164:3
units
  162:20
University
  27:17
unlimited
  161:14
Unmesh
  105:10
uphold
  23:19,22
upkeep
  43:19 150:18
  155:25
  157:19
upper-right
  4:22
UTC
  5:1 7:10
  45:10,14
  89:21,25
  96:18,21
  149:20,24
  176:8,12
  177:7
utilities
  133:8 138:21
  150:18
  160:10
  164:10,11

_____

V

vacation
  97:7
vaguely
  78:19,21
  110:6
valuable
  47:11
valuables
  122:6 147:19
van
  31:7 32:22

33:2,3,24,25
34:1,3
**varied**
28:25 35:17
**Vectra**
50:5 110:25
152:5,6,18,
20
**vehicle**
137:12
165:18
**verbally**
5:17 6:12
**Veritas**
11:1,13,17
12:3,13,14
13:18 14:9,
12,24 16:21
19:9,17,21
20:16 21:9
50:12,17,21
57:3,15
58:21 67:16
100:10,13
101:1 120:16
128:5 129:12
132:15
137:22,25
138:4,11,18
139:7,9,12,
16 140:4
142:3 150:3
163:20
164:13,23
167:4 171:13
173:14
174:22
**Veritas's**
88:18
**versus**
5:3 12:12
**video**
4:14,15,18,
20 5:4 6:23
8:8 45:18
70:14

**video-
recorded**
4:23
**view**
4:15,21
**Virginia**
29:7,10,18,
20
**visit**
46:19 97:9
**visited**
28:4
**voice**
125:18
**volunteer**
47:22
**Voya**
102:7,8,11
103:8 107:4,
5,9,21 108:5

---

**W**

**W-2**
39:14 40:6,
8,19 41:10
43:9,10,14
44:20
**wade**
77:6
**wages**
41:3
**waive**
5:20
**Waldorf**
61:7
**walked**
18:2 145:1
**walls**
147:11,17
**wanted**
6:18 10:7
23:22 76:16
93:15 100:14
101:11
146:23
155:18

167:13
**watching**
25:24
**water**
132:11
146:6,8
157:16
161:11,15,
17,19 173:16
**ways**
39:1 58:16
59:18 119:11
155:2
**wealth**
24:1,12
97:23 111:8,
17 113:13
120:8 133:13
**wear**
122:3
**website**
51:23 52:4,
15 83:2
**Wednesday**
4:25
**weeds**
160:14
**week**
35:15 36:18,
24 38:20
43:6,11,21
51:22 60:12,
14,16,18
61:13 81:20
86:1 95:23
97:6
**weekend**
28:5 66:6
**weeks**
10:6 17:10
21:13 82:17
95:23 176:21
**wellness**
61:17
**Whatsapp**
58:18,19,22
59:4 87:5

**whirlwind**
41:16
**wisely**
73:22
**withdraw**
155:1
**withdrawal**
153:7
**withdrawals**
150:9
**witness's**
4:20
**witness-only**
4:13
**witnessed**
105:14
**woman**
69:22
**won**
80:20
**word**
161:23
**words**
126:17
**work**
16:17 34:8,
12 35:15
36:11,15
37:12 39:10,
11,13 42:13,
25 43:9,10,
17 44:3
47:10 51:6,
9,25 52:8,18
59:19 60:13,
19,22 61:1
84:16 88:12
151:10
155:25
156:18 160:3
170:9
**worked**
35:9 43:16,
22 44:24
102:2 108:16
149:8 155:24
163:22

Azuraye Wycoff
June 23, 2021

**working**
  23:14 25:13
  28:1,3 29:4,
  7,24 34:6,
  15,16 36:18,
  23,25 37:2,
  10,13 59:22
  61:20 74:15
  85:6,8 87:23
  106:1 154:3
  174:4
**world**
  59:25
**worth**
  23:18 26:8,
  13 122:6
  146:17
  147:16,20
**wrap**
  8:23 20:3
**wrapped**
  156:18
**wrapping**
  66:23
**wreck**
  71:9 89:8
**write**
  75:14 136:21
  139:15 150:5
  151:25
  164:18
**writing**
  7:23 150:2
**written**
  8:6 15:12
  26:20
  110:17,18,20
  140:8 143:20
  150:12,15
**wrong**
  9:9 114:23
  115:21 116:4
  117:16,21
**wrote**
  96:1
**Wu**
  98:1

**Wycoff**
  4:24 6:2,11,
  16 7:14 9:12
  11:7,9 17:1
  22:14 45:4,
  16 67:13
  90:2 96:23
  101:14,18,19
  128:17,18
  135:5,8,12,
  20,21 136:5
  150:1 164:23
  176:13,24
  177:6

---

**X**

**Xcel**
  159:12
  160:10

---

**Y**

**year**
  29:8 30:11,
  23 34:14
  35:8,9
  40:18,21
  41:1,6,15
  42:10 44:8
  47:19,22
  52:21 53:10
  63:14,18
  84:3 97:12
  158:12
  161:14
  166:11 167:2
**years**
  30:23 31:3
  38:1,2 41:22
  43:18 44:11
  76:13 81:23
  82:2 84:5
  123:12 138:8
  146:18 148:4
  158:13
  163:18
  165:10,18

  169:17 174:4
**yellow**
  167:7
**Yellowbarn.**
**farm**
  58:11
**yeses**
  8:9
**York**
  83:21 86:18,
  20 87:21
  88:1,3 95:19
  111:25
**young**
  152:8
**youth**
  152:3,9,15
  154:9
**Yup**
  52:9 62:7,17
  66:15 104:23

---

**Z**

**ZAP**
  5:3 11:5
  23:14,16
  25:21 43:16,
  17 99:4
  151:18,25
  153:20,23,24
  154:3,8
  168:21
  170:14,17,20
  172:15
**Zealand**
  49:10,17
  82:1,14
  85:2,3 86:2,
  5,10,14,20
  89:3
**Zodiac**
  97:22,25
**zone**
  5:1
**zoned**
  144:9

**zoning**
  157:20
**zoom**
  109:17
  112:19