Page 1

1           IN THE UNITED STATES DISTRICT COURT
              FOR THE DISTRICT OF COLORADO
2

   Civil Action No. 1:20-cv-03142-DDD-KLM
3  _____

4  VIDEOTAPE DEPOSITION OF:  MERRIE WYCOFF
                             August 26, 2021
5                            (Via RemoteDepo)
   _____
6

   MIDLAB, INC., a Tennessee Corporation,
7

   Plaintiff,
8

   v.
9

   MERRIE PISANO WYCOFF individually and as trustee of
10 The Wycoff Family Trust; WYCOFF FINANCIAL, LLC, a
   Colorado Limited Liability Company; MAGNUS VERITAS
11 LLC, a Colorado Limited Liability Company; and GCS452,
   a Colorado Limited Liability Company,
12

   Defendants.
13 _____

14

15          PURSUANT TO NOTICE, the videotape
   deposition of MERRIE WYCOFF was taken on behalf of the
16 Plaintiff in Longmont, Colorado, via remote means, on
   August 26, 2021, at 9:07 a.m., before Tiffany D.
17 Goulding, Registered Professional Reporter and Notary
   Public within Colorado, appearing remotely from
18 Arapahoe County, Colorado.

19

20

21

22

23

24

25

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                        2 to 5

Page 2

```
 1            A P P E A R A N C E S
 2   For the Plaintiff:
 3        ROSS PULKRABEK, ESQ.
          AARON D. GOLDHAMER, ESQ.
 4        Keating Wagner Polidori Free, P.C.
          1290 Broadway, Suite 600
 5        Denver, Colorado 80203
          agoldhamer@keatingwagner.com
 6        rpulkrabek@keatingwagner.com
 7
 8   For the Defendants:
 9        STEVEN ABELMAN, ESQ.
          Brownstein Hyatt Farber Schreck, LLP
10        410 17th Street, Suite 2200
          Denver, Colorado 80202
11        sabelman@bhfs.com
12
13   Also Present:
14        Dustin Lamb, Video Technician
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION OF MERRIE WYCOFF:              PAGE
     August 26, 2021
 3
     By Mr. Pulkrabek                            9
 4
 5                                           INITIAL
     DEPOSITION EXHIBITS:                   REFERENCE
 6
     (Exhibits provided electronically to the reporter.)
 7
     Exhibit 120  Cover Page to the Book "Niche to    23
 8                Rich, Zap your Way to Success"
 9   Exhibit 121  E-mail to Abelman, Kling, Wycoff,  154
                  and Coburn from Bagchi, 7/2/18,
10                Subject: Wycoff/Zap
11   Exhibit 122  Guaranty (Wycoff)                  122
12   Exhibit 123  Loan Agreement (Wycoff)            119
13   Exhibit 124  Vectra Bank Statement of Accounts  123
14   Exhibit 125  Settlement Agreement               198
15   Exhibit 126  WhatsApp Messages                  267
16   Exhibit 127  E-mail to Bagchi from Abelman,     148
17                6/22/18,  Subject: RE: Wycoff/BC,
                  with attached e-mails
18   Exhibit 128  Transcript of United States Tax     64
                  Court Hearing, 8/14/12
19
     Exhibit 129  Letter from Wolf Re: Notice of      72
20                Claims of Jeffrey Wycoff and His
                  Intention to File Suit, 4/28/15
21
     Exhibit 130  Notice of Motion and Motion By      83
22                Merrie Pisano Wycoff, Successor in
                  Interest of Plaintiff Jeffrey Wycoff,
23                Deceased, to Be Allowed to
                  Continue This Action As His
24                Successor in Interest
25
```

Page 4

```
 1   Exhibit 131  Settlement Agreement and Mutual     89
                  General Release
 2
     Exhibit 132  Deed                               110
 3
     Exhibit 135  Special Warranty Deed              104
 4
     Exhibit 138  Exclusive Right-to-Sell Listing    111
 5                Contract
 6   Exhibit 139  Boulder Model Lease                113
 7   Exhibit 140  Vectra Bank Signature Card         118
 8   Exhibit 142  Letter to Merrie Wycoff 2003       134
                  Insurance Trust from Transamerica,
 9                11/2/17
10   Exhibit 143  E-mail to Wycoff, 11/13/17,        135
                  Subject: Re: Completed Change Forms
11
     Exhibit 144  E-mail to TII Customer Service from 140
12                Wycoff, 11/28/17, Subject: Policy
                  Change
13
     Exhibit 145  E-mail to TII Customer Service from 142
14                Wycoff, 11/28/17, Subject: Policy
                  Change No. 2
15
     Exhibit 146  Letter to Azuraye Wycoff Irrevocable 228
16                Trust from Internal Revenue Service,
                  6/8/18
17
     Exhibit 148  Grant Deed                         231
18
     Exhibit 152 Bank of America Funds Transfer      234
19               Request Authorization
20   Exhibit 165  Bank of America Business           246
                  Resolution or Authorization for
21                Opening and Maintaining Banking
                  Relationship
22
     Exhibit 166  Check No. 0991 to Packard Dierking 247
23                from Wycoff, 7/27/18
24   Exhibit 169  E-mail to Wycoff, Abelman, and     249
                  Clark from Lord, 8/7/18, Subject:
25                RE: leases, with attached e-mails
```

Page 5

```
 1   Exhibit 171  Limited Continuing Guaranty        196
 2   Exhibit 172  Letter to Wycoff from Miles,       193
                  5/25/18
 3
     Exhibit 173  Confidential Settlement Agreement  194
 4                and General Release
 5   Exhibit 174  E-mail to Merrie Wycoff from       200
                  Azuraye Wycoff, 8/6/18, Subject:
 6                Re: Easement Realignment Agreement
 7   Exhibit 175  Easement Realignment Agreement     203
 8   Exhibit 176  Check No. 5439 to Merrie Wycoff    208
                  from Merriam, 6/9/20
 9
     Exhibit 178  1998 U.S. Corporation Income Tax    45
10                Return for Restore 4, Inc.
11   Exhibit 179  Management Agreement                51
12   Exhibit 180  Employment Contract                 36
13   Exhibit 181  Certificate of Approval of Agreement 46
                  of Merger
14
     Exhibit 182  Fax to Transamerica from Wycoff,    52
15                9/17/11, Re:  Beneficiary Change
                  Form
16
     Exhibit 183  Gusto Payroll forms for Azuraye    253
17                Wycoff
18   Exhibit 184  Gusto Payroll forms for Devon      254
                  Wycoff
19
     Exhibit 185  E-mail to uom@metaphysics.com      218
20                from urlmeta@metaphysics.com,
                  2/14/12, Subject: Background
21
     Exhibit 186  E-mail to Wycoff from University of 221
22                Metaphysics & Sedona, 2/15/12,
                  Subject: Re: Enrollment Confirmation
23
     Exhibit 188  E-mail to Wycoff from University of 222
24                Metaphysics & Sedona, 6/26/12,
                  Subject: Re: Certificates
25
```

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 6

1   Exhibit 189   About Your Ministerial And Degree     225
                  Recognition Status
2
    Exhibit 196   Boulder Model Lease                   115
3
4
5   DEPOSITION EXHIBITS:  (Previously marked)
6   Exhibit 28    E-mail between Wycoff and             144
                  Certisimo, 12/15/17
7
    Exhibit 29    Letter to BC24                        154
8
    Exhibit 81    Letter dated 11/3/15                  93
9
    Exhibit 83    Jeffrey and Merrie Wycoff Statement   95
10                of Financial Condition, October 31,
                  2015
11
    Exhibit 93    Statement of Assets and Liabilities   128
12
    Exhibit 110   WhatsApp Messages                     158
13
    Exhibit 111   WhatsApp Messages                     186
14
    Exhibit 113   WhatsApp Messages                     190
15
16
17
18
19
20
21
22
23
24
25

Page 7

1          WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4              *    *    *    *    *
5          THE VIDEOGRAPHER:  We are now on the
6   record.  Participants should be aware that this
7   proceeding is being recorded, and as such all
8   conversations held will be recorded unless there is a
9   request and agreement to go off the record.  Private
10  conversations and/or attorney-client interactions
11  should be held outside the presence of the remote
12  interface.
13         For the purpose of creating a
14  witness-only video recording, the witness is being
15  spotlighted or locked on all video screens while in
16  speaker view.  We ask that the witness not remove the
17  spotlight setting during the deposition, as it may
18  cause other participants to appear in the final video
19  rather than just the witness.  For anyone who doesn't
20  want the witness's video to take up the large part of
21  your screen, you may click the gallery view button in
22  the upper right-hand corner of the remote depo
23  interface.
24         This is the remote video-recorded
25  deposition of Merrie Wycoff being taken by counsel for

Page 8

1   the plaintiff.  Today is Thursday, August 26, 2021.
2   The time is now 3:08 p.m. UTC, 9:08 a.m. Mountain.  We
3   are here in the matter of Midlab, Inc. versus Merrie
4   Pisano Wycoff, et al.
5          My name is Dustin Lamb, remote video
6   technician on behalf of U.S. Legal Support.  I am not
7   related to any party in this action, nor am I
8   financially interested in the outcome.  At this time
9   will the reporter, Tiffany Goulding, on behalf of U.S.
10  Legal Support, please enter the statement for remote
11  proceedings into the record.
12         THE REPORTER:  The attorneys
13  participating in this deposition acknowledge that I am
14  not physically present in the deposition room and that
15  I will be reporting this deposition remotely.  They
16  further acknowledge that, in lieu of an oath
17  administered in person, the witness will verbally
18  declare her testimony in this matter is under penalty
19  of perjury.  The parties and their counsel consent to
20  this arrangement and waive any objections to this
21  manner of reporting.
22         Please indicate your agreement by stating
23  your name and your agreement on the record.
24  Mr. Pulkrabek first.
25         MR. PULKRABEK:  Yes.  Ross Pulkrabek.  I

Page 9

1   agree.
2          THE REPORTER:  Mr. Abelman.
3          MR. ABELMAN:  Steve Abelman.  Yes, I
4   consent.
5          THE REPORTER:  Ms. Wycoff, I will ask you
6   to agree and declare that the testimony you are about
7   to give will be under the penalty.  Do you agree to
8   that?
9          THE DEPONENT:  Yes, I do.
10             MERRIE WYCOFF,
11  having verbally declared that her testimony in this
12  matter is under penalty of perjury, testified as
13  follows:
14             EXAMINATION
15  BY MR. PULKRABEK:
16     Q.   Good morning, Ms. Wycoff.  I'm Ross
17  Pulkrabek, counsel for Midlab.  Before we get started,
18  let me just kind of lay out a couple basic ground
19  rules for the deposition.  One is that if you don't
20  hear a question that I ask or if you don't understand
21  a question that I ask, will you ask me to repeat or
22  restate the question?
23         THE REPORTER:  I didn't hear an answer.
24     Q.   (BY MR. PULKRABEK) Ms. Wycoff, we didn't
25  hear an answer from you.  Can you say it again.

EXHIBIT L                  U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                              10 to 13

Page 10

1      A.   Yes, I will.
2      Q.   Okay.  You may need to move yourself just
3   a little bit closer to the microphone so that we can
4   hear you better.  The other --
5      A.   Where is the microphone?  Where would it
6   be?
7      Q.   Okay.  We're already having some
8   technical difficulties here, it sounds like.  Why
9   don't we just see if we can go forward a little bit
10  further, and if we have to we'll stop.
11           The other basic ground rule here is that
12  we can't talk over each other.  So even though you may
13  see where I'm going with a question, you need to let
14  me ask my question first and stop before you start to
15  answer.  And then I'll wait until you stop answering.
16  Okay?
17     A.   Okay.
18     Q.   Is that a yes?
19     A.   Yes.
20     Q.   Okay.  Thank you.
21     A.   Can you hear that?
22     Q.   I did hear that, yes.  All right.
23  Ms. Wycoff, would you ever lie under oath?
24     A.   Boy, that's loud.
25           THE REPORTER:  I didn't hear that.

Page 11

1      A.   No, I would not lie under oath.
2      Q.   (BY MR. PULKRABEK) I want to start by
3   getting a list of the bank accounts or the bank
4   institutions where you and Jeffrey Wycoff banked
5   starting any time in 2015 forward.  Okay?  Can you
6   give me the best of your memory all the banking
7   institutions where you and Jeffrey Wycoff banked since
8   2015?
9      A.   I think it's just Vectra, Vectra Bank.
10     Q.   Okay.  This would be either Jeffrey
11  Wycoff individually, you individually, or both of you
12  jointly.  So only Vectra?
13     A.   Yes.  I believe only Vectra.  You're very
14  loud.
15           THE REPORTER:  Yeah.  We're getting some
16  feedback from you, Ross.
17           MR. PULKRABEK:  Okay.  I don't know how
18  to adjust this, honestly.  I guess let me know if it
19  continues to be a problem.  I can try to talk a little
20  bit more softly.
21           THE REPORTER:  It sounds like you're a
22  robot.
23           THE VIDEOGRAPHER:  The sound is really
24  distorted.
25           MR. PULKRABEK:  Off the record.

Page 12

1           THE VIDEOGRAPHER:  Going off the record.
2   The time is 3:13 p.m. UTC, 9:13 a.m. Mountain.
3           (Recess taken, 9:13 a.m. to 9:16 a.m.)
4           THE VIDEOGRAPHER:  We are back on the
5   record.  The time is 3:16 p.m. UTC, 9:16 a.m.
6   Mountain.
7      Q.   (BY MR. PULKRABEK) Okay.  Ms. Wycoff, I
8   was asking you about bank accounts for you
9   individually, Jeffrey Wycoff individually, or the two
10  of you since 2015, and you said Vectra Bank.  What
11  about Wachovia?  Did you ever bank at Wachovia?
12     A.   I've never heard that name before.
13     Q.   What about JP Morgan Chase?
14     A.   Oh, yes.  I don't know what.
15     Q.   Okay.  What about Bank of America?  Have
16  you had any personal accounts with Bank of America?
17     A.   Jeff and I did not.
18     Q.   Have you had any personal accounts at
19  Bank of America since 2015?
20     A.   Yes.
21     Q.   All right.  Again, I'm trying to get all
22  the bank accounts that either you individually, Jeff
23  Wycoff individually, and/or the both of you had since
24  2015.  That's my question.  Okay.  So Vectra Bank, JP
25  Morgan Chase.  Any others?

Page 13

1      A.   I don't remember others.
2      Q.   And Bank of America.  What about Wells
3   Fargo?
4      A.   Yeah.  Well, I don't know if that
5   qualifies.  I think the mortgages were with Wells
6   Fargo, but I don't think there was a -- is that
7   banking?
8      Q.   So only mortgages.  What about have you
9   had any nontraditional banking accounts since 2015?
10     A.   I don't know what that means.
11     Q.   For example, crypto currency accounts?
12     A.   Oh, yes.  Yes, but state the question.  I
13  don't know how to answer what that --
14     Q.   You've had crypto currency accounts since
15  2015?
16     A.   Not 2015.  It's much later than that.
17     Q.   When did you start having crypto currency
18  accounts?
19     A.   Probably 2000 -- after 2018.
20     Q.   Okay.  And do you recall when more
21  specifically than after 2018?
22     A.   Do I remember what?
23     Q.   Do you remember when you started putting
24  money into crypto currency accounts?
25     A.   I don't remember.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                    14 to 17

1    Q.   Do you know where you have your crypto
2  currency accounts?
3    A.   Where have I had -- again, help me
4  understand what that means.
5    Q.   Well, you are the one that's putting
6  money into crypto currency and you would know where
7  you're putting money into crypto currency.  I
8  wouldn't.  So can you tell me where you're doing that?
9    A.   Coinbase, I think.
10    Q.   Any others?
11    A.   Yeah, but I can't remember.  Coinbase I
12  know.  There's lots of them, but I don't use much
13  other than just Coinbase.
14    Q.   All right.  What about FirstBank?  Have
15  you ever had any accounts at FirstBank since 2015?
16    A.   I don't think so.
17    Q.   Okay.  I think we've seen a check being
18  written by you into your Vectra Bank account for
19  $50,000 from a FirstBank account.  Does that help jog
20  your memory at all?
21    A.   Sure.  That would probably be my mother.
22  My mother had her accounts at FirstBank and I was her
23  executor.
24    Q.   So did you have -- did you open up an
25  account at FirstBank in your name at some point in

1  time?
2    A.   I don't remember.  It would have to do
3  with her estate.
4    Q.   All right.  How much total life insurance
5  was there on your husband, Jeffrey Wycoff, at the time
6  of his death?
7    A.   Gosh, I don't remember precisely, but
8  maybe 9 million.
9    Q.   Let's go through it a little bit more in
10  detail.  There was life insurance at State Farm;
11  correct?
12    A.   Yes.
13    Q.   You personally made a claim on the State
14  Farm policy; right?
15    A.   Yes.
16    Q.   And there was $4 million total coverage
17  at State Farm; correct?
18    A.   I don't remember, but -- I don't remember
19  exactly how much it was.
20    Q.   $550,000 was paid to Sanctuary of the ON?
21    A.   Right.
22    Q.   $3.45 million approximately was paid to
23  you?
24    A.   Yes.
25    Q.   Was there any other insurance with State

1  Farm?
2    A.   I don't believe so.
3    Q.   Okay.  So that's 4 million at State Farm.
4  Are you familiar with John Hancock?
5    A.   Yes.
6    Q.   We've got a subpoena response from John
7  Hancock indicating $3 million of life insurance with
8  John Hancock; is that accurate, to your knowledge?
9    A.   I don't remember the precise amount, but
10  if they say 3 million.
11    Q.   Are you aware of any more than 3 million
12  with John Hancock?
13    A.   I am not.
14    Q.   There were life insurance policies with
15  Transamerica; correct?
16    A.   Yes.
17    Q.   We got the subpoena response from
18  Transamerica, and that indicated about $3 million of
19  life insurance with Transamerica.  Does that sound
20  correct to you?
21    A.   I don't remember, but maybe.
22    Q.   All right.  What we saw was there was
23  $500,000 that was paid to BC24 LLC; is that accurate?
24    A.   I'm sorry.  How much?
25    Q.   500,000.

1    A.   Yes.
2    Q.   All right.  And then there was -- we've
3  seen 2.45 million paid to or payable to your daughters
4  Azuraye and Devon.  Does that sound accurate?
5    A.   How much?
6    Q.   $2.45 million.
7    A.   From where?
8    Q.   Transamerica.
9    A.   Didn't add up.  So I don't know.
10    Q.   What do you think the amount was paid by
11  Transamerica to your daughters?
12    A.   I don't know.
13    Q.   You're the trustee of the Azuraye J.
14  Wycoff Trust and the Devon A. Wycoff Trust; is that
15  right?
16    A.   Yes, I am.
17    Q.   As trustee you're familiar with assets
18  that were put into trust for them; correct?
19    A.   Somewhat familiar, yes.
20    Q.   So do you know the amount of the life
21  insurance from Transamerica that was put in trust for
22  them?
23    A.   I can't give you a number.
24    Q.   Other than Transamerica and John Hancock
25  and State Farm, are you aware of other life insurance

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 18

1  money that was paid out either to you individually or
2  to your daughters?
3      A.   Hold on.  Let me do it again.  So there
4  was Transamerica.  Say them again, please.
5      Q.   State Farm --
6      A.   State Farm.
7      Q.   -- John Hancock, and Transamerica are the
8  three that I've said so far.  Are you aware of any
9  others that were paid to you individually or to your
10  daughters?
11      A.   I believe there's a Voya account.
12      Q.   Do you know how much that was?
13      A.   I do not.
14      Q.   You had produced some trust documents for
15  the Azuraye J. Wycoff and Devon A. Wycoff Trust that
16  you're trustee of.  Are you familiar with having
17  produced those documents?
18           MR. ABELMAN:  Object to the form.
19      A.   Yes.
20      Q.   (BY MR. PULKRABEK) All right.  And the
21  answer was yes, you're aware of the trust documents?
22      A.   Yes.
23      Q.   And you've read them?
24      A.   No.
25      Q.   You did sign them; correct?

Page 19

1      A.   Yes.
2      Q.   Now, both of the trust documents say that
3  the amount of $4,150,000 was delivered to each of the
4  trusts; is that accurate?
5      A.   I don't know.
6      Q.   How would we find out if it was accurate
7  or not?
8      A.   I don't know.
9      Q.   The trust documents say that $4,150,000
10  was delivered to the trustee for each one of the
11  trusts.  You're the trustee.  So how would we find out
12  if $4,150,000 is an accurate number?
13      A.   I think you could add up the
14  Transamerica, the Voya, the other one, and get that
15  number.
16      Q.   Is there any other way to figure it out?
17      A.   I don't know.
18      Q.   Where did the trust money get deposited?
19      A.   I think I remember BNY Mellon.
20      Q.   All right.  Other than BNY Mellon, has
21  trust money been deposited anywhere else?
22      A.   I don't know.  I can't remember what
23  originally happened before I got BNY Mellon trust
24  money.  Well, trust money would have gone into, I
25  think, Bank of America for the sales.

Page 20

1      Q.   All right.  So if I understand correctly
2  what happened here, there were -- there was life
3  insurance money that then was deposited into trust
4  accounts for the Azuraye Wycoff and Devon Wycoff
5  trusts at BNY Mellon; is that correct?
6      A.   Yeah, I think so.
7      Q.   All right.  Now, if $4.150 million was
8  deposited into each of those trust accounts, as
9  indicated by the trust documents you produced, that
10  would be a total of $8.3 million being deposited into
11  the trusts.  That's just math.  Okay?
12      A.   Okay.
13      Q.   So what I'm trying to figure out is, we
14  see insurance policy money that was payable to your
15  daughters under $6 million.  The total is under
16  $6 million we've seen so far.  So here's my question:
17  Did you take other money and put it into the trusts?
18      A.   No.
19      Q.   Did you take money from the State Farm
20  policy that you received and deposit into these
21  trusts?
22      A.   Absolutely not.
23      Q.   All right.  Can you explain then how is
24  it that $4.150 million would have been deposited into
25  each one of these trusts or received by you as the

Page 21

1  trustee, if there's less than $6 million in insurance
2  that we've seen payable to Devon Wycoff and Azuraye
3  Wycoff?
4      A.   Yes.  Because each of the girls kept some
5  out for their Voya accounts and their John Hancock
6  accounts and the rest was handed over to BNY Mellon.
7      Q.   All right.  Let me ask the question
8  again.  Between the John Hancock money and the
9  Transamerica money that we've seen, it is under
10  $6 million, and yet the trust documents say that
11  4.150 million was deposited in each one of the
12  accounts adding up to $8.3 million.  So there's a
13  discrepancy of more than $2 million.  So can you
14  explain that for me?
15      A.   I can't.
16      Q.   The BNY Mellon statements for the Azuraye
17  J. Wycoff Trust and the Devon A. Wycoff Trust would
18  indicate the amounts that were actually deposited into
19  those accounts; correct?
20      A.   I don't know.
21      Q.   Do you get the statements as the trustee?
22      A.   We all get the statements.
23      Q.   And do you have those statements?
24      A.   I think so.
25      Q.   Would it be difficult for you to provide

EXHIBIT L              U.S. LEGAL SUPPORT, INC
                         713-653-7100

Merrie Wycoff
August 26, 2021                                     22 to 25

Page 22

1  the statements to your legal counsel so that they
2  could be produced in this litigation?
3      A.   I think my counsel -- it would probably
4  be easier to get it from BNY.
5      Q.   Okay.  You'd prefer us to get it directly
6  from BNY; is that what you're telling me?
7      A.   I would have to talk to counsel about
8  that.  So I don't know.
9      Q.   Let me ask you some basic information.
10 Azuraye Wycoff's date of birth is August 16, 1991;
11 correct?
12     A.   Yes.
13     Q.   Devon Wycoff's date of birth is
14 October 3, 1993; correct?
15     A.   Yes.
16     Q.   Jeffrey Wycoff's date of birth was
17 August 29, 1953.  Do I have that right?
18     A.   August 29, yes.
19     Q.   Your date of birth is March 31, 1958?
20     A.   Wrong.
21     Q.   What is it?
22     A.   It's March 11, 1958.
23     Q.   Did you marry Jeffrey Wycoff on April 7,
24 1990?
25     A.   I remember the April 7.

Page 23

1      Q.   Do you remember the year that you married
2  him?
3      A.   I think it's 1990.
4      Q.   All right.  You authored a book called --
5  I'm going to have you say it because I'm not quite
6  sure how to pronounce it, but it's "Zap Your Way to
7  Success."  So what's the full title of that?
8      A.   I think it's called "Niche to Rich, Zap
9  Your Way to Success."
10     Q.   When did you publish that book?
11     A.   I don't remember.
12     Q.   I'd like you to look -- do you have a
13 notebook there that was delivered to you this morning?
14     A.   Yes, I do.
15          (Deposition Exhibit 120 was remotely
16 introduced and provided electronically to the court
17 reporter.)
18     Q.   Why don't you look at Exhibit 120 in that
19 notebook.
20     A.   Yes.  I see it.
21     Q.   All right.  That's the cover page to the
22 book "Niche to Rich, Zap your Way to Success" that you
23 authored; correct?
24     A.   Yes.
25     Q.   And the publisher of that book is Rosa

Page 24

1  Mystica Publishing; is that correct?
2      A.   Correct.
3      Q.   That's the company that you own?
4      A.   Yes.
5      Q.   Do you have a sense how many copies of
6  this book were sold since you started publishing it?
7      A.   Did you buy one?
8      Q.   What's that?
9      A.   Did you buy one?
10     Q.   We bought two.
11     A.   Thank you.
12     Q.   You're welcome.
13     A.   Those are my only two copies.
14     Q.   Okay.  So you've had two sales over the
15 years?
16     A.   Yes.  It wasn't ever meant to be sold
17 like that.
18     Q.   What was it intended to be, then, if it
19 wasn't intended to be sold?
20     A.   It wasn't meant to be sold online like
21 that.  I wanted a public speaking career, and I wrote
22 books in order to have a public speaking career.  And
23 I got a mentor to help me launch into a public
24 speaking career.  And I wanted to speak about esoteric
25 topics, which I'm better at.

Page 25

1          I wrote another book, "Born in Orgasmic
2  Bliss," and that's what I wanted to speak about.  And
3  my mentor said I would never be able to have a career
4  speaking about those kind of topics.  And they kind of
5  pushed me into -- when they heard about Zap!, they
6  pushed me into writing a book, which is a format of
7  lots of quotes, and then you write your story so that
8  you can basically pitch a product.
9          And then that's called a -- I can't
10 remember what it was called.  Something like you sell
11 that book like in the back of the room.  So it's just
12 a way to launch a speaking career.
13     Q.   Okay.  So having the book "Zap Your Way
14 to Success" was to bolster your credentials as a
15 speaker?
16     A.   A book to corporate people who --
17 corporate people would pay money to hear about
18 specific topics.  I think that's the way that she
19 wanted me to position this.
20     Q.   Who is the mentor?
21     A.   It's been so long.  I don't know.
22     Q.   It doesn't matter.  Don't worry about it.
23 When did you decide you wanted to become a public
24 speaker?
25     A.   I knew I wanted to be an author and a

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Page 26

1  public speaker probably in college.
2        Q.  Well, when did you really start taking
3  steps toward becoming a public speaker?  Because it
4  seems like you did that later in life.
5        A.  I don't remember specifically.  I think
6  maybe when I became an empty-nester.
7        Q.  So one of the things that you did to set
8  yourself up for being a public speaker was you
9  authored some books; correct?
10       A.  Right.
11       Q.  Another thing that you did to set
12  yourself up to be a public speaker was you got your
13  Ph.D.?
14       A.  No.  That didn't really have to do
15  with -- again, I wanted to become a minister, a
16  reverend doctor.
17       Q.  All right.  Let me switch gears here.  I
18  want to talk about your daughter Devon Wycoff.  Are
19  you aware that we have requested her deposition in
20  this case?
21       A.  Yes.
22       Q.  And does she have any condition that
23  would prevent her from giving testimony?
24       A.  I didn't hear.  What happened?  Who said
25  what?

Page 27

1        Q.  All right.  Let me repeat the question.
2  Does Devon Wycoff have any condition that would
3  prevent her from giving testimony in this lawsuit?
4        A.  Yes.
5        Q.  What is it?  Go ahead.
6        A.  She has -- sorry.  Go ahead.
7        Q.  What is the condition that she has that
8  would prevent her from giving testimony?
9        A.  Devon has suffered at least eight
10  concussions.  After numerous surgeries, she thinks
11  that she might have a cerebral -- it's called a CSF.
12  It has to do with the spinal fluid, that it's leaking.
13  So she is in a -- she has to stay in her room a lot.
14         She is constantly exhausted.  There's
15  times where she has passed out.  She loses her
16  balance.  She has good days.  And then she also has
17  pretty severe anemia that we have to deal with.  She's
18  got a lot of health issues.
19       Q.  How long has she had these health issues
20  that would prevent her from testifying?
21       A.  She got her first concussion when she was
22  around eight months old in Alaska when she fell off a
23  counter.  Since then she has fallen off her horse.
24  She has fallen off trying to surf off the back of a
25  gator.

Page 28

1         She has gotten a pretty severe concussion
2  with a basketball hitting her in the head.  Now, I
3  don't know if it was a basketball.  It was a girl who
4  was hitting her in the head during a basketball game.
5  That was one of the most severe.  After that she -- I
6  don't know.
7        Q.  Let me just -- if I can, let me just
8  interrupt you, because I'm not trying to get her
9  entire medical history here.  What I'm asking is how
10  long has it been that she would have been unable to
11  testify because of her medical condition.  Has it been
12  since her birth or has it been more --
13       A.  No.
14       Q.  -- recently?
15       A.  Since 2019 when she got into a motorcycle
16  accident where she went off into a ditch.
17       Q.  What year?
18       A.  2019.  2019.
19       Q.  So she has been unable to testify since
20  2019.  And has she been able to work since 2019?
21       A.  She's worked.  Devon does -- sometimes
22  she can do behind-the-scenes photography.  I think she
23  did behind-the-scenes photography for a movie that was
24  shot on our property.  I think she's done something
25  else.  I think a lot of it has to do with photography.

Page 29

1        Q.  All right.  Since 2009 (sic) and her
2  motorcycle accident --
3        A.  '19.
4        Q.  I'm sorry.  2019.  Since 2019 and her
5  motorcycle accident, has she done any work other than
6  behind-the-scenes photography, to your knowledge?
7        A.  Since 2019?
8        Q.  Yeah.
9        A.  Since her motorcycle accident?  I don't
10  know.  I think she got paid for something in film.
11       Q.  Okay.  So we have behind-the-scenes
12  photography and something in film.  Other than those
13  two things, are you aware of any work that Devon
14  Wycoff has done since 2019?
15       A.  I think she did a modeling job for a
16  friend.
17       Q.  Is there anything else?
18       A.  I can't remember.
19       Q.  Has Devon Wycoff had a regular job, say,
20  something that she does 30 hours a week --
21       A.  No.
22       Q.  -- since 2019?
23       A.  No.
24       Q.  Has Devon Wycoff been able to hold down a
25  job where she would work 30 hours a week since 2019?

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Merrie Wycoff
August 26, 2021

30 to 33

Page 30

1   A.   She helps me -- I don't know.  Sometimes
2   she helps me clean up the barn.  Sometimes she helps
3   me sort through files and stuff.  This farm is pretty
4   messy.
5        Q.   So other than helping you sometimes clean
6   the barn, behind-the-scenes photos, film, and maybe
7   some modeling work, there's no other work that Devon
8   Wycoff has done, to your knowledge, since 2019; is
9   that fair?
10       MR. ABELMAN:  Object to the form;
11  foundation.
12       A.   I don't know.  I can't remember.
13       Q.   (BY MR. PULKRABEK) When was the last time
14  that Devon Wycoff was able to work a steady job, in
15  your opinion?
16       A.   I think probably when she was -- I don't
17  know.  A steady job.  I'd say in New York she was a
18  swing dresser, which means that she could choose when
19  and what she wanted to work on.
20       Q.   That would have been sometime before her
21  motorcycle accident?
22       A.   Yes.
23       Q.   So sometime before 2019?
24       A.   Yes.
25       Q.   Does Devon Wycoff handle any of the

Page 31

1   business of Magnus Veritas LLC?
2        A.   Yes.  She is the photographer for the
3   website and for all the events.
4        Q.   Anything else?
5        A.   For Magnus Veritas she helps decorate for
6   events, for farm hops, and for any of the dinners --
7   group dinners and stuff that come.
8        Q.   Anything else?
9        A.   She -- I'm sorry.  What was the question
10  again?
11       Q.   Does she handle any of the business for
12  Magnus Veritas LLC?
13       A.   Does she handle any of the business.  Can
14  you tell me what "the business" means in your terms.
15       Q.   Well, you said she's a photographer,
16  events on the site, the website.  She decorates for
17  events.  She handles dinners.  Is there anything else?
18       A.   What was the last word you said?
19       Q.   I thought you said she did some work on
20  dinners?
21       A.   Dinners.  It just was muffled.  I don't
22  know.  She attends the meetings with Aja and I.
23  Azuraye has taken over the farm.  So she determines --
24  sorry.  Lost my train of thought.  Yeah.  Devon
25  attends meetings and we talk about where Aja wants to

Page 32

1   put the market garden and the hoop house and Devon has
2   strong opinions about where she likes it and where she
3   doesn't like it and the road noise and determining how
4   many chickens we have, things like that.
5        Q.   So she doesn't do any of the accounting
6   work?
7        A.   No.
8        Q.   She doesn't handle the financials?
9        A.   She gets a say in it.
10       Q.   Does she do any of the bookkeeping?
11       A.   No.  I do the bookkeeping.
12       Q.   Does Devon handle any of the business for
13  GCS452, LLC?
14       A.   Devon has strong opinions about what she
15  wants, and I try to fulfill her wishes.
16       Q.   Does she do the bookkeeping for GCS452?
17       A.   No.
18       Q.   Does she handle any of the banking for
19  that company?
20       A.   No.
21       Q.   We talked about how you're a trustee for
22  the Azuraye Wycoff Irrevocable Trust.  Does Devon
23  Wycoff do anything with respect to that trust?
24       A.   Devon and I talk -- wait.  Which one is
25  which?

Page 33

1        Q.   I'm asking about the Azuraye Wycoff Trust
2   right now.  Does Devon Wycoff have a role with respect
3   to the Azuraye Wycoff Trust?
4        A.   Yes.
5        Q.   What's her role?
6        A.   Devon talks to me about funds needed.  I
7   can tell her what's needed and she consents to moving
8   funds to support.
9        Q.   So you tell her and she decides whether
10  she gives consent?
11       MR. ABELMAN:  Object to the form and
12  foundation.
13       Q.   (BY MR. PULKRABEK) Do I have that right?
14       A.   No.  You're saying I tell her.  I explain
15  what needs to be moved in order to pay the bills that
16  are coming in, and Devon and I discuss it and then
17  come to some understanding.
18       Q.   When money actually needs to be moved,
19  who is it that contacts the bank or writes the check?
20       A.   Out of BNY Mellon, the girls have to
21  sign a -- they sign documents that BNY Mellon sends
22  out, along with me.  And they're always on the phone,
23  or at least Azuraye is always on the phone with BNY
24  Mellon trying to determine the best course of action.
25       Q.   Whenever any money is to be taken out of

EXHIBIT L                U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

Page 34

1    BNY Mellon, or at least the trust accounts for Azuraye
2    and Devon at BNY Mellon, you have to sign a document?
3            A.    The three of us have to consent to it.
4            Q.    I want to go through some -- I want to go
5    through the companies that you have had an ownership
6    interest in over the years.  Okay.  It's fair to say
7    you have owned businesses at least since the 1990s;
8    correct?
9            A.    I don't remember if that's the exact
10   date.
11           Q.    Did you have any businesses in the 1990s?
12           A.    Yes.
13           Q.    What I'd like to do to maybe help us move
14   through this a little bit more quickly is I'm going to
15   see if I can pull up a document here that might have a
16   list.  One second.  I'm going to project that on the
17   screen.  And then what I'm going to do is I'm going to
18   ask you some questions about these companies.  If I'm
19   missing any companies, perhaps you can let me know
20   which ones we're missing.  Okay.  That's the next
21   exercise.  Got that?
22           A.    I hear that.
23           Q.    Okay.  While that's loading up -- here we
24   go.  This is all just a little bit slow because of the
25   remote video.  Okay.  You should be able to see now

Page 35

1    some companies.  Do you see that?
2            A.    No.
3            Q.    You don't see that?
4            A.    Yes.
5            Q.    Now you can?
6            A.    Yes.
7            Q.    Okay.  Good.  All right.  Let's go
8    through these companies.  There's a company called
9    Albion Management, Inc.; correct?
10           A.    Yes.
11           Q.    You were one of the owners of that
12   company; right?
13           A.    I don't know.
14           Q.    You were a 50/50 owner with Jeffrey
15   Wycoff in that company; correct?
16           A.    I remember the name of the company.  Can
17   I see anything?  Can you show me any documentation as
18   to -- I don't remember how -- I don't remember the
19   role or I don't remember what the company was.  I
20   remember the name.
21           Q.    You actually -- you were the president of
22   Albion Management, Incorporated when it entered into
23   an employment contract with Jeffrey Wycoff back in
24   2000; is that right?
25           A.    I don't know.

Page 36

1            (Deposition Exhibit 180 was remotely
2    introduced and provided electronically to the court
3    reporter.)
4            Q.    Let's look at Deposition Exhibit 180 in
5    your notebook, please.
6            A.    Yes.
7            Q.    All right.  You see there's an employment
8    contract there?
9            A.    Yes.
10           Q.    This is a document that was from the
11   trial in the petition that you filed with the United
12   States Tax Court.  This is one of the exhibits from
13   that trial.
14           A.    Okay.
15           Q.    You attended that trial; right?
16           A.    I did.
17           Q.    That was back in 2012.  Do you remember
18   that?
19           A.    Is that the first trial or the second
20   trial?
21           Q.    First trial.
22           A.    Okay.
23           Q.    That was August of 2012; right?
24           A.    I don't remember.
25           Q.    You were at the trial.  You just said

Page 37

1    that.  Jeffrey Wycoff, your husband, also was present
2    for the trial; correct?
3            A.    Yes.
4            Q.    Now, this employment contract is between
5    Albion Management and Jeffrey Wycoff; correct?  That's
6    what it says in the first paragraph.
7            A.    I don't know.  I'd have to read it.  Let
8    me see.  Yes.  It says it's an employment contract.
9            Q.    I'd like you to turn -- you see there's a
10   number at the bottom of the page that says 00481.  Do
11   you see that number at the bottom?
12           A.    Yes, I do.
13           Q.    All right.  Now, I want you to turn in
14   this notebook to page 490.  Same exhibit, but
15   page 490.
16           A.    That's awfully legal.  Go ahead.
17           Q.    And so you're on page 490 now?
18           A.    Yes, sir.
19           Q.    Do you recognize underneath the text
20   "Executed as of November 1, 2000, Employer," it says
21   "Albion Management, Inc."  Do you see that?
22           A.    I'm sorry.  Did you say text or tax?
23           Q.    On this page --
24           A.    Yes.
25           Q.    -- there's a signature --

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    38 to 41

Page 38

1    A.    Yes.
2    Q.    -- line?
3    A.    Yes.
4    Q.    Is that your signature?
5    A.    Yes, it is.
6    Q.    Okay.  And you signed Albion Management,
7    Inc. by Merrie Pisano Wycoff, president; is that
8    right?
9    A.    Yes.
10   Q.    Okay.  So as of November 1, 2000, you
11   were president of Albion Management, Inc.; correct?
12   A.    Does it say as of 2000?  As of 2000.  I
13   don't know.  Jeff put it in front of me.  I signed it.
14   I don't know.
15   Q.    Okay.  Did you oftentimes just sign
16   things that Jeff put in front of you without reading
17   them?
18   A.    Yes, I did.
19   Q.    Then on page 493 of the same exhibit.
20   A.    Page 493?
21   Q.    Page 493.
22   A.    Page 493.  Got it.  It's the next page.
23   Q.    All right.  You see you also signed this
24   page as the president of Albion Management; correct?
25   A.    Yes.

Page 39

1    Q.    So were you the president of Albion
2    Management, Inc. as of November 1, 2000, or not?
3    A.    Yes.  Well, I don't know if that's -- I
4    don't know what this is.  So is that an establishment
5    of when somebody is a board member?
6    Q.    It's a document that you signed on behalf
7    of Albion Management, Inc. and it says that you're the
8    president.  So the question is simply, were you or
9    were you not the president of Albion Management, Inc.
10   when you signed as president of the company?
11   A.    Was I the president of Albion, Inc. when
12   I signed it, but I don't think that's what you said.
13   So I thought you said something about that's when it
14   was established that I was president, and I said I
15   didn't know.
16   Q.    Okay.  Let me ask this question.  Just
17   try to follow along.  Were you actually the president
18   of Albion Management, Inc. when you signed this
19   document as the president?
20   A.    That's what I mean.  I don't know if it
21   was established before or if this establishes me as.
22   I don't know.
23   Q.    Would you sign the document as the
24   president of Albion Management, Inc. even though you
25   were not the president?

Page 40

1    A.    No.
2    Q.    So if you signed as the president, then
3    you were the president of Albion Management, Inc.
4    Would you agree with that?
5    A.    You asked me if -- you understand why I
6    was confused, because you asked me if it was
7    established ahead before I signed it as, and I don't
8    know that.  I'm signing this as a president.
9    Q.    This was your company with your husband,
10   wasn't it, Albion Management, Inc.?  That's one of
11   your companies?
12   A.    It's Jeff's company and I'm a board
13   member.
14   Q.    And you signed the document as president
15   back on November 1, 2000; correct?
16   A.    Say that again.
17   Q.    You signed Exhibit 180 as the president
18   of Albion Management, Inc. on November 1, 2000?
19   A.    Yes.
20   Q.    Next company on our list of companies is
21   Alcyone Alliance, LLC.  Do you see that?
22   A.    Right.  Yes.
23   Q.    Do you have an ownership interest in that
24   company?
25   A.    Hold on.  No.

Page 41

1    Q.    Do you know who the owners of that
2    company are?
3    A.    I think it's Azuraye and Devon's
4    irrevocable trust.  How are they -- they're probably
5    dual ownerships of Alcyone.
6    Q.    And what does that company do, Alcyone
7    Alliance?
8    A.    I don't know what it does.  Just acts as
9    a holding for Ascent.
10   Q.    I'm sorry.  Can you say that again.  I
11   didn't hear that.
12   A.    I think it acts as -- I don't know what
13   you call it, a parent -- is it a parent company?  No.
14   I don't know that that's a parent company.  It
15   holds -- I don't know.  It just -- I don't know if it
16   owns -- maybe it might own Ascent IP Holdings.
17   Q.    What is Ascent IP Holdings, LLC?
18   A.    That holds the intellectual property.
19   Q.    Which intellectual property?
20   A.    "Which intellectual property," what does
21   that mean?
22   Q.    You just said that Ascent IP Holdings
23   holds intellectual property and I'm asking what
24   intellectual property generally does it hold?  Can you
25   describe it for us?

EXHIBIT L          U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    42 to 45

Page 42

1      A.   Yes.  I believe it holds trademarks and
2  patents.
3      Q.   Are these the trademarks and patents that
4  were established over the years by Sirius and Restore
5  4 and other companies that you and Jeff Wycoff had?
6      A.   I believe it's the patents that -- the
7  trademarks that Jeff created for all his companies,
8  yeah.
9      Q.   Okay.  Then there is -- let me ask you
10 this:  Do you have a role within Ascent IP Holdings?
11     A.   "Have a role," what does that mean?
12     Q.   Are you an officer, a director, a
13 manager, anything along those lines?
14     A.   I can't remember documents.  Could you
15 show me anything?
16     Q.   So you don't know one way or the other,
17 sitting here today, if you have a position in Ascent
18 IP Holdings?
19     A.   A position as a -- give me an
20 understanding of what a position is.
21     Q.   Any position whatsoever, Ms. Wycoff.
22     A.   I know you're raising your voice.  If you
23 could just help me understand.  I'm trying to do this
24 correctly and you understand the legal.  I don't.
25     Q.   Ms. Wycoff, I think that the question is

Page 43

1  perfectly clear.  I'm just asking if you have any
2  position -- I mentioned officer, director, manager,
3  anything along those lines.  So if you can just let me
4  know if you've got a position, then we can get through
5  this a little bit more quickly.
6      A.   I understand, but these are a lot of
7  questions and I'm trying to do it correctly.
8      Q.   Okay.  So please answer my question.
9  Ascent IP Holdings, do you have a position?
10     A.   You're rushing me and I'm trying to
11 figure out if I hold a position.  I know that the
12 irrevocable trust owned the company.  So what
13 position -- you mean like a title?  I don't know that
14 I have a title.
15     Q.   Ms. Wycoff, if you don't know the answer
16 to the question, just say you don't know.
17     A.   Thank you.
18     Q.   You can say that.  Okay.  But I'm not
19 going to -- we can't have an ongoing conversation
20 about what a question means.
21     A.   You asked me if I had a question that I
22 was allowed to ask you to clarify, and that's what I
23 did.
24     Q.   Alcyone Alliance, do you have any
25 position within Alcyone Alliance as an officer,

Page 44

1  director, manager, or any other position?
2      A.   I don't know without documents.
3      Q.   Let's talk about Autumn Hill Center.
4  What is Autumn Hill Center, LLC?
5      A.   Autumn Hill Center, I think that was the
6  owner of the farm.
7      Q.   And when you say "the owner of the farm,"
8  do you mean the owner of the land?
9      A.   That's a good question.  I don't know if
10 it was -- well, I think the land -- I don't know.
11     Q.   Did you have an ownership interest in
12 Autumn Hill Center, LLC?
13     A.   Yes.
14     Q.   What was your ownership interest?
15     A.   Ownership interest, is that like a
16 percentage?
17     Q.   Right.
18     A.   I think I was probably equal owner with
19 Jeff.
20     Q.   Okay.  Were you a manager of Autumn Hill
21 Center, LLC?
22     A.   Manager.  Yes, I think we were referred
23 to as managers.
24     Q.   Next company, Ideas Unlimited, LLC, do
25 you know what that company is?

Page 45

1      A.   I don't.
2      Q.   What about Restore 4, Inc.?  Have you
3  heard of Restore 4, Inc.?
4      A.   Yes.
5      Q.   And were you an owner of that company?
6      A.   Owner of the company.  I don't know.  I
7  was probably maybe a board member.
8      Q.   All right.  In fact, you were the
9  president of Restore 4, Inc.; correct?
10     A.   I don't know.
11          (Deposition Exhibit 178 was remotely
12 introduced and provided electronically to the court
13 reporter.)
14     Q.   All right.  Why don't we look at
15 Deposition Exhibit 174 in your notebook.  I'm sorry.
16 That's going to be the wrong number.  Bear with me
17 here.  178.  Turn to 178 in the notebook.
18     A.   Yes.
19     Q.   All right.  So you see that Exhibit 178
20 is a tax return for tax year 1998 for Restore 4, Inc.?
21     A.   Tax return for Restore 4, Inc., yes.
22     Q.   And do you recognize your signature at
23 the bottom of the tax return where it says sign here?
24     A.   I do.
25     Q.   And so you signed this tax return for

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Page 46

```
1  1998; correct?
2      A.  Yeah.  Jeff put it in front of me, I
3  signed it.
4      Q.  And you signed it as the president?
5      A.  I did.
6      Q.  Okay.  And the date on this is
7  September 13, 1999?
8      A.  September 13, '99, yes.
9      Q.  So as of September 13, 1999, you were the
10 president of Restore 4, Inc.; correct?
11     A.  Well, I was president when I signed this.
12     Q.  All right.  Did you continue to be
13 president of Restore 4, Inc. after you signed the tax
14 return?
15     A.  Did I continue to be president?  Let's
16 see.  I was living in Colorado.  Jeff was in
17 California and ran the company.  So I probably held
18 that title.
19         (Deposition Exhibit 181 was remotely
20 introduced and provided electronically to the court
21 reporter.)
22     Q.  Let's look at Exhibit 181.
23     A.  Yes.
24     Q.  So Exhibit 181 is a Certificate of
25 Approval of Agreement of Merger.  Do you see that?
```

Page 47

```
1      A.  Yes, I do.
2      Q.  And it says here -- you signed that
3  agreement; right?
4      A.  Yes.
5      Q.  It says here, "The undersigned certifies
6  that:  They are the president and secretary
7  respectively of Restore 4, Inc., a Delaware
8  corporation"; correct?
9      A.  Yes.
10     Q.  And then it is dated June 20, 2005?
11     A.  Uh-huh.
12     Q.  Yes?
13     A.  Yes.
14     Q.  And it is signed Merrie Pisano Wycoff as
15 president; correct?
16     A.  Correct.
17     Q.  So as of June 2005 you were the president
18 of Restore 4; right?
19     A.  Yes.
20     Q.  Can you tell us what was the period of
21 time, to your knowledge, that you were the president
22 of Restore 4?
23     A.  I don't know.  Jeff ran the companies.  I
24 don't know.
25     Q.  Okay.  Next company on our list is Soap
```

Page 48

```
1  Works Company, Inc. d/b/a Simplicity International.
2  Do you see that?
3      A.  I do.
4      Q.  And you were an owner of that company;
5  correct?
6      A.  Was I an owner?  I think I was on the
7  board.
8      Q.  All right.  Did you and Jeffrey Wycoff
9  own that company?
10     A.  I believe so, yes.
11     Q.  Do you recall whether you had an officer
12 position like president, vice-president, secretary in
13 that company?
14     A.  Jeff was always making me something.  So
15 I must.
16     Q.  Next company is Rosa Mystic Ministry,
17 Inc.  Do you see that entity?  Is that a company that
18 you have owned?
19     A.  The name is Rosa Mystica, and yes.
20     Q.  Rosa Mystica Ministry, Inc. is a company
21 that you owned.  Did you own that solely or did you
22 own that with Jeff Wycoff?
23     A.  I don't remember.
24     Q.  Okay.  Did you have an officer position
25 in Rosa Mystica Ministry, Inc., like president or
```

Page 49

```
1  vice-president?
2      A.  It's for my ministry.  So whatever you
3  have to be.  President, probably.  I don't remember.
4      Q.  All right.  The next company on the list
5  is Rosa Mystic.  It should probably be Rosa Mystica
6  Publishing, LLC; correct?
7      A.  Yes.
8      Q.  And is that a company that you owned?
9      A.  Yes.
10     Q.  Do you still own that company?
11     A.  I do.
12     Q.  Are you the sole owner of that company?
13     A.  I don't know.
14     Q.  Are you the manager of that company?
15     A.  Doesn't do anything anymore.  So I don't
16 know.
17     Q.  Next company on the list is Simplicity
18 International, Inc.  Do you see that?
19     A.  I do.
20     Q.  And that was the company that originally
21 marketed the Zap! cleaning products; right?
22     A.  No, I don't think so.
23     Q.  What was the company that sold Zap! tile
24 cleaner?
25     A.  I think that was Sirius.
```

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                50 to 53

Page 50

1    Q.   Okay.  What did Simplicity International
2  do?
3    A.   I think it had a line of hypoallergenic,
4  nontoxic cleaning products.
5    Q.   All right.  And so were you an owner with
6  Jeff Wycoff in Simplicity International, Inc.?
7    A.   I think I was on the board of that, too.
8    Q.   Did you have an officer position in
9  Simplicity International, Inc.?
10   A.   Yeah.  I think they wanted a woman-owned
11  company.  So to launch products, yeah, I think I was.
12   Q.   Next company on the list is Sirius
13  Products, Inc.  You're familiar with Sirius Products;
14  correct?
15   A.   Yes.
16   Q.   And that was the company that originally
17  had the Zap! tile-cleaning products?
18   A.   Correct.
19   Q.   And you were 50/50 owners with Jeff
20  Wycoff in that company; is that right?
21   A.   I don't know if it was 50/50.  I was on
22  the board of that.
23   Q.   All right.  In fact, you were the
24  president of Sirius Products; correct?
25   A.   Boy, that was nice of him.  I don't

Page 51

1  remember.  There's too many companies.  I don't
2  remember what position he gave me.
3         (Deposition Exhibit 179 was remotely
4  introduced and provided electronically to the court
5  reporter.)
6    Q.   All right.  Let's look at Deposition
7  Exhibit 179.
8    A.   Yes.
9    Q.   All right.  So you see this is a document
10  titled "Management Agreement."  This was also out of
11  your tax court case.  And you see, again, the Bates
12  number 00414 at the bottom of the page.  I want you to
13  turn to page 00424, please.
14   A.   Yes.
15   Q.   All right.  That's your signature on
16  page 00424 as president of Sirius Products, Inc.;
17  correct?
18   A.   Yes.  And Jeff as president of Albion.
19  That's interesting.
20   Q.   Right.  So Jeff -- and the date on this
21  document, if you go back to the first page, it is
22  dated October 30, 2000.  Do you see that in the first
23  paragraph?
24   A.   First paragraph, yes.
25   Q.   All right.  So as of October 30, 2000,

Page 52

1  you were the president of Sirius Products, Inc.;
2  right?
3    A.   I don't know.  I can't hear numbers and
4  retain numbers.  So tell me again.
5    Q.   October 30, 2000, president Sirius, Inc.?
6    A.   Yes.  I hear October 30 of 2000.  So can
7  you tell me the question again, please?
8    Q.   You were the president of Sirius
9  Products, Inc. as of October 30, 2000?
10   A.   According to this document, yes.
11        (Deposition Exhibit 182 was remotely
12  introduced and provided electronically to the court
13  reporter.)
14   Q.   And then if you look at Deposition
15  Exhibit 182, please.
16   A.   What is it I'm looking at?
17   Q.   Looking at a document that you sent to
18  Transamerica Insurance Company on September 17 of
19  2011.  Do you see that?
20   A.   Yes.
21   Q.   You sent that fax to Transamerica; right?
22   A.   Yes.
23   Q.   Then on the second page there's a
24  document on Sirius Products, Inc. letterhead.  Do you
25  see that?

Page 53

1    A.   Yes.
2    Q.   And that's your signature together with
3  Jeff Wycoff's signature on this page; right?
4    A.   Yes.
5    Q.   And you signed it on September 17, 2011,
6  Merrie Wycoff, president; correct?
7    A.   Yes.
8    Q.   You had that notarized; right?
9    A.   Yes.
10   Q.   So in 2011 you were president of Sirius
11  Products, Inc.; right?
12   A.   Yes.
13   Q.   So we just saw a document from 2000 and
14  then here's one from 2011.  Is it fair to say that
15  between 2000 and 2011, you were the president of
16  Sirius Products, Inc.?
17   A.   Yes.
18   Q.   Okay.  Now, Sirius Products, Inc. we've
19  already established is the company that was selling
20  the Zap! tile-cleaning product; correct?
21   A.   Correct.
22   Q.   So you were the president of a company
23  that had substantial revenue from selling that
24  product; isn't that right?
25   A.   Correct.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                    54 to 57

Page 54

1    Q.   And the revenues -- do you recall what
2  the revenues were for Sirius Products, Inc.?
3    A.   Yeah.  I want to say, like, I think that
4  the company made, like, 100 -- 160 million, something
5  like that.
6    Q.   So you were the president of a company
7  that made $160 million in sales; right?
8    A.   That sounds impressive.  Jeff made that,
9  not me, but yeah.
10   Q.   The question is, you were the president
11 of a company that had $160 million in sales; correct?
12   A.   Yes.
13   Q.   Now, Sirius Products was sued in a
14 wrongful death case back in 2003; right?
15   A.   I don't know.
16   Q.   You were the president of the company at
17 the point in time when the husband of a woman named
18 Linda Gowbler sued Sirius Products for wrongful death;
19 isn't that right?
20   A.   Sure.
21   Q.   Okay.  You would agree that if somebody
22 died from or even alleged that they had died from the
23 Zap! products, that would be something that would be
24 pretty serious; right?
25   A.   Yes.

Page 55

1    Q.   And as the president of Sirius Products,
2  Inc., you would be expected to know if somebody was
3  accusing the company of having caused a wrongful
4  death?
5         MR. ABELMAN:  Object to foundation.
6         THE DEPONENT:  I don't remember -- Steve,
7  I don't remember what happened after you said that.
8    Q.   (BY MR. PULKRABEK) Ms. Wycoff, let me ask
9  the question again.  As the president of Sirius
10 Products that manufactured the Zap! cleaning product,
11 isn't it reasonable to expect that you would know if
12 the company was sued by somebody who alleged that the
13 product had caused a wrongful death?
14        MR. ABELMAN:  Object to foundation.
15   A.   What year was that?
16   Q.   (BY MR. PULKRABEK) It was in 2003 and it
17 settled in 2005.  Do you remember this?
18   A.   Jeff handled all the legal and all the
19 business.  I was a mom in Colorado.  So I don't
20 remember.
21   Q.   All right.  It was filed in the United
22 States District Court for the Southern District of
23 Alabama.  Does that help refresh your memory at all
24 about a person who was alleged to have died from the
25 Zap! cleaning products?

Page 56

1    A.   A person was alleged to have died from
2  Zap! cleaning products.  Jeff handled all the business
3  and all the legal.  I don't remember.
4    Q.   Did you ever know that Sirius Products,
5  Inc. was sued for wrongful death?
6         MR. ABELMAN:  Object to the form.
7    A.   I don't remember.
8    Q.   (BY MR. PULKRABEK) All right.  Can you
9  tell me why did Sirius Products stop manufacturing the
10 Zap! cleaning product?  You're going to need to speak
11 up because it's hard to hear you.
12   A.   Why they stopped.  I don't remember.
13   Q.   Did Zap! stop making the tile-cleaning
14 product because it had caused a death?
15   A.   What year did they stop?
16   Q.   Ms. Wycoff, you were the president of the
17 company.  I wasn't.  So I guess I'm asking you these
18 questions.  What year did they stop?
19   A.   I don't know.  It was Jeff who ran the
20 business and ran everything.  I wasn't really involved
21 in the business.  So I don't know what year they
22 stopped.
23   Q.   Ms. Wycoff, when you testified in the tax
24 court case, did you testify truthfully or
25 untruthfully?

Page 57

1    A.   I testified truthfully for what I knew
2  then.
3    Q.   All right.  One of the things that you
4  testified to in the tax court case was that you spoke
5  with Jeff Wycoff upwards of 20 times a day?
6    A.   I did.
7    Q.   And that he kept you constantly apprised
8  of what was happening with the business.  Do you
9  remember testifying to that?
10   A.   Yes.
11   Q.   And was it true that Jeff Wycoff actually
12 did talk to you 20 times a day?
13   A.   Jeff called me 20 times a day.
14   Q.   And is it true that Jeff Wycoff kept you
15 constantly apprised of what was going on with the
16 business?
17   A.   Jeff told me all the good things.  Jeff
18 told me when he got a new contract.  Jeff told me when
19 he was going to take a plane trip.  Jeff told me --
20 what did he tell me?  He tried to tell me all the good
21 things.
22   Q.   All right.  Did Jeff Wycoff continue to
23 communicate with you at that same level of frequency
24 through 2017?
25   A.   Wait.  Through 2017.  Through 2017.

EXHIBIT L                U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    58 to 61

Page 58

1  Because he died in 2018. So through 2017, yeah, Jeff
2  and I talked, sure, as husband and wife do.
3      Q.   Well, my question is more geared towards
4  what you told the tax court back in 2012 was that you
5  talked constantly with Jeff Wycoff about the business.
6  So I'm asking, did you continue to talk constantly
7  with Jeff Wycoff about the business through 2017?
8      A.   We talked constantly that Tri Star was
9  going to launch any minute and we were in preparation
10 for that launch, yes. We talked about my role was
11 really only creative. And so we talked about the
12 labels. We talked about the bottles.
13          We talked about changing from Zap! to
14 Restore 4. We talked about the stuff that -- you
15 know, the creative stuff. That infomercial stuff was
16 really the only thing I was good at in the company,
17 was the creative aspect.
18     Q.   So my question was a little bit less
19 specific to what you talked about and it was more
20 geared towards did you talk. So is it fair to say
21 that through 2017 you continued to talk with Jeff
22 Wycoff constantly about the business?
23     A.   We talked about what Jeff wanted me to
24 know, very positive things.
25     Q.   All right. And did it ever change where

Page 59

1  he stopped talking about the business before your
2  husband died, or did you continue talking about the
3  business more or less constantly up through when he
4  died?
5      A.   I don't know. I didn't want to be
6  involved in Zap! anymore and he knew that. And just
7  if he talked, he talked at me and I tuned out.
8      Q.   Let's talk about -- there's a company
9  called Tile Pros?
10     A.   Yes.
11     Q.   And was that the first company that you
12 owned with Jeff Wycoff?
13     A.   Yes.
14     Q.   That was back in the 1990s?
15     A.   Yes.
16     Q.   All right. There's a company called
17 Wycoff Financial, LLC; right?
18     A.   I see it, yeah. I don't know what it
19 stands for. Yeah, I remember the name.
20     Q.   You remember a Wycoff Financial, LLC;
21 correct?
22     A.   I don't know. Probably. I was on every
23 board of every company.
24     Q.   All right. There's a company called
25 Yellow Barn Farm Foundation, Inc. Do you have an

Page 60

1  ownership interest in that company?
2      A.   Ownership, no.
3      Q.   Do you have any position as an officer,
4  director, or other role in that company?
5      A.   I think that's Aja's company.
6      Q.   There's a company called Zap! Holdings,
7  LLC; correct?
8      A.   I see it.
9      Q.   And did you have an ownership interest in
10 that company?
11     A.   I don't remember what it is.
12     Q.   All right. There's a company called Zap!
13 Products, Inc. formerly known as Antares
14 International, Inc.?
15     A.   I remember Antares.
16     Q.   Okay. And you and Jeff Wycoff were 50/50
17 owners of that company; right?
18     A.   I don't know. Is that the Zap! Products,
19 Inc.? That's the current Zap!.
20     Q.   That's right. So you and Jeff Wycoff
21 owned that company 50/50, right, until he died?
22     A.   I never set up any of these companies. I
23 don't know how ownership was ever presented, if it was
24 49/50. So I don't know.
25     Q.   You became the president of Zap!

Page 61

1  Products, Inc. after Jeffrey Wycoff's death; right?
2      A.   After his death, I think.
3      Q.   You reviewed tax returns for Zap!
4  Products, Inc. in that capacity; correct? I'm sorry.
5  You kind of blanked out there, Ms. Wycoff. Is it true
6  that as the president of Zap! Products, Inc. after
7  Jeffrey Wycoff's death, you would have reviewed the
8  tax returns?
9      A.   You cut out. I would do what with the
10 tax returns?
11     Q.   Would have reviewed them. Let me back
12 up.
13     A.   I rely on accountants to do things.
14     Q.   All right. When you became the president
15 of Zap! Products, Inc., did you look at the tax
16 returns?
17     A.   I signed the tax returns.
18     Q.   Did you look at them before you signed
19 them?
20     A.   I look at numbers. Do I understand them?
21 No.
22     Q.   When you became the president of Zap!
23 Products, Inc., did you review its financials?
24     A.   No.
25     Q.   When you became the president of Zap!

EXHIBIT L                U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                     62 to 65

Page 62

1    Products, Inc., did you look over its contracts?
2         A.   I rely on counsel and I rely on
3    accountants.  They understand these and can review
4    these.  I have no experience with these things.
5         Q.   So is it fair to say that when you became
6    the president of Zap! Products, Inc., you did not
7    personally review its contracts?
8         A.   Review the contracts of Zap!?
9         Q.   That's right.
10        A.   I rely on counsel.  I rely on legal
11   advice who understands contracts.
12        Q.   So the question is not do you rely on
13   other people.  The question is different than that.
14   The question is this:  Is it correct that when you
15   became the president of Zap! Products, Inc., you did
16   not personally review any of its contracts?
17        A.   Sir, I lost my husband and the father of
18   my children and we were grieving.  So did I take time
19   to read contracts?  No.
20             MR. PULKRABEK:  Why don't we take a
21   ten-minute break.  We've been going here for about an
22   hour 15 minutes or so.  Is that okay?
23             MR. ABELMAN:  We're going off the record.
24   Merrie, you can mute if you want.
25             THE DEPONENT:  How do you mute?

Page 63

1              THE VIDEOGRAPHER:  Going off the record.
2    The time is 4:32 p.m. UTC, 10:32 a.m. Mountain.
3              (Recess taken, 10:32 a.m. to 10:43 a.m.)
4              THE VIDEOGRAPHER:  We are back on the
5    record.  The time is 4:43 p.m. UTC, 10:43 a.m.
6    Mountain.
7         Q.   (BY MR. PULKRABEK)  Ms. Wycoff, I want to
8    ask you some further questions about your and Jeffrey
9    Wycoff's petition in the United States Tax Court.
10   Okay?
11        A.   Sure.
12        Q.   So the way that the proceedings in the
13   United States Tax Court came about was that the
14   Internal Revenue Service had issued you and Jeffrey
15   Wycoff what is known as a notice of deficiency;
16   correct?
17        A.   I don't remember.
18        Q.   And the Internal Revenue Service said
19   that you and Jeffrey Wycoff owed more tax than you had
20   paid going back to the years back in about 2001; is
21   that right?
22        A.   I don't remember.  Jeff handled all the
23   legal.  I didn't go to any of those meetings.  I don't
24   remember.
25        Q.   Well, you were at the trial; correct?

Page 64

1         A.   I was at the trial.
2         Q.   You sat through the trial; right?
3         A.   That's pretty much the first time I
4    showed up for a meeting.
5         Q.   You were one of the parties petitioning
6    the IRS through the United States Tax Court; right?
7         A.   Does that make me knowledgeable about the
8    case?
9         Q.   You sat through the case and heard what
10   happened; right?
11        A.   I tried.  I tried to understand.
12        Q.   Okay.  And so isn't it right that the
13   Internal Revenue Service was saying that you and Jeff
14   Wycoff owed tax?
15        A.   Was it us?  I can't remember if it was us
16   or the companies.  I don't remember specifically.
17             (Deposition Exhibit 128  was remotely
18   introduced and provided electronically to the court
19   reporter.)
20        Q.   Now, why don't you turn to Deposition
21   Exhibit 128.  Do you have it in front of you?
22        A.   I do.
23        Q.   You can see that Deposition Exhibit 128
24   is a certified copy of part of the transcript of
25   Jeffrey Wycoff and Merrie Pisano Wycoff versus

Page 65

1    Commissioner of Internal Revenue filed in the United
2    States Tax Court.  Do you see that?
3         A.   Yes.
4         Q.   And if we look at -- if you look at the
5    page numbers, they're in the upper corner of the pages
6    of the transcript.  If you want to, you can go to
7    page 305.
8         A.   305, yes.
9         Q.   You see that there's a direct examination
10   that starts on page 305 --
11        A.   Yes.
12        Q.   -- by Mr. Davine.  And that's the direct
13   examination of you; right?
14        A.   Yes.
15        Q.   So you actually testified as a witness in
16   that case; correct?
17        A.   Correct.
18        Q.   And immediately before you testified
19   Barry Marlin testified; right?
20        A.   I don't know.
21        Q.   Okay.  If you want to go back to
22   page 295.
23        A.   295.
24        Q.   A few pages before your testimony starts.
25        A.   Yes.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                    713-653-7100

Merrie Wycoff
August 26, 2021                                        66 to 69

Page 66

1    Q.   All right.  You see that there's a direct
2  examination by Mr. Davine, and it's of Barry Marlin;
3  right?
4    A.   Correct.
5    Q.   So Barry Marlin testified in your trial;
6  correct?
7    A.   Yes.
8    Q.   And you were there when Barry Marlin
9  testified; right?
10   A.   Yes.
11   Q.   And one of the things that you heard
12 during Barry Marlin's examination was that he had been
13 convicted of a felony for fraud; right?
14   A.   Yes.
15   Q.   And that he had operated a Ponzi scheme;
16 right?
17   A.   Was that in trial?
18   Q.   You heard when he was cross-examined that
19 he had participated in a Ponzi scheme; isn't that
20 right?
21   A.   You're asking me about this trial.
22   Q.   Right.  Why don't you look at page 301 of
23 the transcript.  Maybe that will help refresh your
24 memory of what you heard.  Let me know when you're at
25 that page.

Page 67

1    A.   I'm at 301.
2    Q.   Okay.  So one of the things that you
3  heard Mr. Marlin testify to -- starting at line 7 on
4  page 301, the question was, "Are you the same Barry
5  Marlin who was convicted of fraud in 1978?  Answer:
6  Yes.  That's me."  Right.  You heard him testify to
7  that; correct?
8    A.   Yes.
9    Q.   And then next question, "And that was for
10 running a Ponzi scheme, yes?  Answer:  That's your
11 opinion.  You're entitled to it.  It was not a Ponzi
12 scheme, but if you wish to characterize it that way,
13 that's fine."  You heard that; correct?
14   A.   Correct.
15   Q.   And then you heard at line 14 to 16,
16 "Question:  You went to prison for two years in
17 connection with your conviction," and then Mr. Marlin
18 says, "Answer:  Less than two years.  I was
19 incarcerated for 20 months."  You heard all that;
20 right?
21   A.   Well, I'm reading it now.  Yes.
22   Q.   But you heard it when you were sitting
23 there in trial; correct?
24   A.   Yes.
25   Q.   Now, did you know that before you went to

Page 68

1  trial or were you hearing it for the first time in
2  trial in August of 2012?
3    A.   I heard it before trial.
4    Q.   So you knew that when Mr. Marlin
5  testified, this was coming; right?
6    A.   How would I know that?
7    Q.   When did you first hear that Barry Marlin
8  had been convicted of fraud?
9    A.   I don't remember dates.  I remember that
10 there was no Google at the time and Barry was highly
11 recommended from a friend.  And I remember -- how did
12 I find out?  Jeff told me.  I never found out
13 directly, but Jeff told me.
14      I don't remember how he discovered it.
15 And he was mortified.  And I think he parted ways with
16 Barry after that, but I don't remember what year that
17 was.
18   Q.   So sometime before Google was widely
19 available, you learned that Barry Marlin had been
20 convicted of fraud?
21   A.   Yes.
22   Q.   And so that must have been in the early
23 2000s, because Google has been around and pretty
24 predominant since the early 2000s; right?
25   A.   I don't know.

Page 69

1    Q.   Okay.  Another thing that you heard Barry
2  Marlin testify to, if you look at lines 4 to 6 of this
3  transcript, was, "Question:  You didn't provide any
4  written opinions to Mr. Wycoff regarding those
5  transactions, did you?  Answer:  No, sir."
6         You heard Mr. Marlin -- you heard that
7  testimony; right?
8    A.   Please tell me what page we're on again.
9    Q.   We're still on page 301, the same page.
10   A.   We're back to 301.  Wait.  I'm on 305.
11 301.  Yes.  Go ahead.
12   Q.   And one of the things that you heard was
13 you heard the IRS's lawyer ask, "You didn't provide
14 any written opinion to Mr. Wycoff regarding those
15 transactions, did you?"  And Mr. Marlin answered, "No,
16 sir"; right?
17   A.   Can you tell me what number that is?
18   Q.   Lines 4 to 6.
19   A.   Four to six.
20   Q.   Page 301.
21   A.   "Provide any written opinion to
22 Mr. Wycoff regarding those transactions, did you?"
23 I'm reading it now.  I can't say I remember.
24   Q.   You heard it back in 2012 too; right?
25   A.   You're making an assumption that I heard

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021

70 to 73

Page 70

1  it or that I even understood it. I am reading it now.
2      Q.   Now, Barry Marlin was the lawyer who
3  introduced you and Jeff Wycoff to the tax structure
4  that involved the Rabbi Trust and Albion Management;
5  is that right?
6      A.   I don't know. Is that the ESOP?
7      Q.   Right.
8      A.   So say the question again.
9      Q.   Was Barry Marlin the lawyer that
10 introduced you to the ESOP plan?
11     A.   Introduced Jeff to it.
12     Q.   Ms. Wycoff, have you read the opinion
13 that was issued by the United States Tax Court in your
14 case?
15     A.   What's the opinion?
16     Q.   Well, are you aware that in 2017 the tax
17 court ruled against you and Jeffrey Wycoff?
18     A.   Jeff told me that.
19     Q.   Did you read the tax court's opinion?
20     A.   I did not.
21     Q.   You understand, don't you, that the
22 petition that you and Jeffrey Wycoff filed in the
23 United States Tax Court concerned Albion Management,
24 Inc., Sirius Products, Inc. and Restore 4, Inc.?
25     A.   Say that again.

Page 71

1      Q.   Are you aware that the tax court case
2  that you and Jeffrey Wycoff brought involved Albion
3  Management, Inc., Sirius Products, Inc., and
4  Restore 4, Inc.?
5      A.   It involved?
6      Q.   Yeah. Yeah. Do you know that those
7  companies were involved in the case?
8      A.   The companies were involved in the case?
9      Q.   The case concerned those companies. Are
10 you aware of that?
11     A.   Concerned. It was Zap!.
12     Q.   Ms. Wycoff, are you capable of providing
13 complete and accurate testimony today?
14     A.   Sir, I've had COVID for six weeks, and do
15 you know what a long-hauler is?
16     Q.   Okay. I've heard of that, yes. So my
17 question --
18     A.   You're asking things from a long, long
19 time ago that Jeff handled all the legal for the
20 lawyers. So am I aware of things? I showed up in
21 court and I did the best I could do. Did I understand
22 all of it? No. I didn't even know why we went to
23 court.
24     Q.   Getting back to my question, and it's a
25 serious question, do you feel capable of giving

Page 72

1  testimony in a deposition today? Because you seem to
2  be having an awful lot of difficulty testifying.
3      A.   You're asking me to remember things from
4  20 years ago that -- I lived in Colorado. Jeff ran
5  businesses out of California. How could I possibly
6  know all this stuff?
7      Q.   Getting back to my question, do you feel
8  comfortable testifying today or not?
9      A.   Yes.
10     Q.   Okay. Let's try to keep going. There
11 was a malpractice lawsuit that Jeffrey Wycoff filed
12 against the firm Mitchell Silberberg & Knupp, as well
13 as Roland Attenborough and Jeffrey Davine; right?
14     A.   Yes.
15     Q.   And that lawsuit was filed back in 2014?
16     A.   I don't know.
17          (Deposition Exhibit 129 was remotely
18 introduced and provided electronically to the court
19 reporter.)
20     Q.   Let's look at Exhibit 129, please.
21     A.   Yes.
22     Q.   You see this Exhibit 129, this is a
23 document that was produced by you in this lawsuit.
24 You can see the Bates number in the lower right-hand
25 corner. Starts with WYCOFF 1078 Confidential. Do you

Page 73

1  see that?
2      A.   Yes.
3      Q.   All right. So this is something that
4  comes out of whatever files you looked through to
5  produce documents in the case; right?
6      A.   When you say it was produced by me, do
7  you mean me or was it produced by Jeff?
8      Q.   Well, your husband -- you know, you have
9  my condolences for this, but he's not been alive at
10 any point in time in this lawsuit. So it had to be
11 you.
12     A.   He filed it against them.
13     Q.   All right. I'm talking about this is one
14 of the documents that you turned over to us in this
15 case; right?
16     A.   I don't know.
17     Q.   David Wolf was the lawyer representing
18 Jeffrey Wycoff in the malpractice case; correct?
19     A.   Yes.
20     Q.   And then after Jeffrey Wycoff died in
21 about June 2018, you took over that case as his
22 successor; right?
23     A.   Correct.
24     Q.   Okay. So then David Wolf was your lawyer
25 representing you as the successor to Jeffrey Wycoff in

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Page 74

1  that lawsuit; right?
2      A.   My lawyer as a successor to that, yes.
3      Q.   Okay.  Now, this letter that David Wolf
4  sent was sent on April 28, 2015; right?
5      A.   Yes.
6      Q.   And he sent it to a bunch of people;
7  correct?
8      A.   Yes.
9      Q.   And then if you look at the next page,
10  WYCOFF 1079, you can see that the regarding line is
11  "Notice of claims of Jeffrey Wycoff and his intention
12  to file suit against you."  Do you see that?
13      A.   This is page 2?
14      Q.   Right.  Right at the top of the page.
15      A.   Yes.  We represent Jeff Wycoff.
16      Q.   Right.  Yes.  Mr. Wolf writes, "We
17  represent Jeffrey Wycoff and certain of his
18  affiliates, including Sirius Products, Inc.
19  (collectively, Mr. Wycoff)"; correct?
20      A.   Correct.
21      Q.   And then in the introduction -- I'm just
22  going to read the introduction to you.  You can just
23  let me know if I have misread it at all.  Okay?
24      A.   Okay.
25      Q.   Mr. Wolf writes, quote, Mr. Wycoff was a

Page 75

1  client of Reish & Reicher, a professional corporation
2  formerly known as Reish Luftman McDaniel & Reisher
3  (RLMR).  In and before 2002 RLMR, by and through
4  Roland Attenborough ('Mr. Attenborough'), who was a
5  shareholder of that firm, provided Mr. Wycoff with
6  professional advice relating to certain tax-advantaged
7  "S" corp ESOP transactions.  In connection with doing
8  so, RLMR, various of its shareholders and each of them
9  breached fiduciary duties owing to, and perpetrated
10  fraud on, Mr. Wycoff.  As a result of the breach of
11  those duties and fraud, Mr. Wycoff has suffered
12  substantial damage.  To date, he has incurred more
13  than $2 Million in legal fees opposing efforts by the
14  IRS to collect unpaid taxes it claims are owing by him
15  as a result of his having effected those "S" corp ESOP
16  transactions on the advice of RLMR.
17      A.   RLMR.  Okay.  Is there a question?
18           THE REPORTER:  Looks like he might be
19  frozen.
20           THE DEPONENT:  Who might be frozen?
21           MR. ABELMAN:  Looks like Ross.  Ross,
22  we're not able to hear you.
23           THE VIDEOGRAPHER:  Okay.  He just dropped
24  off.  Let me read us off.  Going off the record.  The
25  time is 5:04 p.m. UTC, 11:04 a.m. Mountain.

Page 76

1           (Discussion off the record.)
2           THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 5:05 p.m. UTC, 11:05 a.m.
4  Mountain.
5      Q.   (BY MR. PULKRABEK) All right.  So I was
6  reading the first paragraph on page 2 of Exhibit 129
7  when things froze, but you followed me through where
8  it says, "ESOP transactions on the advice of RLMR";
9  right?
10      A.   Yes.
11      Q.   Okay.  And then it goes on to say, "With
12  interest and penalties, the taxes the IRS claims are
13  owing by Mr. Wycoff now exceed $10 million"; correct?
14      A.   I'm reading it, yes.
15      Q.   "Mr. Wycoff would not have incurred those
16  legal fees, or be subject to the possibility of owing
17  in excess of $10 million in taxes, had RLMR, various
18  of its shareholders and each of them not breached the
19  fiduciary duties owing by them to, and perpetrated
20  fraud on, Mr. Wycoff"; correct?
21      A.   I'm reading it, yes.
22      Q.   Okay.  So this is how the letter sent by
23  Jeffrey Wycoff's lawyer, later your lawyer, in 2014
24  begins; right?
25      A.   I'm reading it, yes.

Page 77

1      Q.   And then if we go to page 7 of the
2  letter, it's Wycoff Financial -- or I'm sorry -- it's
3  WYCOFF 1084.  Let me know when you get to that page.
4  Are you there?
5      A.   Yes, I am.
6      Q.   Do you see the first full paragraph on
7  this page Mr. Wolf writes, quote, Had RLMR and some of
8  you disclosed to Mr. Wycoff what you were ethically
9  obligated to disclose to him, Mr. Wycoff would not
10  have sought or obtained Mr. Attenborough's advice on
11  such matters, would not have contested the IRS'
12  investigations, actions and proceedings, would not
13  have engaged MSK to contest them and would have made
14  arrangements with the IRS to settle and pay the taxes
15  owing by him.  Do you see that?
16      A.   I do.
17      Q.   So this is a statement that Jeffrey
18  Wycoff's lawyer, later your lawyer, made back in 2014;
19  correct?
20      A.   Yeah.  Jeff and David, right.
21      Q.   All right.  Then it goes on, "As a
22  proximate result of the breach of your duties of
23  disclosure and fraud, Mr. Wycoff was wrongfully
24  induced to -- and did -- rely on the advice of
25  Mr. Attenborough to take on a decades-long fight with

EXHIBIT L                   U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Merrie Wycoff
August 26, 2021                                          78 to 81

Page 78

1  the IRS which could and should have been settled;
2  incurred in excess of $2 million in fees paid or
3  payable to MSK and Hochman which he need not have paid
4  or incurred; and, finds himself facing a potential tax
5  liability in excess of $10 million, to his obvious
6  harm and detriment"; correct?
7      A.   That's what it says.
8      Q.   All right.  Now, you ultimately settled
9  the lawsuit and the claims that are being referenced
10 in this letter; right?
11     A.   You're cutting in and out.
12          MR. PULKRABEK:  Okay.  Tiffany, did you
13 get an answer there?  Ms. Wycoff sort of froze for me.
14          THE REPORTER:  I didn't get an answer.
15 She froze for me too.
16     A.   I said you were cutting in and out.
17     Q.   (BY MR. PULKRABEK) Okay.  All right.  The
18 question was, you ultimately settled the legal
19 malpractice claims that Jeffrey Wycoff's lawyer, and
20 later your lawyer, articulated in this letter; right?
21     A.   Later settled the claims, yeah, because
22 the main witness died.  Yes.  Yes, I ended up settling
23 those claims.
24     Q.   And you settled the claims for $475,000;
25 correct?

Page 79

1      A.   That was at the mediation, yes.
2      Q.   And so the law firm and/or its insurance
3  company paid $475,000 to settle the malpractice claims
4  that were being brought by Mr. Wolf on your behalf;
5  right?
6      A.   Yes.
7      Q.   Now, the gist of the claims that you
8  settled was that the IRS was owed taxes and that this
9  law firm, Mitchell Silberberg & Knupp and Roland
10 Attenborough, was wrongfully inducing Jeffrey Wycoff
11 to contest the tax liability.  Isn't that the gist of
12 it?
13     A.   I don't know.  Jeff was handling all
14 this.  I showed up to a mediation, you know.  I don't
15 know.
16     Q.   Well, you were a party to the 2012 tax
17 court case that went to trial; right?
18     A.   Yes.  I was party to it.
19     Q.   And weren't you part of paying the
20 $2 million in legal fees to fight with the IRS?
21 Wasn't that your money as well as Jeff Wycoff's money?
22     A.   Jeff handled all the legal fees.  I don't
23 know about any of that.  Jeff handled all the
24 litigation, legal fees, and talking to lawyers.  I
25 just showed up.

Page 80

1      Q.   Ultimately the IRS assessed the tax
2  against both you and Jeffrey Wycoff; right?
3      A.   I just discovered that, yes.
4      Q.   What do you mean you "just discovered
5  that"?  When did you discover it?
6      A.   I think when it was -- I think when Jeff
7  told me the final outcome of it, that it was against
8  us.
9      Q.   And you're telling me that that's the
10 first time you were aware that you owed tax?
11     A.   You sit through these trials and you
12 don't really understand what's going on.  I don't
13 think Jeff and I knew what was going on until we got
14 to trial.
15     Q.   So is it your testimony that before 2017
16 you did not know that you had a tax deficiency notice
17 with the IRS, you personally?
18     A.   Before 2000 -- say it again.  Before
19 2000 -- no.  I remember pieces of that.  Do I remember
20 specifically in those words, "tax deficiency"?  Those
21 are legal terms.
22     Q.   All right.  So you understand people pay
23 taxes in this country; right?
24     A.   Sure.  Absolutely.
25     Q.   And you understand that when people don't

Page 81

1  pay the taxes that they owe, the IRS can tell them
2  that they need to pay the tax; right?  You understand
3  that, don't you?
4      A.   Well, that's a very simplified term.  I
5  think the IRS can claim that you owe anything and then
6  you're responsible to help show them otherwise.
7      Q.   And in 2009 the IRS issued a notice of
8  deficiency to you and Jeffrey Wycoff; correct?
9      A.   What year was that, sir?
10     Q.   2009.
11     A.   2009.  Is that when it was?  I don't
12 remember the year.
13     Q.   And when did you become aware that the
14 IRS was saying that you and Jeffrey Wycoff both owed
15 tax?
16     A.   I remember Jeff telling me that, that
17 they made claim.  And he told me that they had won
18 everything up until this court case.
19     Q.   Okay.  And when did he tell you that?
20     A.   I don't remember.
21     Q.   Was it before you filed the tax court
22 case?
23     A.   What's the tax court case?
24     Q.   The one that you sat through the trial
25 in.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                          82 to 85

Page 82

1    A.   Okay.  We were talking about MSK.  So I'm
2  not sure where we are.
3    Q.   Once again, there was a case that you and
4  Jeff Wycoff filed in the United States Tax Court and
5  you sat personally in the trial and you testified;
6  right?
7    A.   Yes.
8    Q.   That's the case we're talking about.  So
9  was it before you filed that tax court case that
10 Jeffrey Wycoff told you that the IRS had issued a
11 notice of deficiency and said that you and Jeffrey
12 Wycoff both owed tax?
13   A.   Well, my understanding is that it's a
14 claim and until you go through court and there's a
15 final outcome, it's just a claim.
16   Q.   Where do you get that understanding?
17   A.   I guess --
18        MR. ABELMAN:  Hold on.  I'm just going to
19 caution the witness.  You can explain what your
20 understanding is.  You can explain the source, but you
21 shouldn't reveal conversations -- the substance of
22 conversations between you and tax counsel or any other
23 counsel.
24   A.   Then I guess that remains with the
25 lawyers.

Page 83

1    Q.   (BY MR. PULKRABEK)  Okay.  So you can't
2  testify about that one way or the other, the basis of
3  your belief that it's just a claim?  Is that what
4  you're telling me?
5    A.   I would tell you that the lawyers would
6  know.
7        (Deposition Exhibit 130 was remotely
8  introduced and provided electronically to the court
9  reporter.)
10   Q.   All right.  Turn to Exhibit 130, please.
11   A.   Yes.
12   Q.   This is a Notice of Motion and Motion by
13 Merrie Pisano Wycoff, Successor in Interest of
14 Plaintiff Jeffrey Wycoff, Deceased, to be Allowed to
15 Continue This Action as His Successor in Interest.  Do
16 you see that?
17   A.   I do.
18   Q.   This was filed in the Superior Court of
19 California, County of Los Angeles, on June 26, 2018;
20 right?
21   A.   Hold on.
22   Q.   Upper right-hand corner.
23   A.   Correct.
24   Q.   So this was filed by David Wolf; right?
25   A.   Correct.

Page 84

1    Q.   And if we look at five pages into this
2  document, there's a declaration of Merrie Pisano
3  Wycoff.  Do you see that?
4    A.   Five pages into it.  Are we talking front
5  and back?  One, two, three, four.  Page 5.  No, I
6  don't think that's it.
7    Q.   Do you see a document titled "Declaration
8  of Merrie Pisano Wycoff" at the top?
9    A.   Hold on.  Merrie Pisano Wycoff.  Yes, I
10 do.
11   Q.   If you turn to the next page, that's your
12 signature; right?
13   A.   Correct.
14   Q.   And you executed this document on June 20
15 of 2018?
16   A.   Correct.
17   Q.   All right.  If you go back to the prior
18 page where it says "I, Merrie Pisano Wycoff, declare,"
19 do you see that part?
20   A.   That's at the top of the page?
21   Q.   Yes.
22   A.   Yes.
23   Q.   All right.  And then you say -- what
24 you're asking for in this first paragraph is that you
25 allow -- be allowed to continue as decedent's

Page 85

1  successor in interest in the above-titled action which
2  the decedent commenced on July 10, 2014; correct?
3    A.   Where are you seeing this?  July 10,
4  2014.  Okay.  Successor in interest in the
5  above-titled action which decedent commenced on
6  July 10 of 2014.  I see that.
7    Q.   All right.  So in a declaration under
8  oath made to a court in Los Angeles, you established
9  that Jeffrey Wycoff had started this case July 10,
10 2014; right?
11   A.   Yes.  I think David Wolf sent that to me,
12 yes.
13   Q.   All right.  So you're aware that Midlab
14 in this case is alleging that there was a statement of
15 financial affairs provided to it in November of 2015;
16 correct?
17   A.   2015.  I can't remember the date when
18 they say that happened.
19   Q.   All right.  Before the statement of
20 financial affairs was provided to Midlab, Jeffrey
21 Wycoff had filed a legal malpractice case in
22 California against his lawyers who had advised him to
23 contest the IRS proceedings; isn't that right?
24   A.   Okay.  I'm sorry.  Could you repeat
25 dates?

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                              86 to 89

Page 86

1      Q.    2014.  July 2014, the lawsuit against
2  Jeffrey Wycoff and your lawyers in the tax court case
3  gets filed; right?
4      A.    Okay.  This is MSK?
5      Q.    Yes.
6      A.    Okay.  MSK.
7      Q.    Correct.
8      A.    So you're saying?
9      Q.    What I'm saying is, do you agree that at
10 the time the statement of financial affairs was
11 provided to Midlab, there was a pending legal
12 malpractice case against MSK for wrongfully having
13 induced Jeffrey Wycoff to contest the IRS notice of
14 deficiency?
15     A.    That's a long statement.  Okay.  So can
16 you just make the part that you want answered shorter?
17 You're confusing me with the IRS versus MSK versus
18 Midlab.
19     Q.    Okay.
20     A.    I'm trying to get the correlation.
21     Q.    Your husband Jeffrey Wycoff was suing
22 MSK?
23     A.    Yes.
24     Q.    It was -- he was suing MSK for
25 malpractice; correct?

Page 87

1      A.    MSK for malpractice, yes.
2      Q.    He was suing MSK for malpractice and
3  having induced him into a decades-long battle with the
4  IRS; correct?
5      A.    Yes.
6      Q.    A decades-long battle that should have
7  been settled earlier with the payment of taxes to the
8  IRS; correct?
9            MR. ABELMAN:  Object to the form and
10 foundation.
11     Q.    (BY MR. PULKRABEK) Isn't that right?
12     A.    I don't know.  It was Jeff's case.  And
13 David Wolf probably wrote that.  I don't know.
14     Q.    You ultimately made the decision to
15 settle the case; correct?
16     A.    I did.
17     Q.    You settled the case and you got $475,000
18 for the settlement; right?
19           MR. ABELMAN:  Objection; foundation.
20     A.    I didn't get that much.
21     Q.    (BY MR. PULKRABEK) That's how much the
22 law firm paid; right?
23     A.    That's how much the law firm paid to
24 David Wolf.
25     Q.    When the statement of financial affairs

Page 88

1  was provided to Midlab, the legal malpractice case
2  against MSK was pending; correct?
3      A.    I thought I --
4            MR. ABELMAN:  Objection.
5            THE REPORTER:  I'm sorry.  Say your
6  answer again, please.
7      A.    I thought I heard somebody else.
8      Q.    (BY MR. PULKRABEK) When the statement of
9  financial affairs was provided to Midlab, there was a
10 pending legal malpractice case against MSK involving
11 the IRS tax liability; isn't that right?
12           MR. ABELMAN:  Object to foundation.
13     A.    I don't know how to answer that.  I
14 hadn't seen the statement of financial affairs and I
15 don't know when Midlab saw it.
16     Q.    (BY MR. PULKRABEK) There was a pending
17 legal malpractice case as of October 31, 2015; right?
18     A.    Are we talking MSK?
19     Q.    Yes.
20     A.    Yes.
21     Q.    Are there other legal malpractice cases
22 that you or Jeffrey Wycoff brought that you're aware
23 of?
24     A.    Are there other legal malpractice cases?
25 Was MSK the only one?  Is that all that wraps around

Page 89

1  that?
2      Q.    You tell me, Ms. Wycoff.
3      A.    I don't know.
4      Q.    Are you aware of any other legal
5  malpractice cases that you or Jeffrey Wycoff have
6  brought?
7      A.    I don't know if MSK included
8  Mr. Attenborough or if that's a separate one.  I don't
9  know.
10           (Deposition Exhibit 131 was remotely
11 introduced and provided electronically to the court
12 reporter.)
13     Q.    Let's look at Exhibit 131, please, the
14 next exhibit in the notebook.  So Exhibit 131 is the
15 Settlement Agreement and Mutual General Release
16 between you and MSK, Jeffrey Davine, and Roland
17 Attenborough; right?
18     A.    Yes.
19     Q.    And you signed this release and
20 settlement agreement on pages 6 -- I guess maybe just
21 page 6; is that right?
22     A.    Yes.
23     Q.    You signed it in your capacity as
24 successor in interest to Jeffrey Wycoff; right?
25     A.    Successor in interest, Jeffrey Wycoff,

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 90

1  yes.

2       Q.   You signed this on February 19, 2019;

3  right?

4       A.   Correct.

5       Q.   Okay.  Then back on the first page under

6  paragraph 1, it indicates that the settlement payment

7  being made by MSK was $475,000; is that right?

8       A.   From MSK, yes, I believe it was.

9       Q.   Okay.  And then you received some portion

10 of that $475,000; is that accurate?

11      A.   Correct.

12      Q.   And you deposited that portion that you

13 received into an account titled in your individual

14 name; is that right?

15      A.   I think so.

16      Q.   Did you say yes?

17      A.   I think so.

18      Q.   So you did not open up an account for the

19 estate of Jeffrey Wycoff and deposit that money into

20 an estate account, did you?

21      A.   I did not.

22      Q.   Is there a reason why you decided to keep

23 that money for yourself rather than deposit it into

24 any kind of estate account?

25           MR. ABELMAN:  Object to foundation.

Page 91

1       Q.   (BY MR. PULKRABEK) Go ahead, Ms. Wycoff.

2  You can answer.

3       A.   Is there any reason?  Say it again.

4       Q.   Sure.  The question is -- well, let me

5  back up a little bit.  You understand that Jeffrey

6  Wycoff owed debts when he died; right?

7       A.   That Zap! owed debts, yes.

8       Q.   Not just Zap! owed debts.  Your husband

9  Jeffrey Wycoff owed debts; correct?

10      A.   He personally owed some debts, yes.

11      Q.   And then he had -- one of the assets that

12 he had when he died was this legal malpractice claim

13 that he was in the midst of pursuing when he died;

14 right?

15      A.   Yes.

16      Q.   And there was a $475,000 settlement

17 payment by MSK as part of that claim that he had been

18 pursuing; right?

19      A.   Yes.

20      Q.   So my question then, is there a reason

21 why when you got whatever portion of that you received

22 it went into an individual account rather than

23 depositing it into any kind of an account for the

24 estate of Jeffrey Wycoff?

25      A.   Never heard of an estate account.

Page 92

1       Q.   Well, isn't it true that you actually did

2  open an estate account at Vectra Bank for Jeffrey

3  Wycoff?

4       A.   Estate account?

5       Q.   Yeah.  Didn't you open an account on

6  behalf of the estate of Jeffrey Wycoff?

7       A.   Open an estate account for Jeffrey

8  Wycoff?  I don't think so.

9       Q.   All right.  We'll take a look at that

10 later.  Other than never having heard of an estate

11 account, is there any other explanation you can

12 provide for why you deposited settlement money to your

13 individual account?

14      A.   Reason as to why?

15      Q.   Yes.  Is there any other reason for it?

16      A.   So that I could pay a portion of that

17 account to the IRS attorney that was an outstanding

18 debt, and I wanted to settle that debt too.

19      Q.   Okay.  Is there any other reason other

20 than you wanted to use a little bit of that money to

21 pay the IRS lawyer?

22      A.   Say that again.

23      Q.   I'm trying to get all the reasons, if

24 there are reasons, why you chose to take the money

25 that you got from the malpractice case against MSK and

Page 93

1  put it in an individual account in your name as

2  opposed to putting it in some sort of an account for

3  the estate of Jeffrey Wycoff?

4       A.   I didn't know that was an option.

5       Q.   There's a document that I'd like to show

6  you.  I don't think that it was included in the

7  folder, but it's been previously marked as an exhibit.

8  I'm going to pull it up here and see if I can share

9  it -- share it on my screen here.  Okay.  Are you

10 seeing a shared screen at the moment?

11      A.   Yes.

12      Q.   What are you seeing?

13      A.   Robert Henke, certified public

14 accountant.

15      Q.   Okay.  Good.  All right.  So this was

16 previously marked as Exhibit 81 in Mr. Henke's

17 deposition, and it's a letter dated November 3, 2015.

18 Do you see that?

19      A.   I could barely read the date.

20      Q.   I'll zoom in for you here.  Is that

21 better?  Can you see the date?

22      A.   Thank you.

23      Q.   Okay.  If we look at page 3 -- I'm

24 sorry -- 4 of Exhibit 81, I'd like you to look at the

25 signature here.  Can you confirm that is your

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                          94 to 97

Page 94

1  signature?
2      A.  Yes.  Can you remind me what this
3  document is?
4      Q.  Yes.  This is a letter to engage Robert
5  Henke to perform accounting services in early November
6  of 2015.
7      A.  Okay.
8      Q.  All right.  Did you sign page 4 here?
9      A.  Yes.
10     Q.  And you dated it 11/3/15?
11     A.  Correct.
12     Q.  All right.  Did you meet with Matt Schenk
13 of Midlab on November 4, 2015?
14     A.  Did I meet with Matt Schenk?  Where would
15 I have met him?
16     Q.  I think right where you're sitting, in
17 the barn in that office.
18     A.  Yes.  Yes.  I came over and said hello
19 that day, yes.
20     Q.  What do you recall of that meeting?
21     A.  Nothing other than simple hellos and how
22 do you dos and who are you with.  And I think they're
23 from Tennessee.  I said, How's the weather in
24 Tennessee?
25     Q.  Let me show you another document here

Page 95

1  that came up in Mr. Henke's deposition.  All right.
2  Do you see -- I'll back out for a second.  Do you see
3  Exhibit 83 on your screen?
4      A.  Make it a little bit bigger, please.
5      Q.  Exhibit 83, can you see that?
6      A.  Correct.
7      Q.  Okay.  And then the next page of
8  Exhibit -- second page of Exhibit 83 is titled Jeffrey
9  and Merrie Wycoff Statement of Financial Condition,
10 October 31, 2015.  Do you see that?
11     A.  I do see that.
12     Q.  What, if anything, did you do in early
13 November to review the information that is shown on
14 the second page of Exhibit 83?
15     A.  Nothing.  Jeff handled everything.
16     Q.  Did you do anything to try to make sure
17 that information that would be listed on the second
18 page of Exhibit 83 would be accurate?
19         MR. ABELMAN:  Object to the form and
20 foundation.
21     A.  Sir, the first time I saw this is in the
22 complaint.  I think it might be -- I don't know if
23 it's the amended complaint.  That's the first time I
24 saw this financial statement.
25     Q.  (BY MR. PULKRABEK) So it would be fair to

Page 96

1  say that you did absolutely nothing to try to make
2  sure that information that was being prepared on a
3  statement of financial condition in early 2015 was
4  accurate?
5      A.  Jeff would know values of things.  Jeff
6  would have done that.  I would have had no
7  responsibility in knowing any of that.
8      Q.  All right.  My question is not whether or
9  not you have responsibility.  I think that's something
10 that we're going to be fighting about in this case.
11 The question is simply this:  Is it true that you did
12 nothing to try to make sure that the information that
13 would be put together by Robert Henke on a statement
14 of financial condition in early November 2015 would be
15 accurate?
16         MR. ABELMAN:  Object to the form and
17 foundation.
18     A.  I never saw that until the claim.
19     Q.  (BY MR. PULKRABEK) So the answer to my
20 question is yes, you didn't do anything?
21     A.  Is that a double negative?  I did
22 nothing.  Well, can you state that in a clearer way?
23     Q.  Look, the question is this:  You signed
24 this engagement letter with Bob Henke that we just saw
25 in Exhibit 81?

Page 97

1      A.  Correct.
2      Q.  Bob Henke was preparing a statement of
3  financial affairs.  That's what he was engaged to do
4  in early November 2015.  Do you understand that?
5          MR. ABELMAN:  Object to foundation.
6      A.  I don't know that I knew what he was
7  engaged to do.  Jeff says sign this, you sign
8  something.  And I don't know that I knew what he was
9  engaged to do.
10     Q.  (BY MR. PULKRABEK) All right.  So going
11 back to Exhibit 81, we have Mr. Henke sending a letter
12 addressed to both you and Jeffrey Wycoff.  Do you see
13 that?
14     A.  I do.
15     Q.  And Mr. Henke writes to you and Jeffrey
16 Wycoff, I am pleased to confirm our understanding of
17 the services I am to provide for the interim period
18 ending October 31, 2015.  Do you see that?
19     A.  I do.
20     Q.  And then Mr. Henke writes, I will prepare
21 the statement of financial condition of Jeffrey and
22 Merrie Wycoff as of October 31, 2015, and perform a
23 compilation engagement with respect to the financial
24 statements.  Do you see that?
25     A.  I do.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Page 98

1    Q.   Okay.  And then on page 2 of this letter,
2  Mr. Henke lays out what your responsibilities are.  Do
3  you see that?
4    A.   I do.
5    Q.   Okay.  And then on page 4 you signed and
6  dated it November 3, 2015; right?
7    A.   Yes.  Did I read it?  No.
8    Q.   All right.  If you didn't read it, isn't
9  that on you?
10   A.   I'd say it's on Jeff.
11   Q.   Okay.  So you take no responsibility for
12 signing documents; is that what you're telling us?
13       MR. ABELMAN:  Objection to form.  It's
14 argumentative.
15   Q.   (BY MR. PULKRABEK) I'll restate it.
16 Ms. Wycoff, do you take any responsibility for signing
17 Exhibit 81?
18   A.   "Take any responsibility."  I wish I had
19 read it.
20   Q.   Do you take any responsibility for not
21 having read it?
22   A.   Can you take responsibility for what you
23 haven't read?  I don't know how to answer that.
24   Q.   Do you take responsibility for other
25 documents that you have signed generally or do you

Page 99

1  sign documents and think you just don't have any
2  responsibility for them?  I'm trying to understand
3  what your mind set is here.
4    A.   My mind set is that I hire or Jeff hires
5  or we hire accountants and lawyers to understand and
6  comprehend all these things.  And when Jeff places
7  something in front of me, I trusted him to know what
8  it was about.  Jeff took the lead on all business and
9  all legal and all financial.
10   Q.   So with respect to this particular letter
11 by Mr. Henke to you that you signed, do you take
12 responsibility for whether or not you fulfilled your
13 responsibilities under this letter or not?
14   A.   I relied on Jeff.
15   Q.   So you don't take responsibility; is that
16 fair to say?
17       MR. ABELMAN:  Mr. Pulkrabek, you're
18 asking the same question five times.
19       MR. PULKRABEK:  And she doesn't answer
20 it.  So I'm just trying to -- you know, I'm trying to
21 figure out does she take responsibility or not.  And
22 she says, Well, I relied on Jeff.  I don't know what
23 that means.
24       MR. ABELMAN:  I understand.  That may not
25 be a satisfactory answer, but it's an answer.

Page 100

1        MR. PULKRABEK:  I know it's an answer,
2  but it's not actually answering the question.  So I'm
3  trying to figure out -- I'll ask it again.
4    Q.   (BY MR. PULKRABEK) Ms. Wycoff, with
5  respect to this particular engagement letter of
6  Mr. Henke where he lays out what his responsibilities
7  are going to be and what your responsibilities are
8  going to be, and you signed off on it, do you take any
9  responsibility for any of the obligations under this
10 letter?
11       MR. ABELMAN:  Objection to form.
12   A.   I relied on Jeff to fulfill those
13 responsibilities.
14   Q.   (BY MR. PULKRABEK) Okay.  So in relying
15 on Jeff Wycoff, your husband, to fulfill those
16 responsibilities, would it be fair to say that you
17 made a choice to delegate it to him?
18   A.   I gave those responsibilities to Jeff.
19   Q.   And if he didn't fulfill the
20 responsibilities on this letter that you jointly
21 signed, that's on you, isn't it?
22       MR. ABELMAN:  Object to form.
23   A.   I don't know how to answer that.  I
24 could.
25   Q.   (BY MR. PULKRABEK) All right.  Going back

Page 101

1  to Exhibit 83, which I understand you never even
2  looked at until this case was filed, I'm going to
3  point out a couple things here.  We're on the second
4  page of Exhibit 83 and there's a reference to real
5  estate, dash, farm and then the value next to that is
6  $4.75 million.  Do you see that?
7    A.   I do.
8    Q.   Okay.  Now, at this point in time,
9  October 31, 2015, the farm was owned by a company
10 called Wycoff Financial, LLC; correct?
11   A.   I'm not sure Wycoff Financial.  I didn't
12 really know what that company was.
13   Q.   Well, you later transferred title to the
14 farm from Wycoff Financial to Magnus Veritas; right?
15   A.   I relied on lawyers and accountants and
16 everyone else to make sure that I did everything
17 properly.  It wasn't done just by me.
18   Q.   Okay.  Do you know if you signed
19 documents to transfer title from Magnus -- from Wycoff
20 Financial to Magnus Veritas?  Do you know one way or
21 the other?
22   A.   Transfer title?  The title was
23 transferred after the sale.
24   Q.   Right.  So do you know if you signed
25 documents on behalf of Wycoff Financial to make that

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Merrie Wycoff
August 26, 2021                                              102 to 105

Page 102

1  transfer?
2        A.  Probably did.
3        Q.  Can you explain to me, if you have an
4  answer, why the assets on this financial -- statement
5  of financial condition don't identify the real estate,
6  dash, farm is being held in Wycoff Financial at this
7  point in time?
8        A.  I never saw that.  So how would I know
9  that?
10       Q.  Your residence was held by you and Jeff
11 Wycoff in a trust at this point in time, October 31,
12 2015; isn't that right?
13       A.  I think it might have been, yes.
14       Q.  Why did you transfer title to the
15 residence out of the trust and into your and Jeff
16 Wycoff's personal names?
17       A.  The lawyer advised it.
18       Q.  Which lawyer are you talking about?
19       A.  I don't remember.
20       Q.  All right.  While we're on the topic of
21 your lawyers, who have your lawyers been since 2015?
22 Can you give me their names, to the best of your
23 ability?
24       A.  To my personal lawyers, meaning Jeff's
25 and my lawyers?  Sorry.  Say that again.

Page 103

1        Q.  Yeah.  Who are your and Jeff's lawyers
2  starting in 2015 going forward?
3        A.  I know Brownstein Hyatt, there's Kevin
4  Cudney and Steve Abelman.
5        Q.  Who else?
6        A.  I feel like there's somebody else.  2015,
7  well, I guess David Wolf would be.  I don't know if
8  Jeff Davine would have been, if MSK would have been.
9  I don't know if Barry was a practicing lawyer, but he
10 may have been.  Who else?  I can't remember dates and
11 how far back stuff goes.
12       Q.  Okay.  Barry Marlin was your lawyer back
13 at least in the early 2000s, correct, when you were
14 living out in Los Angeles?
15       A.  Right.  Out in Los Angeles, right.  Well,
16 no.  I moved to Colorado in '98.
17       Q.  Okay.  How long has Brownstein Hyatt been
18 your lawyer?
19       A.  My personal lawyer, I think they started
20 after Jeff died.
21       Q.  What about did they do any legal work for
22 you and Jeff jointly back in 2015?
23       A.  Jeff and me jointly.  I don't know legal
24 terms.  I know they worked with Jeff.  Jeff consulted
25 them.

Page 104

1        (Deposition Exhibit 135 was remotely
2  introduced and provided electronically to the court
3  reporter.)
4        Q.  Turn to Exhibit 135, if you would, in
5  your notebook.  Do you have it in front of you?
6        A.  I'm sorry.  Me.  Turn to 135.  Okay.
7  Sorry.  Yes.  Got it.
8        Q.  All right.  You see that Exhibit 135 in
9  the notebook is a Special Warranty Deed between
10 Jeffrey Wycoff and Merrie Pisano Wycoff, individuals,
11 and Wycoff Financial, LLC.  Do you see that?
12       A.  Financial, Wycoff.  Yes, I do.
13       Q.  And then on the next page you and Jeffrey
14 Wycoff signed as the grantor; correct?
15       A.  Individual.  Where do you see -- oh,
16 grantor.  Got it, yes.
17       Q.  And you signed the special warranty deed
18 on May 9, 2015; correct?
19       A.  May 9, 2015, yes.
20       Q.  On the first page you can see that it
21 says "Recording requested by" and "When recorded
22 please return to:  Brownstein Hyatt Farber Schreck."
23 Do you see that?
24       A.  Is that the bottom or the top, or is that
25 the previous page?

Page 105

1        Q.  Yeah.  It's on the previous page, on the
2  first page.
3        A.  Recording requested by and when recorded
4  return to Brownstein Hyatt Farber Schreck.  Yes.
5        Q.  Brownstein Hyatt prepared this special
6  warranty deed; is that right?
7        A.  It says "Attention:  Kevin Cudney."
8        Q.  Mr. Cudney was helping you and Jeffrey
9  Wycoff with this special warranty deed?
10       A.  Yes.  It says their name.
11       Q.  Does that help refresh your memory as to
12 when Brownstein Hyatt started -- at least by what date
13 they were representing you and Jeffrey Wycoff?
14       A.  Are you asking me if that's the first
15 time?
16       Q.  Well, let me ask that question.  Is this
17 the first time that Brownstein Hyatt did legal work
18 for you and Jeffrey Wycoff?
19       A.  I don't know how to answer that.  My name
20 is on this.  So they did legal work for me this time.
21 Other times, did they do it just for Jeff?  I don't
22 know.
23       Q.  All right.  But at least as of May of
24 2015, the date of this special warranty deed,
25 Brownstein Hyatt was doing work for you and Jeffrey

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 106

1   Wycoff; correct?
2        A.   Yes.
3        Q.   And you and Jeffrey Wycoff were the only
4   two members of Wycoff Financial, LLC; is that right?
5        A.   Gosh, I don't know.
6        MR. PULKRABEK:  Steve, it's 11:54.  I
7   would suggest maybe we take a lunch break.  Can we go
8   off the record?
9        MR. ABELMAN:  Sure.
10       MR. PULKRABEK:  Thanks.
11       THE VIDEOGRAPHER:  Going off the record.
12  The time is 5:54 p.m. UTC, 11:54 a.m. Mountain.
13       (Recess taken, 11:54 a.m. to 12:44 p.m.)
14       THE VIDEOGRAPHER:  We are back on the
15  record.  The time is 6:44 p.m. UTC, 12:44 p.m.
16  mountain.
17       Q.   (BY MR. PULKRABEK) Ms. Wycoff, do you
18  understand you are still under oath?
19       A.   Yes, I do.
20       Q.   All right.  A couple additional companies
21  that we may have missed when we went through the
22  exercise of looking for the list of company.  One is
23  called Paradigm.  Do you remember Paradigm?
24       A.   Vaguely.
25       MR. ABELMAN:  Ross, may I interrupt?

Page 107

1   Before we proceed, did we want to look at Ms. Wycoff's
2   driver's license?
3        THE DEPONENT:  Oh, shoot.  Hold on.  What
4   do I do?
5        THE REPORTER:  Just hold it up to the
6   camera, if you don't mind.  Little bit closer.  There
7   you go.  Thank you so much.
8        Q.   (BY MR. PULKRABEK) There's a company
9   called Paradigm.  Can you explain what that company
10  did?
11       A.   A long time ago.  Paradigm, I remember
12  the name.
13       Q.   Is that the Herplex product?
14       A.   Was it?  Well, if it was the Herplex
15  product, Jeff created a homeopathic product for
16  herpes.
17       Q.   Did you own part of Paradigm?
18       A.   Yes, probably part of it.
19       Q.   Okay.  And were you an officer or
20  director in Paradigm?
21       A.   Paradigm.  Yes, I would think so.
22       Q.   All right.  There's a company called
23  Unified Health Systems West, LLC.
24       A.   Right.
25       Q.   Are you familiar with that company?

Page 108

1        A.   Yeah.  That one is --
2        Q.   What does that company do?
3        A.   It doesn't do anything.
4        Q.   Did you form that company?
5        A.   I don't remember how it was formed, but
6   it was my company, yes.
7        Q.   What was the purpose of Unified Health
8   Systems West, LLC?
9        A.   To do healings.
10       Q.   We were talking before the break about
11  Wycoff Financial, LLC.
12       A.   Right.
13       Q.   To your knowledge, did Wycoff Financial,
14  LLC ever own any assets other than the farm?
15       A.   I don't know.
16       Q.   Did Wycoff Financial ever maintain its
17  own books of account?
18       A.   Oh, gosh.  Books of account is like what?
19  Like accounting?  I don't know.  Just make it simple.
20  Is that like QuickBooks or something?
21       Q.   Sure.  QuickBooks or other ways of
22  keeping its own bookkeeping records.
23       A.   I don't know.  I didn't handle any of
24  that.
25       Q.   So you're not aware of any books of

Page 109

1   account for Wycoff Financial?
2        A.   I'm not.
3        Q.   Have you ever seen any promissory notes
4   made to Wycoff Financial by anybody?
5        A.   Promissory notes made to Wycoff
6   Financial.  I can't remember.
7        Q.   Nothing that you can recall at this time?
8        A.   Promissory notes made to -- promissory
9   notes made to Wycoff Financial, is that, like, from
10  another company making a promissory note to Wycoff
11  Financial?
12       Q.   Yes.  I'm asking about where a person or
13  another business would owe money to Wycoff Financial
14  and there would be a promissory note documenting that
15  money that is owed.
16       A.   I can't remember.
17       Q.   Okay.  Did Wycoff Financial ever file
18  state or federal income tax returns, to your
19  knowledge?
20       A.   Yes, I believe so.
21       Q.   When?
22       A.   I would think every year.
23       Q.   Why do you think it filed tax returns
24  every year?
25       A.   Why do I?  Well, before it was closed, it

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                110 to 113

Page 110

1 must have filed that.
2      Q.   Do you recall seeing any tax returns for
3 Wycoff Financial?
4      A.   I think so.
5      Q.   For what years and who prepared them, if
6 you know?
7      A.   That would have been Bob Henke, and I
8 don't know what years.
9           (Deposition Exhibit 132 was remotely
10 introduced and provided electronically to the court
11 reporter.)
12     Q.   All right.  Please look at Exhibit 132 in
13 your notebook.
14     A.   Yes.
15     Q.   Okay.  Exhibit 132 was a document that
16 was recorded with the Boulder Clerk and Recorder's
17 Office on January 12, 2001.  And you can see that it
18 is a deed dated January 11, 2001, from Sarah Martin,
19 Layton Martin, Lynn Turner, and John Turner to Jeffrey
20 Wycoff and Merrie Pisano Wycoff.  Do you see that?
21     A.   I do.
22     Q.   Then the property that is the subject of
23 this deed is 9417 Foothills Highway.  Do you see that?
24 It's a little bit further down in the deed.
25     A.   Yes.  Right.

Page 111

1      Q.   That's the farm; right?
2      A.   Correct.
3      Q.   Okay.  So this is the deed to the farm.
4 You and Jeffrey Wycoff paid $2,275,000 to buy the farm
5 back in January of 2001; is that right?
6      A.   Yes.  How much did we pay?
7      Q.   It says 2,275,000.
8      A.   Okay.
9      Q.   Is that right?
10     A.   I'll confirm that.
11     Q.   I'm sorry?
12     A.   I'll confirm that's what it says.
13          (Deposition Exhibit 138 was remotely
14 introduced and provided electronically to the court
15 reporter.)
16     Q.   Let's look at Deposition Exhibit 138.
17     A.   138.  Yes.
18     Q.   Deposition Exhibit 138 is an Exclusive
19 Right-to-Sell Listing Contract dated June 13, 2016,
20 between Jeffrey Wycoff and Merrie Pisano Wycoff on the
21 one hand and Karen Bernardi on the other; is that
22 right?
23     A.   Yes.
24     Q.   And you signed that agreement.  You see
25 your signature on the second to last page; right?  Is

Page 112

1 that your signature?
2      A.   Yes, it is.
3      Q.   Is that Jeff Wycoff's signature?
4      A.   Correct.
5      Q.   And so this is signed more than a year
6 after the property was transferred to Wycoff
7 Financial; correct?
8      A.   Seems to be, yes.
9      Q.   So is there a reason why even after
10 transferring title to the property to Wycoff Financial
11 when you entered into a contract involving the
12 property, you still did that in your individual names?
13     A.   I would say that was a Jeff question.  I
14 don't know.
15     Q.   Well, I mean, why isn't it equally a Jeff
16 and Merrie question?
17     A.   Jeff handled all the real estate.  He's
18 the one who negotiated prices.  He's the one who found
19 those brokers.
20     Q.   Well, when you signed documents involving
21 the farm, why didn't you just say the farm is owned
22 now by Wycoff Financial and do it through Wycoff
23 Financial?  Is there a reason why you didn't do that?
24          MR. ABELMAN:  Object to the -- objection;
25 foundation.

Page 113

1      Q.   (BY MR. PULKRABEK) Can you answer the
2 question?
3      A.   I would still say you would have to ask
4 Jeff.  I don't know.
5      Q.   When you dealt with tenants -- you have
6 tenants at the farm; right?
7      A.   Yes.
8      Q.   And there are multiple tenants at the
9 farm; correct?
10     A.   Yes.
11     Q.   When you dealt with tenants and you were
12 leasing the property to tenants after the property had
13 been transferred to Wycoff Financial, you didn't lease
14 the property through Wycoff Financial, did you?
15     A.   What year is this?
16     Q.   After you transferred the farm to Wycoff
17 Financial in May of 2015.
18     A.   No.
19     Q.   You did not tell tenants that the owner
20 of the farm was Wycoff Financial?
21     A.   I would have said it was Allan's Farm or
22 Autumn Hill.
23          (Deposition Exhibit 139 was remotely
24 introduced and provided electronically to the court
25 reporter.)

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                                     713-653-7100

Merrie Wycoff
August 26, 2021                    114 to 117

Page 114

1      Q.   Okay.  And if we look at the next
2  Exhibit 139, you see that Exhibit 139 is a lease that
3  says between Merrie Wycoff, dash, Autumn Hill, Inc.
4  and Brian Williams and Stefani Soychak.  Do you see
5  that?
6      A.   Sure.
7      Q.   And the date on this one is July 20,
8  2016; correct?
9      A.   Yes.
10     Q.   All right.  And these people are going to
11  be renting the yellow cottage at the farm; correct?
12     A.   Correct.
13     Q.   And up above in Section 1 it says "the
14  owner is" and then it says "Merrie Wycoff"; correct?
15     A.   Under agent, yeah.
16     Q.   All right.  Is all this your handwriting
17  on this page?
18     A.   Yes, it is.
19     Q.   Okay.  And you filled that out yourself,
20  not Jeff Wycoff?
21     A.   No.  I filled it out myself.
22     Q.   Okay.  So this one wouldn't be a Jeff
23  Wycoff thing.  This would be a Merrie Wycoff thing;
24  correct?
25     A.   I see.

Page 115

1      Q.   Okay.  So with respect to this lease, can
2  you explain why when you were leasing property to
3  Mr. Williams and Ms. Soychak you didn't lease it
4  through Wycoff Financial, which owned the farm?
5      A.   Yeah.  I didn't understand that Wycoff
6  Financial owned the farm.  I thought it was still
7  under Autumn Hill Estates or that.  I didn't realize I
8  should have put it under Wycoff Financial.
9      Q.   In your own mind was there a difference
10  between Wycoff Financial and you and Jeff Wycoff
11  individually?
12     A.   Is there a difference?
13     Q.   Right.
14     A.   I could answer that I didn't probably
15  fully understand that Wycoff Financial owned the farm,
16  in your words.
17          (Deposition Exhibit 196 was remotely
18  introduced and provided electronically to the court
19  reporter.)
20     Q.   There was another lease agreement that we
21  will -- I'd like to mark this one as Exhibit 196.  And
22  I will e-mail that out after the deposition.  I'm
23  going to pull it up here and I'm going to share it on
24  the screen.  Ms. Wycoff, can you see what I'm sharing
25  on the screen as the Boulder Model Lease?

Page 116

1      A.   Sure.
2      Q.   Okay.  And we'll go through this to the
3  last page.  Can you confirm that on the last page
4  that's your signature dated May 5 of 2017?
5      A.   Yes.
6      Q.   Okay.  And just going back to the first
7  page here, we can see that this is a lease between
8  Merrie Wycoff and Emily Skye Niles and Isabel
9  Schroeter; right?
10     A.   Right.
11     Q.   And the lease premises is, again, the
12  farm?
13     A.   Correct.
14     Q.   Correct?
15     A.   Uh-huh.
16     Q.   And the owner of the farm is identified
17  as Merrie Wycoff; right?
18     A.   Correct.
19     Q.   So this lease with Ms. Niles and
20  Ms. Schroeter is consistent with your not
21  understanding there to be any difference between
22  Wycoff Financial and you individually?
23     A.   Oh, I think there's a difference.  It's
24  just I wasn't fully aware that they owned the farm,
25  and I probably just kept filling it out the way I

Page 117

1  always did.
2      Q.   Okay.  Who did you think owned the farm
3  as of 2017 when you did this lease?
4      A.   2017?
5          MR. ABELMAN:  Is a date on the lease?
6          THE DEPONENT:  It's what?
7          MR. ABELMAN:  I'm asking if there was a
8  date on the lease because I can't see it.
9          MR. PULKRABEK:  Well, we already
10  established that she signed it on May 5 of 2017.
11         MR. ABELMAN:  Okay.  Thanks.
12     Q.   (BY MR. PULKRABEK) So as of May of 2017,
13  Ms. Wycoff, who did you think owned the farm?
14     A.   I wasn't really clear about all that.  I
15  thought that Bloomfield paid off the mortgage, but I
16  wasn't sure.  So, yeah, I probably should have put
17  Wycoff Financial.
18     Q.   Okay.  Did you ever tell any of your
19  tenants that the owner of the farm was Wycoff
20  Financial?
21     A.   No, because I don't know that I
22  understood that totally that it was.
23     Q.   Did Wycoff Financial have a bank account
24  at any point in time before it transferred the farm to
25  Magnus Veritas?

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                      118 to 121

Page 118

1      A.   Wycoff Financial.  I don't know.  Jeff
2  would have handled all of that.
3           (Deposition Exhibit 140 was remotely
4  introduced and provided electronically to the court
5  reporter.)
6      Q.   Let's look at Exhibit 140, please.
7      A.   Look at me.  And what is that for?
8  That's for Wycoff Financial.  Oh, what's the date on
9  that?  Yeah, that's '18.  That's after Jeff died.
10     Q.   Okay.  So Exhibit 140 is a signature card
11  to open a bank account, and it's followed by a number
12  of bank statements.  Do you see that?
13     A.   Yeah, after Jeff died right.
14     Q.   Okay.  And so after Jeff Wycoff passed
15  away on September 18, 2018, you opened a bank account
16  for Wycoff Financial, LLC; is that right?
17     A.   I think it was -- Jeff Wycoff's name was
18  taken off and then my name was solely on it.
19     Q.   All right.  That's not what the document
20  shows.  What this document shows is a new account
21  being opened, as far as I can tell, and the account
22  statements indicate that the account -- the first date
23  on the account is September 17, 2018.  Do you see
24  that?
25     A.   I do.

Page 119

1      Q.   Okay.  So would it be fair to say that
2  after Mr. Wycoff died on September 17, 2018, you
3  opened an account for Wycoff Financial, LLC?
4      A.   Does that say open an account?
5      Q.   Can you answer the question?
6      A.   I can't.
7      Q.   All right.  Let me ask you this:  Are you
8  aware of another account for Wycoff Financial, LLC
9  that predates this one?
10     A.   Nothing -- I can't remember right now.
11          (Deposition Exhibit 123 was remotely
12  introduced and provided electronically to the court
13  reporter.)
14     Q.   Look at Exhibit 123, please.  Exhibit 123
15  is a loan agreement dated May 12, 2015, between Wycoff
16  Financial, LLC and BC24, LLC; correct?
17     A.   Yes.
18     Q.   And then if you go to the signature pages
19  starting on GC 176.
20     A.   176.  Yes.
21     Q.   You recognize Jeffrey Wycoff's signature
22  for the borrower Wycoff Financial, LLC; correct?
23     A.   Correct.
24     Q.   The next page you recognize Jeffrey
25  Wycoff's signature as guarantor, Jeffrey Wycoff

Page 120

1  individually; right?
2      A.   Right.
3      Q.   On the next page do you recognize your
4  own signature under the line guarantor, Merrie Pisano
5  Wycoff individually; correct?
6      A.   Yes.
7      Q.   On the next page you see Acknowledgment
8  of Zap Owner, and then it says "ZAP owner, ZAP!
9  Holdings, LLC," and it's signed by Jeffrey Wycoff;
10  correct?
11     A.   Zap! Holdings.  Yes, I see that.
12     Q.   And then the next page is titled
13  "Acknowledgment of Trust Guarantor, Jeffrey Wycoff and
14  Merrie Wycoff 2003 Insurance Trust Agreement u/a/d
15  December 11, 2003."  Do you see that?
16     A.   I do.
17     Q.   And is that your and Jeffrey Wycoff's
18  signatures under "trust guarantor"?
19     A.   Yes.
20     Q.   Then on the next page -- not the next
21  page, but two pages after that, do you see
22  "Acknowledgment of Trust Guarantor, Merrie Wycoff 2003
23  Insurance Trust Agreement u/a/d December 15, 2003."
24  Do you see that?
25     A.   I do.

Page 121

1      Q.   And is that your signature under "trust
2  guarantor" for that trust?
3      A.   Yes.
4      Q.   Now, back in May of 2015, Wycoff
5  Financial borrowed money from BC24; right?
6      A.   I don't know.  Yes, I think that was a
7  loan.
8      Q.   Well, you signed a number of pages of
9  paperwork for that loan; correct?
10     A.   Uh-huh.  In rapid fire with a notary
11  that -- I can't tell you I understood any of this.  Go
12  ahead.
13     Q.   What is Wycoff Holdings, LLC?
14     A.   I don't know.  Wycoff Holdings?  I don't
15  know.
16     Q.   I'm sorry.  What was -- maybe it was
17  called Zap! Holdings.  Do you know what Zap! Holdings
18  is?
19     A.   No, I do not.
20     Q.   Were you a member of Zap! Holdings?
21     A.   I'm pretty sure Jeff would have made me.
22  I don't know.  I don't know everything.  I don't know.
23     Q.   Did you have legal counsel when you
24  entered into this agreement?
25          MR. ABELMAN:  Object to the form.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                   713-653-7100

Page 122

1    A.   I'm sure Jeff talked about it with
2  lawyers.
3         (Deposition Exhibit 122 was remotely
4  introduced and provided electronically to the court
5  reporter.)
6    Q.   (BY MR. PULKRABEK) Let's look at
7  Deposition Exhibit 122, please.
8    A.   Right.
9    Q.   You see this is titled "Guaranty
10 (Wycoff)"?
11   A.   Yes.
12   Q.   And what it says in the first paragraph
13 is, This guarantee is made as of May 12, 2015, by Zap!
14 Holdings, LLC, a Colorado limited liability company,
15 Jeffrey Wycoff and Merrie Pisano Wycoff, each
16 individually and as a trustee of the Jeffrey Wycoff
17 and Merrie Wycoff 2003 Insurance Trust u/a/d
18 December 11, 2003, in favor of BC24, LLC, a Michigan
19 limited liability company.  Do you see all that?
20   A.   I do.
21   Q.   And you see that that is guaranteeing the
22 obligations of Wycoff Financial, LLC?
23   A.   Yes.  I'm reading that.
24   Q.   And you signed this document; correct?
25   A.   I don't know.  Let's go to the signature

Page 123

1  page.  Yes.
2    Q.   All right.  Did you understand that you
3  were a guarantor of the loan to BC24?
4    A.   I think I heard that later in counsel --
5  what is it when you talk to attorneys.
6    Q.   Did you understand that the insurance
7  trusts were guarantors of BC24?
8    A.   I can't remember.
9    Q.   Do you know what happened with the
10 proceeds of the loan from BC24?
11   A.   "The proceeds of the loan," what does
12 that mean?
13   Q.   So when BC24 loaned money, do you know
14 what happened with the money that it loaned?
15   A.   I do not.
16   Q.   Do you know if that money was used by you
17 and Mr. Wycoff for personal stuff?
18   A.   I didn't know.
19   Q.   Do you know if that money was used by you
20 and Mr. Wycoff for Zap! Products?
21   A.   I don't know.
22   Q.   Do you know whether that money went into
23 an account held by Zap! Products or not?
24   A.   No.
25        (Deposition Exhibit 124 was remotely

Page 124

1  introduced and provided electronically to the court
2  reporter.)
3    Q.   Take a look at Exhibit 124, if you would.
4  Do you see that Exhibit 124 is a bank account at
5  Vectra Bank?  It's a bank statement for Zap! Products,
6  Inc.; correct?
7    A.   Correct.
8    Q.   And the statement here shows a deposit
9  being made on 5/13/2015, so May 13, 2015, in the
10 amount of $2,300,000.
11   A.   Where do you see 2 million?  Yeah.
12 Right.
13   Q.   And you see that's a wire in from First
14 American Title Insurance?
15   A.   Yes.
16   Q.   And that would be the money being
17 borrowed from BC24; correct?
18   A.   I don't know.  It says American Title
19 Insurance.
20   Q.   Were you doing other real estate closings
21 involving real estate that you owned in May of 2015
22 other than the BC24 one?
23   A.   No, but it doesn't say BC24.  Jeff
24 handled all the business and all the accounting stuff.
25 So I'm just looking at this for the first time.

Page 125

1    Q.   Are you aware of any evidence that would
2  indicate that the money that BC24 loaned went into an
3  account titled in the name of Wycoff Financial?
4    A.   I don't know.
5    Q.   You've never seen anything like that,
6  have you?  You haven't seen any evidence that money
7  loaned by BC24 went into an account that was titled in
8  the name of Wycoff Financial?
9    A.   I don't remember.
10   Q.   All right.  And then assuming for the
11 sake of argument that what happened next was money was
12 transferred in part to you and your husband's account,
13 did you ever write a promissory note of any kind to
14 Wycoff Financial?  Did you ever see anything like
15 that?
16        MR. ABELMAN:  Object to the form of the
17 question and foundation.
18   A.   I don't remember.
19   Q.   (BY MR. PULKRABEK) Have you ever seen a
20 promissory note written by Zap! Products, Inc. to
21 Wycoff Financial?
22   A.   I don't remember.
23   Q.   Do you remember looking into a question
24 in this case about whether the $904,000 amount that is
25 listed on the personal financial statement could be

EXHIBIT L                     U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Merrie Wycoff
August 26, 2021                                    126 to 129

Page 126

1  verified or not?
2       A.  Yeah.  I consulted my attorneys.
3       Q.  Other than consulting your attorneys,
4  have you ever been able to verify that you and Jeffrey
5  Wycoff personally had $904,000 as of October 31, 2015?
6       A.  I think I found -- what's it called?
7  What's that called?  It had to do with the money
8  account under -- it was under Zap! that showed that
9  there was over a million dollars in it as of, like,
10  October of -- did you say was it 2015?
11      Q.  Going back to Exhibit 83, which should be
12  on your screen now, do you see it?
13      A.  I do.
14      Q.  Okay.  We're looking at the second page
15  of Exhibit 83.  That exhibit did list investments in
16  Zap! Products separately.  Do you see that?
17      A.  Sure.
18      Q.  So there was $5 million listed on the
19  statement of financial affairs for Zap! Products, the
20  company; correct?
21      A.  Well, I see that.  I can't say correct.
22  I'm just -- you're showing it to me and I'm looking at
23  it.
24      Q.  So then -- but this isn't the financial
25  statement of Zap! Products.  This is the financial

Page 127

1  statement of Jeffrey and Merrie Wycoff.  Do you see
2  that?
3       A.  I do.
4       Q.  So focusing on this cash, slash, cash
5  equivalents category, are you aware of any one or more
6  bank statements owned by you and Mr. Wycoff, or any
7  combination of the two of you, that would add up to
8  $904,000?
9           MR. ABELMAN:  Object to the form of the
10  question.
11      A.  Jeff handled all that.  I don't know.
12      Q.  (BY MR. PULKRABEK) If you had reviewed
13  this financial statement back in 2015, would you have
14  listed both a valuation for Zap! Products as one of
15  your assets and then double counted a bank account in
16  the name of Zap! Products to list more money under
17  cash and cash equivalents?  Would you have done that?
18          MR. ABELMAN:  Object to the form and
19  foundation.
20      A.  Sir, I am not an accountant and I didn't
21  see that until you guys filed a claim.  So I don't
22  know how one comes up with numbers.
23      Q.  (BY MR. PULKRABEK) Well, I'm just asking
24  whether you would or would not have.  So, I mean, do
25  you typically double count assets when you're trying

Page 128

1  to figure out what you're worth?
2       A.  Sir, I'm not an accountant.  I wouldn't
3  know whether you do or you don't.  I don't know.
4       Q.  Well, have you ever gone through the
5  exercise of just thinking, what are my assets?
6       A.  I have never gone through that exercise.
7       Q.  Okay.
8       A.  That's not true.  That's not true.  Not
9  before Jeff died.  After Jeff died, I had to be very
10  responsible.
11      Q.  Let me show you what was marked in
12  Mr. Henke's deposition as Exhibit 93.  Are you able to
13  see Exhibit 93 on your screen?
14      A.  Can you make it bigger, please?
15      Q.  You see that this is Exhibit 93?
16      A.  Yes.
17      Q.  And if you go to the second page of
18  Exhibit 93, this is what you were just referring to.
19  After Jeff Wycoff died, you had a statement of assets
20  and liabilities that was prepared; correct?
21      A.  Say that again.
22      Q.  After Jeff Wycoff died in 2018, there was
23  a statement of assets and liabilities from Merrie
24  Pisano Wycoff that was prepared; is that right?
25      A.  Yes.

Page 129

1       Q.  Okay.  And it was as of July 9, 2018;
2  correct?
3       A.  Correct.
4       Q.  Okay.  Now, we already established that
5  you received $3.45 million of insurance proceeds from
6  the life insurance through State Farm.  And so here's
7  my question:  When you prepared this statement of
8  assets and liabilities as of July 9, 2018, you listed
9  $1,009,000 cash/cash equivalent.  Do you see that?
10      A.  I do.
11      Q.  So can you explain the difference there
12  between the $109,000 (sic) in cash/cash equivalent you
13  listed on this statement of assets and liabilities for
14  BC24 and the fact that you got $3.45 million in life
15  insurance from State Farm?
16      A.  I paid a lot of debt.
17      Q.  I mean, are you telling me that you paid
18  $2.5 million in debt between the time that State Farm
19  gave you the life insurance money and you gave this
20  statement of assets and liabilities to BC24?
21      A.  I paid, let's see, 400,000 to the guild.
22  I paid 100-something thousand to Bluewater.  I paid
23  68,000 to K Stack.  I paid 25, 30,000 to -- what's
24  that company?  I don't remember.
25      Q.  Okay.  Well, Ms. Wycoff, you don't need

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                                   713-653-7100

Page 130

1  to run through everything.  I'll tell you right now --
2      A.   Let's go.  I paid off a ton of debt,
3  credit card debt.  I paid off to -- I paid lots of
4  lawyer fees that were in arrears.  I paid off a lot of
5  debt very quickly.
6      Q.   Okay.  And we have your interrogatory
7  response where you tell us what debts you paid.  I'll
8  point out to you that the $400,000 that you mentioned
9  to BC24, that was after July 9, 2018, and so was the
10 Bluewater settlement.  That was also after July 9,
11 2018.  So you hadn't made those payments yet.
12      So here's my question:  None of what you
13 have listed on your interrogatory response adds up to
14 $2.5 million, and there's $2.5 million that seems to
15 be missing between what you got from State Farm and
16 what shows up under cash and cash equivalents here.
17 So is there any other explanation for why it's not on
18 the July 9, 2018, financial statement?
19      A.   I think I looked at my statements.  I
20 don't know.
21      Q.   Isn't it true that you didn't want BC24
22 taking all of your life insurance money, so you didn't
23 list it on this statement?  Isn't that the reason why
24 this statement only shows hey million?
25      A.   Absolutely not.  Absolutely not.  They

Page 131

1  were aware of what I got and as I was trying to settle
2  up other creditors.
3      Q.   Well, you had more money as of July 9,
4  2018, than the $109,000 (sic) you list here; isn't
5  that true?
6      MR. ABELMAN:  Objection; form and
7  foundation.
8      Q.   (BY MR. PULKRABEK) Go ahead, Ms. Wycoff.
9  Isn't it true that you had more than $109,000 (sic) as
10 of July 9, 2018?
11      A.   I think it says 1,009,000.
12      Q.   $1,009,000.  Thank you.  Isn't it true
13 that you had more than $1,009,000 as of July 9, 2018?
14      A.   I can't remember how it was all divvied
15 up.  Well, so with my annuity, that's 1.5.
16      Q.   Okay.  So was the annuity from State
17 Farm?
18      A.   We had thousands of dollars worth of
19 credit card debt and, you know, other personal money.
20 I paid off a ton of stuff, settled a lot of debt.
21      Q.   Yeah.  Ms. Wycoff, we asked you about
22 that.  You provided that to us in discovery responses.
23 I'm telling you, it doesn't add up anywhere near
24 $2.5 million.  So this is your opportunity to give me
25 the explanation for where the money went, if you can.

Page 132

1  Now, I'm going to ask you again, did any of the money
2  go into Azuraye and Devon's trust accounts at BNY
3  Mellon?
4      A.   Absolutely not.
5      Q.   Did any of that money go into crypto
6  currency?
7      A.   Yes, I believe so.  And that is under --
8  I think it's under surety.
9      Q.   Under surety.  Where are you seeing that?
10      A.   I thought there was a surety that I told
11 Bob about.
12      Q.   So it's not listed on here?
13      A.   I don't know.  I don't see it.
14      Q.   Okay.  So if I'm understanding correctly,
15 some of the money that you got from State Farm you put
16 into crypto currency, and you consider that to be
17 under the category of a surety?
18      A.   I think I was told that that was -- I
19 don't know.  I can't remember.
20      Q.   And then whatever money you put into
21 crypto currency out of the State Farm life insurance
22 proceeds was not listed on this statement of assets
23 and liabilities as of July 9, 2018; correct?
24      A.   What happened in July of '18?  I don't
25 know that I had it in July of 2018.  I'd say it would

Page 133

1  be more like '19.
2      Q.   Okay.  Then we're going down the wrong
3  path.  Let me see if I can ask you again.  There is --
4  there's $3.45 million of the life insurance money that
5  you got from State Farm, and you got it in April 2018,
6  about three months before this statement of assets and
7  liabilities?
8      A.   Right.
9      Q.   Then on the statement of assets and
10 liabilities, you say to BC24 that you've got 1,009,000
11 in cash, slash, cash equivalents.  Okay?
12      A.   Uh-huh.
13      Q.   So is there any explanation for where
14 that money went other than the creditor payments that
15 you've already told us about?
16      A.   I don't know how to answer that.
17      Q.   Well, as I see it, there are two
18 possibilities here.
19      A.   Okay.
20      Q.   One is that you actually spent the money,
21 but you haven't told us all the money that you spend.
22 The other possibility is that you didn't list the
23 money that you had or all the money that you had when
24 you prepared this statement of assets and liabilities.
25 So can you tell me which it is?

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Page 134

1    A.   Let's go to the third one, that I'm
2  crappy with math and every time I add up something it
3  will come out a different number and I do the best
4  that I can under pressure and under stress.
5    Q.   Okay.  Well, whether you're bad at math,
6  I mean, Bob Henke is the one that put this thing
7  together.  So he put this together from information
8  that you provided to him.
9    A.   Right.
10   Q.   If you didn't provide the information to
11 him, then it wouldn't show up on here.
12   A.   Right.
13   Q.   All right.  So are you telling me that
14 because you're bad with math, you told Bob Henke that
15 you only had 1,009,000 in cash when you had more?
16   A.   I can't tell you that.  I'm telling you
17 that this is what I added up at the time and made the
18 best presentation of what I thought I had.
19        (Deposition Exhibit 142 was remotely
20 introduced and provided electronically to the court
21 reporter.)
22   Q.   All right.  Let's turn to Exhibit 142,
23 please.  Turn to 142 in your notebook, Ms. Wycoff.
24   A.   This is me.  Sorry.  I'm sorry.  Yes.
25   Q.   Okay.  So you recognize Exhibit 142 as a

Page 135

1  letter that you got from Transamerica; correct?
2    A.   Yes.
3    Q.   So that letter is addressed only to you.
4  It's not -- it's addressed to your address, 3018 South
5  Lake Ridge Trail; correct?
6    A.   Correct.
7    Q.   And it says "Dear Merrie Wycoff 2003
8  Insurance Trust."  Do you see that?
9    A.   I do.
10   Q.   Then it says, "Thank you for being a
11 valued Transamerica customer.  We have enclosed the
12 following based on your recent request:  Beneficiary
13 Change Form, Ownership Change Form."  Do you see that?
14   A.   Yes.
15   Q.   And you requested that Transamerica send
16 you that information; correct?
17   A.   I don't remember, but yes.
18        (Deposition Exhibit 143 was remotely
19 introduced and provided electronically to the court
20 reporter.)
21   Q.   And then let's look at Exhibit 143.
22   A.   Yes.
23   Q.   All right.  Exhibit 143 is an e-mail
24 exchange between Transamerica and Jeff Wycoff.  Do you
25 see that?

Page 136

1    A.   Yes.
2    Q.   And it starts off with an e-mail from
3  Jeff Wycoff to Transamerica, and you're copied on that
4  e-mail dated November 13, 2017; correct?
5    A.   Where do you see that I'm copied?
6    Q.   Well, let me share my screen again.
7    A.   I see.  Cc.
8    Q.   Okay.  So you see that you are copied on
9  it.  So you got that e-mail; correct?
10   A.   Yes.
11   Q.   All right.  And then the next page we can
12 see is a fax cover page from Zap! Products; correct?
13   A.   Uh-huh.
14   Q.   And it has some information for policy
15 41643514.  Do you see that?
16   A.   I do.
17   Q.   Then if we go to the third page, there's
18 some information that was filled out by Ed Certisimo,
19 trustee, dated 11/10/17; correct?
20   A.   Correct.
21   Q.   You remember back in 2017 you were
22 involved in providing information to Ed Certisimo to
23 fill out in order to change ownership information on
24 the Transamerica policy?
25        MR. ABELMAN:  Object to foundation.

Page 137

1    A.   I'm sorry.  Say that again.
2    Q.   (BY MR. PULKRABEK) Do you recall that
3  back in 2017 you provided information to Ed Certisimo
4  in order to change ownership of life insurance
5  policies out of the trust?
6    A.   Show me something.
7    Q.   I'll show it to you in a moment.  Do you
8  recognize the handwriting on this page?
9    A.   Yes.
10   Q.   We're on page 4.  Whose handwriting is
11 that?
12   A.   Is it what I'm looking at or is it
13 further on?
14   Q.   Well, I'm looking at page 4 of this
15 exhibit.  We're still on Exhibit 143.  Do you
16 recognize the handwriting on this page?
17   A.   Yeah.  It's my handwriting.
18   Q.   Okay.  So you filled out a form to have
19 Ed Certisimo change ownership of a life insurance
20 policy with Transamerica; correct?
21   A.   Correct.
22   Q.   And it was changing the ownership of the
23 life insurance policy from the Merrie Wycoff Life
24 Insurance Trust to Azuraye J. Wycoff; correct?
25   A.   Correct.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Page 138

1    Q.   All right.  Then you listed for the
2  address your home address in Boulder; correct?
3    A.   Correct.
4    Q.   Now, Azuraye Wycoff was living in Boston;
5  right?
6    A.   What year was this?
7    Q.   2017.
8    A.   Yes, I think she was.
9    Q.   Okay.  Then for the phone number -- for
10  Azuraye Wycoff's phone number you listed your own
11  phone number; correct?
12    A.   Correct.
13    Q.   Okay.  Azuraye Wycoff has her own phone
14  number; right?
15    A.   Yes.
16    Q.   Now, let me ask you about the handwriting
17  on page 5.  Is that your handwriting?
18    A.   Yes.
19    Q.   Okay.  What about the handwriting on
20  page 6?  Is that also your handwriting?
21    A.   Yes.
22    Q.   What about the handwriting on page 7?
23  Also your handwriting?
24    A.   Yes.
25    Q.   Okay.  The handwriting on page 9, is that

Page 139

1  your handwriting?
2    A.   Yes.
3    Q.   Can you explain to me why did you fill
4  out this form to transfer ownership of the life
5  insurance policy at Transamerica from the Merrie
6  Wycoff 2003 Insurance Trust to Azuraye Wycoff?  Why
7  did you do that?
8    A.   Jeff directed me to.
9    Q.   Any other explanation than Jeff directed
10  you to?
11    A.   No.  That's what Jeff wanted.
12    Q.   What were the circumstances existing for
13  you and Jeffrey Wycoff as of November of 2017 that
14  would have prompted a change in the ownership of the
15  policy?
16    A.   He told me that he wanted everything
17  split up fairly.
18    Q.   And did he tell you why he would want
19  everything split up fairly?
20    A.   I think I would say health.
21    Q.   What do you mean, "health"?  What do you
22  mean by that?
23    A.   His health was terrible.
24    Q.   Okay.  And was he contemplating his own
25  mortality at the point in time when these insurance

Page 140

1  policies got transferred?
2    A.   He was contemplating going back into
3  hospitals after numerous surgeries over and over again
4  and going under anesthesia.
5    Q.   Isn't it also -- strike that.
6        You learned about the IRS tax case
7  results in October of 2017; right?
8    A.   I think I learned about it later.
9        (Deposition Exhibit 144 was remotely
10  introduced and provided electronically to the court
11  reporter.)
12    Q.   Okay.  Let's look at Deposition
13  Exhibit 145 -- I'm sorry -- 144.
14    A.   Yeah.  Go ahead.
15    Q.   All right.  So you should have that in
16  front of you as well as on the screen.  All right.  So
17  Exhibit 144 is an e-mail dated November 28, 2017, from
18  Jeff Wycoff to Transamerica, copied to you; correct?
19    A.   Where's the cc again?
20    Q.   It's right here.
21    A.   I see it, sir.
22    Q.   Okay.  And so you got that e-mail as
23  well; correct?
24    A.   Yeah.  It says it was sent to me.
25    Q.   All right.  And so the second page of

Page 141

1  this exhibit is a fax cover sheet on Zap! Products'
2  fax stationery, and then there's some information in
3  the right-hand corner with the date, et cetera.  Did
4  you fill that information in yourself?
5    A.   Yes.
6    Q.   Okay.  So the date on this is also
7  November 28, 2017; correct?
8    A.   Correct.
9    Q.   On the third page is a Transfer of
10  Ownership Request Form for Policy No. 41643517;
11  correct?
12    A.   That's what it says.
13    Q.   All right.  And you were the owner of the
14  policy at that point in time; right?
15    A.   I don't know.  Let me go back and look.
16    Q.   It's right under Section 2.
17    A.   Yes.  I just had to turn the page.  Yes,
18  sir.
19    Q.   Okay.  And still on page 3 here, did you
20  fill out all the information here on page 3?
21    A.   Page 3.  Page 1.
22    Q.   Okay.  I'm sorry.  I'm on the third page
23  of the exhibit.  It may be page 1 of the Transamerica
24  change form.
25    A.   Page 3 on mine is blank.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                    713-653-7100

Page 142

1     Q.   Okay.  Let me direct you to look at the
2  screen, if you can.
3     A.   Yes.
4     Q.   You see we're on the third page of the
5  exhibit.  It's titled "Transfer of Ownership Request
6  Form."  Do you see that?
7     A.   I do.
8     Q.   Is this your handwriting on the third
9  page?
10    A.   Yes.
11    Q.   What about the fourth page, looking at
12 the fourth page now?
13    A.   Right there, yes.
14    Q.   And you signed the fourth page Merrie P.
15 Wycoff dated 11/15/17; correct?
16    A.   I did.
17    Q.   Now, we're looking at the sixth page of
18 the exhibit.  Did you also fill out everything on the
19 sixth page?
20    A.   I did.
21    Q.   Did you personally fill out everything on
22 the seventh page?
23    A.   Yeah.  With Jeff's direction, yeah.
24         (Deposition Exhibit 145 was remotely
25 introduced and provided electronically to the court

Page 143

1  reporter.)
2     Q.   Let's look at the next exhibit,
3  Exhibit 145.
4     A.   Yes.
5     Q.   And we'll go through the same series of
6  questions basically, but this Exhibit 145 is another
7  e-mail that Jeff Wycoff sent to Transamerica customer
8  service on November 28, 2017, subject of this one
9  being "policy change No. 2."  Do you see that?
10    A.   Yes.
11    Q.   You were copied on and received this
12 e-mail as well; right?
13    A.   Yes.
14    Q.   Then the second page of this exhibit we
15 can see is another fax cover sheet that you filled
16 out; correct?
17    A.   Correct.
18    Q.   Third page is a Transfer of Ownership
19 Request Form for Policy No. 41643528.  Do you see
20 that?
21    A.   I do.
22    Q.   And you filled out the information on
23 this third page of Exhibit 145; correct?
24    A.   My third page is blank.  Let's go to
25 yours.

Page 144

1     Q.   Okay.  Refer to the one on the screen, if
2  you would, then, please.  Is that your handwriting on
3  the third page that's shown on the screen?
4     A.   Yes.
5     Q.   Same thing with the fourth page, is this
6  all your handwriting on the fourth page?
7     A.   Right there, yes.
8     Q.   Okay.  Did you sign the fourth page
9  Merrie P. Wycoff, date 11/15/17?
10    A.   Yes.
11    Q.   Did you fill out the information on the
12 sixth page?
13    A.   Yes.
14    Q.   All right.  Let me show you what has
15 previously been marked as one of the exhibits in this
16 case.  Let me see if I can pull it up.  Ms. Wycoff,
17 I'm showing you what was previously marked as
18 Exhibit 28.  Are you able to see that?
19    A.   It's up too high.
20    Q.   Okay.  I'm just kind of showing you the
21 exhibit sticker right now.  You're able to see it as
22 Exhibit 28; correct?
23    A.   I see.  Yeah, I see the yellow
24 Exhibit 28.
25    Q.   All right.  And this is -- see if I can

Page 145

1  go to a more full screen.  You see this is an e-mail
2  exchange between you and Ed Certisimo on December 15,
3  2017?
4     A.   Uh-huh.
5     Q.   And you initiated the e-mail exchange.
6  You wrote, Eddie, here are clearer forms.  Thank you
7  so much for your time.  Happiest of holidays.  We've
8  enjoyed the pictures of Kari's new baby.  Best to Pat.
9  Do you see that?
10    A.   Correct.
11    Q.   So fair to say you were the one who sent
12 insurance change forms to Ed Certisimo; correct?
13    A.   I think I filled everything out.  I think
14 Jeff faxed them or however he sent them.  I don't
15 know.
16    Q.   And Mr. Certisimo responded, Merrie,
17 here's the signed document.  Don't hesitate to ask if
18 I did something wrong.  Jeff says the girls will be
19 home for Christmas.  Have a great holiday.  Do you see
20 that?
21    A.   I do.
22    Q.   Do you remember that this was the year
23 that Azuraye Wycoff had injured her arm?
24    A.   No.  I don't remember what year that was.
25    Q.   Do you remember that there was a year

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Merrie Wycoff
August 26, 2021

146 to 149

Page 146

1  when Azuraye Wycoff injured her arm?
2        A.    I do.
3        Q.    She was unable to travel for some period
4  of time?
5        A.    I don't know.  Perhaps she was.
6        Q.    Let me shift gears a little bit.  Do you
7  recall that there was a gentleman by the name of Ed
8  Moley who had a contract on the farm?
9        A.    I know Ed Moley.
10       Q.    You do know Ed Moley?
11       A.    I do not know Ed Moley.  I know a Tim
12 Moley.
13       Q.    Tim Moley.  Okay.  Maybe that's what it
14 was, Tim Moley.  Tim Moley was the owner of a company
15 called Chocolove; is that right?
16       A.    Yes.
17       Q.    Okay.  And he had a -- he was under
18 contract to buy the farm --
19       A.    Yes.
20       Q.    -- at the time that your husband died;
21 right?
22       A.    Yes, he was.
23       Q.    And the contract price on that was
24 $3.3 million?
25       A.    Correct.

Page 147

1        Q.    Then there was a guy named Rennie Davis?
2        A.    Right.
3        Q.    Do you know Rennie Davis?
4        A.    Yes.
5        Q.    He's sort of famous; right?
6        A.    He is famous.
7        Q.    Yeah.  And he was interested in the farm;
8  correct?
9        A.    He was.
10       Q.    Did he put in an offer on the farm?
11       Q.    Did he put in an offer on the farm?  He
12 put in no formalized offer because he needed an
13 investor.
14       Q.    Okay.  Did you ever talk numbers with
15 him?
16       A.    Yes, I believe so.
17       Q.    And what were the numbers you discussed
18 with Rennie Davis?
19       A.    I want to say probably in the threes.
20       Q.    Do you know where in the threes?
21       A.    Well, Rennie represented himself that he
22 could actually come up with money, which he could not.
23 So I never gave it much credence because he needed an
24 investor to come up with the money.
25       Q.    Okay.  Well, setting aside whether he

Page 148

1  needed an investor or not, do you recall where in the
2  threes you were talking with Mr. Davis?
3        A.    I don't know.  Rennie made a lot of
4  representations.  I'd say -- I can remember it's in
5  the threes.
6        Q.    Okay.  If you don't remember any more
7  than it was somewhere in the threes, then that's your
8  answer.  I'm just trying to see if you have anything
9  more specific.  Okay.  And then the way that Rennie
10 Davis is famous, I think so we're on the same page, he
11 was one of the Chicago Seven; right?
12       A.    That was before my time.  That's what he
13 said.
14       Q.    Little before my time too, but that's why
15 he was famous; right?
16       A.    That's what he said.
17             (Deposition Exhibit 127 was remotely
18 introduced and provided electronically to the court
19 reporter.)
20       Q.    Yeah.  Okay.  Let's look at Deposition
21 Exhibit 127, please.  Let me know when you're there.
22       A.    Yes, I am.
23       Q.    Deposition Exhibit 127, it's a multipage
24 exchange of e-mails involving your lawyer Steve
25 Abelman, another attorney named Kasturi Bagchi, and

Page 149

1  then you are on at least some of these e-mails as well
2  as a man named Brandon Kling; correct?
3        A.    Yes.
4        Q.    Okay.  So Brandon Kling was the
5  representative of BC24; right?
6        A.    Uh-huh.
7        Q.    Yes?
8        A.    Yes, I believe he was.
9        Q.    And Kasturi Bagchi, you understood her to
10 be BC24's lawyer; right?
11       A.    Yes, I think she was.
12       Q.    Okay.  Now, if we go down to the first
13 e-mail in this e-mail chain, it starts on page 4 of
14 the exhibit.
15       A.    I turn the page?
16       Q.    Yeah.  We're going to go through page 4.
17 I'll also put it -- I'm going to put it up on the
18 screen, see if this might facilitate things a little
19 bit as well.  All right.  So we're looking at page 4
20 of Exhibit 127.  And there is an e-mail from
21 Ms. Bagchi to Mr. Abelman.  Do you see that?
22       A.    Right.  It's page 4.  Is that what's on
23 your screen?
24       Q.    Yes.  It's page 4 is on my screen.
25 Page 4 is down here.  Page 4.

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                    150 to 153

---

Page 150

1      A.   Okay.  I can't look in the book because I
2  don't think it's the right page.  Go ahead.
3      Q.   Why don't we go off what's on the screen
4  then.  So there is an e-mail from Kasturi Bagchi to
5  Steve Abelman sent on June 13, 2018, with the subject
6  Wycoff, slash, BC; correct?
7      A.   Correct.
8      Q.   And both you and Mr. Kling were copied on
9  that e-mail; correct?
10     A.   Yes.
11     Q.   All right.  And so what Ms. Bagchi wrote
12  was, "Steve, hope you are well; lender has requested
13  certain information from Merrie Wycoff and has not
14  received them to date.  When can we expect the
15  following items."  And then one of the items is No. 2.
16  It says, "We do not understand why we are being asked
17  to remove the life insurance trusts as guarantors and
18  need an explanation of the same."  Do you see that?
19     A.   I do.
20     Q.   Okay.  In addition, under item No. 5
21  Ms. Bagchi asked for "life insurance trusts, dash,
22  updated financials for, one, Jeffrey Wycoff and Merrie
23  Wycoff 2003 Insurance Trust u/a/d December 11, 2003,
24  and Merrie Wycoff 2003 Insurance Trust u/a/d
25  December 15, 2003."  Do you see that?

---

Page 151

1      A.   I do.
2      Q.   They also under, item No. 3, ask for
3  "Financials (personal) updated Personal Financial
4  Statement, 2017 extension."  Do you see that?
5      A.   Yes.
6      Q.   So back in June of 2018, you were
7  communicating with BC24 about how you were going to
8  deal with the payoff of the loan from BC24; correct?
9      A.   What date was that?
10     Q.   It was June 2018.
11     A.   June.  Yes.
12     Q.   That's the context of this communication;
13  correct?
14     A.   Right.
15     Q.   Okay.  And then on June 22, so about a
16  week later, there's an e-mail from Brandon Kling to
17  you and Steve Abelman.  Do you see that?
18     A.   I do.
19     Q.   And Mr. Kling writes, "Any luck in
20  obtaining the items below"; right?
21     A.   Right.
22     Q.   Then he says, "As I mentioned during the
23  call last Thursday, I need to have a resolution on
24  this prior to month-end"; correct?
25     A.   Yes.

---

Page 152

1      Q.   So Mr. Kling is still asking you for
2  information about the life insurance trusts and your
3  personal financial statement; right?
4      A.   Right.
5      Q.   Now, then the same day, Mr. Abelman
6  replies to Mr. Kling and one of the things he says
7  under item two here is, quote, We are not asking for
8  the removal of the Trusts as Guarantors, rather
9  reported that there are no remaining assets.  Merrie
10  contacted the Trustee who supplied the attached
11  letter.  You may contact him directly with any
12  additional questions.  Do you see that?
13     A.   Right.
14     Q.   So you had obtained a letter signed by Ed
15  Certisimo; right?
16     A.   Right.
17     Q.   And can you tell me where and when or
18  where were you when you got the letter from
19  Mr. Certisimo?
20     A.   May have been at Jeff's memorial service.
21     Q.   So you were with Mr. Certisimo in person?
22     A.   Yes.
23     Q.   And then Mr. Kling responds to
24  Mr. Abelman's letter the same day and he copies you
25  and Ms. Bagchi.  Do you see that?

---

Page 153

1      A.   Yes.
2      Q.   And what he says under item No. 2, is he
3  says, Thank you for the clarification.  I am having
4  counsel review the trustee's letter to see if this
5  will satisfy our financial requirements.  And then
6  under item 3 he says, "I do not see the personal
7  financial statement that we requested.  Please forward
8  as soon as possible, and; B is Bob Henke the CPA for
9  both the businesses and Merrie personally?"  Do you
10  see that?
11     A.   Right.
12     Q.   During this period of time, was there
13  ever any discussion about how BC24 did not want to
14  just take the farm in payment of this loan?
15     A.   Taking the farm, we wish they had taken
16  the farm.
17     Q.   But they didn't want the farm?
18     A.   Well, they were offered it.
19     Q.   And they rejected your offer of the farm?
20     A.   Well, they didn't tell me personally.
21     Q.   But you understand that BC24 rejected any
22  offer of the farm; correct?
23     A.   I think so.
24     Q.   That's because what BC24 wanted was it
25  wanted to be paid off in cash; right?

---

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                     713-653-7100

Merrie Wycoff
August 26, 2021                                        154 to 157

Page 154

1    A.    I don't know what they wanted or
2  required.  You need legal counsel to understand all
3  this.  Hit me like a ton of bricks.
4    Q.    Well, ultimately BC24 was paid off in
5  cash; correct?
6          MR. ABELMAN:  Object to the foundation.
7    Q.    (BY MR. PULKRABEK) Okay.  Ms. Wycoff, you
8  were personally involved in the transactions to pay
9  off BC24; right?
10   A.    Yes.
11   Q.    And BC24 was paid off in cash; correct?
12   A.    I think so.
13   Q.    And that's what they wanted.  They wanted
14 to be paid off in cash; right?
15         MR. ABELMAN:  Object to foundation.
16   A.    I don't know what they wanted.  I didn't
17 have those discussions.  It was out of my realm of
18 expertise.
19         (Deposition Exhibit 121 was remotely
20 introduced and provided electronically to the court
21 reporter.)
22   Q.    (BY MR. PULKRABEK) Okay.  Now, let's look
23 at Exhibit 29.  Actually, before we go there, why
24 don't we look at Exhibit 121.  Are you at Exhibit 121?
25   A.    Yes.

Page 155

1    Q.    Okay.  So Exhibit 121 is another e-mail
2  exchange.  This comes from Ms. Bagchi.  It's sent to
3  your lawyer, Mr. Abelman.  And then copied on this are
4  Mr. Kling, as well as yourself, somebody named
5  Nicholas Coburn.  Do you see that?
6    A.    Where would I see Nicholas Coburn?
7    Q.    Right up here at the top.
8    A.    Oh, yes, I see it.
9    Q.    This e-mail was sent to you on July 2,
10 2018; correct?
11   A.    Yes.
12   Q.    So now one of the questions that
13 Ms. Bagchi puts to you and Mr. Abelman is, "What is
14 the total amount of life insurance proceeds that were
15 paid out and to whom?"  Do you see that?
16   A.    Yes.
17   Q.    Did you ever answer that specific
18 question asked by Ms. Bagchi?
19   A.    I don't remember.
20   Q.    And then Ms. Bagchi also asks, "Could we
21 please receive a personal financial statement for
22 Merrie and financial statements for the entity
23 borrowers and the trust?"  Do you see that?
24   A.    That's No. 2.
25   Q.    Okay.  Now, ultimately you did provide a

Page 156

1  personal financial statement; correct?
2    A.    Correct.
3    Q.    And that was the personal financial
4  statement that we looked at that you prepared in 2018;
5  correct?
6    A.    Yes.
7    Q.    And you understood that BC24 was asking
8  for that financial statement so that it could make a
9  financial decision about its loan to Wycoff Financial;
10 right?
11   A.    My lawyers handled all this.  I don't
12 know.
13   Q.    Well, my question --
14   A.    I don't know whether I understood.
15   Q.    My question is a little simpler than any
16 of that.  My question is, you knew the reason why they
17 were asking for a personal financial statement is
18 because they wanted to make some decisions about a
19 loan to Wycoff Financial?
20   A.    No.
21   Q.    Right?
22   A.    I can't say that I understood any of
23 that.
24   Q.    Okay.
25   A.    I took it step by step.  I was hysterical

Page 157

1  during this time because too much was dumped on me and
2  I just was trying to figure things out day by day.
3    Q.    All right.  And then let's talk about
4  Exhibit 28.  I don't think that's in your notebook,
5  but it was previously marked.  Give me one moment
6  here.  That's not the one I want.  Hold on.  Okay.  So
7  we talked a little bit earlier about a letter that was
8  signed by Ed Certisimo.  Do you remember that?
9    A.    I do.
10   Q.    And this has been marked Exhibit 29 in
11 this case.
12   A.    Right.
13   Q.    Now, this is the letter that you provided
14 to BC24; correct?
15   A.    Yes.  Somebody did.
16   Q.    And what was written here was, Be advised
17 as trustee of the subject trusts, that the only assets
18 put in trust was an insurance policy in each trust.
19 Of the two policies, the $10,000 term policy has
20 previously expired.  The second Transamerica policy
21 was collaterally assigned to Bloomfield Capital and
22 subsequently been surrendered.  Do you see that?
23   A.    I do.
24   Q.    Now, that was -- that wasn't entirely
25 truthful, was it?

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                   713-653-7100

Merrie Wycoff
August 26, 2021                                          158 to 161

Page 158

1      A.   Let me put it this way:  When Jeff died,
2  he left me no documents of the 2003 trust.  He left me
3  nothing other than three piles of insurance policies
4  and that $10 million policy, which I had to call on
5  because I didn't know if it was real or not, behind
6  his desk.  That's what I was left with.
7      Q.   Well, one of the reasons why this wasn't
8  entirely truthful was that just months before this, in
9  December of 2017, you worked with Ed Certisimo to
10 transfer the life insurance policy out of the life
11 insurance trusts and over to Azuraye Wycoff; correct?
12     A.   Correct, but that letter is what I
13 believed to be true at the time.
14     Q.   So are you saying that when this letter
15 was prepared, you didn't recall that six months
16 earlier you had transferred life insurance policies
17 out of the trust?
18     A.   I didn't.  Under pressure when asking
19 that stuff, that's what I remembered.
20     Q.   Okay.  Now, let's go ahead and look at
21 what has been marked Deposition Exhibit 110.  I do
22 think you should have a copy of this in your notebook.
23     A.   Is this under 110?
24     Q.   Yes, 110.
25     A.   Yeah.

Page 159

1      Q.   All right.  So you see that Exhibit 110
2  is a set of messages between you, Devon Wycoff, and
3  Azuraye Wycoff using Snap Chat -- or I'm sorry --
4  WhatsApp?
5      A.   Yeah, WhatsApp.
6      Q.   How long have you used WhatsApp to
7  communicate with your daughters?
8      A.   I don't know.
9      Q.   Did you start using WhatsApp after your
10 husband passed away or was it before?
11     A.   I'd say before.
12     Q.   All right.  So this one starts out with
13 you saying to Azuraye and Devon, "Please think of a
14 name for your LLC to buy the house."  Do you see that?
15     A.   I do.
16     Q.   Then you also say, "We need to think
17 about buying the farm for hemp"; correct?
18     A.   Right.
19     Q.   So you were the one that proposed you,
20 Devon, and Azuraye buying the farm?
21          MR. ABELMAN:  Object to form.
22     Q.   Did I propose to them buying the farm?
23     Q.   (BY MR. PULKRABEK) Yeah.  You were the
24 one that raised that topic?
25     A.   It would have been great.  There was a

Page 160

1  possibility of doing hemp on the farm, which Aja very
2  much wanted to do hemp on the farm, but on the other
3  hand, we wanted to get rid of it.
4      Q.   That wasn't my question.  My question
5  was, you're the one that raised the notion of you,
6  Devon, and Azuraye buying the farm together?
7          MR. ABELMAN:  Object to the form.  If you
8  want to know who bought the farm, ask that, please.
9      Q.   (BY MR. PULKRABEK) Okay.  Ms. Wycoff, can
10 you answer the question?
11     A.   You're going to have to repeat the
12 question.
13     Q.   Okay.  We just see it here from your
14 WhatsApp communication, you're the one that is raising
15 the proposal of you, Devon, and Azuraye buying the
16 farm; correct?
17          MR. ABELMAN:  Object to the form and
18 foundation.
19     Q.   (BY MR. PULKRABEK) Go ahead.
20     A.   Yeah.  We thought about buying the farm
21 for hemp.
22     Q.   Okay.  But you're the one that came up
23 with the idea; right?
24     A.   No.
25     Q.   All right.  Who came up with the idea to

Page 161

1  have some combination of you, Devon, and Azuraye buy
2  the farm?
3      A.   I think ultimately Bloomfield.
4      Q.   And you say you "think."  Is that because
5  you don't know for sure?
6      A.   It came from Bloomfield, ultimately.  I
7  was led by whatever Bloomfield wanted.
8      Q.   Were you talking directly to somebody at
9  Bloomfield who said you should buy the farm?
10     A.   I don't know.  Attorneys were handling
11 all the negotiations with Bloomfield, and I just tried
12 to be flexible as to whatever they wanted.
13     Q.   Okay.  So what I'm trying to get at here
14 is, did some individual at Bloomfield tell you that
15 you, Devon, and Azuraye should buy the farm or is it
16 the case that you were being told by your lawyers that
17 there was -- that you and Devon and Azuraye should buy
18 the farm?  Which one was it?
19          MR. ABELMAN:  Object to the form of the
20 question.  Object to any implication of the
21 attorney-client privilege.
22     Q.   (BY MR. PULKRABEK) Okay.  Ms. Wycoff, if
23 you can't answer the question without revealing
24 something that your lawyer told you, that's fine.
25 Just say so and assert the privilege.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                      713-653-7100

Page 162

1    A.   Thank you.
2    Q.   So are you asserting the privilege?
3    A.   I'm asserting the attorney-client
4 privilege.
5    Q.   Okay.  Thank you.  All right.  Now, the
6 next page of Exhibit 110 you send a message that says,
7 "Kimberly Lord will be your attorney for the house
8 sale."  Do you see that?
9    A.   I do.
10   Q.   Okay.  Did you know Kimberly Lord
11 yourself?
12   A.   I did not.
13   Q.   And how did you get the name Kimberly
14 Lord?
15   A.   A referral.
16   Q.   Referral from whom?
17   A.   I don't remember.  Attorneys maybe.
18   Q.   Who?
19   A.   I can't remember.
20   Q.   So, I mean, was it somebody at Brownstein
21 who gave you Kimberly Lord's name?
22   A.   It could have been.
23   Q.   All right.  Then you tell Azuraye and
24 Devon, "She is sending an engagement letter that needs
25 to be signed and sent to me today."  Do you see that?

Page 163

1    A.   I do.
2    Q.   Why were you telling Azuraye and Devon to
3 send Kim Lord's engagement letter to you?
4    A.   So that I can assure that I could get it
5 to Kim Lord.
6    Q.   Let's look at page 4.  On page 4, as of
7 July 5, you're having a conversation on WhatsApp with
8 Devon and Azuraye.  Do you see that?
9    A.   I do.
10   Q.   And Azuraye says, "Mom, the operating
11 agreement that has to be notarized is GCS452 right?"
12 And you respond, "No that one is done.  It's the
13 Magnus Veritas?  Is that what you chose?"
14        Were your daughters confused by the
15 paperwork that they were supposed to be signing during
16 this period of time?
17   A.   I think everyone was confused at the
18 amount of paperwork that had to be done.  I've never
19 done anything like this.  It was my responsibility.  I
20 just did the best I could for me and my girls.
21   Q.   And that was your goal in all of this, to
22 just do the best you could for you and your girls; is
23 that accurate?
24   A.   I'm their mom.  I try to do the best for
25 everybody.

Page 164

1    Q.   Okay.  So your goal was to preserve as
2 much of your family's wealth for you and your girls as
3 possible; is that fair?
4        MR. ABELMAN:  Objection; form and
5 foundation.
6    Q.   (BY MR. PULKRABEK) Ms. Wycoff?
7    A.   I never thought about it in terms of
8 preserving wealth.  I thought about it in terms of how
9 do we pay off Bloomfield.  And we came together as a
10 family.  And I looked at many options, along with
11 trying to sell the farm all along with this.  Before
12 the farm was sold, anyone who came on who looked at
13 anything, I jumped at that opportunity.
14   Q.   Okay.  Next question.  Devon Wycoff
15 writes here, "Mom you're a badass."  And you respond
16 "How?"  Then on the next page we can see that Devon
17 Wycoff responds, "Just that you've taken all this on
18 and are nailing it."  Do you see that?
19   A.   That's so nice.
20   Q.   Well, then you said, "Thanks love";
21 correct?
22        MR. PULKRABEK:  Why don't we take a
23 break.  Okay.  Off the record.
24        THE VIDEOGRAPHER:  Going off the record.
25 The time is 8:18 p.m. UTC, 2:18 p.m. Mountain.

Page 165

1        (Recess taken, 2:18 p.m. 2:34 p.m.)
2        THE VIDEOGRAPHER:  We are back on the
3 record.  The time is 8:34 p.m. UTC, 2:34 p.m.
4 Mountain.
5    Q.   (BY MR. PULKRABEK) Okay.  So we're back
6 on the record after a break.  Mr. Abelman and I have
7 conferred briefly.  I have offered if the deponent
8 would like to recess for the day that we can continue
9 the deposition another day.  And the reason for that
10 really is twofold.  One is Ms. Wycoff has testified
11 earlier about being a, you know, long-haul COVID
12 person who's still kind of getting over that illness.
13 And the other is just had an emotional moment over
14 some questioning before the break.
15        And, you know, the reason for offering if
16 you want to continue this later is that this is -- I
17 need to have your best testimony that you can give,
18 because this deposition is going to be used in this
19 case both maybe in pretrial things as well as at
20 trial.  So it's your decision whether to continue, but
21 it's got to be with the understanding that you need to
22 be able to give me your best testimony you can.  Okay?
23   A.   Let's continue.
24   Q.   Okay.  Just on the subject of COVID, has
25 Devon been -- did she get COVID?

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                             713-653-7100

Page 166

1     A.   You cut out.
2     Q.   I'm asking about Devon Wycoff.  Does
3  Devon Wycoff also have COVID?
4     A.   Yes.  Devon, Azuraye, and I all got COVID
5  in April, May.
6     Q.   Okay.  And is that part of what Devon is
7  still dealing with today or is she over --
8     A.   It's what Devon and I deal with
9  constantly.
10     Q.   I'm sorry.  Go ahead.
11     A.   It's what Devon and I deal with
12  constantly.
13     Q.   Okay.  So in addition to her -- I guess
14  her head injuries, there's COVID in the mix too?
15     A.   Yes.
16     Q.   Okay.  We were going through these text
17  messages in Deposition Exhibit 110.  And Devon Wycoff
18  had made the comment that you are a badass for taking
19  all this on and are nailing it; correct?
20     A.   Yes.
21     Q.   Okay.  And so there's been some testimony
22  in this case that maybe it was, you know, Azuraye who
23  was leading things, but Devon Wycoff's perception,
24  which is communicated to you here, was that you were
25  the one that was taking all this on?

Page 167

1     A.   No.  You don't understand what that
2  means.  It means they looked at their father as the
3  successful entrepreneur and I was a stay-at-home mom.
4  I never had any of this responsibility.  So to have my
5  kids see me in a way that I could step up to the plate
6  made an impression on her.
7     Q.   All right.  Then you say, still on
8  page 5, "I think I'll do a DBA Allan's Farm Estates
9  for rent."  Do you see that?
10     A.   I do.
11     Q.   What did you mean by that?
12     A.   I didn't understand how LLCs work and any
13  of that.  I had an Allan's Farm estate account
14  already, and that's where the rent went.  I didn't
15  realize it all had to be kept with the LLC.  I just
16  didn't understand structure.
17     Q.   Well, in fact, you did call -- you did
18  file a doing business as filing for Magnus Veritas
19  under the name Allan's Farm, didn't you?
20     A.   Correct.
21     Q.   So you did do that.  You're the one that
22  made the decision that you were going to do the d/b/a;
23  correct?
24     A.   Well, I think it was Brownstein to keep
25  it as Allan's Farm because that's the sign on the

Page 168

1  front of the farm.
2     Q.   Okay.  So that was at your lawyer's
3  suggestion.  Is that what you're telling me?
4     A.   No.  It was how do we keep -- people
5  write checks to Allan's Farm, you know.  They don't
6  often know about Magnus Veritas.  They just write it
7  to the front of the name of the farm.
8     Q.   All right.  On page 6 you do say, "That
9  will be the checking account for the farm for renters
10  and expenses"; correct?
11     A.   Correct.
12     Q.   Now, you didn't want the renters to know
13  that the farm was changing ownership; correct?
14     A.   Not in terms of hiding things, in terms
15  of protecting my children.  Now all of a sudden, they
16  owned the farm and they had the money to buy the farm.
17  That puts girls in a precarious position of being
18  targets, and I was very careful to protect my
19  children.
20     Q.   Let me probe on that a little bit,
21  because the farm was just going to be owned in a
22  company called Magnus Veritas LLC; correct?
23     A.   Correct.
24     Q.   So why does it make a difference whether
25  you have your renters know that it's Magnus Veritas

Page 169

1  LLC versus the d/b/a for Magnus Veritas LLC?
2     A.   Because half of them when the new leases
3  came out were writing checks to Magnus Veritas and the
4  other half were writing it to Allan's Farm.  You tell
5  people and they can't hear it.
6     Q.   In fact, the renters never wrote any
7  checks to Magnus Veritas, did they?
8     A.   I think they did and I think I had them
9  correct it.
10     Q.   You never deposited a single check from
11  any renter that said Magnus Veritas on it, did you?
12     A.   I don't know.
13     Q.   All right.
14     A.   The bank accepted -- the bank would have
15  accepted either.
16     Q.   Let's look at page 7.  On July 5, 2018,
17  you send this message to Azuraye and Devon where you
18  say, "They won't let you notarize the last page I sent
19  you?"  Do you see that?
20     A.   Yes.
21     Q.   And then Azuraye responds, "Not without
22  the rest of the document, exclamation mark."  Do you
23  see that?
24     A.   Yes.
25     Q.   What was going on there, if you can

EXHIBIT L          U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

170 to 173

Page 170

1  explain that?
2      A.  Can you give me the date when that was?
3      Q.  It's July 5.
4      A.  I think the operating agreement might not
5  have been done yet, all the rest of the pages that
6  they would have needed to bring in.
7      Q.  All right.  And then you go on and you
8  saying, "Vectra lets me do that."  So have you had
9  experiences with Vectra Bank allowing you to notarize
10  just one page of the document?
11     A.  What was I referring to at that time?  I
12  can't remember what I was referring to at that time.
13  Was that when they were in Europe?
14     Q.  Well, I'll tell you this is shortly
15  before they go to Europe, but I'm referring more to
16  your statement here "Vectra lets me do that."  Do you
17  see that?
18     A.  Right.
19     Q.  Okay.  So apparently you had had one or
20  more experiences at Vectra Bank where you would just
21  take the signature page and get the signature page
22  notarized without the rest of the document?
23     A.  I can't remember what it was in reference
24  to.
25     Q.  But is that an experience you had had at

Page 171

1  Vectra Bank?
2      A.  Again, I don't remember.  I remember it
3  was poignant in the moment and I can't remember what I
4  was referring to.
5      Q.  Is there some reason why you would be
6  telling your daughters that Vectra lets you just
7  notarize the signature page if you hadn't actually had
8  that experience before?
9      A.  I think that when I said that I didn't
10  realize you had to bring the whole operating agreement
11  and that it gets notarized all in one day.
12     Q.  Then you try to say -- then you say,
13  "What about when you go to UPS?"  So you're suggesting
14  that maybe Azuraye could go to UPS and get them to
15  notarize just the signature page.  Do you see that?
16     A.  I do.
17     Q.  Why was it important to you to try to get
18  just the signature page notarized?
19     A.  I can't remember.
20     Q.  All right.  On the next page here Azuraye
21  says, "I don't know, I think as a notary you're not
22  supposed to notarize stuff that is missing the actual
23  thing that you're supposed to be verifying."  Do you
24  see that?
25     A.  I do.

Page 172

1      Q.  Your response to that was "Ha damn law."
2      A.  Right.
3      Q.  Can you explain that to me?  Why did you
4  say "Ha damn law"?
5      A.  Yeah.  I was being snarky, like, yeah, of
6  course it's the law.  I should have realized that.
7      Q.  All right.  Okay.  Then still on July 5
8  you say, "I'll ask Vera if there are Mellon Banks in
9  Europe."  Do you see that?
10     A.  Yeah, I do.
11     Q.  Who is Vera?
12     A.  Vera is their Mellon Bank representative.
13     Q.  Okay.  Let's look at -- there's more
14  messages.  They're going on July 22, 2018.  This was
15  page 11 --
16     A.  Right.
17     Q.  -- of Exhibit 110.  You write, "I just
18  showed the farm."  Do you recall who you had just
19  shown the farm to?
20     A.  There were a couple people I tried to
21  show the farm to.  I can't remember if that was -- I
22  can't remember.
23     Q.  All right.  Devon Wycoff responds -- I'm
24  sorry.  Go ahead.
25     A.  It's usually horse people who I show this

Page 173

1  farm to.
2      Q.  But you don't remember any names?
3      A.  No.  People would, like, call.  I think
4  that might have been a realtor who wanted to list the
5  farm.
6      Q.  What was her name?
7      A.  I don't know.  I can't remember offhand.
8  I just remember there was times where I showed the
9  farm hoping they would know somebody to buy it.
10     Q.  Okay.  So Devon Wycoff responds, "And?"
11  And then your response to that is, "You guys are going
12  to put in an offer tomorrow."  Can you explain -- why
13  were you saying "you guys are going to put in an offer
14  tomorrow" in response to Devon Wycoff's question about
15  details of you just having shown the farm?
16     A.  Yeah.  Because we were under urgency to
17  settle this Bloomfield loan.  And people come on the
18  farm.  I show a lot of people all the time.  And
19  either people never show up with offers or they're not
20  real offers or they're, you know, we'll wait and see.
21  And Bloomfield was pressuring us to resolve this.
22     Q.  Then you write --
23     A.  At that point, by July 22 -- by July 22
24  it was nobody had come to the plate and made a formal
25  offer with money that they could back up and prove

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                            713-653-7100

Merrie Wycoff
August 26, 2021

Page 174

1  that was there.
2      Q.   You then write, "Would you be okay if we
3  then turn around and sold it?"  Do you see that?
4      A.   Right.
5      Q.   So what you were proposing was that you,
6  Devon, and Azuraye would buy the farm and then flip
7  it; right?
8      A.   No.
9          MR. ABELMAN:  Wait, wait, wait.  Object
10 to foundation.
11     A.   I was proposing that Azuraye and Devon
12 buy the farm and if they were going to come home and
13 run it, that it was too much for me and would they
14 consider other offers.
15     Q.   (BY MR. PULKRABEK) I mean, look, that's
16 not what you're saying in this text.  What you're
17 saying is, "Would you be okay if we then turn around
18 and sold it?"  So what you were talking about was --
19     A.   Asking them for permission that would it
20 be okay to have somebody open up for other offers.
21     Q.   Then Azuraye says, "I don't know.  What
22 was the offer"; right?  Do you see that?
23     A.   Yeah.
24     Q.   And you said, "It will be to people who
25 want to carry on dads vision of food and healing."

Page 175

1  Who were these people?  It sounds like it wasn't a
2  realtor, it was some specific people that you had
3  talked to.
4      A.   That was Rennie.
5      Q.   Okay.  A little bit further down here on
6  July 22, 2018, Devon Wycoff writes, "Do we need to put
7  in a offer tomorrow?"  You say "Yes."  Devon Wycoff
8  says, "Would it be simpler if we didn't that way the
9  money didn't go in to your account."  Do you see that?
10     A.   Yeah.
11     Q.   Why didn't you want money going into your
12 account?
13     A.   Well, Devon didn't understand, after many
14 times of explaining it, what Bloomfield was and that
15 money wouldn't go into my account, money would go
16 directly to Bloomfield to pay off the farm.  Devon
17 thought that somehow I would get money from the sale
18 of the farm.
19     Q.   Yeah, but -- okay.  Whether or not Devon
20 was confused, it sounds like there was some objective
21 of not having money go into your account.  So what was
22 that about?
23     A.   Sorry.  I don't know what was going on in
24 her mind.  She didn't understand that money from the
25 farm would go to pay off the loan.  Although it was

Page 176

1  explained so many times, so many ways, Devon didn't
2  understand that.
3      Q.   Okay.  Did you talk to Devon and Azuraye
4  about trying to keep money out of your name --
5      A.   No.
6      Q.   -- rather than accounts in your name?
7      A.   No.  She didn't -- the whole process of
8  selling the house and the farm were to pay off a loan
9  that we all came together on that -- until you buy or
10 sell a house, nobody understands how any of that's
11 done.  You know, I never understood any of how that
12 was done.  Where is that help?
13     Q.   Did you ever talk to Azuraye or Devon
14 about keeping assets out of your name that the IRS
15 could seize?
16     A.   I don't think it had to do with IRS.  I
17 think it had to do with I had so much debt that -- I
18 don't know what you're asking.
19     Q.   What does it have to do with?  Go ahead.
20 Finish your answer.
21     A.   I don't think I confided in either of
22 them how much debt there was and how people kept
23 showing up saying there's more debt and more debt and
24 more debt.  So I can't say Devon really understands
25 about money, but their money is their money and I did

Page 177

1  my best with what I was given to pay off creditors.
2      Q.   Did you ever talk to Devon and Azuraye in
3  any way, shape, or form about having assets out of
4  your name so that the IRS didn't see them?
5      A.   Yes.  I think I made a joke about that.
6  Yeah, I'm pretty sure I made a joke about that.  But
7  what you don't understand is during this time is I had
8  the third letter from the IRS saying that they were
9  going to seize all my assets and all my property.
10         So I had a very short window in order to
11 pay as many creditors as I could and take
12 responsibility for what was coming at me in the order
13 that it came and before the IRS could literally seize
14 everything I had and then I would have no ability to
15 pay anybody.
16     Q.   So throughout this process in June and
17 July 2018, you're mindful that the IRS is potentially
18 going to start seizing your assets?
19     A.   It was another one of my creditors.  I
20 got the third notice, and that was passed on to
21 Bloomfield maybe and perhaps -- I can't tell you
22 what's going on in Bloomfield's mind, but it's
23 probably what prompted them to take the sale of the
24 farm immediately.  Otherwise, I could have listed it
25 and I was interviewing realtors to list the farm.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                          178 to 181

Page 178

1    Q.   All right.  So you felt like you were up
2  against a time clock with the IRS?
3    A.   I didn't know what way my life was going.
4  I didn't know whether I was keeping the house, whether
5  I was going to move into a condo in Boston with
6  Azuraye, which she probably wouldn't like, but I
7  didn't know what was happening.
8         So if you imagine you lose your husband,
9  you imagine you've got a huge debt to the IRS, you
10  have a huge debt to Bloomfield, and then all these
11  other people show up with more and more and more debt
12  that somehow I had to figure out.  And, yeah, I felt
13  the IRS was a time clock, sure.  I had the ability
14  within a very short window to make the choices who I
15  paid.
16    Q.   And so you were dealing with the IRS, you
17  were dealing with Bloomfield, you were dealing with --
18  Bluewater Media was another creditor; right?
19    A.   Yes.
20    Q.   You were dealing with Midlab; right?
21    A.   I don't think they had filed a lawsuit
22  until then.  There were plenty of other lawsuits prior
23  to Midlab.
24    Q.   All right.  Going back to Deposition
25  Exhibit 110, page 13, you write, "Kevin will contact

Page 179

1  your attorney to get the process started."  Do you see
2  that?
3    A.   Yes.
4    Q.   That's referring to Kevin Cudney?
5    A.   Correct.
6    Q.   And then by "your attorney," who were you
7  referring to, Kim Lord?
8    A.   Kim Lord.
9    Q.   And so did you regard this situation as
10  Kevin Cudney was your attorney and then Kim Lord was
11  the attorney for Azuraye and Devon?
12    A.   Correct.
13    Q.   Okay.  Let's look at page 14.  On
14  July 25, 2018, you write, "Magnus Veritas, LLC bank
15  account is now open, exclamation mark."  Do you see
16  that?
17    A.   Yes.
18    Q.   You're the one that opened the Magnus
19  Veritas bank account; right?
20    A.   I think Aja, Devon, and I -- Aja arranged
21  the meeting when she was in Boston, Devon was in New
22  York, and I was in Los Angeles.  And Aja coordinated
23  the whole how we got there and who was going to do it
24  by phone and how that would all coordinate.
25    Q.   Okay.  The question is a little narrower

Page 180

1  than that.  The question is, were you the one that
2  opened the Magnus Veritas bank account?
3    A.   No.  The three of us opened the Magnus
4  Veritas bank account.
5    Q.   All right.  You're confident about that?
6    A.   I remember Aja being in Boston, Devon
7  being in New York, and me being in Colorado
8  coordinating the three phone calls and signing stuff
9  and going back and forth.  That could have been for
10  GCS.
11    Q.   Azuraye responds, "Can I transfer the
12  money GCS owes me?"  Do you see that?
13    A.   Yes.
14    Q.   What money did GCS owe Azuraye at that
15  time?
16    A.   What could it have owed her?  I can't
17  remember.
18    Q.   Is there a reason why -- if there were
19  insurance policies that provided benefits directly to
20  Azuraye Wycoff, why couldn't she have just accessed
21  that money?
22    A.   Yeah.  I don't know.  I don't know what
23  it owed her or what she thought was owed.
24    Q.   Okay.  Let me see if I can understand how
25  the money was handled.  Your husband passes away.

Page 181

1  Claims are made on multiple insurance policies.  And
2  at that point was the money that was from policies
3  where the beneficiary was Azuraye and Devon -- was
4  that just kept at the insurance-company level?
5    A.   Kept at the insurance-company level?  I
6  think the bulk of it was transferred to BNY Mellon and
7  they got a sum every month.
8    Q.   Okay.  So before we get too far ahead of
9  ourselves, I'm going to break this down.  Insurance
10  companies pay money on the policies where Devon and
11  Azuraye are the beneficiaries?
12    A.   Correct.
13    Q.   Does that money go straight into the
14  trust account for Azuraye and Devon from the insurance
15  companies?
16    A.   I don't remember.
17    Q.   Okay.  You were the trustee of the
18  Azuraye Wycoff and Devon Wycoff trusts.  So short of
19  us getting the trust bank statements, are you able to
20  answer this question for us?
21    A.   I'm sorry.  What's the question?
22    Q.   Yeah.  You're pretty much the only person
23  who can answer this question without us getting the
24  bank statements?
25    A.   Right.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    182 to 185

---

Page 182

1    Q.   Okay.  So are you able to answer the
2  question?
3    A.   Right.  Ask me the question again.  I
4  lost my train of thought.
5    Q.   Did the money go straight from the
6  insurance company into the bank accounts opened in the
7  name of the trusts?
8    A.   Accounts opened in the name of the trust.
9  That was odd.  I'm sorry.
10   Q.   So you can't answer the question; is that
11 the answer?
12   A.   I can't remember at this moment.
13   Q.   Okay.  All right.  On August 21 you send
14 a message -- now we're on page 15.  On August 21,
15 2018, you write, "Congratulations you own the farm" to
16 Azuraye and Devon.  Do you see that?
17   A.   Yes.
18   Q.   And Devon says, "Wahoo, good job mom,
19 none of this would have happened without you."  And
20 you say "Huge"; right?
21   A.   Uh-huh.
22   Q.   Yes?
23   A.   Yes.
24   Q.   And then you say, "Aja worked with me to
25 make this happen flawlessly"; right?

Page 183

1    A.   Yes.
2    Q.   And Devon says, "Good job both of you";
3  right?
4    A.   Uh-huh.
5    Q.   Yes?
6    A.   Uh-huh.
7    Q.   You need to say yes or no.
8    A.   Sorry.  Yes.
9    Q.   The court reporter just can't take down
10 "uh-huh."
11   A.   Right.  I'm sorry, court reporter.
12   Q.   So then August 21, 2018, you write, And I
13 just settled a $900,000 lawsuit for $107,000.  Do you
14 see that?
15   A.   I do.
16   Q.   Okay.  Devon Wycoff replies, "Mom killing
17 the game."
18   A.   Yeah.
19   Q.   This is in relationship to -- this is the
20 Bluewater Media; right?  That's the one you settled
21 for 107,000?
22   A.   Yes.
23   Q.   Okay.  You respond -- I mean, how do you
24 say this?
25   A.   "Werking it."  Do you know what "killing

Page 184

1  the game" means?  I think you should know.
2    Q.   Go ahead.  Tell me.
3    A.   It's a Broadway term.  It's when somebody
4  goes in for audition for incredible singing or
5  dancing, and they come out and people go, How did you
6  do, and you reply, Oh, killing the game.  And then the
7  other thing is "werking it" means -- you've seen
8  models on the runway.  When somebody gives -- puts in
9  extra work, an exceptional amount of concentration and
10 they slayed their audition, you come out of the
11 audition, and "werking it" means -- or work, I work,
12 it means congratulations that you put in the effort
13 and it came out all right.  So it's really just
14 Broadway slang.
15   Q.   And Devon Wycoff responds, "What's left?
16 The house?  Alaska?"  And you respond, "Nope you two
17 own that too"; correct?
18   A.   Uh-huh.
19   Q.   So at this point Devon Wycoff is asking
20 the question.  She doesn't know what's happened to the
21 Alaska property; correct?
22   A.   Devon doesn't know what happened to the
23 house.  And you can see where her memory fails her.
24   Q.   And then you have to tell her, No you own
25 that -- two own that too; right?

Page 185

1    A.   I'm very patient and kind with her.
2    Q.   Then you say, "We done did it all!"
3    A.   Yeah.
4    Q.   Is that another Broadway slang thing?
5    A.   Yeah, kind of.
6    Q.   What does that mean?
7    A.   Means we done did it.  It's like these
8  three big transactions and me paying off this debt, I
9  remember being in such a celebratory mood that day.
10 It's like that was another huge debt that was paid
11 off.  And by the time you pay off the house and the
12 farm and having Bloomfield be okay and then K Stack
13 was paid off and a bunch of others, I felt like I was
14 in a great celebratory mood.
15   Q.   And what you say is, "I have no assists
16 for the IRS to seize other than what's left of my
17 cash."
18   A.   Absolutely.
19   Q.   And why did you, in your celebratory
20 mood, make that comment?
21   A.   Because the IRS would have taken it all
22 and wouldn't have cared about any other of my
23 creditors or any other of Jeff's creditors or any
24 other of Zap's creditors.  And I had a very short
25 window in which to satisfy as many debtors as possible

EXHIBIT L                   U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Merrie Wycoff
August 26, 2021                                    186 to 189

Page 186

1  before I didn't have that opportunity anymore.
2      Q.   Well, you don't say here, I've done a
3  good job of paying as many creditors as possible.  You
4  make the comment that you have no assets for the IRS?
5      A.   Sir, these are messages and you talk in
6  very short phrases and two-word, five-word sentences.
7  Devon didn't need to know about all the other debtors
8  that I had paid off and all the stress that had gone
9  on in order to deal with as much stuff as we all had
10 to deal with.  We were grieving.  Nobody could even
11 understand or wake up day to day and go, We've got to
12 do it again.
13     Q.   Let's look at Exhibit 111.
14     A.   Does that mean go to the book?
15     Q.   You can go to the book or I'll put it up
16 on the screen.  You can have both available to you.
17     A.   Okay.
18     Q.   All right.  Exhibit 111 is another set of
19 WhatsApp messages.  This time it's between you and
20 Azuraye; right?
21     A.   Right.
22     Q.   And Azuraye writes, "I just sent a code
23 to dad's email from Amazon, could you send it to me?"
24 Do you see that?
25     A.   Yeah.

Page 187

1      Q.   Now, did you have access to Jeffrey
2  Wycoff's e-mail?
3      A.   Yes.
4      Q.   Do you still have access today?
5      A.   I think I sent you everything from Jeff's
6  stuff in response to this.
7      Q.   Have you specifically looked through
8  Jeffrey Wycoff's e-mail account to send us all
9  documents that would be responsive to any of the
10 discovery requests?
11     A.   I believe I have.
12     Q.   Now, I'll tell you that I don't think
13 we've seen any e-mails other than the ones we got from
14 Transamerica or from State Farm dealing with any of
15 the insurance issues.  So does Jeff Wycoff just not
16 have any -- in his e-mail accounts there are just no
17 e-mails dealing with those things or you just didn't
18 provide them?  What's going on there?
19     A.   I don't remember that question being
20 asked.
21     Q.   Then there were questions about
22 communications with various creditors, and I don't
23 think I've seen anything between Jeff Wycoff's e-mail
24 and any of the creditors being produced, even though
25 we have seen some of those e-mails from subpoena

Page 188

1  responses we got from the creditors.  So did you look
2  through and look for those e-mails in Mr. Wycoff's
3  e-mail?
4      A.   You'd have to give me an exact list of
5  what you're looking for, because me hearing this --
6  you've been asking for stuff since February and --
7      Q.   Okay.  It sounds to me like you haven't
8  looked at that.  We did give you an exact list in our
9  discovery requests.  Have you seen the discovery
10 requests themselves?
11     A.   Yes, and I try to check off everything as
12 I send it.
13     Q.   Okay.  And have you checked off
14 everything by going through Mr. Wycoff's e-mail
15 account while you went through those lists?
16     A.   Yeah.  I can't remember at this time.
17     Q.   I could come up with a number of examples
18 of this.  Like, for example, we got all sorts of
19 e-mails back and forth between your husband and Bob
20 Henke concerning financial statements that you didn't
21 produce.  I'd ask you, Ms. Wycoff, to go back and
22 please look at Mr. Wycoff's e-mail account again for
23 that kind of stuff.  And we'll work with your counsel
24 on it, but I'm going to make a note that we're asking
25 you to do that.

Page 189

1      A.   Sure.
2      Q.   On page 2 of Exhibit 111 you make the
3  comment, "I told Devon there would be more of this and
4  she said she can't handle any more of this."  What is
5  that about?
6      A.   I don't know.
7      Q.   Well, what was it that she couldn't
8  handle any more of?
9      A.   Stress, probably.
10     Q.   Okay.  On June 22, 2018 -- we're on
11 page 4 now -- you write, "Please call this real estate
12 attorney today.  She will represent GCS452, LLC to buy
13 the house.  Let me know when you have talked.  She is
14 expecting your call.  We need to get an engagement
15 letter signed today."  Do you see that?
16     A.   Yes, I do.
17     Q.   What was the urgency of getting Kim
18 Lord's engagement letter signed on June 22, 2018?
19     A.   Maybe that's when Kim wanted it.  I don't
20 know.
21     Q.   On page 5 you write, "Call Kevin and tell
22 him you want to proceed with buying the farm";
23 correct?
24     A.   Right.
25     Q.   And why are you telling your daughters to

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                         713-653-7100

Merrie Wycoff
August 26, 2021                                    190 to 193

Page 190

1  do that? Explain that to me, please.
2       A.  Sure. They came to the understanding
3  that they wanted the farm, but I felt it really needed
4  to come from them to say they wanted to buy the farm
5  and they had to call Kevin, who then would go on, I
6  imagine, you know, to talk to Bloomfield and had to
7  start that ball rolling.
8       Q.  Did you attempt to pay Kim Lord's
9  retainer?
10      A.  I did.
11      Q.  What happened?
12      A.  I think she rejected it.
13      Q.  Let's look at Exhibit 113.
14      A.  Like me do it?
15      Q.  I'll bring it up. Okay. Exhibit 113 is
16 an exchange of WhatsApp messages between you, Devon,
17 and Azuraye starting on June 23, 2018; right?
18      A.  Right.
19      Q.  And you write, "The horse people are
20 trying to steal it for 2.5." Do you see that?
21      A.  Yeah.
22      Q.  Which horse people was that?
23      A.  A realtor came to me with two horse
24 trainers who I have known for years who were -- had
25 fallen out of -- I don't know what the word you use

Page 191

1  is, when they're in the middle of a real estate deal
2  with the farm down the street and that deal went
3  south.
4           So they came to me and presented -- they
5  didn't present me an offer. They just said, Hey, this
6  is what we have; we have 2.5 million; would you
7  consider taking that for the farm? And horse people
8  have no money. And I understood what they wanted to
9  do, and I would love to have supported my horse
10 community.
11          We wanted to keep it in the horse
12 community. It's like, I didn't want to do any horses
13 before, but, you know, when can you get a place that
14 has this amount of stalls and this amount of pasture
15 area around for horse people at a reasonable cost?
16 You can't.
17      Q.  So that wasn't quite the question I
18 asked. I'm just trying to get -- do you remember
19 their names?
20      A.  I think Andrea Allen.
21      Q.  Andrea Allen. And she's a broker?
22      A.  She was the broker.
23      Q.  And then do you remember the name of the
24 buyers?
25      A.  I used to know and I used to know what

Page 192

1  farm they used to be at, but they ended up buying
2  Summerset, which is Night Hawk down the street.
3       Q.  Earlier you had made a statement about
4  how Jeff Wycoff had left you a pile of insurance
5  policies. Do you remember saying that?
6       A.  Yeah, I do.
7       Q.  So I want to follow up on that. Was
8  there, like, a literal pile of insurance policies
9  someplace?
10      A.  There was a literal pile on his desk,
11 which I didn't find until the next day. They were
12 sorted into three piles.
13      Q.  And do you still have those policies?
14      A.  No. I had to send them back.
15      Q.  Okay. I'm sorry. Send them back where?
16      A.  Sorry. What is it called when you give
17 them back to -- I don't remember the word.
18      Q.  All right.
19      A.  I don't know the word.
20      Q.  Did you keep copies of any of these
21 policies?
22      A.  Did I keep copies? I think they were
23 thick. I don't think you can keep copies. Well, I
24 had the $10 million policy, but that wasn't really a
25 policy.

Page 193

1       Q.  All right. There was a lawsuit that was
2  filed by Bluewater Media; correct?
3       A.  Correct.
4           (Deposition Exhibit 172 was remotely
5  introduced and provided electronically to the court
6  reporter.)
7       Q.  And if you could turn to Exhibit 172 in
8  the notebook, we'll talk a little bit about that.
9       A.  Yes.
10      Q.  All right. So this is a cover letter
11 from CR Miles attaching the summons and complaint for
12 the Bluewater Media lawsuit; right?
13      A.  Miles for what? Tell me the number
14 again. I think I'm on the wrong page.
15      Q.  Exhibit 172.
16      A.  The next page. Yes.
17      Q.  Okay. So Mr. Miles sent this letter to
18 you on May 25, 2018?
19      A.  Right.
20      Q.  That's about the date that you learned of
21 the Bluewater Media lawsuit?
22      A.  Probably.
23      Q.  Now, you were sued individually by
24 Bluewater Media; correct?
25      A.  I don't know.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    194 to 197

Page 194

1    Q.   Let's look at page 4.  I've got it up on
2  the screen if it will help.
3    A.   Yes.
4    Q.   And Wycoff Financial also was sued by
5  Bluewater Media; correct?
6    A.   Yes.
7    Q.   So was Zap! Products; right?
8    A.   Right.
9    Q.   And Zap! had incurred obligations to
10  Bluewater Media to the tune of about $900,000;
11  correct?
12    A.   Correct.
13    Q.   And then you and Jeff Wycoff had signed
14  personal guarantees to Bluewater Media?
15    A.   I don't remember.
16    Q.   One of the claims that Bluewater Media
17  alleged against you and Wycoff Financial was violation
18  of the Colorado Uniform Fraudulent Transfer Act;
19  correct?
20    A.   Correct.
21    Q.   Then you ultimately settle with Bluewater
22  Media for the amount that we saw earlier in that text
23  message; right?
24    A.   Right.  Like 109, right.
25    (Deposition Exhibit 173 was remotely

Page 195

1  introduced and provided electronically to the court
2  reporter.)
3    Q.   If you turn to Exhibit 173, that would be
4  your settlement agreement with Bluewater Media;
5  correct?
6    A.   Correct.
7    Q.   And you signed that settlement agreement
8  yourself?
9    A.   Correct.
10    Q.   You signed it both individually as well
11  as the sole member of Wycoff Financial, LLC?
12    A.   I think by that time I must have been the
13  sole member.
14    Q.   You also signed it on behalf of Ascent
15  Holdings, LLC -- Ascent IP Holdings, LLC.
16    A.   Where does it say that?
17    Q.   It's right underneath Wycoff Financial.
18    A.   Mine doesn't say that.
19    Q.   It's up on the screen and that would be
20  on --
21    A.   But in my book it says, President of Zap!
22  Products, Merrie Wycoff -- Pisano Wycoff individually
23  and Merrie Pisano Wycoff, Wycoff Financial.  Doesn't
24  say Ascent on mine.
25    Q.   Perhaps you're looking at a different

Page 196

1  one.  I'm on Exhibit 173, and I've got it up on the
2  screen.  We are looking at the same document.
3    A.   We're looking at different things.  Let
4  me see if there's any more pages.  Okay.  Got it.
5    Q.   So you signed for Ascent IP Holdings,
6  LLC?
7    A.   Correct.
8    (Deposition Exhibit 171 was remotely
9  introduced and provided electronically to the court
10  reporter.)
11    Q.   And if we go to Exhibit 171, I'd like you
12  to confirm for me that's the guarantee that you and
13  Jeffrey Wycoff signed with Bluewater Media.
14    A.   I don't think that's -- I don't think
15  that's in mine under 171.  No.  171 is the summons to
16  Zap! Holdings.
17    Q.   Okay.  It's possible that you've just got
18  it under a different tab or something.  I'd refer you
19  to the deposition label at the bottom of the page.
20  I've got it up on the screen as well.  We're looking
21  at Deposition Exhibit 171.  And that is a limited
22  continuing guaranty with Bluewater Media; right?
23    A.   Uh-huh.
24    Q.   Then just to confirm for me that you
25  signed that on March 26 -- I'm sorry -- March 2, 2016?

Page 197

1    A.   Yes.  That's my signature.
2    Q.   Can you describe your relationship with
3  Russell Leadingham for me?
4    A.   He's like a family member.
5    Q.   Now, he owed an obligation to the IRS.
6  Do you recall that?
7    A.   I do.
8    Q.   I believe he owed about $20,000?
9    A.   Correct.
10    Q.   And did you pay that for him or give him
11  the money to pay it?
12    A.   I believe I paid it.
13    Q.   And then Russell Leadingham testified
14  that you were surprised to learn that Russell had
15  loaned Jeff Wycoff money?
16    A.   Yes.
17    Q.   So how much did Russell Leadingham tell
18  you he had loaned to Jeff Wycoff?
19    A.   I'm going to say it was over $200,000.
20    Q.   Was that the first time that you had
21  learned of that information?
22    A.   Yes.
23    Q.   Okay.  Have you had something called a
24  "collection due process hearing" with the IRS?
25    A.   I don't know.

EXHIBIT L                U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    198 to 201

Page 198

1      Q.    All right.  Any time in the last two or
2  three years have you had any proceedings with the
3  Internal Revenue Service where you had to show up and
4  provide any kind of testimony?
5      A.    I feel like after the first court case
6  there was a second court case.
7      Q.    Okay.  I'm really focused on the period
8  of time since your husband's death.  Has there been
9  any hearings with the IRS?
10     A.    My attorney would know.
11     Q.    All right.  So you don't recall there
12 being any hearings that you've attended?
13     A.    I haven't attended anything.
14            (Deposition Exhibit 125 was remotely
15 introduced and provided electronically to the court
16 reporter.)
17     Q.    Look at Exhibit 125, please.  I'll also
18 try to pull this up on screen.
19     A.    Yes.
20     Q.    Do you have it?  Do you recognize
21 Exhibit 125 as the settlement agreement that you
22 entered into with BC24?
23     A.    Yes.
24     Q.    And you entered into that settlement on
25 August 3, 2018?

Page 199

1      A.    Yes.  Is that the sale of the farm?
2      Q.    I'm talking about the settlement
3  agreement itself.  And the first paragraph says, "This
4  Settlement Agreement is made and entered into as of
5  August 3, 2018 by and among BC24."
6      A.    BC24.  That's Bloomfield; right?
7      Q.    Right.
8      A.    Yeah.
9      Q.    Okay.  And you signed this settlement
10 agreement on behalf of Wycoff Financial; correct?
11     A.    I don't know.
12     Q.    Let's look at it.  Just verify that you
13 signed it.  If you go to --
14     A.    I see it.
15     Q.    So you signed it on behalf of Wycoff
16 Financial, LLC.  You also signed it as the -- on
17 behalf of the estate of Jeffrey B. Wycoff; correct?
18     A.    Yes.
19     Q.    And you signed it as a guarantor
20 individually; correct?
21     A.    Yeah.  Whatever my lawyers wrote up.
22     Q.    Well, I'm not asking that.  I'm asking
23 you to agree or disagree that's your signature
24 individually as a guarantor; correct?
25     A.    That's my signature.

Page 200

1      Q.    You also signed it on behalf of Zap!
2  Holdings, LLC?
3      A.    Correct.
4      Q.    And as the president of Zap! Products,
5  Inc.?
6      A.    Correct.
7      Q.    You do recall that your daughters were in
8  Europe kind of during the period of time that you were
9  dealing with the house and the farm?
10     A.    Yes.
11     Q.    And would it be fair to say that that
12 created some logistical issues?
13     A.    It was crazy.
14     Q.    So one of the documents that got signed
15 in connection with the transfer of the house and the
16 farm was something called an "easement realignment
17 agreement."  Do you remember that?
18     A.    No.
19            (Deposition Exhibit 174 was remotely
20 introduced and provided electronically to the court
21 reporter.)
22     Q.    Let me show you Exhibit -- you can turn
23 to it or I'll show it to you on the screen --
24 Exhibit 174.
25     A.    I'm going to ask you for -- I can do it

Page 201

1  in one minute, if you can just let me run downstairs
2  to go to the restroom, please.
3            MR. PULKRABEK:  Of course.  We can take a
4  break.  Why don't we take five minutes.  Off the
5  record, please.
6            THE VIDEOGRAPHER:  Going off the record.
7  The time is 9:30 p.m. UTC, 3:30 p.m. Mountain.
8            (Recess taken, 3:30 p.m. to 3:41 p.m.)
9            THE VIDEOGRAPHER:  We are back on the
10 record.  The time is 9:41 p.m. UTC, 3:41 p.m.
11 Mountain.
12     Q.    (BY MR. PULKRABEK) Ms. Wycoff, you
13 understand you're still under oath?
14     A.    Yes.
15     Q.    Now, we're looking at --
16     A.    Is there any way you can turn down your
17 volume?  It's just so loud for my ears.
18     Q.    Well, I would suggest maybe you try to
19 turn it down on your speaker or something like that.
20 I don't know how to modulate my volume.
21     A.    Okay.  Sure.  Sorry.  Let me try that
22 again.
23     Q.    So we're looking at what has been marked
24 Deposition Exhibit 174.
25     A.    Is this right here?

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                    202 to 205

Page 202

1      Q.   Yeah.  That is an e-mail from your
2  daughter Azuraye to you dated Monday, August 6, 2018.
3  Do you see that?
4      A.   Yeah, I see that.
5      Q.   Okay.  Then it attaches a document called
6  an "Easement Realignment Agreement."
7      A.   Oh, yeah, I remember this.
8      Q.   Okay.  So let's talk about this a little
9  bit.
10     A.   Okay.
11     Q.   You had sent this to Azuraye Wycoff to
12 get it signed; correct?
13     A.   Yes.
14     Q.   And then so she sent you this e-mail, and
15 she in fact had signed it here; correct?
16     A.   Right.
17     Q.   You see her signature on behalf of GCS,
18 LLC on page 2 of the Easement Realignment Agreement?
19     A.   Right.  This is for the house; right?
20 Yes.  With those people it's for the house, right.
21     Q.   All right.  And then at this point nobody
22 else has signed this agreement.  Do you see these
23 signatures are blank for the Hindes; correct?
24     A.   Let me figure out how to turn this down
25 again.  I just muted it.  Okay.  All right.

Page 203

1      Q.   So you see this is the Hindes haven't
2  signed this agreement yet?
3      A.   Right.
4      Q.   The Jurkowskis haven't sign it yet?
5      A.   Right.
6      Q.   The Kolbecks haven't signed it yet?
7      A.   Yeah.
8      Q.   Left Hand Ditch hasn't signed it.  You
9  see all that; right?
10     A.   Yeah.
11     Q.   Okay.  It's just Azuraye.  And then you
12 see that on this copy that Azuraye has sent you,
13 nobody has notarized it yet; correct?
14     A.   Correct.
15     Q.   All right.  So this gets sent to you on
16 Monday, August 6, 2018.  And I'll tell you, Azuraye
17 Wycoff testified that she was in Spain at that point
18 in time.  She's not in the country?
19     A.   Right.
20          (Deposition Exhibit 175 was remotely
21 introduced and provided electronically to the court
22 reporter.)
23     Q.   Now, let's look at Deposition
24 Exhibit 175, please.
25     A.   Yes.

Page 204

1      Q.   So Deposition Exhibit 175 is the same
2  Easement Realignment Agreement that we were looking at
3  in 174, except this is the official copy that got
4  recorded with the clerk and recorder; correct?
5      A.   I guess, yes.
6      Q.   All right.  And then if we go down on
7  this copy, we can see that it has everybody's
8  signature at this point; correct?
9      A.   Right.
10     Q.   All right.  Now, I want to focus in on
11 the notarization for Azuraye Wycoff's signature on
12 page 4.  Do you see that?
13     A.   Yes.
14     Q.   Okay.  Now, it's been notarized by
15 somebody named Dena Garton.  Do you see that?
16     A.   I do.
17     Q.   Dena Garton was one of your tenants at
18 the farm?
19     A.   Correct.
20     Q.   And she also used to be your insurance
21 representative for State Farm; correct?
22     A.   Correct.  Yes.
23     Q.   And so Dena Garton has notarized
24 Azuraye's signature saying "Acknowledged before me by
25 Azuraye Wycoff, as Manager of GCS452, LLC, a Colorado

Page 205

1  limited liability company, this 6th day of August,
2  2018." Do you see that?
3      A.   I do.
4      Q.   Okay.  Now, we've already established
5  that Azuraye Wycoff sent this to you un-notarized and
6  she was in Europe on the 6th day of August, 2018;
7  right?
8      A.   Right.
9      Q.   Okay.  So what's the story?  What
10 happened here to get this notarized by Dena Garton?
11     A.   Everybody showed up to my house.  All
12 these other people showed up to my house.  And Dena
13 notarized every one of their signatures and their
14 copies.
15     Q.   Yes.  And explain to me then how Dena
16 Garton then proceeds to notarize Azuraye Wycoff's
17 signature as having appeared before her when Azuraye
18 Wycoff obviously wasn't actually there?
19     A.   I don't know.  The only explanation I can
20 give you is that Dena knows Azuraye and I don't know
21 if she's witnessed her signature before.  I can't give
22 you any other explanation other than that.
23     Q.   Okay.  Well, let me paint a couple
24 possibilities for you here.  One possibility is that
25 Dena Garton did not actually notarize this.  Is that

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Page 206

1   what happened?
2        A.   I see her stamp there.
3        Q.   Okay.
4        A.   I know that everybody showed up at my
5   house to get it notarized.
6        Q.   If we subpoena Dena Garton's notary book
7   that she's supposed to keep for a period of ten years,
8   do you think that she will put in that notebook that
9   Azuraye Wycoff appeared before her that day?
10       A.   I don't know.
11       Q.   Did you ask Dena Garton to notarize
12  Azuraye Wycoff's signature even though Azuraye was not
13  present?
14       A.   I'm sorry.  I don't remember.
15       Q.   All right.  Let me ask you a question
16  about somebody named Theodore Merriam.  Do you
17  recognize that name?
18       A.   I do.
19       Q.   And what is your relationship with
20  Theodore Merriam?
21       A.   He's my IRS attorney.
22       Q.   And how long was Theodore Merriam your
23  IRS attorney?
24       A.   I think I had to find Theodore Merriam --
25  after Jeff died, I had to find an IRS attorney.

Page 207

1        Q.   Was he ever Jeff Wycoff's attorney?
2        A.   Jeff Wycoff's attorney.  I feel like Jeff
3   knew Ted Merriam.
4        Q.   I'm sorry?
5        A.   I feel like Jeff knew Ted Merriam.
6        Q.   Well, was he your and Jeff Wycoff's
7   attorney while Jeff Wycoff was still alive?
8        A.   That's a good question.  I can't
9   remember.
10       Q.   Did Theodore Merriam work at all with the
11  lawyer that was handling the malpractice case we
12  talked about earlier?
13       A.   What malpractice case?
14       Q.   Well, you recall that we talked about a
15  malpractice case that was against MSK?
16       A.   A malpractice case.  MSK.  Okay.  Right.
17       Q.   Do you remember that one?
18       A.   Yeah, I do.
19       Q.   And the lawyer's last name was Wolf, I
20  believe?
21       A.   David Wolf, yes.
22       Q.   David Wolf.  All right.  So was Theodore
23  Merriam involved in any way, shape, or form in the IRS
24  case with Mr. Wolf?
25       A.   I don't believe so.

Page 208

1        (Deposition Exhibit 176 was remotely
2   introduced and provided electronically to the court
3   reporter.)
4        Q.   I'd like you to look at Exhibit 176,
5   please.
6        A.   Yes.
7        Q.   All right.  So you see Exhibit 176 is the
8   deposit slip for one of your accounts at Vectra Bank?
9        A.   Yes.
10       Q.   And it's dated June 12, 2020; right?
11       A.   Yes.
12       Q.   You filled out this deposit slip;
13  correct?
14       A.   Correct.
15       Q.   And you were depositing $139,634;
16  correct?
17       A.   Correct.
18       Q.   Then if we look at the next page here, it
19  is a check written by Theodore Merriam to you for
20  $139,000.  And the memo is "partial trust account
21  refund."  Do you see that?
22       A.   Yes, I do.
23       Q.   Can you explain that to me.  What's going
24  on there?
25       A.   I gave Ted a -- what's that word

Page 209

1   called? -- a referral, like a deposit.
2        Q.   A retainer?
3        A.   A retainer.
4        Q.   How much was the retainer you gave
5   Mr. Merriam?
6        A.   I'd say probably 200,000.
7        Q.   And when did you do that?
8        A.   I can't remember.  Maybe in the beginning
9   when I retained him.
10       Q.   That's a very large retainer --
11       A.   Yeah.
12       Q.   -- would you agree?
13       A.   I don't know.  I don't know how much
14  retainers are supposed to be.
15       Q.   Well, was there a basis for the retainer
16  being $200,000?
17       A.   It was for him to do work with the IRS
18  case, and if they needed a deposit, he could write it
19  out of there.
20       Q.   Okay.  Which IRS case are you talking
21  about?
22       A.   The Jeff and Merrie IRS case.
23       Q.   And where did the money for the retainer
24  come from?
25       A.   From my State Farm life insurance policy.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 210

1     Q.   And did you give it to Mr. Merriam
2  straight from the State Farm policy?
3     A.   No.  I think I gave it to him from my
4  Vectra Bank account.
5     Q.   So we should then be able to find a check
6  or some sort of a wire transfer for $200,000 coming
7  out of your Vectra bank account?
8     A.   I'd say probably a check.
9     Q.   Did you include this $139,000 or whatever
10 balance was in Mr. Merriam's account at the time when
11 you did the financial disclosure that you provided to
12 BC24?
13    A.   Did I include this amount?  No.  It was
14 subtracted from the three-point whatever that was
15 deducted --
16    Q.   $3.5 million?
17    A.   Yes.
18    Q.   Okay.  So did you give Mr. Merriam the
19 retainer before or after you did the financial
20 disclosure that you gave to BC24?
21    A.   Did I give Mr. Merriam the check, was
22 prior to the financial disclosure.
23    Q.   All right.  So then when you did the
24 financial disclosure to BC24, you didn't include the
25 roughly $200,000 retainer that you had given to

Page 211

1  Mr. Merriam as part of the cash that you said you had
2  in the financial disclosure?
3            MR. ABELMAN:  Object to the form of the
4  question.
5     Q.   (BY MR. PULKRABEK) Do you understand my
6  question?
7     A.   No, not really.
8     Q.   Okay.  We talked a little bit earlier
9  about it looks like the money maybe was missing
10 between the money you got from State Farm and the
11 money you listed on your July 2018 financial
12 disclosure.  Do you remember that?
13    A.   I do.
14    Q.   Okay.  So --
15    A.   This is part of what I subtracted from
16 that amount.
17    Q.   Why did you subtract that amount that you
18 put in Mr. Merriam's trust account when you told BC24
19 the cash that you had?
20    A.   Because he cashed the check.
21    Q.   But it was in trust for you; correct?
22    A.   I don't know what that means.  I just
23 know that it wasn't in my account.
24    Q.   Do you know what it means to hold money
25 in trust?

Page 212

1     A.   Not really.
2     Q.   You actually hold money in trust, don't
3  you?
4     A.   I don't know.  For?
5     Q.   Do you hold money in trust for anybody?
6     A.   I don't really know what that means.
7     Q.   You are the trustee for two trusts;
8  correct?
9     A.   Yes.  If we're talking about Ted Merriam,
10 he holds it in trust to pay my IRS debt and he deducts
11 his bills from it.
12    Q.   Did Ted Merriam ever pay any of your IRS
13 debt?
14    A.   No.  I don't think we've come to a
15 conclusion on that yet.
16    Q.   Is Mr. Merriam still holding trust money
17 for you?
18    A.   Yes.
19    Q.   What was the basis for giving you a
20 partial trust account refund in June of 2020?
21    A.   Because I had been paying off so many
22 creditors that I was running out of money.  So I asked
23 him for some money back.
24    Q.   So you parked money with Ted Merriam for
25 a couple years while you were dealing with other

Page 213

1  creditors?
2            MR. ABELMAN:  Object to the form of the
3  question.
4     Q.   (BY MR. PULKRABEK) Go ahead.
5     A.   I don't like the word "parked."  I wrote
6  him --
7     Q.   Deposited?
8     A.   Deposited so that he could pay IRS debt.
9     Q.   Which he never did; right?
10    A.   Well, he's talking to them constantly,
11 which I get billed for.
12    Q.   Russell Leadingham also uses the Merriam
13 Law Firm as his legal counsel?
14    A.   Correct.
15    Q.   And did you give him the Merriam Law
16 Firm's name or did he give you the Merriam Law Firm's
17 name?  How did that work?
18    A.   That was Jeff and Russell.  I wasn't a
19 part of any of that until after Jeff died.
20    Q.   So Jeff Wycoff knew Merriam before he
21 died?
22    A.   Yeah.  I think he -- yeah, I said that he
23 knew Ted Merriam.  I couldn't remember how.  Might
24 have been Russell.
25    Q.   All right.  Having looked at the Vectra

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021
214 to 217

Page 214

1 Bank accounts, there are plenty of checks written by
2 Jeff Wycoff to Merriam. So does that help you at all
3 with figuring out the timing of when Merriam was
4 representing you?
5       A.   Well, me dealing directly with Ted
6 Merriam happened after Jeff's death. I think -- well,
7 I can't tell you what I think. I don't know. That
8 was between Jeff and counsel regarding IRS.
9       Q.   All right. Did you ever purchase gold
10 bullion?
11      A.   Yes.
12      Q.   How many times have you done that?
13      A.   For myself, I think I did it once.
14      Q.   Well, how about for other people?
15      A.   Yes. I purchased it for Aja and Devon in
16 their irrevocable trust.
17      Q.   When did you do that?
18      A.   I can't remember the dates.
19      Q.   How much did you purchase for yourself?
20      A.   I think I purchased 200,000 for myself.
21      Q.   Do you know when you did that?
22      A.   I do not.
23      Q.   Did you at the same time also buy the
24 gold bullion for Azuraye and Devon or did you do that
25 at some other time?

Page 215

1       A.   I can't remember.
2       Q.   What money did you use to buy gold
3 bullion for Azuraye and Devon's trust?
4       A.   I think it was the Voya account for
5 Azuraye and I think was John Hancock for Devon.
6       Q.   Okay. And so when you bought the gold
7 bullion, did you actually walk out of a store with
8 gold?
9       A.   No.
10      Q.   Where is it kept?
11      A.   I think in vaults.
12      Q.   And do you know where the vault is
13 located?
14      A.   I think one is in Canada and one is in,
15 I'd say, United States.
16      Q.   Do you know how much life insurance was
17 on the Voya policy?
18      A.   I do not.
19      Q.   When our appraiser went and appraised the
20 farm and the residential property, you did not allow
21 that appraiser access to the entire house?
22      A.   Correct.
23      Q.   Is there a reason for that?
24      A.   COVID. I had just come out of horrible,
25 horrible COVID stuff and I would not allow them access

Page 216

1 to my room or to Devon's room.
2       Q.   Did you explain that to the appraiser?
3       A.   Yes. I was wearing a mask and I told him
4 that I was very, very scared in an enclosed space and
5 was very hesitant about letting people into my house
6 who I didn't know.
7       Q.   Well, had you already had COVID at that
8 point in time?
9       A.   What time is this?
10      Q.   Well, I mean, it would have been roughly
11 June 2021.
12      A.   Yes. We had it in April and May and
13 finished early June.
14      Q.   But you didn't want the appraiser in all
15 the rooms because you were afraid that he'd give you
16 COVID again; is that what you're saying?
17      A.   I'm saying that everyone is scared of
18 COVID right now. And you don't know who's carrying it
19 and who isn't. So we tried to keep distance. And
20 since I was in an enclosed space, I would not allow
21 them into Devon's room and I wouldn't allow them into
22 my room with my oxygen setup. I showed him what I
23 could show him. And I don't want a strange man in my
24 bedroom.
25      Q.   What's your "oxygen setup"? What do you

Page 217

1 mean by that?
2       A.   I had pretty bad lung stuff during COVID.
3 And we have a hyperbaric chamber downstairs for Devon.
4 The girls brought up the oxygen -- I don't know what
5 you call it -- oxygenator so I could have oxygen,
6 because I thought I was having a stroke, honestly.
7       Q.   Switching gears a little bit here,
8 Ms. Wycoff, you have at least at times in your life
9 represented yourself as having a Ph.D.?
10      A.   Yes.
11      Q.   And that was from -- the place you got
12 your Ph.D certificate was from someplace called The
13 University of Sedona. Do I have that right?
14      A.   Yes.
15      Q.   And that is not an accredited academic
16 institution; right?
17      A.   They represented that they are accredited
18 and these were actual Ph.Ds and masters.
19      Q.   Is that what you believe, that you were
20 obtaining an actual Ph.D. as though you were getting
21 it from, say, the University of Colorado in Boulder?
22      A.   I studied very esoteric subjects and they
23 presented me with a Ph.D. certificate. And I did --
24 what's that called? What's that called? Begins with
25 a D.

EXHIBIT L                U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                    218 to 221

Page 218

1     Q.   A dissertation?
2     A.   Dissertation.  I had to present
3  dissertations for both of them.
4     Q.   Okay.  Now, Ms. Wycoff, you did obtain a
5  bachelor's degree when you were younger; correct?
6     A.   Correct.
7     Q.   You did a four-year program?
8     A.   Correct.
9     Q.   At the University of California at Chico?
10    A.   Correct.
11    Q.   And you got an actual bachelor's degree
12  from that university; correct?
13    A.   Correct.
14    Q.   And you knew when you signed up for your
15  multiple degrees at the University of Sedona that it
16  was not an academic program; right?
17    A.   It's not a traditional academic program.
18    Q.   In fact, they tell you it's not an
19  academic degree that you're going to obtain; right?
20    A.   I don't remember them saying that.  They
21  said that you can earn your master's and your Ph.D.
22         (Deposition Exhibit 185 was remotely
23  introduced and provided electronically to the court
24  reporter.)
25    Q.   Let's look at Deposition Exhibit 185,

Page 219

1  please.
2     A.   Yes.
3     Q.   All right.  So when you signed up with
4  the University of Sedona, you had to fill out some
5  information; right?
6     A.   Correct.
7     Q.   And so, for instance, what we can see
8  here is you submitted your address, of course, and
9  your phone number; right?
10    A.   Sure.
11    Q.   Okay.  You gave them your e-mail address;
12  right?
13    A.   I don't see that, but yes.  Yes.  Sorry.
14    Q.   You gave them your date of birth?
15    A.   Right.
16    Q.   Okay.  You gave them your present
17  occupation at Sirius Products; right?
18    A.   Sure.
19    Q.   You gave them Bishop Bill Torvund as a
20  reference?
21    A.   Yes.
22    Q.   All right.  So you filled out all this
23  information.  You had to check a bunch of things, like
24  you had never had a felony; correct?
25    A.   Correct.

Page 220

1     Q.   So this is all information that you
2  provided to Sanctuary of the ON -- I'm sorry -- to
3  Sedona University; right?
4     A.   Correct.
5     Q.   All right.  And then on the third page
6  here you had to provide them an electronic signature;
7  right?
8     A.   Correct.
9     Q.   And then part of what you agreed to here
10  was that you would have to pay a yearly ministerial
11  association fee of $60 to cover administrative costs
12  of keeping records.  Do you see that there?
13    A.   Yes.
14    Q.   Then part of what you agreed to was --
15  here you said, "I understand that my doctoral degree
16  is nonacademic and is religious in nature legally."
17  Do you see that?
18    A.   Yes, I do.
19    Q.   Okay.  Now, at the point in time that you
20  signed up for University of Sedona, you signed up to
21  obtain not just their Ph.D. certification, but also
22  three bachelor's degrees and a master's degree; is
23  that right?
24    A.   Signed up for what?  I know I signed up
25  for the master's degree and the Ph.D. degree.

Page 221

1     Q.   And there were three bachelor's degrees
2  as well that you got.
3     A.   I didn't remember that.
4         (Deposition Exhibit 186 was remotely
5  introduced and provided electronically to the court
6  reporter.)
7     Q.   Okay.  Now, just in terms of the timing
8  of this program, you got your confirmation e-mail from
9  University of Sedona on February 15, 2012, and that's
10  established in Exhibit 186.  Take a look at that.
11    A.   Okay.
12    Q.   So Exhibit 186 is an e-mail from the
13  University of Metaphysics in Sedona to you dated
14  February 15, 2012.  Do you see that?
15    A.   Yes.
16    Q.   And it confirms a total -- a scholarship
17  tuition payment of $990?
18    A.   Yes.
19    Q.   So that was your total tuition for
20  everything at University of Sedona?
21    A.   Yes.
22    Q.   And then initially you had selected to
23  get a Ph.D. in one area, but then you switched at some
24  point in the middle; is that right?
25    A.   I don't remember.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                    713-653-7100

Merrie Wycoff
August 26, 2021                                    222 to 225

Page 222

1    (Deposition Exhibit 188 was remotely
2  introduced and provided electronically to the court
3  reporter.)
4    Q.   Let's look at the next exhibit.  Well,
5  actually, let's look at Exhibit 188.  So Exhibit 188
6  is another e-mail that the University of Metaphysics
7  in Sedona sent to you with the subject certificates.
8  And it was June 26, 2012; correct?
9    A.   Yes.
10    Q.   So the day before that you had actually
11  said to -- you had sent an e-mail to the University of
12  Metaphysics on June 25, 2021.  You said, "Hello,
13  Sandy.  I received my beautiful Ph.D. certificate
14  today, but I still haven't received my Bachelors or my
15  Masters certificates."  Do you see that?
16    A.   I do.
17    Q.   Okay.  So does that help remind you that
18  you got not only the Ph.D. certificate, but also a
19  master's certificate and multiple bachelor's
20  certificates?
21    A.   Yes.  Thank you.
22    Q.   And so just to kind of sum it up, between
23  the time you enrolled with the University of Sedona in
24  February 2012 and June of 2012, they sent you three
25  bachelor's degrees, a master's degree, and a Ph.D. for

Page 223

1  the tuition payment of $990?
2    A.   Yes.
3    Q.   And then after receiving those
4  certificates, you commenced holding yourself out as a
5  Ph.D. to the public?
6    A.   Well, I got the certificates.  I did the
7  dissertations, which are pretty amazing and unusual.
8  And when you say I hold myself out as, I represented
9  myself as what I thought I had achieved.  You're
10  telling me I didn't achieve this?
11    Q.   Well, I'm just asking, you did hold
12  yourself out to the public as a Ph.D.; correct?
13    A.   I submitted a dissertation, a
14  presentation in front of the whole graduating class.
15  I did the work.
16    Q.   My question is you held yourself out as a
17  Ph.D.
18    A.   And I went to the ceremony where they
19  gave me a master's and a Ph.D. with a cap and gown.
20    Q.   You held yourself out as being a Ph.D.,
21  that's the question; right?
22    A.   Well, yes.
23    Q.   Okay.  Now, let's talk about some further
24  details on that.  Is it true that you never attended
25  classes in person in Arizona at any physical location?

Page 224

1    A.   It was online.  They give you the -- for
2  the bachelor's and stuff, it was an online course that
3  was incredibly easy for me.  And I completed all their
4  requirements.  The bachelor's wasn't important.  The
5  opportunity to go, then, for your master's and your
6  Ph.D. and writing dissertations was very exciting to
7  me to explore a topic that was very meaningful for me
8  that I worked very hard for.
9    Q.   Over a period of three months; correct?
10    A.   When you put yourself ten, 12 hours a day
11  in your seat and you don't leave and you read
12  everything possible, which I've been reading for
13  years, and you put it all together and focus on it,
14  yes, you can achieve that.  It was miraculous.  I'm
15  very proud of my work.
16    Q.   Let's talk about -- in accordance with
17  your contract with the University of Sedona, you're no
18  longer legally allowed to hold yourself out as Ph.D.
19  today; isn't that right?
20    A.   I don't know.  I'll have to go back and
21  repay all those so then I get reinserted.
22    Q.   Right, because your Ph.D. requires you to
23  pay an annual licensing fee to the International
24  Metaphysical Ministry in order to maintain your Ph.D.
25  status; is that right?

Page 225

1    A.   I don't know.  I can't say that I
2  received any bills from them.  So I don't know.  I was
3  sporadic in that, given what I've been through.
4    (Deposition Exhibit 189 was remotely
5  introduced and provided electronically to the court
6  reporter.)
7    Q.   Well, let's just look at the
8  International Metaphysical Ministry's requirements.
9  This is Deposition Exhibit 189.  Do you recognize this
10  document as being from the International Metaphysical
11  Ministry?
12    A.   Yes.
13    Q.   And you have at least at times been a
14  member of that institution; correct?
15    A.   Correct.
16    Q.   All right.  And there's a bulletin from
17  them.  It says, "About Your Ministerial and Degree
18  Recognition Status.  Extremely important.  Please read
19  carefully."  Have you carefully read this bulletin
20  from the University of Metaphysics and the University
21  of Sedona before?
22    A.   Perhaps in 2012.
23    Q.   This appears to be coming directly from
24  the founder, Paul Leon Masters.  Do you see that?
25    A.   He died.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                    713-653-7100

Page 226

1          Q.   The bulletin says, "It is our
2    responsibility to ensure you receive all the correct
3    information so you can make a well informed decision.
4    Please take the time to read through the reasons why
5    it is important to renew your annual ministerial
6    affiliation fee of $70."  Do you see that?
7          A.   Yes.
8          Q.   Okay.  And then it goes on to say,
9    "Metaphysical Degrees are determined by the Department
10   of Education in Washington D.C. as non-secular and
11   thus are classified and regarded as religious in
12   nature."  Do you see that?
13         A.   I do.
14         Q.   So, again, it's not an academic
15   credential; correct?
16         A.   It's still regarded as a master and Ph.D.
17   in the religious category, which is what my expertise
18   was in.
19         Q.   This goes on to say, "There is no
20   recognized federal accrediting agency for metaphysical
21   degrees because of the separation of church and
22   state."  Do you see that?
23         A.   I do.
24         Q.   It goes on to say, "In order to ensure
25   that you are legally entitled to use your degree

Page 227

1    titles after your name, the International Metaphysical
2    Ministry gives your degrees their legal status."  Do
3    you see that?
4          A.   I do.
5          Q.   It says, "If you are not an active
6    minister or do not intend to have a ministry, you will
7    be required to renew your annual affiliation fee of
8    $70"; correct?
9          A.   Correct.
10         Q.   All right.  So when is the last time you
11   renewed your ministerial affiliation with them, paid
12   the $70 licensing fee?
13         A.   I don't remember.
14         Q.   Have you continued holding yourself out
15   as a Ph.D. even though you haven't been paying the
16   license fee to them?
17         A.   I don't do any speaking anymore, and I
18   tried to launch another business and I just couldn't.
19         Q.   Is it true that in your e-mail signature
20   you just say that you are a Ph.D.?
21         A.   In my old e-mail signature.
22         Q.   Okay.  So I guess this kind of gets back
23   to where I started with this.  Are you holding
24   yourself out as a Ph.D. or not at this point?
25         A.   Yes, I have been.

Page 228

1          Q.   Just to be clear, you're not currently in
2    good standing with the International Metaphysical
3    Ministry, are you, because you haven't been paying the
4    fee or submitting your reports?
5          A.   I don't know.  It hasn't come up.
6          (Deposition Exhibit 146 was remotely
7    introduced and provided electronically to the court
8    reporter.)
9          Q.   Let's switch gears here.  I want you to
10   look at Exhibit 146.  Exhibit 146 is a letter from the
11   Department of the Treasury addressed to trustee Merrie
12   P. Wycoff at your home address.  Do you see that?
13         A.   Yes.
14         Q.   And this letter is assigning the employer
15   identification number for the Azuraye J. Wycoff
16   Irrevocable Trust; correct?
17         A.   Correct.
18         Q.   And this letter was sent to you on June
19   8, 2018; correct?
20         A.   June 8 of 2018, correct.
21         Q.   So by that time, you had already, at
22   least to the Department of Revenue, represented
23   yourself as being the trustee of that trust?
24         A.   Correct.
25         Q.   And you had requested the EIN yourself;

Page 229

1    right?
2          A.   No.  I believe the trust attorney
3    requested it.
4          Q.   And who was the trust attorney?
5          A.   I can't remember.
6          Q.   Do you remember the law firm?
7          A.   I think it was in New York.
8          Q.   Does the name Sandra Bussell sound
9    familiar?
10         A.   That's it.  That's the one.
11         Q.   Is she the lawyer that you communicated
12   with?
13         A.   Yes.
14         Q.   How many times approximately did you
15   communicate with Sandra Bussell?
16         A.   I introduced myself and told her -- I
17   introduced myself and told her my children would be
18   contacting her.
19         Q.   Why did you use a lawyer in New York
20   state as opposed to somebody here in Colorado?
21         A.   I tried to find one in Colorado.  My
22   children lived in Boston and New York, and so they
23   told me they would not represent my children who were
24   in Boston and New York.
25         Q.   Approximately how long before you got

EXHIBIT L                  U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                              230 to 233

Page 230

1   this EIN for the Azuraye J. Wycoff Trust did you start
2   working on the trust?
3        A.   "Start working on the trust," can you
4   please clarify that?
5        Q.   Well, at some point you started taking
6   some action toward having an Azuraye J. Wycoff trust;
7   right?
8        A.   Correct.
9        Q.   Okay.  When did that start?
10       A.   Probably after I realized there was a
11  tremendous amount of life insurance that needed to
12  be -- I don't know what the word is -- put into a
13  trust.
14       Q.   How much time did you spend on trying to
15  set up these two trusts, the Azuraye Wycoff Trust and
16  Devon Wycoff Trust?
17       A.   I consulted with an attorney.  Attorneys
18  know how to set up trusts.  I don't have any
19  experience in setting up a trust.
20       Q.   Did you start trying to set up the trusts
21  even before the life insurance companies wrote checks?
22       A.   God, I don't know.  I don't remember.
23       Q.   What would help you remember that?
24       A.   E-mails or something.  I don't remember
25  timing on that.

Page 231

1        Q.   Did you have e-mails or WhatsApp messages
2   with your daughters about setting up the trusts?
3        A.   Yeah.  I think there was -- I think they
4   had to get to an appointment in New York.  And I don't
5   remember how that was communicated, but I probably --
6   I don't know.  I can't tell you specifically.  I just
7   remember that they had to get to an appointment to set
8   it up.
9        Q.   When the trust documents were prepared,
10  were they e-mailed to you; do you remember?
11       A.   Trust documents were prepared were they
12  e-mailed to me.  Yes, I believe they were e-mailed to
13  me.
14            (Deposition Exhibit 148 was remotely
15  introduced and provided electronically to the court
16  reporter.)
17       Q.   Let's just look at Exhibit 148.  I'd like
18  you to confirm for me that's just the letter that you
19  received.
20       A.   Am I looking for the book?
21       Q.   Yeah.  You can look in the book.
22       A.   Yes.
23       Q.   I'll pull it up on the screen.  That's
24  the letter you received from the Department of
25  Treasury for the Devon A. Wycoff Trust on or about

Page 232

1   June 8, 2018; right?
2        A.   Correct.
3        Q.   Let me switch gears a little bit and talk
4   about GCS452.  Who are the members of GCS452?
5        A.   Members.  Remind me again what members
6   means.
7        Q.   Well, you've had multiple limited
8   liability companies set up in the past; right?
9        A.   Yeah, but just in regards to this GCS452,
10  can you please read me the language.  I think I'm a
11  trustee.
12       Q.   All right.  Are you -- is it correct and
13  do you know that the members of GCS452 are the Azuraye
14  J. Wycoff Irrevocable Trust and the Devon A. Wycoff
15  Irrevocable Trust.
16       A.   Did you say are they members?
17       Q.   Are you aware that those trusts are the
18  members of GCS452?
19       A.   So does "members" mean owners?  I know
20  that GCS452 is owned by Devon Wycoff Irrevocable Trust
21  and Azuraye J. Wycoff Irrevocable Trust.
22       Q.   So you know that fact?
23       A.   Yes.
24       Q.   All right.  Do you know who owns Magnus
25  Veritas?

Page 233

1        A.   Same thing.
2        Q.   So you know that Magnus Veritas is owned
3   by those two trusts?
4        A.   Correct.
5        Q.   No doubt in your mind about that, is
6   there?
7        A.   No.  I remember that.
8        Q.   Okay.  And you were part of setting that
9   up; right?
10       A.   Correct.
11       Q.   In 2019 you wrote a check to GCS452 for
12  rent.  Do you remember doing that?
13       A.   I do.
14       Q.   Have you written a check in 2020?
15       A.   Let me see.  2018 was for a year.  So
16  2018 went into 2019.  I wrote a check in 2019 that
17  went into 2020.
18       Q.   Did you write any new checks in 2020 for
19  rent?
20       A.   No, I did not.
21       Q.   Why not?
22       A.   Because COVID hit.  I was supposed to --
23  I was trying to go out and get a job.  Devon moved
24  home that needed care.  Then Aja moved home and then
25  that changed.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                          234 to 237

Page 234

1      Q.   Okay.  Just to be clear, you haven't
2  written a check in 2021 either, have you?
3      A.   I have not.
4      Q.   So the last time you wrote a rent check
5  would have been in 2019?
6      A.   Yes.  That covered six months of 2020.
7      Q.   When GCS452, LLC bought the house, you
8  were the person who directed Bank of America to wire
9  transfer funds from GCS452's bank account to Fidelity
10  National Title Company?
11      A.   I don't know.  Can you show me something?
12          (Deposition Exhibit 152 was remotely
13  introduced and provided electronically to the court
14  reporter.)
15      Q.   Sure.  Exhibit 152.  We may need to --
16  you may not have the right thing in your book.  So I
17  may need to project this one up on the screen.  Let's
18  go with the one on the screen, Ms. Wycoff.  I'm afraid
19  this one could have been switched in your book by
20  accident.  Okay.  So you see this is Deposition
21  Exhibit 152 on the screen?
22      A.   Yes.  Correct.
23      Q.   And this is a Funds Transfer Request
24  Authorization in the name of GCS452, LLC.  And the
25  requester is Merrie Pisano Wycoff; correct?

Page 235

1      A.   Correct.
2      Q.   And then you are the one that actually
3  signed this form; right?
4      A.   Can you go back?  Seven, yes.  Go ahead.
5      Q.   And the date that you signed it was
6  July 17, 2018?
7      A.   Correct.
8      Q.   So in terms of actually who handled the
9  transfer of the money from GCS452 to the title company
10  in order to buy the house, that was you; right?
11      A.   Is that when the kids were in Europe?
12      Q.   Well, I think the kids were in Europe,
13  but the question really is, you're the one that -- you
14  were the one that handled the wire transfer of funds
15  from GCS452 to the title company to buy the house?
16      A.   To buy the house, yes.
17      Q.   Okay.  When -- during your lifetime we
18  talked a little bit about how you and Jeff Wycoff had
19  owned your house together in a trust.  Do you recall
20  that earlier?
21      A.   Yes.
22      Q.   And then do you recall that in 2017 it
23  was moved out of the trust and into just your and Jeff
24  Wycoff's names?
25      A.   Yes.

Page 236

1      Q.   And explain to me, why did you do that?
2  Why did you move it out of the trust into your and
3  Jeff Wycoff's names?
4      A.   I think it had to do with the trust being
5  old, not valid.  I don't remember.  Something like
6  that.
7      Q.   In any event, at the time that your
8  husband passed away, one of his assets was whatever
9  equity existed in your house; correct?
10      A.   I don't know.
11      Q.   Okay.  Is there a reason why you don't
12  know whether that was one of your husband's assets?
13      A.   It's kind of a legal question that I
14  would confer with my lawyer to understand what that
15  means.
16      Q.   All right.  Let's put it this way.  Maybe
17  it will be easier.  The day before your husband passed
18  away, did he have an interest in the house?
19      A.   I don't know.  Ask me again.
20      Q.   You owned this house with your husband;
21  right?
22      A.   Yes.
23      Q.   Okay.  So he had an ownership interest in
24  the house before he died; correct?
25      A.   Yes.

Page 237

1      Q.   Okay.  So then when he passed away, did
2  you do anything to try to go through any kind of a
3  probate process so that his ownership interests in the
4  house was dealt with according to the law?
5      A.   According to the law, because my husband
6  had a will, probate was not necessary.
7      Q.   Okay.  So your husband died with a will;
8  correct?
9      A.   Correct.
10      Q.   And then you basically read the will and
11  said, The will names me as the beneficiary of his
12  property?
13          MR. ABELMAN:  Objection; foundation.
14      Q.   (BY MR. PULKRABEK) Is that what happened?
15      A.   I conferred with lawyers who are experts
16  in that area.
17      Q.   Okay.  I mean, would it surprise you to
18  learn that actually any kind of passage of interest in
19  anything through a will, it actually does need to go
20  through a probate proceeding?  Does that surprise you
21  to know that?
22          MR. ABELMAN:  Objection; foundation.
23      A.   I was in discussions with Colorado
24  attorneys who were experts in wills and said I didn't
25  need to open a probate.

EXHIBIT L                  U.S. LEGAL SUPPORT, INC
                                    713-653-7100

Merrie Wycoff
August 26, 2021                                    238 to 241

Page 238

1     Q.   (BY MR. PULKRABEK) Okay.  Who's the
2  lawyer who's an expert in wills who you consulted?
3     A.   At Hutchinson Black who -- that's where
4  my real estate attorney was.  There was also a trust
5  attorney.
6     Q.   And who's that?
7     A.   I can't remember.
8     Q.   So there's an attorney who you consulted
9  who said if there's a will, you don't have to go
10 through a probate?
11    A.   Correct.
12         MR. ABELMAN:  Object to the form of the
13 question.
14    Q.   (BY MR. PULKRABEK) Okay.  What effort, if
15 any, did you -- let me back up.
16         Did you get a written opinion letter
17 telling you from an attorney that you did not have to
18 go through a probate in this case?
19    A.   I relied on the expertise of an attorney.
20    Q.   Well, my question is, did you get a
21 written opinion letter from some attorney telling you
22 that you didn't need to go through probate?
23    A.   What's an opinion letter?
24    Q.   Did you get something in writing from a
25 lawyer telling you you did not need to go through

Page 239

1  probate?
2     A.   I don't remember.
3     Q.   You mentioned earlier that your mother
4  had passed away and that you had a bank account that
5  it sounded like had been her bank account at one point
6  in time.  Do you recall talking about that?
7     A.   Yes.
8     Q.   Did your mother -- when your mother
9  passed away, did that go through probate?
10    A.   No, it did not.
11    Q.   Have you ever been a personal
12 representative for any estate that went through
13 probate?
14    A.   I think my brother's estate will be going
15 through probate, but as of this moment, it's not in
16 probate.
17    Q.   All right.  Did Jeff Wycoff have an
18 interest in the Alaska property at the time of his
19 death?
20    A.   Yes.
21    Q.   And would it be correct to say that you
22 were the one that handled the transfer of that
23 property from your and Jeff Wycoff's individual names
24 to GCS452?
25    A.   I think "transfer" is an inaccurate word.

Page 240

1  It was sold to GCS452 so -- and that money went to
2  Bloomfield.
3     Q.   Yeah.  I understand that we're suing you
4  for violation of the Uniform Fraudulent Transfer Act.
5  So it's always touchy.
6     A.   Yeah.  It was sold --
7     Q.   Isn't it true that title to the property
8  transferred?
9     A.   It was sold.  I will state it was sold.
10 I did not receive.
11    Q.   Let's talk about -- you know what an
12 arm's length sale is?
13    A.   Where everyone had to have an arm's
14 length attorney.
15    Q.   Okay.
16    A.   Attorneys.
17    Q.   What negotiations occurred over the
18 purchase price for the Alaska property?
19    A.   What negotiations?  Can you be more
20 specific?
21    Q.   Were there any negotiations that occurred
22 with respect to the purchase price paid by GCS452 for
23 the Alaska property?
24    A.   Well, negotiations.  I believe I asked
25 the kids if they would be interested in buying it so

Page 241

1  that I could pay more money to Bloomfield that
2  required an extra $400,000.
3     Q.   And were there any negotiations over the
4  purchase price?
5     A.   The purchase price was determined on a --
6  what's that called when you get -- begins with an A.
7  It's like a tax notice.  It gives you how much the
8  property is worth.
9     Q.   Was there anything between you and your
10 daughters where you said, I'll sell it to you for
11 $50,000 and they said, No, we'll only pay $25,000, and
12 then you arrived at $30,000?  Anything like that?
13    A.   How much was it sold for?
14    Q.   You tell me.  What do you remember?
15    A.   I don't remember.  I remember kind of the
16 assessment being around -- I want to say in the 20s.
17 And I believe they paid more than what the assessor
18 thought it was worth.
19    Q.   Was there any negotiation with the kids?
20 You know what a negotiation is.  You've negotiated
21 things in the past.  Was there a negotiation?
22    A.   Back and forth.  This one I requested if
23 the kids would purchase it so that I could pay off
24 more of the Bloomfield loan.
25    Q.   There was no negotiation with your

EXHIBIT L                 U.S. LEGAL SUPPORT, INC
                           713-653-7100

Page 242

1  children; is that fair?
2        A.   I don't remember.
3        Q.   Was there any negotiation with your
4  children over the price for the house?  Did you haggle
5  back and forth like that like you were buying a
6  Persian rug?
7        A.   I think Bloomfield determined the price
8  based off an appraisal.
9        Q.   Okay.  Other than what honestly would be
10 hearsay, I'm not asking if Bloomfield gave you a
11 price.  I guess what I'm asking is, was there any
12 negotiating between the kids and you?  Did a
13 negotiation process occur?
14       A.   It was based on an appraisal that was
15 between -- I think a Karen Bernardi appraisal for
16 900,000 to 1.1 million.  I had an independent
17 appraiser come in who appraised it for -- god, I want
18 to say 1.2 maybe.  I can't remember.  And so the price
19 I believe Bloomfield accepted was -- it was more than
20 what I thought.
21       Q.   Ms. Wycoff, I know you've got a story to
22 tell here.
23       A.   I'm not trying to tell a story, sir.  I'm
24 trying to --
25       Q.   I've heard it now twice.  Look, if we

Page 243

1  have to go to trial on this case, let me just kind of
2  give you a little pointer that in order to get through
3  this, I'll ask a question and if you can answer the
4  question, it will be really helpful.  Okay?  So I'll
5  ask it again.  Is it true that there was no
6  negotiation process between you and your kids over the
7  price of the house?
8        MR. ABELMAN:  Object to the form of the
9  question, and it's been answered.
10       MR. PULKRABEK:  No, it hasn't been
11 answered.
12       Q.   (BY MR. PULKRABEK) Go ahead, Ms. Wycoff.
13 Can you answer the question and just confirm that
14 there was no negotiation process with your kids over
15 the price of the house?
16       MR. ABELMAN:  Object to the form of the
17 question.
18       A.   My attorney believes it's been answered.
19 How do I respond?
20       Q.   (BY MR. PULKRABEK) You still have to
21 answer the question.  So if you can answer it yes or
22 no, that's what I'm looking for.  Go ahead.
23       A.   I believe that Bloomfield determined the
24 price of the house.
25       Q.   Okay.  It sounds like what you're telling

Page 244

1  me is you and your children actually did negotiate
2  back and forth over the price of the house.  So tell
3  me where you started.  What was your starting bid and
4  what was their counteroffer?
5        A.   I believe Bloomfield determined the price
6  of the house.
7        Q.   No, no.  It really sounds to me like
8  there must have been a negotiation here because you
9  can't say -- you can't just admit that there was no
10 negotiation between you and your kids.
11       A.   I don't feel you can --
12       Q.   So I'm just asking, tell me the
13 negotiation that did occur.
14       A.   -- to saying there was no negotiation.
15 Bloomfield determined the price of the house and they
16 agreed to pay it.
17       Q.   So there was no negotiation between you
18 and your kids over the price of the house; correct?
19       MR. ABELMAN:  Object to the form of the
20 question.  Mr. Pulkrabek, as a courtesy, I'll let
21 you -- it's 4:47 and by my calculation the seven hours
22 would be completed no later than five.  So I just want
23 to...
24       MR. PULKRABEK:  We'll figure that out.
25       Q.   (BY MR. PULKRABEK) Is there a reason,

Page 245

1  Ms. Wycoff, why you can't just acknowledge that this
2  wasn't an arm's length transaction between you and
3  your kids and there wasn't a negotiated price?  Is
4  there some reason why you can't admit that fact?
5        A.   Forcing me to admit something that --
6  they each had their own attorney.  Their attorney
7  represented them.  That was arm's length.  We came
8  together to try to figure out how to resolve a huge
9  debt.  And we waited for Bloomfield to determine a
10 price, or I was going to put it on the market and let
11 a realtor handle it and whatever somebody determined
12 that they wanted to buy the house and negotiate it
13 that way.  It was in Bloomfield's court, not my court.
14       Q.   You opened the account for Magnus Veritas
15 bank in New York; correct?
16       A.   I'm sorry.  What?
17       Q.   You opened the account for Magnus Veritas
18 at -- I'm sorry -- Bank of America?
19       A.   Where?
20       Q.   Bank of America.
21       A.   Yeah, but you said -- did you say New
22 York?
23       Q.   Start over.  You opened the account for
24 Bank of -- strike that.
25       You opened the account for Magnus Veritas

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Page 246

1  at Bank of America; correct?
2        A.   Azuraye was present.  Devon was present.
3  I was present in Colorado.  And it was a three-way
4  conversation to open an account.
5              (Deposition Exhibit 165 was remotely
6  introduced and provided electronically to the court
7  reporter.)
8        Q.   Let's look at Deposition Exhibit 165,
9  please.
10       A.   Yes.  Yes.
11       Q.   Okay.  You see this is a Bank of America
12  form called "Opening and Maintaining Banking
13  Relationship"?
14       A.   Yes.
15       Q.   And the name of the business is Magnus
16  Veritas LLC; correct?
17       A.   Correct.
18       Q.   And the only name that we see under
19  result is Merrie Pisano Wycoff; correct?
20       A.   Correct.
21       Q.   Your title there is signer; right?
22       A.   Yes.
23       Q.   And if you turn to page 3 of 3, the date
24  that you signed this was July 25, 2018; correct?
25       A.   Correct.

Page 247

1        Q.   And that is your signature there; right?
2        A.   Correct.
3        Q.   And then 166 is a duplicate.  So what I'd
4  like to do -- we'll substitute another document that
5  will become 166 here.
6        A.   Let me explain how this was done.  We
7  made appointments at Bank of America in Boston.  She
8  made an appointment for Devon in New York.  She made
9  an appointment for me in Colorado.  We all showed up.
10  I signed the one in Colorado.  Aja signed the one in
11  Boston.  Devon signed the one in New York.  And I
12  believe they were faxed to Bank of America in
13  Colorado.
14       Q.   Okay.  And, in fact, your children were
15  in Europe at the time.  So that can't be what
16  happened; isn't that right?
17       A.   Is this GCS or is this Magnus Veritas?
18  This is GCS.
19              (Deposition Exhibit 166 was remotely
20  introduced and provided electronically to the court
21  reporter.)
22       Q.   You just told me it was Magnus Veritas.
23  We just looked at it.  All right.  Let's look at what
24  will be Deposition Exhibit 166.  I'm pulling it up on
25  the screen right now.  All right.  You recognize your

Page 248

1  handwriting on Deposition Exhibit 166?
2        A.   Yes.
3        Q.   And so this is before you even had the
4  official checks printed up for Magnus Veritas' bank
5  account at Bank of America; right?
6        A.   Right.
7        Q.   This is dated July 27, 2018; correct?
8        A.   Yes.
9        Q.   And your check that you filled out here
10  was payment of Packard Dierking's legal fees in the
11  amount of $17,500; correct?
12       A.   I don't know if they're legal fees or
13  what that was for.
14       Q.   Okay.  We talked about how Kim Lord was
15  supposed to be the lawyer representing Azuraye and
16  Devon.  Do you remember that?
17       A.   Yes.
18       Q.   And she's a lawyer at Packard Dierking;
19  correct?
20       A.   Correct.
21       Q.   And so what we see in this exhibit is you
22  writing the check to the lawyer for Azuraye and Devon;
23  correct?
24       A.   Writing it to Packard Dierking, right.  I
25  don't remember if it's legal fees or what it was for.

Page 249

1        Q.   And then you directed the wire transfers
2  of money from Magnus Veritas for purposes of the
3  purchase of the farm; is that true?
4        A.   Do you have something I can look at?
5        Q.   No.  Before we do that, can you remember?
6        A.   Not offhand.  If you could show me
7  something, I'd remember.
8              (Deposition Exhibit 169 was remotely
9  introduced and provided electronically to the court
10  reporter.)
11       Q.   All right.  Let's look at a different
12  exhibit.  Let's look at Exhibit 169.
13       A.   Okay.
14       Q.   Do you recognize Exhibit 169 as an e-mail
15  exchanged between Kim Lord, yourself, Steve Abelman,
16  and Clark Edwards?
17       A.   Yes.
18       Q.   And the subject is "leases."  Do you see
19  that?
20       A.   No.  I thought it was -- hold on.  Where
21  do you see subject?  Leases.  Got it.
22       Q.   Okay.  And this is a set of e-mails that
23  went back and forth on August 7 of 2018 between you,
24  Mr. Abelman, Ms. Lord, and Clark Edwards; correct?
25       A.   Yes.

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 250

1    Q.   And then the e-mail that you wrote shows
2  up on the second -- on the first page kind of in the
3  middle of the page sent at 3:28 p.m. to Kim Lord.  In
4  the second paragraph you said, quote, I would prefer
5  not to have my tenants sign Estoppel agreements
6  because my tenants got so rattled during the last
7  potential sale with Mr. Mowley, that I received a
8  notice to terminate a lease.  They had inspectors come
9  through, appraisers and surveyors and I don't want to
10  rattle them unnecessarily.  Everyone is current with
11  rent payments.  Do you see that?
12    A.   Yes.  So this is in regards to the sale
13  with Tim Moley.
14    Q.   And then you say, "I will continue to do
15  the billing and handle everything for the tenants and
16  property.  You can have a statement that I will direct
17  deposit security deposits to Magnus Veritas, LLC.  I
18  wouldn't do it this way if it wasn't my kids." Do you
19  see that?
20    A.   Yes.
21    Q.   And that was in response to an e-mail
22  from Kim Lord where she said, yeah, the tenants --
23  "Yes, the Tenants will need to get notice of new
24  landlord's name"; right?
25    A.   I don't know where you're seeing this.

Page 251

1    Q.   That was in Lord's earlier e-mail.
2    A.   August of 18.  Kim Lord says -- okay.  So
3  what's the question?  I'm sorry.
4    Q.   So you had responded to Kim Lord's e-mail
5  telling you that the tenants needed to get notice of
6  the new landlord's name by responding that you didn't
7  want the tenants to get notice of the new landlord's
8  name; is that accurate?
9    A.   Well, let's talk about the estoppel.
10  You're asking me specific questions.  Kim Lord is at
11  the same law firm -- real estate law firm that Tim
12  Moley's attorney was at.
13    Q.   So --
14    A.   Can you hear me?
15    Q.   What does that have to do with anything?
16    A.   The estoppel agreement was a big
17  contention for Tim Moley.  And I can't remember now.
18    Q.   Okay.  Ms. Wycoff, more simply put, you
19  instructed Kim Lord that you didn't want to inform the
20  tenants of the change in ownership of the farm;
21  correct?
22         MR. ABELMAN:  Object.  Object to
23  foundation.
24    A.   Correct.
25         MR. PULKRABEK:  Why don't we take a break

Page 252

1  go and off the record here.  Ms. Goulding, maybe you
2  could just add up the time, figure out where we're at.
3  And if we can take just ten minutes, I'll figure out
4  if I've got any further questions.
5         MR. ABELMAN:  I think we're really at the
6  seven hours.  I could be wrong.  I don't really want
7  to take another ten minutes.  So why don't we do a few
8  minutes and see how much time is left.
9         MR. PULKRABEK:  I would like to go over
10  my notes.  I'd like to just have Ms. Goulding take a
11  look at the time.  You know, I don't want to just sit
12  here while we're going.  So let's go off the record,
13  if we're not already.
14         MR. ABELMAN:  Listen, I just have an
15  out-of-town visitor and I need to be at my house at
16  5:30.  So that's in addition to the fact that you've
17  got seven hours.  So I think you should go over your
18  notes.  Can we do this in five minutes?  That's my
19  suggestion.
20         MR. PULKRABEK:  We'll go off the record
21  for five minutes, then come back.
22         MR. ABELMAN:  Thank you.
23         THE VIDEOGRAPHER:  Going off the record.
24  The time is 11 o'clock p.m. UTC, 5 o'clock p.m.
25  Mountain.

Page 253

1         (Recess taken, 5:00 p.m. to 5:04 p.m.)
2         THE VIDEOGRAPHER:  We are back on the
3  record.  The time is 11:04 p.m. UTC, 5:04 p.m.
4  Mountain.
5         MR. PULKRABEK:  I think we need Dustin to
6  read us back in.
7         MR. ABELMAN:  He just did.
8         MR. PULKRABEK:  I'm sorry.  I may have
9  had my volume down too low.
10    Q.   (BY MR. PULKRABEK) All right.  We talked
11  about Devon in her work.  And Devon has not been an
12  employee of Zap! Products, has she?
13    A.   Yeah, I think she has.
14         (Deposition Exhibit 183 was remotely
15  introduced and provided electronically to the court
16  reporter.)
17    Q.   Okay.  Let's look at Deposition
18  Exhibit 183, please.  See if I can bring this up.  So
19  as the president of Zap! Products, are you familiar
20  with its payroll?
21    A.   Somewhat.
22    Q.   All right.  We understand that there's
23  been no sales from Zap! Products since 2016; is that
24  accurate?
25    A.   I believe so.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Page 254

1       Q.   And that Zap! has essentially
2   discontinued business in 2016 and '17; is that
3   accurate?
4       A.   Yes.
5       Q.   Okay.  Now, I'm showing you what's been
6   marked as Deposition Exhibit 183.  And it's a
7   compilation of information from Gusto, which is a
8   payroll processing system.  And I'll kind of take you
9   down towards the end of this document that shows
10  Azuraye Wycoff reportedly working 120 hours a week for
11  Zap! Products in February of this year.  Is that
12  actually happening?
13      A.   Aja was just helping me pack up boxes.
14  And there's years and years and years of Zap! stuff.
15  And Aja helped me reorganize it and try to get rid of
16  some filing cabinets.
17      Q.   Is she working 120 hours a week -- or 120
18  hours a month?
19      A.   Probably not.
20      Q.   Go ahead.
21      A.   No, probably not.
22      Q.   Okay.  What about Devon Wycoff?  Is she
23  working 120 hours a month for Zap! Products?
24      A.   She was paid for it, but no.
25          (Deposition Exhibit 184 was remotely

Page 255

1   introduced and provided electronically to the court
2   reporter.)
3       Q.   Okay.  And why do you have -- as the
4   president of Zap! Products, why do you have your
5   daughters on the payroll as working -- this is
6   Deposition Exhibit 184, by the way, for Devon Wycoff.
7   Why do you have your daughters working 120 hours a
8   month on the payroll for Zap!?
9       A.   For health insurance.
10      Q.   Okay.  So that kind of gets to my point.
11  Is it correct to say that when we see Devon Wycoff and
12  Azuraye Wycoff on the payroll of Zap! Products and
13  getting paid by or through Gusto, the reason for that
14  really has to do with health insurance?
15      A.   Yes.
16      Q.   And can you explain, why are you having
17  your daughters on Zap! Products payroll in order for
18  them to have health insurance?  Why can't they get
19  health insurance through the private market or some
20  other way?
21      A.   I was told that it's a requirement that
22  you turn in their health insurance.  Jeff had set all
23  this up for them to have health insurance through --
24  it's not State Farm.  I don't know what -- it's
25  Anthem, Blue Cross maybe.  It's one or the other.

Page 256

1   Jeff had set all this up years ago for them to be on
2   this health insurance.  And Devon had some pretty
3   specific needs that required specialists.
4       Q.   Do you know if it's legal to report
5   somebody as working 120 hours a month so that they
6   could get health insurance if in fact they're not
7   working?
8       A.   I don't know if it's legal.  I paid for
9   it.
10      Q.   Okay.  And then when this money gets
11  deposited, it goes into an account that is owned
12  jointly between you and Devon or you and Azuraye; is
13  that correct?
14      A.   The money goes into the Zap! account.
15  Aja pays for her health insurance.
16      Q.   Do we see -- part of what we've seen in
17  the bank records are there are deposits and
18  withdrawals going through an account, one of which is
19  held jointly by you and Azuraye.  Another account is
20  held jointly by you and Devon.
21      A.   Correct.
22      Q.   Is that all part of this payroll?  Is
23  that all part of this health insurance thing?
24      A.   Aja pays me monthly for her health
25  insurance.  Then I think it's through Zap! Products

Page 257

1   and I pay -- I transfer money in and then we pay for
2   health insurance.
3       Q.   Okay.  But then there are actual payroll
4   payments being made by Gusto back to this joint
5   account in the name of you and Azuraye.  Are you aware
6   of that?
7       A.   I'm sorry.  What's happening?
8       Q.   So you recall -- let's just take Devon
9   Wycoff, for an example.
10      A.   Sure.
11      Q.   You have a joint account with Devon
12  Wycoff; right?
13      A.   Yes.
14      Q.   And there will be payments made into that
15  joint account for Devon Wycoff from Gusto.  Do you
16  know that?
17      A.   There's payments made into her account?
18      Q.   Okay.  We can take Azuraye Wycoff.  You
19  have a joint account with Azuraye Wycoff; correct?
20      A.   Correct.  Uh-huh.
21      Q.   There are payments by Gusto to this joint
22  account that you own with Azuraye Wycoff.  Are you
23  aware of that?
24      A.   I think I used to get payments into their
25  account.  I don't know how long ago that was.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Merrie Wycoff
August 26, 2021                                    258 to 261

Page 258

1    Q.   Do you know where the payroll payments
2  that Zap! Products makes ostensibly for wages to
3  Azuraye Wycoff and Devon Wycoff are going?
4    A.   Say that again.  Do I know where they're
5  going?
6    Q.   Yeah.  Do you know where they get
7  deposited?
8    A.   I think at one time it was a direct
9  deposit to each of their accounts.
10   Q.   Okay.  Were those into joint accounts
11 that you held jointly with them?
12   A.   I think at one time they were jointly
13 joint.  I think Aja is now on Devon's and has been for
14 a while, and Devon's is on Aja's.
15   Q.   What does that mean, Devon's is on Aja's
16 and Aja's is on Devon's?  I don't understand that.
17   A.   In case of emergencies, which happen
18 often in my family, somebody needed to be responsible
19 to take care of bills or whatever.  And so Aja is now
20 a second on Devon's account and has been for a while,
21 and Devon is a second on Aja's account.
22   Q.   Has Devon ever worked 120 hours per week
23 for Zap!, ever?
24   A.   I think she might have done that when
25 Jeff was alive.  She was helping him do stuff.  I

Page 259

1  don't know what.
2    Q.   Okay.  Not since 2019, though?
3    A.   2019, no.
4          MR. PULKRABEK:  Tiffany, did we ever get
5  a time count on this?
6          THE VIDEOGRAPHER:  So right now we are at
7  six hours, 32 minutes on the record.
8          MR. PULKRABEK:  All right.
9    Q.   (BY MR. PULKRABEK) Ms. Wycoff, have
10 you -- other than the tax court case, have you ever
11 testified before by deposition or in trial?
12   A.   Yes.
13   Q.   How many times?
14   A.   Oh, gosh.  I did for -- well, not in
15 trial.  I took a deposition for MSK and that whole
16 group.  I think I did when I was in my 20s.
17   Q.   What was that for?
18   A.   For Sheridan.
19   Q.   Any others?
20   A.   I can't remember if I went to trial for
21 anything else.
22   Q.   We talked earlier about the number of
23 claims that were brought against Jeffrey Wycoff and/or
24 any of the entities at or about the time of his death.
25 What claims do you recall there being?

Page 260

1    A.   What claims?
2    Q.   Yeah.
3    A.   What does that mean?
4    Q.   Who was making a claim on the estate of
5  Jeff Wycoff?
6    A.   Claim on the estate of Jeff Wycoff.  On
7  the estate, I think only Midlab.
8    Q.   What about Bluewater Media?  Did
9  Bluewater Media ever make any kind of a claim against
10 Jeff Wycoff?
11   A.   So try not to be a lawyer for me.  Is a
12 claim a lawsuit?
13   Q.   Let me make it simpler.  At or around the
14 time of Jeff Wycoff's death, who was saying they were
15 owed money?
16   A.   Oh, God.  Okay.  Let's see.  K Stack,
17 Bluewater, a company called -- had to do with a wave,
18 but that was not a lawsuit.  I've got Bluewater, K
19 Stack, Next Wave.  I feel like there's more, but I
20 can't remember more.
21   Q.   Okay.  The IRS was one of them; right?
22   A.   Oh, yes.  Right.
23   Q.   What about California State Franchise Tax
24 Court?
25   A.   California, right.

Page 261

1    Q.   So at a minimum -- and BC24 was owed
2  money; right?
3    A.   Uh-huh.
4    Q.   Okay.  So at the time of your husband's
5  death, at least the following were asserting that they
6  were owed money:  Midlab, K Stack, Bluewater, Next
7  Wave, the IRS, California, and BC24?
8    A.   Yeah, BC24.
9    Q.   Okay.  Was that a good list that I just
10 gave you?
11   A.   Well, so, again, are we talking claims as
12 in filing a claim, like in a lawsuit?
13   Q.   Well, we're starting out with who said
14 they were owed money.
15   A.   Well, Russell was in there.
16   Q.   Russell.  Any others?
17   A.   Sure.  People from Zap! that felt they
18 were owed money.
19   Q.   Anyone else?  What about Bill Torvund,
20 Sanctuary of the ON?
21   A.   Bill Torvund believed he was owed money.
22   Q.   Do you believe Bill Torvund was owed
23 money?
24   A.   I believe he signed contracts with Jeff.
25   Q.   You had pledged or I should say -- strike

EXHIBIT L          U.S. LEGAL SUPPORT, INC
                          713-653-7100

Merrie Wycoff
August 26, 2021                                    262 to 265

Page 262

1  that.
2           You had transferred or signed paperwork
3  partially transferring the beneficiary on the State
4  Farm policy to Sanctuary of the ON back in 2016.  Do
5  you remember that?
6       A.   Yes, I do.
7       Q.   What were the circumstances there?  Tell
8  me what you remember.
9       A.   Jeff called me into the office and wanted
10 me to sign the State Farm thing that gave Bill a
11 portion of the State Farm.  I'm not sure I really knew
12 what the State Farm thing was.  And after I signed it,
13 I wanted to know what is Bill having to do with this,
14 and he said that Bill made an investment.  And I was
15 very angry about that.  Honestly, I was really angry
16 about that.
17      Q.   Okay.  And just let me know if you need a
18 minute.
19      A.   No.  It just surprised me.
20      Q.   And why did it surprise you?
21      A.   Because Bill was a spiritual friend of
22 mine, and I felt that Jeff turned it into a business
23 deal or Jeff and Bill turned it into a business deal.
24 And that shocked me.  I said, I don't want to know
25 anything about this.  I said, You have to keep me out

Page 263

1  of this.  I said, This will be too much for me, I
2  don't want to know.
3       Q.   So did you feel that that was a betrayal
4  of sorts when that happened?
5       A.   Yes.
6       Q.   You know, Ms. Wycoff, I hate to kind of
7  veer into what I think are more sensitive questions,
8  but I just want to ask because it's really my one
9  chance.  At any point in time did you stop trusting
10 your husband Jeffrey Wycoff with respect to business
11 matters?
12      A.   Did I stop trusting him?
13      Q.   Yes.
14      A.   That one shocked me.
15      Q.   Anything before that?
16      A.   Jeff was -- I thought he was an amazing
17 businessman and he was really positive and
18 communicative with people.  We were all excited about
19 this launch.
20      Q.   One of the things that my clients have
21 said in this lawsuit was that when they talked to Jeff
22 Wycoff he told them that he would be selling the farm
23 and using the proceeds to pay back Midlab.  Had you
24 ever heard that before?
25      A.   I saw that in the claim.

Page 264

1       Q.   Were you aware of that back when it was
2  happening?
3       A.   No.
4       Q.   Russell Leadingham was promised a
5  percentage of the sales of the farm when that happened
6  too; right?
7       A.   Russell was promised a percentage of the
8  sales, yes.
9       Q.   Were you aware of that?
10      A.   I think Russell reminded me of that.
11      Q.   One of the comments that we heard from
12 Russell Leadingham when we took his deposition was
13 that when he spoke with you after Jeffrey Wycoff's
14 death, you had said words to the effect that Jeff
15 Wycoff felt that he was worth more to his family dead
16 than alive?
17      A.   What?
18      Q.   Did you say anything like that to Russell
19 Leadingham?
20      A.   I don't remember saying anything like
21 that to Russell Leadingham.
22      Q.   Ms. Wycoff, did you have -- was Jeffrey
23 Wycoff expressing any thoughts of suicide prior to his
24 death?
25      A.   My husband was in chronic pain.  And six

Page 265

1  months after I married him, he was honest then about
2  his chronic pain.  And sometimes it led him to the
3  brink of wanting to commit suicide.  I've dealt with
4  this on and off for 30 years, but it never happened.
5       Q.   When was -- you know, before his death
6  when was the last time that he had expressed any
7  thoughts of suicide?
8       A.   The worst was when he had surgery when
9  the kids were home and he was screaming every night
10 for the nerve pain.  I don't know when that was.  That
11 was the worst.  That was the worst.  But he -- I think
12 the summer of the infomercial he was in really, really
13 bad pain.
14      Q.   Okay.
15      A.   He was never depressed.  So you just kind
16 of don't take it seriously.
17      Q.   Did he tell you that he prepared a new
18 will in December of 2017?
19      A.   Did he tell me he prepared -- I think we
20 both prepared wills.
21      Q.   So together you went and had wills
22 prepared in December of 2017?
23      A.   He told me we should update our wills.
24      Q.   Is there a -- strike that.
25           MR. ABELMAN:  Can we just go off the

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Page 266

1 record for a second?  Dustin, where are we on time?
2          THE VIDEOGRAPHER:  Currently we're at six
3 hours, 46 minutes.
4          MR. ABELMAN:  We can go back on the
5 record for 14 more minutes.
6          THE VIDEOGRAPHER:  We're still on the
7 record.  Would you like me to take us off?
8          MR. ABELMAN:  No.  Proceed.
9     Q.  (BY MR. PULKRABEK) Ms. Wycoff, when you
10 did the sale to GCS of the house, you sold the
11 contents the house, not just the house; correct?
12    A.  Correct.
13    Q.  Is there a reason why you sold the
14 contents of the house?
15    A.  Yeah.
16    Q.  What was the reason?
17    A.  Because a lot of the stuff -- all of the
18 stuff in the kids' room was theirs.  All the stuff in
19 the back house was Aja's.  Honestly I felt that since
20 it wasn't worth the price that they paid for it --
21 Devon said, If we're going to pay that, can we have
22 everything in the house?  And I said, Yeah, that's
23 actually a good idea, why don't you.  And that's how
24 it came about.
25    Q.  Okay.  Are you sure that's how it came

Page 267

1 about?
2    A.  Devon suggested it first.  I said it to
3 Clark, that I was including the contents of the house.
4 They wanted a -- what's it called when you itemize
5 things?  Well, an item list about what was included in
6 the house.
7    Q.  Okay.
8    A.  I remember telling Aja or reminding -- I
9 had to remind Aja to ask for the stuff in the house,
10 but they wanted an itemized list and I prepared it.
11          (Deposition Exhibit 126 was remotely
12 introduced and provided electronically to the court
13 reporter.)
14    Q.  There is one more document that I want
15 you to look at and I think we'll be done.  Give me a
16 moment to find it here.  Look at Deposition
17 Exhibit 126.  Can you confirm for me that --
18    A.  I'm not there.
19    Q.  Okay.
20    A.  137.  I'm sorry.  Tell me the number
21 again.
22    Q.  136.
23    A.  Wait.  136.  36.  Yes.
24    Q.  Okay.  I'm sorry.  You know what?  I
25 steered you to the wrong thing after all that trouble.

Page 268

1 I wanted you to look at 126.
2    A.  Okay.
3    Q.  I'm going pull up 126 so I have it.  So
4 Exhibit -- are you there?
5    A.  Yeah, but it's hard to read this upside
6 down.  126.  126.
7    Q.  Ms. Wycoff, I also have it on the screen
8 if that will help.
9    A.  Yes.
10   Q.  Okay.  So Exhibit 126 is a set of
11 WhatsApp messages between you and Devon Wycoff;
12 correct?
13   A.  Right.
14   Q.  And you provided these to us directly off
15 your phone?
16   A.  Yes.
17   Q.  You're able to confirm that this is what
18 you provided to us in terms of your WhatsApp messages
19 with Devon; correct?
20   A.  Yes.
21   Q.  Go through each page.  Page 3190, that's
22 from your phone; correct?
23   A.  Yes.
24   Q.  3191 is from your phone; correct?
25   A.  I guess, yes.

Page 269

1    Q.  3192, that's what you provided us from
2 your phone; right?
3    A.  Uh-huh.
4    Q.  3193, correct, it came from your home --
5 or your phone?
6    A.  What's 193?
7    Q.  Page 3193.
8    A.  I see.
9    Q.  This is something that you produced off
10 your phone; correct?
11   A.  Correct.
12   Q.  Page 3194 was provided from your phone;
13 correct?
14   A.  Correct.
15   Q.  3195 was provided from your phone;
16 correct?
17   A.  Uh-huh.
18   Q.  3196, that came off your phone?
19   A.  Yes.
20   Q.  3197 came from your phone?
21   A.  Yes.
22   Q.  3198 came from your phone?
23   A.  Yes.
24   Q.  3199?  We're almost there.
25   A.  Okay.

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                             713-653-7100

Page 270

1  Q.  3200, a message from your phone --
2  A.  Yes.
3  Q.  -- right?
4      3201, that's off your phone; right?
5  A.  Yes.
6  Q.  Okay.  So that whole set in Deposition
7  Exhibit 126, that's off your phone and was provided to
8  your counsel and then provided to us in this case;
9  correct?
10 A.  Yes.
11     MR. PULKRABEK:  All right.  Ms. Wycoff,
12 we're done.  That's all the questions I have for you.
13 I'm sorry this has been such an ordeal, but it's the
14 way that litigation sometimes gets.  So at this point
15 I think we can go off the record unless Mr. Abelman
16 has questions.
17     MR. ABELMAN:  I do not have questions.  I
18 would like a transcript.  I don't need a videotape.
19     THE VIDEOGRAPHER:  Going off the record.
20 This concludes the remote video-recorded deposition of
21 Merrie Wycoff.  The time is now 11:36 p.m. UTC,
22 5:36 p.m. Mountain.  We are off the record.
23     WHEREUPON, the within proceedings were
24 concluded at the approximate hour of 5:36 p.m. on the
25 26th day of August, 2021.

Page 271

1      I, MERRIE WYCOFF, do hereby certify that
2  I have read the above and foregoing deposition and
3  that the same is a true and accurate transcription of
4  my testimony, except for attached amendments, if any.
5
       Amendments attached  ( ) Yes   ( ) No
6
7
   _____
8  MERRIE WYCOFF
9
10
11
12     The signature above of MERRIE WYCOFF was
13 subscribed and sworn to or affirmed before me in the
14 county of _____, state of Colorado, this
15 _____ day of _____, 2021.
16
17
18
   _____
19 Notary Public
   My commission expires
20
21
22
23
24
25 Midlab, Inc. 8/26/21 (tdg)

Page 272

1              REPORTER'S CERTIFICATE
2  STATE OF COLORADO        )
                            ) ss.
3  COUNTY OF ARAPAHOE       )
4      I, TIFFANY D. GOULDING, Registered
   Professional Reporter and Notary Public ID No.
5  19984028637, State of Colorado, do hereby certify that
   previous to the commencement of the examination, the
6  said MERRIE WYCOFF verbally declared that her
   testimony is under the penalty of perjury in relation
7  to the matters in controversy between the parties
   hereto; that the said deposition was taken in machine
8  shorthand by me at the time and place aforesaid and
   was thereafter reduced to typewritten form; that the
9  foregoing is a true transcript of the questions asked,
   testimony given, and proceedings had.
10
       I further certify that I am not employed
11 by, related to, nor of counsel for any of the parties
   herein, nor otherwise interested in the outcome of
12 this litigation.
13     IN WITNESS WHEREOF, I have affixed my
   signature this _____ day of _____,
14 2021.
15     My commission expires November 4, 2022.
16 x____ Reading and Signing was requested.
17 _____ Reading and Signing was waived.
18 _____ Reading and Signing is not required.
19
20
21          Tiffany Goulding
            Registered Professional Reporter
22
23
24
25

Page 273

1  Errata Sheet
2
3  NAME OF CASE: MIDLAB vs MERRIE PISANO WYCOFF
4  DATE OF DEPOSITION: 08/26/2021
5  NAME OF WITNESS: Merrie Wycoff
6  Reason Codes:
7      1. To clarify the record.
8      2. To conform to the facts.
9      3. To correct transcription errors.
10 Page _____ Line _____ Reason _____
11 From _____ to _____
12 Page _____ Line _____ Reason _____
13 From _____ to _____
14 Page _____ Line _____ Reason _____
15 From _____ to _____
16 Page _____ Line _____ Reason _____
17 From _____ to _____
18 Page _____ Line _____ Reason _____
19 From _____ to _____
20 Page _____ Line _____ Reason _____
21 From _____ to _____
22 Page _____ Line _____ Reason _____
23 From _____ to _____
24
25          _____

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                            713-653-7100

Merrie Wycoff
August 26, 2021                                                    1

## $

**$1,009,000**
  129:9
  131:12,13
**$10**
  76:13,17
  78:5  158:4
  192:24
**$10,000**
  157:19
**$107,000**
  183:13
**$109,000**
  129:12
  131:4,9
**$139,000**
  208:20  210:9
**$139,634**
  208:15
**$160**
  54:7,11
**$17,500**
  248:11
**$2**
  21:13  75:13
  78:2  79:20
**$2,275,000**
  111:4
**$2,300,000**
  124:10
**$2.45**
  17:6
**$2.5**
  129:18
  130:14
  131:24
**$20,000**
  197:8
**$200,000**
  197:19
  209:16
  210:6,25
**$25,000**
  241:11

**$3**
  16:7,18
**$3.3**
  146:24
**$3.45**
  15:22  129:5,
  14  133:4
**$3.5**
  210:16
**$30,000**
  241:12
**$4**
  15:16
**$4,150,000**
  19:3,9,12
**$4.150**
  20:7,24
**$4.75**
  101:6
**$400,000**
  130:8  241:2
**$475,000**
  78:24  79:3
  87:17  90:7,
  10  91:16
**$5**
  126:18
**$50,000**
  14:19  241:11
**$500,000**
  16:23
**$550,000**
  15:20
**$6**
  20:15,16
  21:1,10
**$60**
  220:11
**$70**
  226:6  227:8,
  12
**$8.3**
  20:10  21:12
**$900,000**
  183:13
  194:10

**$904,000**
  125:24  126:5
  127:8
**$990**
  221:17  223:1

## '

**'mr**
  75:4

## 0

**00414**
  51:12
**00424**
  51:13,16
**00481**
  37:10

## 1

**1**
  37:20  38:10
  39:2  40:15,
  18  90:6
  114:13
  141:21,23
**1,009,000**
  131:11
  133:10
  134:15
**1.1**
  242:16
**1.2**
  242:18
**1.5**
  131:15
**10**
  85:2,3,6,9
**100**
  54:4
**100-something**
  129:22
**107,000**
  183:21

**1078**
  72:25
**1079**
  74:10
**1084**
  77:3
**109**
  194:24
**10:32**
  63:2,3
**10:43**
  63:3,5
**11**
  22:22  110:18
  120:15
  122:18
  150:23
  172:15
  252:24
**11/10/17**
  136:19
**11/15/17**
  142:15  144:9
**11/3/15**
  94:10
**110**
  158:21,23,24
  159:1  162:6
  166:17
  172:17
  178:25
**111**
  186:13,18
  189:2
**113**
  190:13,15
**11:04**
  75:25  253:3
**11:05**
  76:3
**11:36**
  270:21
**11:54**
  106:6,12,13
**12**
  110:17
  119:15

EXHIBIT L                 U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                                    2

122:13
208:10
224:10
**120**
  23:15,18
  254:10,17,23
  255:7 256:5
  258:22
**121**
  154:19,24
  155:1
**122**
  122:3,7
**123**
  119:11,14
**124**
  123:25
  124:3,4
**125**
  198:14,17,21
**126**
  267:11,17
  268:1,3,6,10
  270:7
**127**
  148:17,21,23
  149:20
**128**
  64:17,21,23
**129**
  72:17,20,22
  76:6
**12:44**
  106:13,15
**13**
  46:7,8,9
  111:19 124:9
  136:4 150:5
  178:25
**130**
  83:7,10
**131**
  89:10,13,14
**132**
  110:9,12,15
**135**
  104:1,4,6,8

**136**
  267:22,23
**137**
  267:20
**138**
  111:13,16,
  17,18
**139**
  113:23 114:2
**14**
  67:15 179:13
  266:5
**140**
  118:3,6,10
**142**
  134:19,22,
  23,25
**143**
  135:18,21,23
  137:15
**144**
  140:9,13,17
**145**
  140:13
  142:24
  143:3,6,23
**146**
  228:6,10
**148**
  231:14,17
**15**
  62:22 120:23
  145:2 150:25
  182:14
  221:9,14
**152**
  234:12,15,21
**16**
  22:10 67:15
**160**
  54:4
**165**
  246:5,8
**166**
  247:3,5,19,
  24 248:1

**169**
  249:8,12,14
**17**
  52:18 53:5
  118:23 119:2
  235:6 254:2
**171**
  196:8,11,15,
  21
**172**
  193:4,7,15
**173**
  194:25 195:3
  196:1
**174**
  45:15
  200:19,24
  201:24 204:3
**175**
  203:20,24
  204:1
**176**
  119:19,20
  208:1,4,7
**178**
  45:11,17,19
**179**
  51:3,7
**18**
  118:9,15
  132:24 251:2
**180**
  36:1,4 40:17
**181**
  46:19,22,24
**182**
  52:11,15
**183**
  253:14,18
  254:6
**184**
  254:25 255:6
**185**
  218:22,25
**186**
  221:4,10,12

**188**
  222:1,5
**189**
  225:4,9
**19**
  29:3 90:2
  133:1
**193**
  269:6
**1953**
  22:17
**1958**
  22:19,22
**196**
  115:17,21
**1978**
  67:5
**1990**
  22:24 23:3
**1990s**
  34:7,11
  59:14
**1991**
  22:10
**1993**
  22:14
**1998**
  45:20 46:1
**1999**
  46:7,9

2

**2**
  74:13 76:6
  98:1 124:11
  141:16 143:9
  150:15 153:2
  155:9,24
  189:2 196:25
  202:18
**2,275,000**
  111:7
**2.45**
  17:3
**2.5**
  190:20 191:6

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                            713-653-7100

Merrie Wycoff
August 26, 2021                                    3

**20**
  47:10 57:5,
  12,13 67:19
  72:4 84:14
  114:7
**200,000**
  209:6 214:20
**2000**
  13:19 35:24
  37:20 38:10,
  12 39:2
  40:15,18
  51:22,25
  52:5,6,9
  53:13,15
  80:18,19
**2000s**
  68:23,24
  103:13
**2001**
  63:20
  110:17,18
  111:5
**2002**
  75:3
**2003**
  54:14 55:16
  120:14,15,
  22,23
  122:17,18
  135:7 139:6
  150:23,24,25
  158:2
**2005**
  47:10,17
  55:17
**2009**
  29:1 81:7,
  10,11
**2011**
  52:19 53:5,
  10,14,15
**2012**
  36:17,23
  58:4 68:2
  69:24 79:16
  221:9,14
  222:8,24

  225:22
**2014**
  72:15 76:23
  77:18 85:2,
  4,6,10 86:1
**2015**
  11:5,8
  12:10,19,24
  13:9,15,16
  14:15 74:4
  85:15,17
  88:17 93:17
  94:6,13
  95:10 96:3,
  14 97:4,18,
  22 98:6
  101:9
  102:12,21
  103:2,6,22
  104:18,19
  105:24
  113:17
  119:15 121:4
  122:13
  124:9,21
  126:5,10
  127:13
**2016**
  111:19 114:8
  196:25
  253:23 254:2
  262:4
**2017**
  57:24,25
  58:1,7,21
  70:16 80:15
  116:4 117:3,
  4,10,12
  136:4,21
  137:3 138:7
  139:13
  140:7,17
  141:7 143:8
  145:3 151:4
  158:9 235:22
  265:18,22
**2018**
  13:19,21

  58:1 73:21
  83:19 84:15
  118:15,23
  119:2 128:22
  129:1,8
  130:9,11,18
  131:4,10,13
  132:23,25
  133:5 150:5
  151:6,10
  155:10 156:4
  169:16
  172:14 175:6
  177:17
  179:14
  182:15
  183:12
  189:10,18
  190:17
  193:18
  198:25 199:5
  202:2 203:16
  205:2,6
  211:11
  228:19,20
  232:1
  233:15,16
  235:6 246:24
  248:7 249:23
**2019**
  28:15,18,20
  29:4,7,14,
  22,25 30:8,
  23 90:2
  233:11,16
  234:5 259:2,
  3
**2020**
  208:10
  212:20
  233:14,17,18
  234:6
**2021**
  8:1 216:11
  222:12 234:2
  270:25
**20s**
  241:16

  259:16
**21**
  182:13,14
  183:12
**22**
  151:15
  172:14
  173:23 175:6
  189:10,18
**23**
  190:17
**25**
  129:23
  179:14
  193:18
  222:12
  246:24
**26**
  8:1 83:19
  196:25 222:8
**26th**
  270:25
**27**
  248:7
**28**
  74:4 140:17
  141:7 143:8
  144:18,22,24
  157:4
**29**
  22:17,18
  154:23
  157:10
**295**
  65:22,23
**2:18**
  164:25 165:1
**2:34**
  165:1,3

---
3
---

**3**
  16:10,11
  22:14 93:17,
  23 98:6
  141:19,20,

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                    4

21,25 151:2
153:6 198:25
199:5 246:23
**30**
29:20,25
51:22,25
52:5,6,9
265:4
**30,000**
129:23
**301**
66:22 67:1,4
69:9,10,11,
20
**3018**
135:4
**305**
65:7,8,10
69:10
**31**
22:19 88:17
95:10 97:18,
22 101:9
102:11 126:5
**3190**
268:21
**3191**
268:24
**3192**
269:1
**3193**
269:4,7
**3194**
269:12
**3195**
269:15
**3196**
269:18
**3197**
269:20
**3198**
269:22
**3199**
269:24
**32**
259:7

**3200**
270:1
**3201**
270:4
**36**
267:23
**3:08**
8:2
**3:13**
12:2
**3:16**
12:5
**3:28**
250:3
**3:30**
201:7,8
**3:41**
201:8,10

---

**4**

**4**
16:3 42:5
45:2,3,9,20,
21 46:10,13
47:7,18,22
58:14 69:2,
18 70:24
71:4 93:24
94:8,13 98:5
137:10,14
149:13,16,
19,22,24,25
163:6 189:11
194:1 204:12
**4.150**
21:11
**400,000**
129:21
**41643514**
136:15
**41643517**
141:10
**41643528**
143:19
**46**
266:3

**49/50**
60:24
**490**
37:14,15,17
**493**
38:19,20,21,
22
**4:32**
63:2
**4:43**
63:5
**4:47**
244:21

---

**5**

**5**
84:5 116:4
117:10
138:17
150:20 163:7
167:8 169:16
170:3 172:7
189:21
252:24
**5/13/2015**
124:9
**50/50**
35:14 50:19,
21 60:16,21
**500,000**
16:25
**5:00**
253:1
**5:04**
75:25 253:1,
3
**5:05**
76:3
**5:30**
252:16
**5:36**
270:22,24
**5:54**
106:12

---

**6**

**6**
69:2,18
89:20,21
138:20 168:8
202:2 203:16
**68,000**
129:23
**6:44**
106:15
**6th**
205:1,6

---

**7**

**7**
22:23,25
67:3 77:1
138:22
169:16
249:23

---

**8**

**8**
228:19,20
232:1
**81**
93:16,24
96:25 97:11
98:17
**83**
95:3,5,8,14,
18 101:1,4
126:11,15
**8:18**
164:25
**8:34**
165:3

---

**9**

**9**
15:8 104:18,

EXHIBIT L                  U.S. LEGAL SUPPORT, INC
                              713-653-7100

19 129:1,8
130:9,10,18
131:3,10,13
132:23
138:25
**900,000**
242:16
**93**
128:12,13,
15,18
**9417**
110:23
**98**
103:16
**99**
46:8
**9:08**
8:2
**9:13**
12:2,3
**9:16**
12:3,5
**9:30**
201:7
**9:41**
201:10

_____

**A**
_____

**a.m.**
8:2 12:2,3,5
63:2,3,5
75:25 76:3
106:12,13
**Abelman**
9:2,3 18:18
30:10 33:11
55:5,14 56:6
62:23 75:21
82:18 87:9,
19 88:4,12
90:25 95:19
96:16 97:5
98:13 99:17,
24 100:11,22
103:4 106:9,
25 112:24

117:5,7,11
121:25
125:16
127:9,18
131:6 136:25
148:25
149:21 150:5
151:17 152:5
154:6,15
155:3,13
159:21
160:7,17
161:19 164:4
165:6 174:9
211:3 213:2
237:13,22
238:12
243:8,16
244:19
249:15,24
251:22
252:5,14,22
253:7 265:25
266:4,8
270:15,17
**Abelman's**
152:24
**ability**
102:23
177:14
178:13
**above-titled**
85:1,5
**absolutely**
20:22 80:24
96:1 130:25
132:4 185:18
**academic**
217:15
218:16,17,19
226:14
**accepted**
169:14,15
242:19
**access**
187:1,4
215:21,25

**accessed**
180:20
**accident**
28:16 29:2,
5,9 30:21
234:20
**accordance**
224:16
**account**
14:18,19,25
18:11 90:13,
18,20,24
91:22,23,25
92:2,4,5,7,
11,13,17
93:1,2
108:17,18
109:1 117:23
118:11,15,
20,21,22,23
119:3,4,8
123:23 124:4
125:3,7,12
126:8 127:15
167:13 168:9
175:9,12,15,
21 179:15,19
180:2,4
181:14 187:8
188:15,22
208:20
210:4,7,10
211:18,23
212:20 215:4
234:9 239:4,
5 245:14,17,
23,25 246:4
248:5
256:11,14,
18,19 257:5,
11,15,17,19,
22,25
258:20,21
**accountant**
93:14 127:20
128:2
**accountants**
61:13 62:3

99:5 101:15
**accounting**
32:5 94:5
108:19
124:24
**accounts**
11:3 12:8,
16,18,22
13:9,11,14,
18,24 14:2,
15,22 20:4,8
21:5,6,12,19
34:1 132:2
176:6 182:6,
8 187:16
208:8 214:1
258:9,10
**accredited**
217:15,17
**accrediting**
226:20
**accurate**
16:8,23 17:4
19:4,6,12
71:13 90:10
95:18 96:4,
15 163:23
251:8 253:24
254:3
**accusing**
55:3
**achieve**
223:10
224:14
**achieved**
223:9
**acknowledge**
8:13,16
245:1
**Acknowledged**
204:24
**Acknowledgmen
t**
120:7,13,22
**Act**
194:18 240:4

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    6

**action**
  8:7 33:24
  83:15 85:1,5
  230:6
**actions**
  77:12
**active**
  227:5
**acts**
  41:8,12
**actual**
  171:22
  217:18,20
  218:11 257:3
**add**
  17:9 19:13
  127:7 131:23
  134:2 252:2
**added**
  134:17
**adding**
  21:12
**addition**
  150:20
  166:13
  252:16
**additional**
  106:20
  152:12
**address**
  135:4 138:2
  219:8,11
  228:12
**addressed**
  97:12 135:3,
  4 228:11
**adds**
  130:13
**adjust**
  11:18
**administered**
  8:17
**administrative**
  220:11
**admit**
  244:9 245:4,

  5
**advice**
  62:11 75:6,
  16 76:8
  77:10,24
**advised**
  85:22 102:17
  157:16
**affairs**
  85:15,20
  86:10 87:25
  88:9,14 97:3
  126:19
**affiliates**
  74:18
**affiliation**
  226:6 227:7,
  11
**afraid**
  216:15
  234:18
**agency**
  226:20
**agent**
  114:15
**agree**
  9:1,6,7 40:4
  54:21 86:9
  199:23
  209:12
**agreed**
  220:9,14
  244:16
**agreement**
  7:9 8:22,23
  46:25 47:3
  51:10 89:15,
  20 111:24
  115:20
  119:15
  120:14,23
  121:24
  163:11 170:4
  171:10
  195:4,7
  198:21
  199:3,4,10

  200:17
  202:6,18,22
  203:2 204:2
  251:16
**agreements**
  250:5
**ahead**
  27:5,6 37:16
  40:7 69:11
  91:1 121:12
  131:8 140:14
  150:2 158:20
  160:19
  166:10
  172:24
  176:19 181:8
  184:2 213:4
  235:4
  243:12,22
  254:20
**Aja**
  31:22,25
  160:1
  179:20,22
  180:6 182:24
  214:15
  233:24
  247:10
  254:13,15
  256:15,24
  258:13,19
  267:8,9
**Aja's**
  60:5 258:14,
  15,16,21
  266:19
**Alabama**
  55:23
**Alaska**
  27:22
  184:16,21
  239:18
  240:18,23
**Albion**
  35:9,22
  37:5,21
  38:6,11,24
  39:1,7,9,11,

  18,24 40:3,
  10,18 51:18
  70:4,23 71:2
**Alcyone**
  40:21 41:5,6
  43:24,25
**alive**
  73:9 207:7
  258:25
  264:16
**Allan's**
  113:21
  167:8,13,19,
  25 168:5
  169:4
**alleged**
  54:22 55:12,
  24 56:1
  194:17
**alleging**
  85:14
**Allen**
  191:20,21
**Alliance**
  40:21 41:7
  43:24,25
**allowed**
  43:22 83:14
  84:25 224:18
**allowing**
  170:9
**amazing**
  223:7 263:16
**Amazon**
  186:23
**amended**
  95:23
**America**
  12:15,16,19
  13:2 19:25
  234:8
  245:18,20
  246:1,11
  247:7,12
  248:5
**American**
  124:14,18

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Merrie Wycoff
August 26, 2021
7

amount
  16:9 17:10,
  20 19:3
  124:10
  125:24
  155:14
  163:18 184:9
  191:14
  194:22
  210:13
  211:16,17
  230:11
  248:11
amounts
  21:18
and/or
  7:10 12:23
  79:2 259:23
Andrea
  191:20,21
anemia
  27:17
anesthesia
  140:4
Angeles
  83:19 85:8
  103:14,15
  179:22
angry
  262:15
annual
  224:23 226:5
  227:7
annuity
  131:15,16
answering
  10:15 100:2
Antares
  60:13,15
Anthem
  255:25
anymore
  49:15 59:6
  186:1 227:17
apparently
  170:19

appeared
  205:17 206:9
appears
  225:23
appointment
  231:4,7
  247:8,9
appointments
  247:7
appraisal
  242:8,14,15
appraised
  215:19
  242:17
appraiser
  215:19,21
  216:2,14
  242:17
appraisers
  250:9
apprised
  57:7,15
Approval
  46:25
approximate
  270:24
approximately
  15:22
  229:14,25
April
  22:23,25
  74:4 133:5
  166:5 216:12
area
  191:15
  221:23
  237:16
argument
  125:11
argumentative
  98:14
Arizona
  223:25
arm
  145:23 146:1
arm's
  240:12,13

  245:2,7
arranged
  179:20
arrangement
  8:20
arrangements
  77:14
arrears
  130:4
arrived
  241:12
articulated
  78:20
Ascent
  41:9,16,17,
  22 42:10,17
  43:9 195:14,
  15,24 196:5
asks
  155:20
aspect
  58:17
assert
  161:25
asserting
  162:2,3
  261:5
assessed
  80:1
assessment
  241:16
assessor
  241:17
assets
  17:17 91:11
  102:4 108:14
  127:15,25
  128:5,19,23
  129:8,13,20
  132:22
  133:6,9,24
  152:9 157:17
  176:14
  177:3,9,18
  186:4 236:8,
  12

assigned
  157:21
assigning
  228:14
assists
  185:15
association
  220:11
assuming
  125:10
assumption
  69:25
assure
  163:4
attached
  152:10
attaches
  202:5
attaching
  193:11
attempt
  190:8
Attenborough
  72:13 75:4
  77:25 79:10
  89:8,17
Attenborough'
  75:4
Attenborough'
  s
  77:10
attended
  36:15
  198:12,13
  223:24
attends
  31:22,25
Attention
  105:7
attorney
  92:17 148:25
  162:7 179:1,
  6,10,11
  189:12
  198:10
  206:21,23,25
  207:1,2,7

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

8

229:2,4
230:17
238:4,5,8,
17,19,21
240:14
243:18 245:6
251:12

**attorney-
client**
7:13 161:21
162:3

**attorneys**
8:12 123:5
126:2,3
161:10
162:17
230:17
237:24
240:16

**audition**
184:4,10,11

**August**
8:1 22:10,
17,18 36:23
68:2 182:13,
14 183:12
198:25 199:5
202:2 203:16
205:1,6
249:23 251:2
270:25

**author**
25:25

**authored**
23:4,23 26:9

**Authorization**
234:24

**Autumn**
44:3,4,5,12,
20 113:22
114:3 115:7

**aware**
7:6 16:11
17:25 18:8,
21 26:19
29:13 70:16
71:1,10,20
80:10 81:13

85:13 88:22
89:4 108:25
116:24 119:8
125:1 127:5
131:1 232:17
257:5,23
264:1,9

**awful**
72:2

**Azuraye**
17:4,13
18:15 20:4
21:2,16
22:10 31:23
32:22 33:1,
3,23 34:1
41:3 132:2
137:24
138:4,10,13
139:6 145:23
146:1 158:11
159:3,13,20
160:6,15
161:1,15,17
162:23
163:2,8,10
166:4,22
169:17,21
171:14,20
174:6,11,21
176:3,13
177:2 178:6
179:11
180:11,14,20
181:3,11,14,
18 182:16
186:20,22
190:17
202:2,11
203:11,12,16
204:11,25
205:5,16,17,
20 206:9,12
214:24
215:3,5
228:15
230:1,6,15
232:13,21

246:2
248:15,22
254:10
255:12
256:12,19
257:5,18,19,
22 258:3

**Azuraye's**
204:24

---

## B

**baby**
145:8

**bachelor's**
218:5,11
220:22 221:1
222:19,25
224:2,4

**Bachelors**
222:14

**back**
12:4 25:11
27:24 35:23
36:17 40:15
51:21 54:14
58:4 59:14
61:11 63:4,
20 65:21
69:10,24
71:24 72:7,
15 76:2
77:18 84:5,
17 90:5 91:5
95:2 97:11
100:25
103:11,12,22
106:14 111:5
116:6 121:4
126:11
127:13
136:21 137:3
140:2 141:15
151:6 165:2,
5 173:25
178:24 180:9
188:19,21
192:14,15,17

201:9 212:23
224:20
227:22 235:4
238:15
241:22 242:5
244:2 249:23
252:21
253:2,6
257:4 262:4
263:23 264:1
266:4,19

**bad**
134:5,14
217:2 265:13

**badass**
164:15
166:18

**Bagchi**
148:25
149:9,21
150:4,11,21
152:25
155:2,13,18,
20

**balance**
27:16 210:10

**ball**
190:7

**bank**
11:3,9 12:8,
10,11,15,16,
19,22,24
13:2 14:18
19:25 33:19
92:2 117:23
118:11,12,15
124:4,5
127:6,15
169:14
170:9,20
171:1 172:12
179:14,19
180:2,4
181:19,24
182:6 208:8
210:4,7
214:1 234:8,
9 239:4,5

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021
9

245:15,18,
20,24 246:1,
11 247:7,12
248:4,5
256:17
**banked**
11:4,7
**banking**
11:6 13:7,9
32:18 246:12
**Banks**
172:8
**barely**
93:19
**barn**
30:2,6 59:25
94:17
**Barry**
65:19 66:2,
5,8,12 67:4
68:7,10,16,
19 69:1
70:2,9
103:9,12
**based**
135:12
242:8,14
**basic**
9:18 10:11
22:9
**basically**
25:8 143:6
237:10
**basis**
83:2 209:15
212:19
**basketball**
28:2,3,4
**Bates**
51:11 72:24
**battle**
87:3,6
**BC**
150:6
**BC24**
16:23 119:16
121:5 122:18

123:3,7,10,
13 124:17,
22,23 125:2,
7 129:14,20
130:9,21
133:10 149:5
151:7,8
153:13,21,24
154:4,9,11
156:7 157:14
198:22
199:5,6
210:12,20,24
211:18
261:1,7,8
**BC24's**
149:10
**Bear**
45:16
**beautiful**
222:13
**bedroom**
216:24
**beginning**
209:8
**begins**
76:24 217:24
241:6
**behalf**
8:6,9 39:6
79:4 92:6
101:25
195:14
199:10,15,17
200:1 202:17
**behind-the-
scenes**
28:22,23
29:6,11 30:6
**belief**
83:3
**believed**
158:13
261:21
**believes**
243:18

**beneficiaries**
181:11
**beneficiary**
135:12 181:3
237:11 262:3
**benefits**
180:19
**Bernardi**
111:21
242:15
**betrayal**
263:3
**bid**
244:3
**big**
185:8 251:16
**bigger**
95:4 128:14
**Bill**
219:19
261:19,21,22
262:10,13,
14,21,23
**billed**
213:11
**billing**
250:15
**bills**
33:15 212:11
225:2 258:19
**birth**
22:10,13,16,
19 28:12
219:14
**Bishop**
219:19
**bit**
10:3,9 11:20
15:9 34:14,
24 43:5
58:18 91:5
92:20 95:4
107:6 110:24
146:6 149:19
157:7 168:20
175:5 193:8
202:9 211:8

217:7 232:3
235:18
**Black**
238:3
**blank**
141:25
143:24
202:23
**blanked**
61:5
**Bliss**
25:2
**Bloomfield**
117:15
157:21
161:3,6,7,9,
11,14 164:9
173:17,21
175:14,16
177:21
178:10,17
185:12 190:6
199:6 240:2
241:1,24
242:7,10,19
243:23
244:5,15
245:9
**Bloomfield's**
177:22
245:13
**Blue**
255:25
**Bluewater**
129:22
130:10
178:18
183:20
193:2,12,21,
24 194:5,10,
14,16,21
195:4
196:13,22
260:8,9,17,
18 261:6
**BNY**
19:19,20,23
20:5 21:6,16

EXHIBIT L
U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    10

22:4,6
33:20,21,23
34:1,2 132:2
181:6

**board**
39:5 40:12
45:7 48:7
50:7,22
59:23

**Bob**
96:24 97:2
110:7 132:11
134:6,14
153:8 188:19

**bolster**
25:14

**book**
23:4,10,22,
25 24:6
25:1,6,11,
13,16 150:1
186:14,15
195:21 206:6
231:20,21
234:16,19

**bookkeeping**
32:10,11,16
108:22

**books**
24:22 26:9
108:17,18,25

**Born**
25:1

**borrowed**
121:5 124:17

**borrower**
119:22

**borrowers**
155:23

**Boston**
138:4 178:5
179:21 180:6
229:22,24
247:7,11

**bottles**
58:12

**bottom**
37:10,11
45:23 51:12
104:24
196:19

**bought**
24:10 160:8
215:6 234:7

**Boulder**
110:16
115:25 138:2
217:21

**boxes**
254:13

**Boy**
10:24 50:25

**Brandon**
149:2,4
151:16

**breach**
75:10 77:22

**breached**
75:9 76:18

**break**
62:21 106:7
108:10
164:23
165:6,14
181:9 201:4
251:25

**Brian**
114:4

**bricks**
154:3

**briefly**
165:7

**bring**
170:6 171:10
190:15
253:18

**brink**
265:3

**Broadway**
184:3,14
185:4

**broker**
191:21,22

**brokers**
112:19

**brother's**
239:14

**brought**
71:2 79:4
88:22 89:6
217:4 259:23

**Brownstein**
103:3,17
104:22
105:4,5,12,
17,25 162:20
167:24

**bulk**
181:6

**bulletin**
225:16,19
226:1

**bullion**
214:10,24
215:3,7

**bunch**
74:6 185:13
219:23

**business**
31:1,11,13,
14 32:12
55:19 56:2,
20,21 57:8,
16 58:5,7,22
59:1,3 99:8
109:13
124:24
167:18
227:18
246:15 254:2
262:22,23
263:10

**businesses**
34:7,11 72:5
153:9

**businessman**
263:17

**Bussell**
229:8,15

**button**
7:21

**buy**
24:7,9 111:4
146:18
159:14
161:1,9,15,
17 168:16
173:9 174:6,
12 176:9
189:12 190:4
214:23 215:2
235:10,15,16
245:12

**buyers**
191:24

**buying**
159:17,20,22
160:6,15,20
189:22 192:1
240:25 242:5

---

**C**

**cabinets**
254:16

**calculation**
244:21

**California**
46:17 72:5
83:19 85:22
218:9
260:23,25
261:7

**call**
41:13 151:23
158:4 167:17
173:3
189:11,14,21
190:5 217:5

**called**
23:4,8 25:9,
10 27:11
35:8 57:13
59:9,16,24
60:6,12
101:10

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                               713-653-7100

106:23
107:9,22
121:17
126:6,7
146:15
168:22
192:16
197:23
200:16 202:5
209:1
217:12,24
241:6 246:12
260:17 262:9
267:4
**calls**
180:8
**camera**
107:6
**Canada**
215:14
**cap**
223:19
**capable**
71:12,25
**capacity**
61:4 89:23
**Capital**
157:21
**card**
118:10 130:3
131:19
**care**
233:24
258:19
**cared**
185:22
**career**
24:21,22,24
25:3,12
**careful**
168:18
**carefully**
225:19
**carry**
174:25
**carrying**
216:18

**case**
26:20 51:11
54:14 56:24
57:4 64:8,9
65:16 70:14
71:1,7,8,9
73:5,15,18,
21 79:17
81:18,22,23
82:3,8,9
85:9,14,21
86:2,12
87:12,15,17
88:1,10,17
92:25 96:10
101:2 125:24
140:6 144:16
157:11
161:16
165:19
166:22
198:5,6
207:11,13,
15,16,24
209:18,20,22
238:18 243:1
258:17
259:10 270:8
**cases**
88:21,24
89:5
**cash**
127:4,17
130:16
133:11
134:15
153:25
154:5,11,14
185:17
211:1,19
**cash/cash**
129:9,12
**cashed**
211:20
**category**
127:5 132:17
226:17

**caused**
55:3,13
56:14
**caution**
82:19
**celebratory**
185:9,14,19
**Center**
44:3,4,5,12,
21
**cerebral**
27:11
**ceremony**
223:18
**certificate**
46:24
217:12,23
222:13,18,19
**certificates**
222:7,15,20
223:4,6
**certification**
220:21
**certified**
64:24 93:13
**certifies**
47:5
**Certisimo**
136:18,22
137:3,19
145:2,12,16
152:15,19,21
157:8 158:9
**cetera**
141:3
**chain**
149:13
**chamber**
217:3
**chance**
263:9
**change**
58:25 135:13
136:23
137:4,19
139:14
141:24 143:9

145:12
251:20
**changed**
233:25
**changing**
58:13 137:22
168:13
**characterize**
67:12
**Chase**
12:13,25
**Chat**
159:3
**check**
14:17 33:19
169:10
188:11
208:19
210:5,8,21
211:20
219:23
233:11,14,16
234:2,4
248:9,22
**checked**
188:13
**checking**
168:9
**checks**
168:5 169:3,
7 214:1
230:21
233:18 248:4
**Chicago**
148:11
**chickens**
32:4
**Chico**
218:9
**children**
62:18
168:15,19
229:17,22,23
242:1,4
244:1 247:14
**Chocolove**
146:15

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                   12

choice
  100:17
choices
  178:14
choose
  30:18
chose
  92:24 163:13
Christmas
  145:19
chronic
  264:25 265:2
church
  226:21
circumstances
  139:12 262:7
Civil
  7:2
claim
  15:13 81:5,
  17 82:14,15
  83:3 91:12,
  17 96:18
  127:21
  260:4,6,9,12
  261:12
  263:25
claims
  74:11 75:14
  76:12 78:9,
  19,21,23,24
  79:3,7 181:1
  194:16
  259:23,25
  260:1 261:11
clarification
  153:3
clarify
  43:22 230:4
Clark
  249:16,24
  267:3
class
  223:14
classes
  223:25

classified
  226:11
clean
  30:2,5
cleaner
  49:24
cleaning
  49:21 50:4
  55:10,25
  56:2,10
clear
  43:1 117:14
  228:1 234:1
clearer
  96:22 145:6
clerk
  110:16 204:4
click
  7:21
client
  75:1
clients
  263:20
clock
  178:2,13
closed
  109:25
closer
  10:3 107:6
closings
  124:20
Coburn
  155:5,6
code
  186:22
Coinbase
  14:9,11,13
collaterally
  157:21
collect
  75:14
collection
  197:24
collectively
  74:19
college

26:1
Colorado
  46:16 55:19
  72:4 103:16
  122:14 180:7
  194:18
  204:25
  217:21
  229:20,21
  237:23 246:3
  247:9,10,13
combination
  127:7 161:1
comfortable
  72:8
commenced
  85:2,5 223:4
comment
  166:18
  185:20 186:4
  189:3
comments
  264:11
Commissioner
  65:1
commit
  265:3
communicate
  57:23 159:7
  229:15
communicated
  166:24
  229:11 231:5
communicating
  151:7
communication
  151:12
  160:14
communications
  187:22
communicative
  263:18
community
  191:10,12
companies
  34:5,18,19

35:1,8
40:11,20
42:5,7 47:23
51:1 60:22
64:16 71:7,
8,9 106:20
181:10,15
230:21 232:8
company
  24:3 32:19
  35:8,12,15,
  16,19 39:10
  40:9,12,20,
  24 41:2,6,
  13,14 43:12
  44:24,25
  45:5,6 46:17
  47:25 48:1,
  4,9,13,16,
  17,20 49:4,
  8,10,12,14,
  17,20,23
  50:11,12,16,
  20 52:18
  53:19,22
  54:4,6,11,16
  55:3,12
  56:17 58:16
  59:8,11,16,
  23,24 60:1,
  4,5,6,10,12,
  17,21 79:3
  101:9,12
  106:22
  107:8,9,22,
  25 108:2,4,6
  109:10
  122:14,19
  126:20
  129:24
  146:14
  168:22 182:6
  205:1 234:10
  235:9,15
  260:17
compilation
  97:23 254:7

EXHIBIT L

Merrie Wycoff
August 26, 2021                                    13

complaint
  95:22,23
  193:11
complete
  71:13
completed
  224:3 244:22
comprehend
  99:6
concentration
  184:9
concerned
  70:23 71:9,
  11
concluded
  270:24
concludes
  270:20
conclusion
  212:15
concussion
  27:21 28:1
concussions
  27:10
condition
  26:22 27:2,7
  28:11 95:9
  96:3,14
  97:21 102:5
condo
  178:5
condolences
  73:9
confer
  236:14
conferred
  165:7 237:15
confided
  176:21
confident
  180:5
Confidential
  72:25
confirm
  93:25 97:16
  111:10,12
  116:3

  196:12,24
  231:18
  243:13
  267:17
  268:17
confirmation
  221:8
confirms
  221:16
confused
  40:6 163:14,
  17 175:20
confusing
  86:17
congratulatio
ns
  182:15
  184:12
connection
  67:17 75:7
  200:15
consent
  8:19 9:4
  33:10 34:3
consents
  33:7
consistent
  116:20
constantly
  27:14 57:7,
  15 58:5,6,8,
  22 59:3
  166:9,12
  213:10
consulted
  103:24 126:2
  230:17
  238:2,8
consulting
  126:3
contact
  152:11
  178:25
contacted
  152:10
contacting
  229:18

contacts
  33:19
contemplating
  139:24 140:2
contention
  251:17
contents
  266:11,14
  267:3
contest
  77:13 79:11
  85:23 86:13
contested
  77:11
context
  151:12
continue
  46:12,15
  57:22 58:6
  59:2 83:15
  84:25 165:8,
  16,20,23
  250:14
continued
  58:21 227:14
continues
  11:19
continuing
  196:22
contract
  35:23 36:8
  37:4,8 57:18
  111:19
  112:11
  146:8,18,23
  224:17
contracts
  62:1,7,8,11,
  16,19 261:24
conversation
  43:19 163:7
  246:4
conversations
  7:8,10
  82:21,22
convicted
  66:13 67:5

  68:8,20
conviction
  67:17
coordinate
  179:24
coordinated
  179:22
coordinating
  180:8
copied
  136:3,5,8
  140:18
  143:11 150:8
  155:3
copies
  24:5,13
  152:24
  192:20,22,23
  205:14
copy
  64:24 158:22
  203:12
  204:3,7
corner
  7:22 65:5
  72:25 83:22
  141:3
corp
  75:7,15
corporate
  25:16,17
corporation
  47:8 75:1
correct
  15:11,17
  16:15,20
  17:18 18:25
  20:5 21:19
  22:11,14
  23:23 24:1,2
  26:9 34:8
  35:9,15
  37:2,5
  38:11,24
  40:15 45:9
  46:1,10
  47:8,15,16

EXHIBIT L                   U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                                              14

48:5 49:6
50:14,18,24
51:17 53:6,
20,21,25
54:11 59:21
60:7 61:4
62:14 63:16,
25 65:16,17
66:4,6 67:7,
13,14,23
73:18,23
74:7,19,20
76:13,20
77:19 78:6,
25 81:8
83:23,25
84:13,16
85:2,16
86:7,25
87:4,8,15
88:2 90:4,11
91:9 94:11
95:6 97:1
101:10
103:13
104:14,18
106:1 111:2
112:4,7
113:9 114:8,
11,12,14,24
116:13,14,18
119:16,22,23
120:5,10
121:9 122:24
124:6,7,17
126:20,21
128:20
129:2,3
132:23
135:1,5,6,16
136:4,9,12,
19,20
137:20,21,
24,25 138:2,
3,11,12
140:18,23
141:7,8,11
142:15
143:16,17,23

144:22
145:10,12
146:25 147:8
149:2 150:6,
7,9 151:8,
13,24 153:22
154:5,11
155:10
156:1,2,5
157:14
158:11,12
159:17
160:16
164:21
166:19
167:20,23
168:10,11,
13,22,23
169:9 179:5,
12 181:12
184:17,21
189:23
193:2,3,24
194:5,11,12,
19,20 195:5,
6,9 196:7
197:9
199:10,17,
20,24 200:3,
6 202:12,15,
23 203:13,14
204:4,8,19,
21,22
208:13,14,
16,17 211:21
212:8 213:14
215:22
218:5,6,8,
10,12,13
219:6,24,25
220:4,8
222:8 223:12
224:9
225:14,15
226:2,15
227:8,9
228:16,17,
19,20,24
230:8 232:2,

12 233:4,10
234:22,25
235:1,7
236:9,24
237:8,9
238:11
239:21
244:18
245:15
246:1,16,17,
19,20,24,25
247:2 248:7,
11,19,20,23
249:24
251:21,24
255:11
256:13,21
257:19,20
266:11,12
268:12,19,
22,24 269:4,
10,11,13,14,
16 270:9

**correctly**
  20:1 42:24
  43:7 132:14
**correlation**
  86:20
**cost**
  191:15
**costs**
  220:11
**cottage**
  114:11
**counsel**
  7:25 8:19
  9:17 22:1,3,
  7 62:2,10
  82:22,23
  121:23 123:4
  153:4 154:2
  188:23
  213:13 214:8
  270:8
**count**
  127:25 259:5
**counted**
  127:15

**counter**
  27:23
**counteroffer**
  244:4
**country**
  80:23 203:18
**County**
  83:19
**couple**
  9:18 101:3
  106:20
  172:20
  205:23
  212:25
**court**
  23:16 36:2,
  12 45:12
  46:20 51:4,
  11 52:12
  55:22 56:24
  57:4 58:4
  63:9,13
  64:6,18 65:2
  70:13,17,23
  71:1,21,23
  72:18 79:17
  81:18,21,23
  82:4,9,14
  83:8,18 85:8
  86:2 89:11
  104:2 110:10
  111:14
  113:24
  115:18 118:4
  119:12 122:4
  124:1 134:20
  135:19
  140:10
  142:25
  148:18
  154:20
  183:9,11
  193:5 195:1
  196:9 198:5,
  6,15 200:20
  203:21 208:2
  218:23 221:5
  222:2 225:5

EXHIBIT L
U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    15

228:7 231:15
234:13
245:13 246:6
247:20 249:9
253:15 255:1
259:10
260:24
267:12
**court's**
70:19
**courtesy**
244:20
**cover**
23:21 136:12
141:1 143:15
193:10
220:11
**coverage**
15:16
**covered**
234:6
**COVID**
71:14
165:11,24,25
166:3,4,14
215:24,25
216:7,16,18
217:2 233:22
**CPA**
153:8
**CR**
193:11
**crappy**
134:2
**crazy**
200:13
**created**
42:7 107:15
200:12
**creating**
7:13
**creative**
58:11,15,17
**credence**
147:23
**credential**
226:15

**credentials**
25:14
**credit**
130:3 131:19
**creditor**
133:14
178:18
**creditors**
131:2 177:1,
11,19
185:23,24
186:3
187:22,24
188:1 212:22
213:1
**Cross**
255:25
**cross-examined**
66:18
**crypto**
13:11,14,17,
24 14:1,6,7
132:5,16,21
**CSF**
27:11
**Cudney**
103:4 105:7,
8 179:4,10
**currency**
13:11,14,17,
24 14:2,6,7
132:6,16,21
**current**
60:19 250:10
**customer**
135:11 143:7
**cut**
61:9 166:1
**cutting**
78:11,16

— D —

**D.C.**
226:10

**d/b/a**
48:1 167:22
169:1
**dad's**
186:23
**dads**
174:25
**damage**
75:12
**damn**
172:1,4
**dancing**
184:5
**dash**
101:5 102:6
114:3 150:21
**date**
22:10,13,16,
19 34:10
46:6 51:20
75:12 85:17
93:19,21
105:12,24
114:7 117:5,
8 118:8,22
141:3,6
144:9 150:14
151:9 170:2
193:20
219:14 235:5
246:23
**dated**
47:10 51:22
93:17 94:10
98:6 110:18
111:19 116:4
119:15
136:4,19
140:17
142:15 202:2
208:10
221:13 248:7
**dates**
68:9 85:25
103:10
214:18
**daughter**
26:18 202:2

**daughters**
17:3,11
18:2,10
20:15 159:7
163:14 171:6
189:25 200:7
231:2 241:10
255:5,7,17
**David**
73:17,24
74:3 77:20
83:24 85:11
87:13,24
103:7
207:21,22
**Davine**
65:12 66:2
72:13 89:16
103:8
**Davis**
147:1,3,18
148:2,10
**day**
57:5,12,13
94:19 152:5,
24 157:2
165:8,9
171:11 185:9
186:11
192:11
205:1,6
206:9 222:10
224:10
236:17
270:25
**days**
27:16
**DBA**
167:8
**dead**
264:15
**deal**
27:17 151:8
166:8,11
186:9,10
191:1,2
262:23

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Merrie Wycoff
August 26, 2021
16

dealing
  166:7
  178:16,17,20
  187:14,17
  200:9 212:25
  214:5
dealt
  113:5,11
  237:4 265:3
Dear
  135:7
death
  15:6 54:14,
  18 55:4,13
  56:5,14
  61:1,2,7
  198:8 214:6
  239:19
  259:24
  260:14 261:5
  264:14,24
  265:5
debt
  92:18
  129:16,18
  130:2,3,5
  131:19,20
  176:17,22,
  23,24 178:9,
  10,11 185:8,
  10 212:10,13
  213:8 245:9
debtors
  185:25 186:7
debts
  91:6,7,8,9,
  10 130:7
decades-long
  77:25 87:3,6
Deceased
  83:14
decedent
  85:2,5
decedent's
  84:25
December
  120:15,23

122:18 145:2
150:23,25
158:9
265:18,22
decide
  25:23
decided
  90:22
decides
  33:9
decision
  87:14 156:9
  165:20
  167:22 226:3
decisions
  156:18
declaration
  84:2,7 85:7
declare
  8:18 9:6
  84:18
declared
  9:11
decorate
  31:5
decorates
  31:16
deducted
  210:15
deducts
  212:10
deed
  104:9,17
  105:6,9,24
  110:18,23,24
  111:3
deficiency
  63:15 80:16,
  20 81:8
  82:11 86:14
degree
  218:5,11,19
  220:15,22,25
  222:25
  225:17
  226:25

degrees
  218:15
  220:22 221:1
  222:25
  226:9,21
  227:2
Delaware
  47:7
delegate
  100:17
delivered
  19:3,10
  23:13
Dena
  204:15,17,23
  205:10,12,
  15,20,25
  206:6,11
Department
  226:9
  228:11,22
  231:24
depo
  7:22
deponent
  9:9 55:6
  62:25 75:20
  107:3 117:6
  165:7
deposit
  20:20 90:19,
  23 124:8
  208:8,12
  209:1,18
  250:17 258:9
deposited
  19:18,21
  20:3,8,10,24
  21:11,18
  90:12 92:12
  169:10
  213:7,8
  256:11 258:7
depositing
  91:23 208:15
deposition
  7:17,25

8:13,14,15
9:19 23:15
26:19 36:1,4
45:11,15
46:19 51:3,6
52:11,14
64:17,20,23
72:1,17 83:7
89:10 93:17
95:1 104:1
110:9
111:13,16,18
113:23
115:17,22
118:3 119:11
122:3,7
123:25
128:12
134:19
135:18
140:9,12
142:24
148:17,20,23
154:19
158:21
165:9,18
166:17
178:24 193:4
194:25
196:8,19,21
198:14
200:19
201:24
203:20,23
204:1 208:1
218:22,25
221:4 222:1
225:4,9
228:6 231:14
234:12,20
246:5,8
247:19,24
248:1 249:8
253:14,17
254:6,25
255:6
259:11,15
264:12
267:11,16

EXHIBIT L

Merrie Wycoff
August 26, 2021                                                     17

270:6,20
**deposits**
  250:17
  256:17
**depressed**
  265:15
**describe**
  41:25 197:2
**desk**
  158:6 192:10
**detail**
  15:10
**details**
  173:15
  223:24
**determine**
  33:24 245:9
**determined**
  226:9 241:5
  242:7 243:23
  244:5,15
  245:11
**determines**
  31:23
**determining**
  32:3
**detriment**
  78:6
**Devon**
  17:4,14
  18:15 20:4
  21:2,17
  22:13 26:18
  27:2,9 28:21
  29:13,19,24
  30:7,14,25
  31:24 32:1,
  12,14,22,24
  33:2,6,16
  34:2 159:2,
  13,20 160:6,
  15 161:1,15,
  17 162:24
  163:2,8
  164:14,16
  165:25
  166:2,3,4,6,

8,11,17,23
169:17
172:23
173:10,14
174:6,11
175:6,7,13,
16,19 176:1,
3,13,24
177:2
179:11,20,21
180:6 181:3,
10,14,18
182:16,18
183:2,16
184:15,19,22
186:7 189:3
190:16
214:15,24
215:5 217:3
230:16
231:25
232:14,20
233:23 246:2
247:8,11
248:16,22
253:11
254:22
255:6,11
256:2,12,20
257:8,11,15
258:3,21,22
266:21 267:2
268:11,19
**Devon's**
41:3 132:2
215:3 216:1,
21 258:13,
14,15,16,20
**died**
54:22 55:24
56:1 58:1
59:2,4 60:21
73:20 78:22
91:6,12,13
103:20
118:9,13
119:2 128:9,
19,22 146:20

158:1 206:25
213:19,21
225:25
236:24 237:7
**Dierking**
248:18,24
**Dierking's**
248:10
**difference**
115:9,12
116:21,23
129:11
168:24
**difficult**
21:25
**difficulties**
10:8
**difficulty**
72:2
**dinners**
31:6,7,17,
20,21
**direct**
65:9,12 66:1
142:1 250:16
258:8
**directed**
139:8,9
234:8 249:1
**direction**
142:23
**directly**
22:5 68:13
152:11 161:8
175:16
180:19 214:5
225:23
268:14
**director**
42:12 43:2
44:1 60:4
107:20
**disagree**
199:23
**disclose**
77:9

**disclosed**
77:8
**disclosure**
77:23
210:11,20,
22,24 211:2,
12
**discontinued**
254:2
**discover**
80:5
**discovered**
68:14 80:3,4
**discovery**
131:22
187:10 188:9
**discrepancy**
21:13
**discuss**
33:16
**discussed**
147:17
**discussion**
76:1 153:13
**discussions**
154:17
237:23
**dissertation**
218:1,2
223:13
**dissertations**
218:3 223:7
224:6
**distance**
216:19
**distorted**
11:24
**District**
55:22
**ditch**
28:16 203:8
**divvied**
131:14
**doctor**
26:16
**doctoral**
220:15

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                 713-653-7100

document
  34:2,15
  36:10 39:6,
  19,23 40:14
  51:9,21
  52:10,17,24
  53:13 72:23
  84:2,7,14
  93:5 94:3,25
  110:15
  118:19,20
  122:24
  145:17
  169:22
  170:10,22
  196:2 202:5
  225:10 247:4
  254:9 267:14
documentation
  35:17
documenting
  109:14
documents
  18:14,17,21
  19:2,9 20:9
  21:10 33:21
  42:14 44:2
  73:5,14
  98:12,25
  99:1 101:19,
  25 112:20
  158:2 187:9
  200:14
  231:9,11
dollars
  126:9 131:18
dos
  94:22
double
  96:21
  127:15,25
doubt
  233:5
downstairs
  201:1 217:3
dresser
  30:18

driver's
  107:2
dropped
  75:23
dual
  41:5
due
  197:24
dumped
  157:1
duplicate
  247:3
Dustin
  8:5 253:5
  266:1
duties
  75:9,11
  76:19 77:22

_____

E

_____

e-mail
  115:22
  135:23
  136:2,4,9
  140:17,22
  143:7,12
  145:1,5
  149:13,20
  150:4,9
  151:16
  155:1,9
  187:2,8,16,
  23 188:3,14,
  22 202:1,14
  219:11
  221:8,12
  222:6,11
  227:19,21
  249:14
  250:1,21
  251:1,4
e-mailed
  231:10,12
e-mails
  148:24 149:1
  187:13,17,25

  188:2,19
  230:24 231:1
  249:22
earlier
  87:7 157:7
  158:16
  165:11 192:3
  194:22
  207:12 211:8
  235:20 239:3
  251:1 259:22
early
  68:22,24
  94:5 95:12
  96:3,14 97:4
  103:13
  216:13
earn
  218:21
ears
  201:17
easement
  200:16
  202:6,18
  204:2
easier
  22:4 236:17
easy
  224:3
Ed
  136:18,22
  137:3,19
  145:2,12
  146:7,9,10,
  11 152:14
  157:8 158:9
Eddie
  145:6
Education
  226:10
Edwards
  249:16,24
effect
  264:14
effected
  75:15

effort
  184:12
  238:14
efforts
  75:13
EIN
  228:25 230:1
electronic
  220:6
electronically
  23:16 36:2
  45:12 46:20
  51:4 52:12
  64:18 72:18
  83:8 89:11
  104:2 110:10
  111:14
  113:24
  115:18 118:4
  119:12 122:4
  124:1 134:20
  135:19
  140:10
  142:25
  148:18
  154:20 193:5
  195:1 196:9
  198:15
  200:20
  203:21 208:2
  218:23 221:5
  222:2 225:5
  228:7 231:15
  234:13 246:6
  247:20 249:9
  253:15 255:1
  267:12
email
  186:23
emergencies
  258:17
Emily
  116:8
emotional
  165:13
employee
  253:12

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021

19

employer
37:20 228:14
employment
35:23 36:7
37:4,8
empty-nester
26:6
enclosed
135:11
216:4,20
end
254:9
ended
78:22 192:1
ending
97:18
engage
94:4
engaged
77:13 97:3,
7,9
engagement
96:24 97:23
100:5 162:24
163:3
189:14,18
enjoyed
145:8
enrolled
222:23
ensure
226:2,24
enter
8:10
entered
35:22 112:11
121:24
198:22,24
199:4
entire
28:9 215:21
entities
259:24
entitled
67:11 226:25
entity
48:17 155:22

entrepreneur
167:3
equal
44:18
equally
112:15
equity
236:9
equivalent
129:9,12
equivalents
127:5,17
130:16
133:11
ESOP
70:6,10
75:7,15 76:8
esoteric
24:24 217:22
essentially
254:1
established
39:14,21
40:7 42:4
53:19 85:8
117:10 129:4
205:4 221:10
establishes
39:21
establishment
39:4
estate
15:3 90:19,
20,24 91:24,
25 92:2,4,6,
7,10 93:3
101:5 102:5
112:17
124:20,21
167:13
189:11 191:1
199:17 238:4
239:12,14
251:11
260:4,6,7
Estates
115:7 167:8

estoppel
250:5 251:9,
16
et al
8:4
ethically
77:8
Europe
170:13,15
172:9 200:8
205:6
235:11,12
247:15
event
236:7
events
31:3,6,16,17
everybody's
204:7
evidence
125:1,6
exact
34:9 188:4,8
examination
9:14 65:9,13
66:2,12
examples
188:17
exceed
76:13
exceptional
184:9
excess
76:17 78:2,5
exchange
135:24
145:2,5
148:24 155:2
190:16
exchanged
249:15
excited
263:18
exciting
224:6
exclamation
169:22

179:15
Exclusive
111:18
executed
37:20 84:14
executor
14:23
exercise
34:21 106:22
128:5,6
exhausted
27:14
exhibit
23:15,18
36:1,4 37:14
38:19 40:17
45:11,15,19
46:19,22,24
51:3,7
52:11,15
64:17,21,23
72:17,20,22
76:6 83:7,10
89:10,13,14
93:7,16,24
95:3,5,8,14,
18 96:25
97:11 98:17
101:1,4
104:1,4,8
110:9,12,15
111:13,16,18
113:23 114:2
115:17,21
118:3,6,10
119:11,14
122:3,7
123:25
124:3,4
126:11,15
128:12,13,
15,18
134:19,22,25
135:18,21,23
137:15
140:9,13,17
141:1,23
142:5,18,24

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                          20

143:2,3,6,
14,23
144:18,21,
22,24
148:17,21,23
149:14,20
154:19,23,24
155:1 157:4,
10 158:21
159:1 162:6
166:17
172:17
178:25
186:13,18
189:2
190:13,15
193:4,7,15
194:25 195:3
196:1,8,11,
21 198:14,
17,21
200:19,22,24
201:24
203:20,24
204:1 208:1,
4,7 218:22,
25 221:4,10,
12 222:1,4,5
225:4,9
228:6,10
231:14,17
234:12,15,21
246:5,8
247:19,24
248:1,21
249:8,12,14
253:14,18
254:6,25
255:6
267:11,17
268:4,10
270:7
**exhibits**
36:12 144:15
**existed**
236:9
**existing**
139:12

**expect**
55:11 150:14
**expected**
55:2
**expecting**
189:14
**expenses**
168:10
**experience**
62:4 170:25
171:8 230:19
**experiences**
170:9,20
**expert**
238:2
**expertise**
154:18
226:17
238:19
**experts**
237:15,24
**expired**
157:20
**explain**
20:23 21:14
33:14 82:19,
20 102:3
107:9 115:2
129:11 139:3
170:1 172:3
173:12 190:1
205:15
208:23 216:2
236:1 247:6
255:16
**explained**
176:1
**explaining**
175:14
**explanation**
92:11 130:17
131:25
133:13 139:9
150:18
205:19,22
**explore**
224:7

**expressed**
265:6
**expressing**
264:23
**extension**
151:4
**extra**
184:9 241:2
**Extremely**
225:18

---

**F**

---

**facilitate**
149:18
**facing**
78:4
**fact**
45:8 50:23
129:14
167:17 169:6
202:15
218:18
232:22 245:4
247:14
252:16 256:6
**fails**
184:23
**fair**
30:9 34:6
53:14 58:20
62:5 95:25
99:16 100:16
119:1 145:11
164:3 200:11
242:1
**fairly**
139:17,19
**fallen**
27:23,24
190:25
**familiar**
16:4 17:17,
19 18:16
50:13 107:25
229:9 253:19

**family**
164:10 197:4
258:18
264:15
**family's**
164:2
**famous**
147:5,6
148:10,15
**Farber**
104:22 105:4
**Fargo**
13:3,6
**farm**
15:10,14,17
16:1,3 17:25
18:5,6 20:19
30:3 31:6,23
44:6,7 59:25
101:5,9,14
102:6 108:14
111:1,3,4
112:21
113:6,9,16,
20,21 114:11
115:4,6,15
116:12,16,24
117:2,13,19,
24 129:6,15,
18 130:15
131:17
132:15,21
133:5 146:8,
18 147:7,10,
11 153:14,
15,16,17,19,
22 159:17,
20,22 160:1,
2,6,8,16,20
161:2,9,15,
18 164:11,12
167:8,13,19,
25 168:1,5,
7,9,13,16,21
169:4
172:18,19,21
173:1,5,9,
15,18 174:6,

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    21

12 175:16,
18,25 176:8
177:24,25
182:15
185:12
187:14
189:22
190:3,4
191:2,7
192:1 199:1
200:9,16
204:18,21
209:25 210:2
211:10
215:20 249:3
251:20
255:24
262:4,10,11,
12 263:22
264:5

**father**
62:17 167:2

**favor**
122:18

**fax**
52:21 136:12
141:1,2
143:15

**faxed**
145:14
247:12

**February**
90:2 188:6
221:9,14
222:24
254:11

**federal**
7:2 109:18
226:20

**fee**
220:11
224:23 226:6
227:7,12,16
228:4

**feedback**
11:16

**feel**
71:25 72:7

103:6 198:5
207:2,5
244:11
260:19 263:3

**fees**
75:13 76:16
78:2 79:20,
22,24 130:4
248:10,12,25

**fell**
27:22

**felony**
66:13 219:24

**felt**
178:1,12
185:13 190:3
261:17
262:22
264:15
266:19

**Fidelity**
234:9

**fiduciary**
75:9 76:19

**fight**
77:25 79:20

**fighting**
96:10

**figure**
19:16 20:13
43:11 99:21
100:3 128:1
157:2 178:12
202:24
244:24 245:8
252:2,3

**figuring**
214:3

**file**
74:12 109:17
167:18

**filed**
36:11 55:21
65:1 70:22
72:11,15
73:12 81:21
82:4,9

83:18,24
85:21 86:3
101:2 109:23
110:1 127:21
178:21 193:2

**files**
30:3 73:4

**filing**
167:18
254:16
261:12

**fill**
136:23 139:3
141:4,20
142:18,21
144:11 219:4

**filled**
114:19,21
136:18
137:18
143:15,22
145:13
208:12
219:22 248:9

**filling**
116:25

**film**
29:10,12
30:6

**final**
7:18 80:7
82:15

**financial**
59:17,20
77:2 85:15,
20 86:10
87:25 88:9,
14 95:9,24
96:3,14
97:3,21,23
99:9 101:10,
11,14,20,25
102:4,5,6
104:11,12
106:4
108:11,13,16
109:1,4,6,9,
11,13,17

110:3 112:7,
10,22,23
113:13,14,
17,20 115:4,
6,8,10,15
116:22
117:17,20,23
118:1,8,16
119:3,8,16,
22 121:5
122:22
125:3,8,14,
21,25
126:19,24,25
127:13
130:18 151:3
152:3 153:5,
7 155:21,22
156:1,3,8,9,
17,19 188:20
194:4,17
195:11,17,23
199:10,16
210:11,19,
22,24 211:2,
11

**financially**
8:8

**financials**
32:8 61:23
150:22 151:3

**find**
19:6,11
68:12 192:11
206:24,25
210:5 229:21
267:16

**finds**
78:4

**fine**
67:13 161:24

**Finish**
176:20

**finished**
216:13

**fire**
121:10

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                             713-653-7100

Merrie Wycoff
August 26, 2021                                                22

**firm**
 72:12 75:5
 79:2,9
 87:22,23
 213:13 229:6
 251:11
**Firm's**
 213:16
**Firstbank**
 14:14,15,19,
 22,25
**five-word**
 186:6
**flawlessly**
 182:25
**flexible**
 161:12
**flip**
 174:6
**fluid**
 27:12
**focus**
 204:10
 224:13
**focused**
 198:7
**focusing**
 127:4
**folder**
 93:7
**follow**
 39:17 192:7
**food**
 174:25
**Foothills**
 110:23
**Forcing**
 245:5
**form**
 18:18 30:10
 33:11 56:6
 87:9 95:19
 96:16 98:13
 100:11,22
 108:4 121:25
 125:16
 127:9,18
 131:6 135:13
 137:18 139:4
 141:10,24
 142:6 143:19
 159:21
 160:7,17
 161:19 164:4
 177:3 207:23
 211:3 213:2
 235:3 238:12
 243:8,16
 244:19
 246:12
**formal**
 173:24
**formalized**
 147:12
**format**
 25:6
**formed**
 108:5
**forms**
 145:6,12
**forward**
 10:9 11:5
 103:2 153:7
**found**
 68:12 112:18
 126:6
**foundation**
 30:11 33:12
 55:5,14
 59:25 87:10,
 19 88:12
 90:25 95:20
 96:17 97:5
 112:25
 125:17
 127:19 131:7
 136:25
 154:6,15
 160:18 164:5
 174:10
 237:13,22
 251:23
**founder**
 225:24
**four-year**
 218:7
**fourth**
 142:11,12,14
 144:5,6,8
**Franchise**
 260:23
**fraud**
 66:13 67:5
 68:8,20
 75:10,11
 76:20 77:23
**Fraudulent**
 194:18 240:4
**frequency**
 57:23
**friend**
 29:16 68:11
 262:21
**front**
 38:13,16
 46:2 64:21
 84:4 99:7
 104:5 140:16
 168:1,7
 223:14
**froze**
 76:7 78:13,
 15
**frozen**
 75:19,20
**fulfill**
 32:15
 100:12,15,19
**fulfilled**
 99:12
**full**
 23:7 77:6
 145:1
**fully**
 115:15
 116:24
**funds**
 33:6,8
 234:9,23
 235:14

**G**

**gallery**
 7:21
**game**
 28:4 183:17
 184:1,6
**garden**
 32:1
**Garton**
 204:15,17,23
 205:10,16,25
 206:11
**Garton's**
 206:6
**gator**
 27:25
**gave**
 51:2 100:18
 129:19
 147:23
 162:21
 208:25 209:4
 210:3,20
 219:11,14,
 16,19 223:19
 242:10
 261:10
 262:10
**GC**
 119:19
**GCS**
 180:10,12,14
 202:17
 247:17,18
 266:10
**GCS452**
 32:13,16
 163:11
 189:12
 204:25
 232:4,9,13,
 18,20 233:11
 234:7,24
 235:9,15
 239:24

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                                23

240:1,22
GCS452's
  234:9
geared
  58:3,20
gears
  26:17 146:6
  217:7 228:9
  232:3
General
  89:15
generally
  41:24 98:25
gentleman
  146:7
get all
  12:21 92:23
girl
  28:3
girls
  21:4 33:20
  145:18
  163:20,22
  164:2 168:17
  217:4
gist
  79:7,11
give
  9:7 11:6
  17:23 42:19
  102:22
  131:24 157:5
  165:17,22
  170:2 188:4,
  8 192:16
  197:10
  205:20,21
  210:1,18,21
  213:15,16
  216:15 224:1
  243:2 267:15
giving
  26:23 27:3,8
  71:25 212:19
goal
  163:21 164:1

god
  230:22
  242:17
  260:16
gold
  214:9,24
  215:2,6,8
good
  9:16 27:16
  35:7 44:9
  57:17,20
  58:16 93:15
  182:18 183:2
  186:3 207:8
  228:2 261:9
  266:23
Google
  68:10,18,23
gosh
  15:7 106:5
  108:18
  259:14
Goulding
  8:9 252:1,10
Gowbler
  54:18
gown
  223:19
graduating
  223:14
grantor
  104:14,16
great
  145:19
  159:25
  185:14
grieving
  62:18 186:10
ground
  9:18 10:11
group
  31:7 259:16
guarantee
  122:13
  196:12
guaranteeing
  122:21

guarantees
  194:14
guarantor
  119:25
  120:4,13,18,
  22 121:2
  123:3
  199:19,24
guarantors
  123:7 150:17
  152:8
guaranty
  122:9 196:22
guess
  11:18 56:17
  82:17,24
  89:20 103:7
  166:13 204:5
  227:22
  242:11
  268:25
guild
  129:21
Gusto
  254:7 255:13
  257:4,15,21
guy
  147:1
guys
  127:21
  173:11,13

————————

H

————————

Ha
  172:1,4
haggle
  242:4
half
  169:2,4
Hancock
  16:4,7,8,12
  17:24 18:7
  21:5,8 215:5
hand
  111:21 160:3
  203:8

handed
  21:6
handle
  30:25 31:11,
  13 32:8,12,
  18 108:23
  189:4,8
  245:11
  250:15
handled
  55:18 56:2
  63:22 71:19
  79:22,23
  95:15 112:17
  118:2 124:24
  127:11
  156:11
  180:25
  235:8,14
  239:22
handles
  31:17
handling
  79:13 161:10
  207:11
handwriting
  114:16
  137:8,10,16,
  17 138:16,
  17,19,20,22,
  23,25 139:1
  142:8 144:2,
  6 248:1
happen
  182:25
  258:17
happened
  19:23 20:2
  26:24 55:7
  64:10 85:18
  123:9,14
  125:11
  132:24
  182:19
  184:20,22
  190:11
  205:10 206:1
  214:6 237:14

EXHIBIT L                        U.S. LEGAL SUPPORT, INC
                                      713-653-7100

Merrie Wycoff
August 26, 2021                                    24

247:16 263:4
264:5 265:4
**happening**
57:8 178:7
254:12 257:7
264:2
**Happiest**
145:7
**hard**
56:11 224:8
268:5
**harm**
78:6
**hate**
263:6
**Hawk**
192:2
**head**
28:2,4
166:14
**healing**
174:25
**healings**
108:9
**health**
27:18,19
107:23 108:7
139:20,21,23
255:9,14,18,
19,22,23
256:2,6,15,
23,24 257:2
**hear**
9:20,23,25
10:4,21,22,
25 25:17
26:24 34:22
41:11 52:3,6
56:11 68:7
75:22 169:5
251:14
**heard**
12:12 25:5
45:3 64:9
66:11,18,24
67:3,6,13,
15,19,22

68:3 69:1,6,
12,13,24,25
71:16 88:7
91:25 92:10
123:4 242:25
263:24
264:11
**hearing**
68:1 188:5
197:24
**hearings**
198:9,12
**hearsay**
242:10
**held**
7:8,11 46:17
102:6,10
123:23
223:16,20
256:19,20
258:11
**hellos**
94:21
**helped**
254:15
**helpful**
243:4
**helping**
30:5 105:8
254:13
258:25
**helps**
30:1,2 31:5
**hemp**
159:17
160:1,2,21
**Henke**
93:13 94:5
96:13,24
97:2,11,15,
20 98:2
99:11 100:6
110:7 134:6,
14 153:8
188:20
**Henke's**
93:16 95:1

128:12
**herpes**
107:16
**Herplex**
107:13,14
**hesitant**
216:5
**hesitate**
145:17
**hey**
130:24 191:5
**hiding**
168:14
**high**
144:19
**highly**
68:10
**Highway**
110:23
**Hill**
44:3,4,5,12,
20 113:22
114:3 115:7
**Hindes**
202:23 203:1
**hire**
99:4,5
**hires**
99:4
**history**
28:9
**hit**
154:3 233:22
**hitting**
28:2,4
**Hochman**
78:3
**hold**
18:3 29:24
40:25 41:24
43:11 82:18
83:21 84:9
107:3,5
157:6 211:24
212:2,5
223:8,11
224:18

249:20
**holding**
41:9 212:16
223:4
227:14,23
**Holdings**
41:16,17,22
42:10,18
43:9 60:6
120:9,11
121:13,14,
17,20 122:14
195:15
196:5,16
200:2
**holds**
41:15,18,23
42:1 212:10
**holiday**
145:19
**holidays**
145:7
**home**
138:2 145:19
174:12
228:12
233:24 265:9
269:4
**homeopathic**
107:15
**honest**
265:1
**honestly**
11:18 217:6
242:9 262:15
266:19
**hoop**
32:1
**hope**
150:12
**hoping**
173:9
**hops**
31:6
**horrible**
215:24,25

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                              25

horse
  27:23 172:25
  190:19,22,23
  191:7,9,11,
  15
horses
  191:12
hospitals
  140:3
hour
  62:22 270:24
hours
  29:20,25
  224:10
  244:21
  252:6,17
  254:10,17,
  18,23 255:7
  256:5 258:22
  259:7 266:3
house
  32:1 159:14
  162:7 176:8,
  10 178:4
  184:16,23
  185:11
  189:13
  200:9,15
  202:19,20
  205:11,12
  206:5 215:21
  216:5 234:7
  235:10,15,
  16,19 236:9,
  18,20,24
  237:4 242:4
  243:7,15,24
  244:2,6,15,
  18 245:12
  252:15
  266:10,11,
  14,19,22
  267:3,6,9
How's
  94:23
huge
  178:9,10
  182:20

185:10 245:8
husband
  15:5 37:1
  40:9 54:17
  58:2 59:2
  62:17 73:8
  86:21 91:8
  100:15
  146:20
  159:10 178:8
  180:25
  188:19
  236:8,17,20
  237:5,7
  263:10
  264:25
husband's
  125:12 198:8
  236:12 261:4
Hutchinson
  238:3
Hyatt
  103:3,17
  104:22
  105:4,5,12,
  17,25
hyperbaric
  217:3
hypoallergeni
c
  50:3
hysterical
  156:25

─────────

         I

idea
  160:23,25
  266:23
Ideas
  44:24
identificatio
n
  228:15
identified
  116:16

identify
  102:5
illness
  165:12
imagine
  178:8,9
  190:6
immediately
  65:18 177:24
implication
  161:20
important
  171:17 224:4
  225:18 226:5
impression
  167:6
impressive
  54:8
inaccurate
  239:25
incarcerated
  67:19
include
  210:9,13,24
included
  89:7 93:6
  267:5
including
  74:18 267:3
income
  109:18
Incorporated
  35:22
incredible
  184:4
incredibly
  224:3
incurred
  75:12 76:15
  78:2,4 194:9
independent
  242:16
indicating
  16:7
individual
  90:13 91:22
  92:13 93:1

104:15
  112:12
  161:14
  239:23
individually
  11:11 12:9,
  22,23 18:1,9
  115:11
  116:22
  120:1,5
  122:16
  193:23
  195:10,22
  199:20,24
individuals
  104:10
induced
  77:24 86:13
  87:3
inducing
  79:10
infomercial
  58:15 265:12
inform
  251:19
information
  22:9 95:13,
  17 96:2,12
  134:7,10
  135:16
  136:14,18,
  22,23 137:3
  141:2,4,20
  143:22
  144:11
  150:13 152:2
  197:21
  219:5,23
  220:1 226:3
  254:7
informed
  226:3
initially
  221:22
initiated
  145:5
injured

EXHIBIT L

145:23 146:1

**injuries**
166:14

**inspectors**
250:8

**instance**
219:7

**institution**
217:16
225:14

**institutions**
11:4,7

**instructed**
251:19

**insurance**
15:4,10,25
16:7,14,19
17:21,25
20:3,14 21:1
52:18 79:2
120:14,23
122:17 123:6
124:14,19
129:5,6,15,
19 130:22
132:21 133:4
135:8 137:4,
19,23,24
139:5,6,25
145:12
150:17,21,
23,24 152:2
155:14
157:18
158:3,10,11,
16 180:19
181:1,9,14
182:6 187:15
192:4,8
204:20
209:25
215:16
230:11,21
255:9,14,18,
19,22,23
256:2,6,15,
23,25 257:2

**insurance-company**
181:4,5

**intellectual**
41:18,19,20,
23,24

**intend**
227:6

**intended**
24:18,19

**intention**
74:11

**interactions**
7:10

**interest**
34:6 40:23
44:11,14,15
60:1,9 76:12
83:13,15
85:1,4
89:24,25
236:18,23
237:18
239:18

**interested**
8:8 147:7
240:25

**interesting**
51:19

**interests**
237:3

**interface**
7:12,23

**interim**
97:17

**Internal**
63:14,18
64:13 65:1
198:3

**International**
48:1 49:18
50:1,6,9
60:14 224:23
225:8,10
227:1 228:2

**interrogatory**
130:6,13

**interrupt**
28:8 106:25

**interviewing**
177:25

**introduced**
23:16 36:2
45:12 46:20
51:4 52:12
64:18 70:3,
10,11 72:18
83:8 89:11
104:2 110:10
111:14
113:24
115:18 118:4
119:12 122:4
124:1 134:20
135:19
140:10
142:25
148:18
154:20 193:5
195:1 196:9
198:15
200:20
203:21 208:2
218:23 221:5
222:2 225:5
228:7
229:16,17
231:15
234:13 246:6
247:20 249:9
253:15 255:1
267:12

**introduction**
74:21,22

**investigations**
77:12

**investment**
262:14

**investments**
126:15

**investor**
147:13,24
148:1

**involved**
56:20 59:6
70:4 71:2,5,
7,8 136:22
154:8 207:23

**involving**
88:10
112:11,20
124:21
148:24

**IP**
41:16,17,22
42:10,18
43:9 195:15
196:5

**irrevocable**
32:22 41:4
43:12 214:16
228:16
232:14,15,
20,21

**IRS**
64:6 75:14
76:12 77:14
78:1 79:8,20
80:1,17
81:1,5,7,14
82:10 85:23
86:13,17
87:4,8 88:11
92:17,21
140:6
176:14,16
177:4,8,13,
17 178:2,9,
13,16
185:16,21
186:4 197:5,
24 198:9
206:21,23,25
207:23
209:17,20,22
212:10,12
213:8 214:8
260:21 261:7

**IRS'**
77:11

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                    27

**IRS's**
  69:13
**Isabel**
  116:8
**issued**
  63:14 70:13
  81:7 82:10
**issues**
  27:18,19
  187:15
  200:12
**item**
  150:20 151:2
  152:7 153:2,
  6 267:5
**itemize**
  267:4
**itemized**
  267:10
**items**
  150:15
  151:20

─────────────

**J**

─────────────

**January**
  110:17,18
  111:5
**Jeff**
  12:17,22
  38:13,16
  42:5,7 44:19
  46:2,16
  47:23 48:14,
  22 50:6,19
  51:18,20
  53:3 54:8
  55:18 56:2,
  19 57:5,11,
  13,14,17,18,
  19,22 58:1,
  5,7,21,23
  59:12 60:16,
  20 63:22
  64:13 68:12,
  13 70:3,11,
  18 71:19

72:4 73:7
74:15 77:20
79:13,21,22,
23 80:6,13
81:16 82:4
95:15 96:5
97:7 98:10
99:4,6,8,14,
22 100:12,
15,18
102:10,15
103:8,20,22,
23,24 105:21
107:15
112:3,13,15,
17 113:4
114:20,22
115:10
118:1,9,13,
14,17 121:21
122:1 124:23
127:11
128:9,19,22
135:24 136:3
139:8,9,11
140:18 143:7
145:14,18
158:1
187:15,23
192:4 194:13
197:15,18
206:25
207:1,2,5,6,
7 209:22
213:18,19,20
214:2,8
235:18,23
236:3
239:17,23
255:22 256:1
258:25
260:5,6,10,
14 261:24
262:9,22,23
263:16,21
264:14
**Jeff's**
40:12 87:12
102:24 103:1

142:23
152:20
185:23 187:5
214:6
**Jeffrey**
11:4,7,10
12:9 15:5
22:16,23
35:14,23
37:1,5 48:8
61:1,7 63:8,
14,19 64:25
70:17,22
71:2 72:11,
13 73:18,20,
25 74:11,17
76:23 77:17
78:19 79:10
80:2 81:8,14
82:10,11
83:14 85:9,
20 86:2,13,
21 88:22
89:5,16,24,
25 90:19
91:5,9,24
92:2,6,7
93:3 95:8
97:12,15,21
104:10,13
105:8,13,18,
25 106:3
110:19
111:4,20
119:21,24,25
120:9,13,17
122:15,16
126:4 127:1
139:13
150:22
187:1,8
196:13
199:17
259:23
263:10
264:13,22
**job**
29:15,19,25

30:14,17
182:18 183:2
186:3 233:23
**jog**
14:19
**John**
16:4,6,8,12
17:24 18:7
21:5,8
110:19 215:5
**joint**
257:4,11,15,
19,21
258:10,13
**jointly**
11:12 100:20
103:22,23
256:12,19,20
258:11,12
**joke**
177:5,6
**JP**
12:13,24
**July**
85:2,3,6,9
86:1 114:7
129:1,8
130:9,10,18
131:3,10,13
132:23,24,25
155:9 163:7
169:16 170:3
172:7,14
173:23 175:6
177:17
179:14
211:11 235:6
246:24 248:7
**jumped**
164:13
**June**
47:10,17
73:21 83:19
84:14 111:19
150:5 151:6,
10,11,15
177:16
189:10,18

EXHIBIT L            U.S. LEGAL SUPPORT, INC
                          713-653-7100

190:17
208:10
212:20
216:11,13
222:8,12,24
228:18,20
232:1
**Jurkowskis**
203:4

---

**K**

**Karen**
111:21
242:15
**Kari's**
145:8
**Kasturi**
148:25 149:9
150:4
**keeping**
108:22
176:14 178:4
220:12
**Kevin**
103:3 105:7
178:25
179:4,10
189:21 190:5
**kids**
167:5
235:11,12
240:25
241:19,23
242:12
243:6,14
244:10,18
245:3 250:18
265:9
**kids'**
266:18
**killing**
183:16,25
184:6
**Kim**
163:3,5
179:7,8,10

189:17,19
190:8 248:14
249:15
250:3,22
251:2,4,10,
19
**Kimberly**
162:7,10,13,
21
**kind**
9:18 25:4
61:5 90:24
91:23 125:13
144:20
165:12
185:1,5
188:23 198:4
200:8 222:22
227:22
236:13
237:2,18
241:15 243:1
250:2 254:8
255:10 260:9
263:6 265:15
**Kling**
149:2,4
150:8
151:16,19
152:1,6,23
155:4
**knew**
25:25 57:1
59:6 68:4
80:13 97:6,8
156:16
207:3,5
213:20,23
218:14
262:11
**knowing**
96:7
**knowledge**
16:8 29:6
30:8 47:21
108:13
109:19

**knowledgeable**
64:7
**Knupp**
72:12 79:9
**Kolbecks**
203:6

---

**L**

**label**
196:19
**labels**
58:12
**Lake**
135:5
**Lamb**
8:5
**land**
44:8,10
**landlord's**
250:24
251:6,7
**language**
232:10
**large**
7:20 209:10
**launch**
24:23 25:12
50:11 58:9,
10 227:18
263:19
**law**
79:2,9
87:22,23
172:1,4,6
213:13,15,16
229:6 237:4,
5 251:11
**lawsuit**
27:3 72:11,
15,23 73:10
74:1 78:9
86:1 178:21
183:13
193:1,12,21
260:12,18
261:12

263:21
**lawsuits**
178:22
**lawyer**
69:13 70:2,9
73:17,24
74:2 76:23
77:18 78:19,
20 92:21
102:17,18
103:9,12,18,
19 130:4
148:24
149:10 155:3
161:24
207:11
229:11,19
236:14
238:2,25
248:15,18,22
260:11
**lawyer's**
168:2 207:19
**lawyers**
71:20 79:24
82:25 83:5
85:22 86:2
99:5 101:15
102:21,24,25
103:1 122:2
156:11
161:16
199:21
237:15
**lay**
9:18
**lays**
98:2 100:6
**Layton**
110:19
**lead**
99:8
**leading**
166:23
**Leadingham**
197:3,13,17
213:12
264:4,12,19,

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                               713-653-7100

21

**leaking**
27:12

**learn**
197:14
237:18

**learned**
68:19 140:6,
8 193:20
197:21

**lease**
113:13 114:2
115:1,3,20,
25 116:7,11,
19 117:3,5,8
250:8

**leases**
169:2
249:18,21

**leasing**
113:12 115:2

**leave**
224:11

**led**
161:7 265:2

**left**
158:2,6
184:15
185:16 192:4
203:8 252:8

**legal**
8:6,10 22:1
37:16 42:24
55:18 56:3
62:10 63:23
71:19 75:13
76:16 78:18
79:20,22,24
80:21 85:21
86:11 88:1,
10,17,21,24
89:4 91:12
99:9 103:21,
23 105:17,20
121:23 154:2
213:13 227:2
236:13
248:10,12,25

**256:4,8**

**legally**
220:16
224:18
226:25

**lender**
150:12

**length**
240:12,14
245:2,7

**Leon**
225:24

**lets**
170:8,16
171:6

**letter**
74:3 76:22
77:2 78:10,
20 93:17
94:4 96:24
97:11 98:1
99:10,13
100:5,10,20
135:1,3
152:11,14,
18,24 153:4
157:7,13
158:12,14
162:24 163:3
177:8
189:15,18
193:10,17
228:10,14,18
231:18,24
238:16,21,23

**letterhead**
52:24

**letting**
216:5

**level**
57:23 181:4,
5

**liabilities**
128:20,23
129:8,13,20
132:23
133:7,10,24

**liability**
78:5 79:11
88:11
122:14,19
205:1 232:8

**license**
107:2 227:16

**licensing**
224:23
227:12

**lie**
10:23 11:1

**lieu**
8:16

**life**
15:4,10
16:7,14,19
17:20,25
20:2 26:4
129:6,14,19
130:22
132:21 133:4
137:4,19,23
139:4
150:17,21
152:2 155:14
158:10,16
178:3 209:25
215:16 217:8
230:11,21

**lifetime**
235:17

**likes**
32:2

**limited**
122:14,19
196:21 205:1
232:7

**Linda**
54:18

**lines**
42:13 43:3
69:2,18

**list**
11:3 34:16
40:20 47:25
49:4,17

**50:12 106:22**
126:15
127:16
130:23 131:4
133:22 173:4
177:25
188:4,8
261:9 267:5,
10

**listed**
95:17 125:25
126:18
127:14
129:8,13
130:13
132:12,22
138:1,10
177:24
211:11

**Listen**
252:14

**Listing**
111:19

**lists**
188:15

**literal**
192:8,10

**literally**
177:13

**litigation**
22:2 79:24
270:14

**lived**
72:4 229:22

**living**
46:16 103:14
138:4

**LLC**
16:23 31:1,
12 32:13
40:21 41:17
44:4,12,21,
24 49:6
59:17,20
60:7 101:10
104:11 106:4
107:23
108:8,11,14

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                             713-653-7100

118:16
119:3,8,16,
22 120:9
121:13
122:14,18,22
159:14
167:15
168:22 169:1
179:14
189:12
195:11,15
196:6 199:16
200:2 202:18
204:25
234:7,24
246:16
250:17
**LLCS**
167:12
**loading**
34:23
**loan**
119:15
121:7,9
123:3,10,11
151:8 153:14
156:9,19
173:17
175:25 176:8
241:24
**loaned**
123:13,14
125:2,7
197:15,18
**located**
215:13
**location**
223:25
**locked**
7:15
**logistical**
200:12
**long**
25:21 27:19
28:10 71:18
86:15 103:17
107:11 159:6
206:22

229:25
257:25
**long-haul**
165:11
**long-hauler**
71:15
**longer**
224:18
**looked**
73:4 101:2
130:19 156:4
164:10,12
167:2 187:7
188:8 213:25
247:23
**Lord**
162:7,10,14
163:5 179:7,
8,10 248:14
249:15,24
250:3,22
251:2,10,19
**Lord's**
162:21 163:3
189:18 190:8
251:1,4
**Los**
83:19 85:8
103:14,15
179:22
**lose**
178:8
**loses**
27:15
**lost**
31:24 62:17
182:4
**lot**
27:13,18
28:25 43:6
72:2 129:16
130:4 131:20
148:3 173:18
266:17
**lots**
14:12 25:7
130:3

**loud**
10:24 11:14
201:17
**love**
164:20 191:9
**low**
253:9
**lower**
72:24
**luck**
151:19
**Luftman**
75:2
**lunch**
106:7
**lung**
217:2
**Lynn**
110:19

---

**M**

**made**
15:13 54:4,
7,8 77:13,18
81:17 85:8
87:14 90:7
100:17
109:4,5,8,9
121:21
122:13 124:9
130:11
134:17 148:3
166:18
167:6,22
173:24
177:5,6
181:1 192:3
199:4 247:7,
8 257:4,14,
17 262:14
**Magnus**
31:1,5,12
101:14,19,20
117:25
163:13
167:18

168:6,22,25
169:1,3,7,11
179:14,18
180:2,3
232:24 233:2
245:14,17,25
246:15
247:17,22
248:4 249:2
250:17
**main**
78:22
**maintain**
108:16
224:24
**Maintaining**
246:12
**make**
64:7 86:16
95:4,16
96:1,12
101:16,25
108:19
128:14
156:8,18
168:24
178:14
182:25
185:20 186:4
188:24 189:2
226:3 260:9,
13
**makes**
258:2
**making**
48:14 56:13
69:25 109:10
260:4
**malpractice**
72:11 73:18
78:19 79:3
85:21 86:12,
25 87:1,2
88:1,10,17,
21,24 89:5
91:12 92:25
207:11,13,
15,16

EXHIBIT L                        U.S. LEGAL SUPPORT, INC
                                    713-653-7100

Merrie Wycoff
August 26, 2021                                          31

man
  149:2 216:23
Management
  35:9,22
  37:5,21
  38:6,11,24
  39:2,7,9,18,
  24 40:3,10,
  18 51:10
  70:4,23 71:3
manager
  42:13 43:2
  44:1,20,22
  49:14 204:25
managers
  44:23
manner
  8:21
manufactured
  55:10
manufacturing
  56:9
March
  22:19,22
  196:25
mark
  115:21
  169:22
  179:15
marked
  93:7,16
  128:11
  144:15,17
  157:5,10
  158:21
  201:23 254:6
market
  32:1 245:10
  255:19
marketed
  49:21
Marlin
  65:19 66:2,
  5,8 67:3,5,
  17 68:4,7,19
  69:2,6,15
  70:2,9

103:12
Marlin's
  66:12
married
  23:1 265:1
marry
  22:23
Martin
  110:18,19
mask
  216:3
master
  226:16
master's
  218:21
  220:22,25
  222:19,25
  223:19 224:5
masters
  217:18
  222:15
  225:24
math
  20:11 134:2,
  5,14
Matt
  94:12,14
matter
  8:3,18 9:12
  25:22
matters
  77:11 263:11
Mcdaniel
  75:2
meaning
  102:24
meaningful
  224:7
means
  13:10 14:4
  30:18 31:14
  43:20 99:23
  167:2 184:1,
  7,11,12
  185:7
  211:22,24
  212:6 232:6

236:15
meant
  24:16,20
Media
  178:18
  183:20
  193:2,12,21,
  24 194:5,10,
  14,16,22
  195:4
  196:13,22
  260:8,9
mediation
  79:1,14
medical
  28:9,11
meet
  94:12,14
meeting
  64:4 94:20
  179:21
meetings
  31:22,25
  63:23
Mellon
  19:19,20,23
  20:5 21:6,16
  33:20,21,24
  34:1,2 132:3
  172:8,12
  181:6
member
  39:5 40:13
  45:7 121:20
  195:11,13
  197:4 225:14
members
  106:4 232:4,
  5,13,16,18,
  19
memo
  208:20
memorial
  152:20
memory
  11:6 14:20
  55:23 66:24

105:11
  184:23
mentioned
  43:2 130:8
  151:22 239:3
mentor
  24:23 25:3,
  20
Merger
  46:25
Merriam
  206:16,20,
  22,24 207:3,
  5,10,23
  208:19 209:5
  210:1,18,21
  211:1 212:9,
  12,16,24
  213:12,15,
  16,20,23
  214:2,3,6
Merriam's
  210:10
  211:18
Merrie
  7:25 8:3
  9:10 38:7
  47:14 53:6
  62:24 64:25
  83:13 84:2,
  8,9,18 95:9
  97:22 104:10
  110:20
  111:20
  112:16
  114:3,14,23
  116:8,17
  120:4,14,22
  122:15,17
  127:1 128:23
  135:7 137:23
  139:5 142:14
  144:9 145:16
  150:13,22,24
  152:9 153:9
  155:22
  195:22,23
  209:22

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                                    32

228:11
234:25
246:19
270:21

**message**
162:6 169:17
182:14
194:23 270:1

**messages**
159:2 166:17
172:14
186:5,19
190:16 231:1
268:11,18

**messy**
30:4

**met**
94:15

**metaphysical**
224:24
225:8,10
226:9,20
227:1 228:2

**Metaphysics**
221:13
222:6,12
225:20

**Michigan**
122:18

**microphone**
10:3,5

**middle**
191:1 221:24
250:3

**Midlab**
8:3 9:17
85:13,20
86:11,18
88:1,9,15
94:13
178:20,23
260:7 261:6
263:23

**midst**
91:13

**Miles**
193:11,13,17

**million**
15:8,16,22
16:3,7,10,
11,18 17:3,6
20:7,10,15,
16,24 21:1,
10,11,12,13
54:4,7,11
75:13 76:13,
17 78:2,5
79:20 101:6
124:11
126:9,18
129:5,14,18
130:14,24
131:24 133:4
146:24 158:4
191:6 192:24
210:16
242:16

**mind**
99:3,4 107:6
115:9 175:24
177:22 233:5

**mindful**
177:17

**mine**
141:25
195:18,24
196:15
262:22

**minimum**
261:1

**minister**
26:15 227:6

**ministerial**
220:10
225:17 226:5
227:11

**ministry**
48:16,20,25
49:2 224:24
225:11
227:2,6
228:3

**Ministry's**
225:8

**minute**
58:9 201:1
262:18

**minutes**
62:22 201:4
252:3,7,8,
18,21 259:7
266:3,5

**miraculous**
224:14

**misread**
74:23

**missed**
106:21

**missing**
34:19,20
130:15
171:22 211:9

**Mitchell**
72:12 79:9

**mix**
166:14

**Model**
115:25

**modeling**
29:15 30:7

**models**
184:8

**modulate**
201:20

**Moley**
146:8,9,10,
11,12,13,14
250:13
251:17

**Moley's**
251:12

**mom**
55:19
163:10,24
164:15 167:3
182:18
183:16

**moment**
93:10 137:7
157:5 165:13
171:3 182:12

239:15
267:16

**Monday**
202:2 203:16

**money**
13:24 14:6,7
18:1 19:18,
21,24 20:3,
14,17,19
21:8,9 25:17
33:18,25
79:21 90:19,
23 92:12,20,
24 109:13,15
121:5
123:13,14,
16,19,22
124:16
125:2,6,11
126:7 127:16
129:19
130:22
131:3,19,25
132:1,5,15,
20 133:4,14,
20,21,23
147:22,24
168:16
173:25
175:9,11,15,
17,21,24
176:4,25
180:12,14,
21,25 181:2,
10,13 182:5
191:8
197:11,15
209:23
211:9,10,11,
24 212:2,5,
16,22,23,24
215:2 235:9
240:1 241:1
249:2
256:10,14
257:1 260:15
261:2,6,14,
18,21,23

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

33

month
  181:7
  254:18,23
  255:8 256:5
month-end
  151:24
monthly
  256:24
months
  27:22 67:19
  133:6 158:8,
  15 224:9
  234:6 265:1
mood
  185:9,14,20
Morgan
  12:13,25
morning
  9:16 23:13
mortality
  139:25
mortgage
  117:15
mortgages
  13:5,8
mortified
  68:15
mother
  14:21,22
  239:3,8
Motion
  83:12
motorcycle
  28:15 29:2,
  5,9 30:21
mountain
  8:2 12:2,6
  63:2,6 75:25
  76:4 106:12,
  16 164:25
  165:4 201:7,
  11 252:25
  253:4 270:22
move
  10:2 34:13
  178:5 236:2

moved
  33:15,18
  103:16
  233:23,24
  235:23
movie
  28:23
moving
  33:7
Mowley
  250:7
MSK
  77:13 78:3
  82:1 86:4,6,
  12,17,22,24
  87:1,2 88:2,
  10,18,25
  89:7,16
  90:7,8 91:17
  92:25 103:8
  207:15,16
  259:15
muffled
  31:21
multipage
  148:23
multiple
  113:8 181:1
  218:15
  222:19 232:7
mute
  62:24,25
muted
  202:25
Mutual
  89:15
Mystic
  48:16 49:5
Mystica
  24:1 48:19,
  20,25 49:5

_____

_____

          N
_____

nailing
  164:18
  166:19

named
  54:17 147:1
  148:25 149:2
  155:4 204:15
  206:16
names
  102:16,22
  112:12 173:2
  191:19
  235:24 236:3
  237:11
  239:23
narrower
  179:25
National
  234:10
nature
  220:16
  226:12
needed
  33:6,7
  147:12,23
  148:1 170:6
  190:3 209:18
  230:11
  233:24 251:5
  258:18
negative
  96:21
negotiate
  244:1 245:12
negotiated
  112:18
  241:20 245:3
negotiating
  242:12
negotiation
  241:19,20,
  21,25 242:3,
  13 243:6,14
  244:8,10,13,
  14,17
negotiations
  161:11
  240:17,19,
  21,24 241:3

nerve
  265:10
nice
  50:25 164:19
Niche
  23:8,22
Nicholas
  155:5,6
night
  192:2 265:9
Niles
  116:8,19
noise
  32:3
non-secular
  226:10
nonacademic
  220:16
nontoxic
  50:4
nontraditiona
l
  13:9
notarization
  204:11
notarize
  169:18 170:9
  171:7,15,22
  205:16,25
  206:11
notarized
  53:8 163:11
  170:22
  171:11,18
  203:13
  204:14,23
  205:10,13
  206:5
notary
  121:10
  171:21 206:6
note
  109:10,14
  125:13,20
  188:24
notebook
  23:13,19

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

34

36:5 37:14
45:15,17
89:14 104:5,
9 110:13
134:23 157:4
158:22 193:8
206:8

**notes**
109:3,5,8,9
252:10,18

**notice**
63:15 74:11
80:16 81:7
82:11 83:12
86:13 177:20
241:7 250:8,
23 251:5,7

**notion**
160:5

**November**
37:20 38:10
39:2 40:15,
18 85:15
93:17 94:5,
13 95:13
96:14 97:4
98:6 136:4
139:13
140:17 141:7
143:8

**number**
17:23 19:12,
15 37:10,11
45:16 51:12
69:17 72:24
118:11 121:8
134:3 138:9,
10,11,14
188:17
193:13 219:9
228:15
259:22
267:20

**numbers**
52:3,4 61:20
65:5 127:22
147:14,17

**numerous**
27:10 140:3

─────────

O

─────────

**oath**
8:16 10:23
11:1 85:8
106:18
201:13

**Object**
18:18 30:10
33:11 55:5,
14 56:6 87:9
88:12 90:25
95:19 96:16
97:5 100:22
112:24
121:25
125:16
127:9,18
136:25
154:6,15
159:21
160:7,17
161:19,20
174:9 211:3
213:2 238:12
243:8,16
244:19
251:22

**objection**
87:19 88:4
98:13 100:11
112:24 131:6
164:4
237:13,22

**objections**
8:20

**objective**
175:20

**obligated**
77:9

**obligation**
197:5

**obligations**
100:9 122:22

194:9

**obtain**
218:4,19
220:21

**obtained**
77:10 152:14

**obtaining**
151:20
217:20

**obvious**
78:5

**occupation**
219:17

**occur**
242:13
244:13

**occurred**
240:17,21

**October**
22:14 51:22,
25 52:5,6,9
88:17 95:10
97:18,22
101:9 102:11
126:5,10
140:7

**odd**
182:9

**offer**
147:10,11,12
153:19,22
173:12,13,25
174:22 175:7
191:5

**offered**
153:18 165:7

**offering**
165:15

**offers**
173:19,20
174:14,20

**offhand**
173:7 249:6

**office**
94:17 110:17
262:9

**officer**
42:12 43:2,
25 48:11,24
50:8 60:3
107:19

**official**
204:3 248:4

**oftentimes**
38:15

**ongoing**
43:19

**online**
24:20 224:1,
2

**open**
14:24 90:18
92:2,5,7
118:11 119:4
174:20
179:15
237:25 246:4

**opened**
118:15,21
119:3 179:18
180:2,3
182:6,8
245:14,17,
23,25

**Opening**
246:12

**operated**
66:15

**operating**
163:10 170:4
171:10

**opinion**
30:15 67:11
69:14,21
70:12,15,19
238:16,21,23

**opinions**
32:2,14 69:4

**opportunity**
131:24
164:13 186:1
224:5

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

opposed
  93:2 229:20
opposing
  75:13
option
  93:4
options
  164:10
ordeal
  270:13
order
  24:22 33:15
  136:23 137:4
  177:10,12
  186:9 224:24
  226:24
  235:10 243:2
  255:17
Orgasmic
  25:1
originally
  19:23 49:20
  50:16
ostensibly
  258:2
out-of-town
  252:15
outcome
  8:8 80:7
  82:15
outstanding
  92:17
owe
  81:1,5
  109:13
  180:14
owed
  63:19 64:14
  79:8 80:10
  81:14 82:12
  91:6,7,8,9,
  10 109:15
  180:16,23
  197:5,8
  260:15
  261:1,6,14,
  18,21,22

owes
  180:12
owing
  75:9,14
  76:13,16,19
  77:15
owned
  34:7 43:12
  48:18,21
  49:8 59:12
  60:21 101:9
  112:21
  115:4,6,15
  116:24
  117:2,13
  124:21 127:6
  168:16,21
  232:20 233:2
  235:19
  236:20
  256:11
owner
  35:14 44:6,
  7,8,18 45:5,
  6 48:4,6
  49:12 50:5
  113:19
  114:14
  116:16
  117:19 120:8
  141:13
  146:14
owners
  35:11 41:1
  50:19 60:17
  232:19
ownership
  34:5 40:23
  44:11,14,15
  60:1,2,9,23
  135:13
  136:23
  137:4,19,22
  139:4,14
  141:10 142:5
  143:18
  168:13
  236:23 237:3

251:20
ownerships
  41:5
owns
  41:16 232:24
oxygen
  216:22,25
  217:4,5
oxygenator
  217:5

——————————

P

——————————

p.m.
  8:2 12:2,5
  63:2,5 75:25
  76:3 106:12,
  13,15 164:25
  165:1,3
  201:7,8,10
  250:3 252:24
  253:1,3
  270:21,22,24
pack
  254:13
Packard
  248:10,18,24
pages
  65:5,24
  84:1,4 89:20
  119:18
  120:21 121:8
  170:5 196:4
paid
  15:20,22
  16:23 17:3,
  10 18:1,9
  29:10 63:20
  78:2,3 79:3
  87:22,23
  111:4 117:15
  129:16,17,
  21,22,23
  130:2,3,4,7
  131:20
  153:25
  154:4,11,14

155:15
178:15
185:10,13
186:8 197:12
227:11
240:22
241:17
254:24
255:13 256:8
266:20
pain
  264:25
  265:2,10,13
paint
  205:23
paperwork
  121:9
  163:15,18
  262:2
Paradigm
  106:23
  107:9,11,17,
  20,21
paragraph
  37:6 51:23,
  24 76:6 77:6
  84:24 90:6
  122:12 199:3
  250:4
parent
  41:13,14
parked
  212:24 213:5
part
  7:20 64:24
  79:19 84:19
  86:16 91:17
  107:17,18
  125:12 166:6
  211:1,15
  213:19
  220:9,14
  233:8
  256:16,22,23
parted
  68:15
partial
  208:20

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                              36

212:20
**partially**
  262:3
**participants**
  7:6,18
**participated**
  66:19
**participating**
  8:13
**parties**
  8:19 64:5
**party**
  8:7 79:16,18
**passage**
  237:18
**passed**
  27:15 118:14
  159:10
  177:20
  236:8,17
  237:1 239:4,
  9
**passes**
  180:25
**past**
  232:8 241:21
**pasture**
  191:14
**Pat**
  145:8
**patents**
  42:2,3,6
**path**
  133:3
**patient**
  185:1
**Paul**
  225:24
**pay**
  25:17 33:15
  77:14 80:22
  81:1,2
  92:16,21
  111:6 154:8
  164:9
  175:16,25
  176:8 177:1,

11,15 181:10
185:11 190:8
197:10,11
212:10,12
213:8 220:10
224:23
241:1,11,23
244:16 257:1
263:23
266:21
**payable**
  17:3 20:14
  21:2 78:3
**paying**
  79:19 185:8
  186:3 212:21
  227:15 228:3
**payment**
  87:7 90:6
  91:17 153:14
  221:17 223:1
  248:10
**payments**
  130:11
  133:14
  250:11
  257:4,14,17,
  21,24 258:1
**payoff**
  151:8
**payroll**
  253:20 254:8
  255:5,8,12,
  17 256:22
  257:3 258:1
**pays**
  256:15,24
**penalties**
  76:12
**penalty**
  8:18 9:7,12
**pending**
  86:11 88:2,
  10,16
**people**
  25:16,17
  62:13 74:6

80:22,25
114:10 168:4
169:5
172:20,25
173:3,17,18,
19 174:24
175:1,2
176:22
178:11 184:5
190:19,22
191:7,15
202:20
205:12
214:14 216:5
261:17
263:18
**percentage**
  44:16 264:5,
  7
**perception**
  166:23
**perfectly**
  43:1
**perform**
  94:5 97:22
**period**
  47:20 97:17
  146:3 153:12
  163:16 198:7
  200:8 206:7
  224:9
**perjury**
  8:19 9:12
**permission**
  174:19
**perpetrated**
  75:9 76:19
**Persian**
  242:6
**person**
  8:17 55:24
  56:1 109:12
  152:21
  165:12
  181:22
  223:25 234:8
**personal**

12:16,18
102:16,24
103:19
123:17
125:25
131:19 151:3
152:3 153:6
155:21
156:1,3,17
194:14
239:11
**personally**
  15:13 62:7,
  16 80:17
  82:5 91:10
  126:5 142:21
  153:9,20
  154:8
**petition**
  36:11 63:9
  70:22
**petitioning**
  64:5
**Ph.d.**
  26:13 217:9,
  12,20,23
  218:21
  220:21,25
  221:23
  222:13,18,25
  223:5,12,17,
  19,20 224:6,
  18,22,24
  226:16
  227:15,20,24
**Ph.d.s**
  217:18
**phone**
  33:22,23
  138:9,10,11,
  13 179:24
  180:8 219:9
  268:15,22,24
  269:2,5,10,
  12,15,18,20,
  22 270:1,4,7
**photographer**
  31:2,15

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021                                                37

photography
  28:22,23,25
  29:6,12
photos
  30:6
phrases
  186:6
physical
  223:25
physically
  8:14
pictures
  145:8
pieces
  80:19
pile
  192:4,8,10
piles
  158:3 192:12
Pisano
  8:4 38:7
  47:14 64:25
  83:13 84:2,
  8,9,18
  104:10
  110:20
  111:20 120:4
  122:15
  128:24
  195:22,23
  234:25
  246:19
pitch
  25:8
place
  191:13
  217:11
places
  99:6
plaintiff
  8:1 83:14
plan
  70:10
plane
  57:19
plate
  167:5 173:24

pleased
  97:16
pledged
  261:25
plenty
  178:22 214:1
poignant
  171:3
point
  14:25 54:17
  73:10 101:3,
  8 102:7,11
  117:24 130:8
  139:25
  141:14
  173:23 181:2
  184:19
  202:21
  203:17 204:8
  216:8 220:19
  221:24
  227:24 230:5
  239:5 255:10
  263:9 270:14
pointer
  243:2
policies
  16:14 137:5
  140:1 157:19
  158:3,16
  180:19
  181:1,2,10
  192:5,8,13,
  21
policy
  15:14 20:14,
  20 136:14,24
  137:20,23
  139:5,15
  141:10,14
  143:9,19
  157:18,19,20
  158:4,10
  192:24,25
  209:25 210:2
  215:17 262:4
Ponzi
  66:15,19

67:10,11
portion
  90:9,12
  91:21 92:16
  262:11
position
  25:19 42:17,
  19,20,21
  43:2,4,9,11,
  13,25 44:1
  48:12,24
  50:8 51:2
  60:3 168:17
positive
  58:24 263:17
possibilities
  133:18
  205:24
possibility
  76:16 133:22
  160:1 205:24
possibly
  72:5
potential
  78:4 250:7
potentially
  177:17
practicing
  103:9
precarious
  168:17
precise
  16:9
precisely
  15:7
predates
  119:9
predominant
  68:24
prefer
  22:5 250:4
premises
  116:11
preparation
  58:9
prepare
  97:20

prepared
  96:2 105:5
  110:5
  128:20,24
  129:7 133:24
  156:4 158:15
  231:9,11
  265:17,19,
  20,22 267:10
preparing
  97:2
presence
  7:11
present
  8:14 37:1
  191:5 206:13
  218:2 219:16
  246:2,3
presentation
  134:18
  223:14
presented
  60:23 191:4
  217:23
preserve
  164:1
preserving
  164:8
president
  35:21 38:7,
  11,24 39:1,
  8,9,10,11,
  14,17,19,24,
  25 40:2,3,8,
  14,17 45:9
  46:4,10,11,
  13,15 47:6,
  15,17,21
  48:12,25
  49:3 50:24
  51:16,18
  52:1,5,8
  53:6,10,15,
  22 54:6,10,
  16 55:1,9
  56:16 60:25
  61:6,14,22,
  25 62:6,15

EXHIBIT L

Merrie Wycoff
August 26, 2021                                              38

195:21 200:4
253:19 255:4

**pressure**
134:4 158:18

**pressuring**
173:21

**pretrial**
165:19

**pretty**
27:17 28:1
30:3 54:24
64:3 68:23
121:21 177:6
181:22 217:2
223:7 256:2

**prevent**
26:23 27:3,
8,20

**previous**
104:25 105:1

**previously**
93:7,16
144:15,17
157:5,20

**price**
146:23
240:18,22
241:4,5
242:4,7,11,
18 243:7,15,
24 244:2,5,
15,18 245:3,
10 266:20

**prices**
112:18

**printed**
248:4

**prior**
84:17 151:24
178:22
210:22
264:23

**prison**
67:16

**private**
7:9 255:19

**privilege**
161:21,25
162:2,4

**probate**
237:3,6,20,
25 238:10,
18,22 239:1,
9,13,15,16

**probe**
168:20

**problem**
11:19

**Procedure**
7:3

**proceed**
107:1 189:22
266:8

**proceeding**
7:7 237:20

**proceedings**
7:1 8:11
63:12 77:12
85:23 198:2
270:23

**proceeds**
123:10,11
129:5 132:22
155:14
205:16
263:23

**process**
176:7 177:16
179:1 197:24
237:3 242:13
243:6,14

**processing**
254:8

**produce**
73:5 188:21

**produced**
18:14,17
20:9 22:2
72:23 73:6,7
187:24 269:9

**product**
25:8 53:20,
24 55:10,13

56:10,14
107:13,15

**products**
49:21 50:4,
11,13,17,24
51:16 52:1,
9,24 53:11,
16,18 54:2,
13,18,23
55:1,10,25
56:2,4,9
60:13,18
61:1,4,6,15,
23 62:1,6,15
70:24 71:3
74:18
123:20,23
124:5 125:20
126:16,19,25
127:14,16
136:12 194:7
195:22 200:4
219:17
253:12,19,23
254:11,23
255:4,12,17
256:25 258:2

**Products'**
141:1

**professional**
75:1,6

**program**
218:7,16,17
221:8

**project**
34:16 234:17

**promised**
264:4,7

**promissory**
109:3,5,8,
10,14
125:13,20

**prompted**
139:14
177:23

**pronounce**
23:6

**properly**
101:17

**property**
28:24 41:18,
19,20,23,24
110:22
112:6,10,12
113:12,14
115:2 177:9
184:21
215:20
237:12
239:18,23
240:7,18,23
241:8 250:16

**proposal**
160:15

**propose**
159:22

**proposed**
159:19

**proposing**
174:5,11

**Pros**
59:9

**protect**
168:18

**protecting**
168:15

**proud**
224:15

**prove**
173:25

**provide**
21:25 69:3,
13,21 92:12
97:17 134:10
155:25
187:18 198:4
220:6

**provided**
23:16 36:2
45:12 46:20
51:4 52:12
64:18 72:18
75:5 83:8
85:15,20

EXHIBIT L                U.S. LEGAL SUPPORT, INC
                            713-653-7100

86:11 88:1,9
89:11 104:2
110:10
111:14
113:24
115:18 118:4
119:12 122:4
124:1 131:22
134:8,20
135:19 137:3
140:10
142:25
148:18
154:20
157:13
180:19 193:5
195:1 196:9
198:15
200:20
203:21 208:2
210:11
218:23 220:2
221:5 222:2
225:5 228:7
231:15
234:13 246:6
247:20 249:9
253:15 255:1
267:12
268:14,18
269:1,12,15
270:7,8
**providing**
71:12 136:22
**proximate**
77:22
**public**
24:21,22,23
25:23 26:1,
3,8,12 93:13
223:5,12
**publish**
23:10
**publisher**
23:25
**publishing**
24:1,6 49:6

**Pulkrabek**
8:24,25
9:15,17,24
11:2,17,25
12:7 18:20
30:13 33:13
55:8,16 56:8
62:20 63:7
76:5 78:12,
17 83:1
87:11,21
88:8,16 91:1
95:25 96:19
97:10 98:15
99:17,19
100:1,4,14,
25 106:6,10,
17 107:8
113:1 117:9,
12 122:6
125:19
127:12,23
131:8 137:2
154:7,22
159:23
160:9,19
161:22
164:6,22
165:5 174:15
201:3,12
211:5 213:4
237:14
238:1,14
243:10,12,20
244:20,24,25
251:25
252:9,20
253:5,8,10
259:4,8,9
266:9 270:11
**pull**
34:15 93:8
115:23
144:16
198:18
231:23 268:3
**pulling**
247:24

**purchase**
214:9,19
240:18,22
241:4,5,23
249:3
**purchased**
214:15,20
**purpose**
7:13 108:7
**purposes**
249:2
**pursuant**
7:2
**pursuing**
91:13,18
**pushed**
25:5,6
**put**
17:18,21
20:17 32:1
38:13,16
46:2 93:1
96:13 115:8
117:16
132:15,20
134:6,7
147:10,11,12
149:17
157:18 158:1
173:12,13
175:6 184:12
186:15 206:8
211:18
224:10,13
230:12
236:16
245:10
251:18
**puts**
155:13
168:17 184:8
**putting**
13:23 14:5,7
93:2

**Q**

**qualifies**
13:5
**question**
9:20,21,22
10:13,14
12:24 13:12
20:16 21:7
27:1 31:9
39:8,16
42:25 43:8,
16,20,21
44:9 52:7
54:10 55:9
58:3,18
62:12,13,14
67:4,9,16
69:3 70:8
71:17,24,25
72:7 75:17
78:18 91:4,
20 96:8,11,
20,23 99:18
100:2 105:16
112:13,16
113:2 119:5
125:17,23
127:10 129:7
130:12
155:18
156:13,15,16
160:4,10,12
161:20,23
164:14
173:14
179:25 180:1
181:20,21,23
182:2,3,10
184:20
187:19
191:17
206:15 207:8
211:4,6
213:3
223:16,21
235:13

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

Merrie Wycoff
August 26, 2021

40

236:13
238:13,20
243:3,4,9,
13,17,21
244:20 251:3
questioning
165:14
questions
34:18 43:7
56:18 63:8
143:6 152:12
155:12
187:21
251:10 252:4
263:7
270:12,16,17
Quickbooks
108:20,21
quickly
34:14 43:5
130:5
quote
74:25 77:7
152:7 250:4
quotes
25:7

———————————

R

Rabbi
70:4
raised
159:24 160:5
raising
42:22 160:14
ran
46:17 47:23
56:19,20
72:4
rapid
121:10
rattle
250:10
rattled
250:6
read
18:23 37:7

62:19 70:12,
19 74:22
75:24 93:19
98:7,8,19,
21,23 224:11
225:18,19
226:4 232:10
237:10 253:6
268:5
reading
38:16 67:21
69:23 70:1
76:6,14,21,
25 122:23
224:12
real
101:4 102:5
112:17
124:20,21
158:5 173:20
189:11 191:1
238:4 251:11
realignment
200:16
202:6,18
204:2
realize
115:7 167:15
171:10
realized
172:6 230:10
realm
154:17
realtor
173:4 175:2
190:23
245:11
realtors
177:25
reason
90:22 91:3,
20 92:14,15,
19 112:9,23
130:23
156:16
165:9,15
171:5 180:18
215:23

236:11
244:25 245:4
255:13
266:13,16
reasonable
55:11 191:15
reasons
92:23,24
158:7 226:4
recall
13:20 48:11
54:1 94:20
109:7 110:2
137:2 146:7
148:1 158:15
172:18 197:6
198:11 200:7
207:14
235:19,22
239:6 257:8
259:25
receive
155:21 226:2
240:10
received
20:20,25
90:9,13
91:21 129:5
143:11
150:14
222:13,14
225:2
231:19,24
250:7
receiving
223:3
recent
135:12
recently
28:14
recess
12:3 63:3
106:13
165:1,8
201:8 253:1
Recognition
225:18

recognize
37:19 45:22
119:21,24
120:3 134:25
137:8,16
198:20
206:17 225:9
247:25
249:14
recognized
226:20
recommended
68:11
record
7:6,9 8:11,
23 11:25
12:1,5 62:23
63:1,5 75:24
76:1,3
106:8,11,15
164:23,24
165:3,6
201:5,6,10
252:1,12,20,
23 253:3
259:7 266:1,
5,7 270:15,
19,22
recorded
7:7,8 104:21
105:3 110:16
204:4
recorder
204:4
Recorder's
110:16
recording
7:14 104:21
105:3
records
108:22
220:12
256:17
refer
144:1 196:18
reference
101:4 170:23
219:20

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    41

referenced
  78:9
referral
  162:15,16
  209:1
referred
  44:22
referring
  128:18
  170:11,12,15
  171:4 179:4,
  7
refresh
  55:23 66:23
  105:11
refund
  208:21
  212:20
regard
  179:9
regarded
  226:11,16
regular
  29:19
Reicher
  75:1
reinserted
  224:21
Reish
  75:1,2
Reisher
  75:2
rejected
  153:19,21
  190:12
related
  8:7
relating
  75:6
relationship
  183:19 197:2
  206:19
  246:13
release
  89:15,19
relied
  99:14,22

100:12
101:15
238:19
religious
  220:16
  226:11,17
rely
  61:13 62:2,
  10,12 77:24
relying
  100:14
remaining
  152:9
remains
  82:24
remember
  13:1,22,23,
  25 14:11
  15:2,7,18
  16:9,21
  19:19,22
  22:25 23:1,
  11 25:10
  26:5 29:18
  30:12 34:9
  35:16,18,19,
  20 36:17,24
  42:14 48:23
  49:3 51:1,2
  55:6,7,17,20
  56:3,7,12
  57:9 59:19,
  20 60:11,15
  63:17,22,24
  64:15,16
  68:9,11,14,
  16 69:23
  72:3 80:19
  81:12,16,20
  85:17 102:19
  103:10
  106:23
  107:11 108:5
  109:6,16
  119:10 123:8
  125:9,18,22,
  23 129:24
  131:14

132:19
135:17
136:21
145:22,24,25
148:4,6
155:19 157:8
162:17,19
170:12,23
171:2,3,19
172:21,22
173:2,7,8
180:6,17
181:16
182:12 185:9
187:19
188:16
191:18,23
192:5,17
194:15
200:17 202:7
206:14
207:9,17
209:8 211:12
213:23
214:18 215:1
218:20
221:3,25
227:13
229:5,6
230:22,23,24
231:5,7,10
233:7,12
236:5 238:7
239:2
241:14,15
242:2,18
248:16,25
249:5,7
251:17
259:20
260:20
262:5,8
264:20 267:8
remembered
  158:19
remind
  94:2 222:17
  232:5 267:9

reminded
  264:10
reminding
  267:8
remote
  7:11,22,24
  8:5,10 34:25
  270:20
remotely
  8:15 23:15
  36:1 45:11
  46:19 51:3
  52:11 64:17
  72:17 83:7
  89:10 104:1
  110:9 111:13
  113:23
  115:17 118:3
  119:11 122:3
  123:25
  134:19
  135:18 140:9
  142:24
  148:17
  154:19 193:4
  194:25 196:8
  198:14
  200:19
  203:20 208:1
  218:22 221:4
  222:1 225:4
  228:6 231:14
  234:12 246:5
  247:19 249:8
  253:14
  254:25
  267:11
removal
  152:8
remove
  7:16 150:17
renew
  226:5 227:7
renewed
  227:11
Rennie
  147:1,3,18,
  21 148:3,9

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                              713-653-7100

Merrie Wycoff
August 26, 2021                              42

175:4

**rent**
167:9,14
233:12,19
234:4 250:11

**renter**
169:11

**renters**
168:9,12,25
169:6

**renting**
114:11

**reorganize**
254:15

**repay**
224:21

**repeat**
9:21 27:1
85:24 160:11

**replies**
152:6 183:16

**reply**
184:6

**report**
256:4

**reported**
152:9

**reportedly**
254:10

**reporter**
8:9,12 9:2,
5,23 10:25
11:15,21
23:17 36:3
45:13 46:21
51:5 52:13
64:19 72:19
75:18 78:14
83:9 88:5
89:12 104:3
107:5 110:11
111:15
113:25
115:19 118:5
119:13 122:5
124:2 134:21
135:20

140:11 143:1
148:19
154:21
183:9,11
193:6 195:2
196:10
198:16
200:21
203:22 208:3
218:24 221:6
222:3 225:6
228:8 231:16
234:14 246:7
247:21
249:10
253:16 255:2
267:13

**reporting**
8:15,21

**reports**
228:4

**represent**
74:15,17
189:12
229:23

**representatio
ns**
148:4

**representativ
e**
149:5 172:12
204:21
239:12

**represented**
147:21
217:9,17
223:8 228:22
245:7

**representing**
73:17,25
105:13 214:4
248:15

**request**
7:9 135:12
141:10 142:5
143:19
234:23

**requested**
26:19 104:21
105:3 135:15
150:12 153:7
228:25 229:3
241:22

**requester**
234:25

**requests**
187:10
188:9,10

**required**
154:2 227:7
241:2 256:3

**requirement**
255:21

**requirements**
153:5 224:4
225:8

**requires**
224:22

**residence**
102:10,15

**residential**
215:20

**resolution**
151:23

**resolve**
173:21 245:8

**respect**
32:23 33:2
97:23 99:10
100:5 115:1
240:22
263:10

**respond**
163:12
164:15
183:23
184:16
243:19

**responded**
145:16 251:4

**responding**
251:6

**responds**
152:23

164:17
169:21
172:23
173:10
180:11
184:15

**response**
16:6,17
130:7,13
172:1
173:11,14
187:6 250:21

**responses**
131:22 188:1

**responsibilit
ies**
98:2 99:13
100:6,7,13,
16,18,20

**responsibilit
y**
96:7,9
98:11,16,18,
20,22,24
99:2,12,15,
21 100:9
163:19 167:4
177:12 226:2

**responsible**
81:6 128:10
258:18

**responsive**
187:9

**rest**
21:6 169:22
170:5,22

**restate**
9:22 98:15

**Restore**
42:4 45:2,3,
9,20,21
46:10,13
47:7,18,22
58:14 70:24
71:4

**restroom**
201:2

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    43

result
  75:10,15
  77:22 246:19
results
  140:7
retain
  52:4
retained
  209:9
retainer
  190:9 209:2,
  3,4,10,15,23
  210:19,25
retainers
  209:14
return
  45:20,21,23,
  25 46:14
  104:22 105:4
returns
  61:3,8,10,
  16,17
  109:18,23
  110:2
reveal
  82:21
revealing
  161:23
revenue
  53:23 63:14,
  18 64:13
  65:1 198:3
  228:22
revenues
  54:1,2
reverend
  26:16
review
  61:23 62:3,
  7,8,16 95:13
  153:4
reviewed
  61:3,7,11
  127:12
Rich
  23:8,22

rid
  160:3 254:15
Ridge
  135:5
right-hand
  7:22 72:24
  83:22 141:3
Right-to-sell
  111:19
RLMR
  75:3,8,16,17
  76:8,17 77:7
road
  32:3
Robert
  93:13 94:4
  96:13
robot
  11:22
Roland
  72:13 75:4
  79:9 89:16
role
  33:2,5 35:19
  42:10,11
  58:10 60:4
rolling
  190:7
room
  8:14 25:11
  27:13 216:1,
  21,22 266:18
rooms
  216:15
Rosa
  23:25 48:16,
  19,20,25
  49:5
Ross
  8:25 9:16
  11:16 75:21
  106:25
roughly
  210:25
  216:10
rug
  242:6

rule
  10:11
ruled
  70:17
rules
  7:2 9:19
run
  130:1 174:13
  201:1
running
  67:10 212:22
runway
  184:8
rushing
  43:10
Russell
  197:3,13,14,
  17 213:12,
  18,24
  261:15,16
  264:4,7,10,
  12,18,21

———————————

S

———————————

sake
  125:11
sale
  101:23 162:8
  175:17
  177:23 199:1
  240:12
  250:7,12
  266:10
sales
  19:25 24:14
  54:7,11
  253:23
  264:5,8
Sanctuary
  15:20 220:2
  261:20 262:4
Sandra
  229:8,15
Sandy
  222:13

Sarah
  110:18
sat
  64:2,9 81:24
  82:5
satisfactory
  99:25
satisfy
  153:5 185:25
scared
  216:4,17
scheme
  66:15,19
  67:10,12
Schenk
  94:12,14
scholarship
  221:16
Schreck
  104:22 105:4
Schroeter
  116:9,20
screaming
  265:9
screen
  7:21 34:17
  93:9,10 95:3
  115:24,25
  126:12
  128:13 136:6
  140:16 142:2
  144:1,3
  145:1
  149:18,23,24
  150:3 186:16
  194:2 195:19
  196:2,20
  198:18
  200:23
  231:23
  234:17,18,21
  247:25 268:7
screens
  7:15
seat
  224:11

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

Merrie Wycoff
August 26, 2021
44

secretary
  47:6 48:12
Section
  114:13
  141:16
security
  250:17
Sedona
  217:13
  218:15 219:4
  220:3,20
  221:9,13,20
  222:7,23
  224:17
  225:21
seize
  176:15
  177:9,13
  185:16
seizing
  177:18
selected
  221:22
sell
  25:10 164:11
  176:10
  241:10
selling
  53:19,23
  176:8 263:22
send
  135:15 162:6
  163:3 169:17
  182:13
  186:23 187:8
  188:12
  192:14,15
sending
  97:11 162:24
sends
  33:21
sense
  24:5
sensitive
  263:7
sentences
  186:6

separate
  89:8
separately
  126:16
separation
  226:21
September
  46:7,8,9
  52:18 53:5
  118:15,23
  119:2
series
  143:5
service
  63:14,18
  64:13 143:8
  152:20 198:3
services
  94:5 97:17
set
  26:7,11
  60:22 99:3,4
  159:2 186:18
  230:15,18,20
  231:7 232:8
  249:22
  268:10 270:6
set all
  255:22 256:1
setting
  7:17 147:25
  230:19 231:2
  233:8
settle
  77:14 79:3
  87:15 92:18
  131:1 173:17
  194:21
settled
  55:17 78:1,
  8,18,21,24
  79:8 87:7,17
  131:20
  183:13,20
settlement
  87:18 89:15,
  20 90:6

91:16 92:12
  130:10
  195:4,7
  198:21,24
  199:2,4,9
settling
  78:22
setup
  216:22,25
seventh
  142:22
severe
  27:17 28:1,5
shape
  177:3 207:23
share
  93:8,9
  115:23 136:6
shared
  93:10
shareholder
  75:5
shareholders
  75:8 76:18
sharing
  115:24
sheet
  141:1 143:15
Sheridan
  259:18
shift
  146:6
shocked
  262:24
  263:14
shoot
  107:3
short
  177:10
  178:14
  181:18
  185:24 186:6
shorter
  86:16
shortly
  170:14

shot
  28:24
show
  35:17 42:15
  81:6 93:5
  94:25 128:11
  134:11
  137:6,7
  144:14
  172:21,25
  173:18,19
  178:11 198:3
  200:22,23
  216:23
  234:11 249:6
showed
  64:4 71:20
  79:14,25
  126:8 172:18
  173:8
  205:11,12
  206:4 216:22
  247:9
showing
  126:22
  144:17,20
  176:23 254:5
shown
  95:13 144:3
  172:19
  173:15
shows
  118:20 124:8
  130:16,24
  250:1 254:9
sic
  29:1 129:12
  131:4,9
sign
  18:25 33:21
  34:2 38:15
  39:23 45:23
  94:8 97:7
  99:1 144:8
  167:25 203:4
  250:5 262:10
signature
  37:25 38:4

EXHIBIT L
U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                    45

45:22 51:15
53:2,3 84:12
93:25 94:1
111:25
112:1,3
116:4 118:10
119:18,21,25
120:4 121:1
122:25
170:21
171:7,15,18
197:1
199:23,25
202:17
204:8,11,24
205:17,21
206:12 220:6
227:19,21
247:1
**signatures**
120:18
202:23
205:13
**signed**
38:6,13,23
39:6,10,12,
18 40:2,7,
14,17 45:25
46:3,4,11,13
47:2,14 53:5
61:17,18
89:19,23
90:2 96:23
98:5,25
99:11 100:8,
21 101:18,24
104:14,17
111:24
112:5,20
117:10 120:9
121:8 122:24
142:14
145:17
152:14 157:8
162:25
189:15,18
194:13
195:7,10,14

196:5,13,25
199:9,13,15,
16,19 200:1,
14 202:12,
15,22 203:2,
6,8 218:14
219:3
220:20,24
235:3,5
246:24
247:10,11
261:24
262:2,12
**signer**
246:21
**signing**
40:8 98:12,
16 163:15
180:8
**Silberberg**
72:12 79:9
**simple**
94:21 108:19
**simpler**
156:15 175:8
260:13
**Simplicity**
48:1 49:17
50:1,6,9
**simplified**
81:4
**simply**
39:8 96:11
251:18
**singing**
184:4
**single**
169:10
**sir**
37:18 62:17
69:5,16
71:14 81:9
95:21 127:20
128:2 140:21
141:18 186:5
242:23

**Sirius**
42:4 49:25
50:12,13,24
51:16 52:1,
5,8,24
53:10,16,18
54:2,13,18
55:1,9 56:4,
9 70:24 71:3
74:18 219:17
**sit**
80:11 252:11
**site**
31:16
**sitting**
42:17 67:22
94:16
**situation**
179:9
**sixth**
142:17,19
144:12
**Skye**
116:8
**slang**
184:14 185:4
**slash**
127:4 133:11
150:6
**slayed**
184:10
**slip**
208:8,12
**slow**
34:24
**Snap**
159:3
**snarky**
172:5
**Soap**
47:25
**softly**
11:20
**sold**
24:6,16,19,
20 49:23
164:12

174:3,18
240:1,6,9
241:13
266:10,13
**sole**
49:12
195:11,13
**solely**
48:21 118:18
**someplace**
192:9 217:12
**sort**
30:3 78:13
93:2 147:5
210:6
**sorted**
192:12
**sorts**
188:18 263:4
**sought**
77:10
**sound**
11:23 16:19
17:4 229:8
**sounded**
239:5
**sounds**
10:8 11:21
54:8 175:1,
20 188:7
243:25 244:7
**source**
82:20
**south**
135:4 191:3
**Southern**
55:22
**Soychak**
114:4 115:3
**space**
216:4,20
**Spain**
203:17
**speak**
24:24 25:2
56:10

EXHIBIT L                U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

46

speaker
7:16 25:15,
24 26:1,3,8,
12 201:19

speaking
24:21,22,24
25:4,12
227:17

special
104:9,17
105:5,9,24

specialists
256:3

specific
25:18 58:19
148:9 155:17
175:2 240:20
251:10 256:3

specifically
13:21 26:5
64:16 80:20
187:7 231:6

spend
133:21
230:14

spent
133:20

spinal
27:12

spiritual
262:21

split
139:17,19

spoke
57:4 264:13

sporadic
225:3

spotlight
7:17

spotlighted
7:15

Stack
129:23
185:12
260:16,19
261:6

stalls
191:14

stamp
206:2

standing
228:2

stands
59:19

Star
58:8

start
10:14 11:2
13:17 26:2
159:9 177:18
190:7 230:1,
3,9,20
245:23

started
9:17 13:23
24:6 85:9
103:19
105:12 179:1
227:23 230:5
244:3

starting
11:5 67:3
103:2 119:19
190:17 244:3
261:13

starts
65:10,24
72:25 136:2
149:13
159:12

state
13:12 15:10,
13,17,25
16:3 17:25
18:5,6 20:19
96:22 109:18
129:6,15,18
130:15
131:16
132:15,21
133:5 187:14
204:21
209:25 210:2
211:10

226:22
229:20 240:9
255:24
260:23
262:3,10,11,
12

statement
8:10 77:17
85:14,19
86:10,15
87:25 88:8,
14 95:9,24
96:3,13
97:2,21
102:4 124:5,
8 125:25
126:19,25
127:1,13
128:19,23
129:7,13,20
130:18,23,24
132:22
133:6,9,24
151:4 152:3
153:7 155:21
156:1,4,8,17
170:16 192:3
250:16

statements
21:16,21,22,
23 22:1
97:24
118:12,22
127:6 130:19
155:22
181:19,24
188:20

States
36:12 55:22
63:9,13 64:6
65:2 70:13,
23 82:4
215:15

stating
8:22

stationery
141:2

status
224:25
225:18 227:2

stay
27:13

stay-at-home
167:3

steady
30:14,17

steal
190:20

steered
267:25

Stefani
114:4

step
156:25 167:5

steps
26:3

Steve
9:3 55:6
103:4 106:6
148:24
150:5,12
151:17
249:15

sticker
144:21

stop
10:10,14,15
56:9,13,15,
18 263:9,12

stopped
56:12,22
59:1

store
215:7

story
25:7 205:9
242:21,23

straight
181:13 182:5
210:2

strange
216:23

street
191:2 192:2

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

47

stress
134:4 186:8
189:9
strike
140:5 245:24
261:25
265:24
stroke
217:6
strong
32:2,14
structure
70:3 167:16
studied
217:22
stuff
30:3 31:7
58:14,15
72:6 103:11
123:17
124:24
131:20
158:19
171:22 180:8
186:9 187:6
188:6,23
215:25 217:2
224:2 254:14
258:25
266:17,18
267:9
subject
76:16 110:22
143:8 150:5
157:17
165:24 222:7
249:18,21
subjects
217:22
submitted
219:8 223:13
submitting
228:4
subpoena
16:6,17
187:25 206:6

subsequently
157:22
substance
82:21
substantial
53:23 75:12
substitute
247:4
subtract
211:17
subtracted
210:14
211:15
Success
23:7,9,22
25:14
successful
167:3
successor
73:22,25
74:2 83:13,
15 85:1,4
89:24,25
sudden
168:15
sued
54:13,18
55:12 56:5
193:23 194:4
suffered
27:9 75:11
suggest
106:7 201:18
suggested
267:2
suggesting
171:13
suggestion
168:3 252:19
suicide
264:23
265:3,7
suing
86:21,24
87:2 240:3
suit
74:12

sum
181:7 222:22
summer
265:12
Summerset
192:2
summons
193:11
196:15
Superior
83:18
supplied
152:10
support
8:6,10 33:8
supported
191:9
supposed
163:15
171:22,23
206:7 209:14
233:22
248:15
surety
132:8,9,10,
17
surf
27:24
surgeries
27:10 140:3
surgery
265:8
surprise
237:17,20
262:20
surprised
197:14
262:19
surrendered
157:22
surveyors
250:9
swing
30:18
switch
26:17 228:9
232:3

switched
221:23
234:19
Switching
217:7
system
254:8
Systems
107:23 108:8

_____

T

tab
196:18
taking
26:2 130:22
153:15
166:18,25
191:7 230:5
talk
10:12 11:19
22:7 26:18
31:25 32:24
44:3 57:12
58:6,20,21
59:8 123:5
147:14 157:3
176:3,13
177:2 186:5
190:6 193:8
202:8 223:23
224:16 232:3
240:11 251:9
talked
32:21 58:2,
5,8,10,11,
12,13,14,19,
23 59:7
122:1 157:7
175:3 189:13
207:12,14
211:8 235:18
248:14
253:10
259:22
263:21
talking

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021

48

59:1,2 73:13
79:24 82:1,8
84:4 88:18
102:18
108:10 148:2
161:8 174:18
199:2 209:20
212:9 213:10
239:6 261:11

**talks**
33:6

**targets**
168:18

**tax**
36:12 37:22
45:20,21,23,
25 46:13
51:11 56:23
57:4 58:4
61:3,8,10,
15,17 63:9,
13,19 64:6,
14 65:2
70:3,13,16,
19,23 71:1
78:4 79:11,
16 80:1,10,
16,20 81:2,
15,21,23
82:4,9,12,22
86:2 88:11
109:18,23
110:2 140:6
241:7 259:10
260:23

**tax-advantaged**
75:6

**taxes**
75:14 76:12,
17 77:14
79:8 80:23
81:1 87:7

**technical**
10:8

**technician**
8:6

**Ted**
207:3,5
208:25
212:9,12,24
213:23 214:5

**telling**
22:6 80:9
81:16 83:4
98:12 129:17
131:23
134:13,16
163:2 168:3
171:6 189:25
223:10
238:17,21,25
243:25 251:5
267:8

**ten**
206:7 224:10
252:3,7

**ten-minute**
62:21

**tenants**
113:5,6,8,
11,12,19
117:19
204:17
250:5,6,15,
22,23 251:5,
7,20

**Tennessee**
94:23,24

**term**
81:4 157:19
184:3

**terminate**
250:8

**terms**
31:14 80:21
103:24
164:7,8
168:14 221:7
235:8 268:18

**terrible**
139:23

**testified**
9:12 56:23
57:1,4

65:15,18,19
66:5,9 68:5
82:5 165:10
197:13
203:17
259:11

**testify**
28:11,19
56:24 67:3,6
69:2 83:2

**testifying**
27:20 57:9
72:2,8

**testimony**
8:18 9:6,11
26:23 27:3,8
65:24 69:7
71:13 72:1
80:15
165:17,22
166:21 198:4

**text**
37:19,22
166:16
174:16
194:22

**Theodore**
206:16,20,
22,24
207:10,22
208:19

**thick**
192:23

**thing**
26:11 58:16
69:1 114:23
134:6 144:5
171:23 184:7
185:4 233:1
234:16
256:23
262:10,12
267:25

**things**
26:7 29:13
32:4 38:16
57:3,17,21
58:24 61:13

62:4 66:11
67:2 69:12
71:18,20
72:3 76:7
96:5 99:6
101:3 149:18
152:6 157:2
165:19
166:23
168:14
187:17 196:3
219:23
241:21
263:20 267:5

**thinking**
128:5

**thinks**
27:10

**thought**
31:19,24
39:13 88:3,7
115:6 117:15
132:10
134:18
160:20
164:7,8
175:17
180:23 182:4
217:6 223:9
241:18
242:20
249:20
263:16

**thoughts**
264:23 265:7

**thousand**
129:22

**thousands**
131:18

**three-point**
210:14

**three-way**
246:3

**threes**
147:19,20
148:2,5,7

**Thursday**
8:1 151:23

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021                                        49

**Tiffany**
  8:9 78:12
  259:4
**tile**
  49:23 59:9
**tile-cleaning**
  50:17 53:20
  56:13
**Tim**
  146:11,13,14
  250:13
  251:11,17
**time**
  8:2,8 11:5
  12:2,5 15:1,
  5 30:13
  47:21 54:17
  62:18 63:2,5
  64:3 68:1,10
  71:19 73:10
  75:25 76:3
  80:10 86:10
  95:21,23
  101:8 102:7,
  11 105:15,
  17,20
  106:12,15
  107:11 109:7
  117:24
  124:25
  129:18
  134:2,17
  139:25
  141:14 145:7
  146:4,20
  148:12,14
  153:12 157:1
  158:13
  163:16
  164:25 165:3
  170:11,12
  173:18 177:7
  178:2,13
  180:15
  185:11
  186:19
  188:16
  195:12

  197:20
  198:1,8
  200:8 201:7,
  10 203:18
  210:10
  214:23,25
  216:8,9
  220:19
  222:23 226:4
  227:10
  228:21
  230:14 234:4
  236:7 239:6,
  18 247:15
  252:2,8,11,
  24 253:3
  258:8,12
  259:5,24
  260:14 261:4
  263:9 265:6
  266:1 270:21
**times**
  27:15 57:5,
  12,13 99:18
  105:21 173:8
  175:14 176:1
  214:12 217:8
  225:13
  229:14
  259:13
**timing**
  214:3 221:7
  230:25
**title**
  23:7 43:13,
  14 46:18
  101:13,19,22
  102:14
  112:10
  124:14,18
  234:10
  235:9,15
  240:7 246:21
**titled**
  51:10 84:7
  90:13 95:8
  120:12 122:9
  125:3,7

  142:5
**titles**
  227:1
**today**
  8:1 42:17
  71:13 72:1,8
  162:25 166:7
  187:4
  189:12,15
  222:14
  224:19
**told**
  57:17,18,19
  58:4 68:12,
  13 70:18
  80:7 81:17
  82:10
  132:10,18
  133:15,21
  134:14
  139:16
  161:16,24
  189:3 211:18
  216:3
  229:16,17,23
  247:22
  255:21
  263:22
  265:23
**tomorrow**
  173:12,14
  175:7
**ton**
  130:2 131:20
  154:3
**top**
  74:14 84:8,
  20 104:24
  155:7
**topic**
  102:20
  159:24 224:7
**topics**
  24:25 25:4,
  18
**Torvund**
  219:19
  261:19,21,22

**total**
  15:4,16
  20:10,15
  155:14
  221:16,19
**totally**
  117:22
**touchy**
  240:5
**trademarks**
  42:1,3,7
**traditional**
  218:17
**Trail**
  135:5
**train**
  31:24 182:4
**trainers**
  190:24
**transaction**
  245:2
**transactions**
  69:5,15,22
  75:7,16 76:8
  154:8 185:8
**Transamerica**
  16:15,18,19
  17:8,11,21,
  24 18:4,7
  19:14 21:9
  52:18,21
  135:1,11,15,
  24 136:3,24
  137:20 139:5
  140:18
  141:23 143:7
  157:20
  187:14
**transcript**
  64:24 65:6
  66:23 69:3
  270:18
**transfer**
  101:19,22
  102:1,14
  139:4 141:9
  142:5 143:18

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                       713-653-7100

Merrie Wycoff
August 26, 2021                                    50

158:10
180:11
194:18
200:15 210:6
234:9,23
235:9,14
239:22,25
240:4 257:1
**transferred**
101:13,23
112:6
113:13,16
117:24
125:12 140:1
158:16 181:6
240:8 262:2
**transferring**
112:10 262:3
**transfers**
249:1
**travel**
146:3
**Treasury**
228:11
231:25
**tremendous**
230:11
**Tri**
58:8
**trial**
36:11,13,15,
19,20,21,25
37:2 63:25
64:1,2 66:5,
17,21 67:23
68:1,2,3
79:17 80:14
81:24 82:5
165:20 243:1
259:11,15,20
**trials**
80:11
**trip**
57:19
**trouble**
267:25

**true**
57:11,14
61:5 92:1
96:11 128:8
130:21
131:5,9,12
158:13
223:24
227:19 240:7
243:5 249:3
**trust**
17:14,18,21
18:14,15,21
19:2,9,18,
21,23,24
20:3,8,9
21:10,17
32:22,23
33:1,3 34:1
41:4 43:12
70:4 102:11,
15 120:13,
14,18,22,23
121:1,2
122:17 132:2
135:8 137:5,
24 139:6
150:23,24
155:23
157:18
158:2,17
181:14,19
182:8 208:20
211:18,21,25
212:2,5,10,
16,20 214:16
215:3
228:16,23
229:2,4
230:1,2,3,6,
13,15,16,19
231:9,11,25
232:14,15,
20,21
235:19,23
236:2,4
238:4
**trusted**

99:7
**trustee**
17:13,17
18:16 19:10,
11 21:1,21
32:21 122:16
136:19
152:10
157:17
181:17 212:7
228:11,23
232:11
**trustee's**
153:4
**trusting**
263:9,12
**trusts**
19:4,11
20:5,11,17,
21,25 123:7
150:17,21
152:2,8
157:17
158:11
181:18 182:7
212:7
230:15,18,20
231:2 232:17
233:3
**truthful**
157:25 158:8
**truthfully**
56:24 57:1
**tuition**
221:17,19
223:1
**tune**
194:10
**tuned**
59:7
**turn**
37:9,13
45:17 51:13
64:20 83:10
84:11 104:4,
6 134:22,23
141:17
149:15

174:3,17
193:7 195:3
200:22
201:16,19
202:24
246:23
255:22
**turned**
73:14
262:22,23
**Turner**
110:19
**two-word**
186:6
**twofold**
165:10
**typically**
127:25

_____

**U**

**U.S.**
8:6,9
**u/a/d**
120:14,23
122:17
150:23,24
**uh-huh**
47:11 116:15
121:10
133:12
136:13 145:4
149:6 182:21
183:4,6,10
184:18
196:23
257:20 261:3
269:3,17
**ultimately**
78:8,18 80:1
87:14 154:4
155:25
161:3,6
194:21
**un-notarized**
205:5

EXHIBIT L                     U.S. LEGAL SUPPORT, INC
                                 713-653-7100

Merrie Wycoff
August 26, 2021                                    51

unable
  28:10,19
  146:3
underneath
  37:19 195:17
undersigned
  47:5
understand
  9:20 14:4
  20:1 40:5
  42:23,24
  43:6 61:20
  62:3 64:11
  70:21 71:21
  80:12,22,25
  81:2 91:5
  97:4 99:2,5,
  24 101:1
  106:18
  115:5,15
  123:2,6
  150:16
  153:21 154:2
  167:1,12,16
  175:13,24
  176:2 177:7
  180:24
  186:11
  201:13 211:5
  220:15
  236:14 240:3
  253:22
  258:16
understanding
  33:17 42:20
  82:13,16,20
  97:16 116:21
  132:14
  165:21 190:2
understands
  62:11
  176:10,24
understood
  70:1 117:22
  121:11 149:9
  156:7,14,22
  176:11 191:8

Unified
  107:23 108:7
Uniform
  194:18 240:4
United
  36:11 55:21
  63:9,13 64:6
  65:1 70:13,
  23 82:4
  215:15
university
  217:13,21
  218:9,12,15
  219:4 220:3,
  20 221:9,13,
  20 222:6,11,
  23 224:17
  225:20
Unlimited
  44:24
unnecessarily
  250:10
unpaid
  75:14
untruthfully
  56:25
unusual
  223:7
update
  265:23
updated
  150:22 151:3
upper
  7:22 65:5
  83:22
UPS
  171:13,14
upside
  268:5
upwards
  57:5
urgency
  173:16
  189:17
UTC
  8:2 12:2,5
  63:2,5 75:25

  76:3 106:12,
  15 164:25
  165:3 201:7,
  10 252:24
  253:3 270:21

_____

V

_____

Vaguely
  106:24
valid
  236:5
valuation
  127:14
valued
  135:11
values
  96:5
vault
  215:12
vaults
  215:11
Vectra
  11:9,12,13
  12:10,24
  14:18 92:2
  124:5 170:8,
  9,16,20
  171:1,6
  208:8 210:4,
  7 213:25
veer
  263:7
Vera
  172:8,11,12
verbally
  8:17 9:11
verified
  126:1
verify
  126:4 199:12
verifying
  171:23
Veritas
  31:1,5,12
  101:14,20
  117:25

  163:13
  167:18
  168:6,22,25
  169:1,3,7,11
  179:14,19
  180:2,4
  232:25 233:2
  245:14,17,25
  246:16
  247:17,22
  249:2 250:17
Veritas'
  248:4
versus
  8:3 64:25
  86:17 169:1
vice-
president
  48:12 49:1
video
  7:14,15,18,
  20 8:5 34:25
video-
recorded
  7:24 270:20
videotape
  270:18
view
  7:16,21
violation
  194:17 240:4
vision
  174:25
visitor
  252:15
voice
  42:22
volume
  201:17,20
  253:9
Voya
  18:11 19:14
  21:5 215:4,
  17

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                713-653-7100

**W**

**Wachovia**
  12:11
**wages**
  258:2
**Wahoo**
  182:18
**wait**
  10:15 32:24
  57:25 69:10
  173:20 174:9
  267:23
**waited**
  245:9
**waive**
  8:20
**wake**
  186:11
**walk**
  215:7
**wanted**
  24:21,24
  25:2,19,23,
  25 26:15
  30:19 50:10
  58:23 92:18,
  20 139:11,16
  153:24,25
  154:1,13,16
  156:18
  160:2,3
  161:7,12
  173:4 189:19
  190:3,4
  191:8,11
  245:12
  262:9,13
  267:4,10
  268:1
**wanting**
  265:3
**warranty**
  104:9,17
  105:6,9,24

**Washington**
  226:10
**wave**
  260:17,19
  261:7
**ways**
  68:15 108:21
  176:1
**wealth**
  164:2,8
**wearing**
  216:3
**weather**
  94:23
**website**
  31:3,16
**week**
  29:20,25
  151:16
  254:10,17
  258:22
**weeks**
  71:14
**Wells**
  13:2,5
**werking**
  183:25
  184:7,11
**West**
  107:23 108:8
**Whatsapp**
  159:4,5,6,9
  160:14 163:7
  186:19
  190:16 231:1
  268:11,18
**whatsoever**
  42:21
**widely**
  68:18
**wife**
  58:2
**Williams**
  114:4 115:3
**wills**
  237:24 238:2
  265:20,21,23

**window**
  177:10
  178:14
  185:25
**wire**
  124:13 210:6
  234:8 235:14
  249:1
**wishes**
  32:15
**withdrawals**
  256:18
**witness's**
  7:20
**witness-only**
  7:14
**witnessed**
  205:21
**Wolf**
  73:17,24
  74:3,16,25
  77:7 79:4
  83:24 85:11
  87:13,24
  103:7
  207:19,21,
  22,24
**woman**
  54:17
**woman-owned**
  50:10
**won**
  81:17
**word**
  31:18 190:25
  192:17,19
  208:25 213:5
  230:12
  239:25
**words**
  80:20 115:16
  264:14
**work**
  28:20 29:5,
  13,25 30:7,
  14,19 31:19
  32:6 103:21

  105:17,20,25
  167:12
  184:9,11
  188:23
  207:10
  209:17
  213:17
  223:15
  224:15
  253:11
**worked**
  28:21 103:24
  158:9 182:24
  224:8 258:22
**working**
  230:2,3
  254:10,17,23
  255:5,7
  256:5,7
**Works**
  48:1
**worry**
  25:22
**worst**
  265:8,11
**worth**
  128:1 131:18
  241:8,18
  264:15
  266:20
**wraps**
  88:25
**write**
  25:7 125:13
  168:5,6
  172:17
  173:22 174:2
  178:25
  179:14
  182:15
  183:12
  189:11,21
  190:19
  209:18
  233:18
**writes**
  33:19 74:16,
  25 77:7

EXHIBIT L                    U.S. LEGAL SUPPORT, INC
                                  713-653-7100

97:15,20
151:19
164:15 175:6
186:22

**writing**
25:6 169:3,4
224:6 238:24
248:22,24

**written**
14:18 69:4,
14,21 125:20
157:16
208:19 214:1
233:14 234:2
238:16,21

**wrong**
22:20 45:16
133:2 145:18
193:14 252:6
267:25

**wrongful**
54:14,18
55:3,13 56:5

**wrongfully**
77:23 79:10
86:12

**wrote**
24:21 25:1
87:13 145:6
150:11 169:6
199:21 213:5
230:21
233:11,16
234:4 250:1

**Wycoff**
7:25 8:4
9:5,10,16,24
10:23 11:4,
7,11 12:7,9,
23 15:5
17:14 18:15
20:4 21:2,3,
17 22:23
26:18 27:2
29:14,19,24
30:8,14,25
32:22,23
33:1,2,3

35:15,23
37:1,5 38:7
42:5,21,25
43:15 47:14
48:8,22
50:6,20 53:6
55:8 56:16,
23 57:5,11,
14,22 58:5,
7,22 59:12,
17,20 60:16,
20 61:5
63:7,15,19
64:14,25
69:4,14,22
70:3,12,17,
22 71:2,12
72:11,25
73:18,20,25
74:10,11,15,
17,19,25
75:5,10,11
76:13,15,20
77:2,3,8,9,
23 78:13
79:10 80:2
81:8,14
82:4,10,12
83:13,14
84:3,8,9,18
85:9,21
86:2,13,21
88:22 89:2,
5,24,25
90:19 91:1,
6,9,24 92:3,
6,8 93:3
95:9 97:12,
16,22 98:16
100:4,15
101:10,11,
14,19,25
102:6,11
104:10,11,
12,14 105:9,
13,18 106:1,
3,4,17
108:11,13,16
109:1,4,5,9,

10,13,17
110:3,20
111:4,20
112:6,10,22
113:13,14,
16,20 114:3,
14,20,23
115:4,5,8,
10,15,24
116:8,17,22
117:13,17,
19,23 118:1,
8,14,16
119:2,3,8,
15,22,25
120:5,9,13,
14,22 121:4,
13,14
122:10,15,
16,17,22
123:17,20
125:3,8,14,
21 126:5
127:1,6
128:19,22,24
129:25
131:8,21
134:23
135:7,24
136:3
137:23,24
138:4,13
139:6,13
140:18
142:15 143:7
144:9,16
145:23 146:1
150:6,13,22,
23,24 154:7
156:9,19
158:11
159:2,3
160:9 161:22
164:6,14,17
165:10
166:2,3,17
172:23
173:10
175:6,7

180:20
181:18
183:16
184:15,19
187:15
188:21 192:4
194:4,13,17
195:11,17,
22,23 196:13
197:15,18
199:10,15,17
201:12
202:11
203:17
204:25
205:5,18
206:9 207:7
213:20 214:2
217:8 218:4
228:12,15
230:1,6,15,
16 231:25
232:14,20,21
234:18,25
235:18
239:17
242:21
243:12 245:1
246:19
251:18
254:10,22
255:6,11,12
257:9,12,15,
18,19,22
258:3 259:9,
23 260:5,6,
10 263:6,10,
22 264:15,
22,23 266:9
268:7,11
270:11,21

**Wycoff's**
22:10,13,16
53:3 61:1,7
63:9 76:23
77:18 78:19
79:21 102:16
107:1 112:3
118:17

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100

Merrie Wycoff
August 26, 2021
54

119:21,25
120:17
138:10
166:23
173:14
187:2,8,23
188:2,14,22
204:11
205:16
206:12
207:1,2,6
235:24 236:3
239:23
260:14
264:13

---

**Y**

**year**
23:1 28:17
45:20 55:15
56:15,18,21
68:16 81:9,
12 109:22,24
112:5 113:15
138:6
145:22,24,25
233:15
254:11
**yearly**
220:10
**years**
24:15 34:6
42:4 63:20
67:16,18
72:4 110:5,8
190:24 198:2
206:7 212:25
224:13
254:14 256:1
265:4
**yellow**
59:25 114:11
144:23
**York**
30:17 179:22
180:7 229:7,
19,22,24

231:4
245:15,22
247:8,11
**younger**
218:5

---

**Z**

**Zap**
23:6,8,22
25:5,13
49:21,23
50:17 53:20
54:23 55:10,
25 56:2,10,
13 58:13
59:6 60:6,
12,18,19,25
61:3,6,15,
22,25 62:6,
8,15 71:11
91:7,8
120:8,11
121:17,20
122:13
123:20,23
124:5 125:20
126:8,16,19,
25 127:14,16
136:12 141:1
194:7,9
195:21
196:16
200:1,4
253:12,19,23
254:1,11,14,
23 255:4,8,
12,17
256:14,25
258:2,23
261:17
**Zap's**
185:24
**zoom**
93:20

EXHIBIT L

U.S. LEGAL SUPPORT, INC
713-653-7100