Edward Certisimo
June 24, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03242-KLM

_____

VIDEOTAPE DEPOSITION OF:
EDWARD J. CERTISIMO - June 24, 2021
(via RemoteDepo)

_____

MIDLAB, INC., a Tennessee Corporation,

Plaintiff,

v.

ZAP! PRODUCTS, INC., a Colorado Corporation;
MERRIE PISANO WYCOFF, individually and as trustee of
The Wycoff Family Trust; WYCOFF FINANCIAL, LLC, a
Colorado Limited Liability Company; MAGNUS VERITAS
LLC, a Colorado Limited Liability Company; and
GCS452, LLC, a Colorado Limited Liability Company,

Defendants.

_____

PURSUANT TO NOTICE, the videotape
deposition of EDWARD J. CERTISIMO was taken on behalf
of the Plaintiff in Sarasota County, Florida, by remote
means, on June 24, 2021, at 9:05 a.m. MDT, before Gail
Obermeyer, Registered Professional Reporter and Notary
Public within Colorado, appearing remotely from Douglas
County, Colorado.

EXHIBIT M       U.S. Legal Support | www.uslegalsupport.com

Edward Certisimo
June 24, 2021

**Page 2**

```
1                    REMOTE APPEARANCES
2  For the Plaintiff:
3            AARON D. GOLDHAMER, ESQ.
             Keating Wagner Polidori Free, P.C.
4            1290 Broadway, Suite 600
             Denver, Colorado 80203
5            Email:  agoldhamer@keatingwagner.com
6
   For the Defendants:
7
             STEVEN ABELMAN, ESQ.
8            Brownstein Hyatt Farber Schreck, LLP
             410 17th Street, Suite 2200
9            Denver, Colorado 80202
             Email:  sabelman@bhfs.com
10
11 Also Present:
12           Cole Bartelt, Remote Video Technician
             Rachel Levine
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
1              I N D E X (Continued)
2                                          INITIAL
   DEPOSITION EXHIBITS:                   REFERENCE
3
   Exhibit 13  Fax cover sheet to TransAmerica      26
4              from Certisimo, 5/18/15, Re:
               Change of Beneficiary/Ownership,
5              with attachments
6  Exhibit 14  Letter to Certisimo from            30
               Transamerica Customer Contact
7              Center, 4/22/09, Re:  Certificate
               #VXL9663080, with attachment
8
   Exhibit 15  Flexible Premium Survivorship        33
9              Adjustable Life Insurance Policy
               pertaining to Jeffrey B. and
10             Merrie P. Wycoff, 3/6/04
11 Exhibit 16  Letter to Certisimo from John        35
               Hancock Customer Service Center,
12             2/9/11, Re:  Policy No. 58909292,
               with attachments
13
   Exhibit 17  John Hancock, Request for Policy     36
14             Surrender, 2/28/11
15 Exhibit 18  Letter to Certisimo from John        38
               Hancock Policy Disbursement Team,
16             3/25/11
17 Exhibit 19  Manulife Financial, Absolute/Gift    39
               Assignment - Life Insurance,
18             12/3/03, with attachments
19 Exhibit 20  John Hancock, Change of Ownership    41
               (Absolute Assignment), 4/2/13,
20             with attachment
21 Exhibit 21  Email to Certisimo from Jeff         51
               Wycoff, 11/10/17, Subject:  Part 3,
22             with attachments
23 Exhibit 22  Email to Certisimo from Jeff         56
               Wycoff, 10/10/17, Subject:  Clean
24             Copies, with attachments
25
```

**Page 3**

```
1                  I N D E X
2  EXAMINATION OF EDWARD J. CERTISIMO:       PAGE
   June 24, 2021
3
   By Mr. Goldhamer                            8
4
   By Mr. Abelman                            102
5
6                                          INITIAL
   DEPOSITION EXHIBITS:                   REFERENCE
7
   (Exhibits provided electronically to the
8  reporter.)
9  Exhibit 7   Subpoena to Produce Documents,    9
               Information, or Objects or to
10             Permit Inspection of Premises
               in a Civil Action to Edward
11             Certisimo, 4/6/21, with
               attachments
12
   Exhibit 8   Letter to Goldhamer from         10
13             Certisimo, undated, Re:  Midlab,
               Inc. v. Merrie Pisano Wycoff
14
   Exhibit 9   Irrevocable Trust Agreement of   18
15             the Jeffrey Wycoff and Merrie
               Wycoff 2003 Insurance Trust,
16             between Jeffrey Wycott and
               Merrie Wycoff and Edward
17             Certisimo, 12/15/03
18 Exhibit 10  Irrevocable Trust Agreement of   19
               the Jeffrey Wycoff 2003 Insurance
19             Trust, between Jeffrey Wycoff and
               Edward Certisimo, 12/15/03
20
   Exhibit 11  Irrevocable Trust Agreement of   20
21             the Merrie Wycoff 2003 Insurance
               Trust, between Merrie Wycoff and
22             Edward Certisimo, 12/15/03
23 Exhibit 12  Transamerica, Beneficiary        21
               Designation of Life Insurance
24             Policies, Policy No. 41643514,
               3/14/04, with attachments
25
```

**Page 5**

```
1              I N D E X (Continued)
2                                          INITIAL
   DEPOSITION EXHIBITS:                   REFERENCE
3
   Exhibit 23  Email to Jeff Wycoff from         61
4              Certisimo, 11/10/17, Subject:
               Transamerica Forms, with
5              attachments
6  Exhibit 24  Action by Written Consent of the  75
               Trustee of The Jeffrey Wycoff
7              and Merrie Wycoff 2003 Insurance
               Trust and The Merrie Wycoff 2003
8              Insurance Trust, 5/12/15
9  Exhibit 25  Reaffirmation, Ratification, and  84
               Acknowledgment of Guarantor,
10             unsigned, undated
11 Exhibit 26  Email to Certisimo from Jeff      85
               Wycoff, 12/6/17, Subject:
12             Signature pages, with attachments
13 Exhibit 27  Email to Jeff Wycoff from         87
               Certisimo, 12/7/17, Subject:
14             Notarized Docs, with attachments
15 Exhibit 28  Email to Merrie Wycoff from       90
               Certisimo, 12/15/17, Subject:
16             RE: Trust Certification signature,
               with email attached and attachment
17
   Exhibit 29  Letter to Henke from Certisimo,   93
18             6/15/18, Subject:  Jeffrey and
               Merrie Wycoff 2003 Insurance Trust,
19             Merrie Wycoff Insurance Trust
20 Exhibit 30  Transamerica, Collateral          98
               Assignment Policy 41643523,
21             5/25/15
22
23
24
25
```

Edward Certisimo
June 24, 2021

Page 6

1       WHEREUPON, the following proceedings
2   were taken pursuant to the Federal Rules of Civil
3   Procedure.
4           *     *     *     *     *
5           THE VIDEOGRAPHER:  Good morning.  We are
6   now on the record.  Participants should be aware that
7   this proceeding is being recorded, and as such, all
8   conversations held will be recorded, unless there is a
9   request and agreement to go off the record.  Private
10  conversations and/or attorney-client interactions
11  should be held outside the presence of the remote
12  interface.
13          For the purpose of creating a witness-only
14  video recording, the witness is being spotlighted or
15  locked on all video screens while in speaker view.  We
16  ask that the witness not remove the spotlight setting
17  during the deposition, as it may cause other
18  participants to appear on the final video, rather than
19  just the witness.  For anyone who doesn't want the
20  witness's video to take up the large part of your
21  screen, you may click the gallery view button in the
22  upper-right corner of the RemoteDepo interface.
23          This is the remote video-recorded
24  deposition of Edward Certisimo, being taken by counsel
25  for the plaintiff.  Today is Thursday, June 24, 2021.

Page 7

1   The time is now 3:05 p.m. in the UTC time zone, or 9:05
2   a.m. Mountain Time.  We are here in the matter of
3   Midlab, Inc. versus ZAP! Products, Inc., et al.
4           My name is Cole Bartelt, remote video
5   technician on behalf of U.S. Legal Support, located in
6   Denver, Colorado.  I am not related to any party in
7   this action, nor am I financially interested in the
8   outcome.  At this time will the reporter, Gail
9   Obermeyer, on behalf of U.S. Legal Support, please
10  enter the statement for remote proceedings into the
11  record.
12          THE REPORTER:  The attorneys participating
13  in this deposition acknowledge that I am not physically
14  present in the deposition room and that I will be
15  reporting this deposition remotely.  They further
16  acknowledge that, in lieu of an oath administered in
17  person, the witness will verbally declare his testimony
18  in this matter is under penalty of perjury.  The
19  parties and their counsel consent to this arrangement
20  and waive any objections to this manner of reporting.
21  Please indicate your agreement by stating your name and
22  your agreement on the record.
23          MR. GOLDHAMER:  This is Aaron Goldhamer
24  for plaintiff, and I so agree.
25          MR. ABELMAN:  Steve Abelman on behalf of

Page 8

1   defendants.  I consent.
2           THE REPORTER:  And, Mr. Certisimo, do you
3   declare that your testimony in this matter is under
4   penalty of perjury?
5           THE DEPONENT:  I do.
6           THE REPORTER:  Thank you.
7           EDWARD J. CERTISIMO,
8   having verbally declared his testimony in this matter
9   is under penalty of perjury, testified as follows:
10              EXAMINATION
11  BY MR. GOLDHAMER:
12      Q.   Good morning, Mr. Certisimo.  How are you
13  today?
14      A.   Good, Aaron.
15      Q.   Good.  You mentioned that you were
16  retired.  But when you were working, what was your
17  profession?
18      A.   I was a corporate executive; mostly
19  finance, but I've done information technology
20  contracts, operations.
21      Q.   Okay.  And do you live in Florida right
22  now?
23      A.   I do.
24      Q.   How long have you lived in Florida?
25      A.   This will be my sixth year or seventh.

Page 9

1   I'm not sure.  I think I retired the end of '90 -- of
2   '14, so the end of '20 would be six.  I'm in my seventh
3   year.
4       Q.   Did you live in Illinois and Georgia
5   before that?
6       A.   I lived in nine states and Germany.
7       Q.   Okay.  Did you ever live in Colorado?
8       A.   I did not.
9       Q.   I'm going to share my screen with you, and
10  hopefully that will be something that you can see and
11  know what I'm talking about.  So can you see --
12      A.   I can.
13      Q.   -- this subpoena?
14      A.   I do.
15      Q.   And did you receive this subpoena in this
16  case?  And I can scroll --
17      A.   I received the subpoena, you know.  And it
18  requested that I give you everything in writing,
19  whatever, and everything else, yes.  If that's the
20  subpoena, then, yes.
21          MR. GOLDHAMER:  Okay.  We're going to mark
22  this as Exhibit 7.
23          (Deposition Exhibit 7, remotely introduced
24  and provided electronically to the court reporter.)
25      Q.   (BY MR. GOLDHAMER)  And at the end of the

Edward Certisimo
June 24, 2021

Page 10

1   subpoena, there's sort of a description of what we
2   asked you to provide.  Do you see that?
3       A.   Right.
4       Q.   Okay.
5       A.   Yup.
6       Q.   And then in response to that subpoena, you
7   sent some documents, correct?
8       A.   Documents and emails.
9       Q.   Documents and emails.  And you also sent
10  me this cover letter --
11      A.   Right.
12      Q.   -- correct?
13           MR. GOLDHAMER:  We'll mark this cover
14  letter as Exhibit 8.
15           (Deposition Exhibit 8, remotely introduced
16  and provided electronically to the court reporter.)
17      Q.   (BY MR. GOLDHAMER)  And in the first
18  sentence of your -- the second sentence of your letter,
19  you state that, "Please be aware that the trustee
20  relationship spanned almost twenty years."  Do you see
21  that?
22      A.   Uh-huh.
23           THE REPORTER:  Is that a yes,
24  Mr. Certisimo?
25           THE DEPONENT:  That is.

Page 11

1       Q.   (BY MR. GOLDHAMER)  And the trustee
2   relationship that you're talking about was for trusts
3   that related to the Wycoff family; is that correct?
4       A.   Yes.
5       Q.   And the trustee relationship was for how
6   many different trusts for the Wycoff family?
7       A.   Three.
8       Q.   That included the Jeffrey B. Wycoff and
9   Merrie Wycoff 2003 Insurance Trust?
10      A.   Correct.
11      Q.   And the Merrie Wycoff 2003 Insurance
12  Trust?
13      A.   Correct.
14      Q.   And the Jeffrey Wycoff 2003 Insurance
15  Trust?
16      A.   That is correct.
17      Q.   Were there also 1999 insurance trusts?
18      A.   Not that I'm aware of.
19      Q.   Was there a separate Wycoff insurance
20  trust, generally, that didn't have Merrie or Jeff in
21  the name?
22      A.   Their insurance trust?  No, not that I'm
23  aware of.
24      Q.   So you were only trustee of three
25  different trusts for the Wycoffs, correct?

Page 12

1       A.   That is correct.
2       Q.   Now, in your letter you state that,
3   ". . . the administration of the insurance and the
4   actual policies" were -- "was performed by the deceased
5   or his legal representation."  Do you see that in your
6   letter?
7       A.   Yes.  I'm not reading it very clearly, but
8   I did put that in the letter.
9       Q.   Let me blow it up a little bit.
10      A.   There you go.  Thanks.
11      Q.   Does that help?
12      A.   Yeah.  You got to remember, I'm old.
13      Q.   Okay.  So you see that in the letter you
14  wrote, ". . . the administration of the insurance and
15  the actual policies was performed by the deceased or
16  his legal representation."  Do you see that?
17      A.   Correct.  Yes, I do.
18      Q.   By "the deceased," did you mean Jeffrey
19  Wycoff?
20      A.   Yes, I did.
21      Q.   And you wrote that the administration of
22  the policies -- or you wrote that foregoing statement
23  about the administration of the policies, because you
24  weren't substantively involved with the policies; is
25  that right?

Page 13

1       A.   That is correct.
2       Q.   And you weren't substantively involved
3   with the insurance companies that issued the policies,
4   correct?
5       A.   That's correct, other than filing forms or
6   whatever, as I had to do for -- as a trustee.
7       Q.   And you weren't involved in the
8   application for the policies?
9       A.   No, not at all.
10      Q.   And you didn't have copies of the
11  policies?
12      A.   I did not.
13      Q.   And you didn't have to deal with paying
14  premiums for the policies?
15      A.   I did pay them -- when they were first
16  established in 2003, I was requested to set up a bank
17  account and to pay the -- pay the premiums.  That
18  lasted about six months.  They never put any assets
19  into the -- into the trust, so every month I would have
20  to call the lawyer and have money transmitted.  And
21  then -- then I would pay.  And then we were paying fees
22  to the bank, because there were no -- there was no
23  money in it, other than, you know, what was required to
24  keep the account open.
25           And finally, after about six months, the

Edward Certisimo
June 24, 2021

Page 14

1  lawyer who I -- was Barry Marlin at the time, basically
2  stated, "I'll just do this myself."  And since then --
3  so that was -- you know, that was in the middle of
4  2004 -- they've been paying all the premiums and
5  everything else.
6      Q.   So it was pretty hands-off for you after
7  that point?
8      A.   Right.
9      Q.   And did you actually write the insurance
10 companies to tell them they could deal with other
11 people, like Barry Marlin or Jeff Wycoff, with respect
12 to the policies?
13     A.   No, not at all.  They would initiate what
14 they wanted to do.  And then as you saw in some of the
15 emails or whatever, they -- they would send me the
16 document to sign, and I would send it back.  So that is
17 basically how I was involved.
18     Q.   And so you actually did very little for
19 the trusts when you were a trustee, right?
20     A.   Exactly.  And, you know, I was working,
21 like, 70 hours a week, so . . .
22     Q.   Okay.  So that's why you wrote the next
23 few sentences in this letter to me.  "I never had the
24 policies in my possession, nor did I make a [sic]
25 premium payment [sic].  I acted as trustee for the

Page 15

1  convenience of a relative," correct?
2      A.   That's correct.
3      Q.   And so which relative were you referring
4  to?
5      A.   Jeffrey.  He's my cousin.  And he
6  actually -- he and his mother lived with our family for
7  a long time when we were children, because his -- well,
8  whatever.
9      Q.   Well, go ahead.  Do you want to explain
10 why?
11     A.   Well, just his mother was divorced.  And
12 at the time, 50 years ago, that wasn't accepted.  And
13 so she had nothing -- nowhere to go or whatever.  And
14 my parents took her and Jeffrey in, and we kind of grew
15 up together for, you know, several years, until she got
16 herself established.  So Jeff and I were pretty close.
17     Q.   So can you -- your -- Jeff's parents -- or
18 was Jeff's mom related to your family, or was Jeff's
19 dad related to your family?
20     A.   Jeff's mother was my mother's sister.
21     Q.   Okay.  And the -- your mother's name was
22 what?
23     A.   Harriet.  Harriet -- her final name,
24 because my father divorced her, was Harriet DeMarco.
25     Q.   And then Harriet was sister to Jeff

Page 16

1  Wycoff's mother?
2      A.   Correct, Miriam.
3      Q.   Miriam.  And what is her full name?  Do
4  you know?
5      A.   Miriam, I think her middle initial may be
6  B, Wycoff.  She was married several times, also.
7      Q.   Now, this phrase, "for the convenience of
8  a relative," by that, do you mean you were basically
9  just doing Jeff a favor?
10     A.   Basically, yes.
11     Q.   Okay.  Anything else that -- that you can
12 explain about that phrase, "for the convenience of a
13 relative"?
14     A.   No.  Jeff always -- because I was an
15 executive and a financial executive, Jeff always looked
16 toward me to almost help him.  In the beginning of his
17 businesses, way back in the early 2000s, he would rely
18 on me to look at contracts and the like and -- and
19 everything else.
20          Once he got established and had
21 accountants and lawyers, you know, I wasn't really
22 there anymore.  And because I was so busy with my work,
23 you know, Jeff kind of let me be.  You know, he didn't
24 want to impose upon me.  So that's when -- you know,
25 actually, we didn't even stay in touch all that well

Page 17

1  after that.  We talked maybe once every two months or
2  so.
3      Q.   Okay.  So the favor that we've been
4  describing that you did for Jeff Wycoff, it really
5  didn't take much work from you?
6      A.   No.  I would sign something.  I would
7  either take it to FedEx and -- if they needed the
8  original copies, or I would scan it and email it to him
9  if they didn't need the original copies.
10     Q.   You were sort of trustee and in name only,
11 because he or his agents were taking care of the
12 administration of the insurance?
13     A.   Right.  I would have imagined if I
14 ended -- if the trust ended up having to be dissolved,
15 I would have been more active.  But the administration
16 of it through its time, I didn't do much of anything.
17     Q.   In your letter you wrote, ". . . and the
18 actual policies was performed by the deceased or his
19 legal representation."  That was after the statement
20 about administration.  Can you explain what you meant
21 by, "the actual policies was performed by"?
22     A.   Did I actually write in poor -- poor
23 grammar like that?
24     Q.   Well, that's what -- I'm not going to
25 judge.  I'm just trying to understand.

Edward Certisimo
June 24, 2021

Page 18

1    A.   I guess I should have proofed it a little
2  better.  "Furthermore, as you review the information
3  you will come to notice that the administration of the
4  insurance and the actual policies" -- should have been
5  "were" -- "performed by the deceased or his legal
6  representative [sic]."
7        And what I meant by that, when you started
8  looking at it and you went through my emails, you would
9  see that the communication with me wasn't substantial
10  at all.  It was, "Hey, we're going to do this, sign
11  this piece of paper."  And that's what I really meant
12  by that.  And he and his representation, whoever he was
13  getting advice from -- I would think it would be his
14  lawyer -- would actually be doing all the actual
15  administration.
16        Q.   So basically, they would just sort of tell
17  you what they wanted to do, and you would do it?
18        A.   Correct.
19        MR. GOLDHAMER:  I'm bringing up what we're
20  going to mark as Exhibit 9.
21        (Deposition Exhibit 9, remotely introduced
22  and provided electronically to the court reporter.)
23        Q.   This is a document you sent me that was
24  titled the "Irrevocable Trust Agreement of the Jeffrey
25  Wycoff and Merrie Wycoff 2003 Insurance Trust."  Do you

Page 19

1  see that?
2        A.   I do.
3        Q.   Was this the trust instrument?
4        A.   Yes.
5        Q.   Okay.  And it's about 40 pages.  You know,
6  I can scroll through it.  It looks familiar as the
7  trust instrument, to you?
8        A.   Yes.
9        Q.   Okay.  And near the back of it on this
10  page that I'm looking at right now with 34 on the
11  bottom, you see that Merrie Wycoff's signature is on
12  there?
13        A.   I do.
14        Q.   And that's your signature above it?
15        A.   That is correct.
16        MR. GOLDHAMER:  Okay.  I'm going to bring
17  up another document that we'll mark as Exhibit 10.
18        (Deposition Exhibit 10, remotely
19  introduced and provided electronically to the court
20  reporter.)
21        Q.   (BY MR. GOLDHAMER)  Do you recognize this
22  as a document you sent me, the "Irrevocable Trust
23  Agreement of the Jeffrey Wycoff 2003 Insurance Trust"?
24        A.   I do.
25        Q.   Okay.  And this was the trust instrument

Page 20

1  for that trust?
2        A.   It is.
3        Q.   Okay.  And on page 36, that's your
4  signature?
5        A.   That is.
6        MR. GOLDHAMER:  Okay.  We'll mark as
7  Exhibit 11 this next document, "Irrevocable Trust
8  Agreement of the Merrie Wycoff 2003 Insurance Trust."
9        (Deposition Exhibit 11, remotely
10  introduced and provided electronically to the court
11  reporter.)
12        A.   Yes.
13        Q.   (BY MR. GOLDHAMER)  Do you recognize this
14  as the trust instrument from your files?
15        A.   I do.
16        Q.   Okay.  And do you see a page 36?  Is that
17  your signature?
18        A.   It is.
19        Q.   And below that is Merrie Wycoff's
20  signature?
21        A.   It is.
22        Q.   Okay.  I want to ask you about which --
23  what kind of insurance policies these trusts actually
24  had.  Are you familiar with these trusts having
25  Transamerica insurance policies?

Page 21

1        A.   Definitely Transamerica.
2        Q.   Were there also John Hancock policies?
3        A.   Yes.
4        Q.   And were you aware that Manufacturers Life
5  Insurance was essentially bought by John Hancock, and
6  that some of the policies may have originated with
7  Manufacturers Life and then were transferred in to John
8  Hancock?
9        A.   I wasn't aware that that happened, but
10  I -- you know, in the recent past, I -- I remembered
11  there was another insurance company, but I didn't know
12  that's how it kind of got consolidated.
13        Q.   Well, were there any other additional
14  insurance companies that you can think of that were --
15  that had policies that were owned by the trusts or
16  involved the trusts; like Voya or ING?
17        A.   No, not that I'm aware of.  It was really
18  just the three that you mentioned that became two.
19        MR. GOLDHAMER:  Okay.  I'm just going to
20  close some of these exhibits here and show you a new
21  one that we're going to call Exhibit 12.
22        (Deposition Exhibit 12, remotely
23  introduced and provided electronically to the court
24  reporter.)
25        Q.   (BY MR. GOLDHAMER)  Now, this document

Edward Certisimo
June 24, 2021

Page 22

1 came from Transamerica's files.
2      A.   Okay.
3      Q.   You see that your name is listed as
4 trustee of the Jeffrey and Merrie Insurance Trust, the
5 2003 Insurance Trust.  Do you see that?
6      A.   I do.
7      Q.   Okay.  And you see that the policy number
8 is 41643514?
9      A.   I do.
10     Q.   So to try to save time, I'll try to just
11 refer to the last three numbers of the policy.  So
12 this would be the 514 policy.  Do you see that the
13 beneficiary is listed as you or your successor as
14 trustee of the Jeff and Merrie 2003 Insurance Trust?
15 Do you see that?
16     A.   I do.
17     Q.   Okay.  And you see your signature
18 underneath here (indicating)?
19     A.   Uh-huh.
20     Q.   And that's a yes?
21     A.   There I go again.  Yes.
22     Q.   That's all right.  Since this wasn't in
23 your files, do -- do you know -- do you know why this
24 wasn't in your files?
25     A.   Do you have a date on it?  I'm showing

Page 23

1 Hammonds Ferry, so it was 2003 while I was in Augusta,
2 Georgia -- oh, 2004.  Okay.
3      Q.   I mean, I understand --
4      A.   I was transferring right then from Georgia
5 to Illinois, so I might have been in Illinois and Patty
6 might have been in Georgia.  And I was in Georgia when
7 I did this.
8      Q.   Okay.
9      A.   Yes, I see my signature.  And why it
10 wasn't in there was basically because I probably
11 changed computers three or four times and lost
12 documents.
13     Q.   Understandable.  And you see the next page
14 is still this 514?
15     A.   Correct.
16     Q.   Let me -- yeah.  It's still this 514.  It
17 refers to, you know, basically a verification of
18 this -- of the trust.  And do you see your -- your
19 signature is on the bottom here?
20     A.   Yes.
21     Q.   There's reference to a current owner,
22 Edward Certisimo, Trustee of the Wycoff Insurance
23 Trust, dated 7/20/1999.  Was that a different trust
24 that you were trustee for?
25     A.   You know, I probably read the insurance

Page 24

1 trust, but I've never seen a document dated 1999.  The
2 only ones I've seen or had any possession of were the
3 three that I provided to you.  So that may have been
4 something that, at the time, Barry Marlin had done with
5 Jeff in his estate planning or whatever.  And when they
6 finally -- how could they -- I don't remember.  I'm
7 sorry.  But it says that I'm the trustee, so I had to
8 have signed it.
9      Q.   I guess, to the best of your memory, do
10 you recall agreeing to serve as trustee for the Wycoff
11 Insurance Trust, dated 7/20/1999, before the other 2003
12 insurance trusts that we looked at?
13     A.   I don't, unless I became -- maybe I was --
14 I don't know.  I'd be speculating.  I don't recall.
15     Q.   Okay.  Do you remember when you first
16 started serving as a trustee for Wycoff-related trusts?
17     A.   You know, I don't.  I -- I picture myself
18 in my Indiana home, which was before 2001.  So maybe I
19 did sign that.  I remember, because I had a nice study.
20 I actually had to look at the trust documents to
21 understand the time frame, because I had moved so much,
22 my chronology is very difficult in my head.
23     Q.   Well, I know this is a trip down memory
24 lane here, so we'll do the best we can.
25     A.   Okay.

Page 25

1      Q.   Do you ever recall any conversations with
2 the Wycoffs about why they would need to change their
3 trust situation from a 1999 trust to a 2003 trust?
4      A.   No, I -- I don't know.  It's most likely
5 the lawyers thinking that it --- there was a better --
6 better vehicles or something.  That would be
7 speculation on my part.
8      Q.   Did you ever have any substantive
9 conversations with Jeff or Merrie Wycoff about why
10 these certain structures were in place, the trust
11 structures?
12     A.   No, absolutely not.
13     Q.   They just sort of asked for a favor, and
14 you were willing to do it for them?
15     A.   Right.  I was basically facilitating what
16 needed to be done for them to effective -- make this
17 effective.
18     Q.   And do you see this last -- the last page
19 of this document is a letter from KMZ Rosenman?  It
20 looks like it's probably a --
21     A.   A law firm.
22     Q.   -- A law firm in Los Angeles.  And they're
23 writing to Transamerica saying that they've enclosed
24 new forms, indicating the date of the various trusts.
25 In apparently Transamerica's letter, you (sic) also

Edward Certisimo
June 24, 2021

Page 26

1  state, ". . . that Merrie Wycoff must sign the transfer
2  form as Trustee of the Trust.  Please be advised that
3  Merrie Wycoff is not a trustee of either the" -- "of
4  either the former owner trust or current owner trust,
5  Edward Certisimo is the sole trustee of both trusts."
6          Does that help refresh any recollections
7  of -- concerning this document?
8      A.  No, other than I remember -- by the way,
9  you said I said.  I didn't say that.  Valerie Vacca
10  said that.
11      Q.  I'm sorry.
12      A.  And the other aspect of it is that I
13  recognize the law firm as being one that I've seen
14  before.  But other than that, I don't recall this.
15      Q.  So this law firm, KMZ Rosenman, was one
16  that you'd worked with before in connection with the
17  Wycoffs?
18      A.  Well, Jeff worked with it, and I would get
19  letters with that letterhead on it.
20      Q.  Okay.  So I want to show you what's going
21  to be marked as Exhibit 13.
22          (Deposition Exhibit 13, remotely
23  introduced and provided electronically to the court
24  reporter.)
25      Q.  It starts with a fax cover sheet saying

Page 27

1  that it's from you.  Is your address 300 Stone Briar
2  Creek Drive, Venice, Florida?
3      A.  Yes.  It has been since 2014 or '11.  I
4  owned the house, but I didn't live here.
5      Q.  Okay.  And I'll scroll down.  And it says
6  that it's still for this 514 policy?
7      A.  Correct.
8      Q.  And it indicates a beneficiary
9  designation.  Do you recognize any of the handwriting
10  on here as your own?
11      A.  The address is my own, the owner's name is
12  not.  The "Fax To:" is my own.  Other than that, it's
13  not mine.
14      Q.  Okay.  So the owner's name, someone else
15  had filled this in, Ed Certisimo, and sent it to you?
16      A.  As you can see, I put "Trustee" there.
17      Q.  Okay.  And so the policy number, the
18  insured's name, maybe the beneficiary information, none
19  of that is your handwriting.  This came to you
20  pre-filled-out?
21      A.  Correct.
22      Q.  Was that a pretty common practice, the
23  Wycoffs would send you forms that were pre-filled-out
24  in certain respects and ask you to sign them?
25      A.  Exactly.  I didn't know what they were

Page 28

1  trying to do; so, you know.
2      Q.  Okay.  And do you see the signature at the
3  bottom of this?
4      A.  Uh-huh.
5      Q.  That's a yes?
6      A.  Yes.
7      Q.  Great.  And the next page indicates an
8  ownership change for the 514 policy, indicating that
9  the new owner was Merrie P. Wycoff.  Do you see that?
10      A.  I do.
11      Q.  And again, you signed this?
12      A.  I did.
13      Q.  And --
14      A.  You can see it was filled out by someone
15  else.
16      Q.  So it was mostly filled out by someone
17  else.  You might have included information concerning
18  your address and --
19      A.  Right.
20      Q.  -- and the date you signed it?
21      A.  Yup, yes.
22      Q.  So did you know -- did you have any
23  conversations about why this policy, the 514 policy,
24  was being moved out of the insurance trusts where you
25  were trustee?

Page 29

1      A.  I can't say that I do.
2      Q.  Okay.  Do you think you have anything --
3  had anything to do with this policy after it was -- the
4  ownership was changed?
5      A.  No.
6      Q.  Did you ever say to Jeffrey or Merrie
7  Wycoff anything along the lines of, "Well, hold on.
8  I'm the trustee of this trust.  And the ownership is
9  changing, and it's just going away.  I need to
10  understand this," or "I'm not comfortable with this,"
11  or did you just kind of do whatever they wanted you to
12  do?
13      A.  I did whatever they wanted me to do, and I
14  was happy it was going away.
15      Q.  You didn't have to deal with it.
16          MR. ABELMAN:  Excuse me.  I'm sorry.  I
17  had it on mute.  I was trying to register an objection
18  to form as to the question.  It's -- it's -- it's
19  unclear to me with whom conversations may have been
20  had, whether it was Jeff or Merrie or both.
21          MR. GOLDHAMER:  Okay.  I'll try to clear
22  that -- this up a little bit.
23          MR. ABELMAN:  Thank you.
24      Q.  (BY MR. GOLDHAMER)  Did you ever --
25  Mr. Certisimo, did you ever have any conversations with

Edward Certisimo
June 24, 2021

Page 30

1  Jeff indicating that you weren't comfortable with
2  changing the ownership of the policy out of the
3  insurance trust for which you were trustee?
4       A.   I did not.  Sorry.  I did not.
5       Q.   And did you have any conversations with
6  Merrie about needing more information or you being
7  uncomfortable with changing the ownership of this
8  insurance policy to Merrie, from the trust for which
9  you were trustee?
10      A.   I did not.
11      Q.   Okay.  You just signed whatever forms they
12 asked you to sign?
13      A.   Yeah, I did.
14      Q.   And -- and that's okay.  I'm going to show
15 you what's going to be marked as Exhibit 14.
16           (Deposition Exhibit 14, remotely
17 introduced and provided electronically to the court
18 reporter.)
19      Q.   Do you see that it's a letter from
20 Transamerica to the Merrie Wycoff 2003 Insurance Trust,
21 maybe care of you as trustee, at an address in Geneva,
22 Illinois.  Do you see that?
23      A.   That's correct.
24      Q.   Okay.  And this was regarding policy
25 VXL9663080.  Do you see that?

Page 31

1       A.   I do.
2       Q.   Okay.  And it's dated 2009.  Do you see
3  that?
4       A.   Uh-huh, yes.
5       Q.   And it seems to be saying to you, "We have
6  changed our records to reflect Merrie Wycoff 2003
7  Insurance Trust," Ed Certisimo -- and it's got the date
8  for it -- "Ed Certisimo, Trustee as the owner(s)
9  effective April 1, 2009."  Do you see that?
10      A.   I do.
11      Q.   And we have changed -- it states, "We have
12 changed our records to reflect Barry S. Marlin as the
13 payor(s) effective April 1, 2009.  Do you see that?
14      A.   I do.
15      Q.   So do you think that you had told
16 Transamerica at some point, "Look, I'm not paying for
17 this.  You need -- Barry Marlin is going to be the one
18 paying for this"?
19      A.   I did not tell them, unless they had
20 provided me a document.  And I'm sure that they're
21 responding to a document that was submitted to them.
22      Q.   Okay.
23      A.   In other words, I did not take the
24 initiative to do that.
25      Q.   Okay.  But it wouldn't surprise you if --

Page 32

1  if you were getting sick of dealing with paying for
2  premiums, if Jeff or Merrie had told you, "Hey, get
3  Barry to pay for the premiums.  Send this letter in to
4  Transamerica"?
5       A.   As I told you before, it was only the
6  first maybe six months where I paid the premiums.  And
7  Barry had been paying them ever since.  So the
8  motivation for this document that resulted in this
9  letter, I have no idea.
10      Q.   Okay.  And so this -- I'll refer to this
11 policy as the VXL policy --
12      A.   Okay.
13      Q.   -- the only policy with letters in it.
14 But it indicates that the Merrie Wycoff 2003 Insurance
15 Trust became the owner of --
16      A.   And if you notice, the only thing that's
17 in my handwriting is my signature.
18      Q.   Okay.  So this was -- so your new owner's
19 signature was in your handwriting.  Then everything
20 else had been pre-filled-in by one of the Wycoffs?
21      A.   I don't know who it was pre-filled in by,
22 but it was pre-filled-in.
23      Q.   Okay.  And then sent to you by one of the
24 Wycoffs?
25      A.   Yes.

Page 33

1       Q.   Okay.  I'm going to show you what's --
2  what we're going to call Exhibit 15.
3           (Deposition Exhibit 15, remotely
4  introduced and provided electronically to the court
5  reporter.)
6       Q.   This is a document that we got from the
7  Wycoffs -- or from the defendants in this case.  It
8  came from their file.  You can see it's a Manulife
9  Financial document.  It refers to Policy
10 No. 58 909 292.  Do you see that?
11      A.   I do.
12      Q.   And the next page indicates that it had a
13 face amount of $10 million.  Do you see that?
14      A.   I do.
15      Q.   Were you -- do you remember a $10 million
16 life insurance policy in connection with any of the
17 insurance trusts?
18      A.   I remember a 10 million insurance policy.
19 I don't know if this is the one.
20      Q.   Okay.  And then you see on the final page,
21 it's kind of cut off, but it seems to suggest that that
22 is a Manufacturers Life Insurance Company form.  And it
23 indicates that the owner name was "Merrie P. Wycoff &
24 Edward Certisimo, Trustees of the Wycoff Insurance
25 Trust Dated July 20, 1999."  Do you see that?

Edward Certisimo
June 24, 2021

Page 34

1    A.   I do.
2    Q.   Do you recall being a co-trustee with
3  Merrie of any trusts?
4    A.   Not in the trust documents that I saw, but
5  I do recall that being the case -- I recall seeing
6  something on that.  But I don't know -- I don't know if
7  I saw a trust document that said that.  The three trust
8  documents that I gave you, they did not show co, did
9  they?
10    Q.   Well, actually, I'm not answering
11  questions here.  But we can go back and look, if you
12  want.
13    A.   No, no, no.  That's okay.  But I don't
14  recall that.
15    Q.   I didn't recall it, either, but -- but you
16  see that the owner name listed involved the insurance
17  trusts from 1999.  And then there's an indication that
18  the new owner would be the Jeff and Merrie 2003
19  Insurance Trust, so the new 2003 insurance trust.  Do
20  you see that?
21    A.   I do.
22    Q.   And your signature appears on this
23  document in a couple places?
24    A.   It does, yes.
25    Q.   Okay.  So this 292 policy was -- was in

Page 35

1  this insurance trust, the Jeff and Merrie 2003
2  Insurance Trust at one point, correct?
3    A.   Yes, correct.  So the co-owner insurance
4  policy -- the co-owner trust was the trust that I don't
5  recall.
6    Q.   The co-trustee trust?
7    A.   Yeah, the co-trustee trust.
8    Q.   Okay.  I'm going to show you what's going
9  to be labeled Exhibit 16.
10         (Deposition Exhibit 16, remotely
11  introduced and provided electronically to the court
12  reporter.)
13    Q.   And this is a John Hancock document,
14  addressed to you, with reference to this 292 policy
15  that we were just talking about.
16    A.   Right.
17    Q.   And do you see that it's a "Summary of
18  Policy" document, dated --
19    A.   Yes.
20    Q.   -- February 9, 2011?
21    A.   Yes.
22    Q.   And it's referring, again, to this gross
23  death benefit of $10 million, correct?
24    A.   That is correct.
25    Q.   And it's describing a surrender value of

Page 36

1  about $376,000.  Do you see that?
2    A.   Yes, I do.
3    Q.   Do you recall why this document came to
4  you?
5    A.   I don't.  I would -- I would imagine -- I
6  would only speculate that they would want to know what
7  it was worth.  But I don't know why it is.  I'm sure I
8  signed the document asking for it, and this was
9  provided.  As a matter of fact, I gave you this
10  document.
11    Q.   I think that's correct.  So you don't
12  recall anything about how this document came into your
13  possession, the surrounding circumstances?
14    A.   No, no, other -- you know, I do not.
15    Q.   So do you recall any discussions with the
16  Wycoffs concerning, "Well, we need to know what this
17  thing is worth on its surrender value.  We -- we need
18  to take some money out"?
19    A.   I have never spoken to Jeff or Merrie as
20  to why they initiated this transaction.
21    Q.   Okay.  I'm going to -- I'm pulling up a
22  new document that we'll mark as Exhibit 17.
23         (Deposition Exhibit 17, remotely
24  introduced and provided electronically to the court
25  reporter.)

Page 37

1         And you see it's a John Hancock form
2  titled "Request for Policy Surrender"?  Do you see
3  that?
4    A.   I do.
5    Q.   And your name and signature are at the
6  bottom of this?
7    A.   Yes.
8    Q.   And this is regarding the 292 policy?
9    A.   It is.
10    Q.   And so it looks like in late February
11  2011, you requested that this policy be surrendered; is
12  that correct?
13    A.   That is correct.
14    Q.   Do you remember any of the circumstances
15  surrounding this request or how it came about?
16    A.   I do not.
17    Q.   Do you assume that it was simply a request
18  from one of the Wycoffs that this policy be
19  surrendered?
20         MR. ABELMAN:  Object to the form of the
21  question.
22    Q.   (BY MR. GOLDHAMER)  You can go ahead and
23  answer.  And maybe I'll try to clean up the question.
24    A.   I could only speculate that they needed
25  money.

Edward Certisimo
June 24, 2021

Page 38

1       Q.   But you didn't initiate this surrender,
2  did you?
3       A.   No, absolutely not.
4       Q.   It wasn't your idea?
5       A.   That's correct.
6       Q.   It was -- anything that -- any actions
7  that you took were at the Wycoffs' direction?
8       A.   That's correct.
9       Q.   I'll bring up a new document that we'll
10  mark as Exhibit 18.
11           (Deposition Exhibit 18, remotely
12  introduced and provided electronically to the court
13  reporter.)
14       That is, again, a John Hancock document
15  referring to the 292 policy that says that it's
16  providing you a check for $379,617.68.  Do you see
17  that?
18       A.   I do.
19       Q.   Do you recall receiving that check?
20       A.   No, I can't say that I do.
21       Q.   Do you know what you would have done with
22  that check if you got it?
23       A.   I would have sent it to Jeff.
24       Q.   Okay.
25       A.   Well, depending upon how it was made out,

Page 39

1  I would have -- I would have somehow forwarded it to
2  Jeff.  I may have taken steps that I don't recall, that
3  required me to cash it and then transfer it or
4  whatever.  You know, I don't know how the check was
5  made out.  It was probably made out to the trust,
6  wasn't it?  So I probably had to open a bank account,
7  because I probably didn't have a bank account.  I have
8  no idea.  I don't recall, but it would have been me
9  getting the money to Jeff somehow.
10       Q.   But you know for sure that you did not
11  retain this money, this $379,000 and change?
12       A.   No, I didn't.
13       Q.   You didn't retain it yourself, and you
14  didn't retain it within the trust, correct?
15       A.   That is correct.
16       Q.   And I think I said that we were going to
17  call that Exhibit 18.  Okay.  I want to ask you about a
18  different Hancock policy -- or Hancock Manulife
19  financial policy.  We'll mark this as Exhibit 19.
20           (Deposition Exhibit 19, remotely
21  introduced and provided electronically to the court
22  reporter.)
23       Q.   Do you see that this is a Manulife
24  Financial document that suggests that the owner of the
25  policy that's being referenced here, the 56643737

Page 40

1  policy, was Merrie Wycoff.  Do you see that?
2       A.   I do.  Can you make it just a little
3  larger?
4       Q.   Sure.
5       A.   That's great.  Thank you.
6       Q.   Okay.  Do you see that the owner is listed
7  as Merrie Wycoff?
8       A.   Correct.
9       Q.   And it's being assigned to a new owner,
10  Jeffrey Wycoff.  Do you see that?
11       A.   Yes.
12       Q.   Okay.  And then it's got Merrie Wycoff's
13  signature on it, correct?
14       A.   Yes.
15       Q.   And then the second page is still the
16  737 policy, that indicates the owner is Jeffrey Wycoff
17  and that the policy was being assigned to a new owner,
18  "Edward Certisimo, as" -- "or his successor as Trustee
19  of the Jeffrey Wycoff 2003 Insurance Trust."  Do you
20  see that?
21       A.   I do.
22       Q.   Okay.  And you see that your signature is
23  on this document as well, correct?
24       A.   Yes.  It looks like it was right after the
25  establishment of the trust --

Page 41

1       Q.   Okay.
2       A.   -- in 2003.
3       Q.   And then the last page is another letter
4  from KMZ Rosenman to Manulife Financial that describes
5  how this policy, No. 737, was transferred from Merrie,
6  as prior owner, to Jeff, as the new owner; and then
7  from Jeff, as prior owner, to Edward Certisimo, as
8  trustee of the Jeffrey 2003 Insurance Trust.  Do you
9  see that?
10       A.   I do.
11       Q.   Do you recall anything about this series
12  of transactions?
13       A.   No, I don't.
14       Q.   Okay.  But this seems to suggest that the
15  737 policy was in the Jeffrey 2003 Insurance Trust,
16  correct?
17       A.   That is correct.
18       Q.   And that last document was Exhibit 19.
19  We'll look at Exhibit 20 now.
20           (Deposition Exhibit 20, remotely
21  introduced and provided electronically to the court
22  reporter.)
23       Q.   And here is the zoomed-out version, but
24  I'll zoom in for you to make it easier on your eyes.
25  It's a John Hancock form referencing Policy

Edward Certisimo
June 24, 2021

Page 42

1  No. 56643737, the 737 policy that we've been talking
2  about.  And it lists you as trustee of the Jeffrey
3  Wycoff 2003 Insurance Trust, as the owner, right?
4       A.   Yes.
5       Q.   And it looks like you were in Germany at
6  the time, perhaps, when you signed this?
7       A.   Yes.
8       Q.   And it indicates there's a change of
9  ownership as a "Gift for Love of" Affect -- "and
10  Affection" --
11       A.   Okay.
12       Q.   -- to Merrie Pisano.  Do you see that?
13       A.   I don't -- oh, under "Name of New Owner,"
14  yes.
15       Q.   Right there.  Okay.  So this 737 policy
16  was transferred out of the insurance trust, it looks
17  like, correct?
18       A.   It was, yes.
19       Q.   Do you recall anything about this
20  transaction?
21       A.   I do not.
22       Q.   Okay.
23       A.   I had 30 factories in 15 countries, and I
24  was traveling 250,000 miles a year, so I didn't ask a
25  lot of questions about what Jeff wanted to do.

Page 43

1       Q.   Okay. That sounds exhausting.  Okay.  So
2  we've looked at a number of insurance policies that may
3  have been in the insurance trusts at one point.  Do you
4  know of any other insurance policies that were in the
5  2003 insurance trusts at any point?
6       A.   No, I can't say that I do.  What I had, I
7  gave to you, and that's what I do recall.
8       Q.   Nothing about Voya or ING policies?  You
9  can't recall anything?
10       A.   No, no, not at all.
11       Q.   I want to ask you about your familiarity
12  with the Wycoffs' financial situation, generally.  Did
13  you know that they were involved in proceedings with
14  the IRS?
15       A.   Jeff told me about that many years ago,
16  but I didn't -- you know, at the time, it was something
17  he said he was fighting really hard and -- but he
18  couldn't -- you know, he thought he had a really good
19  case.  But I haven't followed -- I didn't follow it
20  recently, so my information on that is probably ten
21  years old.  I don't know.  I'm guessing at that.
22       Q.   So you got that information from a
23  conversation with Jeff Wycoff?
24       A.   That's correct.
25       Q.   And is there anything else that you

Page 44

1  remember about the conversation?  Did he say how much
2  the controversy with the IRS was for?
3       A.   I think when it first started it was -- it
4  had to do with some employee ownership plan or
5  something.  And at the time, it was only a hundred
6  thousand dollars.
7       Q.   Okay.  And did -- did that amount
8  increase?  Do you know?
9       A.   No, I have no idea -- well, I do have an
10  idea.  Just recently, someone told me, you know, after
11  the fact, that it became a very large number.
12       Q.   Who was that?
13       A.   Steve.
14       Q.   Okay.  So you had a conversation with
15  Steve Abelman about the Wycoffs' tax debt?
16       A.   I only mentioned it to him that I -- you
17  know, that -- and then he told me, "Geez, it's a lot
18  larger than that," and he told me what it was.
19       Q.   How many times -- sorry.
20       A.   Go ahead.  How many times?
21       Q.   How many times have you talked with Steve
22  Abelman?
23       A.   I think at least two, maybe three.
24       Q.   Do you recall when those conversations
25  were?

Page 45

1       A.   Yes.  He called me to let me know that I
2  was going to get a subpoena and then a couple of other
3  conversations while we were trying to establish a date.
4       Q.   So the first conversation when he was
5  talking with you about letting you know that you were
6  going to get a subpoena, do you recall what else you
7  talked about?
8       A.   I think he provided some background on
9  what the issues were.
10       Q.   Do you recall what that background was,
11  what was discussed?
12       A.   Well, I asked him questions.  I had
13  thought that Midlabs (sic) -- well, he told me there
14  was a dispute with Midlabs.  And I was asking about was
15  it with the company or what, and he said no.  He told
16  me now, and that Jeff had given a personal
17  guaranty, I think he told me.  I haven't seen it, don't
18  know anything about it.  So he just gave me some
19  background on what was going on.
20       Q.   Did you discuss the loan involving
21  Bloomfield Capital or BC24?
22       A.   Did not, that I recall.
23       Q.   Did you discuss how the insurance trusts
24  of which you were trustee were related to this case?
25       A.   Yes.

Edward Certisimo
June 24, 2021

Page 46

1    Q.   What do you recall from that conversation?
2    A.   I recall that the plaintiff was trying
3 to -- or accusing the Wycoffs of manipulating the
4 insurance in such a way as to not provide him the --
5 the money he was due.  I don't know how to put it other
6 than that.
7    Q.   Did you have any response to that?
8    A.   No.  What do I know?  Obviously, nothing.
9    Q.   Is there anything else you recall from
10 your conversations with Steve Abelman?
11   A.   The only other conversation was what every
12 lawyer would do prior to a deposition -- which I've had
13 many of, believe it or not, and whatever -- that I
14 should just answer the questions and not let you make
15 me talk a lot.
16   Q.   Well, I hope I'm not making you talk too
17 much.
18   A.   I talk too much anyway.  But in this case,
19 it doesn't matter.  I don't know anything.
20   Q.   Well, my condolences that you've gone
21 through so many depositions.
22   A.   Yeah.  Thank you.  Federal Trade
23 Commission, even, you know.
24   Q.   Can you describe, generally, what those
25 previous depositions were about and where they were?

Page 47

1    A.   Well, I can tell you that one was in
2 Washington, D.C., Federal Trade Commission, on an
3 anti-trust case that we were filing.  And that was
4 where our competitor had -- had purchased a company
5 that we had a strategic alliance with, that the
6 alliance was required to compete with them.  And I
7 don't recall the other ones, but I know I've had other
8 depositions.  That one was so big, I remembered it.
9    Q.   Okay.  Have you had any -- have you been
10 involved in any litigation with you serving as trustee
11 or that related to your service as a trustee?
12   A.   No.  The only trust -- trustee -- trusts I
13 was involved are the ones we're talking about here
14 today.
15   Q.   You've never been a trustee for any other
16 trusts, except for Wycoff-related trusts?
17   A.   That is correct.
18   Q.   Okay.  So do you know when the Wycoffs'
19 tax issues came to a head with the IRS?
20   A.   I don't.  As I said, I didn't follow it
21 with him.  I just know that he mentioned it to me.  And
22 I would ask him about it every now and then, and he
23 would tell me that it wasn't settled yet.
24   Q.   Okay.
25   A.   But . . .

Page 48

1    Q.   When do you think the last time that you
2 had asked Jeff about that tax issue was?
3    A.   I couldn't recall.
4    Q.   Okay.
5    A.   I do know that I asked him a couple times.
6    Q.   So you did not know that the United States
7 Tax Court issued a ruling against the positions that
8 the Wycoffs were taking, on October 16th, 2017?
9    A.   Oh, no, not at all.  I was here.
10   Q.   Do you recall if shortly after October 16,
11 2017 the Wycoffs started talking to you about
12 additional changes with respect to the insurance
13 policies?
14   A.   No, not at all.  There was no
15 conversations.
16   Q.   There were no conversations at all?
17   A.   That's correct -- well, I -- I told you
18 that I spoke with Jeff maybe once every two months.  So
19 there were conversations, but not about what you're --
20 you're discussing.  Not about the insurance trusts --
21 or not about the IRS or whatever.
22   Q.   Okay.  Well, let's focus back on the -- on
23 the insurance policies related to the insurance trusts.
24 Shortly after October 16, 2017, did one or more of the
25 Wycoffs get in touch with you about wanting to make

Page 49

1 additional changes to the insurance policies?
2    A.   No, not that I'm aware of, in '17.
3    Q.   So this is going to be an email.  I just
4 want you to see that it's a -- that's it's an email.
5 And, ultimately, this -- so I'm sharing my screen
6 again.  Do you see this email that's called Part 1?
7    A.   Yes, I do.
8    Q.   And it's from Jeff Wycoff to -- let's see
9 if I can get this -- it says it's to Ed Certisimo New.
10 And if you click on it, it shows that it's to
11 certis@hotmail.com.  Do you see that?
12   A.   Yes, I do.
13        THE DEPONENT:  Uh-oh.  I just heard the
14 garage door open.  Was that you, Karen?  Okay.  I
15 thought it was my grandchildren.  That would have been
16 terrible.  Go ahead.  I'm sorry.
17        MR. GOLDHAMER:  I'm sure -- I'm sure
18 they're bundles of joy.
19        THE DEPONENT:  Yes; but loud.
20   Q.   (BY MR. GOLDHAMER)  And is this a document
21 that you provided in response to the subpoena?
22   A.   Yes, it is.  This is one of my emails, I
23 believe.
24   Q.   Okay.  And do you see that it's dated
25 November 10th, 2017?

Edward Certisimo
June 24, 2021

Page 50

1      A.   Okay.  I guess I didn't really understand
2  the time frame that you were talking about before.
3      Q.   Okay.  That's okay.  And it says:  Hi, Ed.
4  First, thanks for your help with this.  Attached are
5  the completed forms.
6           There's not a whole lot of description
7  there about what's going on, but do you believe that
8  there would have been, like, a phone conversation with
9  Jeff prior to him sending this email about --
10      A.   I think if you look through the emails I
11  sent, I think we tried to do this a couple of times.
12  And I think that's what he means by, "Thanks for the
13  help with this," or -- or just assign it.  But we
14  didn't have any conversations as to why he was doing it
15  or anything.
16      Q.   Okay.  But he might have given you a call
17  saying, "Heads up.  I'm going to send you a form to
18  sign.  Please sign it"?
19      A.   Yeah, I might have had a call like that,
20  yes; probably did.
21      Q.   But you don't recall him telling you why
22  this change was happening?
23      A.   No, that's correct.
24      Q.   Okay.
25           MR. ABELMAN:  Aaron, is this designated as

Page 51

1  an exhibit?
2           MR. GOLDHAMER:  I've got a bunch more
3  emails, so I think I'll skip on this one.
4      Q.   (BY MR. GOLDHAMER)  But just referencing,
5  you know, saying:  This is part 1 of -- this part 1 of
6  4 it says.  Do you see that?
7      A.   Yes.
8      Q.   It looked like in the emails you provided
9  to me that there was a part 1, a part 2, a part 3 --
10  and maybe a part 3 was included twice -- but there was
11  no part 4.  Do you remember finding a part 4 email in
12  your files?
13      A.   I don't.  I provided everything that was
14  in there that was -- and I even provided duplicates.
15  So everything that I had that was related to this, you
16  received.
17      Q.   Okay.  I'm going to open up a new email
18  here.  And we will call this -- I believe this is
19  Exhibit 21, this email and the attachment.
20           (Deposition Exhibit 21, remotely
21  introduced and provided electronically to the court
22  reporter.)
23      Q.   (BY MR. GOLDHAMER)  You see that it's an
24  email from Jeff Wycoff to you?  We can double-click on
25  that to see that it's to certis@hotmail.  Do you see

Page 52

1  that?
2      A.   Uh-huh.
3      Q.   That's a yes?
4      A.   Yes.
5      Q.   Okay.  And then if we click on the
6  attachment, it's this VXL policy that we talked about
7  earlier, correct?
8      A.   That is correct.  We did talk about it
9  earlier.
10      Q.   And it's a form that's been filled in by
11  someone else already, correct?
12      A.   Right.
13      Q.   And the current owner is the Merrie Wycoff
14  2003 Insurance Trust, with Ed Certisimo as trustee.  Do
15  you see that?
16      A.   I do.
17      Q.   And then it indicates the new owner is
18  Devon Wycoff.  Do you see that?
19      A.   I do.
20      Q.   And it's got sort of a little yellow arrow
21  here that would be seeming to be indicating where you
22  need to sign as the current owner, correct?
23      A.   Right.
24      Q.   Okay.  And so do you remember anything
25  about this form?

Page 53

1      A.   I remember the document.  Again, I don't
2  remember why.  The reason there's no signature there,
3  most likely, is because I signed it, scanned it, and
4  email it back, but I didn't have that email.
5      Q.   Well, so this -- this was an attachment
6  that was from an email from Jeff to you, so you hadn't
7  received the document yet, correct?
8      A.   Right, right.
9      Q.   And you see later down there's some
10  address change issues.  Do you recall what these
11  address change issue that you had to deal with was?
12      A.   Can you go back on that address change?
13  Oh, yeah.  They actually had one of my prior addresses
14  on the -- on their records, and I had to change it to
15  my current address before they would process it.
16      Q.   Okay.
17      A.   It's not like I didn't have other
18  addresses.
19      Q.   Sure.  And so, I mean, the fact that
20  Transamerica had your old address and this was only
21  coming up in 2017 when this change was happening, I
22  mean, how long had you been at this Stone Briar Creek
23  Drive address by 2017?
24      A.   I -- I was -- again, I owned the house
25  from 2011, lived in Germany, and January of 2015 I

Edward Certisimo
June 24, 2021

Page 54

1  lived here.  So it was fairly recent.
2       Q.   So even if Transamerica had your address
3  in Germany previously, you would have been not getting
4  any information on this policy for at least two years
5  in the mail, correct?
6       A.   Correct, correct; more than that, most
7  likely.  I probably -- well, yes, that's correct.
8       Q.   But -- but since the administration of the
9  trust was sort of taken care of by others, did you even
10 get much in the mail from Transamerica?
11      A.   I don't recall anything during my time in
12 Germany or up to this particular thing, prior -- during
13 that time frame, any kind of communication at all.
14      Q.   And how long were you in Germany for?
15 What was -- when was the start?
16      A.   Well, it started -- I was there 2011,
17 '12 -- no, '12, '13, and '14.  It was three years.
18      Q.   2012, 2013, and 2014?
19      A.   Right.
20      Q.   And then where did you go?
21      A.   I retired; Florida.
22      Q.   You retired to Florida.  So you were at a
23 different Florida address from --
24      A.   No, no, same.  I've only had one house in
25 Florida.

Page 55

1       Q.   Okay.
2       A.   When I went to Germany, I sold my house in
3  Illinois.  Bought a house in Florida I told you I
4  didn't live in, right?  Lived in Germany, and then
5  after my retirement I lived here.
6       Q.   So since at least 2012, you don't recall
7  getting any significant mail from Transamerica?
8       A.   That's correct.
9       Q.   Because other people were taking care of
10 the administration of the insurance, correct?
11      A.   I would imagine, if there were any
12 transactions, yes.
13      Q.   And so we're seeing in this --
14      A.   I'm not saying there wasn't any, by the
15 way.  I said I don't recall.
16      Q.   Okay.  That's fine.  And you see that the
17 beneficiaries were -- was designated as Devon Wycoff on
18 this VXL policy as well?  Do you see that?
19      A.   Yes.
20      Q.   And you don't recall any conversations
21 about any of this beneficiary designation, ownership
22 change, anything, correct?
23      A.   I do not.
24      Q.   Okay.  So both the email and the
25 attachment we just looked at we'll call Exhibit 21.

Page 56

1       Q.   Let me just track down where this next email is.  Okay.
2  Do you see this email with the subject line "Clean
3  copies"?
4       A.   Yes.
5            MR. GOLDHAMER:  We'll mark this email and
6  the attachment Exhibit 22.
7            (Deposition Exhibit 22, remotely
8  introduced and provided electronically to the court
9  reporter.)
10      Q.   You see that's an email from Jeff at his
11 ZAP! Products email address, to you, copying his AOL
12 address.  Do you see that?
13      A.   I do.
14      Q.   And you see that this is an email dated
15 November 10th, 2017, right?
16      A.   Correct.
17      Q.   And he says, "Ed, Attached are copies that
18 are more legible.  I accidentally sent you all the
19 policies we are changing.  You can ignore the Voya and
20 the Ing policy forms, just Transamerica."  Do you see
21 that?
22      A.   I do.
23      Q.   Did you find any emails from Jeff Wycoff
24 involving Voya and Ing policy forms?  Because I'll
25 represent to you I didn't see anything in what you

Page 57

1  provided us.
2       A.   I did not.  You know, I see what's written
3  here, but I have no knowledge of any Voya or Ing.  And
4  maybe he sent me forms that were incorrect.  I have no
5  idea.
6       Q.   And again, the attachments to this email
7  are policy change forms; is that right?
8       A.   Yes, transfer of ownership form.
9       Q.   And, you know, some of these have some
10 filled-in sections, correct?
11      A.   Correct, yes.
12      Q.   So -- sorry.  We'll look at this one more
13 time here.  He referred to "all the policies we are
14 changing."  Did you have any understanding that they
15 were changing more policies that just the ones that
16 needed your signature?
17      A.   I did not, no.
18      Q.   Did you have any conversation with the
19 Wycoffs about these other policy changes?
20      A.   I did not have any conversation with
21 Merrie or Jeff on policy changes at all.
22      Q.   Okay.  Because, again, it was basically
23 you just did what they said.  They drafted stuff up and
24 you signed it?
25      A.   Correct.

Edward Certisimo
June 24, 2021

Page 58

1    MR. ABELMAN:  I'm sorry.  I object to the
2  form and the foundation of the question, the use of the
3  word "they."  I don't think Mr. Certisimo has testified
4  about any conversations he's had with Merrie Wycoff
5  thus far.  But we can --
6    THE DEPONENT:  That is correct.  I have
7  never spoken to Merrie about any of this.
8    Q.  (BY MR. GOLDHAMER)  How about email
9  correspondence with Merrie about the trusts concerning
10  which you were a trustee?
11    A.  No; no email correspondence, no verbal
12  correspondence, no snail mail correspondence, none at
13  all.  All my interfaces were always just with Jeff.
14    Q.  We'll mark this as an exhibit a little bit
15  later on, but do you see this email with the subject
16  line "Trust Certification Signature."  Do you see that?
17    A.  Right.  She probably asked for something
18  and I sent it to her.
19    Q.  Okay.  And this -- this was -- this was an
20  email with Merrie Wycoff regarding a trust
21  certification, correct?
22    A.  Yes.
23    Q.  So you actually did have some contact with
24  Merrie Wycoff concerning the trusts, correct?
25    A.  What's the date on this?  Do we know what

Page 59

1  date it is?
2    Q.  Well, it looks right there that it's a --
3    A.  2017.  I guess, okay.  Maybe there was a
4  one-off or something.
5    Q.  -- a December 15, 2017 email that you had
6  with Merrie concerning the trusts; is that right?
7  That's what we're looking at right now?
8    A.  That is what we are looking at.  I
9  think -- you know, I don't know, was Jeff alive then?
10  I don't even know when he passed away, to be honest
11  with you, as far as the date goes.
12    Q.  I'll represent to you that Mr. Wycoff died
13  on March 31st, 2018, so he was alive.
14    A.  Okay.  So most likely, Jeff called me and
15  asked me to send it to Merrie, and I did that.
16    Q.  Okay.  Well, it looks like this is an
17  email from you to Merrie, responding to an email that
18  she had sent you.
19    A.  Okay.
20    Q.  Do you see that?
21    A.  "Eddie, here are clearer forms."  So Jeff
22  asked her to send me something.
23    Q.  So now that we see that you actually have
24  had interactions with Merrie Wycoff related to the
25  trusts, are you confident that you've -- that you

Page 60

1  searched for Merrie Wycoff-related communications in
2  response to the subpoena?
3    A.  No; I mean, I did a full search -- how did I
4  search?  I searched on Jeff.  And I can't say that I
5  recall searching on Merrie.  I can do that.  But let me
6  tell you this.  My computer has been acting up, so I
7  reinstalled Windows.  And although I still have my
8  Outlook PDF files --
9    Q.  PST files?
10    A.  PST files, yeah.  I'm sorry.  You've shown
11  me so many PDF files.  -- PST files, there were old
12  archived -- I had a directory called "Old Windows."
13  And I actually went into that, also, and looked for
14  files that -- that were Outlook files that I then
15  reinstated to current Outlook files.  And when I
16  reinstalled Windows, I didn't save the "Old Windows"
17  folder, so I lost that.
18    I do have stuff on that -- I still have
19  everything that I had on -- on my current drive, but I
20  don't know what's on there.  I could -- I could search
21  that for sure.
22    Q.  Okay.  Well, maybe we can chat about that
23  when we take a break.
24    MR. GOLDHAMER:  How are you doing, by the
25  way?  Do you need a break, or are you okay?

Page 61

1    THE DEPONENT:  I'm fine.
2    MR. GOLDHAMER:  Okay.
3    THE DEPONENT:  Depends on how long you're
4  going to go.  I could use a drink; not alcohol, but
5  water.  I'm good for about a half-hour or so.
6    MR. GOLDHAMER:  Okay.
7    Q.  (BY MR. GOLDHAMER)  So we'll come back to
8  this communication with Merrie Wycoff.
9    A.  I really don't remember how I -- how I --
10  how I sorted -- how I searched.  But, most likely, on
11  Jeff.
12    Q.  Did you talk with Mr. Abelman about trying
13  to leave Merrie out of this --
14    A.  No, absolutely not.
15    Q.  -- lawsuit?
16    A.  Absolutely not.
17    MR. GOLDHAMER:  Okay.  Okay.  I think
18  we're on Exhibit 23.  We'll call this email and its
19  attachments Exhibit 23.
20    (Deposition Exhibit 23, remotely
21  introduced and provided electronically to the court
22  reporter.)
23    Q.  (BY MR. GOLDHAMER)  You see that this is
24  an email that you provided that was from you to Jeff
25  Wycoff, with the subject line "Transamerica Forms"?

Edward Certisimo
June 24, 2021

Page 62

1   A.   Yes.
2        Q.   And do you recall sending this email?
3   A.   No, but I do recall that it's mine.
4        Q.   Okay.  Does it appear that this email is
5   the email transmitting back to Jeff Wycoff the forms
6   that he had wanted you to sign?
7   A.   Yes.
8        Q.   It's got -- it references the VXL policy
9   and the 514 policy.
10  A.   Correct.
11       Q.   Do you see that?
12  A.   Yes.
13       Q.   Okay.
14  A.   Could you click it down just one, because
15  the gallery photos are cutting off the right side.
16  Shrink down your -- your screen just --
17       Q.   Oh, like this (indicating)?
18  A.   Yeah; maybe one more.  Good.  I can read
19  that.
20       Q.   Okay.  Let me know if you need more time
21  to review this.
22  A.   Yeah.  Let me just read it through.
23       (Deponent examined document.)  Okay.
24       Q.   All right.  Now, if we look at the
25  attachments -- let me know if you need any changes to

Page 63

1   this -- this is the first attachment that referred to
2   the address change issue.  And that's your signature,
3   correct?
4   A.   It is.
5        Q.   Okay.  Now, the second attachment refers
6   to a transfer of ownership.  We'll just make -- try to
7   put this over here.  And this is, again, the
8   514 policy.
9   A.   Yeah.  We've seen this before, correct?
10       Q.   Well, they may have sent you --
11  A.   (Inaudible) contingent beneficiary, yeah.
12       Q.   Yeah.  So there, you signed where the
13  arrow is.
14  A.   Okay.  So we saw it before without my
15  signature.
16       Q.   Yeah.  So you're sending this back --
17  A.   Signed.
18       Q.   -- signed, indicating that there was a
19  change of ownership for the 514 policy from the Merrie
20  Wycoff 2003 Insurance Trust to Azuraye Wycoff.  Do you
21  see that?
22  A.   I do.
23       Q.   Okay.  And then this first VXL attachment
24  appears to be just your address change?
25  A.   Correct.

Page 64

1        Q.   With your signature?
2   A.   Correct.
3        Q.   And then this second VXL attachment has
4   the transfer of ownership with Devon -- from the Merrie
5   Wycoff 2003 Insurance Trust to Devon Wycoff.  Do you
6   see that?
7   A.   I do.
8        Q.   And it's got your signature at the bottom.
9   Do you see that?
10  A.   That is correct.
11       Q.   Okay.  So these were two forms that you
12  were sending back to the -- to Jeff regarding changes
13  to the 514 policy and the VXL policy, correct?
14  A.   Right.
15       Q.   Did you ever have any conversations with
16  Devon Wycoff concerning these policies?
17  A.   That I can say I never did.  No, neither
18  of the girls; not Devon, nor Azuraye.
19       Q.   So neither written communication or oral
20  communication?
21  A.   I can't say that I recall any.  That is
22  correct.
23       Q.   Okay.  And they weren't involved in this
24  process of changing anything with the insurance trusts?
25  A.   Well, I have no idea if they were or they

Page 65

1   weren't.  If they were, it was between them and their
2   parents.
3        Q.   But, to your knowledge, they weren't
4   involved with you and these changes to the insurance
5   policies, correct?
6   A.   That is correct.
7        Q.   Okay.  How often do you see Devon or
8   Azuraye?
9   A.   Probably in the last 15, 20 years I saw
10  them once or twice.  They're in Colorado, and we never
11  got out there.  And, you know, we just never really got
12  together.
13       Q.   Did you ever give Azuraye a ride --
14  A.   Yes.
15       Q.   -- between cities on the East Coast?
16  A.   I did.  How did you find out about that?
17       Q.   What do you remember?
18  A.   It was a family reunion after Jeff's death
19  in Pennington, New Jersey, which is right outside of
20  Princeton, and my uncle's house.  And we were going to
21  Cape Cod.  And Azuraye lived in Boston, and she was
22  going to take the train, and I said I'd drop her off in
23  Boston.
24       Q.   Do you recall what you talked about?
25  A.   What did we talk about?

Edward Certisimo
June 24, 2021

Page 66

1    Q.   Yeah.  Do you recall what you talked about
2  on the ride?
3    A.   We talked about how she was doing, what --
4  where she lived, what her job was.  She was asking us
5  about our background.  We obviously had a lot to talk
6  about, personally, being that we -- we hadn't seen each
7  other in so many years.  So that's about -- I don't
8  recall anything other than personal conversations.
9    Q.   Do you recall any conversations about
10 insurance issues?
11   A.   Absolutely not.  I don't recall anything
12 about that.
13   Q.   Do you recall having any conversations
14 about the family farm that the Wycoffs have out in
15 Boulder?
16   A.   Probably, you know, just because it's such
17 a big part of their existence out in Boulder.  But I
18 don't recall anything specifically about it.
19   Q.   Why do you say it's such a big part of
20 their existence?
21   A.   Well, when they first bought it, it was an
22 equestrian training site for -- and then Devon got very
23 involved.  And, actually, Devon competed in the Junior
24 Olympics and everything else.  And then recently when
25 they closed the training site, you know, it was -- Jeff

Page 67

1  was making it into his offices for ZAP!  You know, it
2  was just -- there was always something going on there.
3    Q.   Do you recall any conversations about the
4  family home that they have out there?
5    A.   No.  And I've only been there once.
6    Q.   Were you surprised by Jeff's death?
7    A.   Very much so, very much so.
8    Q.   Why do you say that?
9    A.   Well, I guess -- should I say I'm very
10 surprised?  Jeff has always had physical pain and has
11 always had issues with -- with life, shall I say.  I
12 was surprised he was as successful as he was in his
13 businesses.  But I know that he was -- he was in pain.
14 And I can tell you that back in the 1970s, he did talk
15 to me once about taking his life back then, so . . .
16   Q.   What do you recall --
17   A.   Excuse me?
18   Q.   What do you recall about that
19 conversation?
20   A.   Well, he had a girlfriend who had cancer.
21 He and his girlfriend went up to Boston to -- to study
22 under some Japanese guy, Misu Kutchi (phonetic) or
23 something like that and I guess her, you know, eating
24 healthy.  And supposedly -- and she basically -- she
25 was his first love.  And she was -- went into

Page 68

1  remission.  And when they came back to Jersey, her
2  parents wouldn't let her see him anymore.  And they
3  ended up breaking up, and he was distraught.
4        And I remember I had -- I lived in a place
5  where there's a mountain in the back.  We walked up the
6  mountain and we sat down and we were talking.  And he
7  was -- you know, he just wanted to give up at that
8  point.  So the fact that he talked about it to me once,
9  I guess I can't say I was totally surprised, but I was
10 surprised that it happened.
11   Q.   Do you recall what he said?  Did he say,
12 "I'm thinking about killing myself"?
13   A.   Back in 1970, yeah, he did.
14   Q.   Okay.
15   A.   But it was out of distraught (sic) for,
16 you know, losing his first love, shall we say.
17   Q.   You mentioned that he had issues in life,
18 in addition to his pain.  What -- what did you mean by
19 "issues in life"?
20   A.   Well, he was the type of person that would
21 never let go of things.  We were -- as I told you, we
22 lived together.  And at one point in time I got mad at
23 him, and I punched him in his back, and I hurt him.
24 And he was still talking about it when we were 50 years
25 old.  I mean, get over it, you know.  So there were

Page 69

1  those types of things.  You know, everything was
2  building -- always built up for him.  He never forgot
3  anything.  And sometimes it was some things he should
4  have forgotten, shall I say.  I don't recall what they
5  were, but . . .
6    Q.   Were there -- were there any other issues
7  that you're referring to when you were talking about
8  "issues in life"?
9    A.   No.  I -- he'd always talk to my uncle.
10 My uncle, Buddy, was the patriarch of our family.  And
11 he would always talk to him.  And it was -- and I know,
12 just from knowing him and talking to my uncle, that
13 Jeff always had issues.  There was never -- you know,
14 when I say, "issues" -- how do I say that?  How do I
15 mean this? -- things bothered him, and he had to talk
16 them through.  And he talked them through with my uncle
17 more than more.  I don't know.  He's never really
18 talked to me about that, because he was jealous of me,
19 because I was successful.  And so he would never talk
20 to me about those things, what bothered him.  But I do
21 know he talked to my uncle a lot.  But, you know --
22   Q.   Remind me which uncle --
23   A.   -- I would say anything that had to do
24 with business.  What?
25   Q.   Which uncle are you talking?

Edward Certisimo
June 24, 2021

---

Page 70

1    A.   My Uncle Buddy, Sanford Bing.  You saw him
2 in one of the trusts.
3    Q.   Okay.  So you said anything to do with
4 business, you thought Jeff was somewhat jealous of you?
5    A.   Yeah.  I think -- as I said, we lived
6 together.  He was competitive.  And because he was
7 competitive, I think he was a little bit envious about
8 how I was successful.  And so he would brag to me about
9 how well he was doing and stuff like that, you know.
10 That's why I -- why I say that.  And when he first
11 started, he did very well with ZAP!.  You know, he
12 would make sure that he told me how much he was worth
13 at that time and stuff like that.  And, you know, so
14 that's what I was reading into it.
15    Q.   Do you recall what he said about how much
16 he was worth and when?
17    A.   Yeah.  The "when" was probably right
18 around when we were doing these trusts.  And at one
19 point he told me he was worth $11 million, but I know
20 that wasn't the case toward the end.
21    Q.   So --
22    A.   When I say, "I know that wasn't the case
23 toward the end," because he actually asked me for money
24 at one point.
25    Q.   So he told you around 2003, when the

Page 71

1 insurance trusts were created, that he was worth
2 $11 million?
3    A.   Right.  And I don't know if he was or he
4 wasn't, but that's what he told me.
5    Q.   Okay.  And then you said that he was not
6 worth that much, in your understanding, because he
7 asked you for loans; is that right?
8    A.   He asked me for a loan, yes.
9    Q.   Do you recall when that was?
10    A.   Not too long ago.  Probably about seven
11 months or so before -- before he passed away.  It was
12 the last year before he passed away.  I don't know any
13 specific date.
14    Q.   Do you recall how much he wanted to
15 borrow?
16    A.   He asked me for a hundred thousand
17 dollars.
18    Q.   Did you do it?
19    A.   I did not.  I -- well, I told him that
20 most of my money was tied up in an IRA and that I had
21 tax issues if I wanted to give it to him; but if he
22 really needed it, I'd get him the money.  And then he
23 refused.
24    Q.   Do you know about any other loans that
25 Jeff Wycoff sought?

Page 72

1    A.   No, not from me.
2    Q.   Well, how about any loans from anyone
3 else?  Do you know?
4    A.   I have no idea.  I have no idea.
5    Q.   Do you know if other family members loaned
6 Jeff Wycoff or his businesses money?
7    A.   No, I'm not aware of anything.
8    Q.   Okay.  Did you receive any compensation
9 for your work as trustee?
10    A.   Oh, no, not at all.  I always thought he
11 should buy me a car or something.  But, you know, he
12 told me how rich he was, you know.  No, I never
13 received any compensation.
14    Q.   Okay.  So it sounded like that you could
15 use a break, and that there also might be some
16 additional Merrie Wycoff searches that you can
17 undertake to fully respond to the subpoena.
18    A.   It's -- yeah.  Let me -- let me basically
19 tell you where I am there.  I know that I never really
20 talked to Merrie about anything.  What you showed me, I
21 guarantee Jeff was busy, and he asked Merrie to
22 communicate with me to do something.  And I'm not
23 saying that that didn't happen again.
24         But I do know -- I can tell you
25 completely, and I know I'm under oath, that I've never

Page 73

1 spoken to Merrie or had any kind of communications
2 where she was directing me to do anything that wasn't
3 an intermediary from Jeff or we've discussed anything
4 whatsoever with -- with regard to the policies or the
5 trusts or anything like that.
6         MR. GOLDHAMER:  Okay.  Well, so what I'd
7 like to do now is take a 10- to 15-minute break so you
8 can get that water you were talking about, stretch your
9 legs briefly, and then also look for any other
10 communications with Merrie Wycoff that might be
11 accessible to you on your computer system --
12         THE DEPONENT:  Okay.
13         MR. GOLDHAMER:  -- as it exists today.
14         THE DEPONENT:  Okay.
15         MR. GOLDHAMER:  Does that sound good?
16         THE DEPONENT:  Yeah, I can do that.
17         MR. GOLDHAMER:  Okay.  Let's -- let's take
18 a 15-minute break and --
19         THE DEPONENT:  1 o'clock?
20         MR. GOLDHAMER:  Yeah.  11 o'clock Mountain
21 Time, 1 o'clock Eastern Time.  And if -- if you need
22 lunch, we're happy to talk about that, too.  So we can
23 go off the record.
24         THE DEPONENT:  I'm okay.  Believe me, I
25 have enough reserves to feed off.

Edward Certisimo
June 24, 2021

Page 74

1    THE VIDEOGRAPHER:  We're going off the
2  record at 10 -- 4:43 p.m. UTC time or 10:43 a.m.
3  Mountain Time.
4    (Recess, 10:43 a.m. to 10:59 a.m. MDT.)
5    THE VIDEOGRAPHER:  We are going back on
6  the record at 4:59 p.m. UTC time or 10:59 a.m. Mountain
7  Time.
8    Q.   (BY MR. GOLDHAMER)  Mr. Certisimo, during
9  the break you had a chance to look at some of the files
10  on your computer; is that correct?
11    A.   Yes.
12    Q.   And did you locate any additional
13  communications with Merrie Wycoff?
14    A.   I did not.
15    Q.   And you actually were not able to locate
16  one that you previously sent me; is that correct?
17    A.   That is correct.
18    Q.   So that suggests to you that that
19  communication with Merrie Wycoff was in the batch of
20  documents that may have been lost to a computer update?
21    A.   That's correct.
22    Q.   Did you talk with anybody else during the
23  break?
24    A.   Just my daughter.  She's in my -- in my
25  bedroom working out.  And I -- when the grandkids come

Page 75

1  home, I may have to go in there.
2    Q.   Okay.  Well, hopefully we'll get you
3  wrapped up here shortly.
4    MR. GOLDHAMER:  I believe we're on
5  Exhibit 24.
6    (Deposition Exhibit 24, remotely
7  introduced and provided electronically to the court
8  reporter.)
9    Q.   (BY MR. GOLDHAMER)  Mr. Certisimo, I'm
10  showing you what's been marked as Exhibit 24.  The
11  title of this document is "Action by Written Consent of
12  the Trustee of The Jeffrey Wycoff and Merrie Wycoff
13  2003 Insurance Trust and The Merrie Wycoff 2003
14  Insurance Trust."  You see this document?
15    A.   I do.
16    Q.   Do you recognize this document?
17    A.   I don't.
18    Q.   Okay.  Do you see that it's dated
19  May 12th, 2015?
20    A.   Yes, I do see that.
21    Q.   And do you see that it's relating to
22  borrowing from Wycoff Financial -- whoops, Wycoff
23  Financial borrowing from BC24.  Do you see that?
24    A.   I do.
25    Q.   And that it references a guaranty.  Do you

Page 76

1  see that?
2    A.   I do.
3    Q.   And that -- you know, at the very
4  beginning it refers to the "Trustee" of the Jeff and
5  Merrie 2003 Insurance Trust and the Merrie 2003
6  Insurance Trust, referring to the trusts.  Do you see
7  that?
8    A.   I do.
9    Q.   And it refers to a trust making a guaranty
10  with respect to this loan; is that right?
11    A.   It does.
12    Q.   Okay.  And it refers to Jeff and Merrie
13  Wycoff being authorized to sign a guaranty on behalf of
14  the trusts.  Do you see that?
15    A.   I do.
16    Q.   Do you -- do you remember anything about
17  this document?
18    A.   The only thing I remember is I did sign
19  the final signature page of a guaranty.  I asked for
20  it, to see it, and I never got it.
21    Q.   Okay.
22    A.   Now I'm really upset.
23    Q.   Why are you upset?
24    A.   Oh, because they -- they didn't even show
25  me this, and they just gave me a page and asked me to

Page 77

1  sign it.  I think I sent it to you.  I think in my
2  documents I signed a page that showed the signature
3  page for a guaranty.  And I had no -- I didn't have
4  this document, and this is the first time I'm seeing
5  it.
6    Q.   Okay.
7    A.   That's why I'm upset.  And I asked for it
8  and didn't get it.
9    Q.   So did you ask Jeff Wycoff to see the
10  guaranty that you were signing?
11    A.   I asked for it after the -- I asked for it
12  after the fact, yes.
13    Q.   So this may be an earlier guaranty, just
14  so we're clear.  And we'll get to those other
15  guaranties that -- those other documents that you did
16  send me.  And you see on the last page it's --
17    A.   Signed by me.
18    Q.   -- signed by you in two places.  Do you
19  see that?
20    A.   I do.
21    Q.   Okay.  And it just kind of refers to
22  approving and adopting the foregoing resolutions and
23  consent.  Do you -- do you see where it says that?
24    A.   Yes.
25    Q.   Do you think either of the Wycoffs ever

Edward Certisimo
June 24, 2021

Page 78

1  provided you with the actual resolutions and consent?
2      A.   No, they did not.
3      Q.   Okay.  So do you think that either of the
4  Wycoffs told you what this 2015 document was about?
5      A.   I don't recall, no.
6      Q.   And did this document come up at all with
7  the Wycoffs in connection with the later moving of
8  insurance policies out of the insurance trusts?
9      A.   No.  I was not aware of any guaranties
10  whatsoever.
11      Q.   But you weren't aware that the trusts had
12  guarantied anything; is that right?
13      A.   That's correct, other than -- you know, to
14  be honest, when -- well, I'm always honest -- but to be
15  honest, when I was preparing the documents for you, I
16  saw there was one page that talked about a guaranty
17  that I had signed, but I didn't have any document.
18  They only sent me the one page.  And that actually -- I
19  didn't ask Jeff.  I asked Merrie, after the fact,
20  because I was angry about it.  I asked her.  So again,
21  I spoke with Merrie.  But I spoke with Merrie after the
22  subpoena was issued.  And when I put this together and
23  I saw that guaranty page -- and she had told me she
24  didn't have a copy of what I was asking her for.
25      Q.   So after the subpoena was issued, you had

Page 79

1  a phone conversation with Merrie.  Is that what you're
2  saying?
3      A.   Yes.  When I saw that guaranty page, I
4  said, "Merrie, you got to send me what I signed.  I
5  signed the document, and I don't even know what it
6  was."  And so -- whatever.
7      Q.   What else did you talk about in this
8  conversation with Merrie?
9      A.   Just that there was a subpoena.  And I
10  told her that, you know, I was going to provide all
11  this information.  And she had said, "Oh, geez.  I wish
12  you didn't have to."  I told her that, "Look, I was
13  given a subpoena and I was going to do the right thing.
14  And I'm not going to get in trouble for anything you
15  guys did.  And I'm just going to respond correctly."
16      She didn't tell me -- and, you know, she
17  said, "I understand.  I understand.  You know, she's
18  nervous, obviously.
19      Q.   Do you remember anything else about the
20  conversation?
21      A.   No.  That was pretty much it.  It was
22  pretty short.
23      Q.   You said you were upset with the
24  situation.  Can you describe if this is standard
25  business practice?

Page 80

1      A.   Well, what with (inaudible) and you don't
2  know what it is?  Obviously not.
3      MR. ABELMAN:  Object to foundation.  Hold
4  on.  I just want to register an objection to
5  foundation.  Okay.  You can answer.
6      A.   Okay.  As I told you in the past, they
7  sent me documents.  I just signed them.  Okay.  And
8  this was one of those things where they sent me and I
9  signed them.  And then after we found out -- after the
10  subpoena and I knew what I was doing at that point in
11  time, I looked at one of the documents, and it showed
12  guaranty.  And I said, you know, where is it?  What did
13  I sign, you know?  And I signed it on the belief that
14  they were doing the right thing.
15      And, you know, they'd frequently give me,
16  you know, just a piece of paper and ask me to sign it,
17  and I'd sign it.  So that was probably not a good
18  thing.  I'm just upset about that, that they would do
19  that.  That seemed to be pretty important, that they
20  should let me know what was going on, and they did not.
21      Q.   (BY MR. GOLDHAMER)  So just to be clear,
22  you trusted the Wycoffs to do the right thing.  Is that
23  what your testimony is?
24      A.   Yes, yes.
25      Q.   And you are upset that there is this issue

Page 81

1  with you not knowing what you signed with respect to
2  this guaranty; is that right?
3      A.   I'm upset after the fact, yes.
4      Q.   And you testified that maybe you shouldn't
5  have just trusted them to do the right thing; is that
6  right?
7      MR. ABELMAN:  Object to the form of the
8  question and object to the foundation.
9      A.   Could you repeat the question?  I don't
10  know how to answer that.  I -- I was -- as I stated
11  previously, after the fact, when I was putting this
12  together and understanding the issue that we were
13  talking about, that -- that there was a guaranty and
14  that there was a question -- a question about it, and I
15  saw that I signed a document that was associated with a
16  guaranty.
17      I didn't even know if it was the guaranty
18  we were talking about, where if it was or it wasn't,
19  but I was upset that I -- I said I wanted to get a copy
20  of what I signed; at that point in time, after the
21  fact.  And I was told that I couldn't get it, because
22  she didn't have it.  So upset?  Yeah.  I was upset with
23  myself, more than anything else, that I didn't question
24  it when I signed it.
25      Q.   (BY MR. GOLDHAMER)  Looking back at the

Edward Certisimo
June 24, 2021

Page 82

1 situation, do you wish that you had full copies of
2 everything that you were signing?
3      A.   In retrospect, it would have been nice to
4 understand what I was signing.  But like I had told
5 you, that Jeff was managing it with his lawyers, and I
6 just trusted it to be correct.  And so I just pretty
7 much signed what they asked me to sign.
8      Q.   So would you have done it differently if
9 you could go back and do it again?
10     A.   I don't really know what I'd do.  I don't
11 know.  I don't think that I would, for the most part.
12 For this particular transaction that we were discussing
13 just recently on the guaranty, I probably wish I would
14 have thought about it a little bit more than what I
15 did.  But on all these changes on beneficiaries and all
16 these changes of ownership and the like, you know, as
17 far as I was concerned, he was doing -- he was working
18 with his advisors and doing what they said was the
19 right thing to do.  And that was my assumption,
20 obviously.  I don't know that.
21     Q.   Do you just -- do you regret just signing
22 documents that they -- Jeff Wycoff presented to
23 you without --
24     A.   Not really; not -- not really.  I don't
25 know that there was any intention to do anything wrong

Page 83

1 throughout anything.
2      Q.   But at the time of this 2015 action by
3 written consent, you didn't understand that the
4 insurance trusts were guarantying anything; is that
5 right?
6      A.   That's correct.
7      Q.   So you would not have known to ask further
8 questions of Jeff Wycoff when assets were being moved
9 out of the insurance trusts that had signed a guaranty,
10 because you didn't know there had been any guaranty at
11 all, correct?
12          MR. ABELMAN:  Object to the form of the
13 question, object to foundation.  There's been no -- go
14 on.
15     Q.   (BY MR. GOLDHAMER)  So I'm -- I'm trying
16 to establish that when the insurance policies were
17 moved out of the insurance trusts, you did not know
18 that there was any guaranty signed by any insurance
19 trust, correct?
20     A.   I did not know.  That is correct.
21     Q.   So you did not have any additional reason
22 to ask Jeff Wycoff about whether it was okay to move
23 any assets out of the insurance trusts, in light of the
24 guaranty, because you didn't know about the guaranty,
25 correct?

Page 84

1      A.   Correct.
2          MR. ABELMAN:  Object to the form of the
3 question, specifically the use of the word "assets."
4 One the one hand you're saying "policy," on the other
5 hand you're saying "assets."  Please -- please be
6 consistent there.
7      Q.   (BY MR. GOLDHAMER)  Okay.  Mr. Certisimo,
8 you didn't have any reason to ask any further questions
9 about moving any policy ownership out of the insurance
10 trusts, because -- with respect to any guaranty,
11 because you didn't know about any guaranty, correct?
12     A.   Correct.
13          MR. GOLDHAMER:  I believe we're on
14 Exhibit 25 now.
15          THE REPORTER:  Yes.
16          (Deposition Exhibit 25, remotely
17 introduced and provided electronically to the court
18 reporter.)
19     Q.   (BY MR. GOLDHAMER)  Mr. Certisimo, this is
20 a document that you had provided us in response to the
21 subpoena, referring to a "Reaffirmation, Ratification,
22 and Acknowledgment of Guarantor."  Do you see this?
23     A.   Right.
24     Q.   This was just kind of in the file that you
25 sent us, without any transmission email.  Do you know

Page 85

1 what the context was for this?
2      A.   I do not.
3      Q.   But it refers to the two trusts of which
4 you were trustee, correct?
5      A.   Correct, yes.  I couldn't even tell you if
6 I signed it.  And I don't really understand what it's
7 for.
8          MR. GOLDHAMER:  Okay.  We'll mark
9 Exhibit 26, which will be this email that will pop up
10 in a second here.
11          (Deposition Exhibit 26, remotely
12 introduced and provided electronically to the court
13 reporter.)
14     Q.   (BY MR. GOLDHAMER)  The subject line is
15 "Signature pages," for Jeff Wycoff, to you.  And it
16 says, "Ed, Here are the signature pages.  Thanks,
17 Jeff."  Do you see that?
18     A.   Right.
19     Q.   And that's dated 12/6/2017?
20     A.   Correct.
21     Q.   And then if we open the attachment, which
22 will be part of Exhibit 26, it refers to a guaranty, a
23 guarantor, a guarantor being the Jeff and Merrie 2003
24 Insurance Trust, you as trustee.  And then it's also
25 got, on the second page, a guaranty and a guarantor,

Edward Certisimo
June 24, 2021

Page 86

1 the guarantor being the Merrie Wycoff 2003 Insurance
2 Trust, with you as the trustee.  Is this the document
3 you were talking about before that you did sign, but
4 didn't have anything connected with?
5        A.   Is that -- it's very possible that is it.
6 I don't know -- was there anything else -- I don't know
7 if in my documents I sent you, I don't know if this was
8 the only one associated with the guaranty or not.  But
9 yeah, I didn't review everything I sent you prior to
10 this deposition, so -- but I think so, yes.  I would
11 imagine -- there was a document about a guaranty that
12 drove -- that drove the prior conversation.  So I think
13 this -- this is probably it.  But as you see, he sent
14 me signature pages to sign.
15        Q.   He sent you something involving a guaranty
16 and the insurance trusts, or at least the Jeffrey and
17 Merrie 2003 Insurance Trusts and the Merrie 2003
18 Insurance Trust --
19        A.   Right.
20        Q.   -- that referenced a guaranty and doesn't
21 have anything else of substance, really?
22        A.   Right.
23        Q.   And you didn't ask him for any more detail
24 about what you were signing or what this was about?
25        A.   I did not.  I guess I just get caught --

Page 87

1 got caught up in the fact that this was kind of normal;
2 you know, send me -- sign this and send it back type
3 thing.
4             MR. GOLDHAMER:  Okay.  So we'll mark this
5 email that is "Notarized Docs" in the subject line as
6 Exhibit 27, along with its attachment.
7             (Deposition Exhibit 27, remotely
8 introduced and provided electronically to the court
9 reporter.)
10        Q.   (BY MR. GOLDHAMER)  And you're writing
11 back to Jeff saying, here are scanned copies, you'll
12 receive the originals tomorrow.  Do you see that?
13        A.   I do.
14        Q.   And then the attachment is signed,
15 notarized copies of this guaranty signature page.  Do
16 you see that?
17        A.   Yes, I do.
18        Q.   With your signature, correct?
19        A.   Correct.
20        Q.   So you knew that some sort of guaranty was
21 being signed by these trusts in December of 2017,
22 correct?
23        A.   Yes, I guess.  I knew at the time, yeah.
24 Let me stop.  To be honest, I can't recall exactly what
25 I knew at the time, but I -- I know that I signed it,

Page 88

1 obviously.  I don't know if I really questioned what I
2 was signing or not.
3        Q.   You also knew that the insurance policies
4 owned by these insurance trusts had been transferred
5 out of the insurance trusts at that time, correct?
6        A.   I didn't know if this was before or after,
7 to be honest with you.  I don't know where we were
8 going.  And so, no, I did not know that.  I didn't -- I
9 probably knew that, if I put two and two together, but
10 I didn't.
11        Q.   Okay.  Well, we can go through the
12 timeline that we went through already in this
13 deposition, but I'll represent to you that these
14 changes all occurred prior to this -- whatever this
15 guaranty was that you were signing, that you signed it.
16        A.   Right.
17        Q.   So I'm just trying to understand what you
18 thought the trusts were -- would have to satisfy any
19 guaranty?
20        A.   And --
21             MR. ABELMAN:  Object -- excuse me.  Object
22 to foundation.  And I think it's important to go
23 through the dates and figure out what date to which --
24 to what dates you're referring.
25        Q.   (BY MR. GOLDHAMER)  Did you know --

Page 89

1 let's -- let's back up here.  As the trustee of the
2 trusts, you knew what assets the trusts owned, right?
3        A.   The only thing -- yes, the insurance
4 policies.  That was it.
5        Q.   And you knew that there were -- there was
6 a series of transfers of these insurance policies out
7 of the trusts, correct?
8        A.   I did.  I knew that that took place, yes.
9        Q.   Did you know if there were any assets in
10 the trusts at the time that this additional guaranty
11 was signed?
12        A.   At the time, I didn't even think about it,
13 because I was operating in the manner in which I told
14 you that I was operating.  I was signing things that he
15 asked me to sign.  So I can't say that I knew or didn't
16 know.  If I -- if I had thought about it and I reviewed
17 the documents, then I would say I knew; but I didn't.
18 If you understand what I'm saying?
19             It's hard to -- you know, even when you
20 were talking about it now, I didn't understand the
21 timeline, until you just pointed it out to me.
22        Q.   Well, do you think it's appropriate for
23 trusts to sign guaranties if they don't have any assets
24 or own anything to satisfy a guaranty with?
25        A.   Do I think it's appropriate?  No.

Edward Certisimo
June 24, 2021

Page 90

1      Q.   But you didn't necessarily appreciate that
2   that was the situation?
3      A.   That's correct.
4      Q.   You trusted Jeff Wycoff in connection with
5   signing all these documents?
6      A.   That is correct.
7           MR. GOLDHAMER:  Okay.  We looked at this
8   email before.  We'll now mark it as Exhibit 28.
9           (Deposition Exhibit 28, remotely
10  introduced and provided electronically to the court
11  reporter.)
12     Q.   (BY MR. GOLDHAMER)  And it refers to --
13  it's this email with Merrie Wycoff that you had
14  previously, right?
15     A.   Right.
16     Q.   And it's you sending back a certification
17  of trusts and trustee powers to Merrie Wycoff, correct?
18     A.   Correct.
19     Q.   So at least this document shows that
20  Merrie Wycoff had some involvement with these insurance
21  trusts and the insurance policies, correct?
22          MR. ABELMAN:  Objection to foundation,
23  objection to the form of the question.
24          MR. GOLDHAMER:  What's the objection to
25  form?

Page 91

1      A.   Again, I --
2           MR. GOLDHAMER:  Hold on, hold on, Ed, Ed,
3   one second.  I want to clean up this question.  I want
4   to understand the objection.  Can you articulate the
5   objection to form?
6           MR. ABELMAN:  Because you're
7   inaccurately -- or potentially inaccurately stating the
8   question.  Merrie Wycoff's name is in here.  You
9   haven't asked what -- what she had to do with this.
10     Q.   (BY MR. GOLDHAMER)  Okay.  So,
11  Mr. Certisimo, you knew that Merrie Wycoff at least was
12  sending you emails with forms, and you were sending her
13  back emails with signed forms that related to this
14  Merrie Wycoff 2003 Insurance Trust, correct?
15          MR. ABELMAN:  Object to the form of the
16  question and to foundation.  The testimony was that --
17  what you showed is that there was one email between
18  them.
19          THE DEPONENT:  And that's what I was going
20  to say.
21          MR. GOLDHAMER:  (Inaudible.)  Steve, you
22  can just make a -- a standard objection.  You don't
23  have to coach the witness.
24          THE DEPONENT:  I was actually going to say
25  that anyway.

Page 92

1      A.   If you look look at the email, it
2   basically states that, you know, Jeff -- I was talking
3   to Jeff prior to Merrie sending me this.  It says:
4   Jeff told me the girls were going to be home for
5   Christmas, and hope you have a good holiday.
6           So I seem to recall that Jeff was on the
7   road, or whatever, and he asked Merrie to do this for
8   him.  But I'm not -- I can't say that for positive.
9   And this is the only thing that I can remember.  She
10  may have acted as an intermediary, like I said, between
11  Jeff and I, because she had access to information.
12  That's all I know.  And what she knew, I don't know.
13     Q.   (BY MR. GOLDHAMER)  When do you think your
14  computer update might have impacted your files in this
15  matter?
16     A.   I was hoping that I could get the tips
17  (sic) done, because my computer is still not right.
18  It -- it actually -- I'd say it was after I sent you
19  the subpoena stuff and probably a month ago or so.  I
20  don't know.  You know, when you're retired, you don't
21  even know what day of the week it is.
22          MR. ABELMAN:  I aspire to that.
23          THE DEPONENT:  About every -- about every
24  week I say, "Is this Friday?"
25     Q.   (BY MR. GOLDHAMER)  So about a month ago,

Page 93

1   you had some sort of computer issue?
2      A.   Right.  It continued to freeze.
3      Q.   But your -- if we look back at your letter
4   to me with the subpoena responses, that was April 30th
5   of 2021, correct?
6      A.   Okay.  Yes.
7      Q.   So I want to show you Exhibit 29.
8           (Deposition Exhibit 29, remotely
9   introduced and provided electronically to the court
10  reporter.)
11     Q.   First of all, do you recognize this
12  letterhead?
13     A.   It's a template out of Microsoft; yeah,
14  probably.
15     Q.   Is that something you've used?
16     A.   No, no, not -- I didn't use anything
17  consistently.  As you saw in my transmittal letter to
18  you, I just tried to do a basic business letter.
19     Q.   Okay.  Do you recognize --
20     A.   Can you make it a little bigger, please?
21     Q.   Yes.  Let's -- I just wanted you to see
22  the whole thing.
23     A.   Oh, not too big.
24     Q.   Is that too big?  Do you want me to zoom
25  out?

Edward Certisimo
June 24, 2021

Page 94

1    A.    Yeah.  You're going to cut -- you're going
2  to cut off.  Just click one more.  That's good.
3    Q.    Do you recognize this letter?
4    A.    I do.  (Inaudible) to Bloomfield.
5  Subsequently it had been surrendered.  At this point,
6  no other assets reside in the trust.
7    Q.    Okay.  So did you write this letter?
8    A.    I don't know.  I think I was -- I
9  obviously wrote the letter, but I don't know if I was
10  coached on how to write it or not.  But I think --
11  let's say I wrote the letter.
12    Q.    Well, I just want to understand what your
13  testimony is.  I'm not saying you wrote the letter or
14  not.  This letter was not in the --
15    A.    I don't really recall the transaction that
16  we were at -- that we were dealing with here.  I'm
17  sure, at the time, I was asked to write the letter.
18  That -- and this was after Jeff had passed away,
19  correct, June?
20    Q.    Correct.
21    A.    So I'm sure that Merrie -- so another --
22  another communication with Merrie -- Merrie -- shit.
23  Merrie probably told me that this was needed, and I
24  needed to -- oh, you know what?  This was the family
25  reunion after Jeff passed away.  And this was at the

Page 95

1  party, and I think we drafted it together.  This is
2  where I drove Azuraye back to Boston that we talked
3  about.
4    Q.    Yes.  So you were at a family reunion, and
5  you were sitting down at a computer with Merrie Wycoff,
6  and she was helping you draft this letter?
7    A.    Yeah.  She told me she needed me to draft
8  a letter.  And I borrowed -- I used the computer, my
9  uncle's computer, to do it.  And I asked her to tell me
10  what she needed to say, and then I put it into words,
11  I'm sure.  And I think it's correct, isn't it?  And I
12  didn't know anything about Bloomfield Capital at the
13  time.  I know now.  I guess she took out a loan on the
14  farm or something with Bloomfield.  I don't know.
15  Anyway, I'm talking, and I shouldn't be.
16    Q.    So just to be clear, Merrie Wycoff told
17  you what she needed to be in this letter, and you
18  drafted it up?
19    A.    Right.
20    Q.    And you were at a family reunion, so you
21  didn't necessarily have your files to check, correct?
22    A.    Correct.
23    Q.    And so you didn't do any due diligence
24  with respect to this letter, correct?
25    A.    That is correct.

Page 96

1    Q.    And the letter actually is not correct, is
2  it?
3    A.    Well, the 10,000 [sic] had expired -- or,
4  actually, it was -- it was surrendered, wasn't it?  I
5  don't remember.
6    Q.    We -- so we looked at this previously.
7  It's 10 million, not 10,000, right?
8    A.    Yeah, 10 million -- 10 million is correct.
9  I'm sorry.
10    Q.    "Of the two policies, the $10,000,000 term
11  policy has previously expired."  We actually -- that's
12  what the letter says, right?
13    A.    Correct.
14    Q.    But that policy was actually surrendered,
15  correct?
16    A.    Correct, correct.
17    Q.    Okay.  And then going back to the first
18  sentence, "Please be advised, as trustee of the subject
19  trusts, that the only assets put in trust was an
20  insurance policy in each trust."  You see that?
21    A.    Yes.
22    Q.    But we actually looked at a whole number
23  of insurance policies previously, correct, more than
24  just two?
25    A.    There were three trusts, and they were --

Page 97

1  different insurance policies were in different trusts.
2  We only looked at three insurance policies, I believe.
3    Q.    Well, we can look back through it, but I
4  guess the question is, the only assets piece was a
5  statement that you made at Merrie's direction, correct?
6    A.    Which I thought was true, yes, I believed
7  was true.  There was never anything other than
8  insurance policies put in the trust.
9    Q.    And there may have been more than two
10  policies that we're talking about here, correct?
11    A.    Possible.  I'd have to go back and try to
12  put everything together.  I know there were three
13  policies that we discussed, and I know there were three
14  trusts.  So it's possible that -- I don't know.  I
15  don't know if there was more than one policy in a
16  particular trust.
17    Q.    And the next sentence is incorrect,
18  because the $10 million term policy was actually
19  surrendered.  It didn't expire.
20    A.    Okay.  But it wasn't an asset, right?
21  Okay.
22    Q.    So you agree that that second sentence
23  isn't correct, right?
24    A.    The word "expired" is -- is wrong.  It
25  should have been "surrendered."

Edward Certisimo
June 24, 2021

Page 98

1       Q.   And then there's a reference to, "The
2  second Transamerica policy was collaterally assigned to
3  Bloomfield Capital, and subsequently been surrendered."
4  Do you see that?
5       A.   Yes.
6       Q.   Do you know which policy that is talking
7  about?
8       A.   I do not.
9       Q.   Let me show you Exhibit 30.
10           (Deposition Exhibit 30, remotely
11  introduced and provided electronically to the court
12  reporter.)
13      Q.   Do you see that this is a Transamerica
14  form with respect to Policy No. 41643523?  Do you see
15  that?
16           MR. ABELMAN:  Aaron, let me interrupt you
17  first.  Was that document Exhibit 29?  If you -- if you
18  said that, I missed it.
19           MR. GOLDHAMER:  Yes.  The last letter was
20  Exhibit 29.
21           MR. ABELMAN:  Okay.  Thanks.
22      A.   A little bigger, Aaron.  That's good.
23      Q.   (BY MR. GOLDHAMER)  It's a Transamerica
24  form, Policy No. 41643523.  This is a "Collateral
25  Assignment."  Do you see that?

Page 99

1       A.   Yes.
2       Q.   And it's signed by the owner, Merrie
3  Wycoff.  Do you see that?
4       A.   Uh-huh.
5       Q.   Yes?
6       A.   Yes.  I'm sorry.
7       Q.   And that wasn't any of the trust policies
8  that we talked about previously, is it, the --
9       A.   I don't recognize the number, that's for
10  sure.
11      Q.   -- the 523 policy?
12      A.   Correct.  I do not recognize it.
13      Q.   Okay.  So of the two policies described --
14  and this is a Collateral Assignment to BC24.  Do you
15  see that?
16      A.   Is that Bloomfield?  Yes, I do see that.
17      Q.   I will represent to you that BC24 is a
18  subsidiary of Bloomfield Capital.
19      A.   Okay.
20      Q.   So going back to the letter, Exhibit 29,
21  there's two policies referenced here; the $10 million
22  term policy and a policy that was collaterally
23  assigned.
24      A.   Correct.
25      Q.   And those are the only two policies

Page 100

1  mentioned, correct?
2       A.   That is correct; in that letter, correct.
3       Q.   None of the other -- none of the policies
4  that we talked about today were mentioned, correct?
5       A.   Correct.
6       Q.   Okay.  And that would include the
7  Transamerica 514 policy we talked about, correct?
8       A.   That was not mentioned, yes, because that
9  was not collaterally assigned.
10      Q.   And that would include the Transamerica
11  VXL policy that we talked about, correct?
12      A.   Yes.
13      Q.   And we talked about the Hancock
14  Manulife 292 policy that was surrendered, but there was
15  also the Hancock Manulife 737 policy we talked about,
16  correct?  And that's not mentioned here.
17      A.   Okay.  I don't -- I don't recall that
18  policy, but okay, in our conversation.
19      Q.   So would you agree that this letter is not
20  completely accurate?
21      A.   I would.
22      Q.   But you signed it anyway, because you
23  trusted Merrie Wycoff and what she was saying to you?
24      A.   Correct.
25           MR. ABELMAN:  Object -- object to the

Page 101

1  foundation.
2           MR. GOLDHAMER:  You're going to have to
3  articulate that objection a little bit more.  Where is
4  the foundation issue?
5           MR. ABELMAN:  That's not his testimony.
6  You're putting words in his mouth.  Why don't you just
7  ask him the question, which is a why.
8           MR. GOLDHAMER:  I think that's a fine
9  question.
10      Q.   (BY MR. GOLDHAMER)  Why did you sign it,
11  though?  We'll ask that question.
12      A.   I signed it because Merrie asked me to.
13  And I believed that what she was telling me to put in
14  the letter was correct.
15      Q.   And did you believe her because you
16  trusted her?
17      A.   I did.
18      Q.   And it didn't come to your mind to mention
19  any of the other policies that you had signed off on
20  moving outside of either of these trusts, correct?
21      A.   Correct.
22      Q.   Because of the nature of the relationship,
23  right?
24      A.   That is correct.  It's the nature of the
25  relationship that had taken place since the beginning

Edward Certisimo
June 24, 2021

Page 102

1 of my trusteeship.

2      Q.   And that was the relationship with, first,
3 Jeff Wycoff, but then impacted your -- your trusting of
4 Merrie Wycoff in connection with this letter, right?

5      A.   Correct.

6           MR. GOLDHAMER:  Okay.  Okay.  I think
7 that's all the questions I have.

8           MR. ABELMAN:  I have a few.  Let's --
9 Aaron, would you -- would you keep Exhibit 29, this
10 letter, up?

11           MR. GOLDHAMER:  Yes.

12           MR. ABELMAN:  Thank you.

13                EXAMINATION

14 BY MR. ABELMAN:

15      Q.   Mr. Certisimo, do you recall -- well,
16 first of all, Exhibit 29 is a letter -- you've
17 identified it as a letter that you wrote, but I don't
18 think you identified to whom.  Would you do so?

19      A.   Robert Henke, CPA.

20      Q.   Did you -- do you know who Robert Henke,
21 CPA is?

22      A.   No.

23      Q.   Did Merrie Wycoff explain to you why she
24 wanted you to write a letter to Robert Henke, CPA?

25      A.   Not that I can recall.

Page 103

1      Q.   Okay.  Did she explain to you what the
2 point of this letter was; what -- what it was that
3 she -- she had hoped to communicate or she hoped for
4 you to communicate, either of them?

5      A.   No, not that I can recall.

6      Q.   Okay.  So let's go back.  The use of the
7 word "expired," do you recall who came up with the word
8 "expired"?

9      A.   I can't say that I do.

10      Q.   Can you say whether -- whether it was
11 suggested to you by Merrie Wycoff?

12      A.   No, I cannot.

13      Q.   Okay.  I asked you previously if you
14 recalled what the purpose of this letter was.  Would
15 you look at the last sentence in the first paragraph
16 and let me know if -- if that jogs your memory about
17 why or what the purpose of this letter was?

18      A.   "At this point no assets reside in either
19 trust."  I believe that was true, and it does not just
20 jog my memory.

21      Q.   Do you believe that it's true -- can you
22 tell me the basis for your belief that it is -- that --
23 well, you believe it to be true -- let -- let me be
24 more specific.  As of June 15th, 2018, did you believe
25 it to be true?

Page 104

1      A.   I believed that the $10 million policy was
2 no longer there.  I don't know about the policy with
3 Bloomfield.  I did not -- so I guess I didn't even -- I
4 was relying on Merrie at this point, also.

5      Q.   Okay.  Did have -- you learned anything
6 today with regard to that sentence that you read, "At
7 this point no assets reside in either trust"?  Did you
8 learn anything today that would make you question that
9 as of June 15, 2018, that statement was anything but
10 accurate?

11      A.   Did I learn anything today?  I -- yes, I
12 think.  I think because the transfer of ownership
13 documents took place, I think in December of '17, was
14 it?

15      Q.   Yes.

16      A.   -- so -- so, yes.

17      Q.   Well, okay.  This letter is dated -- what
18 is the date of this letter?

19      A.   June 15, 2018.

20      Q.   Okay.  So what -- so what assets are you
21 aware of today that existed in either trust?  And
22 we've -- you've established that there were three
23 trusts, but -- so -- but at this point, no assets exist
24 in either trust.  What -- what have you learned today
25 that would lead you to believe that as of June 15,

Page 105

1 2018, there were assets that resided in either trust?

2      A.   Nothing.

3           MR. ABELMAN:  Okay.  No further questions.

4           MR. GOLDHAMER:  Okay.  I think that's all,
5 Mr. Certisimo.

6           THE DEPONENT:  Okay.

7           MR. GOLDHAMER:  This -- I think -- we can
8 go off the record.

9           THE VIDEOGRAPHER:  The concludes the
10 videotaped deposition of Edward Certisimo.  We are
11 going off the record at 5:49 p.m. UTC time or
12 11:49 a.m. Mountain Time.

13           (The following proceedings were held
14 outside the videotape portion of the deposition.)

15           THE REPORTER:  Mr. Abelman, would you like
16 this deponent to read and his sign his transcript?

17           MR. ABELMAN:  I not sure that's -- that's
18 my -- I'm not sure that's up to me.

19           MR. GOLDHAMER:  Well, I think we should
20 defer to Mr. Certisimo.

21           THE DEPONENT:  Whether I want the
22 recording stopped?

23           MR. GOLDHAMER:  Well, no.

24           THE DEPONENT:  Sure.  Stop it.

25           MR. GOLDHAMER:  The question is, do you

Edward Certisimo
June 24, 2021

## Page 106

1   want to see a copy of your -- a written copy of your

2   testimony today and have the opportunity to sign it

3   and/or make any corrections that appear from the face

4   of the transcript?

5           THE DEPONENT:  I'd like to see a written

6   copy, just as a record.  But as far as making

7   corrections or whatever -- so yes, I'd like to see a

8   written copy, unless I shouldn't have done that.

9   Should I have done that, Steve?

10          MR. ABELMAN:  Well, I don't represent you.

11          THE DEPONENT:  I know.

12          MR. ABELMAN: It's really -- it's really up

13  to you.  If you'd be more comfortable --

14          THE DEPONENT:  Yeah, I'd like to have a

15  copy.  And I don't believe that I would make any

16  changes.

17          THE REPORTER:  Okay.  So I'm going to put

18  down that you're waiving signature.

19          THE DEPONENT:  Okay.

20          THE REPORTER:  Mr. Abelman, would you like

21  to send him a copy, once I send you your copy?

22          MR. ABELMAN:  I'd be happy to do so.

23          THE REPORTER:  And, Mr. Goldhamer, do you

24  need a copy of the transcript?

25          MR. GOLDHAMER:  Yes, please; and video,

## Page 107

1   please.

2           THE REPORTER:  Mr. Abelman, do you want

3   the same order you had yesterday, the etran and

4   exhibits?

5           MR. ABELMAN:  Yes, please.  No video.

6           THE VIDEOGRAPHER:  I was just going to

7   ask, you didn't want a video from yesterday either,

8   correct?

9           MR. ABELMAN:  Correct.

10          THE VIDEOGRAPHER:  Okay.  I just wanted to

11  double-check.

12          MR. GOLDHAMER:  I will email the exhibits.

13  I will do one copy of the exhibits as well.

14          THE REPORTER:  Thank you.

15          WHEREUPON, the within proceedings were

16  concluded at the approximate hour of 11:51 a.m. MDT on

17  the 24th day of June, 2021.

18          *    *    *    *    *

19          (It was stipulated and agreed by counsel,

20  with the consent of the deponent, that the reading and

21  signing of the within deposition by the deponent was

22  waived.)

23

24

25

## Page 108

1              REPORTER'S CERTIFICATE

2   STATE OF COLORADO        )

                            ) ss.

3   CITY AND COUNTY OF DENVER )

4           I, GAIL OBERMEYER, Registered Professional
    Reporter and Notary Public ID 19994012647, State of

5   Colorado, do hereby certify that previous to the
    commencement of the examination, the said EDWARD J.

6   CERTISIMO verbally declared his testimony in this
    matter is under penalty of perjury; that the said

7   deposition was taken in machine shorthand by me at the
    time and place aforesaid and was thereafter reduced to

8   typewritten form; that the foregoing is a true
    transcript of the questions asked, testimony given, and

9   proceedings had.

10          I further certify that I am not employed
    by, related to, nor of counsel for any of the parties

11  herein, nor otherwise interested in the outcome of this
    litigation.

12

            IN WITNESS WHEREOF, I have affixed my

13  signature this 1st day of July, 2021.

14          My commission expires May 20, 2023.

15

16          _____

            Gail Obermeyer, RPR

17          Registered Professional Reporter
            Notary Public, State of Colorado

18

19

20  _____ Reading and Signing was requested.

21  __X__ Reading and Signing was waived.

22  _____ Reading and Signing is not required.

23

24

25

Edward Certisimo
June 24, 2021

## $

**$10**
33:13,15
35:23 97:18
99:21 104:1
**$10,000,000**
96:10
**$11**
70:19 71:2
**$376,000**
36:1
**$379,000**
39:11
**$379,617.68**
38:16

## 1

**1**
31:9,13 49:6
51:5,9
73:19,21
**10**
19:17,18
33:18 74:2
96:7,8
**10,000**
96:3,7
**10-**
73:7
**10:43**
74:2,4
**10:59**
74:4,6
**10th**
49:25 56:15
**11**
20:7,9 27:3
73:20
**11:49**
105:12
**12**
21:21,22
54:17

**12/6/2017**
85:19
**12th**
75:19
**13**
26:21,22
54:17
**14**
9:2 30:15,16
54:17
**15**
33:2,3 42:23
59:5 65:9
104:9,19,25
**15-minute**
73:7,18
**15th**
103:24
**16**
35:9,10
48:10,24
**16th**
48:8
**17**
36:22,23
49:2 104:13
**18**
38:10,11
39:17
**19**
39:19,20
41:18
**1970**
68:13
**1970s**
67:14
**1999**
11:17 24:1
25:3 33:25
34:17

## 2

**2**
51:9
**20**
9:2 33:25

41:19,20
65:9
**2000s**
16:17
**2001**
24:18
**2003**
11:9,11,14
13:16 18:25
19:23 20:8
22:5,14 23:1
24:11 25:3
30:20 31:6
32:14 34:18,
19 35:1
40:19 41:2,
8,15 42:3
43:5 52:14
63:20 64:5
70:25 75:13
76:5 85:23
86:1,17
91:14
**2004**
14:4 23:2
**2009**
31:2,9,13
**2011**
35:20 37:11
53:25 54:16
**2012**
54:18 55:6
**2013**
54:18
**2014**
27:3 54:18
**2015**
53:25 75:19
78:4 83:2
**2017**
48:8,11,24
49:25 53:21,
23 56:15
59:3,5 87:21
**2018**
59:13 103:24
104:9,19

105:1
**2021**
6:25 93:5
**21**
51:19,20
55:25
**22**
56:6,7
**23**
61:18,19,20
**24**
6:25 75:5,6,
10
**25**
84:14,16
**250,000**
42:24
**26**
85:9,11,22
**27**
87:6,7
**28**
90:8,9
**29**
93:7,8
98:17,20
99:20 102:9,
16
**292**
33:10 34:25
35:14 37:8
38:15 100:14

## 3

**3**
51:9,10
**30**
42:23 98:9,
10
**300**
27:1
**30th**
93:4
**31st**
59:13

Edward Certisimo
June 24, 2021

**34**
  19:10
**36**
  20:3,16
**3:05**
  7:1

---

**4**

**4**
  51:6,11
**40**
  19:5
**41643514**
  22:8
**41643523**
  98:14,24
**4:43**
  74:2
**4:59**
  74:6

---

**5**

**50**
  15:12 68:24
**514**
  22:12 23:14,
  16 27:6
  28:8,23 62:9
  63:8,19
  64:13 100:7
**523**
  99:11
**56643737**
  39:25 42:1
**58**
  33:10
**5:49**
  105:11

---

**7**

**7**
  9:22,23

**7/20/1999**
  23:23 24:11
**70**
  14:21
**737**
  40:16 41:5,
  15 42:1,15
  100:15

---

**8**

**8**
  10:14,15

---

**9**

**9**
  18:20,21
  35:20
**90**
  9:1
**909**
  33:10
**9:05**
  7:1

---

**A**

**a.m.**
  7:2 74:2,4,6
  105:12
**Aaron**
  7:23 8:14
  50:25 98:16,
  22 102:9
**Abelman**
  7:25 29:16,
  23 37:20
  44:15,22
  46:10 50:25
  58:1 61:12
  80:3 81:7
  83:12 84:2
  88:21 90:22
  91:6,15
  92:22 98:16,
  21 100:25

  101:5 102:8,
  12,14 105:3,
  15,17
**able**
  74:15
**above**
  19:14
**absolutely**
  25:12 38:3
  61:14,16
  66:11
**accepted**
  15:12
**access**
  92:11
**accessible**
  73:11
**accidentally**
  56:18
**account**
  13:17,24
  39:6,7
**accountants**
  16:21
**accurate**
  100:20
  104:10
**accusing**
  46:3
**acknowledge**
  7:13,16
**Acknowledgment**
  84:22
**acted**
  14:25 92:10
**acting**
  60:6
**action**
  7:7 75:11
  83:2
**actions**
  38:6
**active**
  17:15
**actual**
  12:4,15

  17:18,21
  18:4,14 78:1
**addition**
  68:18
**additional**
  21:13 48:12
  49:1 72:16
  74:12 83:21
  89:10
**address**
  27:1,11
  28:18 30:21
  53:10,11,12,
  15,20,23
  54:2,23
  56:11,12
  63:2,24
**addressed**
  35:14
**addresses**
  53:13,18
**administered**
  7:16
**administration**
  12:3,14,21,
  23 17:12,15,
  20 18:3,15
  54:8 55:10
**adopting**
  77:22
**advice**
  18:13
**advised**
  26:2 96:18
**advisors**
  82:18
**Affect**
  42:9
**Affection**
  42:10
**agents**
  17:11
**ago**
  15:12 43:15
  71:10 92:19,
  25

Edward Certisimo
June 24, 2021

agree
  7:24 97:22
  100:19
agreeing
  24:10
agreement
  6:9 7:21,22
  18:24 19:23
  20:8
ahead
  15:9 37:22
  44:20 49:16
alcohol
  61:4
alive
  59:9,13
alliance
  47:5,6
amount
  33:13 44:7
and/or
  6:10
Angeles
  25:22
angry
  78:20
answer
  37:23 46:14
  80:5 81:10
answering
  34:10
anti-trust
  47:3
anybody
  74:22
anymore
  16:22 68:2
anyone
  6:19 72:2
AOL
  56:11
apparently
  25:25
appears
  34:22 63:24
application
  13:8

appreciate
  90:1
appropriate
  89:22,25
approving
  77:22
April
  31:9,13 93:4
archived
  60:12
around
  70:18,25
arrangement
  7:19
arrow
  52:20 63:13
articulate
  91:4 101:3
asked
  10:2 25:13
  30:12 45:12
  48:2,5 58:17
  59:15,22
  70:23 71:7,
  8,16 72:21
  76:19,25
  77:7,11
  78:19,20
  82:7 89:15
  91:9 92:7
  94:17 95:9
  101:12
  103:13
asking
  36:8 45:14
  66:4 78:24
aspect
  26:12
aspire
  92:22
asset
  97:20
assets
  13:18 83:8,
  23 84:3,5
  89:2,9,23
  94:6 96:19

97:4 103:18
104:7,20,23
105:1
assign
  50:13
assigned
  40:9,17 98:2
  99:23 100:9
Assignment
  98:25 99:14
associated
  81:15 86:8
assume
  37:17
assumption
  82:19
Attached
  50:4 56:17
attachment
  51:19 52:6
  53:5 55:25
  56:6 63:1,5,
  23 64:3
  85:21 87:6,
  14
attachments
  57:6 61:19
  62:25
attorney-
client
  6:10
attorneys
  7:12
Augusta
  23:1
authorized
  76:13
aware
  6:6 10:19
  11:18,23
  21:4,9,17
  49:2 72:7
  78:9,11
  104:21
Azuraye
  63:20 64:18
  65:8,13,21

95:2

**B**

back
  14:16 16:17
  19:9 34:11
  48:22 53:4,
  12 61:7 62:5
  63:16 64:12
  67:14,15
  68:1,5,13,23
  74:5 81:25
  82:9 87:2,11
  89:1 90:16
  91:13 93:3
  95:2 96:17
  97:3,11
  99:20 103:6
background
  45:8,10,19
  66:5
bank
  13:16,22
  39:6,7
Barry
  14:1,11 24:4
  31:12,17
  32:3,7
Bartelt
  7:4
basic
  93:18
basically
  14:1,17
  16:8,10
  18:16 23:10,
  17 25:15
  57:22 67:24
  72:18 92:2
basis
  103:22
batch
  74:19
BC24
  45:21 75:23
  99:14,17

Edward Certisimo
June 24, 2021

bedroom
  74:25
beginning
  16:16 76:4
  101:25
behalf
  7:5,9,25
  76:13
belief
  80:13 103:22
believe
  46:13 49:23
  50:7 51:18
  73:24 75:4
  84:13 97:2
  101:15
  103:19,21,
  23,24 104:25
believed
  97:6 101:13
  104:1
below
  20:19
beneficiaries
  55:17 82:15
beneficiary
  22:13 27:8,
  18 55:21
  63:11
benefit
  35:23
best
  24:9,24
better
  18:2 25:5,6
big
  47:8 66:17,
  19 93:23,24
bigger
  93:20 98:22
Bing
  70:1
bit
  12:9 29:22
  58:14 70:7
  82:14 101:3

Bloomfield
  45:21 94:4
  95:12,14
  98:3 99:16,
  18 104:3
blow
  12:9
borrow
  71:15
borrowed
  95:8
borrowing
  75:22,23
Boston
  65:21,23
  67:21 95:2
bothered
  69:15,20
bottom
  19:11 23:19
  28:3 37:6
  64:8
bought
  21:5 55:3
  66:21
Boulder
  66:15,17
brag
  70:8
break
  60:23,25
  72:15 73:7,
  18 74:9,23
breaking
  68:3
Briar
  27:1 53:22
briefly
  73:9
bring
  19:16 38:9
bringing
  18:19
Buddy
  69:10 70:1
building
  69:2

built
  69:2
bunch
  51:2
bundles
  49:18
business
  69:24 70:4
  79:25 93:18
businesses
  16:17 67:13
  72:6
busy
  16:22 72:21
button
  6:21
buy
  72:11

---

## C

call
  13:20 21:21
  33:2 39:17
  50:16,19
  51:18 55:25
  61:18
called
  45:1 49:6
  59:14 60:12
cancer
  67:20
Cape
  65:21
Capital
  45:21 95:12
  98:3 99:18
car
  72:11
care
  17:11 30:21
  54:9 55:9
case
  9:16 33:7
  34:5 43:19
  45:24 46:18
  47:3 70:20,

22
cash
  39:3
caught
  86:25 87:1
certain
  25:10 27:24
certification
  58:16,21
  90:16
certis@
hotmail
  51:25
certis@
hotmail.com.
  49:11
Certisimo
  6:24 8:2,7,
  12 10:24
  23:22 26:5
  27:15 29:25
  31:7,8 33:24
  40:18 41:7
  49:9 52:14
  58:3 74:8
  75:9 84:7,19
  91:11 102:15
  105:5,10,20
chance
  74:9
change
  25:2 28:8
  39:11 42:8
  50:22 53:10,
  11,12,14,21
  55:22 57:7
  63:2,19,24
changed
  23:11 29:4
  31:6,11,12
changes
  48:12 49:1
  57:19,21
  62:25 64:12
  65:4 82:15,
  16 88:14

Edward Certisimo
June 24, 2021

changing
29:9 30:2,7
56:19 57:14,
15 64:24

chat
60:22

check
38:16,19,22
39:4 95:21

children
15:7

Christmas
92:5

chronology
24:22

circumstances
36:13 37:14

cities
65:15

Civil
6:2

clean
37:23 56:2
91:3

clear
29:21 77:14
80:21 95:16

clearer
59:21

clearly
12:7

click
6:21 49:10
52:5 62:14
94:2

close
15:16 21:20

closed
66:25

co-owner
35:3,4

co-trustee
34:2 35:6,7

coach
91:23

coached
94:10

Coast
65:15

Cod
65:21

Cole
7:4

Collateral
98:24 99:14

collaterally
98:2 99:22
100:9

Colorado
7:6 9:7
65:10

come
18:3 61:7
74:25 78:6
101:18

comfortable
29:10 30:1

Commission
46:23 47:2

common
27:22

communicate
72:22 103:3,
4

communication
18:9 54:13
61:8 64:19,
20 74:19
94:22

communications
60:1 73:1,10
74:13

companies
13:3 14:10
21:14

company
21:11 33:22
45:15 47:4

compensation
72:8,13

compete
47:6

competed
66:23

competitive
70:6,7

competitor
47:4

completed
50:5

completely
72:25 100:20

computer
60:6 73:11
74:10,20
92:14,17
93:1 95:5,8,
9

computers
23:11

concerned
82:17

concludes
105:9

condolences
46:20

confident
59:25

connected
86:4

connection
26:16 33:16
78:7 90:4
102:4

consent
7:19 8:1
75:11 77:23
78:1 83:3

consistent
84:6

consistently
93:17

consolidated
21:12

contact
58:23

context
85:1

contingent
63:11

continued
93:2

contracts
8:20 16:18

controversy
44:2

convenience
15:1 16:7,12

conversation
43:23 44:1,
14 45:4
46:1,11 50:8
57:18,20
67:19 79:1,
8,20 86:12
100:18

conversations
6:8,10 25:1,
9 28:23
29:19,25
30:5 44:24
45:3 46:10
48:15,16,19
50:14 55:20
58:4 64:15
66:8,9,13
67:3

copies
13:10 17:8,9
56:3,17 82:1
87:11,15

copy
78:24 81:19

copying
56:11

corner
6:22

corporate
8:18

correct
10:7,12
11:3,10,13,
16,25 12:1,
17 13:1,4,5
15:1,2 16:2

Edward Certisimo
June 24, 2021

18:18 19:15
23:15 27:7,
21 30:23
35:2,3,23,24
36:11 37:12,
13 38:5,8
39:14,15
40:8,13,23
41:16,17
42:17 43:24
47:17 48:17
50:23 52:7,
8,11,22 53:7
54:5,6,7
55:8,10,22
56:16 57:10,
11,25 58:6,
21,24 62:10
63:3,9,25
64:2,10,13,
22 65:5,6
74:10,16,17,
21 78:13
82:6 83:6,
11,19,20,25
84:1,11,12
85:4,5,20
87:18,19,22
88:5 89:7
90:3,6,17,
18,21 91:14
93:5 94:19,
20 95:11,21,
22,24,25
96:1,8,13,
15,16,23
97:5,10,23
99:12,24
100:1,2,4,5,
7,11,16,24
101:14,20,
21,24 102:5
**correctly**
79:15
**correspondenc**
**e**
58:9,11,12

**counsel**
6:24 7:19
**countries**
42:23
**couple**
34:23 45:2
48:5 50:11
**court**
9:24 10:16
18:22 19:19
20:10 21:23
26:23 30:17
33:4 35:11
36:24 38:12
39:21 41:21
48:7 51:21
56:8 61:21
75:7 84:17
85:12 87:8
90:10 93:9
98:11
**cousin**
15:5
**cover**
10:10,13
26:25
**CPA**
102:19,21,24
**created**
71:1
**creating**
6:13
**Creek**
27:2 53:22
**current**
23:21 26:4
52:13,22
53:15 60:15,
19
**cut**
33:21 94:1,2
**cutting**
62:15

---
**D**
---

**D.C.**
47:2
**dad**
15:19
**date**
22:25 25:24
28:20 31:7
45:3 58:25
59:1,11
71:13 88:23
104:18
**dated**
23:23 24:1,
11 31:2
33:25 35:18
49:24 56:14
75:18 85:19
104:17
**dates**
88:23,24
**daughter**
74:24
**day**
92:21
**deal**
13:13 14:10
29:15 53:11
**dealing**
32:1 94:16
**death**
35:23 65:18
67:6
**debt**
44:15
**deceased**
12:4,15,18
17:18 18:5
**December**
59:5 87:21
104:13
**declare**
7:17 8:3
**declared**
8:8

**defendants**
8:1 33:7
**defer**
105:20
**Definitely**
21:1
**Demarco**
15:24
**Denver**
7:6
**depending**
38:25
**Depends**
61:3
**deponent**
8:5 10:25
49:13,19
58:6 61:1,3
62:23 73:12,
14,16,19,24
91:19,24
92:23 105:6,
16,21,24
**deposition**
6:17,24
7:13,14,15
9:23 10:15
18:21 19:18
20:9 21:22
26:22 30:16
33:3 35:10
36:23 38:11
39:20 41:20
46:12 51:20
56:7 61:20
75:6 84:16
85:11 86:10
87:7 88:13
90:9 93:8
98:10
105:10,14
**depositions**
46:21,25
47:8
**describe**
46:24 79:24
**described**

Edward Certisimo
June 24, 2021

99:13

describes
41:4

describing
17:4 35:25

description
10:1 50:6

designated
50:25 55:17

designation
27:9 55:21

detail
86:23

Devon
52:18 55:17
64:4,5,16,18
65:7 66:22,
23

died
59:12

different
11:6,25
23:23 39:18
54:23 97:1

differently
82:8

difficult
24:22

diligence
95:23

directing
73:2

direction
38:7 97:5

directory
60:12

discuss
45:20,23

discussed
45:11 73:3
97:13

discussing
48:20 82:12

discussions
36:15

dispute
45:14

dissolved
17:14

distraught
68:3,15

divorced
15:11,24

Docs
87:5

document
14:16 18:23
19:17,22
20:7 21:25
24:1 25:19
26:7 31:20,
21 32:8
33:6,9 34:7,
23 35:13,18
36:3,8,10,
12,22 38:9,
14 39:24
40:23 41:18
49:20 53:1,7
62:23 75:11,
14,16 76:17
77:4 78:4,6,
17 79:5
81:15 84:20
86:2,11
90:19 98:17

documents
10:7,8,9
23:12 24:20
34:4,8 74:20
77:2,15
78:15 80:7,
11 82:22
86:7 89:17
90:5 104:13

doing
16:9 18:14
50:14 60:24
66:3 70:9,18
80:10,14
82:17,18

dollars
44:6 71:17

door
49:14

double-click
51:24

draft
95:6,7

drafted
57:23 95:1,
18

drink
61:4

drive
27:2 53:23
60:19

drop
65:22

drove
86:12 95:2

due
46:5 95:23

duplicates
51:14

---

**E**

earlier
52:7,9 77:13

early
16:17

easier
41:24

East
65:15

Eastern
73:21

eating
67:23

Ed
27:15 31:7,8
49:9 50:3
52:14 56:17
85:16 91:2

Eddie
59:21

Edward
6:24 8:7
23:22 26:5
33:24 40:18
41:7 105:10

effective
25:16,17
31:9,13

either
17:7 26:3,4
34:15 77:25
78:3 101:20
103:4,18
104:7,21,24
105:1

electronically
9:24 10:16
18:22 19:19
20:10 21:23
26:23 30:17
33:4 35:11
36:24 38:12
39:21 41:21
51:21 56:8
61:21 75:7
84:17 85:12
87:8 90:10
93:9 98:11

email
17:8 49:3,4,
6 50:9
51:11,17,19,
24 53:4,6
55:24 56:1,
2,5,10,11,14
57:6 58:8,
11,15,20
59:5,17
61:18,24
62:2,4,5
84:25 85:9
87:5 90:8,13
91:17 92:1

emails
10:8,9 14:15
18:8 49:22
50:10 51:3,8
56:23 91:12,
13

employee
44:4

Edward Certisimo
June 24, 2021

enclosed
  25:23
end
  9:1,2,25
  70:20,23
ended
  17:14 68:3
enter
  7:10
envious
  70:7
equestrian
  66:22
essentially
  21:5
establish
  45:3 83:16
established
  13:16 15:16
  16:20 104:22
establishment
  40:25
estate
  24:5
et al
  7:3
exactly
  14:20 27:25
  87:24
EXAMINATION
  8:10 102:13
examined
  62:23
excuse
  29:16 67:17
  88:21
executive
  8:18 16:15
exhausting
  43:1
exhibit
  9:22,23
  10:14,15
  18:20,21
  19:17,18
  20:7,9
  21:21,22

  26:21,22
  30:15,16
  33:2,3 35:9,
  10 36:22,23
  38:10,11
  39:17,19,20
  41:18,19,20
  51:1,19,20
  55:25 56:6,7
  58:14 61:18,
  19,20 75:5,
  6,10 84:14,
  16 85:9,11,
  22 87:6,7
  90:8,9 93:7,
  8 98:9,10,
  17,20 99:20
  102:9,16
exhibits
  21:20
exist
  104:23
existed
  104:21
existence
  66:17,20
exists
  73:13
expire
  97:19
expired
  96:3,11
  97:24 103:7,
  8
explain
  15:9 16:12
  17:20 102:23
  103:1
eyes
  41:24

_____

_____

F

face
  33:13
facilitating
  25:15

fact
  36:9 44:11
  53:19 68:8
  77:12 78:19
  81:3,11,21
  87:1
factories
  42:23
fairly
  54:1
familiar
  19:6 20:24
familiarity
  43:11
family
  11:3,6 15:6,
  18,19 65:18
  66:14 67:4
  69:10 72:5
  94:24 95:4,
  20
far
  58:5 59:11
  82:17
farm
  66:14 95:14
father
  15:24
favor
  16:9 17:3
  25:13
fax
  26:25 27:12
February
  35:20 37:10
Federal
  6:2 46:22
  47:2
Fedex
  17:7
feed
  73:25
fees
  13:21
Ferry
  23:1

fighting
  43:17
figure
  88:23
file
  33:8 84:24
files
  20:14 22:1,
  23,24 51:12
  60:8,9,10,
  11,14,15
  74:9 92:14
  95:21
filing
  13:5 47:3
filled
  27:15 28:14,
  16 52:10
filled-in
  57:10
final
  6:18 15:23
  33:20 76:19
finally
  13:25 24:6
finance
  8:19
financial
  16:15 33:9
  39:19,24
  41:4 43:12
  75:22,23
financially
  7:7
find
  56:23 65:16
finding
  51:11
fine
  55:16 61:1
  101:8
firm
  25:21,22
  26:13,15
first
  10:17 13:15
  24:15 32:6

Edward Certisimo
June 24, 2021

44:3 45:4
50:4 63:1,23
66:21 67:25
68:16 70:10
77:4 93:11
96:17 98:17
102:2,16
103:15
**Florida**
8:21,24 27:2
54:21,22,23,
25 55:3
**focus**
48:22
**folder**
60:17
**follow**
43:19 47:20
**followed**
43:19
**following**
6:1 105:13
**follows**
8:9
**foregoing**
12:22 77:22
**forgot**
69:2
**forgotten**
69:4
**form**
26:2 29:18
33:22 37:1,
20 41:25
50:17 52:10,
25 57:8 58:2
81:7 83:12
84:2 90:23,
25 91:5,15
98:14,24
**forms**
13:5 25:24
27:23 30:11
50:5 56:20,
24 57:4,7
59:21 61:25
62:5 64:11

91:12,13
**forwarded**
39:1
**found**
80:9
**foundation**
58:2 80:3,5
81:8 83:13
88:22 90:22
91:16 101:1,
4
**four**
23:11
**frame**
24:21 50:2
54:13
**freeze**
93:2
**frequently**
80:15
**Friday**
92:24
**full**
16:3 60:3
82:1
**fully**
72:17

---

**G**

---

**Gail**
7:8
**gallery**
6:21 62:15
**garage**
49:14
**gave**
34:8 36:9
43:7 45:18
76:25
**geez**
44:17 79:11
**generally**
11:20 43:12
46:24
**Geneva**
30:21

**Georgia**
9:4 23:2,4,6
**Germany**
9:6 42:5
53:25 54:3,
12,14 55:2,4
**getting**
18:13 32:1
39:9 54:3
55:7
**Gift**
42:9
**girlfriend**
67:20,21
**girls**
64:18 92:4
**give**
9:18 65:13
68:7 71:21
80:15
**given**
45:16 50:16
79:13
**goes**
59:11
**going**
9:9,21 17:24
18:10,20
19:16 21:19,
21 26:20
29:9,14
30:14,15
31:17 33:1,2
35:8 36:21
39:16 45:2,
6,19 49:3
50:7,17
51:17 61:4
65:20,22
67:2 74:1,5
79:10,13,14,
15 80:20
88:8 91:19,
24 92:4 94:1
96:17 99:20
101:2 105:11
**Goldhamer**
7:23 8:11

9:21,25
10:13,17
11:1 18:19
19:16,21
20:6,13
21:19,25
29:21,24
37:22 49:17,
20 51:2,4,23
56:5 58:8
60:24 61:2,
6,7,17,23
73:6,13,15,
17,20 74:8
75:4,9 80:21
81:25 83:15
84:7,13,19
85:8,14
87:4,10
88:25 90:7,
12,24 91:2,
10,21 92:13,
25 98:19,23
101:2,8,10
102:6,11
105:4,7,19,
23,25
**good**
6:5 8:12,14,
15 43:18
61:5 62:18
73:15 80:17
92:5 94:2
98:22
**grammar**
17:23
**grandchildren**
49:15
**grandkids**
74:25
**great**
28:7 40:5
**grew**
15:14
**gross**
35:22
**guarantee**
72:21

Edward Certisimo
June 24, 2021

guarantied
  78:12
guaranties
  77:15 78:9
  89:23
guarantor
  84:22 85:23,
  25 86:1
guaranty
  45:17 75:25
  76:9,13,19
  77:3,10,13
  78:16,23
  79:3 80:12
  81:2,13,16,
  17 82:13
  83:9,10,18,
  24 84:10,11
  85:22,25
  86:8,11,15,
  20 87:15,20
  88:15,19
  89:10,24
guarantying
  83:4
guess
  18:1 24:9
  50:1 59:3
  67:9,23 68:9
  86:25 87:23
  95:13 97:4
  104:3
guessing
  43:21
guy
  67:22
guys
  79:15

**H**

half-hour
  61:5
Hammonds
  23:1
Hancock
  21:2,5,8

35:13 37:1
38:14 39:18
41:25
100:13,15
hand
  84:4,5
hands-off
  14:6
handwriting
  27:9,19
  32:17,19
happen
  72:23
happened
  21:9 68:10
happening
  50:22 53:21
happy
  29:14 73:22
hard
  43:17 89:19
Harriet
  15:23,24,25
head
  24:22 47:19
Heads
  50:17
healthy
  67:24
heard
  49:13
held
  6:8,11
  105:13
help
  12:11 16:16
  26:6 50:4,13
helping
  95:6
Henke
  102:19,20,24
Hey
  18:10 32:2
hold
  29:7 80:3
  91:2

holiday
  92:5
home
  24:18 67:4
  75:1 92:4
honest
  59:10 78:14,
  15 87:24
  88:7
hope
  46:16 92:5
hoped
  103:3
hoping
  92:16
hours
  14:21
house
  27:4 53:24
  54:24 55:2,3
  65:20
hundred
  44:5 71:16
hurt
  68:23

**I**

idea
  32:9 38:4
  39:8 44:9,10
  57:5 64:25
  72:4
identified
  102:17,18
ignore
  56:19
Illinois
  9:4 23:5
  30:22 55:3
imagine
  36:5 55:11
  86:11
imagined
  17:13
impacted
  92:14 102:3

important
  80:19 88:22
impose
  16:24
inaccurately
  91:7
inaudible
  63:11 80:1
  91:21 94:4
include
  100:6,10
included
  11:8 28:17
  51:10
incorrect
  57:4 97:17
increase
  44:8
Indiana
  24:18
indicate
  7:21
indicates
  27:8 28:7
  32:14 33:12,
  23 40:16
  42:8 52:17
indicating
  22:18 25:24
  28:8 30:1
  52:21 62:17
  63:18
indication
  34:17
information
  8:19 18:2
  27:18 28:17
  30:6 43:20,
  22 54:4
  79:11 92:11
Ing
  21:16 43:8
  56:20,24
  57:3
initial
  16:5

Edward Certisimo
June 24, 2021

initiate
  14:13 38:1
initiated
  36:20
initiative
  31:24
instrument
  19:3,7,25
  20:14
insurance
  11:9,11,14,
  17,19,22
  12:3,14 13:3
  14:9 17:12
  18:4,25
  19:23 20:8,
  23,25 21:5,
  11,14 22:4,
  5,14 23:22,
  25 24:11,12
  28:24 30:3,
  8,20 31:7
  32:14 33:16,
  17,18,22,24
  34:16,19
  35:1,2,3
  40:19 41:8,
  15 42:3,16
  43:2,3,4,5
  45:23 46:4
  48:12,20,23
  49:1 52:14
  55:10 63:20
  64:5,24 65:4
  66:10 71:1
  75:13,14
  76:5,6 78:8
  83:4,9,16,
  17,18,23
  84:9 85:24
  86:1,16,17,
  18 88:3,4,5
  89:3,6
  90:20,21
  91:14 96:20,
  23 97:1,2,8
insured's
  27:18

intention
  82:25
interactions
  6:10 59:24
interested
  7:7
interface
  6:12,22
interfaces
  58:13
intermediary
  73:3 92:10
interrupt
  98:16
introduced
  9:23 10:15
  18:21 19:19
  20:10 21:23
  26:23 30:17
  33:4 35:11
  36:24 38:12
  39:21 41:21
  51:21 56:8
  61:21 75:7
  84:17 85:12
  87:8 90:10
  93:9 98:11
involved
  12:24 13:2,7
  14:17 21:16
  34:16 43:13
  47:10,13
  64:23 65:4
  66:23
involvement
  90:20
involving
  45:20 56:24
  86:15
IRA
  71:20
Irrevocable
  18:24 19:22
  20:7
IRS
  43:14 44:2
  47:19 48:21

issue
  48:2 53:11
  63:2 80:25
  81:12 93:1
  101:4
issued
  13:3 48:7
  78:22,25
issues
  45:9 47:19
  53:10 66:10
  67:11 68:17,
  19 69:6,8,
  13,14 71:21

_____

J

_____

January
  53:25
Japanese
  67:22
jealous
  69:18 70:4
Jeff
  11:20 14:11
  15:16,25
  16:9,14,15,
  23 17:4
  22:14 24:5
  25:9 26:18
  29:20 30:1
  32:2 34:18
  35:1 36:19
  38:23 39:2,9
  41:6,7 42:25
  43:15,23
  45:16 48:2,
  18 49:8 50:9
  51:24 53:6
  56:10,23
  57:21 58:13
  59:9,14,21
  60:4 61:11,
  24 62:5
  64:12 66:25
  67:10 69:13
  70:4 71:25
  72:6,21 73:3

  76:4,12 77:9
  78:19 82:5,
  22 83:8,22
  85:15,17,23
  87:11 90:4
  92:2,3,4,6,
  11 94:18,25
  102:3
Jeff's
  15:17,18,20
  65:18 67:6
Jeffrey
  11:8,14
  12:18 15:5,
  14 18:24
  19:23 22:4
  29:6 40:10,
  16,19 41:8,
  15 42:2
  75:12 86:16
Jersey
  65:19 68:1
job
  66:4
jog
  103:20
jogs
  103:16
John
  21:2,5,7
  35:13 37:1
  38:14 41:25
joy
  49:18
judge
  17:25
July
  33:25
June
  6:25 94:19
  103:24
  104:9,19,25
Junior
  66:23

Edward Certisimo
June 24, 2021

**K**

**Karen**
  49:14
**keep**
  13:24 102:9
**killing**
  68:12
**kind**
  15:14 16:23
  20:23 21:12
  29:11 33:21
  54:13 73:1
  77:21 84:24
  87:1
**KMZ**
  25:19 26:15
  41:4
**knew**
  80:10 87:20,
  23,25 88:3,9
  89:2,5,8,15,
  17 91:11
  92:12
**know**
  9:11,17
  13:23 14:3,
  20 15:15
  16:4,21,23,
  24 19:5
  21:10,11
  22:23 23:17,
  25 24:14,17,
  23 25:4
  27:25 28:1,
  22 32:21
  33:19 34:6
  36:6,7,14,16
  38:21 39:4,
  10 43:4,13,
  16,18,21
  44:8,10,17
  45:1,5,18
  46:5,8,19,23
  47:7,18,21
  48:5,6 51:5
  57:2,9 58:25

59:9,10
60:3,20
62:20,25
65:11 66:16,
25 67:1,13,
23 68:7,16,
25 69:1,11,
13,17,21
70:9,11,13,
19,22 71:3,
12,24 72:3,
5,11,12,19,
24,25 76:3
78:13 79:5,
10,16,17
80:2,12,13,
15,16,20
81:10,17
82:10,11,16,
20,25 83:10,
17,20,24
84:11,25
86:6,7 87:2,
25 88:1,6,7,
8,25 89:9,
16,19 92:2,
12,20,21
94:8,9,24
95:12,13,14
97:12,13,14,
15 98:6
102:20
103:16 104:2
**knowing**
  69:12 81:1
**knowledge**
  57:3 65:3
**known**
  83:7
**Kutchi**
  67:22

**L**

**labeled**
  35:9
**lane**
  24:24

**large**
  6:20 44:11
**larger**
  40:3 44:18
**lasted**
  13:18
**late**
  37:10
**law**
  25:21,22
  26:13,15
**lawsuit**
  61:15
**lawyer**
  13:20 14:1
  18:14 46:12
**lawyers**
  16:21 25:5
  82:5
**lead**
  104:25
**learn**
  104:8,11
**learned**
  104:5,24
**leave**
  61:13
**legal**
  7:5,9 12:5,
  16 17:19
  18:5
**legible**
  56:18
**legs**
  73:9
**letter**
  10:10,14,18
  12:2,6,8,13
  14:23 17:17
  25:19,25
  30:19 32:3,9
  41:3 93:3,
  17,18 94:3,
  7,9,11,13,
  14,17 95:6,
  8,17,24
  96:1,12

98:19 99:20
100:2,19
101:14
102:4,10,16,
17,24 103:2,
14,17
104:17,18
**letterhead**
  26:19 93:12
**letters**
  26:19 32:13
**letting**
  45:5
**lieu**
  7:16
**life**
  21:4,7
  33:16,22
  67:11,15
  68:17,19
  69:8
**light**
  83:23
**line**
  56:2 58:16
  61:25 85:14
  87:5
**lines**
  29:7
**listed**
  22:3,13
  34:16 40:6
**lists**
  42:2
**litigation**
  47:10
**little**
  12:9 14:18
  18:1 29:22
  40:2 52:20
  58:14 70:7
  82:14 93:20
  98:22 101:3
**live**
  8:21 9:4,7
  27:4 55:4

Edward Certisimo
June 24, 2021

**lived**
8:24 9:6
15:6 53:25
54:1 55:4,5
65:21 66:4
68:4,22 70:5

**loan**
45:20 71:8
76:10 95:13

**loaned**
72:5

**loans**
71:7,24 72:2

**locate**
74:12,15

**located**
7:5

**locked**
6:15

**long**
8:24 15:7
53:22 54:14
61:3 71:10

**longer**
104:2

**look**
16:18 24:20
31:16 34:11
41:19 50:10
57:12 62:24
73:9 74:9
79:12 92:1
93:3 97:3
103:15

**looked**
16:15 24:12
43:2 51:8
55:25 60:13
80:11 90:7
96:6,22 97:2

**looking**
18:8 19:10
59:7,8 81:25

**looks**
19:6 25:20
37:10 40:24
42:5,16

59:2,16

**Los**
25:22

**losing**
68:16

**lost**
23:11 60:17
74:20

**lot**
42:25 44:17
46:15 50:6
66:5 69:21

**loud**
49:19

**love**
42:9 67:25
68:16

**lunch**
73:22

---

**M**

**mad**
68:22

**made**
38:25 39:5
97:5

**mail**
54:5,10 55:7
58:12

**make**
14:24 25:16
40:2 41:24
46:14 48:25
63:6 70:12
91:22 93:20
104:8

**making**
46:16 67:1
76:9

**managing**
82:5

**manipulating**
46:3

**manner**
7:20 89:13

**Manufacturers**
21:4,7 33:22

**Manulife**
33:8 39:18,
23 41:4
100:14,15

**March**
59:13

**mark**
9:21 10:13
18:20 19:17
20:6 36:22
38:10 39:19
56:5 58:14
85:8 87:4
90:8

**marked**
26:21 30:15
75:10

**Marlin**
14:1,11 24:4
31:12,17

**married**
16:6

**matter**
7:2,18 8:3,8
36:9 46:19
92:15

**MDT**
74:4

**mean**
12:18 16:8
23:3 53:19,
22 68:18,25
69:15

**means**
50:12

**meant**
17:20 18:7,
11

**members**
72:5

**memory**
24:9,23
103:16,20

**mention**
101:18

**mentioned**
8:15 21:18
44:16 47:21
68:17 100:1,
4,8,16

**Merrie**
11:9,11,20
18:25 19:11
20:8,19
22:4,14 25:9
26:1,3 28:9
29:6,20
30:6,8,20
31:6 32:2,14
33:23 34:3,
18 35:1
36:19 40:1,
7,12 41:5
42:12 52:13
57:21 58:4,
7,9,20,24
59:6,15,17,
24 60:1,5
61:8,13
63:19 64:4
72:16,20,21
73:1,10
74:13,19
75:12,13
76:5,12
78:19,21
79:1,4,8
85:23 86:1,
17 90:13,17,
20 91:8,11,
14 92:3,7
94:21,22,23
95:5,16 99:2
100:23
101:12
102:4,23
103:11 104:4

**Merrie's**
97:5

**Microsoft**
93:13

**middle**
14:3 16:5

Edward Certisimo
June 24, 2021

**Midlab**
7:3
**Midlabs**
45:13,14
**miles**
42:24
**million**
33:13,15,18
35:23 70:19
71:2 96:7,8
97:18 99:21
104:1
**mind**
101:18
**mine**
27:13 62:3
**Miriam**
16:2,3,5
**missed**
98:18
**Misu**
67:22
**mom**
15:18
**money**
13:20,23
36:18 37:25
39:9,11 46:5
70:23 71:20,
22 72:6
**month**
13:19 92:19,
25
**months**
13:18,25
17:1 32:6
48:18 71:11
**morning**
6:5 8:12
**mother**
15:6,11,20
16:1
**mother's**
15:20,21
**motivation**
32:8

**mountain**
7:2 68:5,6
73:20 74:3,6
105:12
**mouth**
101:6
**move**
83:22
**moved**
24:21 28:24
83:8,17
**moving**
78:7 84:9
101:20
**mute**
29:17

**N**

**name**
7:4,21 11:21
15:21,23
16:3 17:10
22:3 27:11,
14,18 33:23
34:16 37:5
42:13 91:8
**nature**
101:22,24
**necessarily**
90:1 95:21
**need**
17:9 25:2
29:9 31:17
36:16,17
52:22 60:25
62:20,25
73:21
**needed**
17:7 25:16
37:24 57:16
71:22 94:23,
24 95:7,10,
17
**needing**
30:6

**nervous**
79:18
**never**
13:18 14:23
24:1 36:19
47:15 58:7
64:17 65:10,
11 68:21
69:2,13,17,
19 72:12,19,
25 76:20
97:7
**nice**
24:19 82:3
**nine**
9:6
**normal**
87:1
**notarized**
87:5,15
**notice**
18:3 32:16
**November**
49:25 56:15
**number**
22:7 27:17
43:2 44:11
96:22 99:9
**numbers**
22:11

**O**

**oath**
7:16 72:25
**Obermeyer**
7:9
**object**
37:20 58:1
80:3 81:7,8
83:12,13
84:2 88:21
91:15 100:25
**objection**
29:17 80:4
90:22,23,24
91:4,5,22

101:3
**objections**
7:20
**obviously**
46:8 66:5
79:18 80:2
82:20 88:1
94:9
**occurred**
88:14
**October**
48:8,10,24
**offices**
67:1
**okay**
8:21 9:7,21
10:4 12:13
14:22 15:21
16:11 17:3
19:5,9,16,25
20:3,6,16,22
21:19 22:2,
7,17 23:2,8
24:15,25
26:20 27:5,
14,17 28:2
29:2,21
30:11,14,24
31:2,22,25
32:10,12,18,
23 33:1,20
34:13,25
35:8 36:21
38:24 39:17
40:6,12,22
41:1,14
42:11,15,22
43:1 44:7,14
47:9,18,24
48:4,22
49:14,24
50:1,3,16,24
51:17 52:5,
24 53:16
55:1,16,24
56:1 57:22
58:19 59:3,
14,16,19,22

Edward Certisimo
June 24, 2021

60:22,25
61:2,6,17
62:4,13,20,
23 63:5,14,
23 64:11,23
65:7 68:14
70:3 71:5
72:8,14
73:6,12,14,
17,24 75:2,
18 76:12,21
77:6,21 78:3
80:5,6,7
83:22 84:7
85:8 87:4
88:11 90:7
91:10 93:6,
19 94:7
96:17 97:20,
21 98:21
99:13,19
100:6,17,18
102:6 103:1,
6,13 104:5,
17,20 105:3,
4,6
Olympics
66:24
once
16:20 17:1
48:18 65:10
67:5,15 68:8
one
21:21 26:13,
15 31:17
32:20,23
33:19 35:2
37:18 43:3
47:1,8 48:24
49:22 51:3
53:13 54:24
57:12 62:14,
18 68:22
70:2,18,24
74:16 78:16,
18 80:8,11
84:4 86:8
91:3,17 94:2

97:15
one-off
59:4
ones
24:2 47:7,13
57:15
open
13:24 39:6
49:14 51:17
85:21
operating
89:13,14
operations
8:20
oral
64:19
original
17:8,9
originals
87:12
originated
21:6
outcome
7:8
Outlook
60:8,14,15
outside
6:11 65:19
101:20
105:14
owned
21:15 27:4
53:24 88:4
89:2
owner
23:21 26:4
28:9 32:15
33:23 34:16,
18 39:24
40:6,9,16,17
41:6,7 42:3,
13 52:13,17,
22 99:2
owner's
27:11,14
32:18

owner(s)
31:8
ownership
28:8 29:4,8
30:2,7 42:9
44:4 55:21
57:8 63:6,19
64:4 82:16
84:9 104:12

_____

**P**

_____

p.m.
7:1 74:2,6
105:11
page
19:10 20:3,
16 23:13
25:18 28:7
33:12,20
40:15 41:3
76:19,25
77:2,3,16
78:16,18,23
79:3 85:25
87:15
pages
19:5 85:15,
16 86:14
paid
32:6
pain
67:10,13
68:18
paper
18:11 80:16
paragraph
103:15
parents
15:14,17
65:2 68:2
part
6:20 25:7
49:6 51:5,9,
10,11 66:17,
19 82:11
85:22

participants
6:6,18
participating
7:12
particular
54:12 82:12
97:16
parties
7:19
party
7:6 95:1
passed
59:10 71:11,
12 94:18,25
past
21:10 80:6
patriarch
69:10
Patty
23:5
pay
13:15,17,21
32:3
paying
13:13,21
14:4 31:16,
18 32:1,7
payment
14:25
payor(s)
31:13
PDF
60:8,11
penalty
7:18 8:4,9
Pennington
65:19
people
14:11 55:9
performed
12:4,15
17:18,21
18:5
perjury
7:18 8:4,9
person
7:17 68:20

Edward Certisimo
June 24, 2021

**personal**
  45:16 66:8
**personally**
  66:6
**phone**
  50:8 79:1
**phonetic**
  67:22
**photos**
  62:15
**phrase**
  16:7,12
**physical**
  67:10
**physically**
  7:13
**picture**
  24:17
**piece**
  18:11 80:16
  97:4
**Pisano**
  42:12
**place**
  25:10 68:4
  89:8 101:25
  104:13
**places**
  34:23 77:18
**plaintiff**
  6:25 7:24
  46:2
**plan**
  44:4
**planning**
  24:5
**please**
  7:9,21 10:19
  26:2 50:18
  84:5 93:20
  96:18
**point**
  14:7 31:16
  35:2 43:3,5
  68:8,22
  70:19,24
  80:10 81:20

94:5 103:2,
18 104:4,7,
23
**pointed**
  89:21
**policies**
  12:4,15,22,
  23,24 13:3,
  8,11,14
  14:12,24
  17:18,21
  18:4 20:23,
  25 21:2,6,15
  43:2,4,8
  48:13,23
  49:1 56:19
  57:13,15
  64:16 65:5
  73:4 78:8
  83:16 88:3
  89:4,6 90:21
  96:10,23
  97:1,2,8,10,
  13 99:7,13,
  21,25 100:3
  101:19
**policy**
  22:7,11,12
  27:6,17
  28:8,23 29:3
  30:2,8,24
  32:11,13
  33:9,16,18
  34:25 35:4,
  14,18 37:2,
  8,11,18
  38:15 39:18,
  19,25 40:1,
  16,17 41:5,
  15,25 42:1,
  15 52:6 54:4
  55:18 56:20,
  24 57:7,19,
  21 62:8,9
  63:8,19
  64:13 84:4,9
  96:11,14,20
  97:15,18

98:2,6,14,24
99:11,22
100:7,11,14,
15,18 104:1,
2
**poor**
  17:22
**pop**
  85:9
**portion**
  105:14
**positions**
  48:7
**positive**
  92:8
**possession**
  14:24 24:2
  36:13
**possible**
  86:5 97:11,
  14
**potentially**
  91:7
**powers**
  90:17
**practice**
  27:22 79:25
**pre-filled**
  32:21
**pre-filled-in**
  32:20,22
**pre-filled-out**
  27:20,23
**premium**
  14:25
**premiums**
  13:14,17
  14:4 32:2,3,
  6
**preparing**
  78:15
**presence**
  6:11
**present**
  7:14

**presented**
  82:22
**pretty**
  14:6 15:16
  27:22 79:21,
  22 80:19
  82:6
**previous**
  46:25
**previously**
  54:3 74:16
  81:11 90:14
  96:6,11,23
  99:8 103:13
**Princeton**
  65:20
**prior**
  41:6,7 46:12
  50:9 53:13
  54:12 86:9,
  12 88:14
  92:3
**Private**
  6:9
**probably**
  23:10,25
  25:20 39:5,
  6,7 43:20
  50:20 54:7
  58:17 65:9
  66:16 70:17
  71:10 80:17
  82:13 86:13
  88:9 92:19
  93:14 94:23
**Procedure**
  6:3
**proceeding**
  6:7
**proceedings**
  6:1 7:10
  43:13 105:13
**process**
  53:15 64:24
**Products**
  7:3 56:11

Edward Certisimo
June 24, 2021

profession
 8:17
proofed
 18:1
provide
 10:2 46:4
 79:10
provided
 9:24 10:16
 18:22 19:19
 20:10 21:23
 24:3 26:23
 30:17 31:20
 33:4 35:11
 36:9,24
 38:12 39:21
 41:21 45:8
 49:21 51:8,
 13,14,21
 56:8 57:1
 61:21,24
 75:7 78:1
 84:17,20
 85:12 87:8
 90:10 93:9
 98:11
providing
 38:16
PST
 60:9,10,11
pulling
 36:21
punched
 68:23
purchased
 47:4
purpose
 6:13 103:14,
 17
pursuant
 6:2
put
 12:8 13:18
 27:16 46:5
 63:7 78:22
 88:9 95:10
 96:19 97:8,

 12 101:13
putting
 81:11 101:6

_____

Q

question
 29:18 37:21,
 23 58:2
 81:8,9,14,23
 83:13 84:3
 90:23 91:3,
 8,16 97:4
 101:7,9,11
 104:8 105:25
questioned
 88:1
questions
 34:11 42:25
 45:12 46:14
 83:8 84:8
 102:7 105:3

_____

R

Ratification
 84:21
read
 23:25 62:18,
 22 104:6
 105:16
reading
 12:7 70:14
Reaffirmation
 84:21
reason
 53:2 83:21
 84:8
recall
 24:10,14
 25:1 26:14
 34:2,5,14,15
 35:5 36:3,
 12,15 38:19
 39:2,8 41:11
 42:19 43:7,9
 44:24 45:6,

 10,22 46:1,
 2,9 47:7
 48:3,10
 50:21 53:10
 54:11 55:6,
 15,20 60:5
 62:2,3 64:21
 65:24 66:1,
 8,9,11,13,18
 67:3,16,18
 68:11 69:4
 70:15 71:9,
 14 78:5
 87:24 92:6
 94:15 100:17
 102:15,25
 103:5,7
recalled
 103:14
receive
 9:15 72:8
 87:12
received
 9:17 51:16
 53:7 72:13
receiving
 38:19
recent
 21:10 54:1
recently
 43:20 44:10
 66:24 82:13
recess
 74:4
recognize
 19:21 20:13
 26:13 27:9
 75:16 93:11,
 19 94:3
 99:9,12
recollections
 26:6
record
 6:6,9 7:11,
 22 73:23
 74:2,6
 105:8,11

recorded
 6:7,8
recording
 6:14 105:22
records
 31:6,12
 53:14
refer
 22:11 32:10
reference
 23:21 35:14
 98:1
referenced
 39:25 86:20
 99:21
references
 62:8 75:25
referencing
 41:25 51:4
referred
 57:13 63:1
referring
 15:3 35:22
 38:15 69:7
 76:6 84:21
 88:24
refers
 23:17 33:9
 63:5 76:4,9,
 12 77:21
 85:3,22
 90:12
reflect
 31:6,12
refresh
 26:6
refused
 71:23
regard
 73:4 104:6
regarding
 30:24 37:8
 58:20 64:12
register
 29:17 80:4
regret
 82:21

Edward Certisimo
June 24, 2021

**reinstalled**
  60:7,16
**reinstated**
  60:15
**related**
  7:6 11:3
  15:18,19
  45:24 47:11
  48:23 51:15
  59:24 91:13
**relating**
  75:21
**relationship**
  10:20 11:2,5
  101:22,25
  102:2
**relative**
  15:1,3 16:8,
  13
**rely**
  16:17
**relying**
  104:4
**remember**
  12:12 24:6,
  15,19 26:8
  33:15,18
  37:14 44:1
  51:11 52:24
  53:1,2 61:9
  65:17 68:4
  76:16,18
  79:19 92:9
  96:5
**remembered**
  21:10 47:8
**Remind**
  69:22
**remission**
  68:1
**remote**
  6:11,23 7:4,
  10
**Remotedepo**
  6:22
**remotely**
  7:15 9:23

10:15 18:21
19:18 20:9
21:22 26:22
30:16 33:3
35:10 36:23
38:11 39:20
41:20 51:20
56:7 61:20
75:6 84:16
85:11 87:7
90:9 93:8
98:10
**remove**
  6:16
**repeat**
  81:9
**reporter**
  7:8,12 8:2,6
  9:24 10:16,
  23 18:22
  19:20 20:11
  21:24 26:24
  30:18 33:5
  35:12 36:25
  38:13 39:22
  41:22 51:22
  56:9 61:22
  75:8 84:15,
  18 85:13
  87:9 90:11
  93:10 98:12
  105:15
**reporting**
  7:15,20
**represent**
  56:25 59:12
  88:13 99:17
**representatio
n**
  12:5,16
  17:19 18:12
**representativ
e**
  18:6
**request**
  6:9 37:2,15,
  17

**requested**
  9:18 13:16
  37:11
**required**
  13:23 39:3
  47:6
**reserves**
  73:25
**reside**
  94:6 103:18
  104:7
**resided**
  105:1
**resolutions**
  77:22 78:1
**respect**
  14:11 48:12
  76:10 81:1
  84:10 95:24
  98:14
**respects**
  27:24
**respond**
  72:17 79:15
**responding**
  31:21 59:17
**response**
  10:6 46:7
  49:21 60:2
  84:20
**responses**
  93:4
**resulted**
  32:8
**retain**
  39:11,13,14
**retired**
  8:16 9:1
  54:21,22
  92:20
**retirement**
  55:5
**retrospect**
  82:3
**reunion**
  65:18 94:25
  95:4,20

**review**
  18:2 62:21
  86:9
**reviewed**
  89:16
**rich**
  72:12
**ride**
  65:13 66:2
**right**
  8:21 10:3,11
  12:25 14:8,
  19 17:13
  19:10 22:22
  23:4 25:15
  28:19 35:16
  40:24 42:3,
  15 52:12,23
  53:8 54:19
  55:4 56:15
  57:7 58:17
  59:2,6,7
  62:15,24
  64:14 65:19
  70:17 71:3,7
  76:10 78:12
  79:13 80:14,
  22 81:2,5,6
  82:19 83:5
  84:23 85:18
  86:19,22
  88:16 89:2
  90:14,15
  92:17 93:2
  95:19 96:7,
  12 97:20,23
  101:23 102:4
**road**
  92:7
**Robert**
  102:19,20,24
**room**
  7:14
**Rosenman**
  25:19 26:15
  41:4
**Rules**
  6:2

Edward Certisimo
June 24, 2021

ruling
  48:7

_____

S
_____

Sanford
  70:1
sat
  68:6
satisfy
  88:18 89:24
save
  22:10 60:16
saying
  25:23 26:25
  31:5 50:17
  51:5 55:14
  72:23 79:2
  84:4,5 87:11
  89:18 94:13
  100:23
says
  24:7 27:5
  38:15 49:9
  50:3 51:6
  56:17 77:23
  85:16 92:3
  96:12
scan
  17:8
scanned
  53:3 87:11
screen
  6:21 9:9
  49:5 62:16
screens
  6:15
scroll
  9:16 19:6
  27:5
search
  60:3,4,20
searched
  60:1,4 61:10
searches
  72:16

searching
  60:5
second
  10:18 40:15
  63:5 64:3
  85:10,25
  91:3 97:22
  98:2
sections
  57:10
see
  9:10,11
  10:2,20
  12:5,13,16
  18:9 19:1,11
  20:16 22:3,
  5,7,12,15,17
  23:9,13,18
  25:18 27:16
  28:2,9,14
  30:19,22,25
  31:2,9,13
  33:8,10,13,
  20,25 34:16,
  20 35:17
  36:1 37:1,2
  38:16 39:23
  40:1,6,10,
  20,22 41:9
  42:12 49:4,
  6,8,11,24
  51:6,23,25
  52:15,18
  53:9 55:16,
  18 56:2,10,
  12,14,20,25
  57:2 58:15,
  16 59:20,23
  61:23 62:11
  63:21 64:6,9
  65:7 68:2
  75:14,18,20,
  21,23 76:1,
  6,14,20
  77:9,16,19,
  23 84:22
  85:17 86:13
  87:12,16

  93:21 96:20
  98:4,13,14,
  25 99:3,15,
  16
seeing
  34:5 55:13
  77:4
send
  14:15,16
  27:23 32:3
  50:17 59:15,
  22 77:16
  79:4 87:2
sending
  50:9 62:2
  63:16 64:12
  90:16 91:12
  92:3
sentence
  10:18 96:18
  97:17,22
  103:15 104:6
sentences
  14:23
separate
  11:19
series
  41:11 89:6
serve
  24:10
service
  47:11
serving
  24:16 47:10
set
  13:16
setting
  6:16
settled
  47:23
seven
  71:10
seventh
  8:25 9:2
several
  15:15 16:6

share
  9:9
sharing
  49:5
sheet
  26:25
shit
  94:22
short
  79:22
shortly
  48:10,24
  75:3
show
  21:20 26:20
  30:14 33:1
  34:8 35:8
  76:24 93:7
  98:9
showed
  72:20 77:2
  80:11 91:17
showing
  22:25 75:10
shown
  60:10
shows
  49:10 90:19
Shrink
  62:16
sic
  14:24,25
  25:25 45:13
  68:15 92:17
  96:3
sic]
  18:6
sick
  32:1
side
  62:15
sign
  14:16 17:6
  18:10 24:19
  26:1 27:24
  30:12 50:18
  52:22 62:6

Edward Certisimo
June 24, 2021

76:13,18
77:1 80:13,
16,17 82:7
86:3,14 87:2
89:15,23
101:10
105:16
**signature**
19:11,14
20:4,17,20
22:17 23:9,
19 28:2
32:17,19
34:22 37:5
40:13,22
53:2 57:16
58:16 63:2,
15 64:1,8
76:19 77:2
85:15,16
86:14 87:15,
18
**signed**
24:8 28:11,
20 30:11
36:8 42:6
53:3 57:24
63:12,17,18
77:2,17,18
78:17 79:4,5
80:7,9,13
81:1,15,20,
24 82:7
83:9,18 85:6
87:14,21,25
88:15 89:11
91:13 99:2
100:22
101:12,19
**significant**
55:7
**signing**
77:10 82:2,
4,21 86:24
88:2,15
89:14 90:5
**simply**
37:17

**sister**
15:20,25
**site**
66:22,25
**sitting**
95:5
**situation**
25:3 43:12
79:24 82:1
90:2
**sixth**
8:25
**skip**
51:3
**snail**
58:12
**sold**
55:2
**sole**
26:5
**sort**
10:1 17:10
18:16 25:13
52:20 54:9
87:20 93:1
**sorted**
61:10
**sought**
71:25
**sound**
73:15
**sounded**
72:14
**sounds**
43:1
**spanned**
10:20
**speaker**
6:15
**specific**
71:13 103:24
**specifically**
66:18 84:3
**speculate**
36:6 37:24
**speculating**
24:14

**speculation**
25:7
**spoke**
48:18 78:21
**spoken**
36:19 58:7
73:1
**spotlight**
6:16
**spotlighted**
6:14
**standard**
79:24 91:22
**start**
54:15
**started**
18:7 24:16
44:3 48:11
54:16 70:11
**starts**
26:25
**state**
10:19 12:2
26:1
**stated**
14:2 81:10
**statement**
7:10 12:22
17:19 97:5
104:9
**states**
9:6 31:11
48:6 92:2
**stating**
7:21 91:7
**stay**
16:25
**steps**
39:2
**Steve**
7:25 44:13,
15,21 46:10
91:21
**Stone**
27:1 53:22
**stop**
87:24 105:24

**stopped**
105:22
**strategic**
47:5
**stretch**
73:8
**structures**
25:10,11
**study**
24:19 67:21
**stuff**
57:23 60:18
70:9,13
92:19
**subject**
56:2 58:15
61:25 85:14
87:5 96:18
**submitted**
31:21
**subpoena**
9:13,15,17,
20 10:1,6
45:2,6 49:21
60:2 72:17
78:22,25
79:9,13
80:10 84:21
92:19 93:4
**subsequently**
94:5 98:3
**subsidiary**
99:18
**substance**
86:21
**substantial**
18:9
**substantive**
25:8
**substantively**
12:24 13:2
**successful**
67:12 69:19
70:8
**successor**
22:13 40:18

Edward Certisimo
June 24, 2021

suggest
  33:21 41:14
suggested
  103:11
suggests
  39:24 74:18
Summary
  35:17
Support
  7:5,9
supposedly
  67:24
sure
  9:1 31:20
  36:7 39:10
  40:4 49:17
  53:19 60:21
  70:12 94:17,
  21 95:11
  99:10
  105:17,18,24
surprise
  31:25
surprised
  67:6,10,12
  68:9,10
surrender
  35:25 36:17
  37:2 38:1
surrendered
  37:11,19
  94:5 96:4,14
  97:19,25
  98:3 100:14
surrounding
  36:13 37:15
system
  73:11

—————————

T

take
  6:20 17:5,7
  31:23 36:18
  60:23 65:22
  73:7,17

taken
  6:2,24 39:2
  54:9 101:25
taking
  17:11 48:8
  55:9 67:15
talk
  46:15,16,18
  52:8 61:12
  65:25 66:5
  67:14 69:9,
  11,15,19
  73:22 74:22
  79:7
talked
  17:1 44:21
  45:7 52:6
  65:24 66:1,3
  68:8 69:16,
  18,21 72:20
  78:16 95:2
  99:8 100:4,
  7,11,13,15
talking
  9:11 11:2
  35:15 42:1
  45:5 47:13
  48:11 50:2
  68:6,24
  69:7,12,25
  73:8 81:13,
  18 86:3
  89:20 92:2
  95:15 97:10
  98:6
tax
  44:15 47:19
  48:2,7 71:21
technician
  7:5
technology
  8:19
tell
  14:10 18:16
  31:19 47:1,
  23 60:6
  67:14 72:19,
  24 79:16

85:5 95:9
  103:22
telling
  50:21 101:13
template
  93:13
ten
  43:20
term
  96:10 97:18
  99:22
terrible
  49:16
testified
  8:9 58:3
  81:4
testimony
  7:17 8:3,8
  80:23 91:16
  94:13 101:5
Thank
  8:6 29:23
  40:5 46:22
  102:12
thanks
  12:10 50:4,
  12 85:16
  98:21
thing
  32:16 36:17
  54:12 76:18
  79:13 80:14,
  18,22 81:5
  82:19 87:3
  89:3 92:9
  93:22
things
  68:21 69:1,
  3,15,20 80:8
  89:14
think
  9:1 16:5
  18:13 21:14
  29:2 31:15
  36:11 39:16
  44:3,23
  45:8,17 48:1

50:10,11,12
  51:3 58:3
  59:9 61:17
  70:5,7 77:1,
  25 78:3
  82:11 86:10,
  12 88:22
  89:12,22,25
  92:13 94:8,
  10 95:1,11
  101:8 102:6,
  18 104:12,13
  105:4,7,19
thinking
  25:5 68:12
thought
  43:18 45:13
  49:15 70:4
  72:10 82:14
  88:18 89:16
  97:6
thousand
  44:6 71:16
three
  11:7,24
  21:18 22:11
  23:11 24:3
  34:7 44:23
  54:17 96:25
  97:2,12,13
  104:22
Thursday
  6:25
tied
  71:20
time
  7:1,2,8 14:1
  15:7,12
  17:16 22:10
  24:4,21 42:6
  43:16 44:5
  48:1 50:2
  54:11,13
  57:13 62:20
  68:22 70:13
  73:21 74:2,
  3,6,7 77:4
  80:11 81:20

Edward Certisimo
June 24, 2021

83:2 87:23,
25 88:5
89:10,12
94:17 95:13
105:11,12
**timeline**
88:12 89:21
**times**
16:6 23:11
44:19,20,21
48:5 50:11
**tips**
92:16
**title**
75:11
**titled**
18:24 37:2
**today**
6:25 8:13
47:14 73:13
100:4 104:6,
8,11,21,24
**told**
31:15 32:2,5
43:15 44:10,
17,18 45:13,
15,17 48:17
55:3 68:21
70:12,19,25
71:4,19
72:12 78:4,
23 79:10,12
80:6 81:21
82:4 89:13
92:4 94:23
95:7,16
**tomorrow**
87:12
**totally**
68:9
**touch**
16:25 48:25
**track**
56:1
**Trade**
46:22 47:2

**train**
65:22
**training**
66:22,25
**transaction**
36:20 42:20
82:12 94:15
**transactions**
41:12 55:12
**Transamerica**
20:25 21:1
25:23 30:20
31:16 32:4
53:20 54:2,
10 55:7
56:20 61:25
98:2,13,23
100:7,10
**Transamerica's**
22:1 25:25
**transcript**
105:16
**transfer**
26:1 39:3
57:8 63:6
64:4 104:12
**transferred**
21:7 41:5
42:16 88:4
**transferring**
23:4
**transfers**
89:6
**transmission**
84:25
**transmittal**
93:17
**transmitted**
13:20
**transmitting**
62:5
**traveling**
42:24
**trip**
24:23

**trouble**
79:14
**true**
97:6,7
103:19,21,
23,25
**trust**
11:9,12,15,
20,22 13:19
17:14 18:24,
25 19:3,7,
22,23,25
20:1,7,8,14
22:4,5,14
23:18,23
24:1,11,20
25:3,10
26:2,4 29:8
30:3,8,20
31:7 32:15
33:25 34:4,
7,19 35:1,2,
4,6,7 39:5,
14 40:19,25
41:8,15
42:3,16
47:12 52:14
54:9 58:16,
20 63:20
64:5 75:13,
14 76:5,6,9
83:19 85:24
86:2,18
91:14 94:6
96:19,20
97:8,16 99:7
103:19
104:7,21,24
105:1
**trusted**
80:22 81:5
82:6 90:4
100:23
101:16
**trustee**
10:19 11:1,
5,24 13:6
14:19,25

17:10 22:4,
14 23:22,24
24:7,10,16
26:2,3,5
27:16 28:25
29:8 30:3,9,
21 31:8
40:18 41:8
42:2 45:24
47:10,11,12,
15 52:14
58:10 72:9
75:12 76:4
85:4,24 86:2
89:1 90:17
96:18
**Trustees**
33:24
**trusteeship**
102:1
**trusting**
102:3
**trusts**
11:2,6,17,25
14:19 20:23,
24 21:15,16
24:12,16
25:24 26:5
28:24 33:17
34:3,17
43:3,5 45:23
47:12,16
48:20,23
58:9,24
59:6,25
64:24 70:2,
18 71:1 73:5
76:6,14
78:8,11
83:4,9,17,23
84:10 85:3
86:16,17
87:21 88:4,
5,18 89:2,7,
10,23 90:17,
21 96:19,25
97:1,14
101:20

Edward Certisimo
June 24, 2021

104:23

**try**
22:10 29:21
37:23 63:6
97:11

**trying**
17:25 28:1
29:17 45:3
46:2 61:12
83:15 88:17

**twenty**
10:20

**twice**
51:10 65:10

**two**
17:1 21:18
44:23 48:18
54:4 64:11
77:18 85:3
88:9 96:10,
24 97:9
99:13,21,25

**type**
68:20 87:2

**types**
69:1

---

**U**

**U.S.**
7:5,9

**Uh-huh**
10:22 22:19
28:4 31:4
52:2 99:4

**Uh-oh**
49:13

**ultimately**
49:5

**uncle**
69:9,10,12,
16,21,22,25
70:1

**uncle's**
65:20 95:9

**unclear**
29:19

**uncomfortable**
30:7

**underneath**
22:18

**understand**
17:25 23:3
24:21 29:10
50:1 79:17
82:4 83:3
85:6 88:17
89:18,20
91:4 94:12

**Understandable**
23:13

**understanding**
57:14 71:6
81:12

**undertake**
72:17

**United**
48:6

**update**
74:20 92:14

**upper-right**
6:22

**upset**
76:22,23
77:7 79:23
80:18,25
81:3,19,22

**UTC**
7:1 74:2,6
105:11

---

**V**

**Vacca**
26:9

**Valerie**
26:9

**value**
35:25 36:17

**various**
25:24

**vehicles**
25:6

**Venice**
27:2

**verbal**
58:11

**verbally**
7:17 8:8

**verification**
23:17

**version**
41:23

**versus**
7:3

**video**
6:14,15,18,
20 7:4

**video-recorded**
6:23

**VIDEOGRAPHER**
6:5 74:1,5
105:9

**videotape**
105:14

**videotaped**
105:10

**view**
6:15,21

**Voya**
21:16 43:8
56:19,24
57:3

**VXL**
32:11 52:6
55:18 62:8
63:23 64:3,
13 100:11

**VXL9663080**
30:25

---

**W**

**waive**
7:20

**walked**
68:5

**want**
6:19 15:9

16:24 20:22
26:20 34:12
36:6 39:17
43:11 49:4
80:4 91:3
93:7,24
94:12 105:21

**wanted**
14:14 18:17
29:11,13
42:25 62:6
68:7 71:14,
21 81:19
93:21 102:24

**wanting**
48:25

**Washington**
47:2

**water**
61:5 73:8

**way**
16:17 26:8
46:4 55:15
60:25

**week**
14:21 92:21,
24

**went**
18:8 55:2
60:13 67:21,
25 88:12

**whatsoever**
73:4 78:10

**whoops**
75:22

**Windows**
60:7,12,16

**witness**
6:14,16,19
7:17 91:23

**witness's**
6:20

**witness-only**
6:13

**word**
58:3 84:3
97:24 103:7

Edward Certisimo
June 24, 2021

**words**
  31:23 95:10
  101:6
**work**
  16:22 17:5
  72:9
**worked**
  26:16,18
**working**
  8:16 14:20
  74:25 82:17
**worth**
  36:7,17
  70:12,16,19
  71:1,6
**wrapped**
  75:3
**write**
  14:9 17:22
  94:7,10,17
  102:24
**writing**
  9:18 25:23
  87:10
**written**
  57:2 64:19
  75:11 83:3
**wrong**
  82:25 97:24
**wrote**
  12:14,21,22
  14:22 17:17
  94:9,11,13
  102:17
**Wycoff**
  11:3,6,8,9,
  11,14,19
  12:19 14:11
  16:6 17:4
  18:25 19:23
  20:8 23:22
  24:10 25:9
  26:1,3 28:9
  29:7 30:20
  31:6 32:14
  33:23,24
  40:1,7,10,

  16,19 42:3
  43:23 49:8
  51:24 52:13,
  18 55:17
  56:23 58:4,
  20,24 59:12,
  24 61:8,25
  62:5 63:20
  64:5,16
  71:25 72:6,
  16 73:10
  74:13,19
  75:12,13,22
  76:13 77:9
  82:22 83:8,
  22 85:15
  86:1 90:4,
  13,17,20
  91:11,14
  95:5,16 99:3
  100:23
  102:3,4,23
  103:11
**Wycoff's**
  16:1 19:11
  20:19 40:12
  91:8
**Wycoff-**
**related**
  24:16 47:16
  60:1
**Wycoffs**
  11:25 25:2
  26:17 27:23
  32:20,24
  33:7 36:16
  37:18 46:3
  48:8,11,25
  57:19 66:14
  77:25 78:4,7
  80:22
**Wycoffs'**
  38:7 43:12
  44:15 47:18

**Y**

**yeah**
  12:12 23:16
  30:13 35:7
  46:22 50:19
  53:13 60:10
  62:18,22
  63:9,11,12,
  16 66:1
  68:13 70:5,
  17 72:18
  73:16,20
  81:22 86:9
  87:23 93:13
  94:1 95:7
  96:8
**year**
  8:25 9:3
  42:24 71:12
**years**
  10:20 15:12,
  15 43:15,21
  54:4,17 65:9
  66:7 68:24
**yellow**
  52:20
**Yup**
  10:5 28:21

**Z**

**ZAP**
  7:3 56:11
  67:1 70:11
**zone**
  7:1
**zoom**
  41:24 93:24
**zoomed-out**
  41:23