## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

**Civil Action No.: 1:20-cv-03142-KLM**

MIDLAB, INC., a Tennessee Corporation,

      Plaintiff,

v.

MERRIE PISANO WYCOFF individually and as trustee of The Wycoff Family Trust;
WYCOFF FINANCIAL, LLC, a Colorado limited liability company;
MAGNUS VERITAS LLC, a Colorado limited liability company; and
GCS452, LLC, a Colorado limited liability company,

      Defendants.

---

## AFFIDAVIT OF BRANDON KLING

---

I, Brandon Kling, being first duly sworn, on my oath depose and say as follows:

1.     I am a Vice President at Bloomfield Capital Holdings, LLC, which maintains offices in New York, Detroit, Portland (ME), Los Angeles, Denver and Chicago.

2.     In that capacity, I have knowledge regarding the loan made by BC24, LLC (an affiliate of Bloomfield Capital Holdings, LLC) to Wycoff Financial, LLC, which closed on May 12, 2015 (the "Loan"). The Loan was in the original principal amount of $3,707,287.60. The Loan was evidenced by a Promissory Note, Loan Agreement and a Guaranty executed concurrently, together with other loan documents. A copy of the Promissory Note is attached as **Exhibit A**.

23019188

3.     To my knowledge, the negotiations which precipitated the Loan and the financial information obtained from the Borrower were conducted with Jeff Wycoff.  To my knowledge, I had no direct telephone communication with Merrie Wycoff prior to the death of Jeff Wycoff.

4.     Our understanding was according to Jeff Wycoff, the primary purpose of the Loan was to generate monies for ZAP! Products, Inc., a business we understood was owned by Jeff and Merrie Wycoff and that sold home cleaning products.

5.     BC24 required the Loan be secured by a deed of trust on the real estate and improvements located at 9417 N. Foothills Hwy, Longmont, Colorado 80503 (the "Farm").

6.     As a requirement of the Loan, and to protect BC24's interest in its collateral, BC24 required that the Farm be transferred to a single purpose entity. Wycoff Financial, LLC was agreed to by the parties to be the single purpose entity.  As a condition to the Loan closing, Merrie and Jeff Wycoff transferred the Farm to Wycoff Financial, the borrower under the Promissory Note.

7.     As additional collateral for the Loan, Jeff and Merrie Wycoff executed a Collateral Assignment pledging to BC24 Transamerica Term Life Insurance Policy Number 41643523, as evidenced by the Collateral Assignment dated May 25, 2015. **Exhibit B**.

8.     The Loan was guaranteed by ZAP! Holdings, LLC, Jeffrey Wycoff, Merrie Wycoff, each individually and as a trustee to Jeffrey and Merrie Wycoff 2003 Insurance Trust u/a/d December 11, 2003, and as trustee of the Wycoff Family Trust u/a/d June 12, 1998.  See the Guaranty dated May 12, 2015. **Exhibit C**.

9.     Within approximately one year from the date the Loan was originated, Wycoff Financial was unable to service the debt owed to BC24.  BC24 worked with Jeff Wycoff through numerous loan extensions, these included the First Amendment dated May 12, 2016; the Second

2

EXHIBIT O

Amendment dated November 30, 2016; the Third Amendment dated December 31, 2016; and the Fourth Amendment dated July 31, 2017. Some of the amendments, among other things, rolled outstanding interest, extension fees, closing costs, and unpaid reimbursements into the principal such that the Fourth Amendment reflected principal owed in the amount of $4,621,852.73.

10.     Throughout the restructuring process, starting around the summer of 2016, Jeff Wycoff represented to me that he was attempting to sell the Farm. To my knowledge, Jeff Wycoff indicated he believed the proceeds generated from BC24's collateral would be sufficient to pay off the Loan. As best as I recall, Jeff Wycoff represented the property was listed for sale at $5,850,000 with the Bernardi Group during the summer of 2016.

11.     We were advised that the sales efforts during the next year were unsuccessful. Sometime in or around August 2017, Jeff Wycoff informed us he reduced the listing for the Farm to around $3.7 million. For internal purposes, we assumed a sale price at that time of $3.3 million which would generate net proceeds to BC24 of approximately $3 million. **Exhibit D**.

12.     The Loan matured on March 31, 2018, without it being paid in full by Wycoff Financial. Also on March 31, 2018, Jeff died. I began communicating with Merrie Wycoff and our counsel communicated with Merrie Wycoff's counsel, Steve Abelman.

13.     After Jeff Wycoff's death, Merrie Wycoff's counsel reported to BC24's counsel there was a contract to sell the Farm for $3.3 million. In late April or early May 2018, we were informed the offer had been terminated. Additional inquiries were made regarding how and when the Borrower intended to pay off the Loan.

14.     On May 15, 2018, our legal counsel sent the Notice of Default and Demand and Reservation of Rights, citing the aforementioned two Events of Default. See **Exhibit E**. In

particular, demand was made for payment in full of $4,621,852.73 plus subsequently accruing interest and enforcement costs.

15.     On June 27, 2018, a settlement proposal was sent on behalf of Merrie Wycoff to BC24, which formed the basis for the Settlement Agreement between the parties.  See **Exhibits F and G**.  We were advised that the settlement was largely predicated upon the Wycoff children using insurance proceeds obtained upon the death of their father to purchase the Farm for $2.5 million and the Residence for $1,275,000.  All net proceeds plus $400,000 would be paid to BC24.  In the alternative, Merrie Wycoff offered to convey the Farm to BC24.

16.     Under the circumstances, BC24 determined it would rather accept $2.5 million for release of the Farm then to foreclose, take ownership, and attempt to sell the Farm itself.  BC24 accepted a total discounted payoff of $3,230,000 as a full and complete payment of indebtedness in the amount of $4,814,328.33.

Dated: ___8/18/21___

By: _____

Brandon Kling
Vice President
Bloomfield Capital Holdings, LLC

Subscribed and sworn to before me this 18th day of August, 2021.

Witness my hand and official seal.

Julia Centofanti
Notary Public of Michigan
Macomb County
Expires 04/08/2024
Acting in the County of Oakland

_____
Notary Public

My commission expires: 4-8-2024

EXHIBIT A

PROMISSORY NOTE

Date: As of May 12, 2015

Due Date: Earlier of acceleration or May 12, 2016 provided, however, if the Borrower exercises its Extension Option (hereinbelow defined), the Due Date shall be the earlier of acceleration or November 12, 2016.

PROMISE TO PAY. For value received, Wyewill Financial, LLC, a Colorado limited liability company ("Borrower") promises to pay to the order of BGTd, LLC, a Michigan limited liability company ("Lender"), having an address of 280 North Old Woodward Avenue, Suite 100, Birmingham, Michigan 48009 ("Lender") the sum of Three Million Seven Hundred Seven Thousand Two Hundred Eighty Seven and 60/100 ($3,707,287.60) Dollars, with interest, as follows:

> Accrued interest upon the principal amount advanced and outstanding hereunder is due and payable on the tenth (10th) of each month commencing June 10, 2015, until May 10, 2016, with a final payment of all outstanding principal and accrued and unpaid interest thereon on May 12, 2016, unless Borrower avails itself of the Extension Option (as such term is hereinafter defined) in which case payments shall continue to be made on the tenth (10th) day of each month until November 10, 2016, with a final payment of all outstanding principal and accrued and unpaid interest thereon on November 12, 2016. Anything contained herein to the contrary notwithstanding, the Due Date shall be the earlier of May 12, 2016 (or November 12, 2016, as applicable, or the date of acceleration by Lender of the Indebtedness evidenced hereby).

All payments under this Note shall be made at the Lender's office at the address hereinabove set forth, or at such other address as the Lender may designate in writing. Borrower shall be required to make all payments due hereunder by federal wire transfer only pursuant to the wire transfer instructions attached hereto as Exhibit "A". Lender reserves the right to reject payments made by or on behalf of Borrower which are not sent via federal wire transfer as set forth above. Without waiving Lender's rights and remedies as set forth herein including, without limitation, the right to declare a default hereunder; in the event Lender receives a payment hereunder by check and such check is received later than seven (7) days prior to the date payment is due hereunder, Borrower shall automatically be subject to the "Late Fee" provided below with respect to such payment irrespective of when such check is cleared (if at all) by Lender's financial institution. Payments due and payable on a day on which the Lender is not open for business are due on the next succeeding business day. Payments will be applied (at the Lender's option) first to any unpaid fees or charges under this Note, then to accrued interest, and then to principal: provided that the Lender shall have the option of holding any overpayment of interest, arising from the Lender's receipt of a payment prior to its due date or otherwise, for application on subsequently accruing interest. All advances hereunder shall be charged to a loan account in Borrower's name on Lender's books, which shall be maintained in accordance with Lender's accounting practices, consistently applied, and Lender shall debit to such account the amount of each advance when made and credit to such account the amount of any principal repayment hereunder. Lender's books and records and any statement of account rendered by Lender to Borrower shall, absent manifest error, be prima facie evidence of the advances owing to Lender by Borrower hereunder. Lender may from time to time issue a written statement of account to Borrower setting forth the Borrower' loan balance in said loan account which shall be deemed to be correct and accepted by and binding upon Borrower unless Lender discovers an error or Lender receives a written statement of exceptions within ten (10) business days after such statement has been rendered to Borrower.

INTEREST RATE. The outstanding principal balance of this Note will bear interest until the Due Date (whether by acceleration or otherwise) at eleven percent (11%) per annum so long as no Event of Default shall have occurred and so long as the Due Date shall not have occurred. Interest will be computed on the basis of the actual number of days elapsed and a year consisting of 365 or 366 days, as the case may be. On the Due Date or, if earlier, when an Event of Default (as such term is hereinafter defined) occurs, the interest rate shall be 18% basis points per annum above the rate otherwise in effect (the "Default Rate"). In no event shall the interest rate exceed the maximum rate allowed by law. Borrower acknowledges that none of the terms and provisions contained in this Note or in any of the documentation entered into in connection herewith shall ever be construed to create a contract for the use, forbearance or detention of money requiring payment of interest at a rate in excess of the Maximum Rate (as such term is hereinafter defined). Borrower or any other party now or later liable for the payment of this Note shall never be required to pay interest on this Note at a rate in excess of the Maximum Rate. As used in this Note, the term "Maximum Rate" means the maximum rate (or, if the context so permits or requires, an amount calculated at such rate) of interest which at the time in question would not cause the interest charged on the indebtedness evidenced by this Note or the other documentation entered into in connection herewith at such time to exceed the maximum amount which Lender would be allowed to contract for, charge, take, reserve or receive under the laws of the State of Colorado or any other applicable law other than taking into account, to the extent required by the laws of the State of Colorado or any other applicable law, all relevant payments or charges under this Note and the other documentation entered into in connection herewith. The terms and provisions of the other documentation entered into by Borrower in connection with the indebtedness evidenced hereby (collectively, the "Loan Documents") are incorporated herein by reference with respect to the Maximum Rate and collection of any sums in excess of the Maximum Rate.

17091893.5

LOAN AGREEMENT
Schedule 2.o.

16994685.11

EXHIBIT O

CONFIDENTIAL

BC000185

**EXIT FEE.** At any time the Note is paid in full, whether voluntarily or involuntarily, or before or after the Due Date, the Borrower shall pay an additional fee equal to one percent (1%) of the then outstanding balance under this Note, accruing at the then applicable interest rate in effect under the Note (the "Exit Fee"). The Exit Fee is in addition to any applicable prepayment premium on any applicable repayment fee due and payable under this Note.

**LATE PAYMENT.** If any payment under this Note is not received by the Lender when due, then: (i) it shall constitute an Event of Default hereunder and pursuant to the Loan Documents; and (ii) a late charge of ten percent (10%) of the payment amount (and any related escrow payment) (the "Late Fee") will be due and owing except that the Late Fee shall not apply to any balloon payment; and (iii) the Default Rate shall apply on the entire Indebtedness (hereinafter defined) then due and owing. Borrower agrees that the Late Fee is a reasonable estimate of the administrative costs which the Lender will incur in processing the delinquency. The Lender's acceptance of a late payment and/or of the Late Fee will not waive any default under this Note or affect the acceleration of this Note (if this Note has been accelerated).

**PREPAYMENT.** Borrower shall be required to give Lender thirty (30) days prior written notice of any prepayment of principal hereunder and provided such notice is given, Borrower may prepay principal hereunder, in whole or part, plus all accrued interest then outstanding and all other fees, costs and other amounts due Lender at provided in this Note and the other Loan Documents, without premium or penalty except as expressly otherwise provided in the immediately following sentence. During the first twelve (12) months of the term of this Note, any prepayment of principal under this Note shall be accompanied by a prepayment premium equal to interest upon the amount prepaid for a period of twelve (12) months at the interest rate provided in this Note, with credit given Borrower for interest paid upon such prepaid principal amount from the date of this Note through the date of prepayment. The prepayment premium described above is not a penalty but a pre-estimate by Lender of lost income upon the principal amount so prepaid, it being acknowledged by Borrower that the exact amount of such lost income would be difficult to precisely establish and Borrower agrees that the foregoing prepayment premium is fair and reasonable. Prepayments will be applied to installments of principal in their inverse order of maturity. No prepayment shall reduce the dollar amount of any required installment payments, until this Note is paid in full. No prepayment shall obligate the Lender to re-advance all or any portion thereof. Notwithstanding the foregoing right to prepay all or a portion of the outstanding principal hereunder, if the effect of any prepayment by Borrower shall be to reduce the outstanding principal balance hereunder to an amount which is less than Five Hundred Thousand and 00/100 ($500,000.00) Dollars, Borrower shall be required to prepay this Note in full and Lender shall be under no obligation to accept any partial prepayment amount which would have the effect of reducing the principal balance hereunder after such prepayment to less than Five Hundred Thousand and 00/100 ($500,000.00) Dollars unless such prepaid amount prepays this Note in full. Under any and all circumstances any prepayment hereunder during the first twelve (12) months of the term of this Note, whether in whole or in part must include the prepayment premium hereinabove described.

**COLLATERAL.** This Note and any other present or future indebtedness or liability of any Borrower to the Lender, whether joint or several, contingent or absolute arising under this Note or any of the Loan Documents (as defined in the Loan Agreement) (collectively, "Indebtedness"), are, to the extent permitted by law, secured by, and Borrower grants to the Lender a security interest in, all property of such entity from time to time in the possession of the Lender. This Note shall also be secured by and in accordance with the terms of any mortgage, security agreement, pledge, assignment or other agreement executed by Borrower from time to time to or for the benefit of the Lender. All property securing the Indebtedness is referred to as the "Collateral."

**EVENT OF DEFAULT.** For purposes of this Note, the term "Event of Default" shall have the meaning ascribed thereto in the Loan Agreement (as hereinafter defined).

**REMEDIES.** If an Event of Default occurs, the Lender shall have the option to declare all or part of the Indebtedness (including this Note) immediately due and payable. If this Note is not paid at the Due Date (whether by acceleration or otherwise), the Lender shall have all of the rights and remedies provided at law or equity or by agreement, including, without limit, the right to sell or liquidate all or any part of the Collateral or offset or apply against the Indebtedness any account balance or other deposit. The remedies of the Lender are cumulative and not exclusive. No delay by the Lender in the exercise of any right or remedy shall operate as a waiver. No single or partial exercise by the Lender of any right or remedy shall preclude any future exercise of such right or remedy or the exercise of any other right or remedy. No waiver or indulgence by the Lender of any default or Event of Default shall be effective unless in writing and signed by the Lender, nor shall a waiver on one occasion be construed as a bar to any right or remedy, or waiver of any default or Event of Default on any future occasion.

**WAIVER.** Borrower and all guarantors and endorsers, and any other party liable for the Indebtedness evidenced by this Note: (i) severally waive presentment, demand, protest, notice of dishonor, notice of non-payment and notice of acceleration of this Note, and (ii) agree that no extension or postponement of the time for payment, or waiver, indulgence or forbearance granted to Borrower, without limit as to number or period, or any modification of this Note, or any substitution, exchange or release of any part of the Collateral, or addition of any party to this Note, or release or discharge of, or suspension of any rights and remedies against, any party liable on this Note, shall reduce or affect the obligation of any other party liable for the payment of this Note.

PROMISSORY NOTE
2

17993893.3

LOAN AGREEMENT
Schedule 2.a.

16994685.11

EXHIBIT O

CONFIDENTIAL
BC000186

REIMBURSEMENT OF EXPENSES. Borrower shall reimburse the Lender for all costs and expenses, including attorneys' fees, incurred by the Lender in administering the loan evidenced hereby and in enforcing its rights under this Note, including without limitation, those incurred in any bankruptcy, reorganization, insolvency or other similar proceeding. Any reference in this Note to attorneys' fees shall mean fees, charges, costs and expenses of both in-house and outside counsel and paralegals, whether or not a suit or proceeding is instituted, and whether incurred at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding, in consultation with counsel, or otherwise.

EXAMINATION OF RECORDS. Borrower shall at all times keep full and accurate records of its business and of the Collateral, which records shall be open to inspection and copying by the Lender upon reasonable prior written notice during normal business hours.

LOAN AGREEMENT. The provisions of the Loan Agreement executed on even date herewith by and between Lender and Borrower ("Loan Agreement") are incorporated herein to the extent not expressly inconsistent with the provisions of this Note, the same as if they were fully set forth in this Note; provided, however, in the event of any such inconsistency, the term or provision more favorable to Lender, as determined by Lender in its sole and absolute discretion shall apply.

EXTENSION OPTION. The initial Due Date hereunder is May 12, 2016 ("Initial Due Date"), subject however to earlier maturity upon acceleration after the occurrence of an Event of Default. Notwithstanding the foregoing, Borrower shall have the option ("Extension Option") to extend the Initial Due Date for one (1) period of six (6) months (such extended Initial Due Date hereinafter called the "Extended Due Date"), subject to the following terms and conditions: (1) Borrower must notify Lender in writing of its election to exercise the Extension Option at least thirty (30) days but not more than ninety (90) days prior to the Initial Due Date, which notice shall be accompanied by a payment to Lender of extension points in the amount of two percent (2%) of the then outstanding and unpaid Indebtedness (which shall be nonrefundable and deemed earned upon receipt by Lender) ("Extension Fee"); (2) Lender shall, in its sole and absolute discretion, be satisfied with the occupancy of the property subject to Lender's mortgage (the "Property"); (3) each and every guaranty of the Indebtedness shall be in full force and effect; (4) no Event of Default shall have occurred at any time prior to Borrower requesting the Extension Option; (5) no Event of Default or condition or event which with notice or the passage of time could mature into an Event of Default shall exist either at the time Borrower exercises the Extension Option or at the beginning of the extension period; (6) Borrower and all guarantors of the loan evidenced hereby must provide documentation reasonably evidencing the authority and capacity of Borrower to extend the term of the loan evidenced hereby and must execute such documentation as is reasonably required by Lender in connection with the extension of the Initial Due Date, including, but not limited to, an amendment to this Note to evidence the extension of the Initial Due Date, a reaffirmation of the Guaranty and all other Loan Documents, as amended; (7) Borrower must pay Lender's legal fees and expenses in connection with the extension; (8) no material adverse change, in Lender's sole opinion, shall have occurred in the condition of the Property, the Borrower or any guarantor or in its financial position, both at the time Borrower exercises its Extension Option and at the beginning of the extension period. In the Event that Borrower exercises the Extension Option, from and including the Initial Due Date through and including the Extended Due Date, all terms and conditions contained in this Note and the other Loan Documents shall remain in full force and effect except to the extent amended as hereinabove provided, and as may be amended pursuant to any written instrument signed by Borrower, the guarantor and Lender, as applicable.

REPAYMENT FEE. Anything contained in this Note to the contrary notwithstanding, In the event that Borrower does not fully pay the indebtedness evidenced by this Note by the Initial Due Date or, in the event Borrower properly exercises its right to extend the Initial Due Date to the Extended Due Date, then by the Extended Due Date, then, in addition thereto, Borrower shall thereafter be liable to Lender for payment of a "repayment fee" in the amount of two (2%) percent of the outstanding principal amount of the Loan on the Initial Due Date or the Extended Due Date, as the case may be, which repayment fee shall constitute additional indebtedness hereunder and be in addition to any late payment fee, exit fee or interest at the default rate.

WAIVER OF JURY TRIAL. BORROWER AND THE LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED, EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL, OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IS ANY WAY RELATED TO, THIS NOTE OR THE INDEBTEDNESS.

MISCELLANEOUS. The terms of this Note may only be changed in writing, executed by Borrower and a duly authorized officer of the Lender. Borrower, if more than one, shall be jointly and severally liable, and the term "Borrower" shall mean any one and all of them. This Note binds Borrower's heirs, personal representatives, successors and assigns. This Note shall be governed by the laws of the State of Colorado. Borrower agrees to submit to the non-exclusive jurisdiction of the state and federal courts located in the Eastern District of Michigan or Colorado for all purposes in respect of this Note or the Indebtedness. The Lender is a Michigan limited liability company with its principal place of business in Birmingham, Michigan and it is the intention of the Borrower and Lender, to the extent allowed by law, to elect the laws of Colorado as the choice of law to be used to govern the Loan Documents.

PROMISSORY NOTE

3

1300190+1

CONFIDENTIAL

BC000187

The Borrower understands that a substantial part of the Borrower's obligations relating to the indebtedness evidenced hereby, including, but not limited to making payments hereunder is performable in Colorado and that the loan evidenced hereby and evidenced, governed and secured by the other Loan Documents bears a reasonable relation to Colorado. A substantial part of the negotiations relating to the indebtedness evidenced hereby occurred in Colorado.

**(SIGNATURES ON NEXT PAGE.)**

PROMISSORY NOTE

4

[Bar Loan]

16994685.11

**LOAN AGREEMENT**
Schedule 2.o.

**EXHIBIT O**

CONFIDENTIAL

BC000188

This is the signature page to the Promissory Note.

Borrower's Address:

9417 North Foothills Highway
Longmont, Colorado 80503

Wycoff Financial, LLC,
a Colorado limited liability company

By: _____ (SEAL)

Its: _____

STATE OF COLORADO        )
                         )ss.
COUNTY OF _____       )

The foregoing instrument was acknowledged before me on May ____, 2015, by Jeffrey Wycoff, the _____ of Wycoff Financial, LLC, a Colorado limited liability company, on behalf of the company.

Witness my hand and official seal

My Commission Expires: _____

_____
Notary Public

> LISA B. FORSEEN
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20054037075
> MY COMMISSION EXPIRES OCTOBER 19, 20__

LOAN AGREEMENT
Schedule 2.o.

16994685.11

EXHIBIT O

CONFIDENTIAL

BC000189

EXHIBIT B

**TRANSAMERICA**
LIFE INSURANCE COMPANY

Transamerica Life Insurance Company
Home Office: 4333 Edgewood Road NE
Cedar Rapids, IA 52499
(the "Company")

**Collateral Assignment**

(This form does not change the beneficiary of the Policy)

Policy Number: 41643523      Insured's Name: Jeff Wycoff

THIS FORM WILL NOT BE RECORDED IF MODIFIED UNLESS APPROVED BY THE COMPANY

For value received, all rights, title and interest of the undersigned in this Policy are hereby assigned to:

Name of Assignee: BC24, LLC

Address of Assignee: 280 North Old Woodward Ave, Suite 100   Birmingham     Michigan      48009
                     Address                              City           State         Zip

And his, her or its executors, administrators, successors or assigns (herein called "Assignee") with the right to exercise any and all rights and privileges thereunder (except as provided in paragraph B hereof), subject to all the terms and conditions of the Policy and to all superior liens, if any, including those which the Company may have against the Policy. The undersigned jointly and severally agree and the Assignee by the acceptance of this Assignment agrees to the conditions and provisions hereof.

A.  It is agreed that, without detracting from the generality of the foregoing, the following rights are included in this Agreement: (1) the sole right to collect from the Company the net proceeds of the Policy when it becomes a claim by death or maturity; (2) the sole right to surrender the Policy and receive the surrender value thereof at any time provided by the terms of the Policy and at such other times as the Company may allow; (3) the sole right to obtain one or more loans or advances on the Policy, either from the Company or, at any time, from other persons, and to pledge or assign all of its interest under this Assignment for such loans or advances; (4) the sole right to collect and receive all distributions or shares of surplus, dividend deposits or additions to the Policy now or hereafter made or apportioned thereto, and to exercise any and all options contained in the Policy with respect thereto; provided, that unless and until the Assignee shall notify the Company in writing to the contrary, the distribution of shares of surplus, dividend deposits and additions shall continue on the plan in force at the time of this Assignment; and (5) the sole right to exercise all nonforfeiture rights permitted by the terms of the Policy or allowed by the Company and to receive all benefits and advantages derived therefrom.

B.  It is agreed that the following rights, so long as the Policy has not been surrendered, are excluded from this Assignment: (1) the right to collect from the Company any disability income; (2) the right to designate and change the beneficiary; and (3) the right to elect optional modes of settlement, but the reservation of these rights shall in no way impair the right of the Assignee to surrender the Policy completely with all its incidents or impair any other right to the Assignee hereunder, and any designation or change of beneficiary or election of a mode of settlement shall be made subject to this Assignment and to the rights of the Assignee hereunder.

C.  This Assignment is made and the Policy is to be held as collateral security for any and all liabilities of the undersigned, or any of them, to the Assignee, either now existing or that may hereafter arise in the ordinary course of business between any of the undersigned and the Assignee (all of which liabilities secured or to become secured are herein called "Liabilities").

D.  The Assignee covenants and agrees with the undersigned as follows:
    1.  That any balance of sums received hereunder from the Company remaining after payment of the then existing Liabilities shall be paid by the Assignee to the persons entitled thereto under the terms of the Policy as though this Assignment had not been executed.
    2.  That the Assignee will not exercise either the right to surrender the Policy or (except for the purpose of paying premiums) the right to obtain Policy loans from the Company until there has been default in any of the Liabilities or a failure to pay any premium when due, nor until twenty days after the Assignee shall have mailed, by first-class mail, to the undersigned at the address given herein below, notice of intention to exercise such right; and
    3.  That the Assignee will upon request forward without unreasonable delay to the Company the Policy for endorsement of any designation or change of beneficiary or any election of an optional mode of settlement.

E.  The Company is hereby authorized to recognize the Assignee's claim to rights hereunder without investigating the reasons for any action taken by the Assignee, or the validity of the amount of the Liabilities or the existence of any default therein, or the giving of any notice under Paragraph D(2) above or otherwise, or the application to be made by the Assignee of any amounts to be paid to the Assignee. The sole signature of the Assignee shall be sufficient for the exercise of any rights under the Policy assigned hereby and the sole receipt of the Assignee for any sums received shall fully discharge and release the Company for such Policy obligations.

F.  The Assignee shall be under no obligation to pay any premium or the principal of or interest on any loans or advances on the Policy whether or not obtained by the Assignee, or any other charges on the Policy, but any such amounts so paid by the Assignee from its own funds, shall become a part of the Liabilities hereby secured, shall be due immediately, and shall draw interest at a rate fixed by the Assignee from time to time not exceeding 6% per annum.

G.  With regard to the exercise of any right or privilege given herein to the Assignee (except as restricted in Paragraph D(2) above) the Assignee may exercise any such right or privilege without notice to, or assent by, or affecting the liability of, or releasing any interest hereby assigned by the undersigned, or any of them.

H.  The Assignee may take or release other security, may release any party primarily or secondarily liable for any of the Liabilities, may grant extensions, renewals or indulgences with respect to the Liabilities, or may apply to the Liabilities proceeds of the Policy hereby assigned or any amount received on account of the Policy by the exercise of any right permitted under this Assignment, without regard to other security.

I.  In the event of any conflict between the provisions of this Assignment and provisions of the note or other evidence of any Liability, with respect to the Policy or rights of collateral security therein, the provisions of this Assignment shall prevail.

J.  Each of the undersigned declares that no proceedings in bankruptcy are pending against him and that this Policy is not subject to any assignment for the benefit of creditors.

K.  This Assignment shall apply to and be effective under any Policy issued by the Company in exchange for the Policy or as a renewal or conversion thereof.

L.  The validity of this Assignment is hereby guaranteed by each of the undersigned.

M.  For administration of the Policy by the Company, the effective date of this Assignment shall be the same as the date it is accepted by the Company.

If this form is recorded by the Company, such recording does not mean we have passed on the legal adequacy or validity of the transaction.

303-440-8033                              Merrie Wycoff
Owner's Daytime Telephone Number          Print Owner's Complete Name

                                          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
Witness Signature                         Owner's Social Security Number/Tax ID Number

Address of Witness                        Owner's Signature (include Title, if Business or Trust)

                                          Owner's Signature (include Title, if Business or Trust)

                                          Date Signed: 5-25-15

TOA 500M-0809

(SIGNATURE REQUIREMENTS ON NEXT PAGE)

CONFIDENTIAL

BC000412

EXHIBIT O

## GUARANTY
## (WYCOFF)

THIS GUARANTY ("Guaranty") is made as of May 12, 2015, by ZAP! Holdings, LLC, a Colorado limited liability company ("ZAP Owner"), Jeffrey Wycoff and Merrie Pisano Wycoff, each individually and as a trustee of Jeffrey Wycoff and Merrie Wycoff 2003 Insurance Trust u/a/d December 11, 2003, (ZAP Owner, and the parties listed above, together and each individually, a "Guarantor"), in favor of BC24, LLC, a Michigan limited liability company, of 280 North Old Woodward Avenue, Suite 104, Birmingham, Michigan 48009 ("Lender"), to induce Lender to make loans, extend or continue credit or some other benefit (collectively, "Indebtedness"), to WYCOFF FINANCIAL, LLC, a Colorado limited liability company ("Borrower"), and because Guarantor has determined that executing and delivering this Guaranty is in Guarantor's interest and to Guarantor's financial benefit. For valuable consideration, GUARANTOR AGREES AS FOLLOWS:

1.     **GUARANTEE.** Guarantor unconditionally and irrevocably guarantees to Lender the full and prompt payment when due of all indebtedness, liabilities and obligations of Borrower to Lender howsoever evidenced, governed and/or secured, whether present or future, primary or secondary, absolute or contingent, direct or indirect, several, joint or joint and several (collectively, "Indebtedness"), including, without limit, the obligations and liabilities arising under or evidenced by the following:

(a)     $3,707,287.60 Promissory Note dated as of May 12, 2015, made by Borrower to Lender; and Loan Agreement dated as of May 12, 2015, made between Borrower and Lender ("Loan Agreement");

(b)     Deed of Trust, Assignment of Leases and Rents, and Security Agreement made by Borrower for the benefit of Lender covering the property commonly known as 9417 N. Foothills Highway, Longmont, Colorado 80593, including without limitation, Forty three (43) shares in the Left Hand Ditch Company ("Water Shares") owned by Jeffrey Wycoff and Merrie Pisano Wycoff, as Joint Tenants, Equity Owners, as evidenced by Certificate 2200, dated February 21, 2001 together with any extensions, renewals, modifications, substitutions or replacements of documentation evidencing the Water Shares; and

(c)     Security Agreements made by Borrower (with respect to the Cube patents and trademarks, as described in such documents) and by ZAP Owner (with respect to ZAP! patents and trademarks, as described in such documents), each for the benefit of Lender covering all patent rights existing and arising in connection with certain intellectual property described in such documents ("IP Collateral");

together with expenses, costs and attorneys' fees, incurred by Lender in connection with the enforcement of this Guaranty and/or any obligations of the Borrower to Lender. Lender may have immediate recourse against Guarantor for full and immediate payment of the Indebtedness at any time when the Indebtedness, or any portion, has not been paid when due (whether by acceleration or otherwise). All payments by Guarantor shall be made in lawful money of the United States of America and in immediately available funds. Guarantor's obligations under this Guaranty are **UNLIMITED**, and include the amount of all advances made by the Lender for protection of any collateral security for the Indebtedness.

2.     **NATURE OF GUARANTEE.** This is a guarantee of payment and not of collection. At any time when the Indebtedness, or any portion thereof, has not been paid when due (whether by acceleration or otherwise) Lender can require that Guarantor or any one of them pay Lender the amounts owing under this Guaranty immediately, and Lender is not required to collect first from the Borrower, any collateral or any other person liable for the Indebtedness. No delay or stay in any acceleration of the Indebtedness, as against the Borrower, due to the application of any bankruptcy, insolvency or other law or proceeding shall be effective under this Guaranty and Guarantor agrees to pay immediately any amount of the Indebtedness that would be due and payable but for such delay or stay. Guarantor's liability for payment of the Indebtedness shall be a primary obligation and shall be absolute and unconditional. Guarantor agrees that none of the following acts, omissions or occurrences shall diminish or impair the liability of Guarantor in any respect (all of which acts, omissions or occurrences may be done or occur without notice to Guarantor):

17001380.8

CONFIDENTIAL

BC000258

(a)     Any extension, modification, indulgence, compromise, settlement or variation of any of the terms of the Indebtedness.

(b)     Any assignment or transfer of any interest in any of the Indebtedness.

(c)     The discharge or release of any obligations of the Borrower or any other person now or hereafter liable on the Indebtedness, by reason of bankruptcy or insolvency laws or otherwise.

(d)     The acceptance or release by Lender of any collateral, security or other guaranty from any Guarantor, the Borrower or any other person, or any settlement, compromise or extension with respect to any such collateral, security or other guaranty.

(e)     The application or allocation by Lender of payments, collections or credits on the Indebtedness.

(f)     The creation of any new indebtedness by the Borrower.

(g)     The making of a demand, or absence of demand, for payment of the Indebtedness, or giving, or failing to give, any notice of dishonor, protest, presentment or non-payment or any other notice.

(h)     Any failure, omission or delay on the part of the Borrower, any Guarantor or any other person now or hereafter liable on the Indebtedness, or anyone claiming by or through any of them, to comply with any instrument or agreement relating to any of the Indebtedness.

(i)     To the extent permitted by law, any release or discharge, by operation of law, of any Guarantor from the performance or observance of any obligation, covenant or agreement contained in this Guaranty.

(j)     Any merger or consolidation of the Borrower, any Guarantor or any other person now or hereafter liable on the Indebtedness, into or with any other corporation or other entity, or any sale, lease or transfer of any of the assets of the Borrower or any Guarantor to any other person or entity.

(k)     Any other occurrence or circumstance which might otherwise constitute a legal or equitable defense or discharge of the liabilities of a guarantor or surety or which might otherwise limit recourse against any Guarantor.

The obligations of Guarantor set forth in this Guaranty constitute full recourse obligations of Guarantor, enforceable against Guarantor to the full extent of such party's assets and properties. Guarantor's liability under this Guaranty is independent of Guarantor's liability under any other guaranty previously or subsequently executed by such Guarantor, singularly or together with others, as to all or any part of the Indebtedness, and may be enforced for the full amount of this Guaranty regardless of Guarantor's liability under any other guaranty.

3.      **WAIVERS.** Without limiting the generality of the foregoing, to the fullest extent permitted by law, Guarantor unconditionally waives (a) any right of subrogation to the rights of Lender against the Borrower; (b) Lender's acceptance of this Guaranty; (c) any set-offs or counterclaims against Lender which would otherwise impair Lender's rights against Guarantor; (d) any demand or notice of any action that Lender takes regarding the Borrower, anyone else, any collateral, or any Indebtedness, which Guarantor might be entitled to by law or under any other agreement; and (e) any requirement of diligence on the part of anyone; (f) any right to notice of any foreclosure under Colorado law; and (g) any right to require confirmation of foreclosure against Borrower pursuant to under Colorado law and any deficiency action against Borrower or Guarantor resulting from a successful confirmation action described above.

GUARANTY
2

EXHIBIT O

CONFIDENTIAL                                                   BC000259

4. **REPRESENTATIONS AND WARRANTIES**. Guarantor represents and warrants to Lender as follows:

(a) Guarantor hereby represents that at the time of execution and delivery of this Guaranty, he has no revocable trust and he represents and warrants that no such revocable trust shall be created or established nor shall any assets of such Guarantor be transferred to a trust without the prior written consent of Lender.

(b) To the extent Guarantor is a member in the Borrower, such interests are not subject to any assignment, claim, lien, encumbrance or agreement for sale, transfer or other disposition.

(c) The execution and delivery of this Guaranty, and the performance of the obligations imposed under this Guaranty, do not violate any law and do not conflict with any agreement by which any Guarantor is bound, and do not require any consent or approval of any governmental authority or any third party. This Guaranty is a legal, valid and binding obligations of each Guarantor, enforceable in accordance with its terms, except as may be limited by bankruptcy, insolvency, reorganization, moratorium or other laws affecting, creditors' rights generally and the effects of general principles of equity.

(d) All financial information of Guarantor delivered to Lender as of the date hereof is correct and complete and accurately presents in all material respects the financial condition of Guarantor on the dates thereof. There has been no material adverse change in the business, property or condition of Guarantor since the date of the most recent financial information delivered to Lender, and Guarantor is not in material default under any indebtedness or material obligation.

(e) There are no actions, suits or proceedings, and no proceedings before any arbitrator or by or before any governmental commission, board, bureau or other administrative agency, pending or, to the best knowledge of Guarantor, threatened against or affecting any Guarantor, or any properties or rights of any Guarantor, which, if adversely determined, could have a materially adverse effect upon the financial condition of any Guarantor.

(f) Guarantor delivers this Guaranty based solely on Guarantor's independent investigation of (or decision not to investigate) the financial condition of the Borrower and is not relying on any information furnished by Lender. Guarantor assumes full responsibility for obtaining any further information concerning the Borrower's financial condition, the status of the Indebtedness or any other matter which Guarantor may deem necessary or appropriate (now or later). Guarantor waives any duty on the part of Lender, and agrees that Guarantor is not relying upon nor expecting Lender to disclose to Guarantor any fact now or later known by Lender, whether relating to the operations or condition of the Borrower, the existence, liabilities or financial condition of any co-guarantor of the Indebtedness, the occurrence of any default with respect to the Indebtedness, or otherwise, notwithstanding any effect such fact may have upon Guarantor's risk under this Guaranty, or Guarantor's rights against the Borrower.

(g) Lender has made no representation to Guarantor as to the credit-worthiness of the Borrower, and that Guarantor is satisfied with the means that Guarantor has for obtaining from the Borrower, on a continuing basis, financial and other information pertaining to the Borrower's financial condition.

5. **SECURITY**. To secure performance of Guarantor's obligations under this Guaranty, each Guarantor grants to Lender a security interest in all account balances, if any, of such party from time to time deposited with Lender, and all property, if any, of Guarantor from time to time in the possession of Lender. This Guaranty shall also be secured by and in accordance with the terms of any mortgage, security agreement, pledge, assignment or other agreement issued by each Guarantor from time to time to or for the benefit of Lender including, without limitation, the specific collateral described in paragraph 1, as to the owner thereof. All property subject to any of the foregoing is referred to as the "Collateral". If Guarantor fails to pay any amount owing under this Guaranty, Lender shall have all of the rights and remedies provided by law or under any other agreement to liquidate or foreclose on the Collateral; including, without limit, the rights and remedies of a secured party under the Colorado Uniform Commercial Code. These rights and remedies shall be cumulative and not exclusive. If Guarantor is entitled to notice, that requirement will be met if Lender sends notice at least five (5) days prior to the date of sale, disposition or other event which requires notice. The proceeds of any sale shall be applied first to costs, then toward payment of the amount owing under this Guaranty. Lender is authorized to cause all or any part of the Collateral to be transferred to or registered in Lender's name or in the name of any designee of Lender. If any monies become

17001380.8

CONFIDENTIAL

BC000260

available that Lender can apply to the Indebtedness, Lender may apply them in any manner it chooses. Lender may waive or delay enforcing any of its rights without losing those rights.

6.     **OTHER GUARANTORS**. If more than one person signs this Guaranty, their duties and obligations under this Guaranty shall be joint and several. All references to Guarantor shall be to each or any two or more of them. Any Guarantor's duties and obligations under this Guaranty are joint and several with any other guarantor of the Indebtedness. If Lender elects to enforce its rights against all guarantors of the Indebtedness, that election shall not release Guarantor from his or her duties and obligations under this Guaranty. The compromise or release of any of the obligations of any of the other guarantors, or the Borrower, shall not serve to waive, alter or release Guarantor's obligations. To the fullest extent permitted by law, each Guarantor waives any defense or limitation on liability based on C.R.S. §§13-50-102 and 13-50-103.

7.     **REINSTATEMENT**. This Guaranty, and any agreement securing this Guaranty, shall continue to be effective, or shall be automatically reinstated, as the case may be, if at any time payment of all or any part of the Indebtedness is rescinded or must otherwise be restored or returned by Lender upon the insolvency, bankruptcy, dissolution, liquidation or reorganization of the Borrower, or upon, or as a result of, the appointment of a custodian, receiver, trustee or other officer with similar powers with respect to the Borrower or any substantial part of the Borrower's property, or for any other reason, all as though such payments had not been made.

8.     **CONTINUED RELIANCE**. Lender may continue to make loans or extend credit to the Borrower based on this Guaranty until an officer of Lender receives written notice of termination from Guarantor. That notice shall be effective as of Lender's opening for business on the fifth (5th) day after receipt of the notice. If terminated, Guarantor will continue to be liable to Lender for any Indebtedness created, assumed or committed to at the time the termination becomes effective, and all subsequent renewals, extensions, modifications and amendments of such Indebtedness.

9.     **RELEASE**. Lender shall release ZAP Owner from its obligations under this Guaranty, and all of ZAP Owner's obligations hereunder shall terminate, without any further action by any party, upon the occurrence of the events set forth in Section 11(l) of the Loan Agreement.

10.    **MISCELLANEOUS**.

        (a)     This Guaranty shall be construed in accordance with the laws of the State of Colorado without regard to conflict of law principles.

        (b)     For all purposes in respect to this Guaranty, Guarantor agrees to submit to the non-exclusive jurisdiction of the state and federal courts located in Colorado.

        (c)     This Guaranty shall be binding upon the heirs, successors and assigns of Guarantor, and the rights and privileges of Lender under this Guaranty shall inure to the benefit of its successors and assigns.

        (d)     Any notice required from one party to another relating to this Guaranty shall be deemed effective if made in writing and in accordance with the requirements of the Loan Agreement.

        (e)     Any amendment of this Guaranty shall be in writing and shall require the signature of Guarantor and Lender. Any waiver or consent to departure from compliance with this Guaranty must be in writing and signed by Lender.

        (f)     The invalidity or unenforceability of any provision of this Guaranty shall not affect the validity or enforceability of the remaining provisions of this Guaranty. The use of headings does not limit the terms of this Guaranty.

        (g)     Any reference in this Guaranty to attorneys' fees shall refer to fees, charges, costs and expenses of in-house and outside attorneys and paralegals, whether or not a suit or proceeding is instituted, and whether incurred

17001380.8

CONFIDENTIAL

BC000261

at the trial court level, on appeal, in a bankruptcy, administrative or probate proceeding, in consultation with counsel, or otherwise.

(h) **WAIVER OF JURY TRIAL. GUARANTOR AND LENDER ACKNOWLEDGE THAT THE RIGHT TO TRIAL BY JURY IS A CONSTITUTIONAL ONE, BUT THAT IT MAY BE WAIVED. EACH PARTY, AFTER CONSULTING (OR HAVING HAD THE OPPORTUNITY TO CONSULT) WITH COUNSEL OF THEIR CHOICE, KNOWINGLY AND VOLUNTARILY, AND FOR THEIR MUTUAL BENEFIT, WAIVES ANY RIGHT TO TRIAL BY JURY IN THE EVENT OF LITIGATION REGARDING THE PERFORMANCE OR ENFORCEMENT OF, OR IN ANY WAY RELATED TO, THIS GUARANTY OR THE INDEBTEDNESS.**

(i) With respect to any payments required to be made by the Guarantor, such payments shall be made relative to each applicable obligation, in the currency (the "Original Currency") in which the guaranteed obligation is originally expressed. If the Guarantor makes payment relative to any obligation in a currency (the "Other Currency") other than the Original Currency (whether voluntarily or pursuant to an order or judgment of a court or tribunal of any jurisdiction), such payment shall constitute a discharge of the liability of the Guarantor in respect of the applicable obligation only to the extent of the amount of the Original Currency which the Lender is able to purchase at Detroit, Michigan with the amount it receives on the date of receipt in accordance with its normal practice. If the amount of the Original Currency which the Lender is able to purchase is less than the amount of such currency originally due to it in respect to the relevant obligation, the Guarantor shall indemnify and save the Lender harmless from and against any loss or damage arising as a result of such deficiency. This indemnity shall constitute an obligation separate and independent from the other obligations contained herein, shall give rise to a separate and independent cause of action, shall apply irrespective of any indulgence granted by the Lender and shall continue in full force and effect notwithstanding any judgment or order in respect of any amount due hereunder or under any judgment or order.

(j) All payments to be made by the Guarantor shall be made without set-off or counterclaim and without deduction for any taxes, levies, duties, fees, deductions, withholdings, restrictions or conditions of any nature whatsoever. If at any time any applicable law, regulation or international agreement requires the party obligated hereunder to make any such deduction or withholding from any such payment, the sum due from the Guarantor in respect to such payment shall be increased to the extent necessary to ensure that, after the making of such deduction or withholding, the Lender receives a net sum equal to the sum which it would have received had no deduction or withholding been required.

(k) Guarantor hereby irrevocably agrees that any legal action, suit, or proceeding against him with respect to his obligations, liabilities or any other matter under or arising out of or in connection with this Guaranty, the guaranteed obligations or the transactions or documents contemplated hereby or for recognition or enforcement of any judgment rendered in any such action, suit or proceeding may be brought in a federal or state court in Colorado. Each Guarantor hereby submits to the jurisdiction of such courts for the purpose of any such suit, action, proceeding or judgment (and waives for such purpose any other preferential jurisdiction by reason of its present or future domicile or otherwise). Each Guarantor hereby irrevocably waives any objection which it may now or hereafter have to the laying of the venue of any suit, action or proceeding arising out of or relating to this Guaranty brought in any such court as being brought in an inconvenient forum. To the extent any Guarantor has or hereafter may acquire any immunity from jurisdiction of any court or from any legal process (whether from service or notice, attachment prior to judgment, attachment in aid of execution, execution or otherwise) with respect to himself or his property, such individual hereby irrevocably waives such immunity in respect of its obligations under this Guaranty. Each Guarantor further agrees that final judgment against him in any action, suit, or proceeding referred to herein shall be conclusive and may be enforced in any other jurisdiction, within or outside the United States of America, by suit on the judgment, a certified or exemplified copy of which shall be conclusive evidence of the fact and of the amount of its indebtedness. Each Guarantor agrees that service upon him to his address set forth below shall constitute valid and effective personal service upon him. Nothing herein shall, or shall be construed so as to, limit the right of the Lender, or any of its successors or assigns, to bring actions, suits or proceedings with respect to the obligations and liabilities of the Guarantor under, or any other matter arising out of or in connection with, this Guaranty, the Indebtedness or the transactions or documents contemplated hereby, or for recognition or enforcement of any judgment rendered in any proceeding, in the courts of whatever jurisdiction in which the Indebtedness or the obligations or liabilities of the Guarantor hereunder may arise or are created or in which the assets of any Guarantor

GUARANTY
5

17001380.8

CONFIDENTIAL

BC000262

may be found or as otherwise shall seem appropriate to the Lender, or any of its successors or assigns, or to affect the right to service of process in any jurisdiction in any other manner permitted by law.

**(Signature Page Follows)**

GUARANTY
6

17001380.8

EXHIBIT O

CONFIDENTIAL                                                                                                                    BC000263

In witness whereof, this Guaranty has been executed and delivered under seal the day and year first above written.

GUARANTORS:

_____ (SEAL)
Jeffrey Wycoff

_____ (SEAL)
Merrie Pisano Wycoff

each, individually and as a Trustee of
The Wycoff Family Trust u/a/d June 12, 1998

ZAP! Holdings, LLC,
a Colorado limited/liability company

By: _____

Its: _____

Address: 9417 N. Foothills Highway,
Longmont, Colorado 80593

**(Notary Page Follows)**

GUARANTY
6

17001380.5

CONFIDENTIAL

BC000264

STATE OF COLORADO )
)ss.
COUNTY OF Boulder )

The foregoing instrument was acknowledged before me this 7th day of May, 2015, by Jeffrey Wycoff, individually and as a trustee of The Wycoff Family Trust u/a/d June 12, 1998, as his own free act and deed.

Witness my hand and official seal.

My Commission Expires: 10/19/17

LISA B. FORSEEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054037075
MY COMMISSION EXPIRES OCTOBER 19, 2017

_____
Notary Public

STATE OF Colorado )
)ss.
COUNTY OF Boulder )

The foregoing instrument was acknowledged before me this 7th day of May, 2015, by Merrie Pisano Wycoff, individually and as a trustee of The Wycoff Family Trust u/a/d June 12, 1998, as her own free act and deed.

Witness my hand and official seal.

My Commission Expires: 10/19/17

LISA B. FORSEEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054037075
MY COMMISSION EXPIRES OCTOBER 19, 2017

_____
Notary Public

STATE OF COLORADO )
)ss.
COUNTY OF Boulder )

This instrument was acknowledged before me on May 7th, 2015, by Jeffrey Wycoff, the Pres. of ZAPI Holdings, LLC, a Colorado limited liability company, on behalf of the company.

Witness my hand and official seal.

My Commission Expires:

LISA B. FORSEEN
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20054037075
MY COMMISSION EXPIRES OCTOBER 19, 2017

_____
Notary Public

GUARANTY
7

1700138O.5

CONFIDENTIAL

BC000265

Jeffrey Wycoff and Merrie Wycoff 2003 Insurance Trust u/a/d December 11, 2003

By: _____

Its: Trustee

Merrie Wycoff 2003 Insurance Trust u/a/d December 15, 2003

By: _____

Its Trustee

(Notary Pages Follow)

GUARANTY
8

17001380.8

EXHIBIT O

CONFIDENTIAL

BC000266

```
                                        ┌─────────────────────────────────┐
                                        │         DREW BRITTON            │
                                        │        NOTARY PUBLIC            │
STATE OF COLORADO          )            │      STATE OF COLORADO         │
                           )ss.         │    NOTARY ID 20114019797       │
COUNTY OF Boulder          )            │ MY COMMISSION EXPIRES APRIL 1, 2019 │
                                        └─────────────────────────────────┘
```

The foregoing instrument was acknowledged before me this _15th_ day of May, 2015, by Jeffrey Wycoff, individually, as his own free act and deed.

Witness my hand and official seal.

My Commission Expires: 4-1-2019

_____
Notary Public

```
                                        ┌─────────────────────────────────┐
                                        │         DREW BRITTON            │
                                        │        NOTARY PUBLIC            │
STATE OF Colorado          )            │      STATE OF COLORADO         │
                           )ss.         │    NOTARY ID 20114019797       │
COUNTY OF Boulder          )            │ MY COMMISSION EXPIRES APRIL 1, 2019 │
                                        └─────────────────────────────────┘
```

The foregoing instrument was acknowledged before me this _15th_ day of May, 2015, by Merrie Pisano Wycoff, individually, as her own free act and deed.

Witness my hand and official seal.

My Commission Expires: 4-1-2019

_____
Notary Public

```
                                        ┌─────────────────────────────────┐
                                        │         DREW BRITTON            │
                                        │        NOTARY PUBLIC            │
STATE OF COLORADO          )            │      STATE OF COLORADO         │
                           )ss.         │    NOTARY ID 20114019797       │
COUNTY OF Boulder          )            │ MY COMMISSION EXPIRES APRIL 1, 2019 │
                                        └─────────────────────────────────┘
```

This instrument was acknowledged before me on May _15th_, 2015, by Jeffrey Wycoff, the _President_ of ZAPI Holdings, LLC, a Colorado limited liability company, on behalf of the company.

Witness my hand and official seal.

My Commission Expires: 4-1-2019

_____
Notary Public

GUARANTY
9

17001380.8

EXHIBIT O

CONFIDENTIAL

BC000267

STATE OF _Colorado_ )
)ss.
COUNTY OF _Boulder_ )

> DREW BRITTON
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20114019797
> MY COMMISSION EXPIRES APRIL 1, 2019

The foregoing instrument was acknowledged before me this 15th day of May, 2015, by _Jeffrey Allen Wycoff_, Trustee of the Jeffrey Wycoff and Merrie Wycoff 2003 Insurance Trust Agreement u/a/d December 11, 2003 as ___ own free act and deed.

Witness my hand and official seal. My Commission Expires: 4-1-2019

_____
Notary Public

STATE OF _Colorado_ )
)ss.
COUNTY OF _Boulder_ )

> DREW BRITTON
> NOTARY PUBLIC
> STATE OF COLORADO
> NOTARY ID 20114019797
> MY COMMISSION EXPIRES APRIL 1, 2019

The foregoing instrument was acknowledged before me this 15th day of May, 2015, by _Merrie Wycoff_, Trustee of the Merrie Wycoff 2003 Insurance Trust Agreement u/a/d December 15, 2003 as ___ own free act and deed.

Witness my hand and official seal. My Commission Expires: 4-1-2019

_____
Notary Public

GUARANTY
10

17001380.8

CONFIDENTIAL

EXHIBIT O

BC000268

| From: | Brandon Kling <bkling@bloomfieldcapital.com> |
|---|---|
| To: | Nicholas Coburn; Jason Jarjosa |
| Sent: | 8/13/2017 9:28:51 PM |
| Subject: | Fwd: FW: Price Reduction |
| Attachments: | Effective Yield Comparisons 8.10.17.xlsx; Wycoff Stmt of Financial Condition 02.28.2017.pdf |

### 78.Boulder_Wycoff

Nick -

I did speak with Jason briefly on Friday regarding Wycoff, but you and I have yet to connect. Here are a few things to consider:

**1.** Below is a snapshot of where we sit today, and where we would sit at the end of the year if we let him *a)* roll the accrued interest from 3/1-7/31, *b)* roll the 2% extension fee we would need to get him from 7/31 to 12/31, and; *c)* let him continue accruing from 8/1 - 12/31. All of the aforementioned would take him from $4.0MM to $4.5MM. His farm is now listed at $3.7MM. If you assume a sale at $3.3MM, and net proceeds of $3.0MM, that would leave us with $1.5MM on Zap, Restore4, and the Cube. And presumably he would still be unable to service the remaining $1.5MM, so that figure would continue to grow.

| Current Balance | $ | 4,027,673.28 |
|---|---|---|
| 3/1 - 7/31 accrued interest | $ | 202,597.48 |
| 2% ext fee | $ | 84,605.42 |
| **Proposed New Balance on 8/1:** | $ | 4,314,876.18 |
| | | |
| 8/1 - 12/31 to be accrued | $ | 202,597.48 |
| **Projected Balance on 12/31:** | **$** | **4,517,473.66** |
| | | |
| Less: Sale of Farm (net) | $ | (3,000,000.00) |
| | | |
| Remaining Balance: | $ | 1,517,473.66 |
| (on Zap, Restore4, & ZAP) | | |

**2.** I didn't catch this before, but back in February when we did the last amendment, I made him supply us with fresh financials. Below is his balance sheet as of Feb '17. Notice the valuation he is listing on the IP. Could be useful.

CONFIDENTIAL

BC001263

ASSETS -

| | | |
|---|---|---:|
| CASH/CASH EQUIVALENTS | $ | 160,000 |
| MARKETABLE SECURITIES | | 3,500 |
| VEHICLES | | 51,000 |
| PERSONAL PROPERTY | | 200,000 |
| RESIDENCE | | 1,850,000 |
| REAL ESTATE - FARM | | 6,000,000 |
| REAL ESTATE - ALASKA BARE LAND | | 75,000 |
| INVESTMENTS - | | |
| ZAP! PRODUCTS | | 25,000,000 |
| ASCENT HOLDINGS | | 10,000,000 |
| | | $ 43,339,500 |

LIABILITIES -

| | | |
|---|---|---:|
| REVOLVING CREDIT | $ | 120,000 |
| VEHICLES | | 36,000 |
| MORTGAGE PAYABLE - RESIDENCE | | 962,000 |
| MORTGAGE PAYABLE - FARM | | 4,025,000 |
| | | $ 5,143,000 |

**3.** Also on that balance sheet, I see he's showing around $900M of equity in his residence. I was not intimately involved on the front-end, so I can't speak as to why we ultimately decided against the 2nd on his home, but I would think that is definitely in play now given that he has no cashflow to pay interest for the entirety of 2017 and also the extension fees.

In order to roll the interest/fees and to provide him with yet another extension to 12/31, I would think we need some combination of:

1. 2nd on home
2. equity interest in IP. Could be either a small perpetual ownership, or a larger percentage (i.e. - his 50%) of the first, say, $500M of sales/net income.
3. try to make him bring something to closing - even if only ~$25M

As soon as we have business terms finalized I can wrap this up with Kas. Let's discuss.

### Brandon T. Kling | Bloomfield Capital

Detroit | Chicago | Denver | Greenwich

Desk: (248) 220-2401 | Main: (248) 745-1700

bkling@bloomfieldcapital.com

www.bloomfieldcapital.com

---------- Forwarded message ----------
From: **Jeff Wycoff** <JeffWycoff@zapproducts.com>
Date: Sun, Aug 13, 2017 at 4:08 PM
Subject: FW: Price Reduction

EXHIBIT O

CONFIDENTIAL

BC001264

To: nicholas coburn <coburn@bloomfieldcapital.com>, Brandon Kling <bkling@bloomfieldcapital.com>

FYI

Jeff Wycoff

President/CEO

Zap! Products Inc.

9417 N. Foothills Hwy

Longmont, CO 80503

(303) 440-8082



DISCLAIMER: This e-mail and any accompanying documents may contain copyright, confidential, or privileged information intended only for the sole use of the recipient named in this e-mail. If you are not the intended recipient, you are hereby notified that any retention, dissemination or copying of this e-mail is strictly prohibited. If you have received this e-mail in error, please contact the sender and delete all copies from your system and shred any printed material derived from this e-mail. As the Internet is not a guaranteed secure environment, the sender cannot guarantee the integrity of this communication, or that it is free from errors, viruses, or interference. If you received this as a solicited or unsolicited e-mail and would like to unsubscribe, please reply to the sender requesting to be removed.

**From:** Office_Coordinator [mailto:officecoordinator@thebernardigroup.com]
**Sent:** Saturday, August 12, 2017 9:21 AM
**To:** Jeff Wycoff <JeffWycoff@zapproducts.com>; Merrie Wycoff AOL <MerriePWycoff@aol.com>
**Cc:** Listing_Manager <listingmanager@thebernardigroup.com>
**Subject:** Price Reduction

Good Morning Merrie and Jeff,

CONFIDENTIAL                                                                                      BC001265

We reduced the price on your property this afternoon to $3,789,000. I wanted to give you a synopsis of what we do when we reduce the price on your property.

Below are the things that we have done today:

Multiple Listing Service (MLS) – The price of your property has been reduced in the database that is used by real estate agents. This will show up on their hot sheet and prompt their buyers who are signed up for updated as well.

Centralized Showings – The price of your property has been reduced in the Centralized Showings service. All of the agents that have shown your property received an email to let them know that the price has been reduced. We also called agents with interested buyers to let them know that the price has been reduced.

Personalized 800# recording – The recording has been updated with the new price.

Web Sites – 99% of the web sites that your property appears on will automatically download the new price information, ranging in time frame from overnight to several days. We also post the new price on Karen's Twitter and Facebook accounts which are followed by over 2,000 people.

Hot Sheet – Your property will be featured in the weekly Hot Sheet that we sent to 3000+ local real estate agents this afternoon.

Prospective Buyers – We will be calling all prospective buyers that have called about your property from our Sunday Daily Camera ad or that have called the personalized 800# for your property to let them know that the price has been reduced.

Please let me know if you have any questions, we are hoping this new price will bring you a great buyer.

EXHIBIT O

CONFIDENTIAL



**SHANNON WEISSLEDER**
Listing Manager

Direct: 303.402.6023    Office: 303.402.6000
listingmanager@thebernardigroup.com



THE
**BERNARDI GROUP**
**COLDWELL BANKER**
RESIDENTIAL BROKERAGE
*"We appreciate your referrals"*

www.bernardirealestate.com    BernardiBuzz.com - Karen's Blog    Twitter.com – Follow us on Twitter!

*CONFIDENTIALITY NOTICE: This message and any attachments to it are intended for use only by the addressee(s), and may contain privileged and/or confidential information. If you are not the intended recipient, you are not authorized to read, print, copy or disseminate this message or any attachments to it, or to take any action based on them. If you have received this message in error, please notify me immediately by telephone at 303-402-6000 and permanently delete the original.*

EXHIBIT O

# HONIGMAN

Honigman Miller Schwartz and Cohn LLP
Attorneys and Counselors

Kasturi Bagchi

(248) 566-8554
Fax: (248) 566-8555
kbagchi@honigman.com

May 15, 2018

## NOTICE OF DEFAULT AND DEMAND AND RESERVATION OF RIGHTS

### *Via Federal Express*

Wycoff Financial, LLC
9417 North Foothills Highway
Longmont, Colorado 80503

Merrie Pisano Wycoff and The Estate of Jeffrey Wycoff
9417 North Foothills Highway
Longmont, Colorado 80503

Zap! Holdings, LLC
9417 North Foothills Highway
Longmont, Colorado 80503

### *Via Federal Express and Email*
sabelman@bhfs.com
Steven E. Abelman, Esq.
Brownstein Hyatt Farber Schreck
410 Seventeenth Street, Suite 2200
Denver, Colorado 80202-4432

*Re:* *Loan From BC24, LLC (the "Lender") to Wycoff Financial, LLC, a Colorado limited liability company (the "Borrower") in the principal amount of $3,819,247.68 (the "Loan") and guaranteed by ZAP! Holdings, LLC, a Colorado limited liability company ("ZAP Owner"), Zap! Products, Inc., a Colorado corporation ("Zap! Products"), Jeffrey Wycoff, individually, Merrie Pisano Wycoff, individually, Jeffrey Wycoff and Merrie Wycoff 2003 Insurance Trust u/a/d December 11, 2003, and Merrie Wycoff 2003 Insurance Trust u/a/d December 15, 2003 (ZAP Owner, Zap! Products, and the parties listed above, together and each individually, a "Guarantor")*

Ladies and Gentlemen:

As you know, the Lender is the owner and holder of the following documents relating to, evidencing and securing the above-referenced Loan:

1. That certain Fourth Amended and Restated Promissory Note made by the Borrower and effectively dated as of July 31, 2017 in the principal amount of $4,621,852.73 (the "Note");

39400 Woodward Avenue · Suite 101 · Bloomfield Hills, Michigan 48304-5151
*Detroit · Ann Arbor · Bloomfield Hills · Chicago · Kalamazoo · Lansing*

27618710.1

# HONIGMAN

2.   That certain Loan Agreement effectively dated as of May 12, 2015, as amended by that certain First Amendment to Loan Agreement and Loan Documents made as of May 12, 2016, as amended by that certain Second Amendment to Loan Agreement and Loan Documents made as of November 30, 2016, as amended by that certain Third Amendment to Loan Agreement and Loan Documents made as of December 31, 2016, as amended by that certain Fourth Amendment to Loan Agreement and Loan Documents made as of July 31, 2017, each of the foregoing by and between Borrower and Lender and acknowledged by the Guarantors (collectively, the "Loan Agreement");

3.   That certain Deed Of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of May 12, 2015 by Borrower for the benefit of the Lender and recorded on May 15, 2015 as instrument number 03445958 with the Boulder County, Colorado Land Records, as amended by that certain First Amendment to Deed of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of May 12, 2016 by Borrower for the benefit of the Lender and joined in by Lender and recorded June 7, 2016 as instrument number 03522687 with the Boulder County, Colorado Land Records, as further amended by Borrower for the benefit of the Lender and joined in by Lender with the Boulder County, Colorado Land Records (collectively, "Security Instrument"), which Security Instrument encumbers the Property as defined in the Security Instrument;

4.   That certain Royalty and Profit Sharing Agreement made as of December 8, 2017 among ZAP Owner, Zap! Products and Lender ("Royalty Agreement");

5.   That certain Amended and Restated Guaranty from the Guarantors effectively dated as of July 31, 2017 (collectively, the "Guaranty"); and

6.   All other documents, instruments and agreements, including, without limitation, Security Agreements and/or UCC Financing Statements, evidencing, securing and/or relating to the Loan.

The Note, the Loan Agreement, the Security Instrument, the Guaranty, together with all other documents, instruments and agreements evidencing, securing and governing the Loan, as all of the foregoing have been amended and/or restated from time to time are hereinafter collectively referred to as the "Loan Documents."

Notice is hereby given to you that the following Events of Default have occurred and are continuing as of March 31, 2018: (1) the Loan matured on March 31, 2018 and Borrower has failed to repay the Loan and other indebtedness due and owing under the Loan Documents in full by March 31, 2018; (2) Jeffrey Wycoff has died. Therefore, as of March 31, 2018, the sum of $4,621,852.73 plus accruing interest and enforcement costs and all other sums due and owing under the Loan Documents, including, without limitation, the Royalty Agreement, is due and payable in full.

Please note that additional monetary and/or non-monetary defaults may also exist under the various Loan Documents. The failure to list the same here shall not be considered a waiver of the Lender's right to

EXHIBIT O

27616710 1

# HONIGMAN

assert the existence of any such default in the future. Nothing in this letter shall be deemed to waive any rights or remedies of Lender.

**Lender hereby demands payment in full of the Loan in accordance with the terms of the Loan Documents and starting as of March 31, 2018, Lender has the right to apply late charges and default rate of interest on the Loan. No course of conduct or dealing shall be imputed to the Lender by virtue of any partial payment(s) received and Lender does not waive compliance with any Loan Documents. Strict compliance with the terms and provisions of the Loan Documents shall continue to be insisted upon, and in addition to imposing any late charge and/or default rate of interest, Lender reserves the right to exercise any one or more of the other remedies available to Lender pursuant to the Loan Documents or at law or in equity, and nothing contained in this letter shall constitute a waiver of any rights of Lender to pursue such rights and remedies.**

Payment to the Lender in an amount less than the total sums due under the Loan Documents should not be construed as an accord and satisfaction or as Lender's agreement to accept a lesser amount as payment in full of the total amount due. Additionally, Lender's acceptance of any endorsement or statement on any check evidencing a payment or letter accompanying a payment may not be deemed to be an accord and satisfaction, and the Lender may accept any such payment or check without prejudice to its right to receive the balance of all amounts due under the Loan Documents, or pursue its remedies.

Any prior, current, or ongoing negotiations among the Lender, Borrower and/or Guarantors shall not constitute a waiver of Lender's ability to exercise any and all rights and remedies under the Loan Documents or otherwise at law or in equity. Any such waiver shall not be effective unless set forth in writing, duly executed by an authorized representatives of Lender, Borrower and Guarantors. Borrower and Guarantors shall not be entitled to rely upon any oral or written statements made or purported to be made by or on behalf of the Lender in connection with any alleged agreement by or on behalf of the Lender to modify or extend the Loan and/or refrain from exercising any of its rights under the Loan Documents or otherwise at law or in equity, unless such statement is set forth in writing, duly executed by an authorized representatives of Lender, Borrower and Guarantors.

The purpose of this letter is to serve you with a notice of an existing default and preserve Lender's rights and remedies under the Loan Documents. Neither this letter nor any statement by or on behalf of Lender: (i) shall constitute a waiver of any rights of Lender to collect any amounts to which Lender may be lawfully entitled pursuant to the terms of the Loan Documents, or otherwise at law or in equity; or (ii) shall constitute an offer to settle or waive any rights of Lender under any of the Loan Documents. Lender has received no notice of any pending bankruptcy proceedings affecting any person or entity obligated in any way under the Loan Documents. If any party in receipt hereof is a debtor in a bankruptcy proceeding subject to the provisions of the United States Bankruptcy Code (the "Code"), this letter is merely written notice that formal demand has been made on the Borrower and Guarantors in compliance with the Loan Documents and applicable state law. This letter is not an act to collect, assess

EXHIBIT O

27618716 1

# HONIGMAN

Notice/BC24/Wycoff & Zap
May 15, 2018
Page 4

or recover a claim against a debtor in a bankruptcy proceeding, nor is this letter intended to violate any provision of the Code. Any claims against a debtor in a bankruptcy proceeding will be properly asserted in compliance with the Code in the respective bankruptcy proceeding.

Very truly yours,

HONIGMAN MILLER SCHWARTZ AND COHN LLP

Kasturi Bagchi

cc:     Nicholas Coburn via email
        Brandon Kling via email

**39400 Woodward Avenue · Suite 101 · Bloomfield Hills, Michigan 48304-5151**
*Detroit · Ann Arbor · Bloomfield Hills · Chicago · Kalamazoo · Lansing*

27618716.1

EXHIBIT O

EXHIBIT F

**Passow, Genie L.**

| | |
|---|---|
| **From:** | Abelman, Steven E. |
| **Sent:** | Wednesday, June 27, 2018 12:10 PM |
| **To:** | Bagchi, Kasturi (KBagchi@honigman.com) |
| **Subject:** | Merrie Wycoff |
| **Attachments:** | 2nd notice.jpeg; Scan_Abelman, Steven E._16_03_26-06-2018.pdf |

Kas,

This email is sent pursuant to our call today wherein we discussed a proposed resolution I formulated. As such it is intended to be an offer of compromise.

Attached is a copy of the Second Notice of Assessment recently received by the IRS for $9,437,811. There will likely be one additional notice prior to the IRS issuing tax liens against the property owned by Merrie Wycoff. Also attached is a lawsuit against Merrie Wycoff et al seeking $932,000. Clearly the IRS claim will take everything remaining in Merrie's possession . Those insurance proceeds inherited by Merrie's two daughters are neither subject to any claims of the IRS nor to any creditors of Jeff and Merrie. Prior to the IRS attachment, Merrie and her two daughters are trying to utilize their respective liquidity to resolve as many of the outstanding claims against Merrie as practical, especially with regard to those creditors who have been cooperative. Bloomfield has a long history of being supportive and patient, for which we are grateful. To that end , I propose the following:

1) Merrie's daughters will purchase the farm for $2.5 million. If I misspoke earlier and said $2.8 million, I apologize for the misunderstanding. All net proceeds go to BC24
2) Merrie's daughters will purchase the house for $1,275,000. While this is the appraised value, Karen Bernardi , a broker with Coldwell Banker, recommended in writing that the house be listed at between $975,000 and $1.1 million. Since there is a first deed of trust in the amount of $483,265 , and a second deed of trust in the amount of $458,693, the sale should generate approximately $300,000, all of which would be paid to BC24.
3) Between Merrie and the kids, they would pay another $400,000 in cash to BC24.

A few more comments. The nature of these transactions avoids brokerage commissions, which I estimate at 6%, will generate $245,000 of savings, all which inure to the benefit of BC24. Timing with the IRS is problematic, so reducing an agreement to writing should be done as soon as possible, at which time we would move swiftly towards consummating this transaction. I estimate BC24 would be paid the above amounts within 30 to 45 days. The total payment to BC24, including the $500,000 in insurance already collected , would be approximately $3.7 million. Under the less than optimal circumstances we find ourselves in, BC24 will fare much better than all the other creditors.

Please let me know your client's position at your earliest convenience and thank you for your consideration.

**Steven E. Abelman**
**Brownstein Hyatt Farber Schreck, LLP**
410 Seventeenth Street, Suite 2200
Denver, CO 80202

303.223.1102 tel
303.912.2515 cell
SAbelman@BHFS.com

*Brownstein Hyatt Farber Schreck: celebrating 50 years of leadership at the intersection of business, law and politics.*

EXHIBIT G

## SETTLEMENT AGREEMENT

This Settlement Agreement ("Agreement") is made and entered into as of August 3, 2018 (the "Effective Date"), by and among **BC24, LLC**, a Michigan limited liability company, of 280 North Old Woodward Avenue, Suite 104, Birmingham, Michigan 48009  (the "Lender"), **WYCOFF FINANCIAL, LLC**, a Colorado limited liability company, of 9417 North Foothills Highway, Longmont, Colorado 80503 ("Borrower"), The Estate of Jeffrey B. Wycoff, c/o Merrie Pisano Wycoff as the Nominated Personal Representative under the Last Will and Testament of Jeffrey B. Wycoff dated December 14, 2017, of 9417 North Foothills Highway, Longmont, Colorado 80503 ("Estate"), Merrie Pisano Wycoff a/k/a Merrie Pisanno Wycoff, of 9417 North Foothills Highway, Longmont, Colorado 80503 ("Merrie"), **ZAP! Holdings, LLC**, a Colorado limited liability company, of 9417 North Foothills Highway, Longmont, Colorado 80503 ("Zap! Holdings"),  and ZAP! Products, Inc., a Colorado corporation, of 9417 North Foothills Highway, Longmont, Colorado 80503 ("Zap! Inc."; jointly and severally with Estate, Merrie and Zap! Holdings, "Guarantors" and each a "Guarantor"; Borrower and Guarantors shall also be referred to as "Obligors").

## RECITALS

A.    Lender and Borrower entered into a certain Loan Agreement dated as of May 12, 2015 ("Original Loan Agreement"), as amended by that certain First Amendment to Loan Agreement and Loan Documents made as of May 12, 2016 ("First Amendment"), as further amended by that certain Second Amendment to Loan Agreement and Loan Documents made as of November 30, 2016 ("Second Amendment'), as further amended by that certain Third Amendment to Loan Agreement and Loan Document made as of December 31, 2016 ("Third Amendment"), and as further amended by that certain Fourth Amendment to Loan Agreement and Loan Documents made as of July 31, 2017 ("Fourth Amendment"; the Original Loan Agreement, First Amendment,  Second Amendment, Third Amendment and Fourth Amendment shall collectively be referred to as "Loan Agreement"), that certain Fourth Amended and Restated Promissory Note made as of July 31, 2017 in the principal amount of $4,621,852.73 ("Note") and certain other documents executed by any of the Obligors from time to time ("Loan Documents") in connection therewith to evidence, secure and govern a loan from Lender to Borrower in the original principal amount of $4,621,852.73 ("Loan").

B.    The Loan is guaranteed on a joint and several basis by Jeffrey B. Wycoff, now deceased, the Guarantors, Jeffrey B. Wycoff and Merrie Wycoff 2003 Insurance Trust u/a/d December 11, 2003 ("Insurance Trust 1"), and Merrie Wycoff 2003 Insurance Trust u/a/d December 15, 2003 ("Insurance Trust 2; together with Insurance Trust 1, "Insurance Trusts") pursuant to that certain Amended and Restated Guaranty made as of July 31, 2017.

C.    The Loan is secured in part by that certain Deed Of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of May 12, 2015 by Borrower to the Public Trustee for Boulder County, Colorado for the benefit of the Lender and recorded on May 15, 2015 as instrument number 03445958 in the real

property records of Boulder County, Colorado, as amended by that certain First Amendment to Deed of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of May 12, 2016 and recorded June 7, 2016 as instrument number 03522687 filed in the real property records of Boulder County, Colorado, as amended by that certain Second Amendment to Deed of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of November 30, 2016 and recorded on December 13, 2016 as instrument number 03562995 filed in the real property records of Boulder County, Colorado, as amended by that Third Amendment to Deed of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of December 31, 2016 and recorded on March 22, 2017 as instrument number 03581823 filed in the real property records of Boulder County, Colorado, and as amended by that Fourth Amendment to Deed of Trust, Security Agreement, Fixture Filing Statement, and Assignment of Leases and Rents made as of July 31, 2017 and recorded on December 13, 2017 as instrument number 03630783 filed in the real property records of Boulder County, Colorado (collectively, "Deed of Trust""), which Deed of Trust encumbers the real property legally described on Exhibit "A" attached hereto and incorporated by reference, together with Water Rights as described in the Deed of Trust, and commonly known as 9417 N. Foothills Highway, Longmont, Colorado in Boulder County ("Farm Property").

D.   The Loan is further secured by the IP Collateral as defined in the Loan Agreement and other Loan Documents, all of which are cross-defaulted and cross-collateralized with the Royalty and Profit Sharing Agreement dated December 8, 2017 by and among Lender, Zap! Holdings and Zap! Inc.. The Farm Property, the water rights attendant to the Farm Property, which include a ditch certificate, and the IP Collateral are collectively referred to as the "Collateral".

E.   Borrower is in default under the terms of the Loan Documents, due to (i) Borrower's failure to timely pay the Loan in full on or before the Due Date of March 31, 2018 as required pursuant to the Loan Documents, (ii) the death of Jeffrey B. Wycoff, (iii) the disclaimer of liability pursuant to the Guaranty by the Insurance Trusts based on the disbursement of the life insurance proceeds, the sole trust assets, to the beneficiaries, (iv) adverse outcome of the Tax Litigation as defined in the Original Loan Agreement, (v) the cancellation of the Walmart Purchase Orders as defined in the Original Loan Agreement, and (vi) the commencement of proceedings against the Obligors by Bluewater Media, LLC (the "Current Defaults").

F.   Pursuant to the security interest in the proceeds arising under that certain Transamerica Life Insurance Policy number 41643523 as evidenced by that certain collateral assignment recorded with the home office of the insurer on or about May 25, 2015, following the death of Jeffrey B. Wycoff, Lender received on May 23, 2018 $501,541.24 in life insurance proceeds ("Insurance Proceeds") of which Lender applied $25,699.91 towards the principal portion of the Loan thereby reducing it to $4,596,152.82 and the remaining balance towards default interest, base rate interest, and other fees, reimbursements, and expenses accruing through May 23, 2018.

Settlement Agreement

**2** | P a g e
28312625.12

G.    Borrower agrees to make a principal reduction payment of the Loan by $730,000.00 as set forth in Section 2(c) below in exchange for a forbearance period from the Lender in favor of the Obligors in order to complete the sale transaction of the Farm Property for $2,500,000.00 ("Sale") pursuant to that certain Contract To Buy and Sell Real Estate executed as of July 30, 2018 by and between Borrower and Magnus Veritas, LLC, a Colorado limited liability company ("Farm Contract") from and pursuant to which Borrower agrees to remit the net proceeds of such Sale to Lender.

H.    Obligors shall pay Lender a total of $3,230,000 ("Settlement Sum") in good funds (U.S. Dollars) consistent with this Agreement as a full and complete resolution of all indebtedness and claims arising from the Loan, except as set forth herein.

## AGREEMENT

NOW, THEREFORE, Lender and Obligors hereby agree as follows:

1.    **ACKNOWLEDGEMENT OF INDEBTEDNESS AND DEFAULT.**

(a)    As of July 30, 2018, Obligors acknowledge that the following sums are due and owing under the Loan Documents:

| | | |
|---|---|---|
| (i) | Outstanding Principal: | $4,596, 152.82 |
| (ii) | Accrued and Unpaid Interest[1]: | |
| | Base Interest (14%) | $121,640.65 |
| | Default Interest (plus 8%) | $69,508.94 |
| (iii) | Attorney Fees: | $25,743.65 |
| (iv) | Costs and Other Expenses: | $1,282.27- |
| (v) | Reserves | $0.00 |

**"Total Outstanding Loan Balance" is equal to $4,814,328.33 plus per diem of $2,770.29 and other amounts due and owing under the Loan Documents, including, without limitation, enforcement costs and attorney fees accruing after July 30, 2018.**

(b)    Obligors agree to the accuracy of the above Recitals as well as to the authenticity and validity of each of the Loan Documents, and to the validity of the Total Outstanding Loan Balance.

---

[1] The interest amounts are as of May 23, 2018 through July 30, 2018 .

(c)    Obligors acknowledge the Current Defaults and acknowledge that the Current Defaults remain uncured.  Obligors acknowledge and agree that there is no defense, claim or offset to the Current Defaults or the payment of the Total Outstanding Loan Balance.

(d)    Obligors acknowledge and represent that the gross price of $2,500,000.00 for the Sale of the Farm Property is fair value for the Farm Property.

2.    **CONDITIONS TO FORBEARANCE.**  In order to induce Lender to execute this Agreement and any obligations of Lender to forbear from the exercise of its rights and remedies, and the enforceability of this Agreement by Obligors, shall be subject to the following conditions (which cannot be waived except in writing by Lender) (collectively, "Forbearance Conditions"):

(a)    Obligors shall deliver their original, properly notarized signatures to this Agreement to Lender on or before August 3, 2018;

(b)    Each of the Obligors provide documentary evidence satisfactory to Lender that the signatory for such Obligor is authorized to enter into this Agreement and that consent is not required from any other persons and once executed and delivered, this Agreement shall be enforceable against the Obligors in accordance with its terms; and to the extent an Obligor is an entity, such Obligor will provide an authorizing resolution and good standing certificate;

(c)    No later than 3:00 P.M. EST on  August 3, 2018, Lender shall have received from Borrower payment by wire transmission from Borrower based on the wiring instructions set forth in the Note, in the amount of $730,000.00 which shall constitute consideration for the limited forbearance granted in Section 3 below and also be applied towards the principal portion of the Total Outstanding Loan Balance (subject to Section 3 and Section 5 below), and which is secured in part by the Farm Property.

3.    **LIMITED FORBEARANCE AND REAPPLICATION OF INSURANCE PROCEEDS; LAPSE OF FORBEARANCE EXPIRATION DATE.**  Provided that the Forbearance Conditions are timely satisfied:

(a)    Lender agrees only to forbear from the exercise of its rights and remedies arising solely as a result of the Current Defaults until the Forbearance Expiration Date (as defined below).  Upon the Forbearance Expiration Date, this limited forbearance shall be void and of no effect.  On and after the Forbearance Expiration Date, Lender shall have, without limitation, all rights and remedies available to it under the Loan Documents and this Agreement. In the event that an Event of Default occurs other than the Current Defaults from and after the date of this Agreement, this limited forbearance with respect to the Current Defaults shall be

void and of no effect ab initio at Lender's election.   Provided that the Forbearance Conditions are deemed satisfied by Lender, Lender's obligation to forbear under this Agreement shall commence on the Effective Date and shall expire, on the earlier of September 4, 2018 or the occurrence of an Event of Default  as defined in this Agreement (the "Forbearance Expiration Date").

      (b)    Lender shall reapply the Insurance Proceeds all to the principal portion of the Loan in the amount of $4,596, 152.82 so that the following sums are due and owing under the Loan Documents as acknowledged and affirmed by the Obligors as of July 30, 2018,

| | | |
|---|---|---|
| (i) | Outstanding Principal: | $4,120,311.49 |
| (ii) | Accrued and Unpaid Interest[2]: | |
| | Base Interest (14%) | $415,735.57 |
| | Default Interest  (plus 8%) | $114,989.12 |
| (iii) | Attorney Fees: | $25,743.65 |
| (iv) | Costs and Other Expenses: | $1,282.27 |
| (v) | Reserves | $0.00 |

**"Revised Total Outstanding Loan Balance" is equal to $4,678,062.10 plus per diem of $2,483.47 and other amounts due and owing under the Loan Documents, including, without limitation, enforcement costs and attorney fees accruing after July 30, 2018.**

      (c)    Notwithstanding the lapse of the Forbearance Expiration Date following an Event of Default as defined in this Agreement, this Agreement shall remain in full force and effect as long as the Forbearance Conditions have been timely satisfied, no Bankruptcy/Transfer Default (as defined below) or Authority Default (as defined below) has occurred, the Farm Contract has not been terminated, and Lender has received the balance of the Settlement Sum in accordance with Section 4 of this Agreement. If the Forbearance Conditions are not timely satisfied, or if a Bankruptcy/Transfer Default occurs, or if the Farm Contract has been terminated, or if an Authority Default occurs, or if September 4, 2018 has lapsed and Lender has not received the balance of the Settlement Sum as required under Section 4 of this Agreement, then at Lender's election, this Agreement shall have no force and effect and the parties will return to their respective positions prior to the Effective Date of this Agreement except that Lender shall retain all payments made by the Obligors and may reapply such retained payments against the then Total Outstanding Loan Balance (or Revised Total Outstanding Loan Balance if Lender so elects) in any manner or order as Lender desires in its sole discretion.

---

[2] The interest amounts are as of December 1, 2017 through July 30, 2018.

4.     **PAYMENT.**  On or before 3:00 P.M. EST of September 4, 2018, Borrower shall wire to Lender based on the wiring instructions set forth in the Note, the remaining balance of the Settlement Sum in the amount of $2,500,000.00 for application to the principal portion of the Revised Total Outstanding Loan Balance in the amount of $4,120,311.49.

5.     **RELEASE OF OBLIGORS.**

(a)     Borrower owes the Lender and is liable for the then current Total Outstanding Loan Balance; however, so long as the Forbearance Conditions have been  satisfied, no Bankruptcy/Transfer Default or Authority Default has occurred, the Farm Contract has not been terminated, and Lender has received the entire Settlement Sum prior to 3:00 P.M. EST of September 4, 2018 and subject to the reinstatement provision in Section 5(b) below, then and only then:

(i) Lender, on behalf of its past, present and future grantees, agents, representatives, heirs, devisees, trustees, assigns, executors, predecessors, successors, investors, loan participants, , agents, assignors, attorneys, insurers, related persons, or representatives (collectively, the "Releasing Parties"), hereby voluntarily, knowingly and willingly agree to release and forever discharge by this Agreement the Obligors, their past and present agents, employees, representatives, officers, directors, shareholders, members, attorneys, accountants, insurers, advisors, investors, partners, managers, servants, consultants, partners, partnerships, parents, divisions, subsidiaries, affiliates, assigns, agents, independent contractors, successors, heirs, predecessors in interest, joint ventures, and commonly-controlled corporations (collectively "Released Parties") from all liabilities, causes of action, actions, debts, charges, complaints, suits, claims, obligations, costs, expenses, demands, orders, penalties, losses, damages, rights, judgments of every character, nature kind or source, attorneys' fees, expenses, bonds, bills, penalties, fines, and all other legal responsibilities of any form whatsoever, whether known or unknown, whether presently existing or arising in the future, whether suspected or unsuspected, whether fixed or contingent, including those arising under any theory of law, whether common, constitutional, statutory or other of any jurisdiction, foreign or domestic, whether in law or in equity, which any of the Releasing Parties had or may claim to have against any of the Released Parties, each of the foregoing arising out of or relating solely to: (i) the Loan and the Loan Documents, except for those environmental indemnification obligations in the Loan Documents which expressly survive the repayment of the Loan; (ii) the Royalty and Profit Sharing Agreement dated December 8, 2017; (iii) any acts or omissions by the Released Parties occurring prior to the Effective Date; and (iv) any costs, attorneys' fees or expenses incurred by the Releasing Parties in

connection with the subject matter of this Agreement <u>prior to the Effective Date</u> except to the extent they are reinstated pursuant to Section 5(c) below, specifically excluding any costs, attorneys' fees or expenses incurred by the Releasing Parties in enforcing and/or collecting under this Agreement and specifically excluding any claims that the Releasing Parties may have against the Released Parties as to their obligations arising under this Agreement (collectively, the "<u>Released Claims</u>"); and

(ii) Lender shall promptly release any and all security interests, liens and claims it possesses or holds against the Collateral and Lender shall execute and record release and termination instruments at Lender's own cost and expense.

(b)     Notwithstanding the foregoing, Obligors acknowledge and agree that to the extent that an Authority Default or Bankruptcy/Transfer Default occurs at any time after the releases in Section 5(a) otherwise take effect, or to the extent that any prior or future payment or proceeds received by Lender for Borrower's benefit are subsequently invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian, creditor or any other party under any bankruptcy law, common law, equitable cause, or other law, then, to such extent: (1) the releases granted under Section 5(a)(i) and Section 5(a)(ii) shall be rendered null and void, (2) the then Total Outstanding Loan Balance (or the Revised Total Outstanding Loan Balance if Lender so elects) shall automatically be reinstated, revived and continue, including, without limitation, any and all costs incurred by Lender to enforce this Agreement and the Loan Documents and any and all other amounts due and owing under the Loan Documents, less any payments retained by Lender which have not been invalidated, declared to be fraudulent or preferential, set aside or required to be repaid to a trustee, debtor in possession, receiver, custodian, creditor or any other party under any bankruptcy law, common law, equitable cause, or other law, and Lender may apply or reapply such retained payments against the then Total Outstanding Loan Balance (or the Revised Total Outstanding Loan Balance if Lender so elects) in any manner or order as Lender desires in its sole discretion (3) the effectiveness of all Loan Documents, including, without limitation, any Loan Documents evidencing  or granting any Collateral securing the Loan such as the Farm Property and the IP Collateral (by way of example and not limitation), shall automatically continue and be deemed as reinstated, and the nullification described in clause (1) and reinstatements described in clause (2) and clause (3) shall occur as if in the case of the Authority Default or Bankruptcy/Transfer Default, the parties had not entered into this Agreement,  and in the case of a prior or future payment being set aside, invalidated or required to be repaid, as if such prior or future payment or proceeds had not been received by Lender, and in any case , as if Lender had not changed its position and released the Obligors or any of the collateral securing the Loan, and in any case shall be considered an Event of Default under this Agreement.  In the event of continuation or reinstatement of the Loan or any of the Loan Documents, Obligors agree upon demand by the Lender to execute and deliver to the Lender those documents which the Lender determines are reasonably appropriate to further evidence (in the public records or otherwise) this continuation or reinstatement, although the failure of the Obligors to do so shall

not affect in any way the reinstatement or continuation. If the Obligors do not execute and deliver to the Lender upon demand such documents, the Lender and each of its officers is irrevocably appointed (which appointment is coupled with an interest) the true and lawful attorney of the Obligors (with full power of substitution) to execute and deliver such documents in the name and on behalf of the Obligors.

(c)     If a Bankruptcy/Transfer Default occurs, or if an Authority Default occurs, or if the Farm Contract is terminated, or if the Lender fails to receive the payment by wire in the amount of $2,500,000.00 on or before 3:00 P.M. EST of September 4, 2018, all rights of Borrower to payoff the Loan for an amount less than the then current amount of the Total Outstanding Loan Balance and obtain the releases described in Section 5(a) shall be of no force and effect and shall be considered void and Borrower shall remain liable for the then current amount of the Total Outstanding Loan Balance (or the Revised Total Outstanding Loan Balance if Lender so elects).

6.     **EVENT OF DEFAULT.**  The following shall constitute an "Event of Default" under this Agreement: (a) any default under this Agreement or the Royalty and Profit Sharing Agreement dated December 8, 2017, or (b) other than the Current Defaults, any Event of Default as defined under the Loan Documents , (c) the filing of a petition commencing a case in bankruptcy naming any of the Obligors as a debtor or any action under federal, state or common law commenced to set aside this Agreement or any payment made to Lender; ("Bankruptcy/Transfer Default"), provided that a Bankruptcy/Transfer Default shall not be deemed to have occurred in the event (i) such filing is involuntary, and (ii) such filing occurs after the Lender has received the Settlement Sum in full by September 4, 2018, and (iii) Obligors comply with the indemnification obligations set forth in Section 22 below, and (iv) the case or proceeding commenced by such filing is vacated or dismissed within ninety (90) days following the date of the filing; (d) the Farm Contract is terminated;  (e) Borrower has not delivered to Lender on or before August 21, 2018 proof of current insurance paid to date on the Farm, proof that real estate taxes and assessments due and owing on the Farm are paid to date and not delinquent, and a draft settlement statement with respect to the Sale together with documentary proof of other funds as necessary to confirm that there are sufficient  proceeds in the aggregate being remitted to Lender to pay the Settlement Sum in full, and (f) any proceeding or claim is commenced alleging that any of the Obligors did not have sufficient authority to enter into this Agreement ("Authority Default"), provided that an Authority Default shall not be deemed to have occurred in the event (i) such filing is involuntary, and (ii) such filing occurs after the Lender has received the Settlement Sum in full by September 4, 2018, and (iii) Obligors comply with the indemnification obligations set forth in Section 22 below, and (iv) the case or proceeding commenced by such filing is vacated or dismissed within ninety (90) days following the date of the filing. Following the occurrence of an Event of Default, then in addition to all other rights and remedies as set forth in this Agreement and the Loan Documents, the following shall occur:

(a)     Subject to Sections 4 and 5 above, the then Total Outstanding Loan Balance (or the Revised Total Outstanding Loan Balance if Lender so

Settlement Agreement

elects), including, without limitation, all outstanding principal, accrued and unpaid interest and default rate interest, accrued and unpaid late fees, the Repayment Fee, and any other amounts due and owing under the Loan Documents (as amended by this Agreement) and attorney fees accruing after the date hereof, shall continue to be accelerated and immediately due and payable;

(b)     Lender, may at its sole option, commence exercise of any and all remedies available at law and pursuant to the Loan Documents, including, without limitation, the foreclosure of the Deed of Trust on the Farm Property or any other Collateral, and Obligors agree that they shall cooperate fully with Lender during the foreclosure process or the exercise of any other remedies and hereby waive the right to challenge any foreclosure through legal processes or the exercise of any other remedies;

(c)     All funds remaining in any escrow accounts shall belong to Lender to pay down the outstanding obligations under the Loan.

7.     **RELEASE OF LENDER.**  Obligors hereby waive, discharge and forever release Lender, and its subsidiaries and affiliates, and the employees, officers, directors, attorneys, members, stockholders, and successors and assigns of any of the foregoing, from any and all claims, causes of action, allegations, or assertions that any of the Obligors may have or may have made at any time up through and including the date of this Agreement, against any or all of the foregoing, with respect to such claims, causes of action, allegations, or assertions arising out of or related to Lender's actions or omissions in connection with the Loan Documents, the Loan, Lender's administration of the Loan, or any other obligations of any nature or kind of any of the Obligors to Lender, any banking relationships that any of the Obligors has or may have had with Lender at any time and for any reason including, but not limited to, any demand deposit accounts, or otherwise. This Section 7 survives the date of this Agreement or any termination of this Agreement or if any provision of this Agreement is rendered null and void.

8.     **NEGATIVE COVENANTS.**  Obligors agree that they shall not  voluntarily or involuntarily: (i) grant any interest in or option with respect to the Farm Property, IP Collateral or any other Collateral securing repayment of the Loan; (ii) create or permit to exist any lien, security interest, or other charge or encumbrance upon or with respect to any of Lender's Collateral for the Loan, except for Lender's already existing security interest and lien, or sell such collateral for the benefit of itself or any party or in any manner other than in connection with paying off the Loan in full.

9.     **NO OTHER CHANGES.**  Except as expressly amended by this Agreement, all of the covenants, agreements, conditions or terms of the Loan Documents remain unmodified and in full force and effect. The Deed of Trust and other collateral documents continue to secure on a first and prior lien basis the due and punctual payments of the Loan and performance of obligations of the Obligors under the Loan Documents and the Royalty and Profit Sharing Agreement dated December 8, 2017. Except as expressly set forth in this Agreement, (a) none of

Borrower's and/or any other Obligors' obligations or liabilities under the Loan Documents and the Royalty and Profit Sharing Agreement dated December 8, 2017 shall be diminished or released by any provisions herein; and (b) this Agreement shall not in any way waive, impair, diminish, or affect any of Lender's rights or remedies in the Loan Documents and the Royalty and Profit Sharing Agreement dated December 8, 2017, whether such rights or remedies arise herein or by operation of law.

10.  **ADVICE OF COUNSEL.**   In entering into this Agreement, the parties acknowledge that they have relied upon the advice of their counsel, who is the counsel of their choice, concerning the legal consequences of this Agreement; that the terms of this Agreement have been completely read by them and explained to them by their counsel; that they were not required or compelled in any way to sign this Agreement; and that the terms of this Agreement are understood and accepted by them voluntarily as a free act and deed.  Alternatively, Obligors acknowledge that they have been given the opportunity to seek the advice of counsel of their choice; that the terms of this Agreement have been completely read and understood by Obligors; that they were not required or compelled in any way to sign this Agreement; and that the terms of this Agreement are understood and accepted by Obligors voluntarily as a free act and deed.

11.  **CONTINUING VALIDITY; RATIFICATION OF LOAN DOCUMENTS.** This Agreement is not intended to be nor shall it constitute a novation of the Loan Documents and the Royalty and Profit Sharing Agreement dated December 8, 2017 or the indebtedness and obligations evidenced or secured thereby, as the case may be.  Obligors hereby ratify, confirm, reaffirm and approve all terms, provisions, conditions and remedies of and contained in the Royalty and Profit Sharing Agreement dated December 8, 2017 and Loan Documents, as modified and amended, including without limitation, the terms of this Agreement, and the indebtedness and obligations evidenced and/or secured by the Loan Documents, the Royalty and Profit Sharing Agreement dated December 8, 2017 and/or this Agreement, and Obligors agree that the same are valid and binding agreements of Obligors, as the case may be, enforceable in accordance with their terms.  Borrower and Guarantors hereby reaffirm as true and correct in all respects, as of the date hereof, any and all representations and warranties contained in the Loan Documents, the Royalty and Profit Sharing Agreement dated December 8, 2017 and this Agreement.  Borrower and Guarantors do hereby reaffirm and agree to perform each and every covenant, condition, obligation and provision set forth in the Loan Documents, the Royalty and Profit Sharing Agreement dated December 8, 2017 and in this Agreement, with time being strictly of the essence.

12.  **NO RELIANCE; CONSTRUCTION.**   Each of the parties hereto hereby declares that, prior to the execution of this Agreement they have apprized themselves of sufficient relevant data in order that they might intelligently exercise their own judgments in deciding on the contents of this Agreement and whether to execute this Agreement.  Borrower and Guarantors declare that its/his/her decision to execute this Agreement is not as a result of undue influence or duress, and not predicated on or influenced by any declarations or representations not set forth in this Agreement, by Lender, or any other person or party or any predecessors in interest, its successors, assigns, officers, directors, employees, agents or attorneys. Each of the parties hereto hereby further acknowledges and agrees that each of them

Settlement Agreement

EXHIBIT O

has had significant input in the development of this Agreement and this Agreement shall not therefore be construed against any one party.

13.     **NO ORAL MODIFICATION.**   This Agreement may not be amended or modified in any way except by a written instrument executed by all of the parties hereto.

14.     **SUCCESSORS AND ASSIGNS.**   This Agreement shall be binding upon and inure to the benefit of the signatories to this Agreement and each of their respective successors and assigns. The obligations of the signatories to this Agreement shall not be delegated or assigned.

15.     **TIME.** Time is of the essence with respect to this Agreement.

16.     **ATTORNEYS' FEES, JURY TRIAL WAIVER.**

    (a)     In the event that any party hereto brings suit for the collection of any damages resulting from, or the injunction of any action constituting, a breach of any terms or provisions of this Agreement, then the prevailing party shall be entitled to recover all reasonable court costs and attorney's fees, at all levels, from the party that breached this Agreement.

    (b)     **BORROWER AND GUARANTORS EACH HEREBY KNOWINGLY, VOLUNTARILY AND INTENTIONALLY WAIVES HIS/ITS RIGHT TO A TRIAL BY JURY IN RESPECT TO ANY LITIGATION BASED HEREON OR ARISING OUT OF, UNDER OR IN CONNECTION WITH THIS AGREEMENT, THE LOAN DOCUMENTS, ANY OTHER DOCUMENTS EXECUTED OR DELIVERED IN CONNECTION HEREWITH, AND ANY AGREEMENT CONTEMPLATED TO BE EXECUTED OR DELIVERED IN CONJUNCTION HEREWITH OR ANY COURSE OF CONDUCT, COURSE OF DEALING, STATEMENTS (WHETHER VERBAL OR WRITTEN) OR ACTIONS OF ANY PARTY. THIS PROVISION IS A MATERIAL INDUCEMENT FOR LENDER ENTERING INTO THIS AGREEMENT.**

17.     **GOVERNING PROVISIONS; INCORPORATION OF OTHER AGREEMENTS; CONFLICTING TERMS.**   Until the Loan has been paid in full, the obligations of Borrower and Guarantors shall continue to be governed by the covenants, terms, conditions, representations and warranties (which shall be deemed made as of the date hereof) of the Loan Documents and the Royalty and Profit Sharing Agreement dated December 8, 2017, which are hereby incorporated herein by this reference, except to the extent that same have been superseded, amended, modified or supplemented by this Agreement.   To the extent of any inconsistency between the Loan Documents, the Royalty and Profit Sharing Agreement dated December 8, 2017 and this Agreement, this Agreement shall control.   This Agreement, the Loan Documents and the Royalty and Profit Sharing Agreement dated December 8, 2017 contain the

entire agreement of the parties hereto and Lender shall not be bound by any other different, additional or further agreements or understandings except as consented to in writing by Lender.

18.   **AUTHORIZATION.**   The execution, delivery and performance by each party to this Agreement and all documents and instruments delivered in connection herewith have been duly authorized.   More specifically, Merrie covenants agrees, represents and warrants that: (a) she is entering into this Agreement in her individual capacity, in her capacity as the nominated personal representative of under the Last Will and Testament of Jeffrey B. Wycoff dated December 14, 2017, in her capacity as the primary beneficiary under the Last Will and Testament of Jeffrey B. Wycoff dated December 14, 2017, and in any other capacity in which she may act on behalf of the Estate or the interests of Jeffrey B. Wycoff; and (b) a true and correct copy of the Last Will and Testament of Jeffrey B. Wycoff dated December 14, 2017 has been delivered to Lender and such instrument is still in full force and effect and has not been revoked, rescinded or modified. This Agreement and all documents and instruments delivered in connection herewith are legal, valid and binding obligations of the party executing and delivering same, enforceable against such party in accordance with their respective terms.

19.   **COUNTERPARTS.**   This Agreement may be executed in one or more counterparts, all of which together shall constitute one and be deemed an original and shall be binding on all parties.   This Agreement may be executed in telecopy (faxed) copies and electronic (e-mail) copies and facsimile and electronic signatures and shall be binding upon the parties.

20.   **RECITALS.**   The Recitals on the first page of this Agreement are hereby incorporated and made a part of this Agreement.

21.   **DEFINITIONS.** Any capitalized term that is not defined in this Agreement shall have the meaning ascribed to such term in the Loan Documents.

22.   **INDEMNIFICATION OBLIGATIONS.** In the event (i) a petition is filed commencing a case in bankruptcy naming any of the Obligors as a debtor, or (ii) any action under federal, state or common law is commenced to set aside this Agreement, or any payment made to Lender, or (iii) any proceeding or claim is commenced alleging that any of the Obligors did not have sufficient authority to enter into this Agreement (each a "Proceeding" and collectively, "Proceedings"), then Obligors hereby absolutely and unconditionally agree at their sole cost and expense to indemnify, defend and hold the Releasing Parties harmless, upon demand at any time and as often as the occasion therefor may require, against any and all claims, demands, suits, actions, damages, losses, costs, expenses (including attorneys' fees) and all other liabilities whatsoever which any of the Releasing Parties may sustain or incur as a consequence of any such Proceeding. Upon ten (10) days written demand from time to time, the Obligors shall pay or reimburse the Releasing Parties for any fees, expenses, disbursements and other sums within the scope of the indemnity described in the preceding sentence  incurred or suffered by the Releasing Parties in connection with such Proceedings.

[Signatures on following page]

Settlement Agreement

28312625.12

EXHIBIT O

Witness the due execution of this agreement as a document under seal as of the date first written above.

**LENDER:**

BC24, LLC,
a Michigan limited liability company

By: _____

Name: Nicholas Coburn
Title: Authorized Agent

STATE OF MICHIGAN    )
                     )ss.
COUNTY OF Oakland    )

This instrument was acknowledged before me on _____August 2nd_____, 2018, by _____Nicholas Coburn_____, Authorized Agent of BC24, LLC, a Michigan limited liability company, on behalf of the company.

Julia Centofanti
Notary Public of Michigan
Macomb County
Expires 04/08/2024
Acting in the County of Oakland

_____
Notary Public
Macomb County, Michigan
Acting in Oakland County, Michigan
My commission expires: 4-8-2024

Settlement Agreement

EXHIBIT O

Witness the due execution of this agreement as a document under seal as of the date first written above.

BORROWER:

WYCOFF FINANCIAL, LLC, a Colorado limited liability company

By: _Merrie Pisano Wycoff_
     Merrie Pisano Wycoff
Its:  Manager

Facsimile No.: (_____) _____

STATE OF COLORADO    )
                    )ss.
COUNTY OF _Boulder_   )

    The foregoing instrument was acknowledged before me this _2_ day of _August_, 2018, by Merrie Pisano Wycoff, as the Manager of Wycoff Financial, LLC, a Colorado limited liability company.

Witness my hand and official seal.

My Commission Expires: _11/22/21_ _____

                                        Notary Public

JASON PRIMM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20174048260
MY COMMISSION EXPIRES NOVEMBER 22, 2021

Settlement Agreement

EXHIBIT O

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

GUARANTOR:

ESTATE OF JEFFREY B. WYCOFF

*Merrie Pisano Wycoff* (SEAL)

Merrie Pisano Wycoff, as the Nominated Personal Representative Under the Last Will and Testament of Jeffrey B. Wycoff dated December 14, 2017

STATE OF _Colorado_ )
                                      )ss.
COUNTY OF _Boulder_ )

        The foregoing instrument was acknowledged before me this _2_ day of _August_, 2018, by Merrie Pisano Wycoff, as the as the Nominated Personal Representative Under the Last Will and Testament of Jeffrey B. Wycoff dated December 14, 2017.

Witness my hand and official seal.

My Commission Expires: 11/22/21

                                                    Notary Public

JASON PRIMM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 2017404620
MY COMMISSION EXPIRES NOVEMBER 22, 2021

Settlement Agreement

EXHIBIT O

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

GUARANTOR:

_Merrie Pisano Wycoff_ (SEAL)
Merrie Pisano Wycoff a/k/a Merrie Pisanno Wycoff

STATE OF _Colorado_ )
)ss.
COUNTY OF _Boulder_ )

The foregoing instrument was acknowledged before me this _2_ day of _August_, 2018, by Merrie Pisano Wycoff a/k/a Merrie Pisano Wycoff, individually.

Witness my hand and official seal.

My Commission Expires: 11|22|21

Notary Public

JASON PRIMM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20174046260
MY COMMISSION EXPIRES NOVEMBER 22, 2021

Settlement Agreement

EXHIBIT O

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

GUARANTOR:

ZAP! Holdings, LLC,
a Colorado limited liability company

By:   *Merrie Pisano Wycoff*
      Merrie Pisano Wycoff
Its:   Manager

STATE OF COLORADO      )
                       )ss.
COUNTY OF Boulder      )

The foregoing instrument was acknowledged before me on August 2, 2018, by Merrie Pisano Wycoff, as the Manager of ZAP! Holdings, LLC, a Colorado limited liability company on behalf of the company.

Witness my hand and official seal.

My Commission Expires: 11/22/21

_____
Notary Public

JASON PRIMM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20174048260
MY COMMISSION EXPIRES NOVEMBER 22, 2021

Settlement Agreement

WITNESS the due execution hereof as a document under seal, as of the date first written above, with the intent to be legally bound hereby.

**GUARANTOR:**

ZAP! Products, Inc.,
a Colorado corporation

By: _Merrie Pisano Wycoff_

Its: _President_

STATE OF COLORADO        )
                         )ss.
COUNTY OF _Boulder_      )

The foregoing instrument was acknowledged before me on _August 2_, 2018, by _Merrie Wycoff_, as the _President_ of ZAP! Products, Inc., a Colorado corporation on behalf of the corporation.

Witness my hand and official seal.

My Commission Expires: 11/22/21

_____
Notary Public

JASON PRIMM
NOTARY PUBLIC
STATE OF COLORADO
NOTARY ID 20174048260
MY COMMISSION EXPIRES NOVEMBER 22, 2021

Settlement Agreement

EXHIBIT O

EXHIBIT A

The land situated in the County of Boulder, State of Colorado and is described as follows:

Lot 1, Block 2, and Outlot B,
MOUNTAIN RIDGE,
County of Boulder,
State of Colorado.

For informational purposes only: APN(s):131912004001 (Parcel 1 - Lot 1)
131912001020 (Parcel 1 - Outlot B

## TOGETHER WITH

All water and water rights (whether decreed or undecreed, tributary, nontributary, or not nontributary, surface or underground, or appropriated, conditionally appropriated, or unappropriated), ditches and  ditch rights, springs and spring rights, canals and canal rights, reservoirs and reservoir rights, water transportation and delivery rights, water wells and well rights, and shares of stock in water, ditch, reservoir, canal, water transportation or delivery, and other companies associated with any of the foregoing rights, well permits, and all other evidences of any of such rights, whether now owned or hereafter acquired by Grantor, and on, underlying, related or appurtenant to or used or useful in connection with the Land, Improvements or other Property, and specifically including, without limitation, all right, title and interest in and to 43 shares of the capital stock of Left Hand Ditch Company, a Colorado nonprofit corporation and a mutual ditch company, that are presently held and registered on the books of Left Hand Ditch Company Certificate 2200, as held by Grantor, as the equity owner (the "**Water Shares**"), and the water and water rights and interests which are represented by the Water Shares, and related rights and interests in ditch, reservoir and other pumps, pipes, channels, improvements, facilities and works associated with the use and enjoyment of such water and water rights represented by the Water Shares, or any of the other above-described rights (sometimes herein collectively the "**Water Rights**");