*Midlab Inc*

*VS.*

*Wycoff*

STEVEN RAY MILLER

August 02, 2021



**AB Litigation**
SERVICES

**216 16th Street, Suite 600**
**Denver, CO 80202**
**303-296-0017**

EXHIBIT P

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:20-cv-03142-KLM
_____

REMOTE VIDEO DEPOSITION OF STEVEN RAY MILLER
August 2, 2021
_____

PLAINTIFF:
MIDLAB, INC., a Tennessee Corporation
vs.
DEFENDANTS:
MERRIE PISANO WYCOFF individually and as trustee of
The Wycoff Family Trust; WYCOFF FINANCIAL, LLC, a
Colorado limited liability company; MAGNUS VERITAS
LLC, a Colorado limited liability company; and
GCS452, LLC, a Colorado limited liability company
_____

APPEARANCES:
    KEATING WAGNER POLIDORI & FREE, PC
        By Aaron D. Goldhamer, Esq.
        1290 Broadway, Suite 600
        Denver, Colorado  80203
            Appearing on behalf of Plaintiff.
            (Via Zoom videoconference.)
    BROWNSTEIN HYATT FARBER SCHRECK, LLP
        By Steven E. Abelman, Esq.
        410 Seventeenth Street, Suite 2200
        Denver, Colorado  80202
            Appearing on behalf of Defendants.
            (Via Zoom videoconference.)
    Also present: Genie Passow, Aaron Nelson, CLVS
```

**Page 2**

```
1        Pursuant to Notice and the Federal
2   Rules of Civil Procedure, the video deposition of
3   STEVEN RAY MILLER, called by Defendants, was taken
4   on Monday, August 2, 2021, commencing at 11:32 a.m.,
5   via Zoom videoconference, before Sharon R. Dobson,
6   Registered Professional Reporter and Notary Public
7   within and for the State of Colorado.
8              I N D E X
9   DEPOSITION OF STEVEN RAY MILLER
10  EXAMINATION BY:                      PAGE
11    Mr. Goldhamer                      125
12    Mr. Abelman                          6
13  EXHIBITS                    INITIAL REFERENCE
14  Exhibit 31  Manufacturing and Supply     25
                Agreement
15
    Exhibit 32  FY 2017 1Q Board Meeting,    34
16              July 14, 2016
17  Exhibit 33  November 10, 2015 Meeting    59
18  Exhibit 34  FY 2016 3Q Board Meeting,    59
                January 28, 2016
19
    Exhibit 35  Bluewater Media email to Eden  62
20              and Harkey from Pomponi,
                1/26/16
21
    Exhibit 36  FY 2016 4Q Board Meeting,    63
22              April 20, 2016
23  Exhibit 37  FY 2017 2Q Board Meeting,    70
                October 20, 2016
24
    Exhibit 38  FY 2017 3Q Board Meeting,    77
25              January 26, 2017
```

**Page 3**

```
1   EXHIBITS                    INITIAL REFERENCE
2   Exhibit 39  Email to Miller from Rose,    87
                9/28/15
3
    Exhibit 40  Email chain, including email  89
4               to Rose and Miller from
                J. Wycoff, 11/11/15
5
    Exhibit 41  Email chain, including email  90
6               from J. Wycoff, 2/16/16,
                9:15 a.m.
7
    Exhibit 42  Email to V. Keller from       92
8               Speth, 3/25/16
9   Exhibit 43  Email to V. Keller, et. al.,  95
                from Speth, 5/13/16
10
    Exhibit 44  Email to Miller from Speth,   98
11              7/2/16
12  Exhibit 45  Email to Schenk and Miller   100
                from J. Wycoff, 8/15/16
13
    Exhibit 46  Email chain, including email 101
14              to V. Keller, et. al. from
                Miller, 9/2/16
15
    Exhibit 47  Email to Keller and Bodie    111
16              from Miller, 9/14/16
17  Exhibit 48  Email chain, including email 114
                to Eisen and Schenk from
18              J. Wycoff, 3/28/17
19  Exhibit 49  Email to Lowe and Miller     117
                from Housley, 3/16/20
20
    Exhibit 50  Amendment to Manufacturing   121
21              and Supply Agreement
22  Exhibit 51  Limited Continuing Guaranty  122
                (Guaranty Limited to $1,000,000)
23
24
25
```

**Page 4**

```
1            P R O C E E D I N G S
2        THE VIDEOGRAPHER:  All right.  We are on
3   the record at 11:32 a.m.  Today is August 2nd, 2021.
4   This begins the videotaped deposition of Steve
5   Miller, taken by the defendant, in the matter of
6   Midlab, Inc., versus Merrie Pisano Wycoff, et. al.
7   We are on Zoom -- I'm sorry.  The court reporter is
8   Shar Dobson.  The videographer is Aaron Nelson.
9        Counsel, will you please introduce
10  yourselves beginning with plaintiffs?
11       MR. GOLDHAMER:  This is Aaron Goldhamer
12  for the plaintiffs (sic).
13       And I just need to to make a short record
14  before we start as well.  I'm happy to do that after
15  your you're done, Steve.
16       MR. ABELMAN:  This is Steve Abelman,
17  representing the defendants in this action.
18       THE VIDEOGRAPHER:  All right.  And will
19  the court reporter please swear in the witness.
20       THE COURT REPORTER:  First, Counsel, the
21  oath for this deposition is being given remotely,
22  and the parties have agreed not to challenge the
23  oath based on the deponent and court reporter being
24  in different locations.
25       Is that correct, Mr. Miller?
```

*AB Litigation Services*

**Page 5**

1   THE DEPONENT:  Yes.
2   THE COURT REPORTER:  I'm sorry,
3   Mr. Goldhamer?
4   MR. GOLDHAMER:  That's correct.
5   THE COURT REPORTER:  And, Mr. Abelman?
6   MR. ABELMAN:  Yes, I consent as well.
7   THE COURT REPORTER:  Thank you.
8   STEVEN RAY MILLER,
9   being first duly sworn in the above cause, was
10  examined and testified as follows:
11  THE COURT REPORTER:  Thank you.  Please
12  begin.
13  MR. GOLDHAMER:  And just very briefly,
14  Mr. Abelman, this is Aaron Goldhamer.  I may object
15  at times to the form of a question.  I may simply
16  say "form" to articulate that objection to save us
17  some time.  I may object to the foundation for a
18  question.  I may simply say foundation for such an
19  objection.
20  I also don't believe that there was a
21  notice provided concerning the videotaped nature
22  of today's deposition, and -- and we'll reserve
23  objections on -- on the use of video.
24  MR. ABELMAN:  Okay.
25

**Page 6**

1   EXAMINATION
2   BY MR. ABELMAN:
3   Q    Mr. Miller, have you ever been deposed
4   before?
5   A    No.
6   Q    In the context of -- of -- of what kind of
7   proceeding?
8   A    No, I have not.
9   Q    Okay.  As the court reporter, Shar Dobson,
10  indicated, this is all being recorded, both by her
11  and through video, and so there are some basic rules
12  that we would like to follow.  And I will quickly go
13  over those.
14  The first is that all your answers need to
15  be verbal in nature.
16  Second, that if you don't understand a
17  question, it is okay to ask me to repeat it or
18  rephrase it.
19  It's important that we don't talk over
20  each other so that -- in a normal conversation
21  people will sometimes interrupt one another just to
22  expedite things.  Because this is being recorded,
23  it's important that you wait until I finish
24  before -- my question before you respond with your
25  answer.  Is that -- does that all make sense to you?

**Page 7**

1   A    Yes.
2   Q    Is there any reason that you will be --
3   that you are unable to give truthful and accurate
4   responses to questions today?
5   A    No.
6   Q    Good.  So you are currently in Tennessee.
7   Are you at your place of work?
8   A    Yes.
9   Q    And where is your place of work?  Please
10  name -- please state the name of your employer and
11  the address.
12  A    It's Midlab, Inc.  Address is 140 Private
13  Brand Way, Athens, Tennessee 37303.
14  Q    And is there anybody in the room with you?
15  A    No, there's not.
16  Q    Did you bring any notes or documents with
17  you for purposes of this deposition?
18  A    I have a notebook where I jotted some
19  dates on it.
20  Q    And what's -- what kind of dates did
21  you -- did you jot down?
22  A    Dates on contracts.
23  Q    Which contracts?
24  A    Supply Agreement, the Amendment 1,
25  Amendment 2.  The Bloomfield --

**Page 8**

1   Q    Any other -- any other dates?
2   THE COURT REPORTER:  And, I'm sorry, he
3   was continuing his answer.
4   A    The Bloom -- the Bloomfield note.
5   Q    (By Mr. Abelman) I just violated my first
6   rule for you.
7   Are there any other dates in addition to
8   what you've already stated?
9   A    No.
10  Q    Okay.  Did you have any discussions
11  with -- with coworkers about this deposition?
12  A    Yes.
13  Q    Please tell me with whom you spoke and
14  what was discussed.
15  A    I've spoken with the other parties
16  involved, and just general comments about -- about
17  times and dates.
18  Q    Who are the other parties involved?
19  A    Matt Schenk.  Mainly Matt Schenk.  I
20  haven't spoken to the others.
21  Q    Let's start with some of your background.
22  What is your post secondary-education?
23  A    I have a college degree from the
24  University of Tennessee, undergraduate in marketing.
25  I have an MBA from the University of Tennessee in

*AB Litigation Services*

**Page 9**

```
 1   finance.
 2        Q    And what is your current position with
 3   Midlab?
 4        A    Vice -- vice president finance.
 5        Q    And how long have you occupied that
 6   position?
 7        A    Approximately 10 years.
 8        Q    Were you at Midlab prior to accepting the
 9   position of vice president of finance?
10        A    I was at a sister company where I was --
11   was an accounting manager.
12        Q    What's the name of the sister company?
13        A    Kelsan, Inc.
14        Q    How do you --
15        A    It's also --
16        Q    -- spell that, please?
17        A    K-e-l-s-a-n.  It's also Midlab's parent
18   company.
19        Q    How many sister companies does Midlab
20   have?
21        A    None other.
22        Q    And how long did you work at Kelsan, Inc.?
23        A    Kelsan, about a year and a half.
24        Q    And what position did you have prior to
25   joining Elsan (sic)?
```

**Page 10**

```
 1        A    Kelsan.  K-e-l-s-a-n.  Kelsan.
 2        Q    Oh, I thought you said.  A-e-l.  Okay.
 3   Thank you for that correction.
 4        A    You're welcome.  Prior to Kelsan, I was in
 5   finance at Suncoke Energy.
 6        Q    And how long were you there?
 7        A    One year.
 8        Q    And what was your precise position there?
 9        A    I was a business analyst.
10        Q    Okay.  What is your current job
11   description as a vice president of finance?
12        A    I have resons --
13        Q    What are your responsibilities?
14        A    I have responsibility for the accounting
15   and the pricing functions of Midlab.
16        Q    Explain what you mean by accounting and
17   pricing functions.
18        A    So all the accounting functions roll up to
19   me as my responsibility.  That includes AP, AR, and
20   my staff accountants and my controller.  They handle
21   all the financials of the -- of the business.
22        Q    And what about pricing functions?
23        A    Pricing functions, I'm responsible to make
24   sure all of our programs are priced appropriately
25   and all the costs associated with those are -- are
```

**Page 11**

```
 1   accounted for so that we are able to price our
 2   customers.
 3        Q    To whom do you report?
 4        A    I report to the CFO of the Keller Group.
 5        Q    And who is that?
 6        A    Kyle Kirchhofer.  I'll spell his last
 7   name.  K-i-r-c-h-h-o-f-e-r.
 8        Q    And what's the relationship of the Keller
 9   Group to Midlab?
10        A    Keller Group is the holding company for
11   all of the Keller companies.
12        Q    So does the Keller Group own Kelsan, Inc.?
13        A    Yes.
14        Q    What other companies does the Keller Group
15   own?
16        A    They own several, and I don't know them
17   all.
18        Q    Okay.  Please list --
19        A    They own the -- they own -- they own a
20   couple car dealerships by the name of Smart Auto and
21   Bright Motors.  They own a -- a rent-to-own home
22   goods store called Smart Way.  Then they have
23   some -- several companies that own the properties
24   that their companies operate.  So for instance,
25   Keller Group owns a company that owns the building
```

**Page 12**

```
 1   that Midlab operates out of.
 2        Q    The building which Midlab operates from
 3   is -- does -- is Midlab the sole occupant?
 4        A    Yes.
 5        Q    How many people report to you?
 6        A    I have two.
 7        Q    And who are they?
 8        A    Vance Lowe and Rob Thress, T-h-r-e-s-s.
 9        Q    And what positions do they occupy?
10        A    Vance Lowe, controller, Rob Thress,
11   pricing analyst.
12        Q    How often is your performance as vice
13   president of finance evaluated?
14        A    Quarterly.
15        Q    Quarterly?
16        A    Quarterly.
17        Q    And who performs that evaluation?
18        A    Kyle Kirchhofer.
19        Q    When was your last evaluation?
20        A    It would have been -- I don't remember
21   exactly.  It was after the end of the year, our
22   fiscal year, in March.
23        Q    Please describe what criteria are used in
24   your evaluations.
25        A    We have a form (inaudible.)
```

*AB Litigation Services*

1   Q   (Inaudible.)
2       THE COURT REPORTER:  I didn't hear your
3   last couple of words.
4   A   (inaudible) evaluation.
5       (Interruption by the court reporter.)
6   Q   (By Mr. Abelman) I just wanted to clarify
7   performance evaluations.
8   A   We have a form that is used that has about
9   four or five questions; rate your performance, what
10  did you accomplish, does it match -- did it match
11  the criteria, the goals set, what could you have
12  done better during the 90 days, what's next year --
13  now what's the next 90 days look like, core values,
14  and then a summary.
15  Q   In any of your evaluations, has ZAP! or
16  the Wycoffs ever been discussed?
17  A   No.  Not -- yes, but only in the context
18  that it's a big piece of business, looks like it's
19  moving forward, we're on track, we're off track.
20  Those -- that type of nature.
21  Q   Who are the other officers of Midlab?
22  A   I don't have them listed in front of me.
23  Q   Do you know any of them?
24  A   Vince is one.  Matt Schenk is one.  I
25  don't have the others listed.

1   Q   Does Midlab have its own board of
2   directors?
3   A   What do you mean by "its own board of
4   directors"?
5   Q   A board of directors for Midlab, Inc.
6   A   We do have a board of directors that we
7   report to quarterly.
8   Q   And is that the same board for any of the
9   sister or affiliated companies or is it solely for
10  Midlab?
11  A   It -- it's across the companies.
12  Q   Okay.  Who -- who -- who is -- is on the
13  board of directors?
14  A   Tillman -- Tillman Keller.  Tim Keller.
15  The -- so Tim Keller, Vince Keller.  Mike.  I can't
16  remember Mike's last name.  Chuck -- Chuck Cowart
17  Q   How do you spell the last name, please?
18  A   C-o-w-a-r-t, I believe.
19  Q   Okay.
20  A   That's them.
21  Q   And what's the relationship between Tim
22  Keller and Vince Keller?
23  A   Tim is father, Vince is son.
24  Q   You say you report to the board quarterly.
25  Are there face-to-face meetings?  How do those board

1   meetings -- how are those board meetings handled?
2   A   Face-to-face meetings.
3   Q   Who prepares the agenda for the board
4   meetings?
5   A   The management team submits the agenda.
6   Q   And who's on the management team?  Are you
7   on the management team?
8   A   I am.
9   Q   Is Matt Schenk on the management team?
10  A   He is.
11  Q   Who else?
12  A   Matt Johnston.
13  Q   I'm sorry?
14  A   Matt Johnston.
15  Q   What's Pat (sic) Johnson's (sic) role?
16  A   COO.
17  Q   Anybody else?
18  A   No.  There are others on the management
19  team, but these are the three that -- that put the
20  agenda together.
21  Q   Are records kept of the board meeting and
22  the decisions made at the board meeting?
23  A   Yes.
24  Q   And who keeps those records?
25  A   Kyle Kirchhofer takes them currently.

1   Q   And does he keep minutes of the meeting?
2   A   That's the minutes.  Minutes.
3   Q   Minutes of meetings were provided to me
4   this past Friday.  Were you designated to collect
5   the minutes from -- from -- from Kyle?
6   A   No.
7   Q   Do you know who was?
8   A   I don't.
9   Q   When Midlab entertains bringing on a new
10  customer, what, if any, role do you have in that
11  process?
12  A   I'm involved in the evaluation of those
13  types of businesses.
14  Q   Okay.  Describe what you mean by
15  "evaluation."
16  A   Depends on the size of the company.  It
17  could be anything from here is a pricing proposal,
18  along with con -- it could include contracts.  It
19  could include financial analysis, all depending on
20  the size of the -- the business and the opportunity
21  presented.
22  Q   And why do you -- why do you -- why is
23  that function important to Midlab?
24  A   To protect Midlab.
25  Q   Protect Midlab how?  Does Midlab provide

AB Litigation Services

1  credit?

2      A     Anytime we extend terms, credit terms for

3  payment, then we're a creditor.

4      Q     And so are the credit terms in -- in the

5  contract that is entered into with customers?

6      A     Sometimes.

7      Q     Where else would the credit terms be?

8      A     Sometimes they're verbal.  Lots of times

9  they're in contracts.  They're also in our -- in

10  our -- in -- in our -- our system, our accounting

11  systems.

12      Q     What about on invoices?

13      A     Those terms would appear on invoices.

14      Q     Who decides -- who makes the decision

15  about whether to do business with a -- with -- with

16  a particular party?

17      A     It's typically a team decision, depending

18  on the opportunity.  It can be -- it can be sales

19  decision.  It can -- if it's a larger opportunity,

20  it can be management decision.  If it's very large,

21  it can be -- it can be management and board

22  decision.

23      Q     Do you have a checklist that you go

24  through when you're evaluating a customer?

25      A     Not a standard, formalized checklist.

1      Q     What is required from a customer who is

2  being evaluated by you or -- or your department?

3      A     We typically ask for credit -- credit

4  applications.  That's for normal business.  For

5  larger opportunities, the opportunity will -- would

6  dictate what's -- what's asked for.

7      Q     And who provides the credit application to

8  the customer?  Is that something that you do

9  directly?

10      A     Depends on the opportunity.  Sometimes our

11  salespeople will provide that and forward it back to

12  accounting.  Sometimes I will -- I will do that and

13  run it through our accounting.

14      Q     Are you ultimately responsible for

15  analyzing the credit application?

16      A     Yes.  I provide -- I provide my feedback

17  on -- on the application.

18      Q     Did ZAP! submit a credit application?

19      A     I don't remember.

20      Q     Did you look through your file to see if

21  there is a credit application from ZAP!?

22      A     I did go through my files.  I did not see

23  one.

24      Q     So what -- what would that indicate to

25  you, the fact that you couldn't find a credit

1  application?

2      A     If I didn't have it in my files, I

3  probably didn't send one.

4      Q     And so if you didn't send one, what --

5  what would that be a product of, that -- just the

6  size of the deal or what other factors?

7      A     The product would be a size -- because of

8  the size of the deal, we had financial analysis in

9  other -- in other capacities.

10      Q     Okay.  What financial analysis did you

11  perform?

12      A     We asked for his three-year business plan,

13  which we did extensive analysis on.

14      Q     And -- and when -- when -- let -- let's --

15  let's set a date.  Approximately when did you ask

16  for the three-year business plan?

17      A     It would be -- it would have been in

18  three -- in 2015 at some point before the business

19  started.

20      Q     Would it have been before the

21  manufacturing and supply agreement was drafted

22  and -- and given to ZAP!?

23      A     Yes.

24      Q     So sequentially is it your -- your

25  policy -- Midlab's policy to perform a credit

1  evaluation to its satisfaction prior to getting a

2  Manufacturing and Supply Agreement executed?

3      A     Yes.

4      Q     We're going to go back to -- to the

5  particulars of ZAP! in a few minutes, but before I

6  do, I want to cover another part of what I think

7  your job is.  Do you -- you -- you are responsible

8  for monitoring accounts receivable and accounts

9  payable?

10      A     Yes.

11      Q     I'm just interested in the accounts

12  receivable portion.  Explain to me what you do on a

13  regular basis.

14      A     I have -- I have two employees that handle

15  that.  One is my accounting -- accounts receivable

16  coordinator.  That -- that reports to my -- the

17  staff accountant that reports to my controller.

18      Q     And that -- what is that person's name?

19      A     Which one?

20      Q     The account receivable coordinator.

21      A     Currently or at the time of ZAP!?

22      Q     Both.

23      A     Currently, Kim Monroe.  Previously, Sue

24  Hall.

25      Q     And under your supervision are there

*AB Litigation Services*

1 reports, account receivable aging reports prepared?
2     A    Yes.  Yes.
3     Q    How often?
4     A    We have them on demand.
5     Q    I'm not sure I understand what that means.
6 Would you explain?
7     A    Anytime I need them, I can print them and
8 look at them.
9     Q    Okay.  Do you submit them to the
10 management team or the board on a reg -- regular
11 basis?
12     A    No.
13     Q    So the account receivable report is not
14 shared with anybody on a regular basis as a matter
15 of policy?
16     A    No.
17     Q    Do you have regular meetings about the
18 account -- about accounts receivable with your
19 account receivable coordinator?
20     A    Directly, no.
21     Q    What about indirectly?
22     A    My staff accountant manages that position
23 directly and meets -- and meets on an ongoing basis.
24     Q    Does the staff accountant keep records
25 about discussions concerning particular receivables?

1     A    I don't know if there's formal records
2 kept, no.
3     Q    Did you inquire?
4     A    I do inquire.  Not necessarily about
5 formal records.
6     Q    Did you ask --
7     A    I inquire about AR.
8     Q    Did you ask the staff accountant about
9 what records might be in the system -- your Midlab
10 computer system regarding ZAP!?
11     A    No, I have not asked them that question,
12 but there are history records on our AR in our
13 computer system.
14     Q    Have those records been provided?
15     A    To who?  To me?
16     Q    Well, actually, what I'm asking is have
17 they been produced to me?
18     A    We sent AR records regarding ZAP! and the
19 contracts.
20     Q    What form of AR records did you provide?
21     A    We provided the invoicing.
22     Q    And what sort of aging records did you
23 provide?
24     A    We provided rec -- aging records regarding
25 the amount that is owed at the end of the contract,

1 as well as the aging record that was attached to the
2 amendment, Amendment 1.
3     Q    And what form of aging records -- describe
4 the form of the aging records that you -- that you
5 produced.
6     A    Aging records with the Amendment 1 was a
7 PDF as part of the agreement.  The aging record at
8 the end of the agreement was an Excel spreadsheet.
9     Q    I'm sorry.  Did you just say that there
10 was an aging record that was supplied as part of the
11 agreement?  What agreement -- to what agreement are
12 you referring?
13     A    Amendment 1 of the supply agreement.
14     Q    So you didn't provide monthly aging
15 reports showing the outstanding accounts receivable
16 for ZAP!?
17     A    For the end of the agreement, for the end
18 of the business that we had, we spoke about AR much
19 more often.  And then the management team did share
20 AR -- AR aging more often.  Whether that was monthly
21 or not, I'm -- I'm not sure.
22     MR. ABELMAN:  Shar, I'd like to -- I'd
23 like you to pull up Bates -- Midlab Bates No. 000019
24 through 30.
25     THE COURT REPORTER:  And for your

1 information, Aaron will be pulling up and marking
2 the documents.
3     MR. ABELMAN:  Okay.  Thank you.
4     THE VIDEOGRAPHER:  Let me just find that
5 one.  You guys sent over 13 exhibits.  Do you know
6 which one that might be?
7     MS. PASSOW:  Manufacturing and Supply
8 Agreement.
9     MR. ABELMAN:  It's the Manufacturing and
10 Supply Agreement.
11     (Discussion off the record between
12 Mr. Abelman and Ms. Passow.)
13     MR. GOLDHAMER:  Aaron, I don't know if
14 these are also files you can put in the chat at all.
15     THE VIDEOGRAPHER:  I can as soon as I -- I
16 find this one.  Not the invoice.  Sorry.  The actual
17 agreement.
18     THE COURT REPORTER:  It's always helpful
19 if you can tell the videographer what the file name
20 is that you sent over.
21     MS. PASSOW:  I thought it was
22 Manufacturing and Supply Agreement.
23     MR. ABELMAN:  Well --
24     MS. PASSOW:  Let me -- I'm going to go
25 get -- print a list, but I thought it was

**Page 25**

1    Manufacturing and Supply Agreement.
2         (Discussion off the record between
3    Mr. Abelman and Ms. Passow.)
4         THE VIDEOGRAPHER:  Okay.  Bates 64, Bates
5    79, 83, 62.  Sorry, Shar.  I have a job invoice.
6    Nope.  Which Bates number again?
7         MR. ABELMAN:  It's 000 -- four zeros
8    followed by 19.
9         THE VIDEOGRAPHER:  19.  Okay.  And that --
10   that is going to be Exhibit 1?
11        MR. ABELMAN:  Yes.
12        MR. GOLDHAMER:  Are we continuing exhibit
13   numbers?
14        MR. ABELMAN:  Sure.  So where did we leave
15   off, Aaron?
16        MR. GOLDHAMER:  Let me take a quick look.
17   I think we left off at 30.
18        MR. ABELMAN:  Okay.  So we can make this
19   31.
20        MR. GOLDHAMER:  Great.
21        (Exhibit 31 marked.)
22        THE VIDEOGRAPHER:  Okay.
23   **Q    (By Mr. Abelman) Mr. Miller, can you --**
24   **can you access this document?  Can you see it?**
25        A    I don't -- here it comes.

**Page 26**

1         THE VIDEOGRAPHER:  There you go.  Can
2    everybody see that now?
3         THE COURT REPORTER:  I can see it.
4         A    Yes.
5    **Q    (By Mr. Abelman) Mr. Miller, can you**
6    **identify this document?**
7         THE DEPONENT:  Can you scroll all the way
8    to the top?
9         THE VIDEOGRAPHER:  Are you talking about
10   to the first page?
11        THE DEPONENT:  First page of the document
12   we're looking at.
13        A    Okay.  I am not familiar with this
14   document.
15   **Q    (By Mr. Abelman) You've never seen this**
16   **document before?**
17        A    I've not seen a document between AW --
18        THE DEPONENT:  Back up to the top.
19        A    I have not seen what looks like a lease
20   agreement between AW Southglenn and Edible Fruits.
21        MR. GOLDHAMER:  This looks like a document
22   for a different case.
23        MS. PASSOW:  That's not what I produced.
24        MR. ABELMAN:  This is not -- I don't
25   recognize that, and I don't believe that's what we

**Page 27**

1    produced.  I don't know why it's being pulled up
2    right now.
3         MS. PASSOW:  Aaron, I set over 41
4    documents, not 21.
5         THE VIDEOGRAPHER:  Okay.  Would you like
6    to go off the record real quick?
7         MR. ABELMAN:  Sure.
8         (Break taken.)
9         THE VIDEOGRAPHER:  We are going back on
10   the record at 12:25.
11   **Q    (By Mr. Abelman) Let's do this Take 2.**
12   **Mr. Miller, is this a document that you can**
13   **identify?**
14        A    Yes.
15   **Q    And please -- please do so.**
16        A    That is the Manufacturing and Supply
17   Agreement between ZAP! and Midlab.
18   **Q    And what is the date of this document?**
19        A    September 16, 2015.
20        MR. GOLDHAMER:  Mr. Abelman, sorry to
21   interrupt, but, Aaron, can you put the -- these
22   documents in the chat when they come up as well?
23        THE VIDEOGRAPHER:  Yes.  Do you mind if I
24   send you the full folder or -- that's fine.
25        MR. GOLDHAMER:  I mean, I'll take it, but

**Page 28**

1    I don't know if that's going to line up with what
2    Mr. Abelman ends up presenting.
3         THE VIDEOGRAPHER:  Let me -- let me do
4    that for you now.  Sorry.  Okay, the link has been
5    sent.
6    **Q    (By Mr. Abelman) Mr. Miller, the first**
7    **page on this is marked Bates Stamp 19.  If you could**
8    **go to Bates Stamp 25.  Let me know who executed this**
9    **document on behalf of ZAP! products.**
10        A    Jeff Wycoff.
11   **Q    And what was his title according to this**
12   **document?**
13        A    President.  President.
14   **Q    So prior to September 16, 2015, when this**
15   **document was executed, describe what your**
16   **responsibility was or what role you played with**
17   **regard to evaluating ZAP! as a -- as a customer.**
18        A    I worked with Jeff to cost and price
19   products that he was looking at offering.  I also
20   worked with his team on evaluating his business plan
21   and three-year projections.
22   **Q    And approximately when did you do that?**
23        A    It would have been throughout the summer
24   before the -- the agreement was signed.
25   **Q    And you -- you worked with Jeff directly?**

*AB Litigation Services*

1   A   At times.

2   Q   And you worked with his team.

3   A   Yes.

4   Q   Do you recall who was on his team?

5   A   The controller at the time was Valerie
6   Hiduke.  And I can't -- I can't remember the
7   gentleman's name who was the COO -- or CFO.

8   Q   When you say that you worked with him
9   evaluating his three-year plan, tell me with more
10  particularity what that involved.

11  A   We would look at his business plan,
12  evaluate the -- evaluate the sales projections and
13  the volumes.  Then we would ask Jeff questions
14  regarding why would he -- you know, as to the nature
15  of why he thinks that would happen, ask him to
16  substantiate those, of which he then would.  And
17  then he would also work back with us regarding his
18  plan for rollout, marketing spend, customers, his
19  customers that he would be -- he would be selling
20  through.

21  Q   It sounds very collaborative in nature.
22  Is that how you would characterize it?

23  A   Yes.

24  Q   And were these projections based in part
25  on prior performance?

1   A   I would say probably so as he had done --
2   as he had released them before.  He had -- he had
3   brought the product to market in the -- previously.

4   Q   And I'm going to ask you to recall what
5   your impressions of Jeff Wycoff were at that time in
6   terms of his -- his knowledge and understanding
7   about his products and the marketplace for his
8   product.

9   A   He was very knowledgeable about his
10  products as well as the marketplace.

11  Q   Did he instill confidence in you and your
12  team that he could meet these -- the three-year
13  plan?

14  A   Yes.

15  Q   If -- if you were to characterize any
16  strengths of Jeff Wycoff, what would you say?

17  A   He was very charismatic.  He definitely
18  was well spoken, well connected.  He knew his -- he
19  knew his product and had a good sense of the market
20  that he had always said that he helped to create.

21  Q   And same question with regard to -- and
22  this is asking you at that time, do you recall
23  noting any weaknesses that he may have had?

24  A   Him personally?

25  Q   Whatever.

1   A   Not -- not at that time.

2   Q   So you said you started working with him
3   in the summer.  Approximately how long was this --
4   was (sic) the precontract process encompass?

5   A   I don't recall when we started working on
6   this round.  I had had -- I had had previous
7   dealings with Jeff since I joined Midlab.

8   Q   And what were the nature of your previous
9   dealings with him?

10  A   They were -- Jeff had always talked about
11  bringing these products to market so, therefore, we
12  had -- we had gone through almost annually recosting
13  and -- of these types of products because Jeff was
14  continually working on bringing them to market.  It
15  wasn't till 2015 that it actually get any legs to
16  begin moving forward.

17  Q   And what was different in 2015 than
18  previously?

19  A   He seemed to have -- he seemed to have
20  some funding, he seemed to have -- had put a
21  business plan together.  And he seemed to have --
22  there -- just had more -- there was more
23  substantiation to it than just asking for pricing.

24  Q   So who was involved in the approval of
25  Mid -- of -- of ZAP! as a customer once -- pri --

1   prior to the execution of this Manufacturing and
2   Supply Agreement?

3   A   I worked with the -- the team consisting
4   of Vince Keller, Matt Schenk, Colman Hoffman,
5   myself.  And at the time I had a -- I had a
6   supervisor or boss -- or report to of Kerry Speth.

7   Q   So you do this regularly as -- as you
8   previously testified to.  Was this a hard push or
9   was this a normal -- a normal approval?

10  A   No.  This was a much bigger -- a much
11  bigger approval.  There was more -- there was more
12  risk associated with it.  There was more -- more
13  potential gain associated with it.  It would -- it
14  would have required us to carry special, specific
15  product components that was -- that were
16  specifically for -- for ZAP! and could only be sold
17  as ZAP!.  So -- so the risk to Midlab was greater,
18  therefore, we looked -- we took a harder look at it.

19  Q   And so what kind of speciali --
20  specialized products would you have to carry that
21  were unique to ZAP!

22  A   Every one of their products that they
23  offered would -- once they're put -- once they are
24  packaged are specific to them.  They own the
25  formulas of them.  So we couldn't take those

*AB Litigation Services*

Page 33

1   formulas and give them to anybody else because they
2   were proprietary to them.  They did use one of our
3   formulas in the line.  That would be different.
4   But -- but once they were packaged with his label,
5   they belonged -- they would have belonged to him.
6       Q    And what were the invoice terms prescribed
7   for ZAP!?
8       A    Net 30.
9       Q    Okay.  Net 30 meaning that 30 days after
10  the invoice is received, payment is due?
11      A    Correct.
12      Q    Is that normal in this industry?
13      A    It is.
14      Q    And that also reflects your allocation
15  of -- Midlab's allocation of risk because you're not
16  carrying these accounts receivable for very long?
17      A    That's correct.
18           MR. GOLDHAMER:  Object to form.  Object to
19  form and foundation.
20      Q    (By Mr. Abelman) Okay.  So would you
21  describe the process for approval of ZAP! as a
22  customer as generally more careful than other
23  customers because of the size and the risk that you
24  described?
25      A    Yes.

Page 34

1            MR. ABELMAN:  Aaron, can we go to Bates
2   No. 014553, which is the -- it's -- it's -- it's
3   labeled as FY 2017.
4            THE VIDEOGRAPHER:  Okay.  Let me find
5   that.
6            MR. ABELMAN:  Oh, wait a second.  I'm
7   sorry.  Yeah.  FY 2017 1Q board meeting.  The date
8   is July 14, 2016.
9            THE VIDEOGRAPHER:  Can you give me that
10  Bates number again?  I'm sorry.
11           MR. ABELMAN:  It's 014553.
12           THE VIDEOGRAPHER:  Just getting a copy for
13  everyone.  Okay, the copy has been pasted in the
14  chat.  And this is going to be Exhibit No. 32,
15  correct?
16           MR. ABELMAN:  Sure.
17           (Exhibit 32 marked.)
18      Q    (By Mr. Abelman) Mr. Miller, can you
19  identify this exhibit?
20      A    That's the Midlab board presentation for
21  Q1 fiscal -- for -- for Q1 fiscal '17.
22      Q    Were you involved in the preparation of
23  this presentation?
24      A    Yes.
25      Q    What role did you have?

Page 35

1       A    At that time I typically assembled and put
2   a lot of the presentation together, specifically the
3   financials of the presentation.
4            MR. ABELMAN:  Aaron, can we skip to what's
5   Page 25 of this document, which is Bates number
6   ending in 577.  That.  That's it.  Thank you.
7       Q    (By Mr. Abelman) Mr. Miller, I'm going to
8   ask you some questions about this.  What I'm trying
9   to understand is I'm trying to get an overview of
10  the account receivable position of ZAP!, of what
11  ZAP! owed to Midlab.  And this is the only chart
12  that's been provided to me.  I'm assuming -- well,
13  you tell me.  Is -- is -- is -- is -- is this the
14  only version of this chart or is this chart a
15  regular -- is this chart a record that is kept --
16  was kept throughout the relationship?
17      A    That is the only time that chart was
18  updated was for this presentation.
19      Q    And why -- why was it done for this
20  presentation?  Why was this chart created?
21      A    It was -- I created this chart in order to
22  show the history of where ZAP! had been since they
23  purchased in December, and where they were as of
24  July of 2017, and to -- and to describe the past due
25  position of that -- of that account.

Page 36

1       Q    Okay.  I'm going to ask you to explain
2   this chart to me because, for one, I'm confused.  It
3   says the ZAP! account receivable balance versus past
4   due as of July 6th of 2016, and yet it goes through
5   July 6th of 2017.
6       A    That was done -- that was done on a -- I
7   can't tell you why there was a difference there.
8   That should have been -- I would have expected that
9   would have been '16, because that's when we were
10  doing that business.  And at the same time we were
11  on a fiscal year, so there's probably a discrepancy
12  between the calendar year that we were in and the
13  fiscal year that we were in.
14      Q    Okay.  I'm not sure I understand that.
15  The hor -- the horizontal dates at the bottom, you
16  know, above the word balance --
17      A    Yeah.
18      Q    -- and past due, are those -- are --
19  are -- are -- are the years reflected there
20  correct --
21      A    No.
22      Q    -- or should it?
23           THE DEPONENT:  I'm sorry.
24      Q    (By Mr. Abelman) Please -- please go
25  ahead.  I -- I mean, I was going to ask is it --

*AB Litigation Services*

Page 37

1 what it probably should have said is -- from what I
2 can discern is the first date might have been
3 December 26th of 2015, and then the years thereafter
4 were all 2016 rather than 2017.
5     A    Yes.  That's what I would agree.
6     Q    Okay.  Thank you.
7     A    ZAP! start -- ZAP! started buying in
8 December of 2015, and -- and went through the summer
9 of 2016 calendar year.
10     Q    So when you say "ZAP! started buying,"
11 explain to me what -- what you mean by that.
12     A    They started placing purchase orders in
13 December for the -- for the program.
14     Q    Okay.  Let's start with the column on the
15 far left.  What -- what is meant by, Initial
16 extension 510k, April 1, 2016?
17     A    In April they asked us for -- to help them
18 with some cash flow.  At that point in time they had
19 $510,000 in accounts receivable that was past due.
20 And you can see that in the -- on the chart.  On
21 the -- on the bottom line it's 510,129.  In April
22 it's 20 -- what -- it's labeled 2017.  That should
23 be 2016.  At that point they asked us for an
24 extension.  And that corresponded with -- with an
25 amendment that we created to the -- an extension of

Page 38

1 those terms.
2     Q    And just so we understand this, the blue
3 line represents the outstanding balance that was
4 owed by ZAP! to Midlab?
5     A    Correct.
6     Q    And the ye -- the orange line represents
7 past due, meaning it was more than 30 days since the
8 invoice had been delivered?
9     A    Correct.
10     Q    And when ZAP! asked for an extension in
11 April, how did that -- how did that ensue?  What --
12 by what means did they request an extension?
13     A    Jeff -- Jeff called and requested it,
14 asked if we could help -- provide some assistance.
15     Q    Did he call you directly?
16     A    I had spoken with him on several occasions
17 on it.  I don't know if I -- I don't know that I was
18 the first call, but I did speak with him.
19     Q    Was that pretty normal for you to speak to
20 Jeff directly?
21     A    Yes.
22     Q    How often did you speak to him during this
23 period?
24     A    One -- I would say once a week, once every
25 couple weeks.

Page 39

1     Q    So after he asked for an extension, what
2 happened internally at Midlab?
3     A    We then did a chart like this, had some
4 discussion around it.  Then also had some discussion
5 with the board of directors.  Typically it --
6 sometimes it went to the board, sometimes it didn't
7 depending on what time in the quarter it was.  And
8 then we would -- we would make a decision whether or
9 not to extend him terms.  If we did, we'd write up
10 an amendment as to what those -- what the parameters
11 of that extension was.
12     Q    So let me get this straight.  Did the
13 management team discuss it before a recommendation
14 was taken to the board?
15     A    Yes.
16     Q    Okay.  So do you recall who was involved
17 in the discussion for the first -- the initial
18 extension?
19     A    That would be me, Matt Schenk, Vince
20 Keller.
21     Q    And then the management team approved the
22 initial extension, and was that subject to board
23 approval?
24     A    I don't remember if that one went before
25 the board or not.

Page 40

1     Q    So you don't remember whether it went to
2 the board for approval, but clearly it -- it --
3 it -- you're sharing this with the board in July of
4 2016.
5     A    Correct.
6     Q    So it really wasn't -- it looks here it
7 really wasn't until March of 2016 or maybe -- maybe
8 February where production really started ramping up
9 on ZAP! products.
10     MR. GOLDHAMER:  Object to form.
11     A    They began buying in December, and were
12 steady from December forward.
13     Q    (By Mr. Abelman) And was it your
14 expectation when you started this relationship with
15 ZAP! that they would be spending in excess of a
16 million dollars?
17     A    If the market was created properly.  When
18 I say "properly," if the market was created and it
19 really took off, it would -- it had that potential.
20 But the line -- the -- the peak at a million 229 was
21 not their purchasing -- it was what their AR balance
22 was, but that was not their steady state purchasing.
23     Q    It wasn't their what purchasing?
24     A    Steady state, what they would -- what they
25 would submit on a regular basis.  A million 229

*AB Litigation Services*

1  included -- included all of the past due as well as
2  current invoices that were open at that time.
3      Q    So looking at your past due line, it looks
4  like starting in March of 2016 through April of 2016
5  the past due amount held pretty steady.  Is that
6  accurate?
7      A    Yes.
8      Q    And then describe what happened next.
9      A    Towards the end of the program, Jeff ran
10 into cash flow -- cash flow strains and -- and
11 therefore we didn't -- we stopped getting payments,
12 therefore the balance increased.
13     Q    So tell me when that happened according to
14 this chart.
15     A    It's not on this chart.  It happened --
16     Q    Okay.
17     A    -- after this chart.
18     Q    Okay.  When did it happen?
19     A    Well, I mean, if you see -- if you see the
20 total amount, the total amount is 899,772 was just
21 above the amount right before his final payments
22 that he made to us.  So, therefore, at the end of
23 this time frame after July, you would see the orange
24 line begin to tick up towards -- towards the 8 --
25 841,000 that we finally -- that we finally had in

1  open AR balance at the end.  So this is towards the
2  end of his purchases, but we still had about half of
3  it that was current.
4      Q    Okay.  So on the far left it says --
5  column it says, Initial extension paid in full,
6  May 20, 2016.  What -- what does that mean?
7      A    The initial extension of $510,000 was
8  given to him on 4-1.  But as of 5-20, a -- a month
9  and a half later, he had paid back that ex -- all
10 of the 510 that was associated with that extension.
11 And you can see that in the chart as the -- as
12 the li -- the balance line comes back down into that
13 700,000 range.  That was the additional payments he
14 was making on the -- on the past due extension that
15 we gave him on -- on April 1st.
16     Q    And do you know what the source for the
17 moneys to pay the extension in full were?
18     A    No.
19     Q    What was Midlab's response when it
20 received that $510,000?
21     A    We were -- we were excited that he had --
22 he had kept his commitment.
23     Q    And then underneath that it says, Request
24 for extension renewal, 5-20, 2016.  What -- what
25 does that mean?

1      A    At that point in time he asked us to re --
2  renew the extension to provide him some cash -- some
3  cash flow relief.
4      Q    And so what -- in particular, what was the
5  extension -- well, did Midlab renew the extension?
6      A    It did.
7      Q    And what -- what extension did they renew
8  in par -- in particular?
9      A    I believe there's an Amendment 2 out
10 there, an Amendment 2 that we had that we -- we
11 looked at extending another half a million dollars.
12 And it has some different provisions attached to it,
13 some conversion provisions.
14     Q    So the request was made, and then what
15 happened?
16     A    The management team discussed that one.  I
17 believe that's -- and then -- and then I believe
18 that was put in place as well.
19     Q    Do you recall whether that was -- that
20 extension request was brought to the board?
21     A    Yes.  I believe we talked about that one.
22     Q    And what did the board do?
23     A    I don't recall the final deci -- decision
24 on that one.
25     Q    You don't recall whether the board

1  approved it or not?
2      A    Yeah.
3      Q    I'm sorry.  Did you answer?
4      A    I have not yet.  I believe we approved
5  that one, and we put the second amendment --
6  amendment in place.
7      Q    What happened next with regard to the ZAP!
8  account receivables?
9      A    We continued -- we continued selling to
10 Jeff, as you can see, between 5-15 and 7-6 on the
11 chart.  And then we began to see cash flow strains
12 again as he -- as he had that -- had that extension
13 in place.  Jeff became -- that began to get very
14 cash strained.
15     Q    And so what did that -- what did that mean
16 for the account receivable owed to Midlab?
17     A    That means the past -- past due balances
18 continued to climb.
19     Q    When did you cut off purchases or end
20 expenditures for ZAP!
21     A    I don't remember the exact date.
22     Q    Approximately?
23     A    It would have been -- it would have been
24 during the summer of -- I don't remember the exact
25 date.

*AB Litigation Services*

1    Q    The summer of what year?

2    A    I would expect it had been -- it had

3    been -- yeah, I don't remember that -- that time

4    frame.

5    Q    Well, this -- this chart goes through July

6    of 2016.  Was it shortly thereafter?

7    A    I believe it happened during the summer,

8    the summer of that year.  Summer or early fall.

9    Q    And how was that decision made to

10   participate?

11   A    We -- Matt -- Matt, Vince and myself,

12   as well as -- and we -- we would have had discussion

13   regarding the balances.  I believe we probably

14   took -- had -- had discussion with the board as well

15   and -- and said -- and made the decision that the --

16   that the amount of money that was owed was too great

17   a risk for Midlab, and we made the decision to stop

18   shipping.

19   Q    Do you have any correspondence in your

20   file or notes that reflect that decision?

21   A    Not without looking.  I can't -- I don't

22   remember.  I don't know.

23   Q    Okay.  Have -- have you looked?

24   A    I have not looked for that specific --

25   specific correspondence.

1    Q    Do you recall having a discussion with

2    Jeff Wycoff and explaining Midlab's position?

3    A    Yes.  There was a discussion -- there was

4    a discussion with him regarding that decision.

5    Q    Were you part of that discussion?

6    A    Yes.

7    Q    When was that discussion?

8    A    I don't remember.

9    Q    What do you remember from that discussion?

10   A    We -- we -- we told him about our

11   position.  We told him about our -- we reminded him

12   of the AR balance -- balances that were there,

13   and -- and that -- and then had discussion regarding

14   the cash flow, cash flows, and that -- that the --

15   that the business was too great of a risk at that

16   point in time.

17   Q    And what was his --

18   A    (Inaudible.)

19   Q    Oh.  Sorry.

20   A    Continue.  I'm done.

21   Q    And what was his response?

22   A    Disappointed, but understood.

23   Q    Now, as his -- as ZAP!'s accounts

24   receivable grew in the summer of 2016, what kind of

25   financial disclosures was ZAP! making?

1    A    Can you rephrase that question to clarify?

2    Q    Okay.  So I'm still looking at this chart.

3    And let's -- let's -- let's start from December of

4    2015 when this program seemed to commence.  What

5    kinds of financial disclosures from ZAP! did Midlab

6    require?

7    A    We asked him for financial projections.

8    We asked him for -- this is 2016.  We asked him

9    for -- we had asked him for -- when we went

10   through the -- the amendments we had -- we had asked

11   him for a personal guaranty.  And, of course, the --

12   the ongoing pro -- the projections were ongoing.

13   We'd get those regularly.

14   Q    What do you mean by regular -- regularly?

15   Did you ask for those monthly?

16   A    No less than monthly, as they were closing

17   the books.

18   Q    And did you -- did you have to initiate

19   those requests?

20   A    I did.  I worked with their -- their

21   controller.

22   Q    Were they forthcoming with financial

23   information?

24   A    Yes.

25   Q    And did you personally review their

1    projections?

2    A    Yes.

3    Q    Did you ask questions about the

4    assumptions underlying those objections (sic)?

5    A    Yes.

6    Q    Were you generally satisfied with the

7    quality of the information you were provided by ZAP!

8    A    I was -- I was generally satisfied.

9    Q    I'm sorry.  What was the word?

10   A    Yes, I was generally satisfied.

11   Q    Do you recall anything in particular that

12   you were dissatisfied with?

13   A    My concern on the financials was the --

14   the breakeven points that they would have con --

15   had.  And there was some particular pieces of

16   business that would have pushed them into a cash

17   flow state.

18   Q    Would you describe that with more

19   particularity?

20   A    Jeff presented -- Jeff presented a

21   purchase order that he had with -- with Walmart.

22   And he was always pursuing Walmart and some of the

23   large box and wholesalers or the -- the warehouse --

24   the member clubs, like Sam's, that were part of the

25   projections.  I was always concerned that those

*AB Litigation Services*

**Page 49**

1  would not come through even though he had a PO in
2  hand.
3      Q    And what was the basis for your concern,
4  your experience with those -- with -- with Wal --
5  with Walmart or Sam's Club?
6      A    The -- the basis was, you know, I'd --
7  just in working with him and the longer -- the
8  longer things pushed out on delving into those types
9  of facilities it seemed the less likely it was going
10 to happen.  And I just -- when you work with
11 customers, it's -- you know, you -- there's --
12 there's times they tell you what's going on, and
13 there's typically a -- a sense of skepticism until
14 you see it happen.
15     Q    And your skepticism was ultimately proved
16 to be well placed or well advised, wasn't it?
17     A    Yes.
18     Q    Do you have an opinion as to what the
19 primary cause of ZAP!'s inability to pay Midlab was?
20         MR. GOLDHAMER:  Form.  Foundation.
21     A    My opinion was spending too much on media
22 too quickly, and not -- and not a full understanding
23 or a good understanding of the level of inventory
24 needed to service it.
25     Q    (By Mr. Abelman) That's interesting.  Can

**Page 50**

1  you -- would you mind elaborating on that so a
2  neophyte in this would understand.  And --
3      A    Yeah.
4      Q    -- so that I would understand -- I can
5  understand.
6      A    Yeah.  Jeff's business plan required --
7  and -- and stated and required a high level of TV
8  time to create this market.  And when he -- when he
9  created the market and began to get orders, it
10 required large amounts of inventory.  In my opinion,
11 he was undercapitalized, did not have enough cash to
12 sustain those -- those two drags -- those two
13 requirements for working capital, for money.
14     Q    Are you aware of times when ZAP! was
15 unable to keep up with the demand because the in --
16 they didn't have enough inventory?
17     A    Yes, toward the end.
18     Q    If -- in your opinion, if ZAP! had more
19 inventory, do you think ZAP! would have been able to
20 sustain itself?
21         MR. GOLDHAMER:  Form and foundation.
22     A    Not without cash.
23     Q    (By Mr. Abelman) Right.  That -- my
24 question presupposes that they had more -- more
25 capital to purchase inventory.

**Page 51**

1      A    If -- if they had capital, then they --
2  and they had been able to pay for that -- that
3  inventory, then I think it would have still
4  sustained itself.
5      Q    Okay.  So I'm moving back to what's been
6  marked as Exhibit 32 and Page -- we were on Page 25.
7  I'd like to go back -- go back two pages to 23,
8  which is -- okay.
9          Mr. Miller, did you prepare this -- this
10 chart?
11     A    Yes.
12     Q    Would you describe to me what this chart
13 is intended to represent to the board of directors
14 of Midlab?
15     A    This is a summary sale -- summary of the
16 sales that were sold to ZAP! and the margin that
17 Midlab was making on the pro -- program and the
18 commitment to the packaging and access -- the
19 packaging and accessories that -- that were sold
20 and -- and sitting here.
21     Q    So explain to me the bottom line, which is
22 total net margin.  Would you explain to me what --
23 what those numbers represent?
24     A    Net margin would be the -- the profit that
25 we made for selling -- for selling the ZAP! products

**Page 52**

1  to Jeff.
2      Q    So the first quarter of 2017, the fiscal
3  year 2017, which would be what -- what months?
4  Fiscal year starts July 1?
5      A    No.  Fiscal year starts April.  And so
6  that -- April 2016, that would be April, May, and
7  June of 2016.
8      Q    So this first column is first quarter, it
9  says, fiscal year 2017.
10     A    Correct, because we name our fiscal years
11 in the year that it ends, not the year it begins.
12     Q    Okay.  Thank you.  So these -- these are
13 actual -- the -- the total net margin are actual
14 numbers, not projections?
15     A    Correct.
16     Q    So Midlab made $520,000 in the first
17 quarter of -- of fiscal year '17, and 703,489 on the
18 fourth quarter for fiscal 2016 from the ZAP!
19 products?
20     A    Correct.
21     Q    Okay.
22         MR. ABELMAN:  Can we go to the next page,
23 please?  Well, I'm sorry, let's -- let's stay there.
24     Q    (By Mr. Abelman) Where did these -- the --
25 the margins -- were those in line with -- with

*AB Litigation Services*

1  Midlab's projected margins?
2      A    Yes.
3      Q    Okay.  Let's -- let's go to the next page,
4  please, Bates No. 014576, Page 24 on this.
5      Q    (By Mr. Abelman) Would you describe what
6  this page consists of?
7      A    This is an update based on what Jeff was
8  telling us that he was getting as far as his sales
9  channels.  He had a direct campaign going, which he
10  expected to sell between 3,000 to 5,000 -- to 3,500
11  units per week.
12          He was projecting to be in Walmart in the
13  As Seen On TV department in selling 3,000 to 4,000
14  units per week.
15          And he was -- he was launching into the
16  cleaning aisle of the store with the -- with the
17  other cleaners, which is a different department.
18          He was projecting that he would be into
19  the -- into the member -- the mem -- the warehouses,
20  Sam's and Costco, and he expected that in the second
21  quarter.  And he met with the buyer -- he -- he met
22  with the buyer of Costco on June 21st of that year.
23          Then he was also working with Amazon to
24  relaunch the product on Amazon.
25          And then he also was expecting to launch

1  to Publix and HEB.
2      Q    Okay.  So this was as of July of 2016, and
3  you're reporting -- you're reporting these sales
4  efforts to the board?
5      A    Correct.
6      Q    Let's go through that list, and I'd like
7  your comments with regard to whether these sales
8  efforts were successful or maintained or
9  unsuccessful starting with --
10      A    On the direct campaign --
11      Q    Go on.
12      A    Okay.  On the direct campaign, he wanted
13  to be between 30 -- 3,000 and 3,500 a week.  He did
14  not make it to that level.  Walmart he did make it
15  into the -- to the As Seen On TV, but he -- he never
16  made it to the level that they were selling 3 to
17  4,000 per week.  He never did make it into the
18  cleaning -- I don't believe he made it into the
19  cleaning aisle.  I'm not -- I'm unsure whether he
20  actually made it into the cleaning aisle or not.
21          Sam's and Costco, they did not come to
22  fruition.
23          Amazon, it was on Amazon, but not selling
24  at the level that he wanted.
25          And I'm not sure if he ever got into

1  Publix or HEB.
2      Q    Do you recall what -- the direct campaign
3  he -- he was unable to sustain at 3,000 to 3,500
4  units per week, do you recall about where it was?
5      A    I don't.
6      Q    Okay.  We've covered the -- the next page,
7  which is Page 25.  If we could go to Page 26.  What
8  was the purpose of this chart?
9      A    This was -- this was to describe to the
10  board the level of -- the level of investment that
11  we had in -- in ZAP!, meaning inventories, on the
12  top section, and -- and the AR exposure that we had
13  on the bottom, and to show them how much we had
14  in -- in excess exposure.
15      Q    How would you characterize this excess
16  exposure number?
17      A    This is -- this is a -- Midlab was at risk
18  of not being able to collect -- collect that given
19  that -- that he would -- that he acted on his
20  personal guaranty and was able to cover that.  So
21  the excess exposure was what was -- was above the
22  personal guaranty that we had in place.
23      Q    We've talked about how you required
24  monthly finance -- monthly sales projections.
25  The -- you -- you also required, I'm assuming within

1  the ambit of monthly sales projections, up-to-date
2  sales numbers.
3      A    Yes.
4      Q    Is that -- and how did you get those
5  numbers?
6      A    Their controller sent them to me.
7      Q    And was that something that was -- that
8  was done monthly or did you -- did you or someone in
9  your department have to call to receive those?
10      A    We would call them to get them.
11          (Interruption by the court reporter.)
12          THE DEPONENT:  Ma'am?
13      A    We would call them to get them.  Being
14  that they were a small company -- being that they
15  were a small company, it took them a while to put
16  them together.
17      Q    (By Mr. Abelman) Were there sales
18  projection numbers reliable in your -- in your
19  opinion?
20      A    They typically came in -- actuals came in
21  less than what they projected.
22      Q    So I'm not asking whether their
23  projections were reliable.  Were -- were the numbers
24  that they provided you for actual sales -- do you
25  think those were reliable?

*AB Litigation Services*

1    A    Correct.

2         MR. ABELMAN:  Let's go to Bates

3    No. 014687, which is denominated as November 10,

4    2015, Meeting on the top.

5         THE VIDEOGRAPHER:  Okay.  Let me go find

6    that.  Give me that Bates number one more time.  So

7    sorry.

8         MR. ABELMAN:  It's 1 -- 014687.  0146 --

9    687.

10        THE VIDEOGRAPHER:  4687.  One over.

11   Sorry.  Okay.  That has been posted in the chat.

12   Screen share.  We've got lots more.  This one right

13   here?

14        MR. ABELMAN:  Yes.

15    Q    (By Mr. Abelman) So, Mr. Miller, was it

16   common for you to receive the minutes of board

17   meetings?

18    A    No.

19    Q    Okay.  Do you know why -- well, were you

20   at the -- do you know if you were at -- at the board

21   meeting on November 10th, 2015?

22    A    Yes, I was.

23    Q    And these minutes say, Mr. Schenk then

24   reviewed with the board the ZAP! business.  Does

25   that comport with your recollection?

1    A    Yes.

2    Q    Do you -- do you recall why Mr. Schenk was

3    reviewing with the board the ZAP! business rather

4    than you?

5    A    We -- we as a team share different parts

6    of -- of -- so any -- any of us could be commenting

7    on the -- on the minutes, on the activities.

8    Q    And do you recall what -- what transpired

9    at this board meeting?

10    A    I do not specifically recall at that --

11   what's going on in that particular conversation.

12    Q    Well, it was November of 2015.  That

13   was about the time wherein ZAP! was being onboarded

14   to -- to Midlab.  Does that jog your memory?

15    A    I mean, I -- I can give you a -- I would

16   expect that we were talking about the -- the

17   potential of the business as well as the signing of

18   the agreements as we were beginning to -- to launch

19   the ZAP! business.

20    Q    Okay.  I -- I note that there --

21   there's -- there's no agenda that's been provided

22   with regard to this meeting.  Do you have any idea

23   why?

24    A    I don't know why.

25    Q    Do you know if someone reviewed the -- the

1    agenda for that November 10th meeting and looked to

2    see if there was any -- anything in there with

3    regard to ZAP!?

4    A    I don't -- I don't know that anybody

5    looked at it.

6    Q    Okay.

7         MR. ABELMAN:  The next exhibit -- well,

8    let's mark that exhibit.  I guess it's 30 --

9         MS. PASSOW:  33.

10        MR. ABELMAN:  33.

11        (Exhibit 33 marked.)

12        THE VIDEOGRAPHER:  This one that we're

13   currently on is 33?

14        MR. ABELMAN:  No, the one we just

15   discarded -- the one we just discussed.

16        THE VIDEOGRAPHER:  Got it.

17        MR. GOLDHAMER:  To be clear, Mr. Abelman,

18   you're talking about the November 10, 2015, minutes,

19   the -- the document that starts with that?

20        MR. ABELMAN:  Right.

21        MR. GOLDHAMER:  Okay.

22    Q    (By Mr. Abelman) Okay.  The -- the next

23   exhibit, which we'll mark as 34, is Bates

24   No. 014598.  And it's the board meeting of

25   January 28th, 2016.

1         (Exhibit 34 marked.)

2    Q    (By Mr. Abelman) And we'll look at it in

3    conjunction with what should be marked as

4    Exhibit 35, which is Bates No. 14688.

5         THE VIDEOGRAPHER:  14 -- sorry.

6         MR. ABELMAN:  688.

7    Q    (By Mr. Abelman) So they both relate to

8    the January 28, 2016, board meeting.  One is -- what

9    should be marked as Exhibit 34 is the agenda, and 35

10   apparently are the minutes.

11        THE VIDEOGRAPHER:   Okay.  I'm going to

12   need to pull up the other one.

13    Q    (By Mr. Abelman) Mr. Miller, I'm going to

14   ask -- ask you to look at Exhibit 35 first.

15        THE VIDEOGRAPHER:  14688?

16        MR. ABELMAN:  Yes.

17        THE VIDEOGRAPHER:  Okay.  That was given

18   as a collection.  It's the one that I just marked as

19   Exhibit 33.  And you want that marked as Exhibit 35,

20   14688?

21        MR. ABELMAN:  Yes.

22        THE VIDEOGRAPHER:  Okay.

23        MR. ABELMAN:  Well, I'm sorry.

24        THE VIDEOGRAPHER:  That was given to me as

25   the same document.  It's just the next page of the

*AB Litigation Services*

Page 61

1  one we were just on.
2        MR. ABELMAN:  Oh, I see.  I see.  So
3  it's -- it's -- it's part of Exhibit 33.  Okay.
4  Okay.
5        THE COURT REPORTER:  So we're removing
6  which exhibit?
7        MR. ABELMAN:  We're -- we're not -- we
8  don't have an Exhibit 35 yet.
9        THE COURT REPORTER:  Okay.  Thank you.
10       THE VIDEOGRAPHER:  Okay.  And you wanted
11 to be on 014688 first?
12       MR. ABELMAN:  Correct.
13       THE VIDEOGRAPHER:  Okay.
14       MR. ABELMAN:  Correct.
15    Q    (By Mr. Abelman) So the minutes from the
16 January 28, 2016, board meeting say, Mr. Schenk then
17 reported to the board on the company's business
18 opportunities, including ZAP! sales and the
19 company's private brand business.
20       Mr. Miller, were you at this board
21 meeting?
22    A    Yes, I was.
23    Q    Can you elaborate on what Mr. Schenk
24 reported to the board about?
25    A    It was a -- a general update on -- on how

Page 62

1  the business was and -- and what -- what sales
2  activities there were and purchases.  It was a
3  general update on it.
4    Q    And what was the message delivered?
5    A    That -- that it was moving along.  They
6  were making purchases that had been launched.
7    Q    Okay.  Do you have any particular
8  recollection about this meeting and anything
9  important that was raised with regard to ZAP!?
10   A    Not to my recollection.
11   Q    Okay.  Let's move to -- we'll try doing
12 Exhibit 35 again.  This time it's Bates No. 14683.
13 It's got Bluewater Media in the upper right-hand
14 corner.
15       THE VIDEOGRAPHER:  Let me just get a copy
16 of that.  35 is in the chat.  This one?
17       MR. ABELMAN:  Yes.  Mark that as
18 Exhibit 35.
19       (Exhibit 35 marked.)
20   Q    (By Mr. Abelman) Mr. Miller, have you ever
21 seen this before?
22   A    No.
23   Q    Are you familiar with Bluewater Media?
24   A    I am.
25   Q    Would you explain to me what you -- what

Page 63

1  you believe to be the relationship between Bluewater
2  Media and ZAP!?
3    A    In talking with Jeff, Bluewater Media was
4  the television advertising company that he did --
5  that he basically spent money with in order to -- to
6  commercialize the products direct to consumer.
7    Q    Okay.  Did -- to the best of your
8  knowledge, did Midlab have any direct communication
9  with Bluewater Media?
10   A    No.
11   Q    So you don't know how Midlab obtained this
12 memo?
13   A    I don't rec -- I don't recall seeing it.
14   Q    Okay.  The next -- the next exhibit is
15 Bates No. 14 -- starts at 014660.  It's the agenda
16 for the board meeting dated April 20th, 2016.
17       (Exhibit 36 marked.)
18       THE VIDEOGRAPHER:  14660?
19       MR. ABELMAN:  Yes.
20       THE VIDEOGRAPHER:  Okay.  This will be
21 Exhibit No. 36.  It has been posted in the chat.
22 Sharing the screen now.
23   Q    (By Mr. Abelman) Mr. Miller, can you
24 identify this document that's been marked as
25 Exhibit 36?

Page 64

1    A    That is the board presentation for Midlab
2  for fiscal year 2016 fourth quarter.
3    Q    And you -- you were at this board meeting?
4    A    Yes.
5    Q    And on Page 2 of the agenda, it says
6  there's a ZAP! update starting on Page 20.  Do you
7  see that?
8    A    Yes.
9    Q    Did you do the ZAP! update?
10   A    Can you turn to the back of the -- the
11 slides, Page 20?
12   Q    Yeah.  You might want to go to 22 instead
13 of 20, but...
14       THE DEPONENT:  Let's start at -- let's
15 start at 20, if you can, the very first of the
16 section.  Okay.  Next page.  Okay.  Next page.  Next
17 page.
18   A    Yes.  I recall -- I recall this
19 conversation.
20   Q    (By Mr. Abelman) And so what do you recall
21 about this conversation?  What were you trying to
22 accomplish?
23   A    I put these slides together.  We were
24 updating the board as to the decision to extend
25 terms on 510,000 of AR to 85 days.  Gave -- gave an

*AB Litigation Services*

---

**Page 65**

1  update as to the number of -- the invoice date that
2  pertained to as well as the total A -- AR that was
3  open.  We also gave a current cash collected number
4  of what had been currently -- that had been
5  collected to date.  It was a general -- it was a
6  general update to the board.
7      Q    Let's talk about the cash update.  Is that
8  on Page 23?
9      A    Yes.
10     Q    Would you explain to me what this chart
11  reflects?
12     A    So it -- it re -- it reflects the total
13  amount of AR that's open and the dates that they
14  pertain to.
15     Q    And it says, Cash collected, and it --
16  it -- it has a number crossed out.  Tell me what's
17  going on there.
18     A    It was an update of a previous -- of --
19  there's a time frame between the time we actually
20  put it together and the time we actually -- actually
21  give it there.  So we updated the number so that we
22  were the most current so we could possibly be, 698,000
23  collected.
24     Q    And that was collected during what period?
25     A    I would have to look at those collections.

**Page 66**

1  I would expect it to be during the quarter.  It
2  would be -- it would be -- in this particular case
3  it's ZAP! -- ZAP! program to date, so it would have
4  been from their December purchases forward.
5      Q    Thank you.  Do you recall what you told
6  the board about Midlab's accounts receivable
7  strategy for ZAP! at that time?
8      A    We explained -- we explained the Jeff
9  had -- had requested some extended terms on the
10  510,000, that we would work with him directly in
11  order to -- to get that -- those payments current.
12  And then I -- we would just -- we would stay -- stay
13  in close communication with him to make sure the
14  payments were -- were continuing -- continuing to
15  come in.
16     Q    And did you do that?
17     A    We did.
18     Q    Okay.  Let's go back to Exhibit 33 for a
19  moment.  I'm looking at Bates No. 014690.
20         THE VIDEOGRAPHER:  I had muted myself.
21  What was that Bates number again?
22         MR. ABELMAN:  014690.  And it's
23  Exhibit 33.
24         THE VIDEOGRAPHER:  Okay.
25         (Discussion off the record between

**Page 67**

1  Mr. Abelman and Ms. Passow.)
2          THE VIDEOGRAPHER:  Yeah, that is
3  Exhibit No. 33.
4      Q    (By Mr. Abelman) Mr. Miller, would you --
5  would you read this -- the minutes from the
6  July 14th, 2016, board meeting.
7      A    Mr. Miller then provided a ZAP! update and
8  reported on additional sales opportunities,
9  including Bunzl and Waxie.  Board then discussed
10  ZAP! accounts receivable and capital needs.
11     Q    What -- what -- what were the
12  opportunities of Bunzl and Waxie.
13     A    That was a different -- that was a
14  different piece of business, different customers.
15  Had nothing to do with ZAP!.
16     Q    Oh, okay.  And then do you recall
17  discussing the capital needs with the board, ZAP!'s
18  capital needs?
19     A    What time frame was this?
20     Q    Well, this the July 14th, 2016, board
21  meeting.
22     A    Okay.  Okay.  We were -- we were towards
23  the end of that -- the chart that you had showed
24  before.  And we -- we talk -- we spoke about the
25  levels of -- of AR that was there and what -- what

**Page 68**

1  we needed to see as far as collections.
2  (Inaudible.)
3      Q    Do you recall what you --
4      A    (Inaudible.)
5          (Interruption by the court reporter.
6      A    But we talked about the levels of accounts
7  receivable and the need for collections as well as
8  the levels of inventory that were out there.
9      Q    (By Mr. Abelman) And did -- do you recall
10  what you told the board with regard to the levels of
11  inventory?
12     A    No.  I would have to see the presentation
13  to -- to see that.
14     Q    Well, let's talk about these -- the
15  presentations that you made to the board.  How --
16  how were they made?  Were they made by PowerPoint?
17     A    They were PowerPoint, and we -- they were
18  face to face.
19     Q    So do you still have the PowerPoint
20  presentations?
21     A    Yes.
22     Q    Did anybody ask you to produce the --
23  those parts of the PowerPoint presentations relating
24  to ZAP!
25     A    I -- I did not -- I did not give those.

AB Litigation Services

1  I -- I don't know if that was part of the request.
2  **Q    Who explained to you what you were -- what**
3  **Midlab is supposed to produce?**
4  A    We receive -- we received a request to --
5  to pro -- provide related documents to -- as much as
6  we could provide.
7  **Q    Okay.  I -- I don't want you to reveal any**
8  **conversations or correspondence between you and your**
9  **counsel, but you can tell me who prod -- who sent**
10 **you that request?**
11 A    I don't recall who I got it from.  It
12 probably filtered through our management team
13 into -- to us.  Probably came either through Matt
14 Schenk or Colman or -- or Vince --
15 **Q    So --**
16 A    -- as they were (inaudible.)
17 (Interruption by the court reporter.)
18 A    -- as we were following up on -- on ZAP!.
19 **Q    (By Mr. Abelman) So if -- if you were**
20 **asked today to produce the PowerPoints that -- that**
21 **portion of the PowerPoints relating to ZAP!, would**
22 **you be able to do so?**
23 A    Yes.
24 **Q    Okay.  Let's go to the board meeting of**
25 **October 20th.  And that's Bates No. 014579.  Bates**

1  No. 014579.
2       THE VIDEOGRAPHER:  Okay.  That's going to
3  be Exhibit No. 37?
4       MR. ABELMAN:  Correct.
5       THE VIDEOGRAPHER:  Okay.
6       (Exhibit 37 marked.)
7       THE VIDEOGRAPHER:  It's been posted to
8  chat.
9       **Q    (By Mr. Abelman) So, Mr. Miller, the --**
10 **if you look at Page 2, it shows a ZAP! update**
11 **starting on Page 15.  In fact, I think it starts on**
12 **Page 14, but I'm going to ask you about Page 16.  So**
13 **you can -- if you want to look at 14, 15, 16, that's**
14 **your discretion, but I'm only going to ask you about**
15 **16.**
16 A    Okay.  Yes, please.
17      THE DEPONENT:  Can you scroll back up,
18 please?
19      MR. GOLDHAMER:  Just -- just to clarify,
20 he's not driving this.  This is Aaron, the
21 videographer, driving which pages he's -- he can
22 look at, so he'll need to ask him.
23      THE DEPONENT:  Okay.
24      Aaron, next page.  Next page, please.  And
25 next page.  Go one more.  Okay.  You can go back,

1  Page 15, please -- or 16.
2  A    Okay.
3  **Q    (By Mr. Abelman) So you made -- you made a**
4  **presentation to -- to the board about ZAP! on**
5  **October 20th, 2016?**
6  A    Yes.
7  **Q    And looking at the agenda, would you tell**
8  **me what presentation -- describe the presentation**
9  **you made to the board.**
10 A    This was our -- this was our second
11 quarter fiscal year '17 presentation, quarterly
12 presentation.  And in this particular case we
13 addressed the next steps of ZAP! that were related
14 to the ZAP! program.
15 **Q    Okay.  What, in particular, did you**
16 **discuss?**
17 A    ZAP! had a -- we had already told ZAP!
18 that -- that -- that we were not shipping any more.
19 And ZAP! and Jeff had brought us a -- the next steps
20 where he had -- had come into a royalty contract,
21 had -- had -- had entered into a royalty contract
22 with a -- with one of the leaders in the direct
23 consumer market called Tristar Products.  They were
24 interested in -- in acquiring the rights to -- to
25 market and sell the ZAP! products direct to

1  consumer.
2  **Q    So what did that mean for purposes of**
3  **Midlab?**
4  A    For Midlab that was an opportunity to
5  potentially recover some of the -- some of the
6  investment that we had sitting out there that we
7  were not getting paid for by Jeff.
8  **Q    Would you explain that to me?  I...**
9  A    So at this time with Jeff -- Jeff owed us
10 over a million dollars in -- in AR and inventory.
11 And so with that there was -- there was a potential
12 here to continue ZAP! program with a company that --
13 that was very well known in -- in the market and
14 very well capitalized in order to -- in order to
15 obviously earn a profit on -- on those products, but
16 also recover some of the -- some of the investment
17 that we had from ZAP!.
18 **Q    So what did you recommend to the board?**
19 A    We recommended that we -- we partner with
20 them in order to supply them the ZAP! products as
21 defined by the royalty contracts and -- and then
22 the -- and -- and their business agreement.
23 **Q    And what did the board say?  Was a**
24 **decision made?**
25 A    Agreed.

*AB Litigation Services*

1  Q   Okay.

2  A   Yes.

3  Q   And what happened next with regard to
4  Tristar?

5  A   We did -- we did work with them to supply
6  that -- supply product for them to -- to launch the
7  ZAP! family or, you know, one or -- one or two of
8  the products under a different brand name that Jeff
9  owned.

10  Q   And how did that work out?

11  A   It worked -- it worked out okay being
12  that -- meaning that they purchased a substantial
13  amount of inventory. They paid for it. But they
14  never really got -- got off the ground as far as
15  selling -- selling that inventory. They always
16  seemed to have other investments that seemed to take
17  priority.

18  Q   Do you know approximately how much
19  inventory Tristar purchased from Midlab?

20  A   Approximately, I think they purchased
21  close to a million dollars.

22  Q   And was that all -- all cash on delivery
23  or how did Tristar pay for it?

24  A   They -- they had their 30-day terms.

25  Q   And did Tristar pay for all the inventory

1  Midlab provided?

2  A   Yes.

3  Q   Did you -- how did you find out about the
4  Tristar deal?

5  A   Jeff brought it to us.

6  Q   Did Jeff share you with the royalty
7  contract?

8  A   Yes.

9  Q   Did he encourage you to do business with
10  Tristar?

11  A   Yes.

12  Q   Were the margins with -- were the profit
13  margins with Tristar similar to the profit margins
14  that you experienced with ZAP!

15  A   Yes.

16  Q   Do you know what kind of profit you made
17  from your business with -- with Tristar?

18  A   Not specifically without reviewing that.

19  Q   But it's something you could figure out
20  pretty quickly?

21  A   Yes.

22  Q   Do you remember what period of time --
23  during what period of time you did business with
24  Tristar?

25  A   Well, the agreement happened on 9-22. I

1  believe it took them about six months before they
2  ordered something, but I would have to look at those
3  dates specifically.

4  Q   And when did -- when did Midlab stop doing
5  business with Tristar?

6  A   They purchased -- they purchased a -- a
7  few orders, and then -- and then that -- that was
8  all. It took maybe a quarter of a year.

9  Q   So what -- so what -- what period of
10  time -- what general date would you -- would you
11  say --

12  A   By the summer -- by the summer it was --
13  it was done.

14  Q   Do you know what happened with Tristar,
15  what -- what satiated their interest?

16  A   They purchased a large of amount of
17  inventory in order to cap -- in order to go to
18  market. They did test marketing. And -- and -- and
19  like I said, it -- it -- it seemed like they had a
20  lot of different investments in the -- in the thing.
21  So whether they -- whether they put enough focus on
22  this one or not, but it just didn't seem to be a
23  high priority for them.

24  Q   Did -- who -- who handled communications
25  between Midlab and Tristar?

1  A   A gentleman by the name of Andy Eisen.

2  Q   So Andy Eisen was handling it on -- was
3  handling communications on behalf of -- of who --
4  whom?

5  A   Jeff designated Andy Eisen to be the
6  relationship go-between between Tristar and Midlab.

7  Q   So when he was -- when he assumed that
8  role, was he acting as an agent for Tristar or for
9  Midlab or for ZAP!

10  A   For Jeff. For Jeff.

11  MR. GOLDHAMER: Object to form and
12  foundation.

13  Q   (By Mr. Abelman) So who at Midlab was
14  involved in those transactions?

15  A   I spoke with Andy as well as Matt Schenk
16  on a regular basis.

17  Q   So you -- you didn't -- you didn't go
18  directly to Tristar, you went through Andy Eisen?

19  A   Typically, yes.

20  Q   And who informed you that Tristar was not
21  going to purchase any -- any more inventory?

22  A   I don't know that they ever formally came
23  out and said they wouldn't.

24  Q   Okay.

25  A   They never formally said they wouldn't,

*Steven Ray Miller - 08/02/2021*

*AB Litigation Services*

1   they just didn't purchase.
2       Q    Got -- got it.
3       A    Steve, going back to the level of
4   purchases from Tristar, they purchased --
5       Q    Yes, sir.
6       A    -- approximate -- approx -- they purchased
7   approximately $750,000 from us.
8       Q    And do you know what the approximate
9   profit margin on that was?
10      A    Approximately 50 percent.
11      Q    Okay.  One more board agenda.  And that
12  would be January 26th of 2017.  That's Bates
13  No. 014635.  014635.  And I think that'll be marked
14  Exhibit 38.
15           (Exhibit 38 marked.)
16           THE VIDEOGRAPHER:  That has been put in
17  the chat.  All right.
18      Q    (By Mr. Abelman) So the ZAP! update,
19  according to Page 2 of the agenda, says -- starts on
20  Page 16.  Pages 16 and 17 are similar to what we've
21  seen in the past.  I'm only going to ask you about
22  Page 18, but you can certainly look at whatever
23  pages you want.
24      A    Okay.
25           THE DEPONENT:  You can go on to 18.  Thank

1   you.
2       Q    (By Mr. Abelman) Okay.  This -- this is
3   another presentation you made to the board in
4   January 26th of -- on January 26th, 2017.  Would you
5   take a look at Page 18, and tell me about the
6   presentation you made, what -- what you were
7   communicating to the board.
8       A    On this particular slide, we were -- we
9   were communicating the general overview of what
10  Tristar was looking at doing with the -- the former
11  ZAP! product.  They rebranded ZAP!, a different --
12  different product as Restore 4, which was another --
13  another brand that Jeff owned.  And -- and this
14  talks about the test market that they ran in the
15  first week of January with the result that they
16  weren't -- the results were not as high as they
17  wanted, but they performed four times as good as
18  what ZAP! did.
19      Q    What -- and -- and what was the basis
20  for -- for this information from Tristar test
21  results?
22      A    This would be based on communications with
23  Andy Eisen and information that he was provided
24  for -- from Tristar regarding the test markets.
25      Q    Do you know what was meant by the results

1   were not as high as they wanted, yet it performed
2   four times -- Restore 4 performed four times the
3   results from ZAP!?  Did the -- how do you reconcile
4   those two points?
5       A    So Andy was involved with Jeff and ZAP!,
6   and -- and had -- was privy to all those Bluewater
7   Media reports.  And then he was also heavily
8   involved with Tristar.  He explained to me that --
9   that Tristar set a certain -- they had a specific
10  measure in the -- in the media market for how many
11  people view and/or purchase -- whatever that metric
12  is defined as, they had a level what they were --
13  that they were looking at.  They said that the
14  results were not as high as they wanted based on
15  that metric, but yet comparing to the met -- the
16  same type of metric that ZAP! had, it was a lot
17  better than what ZAP! performed at.
18      Q    So it was based upon a metric that Tristar
19  used, but was never adequately explained to you?
20      A    Correct.
21      Q    That was my experience also.
22           Let's go back to Exhibit 33.  In
23  particular, Bates No. 014692.  014692.  So the
24  minutes from the January 26, 2017, meeting says that
25  you provided a ZAP! update, including collection of

1   outstanding accounts receivable.  What -- what did
2   you discuss with regard to the outstanding accounts
3   receivable in January of 2017?
4       A    I don't recall specifically what we spoke
5   about during that time.  That would have been the
6   same board presentation as the one that we just
7   looked at.  And so given that there wasn't a slide
8   dedicated to that, it was probably just an update
9   that says, you know, we still haven't received any
10  collection on -- on the ZAP! product.
11      Q    Do you have any notes that might reveal
12  what transpired at this board meeting?
13           THE DEPONENT:  You can flip back over to
14  the December -- to the December third quarter fiscal
15  year '17 slides, please.
16           THE VIDEOGRAPHER:  Sorry.  Say again.
17  Which slide?
18           THE DEPONENT:  The board presentation
19  that's labeled third quarter fiscal year '17.
20  Different exhibit.
21           MR. ABELMAN:  Exhibit 38.  Well, I'm
22  sorry, no.  Third quarter 2017 is January 26, 2017,
23  board meeting.
24           THE VIDEOGRAPHER:  Okay.
25      A    Which date are we talking about on the --

Page 81

1  on the minutes?  '16?

2      Q    (By Mr. Abelman) January 26 --

3      A    Do you have --

4      Q    -- 2017.

5      A    Right.

6           THE DEPONENT:  So please pull back up

7  those slides, and let's look through the slides.

8  Okay.  Next page.  Go forward.  Next page.  Next

9  page.  Next page.  Next page.  Okay.

10     A    There was no specific slide in -- in the

11 presentation dedicated to ZAP! AR collections,

12 therefore, it would have been a general -- it would

13 have been a general conversation regarding that we

14 still had open AR and that collections had not been

15 received on the ZAP! program.

16          MR. ABELMAN:  Okay.  So let's go to Bates

17 No. 014693.  And that's part of Exhibit 33.  So

18 you're -- you already have Exhibit 33 up, I believe.

19     Q    (By Mr. Abelman) Would you read this --

20 these minutes -- this one sentence as a minute from

21 the May 11th meeting.

22     A    Mr. Vincent Keller then provided the board

23 with a ZAP! accounts receivable update.

24     Q    Did you attend this meeting?

25     A    I did.

Page 82

1      Q    What was -- well, what did Mr. Vincent

2  Keller say about the accounts receivable update?

3      A    I don't remember specifically.  I'm not

4  sure.  But at that point in time we still had not

5  received any -- any accounts receivable payments.

6      Q    Why was -- why was he giving the accounts

7  receivable update instead of you, because you had

8  given all the prior accounts receivable updates?

9      A    We shifted -- at the point after -- after

10 we -- that Tristar took over, the conversations

11 became less with me and Jeff.  I really didn't have

12 much contact with him at all once Tristar took over

13 the business.  And then there were much more

14 conversations between him and Matt and him and

15 Vince.  Jeff being Jeff.  And so Vince would have

16 given an update on any discussions he would have had

17 regarding payments.

18     Q    This is the last board of directors

19 minutes that were supplied.  Is it your testimony

20 that since May 11, 2017, there's been no discussion

21 of the ZAP! accounts receivable at a board of

22 directors meeting?

23     A    That would be correct.

24     Q    Isn't that odd?  I mean, you were talking

25 about ZAP! at every quarterly meeting, and then in

Page 83

1  May of 2017 you stopped.

2      A    No.  At that point in time we began doing

3  business with Tristar, including here in May we --

4  we gave an update on ZAP! and -- and Tristar

5  business.  But after that, there wasn't a lot of

6  discussion at the board meeting.

7      Q    Where -- where were the -- where were

8  there discussions about the ZAP! account receivable?

9      A    It would have been discussions of -- it

10 would have been discussions between the management

11 team that says -- you know, when -- when things came

12 up and when things were discovered or there was --

13 there was items to discuss.

14     Q    So what kind of items were discovered or

15 discussed since May of 2017?

16     A    Since -- since May of 2017 we talked

17 about -- talked about, okay, when -- when is it

18 time to make the move to a transition of filing

19 liens or -- or filing lawsuits, having those

20 discussions.

21          There were discussions all during those

22 times regarding Vince and -- and his conversation

23 with Jeff regar -- regarding that -- the farm and

24 those -- and those -- and the values of that.

25 And -- and then -- and then -- then we moved into a

Page 84

1  position of -- of making a decision to -- to move on

2  the A -- on the AR and inventory, to pursue it.

3          THE COURT REPORTER:  To clarify, did you

4  say the word farm, f-a-r-m?

5          THE DEPONENT:  Yes, ma'am.

6          THE COURT REPORTER:  Thank you.

7      Q    (By Mr. Abelman) So what, if any, role

8  have you had with regard to collections since May of

9  2017?

10     A    Very little.

11     Q    Who's -- who's making the decisions?

12     A    The decisions for what?

13     Q    For collecting.

14     A    We had discussed as a management team to

15 move forward with the -- the collection of that --

16 of that debt.

17     Q    And when was the decision made to move

18 forward with the collection of that debt?

19          MR. GOLDHAMER:  (Inaudible.)

20     A    When we filed the lawsuit.

21          THE COURT REPORTER:  Was there an

22 objection?

23          MR. GOLDHAMER:  No.  I was just going to

24 say, Mr. Miller, you do not have to reveal the

25 contents of your discussions with your lawyers to

*AB Litigation Services*

1    the extent any of these questions implicate those
2    discussions, whether that's, you know, Colman or me
3    or Ross or what have you.
4        THE DEPONENT:  Okay.
5        Q    (By Mr. Abelman) When was that decision
6    made?
7        A    I don't know the exact date.
8        Q    What were the considerations that
9    underlied that decision?
10       MR. GOLDHAMER:  Again, Mr. Miller, if the
11   answer to the question implicates, you know,
12   communications with your attorney, you do not have
13   to answer.
14       Q    (By Mr. Abelman) Mr. Miller, do you have
15   an answer to my question?
16       A    Can you repeat the question?
17       Q    Okay.  Let's -- let's talk about -- I
18   asked what considerations went into the decision to
19   file a lawsuit, and I'm just asking about the
20   internal decisions not involving an attorney.
21       A    Okay.  Those decisions were the -- the
22   relationship with Restore 4 and -- and the business
23   that didn't -- that did not come to fruition with
24   that.  At that point it left us no decision --
25   really no option but to -- but to pursue -- pursue

1    that -- to pursue collection.
2        MR. ABELMAN:  Okay.  I think this is
3    probably an opportune time to take a break, and we
4    can come back in, I don't know, 15 minutes.  Okay.
5        MR. GOLDHAMER:  Sounds good.
6        THE VIDEOGRAPHER:  Okay.  We are going off
7    the record at 2:20.
8        (Break taken.)
9        THE VIDEOGRAPHER:  We're going back on the
10   record at 2:36 p.m.
11       MR. GOLDHAMER:  I'm sorry.  Real quick,
12   Mr. Abelman, do you have a notion of how much more
13   time you might have?
14       MR. ABELMAN:  I think that I can complete
15   this in the next hour.
16       MR. GOLDHAMER:  Okay.  Great.  Mr. Miller
17   is on the East Coast time zone, so I'm just trying
18   to pay attention to his needs to get home
19   eventually.
20       MR. ABELMAN:  Understood.
21       Q    (By Mr. Abelman) Mr. Miller, we talked
22   about how the ZAP! business was -- in 2017 was
23   shifted to Tristar.  And you said that Tristar
24   ordered about three-quarters of a million dollars of
25   inventory from Midlab.

1        A    Yes.
2        Q    And the profit margin on that order was
3    approximately 50 percent?
4        A    Yes.
5        Q    Did Midlab apply that profit towards the
6    outstanding accounts receivable that ZAP! owed to
7    Midlab?
8        A    No, because it was a separate business.
9        Q    How was it a separate business?  Did
10   Tristar have a contract with Midlab?
11       A    Through their purchase orders.
12       Q    Was there a manufacturing agreement
13   between Midlab and Tristar?
14       A    No.
15       Q    Okay.
16       MR. ABELMAN:  Let's go to Bates
17   No. 001317.  Aaron, this is -- it's -- it's -- it's
18   an email.  I think it's going to be Exhibit 39.
19       THE VIDEOGRAPHER:  Give me that Bates
20   number one more time.
21       MR. ABELMAN:  001317.
22       THE VIDEOGRAPHER:  1317.  Okay.  That is
23   being posted to the chat.  This is going to be
24   Exhibit No. 39?
25       THE COURT REPORTER:  Yes.

1        (Exhibit 39 marked.)
2        THE VIDEOGRAPHER:  Correct?
3        THE COURT REPORTER:  Yes.
4        MR. ABELMAN:  Correct.
5        THE VIDEOGRAPHER:  There we are.
6        Q    (By Mr. Abelman) Mr. Miller, can you
7    identify what's been marked as Exhibit 39?
8        A    Yes.  It's an email to me by John Rose.
9        Q    What's the background for this email?
10       A    So John Rose worked with Jeff.  And this
11   is September.  So as we were looking at taking on
12   this business with Jeff Wycoff and the risk that it
13   posed, we asked for them to give us a standby letter
14   of credit in order to help secure the payments and
15   in -- in a potential default.
16       Q    And who is "them"?  Do you mean Growth
17   Partners?
18       A    We spoke with -- we spoke with Jeff to
19   provide the letter of credit.  And, of course, Jeff
20   would have reached out to John Rose.
21       Q    And what happened?
22       A    It never came to fruition.
23       Q    Do you know why?
24       A    I don't.
25       Q    Okay.

AB Litigation Services

1          MR. ABELMAN:  Let's move to Bates
2   No. 005990.  Bates No. 005990.
3          THE VIDEOGRAPHER:  Okay.  That has been
4   posted to the chat.  And there we are.
5          THE COURT REPORTER:  This -- is this
6   Exhibit 40?
7          MR. ABELMAN:  I believe this is
8   Exhibit 40.
9          THE VIDEOGRAPHER:  Yep.
10         (Exhibit 40 marked.)
11    **Q     (By Mr. Abelman) Could you identify these**
12  **emails, Mr. Miller?**
13    A     Yes.  That was a discussion that -- that
14  followed the line of cred -- the letter of credit
15  entering into discussion regarding a continuing -- a
16  personal guaranty.
17    **Q     So when the letter of credit could not**
18  **be -- was not produced, did you seek a personal**
19  **guaranty from Jeff Wycoff?**
20    A     We did.
21    **Q     And what did you ask in this email of**
22  **November 11th?**
23    A     I asked John how many -- how many personal
24  guaranties does he have in play and is he committed
25  to anybody else?  And he responded this is the only

1   one other than the Bloomfield note.  Bloomfield.
2     **Q     And who -- who responded?**
3     A     Jeff.
4     **Q     Did you ever ask Jeff subsequent to this**
5   **date about any other guaranties he might have?**
6     A     I'm not -- I did not ask for any other --
7   at any other time about any other guaranties.
8     **Q     Did you ask Jeff about any other**
9   **liabilities he had after this date?**
10    A     Jeff sent us a loan agreement, the
11  Bloomfield agreement.
12         THE COURT REPORTER:  A what agreement?
13    A     The Bloomfield agreement.
14    **Q     (By Mr. Abelman) I'm not sure that's**
15  **responsive to my question.**
16    A     Repeat the question.
17    **Q     Jeff -- Jeff guarantied the Bloomfield**
18  **agreement.  I asked you if you ever inquired from**
19  **Jeff after November 11, 2015, about any other**
20  **liabilities Jeff had personally.**
21    A     Not that I recall.
22         MR. ABELMAN:  Would you -- Aaron, would
23  you pull up Bates No. 0013891.  It's 0013891.  And
24  we'll mark that Exhibit 41.
25         THE VIDEOGRAPHER:  41, okay.  That is

1   posting to the chat.
2          (Exhibit 41 marked.)
3     **Q     (By Mr. Abelman) Do you recognize this**
4   **email, Mr. Miller?**
5          THE DEPONENT:  Can you -- can you zoom in,
6   please?
7     A     I remember this email.
8     **Q     (By Mr. Abelman) I'm sorry?**
9     A     Yes, I remember it.
10    **Q     And what's the date of this email?**
11    A     2-16, 2016.
12    **Q     And at the bottom it says in an email from**
13  **Jordan Whitney to Jeff.  Attached are your two --**
14  **your February 19th, 2016, Greensheet rankings.  What**
15  **are Greensheet rankings?**
16         MR. GOLDHAMER:  Mr. Abelman, we -- we did
17  not get a scrolldown on the screen.  There we go.
18         THE VIDEOGRAPHER:  Sorry about that.
19    **Q     (By Mr. Abelman) Do you know, Mr. Miller,**
20  **what are Greensheet rankings?**
21    A     I don't -- I don't recall that term
22  specifically.  I'm not sure that I received those
23  attachments.  He forwarded the information --
24  information in the word verbiage up above, but I'm
25  not sure that the actual attachments were sent to

1   us.
2     **Q     Was it pretty normal for Jeff to -- to try**
3   **and keep you apprised of what his sales efforts**
4   **were?**
5     A     Yes.
6     **Q     And he would frequently send you emails or**
7   **make phone calls?**
8     A     Yes.
9          MR. ABELMAN:  Let's go to -- let's go to
10  Bates No. 009709.  009709.  Call that Exhibit 42.
11         (Exhibit 42 marked.)
12         THE VIDEOGRAPHER:  All right.  That has
13  been posted in the chat.
14    **Q     (By Mr. Abelman) Okay.  Would you identify**
15  **this?  And when I ask you to identify something, it**
16  **means that if you know, state, for an email, who the**
17  **author is and whether it's -- and -- and -- and who**
18  **it's to as well as the date and the subject matter.**
19    A     This is an email to Vince Keller, copying
20  me, from Kerry Speth, on 3-25, 2016, talking about
21  the pro formas that we received and ran analysis on.
22    **Q     Okay.  Well, I'd like you to go line by**
23  **line and explain what -- what the purpose of this**
24  **evaluation or calculation is.**
25    A     Okay.  Kerry sent -- Kerry summarized an

1  evaluation that we did on their pro formas with the
2  talking points as follows; ZAP!, one year pro forma.
3  The scenario was we ran it on 50 million --
4  50.6 million in sales projection, and the EBITDA
5  expec -- or projection based on that level of sales
6  for 3.8 million.
7          We ran some analysis and did some
8  adjustment to it and -- and came up and said, Okay,
9  if we are -- if we only receive 75 percent of that
10  target, and that would put their sales at 3 -- at
11  38 million, and it would -- it would lower their
12  EBITDA or profit projection to 2.25 million.
13          We then summarized our conversation with
14  our bank -- our bank's valuation department and --
15  to find out what multiples these types of business
16  were -- were going for in the market as far as
17  purchase price and what -- the level of multiple for
18  EBITDA they were seeing.  And they -- and they were
19  seeing four to six times.
20          So they then put a valuation on ZAP! given
21  that -- given that level of pro forma at 9 million
22  to $13 million valuation.
23      Q    It's actually 13-and-a-half million, isn't
24  it?
25      A    13-and-a-half million.  Sorry.

1      Q    So there's a reference to talking points.
2  Talking points for what purpose?
3      A    We were -- we were evaluating the -- the
4  business, the business, because Jeff had asked us if
5  we wanted to take an investment, become an -- a
6  partner in the business for -- and so we were
7  looking at -- at -- at that -- at that, but what the
8  valuations would be and what -- what type of
9  investment it would be.
10      Q    Was he ask -- asking Midlab to take an
11  in -- make an investment so that it would be -- have
12  an equity interest?
13      A    Yes.
14      Q    And was the equity interest going to be
15  paid for by a reduction in accounts receivable or
16  how -- how would that -- how would that interest be
17  acquired?
18      A    Yes.  There was a -- there was one of the
19  amendments that -- and the extensions of accounts
20  receivable that would have been potentially
21  convertible to -- to an equity position.
22      Q    And so what happened?
23      A    After evaluation of it, we were not
24  interested in making that -- make -- becoming a
25  partner -- an equity partner in that.

1      Q    And tell me why -- why -- why you reached
2  that conclusion.
3      A    We determined the return wasn't there and
4  the risk was too high.
5      Q    Is that something you've done -- that
6  Midlab's done previously?
7      A    In the 10 years -- the 10 years I've been
8  at Midlab, we have not.  We have not become partners
9  in businesses with other people.
10      Q    How much -- how much was Jeff asking you
11  to put in?
12      A    That was around -- that was around the
13  time we did the amendment for 500,000, the extension
14  of it.  So it was 5 -- a half a million dollars.
15      Q    I'm sorry.  How much?
16      A    A half a million dollars.  That was a half
17  a million dollar extended terms with the possibility
18  of converting that to equity.
19      Q    Okay.
20      MR. ABELMAN:  Let's go to Bates
21  No. 001203.  Call that Exhibit 43.
22          (Exhibit 43 marked.)
23          THE VIDEOGRAPHER:  Okay.  Okay.  That's
24  been posted to the chat.
25      Q    (By Mr. Abelman) Would you identify what's

1  been marked as Exhibit 43, please?
2      A    This is an email from Kerry to Vince
3  Keller and Steve Miller, dated 5-13, 2016, with a
4  couple of additional thoughts.  I'm going to read
5  through them real quick.
6      Q    So describe what's happening here.
7      A    Give me one second to read it.  In this
8  email we were talking about different ways of --
9  in relation to the -- to the writing of the -- of
10  the -- the equity agreement.  That 4.1 basically
11  says if we're -- if -- running through the scenario
12  that if we offer a factoring agreement -- do I need
13  to define what that is?
14      Q    I understand what it is.
15      A    Okay.  -- a factoring agreement, then we
16  would be -- basically not be making enough margin on
17  it to give -- if there were returns coming back from
18  Walmart.
19          So, therefore, the -- the statement there
20  was we would have to make some clause in the
21  agreement in order to make Midlab whole because
22  factoring their AR to ZAP! would give us less
23  sales -- less cash collection on items that were
24  being returned by Walmart, basically saying that
25  that's not a good option unless there was a very

*AB Litigation Services*

Page 97

```
1    good clause written to cover us.
2            The second one was a different option to
3    that agreement, that factoring option, that we could
4    convert -- convert an AR to a short-term loan with a
5    promissory note with personal guaranty that was
6    collateralized by the -- by the items.  And that
7    note -- that note -- we'd take -- basically we'd
8    take 850,000 off -- off -- off the balance sheet,
9    create a notes receivable.  So that was an alternate
10   option for -- for the factoring potential --
11   potential factoring arrangement.
12       Q    Well, who came up with the factoring
13   option?
14       A    I believe it was a conversation between me
15   and Kerry and Vince as we were talking about
16   possible ways of -- of becoming -- as we were
17   vetting out the potential of becoming partners in
18   this -- in this business.
19       Q    Becoming partners in what respect?
20       A    In -- as far as taking that AR and then
21   extending terms of that and potentially taking an
22   investment position.
23            THE COURT REPORTER:  Taking a what
24   position?
25            THE DEPONENT:  An investor position.
```

Page 98

```
1            THE COURT REPORTER:  I'm sorry, there's
2    paper shuffling.  I can't hear that word.
3        A    Investment.
4            THE COURT REPORTER:  Position?
5        A    Position.
6            THE COURT REPORTER:  Thank you.
7        Q    (By Mr. Abelman) So what was determined?
8        A    We didn't do either one of them.
9        Q    And why not?
10       A    We were not -- I think we didn't do any --
11   either one of them.  The second one we ended up with
12   an AR -- an AR balance with a personal guaranty.  We
13   did go down the personal guaranty route, but not as
14   an -- not as an investor.
15           We did not do the factoring because we
16   couldn't run any scenario that would work out well
17   for Midlab that was -- that was in our best
18   interest.
19           MR. ABELMAN:  I'd like to go to Bates
20   No. 009720.  009720.  That would be Exhibit 41.
21           THE COURT REPORTER:  44?
22           MR. ABELMAN:  I mean 44.
23           (Exhibit 44 marked.)
24           THE VIDEOGRAPHER:  That has been placed in
25   the chat.
```

Page 99

```
1        Q    (By Mr. Abelman) Can you identify what's
2    been marked as Exhibit 44?
3        A    An email to me by Kerry Speth, dated 7-20,
4    2016, asking if there's any update on ZAP!'s cash
5    position.  Purpose of this was just an update on AR,
6    where we were as we received payments.
7        Q    So it says that Kerry Speth is vice
8    president of finance.  I thought that was your
9    position.
10       A    I'm sorry?
11       Q    I thought that was your position.
12       A    The email says he's vice president of
13   finance of Kelsan, sister company.  At the time he
14   was also my -- my -- my supervisor who I reported
15   to.
16       Q    How did you respond to this inquiry?
17       A    I don't recall, but at that time there was
18   no -- there was no cash received.
19       Q    Did you check your emails to see if you
20   have a re -- an email response?
21       A    I haven't right now.
22       Q    I'm sorry?
23       A    I -- I haven't right now, no.
24       Q    You have not?
25       A    I have not.
```

Page 100

```
1        Q    Were you asked to check your emails for
2    any response?
3        A    I probably did respond -- I probably did
4    respond, but I don't recall the exact response that
5    I gave.  But at that time there was no -- there was
6    no cash collections.
7        Q    I -- I understand that.  My question is
8    did anybody ask you to check your emails for
9    correspondence relating to ZAP!?
10       A    Yes.  We sent -- yes.
11       Q    So you did check your emails for
12   correspondence relating to ZAP!
13       A    Yes.
14           MR. ABELMAN:  I'd like you to look at
15   Bates No. 0011463.  That's 0011463.  And we'll mark
16   that Exhibit 45.
17           THE VIDEOGRAPHER:  I was muted.  That has
18   been posted.
19           (Exhibit 45 marked.)
20       Q    (By Mr. Abelman) Would you identify what's
21   been marked Exhibit 45?
22       A    (Inaudible.)
23           THE COURT REPORTER:  I can't understand
24   you.  I'm sorry.
25           THE VIDEOGRAPHER:  Sorry.
```

*AB Litigation Services*

1   THE DEPONENT: Aaron, will you expand?

2   THE VIDEOGRAPHER: Is that better?

3   THE DEPONENT: Yes. Thank you.

4   A    This is an email from Jeff Wycoff to Matt

5   Schenk and Steve Miller, and copying Andy Eisen.

6   Jeff is -- is talking about AR. Let me read it,

7   please.

8        So Jeff was -- so Jeff was communicating

9   to us his plan for giving -- for distributing --

10  distributing payments to the vendors that he was

11  dealing with based on a proportion that -- that each

12  of the vendors owed, and he would split that -- and

13  split those out of his collection.

14  Q    Is it your belief that Jeff was doing his

15  level best to get Midlab paid?

16       MR. GOLDHAMER: Objection. Foundation.

17  Form.

18  A    Yes. Jeff -- Jeff made some payments

19  based on -- during that time.

20  Q    (By Mr. Abelman) Was there ever

21  anything -- any efforts that you suggested he

22  undertake that he refused to do?

23  A    No.

24       MR. ABELMAN: Let's look at Bates

25  No. 008846. We'll call that Exhibit 46.

1        (Exhibit 46 marked.)

2        THE VIDEOGRAPHER: Okay. That's posted in

3   the chat.

4   Q    (By Mr. Abelman) Would you identify what's

5   been marked as Exhibit 46?

6   A    It's an email from me, Steve Miller, to

7   Vince Keller, Ken Bodie, Matt Schenk, and Kerry

8   Speth about an amendment with a right to -- right to

9   sell on 9-2, 2016.

10  Q    Indeed, it's the second amendment, isn't

11  it?

12  A    It is. It is the second amendment.

13  Q    And so what was the purpose for this

14  Second Amendment to Manufacturing and Supply

15  Agreement?

16  A    This -- the purpose of this agreement was

17  to grant us the right to sell to any and all people

18  any ZAP! product that we were -- that we had

19  in-house to try to collect on the debt that Jeff

20  owed us.

21  Q    And whose i --

22  A    And this was -- this was him granting --

23  this was him granting us that right.

24  Q    And whose idea was it to -- to do this

25  Second Amendment?

1   A    It was a team -- team decision, a team --

2   team idea.

3   Q    So what was the team's concept that they

4   were going to try and sell ZAP! products on -- on

5   their own?

6   A    Yes. The -- the thought was that he

7   had -- he had an Amazon presence, and he had -- and

8   he had some -- some customers that were purchasing

9   that, and that -- that if he was unable and -- to

10  continue business, then Midlab would have the right

11  to tap into those -- those customer relationships to

12  try to move the remaining product to pay the debt

13  down.

14  Q    So this was -- this was a move to take

15  into account if ZAP! failed?

16  A    Correct.

17  Q    Well, ZAP! did fail, so did Midlab make

18  efforts to sell to third parties?

19  A    We did.

20  Q    And what happened?

21  A    We sold some, but -- but we weren't able

22  to move a whole lot of it.

23  Q    Well, how much did Midlab sell?

24  A    I don't know -- I don't know the actual

25  dollar amount. It was -- it was small compared to

1   what -- compared to what the amount we had on it --

2   in hand was.

3   Q    Well, who -- who -- how much did you have

4   on hand at this point?

5        MR. GOLDHAMER: Can you clarify what

6   you're asking, Mr. Abelman? Could -- are you -- are

7   you talking about the debt on hand or the products

8   on hand?

9        MR. ABELMAN: Well, I'm following up on --

10  on what Mr. Miller said, and I think he was

11  referring to products.

12       MR. GOLDHAMER: Okay. Well, let's --

13  let's just make -- make it clear.

14  Q    (By Mr. Abelman) Mr. Miller, were you

15  referring to products on hand?

16  A    Yes.

17  Q    So how much in -- in ZAP! products were on

18  hand -- approximately how much of ZAP! products were

19  on hand in September of 2016?

20  A    We had between 50 and a hundred thousand

21  dollars worth of finished.

22       THE COURT REPORTER: I'm sorry, I need

23  that again. I couldn't hear the beginning.

24  A    We had between 50 and a hundred thousand

25  of finished goods, along with packaging that was not

AB Litigation Services

1    sellable.

2    Q    (By Mr. Abelman) And who knows how much of

3    the -- how much goods you were able to se -- Midlab

4    was able to sell after September 2nd, 2016?

5    A    I can pull those numbers.  I just don't

6    have it in front of me.

7    Q    Whatever Midlab --

8    A    (Inaudible. )

9    Q    Sorry.  Go ahead.

10    A    It was less than -- less than 50,000.

11    Q    So was -- whatever product was sold, were

12    the proceeds applied to -- towards the ZAP! debt?

13    A    The proceeds were applied to the ZAP!

14    inventory that we had on hand to reduce the amount

15    of inventory.

16    Q    I'm not sure I follow that.  Could you

17    explain?

18    A    We had -- we had approximately $250,000 in

19    inventory between finished goods and packaging

20    materials.  Any proceeds that we received off those

21    sales were -- the -- the -- was put toward reducing

22    the amount of inventory that we -- that we had on

23    hand.

24    Q    I still don't understand.  How do you

25    reduce the amount of inventory other than selling

1    inventory?

2    A    That -- we did that.  We sold the

3    inventory.

4    Q    Okay.  I'm asking about the proceeds from

5    the sale of the inventory.

6    A    The -- the -- the inventory was sold.  A

7    standard margin was -- was taken, just like it would

8    have under the -- under the ZAP! business.  And

9    that -- and that reduced the amount of inventory.

10    The margin was not applied back to the -- to the

11    inventory, but the inventory was reduced due to the

12    sale of the inventory.

13    Q    Were the sales proceeds applied to reduce

14    the indebtedness owed by ZAP! to Midlab?

15    A    No.

16    Q    Why not?

17    A    During that time we were still working

18    with -- with Restore 4., so there was still an

19    agreement on the table that would -- that would then

20    pay for that debt as discussed with Jeff.

21    THE COURT REPORTER:  Didn't hear the end

22    of that.

23    A    As discussed with Jeff.

24    Q    (By Mr. Abelman) Okay.  You discussed you

25    had some sort of agreement relating to Restore 4.

1    What were the -- what were the terms of the

2    agreement?

3    A    In the -- in the Restore 4 business

4    agreement, his royalty agreement, he would earn

5    royalties based on Tristar selling inventory.  And

6    out of those royalties he would pay -- he would pay

7    back toward the debt that he owed.

8    Q    Okay.  So when Tristar purchased inventory

9    from Midlab, ZAP! owned a royalty, is that what

10    you're saying?

11    A    There was an agreement between Tristar and

12    ZAP!  In the Tristar agreement there was a royalty

13    agreement.  Never got to a -- a -- a positive profit

14    position, therefore, he never earned any royalty.

15    Q    I understand that.

16    A    Therefore no -- therefore (inaudible.)

17    Q    My question is --

18    THE COURT REPORTER:  I'm -- I'm sorry.

19    There -- I didn't hear --

20    Q    (By Mr. Abelman) My question is --

21    THE COURT REPORTER:  I didn't hear that

22    answer.

23    Q    (By Mr. Abelman) -- when you --

24    THE COURT REPORTER:  "Therefore no" -- He

25    was continuing and I didn't hear it.

1    A    Therefore no additional payments were made

2    to Midlab.

3    Q    (By Mr. Abelman) Mr. Miller, I -- I think

4    we're having trouble hearing you.  I don't know if

5    you need to get a little closer to the speaker or if

6    it's your hands in front of your face, but it's

7    coming across a little garbled.

8    My question, nonetheless, was when Midlab

9    sold inventory which it charged ZAP! for, why

10    weren't the proceeds applied to reduce the ZAP!

11    debt?

12    MR. GOLDHAMER:  Object to form.

13    A    The focus was to liquidate the inventory

14    under the agreement.

15    Q    (By Mr. Abelman) Under which agreement?

16    A    The amendment, second Amendment.

17    Q    Okay.  Well, the second amendment is in

18    front of you.  Point out in the second Amendment

19    where it relates to how the proceeds from the sale

20    of inventory would be applied.

21    MR. GOLDHAMER:  Aaron, I think we're going

22    to need to scroll down the exhibit to see the text

23    of the second Amendment.

24    THE VIDEOGRAPHER:  Is that okay?

25    MR. GOLDHAMER:  Well, Mr. Miller will need

*AB Litigation Services*

1  to read more of it.
2          THE DEPONENT:  Scroll down, please.  Okay.
3      A    Paragraph 1 there, Section 1 is, In the
4  event that the buyer fails to make payment in
5  accordance to Exhibit A, then supplier, with the
6  written approval of the buyer, can continue to
7  manufacture the product and sell the product
8  directly to other customers for its own account for
9  the purpose of recovering amounts owed to suppliers
10 by buyer, and to recruit -- recoup damages as a
11 result of any other breach of the agreement by
12 buyer.  Buyer agrees to make available to supplier
13 all of buyer's distribution channels.  Buyer makes
14 no representation or warranty as to such
15 distribution channels and supply chain networks to
16 support, and provides no assurance -- no assurance
17 that sales of the product will occur during such
18 distribution channel and supply chain networks as
19 supported -- as support.
20         So we didn't make -- we didn't continue to
21 manufacture product, number one, because the product
22 that we had in-house was product that was
23 manufactured while Jeff -- while Jeff was doing
24 business as ZAP!.  Therefore, there was no
25 ongoing -- ongoing production.  We did make attempts

1  to sell the existing product of which did not move
2  very much.  Marginal, at -- at best.
3      Q    (By Mr. Abelman) Mr. Miller, who is the
4  supplier in this agreement?
5          THE DEPONENT:  Scroll up, please.
6      A    The buyer in this agreement is ZAP! and
7  the supplier in this agreement would be Midlab.
8      Q    (By Mr. Abelman) So what you just read to
9  me says that supplier can -- can continue to
10 manufacture the product and sell the product
11 directly to other customers for its own account,
12 okay, for the purpose of recovering amounts owed to
13 supplier by buyer.  Doesn't that say that you're
14 supposed to reduce ZAP!'s indebtedness with the
15 proceeds you recover from sales to third parties?
16         MR. GOLDHAMER:  Objection.  Form.
17     A    If you were able to sell and continue
18 to manufacture, which we did not continue to
19 manufacture.
20     Q    (By Mr. Abelman) Oh, so you're saying
21 because you didn't continue to manufacture, you
22 don't have to apply the proceeds.  Is that what --
23 is that what you're saying?
24         MR. GOLDHAMER:  Objection to form.
25     A    We did not apply the proceeds except as a

1  reduction of inventory as it sold.  Many of these --
2  many of these particular sales to -- a lot of it was
3  attempted on Amazon.  And I can tell you all the
4  Amazon sales that we sold, they were at a loss in
5  order to just recover what we could from inventory.
6  So there really was no margin in addition to that;
7  we sold at a loss just to try to recover.
8      Q    (By Mr. Abelman) Have you supplied me with
9  records showing the losses you sustained from these
10 Amazon sales?
11     A    I'm not sure -- I'm not sure if we have
12 that or not, have supplied or not.  I would
13 have to review it.
14     Q    Okay.
15         MR. ABELMAN:  Let's go to Bates
16 No. 008831.
17         THE VIDEOGRAPHER:  That's going to be
18 No. 47, correct?
19         MR. ABELMAN:  Yes, thanks.
20         THE VIDEOGRAPHER:  It has been pasted in
21 chat, and there you go.
22         (Exhibit 47 marked.)
23     Q    (By Mr. Abelman) Mr. Miller, would you
24 identify what's been marked as Exhibit 47?
25     A    It's an email from me to Vince Keller, Ken

1  Bodie, copying Matt Schenk and Kerry Speth,
2  regarding the ZAP! agreement with Tristar.  And
3  there's an attachment of the Tristar agreement.
4      Q    And what was -- what was the purpose of --
5  for your reviewing the Tristar agreement?
6      A    To forward -- to forward to our management
7  team the agreement that Jeff Wycoff sent me
8  regarding the royalty agreement with Tristar.
9      Q    And why -- why were you reviewing it?
10     A    Because we were looking and seeing if
11 there was still a viable -- was there still a viable
12 option of -- of selling product under the -- under
13 the Tri -- under the ZAP! family of brands in
14 conjunction with Jeff Wycoff.
15     Q    And what did -- I mean, attached is a --
16 is a -- is a memo.  Who prepared this?  Or it's an
17 analysis.  Who prepared the -- the five or six pages
18 attached?
19         THE DEPONENT:  Can I see the -- can I see
20 the attachment?
21     A    That is the agreement between Jeff Wycoff
22 and -- and Tristar.
23     Q    (By Mr. Abelman) Right.  And what was your
24 response to this agreement?
25     A    The response was -- was promising that --

EXHIBIT P

*AB Litigation Services*

1 that there was a viable market there for Tristar to
2 take it to -- to the customers, to -- direct to
3 consumer.
4    Q    And how would that have helped Midlab?
5    A    We would have sold products to Tristar,
6 who would have marketed products under -- on their
7 infomercials to consumers, which would then turn a
8 profit, which would then go back to Jeff as a
9 royalty.  And out of that royalty he would have paid
10 his debt back to Midlab.
11    Q    So Midlab would get paid two ways.  One,
12 they'd make the margin on the sale to Tristar, and
13 then they would make the royalty that -- that inured
14 to ZAP!?
15           MR. GOLDHAMER:  Object to form.
16    Q    (By Mr. Abelman) Is that right,
17 Mr. Miller?
18           MR. GOLDHAMER:  Go ahead.
19    A    Correct, because we're selling to the
20 customer.  We did not enter the Tristar agreement
21 for the purposes of the sales from them going
22 against the debt for ZAP!.
23    Q    (By Mr. Abelman) Would you look at Page 8
24 of that agreement.
25    A    Okay.

1           MR. ABELMAN:  So, Shar, would -- would you
2 just quickly read back to me the last statement
3 Mr. Miller made.
4           (Page 113, Line 8 through Line 21, read.)
5    Q    (By Mr. Abelman) Mr. Miller, you're
6 accurate in saying that you didn't enter the Tristar
7 agreement.  In fact, Midlab's not a party to the
8 Tristar agreement, is it?
9    A    Correct.
10    Q    Okay.  Would you look at Bates
11 No. 0013176?
12           THE VIDEOGRAPHER:  1316?
13           MR. ABELMAN:  0013176.
14           THE VIDEOGRAPHER:  13176.
15           MR. ABELMAN:  And that should be marked as
16 Exhibit 48.  Oh, I'm sorry.  No, that's right.
17 That's right.
18           (Exhibit 48 marked.)
19           THE VIDEOGRAPHER:  All right.  That's been
20 pasted in the chat.
21    Q    (By Mr. Abelman) Would you identify
22 what's -- that exhibit?
23    A    It's --
24           THE DEPONENT:  Please zoom in.
25    A    This is an email from Jeff Wycoff to Andy

1 Eisen and Matt Schenk, copying Steve Miller,
2 regarding inventory.
3           THE DEPONENT:  Scroll all the way down to
4 the bottom.  Keep going, all the way.
5           THE VIDEOGRAPHER:  Say again.  Sorry.
6           THE DEPONENT:  Is there more after this
7 page?  Okay.  Keep going.  Okay.  Looks like a
8 duplicate.  Okay.  Scroll up, please.  Right there.
9 Let me read the part from Andy Eisen, down at the
10 bottom.  Scroll up.
11    Q    (By Mr. Abelman) Would you read the first
12 two paragraphs aloud, please?
13    A    Matt -- from -- from Andy Eisen.  Matt, in
14 reviewing with Jeff, we all agree with our scenario
15 being kept -- being to keep the filed bottles --
16 filled bottles, pads, cap and sprayers, and trash
17 everything else.  The kept inventory Midlab can use
18 to sell to Tristar and deduct from ZAP! old
19 invoices.
20    Q    And then at the top of this there's an
21 email from Jeff to Andy Eisen, Matt Schenk and you
22 that says, Agreed, correct?
23    A    Correct.
24    Q    It sure looks to me like the agreement was
25 that the proceeds from the inventory should be

1 applied against invoices.
2    A    Time out, please.  I just lost the Zoom
3 meeting.  I just got kicked out.
4           THE COURT REPORTER:  Off the record?
5           MR. ABELMAN:  Sure.
6           THE VIDEOGRAPHER:  Okay.  We are going off
7 the record at 3:40.
8           (Break taken.)
9           THE VIDEOGRAPHER:  Okay.  We are going
10 back on the record at 3:41.
11    Q    (By Mr. Abelman) So I was looking in
12 Exhibit 48, and I was saying that it sure looks to
13 me like the agreement was that Midlab was to use the
14 proceeds from the sales of product to Tristar, and
15 to apply them to the ZAP! old invoices.  Isn't that
16 what -- what -- what this says?
17           MR. GOLDHAMER:  Object to form.
18    A    That is what that says.
19    Q    (By Mr. Abelman) Okay.
20    A    Midlab did not do that because they didn't
21 use the old inventory.
22    Q    Okay.  Define for me what the old
23 inventory -- what you think the old inventory was.
24    A    There was specific -- there was specific
25 inventory that they -- that Jeff had to produce the

1 ZAP! bottles, which were specific sizes and specific
2 components that went with that -- with -- with that
3 inventory.
4       When Tristar got -- got the program, they
5 changed all of the bottles and all of the bottle
6 sizes and the labels and, therefore, were -- we were
7 not able to sell any of those items to Tristar,
8 therefore -- therefore, there was no inventory
9 offset because Tristar didn't use them.
10      Q   So what inventory did Midlab sell to
11 Tristar?
12      A   We had to procure new -- new bottles
13 and -- and things to match -- and items, components
14 to match their specs.
15      Q   And where are the records that show that
16 you purchased new bottles and -- and new materials?
17      A   I -- I'm not sure if that was provided or
18 not.
19      Q   Okay.  Let's move to --
20          (Audio recording inadvertently played.)
21          MR. ABELMAN:  Let's move to
22 Bates No. 009705.  We'll mark this as Exhibit 49.
23          (Exhibit 49 marked.)
24          THE VIDEOGRAPHER:  It has been posted to
25 chat.

1      Q   (By Mr. Abelman) Mr. Miller, would you
2 identify this exhibit for me.
3      A   This is an email from Cody Housley to
4 Vance Lowe and Steve Miller regarding ZAP! products
5 and the AR Attachments.
6      Q   And what is it saying?
7      A   It says, ZAP! has been written off.
8 Please see attachment for the detail in -- detail in
9 the Excel file.
10     Q   What's the purpose of this email?
11     A   At this point in time, we had -- we had --
12 we had cleared our AR in order to set that aside, in
13 order to get it off of our books as it's deemed
14 uncollectible.
15     Q   And when you say "this point in time,"
16 what point in time is it?
17     A   It's March 16th, 2020, at the end of our
18 fiscal 2020 year --
19     Q   So what's the advantage --
20     A   -- as we're -- as we're about to prepare
21 for our audit.
22     Q   What's the advantage of -- of writing this
23 off for Midlab?
24     A   In order to be in compliance with GAAP
25 principles for accounting.

1      Q   So you're familiar with GAAP principles?
2      A   Yes.
3      Q   Does this allow you to take a deduction
4 for bad debt?
5      A   Yes.  We had -- we had -- we had accrued
6 bad debt.  We did write this off as bad debt.
7      Q   And when did you write it off for bad
8 debt?
9      A   Over the previous four years, three to
10 four years as we were -- as we were -- as we deemed
11 it uncollectible.
12     Q   And that's reflected in your -- in Midlab
13 tax returns?
14     A   Yes, it is.  It's in -- it's in the
15 monthly financial statements.
16     Q   Whose monthly financial statements?
17     A   Midlab's.
18         MR. ABELMAN:  Okay.  Let's go to what's
19 been marked as -- well, we're going to mark it as
20 Exhibit 50, but it -- it's -- it's Bates No. 000031.
21         THE VIDEOGRAPHER:  Okay.
22         (Discussion off the record between counsel
23 and Ms. Passow.)
24         MR. ABELMAN:  It's the first Amendment
25 on -- on the list.  Aaron, do you need any help

1 locating this?
2         THE VIDEOGRAPHER:  Yes.  I am not seeing
3 it.
4         MR. ABELMAN:  So it's labeled --
5         MS. PASSOW:  First AM, period, Manu,
6 period, Supply Agreement.
7         MR. ABELMAN:  I think it's one of the
8 first documents on the --
9         MS. PASSOW:  Might have rearranged
10 (inaudible.)
11        MR. ABELMAN:  Okay.
12        THE VIDEOGRAPHER:  I have got 00030.  I'm
13 not seeing a 31.
14        MR. ABELMAN:  What do you have?
15        THE VIDEOGRAPHER:  It is Product
16 Specifi -- Specifications.  The first page is
17 Manufacturing and Supply Agreement, but it starts at
18 000019.
19        MR. ABELMAN:  No.
20        THE VIDEOGRAPHER:  Yeah.
21        MR. ABELMAN:  Okay.
22        THE VIDEOGRAPHER:  Re-logging back on to
23 the folder that you guys shared with me.  What's the
24 title of it again?  Is it first --
25        MR. ABELMAN:  Amendment to Manufacturing

*AB Litigation Services*

1  and Supply Agreement.  But it's -- it may also
2  say -- well...
3        THE VIDEOGRAPHER:  Okay.
4        MR. ABELMAN:  May also say first
5  Amendment.
6        THE VIDEOGRAPHER:  There it is.  Okay.
7  Let me do this.  Sorry about that, everyone.  This
8  is going to be Exhibit 50.  Okay.  And posting the
9  link in the chat now.  There you go.
10       (Exhibit 50 marked.)
11    Q    (By Mr. Abelman) Mr. Miller, would you
12  kindly identify what's been marked as Exhibit 50.
13    A    It's the amendment to the Manufacturing
14  and Supply Agreement dated April 1st, 2016.
15    Q    And I -- I know we touched upon this
16  earlier.  What was the purpose of this amendment?
17    A    This was -- the purpose of this amendment
18  was to assist Jeff with his cash flow needs by
19  giving him extended terms on a -- on a specific set
20  of invoices.
21       MR. ABELMAN:  And if you go to the next
22  page, Aaron.
23    Q    (By Mr. Abelman) Who executed the
24  amendment to Manufacturing and Supply Agreement?
25    A    For ZAP! products, it was Jeff Wycoff.

1    Q    And there's a signature from a -- from a
2  guarantor.  And who is that?
3    A    Jeff Wycoff.
4        MR. ABELMAN:  Okay.  Let's go to
5  Exhibit (sic) 000009, which is the Limited
6  Continuing Guaranty.
7        THE VIDEOGRAPHER:  00009 or 1219?
8        MR. ABELMAN:  It's five zeros and a 9.
9  It's the Limited Continuing Guaranty.
10       THE VIDEOGRAPHER:  Okay.  There it is.
11       MR. ABELMAN:  Thank you, Aaron.
12       THE VIDEOGRAPHER:  Yep.  No. 51.
13       (Exhibit 51 marked.)
14       THE VIDEOGRAPHER:  Okay.  That is being
15  uploaded.  That is very big.
16    A    May I take a moment -- may I take a moment
17  to text my wife just to let her know I'm still in
18  the deposition?
19    Q    Sure.
20    A    Do you mind?
21       THE VIDEOGRAPHER:  Would you like to --
22    Q    (By Mr. Abelman) Tell her you're fine,
23  too.
24    A    I will.  Okay.  Thank you.
25    Q    (By Mr. Abelman) Mr. Miller, would you

1  identify what's been marked as Exhibit 51?  We
2  touched upon this already.
3    A    This is the Limiting -- Limited Continuing
4  Guaranty, guaranty limited to a million dollars.
5    Q    And how -- how did this guaranty come
6  about?
7    A    As we were -- as we were reviewing the --
8  the -- the program coming out of the summer and
9  through the -- through the third quarter -- third
10  calendar quarter of 2015, we began talking about
11  ways to put protections in place in order for -- to
12  have something -- to have some protections in case
13  the company defaults on -- on its promises.
14    Q    And so you decided that Jeff Wycoff should
15  be surety for the -- any indebtedness that was
16  incurred through that prospective relationship
17  between Midlab and ZAP!
18    A    Yes.  Yes.
19    Q    So did you seek a guaranty from Merrie
20  Wycoff?
21    A    No.
22    Q    And why not?
23    A    We -- it was -- it was for ZAP! Products,
24  and our contact was -- was Jeff.
25    Q    Okay.  So Midlab was not relying upon

1  Merrie Wycoff to pay off any ZAP! indebtedness, were
2  they?
3        MR. GOLDHAMER:  Object to form.
4  Foundation.
5    A    We did not -- we did not seek a limited
6  guaranty specifically named -- naming Merr -- Merrie
7  Wycoff.
8    Q    (By Mr. Abelman) So the Midlab -- you're
9  in charge of Midlab's accounting records, correct?
10    A    Yes.
11    Q    And the accounting of the ZAP!
12  indebtedness, the account receivable, it never --
13  your books and records never showed that Merrie
14  Wycoff was liable for that account receivable; is
15  that correct?
16    A    I do not show her named.
17       MR. ABELMAN:  Let's, then, go to what's
18  been labeled as Bates Nos. 000012 and 000013.  And
19  we'll call this Exhibit 52.
20       MR. ABELMAN:  Okay, Aaron, apparently
21  the -- what I -- what I -- the documents I want to
22  get at are also part of Exhibit 51, so --
23       THE VIDEOGRAPHER:  Oh, perfect.
24       MR. ABELMAN:  -- that'll make it easier.
25  So in particular I'm looking at Exhibit 51, and

*AB Litigation Services*

1  Bates No. 00012.

2          THE VIDEOGRAPHER:  Okay.

3      Q    (By Mr. Abelman) Mr. Miller, have you seen

4  this before?

5      A    I'm reading this real quickly.  No, I've

6  not seen this.

7          MR. ABELMAN:  Would you -- Aaron, would

8  you go to the next page.

9      Q    (By Mr. Abelman) Mr. Miller, have you seen

10  this before?

11      A    I have not seen this.

12      Q    Okay.  I do not have any further questions

13  of you, Mr. Miller.  I appreciate your patience

14  today.  Thank you.

15      A    You're welcome.

16          MR. GOLDHAMER:

17              EXAMINATION

18  BY MR. GOLDHAMER:

19      Q    Mr. Miller, this is Aaron Goldhamer.

20          There was some discussion and possible

21  confusion with respect to the previous -- with

22  respect to the inventory on hand that Midlab sold.

23  Do you recall some of that earlier testimony?

24      A    Yes.

25      Q    Is there anything that you want to clarify

1  about that testimony?

2      A    So at the end of the ZAP! -- at the end of

3  the ZAP! business, we had about $250,000 worth of

4  inventory at the point which we had sold everything

5  we possibly could sell until we -- we ended up with

6  about $200,000 worth of inventory, around,

7  approximately.

8      Q    And so do you -- do you think that Midlab

9  had accounted for the sale of that inventory

10  correctly in this case?

11      A    Yes.

12          MR. GOLDHAMER:  Okay.  That's all I had.

13          So I don't know if Mr. Abelman has any

14  follow-up or if we're done.

15          MR. ABELMAN:  I'd say we're done.

16          THE VIDEOGRAPHER:  Okay.  This is going to

17  conclude the deposition at 4:06.

18          (The deposition concluded at 4:06 p.m. on

19  August 2, 2021.)

20

21

22

23

24

25

1          I, STEVEN RAY MILLER, do hereby certify

2  that I have read the foregoing transcript and that

3  the same and accompanying amendment sheets, if any,

4  constitute a true and complete record of my

5  testimony.

6

7

8

9          _____

SRD              Signature of Deponent

10

              (  ) No amendments

11              (  ) Amendments attached

12

13      Acknowledged before me this ____day

14  of _____, 20_____.

15

16      Notary Public: _____

17      My commission expires _____

18      Seal:

19

20

21

22

23

24

25

1  STATE OF COLORADO  )

                    ) SS. REPORTER'S CERTIFICATE

2  COUNTY OF DENVER   )

3          I, Sharon R. Dobson, do hereby certify

4  that I am a Registered Professional Reporter and

5  Notary Public within the State of Colorado; that

6  previous to the commencement of the examination, the

7  deponent was duly sworn to testify to the truth.

8          I further certify that this deposition was

9  taken in shorthand by me at the time and place

10  herein set forth, that it was thereafter reduced to

11  typewritten form, and that the foregoing constitutes

12  a true and correct transcript.

13          I further certify that I am not related

14  to, employed by, nor of counsel for any of the

15  parties or attorneys herein, nor otherwise

16  interested in the result of the within action.

17          In witness whereof, I have affixed my signature

18  on August 10, 2021.

19          My commission expires January 8, 2023.

20          _____

              Sharon R. Dobson, RPR

21              216 - 16th Street, Suite 600

              Denver, Colorado  80202

22

23

24

25

```
1   AB LITIGATION SERVICES
    216 - 16th Street, Suite 600
2   Denver, Colorado  80202
3   August 10, 2021
4   Aaron D. Goldhamer, Esq.
    Keating Wagner Polidori & Free, PC
5   1290 Broadway, Suite 600
    Denver, CO  80203
6
    Re:  Deposition of STEVEN RAY MILLER
7        Midlab, Inc., vs. Wycoff, et. al.
         Civil Action No. 1:20-cv-03142-KLM
8
    The aforementioned deposition is ready for reading
9   and signing.  Please attend to this matter by
    following BOTH of the items indicated below:
10
    _____ Call 303-296-0017 and arrange with us to
11         read and sign the deposition in our office
12  _XXX_ Have the deponent read your copy and sign
          the signature page and amendment sheets,
13        if applicable; the signature page is
          attached
14
    _____ Read the enclosed copy of the deposition
15         and sign the signature page and amendment
           sheets, if applicable; the signature page
16         is attached
17  _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18  _____ By _____ due to a trial
           date of
19
    Please be sure the original signature page and
20  amendment sheets, if any, are SIGNED BEFORE A NOTARY
    PUBLIC and returned to AB Litigation Services for
21  filing with the original deposition.  A copy of
    these changes should also be forwarded to counsel of
22  record.  Thank you.
23  AB LITIGATION SERVICES
24  cc:  All Counsel
25
```

```
1   AB LITIGATION SERVICES
    216 - 16th Street, Suite 600
2   Denver, Colorado  80202
3
4
5              STEVEN RAY MILLER
               August 2, 2021
6       Midlab, Inc., vs. Wycoff, et. al.
        Civil Action No. 1:20-cv-03142-KLM
7
8
9   The original deposition was filed with Steven E.
    Abelman, Esq., on approximately the 10th day of
10  August, 2021.
11  _____ Signature waived
12  _____ Signature not requested
13  _____ Unsigned; signed signature page and
           amendment sheets, if any, to be filed at
14         trial
15  _XXX_ Unsigned; amendment sheets and/or
          signature pages should be forwarded to
16        AB Litigation Services to be filed in the
          envelope attached to the sealed original
17
    Thank you.
18
    AB LITIGATION SERVICES
19
    cc:  All Counsel
20
21
22
23
24
25
```

```
           - AMENDMENT SHEET -

      Deposition of STEVEN RAY MILLER

             August 2, 2021

      Midlab, Inc., vs. Wycoff, et. al.

      Civil Action No. 1:20-cv-03142-KLM

The deponent wishes to make the following changes in

the testimony as originally given:

Page  Line        Should Read          Reason
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,

20___.

(seal)      Notary's signature _____

            My commission expires_____
```

*AB Litigation Services*

## Exhibits

**exhibit 31** 2:14 25:21

**exhibit 32** 2:15 34:14,17 51:6

**exhibit 33** 2:17 59:11 60:19 61:3 66:18,23 67:3 79:22 81:17,18

**exhibit 34** 2:18 60:1, 9

**exhibit 35** 2:19 60:4, 14,19 61:8 62:12,18, 19

**exhibit 36** 2:21 63:17,21,25

**exhibit 37** 2:23 70:3, 6

**exhibit 38** 2:24 77:14,15 80:21

**exhibit 39** 3:2 87:18, 24 88:1,7

**exhibit 40** 3:3 89:6, 8,10

**exhibit 41** 3:5 90:24 91:2 98:20

**exhibit 42** 3:7 92:10, 11

**exhibit 43** 3:9 95:21, 22 96:1

**exhibit 44** 3:10 98:23 99:2

**exhibit 45** 3:12 100:16,19,21

**exhibit 46** 3:13 101:25 102:1,5

**exhibit 47** 3:15 111:22,24

**exhibit 48** 3:17 114:16,18 116:12

**exhibit 49** 3:19 117:22,23

**exhibit 50** 3:20 119:20 121:8,10,12

**exhibit 51** 3:22 122:13 123:1 124:22, 25

## $

**$13** 93:22

**$200,000** 126:6

**$250,000** 105:18 126:3

**$510,000** 37:19 42:7,20

**$520,000** 52:16

**$750,000** 77:7

## 0

**000** 25:7

**000009** 122:5

**000012** 124:18

**000013** 124:18

**000019** 23:23 120:18

**000031** 119:20

**00009** 122:7

**00012** 125:1

**00030** 120:12

**0011463** 100:15

**001203** 95:21

**001317** 87:17,21

**0013176** 114:11,13

**0013891** 90:23

**005990** 89:2

**008831** 111:16

**008846** 101:25

**009705** 117:22

**009709** 92:10

**009720** 98:20

**014553** 34:2,11

**014576** 53:4

**014579** 69:25 70:1

**014598** 59:24

**0146** 57:8

**014635** 77:13

**014660** 63:15

**014687** 57:3,8

**014688** 61:11

**014690** 66:19,22

**014692** 79:23

**014693** 81:17

## 1

**1** 7:24 23:2,6,13 25:10 37:16 52:4 57:8 109:3

**10** 9:7 57:3 59:18 95:7

**10th** 57:21 59:1

**11** 82:20 90:19

**113** 114:4

**11:32** 4:3

**11th** 81:21 89:22

**1219** 122:7

**12:25** 27:10

**13** 24:5

**13-and-a-half** 93:23,25

**1316** 114:12

**1317** 87:22

**13176** 114:14

**14** 34:8 60:5 63:15 70:12,13

**140** 7:12

**14660** 63:18

**14683** 62:12

**14688** 60:4,15,20

**14th** 67:6,20

**15** 70:11,13 71:1 86:4

**16** 27:19 28:14 36:9 70:12,13,15 71:1

**77:20 81:1**

**16th** 118:17

**17** 34:21 52:17 71:11 77:20 80:15,19

**18** 77:22,25 78:5

**19** 25:8,9 28:7

**19th** 91:14

**1Q** 34:7

**1st** 42:15 121:14

## 2

**2** 7:25 27:11 43:9,10 64:5 70:10 77:19 126:19

**2-16** 91:11

**2.25** 93:12

**20** 37:22 42:6 64:6, 11,13,15

**2015** 19:18 27:19 28:14 31:15,17 37:3, 8 47:4 57:4,21 58:12 59:18 90:19 123:10

**2016** 34:8 36:4 37:4, 9,16,23 40:4,7 41:4 42:6,24 45:6 46:24 47:8 52:6,7,18 54:2 59:25 60:8 61:16 63:16 64:2 67:6,20 71:5 91:11,14 92:20 96:3 99:4 102:9 104:19 105:4 121:14

**2017** 34:3,7 35:24 36:5 37:4,22 52:2,3,9 77:12 78:4 79:24 80:3,22 81:4 82:20 83:1,15,16 84:9 86:22

**2020** 118:17,18

**2021** 4:3 126:19

**20th** 63:16 69:25 71:5

**21** 27:4 114:4

**21st** 53:22

**22** 64:12

*Steven Ray Miller  - 08/02/2021*                    1

*AB Litigation Services*

**229** 40:20,25

**23** 51:7 65:8

**24** 53:4

**25** 28:8 35:5 51:6 55:7

**26** 55:7 79:24 80:22 81:2

**26th** 37:3 77:12 78:4

**28** 60:8 61:16

**28th** 59:25

**2:20** 86:7

**2:36** 86:10

**2nd** 4:3 105:4

---

**3**

**3** 54:16 93:10

**3,000** 53:10,13 54:13 55:3

**3,500** 53:10 54:13 55:3

**3-25** 92:20

**3.8** 93:6

**30** 23:24 25:17 33:8,9 38:7 54:13 59:8

**30-day** 73:24

**31** 25:19,21 120:13

**32** 34:14,17 51:6

**33** 59:9,10,11,13 60:19 61:3 66:18,23 67:3 79:22 81:17,18

**34** 59:23 60:1,9

**35** 60:4,9,14,19 61:8 62:12,16,18,19

**36** 63:17,21,25

**37** 70:3,6

**37303** 7:13

**38** 77:14,15 80:21 93:11

**39** 87:18,24 88:1,7

**3:40** 116:7

**3:41** 116:10

---

**4**

**4** 78:12 79:2 85:22 106:18,25 107:3

**4,000** 53:13 54:17

**4-1** 42:8

**4.1** 96:10

**40** 89:6,8,10

**41** 27:3 90:24,25 91:2 98:20

**42** 92:10,11

**43** 95:21,22 96:1

**44** 98:21,22,23 99:2

**45** 100:16,19,21

**46** 101:25 102:1,5

**4687** 57:10

**47** 111:18,22,24

**48** 114:16,18 116:12

**49** 117:22,23

**4:06** 126:17,18

---

**5**

**5** 95:14

**5,000** 53:10

**5-13** 96:3

**5-15** 44:10

**5-20** 42:8,24

**50** 77:10 87:3 93:3 104:20,24 119:20 121:8,10,12

**50,000** 105:10

**50.6** 93:4

**500,000** 95:13

**51** 122:12,13 123:1 124:22,25

**510** 42:10

**510,000** 64:25 66:10

**510,129** 37:21

**510k** 37:16

**52** 124:19

**577** 35:6

---

**6**

**62** 25:5

**64** 25:4

**687** 57:9

**688** 60:6

**698,000** 65:22

**6th** 36:4,5

---

**7**

**7-20** 99:3

**7-6** 44:10

**700,000** 42:13

**703,489** 52:17

**75** 93:9

**79** 25:5

---

**8**

**8** 41:24 113:23 114:4

**83** 25:5

**841,000** 41:25

**85** 64:25

**850,000** 97:8

**899,772** 41:20

---

**9**

**9** 93:21 122:8

**9-2** 102:9

**9-22** 74:25

**90** 13:12,13

---

**A**

**A-E-L** 10:2

**a.m.** 4:3

**Aaron** 4:8,11 5:14 24:1,13 25:15 27:3, 21 34:1 35:4 70:20, 24 87:17 90:22 101:1 108:21 119:25 121:22 122:11 124:20 125:7,19

**Abelman** 4:16 5:5,6, 14,24 6:2 8:5 13:6 23:22 24:3,9,12,23 25:3,7,11,14,18,23 26:5,15,24 27:7,11, 20 28:2,6 33:20 34:1, 6,11,16,18 35:4,7 36:24 40:13 49:25 50:23 52:22,24 53:5 56:17 57:2,8,14,15 59:7,10,14,17,20,22 60:2,6,7,13,16,21,23 61:2,7,12,14,15 62:17,20 63:19,23 64:20 66:22 67:1,4 68:9 69:19 70:4,9 71:3 76:13 77:18 78:2 80:21 81:2,16, 19 84:7 85:5,14 86:2, 12,14,20,21 87:16,21 88:4,6 89:1,7,11 90:14,22 91:3,8,16, 19 92:9,14 95:20,25 98:7,19,22 99:1 100:14,20 101:20,24 102:4 104:6,9,14 105:2 106:24 107:20, 23 108:3,15 110:3,8, 20 111:8,15,19,23 112:23 113:16,23 114:1,5,13,15,21 115:11 116:5,11,19 117:21 118:1 119:18, 24 120:4,7,11,14,19, 21,25 121:4,11,21,23 122:4,8,11,22,25 124:8,17,20,24 125:3,7,9 126:13,15

**accepting** 9:8

**access** 25:24 51:18

*AB Litigation Services*

accessories 51:19

accomplish 13:10 64:22

accordance 109:5

account 20:20 21:1, 13,18,19 35:10,25 36:3 44:8,16 83:8 103:15 109:8 110:11 124:12,14

accountant 20:17 21:22,24 22:8

accountants 10:20

accounted 11:1 126:9

accounting 9:11 10:14,16,18 17:10 18:12,13 20:15 118:25 124:9,11

accounts 20:8,11,15 21:18 23:15 33:16 37:19 46:23 66:6 67:10 68:6 80:1,2 81:23 82:2,5,6,8,21 87:6 94:15,19

accrued 119:5

accurate 7:3 41:6 114:6

acquired 94:17

acquiring 71:24

acted 55:19

acting 76:8

action 4:17

activities 58:7 62:2

actual 24:16 52:13 56:24 91:25 103:24

actuals 56:20

addition 8:7 111:6

additional 42:13 67:8 96:4 108:1

address 7:11,12

addressed 71:13

adequately 79:19

adjustment 93:8

advantage 118:19, 22

advertising 63:4

advised 49:16

affiliated 14:9

agenda 15:3,5,20 58:21 59:1 60:9 63:15 64:5 71:7 77:11,19

agent 76:8

aging 21:1 22:22,24 23:1,3,4,6,7,10,14,20

agree 37:5 115:14

agreed 4:22 72:25 115:22

agreement 7:24 19:21 20:2 23:7,8,11, 13,17 24:8,10,17,22 25:1 26:20 27:17 28:24 32:2 72:22 74:25 87:12 90:10, 11,12,13,18 96:10, 12,15,21 97:3 102:15,16 106:19,25 107:2,4,11,12,13 108:14,15 109:11 110:4,6,7 112:2,3,5, 7,8,21,24 113:20,24 114:7,8 115:24 116:13 120:6,17 121:1,14,24

agreements 58:18

agrees 109:12

ahead 36:25 105:9 113:18

aisle 53:16 54:19,20

allocation 33:14,15

aloud 115:12

alternate 97:9

Amazon 53:23,24 54:23 103:7 111:3,4, 10

ambit 56:1

amendment 7:24,25 23:2,6,13 37:25 39:10 43:9,10 44:5,6

95:13 102:8,10,12, 14,25 108:16,17,18, 23 119:24 120:25 121:5,13,16,17,24

amendments 47:10 94:19

amount 22:25 41:5, 20,21 45:16 65:13 73:13 75:16 103:25 104:1 105:14,22,25 106:9

amounts 50:10 109:9 110:12

analysis 16:19 19:8, 10,13 92:21 93:7 112:17

analyst 10:9 12:11

analyzing 18:15

and/or 79:11

Andy 76:1,2,5,15,18 78:23 79:5 101:5 114:25 115:9,13,21

annually 31:12

answers 6:14

Anytime 17:2 21:7

AP 10:19

apparently 60:10 124:20

application 18:7,15, 17,18,21 19:1

applications 18:4

applied 105:12,13 106:10,13 108:10,20 116:1

apply 87:5 110:22,25 116:15

apprised 92:3

appropriately 10:24

approval 31:24 32:9,11 33:21 39:23 40:2 109:6

approved 39:21 44:1,4

approx 77:6

approximate 77:6,8

approximately 9:7 19:15 28:22 31:3 44:22 73:18,20 77:7, 10 87:3 104:18 105:18 126:7

April 37:16,17,21 38:11 41:4 42:15 52:5,6 63:16 121:14

AR 10:19 22:7,12,18, 20 23:18,20 40:21 42:1 46:12 55:12 64:25 65:2,13 67:25 72:10 81:11,14 84:2 96:22 97:4,20 98:12 99:5 101:6 118:5,12

arrangement 97:11

articulate 5:16

assembled 35:1

assist 121:18

assistance 38:14

assumed 76:7

assuming 35:12 55:25

assumptions 48:4

assurance 109:16

Athens 7:13

attached 23:1 43:12 91:13 112:15,18

attachment 112:3, 20 118:8

attachments 91:23, 25 118:5

attempted 111:3

attempts 109:25

attend 81:24

attention 86:18

attorney 85:12,20

audio 117:20

audit 118:21

August 4:3 126:19

author 92:17

*AB Litigation Services*

Auto 11:20

AW 26:17,20

aware 50:14

**B**

back 18:11 20:4
26:18 27:9 29:17
42:9,12 51:5,7 64:10
66:18 70:17,25 77:3
79:22 80:13 81:6
86:4,9 96:17 106:10
107:7 113:8,10 114:2
116:10 120:22

background 8:21
88:9

bad 119:4,6,7

balance 36:3,16
38:3 40:21 41:12
42:1,12 46:12 97:8
98:12

balances 44:17
45:13 46:12

bank 93:14

bank's 93:14

based 4:23 29:24
53:7 78:22 79:14,18
93:5 101:11,19 107:5

basic 6:11

basically 63:5
96:10,16,24 97:7

basis 20:13 21:11,
14,23 40:25 49:3,6
76:16 78:19

Bates 23:23 25:4,6
28:7,8 34:1,10 35:5
53:4 57:2,6 59:23
60:4 62:12 63:15
66:19,21 69:25 77:12
79:23 81:16 87:16,19
89:1,2 90:23 92:10
95:20 98:19 100:15
101:24 111:15
114:10 117:22
119:20 124:18 125:1

began 40:11 44:11,
13 50:9 83:2 123:10

begin 5:12 31:16
41:24

beginning 4:10
58:18 104:23

begins 4:4 52:11

behalf 28:9 76:3

belief 101:14

belonged 33:5

big 13:18 122:15

bigger 32:10,11

Bloom 8:4

Bloomfield 7:25 8:4
90:1,11,13,17

blue 38:2

Bluewater 62:13,23
63:1,3,9 79:6

board 14:1,3,5,6,8,
13,24,25 15:1,3,21,
22 17:21 21:10 34:7,
20 39:5,6,14,22,25
40:2,3 43:20,22,25
45:14 51:13 54:4
55:10 57:16,20,24
58:3,9 59:24 60:8
61:16,17,20,24 63:16
64:1,3,24 65:6 66:6
67:6,9,17,20 68:10,
15 69:24 71:4,9
72:18,23 77:11 78:3,
7 80:6,12,18,23
81:22 82:18,21 83:6

Bodie 102:7 112:1

books 47:17 118:13
124:13

boss 32:6

bottle 117:5

bottles 115:15,16
117:1,5,12,16

bottom 36:15 37:21
51:21 55:13 91:12
115:4,10

box 48:23

brand 7:13 61:19
73:8 78:13

brands 112:13

breach 109:11

break 27:8 86:3,8
116:8

breakeven 48:14

briefly 5:13

Bright 11:21

bring 7:16

bringing 16:9 31:11,
14

brought 30:3 43:20
71:19 74:5

building 11:25 12:2

Bunzl 67:9,12

business 10:9,21
13:18 16:20 17:15
18:4 19:12,16,18
23:18 28:20 29:11
31:21 36:10 46:15
48:16 50:6 57:24
58:3,17,19 61:17,19
62:1 67:14 72:22
74:9,17,23 75:5
82:13 83:3,5 85:22
86:22 87:8,9 88:12
93:15 94:4,6 97:18
103:10 106:8 107:3
109:24 126:3

businesses 16:13
95:9

buyer 53:21,22
109:4,6,10,12,13
110:6,13

buyer's 109:13

buying 37:7,10
40:11

**C**

C-O-W-A-R-T 14:18

calculation 92:24

calendar 36:12 37:9
123:10

call 38:15,18 56:9,
10,13 92:10 95:21
101:25 124:19

called 11:22 38:13
71:23

calls 92:7

campaign 53:9
54:10,12 55:2

cap 75:17 115:16

capacities 19:9

capital 50:13,25
51:1 67:10,17,18

capitalized 72:14

car 11:20

careful 33:22

carry 32:14,20

carrying 33:16

case 26:22 66:2
71:12 123:12 126:10

cash 37:18 41:10
43:2,3 44:11,14
46:14 48:16 50:11,22
65:3,7,15 73:22
96:23 99:4,18 100:6
121:18

CFO 11:4 29:7

chain 109:15,18

challenge 4:22

changed 117:5

channel 109:18

channels 53:9
109:13,15

characterize 29:22
30:15 55:15

charge 124:9

charged 108:9

charismatic 30:17

chart 35:11,14,15,
17,20,21 36:2 37:20
39:3 41:14,15,17
42:11 44:11 45:5
47:2 51:10,12 55:8
65:10 67:23

chat 24:14 27:22
34:14 57:11 62:16
63:21 70:8 77:17

EXHIBIT P

*AB Litigation Services*

87:23 89:4 91:1 92:13 95:24 98:25 102:3 111:21 114:20 117:25 121:9

**check** 99:19 100:1,8, 11

**checklist** 17:23,25

**Chuck** 14:16

**clarify** 13:6 47:1 70:19 84:3 104:5 125:25

**clause** 96:20 97:1

**cleaners** 53:17

**cleaning** 53:16 54:18,19,20

**clear** 59:17 104:13

**cleared** 118:12

**climb** 44:18

**close** 66:13 73:21

**closer** 108:5

**closing** 47:16

**Club** 49:5

**clubs** 48:24

**Coast** 86:17

**Cody** 118:3

**collaborative** 29:21

**collateralized** 97:6

**collect** 16:4 55:18 102:19

**collected** 65:3,5,15, 23,24

**collecting** 84:13

**collection** 60:18 79:25 80:10 84:15,18 86:1 96:23 101:13

**collections** 65:25 68:1,7 81:11,14 84:8 100:6

**college** 8:23

**Colman** 32:4 69:14 85:2

**column** 37:14 42:5 52:8

**commence** 47:4

**commenting** 58:6

**comments** 8:16 54:7

**commercialize** 63:6

**commitment** 42:22 51:18

**committed** 89:24

**common** 57:16

**communicating** 78:7,9 101:8

**communication** 63:8 66:13

**communications** 75:24 76:3 78:22 85:12

**companies** 9:19 11:11,14,23,24 14:9, 11

**company** 9:10,12,18 11:10,25 16:16 56:14,15 63:4 72:12 99:13 123:13

**company's** 61:17, 19

**compared** 103:25 104:1

**comparing** 79:15

**complete** 86:14

**compliance** 118:24

**components** 32:15 117:2,13

**comport** 57:25

**computer** 22:10,13

**con** 16:18 48:14

**concept** 103:3

**concern** 48:13 49:3

**concerned** 48:25

**conclude** 126:17

**concluded** 126:18

**conclusion** 95:2

**confidence** 30:11

**confused** 36:2

**confusion** 125:21

**conjunction** 60:3 112:14

**connected** 30:18

**consent** 5:6

**considerations** 85:8,18

**consisting** 32:3

**consists** 53:6

**consumer** 63:6 71:23 72:1 113:3

**consumers** 113:7

**contact** 82:12 123:24

**contents** 84:25

**context** 6:6 13:17

**continually** 31:14

**continue** 46:20 72:12 103:10 109:6, 20 110:9,17,18,21

**continued** 44:9,18

**continuing** 8:3 25:12 66:14 89:15 107:25 122:6,9 123:3

**contract** 17:5 22:25 71:20,21 74:7 87:10

**contracts** 7:22,23 16:18 17:9 22:19 72:21

**controller** 10:20 12:10 20:17 29:5 47:21 56:6

**conversation** 6:20 58:11 64:19,21 81:13 83:22 93:13 97:14

**conversations** 69:8 82:10,14

**conversion** 43:13

**convert** 97:4

**convertible** 94:21

**converting** 95:18

**COO** 15:16 29:7

**coordinator** 20:16, 20 21:19

**copy** 34:12,13 62:15

**copying** 92:19 101:5 112:1 115:1

**core** 13:13

**corner** 62:14

**correct** 4:25 5:4 33:11,17 34:15 36:20 38:5,9 40:5 52:10,15, 20 54:5 57:1 61:12, 14 70:4 79:20 82:23 88:2,4 103:16 111:18 113:19 114:9 115:22, 23 124:9,15

**correction** 10:3

**correctly** 126:10

**corresponded** 37:24

**correspondence** 45:19,25 69:8 100:9, 12

**cost** 28:18

**Costco** 53:20,22 54:21

**costs** 10:25

**counsel** 4:9,20 69:9 119:22

**couple** 11:20 13:3 38:25 96:4

**court** 4:7,19,20,23 5:2,5,7,11 6:9 8:2 13:2,5 23:25 24:18 26:3 56:11 61:5,9 68:5 69:17 84:3,6,21 87:25 88:3 89:5 90:12 97:23 98:1,4,6, 21 100:23 104:22 106:21 107:18,21,24 116:4

**cover** 20:6 55:20 97:1

EXHIBIT P

*AB Litigation Services*

**covered** 55:6

**Cowart** 14:16

**coworkers** 8:11

**create** 30:20 50:8 97:9

**created** 35:20,21 37:25 40:17,18 50:9

**cred** 89:14

**credit** 17:1,2,4,7 18:3,7,15,18,21,25 19:25 88:14,19 89:14,17

**creditor** 17:3

**criteria** 12:23 13:11

**crossed** 65:16

**current** 9:2 10:10 41:2 42:3 65:3,22 66:11

**customer** 16:10 17:24 18:1,8 28:17 31:25 33:22 103:11 113:20

**customers** 11:2 17:5 29:18,19 33:23 49:11 67:14 103:8 109:8 110:11 113:2

**cut** 44:19

**D**

**damages** 109:10

**date** 19:15 27:18 34:7 37:2 44:21,25 65:1,5 66:3 75:10 80:25 85:7 90:5,9 91:10 92:18

**dated** 63:16 96:3 99:3 121:14

**dates** 7:19,20,22 8:1, 7,17 36:15 65:13 75:3

**days** 13:12,13 33:9 38:7 64:25

**deal** 19:6,8 74:4

**dealerships** 11:20

**dealing** 101:11

**dealings** 31:7,9

**debt** 84:16,18 102:19 103:12 104:7 105:12 106:20 107:7 108:11 113:10,22 119:4,6,8

**December** 35:23 37:3,8,13 40:11,12 47:3 66:4 80:14

**deci** 43:23

**decided** 123:14

**decides** 17:14

**decision** 17:14,17, 19,20,22 39:8 43:23 45:9,15,17,20 46:4 64:24 72:24 84:1,17 85:5,9,18,24 103:1

**decisions** 15:22 84:11,12 85:20,21

**dedicated** 80:8 81:11

**deduct** 115:18

**deduction** 119:3

**deemed** 118:13 119:10

**default** 88:15

**defaults** 123:13

**defendant** 4:5

**defendants** 4:17

**define** 96:13 116:22

**defined** 72:21 79:12

**degree** 8:23

**delivered** 38:8 62:4

**delivery** 73:22

**delving** 49:8

**demand** 21:4 50:15

**denominated** 57:3

**department** 18:2 53:13,17 56:9 93:14

**depending** 16:19 17:17 39:7

**Depends** 16:16 18:10

**deponent** 4:23 5:1 26:7,11,18 36:23 56:12 64:14 70:17,23 77:25 80:13,18 81:6 84:5 85:4 91:5 97:25 101:1,3 109:2 110:5 112:19 114:24 115:3, 6

**deposed** 6:3

**deposition** 4:4,21 5:22 7:17 8:11 122:18 126:17,18

**describe** 12:23 16:14 23:3 28:15 33:21 35:24 41:8 48:18 51:12 53:5 55:9 71:8 96:6

**description** 10:11

**designated** 16:4 76:5

**detail** 118:8

**determined** 95:3 98:7

**dictate** 18:6

**difference** 36:7

**direct** 53:9 54:10,12 55:2 63:6,8 71:22,25 113:2

**directly** 18:9 21:20, 23 28:25 38:15,20 66:10 76:18 109:8 110:11

**directors** 14:2,4,5,6, 13 39:5 51:13 82:18, 22

**Disappointed** 46:22

**discarded** 59:15

**discern** 37:2

**disclosures** 46:25 47:5

**discovered** 83:12, 14

**discrepancy** 36:11

**discretion** 70:14

**discuss** 39:13 71:16 80:2 83:13

**discussed** 8:14 13:16 43:16 59:15 67:9 83:15 84:14 106:20,23,24

**discussing** 67:17

**discussion** 24:11 25:2 39:4,17 45:12, 14 46:1,3,4,5,7,9,13 66:25 82:20 83:6 89:13,15 119:22 125:20

**discussions** 8:10 21:25 82:16 83:8,9, 10,20,21 84:25 85:2

**dissatisfied** 48:12

**distributing** 101:9, 10

**distribution** 109:13, 15,18

**Dobson** 4:8 6:9

**document** 25:24 26:6,11,14,16,17,21 27:12,18 28:9,12,15 35:5 59:19 60:25 63:24

**documents** 7:16 24:2 27:4,22 69:5 120:8 124:21

**dollar** 95:17 103:25

**dollars** 40:16 43:11 72:10 73:21 86:24 95:14,16 104:21 123:4

**drafted** 19:21

**drags** 50:12

**driving** 70:20,21

**due** 33:10 35:24 36:4,18 37:19 38:7 41:1,3,5 42:14 44:17 106:11

**duly** 5:9

**duplicate** 115:8

*AB Litigation Services*

# E

**earlier** 121:16 125:23

**early** 45:8

**earn** 72:15 107:4

**earned** 107:14

**easier** 124:24

**East** 86:17

**EBITDA** 93:4,12,18

**Edible** 26:20

**efforts** 54:4,8 92:3 101:21 103:18

**Eisen** 76:1,2,5,18 78:23 101:5 115:1,9, 13,21

**elaborate** 61:23

**elaborating** 50:1

**Elsan** 9:25

**email** 87:18 88:8,9 89:21 91:4,7,10,12 92:16,19 96:2,8 99:3, 12,20 101:4 102:6 111:25 114:25 115:21 118:3,10

**emails** 89:12 92:6 99:19 100:1,8,11

**employees** 20:14

**employer** 7:10

**encompass** 31:4

**encourage** 74:9

**end** 12:21 22:25 23:8,17 41:9,22 42:1, 2 44:19 50:17 67:23 106:21 118:17 126:2

**ended** 98:11 126:5

**ending** 35:6

**ends** 28:2 52:11

**Energy** 10:5

**ensue** 38:11

**enter** 113:20 114:6

**entered** 17:5 71:21

**entering** 89:15

**entertains** 16:9

**equity** 94:12,14,21, 25 95:18 96:10

**evaluate** 29:12

**evaluated** 12:13 18:2

**evaluating** 17:24 28:17,20 29:9 94:3

**evaluation** 12:17,19 13:4 16:12,15 20:1 92:24 93:1 94:23

**evaluations** 12:24 13:7,15

**event** 109:4

**eventually** 86:19

**exact** 44:21,24 85:7 100:4

**EXAMINATION** 6:1 125:17

**examined** 5:10

**Excel** 23:8 118:9

**excess** 40:15 55:14, 15,21

**excited** 42:21

**executed** 20:2 28:8, 15 121:23

**execution** 32:1

**exhibit** 25:10,12,21 34:14,17,19 51:6 59:7,8,11,23 60:1,4, 9,14,19 61:3,6,8 62:12,18,19 63:14, 17,21,25 66:18,23 67:3 70:3,6 77:14,15 79:22 80:20,21 81:17,18 87:18,24 88:1,7 89:6,8,10 90:24 91:2 92:10,11 95:21,22 96:1 98:20, 23 99:2 100:16,19,21 101:25 102:1,5 108:22 109:5 111:22, 24 114:16,18,22 116:12 117:22,23

**entered** 118:2 119:20 121:8, 10,12 122:5,13 123:1 124:19,22,25

**exhibits** 24:5

**existing** 110:1

**expand** 101:1

**expec** 93:5

**expect** 45:2 58:16 66:1

**expectation** 40:14

**expected** 36:8 53:10,20

**expecting** 53:25

**expedite** 6:22

**expenditures** 44:20

**experience** 49:4 79:21

**experienced** 74:14

**explain** 10:16 20:12 21:6 36:1 37:11 51:21,22 62:25 65:10 72:8 92:23 105:17

**explained** 66:8 69:2 79:8,19

**explaining** 46:2

**exposure** 55:12,14, 16,21

**extend** 17:2 39:9 64:24

**extended** 66:9 95:17 121:19

**extending** 43:11 97:21

**extension** 37:16,24, 25 38:10,12 39:1,11, 18,22 42:5,7,10,14, 17,24 43:2,5,7,20 44:12 95:13

**extensions** 94:19

**extensive** 19:13

**extent** 85:1

# F

**f-a-r-m** 84:4

**face** 68:18 108:6

**face-to-face** 14:25 15:2

**facilities** 49:9

**fact** 18:25 70:11 114:7

**factoring** 96:12,15, 22 97:3,10,11,12 98:15

**factors** 19:6

**fail** 103:17

**failed** 103:15

**fails** 109:4

**fall** 45:8

**familiar** 26:13 62:23 119:1

**family** 73:7 112:13

**farm** 83:23 84:4

**father** 14:23

**February** 40:8 91:14

**feedback** 18:16

**figure** 74:19

**file** 18:20 24:19 45:20 85:19 118:9

**filed** 84:20 115:15

**files** 18:22 19:2 24:14

**filing** 83:18,19

**filled** 115:16

**filtered** 69:12

**final** 41:21 43:23

**finally** 41:25

**finance** 9:1,4,9 10:5, 11 12:13 55:24 99:8, 13

**financial** 16:19 19:8, 10 46:25 47:5,7,22 119:15,16

EXHIBIT P

**financials** 10:21 35:3 48:13

**find** 18:25 24:4,16 34:4 57:5 74:3 93:15

**fine** 27:24 122:22

**finish** 6:23

**finished** 104:21,25 105:19

**fiscal** 12:22 34:21 36:11,13 52:2,4,5,9, 10,17,18 64:2 71:11 80:14,19 118:18

**flip** 80:13

**flow** 37:18 41:10 43:3 44:11 46:14 48:17 121:18

**flows** 46:14

**focus** 75:21 108:13

**folder** 27:24 120:23

**follow** 6:12 105:16

**follow-up** 126:14

**form** 5:15,16 12:25 13:8 22:20 23:3,4 33:18,19 40:10 49:20 50:21 76:11 101:17 108:12 110:16,24 113:15 116:17 124:3

**forma** 93:2,21

**formal** 22:1,5

**formalized** 17:25

**formally** 76:22,25

**formas** 92:21 93:1

**formulas** 32:25 33:1,3

**forthcoming** 47:22

**forward** 13:19 18:11 31:16 40:12 66:4 81:8 84:15,18 112:6

**forwarded** 91:23

**foundation** 5:17,18 33:19 49:20 50:21 76:12 101:16 124:4

**fourth** 52:18 64:2

**frame** 41:23 45:4 65:19 67:19

**frequently** 92:6

**Friday** 16:4

**front** 13:22 105:6 108:6,18

**fruition** 54:22 85:23 88:22

**Fruits** 26:20

**full** 27:24 42:5,17 49:22

**function** 16:23

**functions** 10:15,17, 18,22,23

**funding** 31:20

**FY** 34:3,7

---

**G**

**GAAP** 118:24 119:1

**gain** 32:13

**garbled** 108:7

**gave** 42:15 64:25 65:3 83:4 100:5

**general** 8:16 61:25 62:3 65:5,6 75:10 78:9 81:12,13

**generally** 33:22 48:6,8,10

**gentleman** 76:1

**gentleman's** 29:7

**give** 7:3 33:1 34:9 57:6 58:15 65:21 68:25 87:19 88:13 96:7,17,22

**giving** 82:6 101:9 121:19

**go-between** 76:6

**goals** 13:11

**Goldhamer** 4:11 5:3,4,13,14 24:13 25:12,16,20 26:21 27:20,25 33:18 40:10 49:20 50:21 59:17,21

70:19 76:11 84:19,23 85:10 86:5,11,16 91:16 101:16 104:5, 12 108:12,21,25 110:16,24 113:15,18 116:17 124:3 125:16, 18,19 126:12

**good** 7:6 30:19 49:23 78:17 86:5 96:25 97:1

**goods** 11:22 104:25 105:3,19

**grant** 102:17

**granting** 102:22,23

**great** 25:20 45:16 46:15 86:16

**greater** 32:17

**Greensheet** 91:14, 15,20

**grew** 46:24

**ground** 73:14

**Group** 11:4,9,10,12, 14,25

**Growth** 88:16

**guarantied** 90:17

**guaranties** 89:24 90:5,7

**guarantor** 122:2

**guaranty** 47:11 55:20,22 89:16,19 97:5 98:12,13 122:6, 9 123:4,5,19 124:6

**guess** 59:8

**guys** 24:5 120:23

---

**H**

**half** 9:23 42:2,9 43:11 95:14,16

**Hall** 20:24

**hand** 49:2 104:2,4,7, 8,15,18,19 105:14,23 125:22

**handle** 10:20 20:14

**handled** 15:1 75:24

**handling** 76:2,3

**hands** 108:6

**happen** 29:15 41:18 49:10,14

**happened** 39:2 41:8,13,15 43:15 44:7 45:7 73:3 74:25 75:14 88:21 94:22 103:20

**happening** 96:6

**happy** 4:14

**hard** 32:8

**harder** 32:18

**he'll** 70:22

**hear** 13:2 98:2 104:23 106:21 107:19,21,25

**hearing** 108:4

**heavily** 79:7

**HEB** 54:1 55:1

**held** 41:5

**helped** 30:20 113:4

**helpful** 24:18

**Hiduke** 29:6

**high** 50:7 75:23 78:16 79:1,14 95:4

**history** 22:12 35:22

**Hoffman** 32:4

**holding** 11:10

**home** 11:21 86:18

**hor** 36:15

**horizontal** 36:15

**hour** 86:15

**Housley** 118:3

**hundred** 104:20,24

---

**I**

**idea** 58:22 102:24 103:2

EXHIBIT P

*AB Litigation Services*

**identify** 26:6 27:13 34:19 63:24 88:7 89:11 92:14,15 95:25 99:1 100:20 102:4 111:24 114:21 118:2 121:12 123:1

**implicate** 85:1

**implicates** 85:11

**important** 6:19,23 16:23 62:9

**impressions** 30:5

**in-house** 102:19 109:22

**inability** 49:19

**inadvertently** 117:20

**inaudible** 12:25 13:1,4 46:18 68:2,4 69:16 84:19 100:22 105:8 107:16 120:10

**include** 16:18,19

**included** 41:1

**includes** 10:19

**including** 61:18 67:9 79:25 83:3

**increased** 41:12

**incurred** 123:16

**indebtedness** 106:14 110:14 123:15 124:1,12

**indirectly** 21:21

**industry** 33:12

**infomercials** 113:7

**information** 24:1 47:23 48:7 78:20,23 91:23,24

**informed** 76:20

**initial** 37:15 39:17,22 42:5,7

**initiate** 47:18

**inquire** 22:3,4,7

**inquired** 90:18

**inquiry** 99:16

**instance** 11:24

**instill** 30:11

**intended** 51:13

**interest** 75:15 94:12, 14,16 98:18

**interested** 20:11 71:24 94:24

**interesting** 49:25

**internal** 85:20

**internally** 39:2

**interrupt** 6:21 27:21

**interruption** 13:5 56:11 68:5 69:17

**introduce** 4:9

**inured** 113:13

**inventories** 55:11

**inventory** 49:23 50:10,16,19,25 51:3 68:8,11 72:10 73:13, 15,19,25 75:17 76:21 84:2 86:25 105:14, 15,19,22,25 106:1,3, 5,6,9,11,12 107:5,8 108:9,13,20 111:1,5 115:2,17,25 116:21, 23,25 117:3,8,10 125:22 126:4,6,9

**investment** 55:10 72:6,16 94:5,9,11 97:22 98:3

**investments** 73:16 75:20

**investor** 97:25 98:14

**invoice** 24:16 25:5 33:6,10 38:8 65:1

**invoices** 17:12,13 41:2 115:19 116:1,15 121:20

**invoicing** 22:21

**involved** 8:16,18 16:12 29:10 31:24 34:22 39:16 76:14 79:5,8

**involving** 85:20

**items** 83:13,14 96:23 97:6 117:7,13

---

**J**

**January** 59:25 60:8 61:16 77:12 78:4,15 79:24 80:3,22 81:2

**Jeff** 28:10,18,25 29:13 30:5,16 31:7, 10,13 38:13,20 41:9 44:10,13 46:2 48:20 52:1 53:7 63:3 66:8 71:19 72:7,9 73:8 74:5,6 76:5,10 78:13 79:5 82:11,15 83:23 88:10,12,18,19 89:19 90:3,4,8,10,17,19,20 91:13 92:2 94:4 95:10 101:4,6,8,14, 18 102:19 106:20,23 109:23 112:7,14,21 113:8 114:25 115:14, 21 116:25 121:18,25 122:3 123:14,24

**Jeff's** 50:6

**job** 10:10 20:7 25:5

**jog** 58:14

**John** 88:8,10,20 89:23

**Johnson's** 15:15

**Johnston** 15:12,14

**joined** 31:7

**joining** 9:25

**Jordan** 91:13

**jot** 7:21

**jotted** 7:18

**July** 34:8 35:24 36:4, 5 40:3 41:23 45:5 52:4 54:2 67:6,20

**June** 52:7 53:22

---

**K**

**K-E-L-S-A-N** 9:17 10:1

**K-I-R-C-H-H-O-F-E-R** 11:7

**Keller** 11:4,8,10,11, 12,14,25 14:14,15,22 32:4 39:20 81:22 82:2 92:19 96:3 102:7 111:25

**Kelsan** 9:13,22,23 10:1,4 11:12 99:13

**Ken** 102:7 111:25

**Kerry** 32:6 92:20,25 96:2 97:15 99:3,7 102:7 112:1

**kicked** 116:3

**Kim** 20:23

**kind** 6:6 7:20 32:19 46:24 74:16 83:14

**kindly** 121:12

**kinds** 47:5

**Kirchhofer** 11:6 12:18 15:25

**knew** 30:18,19

**knowledge** 30:6 63:8

**knowledgeable** 30:9

**Kyle** 11:6 12:18 15:25 16:5

---

**L**

**label** 33:4

**labeled** 34:3 37:22 80:19 120:4 124:18

**labels** 117:6

**large** 17:20 48:23 50:10 75:16

**larger** 17:19 18:5

**launch** 53:25 58:18 73:6

**launched** 62:6

**launching** 53:15

**lawsuit** 84:20 85:19

*AB Litigation Services*

lawsuits 83:19

lawyers 84:25

leaders 71:22

lease 26:19

leave 25:14

left 25:17 37:15 42:4 85:24

legs 31:15

letter 88:13,19 89:14,17

level 49:23 50:7 54:14,16,24 55:10 77:3 79:12 93:5,17, 21 101:15

levels 67:25 68:6,8, 10

li 42:12

liabilities 90:9,20

liable 124:14

liens 83:19

limited 122:5,9 123:3,4 124:5

Limiting 123:3

link 28:4 121:9

liquidate 108:13

list 11:18 24:25 54:6 119:25

listed 13:22,25

loan 90:10 97:4

locating 120:1

locations 4:24

long 9:5,22 10:6 31:3 33:16

longer 49:7,8

looked 32:18 43:11 45:23,24 59:1,5 80:7

loss 111:4,7

losses 111:9

lost 116:2

lot 35:2 75:20 79:16 83:5 103:22 111:2

lots 17:8 57:12

Lowe 12:8,10 118:4

lower 93:11

---

## M

made 15:22 41:22 43:14 45:9,15,17 51:25 52:16 54:16, 18,20 68:15,16 71:3, 9 72:24 74:16 78:3,6 84:17 85:6 101:18 108:1 114:3

maintained 54:8

make 4:13 6:25 10:23 25:18 39:8 54:14,17 66:13 83:18 92:7 94:11,24 96:20, 21 103:17 104:13 109:4,12,20,25 113:12,13 124:24

makes 17:14 109:13

making 42:14 46:25 51:17 62:6 84:1,11 94:24 96:16

management 15:5, 6,7,9,18 17:20,21 21:10 23:19 39:13,21 43:16 69:12 83:10 84:14 112:6

manager 9:11

manages 21:22

Manu 120:5

manufacture 109:7, 21 110:10,18,19,21

manufactured 109:23

manufacturing 19:21 20:2 24:7,9,22 25:1 27:16 32:1 87:12 102:14 120:17, 25 121:13,24

March 12:22 40:7 41:4 118:17

margin 51:16,22,24 52:13 77:9 87:2 96:16 106:7,10 111:6

113:12

Marginal 110:2

margins 52:25 53:1 74:12,13

mark 59:8,23 62:17 90:24 100:15 117:22 119:19

marked 25:21 28:7 34:17 51:6 59:11 60:1,3,9,18,19 62:19 63:17,24 70:6 77:13, 15 88:1,7 89:10 91:2 92:11 95:22 96:1 98:23 99:2 100:19,21 102:1,5 111:22,24 114:15,18 117:23 119:19 121:10,12 122:13 123:1

market 30:3,19 31:11,14 40:17,18 50:8,9 71:23,25 72:13 75:18 78:14 79:10 93:16 113:1

marketed 113:6

marketing 8:24 29:18 75:18

marketplace 30:7, 10

markets 78:24

marking 24:1

match 13:10 117:13, 14

materials 105:20 117:16

Matt 8:19 13:24 15:9, 12,14 32:4 39:19 45:11 69:13 76:15 82:14 101:4 102:7 112:1 115:1,13,21

matter 4:5 21:14 92:18

MBA 8:25

meaning 33:9 38:7 55:11 73:12

means 21:5 38:12 44:17 92:16

meant 37:15 78:25

measure 79:10

media 49:21 62:13, 23 63:2,3,9 79:7,10

meet 30:12

meeting 15:21,22 16:1 34:7 57:4,21 58:9,22 59:1,24 60:8 61:16,21 62:8 63:16 64:3 67:6,21 69:24 79:24 80:12,23 81:21,24 82:22,25 83:6 116:3

meetings 14:25 15:1,2,4 16:3 21:17 57:17

meets 21:23

mem 53:19

member 48:24 53:19

memo 63:12 112:16

memory 58:14

Merr 124:6

Merrie 4:6 123:19 124:1,6,13

message 62:4

met 53:21 79:15

metric 79:11,15,16, 18

Mid 31:25

Midlab 4:6 7:12 9:3, 8,19 10:15 11:9 12:1, 2,3 13:21 14:1,5,10 16:9,23,24,25 22:9 23:23 27:17 31:7 32:17 34:20 35:11 38:4 39:2 43:5 44:16 45:17 47:5 49:19 51:14,17 52:16 55:17 58:14 63:8,11 64:1 69:3 72:3,4 73:19 74:1 75:4,25 76:6,9, 13 86:25 87:5,7,10, 13 94:10 95:8 96:21 98:17 101:15 103:10, 17,23 105:3,7 106:14 107:9 108:2,8 110:7 113:4,10,11 115:17

---

*AB Litigation Services*

116:13,20 117:10
118:23 119:12
123:17,25 124:8
125:22 126:8

**Midlab's** 9:17 19:25
33:15 42:19 46:2
53:1 66:6 95:6 114:7
119:17 124:9

**Mike** 14:15

**Mike's** 14:16

**Miller** 4:5,25 5:8 6:3
25:23 26:5 27:12
28:6 34:18 35:7 51:9
57:15 60:13 61:20
62:20 63:23 67:4,7
70:9 84:24 85:10,14
86:16,21 88:6 89:12
91:4,19 96:3 101:5
102:6 104:10,14
108:3,25 110:3
111:23 113:17 114:3,
5 115:1 118:1,4
121:11 122:25 125:3,
9,13,19

**million** 40:16,20,25
43:11 72:10 73:21
86:24 93:3,4,6,11,12,
21,22,23,25 95:14,
16,17 123:4

**mind** 27:23 50:1
122:20

**minute** 81:20

**minutes** 16:1,2,3,5
20:5 57:16,23 58:7
59:18 60:10 61:15
67:5 79:24 81:1,20
82:19 86:4

**moment** 66:19
122:16

**money** 45:16 50:13
63:5

**moneys** 42:17

**monitoring** 20:8

**Monroe** 20:23

**month** 42:8

**monthly** 23:14,20
47:15,16 55:24 56:1,
8 119:15,16

**months** 52:3 75:1

**Motors** 11:21

**move** 62:11 83:18
84:1,15,17 89:1
103:12,14,22 110:1
117:19,21

**moved** 83:25

**moving** 13:19 31:16
51:5 62:5

**multiple** 93:17

**multiples** 93:15

**muted** 66:20 100:17

---

**N**

**named** 124:6,16

**naming** 124:6

**nature** 5:21 6:15
13:20 29:14,21 31:8

**necessarily** 22:4

**needed** 49:24 68:1

**Nelson** 4:8

**neophyte** 50:2

**net** 33:8,9 51:22,24
52:13

**networks** 109:15,18

**nonetheless** 108:8

**normal** 6:20 18:4
32:9 33:12 38:19
92:2

**Nos** 124:18

**note** 8:4 58:20 90:1
97:5,7

**notebook** 7:18

**notes** 7:16 45:20
80:11 97:9

**notice** 5:21

**noting** 30:23

**notion** 86:12

**November** 57:3,21
58:12 59:1,18 89:22
90:19

**number** 25:6 34:10
35:5 55:16 57:6 65:1,
3,16,21 66:21 87:20
109:21

**numbers** 25:13
51:23 52:14 56:2,5,
18,23 105:5

---

**O**

**oath** 4:21,23

**object** 5:14,17 33:18
40:10 76:11 108:12
113:15 116:17 124:3

**objection** 5:16,19
84:22 101:16 110:16,
24

**objections** 5:23
48:4

**obtained** 63:11

**occasions** 38:16

**occupant** 12:3

**occupied** 9:5

**occupy** 12:9

**occur** 109:17

**October** 69:25 71:5

**odd** 82:24

**offer** 96:12

**offered** 32:23

**offering** 28:19

**officers** 13:21

**offset** 117:9

**onboarded** 58:13

**ongoing** 21:23
47:12 109:25

**open** 41:2 42:1 65:3,
13 81:14

**operate** 11:24

**operates** 12:1,2

**opinion** 49:18,21
50:10,18 56:19

**opportune** 86:3

**opportunities** 18:5
61:18 67:8,12

**opportunity** 16:20
17:18,19 18:5,10
72:4

**option** 85:25 96:25
97:2,3,10,13 112:12

**orange** 38:6 41:23

**order** 35:21 48:21
63:5 66:11 72:14,20
75:17 87:2 88:14
96:21 111:5 118:12,
13,24 123:11

**ordered** 75:2 86:24

**orders** 37:12 50:9
75:7 87:11

**outstanding** 23:15
38:3 80:1,2 87:6

**overview** 35:9 78:9

**owed** 22:25 35:11
38:4 44:16 45:16
72:9 87:6 101:12
102:20 106:14 107:7
109:9 110:12

**owned** 73:9 78:13
107:9

**owns** 11:25

---

**P**

**p.m.** 86:10 126:18

**packaged** 32:24
33:4

**packaging** 51:18,19
104:25 105:19

**pads** 115:16

**pages** 51:7 70:21
77:20,23 112:17

**paid** 42:5,9 72:7
73:13 94:15 101:15
113:9,11

**paper** 98:2

**par** 43:8

**Paragraph** 109:3

*AB Litigation Services*

**paragraphs** 115:12

**parameters** 39:10

**parent** 9:17

**part** 20:6 23:7,10 29:24 46:5 48:24 61:3 69:1 81:17 115:9 124:22

**participate** 45:10

**particularity** 29:10 48:19

**particulars** 20:5

**parties** 4:22 8:15,18 103:18 110:15

**partner** 72:19 94:6, 25

**partners** 88:17 95:8 97:17,19

**parts** 58:5 68:23

**party** 17:16 114:7

**Passow** 24:7,12,21, 24 25:3 26:23 27:3 59:9 67:1 119:23 120:5,9

**past** 16:4 35:24 36:3, 18 37:19 38:7 41:1,3, 5 42:14 44:17 77:21

**pasted** 34:13 111:20 114:20

**Pat** 15:15

**patience** 125:13

**pay** 42:17 49:19 51:2 73:23,25 86:18 103:12 106:20 107:6 124:1

**payable** 20:9

**payment** 17:3 33:10 109:4

**payments** 41:11,21 42:13 66:11,14 82:5, 17 88:14 99:6 101:10,18 108:1

**PDF** 23:7

**peak** 40:20

**people** 6:21 12:5 79:11 95:9 102:17

**percent** 77:10 87:3 93:9

**perfect** 124:23

**perform** 19:11,25

**performance** 12:12 13:7,9 29:25

**performed** 78:17 79:1,2,17

**performs** 12:17

**period** 38:23 65:24 74:22,23 75:9 120:5, 6

**person's** 20:18

**personal** 47:11 55:20,22 89:16,18,23 97:5 98:12,13

**personally** 30:24 47:25 90:20

**pertain** 65:14

**pertained** 65:2

**phone** 92:7

**piece** 13:18 67:14

**pieces** 48:15

**Pisano** 4:6

**place** 7:7,9 43:18 44:6,13 55:22 123:11

**placing** 37:12

**plaintiffs** 4:10,12

**plan** 19:12,16 28:20 29:9,11,18 30:13 31:21 50:6 101:9

**play** 89:24

**played** 28:16 117:20

**PO** 49:1

**point** 19:18 37:18,23 43:1 46:16 82:4,9 83:2 85:24 104:4 108:18 118:11,15,16 126:4

**points** 48:14 79:4 93:2 94:1,2

**policy** 19:25 21:15

**portion** 20:12 69:21

**posed** 88:13

**position** 9:2,6,9,24 10:8 21:22 35:10,25 46:2,11 84:1 94:21 97:22,24,25 98:4,5 99:5,9,11 107:14

**positions** 12:9

**positive** 107:13

**possibility** 95:17

**possibly** 65:22 126:5

**post** 8:22

**posted** 57:11 63:21 70:7 87:23 89:4 92:13 95:24 100:18 102:2 117:24

**posting** 91:1 121:8

**potential** 32:13 40:19 58:17 72:11 88:15 97:10,11,17

**potentially** 72:5 94:20 97:21

**Powerpoint** 68:16, 17,19,23

**Powerpoints** 69:20, 21

**precise** 10:8

**precontract** 31:4

**preparation** 34:22

**prepare** 51:9 118:20

**prepared** 21:1 112:16,17

**prepares** 15:3

**prescribed** 33:6

**presence** 103:7

**presentation** 34:20, 23 35:2,3,18,20 64:1 68:12 71:4,8,11,12 78:3,6 80:6,18 81:11

**presentations** 68:15,20,23

**presented** 16:21 48:20

**presenting** 28:2

**president** 9:4,9 10:11 12:13 28:13 99:8,12

**presupposes** 50:24

**pretty** 38:19 41:5 74:20 92:2

**previous** 31:6,8 65:18 119:9 125:21

**previously** 20:23 30:3 31:18 32:8 95:6

**pri** 31:25

**price** 11:1 28:18 93:17

**priced** 10:24

**pricing** 10:15,17,22, 23 12:11 16:17 31:23

**primary** 49:19

**principles** 118:25 119:1

**print** 21:7 24:25

**prior** 9:8,24 10:4 20:1 28:14 29:25 32:1 82:8

**priority** 73:17 75:23

**private** 7:12 61:19

**privy** 79:6

**pro** 47:12 51:17 69:5 92:21 93:1,2,21

**proceeding** 6:7

**proceeds** 105:12, 13,20 106:4,13 108:10,19 110:15,22, 25 115:25 116:14

**process** 16:11 31:4 33:21

**procure** 117:12

**prod** 69:9

**produce** 68:22 69:3, 20 116:25

*AB Litigation Services*

produced 22:17 23:5 26:23 27:1 89:18

product 19:5,7 30:3, 8,19 32:15 53:24 73:6 78:11,12 80:10 102:18 103:12 105:11 109:7,17,21, 22 110:1,10 112:12 116:14 120:15

production 40:8 109:25

products 28:9,19 30:7,10 31:11,13 32:20,22 40:9 51:25 52:19 63:6 71:23,25 72:15,20 73:8 103:4 104:7,11,15,17,18 113:5,6 118:4 121:25 123:23

profit 51:24 72:15 74:12,13,16 77:9 87:2,5 93:12 107:13 113:8

program 37:13 41:9 47:4 51:17 66:3 71:14 72:12 81:15 117:4 123:8

programs 10:24

projected 53:1 56:21

projecting 53:12,18

projection 56:18 93:4,5,12

projections 28:21 29:12,24 47:7,12 48:1,25 52:14 55:24 56:1,23

promises 123:13

promising 112:25

promissory 97:5

properly 40:17,18

properties 11:23

proportion 101:11

proposal 16:17

proprietary 33:2

prospective 123:16

protect 16:24,25

protections 123:11, 12

proved 49:15

provide 16:25 18:11, 16 22:20,23 23:14 38:14 43:2 69:5,6 88:19

provided 5:21 16:3 22:14,21,24 35:12 48:7 56:24 58:21 67:7 74:1 78:23 79:25 81:22 117:17

provisions 43:12,13

Publix 54:1 55:1

pull 23:23 60:12 81:6 90:23 105:5

pulled 27:1

pulling 24:1

purchase 37:12 48:21 50:25 76:21 77:1 79:11 87:11 93:17

purchased 35:23 73:12,19,20 75:6,16 77:4,6 107:8 117:16

purchases 42:2 44:19 62:2,6 66:4 77:4

purchasing 40:21, 22,23 103:8

purpose 55:8 92:23 94:2 99:5 102:13,16 109:9 110:12 112:4 118:10 121:16,17

purposes 7:17 72:2 113:21

pursue 84:2 85:25 86:1

pursuing 48:22

push 32:8

pushed 48:16 49:8

put 15:19 24:14 27:21 31:20 32:23

35:1 43:18 44:5 56:15 64:23 65:20 75:21 77:16 93:10,20 95:11 105:21 123:11

## Q

Q1 34:21

quality 48:7

quarter 39:7 52:2,8, 17,18 53:21 64:2 66:1 71:11 75:8 80:14,19,22 123:9,10

quarterly 12:14,15, 16 14:7,24 71:11 82:25

question 5:15,18 6:17,24 22:11 30:21 47:1 50:24 85:11,15, 16 90:15,16 100:7 107:17,20 108:8

questions 7:4 13:9 29:13 35:8 48:3 85:1 125:12

quick 25:16 27:6 86:11 96:5

quickly 6:12 49:22 74:20 114:2 125:5

## R

raised 62:9

ramping 40:8

ran 41:9 78:14 92:21 93:3,7

range 42:13

rankings 91:14,15, 20

rate 13:9

RAY 5:8

Re-logging 120:22

reached 88:20 95:1

read 67:5 81:19 96:4, 7 101:6 109:1 110:8 114:2,4 115:9,11

reading 125:5

real 27:6 86:11 96:5 125:5

rearranged 120:9

reason 7:2

rebranded 78:11

rec 22:24 63:13

recall 29:4 30:4,22 31:5 39:16 43:19,23, 25 46:1 48:11 55:2,4 58:2,8,10 63:13 64:18,20 66:5 67:16 68:3,9 69:11 80:4 90:21 91:21 99:17 100:4 125:23

receivable 20:8,12, 15,20 21:1,13,18,19 23:15 33:16 35:10 36:3 37:19 44:16 46:24 66:6 67:10 68:7 80:1,3 81:23 82:2,5,7,8,21 83:8 87:6 94:15,20 97:9 124:12,14

receivables 21:25 44:8

receive 56:9 57:16 69:4 93:9

received 33:10 42:20 69:4 80:9 81:15 82:5 91:22 92:21 99:6,18 105:20

recognize 26:25 91:3

recollection 57:25 62:8,10

recommend 72:18

recommendation 39:13

recommended 72:19

reconcile 79:3

record 4:3,13 23:1,7, 10 24:11 25:2 27:6, 10 35:15 66:25 86:7, 10 116:4,7,10 119:22

*Steven Ray Miller  - 08/02/2021*   13

*AB Litigation Services*

recorded 6:10,22

recording 117:20

records 15:21,24
21:24 22:1,5,9,12,14,
18,20,22,24 23:3,4,6
111:9 117:15 124:9,
13

recosting 31:12

recoup 109:10

recover 72:5,16
110:15 111:5,7

recovering 109:9
110:12

recruit 109:10

reduce 105:14,25
106:13 108:10
110:14

reduced 106:9,11

reducing 105:21

reduction 94:15
111:1

reference 94:1

referring 23:12
104:11,15

reflect 45:20

reflected 36:19
119:12

reflects 33:14 65:11,
12

refused 101:22

reg 21:10

regar 83:23

regard 28:17 30:21
44:7 54:7 58:22 59:3
62:9 68:10 73:3 80:2
84:8

regular 20:13 21:10,
14,17 35:15 40:25
47:14 76:16

regularly 32:7
47:13,14

relate 60:7

related 69:5 71:13

relates 108:19

relating 68:23 69:21
100:9,12 106:25

relation 96:9

relationship 11:8
14:21 35:16 40:14
63:1 76:6 85:22
123:16

relationships
103:11

relaunch 53:24

released 30:2

reliable 56:18,23,25

relief 43:3

relying 123:25

remaining 103:12

remember 12:20
14:16 18:19 29:6
39:24 40:1 44:21,24
45:3,22 46:8,9 74:22
82:3 91:7,9

reminded 46:11

remotely 4:21

removing 61:5

renew 43:2,5,7

renewal 42:24

rent-to-own 11:21

repeat 6:17 85:16
90:16

rephrase 6:18 47:1

report 11:3,4 12:5
14:7,24 21:13 32:6

reported 61:17,24
67:8 99:14

reporter 4:7,19,20,
23 5:2,5,7,11 6:9 8:2
13:2,5 23:25 24:18
26:3 56:11 61:5,9
68:5 69:17 84:3,6,21
87:25 88:3 89:5
90:12 97:23 98:1,4,6,
21 100:23 104:22
106:21 107:18,21,24
116:4

reporting 54:3

reports 20:16,17
21:1 23:15 79:7

represent 51:13,23

representation
109:14

representing 4:17

represents 38:3,6

request 38:12 42:23
43:14,20 69:1,4,10

requested 38:13
66:9

requests 47:19

require 47:6

required 18:1 32:14
50:6,7,10 55:23,25

requirements 50:13

reserve 5:22

resons 10:12

respect 97:19
125:21,22

respond 6:24 99:16
100:3,4

responded 89:25
90:2

response 42:19
46:21 99:20 100:2,4
112:24,25

responses 7:4

responsibilities
10:13

responsibility
10:14,19 28:16

responsible 10:23
18:14 20:7

responsive 90:15

Restore 78:12 79:2
85:22 106:18,25
107:3

result 78:15 109:11

results 78:16,21,25
79:3,14

return 95:3

returned 96:24

returns 96:17
119:13

reveal 69:7 80:11
84:24

review 47:25 111:13

reviewed 57:24
58:25

reviewing 58:3
74:18 112:5,9 115:14
123:7

right-hand 62:13

rights 71:24

risk 32:12,17 33:15,
23 45:17 46:15 55:17
88:12 95:4

Rob 12:8,10

role 15:15 16:10
28:16 34:25 76:8
84:7

roll 10:18

rollout 29:18

room 7:14

Rose 88:8,10,20

Ross 85:3

round 31:6

route 98:13

royalties 107:5,6

royalty 71:20,21
72:21 74:6 107:4,9,
12,14 112:8 113:9,13

rule 8:6

rules 6:11

run 18:13 98:16

running 96:11

**S**

sale 51:15 106:5,12
108:19 113:12 126:9

sales 17:18 29:12

*Steven Ray Miller - 08/02/2021*

*AB Litigation Services*

51:16 53:8 54:3,7 55:24 56:1,2,17,24 61:18 62:1 67:8 92:3 93:4,5,10 96:23 105:21 106:13 109:17 110:15 111:2, 4,10 113:21 116:14

**salespeople** 18:11

**Sam's** 48:24 49:5 53:20 54:21

**satiated** 75:15

**satisfaction** 20:1

**satisfied** 48:6,8,10

**save** 5:16

**scenario** 93:3 96:11 98:16 115:14

**Schenk** 8:19 13:24 15:9 32:4 39:19 57:23 58:2 61:16,23 69:14 76:15 101:5 102:7 112:1 115:1,21

**screen** 57:12 63:22 91:17

**scroll** 26:7 70:17 108:22 109:2 110:5 115:3,8,10

**scrolldown** 91:17

**secondary-education** 8:22

**section** 55:12 64:16 109:3

**secure** 88:14

**seek** 89:18 123:19 124:5

**sell** 53:10 71:25 102:9,17 103:4,18,23 105:4 109:7 110:1, 10,17 115:18 117:7, 10 126:5

**sellable** 105:1

**selling** 29:19 44:9 51:25 53:13 54:16,23 73:15 105:25 107:5 112:12 113:19

**send** 19:3,4 27:24 92:6

**sense** 6:25 30:19 49:13

**sentence** 81:20

**separate** 87:8,9

**September** 27:19 28:14 88:11 104:19 105:4

**sequentially** 19:24

**service** 49:24

**set** 13:11 19:15 27:3 79:9 118:12 121:19

**Shar** 4:8 6:9 23:22 25:5 114:1

**share** 23:19 57:12 58:5 74:6

**shared** 21:14 120:23

**sharing** 40:3 63:22

**sheet** 97:8

**shifted** 82:9 86:23

**shipping** 45:18 71:18

**short** 4:13

**short-term** 97:4

**shortly** 45:6

**show** 35:22 55:13 117:15 124:16

**showed** 67:23 124:13

**showing** 23:15 111:9

**shows** 70:10

**shuffling** 98:2

**sic** 4:12 9:25 15:15 31:4 48:4 122:5

**signature** 122:1

**signed** 28:24

**signing** 58:17

**similar** 74:13 77:20

**simply** 5:15,18

**sir** 77:5

**sister** 9:10,12,19 14:9 99:13

**sitting** 51:20 72:6

**size** 16:16,20 19:6,7, 8 33:23

**sizes** 117:1,6

**skepticism** 49:13, 15

**skip** 35:4

**slide** 78:8 80:7,17 81:10

**slides** 64:11,23 80:15 81:7

**small** 56:14,15 103:25

**Smart** 11:20,22

**sold** 32:16 51:16,19 103:21 105:11 106:2, 6 108:9 111:1,4,7 113:5 125:22 126:4

**sole** 12:3

**solely** 14:9

**son** 14:23

**sort** 22:22 106:25

**sounds** 29:21 86:5

**source** 42:16

**Southglenn** 26:20

**speak** 38:18,19,22

**speaker** 108:5

**special** 32:14

**speciali** 32:19

**specialized** 32:20

**Specifi** 120:16

**specific** 32:14,24 45:24,25 79:9 81:10 116:24 117:1 121:19

**specifically** 32:16 35:2 58:10 74:18 75:3 80:4 82:3 91:22 124:6

**Specifications** 120:16

**specs** 117:14

**spell** 9:16 11:6 14:17

**spend** 29:18

**spending** 40:15 49:21

**spent** 63:5

**Speth** 32:6 92:20 99:3,7 102:8 112:1

**split** 101:12,13

**spoke** 8:13 23:18 67:24 76:15 80:4 88:18

**spoken** 8:15,20 30:18 38:16

**sprayers** 115:16

**spreadsheet** 23:8

**staff** 10:20 20:17 21:22,24 22:8

**Stamp** 28:7,8

**standard** 17:25 106:7

**standby** 88:13

**start** 4:14 8:21 37:7, 14 47:3 64:14,15

**started** 19:19 31:2,5 37:7,10,12 40:8,14

**starting** 41:4 54:9 64:6 70:11

**starts** 52:4,5 59:19 63:15 70:11 77:19 120:17

**state** 7:10 40:22,24 48:17 92:16

**stated** 8:8 50:7

**statement** 96:19 114:2

**statements** 119:15, 16

**stay** 52:23 66:12

**steady** 40:12,22,24 41:5

**steps** 71:13,19

*Steven Ray Miller  -  08/02/2021*

*AB Litigation Services*

**Steve** 4:4,15,16 77:3 96:3 101:5 102:6 115:1 118:4

**STEVEN** 5:8

**stop** 45:17 75:4

**stopped** 41:11 83:1

**store** 11:22 53:16

**straight** 39:12

**strained** 44:14

**strains** 41:10 44:11

**strategy** 66:7

**strengths** 30:16

**subject** 39:22 92:18

**submit** 18:18 21:9 40:25

**submits** 15:5

**subsequent** 90:4

**substantial** 73:12

**substantiate** 29:16

**substantiation** 31:23

**successful** 54:8

**Sue** 20:23

**suggested** 101:21

**summarized** 92:25 93:13

**summary** 13:14 51:15

**summer** 28:23 31:3 37:8 44:24 45:1,7,8 46:24 75:12 123:8

**Suncoke** 10:5

**supervision** 20:25

**supervisor** 32:6 99:14

**supplied** 23:10 82:19 111:8,12

**supplier** 109:5,12 110:4,7,9,13

**suppliers** 109:9

**supply** 7:24 19:21 20:2 23:13 24:7,10, 22 25:1 27:16 32:2 72:20 73:5,6 102:14 109:15,18 120:6,17 121:1,14,24

**support** 109:16,19

**supported** 109:19

**supposed** 69:3 110:14

**surety** 123:15

**sustain** 50:12,20 55:3

**sustained** 51:4 111:9

**swear** 4:19

**sworn** 5:9

**system** 17:10 22:9, 10,13

**systems** 17:11

─────────────

**T**

─────────────

**T-H-R-E-S-S** 12:8

**table** 106:19

**takes** 15:25

**taking** 88:11 97:20, 21,23

**talk** 6:19 65:7 67:24 68:14 85:17

**talked** 31:10 43:21 55:23 68:6 83:16,17 86:21

**talking** 26:9 58:16 59:18 63:3 80:25 82:24 92:20 93:2 94:1,2 96:8 97:15 101:6 104:7 123:10

**talks** 78:14

**tap** 103:11

**target** 93:10

**tax** 119:13

**team** 15:5,6,7,9,19 17:17 21:10 23:19

**28:20 29:2,4 30:12 32:3 39:13,21 43:16 58:5 69:12 83:11 84:14 103:1,2 112:7**

**team's** 103:3

**television** 63:4

**telling** 53:8

**Tennesse** 7:13

**Tennessee** 7:6 8:24,25

**term** 91:21

**terms** 17:2,4,7,13 30:6 33:6 38:1 39:9 64:25 66:9 73:24 95:17 97:21 107:1 121:19

**test** 75:18 78:14,20, 24

**testified** 5:10 32:8

**testimony** 82:19 125:23 126:1

**text** 108:22 122:17

**that'll** 77:13 124:24

**thing** 75:20

**things** 6:22 49:8 83:11,12 117:13

**thinks** 29:15

**thought** 10:2 24:21, 25 99:8,11 103:6

**thoughts** 96:4

**thousand** 104:20,24

**three-quarters** 86:24

**three-year** 19:12,16 28:21 29:9 30:12

**Thress** 12:8,10

**tick** 41:24

**till** 31:15

**Tillman** 14:14

**Tim** 14:14,15,21,23

**time** 5:17 20:21 29:5 30:5,22 31:1 32:5

**35:1,17 36:10 37:18 39:7 41:2,23 43:1 45:3 46:16 50:8 57:6 58:13 62:12 65:19,20 66:7 67:19 72:9 74:22,23 75:10 80:5 82:4 83:2,18 86:3,13, 17 87:20 90:7 95:13 99:13,17 100:5 101:19 106:17 116:2 118:11,15,16**

**times** 5:15 8:17 17:8 29:1 49:12 50:14 78:17 79:2 83:22 93:19

**title** 28:11 120:24

**today** 4:3 7:4 69:20 125:14

**today's** 5:22

**told** 46:10,11 66:5 68:10 71:17

**top** 26:8,18 55:12 57:4 115:20

**total** 41:20 51:22 52:13 65:2,12

**touched** 121:15 123:2

**track** 13:19

**transactions** 76:14

**transition** 83:18

**transpired** 58:8 80:12

**trash** 115:16

**Tri** 112:13

**Tristar** 71:23 73:4, 19,23,25 74:4,10,13, 17,24 75:5,14,25 76:6,8,18,20 77:4 78:10,20,24 79:8,9, 18 82:10,12 83:3,4 86:23 87:10,13 107:5,8,11,12 112:2, 3,5,8,22 113:1,5,12, 20 114:6,8 115:18 116:14 117:4,7,9,11

**trouble** 108:4

**truthful** 7:3

*AB Litigation Services*

turn 64:10 113:7

TV 50:7 53:13 54:15

type 13:20 79:16 94:8

types 16:13 31:13 49:8 93:15

typically 17:17 18:3 35:1 39:5 49:13 56:20 76:19

**U**

ultimately 18:14 49:15

unable 7:3 50:15 55:3 103:9

uncollectible 118:14 119:11

undercapitalized 50:11

undergraduate 8:24

underlied 85:9

underlying 48:4

underneath 42:23

understand 6:16 21:5 35:9 36:14 38:2 50:2,4,5 96:14 100:7, 23 105:24 107:15

understanding 30:6 49:22,23

understood 46:22 86:20

undertake 101:22

unique 32:21

units 53:11,14 55:4

University 8:24,25

unsuccessful 54:9

unsure 54:19

up-to-date 56:1

update 53:7 61:25 62:3 64:6,9 65:1,6,7, 18 67:7 70:10 77:18 79:25 80:8 81:23

82:2,7,16 83:4 99:4,5

updated 35:18 65:21

updates 82:8

updating 64:24

uploaded 122:15

upper 62:13

**V**

Valerie 29:5

valuation 93:14,20, 22

valuations 94:8

values 13:13 83:24

Vance 12:8,10 118:4

vendors 101:10,12

verbal 6:15 17:8

verbiage 91:24

version 35:14

versus 4:6 36:3

vetting 97:17

viable 112:11 113:1

vice 9:4,9 10:11 12:12 99:7,12

video 5:23 6:11

view 79:11

Vince 13:24 14:15, 22,23 32:4 39:19 45:11 69:14 82:15 83:22 92:19 96:2 97:15 102:7 111:25

Vincent 81:22 82:1

violated 8:5

volumes 29:13

**W**

wait 6:23 34:6

Wal 49:4

Walmart 48:21,22 49:5 53:12 54:14

96:18,24

wanted 13:6 54:12, 24 61:10 78:17 79:1, 14 94:5

warehouse 48:23

warehouses 53:19

warranty 109:14

Waxie 67:9,12

ways 96:8 97:16 113:11 123:11

weaknesses 30:23

week 38:24 53:11,14 54:13,17 55:4 78:15

weeks 38:25

Whitney 91:13

wholesalers 48:23

wife 122:17

word 36:16 48:9 84:4 91:24 98:2

words 13:3

work 7:7,9 9:22 29:17 49:10 66:10 73:5,10 98:16

worked 28:18,20,25 29:2,8 32:3 47:20 73:11 88:10

working 31:2,5,14 49:7 50:13 53:23 106:17

worth 104:21 126:3, 6

write 39:9 119:6,7

writing 96:9 118:22

written 97:1 109:6 118:7

Wycoff 4:6 28:10 30:5,16 46:2 88:12 89:19 101:4 112:7, 14,21 114:25 121:25 122:3 123:14,20 124:1,7,14

Wycoffs 13:16

**Y**

ye 38:6

year 9:23 10:7 12:21, 22 13:12 36:11,12,13 37:9 45:1,8 52:3,4,5, 9,11,17 53:22 64:2 71:11 75:8 80:15,19 93:2 118:18

years 9:7 36:19 37:3 52:10 95:7 119:9,10

**Z**

ZAP 13:15 18:18,21 19:22 20:5,21 22:10, 18 23:16 27:17 28:9, 17 31:25 32:16,17,21 33:7,21 35:10,11,22 36:3 37:7,10 38:4,10 40:9,15 44:7,20 46:25 47:5 48:7 50:14,18,19 51:16,25 52:18 55:11 57:24 58:3,13,19 59:3 61:18 62:9 63:2 64:6, 9 66:3,7 67:7,10,15 68:24 69:18,21 70:10 71:4,13,14,17,19,25 72:12,17,20 73:7 74:14 76:9 77:18 78:11,18 79:3,5,16, 17,25 80:10 81:11, 15,23 82:21,25 83:4, 8 86:22 87:6 93:2,20 96:22 100:9,12 102:18 103:4,15,17 104:17,18 105:12,13 106:8,14 107:9,12 108:9,10 109:24 110:6 112:2,13 113:14,22 115:18 116:15 117:1 118:4,7 121:25 123:17,23 124:1,11 126:2,3

ZAP!'s 46:23 49:19 67:17 99:4 110:14

zeros 25:7 122:8

zone 86:17

zoom 4:7 91:5 114:24 116:2

*AB Litigation Services*



EXHIBIT P