*Midlab Inc*

*VS.*

*Wycoff*

---

VINCENT T. KELLER

August 06, 2021

---



AB Litigation
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

EXHIBIT Q

*AB Litigation Services*

**Page 1**

```
IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:20-CV-03142-KLM

ZOOM DEPOSITION OF VINCENT T. KELLER
August 6, 2021

MIDLAB, INC., a Tennessee Corporation,
Plaintiff,
vs.
MERRIE PISANO WYCOFF individually and as trustee
of The Wycoff Family Trust; WYCOFF FINANCIAL, LLC,
a Colorado limited liability company; MAGNUS
VERITAS LLC, a Colorado limited liability company;
and GCS452, LLC, a Colorado limited liability
company,
Defendants.

APPEARANCES:
     KEATING WAGNER POLIDORI & FREE, PC
          By Ross W. Pulkrabek, Esq.
             1290 Broadway, Suite 600
             Denver, Colorado  80203
                Appearing via Zoom on behalf of
                Plaintiff
     BROWNSTEIN HYATT FARBER SCHRECK, LLP
          By Steven E. Abelman, Esq.
             410 - 17th Street, Suite 2200
             Denver, Colorado  80202
                Appearing via Zoom on behalf of
                Defendants
Also Present: Ana Herrera, technician
```

**Page 2**

```
 1         Pursuant to Notice and the Federal
 2    Rules of Civil Procedure, the Zoom deposition
 3    of VINCENT T. KELLER, called by Defendants, was
 4    taken on Friday, August 6, 2021, commencing at
 5    9:06 a.m., via remote videoconference, before
 6    Tracy L. Harris, Certified Realtime Reporter,
 7    Registered Merit Reporter, and Notary Public
 8    within and for the State of Colorado.
 9
10
11              I N D E X
12    ZOOM DEPOSITION OF VINCENT T. KELLER
13    EXAMINATION BY:                    PAGE
14       Mr. Pulkrabek                   --
15       Mr. Abelman                      4
16
17    PREVIOUSLY MARKED            INITIAL REFERENCE
      EXHIBITS
18
      Exhibit 31 Manufacturing and Supply Agreement  33
19
      Exhibit 42 E-mail to V. Keller from Speth,    68
20         3/25/17
21    Exhibit 43 E-mail to V. Keller, et al., from  79
           Speth, 5/13/16
22
      Exhibit 47 E-mail to Keller and Bodie from    91
23         Miller, 9/14/16
24    Exhibit 49 E-mail to Lowe and Miller from     98
           Housley, 3/16/20
25
```

**Page 3**

```
 1            I N D E X (Continued)
 2    PREVIOUSLY MARKED            INITIAL REFERENCE
      EXHIBITS
 3
      Exhibit 51 Limited Continuing Guaranty        34
 4         (Guaranty Limited to $1,000,000)
 5    Exhibit 53 E-mail to Keller from Wycoff,       67
           3/21/16
 6
      Exhibit 55 E-mail to Keller from Wycoff,       81
 7         6/12/16
 8    Exhibit 56 E-mail to Keller from Wycoff,       84
           6/13/16
 9
      Exhibit 57 E-mail to Keller from Wycoff,       85
10         7/13/16
11    Exhibit 62 E-mail to Keller, Schenk and Miller 93
           from Wycoff, 4/8/16
12
13    EXHIBITS                     INITIAL REFERENCE
14    Exhibit 68 Amended Complaint                  116
15    Exhibit 69 Handwritten notes                  101
16
17
18
19
20
21
22
23
24
25
```

**Page 4**

```
 1            P R O C E E D I N G S
 2        (Exhibits 68 and 69 marked.)
 3            VINCENT T. KELLER,
 4    being first duly sworn in the above cause, was
 5    examined and testified as follows:
 6                EXAMINATION
 7    BY MR. ABELMAN:
 8        Q    Good morning, Mr. Keller.  This is
 9    Steve Abelman.  I'm an attorney for the
10    defendants.
11        MR. PULKRABEK:  Hold on just one
12    second.  I need to interrupt.  I don't think we
13    did any kind of appearances or anything along
14    those lines.  Did you want to do that before we
15    get going with the questioning?
16        MR. ABELMAN:  I thought I just did
17    that.
18        MR. PULKRABEK:  No.  I don't -- I
19    don't think we were asked to -- for appearances or
20    anything.  Did I miss that?  Maybe the court
21    reporter can clarify, but I just -- Yeah, I
22    didn't hear any kind of appearances on the record,
23    but maybe I just missed it.
24        MR. ABELMAN:  I was making my
25    appearance, Ross.  You're entitled to make yours.
```

*AB Litigation Services*

---

**Page 5**

1    MR. PULKRABEK: Yes. Okay. Well, just
2 for the record, Ross Pulkrabek on behalf of the
3 plaintiff, Midlab. I'm sorry. I didn't hear if
4 there was any kind of a request for that in this
5 case.
6    And, Tracy, we can't hear you. You're
7 on mute.
8    THE REPORTER: I'm sorry. I did not
9 ask for appearances.
10    MR. PULKRABEK: It just seemed like we
11 weren't following the usual protocol, so I just
12 wanted to make sure we did. Thank you very much.
13    **Q    (By Mr. Abelman)** Mr. Keller, have you
14 ever been deposed before?
15    A    No, sir.
16    **Q    So we have a court reporter. You're on**
17 **video, and there's some basic guidelines that are**
18 **beneficial for all of us to follow. So those**
19 **include avoiding talking over one another. Also,**
20 **what I would ask is that all responses to my**
21 **questions be verbal and that you wait until I**
22 **finish talking before you begin. I will try and**
23 **afford you the same courtesy.**
24    **Is that -- Is that --**
25    A    Okay.

---

**Page 6**

1    Q    Okay.
2    A    Yes.
3    **Q    Mr. Keller, is there anything that**
4 **would prevent you from answering questions today**
5 **in an honest and forthright manner?**
6    A    No, there is not.
7    **Q    Where are you presently located,**
8 **physically?**
9    A    Knoxville, Tennessee.
10    Q    And are you in a business office?
11    A    Yes.
12    Q    What business office is that?
13    A    Keller Group, LLC.
14    Q    And is there anybody in the room with
15 you?
16    A    No.
17    Q    Do you have any notes or documents with
18 you?
19    A    Yes.
20    Q    What do you have with you?
21    A    I have copies of three supply
22 agreements between Midlab and ZAP! I have a copy
23 of, I guess, the complaint -- I'm not sure of the
24 legalese -- of Midlab, Inc. vs. -- You know, it's
25 the lawsuit or the complaint.

---

**Page 7**

1    I also have a notebook that I carry
2 with me at all times, keeping notes of my day and
3 meetings I'm in, et cetera. I have a photocopy of
4 some pictures from that notebook and other
5 notebooks in previous times that I think are
6 exhibits that will be used in this case and that
7 are germane to this conversation.
8    I also have a myriad of other paper,
9 unrelated documents around me.
10    **Q    So is it your habit to keep notes of --**
11 **of all the meetings you attend on a daily basis?**
12    A    Generally, yes. That would be my
13 answer. I don't always keep detailed notes, but I
14 often do.
15    **Q    And how far back have you been doing --**
16 **has that been your habit?**
17    A    Since approximately the mid-'90s, maybe
18 the late '90s.
19    **Q    So did you review your notebooks for**
20 **information pertinent to this lawsuit consistent**
21 **with discovery requests from the defendants?**
22    A    I'm not sure what is meant by
23 "consistent with discovery requests," but allow me
24 to elaborate. I certainly did review my notes to
25 see if anything that I had in my notes was germane

---

**Page 8**

1 to the situation. I guess that was in -- in
2 response to requests by Midlab's counsel, and I
3 sent them -- I had a phone call describing them.
4 My handwriting is -- is not very legible, chicken
5 scratches, especially if I'm writing quickly, so I
6 would have read or commentated on what the notes
7 said.
8    So I'm not sure if that fully answers
9 your question. I'm not sure about in specific
10 request by the defense. That -- Yeah, that was
11 never mentioned to me, nor did it occur to me. So
12 I'm trying to answer your question accurately.
13 Did I go back and look through notes at the
14 request of my counsel? Yes.
15    **Q    So your -- And nobody ever asked you**
16 **to review notes responsive to specific requests**
17 **made by my clients, the defendants?**
18    MR. PULKRABEK: Object to the form of
19 the question.
20    **Q    (By Mr. Abelman)** Go ahead and answer
21 **the question, please.**
22    A    I couldn't hear -- Ross said
23 something, and I was waiting for him to clarify.
24    MR. PULKRABEK: I said object to the
25 form of the question.

---

Page 9

1    Q    (By Mr. Abelman)  Mr. Keller, go ahead
2   and answer the question, please.
3        A    Okay.  I -- I'm not aware that I've
4   reviewed my notes in specific request for
5   information asked for by defense counsel.
6        Q    So I take that to mean, among other
7   things, that you never were presented or you've --
8   you've never read the specific requests for
9   production or interrogatories propounded by -- by
10  me?
11            MR. PULKRABEK:  Object to the form of
12  the question.  Also, this calls -- or this may
13  call for an attorney-client communication.
14            So in answering the question,
15  Mr. Keller, I'd instruct you not to reveal
16  communications that have occurred between myself
17  or Mr. Goldhamer and you or Midlab personnel.
18  Thank you.
19       Q    (By Mr. Abelman)  So within -- Keeping
20  in mind Mr. Pulkrabek's admonition, please answer
21  the question.
22       A    Okay.  Would you please repeat the
23  question once more.
24            MR. ABELMAN:  Tracy, would you please
25  read back the question.

Page 10

1            (Page 9, Lines 6 through 10 read.)
2        A    That -- That is correct.  That is my
3   recollection.  I have not seen that or read that.
4        Q    (By Mr. Abelman)  With whom did you
5   discuss your deposition?
6        A    Matthew Schenk, briefly.
7        Q    And what was said in that conversation?
8        A    I asked, "How did your deposition go?"
9   He said, "Fine.  It wasn't terribly long, maybe an
10  hour and a half."
11            There was not much more than that.  I
12  was at a conference in Maine and short on time.  I
13  asked if he knew when -- when my actual deposition
14  was.  I knew it to be on Friday, but I didn't have
15  a time.  He said he did not.
16            That was the extent of it.
17       Q    Did he tell you any questions that were
18  posed to him?
19       A    He said that he was asked why Merrie
20  was involved in the -- why Merrie Wycoff would be
21  involved in this case.
22       Q    And what else did he say with regard to
23  that?
24       A    He did not say anything else in regard
25  to that.

Page 11

1        Q    Mr. Keller, what's your home address?
2        A    2628 Keller Bend Road, Knoxville,
3   Tennessee 37922.
4        Q    And describe your post-secondary
5   education.
6        A    Emory University in Atlanta, Georgia.
7   Harvard Business School for a master's in business
8   administration.
9        Q    And was your MBA anything --  Was there
10  a specialty in your MBA?
11       A    My specialty --  I assume you mean an
12  emphasis on a particular area of business, such as
13  accounting or finance.  If you mean that, I would
14  say no.  It was more of a general management
15  focus.  They don't really have, like, majors like
16  one has in an undergraduate setting.
17       Q    Did you do the executive MBA program?
18       A    No.  It was --  I don't know what --
19  It was the regular full-time MBA program.
20       Q    And what's your current position with
21  the Keller Group?
22       A    I'm in the position of chief executive
23  officer.
24       Q    How long have you been the CEO?
25       A    Approximately 20 to 21 years.

Page 12

1        Q    Are you the sole owner of the Keller
2   Group?
3        A    Keller Group, LLC, yes.
4        Q    And how long have you been the sole
5   owner of the Keller Group, LLC?
6        A    Sole owner?  Approximately seven or
7   eight months.  An owner, 20 years.
8        Q    So describe how you -- how you became
9   the sole owner.
10       A    I purchased the remaining shares of my
11  father and my half-brother.
12       Q    And that was seven or eight months ago?
13       A    Correct.  Yeah, to the best of my
14  recollection.  Certainly not much longer than
15  that, if longer.
16       Q    Was your --  Is your father Till
17  Keller?
18       A    My father is Tillman J. Keller, III; he
19  goes by Tim.  My grandfather was Tillman J.
20  Keller, II, and he went by the name Till.
21       Q    And was it Till Keller who founded the
22  Keller Group?
23       A    No.  My father would have founded the
24  Keller Group.  Till Keller was the founder of a
25  number of companies.  The owner of Midlab,

**Page 13**

1  Incorporated is a company called Kelsan,
2  Incorporated, and he founded that company in 1950.
3      Q    So you're the third generation of
4  Kellers in this family business?
5      A    Yes, sir.
6      Q    Since -- When did you receive your
7  MBA?
8      A    1995.
9      Q    And since 1995, have you worked in the
10  family business?
11      A    Yes.
12      Q    How would you describe your
13  responsibilities as CEO?
14      A    Responsibility for the oversight of not
15  just -- well, for a number of different entities
16  and businesses.  I have operating presidents that
17  report to me that run various organizations.  I'm
18  responsible --  Along with an executive team, I'm
19  responsible for setting strategic direction,
20  financial strategy, banking relations, company
21  culture, merger and acquisition activity,
22  oversight and involvement, strategic planning and
23  such matters like that.
24      Q    So describe for me the relationship
25  between the Keller Group and Kelsan.

**Page 14**

1      A    The Keller Group provides management
2  services to Kelsan.  The best way to describe the
3  Keller Group is that it's a holding company which
4  has control and oversight of Kelsan, but it is not
5  legally a holding company.  It is an LLC that does
6  not control or hold the stock of Kelsan.  It acts
7  like a holding company for -- just for your
8  understanding, if that's helpful to you.
9      But it is a management services company
10  that has management services agreements with
11  Kelsan, but it does not hold the stock of Kelsan,
12  if that helps you.  But that's what Keller Group
13  does and is.
14      Q    That is helpful.  Who holds the stock
15  of Kelsan?
16      A    A spousal limited access trust, my
17  half-brother, Blaine Keller individually, and me
18  individually.
19      Q    And what's the relationship --  Does --
20  Does the Keller Group provide management services
21  to Midlab?
22      A    Yes.
23      Q    And who owns --  Who owns the stock of
24  Midlab?
25      A    Kelsan, Incorporated.

**Page 15**

1      Q    What other companies does Kelsan,
2  Incorporated own and what are their businesses?
3      A    Allow me to think for a moment.
4      I think --  We made an acquisition for
5  a janitorial sanitary supply distributor based in
6  Chattanooga, with offices in Nashville, Tennessee
7  a long time ago, circa 1998, and bought that stock
8  and kept that corporation open.  The name of that
9  company is escaping me at the moment, but I'm sure
10  it will come back to me.  I think somewhat
11  recently, we finally dissolved that entity, so it
12  probably no longer exists; so that might be one.
13  But, again, it seems to me in recent years that
14  might have been folded in and no longer -- no
15  longer is a legal entity.
16      We have one or two other activities
17  that we run as divisions, but they're not legal
18  entities.  We have a shredding business, as in
19  document management and document destruction, like
20  Shred-it or Iron Mountain, if you're familiar with
21  those.  But that's run as a division, so it's not
22  a separate legal corporation.  Therefore, Kelsan
23  doesn't own --  So it just owns the assets of that
24  division.
25      Then the same is true with an on-line

**Page 16**

1  Internet company marketing janitorial and cleaning
2  supplies on-line, but that's also a division of
3  Kelsan, not a legal separate entity.  So that's
4  why I was pausing.
5      I'm not --  And no other companies come
6  to mind that it owns separately as subsidiaries or
7  with an investment.
8      Q    Is there a Kelsan board of directors?
9      A    There are a board of directors for
10  Kelsan, yes.  They're organized --  They're called
11  the Keller Group board, but it's -- it's -- but
12  legally, they are the board of Kelsan,
13  Incorporated, yes.
14      Q    You said they're called the Keller
15  Group board?
16      A    Well, we call it a quarterly Keller
17  Group board meeting.  Kelsan would be one of
18  several companies that would present information
19  to the board, but they -- but -- but statutorily,
20  legally, they're the board of directors for
21  Kelsan, Incorporated, Midlab, Incorporated,
22  et cetera.
23      Q    So the Keller Group provides the
24  individuals who serve on the boards of Kelsan?
25      A    Correct.

**Page 17**

1  Q   And others?
2  A   Correct.
3  Q   And you're one of the board members?
4  A   Correct.
5  Q   Who -- Who are the other board
6  members?
7  A   My father, Tim Keller, Dr. Chuck
8  Cowart, C-o-w-a-r-t -- or Charles Cowart, but he
9  goes by Chuck. And also Mr. Mike Sims, S-i-m-s.
10  We would call those outside directors, non-family
11  members, non- -- non-management directors.
12  Q   So you, your father, Chuck Cowart and
13  Mike Sims?
14  A   Correct.
15  Q   Don't most boards have an odd number of
16  board members?
17  A   I don't know.
18  Q   Okay. And so at regular board
19  meetings, there may be presentations on Midlab as
20  well as Kelsan -- Kelsan and -- and a few other
21  businesses?
22  A   Yes, that is correct.
23  Q   Do any of your children work for the
24  Keller Group or any of the businesses with whom
25  the Keller Group has management services?

**Page 18**

1  A   One of my children does. My son, whose
2  name is Tillman Keller, works for Kelsan.
3  Q   And what's his position?
4  A   He is a salesperson -- Specific title,
5  I think, is business development national
6  accounts; I think that's his specific title. But
7  he -- he -- he is a salesperson generating new
8  business.
9  Q   How many children do you have?
10  A   Two.
11  Q   And the other child's name is . . .
12  A   Heidi, H-e-i-d-i, Keller.
13  Q   Has Heidi ever worked for any of the
14  Keller Group enterprises?
15  A   Very shortly, just for a short period
16  of time, a summer- -- a summertime in one of our
17  businesses that's in the automotive sector. She
18  was there for, I'm guessing, 2-1/2 or 3 months.
19  Q   Has Heidi ever been covered by the
20  Keller Group's health insurance?
21  A   As a dependent on her parents, yes.
22  And she still is.
23  Q   Is -- Is she under the age of 26?
24  A   Yes.
25  Q   Your home at 2628 Keller Bend Road, how

**Page 19**

1  is that titled?
2  A   Jointly with me and my wife.
3  Q   And what do you estimate is the value
4  of that home?
5  MR. PULKRABEK: Form and foundation.
6  THE DEPONENT: So I would ask my
7  counsel, should I answer that question?
8  MR. PULKRABEK: Mr. Abelman, let me ask
9  you, what's the relevance of the estimated value
10  of Vince Keller's home to any issue in this case?
11  MR. ABELMAN: This is all responsive to
12  issues you've raised in your complaint. There's
13  reference to how the Wycoffs have valued their
14  home, and so I think it's clearly relevant and
15  certainly useful for impeachment purposes to
16  understand the standards being employed.
17  So that's why I'm asking.
18  MR. PULKRABEK: Well, as to this
19  particular question, I don't see how it could
20  conceivably be relevant to any issue, and it does
21  seem to be asking for personal information, so I
22  don't think that Mr. Keller should have to answer
23  this particular question. I suppose if you want
24  to go to the Court and ask for an order requiring
25  him to state the value of his personal residence,

**Page 20**

1  you can do that.
2  The -- You know, if you want to ask
3  him about methodologies of -- of home valuation,
4  if it has some connection to the Wycoffs, I think
5  that would be a different question entirely.
6  MR. ABELMAN: Are you directing your
7  client not to answer the question?
8  MR. PULKRABEK: Yeah, I think I just
9  said that. If you want to go to the Court and
10  ask that Mr. Keller state the estimated value of
11  his house, then I guess -- I just don't think it
12  has any conceivable relevance to this case at all,
13  so . . .
14  MR. ABELMAN: Ross, you've raised that
15  the -- the valuation that the Wycoffs have applied
16  to their house has been erroneous, so I want to
17  know what standards are being employed by
18  Mr. Keller. He's -- He's -- He's clearly the --
19  the principal of the plaintiffs, so what's --
20  what's an appropriate standard for a non-expert to
21  utilize when representing the value of their home
22  and other properties.
23  MR. PULKRABEK: Well, you haven't even
24  asked him that question at all. And I think there
25  would be further objections to that on foundation.

*AB Litigation Services*

1  But you're -- I mean, you've asked him
2  specifically what the value of his house is, and
3  that has no bearing on anything in this case.
4       MR. ABELMAN:  Sure, it does.  It has
5  bearing on the standard that -- that you are
6  employing in your complaint.  I want to know what
7  the value -- what he estimates the value of his
8  house to be, and then I'm going to ask him what he
9  bases that on and -- and how -- how he checks
10  that.
11       MR. PULKRABEK:  Yeah.  So you can make
12  that argument to the Court, Mr. Abelman.  I think
13  that this is pretty far afield, how Mr. Keller --
14  in response to your question, what he would say
15  the value of his house is.
16       MR. ABELMAN:  And -- And your concern
17  about the privacy of Mr. Keller is certainly
18  valid, and when I expressed similar concerns with
19  regard to intrusion into the privacy of Azuraye
20  Wycoff, I was met with opposition.  So I'm going
21  to ask this question --  I'm going to ask the
22  question again.  If you're directing your client
23  not to answer it, then please say so.
24       **Q       (By Mr. Abelman)  What do you estimate**
25  **is the present value of your home, Mr. Keller?**

1       MR. PULKRABEK:  Okay.  And, once again,
2  Mr. Keller, don't answer.  You don't need to
3  answer that question.  Mr. Abelman just stated
4  that you had valid concerns about the privacy of
5  that information and conceded that point, and I
6  agree.  You don't need to answer that question.
7  Thank you.
8       **Q       (By Mr. Abelman)  Mr. Keller, do you**
9  **believe that your wife is liable for the debts of**
10  **the Keller Group?**
11       A       Of the Keller Group, no.
12       **Q       Do you believe that your wife is liable**
13  **for the debts of Kelsan?**
14       A       No.
15       MR. PULKRABEK:  Foundation.
16       **Q       (By Mr. Abelman)  Do you believe that**
17  **your wife is liable for the debts of Midlab?**
18       MR. PULKRABEK:  Foundation.
19       THE DEPONENT:  Ross, does that mean I
20  answer or not answer?
21       MR. PULKRABEK:  You can go ahead and
22  answer the question, if you can.
23       A       Okay.  I do not think that my wife is
24  liable for the debts of Midlab.
25       **Q       (By Mr. Abelman)  Explain why you**

1  **believe that, please.**
2       A       Because my wife is not an officer, a
3  party to any of the business of those businesses.
4  She's not made representations to anything like
5  that.  What my wife would be liable for is debts
6  of my personal estate, or if I personally
7  guaranteed something and then passed, my estate
8  would be -- would owe that, and so my wife, as an
9  executor of my estate, would have an obligation to
10  meet my obligations.
11       So that's how my wife might be
12  connected to obligations of me, but not connected
13  to obligations of some separate corporations of
14  which she had no affiliation or part of.  Just
15  from my understanding --
16       **Q       (By Mr. Abelman)  So do you believe**
17  **officers --**
18       A       I'm sorry.  Go ahead.
19       MR. PULKRABEK:  Well, hold on just one
20  second.  I think Mr. Keller needs to finish his
21  answer before the next question gets posed, as
22  opposed to talking over each other.  Thanks.
23       MR. ABELMAN:  Agreed.
24       A       So my layman's understanding of -- of
25  how these things work, she is connected to me

1  personally and to -- and would be connected to my
2  estate if I were to predecease her, and so she is
3  connected in those ways, but not connected to
4  other separate legal entities that she has no
5  affiliation with and no connection with as an
6  officer or owner or party.
7       **Q       (By Mr. Abelman)  So if she -- Are the**
8  **officers of Midlab liable for the debts of Midlab,**
9  **in your opinion?**
10       MR. PULKRABEK:  Form and foundation.
11       Go ahead.
12       A       Not unless the officers had executed
13  personal guarantees for debts of the company.
14  Otherwise, no.
15       **Q       (By Mr. Abelman)  Mr. Keller, do you**
16  **have life insurance?**
17       A       Yes.
18       **Q       Are either of your children named as**
19  **beneficiaries on any of your life insurance**
20  **policies?**
21       A       Allow me to reflect a moment.  I do not
22  think my children are named beneficiaries.  That's
23  my recollection.
24       **Q       Are there trusts for which your**
25  **children are named beneficiaries that are named as**

*AB Litigation Services*

---

**Page 25**

1   beneficiaries of your life insurance?

2       A    Yes.

3       Q    And why did you --  Why is that

4   structured that way?

5       A    I would --  I mean, I don't mind giving

6   you my best recollection to an answer, but -- but

7   I would also say that I was advised by people who

8   do this for a living and would be considered

9   expert in that field that suggested it that way

10  for estate management reasons, tax management

11  reasons.  So that is -- that is, especially

12  regarding estate taxes, an efficient way to

13  transfer wealth, et cetera.  That's my

14  recollection and understanding for why their --

15  the -- at least a couple of policies that I can

16  think of are -- are in trusts.

17      Q    Fair enough.  Tell me why you have your

18  children as ultimate beneficiaries of your life

19  insurance policies -- of some life insurance

20  policies.

21          MR. PULKRABEK:  Form and foundation.

22      A    The reason they would be at least

23  partially beneficiaries --  I don't recall the

24  exact structure for how it works.  Certainly my

25  wife would be a beneficiary as well if she lives

---

**Page 26**

1   past my death, but it would be for their care and

2   enablement going forward.

3       Q    (By Mr. Abelman)  And how old are they?

4   You mentioned your daughter Heidi is under

5   26, but what are their ages?

6       A    My daughter is 23.  My son is 25.  He's

7   25, yeah.

8       Q    I understand that the building where

9   Midlab operates belongs to an entity owned by you

10  directly or indirectly; is that correct?

11      A    I'm am --  I am an owner of an entity

12  that owns the real estate building and real

13  estate, yes.

14      Q    So what's the name of the entity, then,

15  that owns that real estate?

16      A    For Midlab?

17      Q    Yes.

18      A    Exit 49, LLC.

19      Q    And what interest do you have in

20  Exit 49, LLC?

21      A    In terms of an amount of ownership?

22      Q    Yes.

23      A    50 percent.

24      Q    Who owns the other 50 percent?

25      A    My father, Tim Keller.

---

**Page 27**

1       Q    And what is your estimate of the fair

2   market value of that building?

3           MR. PULKRABEK:  You know, the same

4   objection as earlier.  Mr. Abelman, what is the

5   relevance of an estimate by Mr. Keller as to the

6   value of a building owned by an entity that's not

7   even a part of this lawsuit?

8           MR. ABELMAN:  These are all issues that

9   you've raised in your complaint.

10          MR. PULKRABEK:  I don't think we've --

11  We don't have any allegations in our complaint

12  about the value of a building owned by a different

13  entity that's not a party in this -- in this case

14  under -- that is somehow connected to Midlab.

15  Where's that allegation in our complaint?

16          MR. ABELMAN:  The allegation in your

17  complaint, which you very well know, is that the

18  farm was owned by -- by a Wycoff entity, and that

19  that somehow -- that that somehow was a

20  misrepresentation for purposes of the net worth of

21  the Wycoffs.

22          So we're going to go through this.  And

23  that's --  I mean, that's the relevance of it, is

24  whether you think an intermediate enterprise

25  impacts upon the net worth of an individual.

---

**Page 28**

1           MR. PULKRABEK:  Okay.  Well, you

2   haven't laid any foundation that would establish

3   that Mr. Keller's making representations that the

4   value of a building owned by a different entity

5   is -- is impacting his net worth.  If you can lay

6   that foundation, then maybe it's relevant.  Absent

7   that, I think that this is outside the scope of

8   discovery and I'd direct Mr. Keller not to answer

9   that question.

10      Q    (By Mr. Abelman)  Is there a mortgage

11  against the building owned by Exit 49?

12      A    Yes.

13      Q    And in your estimation, is there equity

14  in that building that inures to the benefit of you

15  and your father?

16      A    Yes.

17      Q    And would you consider that that equity

18  would be calculated --  Would you use that equity

19  in any calculation of your personal net worth?

20      A    Yes.

21      Q    Mr. Keller, let's discuss ZAP! in

22  particular.  When did you first become aware of

23  ZAP! or Jeff Wycoff?

24      A    The answer to that would be a bit

25  earlier than, let's say, 2015 -- the fall of '15

---

*AB Litigation Services*

Page 29

1  when -- when we -- when Midlab started
2  manufacturing product for ZAP! And the reason is,
3  going back several years prior, which I'm going to
4  have to give a guess as to how many years before
5  this time period of approximately the fall of
6  2015 -- Midlab did business with Mr. Wycoff years
7  earlier, circa 2005, I'm guessing, plus or minus a
8  couple of years, in manufacturing some product on
9  his behalf. I think the product brand name was
10 Simplicity, and it was a laundry detergent sold at
11 a variety of places, but in particular at Walmart.
12        So I was aware of and knew -- I don't
13 know -- I don't recall knowing him then. I
14 certainly knew of him, and Matt Schenk knew him
15 and dealt with him personally at that time. So --
16 So back to, let's say, 2015 when this situation
17 with ZAP! began and they signed the supply
18 agreement with Midlab, we started making the
19 various Zap! Products, which I guess that was the
20 fall of 2015. Without looking, that's my
21 recollection.
22        I -- I was -- I certainly knew Jeff
23 then and met him at some point and certainly
24 started communicating and speaking to him and
25 e-mailing with him, but I knew him prior, as I've

Page 30

1  described.
2        Q      So for ZAP!, was Matt Schenk the
3  primary source of -- of communication in 2015?
4        A      I think it's fair to characterize him
5  as the primary. He certainly talked with him --
6  Yes, he would be primary. He talked to him more
7  than I did. I did talk to him, but he talked to
8  him more than I did. Yes, that would be accurate.
9        Q      So did you have conversations with
10 Jeff Wycoff prior to the execution of the
11 management and supply agreement?
12       A      I would think, yes. I'm not positive
13 without, again, referring to, you know, journals
14 or e-mails, but -- but I feel comfortable that,
15 yes, I did have conversations with him prior to
16 the execution of the agreement.
17       Q      I took Steve Miller's deposition
18 earlier this week -- And he's the vice president
19 of finance for Midlab; is that correct?
20       A      That is correct.
21       Q      And he testified that before taking on
22 a new customer, Midlab often required an
23 application, and they -- they always required his
24 department to perform a financial analysis.
25              Does that comport with your

Page 31

1  understanding?
2              MR. PULKRABEK:  Form and foundation.
3        A      That comports with my understanding of
4  what would be normal practice. I don't know that
5  it was done always, you know, every time without
6  fail or how thorough that is, but it does comport
7  with my understanding that that would be -- that
8  that would be normal practice and -- and I think
9  often was practice, yes.
10       Q      And Mr. Miller testified that sometime
11 in the summer of 2015, Midlab started -- started
12 evaluating ZAP!'s financials and products and
13 projections under his supervision.
14              Does that -- Is that your
15 understanding as well?
16       A      Yes.
17              MR. PULKRABEK:  Form and foundation.
18              Go ahead.
19       A      That would be -- That would be my
20 understanding, yes.
21       Q      (By Mr. Abelman) And Mr. Miller
22 testified that the results of their analysis are
23 submitted to the management team and that the
24 management team then makes the decision to approve
25 a customer.

Page 32

1              Is that consistent with your
2  understanding?
3        A      It is consistent, yes.
4        Q      And he testified that -- that he
5  presented to the management team and the
6  management team approved ZAP! as a customer.
7              Is that consistent -- Does that
8  comport with your recollection?
9        A      Yes.
10       Q      And he testified that the financial
11 information that was required from Jeff Wycoff and
12 ZAP! was performance and -- and product
13 information as well as projections.
14              Is that what you would expect that your
15 VP of finance would do?
16       A      Yes.
17       Q      And if the management team approved a
18 customer, only then would the -- would a
19 manufacturing and supply agreement be drafted and
20 submitted to the customer.
21              Is that accurate?
22       A      I think that is accurate.
23       Q      And he testified that the management
24 team approved ZAP! as a customer based upon the
25 evaluations you performed, and a manufacturing and

Page 33

1  supply agreement was drafted and submitted to Jeff
2  Wycoff.
3          Is that consistent with your
4  understanding?
5      A    Yes.
6          MR. PULKRABEK:  Form.
7      A    It is.  Yes, it is.
8          MR. ABELMAN:  Ana, could you pull up
9  Exhibit 31.
10         THE REPORTER:  Ana, we just see the
11 list of exhibits.
12         THE TECHNICIAN:  They were re-titled.
13 Do you happen to know what number that exhibit
14 would be?
15         MR. ABELMAN:  It's Exhibit 31.
16         THE DEPONENT:  I think I saw one titled
17 Exhibit 31 on the screen.
18         THE TECHNICIAN:  Do you see it now?
19         THE DEPONENT:  Yes.
20     Q    (By Mr. Abelman)  Mr. Keller, would you
21 identify Exhibit 31 -- what's been marked as
22 Exhibit 31, please.
23     A    It says it is and appears to be a
24 manufacturing and supply agreement between --
25 excuse me -- Midlab and ZAP!

Page 34

1      Q    And when I --  I'll be asking you to
2  identify exhibits in the future as well.  When
3  doing so, would you kindly reference not only the
4  title of the document, but also the date?
5      A    Sure.  This is dated September 16,
6  2015.
7      Q    And is this the same document as the
8  one that you have in -- in your office?
9      A    It appears to be based on this -- on
10 what I'm looking at, yes.
11     Q    And who executed it on behalf of Zap!
12 Products?
13     A    On my copy, when I flip to the end, who
14 executed it for Zap! Products was Jeffrey Wycoff.
15     Q    And in what capacity did he execute it?
16     A    President.
17         MR. ABELMAN:  Ana, would you pull up
18 what's been marked as Exhibit 51, please.
19     Q    (By Mr. Abelman)  Mr. Keller, I'm
20 sorry.  Did --  Are you able to identify this --
21 this --
22     A    Oh, I'm sorry.  I was waiting for you
23 to ask me something.  I can identify it.  It's --
24 It's called the Limited Continuing Guaranty, and
25 it says, in the first line, blah, blah, blah to

Page 35

1  induce Midlab, Inc. to extend credit or continue
2  accommodations of that product.
3          It doesn't have a date on what I can
4  read here.  I just see the top portion of what
5  would be, I guess, Page 1.
6      Q    There is a date.  It's on Page 3.
7          MR. ABELMAN:  Ana, if you could go to
8  Bates No. -000011.  Scroll down.
9      A    Yeah, this appears to be the end of the
10 agreement and the signature section.  And it's
11 dated the 11th day of November, 2015, signed by
12 Jeffrey Wycoff, witnessed by Russell Leadingham.
13     Q    (By Mr. Abelman)  So have you seen this
14 Limited Continuing Guaranty before?
15     A    Yes.
16     Q    Do you recall when you first saw it?
17     A    Well, I saw it yesterday when speaking
18 to my counsel about various exhibits that perhaps
19 will be shown today.  Before that, I was aware of
20 the guaranty.  I don't know that I personally saw
21 it or read it, me personally.  I knew it was
22 $4 million.  I probably saw it in someone's hand,
23 such as Colman Hoffman's, but I can't say with
24 certainly.  Although it's possible I saw it --
25 that I saw it and looked at it and carefully

Page 36

1  examined it back in 2015.
2      Q    Do you know whose idea it was to get a
3  guaranty from Jeff Wycoff?
4      A    I'm not certain, but if you'd like me
5  to kind of give you my view of my best
6  recollection, I can do that.
7      Q    Please.
8      A    I think it was a conversation, a
9  discussion from Matt Schenk, with our counsel
10 Colman Hoffman, with me, independent of one
11 another or together on more than one occasion.
12 And what precipitated it was that ZAP! was going
13 to really grow and purported to do a lot of
14 business and was running up a -- a significant
15 accounts receivable.  It was getting to be
16 impactful to our business and of concern to us,
17 and a thought was "Why not help get us better
18 protection through a personal guaranty" that we're
19 observing here as this exhibit.
20         That's --  That's how and who suggested
21 that.  My recollection was Matt Schenk, Colman
22 Hoffman and myself thinking, "Yes, this would help
23 with security of the situation."  Steve Miller
24 might have opined and said that --  You know, it's
25 possible he chimed in on that as well, but --  So

**Page 37**

1  that's my best recollection on who was involved in
2  that and why.
3      Q      Describe for me what you mean by
4  "security of the situation."
5      A      By security of the situation, I mean by
6  helping to guarantee, to give assurance --
7  increased assurance of payment.  If the business
8  didn't perform or the business venture that he was
9  in -- that he was involved in failed and had
10  financial problems, it was meant to bolster and
11  give security to Midlab's accounts receivable
12  being able to be collected in the event that were
13  to occur.
14      Q      What other guaranties for ZAP! did
15  Midlab require?
16      A      What other guaranties --  I'm trying to
17  understand your question.
18      Q      Were there any other guarantors or
19  guaranties executed?
20      A      No.  There --  To my knowledge, there
21  was not a separate other guaranty executed.  There
22  were two subsequent supply agreement enhancements,
23  addendums, additions, amendments -- I'm not sure
24  of the exact word -- that Jeff Wycoff signed, and
25  those reaffirmed his guaranty, but --  So perhaps

**Page 38**

1  those could be considered that, but I don't know
2  of, yet again, a completely separate personal
3  guaranty other than the one that's on the exhibit
4  now.
5      Q      So you would concede that Midlab did
6  not request a guaranty from Merrie Wycoff?
7      A      I would concede that Midlab did not
8  request a personal guaranty from Merrie Wycoff,
9  yes.
10      Q      And Midlab was not requiring Merrie
11  Wycoff's personal assets to be a backstop for the
12  ZAP! debt?
13      A      I would disagree with that, in that --
14  I would disagree with that, in that the personal
15  financial statement of Jeff Wycoff had substantial
16  assets which, to my understanding, were also joint
17  marital assets, such as his personal residence,
18  which he spoke to me about numerous times; for
19  sure the farm, as he referred to it in Longmont,
20  Colorado, which was on the financial statement,
21  used to validate his credit worthiness, financial
22  strength and ability to make good on a personal
23  guaranty, as well as her --  And it -- it -- it
24  was my understanding and is my understanding that
25  many of the assets on his statement, she had

**Page 39**

1  involvement with, commingling with, whatever the
2  phraseology is.
3      So we did rely on her in that regard,
4  yeah.
5      Q      Fair enough.  Explain what you mean by
6  "joint marital assets."  So if you and your wife
7  own something jointly, do you think that means
8  that half of the asset or all of the asset is
9  accessible to creditors that you may have?
10      MR. PULKRABEK:  Hold on.  Form -- Form
11  and foundation on that question.  Thanks.
12      THE DEPONENT:  So what does that mean,
13  Ross?  Should I answer?
14      MR. PULKRABEK:  If --  Yeah, you can go
15  ahead and answer the question, if you can.
16      A      I don't know the answer to your
17  question, Steve.  But I --  I --  If it's a
18  marital asset, such as a -- such as a residence --
19  a primary place of residence and it's joint, and
20  there's a problem with a spouse --  Let's say a
21  spouse signed a personal guaranty and that asset
22  needs to be used to settle the debt.  Then the
23  creditor can take all of the asset, not just half,
24  if it was, quote, 50 percent jointly owned.
25      That's --  That's my opinion and

**Page 40**

1  understanding to the best of my knowledge.  I hope
2  that answers your question.
3      Q      (By Mr. Abelman)  So are you saying
4  that for any debt that you personally guarantee, a
5  creditor of yours could take all of what is
6  jointly owned between you and your wife?
7      MR. PULKRABEK:  Form and foundation.
8      A      I don't --  The answer is I don't know.
9  I think it would depend on state law.  My
10  understanding is that in certain states, that's
11  possible.  In other states, it's not.
12      Q      (By Mr. Abelman)  Well, what's Midlab's
13  position with regard to the joint assets of -- of
14  the Wycoffs?  Was it Midlab's --  That's the
15  question.
16      MR. PULKRABEK:  All right.  Objection,
17  form, foundation.  That also calls for attorney
18  work product and attorney-client communications to
19  the extent that you're really asking for a legal
20  theory.  So I would instruct this witness not to
21  answer the question.
22      MR. ABELMAN:  I'm not asking for what
23  the lawyers think.  I know what the lawyers think,
24  Ross.  I'm asking for what Mr. Keller thinks.
25      MR. PULKRABEK:  Well, if you're asking

*AB Litigation Services*

**Page 41**

1   for Mr. Keller's legal opinion, the objection --
2           MR. ABELMAN:  I'm asking for his
3   opinion.  He's not a lawyer.  I'm not asking for
4   his legal opinion.  I'm asking for his opinion.
5           MR. PULKRABEK:  Okay.  Form and
6   foundation.
7           Go ahead.
8       A   Okay.  So what -- what -- what --
9   Mr. Abelman, what's the question, then.
10          MR. ABELMAN:  I've -- Would you read
11  it back, please.
12          (Last questoin read.)
13      A   My answer would be that it is Midlab's
14  position that the joint assets served as security
15  on the guaranty and should be used to help make
16  good on the guaranty.
17      Q   (By Mr. Abelman)  I'm sorry.  Did
18  Midlab have a security interest in any of the
19  Wycoff joint assets?
20          MR. PULKRABEK:  Objection, form and
21  foundation.
22      A   I don't know the technical answer to
23  that question.  That's -- Perhaps not.  What they
24  had was a personal guaranty with Jeff Wycoff.
25      Q   (By Mr. Abelman)  Okay.  Isn't it true

**Page 42**

1   that Merrie Wycoff had no personal liability to
2   Midlab in 2015?
3           MR. PULKRABEK:  Form and foundation.
4           If you can answer, go ahead.
5       A   I -- I don't know the answer to your
6   question.
7       Q   (By Mr. Abelman)  Well, had Merrie
8   Wycoff made any commitment to pay anything to
9   Midlab in 2015?
10      A   No.
11      Q   Okay.
12          MR. ABELMAN:  Let's -- I'm not sure
13  why these are part of Exhibit 51, but -- So,
14  Ana, would you go to the next page, which is
15  Bates No. -000012.
16      Q   (By Mr. Abelman)  Mr. Keller, have you
17  ever seen this letter before?
18      A   I saw it yesterday.
19      Q   Was that the first time you saw it?
20      A   It's the first time I recall seeing
21  this letter.
22      Q   Do you know who at Midlab received this
23  letter?
24      A   I don't know if anyone at Midlab
25  received it.  I believe and recollect that Colman

**Page 43**

1   Hoffman received it, and he's -- he was general
2   counsel at the Keller Group level acting on behalf
3   of Midlab.
4       Q   And do you know how it came to be in
5   Mr. Hoffman's possession?
6       A   It's my understanding that it was sent
7   to him by Jeff Wycoff or his representatives.
8       Q   Did you ever discuss this letter with
9   Mr. Hoffman?
10      A   Yes.
11      Q   When did you discuss it with
12  Mr. Hoffman?
13      A   In the fall of 2015.
14      Q   So you discussed this without reading
15  the letter or seeing the letter?
16      A   That's my recollection.
17      Q   What did he -- What did he say to you
18  about the letter?
19      A   That he has -- It was not so much just
20  about the letter, but that he got the personal
21  financial statement of Jeff Wycoff and, you know,
22  any relevant supporting documentation.  I don't
23  recall him saying "and also a separate letter."
24  It was -- It would have been framed in the
25  conversation about the materials related to the

**Page 44**

1   personal financial statement.
2           And so he -- he shared with me his
3   opinion of the assets and whether there was
4   substantial value to warrant the million dollar
5   personal guaranty.
6       Q   Would you read aloud the second
7   paragraph in this letter.
8       A   Yes.  "Jeffrey and Merrie Wycoff have
9   elected to omit substantially all the disclosures
10  required by accounting principles generally
11  accepted in the United States of America.  If the
12  omitted disclosures were included in the statement
13  of financial condition, they might influence the
14  user's conclusions about the financial condition
15  of Jeffrey and Merrie Wycoff.  Accordingly, the
16  financial statement is not" designated "for those
17  who are not informed about such matters."
18      Q   So you have an MBA.  Explain to me what
19  you think that means.
20          MR. PULKRABEK:  Form and foundation.
21          Go ahead, if you can.
22      A   It means that -- My -- My take on
23  what this means is Robert Henke, who signed this
24  letter, is saying that there could very well be
25  things omitted from this and that you need to be

*AB Litigation Services*

**Page 45**

1  aware of that.  And if you're going to take the
2  information, you need -- you should be informed
3  about how things work in such financial matters.
4         That's what I take that second
5  paragraph to mean.
6      Q    (By Mr. Abelman)  Okay.  So how did
7  Midlab respond to that caveat?
8         MR. PULKRABEK:  Form and foundation.
9      A    I'm not sure what your question means.
10  In terms -- Ultimately, they granted a personal
11  guaranty of $1 million on the basis of the
12  disclosures provided.  That might be what,
13  ultimately, what you mean.  That's what -- That's
14  what they did, if that's what you mean.
15     Q    (By Mr. Abelman)  Sure.  Well, I mean,
16  how would you classify that paragraph?  Is it a
17  disclaimer?  Is it a -- Is it a caveat?  What
18  language would you use to classify that second
19  paragraph?
20        MR. PULKRABEK:  Form and foundation.
21     A    I would use that as -- I think your
22  word "disclaimer" is accurate.
23     Q    (By Mr. Abelman)  Okay.  Did you and
24  Mr. Hoffman discuss this disclaimer?
25     A    No.

**Page 46**

1      Q    Is it something that, in retrospect,
2  you would have liked to have been brought to your
3  attention?
4         MR. PULKRABEK:  Objection, form.
5         THE DEPONENT:  I'm not sure what, Ross,
6  you said.
7         MR. PULKRABEK:  I said objection to
8  form.  I -- I don't know if the court reporter
9  got my objection, but . . .
10        THE REPORTER:  I did.
11        THE DEPONENT:  Do I proceed?
12        MR. PULKRABEK:  You can answer --  If
13  you can answer the question, go ahead.
14     A    Do I wish that Colman Hoffman had said,
15  "Hey, there's a" -- "there's a disclaimer at the
16  bottom of" -- "of the cover letter for the
17  personal financial statement saying, you know, use
18  this information carefully?"  I'm -- I guess my
19  answer would be I'm indifferent to that.  I think
20  that one would need to use the financial
21  information carefully regardless of whether
22  there's a disclaimer on the cover.
23        So that's -- That's my -- That's my
24  answer.
25     Q    (By Mr. Abelman)  Isn't -- Isn't

**Page 47**

1  Midlab complaining about some of the accuracy of
2  the contents of this statement of financial
3  condition in its complaint?
4      A    It is my understanding that Midlab is
5  complaining about the accuracy of the financials
6  presented, yes.
7      Q    So there's a disclaimer about the
8  contents of that statement of financial condition,
9  and you weren't alerted to that disclaimer?
10     A    Correct.
11     Q    Okay.
12        MR. ABELMAN:  Let's go to the next
13  page, please.
14     Q    (By Mr. Abelman)  Oh, by the way,
15  before we do that, what was the date on the -- of
16  the letter from Mr. Henke?
17     A    The date is November 3, 2015.
18     Q    And do you know when Mr. Hoffman
19  actually received this?
20     A    I -- I don't know when.
21     Q    Do you know how Mr. Hoffman solicited
22  this letter?
23     A    I do not know precisely, no.  I assume
24  he asked -- I assume he asked someone for it, but
25  I do not know exactly how or whatever.

**Page 48**

1      Q    Do you know if Mr. Hoffman looked
2  through his files to determine whether he had any
3  correspondence relating to this letter?
4         MR. PULKRABEK:  Form and foundation.
5      A    Do I -- Do you mean -- I'm not --
6  I'm not understanding your question, Steve.
7  Back -- Back then did he look -- I'm not
8  understanding.  Ask your question in a different
9  way, please.  I'm not following your question.
10     Q    (By Mr. Abelman)  Well, Midlab was
11  requested to provide various documents to --
12  responsive to discovery propounded by the
13  defendants.
14     A    Okay.
15     Q    And my question is, do you know if
16  Midlab has looked through its files to determine
17  whether there was any correspondence which Midlab
18  was part of which precipitated this letter?
19     A    No.  I do not know --
20        MR. PULKRABEK:  Form and foundation.
21     A    I do not know that.
22     Q    (By Mr. Abelman)  Who would know that?
23        MR. PULKRABEK:  Foundation.
24        Go ahead.
25     A    I -- I'm -- I think -- I'm -- For

**Page 49**

1    the record, I'm not fully understanding your
2    question.  If you're asking did -- was Midlab
3    asked to go through their files and send the
4    defense information related to correspondence for
5    this -- this particular personal financial
6    statement, I -- Yeah, I don't know if they were.
7    If they were, I suspect Colman was asked to do so,
8    or maybe Steve -- Steve Miller, perhaps Matt
9    Schenk.  And I suspect they did, but I don't know
10   the answer to your question.
11        Q     (By Mr. Abelman)  Well, both Steve
12   Miller and Matt Schenk said they had never seen
13   this before.  Steve Miller said he'd never seen
14   it.  Matt Schenk said the first time he saw it was
15   a week ago.
16             MR. PULKRABEK:  Foundation
17        A     And you're referring to the exhibit on
18   the screen?
19        Q     (By Mr. Abelman)  Yeah.  I'm referring
20   to the letter from Mr. Henke and the next page,
21   which is the statement of financial condition?
22        A     Okay.  Thank you.  I'm less confused
23   now.  I am -- Okay.  Obviously, I've been
24   confused.
25             I am not surprised by that.  My

**Page 50**

1    recollection is that Colman Hoffman got this back
2    in 2015, although I don't know the exact date, but
3    shortly after November 3rd, I believe.  And it is
4    also my understanding that he was asked to keep
5    this confidential, as carefully as he could.  He
6    discussed with me, and I'm certain Matt Schenk,
7    but I know he discussed with me -- I remember
8    standing in the frame of his office doorway --
9    about Mr. Wycoff's financial status based on his
10   disclosures in the personal financial statement.
11   So that was discussed with me.
12             I'm sure it was discussed with Matt and
13   Steve Miller, but I don't know that they were ever
14   shown this.  It's my recollection they weren't.  I
15   was not.  And part of the reason, as I recall, was
16   that he was asked, in essence, as a professional
17   courtesy or whatever, "Hey, keep this on the down
18   low," or "Hey, protect this private information.
19   Use it for you, for your counsel to advise, but
20   protect this."
21             So it wasn't widely disseminated -- or
22   not even disseminated to one or two people or
23   beyond even Colman.
24        Q     Who asked Colman to keep it
25   confidential?

**Page 51**

1        A     My understanding was whoever sent this
2    to him, be it Jeff Wycoff or Mr. Wycoff's counsel,
3    and I'm paraphrasing -- it was, "Mr. Hoffman,
4    here's the information.  We ask you to keep this,
5    you know, guarded, private.  Please don't share
6    this, but this is the information you requested."
7             That's my understanding.  That's -- I
8    mean, that's -- Yeah, that's it.  That's my
9    recollection.
10        Q     I don't see such a request in -- in the
11   letter.  Do you?
12        A     No, not in this letter on the screen.
13   I do not.
14        Q     And no notes have been produced
15   reflecting that request.
16             Does that surprise you?
17             MR. PULKRABEK:  Object to the form and
18   foundation.
19             Go ahead and answer the question, if
20   you can.
21        A     I'm neither -- I am not surprised nor
22   -- I'm -- I'm -- I don't have an opinion as to
23   whether I would have thoughts that there would be
24   some letters about that.  I guess, just logically,
25   one would think there's an e-mail or -- or such

**Page 52**

1    that says -- says that -- in it when it was sent.
2    So as I'm just kind of thinking aloud, I guess I
3    am a little surprised if that doesn't exist.
4             Anyway, that's my recollection for how
5    Colman handled the information.
6        Q     (By Mr. Abelman)  Okay.  So I just want
7    to make sure I understand.  You don't believe that
8    you actually saw --
9             MR. ABELMAN:  Can we flip to the next
10   page, please.
11        Q     (By Mr. Abelman)  -- that you actually
12   saw this until recently?
13        A     Yes.
14        Q     And how recently did you review -- I'm
15   sorry.  When was the first time you think you
16   reviewed this?
17        A     Yesterday.
18        Q     Yesterday was the first time you looked
19   at this statement of financial condition?
20        A     Yes.
21        Q     In your view, are the contents of the
22   complaint filed by Midlab -- Is -- Is the
23   statement of financial condition a material aspect
24   of the complaint?
25        A     Yes.

*AB Litigation Services*

1    Q    Yet you never reviewed this until
2  yesterday?
3    A    That -- I personally did not until
4  yesterday, yes.
5    Q    Who is -- Who is supervising the
6  litigation against the Wycoffs on behalf of the
7  Keller Group and/or Midlab?
8    A    Well, supervising it would, I guess, be
9  Matt Schenk, but I -- I think that Midlab relies
10  heavily on Ross, our counsel.
11    Q    Let me get this straight. Matt Schenk
12  said he never saw this statement of financial
13  condition until last week. You never read it
14  until yesterday, yet a complaint was filed on
15  behalf of Midlab asserting that this contains
16  material omissions upon which Midlab relied.
17    Do I have that right?
18    MR. PULKRABEK: Object to the form and
19  foundation.
20    Go ahead.
21    A    Yes. You have -- You have that right,
22  yes. The fact that I didn't see it until
23  yesterday doesn't change any figures on this
24  sheet. It also doesn't change the situation at
25  hand and what our counsel's investigation and

1  studying of the matter revealed. The decision was
2  made based on our counsel's review of the
3  information and assuring us that the assets were
4  substantial.
5    I do recall him talking about the house
6  and its value. Incidentally, and importantly,
7  Jeffrey Wycoff talked to me about that numerous
8  times, and about the farm as well, as well as
9  other assets of the company and intellectual
10  property value with the Simplicity brand and the
11  pet -- the pet products and the herpes products,
12  et cetera. And we had discussed that even prior
13  to the execution of the personal guaranty, so this
14  was the foundation of the decision.
15    Again, it was my understanding and
16  recollection that it was asked to be held closely
17  and was. I -- And I distinctly remember standing
18  in the doorway of Colman Hoffman's office when he
19  said, "Look, Vince, the guy's got a lot of assets.
20  He's got a good net worth, double digit net worth.
21  For the $1 million, it looks like we should be
22  safe. We should be covered there."
23    I remember that conversation. And I'm
24  paraphrasing, so I'm not quoting, but it was very
25  similar to that, said in that way, in that manner.

1  And that's my -- That's -- That's my answer.
2  That's my recollection.
3    Q    Okay. So what in this statement of
4  financial condition do you believe was inaccurate?
5    A    I believe cash and cash equivalents of
6  $904,000 was very likely inaccurate. And it's --
7  I now have knowledge, after understanding our case
8  and talking with counsel and understanding -- and,
9  you know, seeing the complaint filed by Midlab and
10  subsequently learning about the IRS judgment that
11  the "Liabilities" section was -- was grossly
12  inaccurate, because there's not a thing on there
13  about possible -- or -- or IRS claims,
14  judgments -- and "judgments" may not be the right
15  word -- assertions from the service that he owed
16  millions in back taxes, according to the IRS. So
17  I would think the "Liabilities" section is
18  inaccurate.
19    Q    Anything else?
20    A    No. Well, I would also add that with
21  the advantage of knowledge now of things that
22  transpired, in essence, the whole thing is
23  inaccurate, in that he's purporting that these are
24  assets of the -- of their -- of them personally.
25  And I may have the details wrong, but I'm not sure

1  they even own these -- all of these. Maybe
2  certain ones they did at that time, but -- So I
3  would just add to my answer that it's possible --
4  again, I don't have the details of the timing --
5  that some of the assets should -- should not have
6  appeared on here as they are anyway.
7    Q    Such as what?
8    A    Well, again, I'm not sure if, at this
9  exact time, in retrospect, the real estate farm
10  was an asset of Jeffrey and Merrie Wycoff or if it
11  was, on that exact date, October 31, 2015, in a
12  different LLC. I don't know. I'm just saying I'm
13  not sure to its accuracy as I'm sitting here
14  testifying today.
15    Q    But if Jeffrey and -- and Merrie Wycoff
16  were the owners of the LLC, how would that make a
17  difference with regard to their net worth?
18    MR. PULKRABEK: Object to the form.
19    A    I don't know, but it's possible, you
20  know, with an LLC, that it might have other claims
21  on that LLC that wouldn't be shown here. It
22  wouldn't -- If -- It would be possible for it
23  not to give a full picture, would be my opinion,
24  if that were the case. It might not change it,
25  but it might. There's so many other factors one

*AB Litigation Services*

Page 57

1    would need to know.
2        Q      (By Mr. Abelman)  But sitting here
3    today, you don't know -- you don't know, do you?
4        A      I don't know what.
5        MR. PULKRABEK:  Object to form.
6        Q      (By Mr. Abelman)  You don't know
7    whether the ownership of the farm and another LLC
8    caused the value to be misrepresented?
9        A      I -- I do not have enough information
10   to, quote, know.
11       Q      So you've authorized your lawyers to
12   file a lawsuit making that argument, yet you don't
13   know the answer to that?
14       MR. PULKRABEK:  Form and foundation.
15   Also, this calls for attorney-client
16   communication, so I'd instruct the witness not to
17   even answer the question.
18       MR. ABELMAN:  I'm not asking him for
19   what the communication is.  I'm asking him for
20   what --
21       MR. PULKRABEK:  Yeah, you asked him --
22       MR. ABELMAN:  Ross -- Ross, I'm asking
23   him --
24       MR. PULKRABEK:  You're asking for an
25   attorney-client communication.

Page 58

1        MR. ABELMAN:  I'm asking him for what
2    he knows.
3        MR. PULKRABEK:  No, you didn't.  The
4    question was something like, "And you instructed
5    your counsel," which calls for an attorney-client
6    communication.  So that question should not be
7    answered, and I'm instructing the witness not to
8    answer that particular question.  If you want to
9    ask another question, then please go ahead.
10       Q      (By Mr. Abelman)  Then answer the
11   question without implicating --
12       MR. ABELMAN:  Well, are you suggesting
13   that -- that you filed this lawsuit, Ross, without
14   authorization from Mr. Keller?
15       MR. PULKRABEK:  Mr. Abelman, you know
16   it's improper, and it's unethical, frankly, for
17   you to be trying to drive at the communications
18   I'm having with my client.  So ask another
19   question that doesn't --
20       MR. ABELMAN:  I want to be very clear.
21   I am not asking him to reveal the contents of
22   any -- of any conversations, any communications
23   that he had with his counsel.
24       MR. PULKRABEK:  Okay.  So ask a
25   question that doesn't ask for that.

Page 59

1        Q      (By Mr. Abelman)  Did you -- Mr. --
2    Did you authorize the filing of the complaint?
3        A      I or Matt Schenk did.  I certainly
4    agreed with it, if I didn't technically authorize
5    it.  So, yes, I did.
6        Q      Did you read it before it was filed,
7    sir?
8        A      No.
9        Q      When did you read it for the first
10   time?
11       A      I -- I think I read it for the first
12   time through yesterday.
13       Q      Mr. Miller testified that Midlab
14   required ZAP! to regularly update its financial
15   disclosures during the duration of the business
16   relationship.  He said that he would generally
17   obtain financial information directly from Jeff
18   Wycoff or Jeff Wycoff's -- or ZAP!'s bookkeeper
19   monthly.
20       Does that comport with your
21   understanding?
22       MR. PULKRABEK:  Form and foundation.
23   Go ahead.
24       A      Yes, it does.
25       Q      (By Mr. Abelman)  Were there -- Are

Page 60

1    you aware of a single time where Midlab requested
2    an update on this statement of financial condition
3    from Jeff Wycoff?
4        A      No.
5        Q      Would it surprise you to hear that
6    Mr. Henke was never contacted by Midlab with --
7    with a single question concerning this statement
8    of financial condition?
9        A      Would I be surprised?  No.
10       Q      And Mr. Miller testified that he never
11   spoke with Merrie Wycoff or communicated with her
12   about anything related to ZAP! or the Wycoffs'
13   personal financial condition.
14       Is -- Is that consistent with your
15   understanding?
16       MR. PULKRABEK:  Form and foundation
17       A      Steve Miller -- Steve Miller, yes,
18   that would be consistent with my understanding.
19   Matt Schenk, no, because he did speak with Merrie
20   and Jeff.  But not -- But I would agree that
21   Steve Miller likely did not.
22       Q      (By Mr. Abelman)  Are you aware that
23   Mr. Schenk testified that he, prior to Jeff
24   Wycoff's death, met Merrie Wycoff once?
25       A      Am I -- Am I aware of that or do I --

*AB Litigation Services*

Page 61

1    Q    Yes.

2    A    -- agree with that?

3    I -- Yes, I would agree that -- I

4    mean, I'm -- I think that's probably accurate,

5    yes.

6    Q    And his testimony was that at that

7    meeting, he couldn't remember her saying anything

8    in particular, but he did recall she said very

9    little.

10    A    Okay.

11    Q    So you just -- You just mentioned that

12    Mr. Schenk had communications with Jeff Wycoff and

13    Merrie Wycoff. I -- I -- I agree with you that

14    Mr. Schenk and Mr. Wycoff had numerous

15    communications, so I'm just asking you, again,

16    based upon your statement, are you aware of any

17    substantive discussions that anybody from Midlab

18    had with Merrie Wycoff about ZAP!

19    A    Not -- Not -- Not other than the one

20    you just described with Matt Schenk. Not prior to

21    his death, no.

22    Q    What efforts did Midlab make, if any,

23    to confirm any of the numbers on this statement of

24    financial condition?

25    MR. PULKRABEK:  Form and foundation.

Page 62

1    Go ahead.

2    A    My understanding is that Matt Schenk

3    visited Merrie and Jeff and had seen the real

4    estate, saw that it existed, saw that it was

5    actually there and real; that he was at their

6    residence, was at the farm, saw the horse barn and

7    stables, and so I think that would -- That's --

8    That's all, to my knowledge, that was done to

9    verify it.

10    We -- me and Matt Schenk -- relied on

11    the history of our relationship with Jeff, the

12    prior business that I mentioned earlier in this

13    call done with Simplicity years earlier, as well

14    as Jeff's continued and frequent communication and

15    detail of what was going on; how things were

16    going, the promise of things that were going

17    along, and we believed his -- his personal

18    financial statement that he submitted to us.

19    There was no other verification that

20    I'm aware of in terms of asking banks to verify

21    money or things of that nature.

22    Q    So what evidence, if any, do you have

23    that the cash and cash equivalents figure of

24    $904,000 was not accurate as of October 31, 2015?

25    A    I have no evidence.  It's simply an

Page 63

1    opinion, now that I see this, knowing his

2    financial strengths and how he was working

3    diligently to raise capital on borrowed funds,

4    that he would have had that sitting there, because

5    I think he would have used it otherwise. So it's

6    just conjecture.  It's just an opinion of mine.

7    Q    So cash and cash equivalents refers to

8    liquid assets, doesn't it?

9    A    That's my understanding, yes.

10    Q    So that can change day to day, week to

11    week, month to month, year to year, can't it?

12    A    Yes.

13    Q    But you don't believe that, as of

14    October 31st, this number was accurate?

15    A    As I sit here today in 2021 and know

16    what happened, I -- I -- yeah, I question that.

17    That's my opinion.  I don't have any evidence

18    otherwise, as you say.

19    Q    Okay.  And real estate values can

20    change, can't they?

21    A    They can.

22    Q    And they do change frequently, don't

23    they?

24    A    They do, but often not as fast as cash

25    can change from one day to the next.  But they

Page 64

1    certainly can and do, and in recent years have.

2    Q    Fair enough.  Do you see the line item

3    for Zap! Products?

4    A    Yes.

5    Q    What's the valuation for Zap! Products?

6    A    $5 million.

7    Q    Do you have any problem with that

8    valuation?

9    A    If -- I'm going to answer this two

10    ways.  Right now, as I sit here, yes.  It proved

11    to be of no value not terribly long -- maybe just

12    a couple of years after that.  But if I had looked

13    at this at that moment, I would not have balked at

14    that too much.  That -- That could have been

15    acceptable.  I -- I would have taken that at face

16    value, I think.

17    Q    Well, a statement of financial

18    condition, whatever that is, I mean, is -- That's

19    what this is labeled, isn't it?  It says

20    "Statement of Financial Condition"?

21    A    Yes.

22    Q    Are you familiar with that term?

23    A    I am.

24    Q    How does a statement of financial

25    condition differ from a financial statement?

*AB Litigation Services*

---

**Page 65**

1      A      I don't know that it -- Well, a
2  financial statement, as I understand it, is a
3  measurement of the profitability of an entity over
4  a specified period of time, which could be a month
5  or could be a year of operations.
6          A statement of financial condition is a
7  static snapshot, much like a balance sheet, as of
8  a point in time -- in this case, October 31,
9  2015 -- of values at a given moment.
10     Q      Right.  Well, I mean, a personal
11 financial -- What's the difference between a
12 personal financial statement and a statement of
13 financial condition?  If there is one?
14     A      There perhaps is not.  It may be
15 semantics.
16     Q      Ultimately, there was an adverse tax
17 judgment against the Wycoffs that you alluded to
18 earlier; is that correct?
19     A      Yes.
20     Q      And the adverse judgment was close to
21 $9 million in November of 2017; is that right?
22         MR. PULKRABEK:  Form and foundation.
23     A      It's my understanding there was a
24 judgment, and I thought it was in October of 2017,
25 somewhere in the neighborhood of the figure you

---

**Page 66**

1  said.
2      Q      (By Mr. Abelman)  Actually, you're
3  correct.  I stand corrected.  The tax court issued
4  an adverse ruling disallowing all but $3.7 million
5  of management fees and imposing a deficiency of
6  $6 million, $5 million for unpaid taxes and $1
7  million for interest and penalties on October 16,
8  2017.
9          So that's not reflected in this
10 snapshot of October 31, 2015, correct?
11     A      Correct.
12     Q      Because it didn't exist on October 31,
13 2015, correct?
14         MR. PULKRABEK:  Object to the form.
15     A      Correct.  It -- The judgment that you
16 read from October of 2017 did not exist.  It is my
17 understanding there was -- I'm not sure of the
18 word to use -- a claim -- perhaps that's the
19 correct word -- from the Internal Revenue Service
20 stemming from earlier tax returns in the
21 neighborhood of approximately $4 million-something
22 that was outstanding against the Wycoffs -- Jeff
23 Wycoff, and perhaps Merrie, but I'm not sure of
24 that.  That's not reflected as a contingent
25 liability.

---

**Page 67**

1          MR. ABELMAN:  I'd like -- Ana, if you
2  would pull up Exhibit 53.
3          THE TECHNICIAN:  You said 53?
4          MR. ABELMAN:  Yes.  And I can give you
5  Bates numbers if that helps, but it should be
6  designated by exhibit.
7          THE TECHNICIAN:  They are designated by
8  exhibit.  I just don't have 53.  So let me see if
9  I can pull that up.
10         MR. ABELMAN:  Oh, I'm sorry.  You're
11 right.  You have the exhibit, but it's not
12 designated as Exhibit 53.  We might need to use
13 the Bates numbers.
14         THE TECHNICIAN:  If you want to give me
15 that Bates numbers that you have, I can write them
16 down and see which exhibit it's under.
17         MR. ABELMAN:  It's -0013182; that's
18 0013182.
19         THE TECHNICIAN:  Okay.
20         THE REPORTER:  And, Mr. Abelman, if we
21 could take a five-minute break when you get to a
22 good point, I'd appreciate it.
23         MR. ABELMAN:  Yeah, maybe we should do
24 that now.
25         Is that okay with you, Ross?  We could

---

**Page 68**

1  do 5 or 10 minutes.
2          MR. PULKRABEK:  Yeah, let's do 10.
3          MR. ABELMAN:  Okay.
4          (Recess from 10:47 a.m. to 10:58 a.m.)
5      Q      (By Mr. Abelman)  Mr. Keller, would you
6  identify what's been marked as Exhibit 42, please.
7      A      It appears to be an e-mail from Kerry
8  Speth to me copying Steve Miller, and it's titled
9  "ZAP! Valuation," sent --  It just went off the
10 screen.
11     Q      You've got to make the most of your
12 time.
13     A      I know.  It was sent 3-25-2016 at
14 3:23 p.m.
15     Q      And who is Kerry Speth?
16     A      He was the vice --  I don't know his
17 exact title, but he was vice president of finance
18 for Kelsan, the parent company of Midlab.
19     Q      Well, in fact, his exact title is
20 probably on the bottom of this.
21     A      Oh, there it is.  I was right.
22     Q      Yes, you were right.  And so Steven
23 Miller reported to Kerry Speth, because Steven
24 Miller was the vice president for Midlab?
25     A      No, he didn't.  He would work closely

---

Page 69

1  with Kerry, and their banking arrangements are
2  consolidated between the two companies.  At that
3  time, Steve Miller probably reported to Ken Bodie,
4  the president of Kelsan.  Actually, I believe he
5  had --  If you've heard of a matrix reporting
6  relationship, he would report to Ken Bodie, but
7  also to Matt Schenk in his capacity at Midlab.
8         But, anyway, Steve certainly would work
9  closely with Kerry.
10       Q    Mr. Miller testified that --  Well, do
11 you recall why Mr. Speth was doing a valuation of
12 ZAP! in late March of 2016?
13       MR. PULKRABEK:  Foundation, form.
14       A    I --  I don't recall why.  I have a
15 guess.
16       Q    (By Mr. Abelman)  Let me see if I can
17 jog your memory.  I believe Mr. Miller testified
18 that Jeff Wycoff had made a proposal for Midlab to
19 take an equity interest in ZAP! in order to
20 satisfy some of the accounts receivable Zap! owed
21 to Midlab.
22       Does that --
23       A    Correct.
24       Q    Does that ring a bell?
25       A    Yeah.  Well, I said --  Like I said, I

Page 70

1  had a guess.  My recollection would be that the
2  supply agreement, one of the two amendments, other
3  than reaffirming his obligation to us, had
4  language in it about -- and I guess I'd use the
5  word an "option" --  I think that fits; I don't
6  know if it was technically called that -- the
7  opportunity if Midlab wanted to convert a portion
8  of the debt into an equity position in that
9  company or one of his other companies going
10 forward.
11       Q    So Midlab considered the -- the
12 proposal?
13       A    I don't know that I would --  Well, I
14 guess it would be accurate to say they considered
15 it.  We certainly wanted to have the option.  I do
16 not recall us having serious conversations of,
17 "All right.  Let's get this valued and let's think
18 about it.  What are" --  You know, "What are the
19 prospects of this business going forward?  Should
20 we do it or should we not?"
21       It was never to the point of, "All
22 right.  Let's actually convert this," but --  So
23 it would not be inaccurate to say that was a
24 consideration, something we discussed about,
25 "Hey, what about getting the option that if things

Page 71

1  go well with this business, perhaps we could get
2  our money back that way?"
3         So --  So --  So, yeah, it would be a
4  consideration.  It just wasn't considered heavily
5  or in depth or at length.
6       Q    So it didn't go that far, but -- but as
7  an initial step, it appears that Kerry Speth
8  performed an evaluation on -- of ZAP!?
9       MR. PULKRABEK:  Form and foundation.
10       A    It would appear, but I would call that
11 a "back of the envelope" math valuation.  It was
12 no more than what you saw in the e-mail, which is
13 no longer on my screen, but a call or two to a
14 banker, trade multiples going on at the time.  So
15 if you want to call it a valuation, you can.  It
16 was not very in-depth, though.
17       MR. ABELMAN:  Ana, I'll need you to
18 keep the -- keep -- keep that exhibit on the
19 screen until we move to another one.  Thanks.
20       Q    (By Mr. Abelman)  So what is the --  In
21 that first paragraph, what's --  Would you just
22 read the last sentence of this e-mail to you.
23       A    The one that --  The paragraph that
24 begins "In our conversations"?
25       Q    Yes.

Page 72

1       A    You want me to read the last sentence?
2       Q    You can read --  I mean, it's only a
3  couple sentences, so just read the whole thing.
4       A    Sure.  "In our conversations with
5  5/3 Bank's Business Valuation department, the
6  industry multiple for this type of household goods
7  and cleaning supply company is a multiple 4 to 6
8  times of EBITDA.  Therefore, we place a valuation
9  of ZAP! in the range of $9.0 million to $13.5
10 million.
11       "Please let us know if you" have any
12 additional --  "Please let us know if you need any
13 additional information."
14       Q    Do you recall what value Jeff Wycoff
15 ascribed to ZAP! in his statement of financial
16 condition?
17       A    Yes.  $5 million.
18       Q    And so Mr. Speth is saying that the
19 value could be in the range of $9 million to
20 $13.5 million?
21       A    Yes.
22       MR. PULKRABEK:  Form, foundation.
23       Q    (By Mr. Abelman)  And if the value of
24 ZAP! was in that range, that would enhance the
25 Wycoffs' net worth, wouldn't it?

1    A    If it were in that range, it would,
2 yes.  And the valuation was dependent upon EBITDA
3 being certain levels and then multiplied by the
4 valuation multiple range to result in the
5 $13.5 million.  All of those would need to have
6 been true.
7         MR. ABELMAN:  Ana, would you pull up
8 Exhibit 43, please.  Or do you have Exhibit 53 at
9 this -- Do you have Bates No. -0013182.
10        THE TECHNICIAN:  That's Exhibit 53,
11 correct?
12        MR. ABELMAN:  Well, we're -- we're
13 going to mark it as Exhibit 53.  I sent it marked
14 as Exhibit 53.  It hasn't -- I don't believe it's
15 been utilized previously.
16        THE TECHNICIAN:  All right.  Yeah.  I
17 have one that says 53, so if that's the correct
18 one, I'll pull that up right now.
19        MR. ABELMAN:  Yeah.  Could you pull
20 that up, please.
21    **Q    (By Mr. Abelman)  Mr. Keller, this is a**
22 **couple of e-mails.  Could you identify what we've**
23 **marked as Exhibit 53, please, from the top?**
24        MR. PULKRABEK:  Object to form.
25        Go ahead.

1    A    It's an e-mail from Jeff Wycoff to me
2 on 3-21-2016 copying Matt Schenk, subject of
3 "Investment."
4    **Q    (By Mr. Abelman)  And what's the**
5 **essence of the message that he sent to you?**
6    A    Well, let me -- I think I will need to
7 read the lower part, because the top part's not
8 very long.  Let me -- Allow me to read that and
9 then I will comment.
10        So it's an original e-mail that I sent
11 to him on Monday, March 21st, so the same day, but
12 earlier in the day.
13        MR. PULKRABEK:  And to the court
14 reporter, just for the record, we're doing this by
15 Zoom.  The exhibit is only being partially shown
16 on the screen, but it appears to be a multiple
17 page exhibit.
18        MR. ABELMAN:  Well, it's not a multiple
19 page exhibit, but it's -- but we can only see the
20 top half of the page.
21        Ana, could you show us the bottom part
22 as well.  Thank you.
23        MR. PULKRABEK:  Is it -- And I don't
24 mean to quibble, Mr. Abelman, but the document
25 itself shows that it's a two-page document.  So I

1 don't know what's on Page 2.
2         MR. ABELMAN:  Well, the exhibit that's
3 been marked 53 is -- has the Bates No. -0013182.
4         MR. PULKRABEK:  And only that page.
5 Okay.  Understood.
6    **Q    (By Mr. Abelman)  Mr. Keller, could you**
7 **look -- Tell us what the essence of this message**
8 **from Jeff Wycoff was.**
9    A    Yes.  He wrote to me and Matt Schenk,
10 and he's -- he's outlining how promising things
11 are going on a variety of fronts with ZAP! with
12 certain retailers.  That's the bottom of the
13 e-mail, the originating part.
14        THE DEPONENT:  I'll need you to scroll
15 up a little bit, because I can't read all of what
16 I have here.
17        I read it before she scrolled down, and
18 my recollection -- Oh, there we go.
19        THE DEPONENT:  Oh, well, I'll need to
20 scroll up a little bit more.
21    **Q    (By Mr. Abelman)  So it appears that**
22 **there's more, at least from the documents produced**
23 **from Midlab -- or from those documents that were**
24 **produced by Midlab, I should say, the -- that**
25 **there was more direct communication between Jeff**

1 **Wycoff and you starting around the spring of 2016.**
2         **Is that your recollection?**
3         MR. PULKRABEK:  Object to the form.
4    A    Yes, that's what this e-mail shows.
5 Anyway --
6         THE DEPONENT:  So it's scrolled too far
7 down for me to see my response.  Yeah, there we
8 are.
9    A    So I told him we were at a trade show
10 and that we were busy.  He had been seeking
11 investment from numerous sources is my
12 recollection, and -- and had a number of different
13 possibilities.  And as we've already previously
14 discussed on this deposition call, he had been
15 amenable to and I think wanted an investment from
16 Midlab in return for giving portions of the
17 accounts receivable.
18        And what I've said is, you know, if we
19 did something, it would be limited to $500,000 due
20 to our other capital demands and needs.  And if he
21 needs more money, which I think he did, and he
22 said he did, then he needed to keep looking for
23 it.  But that was it.  You know, keep me posted.
24        And then I think he had a nice
25 thank you, talk to y'all soon.  That was it.

*AB Litigation Services*

Page 77

1    Q    (By Mr. Abelman)  And was there
2  anything else that precipitated more communication
3  directly to you starting in the spring of 2016?
4    A    Perhaps.  Nothing that I specifically
5  recall.  I will elaborate and say that whether it
6  was in the spring of '16 or the fall of '15, the
7  summer of '16 or the fall of '16, or the spring of
8  '17 -- and I don't know the preciseness as I just
9  sit here from memory -- we had several phone calls
10  and e-mails.  And the subject matter of -- of --
11  of those was often, "How are things going with
12  ZAP!?  How are things going with the TV
13  commercials and the ratings they're generating?
14  How are things going with various retailers coming
15  onboard?  When might that happen," as well as
16  how -- and then also discussions about how things
17  were going with raising capital from a number of
18  different sources, as well as his farm value and
19  what it's worth, when it was going on the market,
20  if it was going on the market.
21        Another particular conversation I
22  recall was that he was -- is that he had close
23  communication with an account executive for
24  getting things rezoned for his farm that would
25  allow for marijuana -- crop growing of marijuana,

Page 78

1  and that would enhance the value to $10 million
2  for his farm, and that that was in the works and
3  had counsel ready to work on that.
4        I'm just relating -- You asked me was
5  there other communication.  I don't -- Yes, there
6  was, and so I've tried to characterize it.  I
7  don't know if it was exactly in the spring of
8  2016.
9    Q    No.  I appreciate that.  Throughout
10  this business relationship, so let's say from 2015
11  to 2017, were you generally satisfied with the
12  level of communication that Jeff Wycoff was
13  providing Midlab?
14    A    Yes, I was generally -- Yes.  I mean,
15  I was okay with it.
16    Q    What about the content of the
17  communication?  Were there any issues with regard
18  to the financial disclosures that ZAP! was making?
19        MR. PULKRABEK:  Form.
20        Go ahead.
21    A    He -- He would not make, like, written
22  formal disclosures to me.  It was all verbal, and,
23  you know, I would take notes on them.  Jeff was a
24  fast talker and an excitable personality, and he
25  would -- would, you know, bring a lot of the

Page 79

1  energy to our conversations about what was going
2  on and about the promising prospects.
3        His company and his accounting person,
4  one or two different ones, I think, within ZAP!
5  would send, as requested and on occasion to
6  Midlab, to Kerry Speth and to Steve Miller, as an
7  example, you know, cash flow projections and
8  when -- when we would get our next payment, when
9  that might come.  And that would occur on, you
10  know, an occasional basis.
11        And I recall people in our organization
12  being satisfied that they were -- would attempt to
13  communicate, you know, timely, et cetera.  So I
14  didn't have a problem with it in terms of the
15  frequency or if he would return a phone call or
16  something like that.  He didn't, quote, disclose
17  things to me in writing maybe ever, but -- or it
18  was -- He -- I mean, perhaps he did.  I don't
19  recall it, but he certainly communicated verbally
20  and through some e-mails about the type of stuff
21  I've described.
22    Q    (By Mr. Abelman)  Did you ever have a
23  problem with his effort to get accounts receivable
24  paid?
25    A    No, I did not.

Page 80

1        MR. ABELMAN:  Let's move to Exhibit 43.
2    A    Would you like me to comment on that?
3    Q    (By Mr. Abelman)  I mean, you'll have
4  to wait for my question.  So would you identify
5  -- Would you identify what's been marked as
6  Exhibit 43, please.
7    A    Yeah.  Well, You usually want me to say
8  who sent it, so I was ready to jump in.
9        Okay.  This is an e-mail from Kerry
10  Speth to me and Steve Miller on May 13th of 2016.
11    Q    And what's the general purpose of this
12  e-mail?
13    A    Allow me to read it to familiarize --
14  re-familiarize myself with it, if you will.
15        Well, the first point is that he's
16  speaking on some technical details of whether we
17  factored accounts -- I think he means accounts
18  receivable, although he didn't say it, because
19  that's usually what factoring has to do with.  If
20  we factor to Walmart and they return product, it
21  looks like we could have a problem and be perhaps
22  a little upside-down financially, and so he's
23  suggesting that an attorney could -- would know
24  how to write this if we were to enter an agreement
25  to -- to apparently -- or possibly factor with

**Page 81**

1  Walmart.  That's the first point, or that's my
2  understanding of what he's saying.
3          Allow me to read the second point.  In
4  the second point, he's theorizing of the
5  possibility, instead of factoring, of creating a
6  portion of the accounts receivable in a short-term
7  note -- a promissory note in addition, over and
8  above the personal guaranty, and that note carries
9  the same could be collateralized by an invoice to
10 Walmart.
11    Q    Okay.
12         MR. ABELMAN:  Ana, would you pull up
13 Exhibit 56, please.  I'm sorry.  Exhibit 55,
14 please.
15         THE TECHNICIAN:  I don't have 55.  The
16 only ones in the 50s that I do have are 50, 51, 53
17 and 58.
18         MR. ABELMAN:  Okay.  Exhibit -- Did
19 you say you -- You don't have 55 and 56?
20         THE TECHNICIAN:  That is correct.
21         MR. ABELMAN:  Okay.  I will -- I was
22 told that these were sent.  Let me have them sent
23 directly to you.  Give me -- Just give me a
24 couple minutes here.
25         The record should reflect that all of

**Page 82**

1  these were previously sent to Aaron.  I'm not --
2  I'm not suggesting you're at fault in any way,
3  just that we -- we provided these previously.
4          THE TECHNICIAN:  And these were not
5  marked; is that correct?
6          MR. ABELMAN:  These were not marked.
7  The ones in the 50s were not marked.
8          THE TECHNICIAN:  So --
9          MR. ABELMAN:  The ones in the 50s,
10 these were not marked.
11         THE TECHNICIAN:  -- what happened
12 was --  Well, I'm guessing what happened is Aaron
13 only sent the ones that were marked and discarded
14 the ones that were not marked.
15         MR. ABELMAN:  Okay.
16         MR. PULKRABEK:  Just for clarification,
17 who is Aaron?  When you're talking about "Aaron,"
18 you're not talking about Aaron Goldhamer in my
19 office?
20         THE TECHNICIAN:  This is --
21         MR. ABELMAN:  No.
22         THE TECHNICIAN:  This is the video tech
23 from Monday's and Tuesday's depositions.
24         MR. PULKRABEK:  Okay.  Thank you.
25         MR. ABELMAN:  So they're being sent

**Page 83**

1  now.  You can let me know when you get it.
2          THE TECHNICIAN:  All right.  I have
3  received 55 through 57, 62 and 67, correct?
4          MR. ABELMAN:  Great.  Thanks.  So let's
5  start with 55.
6     Q    (By Mr. Abelman)  Would you identify
7  what's been marked as Exhibit 55, please.
8     A    Yes.  It is an e-mail from Jeff Wycoff
9  on 6-12-2016 to me with a subject of "Update."
10    Q    And the purpose of this appears to be
11 Jeff trying to give you a status update?
12    A    Yes.  Well, an update -- Yes, on how
13 the company's, you know, doing and how much money
14 he needs to keep it going in various time frames.
15    Q    Okay.  Do you remember discussing this
16 with him?
17    A    I -- I -- I think I do.  Again, we
18 had multiple conversations about raising money --
19 him raising money and who he was talking to and
20 how likely it might be to happen and when.  So
21 it's hard to remember each one distinctly, but
22 I -- I do have notes in my notebook that -- that
23 reflect numbers from this e-mail that he's
24 recapping for me while we talked live.
25         So, yeah.  I -- I recall this in -- in

**Page 84**

1  a general sense, if that makes sense.
2          MR. ABELMAN:  Could you pull up
3  Exhibit 56, please.
4     Q    (By Mr. Abelman)  And would you
5  identify that.
6     A    Yes, I will.  It's an e-mail from
7  Jeff Wycoff to me, Vince Keller, on 6-13-2016.
8     Q    And what's the general nature of this?
9     A    Allow me a moment to review it, and I
10 will give you my opinion.
11         Okay.  So in the first paragraph, it
12 looks it's promising to get his product into Sam's
13 Club.  In the second paragraph, he has meetings
14 with Costco coming up.  He gives an estimate for
15 what Sam's opening order might be at $4 million.
16 And I do recall him not --  It says it here, but
17 he just didn't have the relationship with Costco.
18 He had never really done business with them.
19         And then in the last paragraph -- well,
20 not the last --  In the next paragraph, he talks
21 about Costco's a different animal, just to quote
22 him.  He's meeting with the L.A. buyer, but
23 they've got to do some testing, so it's not nearly
24 as near term; there's -- there's more to be done
25 there.  And then he mentions a smaller wholesale

Page 85

1   buyers club store known as BJ's.  And he said he
2   does not have an appointment with them, but he's
3   hoping he can get one in the next year with a
4   $700,000 opening order, perhaps.
5        Q    Okay.
6             MR. ABELMAN:  And then Exhibit 57,
7   please.
8        Q    (By Mr. Abelman)  Would you identify
9   what's been marked as Exhibit 57, please.
10       A    Sure.  It's an e-mail from Jeff Wycoff
11  on 7-13-2016 to me, Vince Keller.  The subject is
12  "Farm."  It's so short that I'll just read it.
13            "Vince, I don't think I answered your
14  question this morning.  We priced the farm a bit
15  below market value to sell it quickly.  It may be
16  worth a lot more but anything with a price tag
17  upwards of $5 million takes some time to sell.
18  Jeff."
19       Q    So do you recall what your question was
20  that precipitated this -- this e-mail?
21       A    I -- I think it was -- My
22  recollection is, and the e-mail also seems to
23  imply, I asked him about what's going on with his
24  farm and the marketing of his farm and at what
25  price might it sell?  You know, questions about

Page 86

1   that issue.
2        Q    And did you have any additional
3   discussions in July -- in or around July about how
4   it was being marketed and what the asking price
5   was?
6             MR. PULKRABEK:  Objection --
7        A    I don't know.  It's entirely possible
8   we did.  And, again, as I said some time ago,
9   maybe 10, 20, 30 minutes ago, we talked about his
10  farm on numerous occasions.  So whether it was
11  that summer or that spring or a little bit later
12  in the fall, you know, the evidence would show if
13  it was in an e-mail or in my handwritten notes.
14            So the answer to your question is quite
15  possibly, but I cannot say with specificity just
16  from my memory.
17       Q    (By Mr. Abelman)  Do you -- Do you
18  recall ever seeing the exclusive listing agreement
19  that the Wycoffs signed with Karen Bernardi
20  listing the farm at $5,850,000 in --
21       A    No.
22       Q    -- June of 2016?
23       A    No.  I do not recall ever seeing --
24  actually seeing the agreement.
25       Q    Were you aware of the agreement?

Page 87

1        A    I can't say -- No.  I don't have a
2   recollection of being aware of the agreement or
3   recalling that realtor's name, no.  I -- I -- I
4   do recall him saying that, you know, he was going
5   to sell it and that he had, in fact, listed it,
6   but nothing beyond that general -- that general
7   statement.
8             You know, he -- I don't recall him
9   saying, "I listed it with this company.  Here's my
10  agent.  I'll send you a copy of the MLS agreement"
11  or anything like that.  I just recall him saying,
12  you know, "We're going to get this thing" --
13  He -- He always asserted he -- that he could pay
14  us because of his farm, and so he talked about
15  that a lot.
16            But, again, I don't recall seeing the
17  listing agreement.
18       Q    But you do recall him, Jeff, telling
19  you that he had listed it sometime in the summer
20  of 2016?
21       A    Probably.  And I can't attest to when
22  exactly.  And I -- And I -- And I cannot with
23  certainty say he told me that he put it on the
24  MLS, that he actually did that.  I -- I -- In
25  fact, I don't specifically recall that, but I also

Page 88

1   don't dispute that he may have said that.  He
2   certainly talked about selling his farm a lot, so
3   I'm just trying to be as precise as possible what
4   my recollections are.
5        Q    And you haven't seen the -- the actual
6   exclusive right to sell listing contract that --
7        A    I am unaware of that.  I'm sorry.
8        Q    -- we've provided to your counsel?
9        A    I -- I -- I do not recall seeing the
10  MLS agreement, whether --
11       Q    Okay.
12       A    -- from Jeff or from my counsel.
13       Q    Have you seen the agreement to amend
14  and extend the contract with Karen Bernardi that
15  was a year later in August of 2017 for $3,789,000?
16       A    No.
17       Q    Are you aware that the Wycoffs did not
18  receive any offers for the property between June
19  of 2016 and sometime in 2017?
20            MR. PULKRABEK:  Form and foundation.
21       A    My answer is no, I am unaware of that.
22       Q    (By Mr. Abelman)  Now, throughout
23  the -- You said you had in front of you the
24  manufacturing and supply agreement and the
25  amendment to the manufacturing and supply

*AB Litigation Services*

1　agreement, as well as the second amendment to the
2　manufacturing and supply agreement.  What were the
3　dates of the amendment to the manufacturing and
4　supply agreement and the second amendment to the
5　manufacturing and supply agreement?
6　　　A　I will look.  Just a moment.  The first
7　one, which is referred to as "Amendment to
8　Manufacturing and Supply Agreement," is dated
9　April 1, 2016.  The date of what is referred to as
10　the "Second Amendment to Manufacturing and Supply
11　Agreement" is dated the 2nd day of September,
12　2016.
13　　　Q　And is it fair to say that this first
14　amendment and second amendment represent Midlab's
15　and ZAP!'s continuing efforts to work to get the
16　outstanding accounts receivable and -- and
17　optimize ZAP!'s business position?
18　　　MR. PULKRABEK:  Object to the form of
19　the question.
20　　　A　I think that it's perhaps acceptable to
21　characterize it as you've said it.  I -- I would
22　have -- I would have -- If you had said -- If I
23　had said, "What does this characterize," it was
24　just the documentation of some business terms that
25　we were agreeing to, and we were attempting to be

1　thorough --
2　　　THE REPORTER:  I'm sorry, Mr. Keller.
3　You just cut out for me.  I'm sorry, but I'll need
4　you to start your answer over.
5　　　THE DEPONENT:  Sure.
6　　　THE DEPONENT:  I was saying that I
7　don't particularly agree with the exact
8　characterization that Mr. Abelman was -- as he
9　said it.
10　　　A　I --  If you'd like me to describe what
11　this -- these agreements reflect, they were us
12　trying to, in writing, very specifically document
13　some business term changes and agreements to --
14　to -- that would guide the relationship going
15　forward.
16　　　I don't disagree with you, Mr. Abelman,
17　that it's meant to help the arrangement to a
18　successful venture or conclusion or continuation,
19　but I -- I wouldn't have characterized it as -- as
20　agreements to, quote, support the business.  I
21　would characterize it as documents that simply
22　documented what we were agreeing to.  And maybe
23　it's parsing hairs or --  Anyway, that's how I
24　think of them or would have said it.
25　　　Q　(By Mr. Abelman)  Thank you.

1　　　MR. ABELMAN:  Would you pull up
2　Exhibit 47, please.
3　　　A　Would you like me to overview that?
4　　　Q　(By Mr. Abelman)  Would you identify
5　what's been marked as Exhibit 47, please.
6　　　A　Yes.  It's an e-mail from Steve Miller
7　to Vince Keller, Ken Bodie, copying Matt Schenk
8　and Kerry Speth that is dated September 14, 2016.
9　　　Q　And what's the essence of this
10　communication?
11　　　A　It would appear, as I'm kind of reading
12　it, because it's not very long, that Steve is
13　telling us -- telling Vince -- telling me, Vince,
14　and Ken Bodie that he and Matt Schenk reviewed the
15　ZAP! agreement between ZAP! and Tristar and had
16　the following summary; that it was a licensing
17　play.  And I think he means by that the agreement
18　relationship.  Also that ZAP! retains all
19　ownership rights to the brands and patents and
20　that Tristar has exclusive rights to sell through
21　all channels worldwide.
22　　　"There is no protection of our
23　manufacturing position with Tristar written in the
24　agreement."
25　　　Q　What role would Tristar play with

1　regard to the purchase and sale of Zap! Products?
2　　　MR. PULKRABEK:  Foundation.
3　　　A　They were --
4　　　THE DEPONENT:  I'm sorry.  Ross, did
5　you have something to say?
6　　　MR. PULKRABEK:  Yes.  I said
7　foundation, but go ahead.
8　　　THE DEPONENT:  Thank you.
9　　　A　My understanding of that relationship
10　is that Tristar was taking over, as it says in the
11　e-mail, the rights to sell it and benefit from it.
12　And Jeff was, in essence, licensing them, the name
13　and the rights to use his -- presumably his
14　trademarks and his name, and he would -- and he
15　was going to get commissions from that, but they
16　were the new company in charge.
17　　　So that was my understanding of their
18　relationship.
19　　　Q　(By Mr. Abelman)  So Tristar was going
20　to buy product directly from Midlab -- wasn't it?
21　-- ZAP! product?
22　　　A　Correct.
23　　　Q　And as part of the arrangement, any
24　royalty to which ZAP! was entitled would -- would
25　be paid to Midlab as well?

Page 93

1    A    Well, that was the intention and idea.
2  Certainly not every penny of every dollar they
3  would have gotten, because he still maintained a
4  company that had some employees and he had some
5  expenses, et cetera.  It was Jeff's intention
6  to -- to -- from what he -- from -- you know, from
7  those funds to use it to retire and pay down his
8  accounts receivable to Midlab.
9    Q    So Jeff Wycoff was engaging to try and
10 reduce the outstanding indebtedness ZAP! owed to
11 Midlab?
12   A    Yes.
13        MR. ABELMAN:  Would you pull up Exhibit
14 62, please.  And I think there's another page to
15 that.  Okay.  Yeah.  That's . . .
16   Q    (By Mr. Abelman)  Can you identify
17 what's been marked as Exhibit 62, please.
18   A    Yes.  I don't know if it's all --
19        MR. PULKRABEK:  Object to the form.
20 Yeah.  We have multiple pages here, so I -- I
21 don't know if that's . . .
22   A    Okay.  I don't know if Exhibit 62 is
23 all of these pages, but what's on the screen now
24 would appear to be the origination of an e-mail
25 chain.

Page 94

1    Q    (By Mr. Abelman)  So I -- I -- My
2  questions here will only relate to what's been
3  marked as Bates No. -0013854, which is what's on
4  the screen presently.
5    A    Okay.  On the screen presently is an
6  e-mail from Jeff Wycoff to Matt Schenk dated
7  12-5-2016, subject "Update."  It's pretty short.
8  Do you want me to read it or read it and then
9  characterize it?
10   Q    Well, just read the second paragraph,
11 please.
12   A    The second paragraph, okay.  "The farm:
13 Mr. Trump kicked the cramp" -- I assume he means
14 to say crap, but that's a guess -- "out of high
15 end real estate here in Boulder and elsewhere.
16 Anything over $2 million is pretty much dead in
17 the water until we see how crazy he really is."
18   Q    So Jeff Wycoff was explaining to you in
19 December that the sale of the farm had been
20 unsuccessful thus far.
21        Is that the message being conveyed?
22        MR. PULKRABEK:  Foundation, form.
23   A    I -- He -- He didn't say that, but
24 the -- He's implying that in his opinion, due to
25 the election, I assume, of Mr. Trump, since it is

Page 95

1  dated 2016, and Mr. Donald Trump became president
2  in November, shortly before this -- or was elected
3  president, although he didn't become president
4  yet, that it was Jeff's belief that real estate
5  would be -- that it's value would be damaged.
6  That's what seems to be his assertion.
7        MR. ABELMAN:  Okay.  Can we go to the
8  other page on this exhibit, please, which is Bates
9  No. -0013853.
10   Q    (By Mr. Abelman)  Would you take a
11 quick look at this and describe what you see,
12 please.
13   A    The top's cut off, so all I can see is
14 "Afternoon Vince."  Okay.  So it's -- Now I can
15 see it all.
16        It's an e-mail from Jeff Wycoff to
17 Vince Keller, Matt Schenk and Steve Miller dated
18 4-8-2016.  It's rather long.  So if you want me to
19 say what it says, I'm going to need to read it.
20   Q    Okay.  Take -- Take your time and then
21 give me your summary understanding.
22   A    All right.
23        MR. PULKRABEK:  Object to the form.
24   A    The first paragraph updates that he
25 secured $850,000 to date with access to another

Page 96

1  $500,000.  Anyway, he -- So the first paragraph
2  is talking about fundraising, what's happened and
3  what might happen.
4        The next paragraph talks about Sam's
5  Club and his appointment with the buyer and -- and
6  their Costco --  So the second paragraph is
7  talking about the prospect of possible sales into
8  the club stores and where that might stand.
9        The next paragraph is talking about a
10 rollout that could occur with another Lowe's, Home
11 Depot-type company called Menard's and one or two
12 others, and then some discussion on CVS and Family
13 Dollar.
14        The next paragraph mentions how well
15 the TV commercials are going and their -- their
16 ratios of how they measure success in that -- in
17 that industry, as well as what he plans to do for
18 the rest of the year strategically on a variety of
19 matters.
20   Q    So this is yet another example of -- of
21 Jeff trying to keep Midlab updated on his
22 efforts --
23        MR. PULKRABEK:  Object to the form.
24   Q    (By Mr. Abelman)  -- on his efforts to
25 pay Midlab?

Page 97

1      MR. PULKRABEK:  Object to --
2      A      He's updating us -- In my opinion,
3  he's updating us on how the business is going and
4  its prospects.  He doesn't speak to him paying us.
5  He's speaking to keeping the business going and
6  the capital needed to do so, as well as the
7  prospects for some certain accounts.  But -- But
8  I will agree that it's an effort to update us in
9  general with how things are going.
10     MR. PULKRABEK:  Tracy, are you getting
11  my objections to form?  I'm just not sure if
12  they're coming through.
13     THE REPORTER:  Actually, that one was
14  cut off, as Mr. Keller continued to answer over
15  your objection.
16     MR. PULKRABEK:  Okay.  Mr. Keller, if
17  you wouldn't mind, take a pause between the
18  question that gets asked and then your response,
19  because I think that because we're doing this by
20  Zoom, if I attempt to object while you're talking,
21  it doesn't necessarily register.  So I need you to
22  give me just a moment to insert any objections,
23  okay?
24     THE DEPONENT:  Yes.  I apologize.
25     MR. PULKRABEK:  Thank you.

Page 98

1      MR. ABELMAN:  Ana, would you pull up
2  Exhibit 49, please.
3      Q      (By Mr. Abelman)  Mr. Keller, do you --
4  Do you recognize this e-mail?
5      A      I recognize it as an e-mail.  I don't
6  necessarily recall having seen it before.
7      Q      It's one sentence.  Do you want --
8  It's two sentences.  Do you want to read it?
9      A      I will read it.  It is from Cody
10  Housley to Vance Lowe and Steve Miller on
11  3-16-2020.  "ZAP! Products" is the subject line,
12  and it reads, "Zap has been written off.  Please
13  see the attachments of the detail in the excel
14  file."
15     Q      What, if anything, was your role with
16  regard to writing off ZAP!?
17     MR. PULKRABEK:  Form and foundation.
18     Go ahead.
19     A      My role would have been somewhat or
20  quite removed, more just being informed of the
21  matter as -- as opposed to directing it, if that
22  answers your question.
23     Q      (By Mr. Abelman)  Sure.  Who -- Who
24  has the authority to make a decision to write off
25  ZAP!

Page 99

1      MR. PULKRABEK:  Foundation.
2      Go ahead.
3      A      I would have authority to do so.  Matt
4  Schenk would have authority to do so.  That's who
5  I think would be most likely and have the
6  authority to do it.  I mean, in theory, Ken Bodie
7  would have the authority to do so.  That would be
8  who would -- who would make -- who would do that.
9      Q      (By Mr. Abelman)  So were you consulted
10  on this write-off?
11     A      I don't specifically recall.  Very
12  likely, yes.
13     Q      What went into the decision?
14     A      A decision like that, in general, would
15  be viewpoints from our company auditors and their
16  recommendations.  They compile audited financial
17  statements and have to sign off on them, and so
18  they would have viewpoints and opinions as to the
19  age of accounts receivable, the collectibility of
20  accounts receivable.  So those types of factors go
21  into making the -- a decision such as that.
22     MR. ABELMAN:  Okay.  I think this might
23  be a good time to take a lunch break.  Yeah, this
24  is a good breaking point.
25     MR. PULKRABEK:  Okay.

Page 100

1      MR. ABELMAN:  How much time -- How
2  much time would you like, Mr. Keller, to break for
3  lunch and anything else you may need to
4  accomplish?
5      THE DEPONENT:  Yeah.  I would -- I
6  would defer to the other group, because I could --
7  I don't have to leave my office, so I could take
8  5 minutes or 30 minutes, whatever you-all need to
9  have your lunch.
10     MR. PULKRABEK:  Mr. Abelman, how long
11  do you want -- Go ahead.
12     MR. ABELMAN:  I was going to suggest we
13  reconvene at maybe 12:30.
14     MR. PULKRABEK:  Okay.  That's fine by
15  me.  Vince, does that work for you?
16     THE DEPONENT:  2:30 Eastern Time?
17     MR. ABELMAN:  Yes.
18     (The deposition recessed at 11:52 a.m.,
19     to be reconvened at 12:30 p.m.)

1    AFTERNOON SESSION     12:35 p.m.
2         MR. ABELMAN:  Ana, there was an exhibit
3  sent to you, Exhibit 69.  Do you have that?
4         THE TECHNICIAN:  Yes, I do.  I'm
5  pulling it up right now.
6         MR. ABELMAN:  Thank you.
7         EXAMINATION (Continued)
8  By MR. ABELMAN:
9    Q    Mr. Keller, is Exhibit 69, is that your
10 handwriting?
11   A    I'm embarrassed to say, yes, it is my
12 handwriting.  It's not very neat.
13   Q    You have no cause for embarrassment,
14 because it's -- it's -- Mine is just as bad, if
15 not worse.
16   A    Yes.  That -- Thank you.  That's my
17 handwriting.
18   Q    And these are the notes that you
19 alluded to earlier that you tend to keep
20 contemporaneously with meetings and -- and
21 conferences?
22   A    Yes, that is correct.
23        MR. ABELMAN:  Ana, could you go to
24 Bates No. -0003 -- I'm sorry -- Bates No. -000736.
25   Q    (By Mr. Abelman)  And I'm going to ask

1  you, Mr. Keller, to read a few of these pages for
2  me, starting with -000736.
3    A    Is that -- Is that -- I can't see the
4  numbers?  Is that the one?
5    Q    So it's the one that --
6    A    Yes.
7    Q    -- is -- one, two, three, four, five,
8  six -- Yeah.  Okay.  Could you read -- And if
9  you need to, it looks like it's a continuation of
10 the page before, so --
11   A    I think it is, yep.
12   Q    Yeah.  So if you want to start there --
13 Yeah, why don't you start at -00735, then.
14   A    Okay.  Would you like me to just give
15 an overview or read -- or literally read the --
16 the notes?
17   Q    Well, so let's start with the date.
18 It's dated July 13, 2016.
19   A    Yes.
20   Q    And then there's a $5,850,000 from
21 $3.7 million.  What is that?  Do you know?
22   A    That was Jeff relating to me numbers
23 relative to his farm value on the call.  He said
24 it was worth $5.85 million.  He had presently
25 borrowed $3.7 million, giving him -- I rounded

1  there -- $2 million of net or equity.  It says
2  "2mm net," which means $2 million net value to him
3  right at that time.
4    Q    So you may recall earlier, I asked you
5  if you had seen the exclusive right to sell
6  listing contract and Bernardi as the listing
7  agent, and I referenced that the amount in that
8  contract for the sale of the farm was $5,850,000.
9  It seems like that corresponds to -- to what I had
10 referred to earlier, doesn't it?  It's very
11 consistent.
12   A    I'm -- I'm pausing.  I usually don't
13 pause, but I've been taught to do that.
14        Yes, I think it's consistent.  That's
15 what he said and that's what I wrote down.  But,
16 again, I did not see the agreement.
17   Q    Okay.  Is there anything else on this
18 page referring to the Wycoffs' personal assets?
19   A    Give me a moment.  No, I don't see it.
20 The rest of that page is speaking about his
21 efforts to raise money from various sources.
22   Q    Okay.  And the $3.7-something million
23 that you alluded to earlier, what did you
24 understand that amount represented?
25   A    I understood that amount represented a

1  mortgage, perhaps, borrowing on the -- on the --
2  against the farm.
3    Q    Okay.  Is there anything on the next
4  page that relates to the Wycoffs' personal assets?
5    A    Just a moment.  Technically, perhaps
6  the bullet point that reads "$4.9 mm," meaning
7  million, "in risk by Jeff Wycoff to date."  You
8  know, presumably that's an investment he had made
9  in the business to date and, therefore, would
10 potentially reflect, you know, an investment,
11 therefore an asset, therefore a value.
12        Aside from that, no, I don't see
13 anything that would refer to asset values.
14   Q    Is that -- Is the $4.9 million what
15 Jeff told you he had invested in ZAP!?
16   A    I cannot say with certainty.  My
17 recollection is that -- in the context of that is
18 that's what that meant, and that "in risk by
19 Jeff" --  In other words, I think he was saying as
20 to what's been going on, "Hey, Vince.  I've got
21 $4.9 million tied up in this."  You know,
22 that's -- that's what I think it meant.  I cannot
23 say that with certainty.
24   Q    And so the remainder of this -- of --
25 of your notes, does that primarily reflect updates

Page 105

1  on ZAP!'s progress from Jeff and Andy Eisen?
2      A    Yes.
3      Q    Okay.  Let's go to the page after that,
4  which -000737 is the Bates number.
5      A    Okay.
6      Q    Now, I -- Because of the size of this,
7  I really can't read anything.
8      A    It's harder -- I can read it, mostly.
9      Q    Would you mind just reading it and
10  sharing, please.
11     A    No, that's fine.  I will do so.  The
12  very top says "250,000 pieces to fill the pipeline
13  excluding the" club stores.  So that meant for his
14  supply pipeline, he needed 250,000 bottles or
15  cases -- I don't know what the unit count meant --
16  to fill the supply chain pipeline.
17         Anyway, we were talking --  These notes
18  were taken on 10-9-2017.  Two weeks ago they --
19  Well, I'll just read it verbatim.  Two weeks ago
20  shot Restore 4 shows hosted and unhosted written
21  by Jeff.  Due Friday & will get rolling."
22         What he means by that is --  And
23  Tristar changed the name of ZAP! to Restore 4, by
24  the way.  Perhaps you knew that, but that was the
25  new product name to be used.  Jeff helped them

Page 106

1  write advertisements, and he means they -- they
2  were going to shoot or literally film the
3  production, in which he hosted a little
4  infomercial or commercial or whatever and then an
5  unhosted one with just words.
6          The next bullet point --  So there's
7  several in a row coming up.  The next says,
8  "Commitments from other DR companies," direct
9  response companies," in those countries all around
10  the world literally.
11         "Home Depot given a green light.
12         "All major retailers, Walmart says
13  yes.  A 'PO commitment.'  Spoken to Sam's,
14  basically the same.  All drug chains, Family
15  Dollar, etc.,  Dollar General.
16         "Phase I for Restore 4.  "Keith" --  I
17  think that's the owner or someone influential at
18  Tristar.  "Keith interested in the line
19  extensions," meaning having additional products.
20  "Stainless steel cleaner and Keith wanted
21  consumables."  He wanted to have a line of other
22  products that -- that were used more frequently
23  perhaps than just the tile cleaner.
24         Next, it says "Phase II - Local
25  Attorney in Boulder to get zoned," meaning his

Page 107

1  farm, "for marijuana growth.  Worth" 10 million --
2  "10 MM," it says.  Top county person on their side
3  to get him zoned & meet in a week."  So a top
4  county official that is influential on that matter
5  is on Jeff's side and agreeing to get that done,
6  and he's meeting with him in a week.
7          Towards the bottom, it says, "Phase 3,
8  Henkel," that's a German concern.  And I think
9  they were interested --  Well, now I'm sharing
10  just things I remember.  Henkel was interested in
11  purchasing the Simplicity intellectual property,
12  and so it says, "Henkel - Simplicity -- met in
13  Connecticut 2 hr. meeting that went well."  So
14  Henkel --  What that means is --  There's "Love
15  cube & formula," meaning he loved his cube
16  packaging concept, which is more efficient on the
17  store shelves.  And they brought a chemist there
18  to that meeting, Henkel did, and they had "Lots of
19  questions."  And the chemist's name was Chuck,
20  according to my notes.
21         "Both Don & Jack Guybig" -- Don's a
22  consultant that's worked with Midlab in the past,
23  a chemist, and Jack Guybig, the same thing to a
24  lesser extent -- "joined via conference call."  So
25  apparently that's the meeting with Henkel.

Page 108

1  "Expect a call & offer to sell outright," the
2  intellectual property is what he means, to Henkel.
3          "Jeff Ansel (Sun Brands) guesses," the
4  price would be $5 to $10 million with the cube
5  Simplicity technology.  So that's what that means.
6          And then my writing in the margin above
7  on the upper left-hand side of the current page
8  we're on says, "Keith is prepared to spend a lot
9  of money to make things work."  So Jeff's telling
10  me, "Hey, Keith at Tristar, he's all about this.
11  He's ready to step to the plate and really market
12  things and make this successful."  So that's what
13  he's saying.
14         Then do you want me to go to the next
15  page?
16     Q    Yes, please.
17     A    "Jeff says he has $2 million commitment
18  from Tri- Star.  In order for them to keep the
19  License Agreement they have to pay him this.  He
20  agrees with me & will know by the end of this
21  month what he can do.  He expects them to ask for
22  an amendment by the end of this period (October),"
23  an amendment to that commitment which requires
24  them to pay him $2 million is what he means.
25         The next part, I can read it, but I'm

**Page 109**

1 not sure what the heck it means.  It says,
2 "1 - 1.5" million or "MM rental for farm."  And
3 then below that it says, "4-6.5 MM per year.
4 Would be interested in this to have way more down
5 the road."  I don't know what -- I don't know
6 what he meant by "rental for farm."  I just -- I
7 just don't remember that, but that's what it says.
8         And then in my side margin there, I
9 said, "Agrees he should & will.  Just give three
10 more weeks to commit."  So he had asked me, "Hey,
11 my agreement calls for them to pay me 2 million
12 bucks, but they're going to tell me -- but if I'm
13 going to hold them to that, they're going to say,
14 'Pound sound and we're done.'"
15         He -- He felt they just weren't going
16 to do that and that they were going to ask for an
17 amendment.  He said, "I really think I should give
18 it to him.  I believe this thing's going to work
19 and that's where things stand with Tristar."  And
20 I said to Jeff, "I agree.  Based on what I'm
21 hearing and knowing, I suspect they're not going
22 to come through and pay you the money.  You know,
23 what are you going to do?"  And he goes, "I'll
24 probably give them more time."
25         Anyway, that's what -- that's what

**Page 110**

1 that -- I recall that, so that's what that
2 discussion was about.
3     Q     Would it be fair to say that by the
4 fall of 2017, Jeff's primary -- or ZAP!'s primary
5 lifeline was with Tristar?
6         MR. PULKRABEK:  Form and foundation.
7         Go ahead.
8     A     Yeah.  I mean, I don't think that would
9 be inaccurate.  I -- he was relying heavily on
10 Tristar to have this move forward, and -- Yes, I
11 think that's accurate.  He had tried to raise
12 money elsewhere.  I think he had gotten some here
13 and there, but, you know, he was always talking
14 about needing millions of dollars, and Tristar was
15 capable of that if they had desired.  So, yes.
16     Q     (By Mr. Abelman)  And to the best of
17 your knowledge, he had been successful in
18 marketing these kind of products in the past and
19 doing these kinds of -- these type of infomercials
20 Tristar was considering doing?
21         MR. PULKRABEK:  Form and foundation.
22     A     To the best of my knowledge, he had had
23 previous success.
24     Q     (By Mr. Abelman)  Okay.  Let's go to
25 the next page, which is Bates No. -000738.  This

**Page 111**

1 is a shorter e-mail (sic).  Would you mind reading
2 it, please.
3     A     Yes.  I assume you mean, by "e-mail,"
4 that you mean my notes in the book?
5     Q     Your notes.  I'm sorry.  Starting with
6 the date, please.
7     A     Yes.  So the date is 11-29-2017.  It
8 reads, "Jeff lost case with IRS $11MM" or
9 $11 million.
10         "Restore 4 profit can't be touched or
11 attached.
12         "Farm & house" with an arrow sign,
13 "they will force sale & take it.
14         "Paying Andy only health insurance to
15 keep company viable & legitimate.  Andy has not
16 been paid in a while.  He is struggling really
17 bad.  Home, etc... in jeopardy.
18         "CFO" with an arrow sign, "of Tristar,
19 he is who" -- "who we should work with.
20         "Keith Merchant" -- I don't -- That
21 might be the CFO's name, but I'm not sure.
22 "Keith Merchant is loyal to Andy because he saved
23 him early on during a trucking strike."
24     Q     So Jeff -- So it looks like Jeff
25 informed you about the adverse IRS ruling shortly

**Page 112**

1 after it occurred?
2         MR. PULKRABEK:  Object to the form.
3     Q     (By Mr. Abelman)  Is that true?
4     A     Yes.  I think on 11-29-2017, he
5 informed me of it.  And as we discussed hours ago,
6 I think that occurred in October of 2017, so a
7 month and a half or -- or within 60 days following
8 that would be my understanding.
9     Q     And what, if any -- What, if any,
10 conversations did this call generate with Jeff?
11         THE DEPONENT:  I'm sorry, Ross.  Did
12 you say something?
13         MR. PULKRABEK:  No.  Go ahead and
14 answer.
15         THE DEPONENT:  I'm sorry.
16     A     It generated -- As you can see here in
17 the notes, he informed me about it.  He, you know,
18 was feeling bad for his employee or consultant
19 Andy.  You know, he shared he was really
20 struggling, and Jeff was saying, "Hey, you know,
21 this is largely in Tristar's" -- He had intimated
22 "This is in Tristar's hands, as we've been
23 discussing.  Keith Merchant is the key guy there
24 and he's loyal to Andy; he's kind of your go-to
25 guy."

1   And that's what I recall him saying.
2   That's what he shared.
3   Q   Did this generate any response
4   internally from Midlab or the Keller Group?
5   A   None that I specifically recall.  I
6   don't know that we -- No.  I don't think so.
7   Q   Let's go to the last page, which is
8   Bates No. -0004742.  Would you read -- read this
9   entry of your notes, please.
10   A   Yes.  It occurred on June 1st of 2018.
11   These are notes from a telephone conversation that
12   occurred with Merrie Wycoff and Andy -- I'm sorry.
13   I can't recall his last name, but he was on the
14   call, the Andy -- Andy that we've been referring
15   to -- Matt Schenk and myself.
16   I recall speaking first to -- or Matt
17   Schenk might have said, "Thank you for taking our
18   call," et cetera.  But I had a few talking points
19   to cover, and I had written those talking points
20   before the conversation actually occurred, things
21   I wanted to cover with her.
22   So I shared my condolences, because
23   this was after the death of Jeff, several months
24   later.  And I made the point that "I'm sure your
25   life's topsy-turvy.  Merrie, this is perhaps small

1   in the scheme of things for you, but, you know,
2   this is our duty" -- "our fiduciary duty for our
3   company, because we have this situation, the debt
4   and the ongoing situation, and we have to follow
5   up on this."  I was simply being delicate, or at
6   least trying to be, about the situation.
7   And I explained --  We wanted to gain
8   an increased understanding about the debt and
9   Jeff's intention with it with his estate now --
10   obviously, Jeff was deceased -- his estate and
11   what was going on.  And I asked her or was --  You
12   know, I did ask her -- or I recall asking her, you
13   know, "Do you want us to communicate directly with
14   you in the future or" -- or this blank here, you
15   know, to write in a name.
16   I had thought we might go over numbers
17   in some detail.  I recall asking her about an
18   executor.  It is my recollection that she said, on
19   this call, "Oh, we're not probating it and I'm
20   not" -- "not real familiar with all of that."  I
21   don't know --  I didn't know, at that time, what
22   that meant, but she -- but I do recall her saying
23   that.
24   I specifically recall, as I wrote here,
25   Merrie saying that she's been familiar with

1   things, meaning business, and what's been going on
2   and of the many communications on the sidelines.
3   She was aware of the many things that Jeff said to
4   me, his promises, et cetera.  She acknowledged --
5   I mean, you know, with perfect hindsight, I would
6   have acknowledged the debt.  And she said, "Things
7   are really crazy now.  We're dealing with a lot of
8   stuff and we will deal with this the best we can."
9   And that was it.  That was the call.
10   I'm guessing it was five to eight minutes in
11   length or something like that.  And I recall
12   talking with Matt Schenk after the call, feeling
13   that it went pretty well.  She acknowledged the
14   debt and indicated an intention to pay it and work
15   with us, but she needed time and was dealing with
16   a lot of issues.
17   Q   Was this the last conversation you had
18   directly with her?
19   A   To my recollection, yes.
20   Q   Neither Jeff Wycoff or Merrie Wycoff
21   has ever disputed the debt that ZAP! owed or Jeff
22   owed to Midlab, have they?
23   A   To my knowledge, they have not disputed
24   it.
25   MR. ABELMAN:  Would you pull up

1   Exhibit 68, please.
2   Q   (By Mr. Abelman)  Would you identify
3   that, Mr. Keller.
4   A   It says, "In the United States District
5   Court For the District of Colorado, Civil Action"
6   and then has a long number with letters.  It says,
7   "Midlab, Inc., a Tennessee Corporation, Plaintiff,
8   v. Merrie Pisano Wycoff individually," and then it
9   names a variety of trusts and other entities.  It
10   is dated -- or filed 7-21-21.
11   Q   Okay.  And the plaintiff is Midlab?
12   A   Yes.
13   Q   And you would expect that a legal
14   document prepared on behalf of Midlab would be
15   honest and accurate, wouldn't you?
16   A   Yes.
17   MR. ABELMAN:  Let's start at Page 5,
18   which is Exhibit -- which is where we'll see
19   Paragraph 18.  Ana, could you move to Page 5.  I'm
20   sorry.  It's Paragraphs 17 and 18.
21   Q   (By Mr. Abelman)  Do you see that
22   there's representations here that --  Well,
23   Paragraph 17 says, "BHFS represented Jeffrey
24   Wycoff and Merrie Wycoff in connection with the
25   Guaranty, as evidenced by, inter alia, exchanges

*AB Litigation Services*

1  of emails between BHFS attorney Kevin A. Kudney
2  and Coleman Hoffman in November 2015, concerning
3  the Guaranty and Jeffrey Wycoff's agreement
4  to personally guaranty the obligations of Zap!
5  Products, Inc. to Midlab, Inc. up to a
6  $1,000,000."
7          And we've previously established that
8  only Jeff Wycoff executed a guaranty on behalf of
9  Midlab, correct?
10     A    I think that is the case. It was --
11 The reason I pause is I was uncertain -- It is my
12 understanding that Merrie acknowledged, in a
13 letter or in some way with whoever compiled the
14 information that it was accurate, but she did not
15 sign the personal guaranty. That's just my
16 understanding.
17     Q    That --
18     A    I might be wrong.
19     Q    That what was accurate?
20     A    The financial -- The -- The statement
21 of financial condition.
22     Q    What's the basis for that conclusion --
23 for your conclusion?
24          MR. PULKRABEK:  Form and foundation.
25     A    I guess conversations that -- that --

1  that that happened.
2      Q    (By Mr. Abelman)  Conversations with
3  whom?
4          MR. PULKRABEK:  Mr. --  I'm sorry.
5  Mr. Keller, if you're going to get into
6  conversations with my office at this point, I'd
7  just instruct you not to answer questions about
8  that, as that would implicate the attorney-client
9  privilege.
10         MR. ABELMAN:  Actually, that does not
11 implicate the attorney-client privilege, Ross.
12 I'm asking for conversations with whom.  I'm not
13 asking about the content.
14         MR. PULKRABEK:  All right.  So has he
15 discussed -- Has he had discussions with legal
16 counsel about the complaint?
17         MR. ABELMAN:  No, that's not what I
18 asked.  I asked who -- He said -- We went back,
19 and he said that Merrie Wycoff --
20     Q    (By Mr. Abelman)  I believe, but
21 correct me if I'm wrong, Mr. Keller, you said that
22 Merrie Wycoff had acknowledged the validity of the
23 guaranty?
24         Is that what you said?
25         MR. PULKRABEK:  Object to the form.

1      A    I said -- I said it was my
2  understanding that Merrie acknowledged the
3  validity of the information on the financial
4  disclosure; that was my understanding.
5      Q    (By Mr. Abelman)  Okay.  Then I asked
6  you, "What was the basis for that understanding,"
7  and you said "Conversations."  And I asked you,
8  "Conversations with whom?"
9      A    Correct.  And then my counsel objected
10 and instructed me not to answer.
11         MR. PULKRABEK:  You can answer the
12 question -- Without getting into communications
13 with legal counsel, you can answer the question.
14     A    With -- With counsel is the answer.
15     Q    (By Mr. Abelman)  Okay.  Now, this --
16 You were referring to the statement of financial
17 condition, I believe, which was Exhibit 51.  I'm
18 looking at it now.  I don't see Merrie Wycoff's
19 signature on that.  Do you have a copy of this
20 statement of financial condition with Merrie
21 Wycoff's signature on it?
22     A    I -- I do not have a copy of it.  I do
23 recall seeing it on the screen earlier today, but
24 I -- I do not recall, in those hours ago, seeing
25 her signature on it.

1      Q    Okay.  And it says "BHFS," which is my
2  law firm, "represented Jeffrey Wycoff and Merrie
3  Wycoff in connection with the Guaranty."
4          What's the basis for that statement?
5          MR. PULKRABEK:  Foundation.
6      A    I do not know the answer to your
7  question.
8      Q    (By Mr. Abelman)  The same allegation
9  is made in Paragraph 18.  It says, "BHFS as
10 counsel for Jeffrey Wycoff, Merrie Wycoff, and
11 Zap! Products, LLC provided Midlab, Inc. with a
12 personal financial statement."
13         Would it surprise you to learn that
14 BHFS never represented Merrie Wycoff prior to
15 Jeff Wycoff's death?
16         MR. PULKRABEK:  Foundation and form.
17     A    Would I be surprised?  I would have
18 to -- I have no -- I have no opinion as to
19 whether I'm surprised or not.  I have no knowledge
20 of it at all.
21     Q    (By Mr. Abelman)  Let's move to Page 7,
22 please.  And, in particular, I'm looking at
23 Paragraph 29.  And so I'd like you to read
24 Paragraph 29, please.
25     A    Okay.  "Jeffrey Wycoff and Merrie

*AB Litigation Services*

---

Page 121

1  Wycoff did not reflect the transfer on the
2  Statement of Financial Condition that they
3  provided to Midlab, Inc., nor did the Statement of
4  Financial Condition otherwise refer to Wycoff
5  Financial, LLC or particular assets held through
6  Wycoff Financial, LLC.  The impression created by
7  the Statement of Financial Condition was that the
8  Farm was an asset of Jeffrey Wycoff and Merrie
9  Wycoff that Midlab, Inc. could rely upon as
10 supporting the Guaranty."
11      Q    So was title to the farm important to
12 Midlab at that time?
13           MR. PULKRABEK:  Foundation.
14           THE DEPONENT:  I assume I can proceed.
15      A    I believe that the answer to that would
16 be yes, it would be, in that it was --  I know in
17 retrospect from seeing this now, this financial
18 statement, believed by Colman Hoffman, who was
19 advising on this, that it made up a substantial
20 part of Jeff's assets -- Jeff Wycoff's assets in
21 signing the guaranty.  Jeff, on numerous
22 occasions, promised me and assured me of financial
23 security in the debts because of the value and the
24 equity he had in the farm, and it could be sold to
25 pay his debts should the business not be able to

---

Page 122

1  do so.
2           So having title or the right to it, the
3  ability to do so and not have them be encumbered
4  in other ways through different entities was
5  important, yes
6      Q    (By Mr. Abelman)  Well, if Jeff and
7  Merrie Wycoff were the owners of Wycoff Financial,
8  wouldn't they have the ability to sell the farm?
9      A    Perhaps, but I do know enough from my
10 business experience to know that when you start
11 having assets legally owned and/or titled in
12 other -- in other entities, that other agreements
13 or situations or conditions of that other entity
14 can interfere with things if it's not just
15 directly owned by an individual that has clear
16 title and right to act.
17           I mean, yes, you might be right.  But
18 it could be far more involved and complex than
19 that.
20      Q    It could be.  You're absolutely right.
21 So what inquiry has -- have you made with regard
22 to whether Wycoff Financial had any obligations
23 about which Midlab was not informed?
24           MR. PULKRABEK:  Foundation and form.
25      A    I can't answer that, because I

---

Page 123

1  personally haven't done that.  So I don't know the
2  answer to your question.
3      Q    (By Mr. Abelman)  Wouldn't that be
4  important for you to find out -- for Midlab to
5  find out before --
6           MR. PULKRABEK:  Object --
7      Q    (By Mr. Abelman)  -- proceeding with
8  this lawsuit?
9           MR. PULKRABEK:  Object to the form of
10 the question.
11           THE DEPONENT:  Should I answer, Ross?
12           MR. PULKRABEK:  If you can, go ahead.
13      A    Well, yes.  I think it would be
14 important, but it was my belief and understanding,
15 assumption that that is and has been done by
16 numerous people under the guidance of our -- of
17 Midlab's counsel.
18      Q    (By Mr. Abelman)  Oh, that's -- that's
19 interesting.  Because as it turns out, Wycoff
20 Financial only owed one creditor, and that was
21 BC 24.  And as we've established, you knew about
22 the mortgage owed by BC 24, correct?
23           MR. PULKRABEK:  Objection.  And this is
24 argumentative.
25           Go ahead, Mr. Keller, if you can.

---

Page 124

1      A    I did not know about BC 24.  I -- I
2  assumed there was a mortgage with some entity.  I
3  had no idea the name and had never heard it,
4  because Jeff said, when he would describe the
5  asset value of the farm, what its market value
6  was, how much he had borrowed on it, which clearly
7  indicates a loan of some kind, that his equity
8  resulting was always as represented by him more
9  than the personal guaranty.
10      Q    (By Mr. Abelman)  Well, Mr. Keller, if
11 you look at the statement of financial condition,
12 it shows a mortgage payable on the farm of
13 $3,650,000.  So --
14      A    Okay.
15      Q    -- right from the inception of your
16 knowledge about the farm, Midlab knew that there
17 was a mortgage against the farm; is --
18      A    Okay.
19      Q    -- that correct?
20      A    I think that is correct.
21      Q    So if -- if the only indebtedness that
22 Wycoff Financial owed was to -- was the mortgage,
23 would -- would it change whether -- would it
24 change what -- what value would be available to
25 Midlab?

---

Page 125

1      MR. PULKRABEK:  Foundation and form.
2      A    I don't know the answer, because I
3 don't -- I -- You know, I wasn't familiar with
4 all of the dealings of Wycoff Financial.  But
5 going back in time, it was my understanding that
6 Jeff Wycoff and his wife owned the farm, not
7 Wycoff Financial, at the time of the guaranty.
8      Q    (By Mr. Abelman)  But what difference
9 would it make from the standpoint of their --
10 What difference would it make from the standpoint
11 of the net -- of their net worth if they owned it
12 directly or indirectly?
13     MR. PULKRABEK:  Foundation and form.
14     A    I -- I don't know, Steve, is my
15 answer.
16     Q    (By Mr. Abelman)  Don't you think it's
17 something you should know now, after the
18 litigation has -- has been ongoing?
19     MR. PULKRABEK:  Object to the form.
20     A    I -- I don't -- I don't have -- I
21 don't have an answer.  I mean, I'd love to know
22 all of the intricacies and details of all of the
23 dealings that have occurred since he signed that
24 guaranty; that would be lovely.  But I don't know
25 them all.  I would love to know them all is my

Page 126

1 answer.
2      Q    (By Mr. Abelman)  I would love for you
3 to know them all as well.  This -- This -- This
4 amended complaint was filed on May 17th of 2021,
5 so there's been a great deal of information
6 produced on precisely these points since the
7 original complaint was filed.  I just don't
8 understand why you're not aware of these salient
9 points.
10     MR. PULKRABEK:  Mr. Abelman, that's not
11 a question.  I'd ask you to limit your examination
12 to questions rather than berating the witness,
13 please.
14     MR. ABELMAN:  I'm not berating.  I'm
15 asking a question.
16     MR. PULKRABEK:  That was not a
17 question.
18     MR. ABELMAN:  I mean, Mr. Keller is a
19 very bright man.  He's got an MBA.  He's --
20 He's -- He's a sophisticated businessman.  I'm
21 surprised that we're -- that he's not familiar
22 with some of the most salient facts in a complaint
23 that's been filed on behalf of his company.
24     MR. PULKRABEK:  Okay.  So ask a
25 question.  You're making a speech about your

Page 127

1 surprise.  The purpose of the deposition is not
2 for you to indicate your surprise.  It's to ask
3 questions, and so I'd ask you to move on and ask a
4 question.
5      MR. ABELMAN:  Would you -- Ana, would
6 you turn to Page 8, please.
7      Q    (By Mr. Abelman)  And, Mr. Keller, I'm
8 going to direct your attention to Paragraph 33.
9 Would you read the allegation in Paragraph 33.
10     A    It reads, "Jeffrey Wycoff also
11 mentioned the Residence to Vince Keller in the
12 context of establishing his net worth."
13     Q    And what did -- When did Mr. Wycoff
14 mention the residence?  And what did he say?
15     A    Like I've said a few other times, I
16 don't recall the specific conversation or which
17 quarter in a given year, but in the several
18 occasions that he would speak about paying us and
19 about the value of his farm, he would often -- I
20 don't know that he did it every time -- also
21 mention his home having value and that the --
22 the -- He would say, you know, "There's the farm
23 and there's the equity left in the farm.  Of
24 course, if it really got tough, there's the
25 house."

Page 128

1      And he would try to give me confidence
2 that he had personal assets that were sufficient
3 to satisfy his obligations.
4      Q    So I'm trying to understand the nature
5 of your -- of this conflict.  And when I say
6 "your," I mean Midlab.  Is there any question that
7 the Wycoffs made efforts to sell the farm?
8      MR. PULKRABEK:  Foundation.
9      A    I am not knowledgeable about the detail
10 of their efforts at all.  Apparently there's an
11 MLS listing which would indicate an effort, and he
12 told me that, you know, they intended to market
13 it.  He told me a lot more about its value, about
14 why it was valuable with Google coming into the
15 area and about the possibility of having a
16 redistrict -- or rezoned for marijuana growth and
17 things of that nature.
18     But it would appear, if he had an MLS
19 agreement, that there was effort made.  I don't
20 know any details beyond that.  I don't know any
21 details about the MLS.  It's just that I'm told it
22 existed, and so I take that at face value.
23     Q    (By Mr. Abelman)  Are you interested in
24 knowing the details, Mr. Keller?
25     A    At this point, not particularly.  If it

Page 129

1  happened, it happened.  I certainly am not
2  interested in reading an MLS listing.
3      Q    Well, but are you interested in finding
4  out what the value of the farm was at -- at this
5  time?
6      A    Yes.  I would like to know the value of
7  the farm, yeah.  I was told all along, as we've
8  discussed today on numerous occasions, what Jeff
9  purported its value to be.  I took him at face
10 value that that was accurate, or largely accurate,
11 or at least within the ballpark of rounding within
12 a half million or million or whatever.
13     Q    So Midlab has requested and the
14 defendants here have provided the backup for the
15 sales efforts as to the farm.
16     A    Okay.
17     Q    So there's -- there's e-mails from the
18 Bernardi Group detailing the sales efforts and the
19 changes in price, starting with a contract that
20 listed the farm for $5,850,000 and ending with, on
21 November 27th of 2017, the real estate broker,
22 Karen Bernardi, recommending that they list the
23 farm at somewhere between $2.3 million and
24 $2.7 million.  And in between, there are e-mails
25 explaining why the price needs to be lower.

Page 130

1          So is any of that of interest to you?
2      A    Yes, it's of interest to --
3          MR. PULKRABEK:  Hold on just one
4  second.  Foundation and form to the question.
5          Go ahead, Mr. Keller.  You can answer
6  the question as to whether it is of interest to
7  you.
8      A    It is affirmatively, yes, of interest
9  to me.
10     Q    (By Mr. Abelman)  I mean, what I'm
11 trying to understand, Mr. Keller is -- I mean, is
12 Midlab upset with the Wycoffs because they don't
13 believe the Wycoffs made an adequate effort to
14 sell the farm or they think that the Wycoffs sold
15 the farm at an inadequate price?
16         MR. PULKRABEK:  Object to the form.
17         Go ahead, Mr. Keller, if you can
18 answer.
19     A    I would not characterize Midlab,
20 speaking for it as an inanimate entity, of having
21 emotion about it.  They're certainly not angry.
22 They -- And as I sit here, and for the first time
23 learn of the value that it was suggested to be
24 sold for, I, as a representative of Midlab, would
25 be disappointed, because that sounds --  You

Page 131

1  said something about a price in the upper to mid
2  $2 million range of a sales price was far less
3  than it was purported to be worth.  So I'm
4  disappointed to hear that would be my
5  characterization.
6      Q    (By Mr. Abelman)  And you mentioned
7  earlier that the value of real estate is -- is
8  informed by market conditions.
9      A    Yes.
10     Q    Did I accurately represent your
11 statement?
12     A    Yes.
13     Q    And when you're selling a piece of real
14 estate, is it your experience that you depend upon
15 your real estate agent to help you assess what an
16 appropriate sales price would be?
17         MR. PULKRABEK:  Form and foundation.
18         Go ahead.
19     A    It would be my experience and just
20 perception that sellers generally rely on their
21 real estate agent to assist in -- in setting value
22 and sales prices.  However --  And, obviously,
23 market conditions dictate what those may be.
24             Individual situations in any given
25 situation can necessitate undermarket value or

Page 132

1  needs to sell property quickly for some reason,
2  and things get sold at or below market value for a
3  myriad of reasons.  I mean, that's my opinion to
4  your question.
5      Q    (By Mr. Abelman)  So here, you were
6  told in the summer of 2016, that the property --
7  the farm was being sold for around $5 million.
8  And so --  You were told there was a listing, and
9  then over the next almost two years, there was
10 only one offer that was obtained.
11             Is that --  Does that comport with your
12 understanding?
13         MR. PULKRABEK:  Form and foundation.
14         You can answer the question
15     A    I --  I do not know how many offers
16 were given or not given.  I --  I have no
17 understanding or knowledge of that.
18     Q    (By Mr. Abelman)  Well, your complaint
19 references one offer, and that was almost two
20 years later at $3.3 million; is that correct?
21     A    If that's what it says in what you're
22 reading there, then I -- I assume that's correct.
23     Q    So in between the summer of 2016 and
24 the spring of 2018, it would appear that the
25 market for properties like the farm was on a

Page 133

1   downward swing.
2           MR. PULKRABEK:  Form and foundation.
3       A       I -- I don't have any close knowledge
4   of the Colorado marketplace aside from residential
5   real estate.  I happen to have a few acquaintances
6   that live there and own multiple homes there and,
7   therefore, have some knowledge of the home values
8   there, which seem astronomically high to me.
9           And so I -- I -- I find that
10  surprising.  It seems counter to what's happening
11  to valuable in-close farms that are near
12  metropolitan areas, which I understand this is.
13  And the fact that it would be declining in
14  Colorado, when water's important and it has water,
15  I just --  It just seems astonishing to me that it
16  would decline in value like that.
17          So that's my opinion, but it's not
18  informed by any more than what I'm saying, you
19  know.
20      Q       (By Mr. Abelman)  So we've established
21  that there was a mortgage against the farm that
22  you were informed about right from the statement
23  of financial condition; is that right?
24      A       Correct.
25      Q       And do you recall how much it was in

Page 134

1   2015, the amount outstanding on the mortgage?
2       A       I -- I don't.  We'd need to see the
3   exhibit, or you can read it to me.  But it's --
4   It seems like it was $2-something million.  I --
5   It was $2 million or $3 million, and it left
6   equity of several -- of a couple million is my
7   recollection.
8       Q       Well, let me help you here.  The --
9       A       All right.
10      Q       -- value that was -- on the statement
11  of financial condition for the farm was listed at
12  $4,750,000.
13      A       Okay.
14      Q       The mortgage on the farm, at that
15  point, was $3,650,000.
16      A       Okay.
17      Q       So --
18      A       Which leaves a delta of $1.1 million,
19  so a bit more than the personal guaranty.
20      Q       Right.  But if it turns out that the
21  farm was worth, as Karen Bernardi said in November
22  of 2017, between $2.3 million and $2.7 million,
23  where does that leave the -- the equity position
24  for the farm?
25          MR. PULKRABEK:  Foundation and form.

Page 135

1           If you are able to answer the question,
2   go ahead, Mr. Keller.
3       A       I -- In fact, that was the value, and
4   if, in fact, a mortgage of -- of $3.65 million
5   remained, it would imply that the property was, as
6   they say, under water, had a negative value,
7   negative equity.
8       Q       (By Mr. Abelman)  So one of the
9   documents provided to Midlab pursuant to its
10  request was a settlement agreement with the holder
11  of the mortgage, and that document indicates that
12  the mortgage, by that point, so in the summer of
13  2018, was $4.9 million.
14          Were you aware of that?
15      A       No.
16          MR. PULKRABEK:  Object to the form and
17  foundation.
18      A       No.
19          MR. PULKRABEK:  Mr. Abelman, when you
20  get to a good point, could we take a break -- a
21  restroom break, please.
22          MR. ABELMAN:  Okay.  Let me finish this
23  subject.
24      Q       (By Mr. Abelman)  So the holder of the
25  mortgage --  And you said you didn't know the name

Page 136

1   of it, but the holder of the mortgage is an entity
2   called BC 24, which is a subsidiary of a lender
3   called Bloomfield out of Michigan.  Were you aware
4   that -- that after Jeff Wycoff's death, and after
5   the $3.3 million purchase contract from Caerleon
6   was terminated by Caerleon, that BC 24 issued a
7   notice of default?
8           MR. PULKRABEK:  Objection form and
9   foundation.
10          Go ahead.
11      A       No.
12      Q       So earlier when you -- when you -- when
13  we were talking about valuations, you mentioned a
14  variety of situations where sometimes property is
15  sold for even below what its fair market value
16  would be, and you gave a description of some
17  examples that, I think, generally would fall under
18  the -- the ambit of distressed sales.
19          Did I get that right?
20      A       Yes.
21      Q       And would a sale that occurred after
22  the lender had issued a notice of default on a
23  loan secured by the property, in your opinion,
24  constitute a potential distressed sale?
25          MR. PULKRABEK:  Foundation and form.

*AB Litigation Services*

Page 137

1     Go ahead.
2     A     Yes, it could.
3     Q     (By Mr. Abelman)  One of the primary
4  allegations in this complaint, Mr. Keller, is
5  that -- and correct me if I'm wrong -- is that
6  Merrie Wycoff sold the farm at a value that was
7  below fair market value.
8        Is that -- Is that an accurate
9  statement about this complaint?
10        MR. PULKRABEK:  Form.
11        THE DEPONENT:  Can I proceed, Ross?
12        MR. PULKRABEK:  Yes.  You can go ahead
13  and answer the question.
14     A     I think that is possibly a fair thing
15  to say.  It's hard for me to say with much
16  certainty, in that it's a long complaint.  I saw
17  it for the first time yesterday, and there's a lot
18  of movements and parts.  But from my brief
19  familiarity with it, I think that that's accurate.
20        MR. PULKRABEK:  Mr. Abelman, I'd like
21  us to take a break.  I do need to use the
22  restroom.
23        MR. ABELMAN:  Okay.  I -- I apologize.
24  Let's take a break.  How much time do you want?
25        MR. PULKRABEK:  If we can just have

Page 138

1  10 minutes, I think that would be sufficient.
2  Thanks.
3        MR. ABELMAN:  Okay.
4        (Recess from 1:33 p.m. to 1:45 p.m.)
5     Q     (By Mr. Abelman)  So, Mr. Keller, I'm
6  just trying to understand, in part, why we're
7  involved in this lawsuit, why Midlab is
8  prosecuting claims against Merrie Wycoff and the
9  other defendants.  One of the -- One of the bases
10  for the lawsuit is that the farm was sold for less
11  than fair market value.
12        If you look at Paragraph 85 of the
13  complaint, it says, "In March and April 2018, the
14  Farm was under contract for" the sale -- "for sale
15  for $3,3000,000."
16        Is that what Midlab believes the fair
17  market value was in the spring and summer of 2018?
18        MR. PULKRABEK:  Foundation.
19        Go ahead, Mr. Keller, if you can.
20     A     I don't know what Midlab thinks,
21  because they don't have a close working knowledge
22  of the real state market in that area.  But it
23  would seem to indicate, if there was a contract
24  with an arm's-length third party, that that might
25  be reflective, although perhaps on the lower end.

Page 139

1     Q     (By Mr. Abelman)  So it might be a good
2  indication, but then when the contract was
3  terminated by the potential purchaser, what in
4  your opinion would that indicate?
5        MR. PULKRABEK:  Foundation.
6        Go ahead, Mr. Keller
7     A     I don't have -- I don't know what it
8  would indicate.  There could be a myriad of
9  things.
10     Q     (By Mr. Abelman)  Sure.  But that
11  could -- But one of the things it could be is
12  that $3.3 million wasn't a fair market value; that
13  it was too high?
14        MR. PULKRABEK:  Foundation and form.
15     A     That's your opinion.  It could mean,
16  literally, 100 different things or more.  It could
17  mean the buyer changed his mind.  It could mean
18  the buyer ran into financial problems.  It could
19  mean the buyer changed its mind for any number of
20  reasons.
21     Q     (By Mr. Abelman)  Okay.  Fair enough.
22  So from Midlab's perspective, what should have
23  happened then?  What -- What should have -- What
24  should Merrie Wycoff have done with regard to the
25  sale of the farm?

Page 140

1        MR. PULKRABEK:  Object to the form of
2  the question
3     A     I -- Mr. Abelman, I -- I -- I don't
4  have close working knowledge of the machinations
5  that were going on after Jeff's death.  I -- So I
6  depend on our counsel for that and the details of
7  the myriad of LLCs that were created and the
8  things sold and transferred, to my understanding,
9  of which I have no specific knowledge.  So it's
10  hard for me to opine.
11        My involvement is at a very high level.
12  Jeff promised to pay.  He said for years on end
13  that the farm and/or the residence, or even other
14  assets of the company would be sufficient to do
15  so.  Merrie was aware of all those conversations
16  and said such.  It is my understanding that she
17  could have sold this property or continued to try
18  to sell the property at the market value of
19  $3.3 million, or perhaps higher.  And, again,
20  without close knowledge of all the details, that's
21  what I would have expected her to do and settle
22  her debts.
23     Q     (By Mr. Abelman)  Mr. Keller, we just
24  took a break.  Did you speak to your counsel
25  during that break?

EXHIBIT Q

*AB Litigation Services*

Page 141

```
 1          MR. PULKRABEK:  Object to the form and
 2  foundation.  And -- And I don't know where this
 3  is going, Mr. Abelman, if you're just about to
 4  inquire into attorney-client communications or
 5  not, but --
 6      Q     (By Mr. Abelman)  Answer the question,
 7  Mr. Keller.
 8      A     Yes, briefly after he used the
 9  restroom.
10      Q     Okay.  So let's dig down on this
11  deeper.  You say you don't have personal knowledge
12  about it.  This is your company that has filed a
13  lawsuit, Mr. Keller.  Why don't you have more
14  knowledge?  Don't you -- Go ahead.
15      A     Because I read the complaint beginning
16  to end for the first time this morning.  I'm a
17  busy person.  I trust the managers and lawyers to
18  handle these issues, and they have been handling
19  these issues.  And that's the answer.  I just --
20  Just like yourself --  I'm sure we're all busy in
21  life and have a myriad of things we're doing, and
22  I'm in the same situation.
23      Q     Mr. Keller, if you're not managing
24  this, who is?  Mr. Schenk wasn't that familiar
25  with the litigation.  Mr. Miller wasn't that
```

Page 142

```
 1  familiar with the litigation.  Who is?
 2          MR. PULKRABEK:  Mr. Abelman, I object
 3  to the -- to foundation and form.
 4          Mr. Keller, if you can answer, go
 5  ahead.
 6      A     The law firm -- Ross' law firm is
 7  largely managing this process, in my opinion.
 8      Q     (By Mr. Abelman)  So you -- Let's
 9  assume for a second that the property was sold for
10  $3.3 million.  How would that have helped Midlab?
11          MR. PULKRABEK:  Foundation.
12          Go ahead and answer, if you are able
13  to, Mr. Keller.
14      A     I don't know what other assets were
15  still available or what remaining funds could have
16  been available to pay us; for instance, the
17  residence, et cetera.  So I -- Yeah.  I don't --
18  I don't know the answer to your question.
19      Q     (By Mr. Abelman)  Well, Mr. Keller,
20  your -- Midlab's lawsuit makes specific claims
21  about a fraudulent conveyance involving the farm.
22  So for purposes of the farm itself, how would a
23  sale at $3.3 million have helped Midlab?
24          MR. PULKRABEK:  Foundation and now also
25  form.
```

Page 143

```
 1          Go ahead, if you're able to answer the
 2  question, Mr. Keller.
 3      A     I don't have anything further to
 4  answer.  I've said -- I've given an answer to the
 5  best of my knowledge.
 6      Q     (By Mr. Abelman)  Are you aware that
 7  the mortgage was in the amount of $4.9 million?
 8          MR. PULKRABEK:  Foundation and form.
 9      A     I'm not aware of that.  It seems like
10  that had been said earlier today, and so perhaps.
11  Again, I'm not close to the detail of it.
12      Q     (By Mr. Abelman)  You have a
13  document --  Your counsel has a document that
14  reflects the mortgage was $4.9 million.  Are you
15  telling me today that you've never bothered to
16  look at that document?
17          MR. PULKRABEK:  Mr. Abelman, I'm going
18  to object, and I'm going to ask that you treat the
19  witness with courtesy and maybe dial back your
20  tone a bit.  This is becoming a bit abusive, in my
21  opinion.  I know that we're not video-recording
22  this deposition, but in my opinion, you're getting
23  a little over the top here.
24          Go ahead, Mr. Keller, if you can
25  answer.
```

Page 144

```
 1      Q     (By Mr. Abelman)  Mr. Keller, there is
 2  no disrespect intended.  I am involved in a
 3  lawsuit brought by a company that you own
 4  indirectly, and I want to understand the basis for
 5  this dispute as best as possible.  So please
 6  answer that question?
 7      A     So I began reviewing detailed documents
 8  this morning.  I don't recall seeing a document
 9  about a mortgage for $4.9 million.  I'm not
10  disputing that fact, and I would not have been
11  aware of it prior to this morning.  It's --  I am
12  aware there was a mortgage on this property in the
13  past, as we've discussed today, according to Jeff
14  Wycoff saying that.  We also had exhibits from my
15  notes that showed that it was something, like,
16  $3-something million, which left a net value of
17  $2 million at the time of our conversations.  You
18  know, that's that.
19          And our counsel -- Colman Hoffman is
20  who I'm referring to -- reviewed the agreement and
21  felt there was sufficient assets to make good on a
22  guaranty, so we went forward on that basis.  I
23  don't have any more specific knowledge or
24  familiarity with specific mortgage documents than
25  that.
```

1    Q    (By Mr. Abelman)  Well, Mr. Keller,
2  forgive me, but I'm going to go through this step
3  by step.  I understand you don't want -- that you
4  don't have more knowledge, but I'm going to take
5  this opportunity to pin you down on each of these
6  issues.
7         So assuming that the -- And I
8  understand you haven't read the settlement
9  agreement, but assuming that the property could be
10  sold at $3.3 million, the farm, and assuming that
11  the mortgage was $4.9 million, what difference did
12  it make whether the sales price was $3.3 million?
13         MR. PULKRABEK:  Foundation and form.
14         Mr. Keller, if you're able to answer
15  that question, you may proceed.
16    A    I -- I assume, under those facts --
17  If -- If we were relying solely on just the farm
18  and those facts occurred and were accurate, we
19  would not get funds from the sale of the farm in
20  that circumstance you've described.
21    Q    (By Mr. Abelman)  So can you think of
22  any incentive that the -- that the Wycoffs would
23  have to sell the farm at less than fair market
24  value?
25         MR. PULKRABEK:  Foundation and form.

1         Go ahead.
2    A    Again, if one was to sell the farm to
3  children or close relatives or insiders or
4  friendly people, close friends, whatever the case
5  may be, there may be an opportunity to preserve
6  value in the remaining value of the property for
7  the related parties.  That would be a reason.
8    Q    (By Mr. Abelman)  How would you expect
9  the lender to respond to an attempt to sell the
10  property at less than fair market value?
11         MR. PULKRABEK:  Foundation and form.
12    A    I can't speak for the lender.  I don't
13  know.
14    Q    (By Mr. Abelman)  Hey, you're a
15  businessman.  Have you ever dealt with a lender
16  who was willing to walk away from a deficiency of
17  $1.6 million when it wasn't in its best interest?
18         MR. PULKRABEK:  Same objection.
19    A    I've not heard -- I've not personally
20  dealt with that, but I've heard of that on
21  occasions with other people I know of.
22    Q    (By Mr. Abelman)  Okay.  Are you aware
23  that -- Are you aware that Merrie Wycoff offered
24  the lender a deed in lieu to the farm as an
25  alternative to the sale at $2.5 million and that

1  the lender declined that offer?
2    A    I am not aware of that, or I don't
3  recall it in reading whatever I read today.
4    Q    There are allegations in the complaint
5  with regard to the residence also.  Did you --
6  Does Midlab believe that the residence was sold
7  for less than fair market value?
8         MR. PULKRABEK:  Foundation and form.
9  And I just want to state for the record that this
10  is not a notice of Rule 30(b)(6) deposition of
11  Midlab.  This is a deposition of Mr. Keller
12  individually.
13         But go ahead, Mr. Keller.
14    A    I don't know the answer to that.  I
15  don't know that they have an opinion or knowledge
16  of it.
17    Q    (By Mr. Abelman)  Do you individually
18  have an opinion or knowledge about that?
19    A    No.
20    Q    Have you seen the e-mail from Karen
21  Bernardi dated November 27th of 2017 where she
22  recommends selling the residence at between
23  $975,000 and $1.1 million?
24         MR. PULKRABEK:  Form.
25    A    No.  I have no -- No.  I have no

1  knowledge of that, no.  I don't recall seeing
2  that.
3    Q    (By Mr. Abelman)  But you're aware that
4  the purchase price was actually $1,275,000?
5    A    How much was it?  I'm sorry.
6    Q    $1,275,000.
7    A    I'm not aware of that or don't recall
8  it.  If you say so, then I accept that.  I don't
9  recall it.
10    Q    Isn't it in the complaint?
11    A    Perhaps.  The complaint's 33 pages, and
12  I read it one time this morning.  I'm not saying
13  it's not there.  I'm just saying I don't recall.
14    Q    Okay.  Would you look at Paragraph 39
15  on Page 9.  Please read it.
16    A    "Based on the representations of
17  Jeffrey Wycoff and Merrie Wycoff made on the
18  Statement of Financial Condition, Midlab, Inc.
19  proceeded with manufacturing products for Zap!
20  Products, Inc., with Jeff Wycoff's obligations
21  under the Guaranty securing payment of Zap!
22  Products, Inc.'s obligations to Midlab, Inc."
23    Q    Do you think that's a full and fair
24  representation?
25         MR. PULKRABEK:  Form.

*AB Litigation Services*

1    Go ahead.

2    A    Yes.

3    Q    (By Mr. Abelman)  I thought we had

4  established that Midlab had a pretty -- had a

5  valuation -- had performed an evaluation of ZAP!

6  that took a couple months before Midlab accepted

7  ZAP! as a customer.

8    Did that not happen?

9    MR. PULKRABEK:  Form, foundation.

10    A    It is my understanding that that

11  happened.  We discussed that earlier today.

12    Q    (By Mr. Abelman)  Where is that

13  referenced in Paragraph 39?

14    A    It is not referenced in Paragraph 39.

15    Q    Doesn't Paragraph 39 make it sound as

16  if the statement of financial condition was the

17  sole or primary basis for Midlab doing the

18  manufacturing?

19    MR. PULKRABEK:  Object to the form.

20    A    My opinion to that answer is that it --

21  it implies and indicates that it was a factor.  It

22  does not say it was the exclusive factor, no.

23    Q    (By Mr. Abelman)  So, at best, it's --

24  it's a statement without important qualifications?

25    MR. PULKRABEK:  Object to the form.

1    A    I -- I don't have an opinion to your

2  characterization.  I don't -- That's your --

3  That's maybe your opinion.  I don't -- I don't

4  have an opinion about your question.

5    Q    (By Mr. Abelman)  Well, if you were

6  writing it, how would you write it?

7    MR. PULKRABEK:  Object to the form.

8    A    I don't know how I would write it off

9  the top of my head in a 10-second answer.

10    Q    (By Mr. Abelman)  Mr. Keller, the other

11  part of this complaint that is one of the more

12  material elements has to do with Jeff Wycoff's and

13  Merrie Wycoff's change in their beneficiary to

14  Jeff Wycoff's insurance policy.

15    Is that accurate?

16    MR. PULKRABEK:  Object to the form and

17  foundation.

18    Mr. Keller, go ahead and answer, if you

19  know.

20    A    Again, I'm not a lawyer and not very

21  familiar with these types of documents.  As to

22  whether -- How foundationally important it is in

23  the overall lawsuit, I'm not qualified to say.  I

24  think that it is an issue and a factor from what

25  my layman's opinion and answer is.

1    Q    (By Mr. Abelman)  Okay.  Well,

2  Mr. Keller, we've already established you're a

3  very smart man and an accomplished business

4  person, well-educated.  Tell me, what is the

5  essence of Midlab's claims against Merrie Wycoff

6  and the other defendants?

7    MR. PULKRABEK:  Object to the form of

8  the question.  I object on the basis of this

9  witness having foundational knowledge.

10    You may answer, if you can.

11    A    I would defer you to the entirety of

12  the complaint, which would state that in a lot of

13  detail.  I -- I don't object to giving you my

14  overall personal opinion.  Jeff signed a guaranty.

15  He promised to pay multiple times using his

16  assets, his home, his farm in particular, but his

17  home and other assets that could be sold that he

18  controlled through various business entities, such

19  as the ZAP! intellectual property value that he

20  was trying to sell to Henkel as an example.

21    He committed suicide.  It became,

22  again, from my layman's understanding, an

23  obligation of his estate and was due.  And there

24  was opportunity to make good on it or portions of

25  it and that was not done.  We were very gentle in

1  our timing and our pressing of Merrie.  She

2  acknowledged the debt and the intention to pay it.

3    It is my understanding, in a limited

4  way, that many machinations went on that assisted

5  them in avoiding that, and so that's the

6  contention of the suit.  I don't have any --

7  That's my answer.

8    Q    (By Mr. Abelman)  Mr. Keller, let me

9  say that I agree that you were gentle and that you

10  were considerate with regard to exercising your

11  remedies until you filed this lawsuit.  But you

12  used the word "opportunities."  Tell me what those

13  opportunities are -- were.

14    MR. PULKRABEK:  Object to the - -

15  object to the form of the question and foundation.

16    Go ahead, if you can.

17    A    I cannot answer your question now.

18    Q    (By Mr. Abelman)  I'm sorry.  You used

19  the word "opportunities."  I want you to explain

20  what -- to what opportunities you were referring.

21  I can have the question read back to you.

22    A    No.  That's okay.  The opportunities

23  are outlined in the complaint as I understand

24  them.

25    Q    I would like you to tell me in your own

Page 153

1   words, though.
2          MR. PULKRABEK:  Object to the form.
3      Q      (By Mr. Abelman)  I mean, we've been
4   through -- We've been through the farm and we've
5   been through the residence.  I've asked you
6   several times about what the fair market value
7   would be, and you don't have knowledge about that.
8          Let's talk about what opportunities --
9   What other assets should have been made available
10  to Midlab?
11         MR. PULKRABEK:  Foundation and form.
12     A      I -- So I -- I don't have a detailed
13  answer for you.  If this goes forward, those would
14  be discovered in a trial, as I understand it.
15     Q      (By Mr. Abelman)  That is true, but you
16  don't have the luxury of not answering the
17  question.
18         MR. PULKRABEK:  Mr. Abelman, I'm going
19  to impose an objection to your statement there.
20  He does have the luxury of answering the way he's
21  answered.  This isn't a 30(b)(6) deposition in
22  which you've noticed topics and asked Mr. Keller
23  to expound on legal theories or anything along
24  those lines.  He's giving you his testimony.  He's
25  answered your questions.  I object to you making

Page 154

1   statements that are inconsistent with what the law
2   is.
3      Q      (By Mr. Abelman)  Mr. Keller, please
4   answer the question.
5          MR. PULKRABEK:  There is no question
6   pending, Mr. Abelman.  You made a statement.  So
7   if you want to ask a new question, ask a new
8   question.
9      Q      (By Mr. Abelman)  I'll repeat the
10  question that's pending, which is please
11  elaborate, in your own words, as to what
12  opportunities or what other assets were available
13  or should have been made available to Midlab.
14         MR. PULKRABEK:  Same objections, form
15  and foundation.
16         Go ahead, Mr. Keller.  You can answer.
17     A      I don't know exactly, but perhaps the
18  home could have been sold, as well as perhaps
19  other -- the remaining intellectual property of
20  the various companies and the farm itself at the
21  higher market values.  I don't know what would
22  have shaken out at the end of paying other
23  obligations, but you've asked for my personal
24  opinion.  So I felt like we were put off and
25  stalled and that others were -- some others were

Page 155

1   paid and dealt with and we were not, to our
2   detriment.
3          I don't know of any other assets to --
4   to list for you or to suggest beyond what I've
5   said.
6      Q      (By Mr. Abelman)  And you're right.
7   Some others were paid.  Are you aware that the
8   other creditors of ZAP! were paid pennies on the
9   dollar?
10     A      I am not aware of that.
11         MR. PULKRABEK:  Foundation.
12     Q      (By Mr. Abelman)  Your -- You have --
13  You have been given -- Your -- Your counsel has
14  been given a list of ZAP! creditors who were paid
15  and how much they were paid.  It -- If that's
16  important to Midlab, why don't you know about it?
17         MR. PULKRABEK:  I object to the form
18  and foundation.  Frankly, it's misstating
19  evidence.
20         Go ahead, Mr. Keller, if you can.
21     A      I don't know why I'm -- I have not been
22  informed of that.  Perhaps I have not asked or
23  have not read all of the multiple documents that
24  have been created.
25     Q      (By Mr. Abelman)  I'm not implying you

Page 156

1   should read the multiple documents that have been
2   created.  I'm asking why you haven't read the ones
3   that are probably the most salient to your
4   lawsuit.
5          MR. PULKRABEK:  Object to the form.
6   Object, foundation.  He's answered the question.
7   You're making a speech, Mr. Abelman, and I'd ask
8   you to move on to a different topic.
9          MR. ABELMAN:  I'm not interested in
10  moving on.
11     Q      (By Mr. Abelman)  Please answer the
12  question.
13     A      I don't have an answer beyond that I
14  just haven't.  I've been busy.  The first time
15  I've gotten very involved in this was yesterday
16  afternoon, and I simply have not.  That is my
17  response.
18     Q      Does Midlab believe it's entitled to be
19  paid by ZAP! at some higher rate than other
20  similarly situated creditors?
21         MR. PULKRABEK:  Form and foundation.
22         If you can answer the question, go
23  ahead.
24     A      I do not have an opinion on that.
25     Q      (By Mr. Abelman)  I'm sorry.  I don't

Page 157

1  understand.  It's --
2       A    I don't know the other creditors.  I
3  don't know their situations.  I -- I'm -- I care
4  about Midlab and their situation, and I don't have
5  anything else to say about that.
6       Q    Well, would it influence your position
7  if you saw what the other creditors of ZAP!
8  accepted as -- as a full and final settlement?
9            MR. PULKRABEK:  Okay.  I'm going to
10  shut the questioning down.  This is actually,
11  essentially, probing into what Midlab's settlement
12  position would be, Mr. Abelman.  It's an improper
13  line of questioning.
14            Don't answer the question.
15            MR. ABELMAN:  I didn't ask him for a
16  number.  I asked him if he was interested.
17            MR. PULKRABEK:  This is --  This has no
18  probative value to the lawsuit, and it's clear
19  that what you're doing is you are probing into
20  Midlab's valuation of a settlement issue for this
21  case, which is an improper line of questioning.
22  There's no probative evidence that could emerge
23  from this line.
24            If you want to take it up with the
25  Court and have -- have the Court rule on it,

Page 158

1  that's certainly your prerogative.
2            MR. ABELMAN:  It's clear that what's
3  happening is you're running amuck with this case,
4  and so -- and we -- and we will be taking some of
5  this up.
6            MR. PULKRABEK:  Mr. Abelman, I mean,
7  it's noted that your law firm happened to get paid
8  100 cents on the dollar out of these creditors,
9  when you're trying to tell Mr. Keller here that it
10  was pennies on the dollar.  So with all respect, I
11  think that your -- your questions are misleading.
12            I think you've been making plenty of
13  speeches, and I'm just asking you to move on to
14  some questions of this witness that are not really
15  just trying to drive at your own speeches and
16  trying to get matters that, frankly, are improper,
17  like Midlab's valuation.
18            MR. ABELMAN:  Ross, don't make
19  misstatements.  I was asking about creditors of
20  ZAP! alone, not creditors of -- of Merrie Wycoff.
21  So the --  You know, talk about speeches.  You
22  just made one.
23            MR. PULKRABEK:  All right.  Can we move
24  on to a question that has something to do with
25  facts that Mr. Keller might be able to testify

Page 159

1  about?
2            MR. ABELMAN:  Well, again, I'm trying
3  to understand the nature of the dispute, so -- so
4  I'll go back to the insurance policies.
5       Q    (By Mr. Abelman)  Mr. Keller, the
6  complaint sets forth that Jeff Wycoff, for
7  instance, in November of 2017, changed the
8  designation of his beneficiaries to his daughters,
9  who are, I think, the ages are 22 and 25
10  currently.  Is it Midlab's position --  Is it your
11  position that the -- the proceeds from the
12  insurance policies shouldn't go to Jeff Wycoff's
13  children and that should have gone to Midlab?
14            MR. PULKRABEK:  Foundation, form,
15  misstates evidence.
16            Go ahead and answer, if you can,
17  Mr. Keller.
18       A    In my opinion, that's -- that's not --
19  So that's not my opinion or Midlab's, in that we
20  never were promised or had insurance policies on
21  Jeff.  So, no.
22       Q    (By Mr. Abelman)  What about --  The --
23  The complaint also references changes that Merrie
24  Wycoff made to her policies that also designated
25  her two daughters as beneficiaries on Jeff's life

Page 160

1  insurance rather than --  I'm sorry.  Let me
2  restate that.
3            Merrie Wycoff was changed from a
4  beneficiary on -- as -- from Jeff's life insurance
5  policy and Merrie Wycoff, the beneficiary, was
6  changed to the Wycoffs' two daughters.  Is it your
7  position that those policies -- or the proceeds
8  from -- from those insurance policies should have
9  been made available to Midlab?
10            MR. PULKRABEK:  Form, foundation.
11            Go ahead, if you can answer.
12       A    I do not have much specific knowledge
13  of that issue, Mr. Abelman.  It is my
14  understanding from reading the complaint and from
15  memory that -- and I may have this slightly wrong,
16  or maybe I have it exactly right -- those
17  insurance proceeds were to originally go to the
18  mortgage holder and that that change was made
19  unbeknownst to the mortgage holder.  Therefore,
20  the farm and other real estate that could have
21  been used to pay other creditors was impaired and
22  wrapped up in this when it should not have been.
23            That's the --  And that's from
24  communications with -- with other people.  I don't
25  have any specific knowledge, but that's my

*AB Litigation Services*

Page 161

1  understanding.  So if true, then indirectly, that
2  would have damaged Midlab.  But I don't have any
3  more knowledge about that than what I've just
4  said.
5      Q      (By Mr. Abelman)  And explain to me how
6  that would have damaged Midlab.
7          MR. PULKRABEK:  Foundation, form.
8          Go ahead, if you're able to answer the
9  question, Mr. Keller.
10     A     If -- If -- If my understanding is
11  correct, the mortgage holder, when the death
12  occurred, would have had plenty of money to have
13  been paid in full.  And the properties would have
14  been free and clear, and there's a lot of dollar
15  value there to go towards other debts.
16     Q      (By Mr. Abelman)  So is it your
17  understanding that these insurance policies were
18  pledged to the mortgage holder?
19          MR. PULKRABEK:  Form and foundation.
20          You can answer.
21     A     I -- I don't know, Mr. Abelman.
22     Q      (By Mr. Abelman)  Would that be
23  important for you to know?
24     A     For me, no.  For my counsel, who -- who
25  pursues the lawsuit and the execution of the

Page 162

1  lawsuit, yes.
2          MR. ABELMAN:  Mr. Keller, I -- I
3  appreciate your time today.  I appreciate your
4  civility.  I apologize if you felt disrespected in
5  any way.  That was not my intent.  I -- I truly
6  have respect for you and your accomplishments.
7          I have no further questions.
8          THE DEPONENT:  Thank you, Steve.  I was
9  not offended.  It's a tiresome process, but I view
10  that you're doing your job to the best of your
11  ability.  Disagreements can sometimes be
12  unpleasant, and that's life.
13          Thank you for your time.
14          MR. PULKRABEK:  I have no questions for
15  the witness.  Thank you.
16          We will read and sign, and I will take
17  an E-tran with exhibits, please.
18          THE REPORTER:  Thanks, everyone.
19          (The deposition concluded at
20          2:22 p.m., August 6, 2021.)
21
22
23
24
25

Page 163

1          I, VINCENT T. KELLER, do hereby certify
2  that I have read the foregoing transcript and
3  that the same and accompanying amendment sheets,
4  if any, constitute a true and complete record
5  of my testimony.
6
7          _____
8          Signature of Deponent
9
10         (  ) No amendments
11         (  ) Amendments attached
12
13         Subscribed and sworn to before me
14  this _____ day of _____, 2021.
15
16     My commission expires _____
17     Seal:
18
19
20
21
22
23  TLH
24
25

Page 164

1  STATE OF COLORADO)
2                   )ss.   REPORTER'S CERTIFICATE
3  COUNTY OF DENVER )
4      I, Tracy L. Harris, do hereby certify that I
5  am a Certified Realtime Reporter, Registered Merit
6  Reporter, and Notary Public within the State of
7  Colorado; that previous to the commencement of the
8  examination, the deponent was duly sworn to
9  testify to the truth.
10     I further certify that this deposition was
11  taken in shorthand by me at the time and place
12  herein set forth, that it was thereafter reduced
13  to typewritten form, and that the foregoing
14  constitutes a true and correct transcript.
15     I further certify that I am not related to,
16  employed by, nor of counsel for any of the parties
17  or attorneys herein, nor otherwise interested in
18  the result of the within action.
19     In witness whereof, I have affixed my
20  signature this 16th day of August, 2021.
21     My commission expires July 30, 2025.
22
23
24          _____
            Tracy L. Harris, CRR, RMR, RPR
            216 - 16th Street, Suite 600
25          Denver, Colorado 80202

EXHIBIT Q

Page 165

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
 3   August 16, 2021
 4   KEATING WAGNER POLIDORI FREE, PC
     Ross W. Pulkrabek, Esq.
 5   1290 Broadway, Suite 600
     Denver, Colorado  80203
 6
     Re:  Deposition of VINCENT T. KELLER
 7       Midlab, Inc. vs. Merrie Pisano Wycoff, et al.
         Civil Action No. 1:20-CV-03142-KLM
 8
     The aforementioned deposition is ready for
 9   reading and signing.  Please attend to this
     matter by following BOTH of the items indicated
10   below:
11   _____ Call 303-296-0017 and arrange with us
            to read and sign the deposition in our
12          office
13   _XXX_ Have the deponent read your copy and sign
            the signature page and amendment sheets, if
14          applicable; the signature page is attached
15   _____ Read the enclosed copy of the deposition
            and sign the signature page and amendment
16          sheets, if applicable; the signature page
            is attached
17
     _XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18
     _____ By _____ due to a trial date of _____
19
     Please be sure the original signature page and
20   amendment sheets, if any, are SIGNED BEFORE A
     NOTARY PUBLIC and returned to AB Litigation
21   Services for filing with the original deposition.
     A copy of these changes should also be forwarded
22   to counsel  of record.  Thank you.
23   AB LITIGATION SERVICES
24   cc:  All Counsel
25
```

Page 166

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
 3
 4
 5           VINCENT T. KELLER
             August 6, 2021
 6   Midlab, Inc. vs. Merrie Pisano Wycoff, et al.
         Civil Action No. 1:20-CV-03142-KLM
 7
 8
 9   The original deposition was filed with
10   Steven E. Abelman, Esq., on
11   approximately the 16th day of August, 2021.
12   _____ Signature waived
13   _____ Signature not requested
14   _____ Unsigned; signed signature page and
            amendment sheets, if any, to be filed at
15          trial
16   _XXX_ Unsigned; original amendment sheets and/or
            signature pages should be forwarded to
17          AB Litigation Services to be filed in the
            envelope attached to the sealed original.
18
19
     Thank you.
20
     AB LITIGATION SERVICES
21
     cc:  All Counsel
22
23
24
25
```

Page 167

```
              - AMENDMENT SHEET -

        Deposition of VINCENT T. KELLER

               August 6, 2021

  Midlab, Inc. vs. Merrie Pisano Wycoff, et al.

       Civil Action No. 1:20-CV-03142-KLM

The deponent wishes to make the following changes

in the testimony as originally given:

Page  Line          Should Read           Reason

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

____  ____  _____  _____

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,

20___.

(Seal)      Notary's signature _____

            My Commission expires _____
```

EXHIBIT Q

*Vincent T. Keller  - 08/06/2021*                    165—167

*AB Litigation Services*

---

**Exhibits**

**Exhibit 68** 3:14
116:1

**Exhibit 69** 3:15
101:3,9

---

**$**

**$1** 45:11 54:21 66:6

**$1,000,000** 117:6

**$1,275,000** 148:4,6

**$1.1** 134:18 147:23

**$1.6** 146:17

**$10** 78:1 108:4

**$11** 111:9

**$11MM** 111:8

**$13.5** 72:9,20 73:5

**$2** 94:16 103:1,2
108:17,24 131:2
134:5 144:17

**$2-something**
134:4

**$2.3** 129:23 134:22

**$2.5** 146:25

**$2.7** 129:24 134:22

**$3** 134:5

**$3,3000,000** 138:15

**$3,650,000** 124:13
134:15

**$3,789,000** 88:15

**$3-something**
144:16

**$3.3** 132:20 136:5
139:12 140:19
142:10,23 145:10,12

**$3.65** 135:4

**$3.7** 66:4 102:21,25

**$3.7-something**
103:22

**$4** 35:22 66:21 84:15

**$4,750,000** 134:12

**$4.9** 104:6,14,21
135:13 143:7,14
144:9 145:11

**$5** 64:6 66:6 72:17
85:17 108:4 132:7

**$5,850,000** 86:20
102:20 103:8 129:20

**$5.85** 102:24

**$500,000** 76:19 96:1

**$6** 66:6

**$700,000** 85:4

**$850,000** 95:25

**$9** 65:21 72:19

**$9.0** 72:9

**$904,000** 55:6 62:24

**$975,000** 147:23

---

**-**

**-000011** 35:8

**-000012** 42:15

**-0003** 101:24

**-0004742** 113:8

**-000736** 101:24
102:2

**-000737** 105:4

**-000738** 110:25

**-0013182** 67:17 73:9
75:3

**-0013853** 95:9

**-0013854** 94:3

**-00735** 102:13

---

**0**

**0013182** 67:18

---

**1**

**1** 35:5 89:9 109:2

**1.5** 109:2

**10** 10:1 68:1,2 86:9
107:1,2 138:1

**10-9-2017** 105:18

**10-second** 150:9

**100** 139:16 158:8

**10:47** 68:4

**10:58** 68:4

**11-29-2017** 111:7
112:4

**11:52** 100:18

**11th** 35:11

**12-5-2016** 94:7

**12:30** 100:13,19

**12:35** 101:1

**13** 102:18

**13th** 80:10

**14** 91:8

**15** 28:25 77:6

**16** 34:5 66:7 77:6,7

**17** 77:8 116:20,23

**17th** 126:4

**18** 116:19,20 120:9

**1950** 13:2

**1995** 13:8,9

**1998** 15:7

**1:33** 138:4

**1:45** 138:4

**1st** 113:10

---

**2**

**2** 75:1 107:13 109:11

**2-1/2** 18:18

**20** 11:25 12:7 86:9

**2005** 29:7

**2015** 28:25 29:6,16,
20 30:3 31:11 34:6
35:11 36:1 42:2,9
43:13 47:17 50:2

56:11 62:24 65:9
66:10,13 78:10 117:2
134:1

**2016** 69:12 76:1 77:3
78:8 80:10 86:22
87:20 88:19 89:9,12
91:8 95:1 102:18
132:6,23

**2017** 65:21,24 66:8,
16 78:11 88:15,19
110:4 112:6 129:21
134:22 147:21 159:7

**2018** 113:10 132:24
135:13 138:13,17

**2021** 63:15 126:4
162:20

**21** 11:25

**21st** 74:11

**22** 159:9

**23** 26:6

**24** 123:21,22 124:1
136:2,6

**25** 26:6,7 159:9

**250,000** 105:12,14

**26** 18:23 26:5

**2628** 11:2 18:25

**27th** 129:21 147:21

**29** 120:23,24

**2:22** 162:20

**2:30** 100:16

**2mm** 103:2

**2nd** 89:11

---

**3**

**3** 18:18 35:6 47:17
107:7

**3-16-2020** 98:11

**3-21-2016** 74:2

**3-25-2016** 68:13

**30** 86:9 100:8

**30(b)(6)** 147:10
153:21

---

*AB Litigation Services*

**31** 33:9,15,17,21,22 56:11 62:24 65:8 66:10,12

**31st** 63:14

**33** 127:8,9 148:11

**37922** 11:3

**39** 148:14 149:13,14, 15

**3:23** 68:14

**3rd** 50:3

---

**4**

**4** 72:7 105:20,23 106:16 111:10

**4-6.5** 109:3

**4-8-2016** 95:18

**42** 68:6

**43** 73:8 80:1,6

**47** 91:2,5

**49** 26:18,20 28:11 98:2

---

**5**

**5** 68:1 100:8 116:17, 19

**5/3** 72:5

**50** 26:23,24 39:24 81:16

**50s** 81:16 82:7,9

**51** 34:18 42:13 81:16 119:17

**53** 67:2,3,8,12 73:8, 10,13,14,17,23 75:3 81:16

**55** 81:13,15,19 83:3, 5,7

**56** 81:13,19 84:3

**57** 83:3 85:6,9

**58** 81:17

---

**6**

**6** 10:1 72:7 162:20

**6-12-2016** 83:9

**6-13-2016** 84:7

**60** 112:7

**62** 83:3 93:14,17,22

**67** 83:3

**68** 4:2 116:1

**69** 4:2 101:3,9

---

**7**

**7** 120:21

**7-13-2016** 85:11

**7-21-21** 116:10

---

**8**

**8** 127:6

**85** 138:12

---

**9**

**9** 10:1 148:15

**90s** 7:18

---

**A**

**a.m.** 68:4 100:18

**Aaron** 82:1,12,17,18

**Abelman** 4:7,9,16, 24 5:13 8:20 9:1,19, 24 10:4 19:8,11 20:6, 14 21:4,12,16,24 22:3,8,16,25 23:16, 23 24:7,15 26:3 27:4, 8,16 28:10 31:21 33:8,15,20 34:17,19 35:7,13 40:3,12,22 41:2,9,10,17,25 42:7, 12,16 45:6,15,23 46:25 47:12,14 48:10,22 49:11,19 52:6,9,11 57:2,6,18,

22 58:1,10,12,15,20 59:1,25 60:22 66:2 67:1,4,10,17,20,23 68:3,5 69:16 71:17, 20 72:23 73:7,12,19, 21 74:4,18,24 75:2,6, 21 77:1 79:22 80:1,3 81:12,18,21 82:6,9, 15,21,25 83:4,6 84:2, 4 85:6,8 86:17 88:22 90:8,16,25 91:1,4 92:19 93:13,16 94:1 95:7,10 96:24 98:1,3, 23 99:9,22 100:1,10, 12,17 101:2,6,8,23, 25 110:16,24 112:3 115:25 116:2,17,21 118:2,10,17,20 119:5,15 120:8,21 122:6 123:3,7,18 124:10 125:8,16 126:2,10,14,18 127:5,7 128:23 130:10 131:6 132:5, 18 133:20 135:8,19, 22,24 137:3,20,23 138:3,5 139:1,10,21 140:3,23 141:3,6 142:2,8,19 143:6,12, 17 144:1 145:1,21 146:8,14,22 147:17 148:3 149:3,12,23 150:5,10 151:1 152:8,18 153:3,15,18 154:3,6,9 155:6,12, 25 156:7,9,11,25 157:12,15 158:2,6,18 159:2,5,22 160:13 161:5,16,21,22 162:2

**ability** 38:22 122:3,8 162:11

**Absent** 28:6

**absolutely** 122:20

**abusive** 143:20

**accept** 148:8

**acceptable** 64:15 89:20

**accepted** 44:11 149:6 157:8

**access** 14:16 95:25

**accessible** 39:9

**accommodations** 35:2

**accomplish** 100:4

**accomplished** 151:3

**accomplishments** 162:6

**account** 77:23

**accounting** 11:13 44:10 79:3

**accounts** 18:6 36:15 37:11 69:20 76:17 79:23 80:17 81:6 89:16 93:8 97:7 99:19,20

**accuracy** 47:1,5 56:13

**accurate** 30:8 32:21, 22 45:22 61:4 62:24 63:14 70:14 110:11 116:15 117:14,19 129:10 137:8,19 145:18 150:15

**accurately** 8:12 131:10

**acknowledged** 115:4,6,13 117:12 118:22 119:2 152:2

**acquaintances** 133:5

**acquisition** 13:21 15:4

**act** 122:16

**acting** 43:2

**Action** 116:5

**activities** 15:16

**activity** 13:21

**acts** 14:6

**actual** 10:13 88:5

**add** 55:20 56:3

**addendums** 37:23

**addition** 81:7

**additional** 72:12,13 86:2 106:19

*AB Litigation Services*

**additions** 37:23

**address** 11:1

**adequate** 130:13

**administration** 11:8

**admonition** 9:20

**advantage** 55:21

**adverse** 65:16,20 66:4 111:25

**advertisements** 106:1

**advise** 50:19

**advised** 25:7

**advising** 121:19

**affiliation** 23:14 24:5

**affirmatively** 130:8

**afford** 5:23

**afield** 21:13

**afternoon** 95:14 101:1 156:16

**age** 18:23 99:19

**agent** 87:10 103:7 131:15,21

**ages** 26:5 159:9

**agree** 22:6 60:20 61:2,3,13 90:7 97:8 109:20 152:9

**agreed** 23:23 59:4

**agreeing** 89:25 90:22 107:5

**agreement** 29:18 30:11,16 32:19 33:1, 24 35:10 37:22 70:2 80:24 86:18,24,25 87:2,10,17 88:10,13, 24 89:1,2,4,5,8,11 91:15,17,24 103:16 108:19 109:11 117:3 128:19 135:10 144:20 145:9

**agreements** 6:22 14:10 90:11,13,20 122:12

**agrees** 108:20 109:9

**ahead** 8:20 9:1 22:21 23:18 24:11 31:18 39:15 41:7 42:4 44:21 46:13 48:24 51:19 53:20 58:9 59:23 62:1 73:25 78:20 92:7 98:18 99:2 100:11 110:7 112:13 123:12,25 130:5,17 131:18 135:2 136:10 137:1, 12 138:19 139:6 141:14 142:5,12 143:1,24 146:1 147:13 149:1 150:18 152:16 154:16 155:20 156:23 159:16 160:11 161:8

**alerted** 47:9

**alia** 116:25

**allegation** 27:15,16 120:8 127:9

**allegations** 27:11 137:4 147:4

**alluded** 65:17 101:19 103:23

**aloud** 44:6 52:2

**alternative** 146:25

**ambit** 136:18

**amenable** 76:15

**amend** 88:13

**amended** 126:4

**amendment** 88:25 89:1,3,4,7,10,14 108:22,23 109:17

**amendments** 37:23 70:2

**America** 44:11

**amount** 26:21 103:7, 24,25 134:1 143:7

**amuck** 158:3

**Ana** 33:8,10 34:17 35:7 42:14 67:1 71:17 73:7 74:21 81:12 98:1 101:2,23 116:19 127:5

**analysis** 30:24 31:22

**and/or** 53:7 122:11 140:13

**Andy** 105:1 111:14, 15,22 112:19,24 113:12,14

**angry** 130:21

**animal** 84:21

**Ansel** 108:3

**answering** 6:4 9:14 153:16,20

**answers** 8:8 40:2 98:22

**apologize** 97:24 137:23 162:4

**apparently** 80:25 107:25 128:10

**appearance** 4:25

**appearances** 4:13, 19,22 5:9

**appeared** 56:6

**appears** 33:23 34:9 35:9 68:7 71:7 74:16 75:21 83:10

**application** 30:23

**applied** 20:15

**appointment** 85:2 96:5

**approve** 31:24

**approved** 32:6,17, 24

**approximately** 7:17 11:25 12:6 29:5 66:21

**April** 89:9 138:13

**area** 11:12 128:15 138:22

**areas** 133:12

**argument** 21:12 57:12

**argumentative** 123:24

**arm's-length** 138:24

**arrangement** 90:17 92:23

**arrangements** 69:1

**arrow** 111:12,18

**ascribed** 72:15

**aspect** 52:23

**asserted** 87:13

**asserting** 53:15

**assertion** 95:6

**assertions** 55:15

**assess** 131:15

**asset** 39:8,18,21,23 56:10 104:11,13 121:8 124:5

**assets** 15:23 38:11, 16,17,25 39:6 40:13 41:14,19 44:3 54:3,9, 19 55:24 56:5 63:8 103:18 104:4 121:5, 20 122:11 128:2 140:14 142:14 144:21 151:16,17 153:9 154:12 155:3

**assist** 131:21

**assisted** 152:4

**assume** 11:11 47:23,24 94:13,25 111:3 121:14 132:22 142:9 145:16

**assumed** 124:2

**assuming** 145:7,9, 10

**assumption** 123:15

**assurance** 37:6,7

**assured** 121:22

**assuring** 54:3

**astonishing** 133:15

**astronomically** 133:8

**Atlanta** 11:6

*Vincent T. Keller  - 08/06/2021*                    3

*AB Litigation Services*

attached 111:11

attachments 98:13

attempt 79:12 97:20 146:9

attempting 89:25

attend 7:11

attention 46:3 127:8

attest 87:21

attorney 4:9 40:17 80:23 106:25 117:1

attorney-client 9:13 40:18 57:15,25 58:5 118:8,11 141:4

audited 99:16

auditors 99:15

August 88:15 162:20

authority 98:24 99:3,4,6,7

authorization 58:14

authorize 59:2,4

authorized 57:11

automotive 18:17

avoiding 5:19 152:5

aware 9:3 28:22 29:12 35:19 45:1 60:1,22,25 61:16 62:20 86:25 87:2 88:17 115:3 126:8 135:14 136:3 140:15 143:6,9 144:11,12 146:22,23 147:2 148:3,7 155:7,10

Azuraye 21:19

## B

back 7:15 8:13 9:25 15:10 29:3,16 36:1 41:11 48:7 50:1 55:16 71:2,11 118:18 125:5 143:19 152:21 159:4

backstop 38:11

backup 129:14

bad 101:14 111:17 112:18

balance 65:7

balked 64:13

ballpark 129:11

Bank's 72:5

banker 71:14

banking 13:20 69:1

banks 62:20

barn 62:6

based 15:5 32:24 34:9 50:9 54:2 61:16 109:20 148:16

bases 21:9 138:9

basic 5:17

basically 106:14

basis 7:11 45:11 79:10 117:22 119:6 120:4 144:4,22 149:17 151:8

Bates 35:8 42:15 67:5,13,15 73:9 75:3 94:3 95:8 101:24 105:4 110:25 113:8

BC 123:21,22 124:1 136:2,6

bearing 21:3,5

began 29:17 144:7

begin 5:22

beginning 141:15

begins 71:24

behalf 5:2 29:9 34:11 43:2 53:6,15 116:14 117:8 126:23

belief 95:4 123:14

believed 62:17 121:18

believes 138:16

bell 69:24

belongs 26:9

Bend 11:2 18:25

beneficial 5:18

beneficiaries 24:19, 22,25 25:1,18,23 159:8,25

beneficiary 25:25 150:13 160:4,5

benefit 28:14 92:11

berating 126:12,14

Bernardi 86:19 88:14 103:6 129:18, 22 134:21 147:21

BHFS 116:23 117:1 120:1,9,14

bit 28:24 75:15,20 85:14 86:11 134:19 143:20

BJ's 85:1

blah 34:25

Blaine 14:17

blank 114:14

Bloomfield 136:3

board 16:8,9,11,12, 15,17,19,20 17:3,5, 16,18

boards 16:24 17:15

Bodie 69:3,6 91:7,14 99:6

bolster 37:10

book 111:4

bookkeeper 59:18

borrowed 63:3 102:25 124:6

borrowing 104:1

bothered 143:15

bottles 105:14

bottom 46:16 68:20 74:21 75:12 107:7

bought 15:7

Boulder 94:15 106:25

brand 29:9 54:10

brands 91:19 108:3

break 67:21 99:23 100:2 135:20,21 137:21,24 140:24,25

breaking 99:24

briefly 10:6 141:8

bright 126:19

bring 78:25

broker 129:21

brought 46:2 107:17 144:3

bucks 109:12

building 26:8,12 27:2,6,12 28:4,11,14

bullet 104:6 106:6

business 6:10,12 11:7,12 13:4,10 15:18 18:5,8 23:3 29:6 36:14,16 37:7,8 59:15 62:12 70:19 71:1 72:5 78:10 84:18 89:17,24 90:13,20 97:3,5 104:9 115:1 121:25 122:10 151:3,18

businesses 13:16 15:2 17:21,24 18:17 23:3

businessman 126:20 146:15

busy 76:10 141:17, 20 156:14

buy 92:20

buyer 84:22 96:5 139:17,18,19

buyers 85:1

## C

C-O-W-A-R-T 17:8

Caerleon 136:5,6

calculated 28:18

calculation 28:19

*Vincent T. Keller  - 08/06/2021*

*AB Litigation Services*

**call** 8:3 9:13 16:16 17:10 62:13 71:10, 13,15 76:14 79:15 102:23 107:24 108:1 112:10 113:14,18 114:19 115:9,12

**called** 13:1 16:10,14 34:24 70:6 96:11 136:2,3

**calls** 9:12 40:17 57:15 58:5 77:9 109:11

**capable** 110:15

**capacity** 34:15 69:7

**capital** 63:3 76:20 77:17 97:6

**care** 26:1 157:3

**carefully** 35:25 46:18,21 50:5

**carries** 81:8

**carry** 7:1

**case** 5:5 7:6 10:21 19:10 20:12 21:3 27:13 55:7 56:24 65:8 111:8 117:10 146:4 157:21 158:3

**cases** 105:15

**cash** 55:5 62:23 63:7,24 79:7

**caused** 57:8

**caveat** 45:7,17

**cents** 158:8

**CEO** 11:24 13:13

**certainty** 87:23 104:16,23 137:16

**cetera** 7:3 16:22 25:13 54:12 79:13 93:5 113:18 115:4 142:17

**CFO** 111:18

**CFO's** 111:21

**chain** 93:25 105:16

**chains** 106:14

**change** 53:23,24 56:24 63:10,20,22,25 124:23,24 150:13 160:18

**changed** 105:23 139:17,19 159:7 160:3,6

**channels** 91:21

**characterization** 90:8 131:5 150:2

**characterize** 30:4 78:6 89:21,23 90:21 94:9 130:19

**characterized** 90:19

**charge** 92:16

**Charles** 17:8

**Chattanooga** 15:6

**checks** 21:9

**chemist** 107:17,23

**chemist's** 107:19

**chicken** 8:4

**chief** 11:22

**child's** 18:11

**children** 17:23 18:1, 9 24:18,22,25 25:18 146:3 159:13

**chimed** 36:25

**Chuck** 17:7,9,12 107:19

**circa** 15:7 29:7

**circumstance** 145:20

**Civil** 116:5

**civility** 162:4

**claim** 66:18

**claims** 55:13 56:20 138:8 142:20 151:5

**clarification** 82:16

**clarify** 4:21 8:23

**classify** 45:16,18

**cleaner** 106:20,23

**cleaning** 16:1 72:7

**clear** 58:20 122:15 157:18 158:2 161:14

**client** 20:7 21:22 58:18

**clients** 8:17

**close** 65:20 77:22 133:3 138:21 140:4, 20 143:11 146:3,4

**closely** 54:16 68:25 69:9

**club** 84:13 85:1 96:5, 8 105:13

**Cody** 98:9

**Coleman** 117:2

**collateralized** 81:9

**collected** 37:12

**collectibility** 99:19

**Colman** 35:23 36:10,21 42:25 46:14 49:7 50:1,23,24 52:5 54:18 121:18 144:19

**Colorado** 38:20 116:5 133:4,14

**comfortable** 30:14

**comment** 74:9 80:2

**commentated** 8:6

**commercial** 106:4

**commercials** 77:13 96:15

**commingling** 39:1

**commissions** 92:15

**commit** 109:10

**commitment** 42:8 106:13 108:17,23

**Commitments** 106:8

**committed** 151:21

**communicate** 79:13 114:13

**communicated** 60:11 79:19

**communicating** 29:24

**communication** 9:13 30:3 57:16,19, 25 58:6 62:14 75:25 77:2,23 78:5,12,17 91:10

**communications** 9:16 40:18 58:17,22 61:12,15 115:2 119:12 141:4 160:24

**companies** 12:25 15:1 16:5,18 69:2 70:9 106:8,9 154:20

**company** 13:1,2,20 14:3,5,7,9 15:9 16:1 24:13 54:9 68:18 70:9 72:7 79:3 87:9 92:16 93:4 96:11 99:15 111:15 114:3 126:23 140:14 141:12 144:3

**company's** 83:13

**compile** 99:16

**compiled** 117:13

**complaining** 47:1,5

**complaint** 6:23,25 19:12 21:6 27:9,11, 15,17 47:3 52:22,24 53:14 55:9 59:2 118:16 126:4,7,22 132:18 137:4,9,16 138:13 141:15 147:4 148:10 150:11 151:12 152:23 159:6, 23 160:14

**complaint's** 148:11

**completely** 38:2

**complex** 122:18

**comport** 30:25 31:6 32:8 59:20 132:11

**comports** 31:3

**concede** 38:5,7

**conceded** 22:5

*Vincent T. Keller - 08/06/2021*

***AB Litigation Services***

conceivable 20:12

conceivably 19:20

concept 107:16

concern 21:16 36:16 107:8

concerns 21:18 22:4

concluded 162:19

conclusion 90:18 117:22,23

conclusions 44:14

condition 44:13,14 47:3,8 49:21 52:19, 23 53:13 55:4 60:2,8, 13 61:24 64:18,20,25 65:6,13 72:16 117:21 119:17,20 121:2,4,7 124:11 133:23 134:11 148:18 149:16

conditions 122:13 131:8,23

condolences 113:22

conference 10:12 107:24

conferences 101:21

confidence 128:1

confidential 50:5,25

confirm 61:23

conflict 128:5

confused 49:22,24

conjecture 63:6

connected 23:12,25 24:1,3 27:14

Connecticut 107:13

connection 20:4 24:5 116:24 120:3

considerate 152:10

consideration 70:24 71:4

considered 25:8 38:1 70:11,14 71:4

consistent 7:20,23 32:1,3,7 33:3 60:14, 18 103:11,14

consolidated 69:2

constitute 136:24

consultant 107:22 112:18

consulted 99:9

consumables 106:21

contacted 60:6

contemporaneously 101:20

content 78:16 118:13

contention 152:6

contents 47:2,8 52:21 58:21

context 104:17 127:12

contingent 66:24

continuation 90:18 102:9

continue 35:1

continued 62:14 97:14 101:7 140:17

continuing 34:24 35:14 89:15

contract 88:6,14 103:6,8 129:19 136:5 138:14,23 139:2

control 14:4,6

controlled 151:18

conversation 7:7 10:7 36:8 43:25 54:23 77:21 113:11, 20 115:17 127:16

conversations 30:9,15 58:22 70:16 71:24 72:4 79:1 83:18 112:10 117:25 118:2,6,12 119:7,8 140:15 144:17

convert 70:7,22

conveyance 142:21

conveyed 94:21

copies 6:21

copy 6:22 34:13 87:10 119:19,22

copying 68:8 74:2 91:7

corporation 15:8,22 116:7

corporations 23:13

correct 10:2 12:13 16:25 17:2,4,14,22 26:10 30:19,20 47:10 65:18 66:3,10,11,13, 15,19 69:23 73:11,17 81:20 82:5 83:3 92:22 101:22 117:9 118:21 119:9 123:22 124:19,20 132:20,22 133:24 137:5 161:11

corrected 66:3

correspondence 48:3,17 49:4

corresponds 103:9

Costco 84:14,17 96:6

Costco's 84:21

counsel 8:2,14 9:5 19:7 35:18 36:9 43:2 50:19 51:2 53:10 55:8 58:5,23 78:3 88:8,12 118:16 119:9,13,14 120:10 123:17 140:6,24 143:13 144:19 155:13 161:24

counsel's 53:25 54:2

count 105:15

counter 133:10

countries 106:9

county 107:2,4

couple 25:15 29:8 64:12 72:3 73:22 81:24 134:6 149:6

court 4:20 5:16 19:24 20:9 21:12 46:8 66:3 74:13 116:5 157:25

courtesy 5:23 50:17 143:19

cover 46:16,22 113:19,21

covered 18:19 54:22

Cowart 17:8,12

cramp 94:13

crap 94:14

crazy 94:17 115:7

created 121:6 140:7 155:24 156:2

creating 81:5

credit 35:1 38:21

creditor 39:23 40:5 123:20

creditors 39:9 155:8,14 156:20 157:2,7 158:8,19,20 160:21

crop 77:25

cube 107:15 108:4

culture 13:21

current 11:20 108:7

customer 30:22 31:25 32:6,18,20,24 149:7

cut 90:3 95:13 97:14

CVS 96:12

**D**

daily 7:11

damaged 95:5 161:2,6

date 34:4 35:3,6 47:15,17 50:2 56:11 89:9 95:25 102:17 104:7,9 111:6,7

dated 34:5 35:11 89:8,11 91:8 94:6

*Vincent T. Keller - 08/06/2021*     6

*AB Litigation Services*

95:1,17 102:18 116:10 147:21

**dates** 89:3

**daughter** 26:4,6

**daughters** 159:8,25 160:6

**day** 7:2 35:11 63:10, 25 74:11,12 89:11

**days** 112:7

**dead** 94:16

**deal** 115:8 126:5

**dealing** 115:7,15

**dealings** 125:4,23

**dealt** 29:15 146:15, 20 155:1

**death** 26:1 60:24 61:21 113:23 120:15 136:4 140:5 161:11

**debt** 38:12 39:22 40:4 70:8 114:3,8 115:6,14,21 152:2

**debts** 22:9,13,17,24 23:5 24:8,13 121:23, 25 140:22 161:15

**deceased** 114:10

**December** 94:19

**decision** 31:24 54:1, 14 98:24 99:13,14,21

**decline** 133:16

**declined** 147:1

**declining** 133:13

**deed** 146:24

**deeper** 141:11

**default** 136:7,22

**defendants** 4:10 7:21 8:17 48:13 129:14 138:9 151:6

**defense** 8:10 9:5 49:4

**defer** 100:6 151:11

**deficiency** 66:5 146:16

**delicate** 114:5

**delta** 134:18

**demands** 76:20

**department** 30:24 72:5

**depend** 40:9 131:14 140:6

**dependent** 18:21 73:2

**DEPONENT** 19:6 22:19 33:16,19 39:12 46:5,11 75:14,19 76:6 90:5,6 92:4,8 97:24 100:5,16 112:11,15 121:14 123:11 137:11 162:8

**deposed** 5:14

**deposition** 10:5,8, 13 30:17 76:14 100:18 127:1 143:22 147:10,11 153:21 162:19

**depositions** 82:23

**Depot** 106:11

**Depot-type** 96:11

**depth** 71:5

**describe** 11:4 12:8 13:12,24 14:2 37:3 90:10 95:11 124:4

**describing** 8:3

**description** 136:16

**designated** 44:16 67:6,7,12 159:24

**designation** 159:8

**desired** 110:15

**destruction** 15:19

**detail** 62:15 98:13 114:17 128:9 143:11 151:13

**detailed** 7:13 144:7 153:12

**detailing** 129:18

**details** 55:25 56:4 80:16 125:22 128:20,

21,24 140:6,20

**detergent** 29:10

**determine** 48:2,16

**detriment** 155:2

**development** 18:5

**dial** 143:19

**dictate** 131:23

**differ** 64:25

**difference** 56:17 65:11 125:8,10 145:11

**dig** 141:10

**digit** 54:20

**diligently** 63:3

**direct** 28:8 75:25 106:8 127:8

**directing** 20:6 21:22 98:21

**direction** 13:19

**directly** 26:10 59:17 77:3 81:23 92:20 114:13 115:18 122:15 125:12

**directors** 16:8,9,20 17:10,11

**disagree** 38:13,14 90:16

**Disagreements** 162:11

**disallowing** 66:4

**disappointed** 130:25 131:4

**discarded** 82:13

**disclaimer** 45:17, 22,24 46:15,22 47:7, 9

**disclose** 79:16

**disclosure** 119:4

**disclosures** 44:9,12 45:12 50:10 59:15 78:18,22

**discovered** 153:14

**discovery** 7:21,23 28:8 48:12

**discuss** 10:5 28:21 43:8,11 45:24

**discussed** 43:14 50:6,7,11,12 54:12 70:24 76:14 112:5 118:15 129:8 144:13 149:11

**discussing** 83:15 112:23

**discussion** 36:9 96:12 110:2

**discussions** 61:17 77:16 86:3 118:15

**dispute** 88:1 144:5 159:3

**disputed** 115:21,23

**disputing** 144:10

**disrespect** 144:2

**disrespected** 162:4

**disseminated** 50:21,22

**dissolved** 15:11

**distinctly** 54:17 83:21

**distressed** 136:18, 24

**distributor** 15:5

**District** 116:4,5

**division** 15:21,24 16:2

**divisions** 15:17

**document** 15:19 34:4,7 74:24,25 90:12 116:14 135:11 143:13,16 144:8

**documentation** 43:22 89:24

**documented** 90:22

**documents** 6:17 7:9 48:11 75:22,23 90:21 135:9 144:7,24 150:21 155:23 156:1

*Vincent T. Keller - 08/06/2021*

*AB Litigation Services*

dollar 44:4 93:2 96:13 106:15 155:9 158:8,10 161:14

dollars 110:14

Don 107:21

Don's 107:21

Donald 95:1

done.' 109:14

doorway 50:8 54:18

double 54:20

downward 133:1

drafted 32:19 33:1

drive 58:17 158:15

drug 106:14

due 76:19 94:24 105:21 151:23

duly 4:4

duration 59:15

duty 114:2

**E**

e-mail 51:25 68:7 71:12,22 74:1,10 75:13 76:4 80:9,12 83:8,23 84:6 85:10, 20,22 86:13 91:6 92:11 93:24 94:6 95:16 98:4,5 111:1,3 147:20

e-mailing 29:25

e-mails 30:14 73:22 77:10 79:20 129:17, 24

E-TRAN 162:17

earlier 27:4 28:25 29:7 30:18 62:12,13 65:18 66:20 74:12 101:19 103:4,10,23 119:23 131:7 136:12 143:10 149:11

early 111:23

Eastern 100:16

EBITDA 72:8 73:2

education 11:5

efficient 25:12 107:16

effort 79:23 97:8 128:11,19 130:13

efforts 61:22 89:15 96:22,24 103:21 128:7,10 129:15,18

Eisen 105:1

elaborate 7:24 77:5 154:11

elected 44:9 95:2

election 94:25

elements 150:12

emails 117:1

embarrassed 101:11

embarrassment 101:13

emerge 157:22

Emory 11:6

emotion 130:21

emphasis 11:12

employed 19:16 20:17

employee 112:18

employees 93:4

employing 21:6

enablement 26:2

encumbered 122:3

end 34:13 35:9 94:15 108:20,22 138:25 140:12 141:16 154:22

ending 129:20

energy 79:1

engaging 93:9

enhance 72:24 78:1

enhancements 37:22

enter 80:24

enterprise 27:24

enterprises 18:14

entirety 151:11

entities 13:15 15:18 24:4 116:9 122:4,12 151:18

entitled 4:25 92:24 156:18

entity 15:11,15 16:3 26:9,11,14 27:6,13, 18 28:4 65:3 122:13 124:2 130:20 136:1

entry 113:9

envelope 71:11

equity 28:13,17,18 69:19 70:8 103:1 121:24 124:7 127:23 134:6,23 135:7

equivalents 55:5 62:23 63:7

erroneous 20:16

escaping 15:9

essence 50:16 55:22 74:5 75:7 91:9 92:12 151:5

essentially 157:11

establish 28:2

established 117:7 123:21 133:20 149:4 151:2

establishing 127:12

estate 23:6,7,9 24:2 25:10,12 26:12,13,15 56:9 62:4 63:19 94:15 95:4 114:9,10 129:21 131:7,14,15, 21 133:5 151:23 160:20

estimate 19:3 21:24 27:1,5 84:14

estimated 19:9 20:10

estimates 21:7

estimation 28:13

evaluating 31:12

evaluation 71:8 149:5

evaluations 32:25

event 37:12

evidence 62:22,25 63:17 86:12 155:19 157:22 159:15

evidenced 116:25

exact 25:24 37:24 50:2 56:9,11 68:17, 19 90:7

examination 4:6 101:7 126:11

examined 4:5 36:1

examples 136:17

excel 98:13

exchanges 116:25

excitable 78:24

excluding 105:13

exclusive 86:18 88:6 91:20 103:5 149:22

excuse 33:25

execute 34:15

executed 24:12 34:11,14 37:19,21 117:8

execution 30:10,16 54:13 161:25

executive 11:17,22 13:18 77:23

executor 23:9 114:18

exercising 152:10

exhibit 33:9,13,15, 17,21,22 34:18 36:19 38:3 42:13 49:17 67:2,6,8,11,12,16 68:6 71:18 73:8,10, 13,14,23 74:15,17,19 75:2 80:1,6 81:13,18 83:7 84:3 85:6,9

*AB Litigation Services*

91:2,5 93:13,17,22 95:8 98:2 101:2,3,9 116:1,18 119:17 134:3

**exhibits** 4:2 7:6 33:11 34:2 35:18 144:14 162:17

**exist** 52:3 66:12,16

**existed** 62:4 128:22

**exists** 15:12

**Exit** 26:18,20 28:11

**expect** 32:14 108:1 116:13 146:8

**expected** 140:21

**expects** 108:21

**expenses** 93:5

**experience** 122:10 131:14,19

**expert** 25:9

**explain** 22:25 39:5 44:18 152:19 161:5

**explained** 114:7

**explaining** 94:18 129:25

**expound** 153:23

**expressed** 21:18

**extend** 35:1 88:14

**extensions** 106:19

**extent** 10:16 40:19 107:24

———————————

**F**

**face** 64:15 128:22 129:9

**fact** 53:22 68:19 87:5,25 133:13 135:3,4 144:10

**factor** 80:20,25 149:21,22 150:24

**factored** 80:17

**factoring** 80:19 81:5

**factors** 56:25 99:20

**facts** 126:22 145:16, 18 158:25

**fail** 31:6

**failed** 37:9

**fair** 25:17 27:1 30:4 39:5 64:2 89:13 110:3 136:15 137:7, 14 138:11,16 139:12, 21 145:23 146:10 147:7 148:23 153:6

**fall** 28:25 29:5,20 43:13 77:6,7 86:12 110:4 136:17

**familiar** 15:20 64:22 114:20,25 125:3 126:21 141:24 142:1 150:21

**familiarity** 137:19 144:24

**familiarize** 80:13

**family** 13:4,10 96:12 106:14

**farm** 27:18 38:19 54:8 56:9 57:7 62:6 77:18,24 78:2 85:12, 14,24 86:10,20 87:14 88:2 94:12,19 102:23 103:8 104:2 107:1 109:2,6 111:12 121:8,11,24 122:8 124:5,12,16,17 125:6 127:19,22,23 128:7 129:4,7,15,20,23 130:14,15 132:7,25 133:21 134:11,14,21, 24 137:6 138:10,14 139:25 140:13 142:21,22 145:10,17, 19,23 146:2,24 151:16 153:4 154:20 160:20

**farms** 133:11

**fast** 63:24 78:24

**father** 12:11,16,18, 23 17:7,12 26:25 28:15

**fault** 82:2

**feel** 30:14

**feeling** 112:18 115:12

**fees** 66:5

**felt** 109:15 144:21 154:24 162:4

**fiduciary** 114:2

**field** 25:9

**figure** 62:23 65:25

**figures** 53:23

**file** 57:12 98:14

**filed** 52:22 53:14 55:9 58:13 59:6 116:10 126:4,7,23 141:12 152:11

**files** 48:2,16 49:3

**filing** 59:2

**fill** 105:12,16

**film** 106:2

**final** 157:8

**finally** 15:11

**finance** 11:13 30:19 32:15 68:17

**financial** 13:20 30:24 32:10 37:10 38:15,20,21 43:21 44:1,13,14,16 45:3 46:17,20 47:2,8 49:5, 21 50:9,10 52:19,23 53:12 55:4 59:14,17 60:2,8,13 61:24 62:18 63:2 64:17,20, 24,25 65:2,6,11,12, 13 72:15 78:18 99:16 117:20,21 119:3,16, 20 120:12 121:2,4,5, 6,7,17,22 122:7,22 123:20 124:11,22 125:4,7 133:23 134:11 139:18 148:18 149:16

**financially** 80:22

**financials** 31:12 47:5

**find** 123:4,5 133:9

**finding** 129:3

**fine** 10:9 100:14 105:11

**finish** 5:22 23:20 135:22

**firm** 120:2 142:6 158:7

**fits** 70:5

**five-minute** 67:21

**flip** 34:13 52:9

**flow** 79:7

**focus** 11:15

**folded** 15:14

**follow** 5:18 114:4

**force** 111:13

**forgive** 145:2

**form** 8:18,25 9:11 19:5 24:10 25:21 31:2,17 33:6 39:10 40:7,17 41:5,20 42:3 44:20 45:8,20 46:4,8 48:4,20 51:17 53:18 56:18 57:5,14 59:22 60:16 61:25 65:22 66:14 69:13 71:9 72:22 73:24 76:3 78:19 88:20 89:18 93:19 94:22 95:23 96:23 97:11 98:17 110:6,21 112:2 117:24 118:25 120:16 122:24 123:9 125:1,13,19 130:4,16 131:17 132:13 133:2 134:25 135:16 136:8, 25 137:10 139:14 140:1 141:1 142:3,25 143:8 145:13,25 146:11 147:8,24 148:25 149:9,19,25 150:7,16 151:7 152:15 153:2,11 154:14 155:17 156:5, 21 159:14 160:10 161:7,19

**formal** 78:22

**formula** 107:15

*Vincent T. Keller - 08/06/2021*

*AB Litigation Services*

forthright 6:5

forward 26:2 70:10, 19 90:15 110:10 144:22 153:13

foundation 19:5 20:25 22:15,18 24:10 25:21 28:2,6 31:2,17 39:11 40:7,17 41:6, 21 42:3 44:20 45:8, 20 48:4,20,23 49:16 51:18 53:19 54:14 57:14 59:22 60:16 61:25 65:22 69:13 71:9 72:22 88:20 92:2,7 94:22 98:17 99:1 110:6,21 117:24 120:5,16 121:13 122:24 125:1,13 128:8 130:4 131:17 132:13 133:2 134:25 135:17 136:9,25 138:18 139:5,14 141:2 142:3,11,24 143:8 145:13,25 146:11 147:8 149:9 150:17 152:15 153:11 154:15 155:11,18 156:6,21 159:14 160:10 161:7, 19

foundational 151:9

foundationally 150:22

founded 12:21,23 13:2

founder 12:24

frame 50:8

framed 43:24

frames 83:14

frankly 58:16 155:18 158:16

fraudulent 142:21

free 161:14

frequency 79:15

frequent 62:14

frequently 63:22 106:22

Friday 10:14 105:21

friendly 146:4

friends 146:4

front 88:23

fronts 75:11

full 56:23 148:23 157:8 161:13

full-time 11:19

fully 8:8 49:1

fundraising 96:2

funds 63:3 93:7 142:15 145:19

future 34:2 114:14

**G**

gain 114:7

gave 136:16

general 11:14 43:1 80:11 84:1,8 87:6 97:9 99:14 106:15

generally 7:12 44:10 59:16 78:11,14 131:20 136:17

generate 112:10 113:3

generated 112:16

generating 18:7 77:13

generation 13:3

gentle 151:25 152:9

Georgia 11:6

German 107:8

germane 7:7,25

give 29:4 36:5 37:6, 11 56:23 67:4,14 81:23 83:11 84:10 95:21 97:22 102:14 103:19 109:9,17,24 128:1

giving 25:5 76:16 102:25 151:13 153:24

go-to 112:24

Goldhamer 9:17 82:18

good 4:8 38:22 41:16 54:20 67:22 99:23,24 135:20 139:1 144:21 151:24

goods 72:6

Google 128:14

grandfather 12:19

granted 45:10

great 83:4 126:5

green 106:11

grossly 55:11

group 6:13 11:21 12:2,3,5,22,24 13:25 14:1,3,12,20 16:11, 15,17,23 17:24,25 18:14 22:10,11 43:2 53:7 100:6 113:4 129:18

Group's 18:20

grow 36:13

growing 77:25

growth 107:1 128:16

guarantee 37:6 40:4

guaranteed 23:7

guarantees 24:13

guaranties 37:14, 16,19

guarantors 37:18

guaranty 34:24 35:14,20 36:3,18 37:21,25 38:3,6,8,23 39:21 41:15,16,24 44:5 45:11 54:13 81:8 116:25 117:3,4, 8,15 118:23 120:3 121:10,21 124:9 125:7,24 134:19 144:22 148:21 151:14

guarded 51:5

guess 6:23 8:1 20:11

29:4,19 35:5 46:18 51:24 52:2 53:8 69:15 70:1,4,14 94:14 117:25

guesses 108:3

guessing 18:18 29:7 82:12 115:10

guidance 123:16

guide 90:14

guidelines 5:17

guy 112:23,25

guy's 54:19

Guybig 107:21,23

**H**

H-E-I-D-I 18:12

habit 7:10,16

hairs 90:23

half 10:10 39:8,23 74:20 112:7 129:12

half-brother 12:11 14:17

hand 35:22 53:25

handle 141:18

handled 52:5

handling 141:18

hands 112:22

handwriting 8:4 101:10,12,17

handwritten 86:13

happen 33:13 77:15 83:20 96:3 133:5 149:8

happened 63:16 82:11,12 96:2 118:1 129:1 139:23 149:11 158:7

happening 133:10 158:3

hard 83:21 137:15 140:10

**AB Litigation Services**

harder 105:8

Harvard 11:7

head 150:9

health 18:20 111:14

hear 4:22 5:3,6 8:22 60:5 131:4

heard 69:5 124:3 146:19,20

hearing 109:21

heavily 53:10 71:4 110:9

heck 109:1

Heidi 18:12,13,19 26:4

held 54:16 121:5

helped 105:25 142:10,23

helpful 14:8,14

helping 37:6

helps 14:12 67:5

Henke 44:23 47:16 49:20 60:6

Henkel 107:8,10,12, 14,18,25 108:2 151:20

herpes 54:11

Hey 46:15 50:17,18 70:25 104:20 108:10 109:10 112:20 146:14

high 94:14 133:8 139:13 140:11

higher 140:19 154:21 156:19

hindsight 115:5

history 62:11

Hoffman 36:10,22 43:1,9,12 45:24 46:14 47:18,21 48:1 50:1 51:3 117:2 121:18 144:19

Hoffman's 35:23 43:5 54:18

hold 4:11 14:6,11 23:19 39:10 109:13 130:3

holder 135:10,24 136:1 160:18,19 161:11,18

holding 14:3,5,7

holds 14:14

home 11:1 18:25 19:4,10,14 20:3,21 21:25 96:10 106:11 111:17 127:21 133:7 151:16,17 154:18

homes 133:6

honest 6:5 116:15

hope 40:1

hoping 85:3

horse 62:6

hosted 105:20 106:3

hour 10:10

hours 112:5 119:24

house 20:11,16 21:2,8,15 54:5 111:12 127:25

household 72:6

Housley 98:10

hr 107:13

_____

**I**

idea 36:2 93:1 124:3

identify 33:21 34:2, 20,23 68:6 73:22 80:4,5 83:6 84:5 85:8 91:4 93:16 116:2

II 12:20 106:24

III 12:18

impactful 36:16

impacting 28:5

impacts 27:25

impaired 160:21

impeachment 19:15

implicate 118:8,11

implicating 58:11

implies 149:21

imply 85:23 135:5

implying 94:24 155:25

important 121:11 122:5 123:4,14 133:14 149:24 150:22 155:16 161:23

importantly 54:6

impose 153:19

imposing 66:5

impression 121:6

improper 58:16 157:12,21 158:16

in-close 133:11

in-depth 71:16

inaccurate 55:4,6, 12,18,23 70:23 110:9

inadequate 130:15

inanimate 130:20

Inc.'s 148:22

incentive 145:22

inception 124:15

Incidentally 54:6

include 5:19

included 44:12

inconsistent 154:1

Incorporated 13:1,2 14:25 15:2 16:13,21

increased 37:7 114:8

indebtedness 93:10 124:21

independent 36:10

indication 139:2

indifferent 46:19

indirectly 26:10 125:12 144:4 161:1

individual 27:25 122:15 131:24

individually 14:17, 18 116:8 147:12,17

individuals 16:24

induce 35:1

industry 72:6 96:17

influence 44:13 157:6

influential 106:17 107:4

infomercial 106:4

infomercials 110:19

information 7:20 9:5 16:18 19:21 22:5 32:11,13 45:2 46:18, 21 49:4 50:18 51:4,6 52:5 54:3 57:9 59:17 72:13 117:14 119:3 126:5

informed 44:17 45:2 98:20 111:25 112:5, 17 122:23 131:8 133:18,22 155:22

initial 71:7

inquire 141:4

inquiry 122:21

insert 97:22

insiders 146:3

instance 142:16 159:7

instruct 9:15 40:20 57:16 118:7

instructed 58:4 119:10

instructing 58:7

insurance 18:20 24:16,19 25:1,19 111:14 150:14 159:4, 12,20 160:1,4,8,17 161:17

intellectual 54:9 107:11 108:2 151:19 154:19

*Vincent T. Keller - 08/06/2021*

*AB Litigation Services*

**intended** 128:12
144:2

**intent** 162:5

**intention** 93:1,5
114:9 115:14 152:2

**inter** 116:25

**interest** 26:19 41:18
66:7 69:19 130:1,2,6,
8 146:17

**interested** 106:18
107:9,10 109:4
128:23 129:2,3 156:9
157:16

**interesting** 123:19

**interfere** 122:14

**intermediate** 27:24

**Internal** 66:19

**internally** 113:4

**Internet** 16:1

**interrogatories** 9:9

**interrupt** 4:12

**intimated** 112:21

**intricacies** 125:22

**intrusion** 21:19

**inures** 28:14

**invested** 104:15

**investigation** 53:25

**investment** 16:7
74:3 76:11,15 104:8,
10

**invoice** 81:9

**involved** 10:20,21
37:1,9 122:18 138:7
144:2 156:15

**involvement** 13:22
39:1 140:11

**involving** 142:21

**Iron** 15:20

**IRS** 55:10,13,16
111:8,25

**issue** 19:10,20 86:1
150:24 157:20

160:13

**issued** 66:3 136:6,
22

**issues** 19:12 27:8
78:17 115:16 141:18,
19 145:6

**item** 64:2

—

**J**

**Jack** 107:21,23

**janitorial** 15:5 16:1

**Jeff** 28:23 29:22
30:10 32:11 33:1
36:3 37:24 38:15
41:24 43:7,21 51:2
59:17,18 60:3,20,23
61:12 62:3,11 66:22
69:18 72:14 74:1
75:8,25 78:12,23
83:8,11 84:7 85:10,
18 87:18 88:12 92:12
93:9 94:6,18 95:16
96:21 102:22 104:7,
15,19 105:1,21,25
108:3,17 109:20
111:8,24 112:10,20
113:23 114:10 115:3,
20,21 117:8 120:15
121:20,21 122:6
124:4 125:6 129:8
136:4 140:12 144:13
148:20 150:12,14
151:14 159:6,12,21

**Jeff's** 62:14 93:5
95:4 107:5 108:9
110:4 114:9 121:20
140:5 159:25 160:4

**Jeffrey** 34:14 35:12
44:8,15 54:7 56:10,
15 116:23 117:3
120:2,10,25 121:8
127:10 148:17

**jeopardy** 111:17

**job** 162:10

**jog** 69:17

**joined** 107:24

**joint** 38:16 39:6,19
40:13 41:14,19

**jointly** 19:2 39:7,24
40:6

**journals** 30:13

**judgment** 55:10
65:17,20,24 66:15

**judgments** 55:14

**July** 86:3 102:18

**jump** 80:8

**June** 86:22 88:18
113:10

—

**K**

**Karen** 86:19 88:14
129:22 134:21
147:20

**keeping** 7:2 9:19
97:5

**Keith** 106:16,18,20
108:8,10 111:20,22
112:23

**Keller** 4:3,8 5:13 6:3,
13 9:1,15 11:1,2,21
12:1,3,5,17,18,20,21,
22,24 13:25 14:1,3,
12,17,20 16:11,14,
16,23 17:7,24,25
18:2,12,14,20,25
19:22 20:10,18
21:13,17,25 22:2,8,
10,11 23:20 24:15
26:25 27:5 28:8,21
33:20 34:19 40:24
42:16 43:2 53:7
58:14 68:5 73:21
75:6 84:7 85:11 90:2
91:7 95:17 97:14,16
98:3 100:2 101:9
102:1 113:4 116:3
118:5,21 123:25
124:10 126:18 127:7,
11 128:24 130:5,11,
17 135:2 137:4
138:5,19 139:6
140:23 141:7,13,23
142:4,13,19 143:2,24
144:1 145:1,14
147:11,13 150:10,18
151:2 152:8 153:22
154:3,16 155:20
158:9,25 159:5,17

161:9 162:2

**Keller's** 19:10 28:3
41:1

**Kellers** 13:4

**Kelsan** 13:1,25 14:2,
4,6,11,15,25 15:1,22
16:3,8,10,12,17,21,
24 17:20 18:2 22:13
68:18 69:4

**Ken** 69:3,6 91:7,14
99:6

**Kerry** 68:7,15,23
69:1,9 71:7 79:6 80:9
91:8

**Kevin** 117:1

**key** 112:23

**kicked** 94:13

**kind** 4:13,22 5:4 36:5
52:2 91:11 110:18
112:24 124:7

**kindly** 34:3

**kinds** 110:19

**knew** 10:13,14
29:12,14,22,25 35:21
105:24 123:21
124:16

**knowing** 29:13 63:1
109:21 128:24

**knowledge** 37:20
40:1 55:7,21 62:8
110:17,22 115:23
120:19 124:16
132:17 133:3,7
138:21 140:4,9,20
141:11,14 143:5
144:23 145:4 147:15,
18 148:1 151:9 153:7
160:12,25 161:3

**knowledgeable**
128:9

**Knoxville** 6:9 11:2

**Kudney** 117:1

—

**L**

**L.A.** 84:22

*AB Litigation Services*

labeled 64:19

laid 28:2

language 45:18 70:4

largely 112:21
129:10 142:7

late 7:18 69:12

laundry 29:10

law 40:9 120:2 142:6
154:1 158:7

lawsuit 6:25 7:20
27:7 57:12 58:13
123:8 138:7,10
141:13 142:20 144:3
150:23 152:11 156:4
157:18 161:25 162:1

lawyer 41:3 150:20

lawyers 40:23 57:11
141:17

lay 28:5

layman's 23:24
150:25 151:22

Leadingham 35:12

learn 120:13 130:23

learning 55:10

leave 100:7 134:23

leaves 134:18

left 127:23 134:5
144:16

left-hand 108:7

legal 15:15,17,22
16:3 24:4 40:19 41:1,
4 116:13 118:15
119:13 153:23

legalese 6:24

legally 14:5 16:12,20
122:11

legible 8:4

legitimate 111:15

lender 136:2,22
146:9,12,15,24 147:1

length 71:5 115:11

lesser 107:24

letter 42:17,21,23
43:8,15,18,20,23
44:7,24 46:16 47:16,
22 48:3,18 49:20
51:11,12 117:13

letters 51:24 116:6

level 43:2 78:12
140:11

levels 73:3

Liabilities 55:11,17

liability 42:1 66:25

liable 22:9,12,17,24
23:5 24:8

License 108:19

licensing 91:16
92:12

lieu 146:24

life 24:16,19 25:1,18,
19 141:21 159:25
160:4 162:12

life's 113:25

lifeline 110:5

light 106:11

limit 126:11

limited 14:16 34:24
35:14 76:19 152:3

lines 4:14 10:1
153:24

liquid 63:8

list 33:11 129:22
155:4,14

listed 87:5,9,19
129:20 134:11

listing 86:18,20
87:17 88:6 103:6
128:11 129:2 132:8

literally 102:15
106:2,10 139:16

litigation 53:6
125:18 141:25 142:1

live 83:24 133:6

lives 25:25

living 25:8

LLC 6:13 12:3,5 14:5
26:18,20 56:12,16,
20,21 57:7 120:11
121:5,6

LLCS 140:7

loan 124:7 136:23

Local 106:24

located 6:7

logically 51:24

long 10:9 11:24 12:4
15:7 64:11 74:8
91:12 95:18 100:10
116:6 137:16

longer 12:14,15
15:12,14,15 71:13

Longmont 38:19

looked 35:25 48:1,
16 52:18 64:12

lost 111:8

lot 36:13 54:19 78:25
85:16 87:15 88:2
108:8 115:7,16
128:13 137:17
151:12 161:14

Lots 107:18

love 107:14 125:21,
25 126:2

loved 107:15

lovely 125:24

low 50:18

Lowe 98:10

Lowe's 96:10

lower 74:7 129:25
138:25

loyal 111:22 112:24

lunch 99:23 100:3,9

luxury 153:16,20

---

**M**

---

machinations
140:4 152:4

made 8:17 15:4 23:4
42:8 54:2 69:18
104:8 113:24 120:9
121:19 122:21 128:7,
19 130:13 148:17
153:9 154:6,13
158:22 159:24 160:9,
18

Maine 10:12

maintained 93:3

major 106:12

majors 11:15

make 4:25 5:12
21:11 38:22 41:15
52:7 56:16 61:22
68:11 78:21 98:24
99:8 108:9,12 125:9,
10 144:21 145:12
149:15 151:24
158:18

makes 31:24 84:1
142:20

making 4:24 28:3
29:18 57:12 78:18
99:21 126:25 153:25
156:7 158:12

man 126:19 151:3

management 11:14
14:1,9,10,20 15:19
17:25 25:10 30:11
31:23,24 32:5,6,17,
23 66:5

managers 141:17

managing 141:23
142:7

manner 6:5 54:25

manufacturing
29:2,8 32:19,25
33:24 88:24,25 89:2,
3,5,8,10 91:23
148:19 149:18

March 69:12 74:11
138:13

margin 108:6 109:8

marijuana 77:25
107:1 128:16

marital 38:17 39:6,

18

**mark** 73:13

**marked** 4:2 33:21 34:18 68:6 73:13,23 75:3 80:5 82:5,6,7, 10,13,14 83:7 85:9 91:5 93:17 94:3

**market** 27:2 77:19, 20 85:15 108:11 124:5 128:12 131:8, 23 132:2,25 136:15 137:7 138:11,17,22 139:12 140:18 145:23 146:10 147:7 153:6 154:21

**marketed** 86:4

**marketing** 16:1 85:24 110:18

**marketplace** 133:4

**master's** 11:7

**material** 52:23 53:16 150:12

**materials** 43:25

**math** 71:11

**matrix** 69:5

**Matt** 29:14 30:2 36:9, 21 49:8,12,14 50:6, 12 53:9,11 59:3 60:19 61:20 62:2,10 69:7 74:2 75:9 91:7, 14 94:6 95:17 99:3 113:15,16 115:12

**matter** 54:1 77:10 98:21 107:4

**matters** 13:23 44:17 45:3 96:19 158:16

**Matthew** 10:6

**MBA** 11:9,10,17,19 13:7 44:18 126:19

**meaning** 104:6 106:19,25 107:15 115:1

**means** 39:7 44:19, 22,23 45:9 80:17 91:17 94:13 103:2 105:22 106:1 107:14 108:2,5,24 109:1

**meant** 7:22 37:10 90:17 104:18,22 105:13,15 109:6 114:22

**measure** 96:16

**measurement** 65:3

**meet** 23:10 107:3

**meeting** 16:17 61:7 84:22 107:6,13,18,25

**meetings** 7:3,11 17:19 84:13 101:20

**members** 17:3,6,11, 16

**memory** 69:17 77:9 86:16 160:15

**Menard's** 96:11

**mention** 127:14,21

**mentioned** 8:11 26:4 61:11 62:12 127:11 131:6 136:13

**mentions** 84:25 96:14

**Merchant** 111:20,22 112:23

**merger** 13:21

**Merrie** 10:19,20 38:6,8,10 42:1,7 44:8,15 56:10,15 60:11,19,24 61:13,18 62:3 66:23 113:12,25 114:25 115:20 116:8, 24 117:12 118:19,22 119:2,18,20 120:2, 10,14,25 121:8 122:7 137:6 138:8 139:24 140:15 146:23 148:17 150:13 151:5 152:1 158:20 159:23 160:3,5

**message** 74:5 75:7 94:21

**met** 21:20 29:23 60:24 107:12

**methodologies** 20:3

**metropolitan** 133:12

**Michigan** 136:3

**mid** 131:1

**mid-'90s** 7:17

**Midlab** 5:3 6:22,24 9:17 12:25 14:21,24 16:21 17:19 22:17,24 24:8 26:9,16 27:14 29:1,6,18 30:19,22 31:11 33:25 35:1 37:15 38:5,7,10 41:18 42:2,9,22,24 43:3 45:7 47:1,4 48:10,16,17 49:2 52:22 53:7,9,15,16 55:9 59:13 60:1,6 61:17,22 68:18,24 69:7,18,21 70:7,11 75:23,24 76:16 78:13 79:6 92:20,25 93:8, 11 96:21,25 107:22 113:4 115:22 116:7, 11,14 117:5,9 120:11 121:3,9,12 122:23 123:4 124:16,25 128:6 129:13 130:12, 19,24 135:9 138:7, 16,20 142:10,23 147:6,11 148:18,22 149:4,6,17 153:10 154:13 155:16 156:18 157:4 159:13 160:9 161:2,6

**Midlab's** 8:2 37:11 40:12,14 41:13 89:14 123:17 139:22 142:20 151:5 157:11, 20 158:17 159:10,19

**Mike** 17:9,13

**Miller** 31:10,21 36:23 49:8,12,13 50:13 59:13 60:10,17,21 68:8,23,24 69:3,10, 17 79:6 80:10 91:6 95:17 98:10 141:25

**Miller's** 30:17

**million** 35:22 44:4 45:11 54:21 64:6 65:21 66:4,6,7 72:9, 10,17,19,20 73:5 78:1 84:15 85:17 94:16 102:21,24,25 103:1,2,22 104:7,14,

21 107:1 108:4,17,24 109:2,11 111:9 129:12,23,24 131:2 132:7,20 134:4,5,6, 18,22 135:4,13 136:5 139:12 140:19 142:10,23 143:7,14 144:9,16,17 145:10, 11,12 146:17,25 147:23

**million-something** 66:21

**millions** 55:16 110:14

**mind** 9:20 16:6 25:5 97:17 105:9 111:1 139:17,19

**mine** 63:6 101:14

**minus** 29:7

**minutes** 68:1 81:24 86:9 100:8 115:10 138:1

**misleading** 158:11

**misrepresentation** 27:20

**misrepresented** 57:8

**missed** 4:23

**misstatements** 158:19

**misstates** 159:15

**misstating** 155:18

**MLS** 87:10,24 88:10 128:11,18,21 129:2

**mm** 104:6 107:2 109:2,3

**moment** 15:3,9 24:21 64:13 65:9 84:9 89:6 97:22 103:19 104:5

**Monday** 74:11

**Monday's** 82:23

**money** 62:21 71:2 76:21 83:13,18,19 103:21 108:9 109:22 110:12 161:12

EXHIBIT Q

*AB Litigation Services*

**month** 63:11 65:4 108:21 112:7

**monthly** 59:19

**months** 12:7,12 18:18 113:23 149:6

**morning** 4:8 85:14 141:16 144:8,11 148:12

**mortgage** 28:10 104:1 123:22 124:2, 12,17,22 133:21 134:1,14 135:4,11, 12,25 136:1 143:7,14 144:9,12,24 145:11 160:18,19 161:11,18

**Mountain** 15:20

**move** 71:19 80:1 110:10 116:19 120:21 127:3 156:8 158:13,23

**movements** 137:18

**moving** 156:10

**multiple** 72:6,7 73:4 74:16,18 83:18 93:20 133:6 151:15 155:23 156:1

**multiples** 71:14

**multiplied** 73:3

**mute** 5:7

**myriad** 7:8 132:3 139:8 140:7 141:21

**N**

**named** 24:18,22,25

**names** 116:9

**Nashville** 15:6

**national** 18:5

**nature** 62:21 84:8 128:4,17 159:3

**neat** 101:12

**necessarily** 97:21 98:6

**necessitate** 131:25

**needed** 76:22 97:6 105:14 115:15

**needing** 110:14

**negative** 135:6,7

**neighborhood** 65:25 66:21

**net** 27:20,25 28:5,19 54:20 56:17 72:25 103:1,2 125:11 127:12 144:16

**nice** 76:24

**non-** 17:11

**non-expert** 20:20

**non-family** 17:10

**non-management** 17:11

**normal** 31:4,8

**note** 81:7,8

**notebook** 7:1,4 83:22

**notebooks** 7:5,19

**noted** 158:7

**notes** 6:17 7:2,10, 13,24,25 8:6,13,16 9:4 51:14 78:23 83:22 86:13 101:18 102:16 104:25 105:17 107:20 111:4, 5 112:17 113:9,11 144:15

**notice** 136:7,22 147:10

**noticed** 153:22

**November** 35:11 47:17 50:3 65:21 95:2 117:2 129:21 134:21 147:21 159:7

**number** 12:25 13:15 17:15 33:13 63:14 76:12 77:17 105:4 116:6 139:19 157:16

**numbers** 61:23 67:5,13,15 83:23 102:4,22 114:16

**numerous** 38:18

54:7 61:14 76:11 86:10 121:21 123:16 129:8

**O**

**object** 8:18,24 9:11 51:17 53:18 56:18 57:5 66:14 73:24 76:3 89:18 93:19 95:23 96:23 97:1,20 112:2 118:25 123:6,9 125:19 130:16 135:16 140:1 141:1 142:2 143:18 149:19, 25 150:7,16 151:7,8, 13 152:14,15 153:2, 25 155:17 156:5,6

**objected** 119:9

**objection** 27:4 40:16 41:1,20 46:4,7, 9 86:6 97:15 123:23 136:8 146:18 153:19

**objections** 20:25 97:11,22 154:14

**obligation** 23:9 70:3 151:23

**obligations** 23:10, 12,13 117:4 122:22 128:3 148:20,22 154:23

**observing** 36:19

**obtain** 59:17

**obtained** 132:10

**occasion** 36:11 79:5

**occasional** 79:10

**occasions** 86:10 121:22 127:18 129:8 146:21

**occur** 8:11 37:13 79:9 96:10

**occurred** 9:16 112:1,6 113:10,12,20 125:23 136:21 145:18 161:12

**October** 56:11 62:24 63:14 65:8,24 66:7, 10,12,16 108:22

112:6

**odd** 17:15

**offended** 162:9

**offer** 108:1 132:10, 19 147:1

**offered** 146:23

**offers** 88:18 132:15

**office** 6:10,12 34:8 50:8 54:18 82:19 100:7 118:6

**officer** 11:23 23:2 24:6

**officers** 23:17 24:8, 12

**offices** 15:6

**official** 107:4

**omissions** 53:16

**omit** 44:9

**omitted** 44:12,25

**on-line** 15:25 16:2

**onboard** 77:15

**ongoing** 114:4 125:18

**open** 15:8

**opening** 84:15 85:4

**operates** 26:9

**operating** 13:16

**operations** 65:5

**opine** 140:10

**opined** 36:24

**opinion** 24:9 39:25 41:1,3,4 44:3 51:22 56:23 63:1,6,17 84:10 94:24 97:2 120:18 132:3 133:17 136:23 139:4,15 142:7 143:21,22 147:15,18 149:20 150:1,3,4,25 151:14 154:24 156:24 159:18,19

**opinions** 99:18

EXHIBIT Q

**AB Litigation Services**

**opportunities** 152:12,13,19,20,22 153:8 154:12

**opportunity** 70:7 145:5 146:5 151:24

**opposed** 23:22 98:21

**opposition** 21:20

**optimize** 89:17

**option** 70:5,15,25

**order** 19:24 69:19 84:15 85:4 108:18

**organization** 79:11

**organizations** 13:17

**organized** 16:10

**original** 74:10 126:7

**originally** 160:17

**originating** 75:13

**origination** 93:24

**outlined** 152:23

**outlining** 75:10

**outright** 108:1

**outstanding** 66:22 89:16 93:10 134:1

**oversight** 13:14,22 14:4

**overview** 91:3 102:15

**owe** 23:8

**owed** 55:15 69:20 93:10 115:21,22 123:20,22 124:22

**owned** 26:9 27:6,12, 18 28:4,11 39:24 40:6 122:11,15 125:6,11

**owner** 12:1,5,6,7,9, 25 24:6 26:11 106:17

**owners** 56:16 122:7

**ownership** 26:21 57:7 91:19

**owns** 14:23 15:23 16:6 26:12,15,24

────────

**P**

**p.m.** 68:14 100:19 101:1 138:4 162:20

**packaging** 107:16

**pages** 93:20,23 102:1 148:11

**paid** 79:24 92:25 111:16 155:1,7,8,14, 15 156:19 158:7 161:13

**paper** 7:8

**paragraph** 44:7 45:5,16,19 71:21,23 84:11,13,19,20 94:10,12 95:24 96:1, 4,6,9,14 116:19,23 120:9,23,24 127:8,9 138:12 148:14 149:13,14,15

**Paragraphs** 116:20

**paraphrasing** 51:3 54:24

**parent** 68:18

**parents** 18:21

**parsing** 90:23

**part** 23:14 27:7 42:13 48:18 50:15 74:7,21 75:13 92:23 108:25 121:20 138:6 150:11

**part's** 74:7

**partially** 25:23 74:15

**parties** 146:7

**parts** 137:18

**party** 23:3 24:6 27:13 138:24

**passed** 23:7

**past** 26:1 107:22 110:18 144:13

**patents** 91:19

**pause** 97:17 103:13 117:11

**pausing** 16:4 103:12

**pay** 42:8 87:13 93:7 96:25 108:19,24 109:11,22 115:14 121:25 140:12 142:16 151:15 152:2 160:21

**payable** 124:12

**paying** 97:4 111:14 127:18 154:22

**payment** 37:7 79:8 148:21

**penalties** 66:7

**pending** 154:6,10

**pennies** 155:8 158:10

**penny** 93:2

**people** 25:7 50:22 79:11 123:16 146:4, 21 160:24

**percent** 26:23,24 39:24

**perception** 131:20

**perfect** 115:5

**perform** 30:24 37:8

**performance** 32:12

**performed** 32:25 71:8 149:5

**period** 18:15 29:5 65:4 108:22

**person** 79:3 107:2 141:17 151:4

**personal** 19:21,25 23:6 24:13 28:19 36:18 38:2,8,11,14, 17,22 39:21 41:24 42:1 43:20 44:1,5 45:10 46:17 49:5 50:10 54:13 60:13 62:17 65:10,12 81:8 103:18 104:4 117:15 120:12 124:9 128:2 134:19 141:11 151:14 154:23

**personality** 78:24

**personally** 23:6 24:1 29:15 35:20,21 40:4 53:3 55:24 117:4 123:1 146:19

**personnel** 9:17

**perspective** 139:22

**pertinent** 7:20

**pet** 54:11

**Phase** 106:16,24 107:7

**phone** 8:3 77:9 79:15

**photocopy** 7:3

**phraseology** 39:2

**physically** 6:8

**picture** 56:23

**pictures** 7:4

**piece** 131:13

**pieces** 105:12

**pin** 145:5

**pipeline** 105:12,14, 16

**Pisano** 116:8

**place** 39:19 72:8

**places** 29:11

**plaintiff** 5:3 116:7,11

**plaintiffs** 20:19

**planning** 13:22

**plans** 96:17

**plate** 108:11

**play** 91:17,25

**pledged** 161:18

**plenty** 158:12 161:12

**PO** 106:13

**point** 22:5 29:23 65:8 67:22 70:21 80:15 81:1,3,4 99:24 104:6 106:6 113:24 118:6 128:25 134:15 135:12,20

EXHIBIT Q

*AB Litigation Services*

**points** 113:18,19
126:6,9

**policies** 24:20
25:15,19,20 159:4,
12,20,24 160:7,8
161:17

**policy** 150:14 160:5

**portion** 35:4 70:7
81:6

**portions** 76:16
151:24

**posed** 10:18 23:21

**position** 11:20,22
18:3 40:13 41:14
70:8 89:17 91:23
134:23 157:6,12
159:10,11 160:7

**positive** 30:12

**possession** 43:5

**possibilities** 76:13

**possibility** 81:5
128:15

**possibly** 80:25
86:15 137:14

**post-secondary**
11:4

**posted** 76:23

**potential** 136:24
139:3

**potentially** 104:10

**Pound** 109:14

**practice** 31:4,8,9

**precipitated** 36:12
48:18 77:2 85:20

**precise** 88:3

**precisely** 47:23
126:6

**preciseness** 77:8

**predecease** 24:2

**prepared** 108:8
116:14

**prerogative** 158:1

**present** 16:18 21:25

**presentations**
17:19

**presented** 9:7 32:5
47:6

**presently** 6:7 94:4,5
102:24

**preserve** 146:5

**president** 30:18
34:16 68:17,24 69:4
95:1,3

**presidents** 13:16

**pressing** 152:1

**pretty** 21:13 94:7,16
115:13 149:4

**prevent** 6:4

**previous** 7:5 110:23

**previously** 73:15
76:13 82:1,3 117:7

**price** 85:16,25 86:4
108:4 129:19,25
130:15 131:1,2,16
145:12 148:4

**priced** 85:14

**prices** 131:22

**primarily** 104:25

**primary** 30:3,5,6
39:19 110:4 137:3
149:17

**principal** 20:19

**principles** 44:10

**prior** 29:3,25 30:10,
15 54:12 60:23 61:20
62:12 120:14 144:11

**privacy** 21:17,19
22:4

**private** 50:18 51:5

**privilege** 118:9,11

**probating** 114:19

**probative** 157:18,22

**probing** 157:11,19

**problem** 39:20 64:7

79:14,23 80:21

**problems** 37:10
139:18

**proceed** 46:11
121:14 137:11
145:15

**proceeded** 148:19

**proceeding** 123:7

**proceeds** 159:11
160:7,17

**process** 142:7 162:9

**produced** 51:14
75:22,24 126:6

**product** 29:2,8,9
32:12 35:2 40:18
80:20 84:12 92:20,21
105:25

**production** 9:9
106:3

**products** 29:19
31:12 34:12,14 54:11
64:3,5 92:1 98:11
106:19,22 110:18
117:5 120:11 148:19,
20,22

**professional** 50:16

**profit** 111:10

**profitability** 65:3

**program** 11:17,19

**progress** 105:1

**projections** 31:13
32:13 79:7

**promise** 62:16

**promised** 121:22
140:12 151:15
159:20

**promises** 115:4

**promising** 75:10
79:2 84:12

**promissory** 81:7

**properties** 20:22
132:25 161:13

**property** 54:10
88:18 107:11 108:2

132:1,6 135:5
136:14,23 140:17,18
142:9 144:12 145:9
146:6,10 151:19
154:19

**proposal** 69:18
70:12

**propounded** 9:9
48:12

**prosecuting** 138:8

**prospect** 96:7

**prospects** 70:19
79:2 97:4,7

**protect** 50:18,20

**protection** 36:18
91:22

**protocol** 5:11

**proved** 64:10

**provide** 14:20 48:11

**provided** 45:12 82:3
88:8 120:11 121:3
129:14 135:9

**providing** 78:13

**Pulkrabek** 4:11,18
5:1,2,10 8:18,24 9:11
19:5,8,18 20:8,23
21:11 22:1,15,18,21
23:19 24:10 25:21
27:3,10 28:1 31:2,17
33:6 39:10,14 40:7,
16,25 41:5,20 42:3
44:20 45:8,20 46:4,7,
12 48:4,20,23 49:16
51:17 53:18 56:18
57:5,14,21,24 58:3,
15,24 59:22 60:16
61:25 65:22 66:14
68:2 69:13 71:9
72:22 73:24 74:13,23
75:4 76:3 78:19
82:16,24 86:6 88:20
89:18 92:2,6 93:19
94:22 95:23 96:23
97:1,10,16,25 98:17
99:1,25 100:10,14
110:6,21 112:2,13
117:24 118:4,14,25
119:11 120:5,16
121:13 122:24 123:6,

*AB Litigation Services*

9,12,23 125:1,13,19 126:10,16,24 128:8 130:3,16 131:17 132:13 133:2 134:25 135:16,19 136:8,25 137:10,12,20,25 138:18 139:5,14 140:1 141:1 142:2, 11,24 143:8,17 145:13,25 146:11,18 147:8,24 148:25 149:9,19,25 150:7,16 151:7 152:14 153:2, 11,18 154:5,14 155:11,17 156:5,21 157:9,17 158:6,23 159:14 160:10 161:7, 19 162:14

**Pulkrabek's** 9:20

**pull** 33:8 34:17 67:2, 9 73:7,18,19 81:12 84:2 91:1 93:13 98:1 115:25

**pulling** 101:5

**purchase** 92:1 136:5 148:4

**purchased** 12:10

**purchaser** 139:3

**purchasing** 107:11

**purported** 36:13 129:9 131:3

**purporting** 55:23

**purpose** 80:11 83:10 127:1

**purposes** 19:15 27:20 142:22

**pursuant** 135:9

**pursues** 161:25

**put** 87:23 154:24

---

**Q**

**qualifications** 149:24

**qualified** 150:23

**quarter** 127:17

**quarterly** 16:16

**question** 8:9,12,19, 21,25 9:2,12,14,21, 23,25 19:7,19,23 20:5,7,24 21:14,21, 22 22:3,6,22 23:21 28:9 37:17 39:11,15, 17 40:2,15,21 41:9, 23 42:6 45:9 46:13 48:6,8,9,15 49:2,10 51:19 57:17 58:4,6,8, 9,11,19,25 60:7 63:16 80:4 85:14,19 86:14 89:19 97:18 98:22 119:12,13 120:7 123:2,10 126:11,15,17,25 127:4 128:6 130:4,6 132:4,14 135:1 137:13 140:2 141:6 142:18 143:2 144:6 145:15 150:4 151:8 152:15,17,21 153:17 154:4,5,7,8,10 156:6, 12,22 157:14 158:24 161:9

**questioning** 4:15 157:10,13,21

**questions** 5:21 6:4 10:17 85:25 94:2 107:19 118:7 126:12 127:3 153:25 158:11, 14 162:7,14

**queston** 41:12

**quibble** 74:24

**quick** 95:11

**quickly** 8:5 85:15 132:1

**quote** 39:24 57:10 79:16 84:21 90:20

**quoting** 54:24

---

**R**

**raise** 63:3 103:21 110:11

**raised** 19:12 20:14 27:9

**raising** 77:17 83:18, 19

**ran** 139:18

**range** 72:9,19,24 73:1,4 131:2

**rate** 156:19

**ratings** 77:13

**ratios** 96:16

**re-familiarize** 80:14

**re-titled** 33:12

**read** 8:6 9:8,25 10:1, 3 35:4,21 41:10,12 44:6 53:13 59:6,9,11 66:16 71:22 72:1,2,3 74:7,8 75:15,17 80:13 81:3 85:12 94:8,10 95:19 98:8,9 102:1,8,15 105:7,8, 19 108:25 113:8 120:23 127:9 134:3 141:15 145:8 147:3 148:12,15 152:21 155:23 156:1,2 162:16

**reading** 43:14 91:11 105:9 111:1 129:2 132:22 147:3 160:14

**reads** 98:12 104:6 111:8 127:10

**ready** 78:3 80:8 108:11

**reaffirmed** 37:25

**reaffirming** 70:3

**real** 26:12,15 56:9 62:3,5 63:19 94:15 95:4 114:20 129:21 131:7,13,15,21 133:5 138:22 160:20

**realtor's** 87:3

**reason** 25:22 29:2 50:15 117:11 132:1 146:7

**reasons** 25:10,11 132:3 139:20

**recall** 25:23 29:13 35:16 42:20 43:23 50:15 54:5 61:8 69:11,14 70:16 72:14 77:5,22 79:11,19

83:25 84:16 85:19 86:18,23 87:4,8,11, 16,18,25 88:9 98:6 99:11 103:4 110:1 113:1,5,13,16 114:12,17,22,24 115:11 119:23,24 127:16 133:25 144:8 147:3 148:1,7,9,13

**recalling** 87:3

**recapping** 83:24

**receivable** 36:15 37:11 69:20 76:17 79:23 80:18 81:6 89:16 93:8 99:19,20

**receive** 13:6 88:18

**received** 42:22,25 43:1 47:19 83:3

**recent** 15:13 64:1

**recently** 15:11 52:12,14

**recess** 68:4 138:4

**recessed** 100:18

**recognize** 98:4,5

**recollect** 42:25

**recollection** 10:3 12:14 24:23 25:6,14 29:21 32:8 36:6,21 37:1 43:16 50:1,14 51:9 52:4 54:16 55:2 70:1 75:18 76:2,12 85:22 87:2 104:17 114:18 115:19 134:7

**recollections** 88:4

**recommendations** 99:16

**recommending** 129:22

**recommends** 147:22

**reconvene** 100:13

**reconvened** 100:19

**record** 4:22 5:2 49:1 74:14 81:25 147:9

**redistrict** 128:16

---

*Vincent T. Keller - 08/06/2021*

*AB Litigation Services*

reduce 93:10

refer 104:13 121:4

reference 19:13 34:3

referenced 103:7 149:13,14

references 132:19 159:23

referred 38:19 89:7, 9 103:10

referring 30:13 49:17,19 103:18 113:14 119:16 144:20 152:20

refers 63:7

reflect 24:21 81:25 83:23 90:11 104:10, 25 121:1

reflected 66:9,24

reflecting 51:15

reflective 138:25

reflects 143:14

regard 10:22,24 21:19 39:3 40:13 56:17 78:17 92:1 98:16 122:21 139:24 147:5 152:10

register 97:21

regular 11:19 17:18

regularly 59:14

relate 94:2

related 43:25 49:4 60:12 146:7

relates 104:4

relating 48:3 78:4 102:22

relations 13:20

relationship 13:24 14:19 59:16 62:11 69:6 78:10 84:17 90:14 91:18 92:9,18

relative 102:23

relatives 146:3

relevance 19:9 20:12 27:5,23

relevant 19:14,20 28:6 43:22

relied 53:16 62:10

relies 53:9

rely 39:3 121:9 131:20

relying 110:9 145:17

remainder 104:24

remained 135:5

remaining 12:10 142:15 146:6 154:19

remedies 152:11

remember 50:7 54:17,23 61:7 83:15, 21 107:10 109:7

removed 98:20

rental 109:2,6

repeat 9:22 154:9

report 13:17 69:6

reported 68:23 69:3

reporter 4:21 5:8,16 33:10 46:8,10 67:20 74:14 90:2 97:13 162:18

reporting 69:5

represent 89:14 131:10

representation 148:24

representations 23:4 28:3 116:22 148:16

representative 130:24

representatives 43:7

represented 103:24,25 116:23 120:2,14 124:8

representing 20:21

request 5:4 8:10,14 9:4 38:6,8 51:10,15 135:10

requested 48:11 51:6 60:1 79:5 129:13

requests 7:21,23 8:2,16 9:8

require 37:15

required 30:22,23 32:11 44:10 59:14

requires 108:23

requiring 19:24 38:10

residence 19:25 38:17 39:18,19 62:6 127:11,14 140:13 142:17 147:5,6,22 153:5

residential 133:4

respect 158:10 162:6

respond 45:7 146:9

response 8:2 21:14 76:7 97:18 106:9 113:3 156:17

responses 5:20

responsibilities 13:13

Responsibility 13:14

responsible 13:18, 19

responsive 8:16 19:11 48:12

rest 96:18 103:20

restate 160:2

Restore 105:20,23 106:16 111:10

restroom 135:21 137:22 141:9

result 73:4

resulting 124:8

results 31:22

retailers 75:12 77:14 106:12

retains 91:18

retire 93:7

retrospect 46:1 56:9 121:17

return 76:16 79:15 80:20

returns 66:20

reveal 9:15 58:21

revealed 54:1

Revenue 66:19

review 7:19,24 8:16 52:14 54:2 84:9

reviewed 9:4 52:16 53:1 91:14 144:20

reviewing 144:7

rezoned 77:24 128:16

rights 91:19,20 92:11,13

ring 69:24

risk 104:7,18

road 11:2 18:25 109:5

Robert 44:23

role 91:25 98:15,19

rolling 105:21

rollout 96:10

room 6:14

Ross 4:25 5:2 8:22 20:14 22:19 39:13 40:24 46:5 53:10 57:22 58:13 67:25 92:4 112:11 118:11 123:11 137:11 158:18

Ross' 142:6

rounded 102:25

rounding 129:11

*Vincent T. Keller  - 08/06/2021*

*AB Litigation Services*

row 106:7

royalty 92:24

rule 147:10 157:25

ruling 66:4 111:25

run 13:17 15:17,21

running 36:14 158:3

Russell 35:12

**S**

S-I-M-S 17:9

safe 54:22

sale 92:1 94:19
103:8 111:13 136:21,
24 138:14 139:25
142:23 145:19
146:25

sales 96:7 129:15,18
131:2,16,22 136:18
145:12

salesperson 18:4,7

salient 126:8,22
156:3

Sam's 84:12,15 96:4
106:13

sanitary 15:5

satisfied 78:11
79:12

satisfy 69:20 128:3

saved 111:22

scheme 114:1

Schenk 10:6 29:14
30:2 36:9,21 49:9,12,
14 50:6 53:9,11 59:3
60:19,23 61:12,14,20
62:2,10 69:7 74:2
75:9 91:7,14 94:6
95:17 99:4 113:15,17
115:12 141:24

School 11:7

scope 28:7

scratches 8:5

screen 33:17 49:18
51:12 68:10 71:13,19

74:16 93:23 94:4,5
119:23

scroll 35:8 75:14,20

scrolled 75:17 76:6

section 35:10 55:11,
17

sector 18:17

secured 95:25
136:23

securing 148:21

security 36:23 37:4,
5,11 41:14,18 121:23

seeking 76:10

sell 85:15,17,25 87:5
88:6 91:20 92:11
103:5 108:1 122:8
128:7 130:14 132:1
140:18 145:23 146:2,
9 151:20

sellers 131:20

selling 88:2 131:13
147:22

semantics 65:15

send 49:3 79:5 87:10

sense 84:1

sentence 71:22 72:1
98:7

sentences 72:3 98:8

separate 15:22 16:3
23:13 24:4 37:21
38:2 43:23

separately 16:6

September 34:5
89:11 91:8

serve 16:24

served 41:14

service 55:15 66:19

services 14:2,9,10,
20 17:25

SESSION 101:1

sets 159:6

setting 11:16 13:19

131:21

settle 39:22 140:21

settlement 135:10
145:8 157:8,11,20

shaken 154:22

share 51:5

shared 44:2 112:19
113:2,22

shares 12:10

sharing 105:10
107:9

sheet 53:24 65:7

shelves 107:17

shoot 106:2

short 10:12 18:15
85:12 94:7

short-term 81:6

shorter 111:1

shortly 18:15 50:3
95:2 111:25

shot 105:20

show 74:21 76:9
86:12

showed 144:15

shown 35:19 50:14
56:21 74:15

shows 74:25 76:4
105:20 124:12

Shred-it 15:20

shredding 15:18

shut 157:10

sic 111:1

side 107:2,5 108:7
109:8

sidelines 115:2

sign 99:17 111:12,18
117:15 162:16

signature 35:10
119:19,21,25

signed 29:17 35:11
37:24 39:21 44:23

86:19 125:23 151:14

significant 36:14

signing 121:21

similar 21:18 54:25

similarly 156:20

Simplicity 29:10
54:10 62:13 107:11,
12 108:5

simply 62:25 90:21
114:5 156:16

Sims 17:9,13

single 60:1,7

sir 5:15 13:5 59:7

sit 63:15 64:10 77:9
130:22

sitting 56:13 57:2
63:4

situated 156:20

situation 8:1 29:16
36:23 37:4,5 53:24
114:3,4,6 131:25
141:22 157:4

situations 122:13
131:24 136:14 157:3

size 105:6

slightly 160:15

small 113:25

smaller 84:25

smart 151:3

snapshot 65:7
66:10

sold 29:10 121:24
130:14,24 132:2,7
136:15 137:6 138:10
140:8,17 142:9
145:10 147:6 151:17
154:18

sole 12:1,4,6,9
149:17

solely 145:17

solicited 47:21

someone's 35:22

*Vincent T. Keller  - 08/06/2021*                    20

*AB Litigation Services*

**son** 18:1 26:6

**sophisticated** 126:20

**sound** 109:14 149:15

**sounds** 130:25

**source** 30:3

**sources** 76:11 77:18 103:21

**speak** 60:19 97:4 127:18 140:24 146:12

**speaking** 29:24 35:17 80:16 97:5 103:20 113:16 130:20

**specialty** 11:10,11

**specific** 8:9,16 9:4,8 18:4,6 127:16 140:9 142:20 144:23,24 160:12,25

**specifically** 21:2 77:4 87:25 90:12 99:11 113:5 114:24

**specificity** 86:15

**speech** 126:25 156:7

**speeches** 158:13, 15,21

**spend** 108:8

**Speth** 68:8,15,23 69:11 71:7 72:18 79:6 80:10 91:8

**spoke** 38:18 60:11

**Spoken** 106:13

**spousal** 14:16

**spouse** 39:20,21

**spring** 76:1 77:3,6,7 78:7 86:11 132:24 138:17

**stables** 62:7

**Stainless** 106:20

**stalled** 154:25

**stand** 66:3 96:8 109:19

**standard** 20:20 21:5

**standards** 19:16 20:17

**standing** 50:8 54:17

**standpoint** 125:9,10

**Star** 108:18

**start** 83:5 90:4 102:12,13,17 116:17 122:10

**started** 29:1,18,24 31:11

**starting** 76:1 77:3 102:2 111:5 129:19

**state** 19:25 20:10 40:9 138:22 147:9 151:12

**stated** 22:3

**statement** 38:15,20, 25 43:21 44:1,12,16 46:17 47:2,8 49:6,21 50:10 52:19,23 53:12 55:3 60:2,7 61:16,23 62:18 64:17,20,24,25 65:2,6,12 72:15 87:7 117:20 119:16,20 120:4,12 121:2,3,7, 18 124:11 131:11 133:22 134:10 137:9 148:18 149:16,24 153:19 154:6

**statements** 99:17 154:1

**states** 40:10,11 44:11 116:4

**static** 65:7

**status** 50:9 83:11

**statutorily** 16:19

**steel** 106:20

**stemming** 66:20

**step** 71:7 108:11 145:2,3

**Steve** 4:9 30:17 36:23 39:17 48:6 49:8,11,13 50:13

60:17,21 68:8 69:3,8 79:6 80:10 91:6,12 95:17 98:10 125:14 162:8

**Steven** 68:22,23

**stock** 14:6,11,14,23 15:7

**store** 85:1 107:17

**stores** 96:8 105:13

**straight** 53:11

**strategic** 13:19,22

**strategically** 96:18

**strategy** 13:20

**strength** 38:22

**strengths** 63:2

**strike** 111:23

**structure** 25:24

**structured** 25:4

**struggling** 111:16 112:20

**studying** 54:1

**stuff** 79:20 115:8

**subject** 74:2 77:10 83:9 85:11 94:7 98:11 135:23

**submitted** 31:23 32:20 33:1 62:18

**subsequent** 37:22

**subsequently** 55:10

**subsidiaries** 16:6

**subsidiary** 136:2

**substantial** 38:15 44:4 54:4 121:19

**substantially** 44:9

**substantive** 61:17

**success** 96:16 110:23

**successful** 90:18 108:12 110:17

**sufficient** 128:2

138:1 140:14 144:21

**suggest** 100:12 155:4

**suggested** 25:9 36:20 130:23

**suggesting** 58:12 80:23 82:2

**suicide** 151:21

**suit** 152:6

**summary** 91:16 95:21

**summer** 31:11 77:7 86:11 87:19 132:6,23 135:12 138:17

**summer-** 18:16

**summertime** 18:16

**sun** 108:3

**supervising** 53:5,8

**supervision** 31:13

**supplies** 16:2

**supply** 6:21 15:5 29:17 30:11 32:19 33:1,24 37:22 70:2 72:7 88:24,25 89:2,4, 5,8,10 105:14,16

**support** 90:20

**supporting** 43:22 121:10

**suppose** 19:23

**surprise** 51:16 60:5 120:13 127:1,2

**surprised** 49:25 51:21 52:3 60:9 120:17,19 126:21

**surprising** 133:10

**suspect** 49:7,9 109:21

**swing** 133:1

**sworn** 4:4

---
**T**
---

**tag** 85:16

*AB Litigation Services*

takes  85:17

taking  30:21 92:10 113:17 158:4

talk  30:7 76:25 153:8 158:21

talked  30:5,6,7 54:7 83:24 86:9 87:14 88:2

talker  78:24

talking  5:19,22 23:22 54:5 55:8 82:17,18 83:19 96:2, 7,9 97:20 105:17 110:13 113:18,19 115:12 136:13

talks  84:20 96:4

taught  103:13

tax  25:10 65:16 66:3, 20

taxes  25:12 55:16 66:6

team  13:18 31:23,24 32:5,6,17,24

tech  82:22

technical  41:22 80:16

technically  59:4 70:6 104:5

TECHNICIAN  33:12,18 67:3,7,14, 19 73:10,16 81:15,20 82:4,8,11,20,22 83:2 101:4

technology  108:5

telephone  113:11

telling  87:18 91:13 108:9 143:15

tend  101:19

Tennessee  6:9 11:3 15:6 116:7

term  64:22 84:24 90:13

terminated  136:6 139:3

terms  26:21 45:10 62:20 79:14 89:24

terribly  10:9 64:11

testified  4:5 30:21 31:10,22 32:4,10,23 59:13 60:10,23 69:10,17

testify  158:25

testifying  56:14

testimony  61:6 153:24

testing  84:23

theories  153:23

theorizing  81:4

theory  40:20 99:6

thing  55:12,22 72:3 87:12 107:23 137:14

thing's  109:18

things  9:7 23:25 44:25 45:3 55:21 62:15,16,21 70:25 75:10 77:11,12,14, 16,24 79:17 97:9 107:10 108:9,12 109:19 113:20 114:1 115:1,3,6 122:14 128:17 132:2 139:9, 11,16 140:8 141:21

thinking  36:22 52:2

thinks  40:24 138:20

thought  4:16 36:17 65:24 114:16 149:3

thoughts  51:23

tied  104:21

tile  106:23

Till  12:16,20,21,24

Tillman  12:18,19 18:2

Tim  12:19 17:7 26:25

time  10:12,15 15:7 18:16 29:5,15 31:5 42:19,20 49:14 52:15,18 56:2,9 59:10,12 60:1 65:4,8

68:12 69:3 71:14 83:14 85:17 86:8 95:20 99:23 100:1,2, 16 103:3 109:24 114:21 115:15 121:12 125:5,7 127:20 129:5 130:22 137:17,24 141:16 144:17 148:12 156:14 162:3,13

timely  79:13

times  7:2,5 38:18 54:8 72:8 127:15 151:15 153:6

timing  56:4 152:1

tiresome  162:9

title  18:4,6 34:4 68:17,19 121:11 122:2,16

titled  19:1 33:16 68:8 122:11

today  6:4 35:19 56:14 57:3 63:15 119:23 129:8 143:10, 15 144:13 147:3 149:11 162:3

told  76:9 81:22 87:23 104:15 128:12,13,21 129:7 132:6,8

tone  143:20

top  35:4 73:23 74:7, 20 105:12 107:2,3 143:23 150:9

top's  95:13

topic  156:8

topics  153:22

topsy-turvy  113:25

touched  111:10

tough  127:24

Tracy  5:6 9:24 97:10

trade  71:14 76:9

trademarks  92:14

transfer  25:13 121:1

transferred  140:8

transpired  55:22

treat  143:18

Tri-  108:18

trial  153:14

Tristar  91:15,20,23, 25 92:10,19 105:23 106:18 108:10 109:19 110:5,10,14, 20 111:18

Tristar's  112:21,22

trucking  111:23

true  15:25 41:25 73:6 112:3 153:15 161:1

Trump  94:13,25 95:1

trust  14:16 141:17

trusts  24:24 25:16 116:9

Tuesday's  82:23

turn  127:6

turns  123:19 134:20

TV  77:12 96:15

two-page  74:25

type  72:6 79:20 110:19

types  99:20 150:21

U

ultimate  25:18

ultimately  45:10,13 65:16

unaware  88:7,21

unbeknownst  160:19

uncertain  117:11

undergraduate  11:16

undermarket  131:25

understand  19:16 26:8 37:17 52:7 65:2 103:24 126:8 128:4 130:11 133:12 138:6

*AB Litigation Services*

144:4 145:3,8 152:23
153:14 157:1 159:3

**understanding**
14:8 23:15,24 25:14
31:1,3,7,15,20 32:2
33:4 38:16,24 40:1,
10 43:6 47:4 48:6,8
49:1 50:4 51:1,7
54:15 55:7,8 59:21
60:15,18 62:2 63:9
65:23 66:17 81:2
92:9,17 95:21 112:8
114:8 117:12,16
119:2,4,6 123:14
125:5 132:12,17
140:8,16 149:10
151:22 152:3 160:14
161:1,10,17

**understood** 75:5
103:25

**unethical** 58:16

**unhosted** 105:20
106:5

**unit** 105:15

**United** 44:11 116:4

**University** 11:6

**unpaid** 66:6

**unpleasant** 162:12

**unrelated** 7:9

**unsuccessful** 94:20

**update** 59:14 60:2
83:9,11,12 94:7 97:8

**updated** 96:21

**updates** 95:24
104:25

**updating** 97:2,3

**upper** 108:7 131:1

**upset** 130:12

**upside-down** 80:22

**upwards** 85:17

**user's** 44:14

**usual** 5:11

**utilize** 20:21

**utilized** 73:15

---

**V**

**valid** 21:18 22:4

**validate** 38:21

**validity** 118:22
119:3

**valuable** 128:14
133:11

**valuation** 20:3,15
64:5,8 68:9 69:11
71:11,15 72:5,8 73:2,
4 149:5 157:20
158:17

**valuations** 136:13

**valued** 19:13 70:17

**values** 63:19 65:9
104:13 133:7 154:21

**Vance** 98:10

**variety** 29:11 75:11
96:18 116:9 136:14

**venture** 37:8 90:18

**verbal** 5:21 78:22

**verbally** 79:19

**verbatim** 105:19

**verification** 62:19

**verify** 62:9,20

**viable** 111:15

**vice** 30:18 68:16,17,
24

**video** 5:17 82:22

**video-recording**
143:21

**view** 36:5 52:21
162:9

**viewpoints** 99:15,
18

**Vince** 19:10 54:19
84:7 85:11,13 91:7,
13 95:14,17 100:15
104:20 127:11

**VINCENT** 4:3

**visited** 62:3

**VP** 32:15

---

**W**

**wait** 5:21 80:4

**waiting** 8:23 34:22

**walk** 146:16

**Walmart** 29:11
80:20 81:1,10 106:12

**wanted** 5:12 70:7,15
76:15 106:20,21
113:21 114:7

**warrant** 44:4

**water** 94:17 133:14
135:6

**water's** 133:14

**ways** 24:3 64:10
122:4

**wealth** 25:13

**week** 30:18 49:15
53:13 63:10,11
107:3,6

**weeks** 105:18,19
109:10

**well-educated**
151:4

**wholesale** 84:25

**widely** 50:21

**wife** 19:2 22:9,12,17,
23 23:2,5,8,11 25:25
39:6 40:6 125:6

**witnessed** 35:12

**word** 37:24 45:22
55:15 66:18,19 70:5
152:12,19

**words** 104:19 106:5
153:1 154:11

**work** 17:23 23:25
40:18 45:3 68:25
69:8 78:3 89:15
100:15 108:9 109:18
111:19 115:14

**worked** 13:9 18:13

107:22

**working** 63:2 138:21
140:4

**works** 18:2 25:24
78:2

**world** 106:10

**worldwide** 91:21

**worse** 101:15

**worth** 27:20,25 28:5,
19 54:20 56:17 72:25
77:19 85:16 102:24
107:1 125:11 127:12
131:3 134:21

**worthiness** 38:21

**wrapped** 160:22

**write** 67:15 80:24
98:24 106:1 114:15
150:6,8

**write-off** 99:10

**writing** 8:5 79:17
90:12 98:16 108:6
150:6

**written** 78:21 91:23
98:12 105:20 113:19

**wrong** 55:25 117:18
118:21 137:5 160:15

**wrote** 75:9 103:15
114:24

**Wycoff** 10:20 21:20
27:18 28:23 29:6
30:10 32:11 33:2
34:14 35:12 36:3
37:24 38:6,8,15
41:19,24 42:1,8 43:7,
21 44:8,15 51:2 54:7
56:10,15 59:18 60:3,
11,24 61:12,13,14,18
66:23 69:18 72:14
74:1 75:8 76:1 78:12
83:8 84:7 85:10 93:9
94:6,18 95:16 104:7
113:12 115:20 116:8,
24 117:8 118:19,22
120:2,3,10,14,25
121:1,4,6,8,9 122:7,
22 123:19 124:22
125:4,6,7 127:10,13
137:6 138:8 139:24

*AB Litigation Services*

144:14 146:23 148:17 151:5 158:20 159:6,24 160:3,5

**Wycoff's** 38:11 50:9 51:2 59:18 60:24 117:3 119:18,21 120:15 121:20 136:4 148:20 150:12,13,14 159:12

**Wycoffs** 19:13 20:4, 15 27:21 40:14 53:6 65:17 66:22 86:19 88:17 128:7 130:12, 13,14 145:22

**Wycoffs'** 60:12 72:25 103:18 104:4 160:6

---

**Y**

**y'all** 76:25

**year** 63:11 65:5 85:3 88:15 96:18 109:3 127:17

**years** 11:25 12:7 15:13 29:3,4,6,8 62:13 64:1,12 132:9, 20 140:12

**yesterday** 35:17 42:18 52:17,18 53:2, 4,14,23 59:12 137:17 156:15

**you-all** 100:8

---

**Z**

**Zap** 6:22 28:21,23 29:2,17,19 30:2 32:6, 12,24 33:25 34:11,14 36:12 37:14 38:12 59:14 60:12 61:18 64:3,5 68:9 69:12,19, 20 71:8 72:9,15,24 75:11 77:12 78:18 79:4 91:15,18 92:1, 21,24 93:10 98:11, 12,16,25 104:15 105:23 115:21 117:4 120:11 148:19,21 149:5,7 151:19 155:8,14 156:19

157:7 158:20

**ZAP!'s** 31:12 59:18 89:15,17 105:1 110:4

**zoned** 106:25 107:3

**Zoom** 74:15 97:20