*Midlab Inc*

*VS.*

*Wycoff*

---

COLMAN BRODKSY HOFFMAN

August 09, 2021

---



**AB Litigation**
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

EXHIBIT R

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:20-cv-03142-KLM

_____

REMOTE DEPOSITION OF COLMAN BRODSKY HOFFMAN
August 9, 2021
_____

PLAINTIFF:
MIDLAB, INC., a Tennessee Corporation
vs.
DEFENDANTS:
MERRIE PISANO WYCOFF individually and as trustee of
The Wycoff Family Trust; WYCOFF FINANCIAL, LLC, a
Colorado limited liability company; MAGNUS VERITAS
LLC, a Colorado limited liability company; and
GCS452, LLC, a Colorado limited liability company
_____

APPEARANCES:
     KEATING WAGNER POLIDORI & FREE, PC
          By Aaron D. Goldhamer, Esq.
             Rachael Levine, Esq.
             Ross W. Pulkrabek, Esq.
             1290 Broadway, Suite 600
             Denver, Colorado 80203
                    Appearing on behalf of Plaintiff.
                    (Via Zoom videoconference.)
     BROWNSTEIN HYATT FARBER SCHRECK, LLP
          By Steven E. Abelman, Esq.
             410 Seventeenth Street, Suite 2200
             Denver, Colorado 80202
                    Appearing on behalf of Defendants.
                    (Via Zoom videoconference.)
     Also present:  Carly Daehnick, Rachael Levine,
                    Roger Stuart, document technician

**Page 2**

1          Pursuant to Notice and the Federal
2     Rules of Civil Procedure, the remote deposition
3     of COLMAN BRODSKY HOFFMAN, called by Defendants,
4     was taken on Monday, August 9, 2021, commencing
5     at 9:05 a.m., via Zoom videoconference, before
6     Sharon R. Dobson, Registered Professional Reporter
7     and Notary Public within and for the State of
8     Colorado.
9
10
11               I N D E X
12     DEPOSITION OF COLMAN BRODSKY HOFFMAN
13     EXAMINATION BY:                      PAGE
14       Mr. Goldhamer                      4, 85
15       Mr. Abelman                        62
16
17
18
19
20
21
22
23
24
25

**Page 3**

1   EXHIBITS                INITIAL REFERENCE
2   Exhibit 70  Email chain, including email      62
                  to Keller, et. al., from
3                 Hoffman, 3/11/16
4   Exhibit 71  Email chain, including email      69
                  to Pulkrabek from Schenk,
5                 8/21/20
6   Exhibit 72  Email to M. Wycoff, et. al.       81
                  from Hoffman, 8/1/18, with
7                 attachments, 8:48:50 AM
8   Exhibit 73  Email chain, including email      82
                  to M. Wycoff, et. al., from
9                 Hoffman, 8/1/18, 1:51:53 PM
10  Exhibit 74  Letter to M. Wycoff from          82
                  Hoffman, 8/3/18, with
11                attachment
12  Exhibit 75  Email chain, including email      83
                  to Keller, et. al., from
13                Hoffman, 10/15/18
14  EXHIBITS PREVIOUSLY MARKED    INITIAL REFERENCE
15  Exhibit 31  Manufacturing and Supply          32
                  Agreement
16
    Exhibit 49  Email to Lowe and Miller          53
17                from Housley, 3/16/20
18  Exhibit 51  Limited Continuing Guaranty       33
                  (Guaranty limited to $1 million)
19
    Exhibit 68  Amended Complaint                 61
20
21
22
23
24
25

**Page 4**

1               P R O C E E D I N G S
2          THE COURT REPORTER:  The oath for this
3     deposition is being given remotely, and the parties
4     have agreed not to challenge the oath based on the
5     deponent and the court reporter being in different
6     locations.
7          Is that correct, Mr. Goldhamer?
8          MR. GOLDHAMER:  That's correct.
9          THE COURT REPORTER:  And, Mr. Abelman, is
10    that correct?
11         MR. ABELMAN:  It is.
12         THE COURT REPORTER:  Thank you.
13         COLMAN BRODSKY HOFFMAN,
14    being first duly sworn in the above cause, was
15    examined and testified as follows:
16
17         THE COURT REPORTER:  Thank you.  Please
18    begin.
19               EXAMINATION
20    BY MR. ABELMAN:
21    Q    Morning, Mr. Hoffman.  This is Steve
22    Abelman, and I represent the defendants in this
23    lawsuit.  Have you already spelled your -- your name
24    for the court reporter?
25    A    I have.

*AB Litigation Services*

Page 5

1    Q   Mr. Hoffman, have you ever been deposed
2 before?
3        MR. GOLDHAMER:  And -- and very briefly,
4 Mr. Abelman, just for -- for my record, I may make
5 objections to the form of the question, and I may
6 simply say form to speed it along.  I may make
7 objections to the foundation for a question.  I may
8 simply say foundation.  And I'm intending to assert
9 those objections if I say those words.
10       MR. ABELMAN:  Understood.  And then
11 Mr. Hoffman can proceed to -- to provide us with his
12 answer
13   Q   (By Mr. Abelman) Mr. Hoffman, have you
14 ever been deposed before?
15   A   I can't recall.  Maybe years ago, but I --
16 I -- I can't recall that I have.
17   Q   Okay.  Mr. Hoffman, where are you
18 presently?
19   A   I am in -- at my home office in Nashville,
20 Tennessee.
21   Q   And what is the address where you're
22 presently located?
23   A    114 Dunham, D-u-n-h-a-m, Springs,
24 S-p-r-i-n-g-s, Lane, Nashville, Tennessee 37205.
25   Q   And is there anybody in the room with you?

Page 6

1    A   No.
2    Q   Do you have any notes or documents with
3 you?
4    A   I have some notes, but they're not from --
5 I have my -- yeah, I do have some notes.
6    Q   Please describe what you have.
7    A   I have some notes that I took in my
8 pre-deposition interview with Mr. Goldhamer.
9    Q   Okay.  And when was that?
10   A   Thursday and Friday of last week.
11   Q   So in a deposition, as you -- as you have
12 noticed, we have a court reporter who is recording
13 the questions and the answers, so it's important
14 that both of us try and avoid speaking over one
15 another so that the court reporter can accurately
16 account for and produce a transcript that reflects
17 the questions and answers.  And so all your answers
18 need to be verbal.  And you need to wait until I
19 finish my question.  Is -- is that okay with you?
20   A   That's fine.
21   Q   Is there any reason why you would be
22 unable today to provide accurate responses to my
23 questions?
24   A   No reason that I can think of.
25   Q   Now, you mentioned you had spoke to

Page 7

1 Mr. Goldhamer on Thursday and Friday of this past
2 week about your deposition.  Did you speak to
3 Mr. Keller about his deposition?
4    A   I did.
5    Q   When?
6    A   This morning.
7    Q   How long did you speak?
8    A   15 or 20 minutes.
9    Q   And what did you discuss?
10       MR. GOLDHAMER:  I'd object, Steve.  I
11 mean, this is, you know, potentially getting into
12 the attorney-client privilege.
13       So, you know, Mr. Hoffman, I -- I think
14 that to the extent the answer implicates any
15 attorney-client privilege issues, you should not
16 answer.
17   Q   (By Mr. Abelman) Mr. Hoffman, are you able
18 to answer without implicating attorney-client
19 privilege?
20   A   Yes.
21   Q   Please proceed, then.
22   A   Vince told me that he was deposed last
23 week.  And not specifically the questions asked, but
24 the types of questions.  And he said it was a long
25 deposition.

Page 8

1    Q   Did you speak to Matt Schenk about his
2 deposition?
3    A   No.
4    Q   Did you speak to Steven Miller about his
5 deposition?
6    A   No.
7    Q   Okay.  Mr. Hoffman, what is your
8 post-secondary education?  Describe it, please.
9    A   I attended the University of Tennessee
10 between the years 1971 and 1975.  I received a
11 Bachelor of Arts degree majoring in psychology.  I
12 then attended the University of Tennessee College of
13 Law from 1975 to 1977.  I received a JD degree.  And
14 I sat for the Bar and passed the Tennessee Bar in
15 1978.  I sat for and passed the Texas Bar in 1979.
16   Q   And -- I'm sorry.
17   A   And I also took classes after I graduated
18 from law school while employed at the Tennessee
19 Department of Banking, now named the Tennessee
20 Department of Financial Institutions.
21   Q   And how long did you work there?
22   A   I worked there from 1981 to 1986.
23   Q   And from there -- from -- from Tennessee
24 Department of Banking Institutions, where did you
25 go?

*AB Litigation Services*

1    A    To the law firm then named Morton Lewis
2  King & Waldrop.  Now the name is Lewis King
3  something.  I don't know.  It was renamed after I
4  left.  And I -- I worked there from 1986 to 1991 or
5  '92.
6    Q    And what was -- what was your area of
7  practice while you were working for the law firm?
8    A    I did a lot of bank regulatory work,
9  general corporate work, mergers and acquisitions,
10  primarily corporate law.
11    Q    And after 1992, where did you go?
12    A    I went to work for the law firm Heiskell
13  Donelson & Bearman, now named Baker Donelson.  And I
14  worked there probably, oh, gosh, '92 to '98, maybe.
15  I can't remember.  I could go back and give you
16  specifics.
17    Q    No.  That's -- that's close enough.  And
18  then in '98 or '99 where did you go?
19    A    I went to work for a company called --
20  what was the name of it -- SR2.  It was a recycling
21  company.
22         We also had a sister company called M&M
23  Holdings.  That was a real estate development
24  company.  And I worked there for a couple years.
25         Then I worked for a company called Accent

1  Mortgage.  Worked there for a couple of years.
2         Then I started at Keller Group around 2004
3  and worked there until 2020.  And then I worked --
4  went to work for Merrill Lynch where I'm currently
5  employed.
6    Q    And what do you do at Merrill Lynch?
7    A    I'm a financial adviser.
8    Q    So you graduated the law, the practice of
9  law?
10    A    Yeah.  I retired, and they hired me out of
11  retirement to primarily do business development.
12    Q    So you worked for the Keller Group for
13  about 15, 16 years?
14    A    I did.
15    Q    And tell me what -- what you did at the
16  Keller Group.  Did you come in -- what position you
17  came in at and whether that evolved into other
18  positions.
19    A    I came in as vice president and general
20  counsel of Keller Group, which is a family-owned
21  management company.  And Keller Group managed
22  several family-owned businesses, including Midlab,
23  Inc.  And I served as vice president and general
24  counsel for Midlab, Inc., which is a wholly owned
25  subsidiary of Kelsan, Inc., of which I was also vice

1  president and general counsel.
2         We also had another company called Theodor
3  Wille Intertrade, which was a military vendor
4  located in Switzerland.  And I was comanaging
5  director of, using the acronym, TWI.
6         I was also an officer of J.D. Byrider,
7  Inc.  Well, it was -- I think it was J.D. Byrider,
8  but it's now Smart Auto.
9         And we also had a company called Fairways
10  and Greens, which is a golf learning center.  I was
11  vice president of that.  I served as an officer of
12  all of the entities which were managed by Keller
13  Group.
14    Q    What's a golf learning center?
15    A    It's a building that has a fitness center
16  and hitting areas and a driving range and golf pros.
17  And they teach golf, sell golf equipment, and have a
18  physical fitness area.
19    Q    Do they cater to people who live in the
20  area of the golf learning center or is it a -- do
21  they provide classes for people who do some sort of
22  intensive training?
23    A    They provide a facility where its members
24  can come hit golf balls and take golf lessons.
25    Q    And the Swiss company you mentioned,

1  what -- what was the product that that Swiss company
2  was selling?
3    A    Food in Europe to the military, and
4  maintenance repair operations in the Middle East,
5  primarily to support the Centcom region that had
6  troops in Afghanistan and Iraq.
7    Q    Has someone replaced you as general
8  counsel for Kelsan and Midlab?
9    A    There is an individual, I've been told,
10  that has some legal background.  I don't know to
11  what extent.  He has other roles in the company, but
12  he is providing internal legal services.  Again, I
13  don't know to what extent.
14    Q    How did you know that --
15    A    I don't know -- sorry.  I don't know if he
16  serves as an officer or -- I don't know what he
17  does.  I just know there is someone that provides
18  some type of internal legal work.  I don't know --
19    Q    Do you know that person's name?
20    A    I do not know his name.
21    Q    So you weren't -- you weren't involved in
22  recruiting a successor?
23    A    No.
24    Q    What -- when -- when was your departure
25  date from -- from Keller Group?

*AB Litigation Services*

Page 13

1    A    January of 2020.

2    Q    **Did you attend all the board meetings or**
3    **virtually all the board meetings of Kelsan?**

4    A    I did.  There were a couple of times where
5    I would be on vacation and I would attend
6    electronically.  There might have been one or two
7    that I missed, but not very many.  And I can't tell
8    you exactly -- over the 15 years, I might have
9    missed one or two.

10   Q    **What would you describe as your general**
11   **role with regard to the board meetings?  How would**
12   **you describe it?**

13   A    I took the minutes.

14   Q    **Did you help create the agenda?**

15   A    I did.

16   Q    **How was the agenda created?**

17   A    I would ask Vince Keller -- we had a
18   boilerplate agenda that would go from meeting to
19   meeting.  We'd review the past meetings' minutes,
20   approve them.  We would present an agenda and
21   approve it.  Periodically, once a year, we would
22   approve our 401(k) plan.  Once a year we would elect
23   officers.  The agenda did not change much.

24           Generally each operating company, Midlab,
25   Kelsan, Fairways and Greens, the automobile company,

Page 14

1    would make presentations of their operations, year
2    to date, quarterly, and provide prospective
3    information on the operation of the company.  They
4    would present operational information, financial
5    information to the board.  And the board would --
6    there would be a notebook with information in
7    writing that was presented to each board member.

8    Q    **And were copies of these notebooks -- was**
9    **a copy of the notebook kept as a record?**

10   A    Yes.

11   Q    **And where was that kept?**

12   A    I had a set of notebooks.  I think Vince
13   Keller kept a set of notebooks.  And Tim Keller,
14   Vince's dad, might have had a set.  I'm not sure if
15   his -- if he kept a set or not.

16   Q    **Well, Mr. Hoffman, were the notebooks --**
17   **they contained the agendas.  Did they also contain**
18   **the substance of any presentation that was made such**
19   **as a PowerPoint?**

20   A    If that was part of the material provided
21   by the presenting company, it would be in the
22   notebook.

23   Q    **So if --**

24   A    There were -- there were handouts from
25   time to time.  And they might be in the notebook or

Page 15

1    they might have been disposed of after the meeting.

2    Q    **Were -- were most of the presentations in**
3    **the form of a PowerPoint?**

4    A    No.  They were in the form of -- there was
5    some PowerPoint presentations, but some of it was
6    written documents.

7    Q    **Mechanically how did you take minutes?**
8    **Did you handwrite them?  Did you type them?**

9    A    I typed them on a laptop.

10   Q    **And then would those minutes go into the**
11   **notebooks?**

12   A    No.  Those minutes would go into the
13   corporate binder.

14   Q    **And did you keep a set of the corporate**
15   **binders as well?**

16   A    They were kept in Tim Keller's assistant's
17   office in a fireproof safe, a fireproof file
18   cabinet.

19   Q    **Let's talk about the Midlab's relationship**
20   **with -- with its prior customer ZAP!.  When did you**
21   **first become aware of ZAP!?**

22   A    Matt Schenk would have reported the
23   opportunity.  And I can't recall if it was in a
24   board meeting or in another conversation.  Matt
25   Schenk at one point moved his office from the

Page 16

1    manufacturing facility to Keller Group, and his
2    office adjoined mine, so we had ongoing
3    communications.  He was gone a lot.  His primary
4    responsibility was business development, so he
5    traveled a lot.  He was gone.  Then he'd spend a lot
6    of time at the plant.  But from time to time he'd
7    tell me about business opportunities.  I can't
8    recall if we discussed ZAP! in one of those
9    conversations or it was reported in the board
10   meeting.

11           And then obviously I became aware of ZAP!
12   when I worked with Steve Miller on the manufacturing
13   agreement.  The opportunity was presented.  We
14   worked on -- with Mr. Cudney on a -- on a
15   manufacturing agreement.  And I was involved in the
16   drafting of that agreement, as was Steve Miller.

17           MR. ABELMAN:  Can we go off the record for
18   a minute?

19           (Discussion off the record.)

20   Q    **(By Mr. Abelman)  Mr. Hoffman, I'd like to**
21   **pivot back -- forgive me for doing this, but I'd**
22   **like to pivot back to your conversation with**
23   **Mr. Keller.  Can you provide more color as to what**
24   **Mr. Keller told you?**

25           MR. GOLDHAMER:  Object to form.

EXHIBIT R

*Colman Brodksy Hoffman  - 08/09/2021*                    13–16

*AB Litigation Services*

**Page 17**

1    THE DEPONENT: Do you want me to answer?
2    Q    (By Mr. Abelman) Please.
3    MR. GOLDHAMER: Yeah.
4    A    He said he was deposed. He said a lot of
5    time was spent on background. He asked if I read
6    the complaint, and I had not. And he sent it to me,
7    and I read it. And that's what we talked about. He
8    didn't give me a lot of detail on his testimony.
9    Q    (By Mr. Abelman) Okay. Did Mr. Goldhamer
10   send you any documents?
11   A    Yes.
12   Q    And what documents did he send you?
13   A    Let me go back and refer to that email, if
14   it's okay. Give me a minute. He sent me a direct
15   exam outline. He sent me a copy of the email where
16   Jeff Wycoff transmitted the personal financial
17   statement, Merrie and Jeff's personal financial
18   statement. He sent me an email from myself to
19   Merrie, Mr. Cudney, Mr. Sabelman (sic), copied to
20   Matt Schenk, Vince Keller, Ken Bodie, Steve Miller
21   and myself.
22        And it was a communication from me to
23   Mrs. Wycoff serving as notice to her that Midlab
24   maintained an outstanding claim against the estate
25   of Jeff Wycoff, and inquiring -- let's see. No.

**Page 18**

1    This is just relating to the claim on the guaranty.
2        He sent me another attachment from -- to
3    Mrs. Wycoff from myself, same information as the
4    email that -- on the --
5    Q    I'm sorry. I didn't catch what you said.
6    A    It's the same communication, but it was on
7    letterhead rather than in an email.
8    Q    And what's -- what's the date of that
9    email?
10   A    The date of the letter was August 3rd.
11   The date of the email --
12   Q    What year, please?
13   A    2018.
14   Q    Okay.
15   A    The date of the email was August 1st.
16   Q    Okay.
17   A    He sent me another attachment where I --
18   let's see, in the email from Matt Schenk to Mr. --
19   to Ross Pulkrabek, dated August 21st, 2020, that in
20   the body of that it had where I had sent
21   Mr. Wycoff's personal financial statement to Matt in
22   August of 2020.
23        And then an email from me to Merrie,
24   Mr. Cudney, Mr. Sabelman, copying Matt Schenk, Vince
25   Keller, Ken Bodie, Steve Miller, and myself where I

**Page 19**

1    said to Mrs. Wycoff, In the previous email I sent
2    you the signature page of -- the guaranty failed to
3    scan into the attachment. Attached is a guaranty
4    included with signature page.
5        He sent me an email thread from myself to
6    Vince Keller, Matt Schenk, Ken Bodie where --
7    Q    But can you -- can you give me the date of
8    the prior one, the correspondence to Merrie Wycoff
9    on the -- did you say Merrie Wycoff asking for a
10   signature page?
11   A    No. It was an email dated August 1st,
12   2018, where I told Mrs. Wycoff that in the email
13   earlier that day where I -- I'll read it. Dear
14   Mrs. Wycoff, this communication serves as notice to
15   you as the surviving spouse of Jeffrey Wycoff that
16   Midlab, Inc. maintains an outstanding claim against
17   the estate of Jeffrey Wycoff in the amount of
18   $841,121.90 plus interest. Attached hereto is
19   Midlab, Inc.'s AR trial balance detail evidencing
20   the outstanding balance for ZAP! Products, Inc.,
21   owed to Midlab, Inc., which is plus 91 days overdue.
22   The date range of overdue invoices is May 6th, 2016,
23   to August 5th, 2016. Also attached is the Limited
24   Continuing Guaranty, guaranty limited to a million
25   dollars, of Jeffrey Wycoff wherein Mr. Wycoff

**Page 20**

1    guaranties the payment of the outstanding invoices
2    of ZAP! Products, Inc., owed to Midlab, Inc. Please
3    acknowledge receipt of this communication by
4    responding that you have received this email.
5        And then following that email I sent her
6    later that day another email where I said,
7    Mrs. Wycoff, in the previous email I sent to you,
8    the signature page of the guaranty failed to scan
9    into the attachment. Attached is a guaranty
10   including the signature page.
11   Q    Okay. Thank you for that clarification.
12   I interrupted you. You were going to the next
13   attachment.
14   A    It's an email from myself, dated
15   October 15th, 2018, to Vince Keller, Matt Schenk,
16   Ken Bodie, with a copy to me. Subject, Forward
17   letter to Colman Hoffman regarding Midlab, Inc., the
18   estate of Jeffrey Wycoff. Attachment, letter to
19   Colman Hoffman regarding Midlab, Inc., from Zoe Almy
20   to me, copy to Mr. Cudney. Subject, letter to
21   Colman Hoffman regarding Midlab, Inc. Pursuant to
22   Mr. Cudney's request, attached please find a letter
23   from Mr. Cudney regarding Midlab, Inc., estate of
24   Jeffrey Wycoff. Please contact me if you are unable
25   to open the attachment. And the attachment is on

*AB Litigation Services*

1   Brownstein Hyatt Farber and Schreck letterhead,
2   dated October 15th, 2018, via certified mail and
3   electronic mail to email Colman.Hoffman@-
4   KellerGroup.net.
5           Dear Mr. Hoffman -- it says, Mr. Hoffman,
6   at the request of our client, Merrie Pisano Wycoff,
7   I am writing in response to your letter dated
8   August 3rd, 2018.  This communication serves as
9   notice to you and your client that we have been
10  advised that no probate estate has been opened for
11  the estate of Jeffrey Wycoff, and that no personal
12  representative has been appointed.  Ms. Wycoff has
13  also advised us that the assets of the decedent
14  subject to the administration have been determined
15  to be insufficient to warrant a probate proceeding.
16  It is not anticipated by Mrs. Wycoff that a probate
17  estate will be required in the future.  Very truly
18  yours, Kevin A. Cudney, and with his signature.  A
19  copy shows to Miss -- Ms. Merrie Pisano Wycoff.
20      Q    Do you recall what Midlab's response was
21  to that letter from Mr. Cudney?
22          MR. GOLDHAMER:  Form of the question.
23      A    I don't know if there was a response or
24  what the response was.  I can't recall.
25      Q    (By Mr. Abelman) What did -- what did you

1   do once you got that letter?
2       A    I communicated that information to Vincent
3   Keller and Matt Schenk.  And I do believe after that
4   time there was some communications between Matt
5   Schenk and Merrie and Vincent Keller -- and Merrie,
6   that I wasn't party to those communications.
7       Q    What, if any, role did you have from that
8   point forward with regard to the collection of the
9   amount due to ZAP! -- I mean from ZAP!?
10      A    I communicated with a lawyer in Denver, I
11  can't remember her name, regarding collecting the
12  money.
13      Q    A lawyer -- I know you can't remember her
14  name, but what was the --
15      A    I can find it.  Give me a second.
16          MR. GOLDHAMER:  Colman, you don't have to
17  go searching through files for this exercise here.
18          THE DEPONENT:  Okay.
19      A    Anyway, Midlab wanted to get paid, and
20  asked me to take what -- other than the
21  conversations between Matthew Schenk and Vince
22  Keller and Merrie, which I wasn't privy to, I was --
23  it was requested of me to proceed with direct legal
24  action.  And I went in search of a lawyer.  And,
25  again, I'd have to find her name.

1       Q    (By Mr. Abelman) And --
2       A    And I talked to her -- I talked to her and
3   we engaged her to represent us.
4       Q    And what happened thereafter?
5       A    With her we paid her a retainer, and she
6   said that --
7           MR. GOLDHAMER:  Well, Colman, I'll just
8   caution you again, you know, if you're -- you can
9   answer the question the best you can, but, you know,
10  Midlab has an attorney-client privilege here that
11  needs to be respected as well.  So to the extent
12  that the -- the answer implicates that privilege,
13  you can't get into that.  But the -- if there are --
14  if there are other questions you can answer that
15  don't implicate that privilege, then you can answer
16  or.  If there's areas of an answer that don't
17  implicate that answer, you can answer.
18          THE DEPONENT:  Well, stop me if I'm
19  getting into the area of attorney-client privilege.
20      A    But we engaged her, paid her a retainer.
21  And the action that eventually resulted was not the
22  type of practice she engaged in, so she sent us to
23  other lawyers, and that's how we ended up with
24  Mr. Goldhamer.
25      Q    (By Mr. Abelman) And were you involved in

1   the decision to sue?
2       A    Are you asking me -- do you want me to
3   respond?
4       Q    Yes, please.
5           MR. GOLDHAMER:  I'll object to the form of
6   the question.
7       Q    (By Mr. Abelman) Midlab filed a lawsuit.
8   Were you involved in that -- the decision to file
9   that lawsuit?
10      A    When was it?
11          MR. GOLDHAMER:  Again, I'll object to the
12  form of the question.
13      A    Do you want me to answer?
14      Q    (By Mr. Abelman) Yes, please.
15      A    I don't think I was.
16      Q    Okay.  Were there other attachments?  You
17  were going through the list and describing the --
18  okay.  Let's go to the top of the list of
19  attachments.  The first thing you said was a direct
20  exam outline.
21      A    That's in the body of the email.
22      Q    I'm not sure what you mean by that.
23  That's not an attachment?
24      A    No.
25      Q    Okay.  And then the next -- the first

*Colman Brodksy Hoffman  - 08/09/2021*                    21–24

*AB Litigation Services*

**Page 25**

1  attachment, then, was an email relating to a -- you
2  said financial statement.  Would you be more
3  specific as to what that attachment consists of?
4       A   It's an email from myself on March 11th,
5  2016, to Vince Keller, Steve Miller, Kerry Speth
6  let's see.  No.  It's an email, Jeff Wycoff to me
7  and Kevin Cudney, copy Matt Schenk, attached, Kevin,
8  please scan and send me a signed copy of the
9  guaranty if you have it.  Thanks.  Oh, this was --
10  this was a personal guaranty.
11       Q   Okay.  I'm -- I'm confused.  I apologize.
12  Let's -- let's start again.
13       A   Okay.  This is an email from Colman
14  Hoffman sent on March 11th, 2016, to Vince Keller,
15  Steve Miller, Kerry Speth, attachment, personal
16  guaranty, where I had received the personal guaranty
17  from Jeff Wycoff as an attachment, and I forwarded
18  it to those individuals.
19       Q   Okay.
20       A   I had -- and in the email -- let's start
21  at the -- the bottom of the email.  It's an email
22  chain.  Kevin Cudney wrote, Colman, per our
23  conversation earlier, attached are the personal
24  financial statements for Jeff and Merrie.  If there
25  is an NDA in place that will continue to be in

**Page 26**

1  effect, please provide a copy of the NDA.  In any
2  event, the attached documents are provided to you on
3  a strictly confidential basis for your eyes only and
4  solely for the purposes of evaluating the support
5  for the Midlab's ZAP! Products contract.  These
6  documents may not be shared with any other person,
7  including any other employee of Midlab's.  Please
8  confirm with a return email that you agree to the
9  foregoing terms before opening the attachment.
10       And then I sent an email from myself to
11  Kevin Cudney.  Kevin, attached is a draft of the
12  personal guaranty of Jeff Wycoff for your review.
13       And Kevin Cudney wrote back, Colman, I
14  thought that Matt Schenk and Jeff Wycoff reached the
15  agreement that the liability under the personal
16  guaranty would be capped at $1 million.
17       And I wrote back to Kevin.  I spoke to
18  Matt.  He agrees the personal guaranty is to be
19  capped at $1 million.  I will -- I will revise the
20  document and send you the revision.
21       And then Kevin wrote back to me, Kevin
22  Cudney, on November 19th, 2015, Colman, thanks.  I
23  look forward to your revised draft.
24       And then on November 13th, 2015, I sent an
25  email to Kevin Cudney, Please scan and send me a

**Page 27**

1  signed copy of the guaranty if you have it.  Thanks.
2       And then Jeff Wycoff on November 13th,
3  2015, sent me an email -- Jeff Wycoff sent me an
4  email dated November 13th, 2015, no subject.  And it
5  says, Attached.
6       And then I forwarded that email to Vince
7  Keller, Steve Miller, and Kerry Speth -- Kerry
8  Speth.  And attached was the personal guaranty
9  signed by Jeff Wycoff.
10       Q   Okay.  We're going to get into those
11  documents in a few minutes.
12       Do you recall that -- whether there was
13  any other emails from you to Kevin Cudney mentioning
14  an NDA or responding to his inquiry about?
15       A   I'd have to search.  It was not in that
16  email chain.
17       Q   So when you say -- when you say you have
18  to search, I mean, what will you search?
19       A   My email documents.
20       Q   Do you still have access to all your
21  emails from when you were employed by the Keller
22  Group?
23       A   Yes.
24       Q   Okay.  Were you part of the management
25  team at Midlab?

**Page 28**

1       A   Well, I served as an officer of Midlab.  I
2  was not involved in the day-to-day management of
3  Midlab.  I was vice president, general counsel and
4  corporate secretary.  And I guess it would depend on
5  your interpretation.  The Midlab management team was
6  Matt Schenk, Steve Miller, Matt Johnston.  They were
7  involved day to day.  Vince Keller was involved day
8  to day.
9       Q   Okay.  Let me -- let me be more specific.
10  Mr. Miller testified that in the summer of 2015,
11  Midlab started evaluating ZAP!'s financial --
12  financials and -- and projections to determine
13  whether it would do business with ZAP!.  Were --
14  were you part of that effort?
15       A   No.
16       MR. GOLDHAMER:  Form.
17       Q   (By Mr. Abelman) But it does sound like
18  your role related to obtaining a personal --
19  obtaining a personal guaranty from Jeff Wycoff; is
20  that correct?
21       A   My role was to respond to the concern of
22  Midlab that they were not getting paid by ZAP! and
23  Merrie and -- and Jeff, that there was aged AR, and
24  how could Midlab proceed.  And I discussed it with
25  Vince Keller.  And in order for Midlab to proceed to

EXHIBIT R

*Colman Brodksy Hoffman  - 08/09/2021*                    25–28

**Page 29**

1  carry additional aged AR on the books for ZAP!, we
2  would -- Midlab would need additional security.
3        And after discussion it was determined
4  that that additional security would be the personal
5  guaranty of Jeff Wycoff supported by financial
6  information of him personally that he could pay the
7  guaranty if called upon.
8    Q    So what -- what role, in particular, did
9  you have with regard to personal guaranty?
10   A    I -- I can't recall.  I -- I think I
11 drafted the personal guaranty and sent it for review
12 by Mr. Cudney, and then negotiated the terms with
13 Mr. Cudney at the same time Matt Schenk was nego --
14 was communicating with Jeff Wycoff and Merrie
15 Wycoff.
16   Q    Do you recall whose idea it was to obtain
17 the personal guaranty?
18       MR. GOLDHAMER:  Foundation.
19   A    You mean at Midlab?
20   Q    (By Mr. Abelman) Yes.
21       MR. GOLDHAMER:  Same objection.
22   A    I can't recall exactly, but I was involved
23 in those discussions.  I can't say Matt Schenk or
24 Vince Keller or myself was the first person to say
25 let's get a guaranty, but I was involved in those

**Page 30**

1  discussions.
2    Q    Had personal guaranties been sought by
3  Midlab with regard to other -- other potential
4  customers of Midlab?
5        MR. GOLDHAMER:  Foundation.
6    A    No.  This -- the business of Midlab to
7  engage in an entrepreneurial effort such as ZAP! was
8  in -- infrequent.  Midlab's normal business was to
9  manufacture products for sale to businesses that had
10 capitalization sufficient to pay their bills on
11 time.  And working with somebody like Jeff Wycoff
12 who was trying to bring a product to the market was
13 outside of Midlab's normal business.
14   Q    (By Mr. Abelman) So ZAP! and -- and Jeff
15 Wycoff were atypical customers of Midlab?
16   A    Yes.
17   Q    And would -- would you explain -- I know
18 you -- you just touched the surface, but would you
19 explain why they were atypical?
20       MR. GOLDHAMER:  Object to form.
21 Foundation.
22   A    Midlab made products.  They made products
23 sold by janitorial dis -- distributors throughout
24 the country.  They sold Midlab brands.  They -- they
25 sold products branded for their customers.  And that

**Page 31**

1  was their normal business.
2        And the type of business that ZAP! was
3  engaged in, developing a product for sale through
4  infomercials, was -- by an entrepreneur was not
5  Midlab's normal business.  It's not something they
6  did normally.
7        On occasion they would manufacture
8  entrepreneurial products like, for instance,
9  Sharp -- Shark sold that floor cleaner.  But Shark
10 was an established company, and Midlab was making a
11 new product line, along with other manufacturers for
12 them.
13       But Shark obviously -- as you know, you
14 see it in Walmart, you see it in Bed Bath & Beyond,
15 you see it on Amazon, it's a well-established
16 company.  We were making a new product for them.
17       In ZAP!'s case it was a new company with a
18 new product, strictly entrepreneurial, not something
19 that Midlab normally did.
20   Q    (By Mr. Abelman) So as I understand it,
21 that's, in part, why the Midlab team decided that
22 they would request a guaranty to support taking on
23 ZAP! as a customer.
24   A    No, that's not correct.  Midlab took on
25 ZAP! as a customer.  They entered into a

**Page 32**

1  manufacturing agreement with ZAP!.  When ZAP! was
2  unable to pay its obligations on time, according to
3  the terms of the manufacturing agreement, Midlab
4  told ZAP! and Jeff Wycoff and Merrie Wycoff
5  additional security would be needed to support the
6  past due AR.  It was not a condition initially.
7    Q    Okay.  Let's look at some exhibits.
8        MR. ABELMAN:  Can we start with
9  Exhibit 31, please.  And I'm asking, Roger, if
10 you'll pull that up, Exhibit 31.
11   Q    (By Mr. Abelman) Mr. Hoffman, can you read
12 that exhibit?  Is that legible to you?
13   A    It is.
14   Q    I'm going to ask you to identify some
15 exhibits.  And when I do ask you to identify it,
16 what I'd like you to do is state the name and date
17 on the exhibit if -- and -- and -- and let me know
18 if you're familiar with that exhibit.
19   A    The date (sic) of the exhibit is
20 Manufacturing and Supply Agreement.  It's dated
21 September 16th, 2015.
22       THE DEPONENT:  If you would, go to the end
23 and let me see if it's executed.
24   Q    (By Mr. Abelman) And let me note it's
25 marked as Exhibit 31.  And --

AB Litigation Services

---

Page 33

1    A    I haven't seen the signature yet.
2         MR. ABELMAN:  The signature page, Roger,
3    is -- is Bates No. 000025.  There we go.
4    A    I receive Jeff's signature.  Was there a
5    counter signature page signed by Midlab?
6    Q    (By Mr. Abelman) Not on this exhibit.
7    A    Okay.
8    Q    Are you familiar with this -- with what's
9    been marked as Exhibit 31?
10   A    I am.  It was an agreement that was
11   negotiated between Steve Miller and myself on behalf
12   of Midlab, and Kevin Cudney on behalf of ZAP!
13   Products.
14        MR. ABELMAN:  Roger, would you pull up
15   Exhibit 51.
16   Q    (By Mr. Abelman) So would you mind
17   identifying what's -- Exhibit 51 has a couple
18   documents.  I'm not sure why -- I don't know why
19   they were all one exhibit.  But let's -- let's take
20   the first document, which is the first three pages
21   of Exhibit -- of Exhibit 30 -- 51.  Could you
22   identify the first three pages of Exhibit 51,
23   please.
24   A    It's a Limited Continuing Guaranty,
25   Guaranty Limited to $1,000,000 for value received to

---

Page 34

1    induce Midlab -- and its address -- to extend credit
2    or continue credit accommodations to ZAP! Products,
3    Inc.
4         MR. ABELMAN:  And, Roger, would you go to
5    Page 3 of this exhibit.
6    Q    (By Mr. Abelman) So, Mr. Hoffman, can see
7    who executed the guaranty?
8    A    Executed by Jeffrey Wycoff and witnessed
9    by Russell Leadingham.
10   Q    And it was executed on what date
11   according --
12   A    11th day of November 2015.
13   Q    So I -- I just want to make sure I
14   understand this.  It appears from these two
15   documents that -- that Midlab decided to take on
16   ZAP! as a customer, and ZAP! executed a
17   Manufacturing and Supply Agreement in September of
18   2015.  That's -- that's correct, right?
19   A    I'd have to go back and look.  I'll take
20   your word for it.
21   Q    And -- and then according to your
22   recollection, there was concern about ZAP!'s ability
23   to pay the invoices in a timely fashion, so Midlab
24   decided to obtain a Limited Continuing Guaranty
25   executed by Jeff Wycoff in November.  Is that -- is

---

Page 35

1    that accurate?
2    A    Due to ZAP!'s inability to keep their AR
3    current according to the terms of the manufacturing
4    agreement, in order for Midlab to continue to
5    manufacture, the outstanding unpaid AR was required
6    to be supported by the continuing guaranty of Jeff
7    Wycoff.
8    Q    And whose idea was it to request a
9    Statement of Financial Condition?
10        MR. GOLDHAMER:  Foundation.
11   Q    (By Mr. Abelman) Or -- or -- or how did --
12   how did the request for a statement for financial
13   condition come about?
14   A    Well, the communication between Merrie
15   Wycoff, Jeff Wycoff, and Matt Schenk was shared with
16   me that the Wycoffs had significant net worth, and
17   the continuing guaranty needed to be supported by
18   net worth.
19        So I can't -- again, I can't tell you
20   whether it was Vincent Keller or myself that first
21   raised the issue, but collectively we decided that
22   the guaranty needed to be supported by evidence of
23   Jeff Wycoff's net worth, which we were led to
24   believe was significant.
25   Q    And what, in particular, was your task

---

Page 36

1    with regard to this Statement of Financial
2    Condition?
3    A    Receive it, review it, communicate the
4    level of net worth of Merrie and Jeff Wycoff, and
5    then hold on to it.
6    Q    Do you recall with whom you spoke about
7    this statement of -- do you -- do you recall if you,
8    in particular, requested from Jeff Wycoff this
9    Statement of Financial Condition?
10   A    Matt Schenk -- I -- I -- I didn't
11   communicate that to Jeff Wycoff.  If I communicated
12   the request, it would have been to Kevin Cudney.
13   And Matt Schenk and Vince Keller were communicating
14   with the Wycoffs.  I had no communication with the
15   Wycoffs other than the communication where he sent
16   me the signed guaranty.
17   Q    Did you have any communications with
18   Robert Henke?
19   A    I can't recall that name.  Who is he?
20   Q    Okay.
21        MR. ABELMAN:  Roger, let's turn the page
22   on the limited -- on -- on what's been marked as
23   Exhibit 51, and go to Bates No. 000012.
24   Q    (By Mr. Abelman) Can you identify this --
25   this letter?

---

*AB Litigation Services*

**Page 37**

1    A    That letter accompanied the financial
2  statement of Merrie and Jeff Wycoff.
3    Q    So does this jog your memory about who
4  Robert Henke is?
5    A    Yes.  Now I recall.
6    Q    Okay.  I'm going to ask you if you
7  would -- well, and -- and -- and the letter is dated
8  November 3rd, 2015, at the bottom, isn't it?
9    A    It is.
10    MR. ABELMAN:  And, Roger, if you would
11  also turn the page.
12    Q    (By Mr. Abelman) I'm going to ask you,
13  Mr. Hoffman, if you see any signatures on this
14  document.
15    A    Other than Robert Henke?
16    Q    Correct.
17    THE DEPONENT:  Keep going.  Keep going.
18  There's another page, I believe, with signatures.
19  Isn't there?  Oh, that's the guaranty.
20    A    Okay.  The only understanding signatures I
21  see are Robert Henke.
22    Q    Okay.  So would you mind reading the first
23  paragraph aloud?
24    A    Jeffrey and Merrie Wycoff are responsible
25  for the accompanying Statement of Financial

**Page 38**

1  Condition as of -- as of October 31st, 2015, in
2  accordance with accounting principles generally
3  accepted in the United States of America.  I have
4  performed a compilation engagement in accordance
5  with Statements on Standards for Accounting and
6  Review Services promulgated by the Accounting and
7  Review -- Review Services Committee of the AICPA.  I
8  did not audit or re -- or review the financial
9  statement nor was I required to perform any
10  procedures to verify the accuracy or completeness of
11  the information provided by Jeff -- Jeffrey and
12  Merrie Wycoff.  Accordingly, I do not express an
13  opinion, a conclusion, nor provide any form of
14  assurance on this financial statement.
15    Q    And do you recall reading this at the time
16  you received it?
17    A    I don't recall reading it or not reading
18  it.  If I received it, I most likely read it.
19    Q    Now, when -- when -- when you read this,
20  is it your impression that Mr. Henke compiled this
21  Statement of Financial Condition on behalf of the
22  Wycoffs?
23    A    I really didn't rely on Mr. Henke's
24  letter.  I relied on the assets that were listed in
25  the financial statement, including the $900,000 of

**Page 39**

1  cash and the farm of several million dollars and he
2  represented net worth of 11,900,000.  And Mr. --
3  Merrie and Jeff Wycoff held themselves out to Matt
4  Schenk and Vince Keller to be individuals with
5  significant net worth, and that they had the ability
6  to pay AR -- or the guaranty if ZAP! was unwilling
7  or unable to.  And that's what we relied on.
8    Q    Okay.
9    A    I did not rely on Mr. Henke's
10  representation or his letter.
11    Q    Reading this -- reading this first
12  paragraph today, is it your impression that the
13  accompanying Statement of Financial Condition was
14  prepared by Jeff Wycoff or was based upon
15  information provided by Jeff Wycoff?
16    MR. GOLDHAMER:  Object to form.
17  Foundation.
18    A    I took that letter to mean that Jeff and
19  Merrie Wycoff gave their personal financial
20  information to Robert Henke, and he put it into a
21  financial statement format without auditing the
22  information contained in the financial statement.
23  That was the representation of Merrie and Jeff
24  Wycoff of their assets, liabilities, and net worth,
25  and Mr. Henke put it into a format -- into a

**Page 40**

1  financial statement format.
2    Q    (By Mr. Abelman) Okay.  I'm going to
3  prevail upon you to read the second paragraph of
4  this letter aloud.
5    A    Jeffrey and Merrie Wycoff have elected to
6  omit substantially all the disclosures required by
7  accounting principles generally accepted in the
8  United States of America.  If the omitted
9  disclosures were included in the Statement of
10  Financial Condition, they might influence the user's
11  conclusions about the financial condition of Jeffrey
12  and Merrie -- Merrie Wycoff.  Accordingly, the
13  financial statement is not designed for those who
14  are not informed about such matters.
15    Q    And when you read this, tell me how you
16  construed that paragraph.
17    MR. GOLDHAMER:  Object to form.
18    A    We were relying on the truthfulness and
19  veracity of Merrie and Jeff Wycoff as to their
20  assets.  We were in a commercial transaction.  The
21  AR had become past due.  In order to proceed and
22  continue to do business with ZAP!, we required a
23  personal guaranty.  And we wanted to find out if
24  Merrie and Jeff could pay the guaranty if it came to
25  it.  And we received the financial statement.  He

*AB Litigation Services*

**Page 41**

1  had communicated that he had significant assets,
2  particularly the farm, and the cash.  We relied on
3  the financial statement to support the guaranty.
4  And as far as that paragraph, it did not impact our
5  conclusion one way or the other.
6      Q   (By Mr. Abelman) Well, tell me what this
7  paragraph means to you.
8      A   Doesn't matter what it means.  It didn't
9  impact our review.
10     Q   Yeah.  I understand your point, which you
11 made articulately.  And I'm asking you what this
12 paragraph means to you.
13     A   This paragraph means that there are -- in
14 the AICPA audit principles and procedures, in order
15 to get -- for a company to obtain an audit report
16 that meets all the conditions set out in those
17 volumes of audit standards and procedures, you got
18 to make certain disclosures.
19         And the -- the financial statement was not
20 audited.  We knew it wasn't audited.  We didn't
21 require an audited financial statement.  And so I
22 took that paragraph as a disclaimer by Robert Henke
23 that was a boilerplate disclosure required under the
24 AICPA standards.  And that's what I took it to be.
25 Nothing more, nothing less.

**Page 42**

1          He just took a letter that he uses all the
2  time with his clients when he does compiled
3  financial statements, and he puts that letter on top
4  of the document.  And, again, that's what I took it
5  to mean.  We didn't rely on that representation.  We
6  relied on the information provided by Merrie and
7  Jeff.  We relied on it to be truthful.  And if it
8  wasn't, shame on them.
9      Q   And I think you said that you never had a
10 conversation with Mr. Henke with regard to this
11 letter.  Is that accurate?
12     A   I had no communication with Mr. Henke at
13 all, the Wycoffs or otherwise.  And in my files, I
14 believe that's the only document that has
15 Mr. Henke's name.
16     Q   Okay.
17     A   We relied on -- we relied on Merrie and
18 Jeff Wycoff's representation that these were their
19 assets, these were their liabilities.  They
20 indicated that they were -- they had significant net
21 worth as -- and they provided their personal
22 financial statement in support of their ability to
23 pay the guaranty, and we relied on that.
24     Q   Great.  Let's turn the page and go through
25 the Statement of Financial Condition.  So what is

**Page 43**

1  the date on this?
2      A   October 31st, 2015.
3      Q   Would you agree with me that this is
4  intended to be a snapshot as of October 31st, 2015?
5      A   Yes.
6      Q   It's not intended to be a projection for
7  three months, six months, nine months, a year or
8  multiple years thereafter?
9      MR. GOLDHAMER:  Object to form foundation.
10     A   It's their assets and liabilities on that
11 day.
12     Q   (By Mr. Abelman) Okay.  So the first line
13 item under assets is cash and cash equivalents.
14 Says $904,000.  Do you have any reason to believe
15 that that number was inaccurate?
16     A   No.
17     Q   Marketable securities, $2,000, do you have
18 any reason to believe that that number was
19 inaccurate?
20     A   No.
21     Q   Vested interest in deferred plans, do you
22 have any reason to believe that number was
23 inaccurate?
24     A   No.
25     Q   Please bear with me.  I'm going to go

**Page 44**

1  through the whole list.  Vehicles, 74,000, do you
2  have any reason to believe that that number was
3  inaccurate?
4      A   No.
5      Q   Personalty, 200,000, do you have any
6  reason to believe that number was inaccurate?
7      A   No.
8      Q   Residence, $1,900,000, do you have any
9  reason to believe that that number was inaccurate?
10     A   No.
11     Q   I'm sorry.  I didn't hear that.
12     A   No.
13     Q   Real estate, dash, farm, $4,750,000, do
14 you have any reason to believe that that number was
15 inaccurate?
16     A   No.
17     Q   Real estate, Alaska, bare land, $75,000,
18 do you have any reason to believe that number was
19 inaccurate?
20     A   No.
21     Q   Okay.  The next group of assets is
22 investments.  And it says Sirius Products,
23 1.5 million, do you believe that -- do you have any
24 reason to believe that number was inaccurate?
25     A   No.

*AB Litigation Services*

Page 45

1      Q      ZAP! Products is listed at $5 million.  Do
2   you have any reason to believe that number was
3   inaccurate?
4      A      No.
5      Q      Simplicity was listed at $2 million.  Do
6   you have any reason to believe that number was
7   inaccurate?
8      A      No.
9      Q      Paradigm was listed at $2 million.  Do you
10  have any reason to believe that number is -- was
11  inaccurate?
12     A      No.
13     Q      And so the list of assets was -- was
14  totaled at 18,416,000.  Do you have any reason to
15  believe that that number was inaccurate?
16     A      No.
17     Q      Okay.  Then we have liabilities, and it
18  shows a revolving credit of $49,000.  Do you have
19  any reason to believe that that number was
20  inaccurate?
21     A      No.
22     Q      For vehicles it shows liabilities at
23  $55,000.  Do you have any reason to believe that
24  number was inaccurate?
25     A      No.

Page 46

1      Q      There's a mortgage payable, dash,
2   residence, at a million dollars.  Do you have any
3   reason to believe that number was inaccurate?
4      A      No.
5      Q      And there's a mortgage payable for the
6   farm that shows a mortgage of $3,650,000.  Do you
7   have any reason to believe that number was
8   inaccurate?
9      A      No.
10     Q      And -- and -- and by the way, the
11  million dollars and the 3,650,000 are kind of round
12  numbers, so it's an indication that it's probably
13  not the precise amount owed at that time.  It was
14  probably -- they were probably using a round number.
15  Is that -- does that comport with your recollection
16  of your review of this document?
17            MR. GOLDHAMER:  Object to form.  Object to
18  foundation.  Object to form and foundation.
19     A      I took the numbers to be accurate.  If
20  they said the mortgage payable was a million
21  dollars, that's what they owed.  If the mortgage
22  payable on the farm was 3,650,000, that was what
23  they owed.
24     Q      (By Mr. Abelman) So there's -- there's
25  liabilities listed at $4,754,000.  Do you have any

Page 47

1   reason to believe that number was inaccurate?
2      A      No.
3      Q      And then there's an entry for, Estimated
4   income taxes, on the differences between the
5   estimated current value -- values of assets and the
6   estimated amounts of current liabilities and their
7   tax bases.  And that -- that shows an amount of
8   $2,080,000.  Do you have any reason to believe that
9   number was inaccurate?
10     A      No.
11     Q      So this shows a net worth of $11,582,000
12  as of October 31, 2015.  Is that correct?
13     A      Correct.
14     Q      So do you believe the Wycoffs
15  misrepresented their net worth as of October 31,
16  2015?
17     A      I don't understand the question.  Do I
18  think they misrepresented their net worth at that
19  time?
20     Q      Yes.
21     A      Knowing what I do now, that there was an
22  outstanding IRS judgment, yeah, I do think it was
23  misrepresenting.
24     Q      Okay.  Tell me why you think it was
25  misrepresented.

Page 48

1      A      They had a judgment -- or at least a claim
2   from the IRS of several million dollars that we
3   found out about after that time.
4      Q      There was an IRS claim against the Wycoffs
5   that was subject to litigation, I think that's what
6   you're referring to, which culminated in an adverse
7   judgment against the Wycoffs in October of 2017.  Is
8   that -- is that what you're referring to?
9      A      Yes.
10            MR. GOLDHAMER:  Object to form.
11  Foundation.
12     Q      (By Mr. Abelman) And so in retrospect, you
13  believe that the Wycoffs should have disclosed that
14  there was a claim against them by the IRS?
15            MR. GOLDHAMER:  Form.  Foundation.
16     A      Yes, if it was a contingent claim that
17  would affect their ability to -- they indicated to
18  Matt and Vince that in the event they needed to pay
19  the guaranty, they could liquidate the farm, and
20  that was going to be the source of proceeds to pay
21  the guaranty.  That's what I was told.  And any
22  liability event that would restrict them from
23  selling that farm to create liquidity to pay Midlab
24  would impact their financial condition.
25     Q      (By Mr. Abelman) Mr. Hoffman, you --

*AB Litigation Services*

Page 49

1  you -- you just said that you were told that they
2  indicated that they had the financial resources to
3  repay the Midlab debt.
4      A    Merrie and Jeffrey Wycoff.
5      Q    And I'm going to ask you to try and recall
6  with greater specificity who made that
7  representation to Matt Schenk and Vince Keller --
8          MR. GOLDHAMER:  Form.  Foundation.
9      Q    (By Mr. Abelman) -- based upon -- I -- I
10  wasn't done -- based upon what they told you,
11  because Mr. Keller testified that he had never spoke
12  to Merrie Wycoff prior to -- prior to Jeff Wycoff's
13  death.  And Mr. Schenk testified that he had met her
14  once, but she had said very little.
15          So I'm going to ask you if you could -- if
16  you recall with specificity whether they told you
17  that it was the Wycoffs together or whether it was
18  Jeff Wycoff who made representations about their
19  ability to repay the Midlab debt.
20          MR. GOLDHAMER:  Form.
21      A    I can't recall.
22          MR. GOLDHAMER:  Form and foundation.
23      A    I can't recall.
24      Q    (By Mr. Abelman) Now, you used the term
25  contingent claim, which reflects -- which -- which

Page 50

1  accurately reflects from a legal standpoint the IRS
2  position with regard to the Wycoffs.  Explain to me
3  what you mean by a contingent claim.
4          MR. GOLDHAMER:  Form and foundation.
5      A    Well, you said to me, I thought, that the
6  judgment was not final.  I consider that to be
7  contingent.  If it was a final judgment, then it
8  would not be contingent.
9      Q    (By Mr. Abelman) And -- and please don't
10  misconstrue.  I agree with you.  I just wanted to
11  make sure I understood precisely what you were
12  saying.
13      A    I hadn't -- I haven't looked at that
14  judgment in a number of years.  And if it was
15  subject to additional litigation, that might be
16  contingent.  If it was a final judgment, it wouldn't
17  be contingent.  I just know that there was a
18  proceeding out there between the -- the Wycoffs and
19  the IRS that had a potential negative impact on
20  their financial condition, and it wasn't disclosed
21  on the financial statement.
22      Q    And so -- so your position is it should
23  have been?  That's your opinion?
24          MR. GOLDHAMER:  Form.  Foundation.
25      Q    (By Mr. Abelman) Let --

Page 51

1      A    Yes.
2      Q    Let me rephrase that.  Your position -- is
3  it your position that the -- the IRS contingent
4  claim should have been disclosed to Midlab as of
5  October 31, 2015?
6          MR. GOLDHAMER:  Form.  Foundation.
7      A    Yes.  Any liabilities that would impact
8  their ability to liquidate assets and pay Midlab
9  should have been disclosed, in my opinion.
10      Q    (By Mr. Abelman) Did the IRS judgment,
11  which entered in October of 2017 -- did that impact
12  upon the Wycoffs' ability to -- or Jeff Wycoff's
13  ability to pay consistent with -- pay Midlab
14  consistent with his guaranty?
15          MR. GOLDHAMER:  Form.  Foundation.  Form
16  and foundation.
17      A    I don't -- I do not know.
18      Q    (By Mr. Abelman) What information would
19  you need in order to answer that question?
20          MR. GOLDHAMER:  Form and foundation.
21      A    The current -- I would need to know the
22  current status of that claim, whether it was
23  settled, paid, what assets were used to pay the
24  claim.  I don't have any information on the series
25  of events regarding that claim subject to that order

Page 52

1  being filed.
2      Q    (By Mr. Abelman) I appreciate the
3  thoughtfulness of your answers.
4          The -- I'm going to tell you and --
5  because you'd have no reason to know this, that the
6  IRS has yet to collect anything from the Wycoffs,
7  from Jeff Wycoff's estate or Merrie Wycoff, yet ZAP!
8  went out of business irrespective of the IRS claim.
9  Are you aware that -- that ZAP! stopped producing
10  products?
11          MR. GOLDHAMER:  Form.  Foundation.
12      A    I had heard that they were out of
13  business.  I heard from Matt Schenk and Vince Keller
14  that after Jeff Wycoff's demise, the company did not
15  survive -- or -- or the product did not survive.  I
16  don't know about the company.  The company might
17  still be in business.
18      Q    (By Mr. Abelman) And, in fact, while you
19  were still with Midlab, I believe, Midlab wrote off
20  the ZAP! debt, didn't they?
21      A    I believe they did.
22          MR. GOLDHAMER:  Object to form and
23  foundation.
24      Q    (By Mr. Abelman) Do you recall when that
25  occurred?

**Page 53**

1    A    I have no idea.

2         MR. GOLDHAMER:  Same objection.

3    Mr. Colman, please give me a chance to make my

4    objections.  Okay?

5         THE DEPONENT:  Okay.

6         MR. ABELMAN:  Roger, would you pull up

7    Exhibit 49, please.

8    Q    (By Mr. Abelman) So, Mr. Hoffman, I need

9    to correct myself because if you look at Exhibit 49,

10   it's a memo from Cody Housley to Vance Lowe and

11   Steve Miller, Subject, ZAP! Products.  And it says,

12   ZAP! has been written off.  Please see the

13   attachment of the detail in the Excel file.

14        So I think your testimony was you left

15   Keller Group in -- as of the beginning of 2020, and

16   it appears that the -- that ZAP! was written off in

17   March of 2020.  Do I have that right?

18        MR. GOLDHAMER:  Object to form.

19   Foundation.

20   A    Correct.

21   Q    (By Mr. Abelman) So if you take my premise

22   that -- or if you take my representation that the

23   IRS has taken no collection actions thus far on its

24   judgment, would it appear to you that the IRS claim

25   had little or nothing to do with ZAP!'s demise?

**Page 54**

1         MR. GOLDHAMER:  Object to form.  Object to

2    foundation.

3    A    I don't know why -- what led to ZAP!'s

4    demise.  I know that Midlab manufactured products,

5    wasn't paid, got -- Midlab obtained a guaranty, and

6    then Jeff Wycoff committed suicide.  Midlab

7    communicated with Merrie Wycoff about getting paid.

8    And as a result of those communications, Midlab was

9    not paid and this litigation ensued.  That's what I

10   know.

11   Q    Okay.  Mr. Hoffman, you accurately pointed

12   out that the Statement of Financial Condition dated

13   October 31, 2015, contained an omission.  And that

14   was the contingent IRS claim.  That's your

15   testimony, isn't it?

16   A    The financial statement did not include

17   the IRS claim, correct.

18   Q    Do you believe that the omission of the

19   IRS claim damaged Midlab?

20   A    The inability of Merrie and Jeff Wycoff to

21   liquidate assets and pay the guaranty that was given

22   to Midlab to encourage Midlab to continue to

23   manufacture products damaged Midlab.  Jeff Wycoff

24   and Merrie Wycoff both were involved in ZAP!.  They

25   represented to Midlab that they had sufficient

**Page 55**

1    assets to pay the outstanding AR that ZAP! was

2    unable to.  Ultimately the claim -- the obligation

3    was not paid.  Midlab relied on the guaranty.  And

4    whether it was selling the farm, using cash, selling

5    the residence, whatever action Merrie, as the

6    survivor of Jeff's estate, needed to do to come up

7    with the cash to pay the claim, that was not done.

8    Those assets are there, I believe.  I don't know if

9    Merrie still owns ownership of the farm, ownership

10   of the residence, what happened to the cash, whether

11   she has other cash.  But the guaranty survived.

12   Midlab's made a claim on it, and it hasn't been

13   paid, and here we are.

14   Q    That's true.  So Merrie Wycoff didn't

15   guaranty the Midlab debt, did she?

16   A    The guaranty was Jeff's guaranty, and

17   Merrie is -- is the survivor of those assets.

18   Q    What do you mean by that, Mr. Hoffman?

19   A    Well, the farm was represented as owned by

20   Merrie and Jeff, and a source of repayment.  The

21   residence was represented owned by Merrie and Jeff

22   as a source of repayment.  The cash was represented

23   to be held by Merrie and Jeff, and a source of

24   repayment.  And that's how Midlab was to be paid if

25   the guaranty was called.

**Page 56**

1    Q    Okay.  But Merrie -- Merrie Wycoff was not

2    liable to Midlab in October 31 -- on October 31,

3    2015, was she?

4         MR. GOLDHAMER:  Object to form.  Object to

5    foundation.

6    A    Merrie Wycoff did not sign the guaranty.

7    Q    (By Mr. Abelman) So neither Jeff Wycoff

8    nor Merrie Wycoff has ever contested that the

9    indebtedness that ZAP! owed to Midlab and the

10   indebtedness that Jeff Wycoff owed to Midlab was

11   legitimate, is that correct, as far as you know?

12   A    If that's what you say.  As far as I know.

13   Q    And so I'm going back to the connection

14   between what you said was a material omission.

15   You -- you mentioned a single material omission.  We

16   went through this entire Statement of Financial

17   Condition, and you told me there was one omission,

18   and that was the failure to include the contingent

19   IRS claim.  Correct?

20   A    Well, that's the --

21        MR. GOLDHAMER:  Form.

22   A    That's the only omission --

23        MR. GOLDHAMER:  Object to form.

24   Foundation.

25   A    That's the only omission that I -- is in

*AB Litigation Services*

1   the public record, that I'm aware of.  There might
2   be others.  There might not.  I don't know.
3       Q    (By Mr. Abelman)  Okay.  And -- and I'm
4   asking you what, if any, connection did that
5   omission have to Midlab's inability to get paid?
6           MR. GOLDHAMER:  Object to form.
7   Foundation.
8       A    I don't know whether it impacted their
9   ability to repay the obligation or not.  Might,
10  might not.  But Midlab through communications
11  between Jeff Wycoff and Matt Schenk and Vince Keller
12  represented that he had value enough in his farm and
13  residence that if need be he would sell those
14  properties and repay Midlab.  That was my
15  understanding.
16      Q    (By Mr. Abelman)  No one's disputing that.
17  You're a savvy businessman.  Do -- does the value of
18  real estate -- can the value of real estate change
19  over time?
20          MR. GOLDHAMER:  Object to foundation.
21      A    I'm not familiar with real estate in
22  Colorado.  Generally real estate values can go up or
23  down based on supply, demand, and the general
24  economic conditions.
25      Q    (By Mr. Abelman)  And so when you received

1   this Statement of Financial Condition, you
2   personally were aware that the value of the
3   residence and the value of the real estate, farm,
4   could go up or down.
5       A    Do you want me to answer?
6       Q    Yes.  It's a yes or no question.
7       A    We were aware that there was equity in the
8   farm and the residence that, if liquidated, would
9   provide enough value to repay Midlab.
10      Q    Okay.  So let's talk about that for a
11  second.  When you -- when Midlab -- well, when you
12  received this Statement of Financial Condition, did
13  you order title work with regard to the residence?
14      A    No.
15      Q    Did you order title work with regard to
16  the farm?
17      A    No.
18      Q    Were you concerned about how either one of
19  those properties was titled?
20      A    We relied on Merrie and Jeff's
21  representation that they owned those real estate
22  assets.
23      Q    Would it matter for purposes of
24  determining their net worth whether it was owned in
25  their name or in the name of a -- of a special

1   purpose entity?
2       A    We didn't consider that.
3       Q    Okay.
4       A    We took their representation that they
5   owned it, that it was available as an asset between
6   the two of them, and they would rely on that asset
7   in the event they needed to pay Midlab.  That's what
8   Jeff -- as it was represented to me, that's what
9   Jeff Wycoff represented to Vince and Matt Schenk,
10  that if the venture wasn't successful, he would sell
11  the farm and use the proceeds to pay his creditors.
12  Whether he was not -- telling the truth or not, I
13  don't know.  I'm just telling you what was
14  represented to me.
15          MR. GOLDHAMER:  Steve, we've been going
16  for about two hours.  Do you think we could get a
17  break here?
18          MR. ABELMAN:  Sure.  Why don't we break in
19  a few minutes.  I just want to finish this -- these
20  questions.
21          MR. GOLDHAMER:  Okay.
22      Q    (By Mr. Abelman)  Did Midlab order -- order
23  an appraisal of the farm?
24      A    No.
25      Q    Did they order an appraisal of the

1   residence?
2       A    No.
3       Q    Did they ever do any due diligence with
4   regard to the value of the farm and the residence at
5   that time?
6           MR. GOLDHAMER:  Form.  Object to
7   foundation.
8       A    I believe that Matt Schenk did visit the
9   farm.
10      Q    (By Mr. Abelman)  And what did he tell you
11  about his view of the value of the farm?
12      A    We never discussed it.
13      Q    Okay.  Let's take a break now.  I
14  appreciate your patience, Mr. Hoffman.  It's
15  11 o'clock.  What time should we reconvene?  How
16  much time would you like, Mr. Hoffman?
17          MR. GOLDHAMER:  15 or 20 minutes.
18          MR. ABELMAN:  I'm sorry, Aaron?
19          MR. GOLDHAMER:  If we can get about
20  15 minutes.  I just need a bathroom break.
21          MR. ABELMAN:  Sure.  So should we --
22      A    I got to return a couple of phone calls.
23      Q    (By Mr. Abelman)  Okay.  So what would
24  be -- what -- what would you like to do?
25      A    Let's do 11:25 your time.

*AB Litigation Services*

1    MR. GOLDHAMER:  So 20 minutes.
2    MR. ABELMAN:  Okay.  We'll go off the
3  record until 11:25.
4    (Break taken.)
5    MR. ABELMAN:  Roger, would you pull up
6  Exhibit 68, please.
7    Q   (By Mr. Abelman) Mr. Hoffman, are you able
8  to identify what's been marked as Exhibit 68?
9    A   Yes.
10   Q   Please do so.
11   A   It's an Amended Complaint filed by Midlab,
12 Inc., against Merrie Pisano Wycoff individually and
13 as trustee of the Wycoff Family Trust; Wycoff
14 Financial, LLC, a Colorado Limited Liability
15 Company; Magnus Verits LLC, a Colorado Limited
16 Liability Company; and GCS452, LLC, a Colorado
17 Limited Liability Company, all as defendants.
18   Q   And when was the first time you read this
19 Amended Complaint?
20   A   This morning.
21   Q   What about the original iteration of the
22 Complaint, have you read that?
23   A   No.
24   Q   So can I surmise that you had no role in
25 the drafting or approval of either the Complaint or

1  the Amended Complaint?
2    A   Correct.
3    MR. ABELMAN:  I have no further questions.
4    EXAMINATION
5  BY MR. GOLDHAMER:
6    Q   I've got just a couple follow-up
7  questions.
8    MR. GOLDHAMER:  Steve, can you tell me
9  what exhibit number we left off with last time?  Is
10 68 the latest we -- we went?
11   MR. ABELMAN:  I believe it was 69.  I
12 believe.
13   MR. GOLDHAMER:  Okay.  I'm going to ask
14 Miss Darhnick -- Daehnick -- very complicated last
15 name -- if she has any notes from Mr. Keller's
16 deposition.
17   THE COURT REPORTER:  Yes, actually, I have
18 an email.  The last exhibit was 69, yes.
19   MR. GOLDHAMER:  Well, then, I'll -- Ill
20 start with Exhibit 70.
21   (Exhibit 70 marked.)
22   Q   (By Mr. Goldhamer) Mr. Hoffman, let's talk
23 about your involvement with ZAP! Products and Jeff
24 and Merrie Wycoff.  Did there come a time when you
25 started corresponding with a lawyer named Kevin

1  Cudney?
2    A   Yes.
3    Q   And can you tell me the context for that
4  correspondence?
5    A   Say that again.
6    Q   Can you -- can you give me the context for
7  the correspondence?
8    A   We started negotiating a Manufacturing
9  Agreement.
10   Q   Okay.  And that was between ZAP! and
11 Midlab?
12   MR. GOLDHAMER:  Steve, just so you know,
13 your papers are coming up with -- on the audio.
14   A   Correct.
15   Q   (By Mr. Abelman) And I'm going to share my
16 screen here.  I guess we can call this Exhibit 70.
17   I can email this around at the conclusion
18 today.
19   MR. GOLDHAMER:  But can everyone see this
20 email from Colman Hoffman dated 3-11, 2016?
21   THE COURT REPORTER:  Yes.
22   Q   (By Mr. Goldhamer) Okay.  And,
23 Mr. Hoffman, I think we discussed this with
24 Mr. Abelman, but do you see the bottom of this email
25 thread is an email from Kevin Cudney?  Do you see

1  that?
2    A   Yes.
3    Q   Did you receive this email?
4    A   Yes.
5    Q   And you see where Mr. Cudney wrote to you
6  that he was attaching a personal financial statement
7  for Jeff and Merrie?
8    A   Can you scroll down?
9    Q   It says my screen sharing is paused.  I
10 don't know what's up with that.  Hopefully this
11 works out.  Yes.  So do you see --
12   A   Yes.
13   Q   -- where it says -- okay.  He's attaching
14 personal financial statements for Jeff and Merrie.
15 You see that?
16   A   Correct.
17   Q   And did you understand Mr. Cudney to be
18 referring to Jeff and Merrie Wycoff?
19   A   Correct.
20   Q   And did you understand Mr. Cudney to be
21 sending it on behalf of Jeff and Merrie Wycoff?
22   A   Yes.
23   Q   Did you understand Mr. Cudney to be an
24 authorized agented for Jeff and Merrie Wycoff?
25   A   Yes.

*AB Litigation Services*

**Page 65**

1     MR. ABELMAN:  Objection.  Form and
2   foundation.
3     Q    (By Mr. Goldhamer) And I -- I heard the
4   answer yes.  Can you -- can you tell us why you
5   answered yes to that question?
6     A    Kevin Cudney was providing information on
7   behalf of Jeff and Merrie Wycoff.
8     Q    And that's what he wrote in the email; is
9   that right?
10    A    He says, Attached are the personal
11  financial statements from Jeff and Merrie Wycoff --
12  or Jeff and Merrie.  If there is an NDA in place,
13  that will continue to be in effect.  Please provide
14  a copy of the NDA.
15    Q    Okay.  I'll -- I'll stop you right there.
16  Do you have any reason to believe that Kevin Cudney
17  was not authorized to speak on behalf -- for Jeff
18  Wycoff and Merrie Wycoff?
19    A    No.
20    Q    Did you understand Mr. Cudney to be a
21  lawyer for ZAP! Products and Jeff and Merrie Wycoff?
22    MR. ABELMAN:  Objection.  Form and
23  foundation.
24    Q    (By Mr. Goldhamer) Go ahead.  You -- you
25  can answer that question.

**Page 66**

1     A    Repeat it, please.
2     Q    Well, let me see if I can back up a little
3   bit.  Did you have any understanding of whether or
4   not Mr. Cudney was a lawyer for Jeff -- for ZAP!
5   Products and Jeff and Merrie Wycoff?
6     MR. ABELMAN:  Objection.  Form and
7   foundation.
8     A    No.
9     Q    (By Mr. Goldhamer) You didn't have any
10  understanding about whether or not he was a lawyer
11  for them?
12    A    My understanding was that he was a lawyer
13  for Jeff and Merrie Wycoff.
14    Q    Okay.  And what was the basis for that
15  understanding?
16    MR. ABELMAN:  Objection.  Form and
17  foundation.
18    A    He had been negotiating for ZAP! when we
19  negotiated the Manufacturing Agreement.  And he
20  continued to represent the Wycoffs on the guaranty
21  and providing the personal financial statements for
22  Jeff and Merrie.
23    Q    (By Mr. Goldhamer) Okay.  So did
24  Mr. Cudney, in fact, attach the personal financial
25  statement for Jeff and Merrie Wycoff to this email

**Page 67**

1   in this thread?
2     MR. ABELMAN:  Objection.  Form and
3   foundation.
4     A    I'm sorry.  State that again.  You faded
5   out.
6     Q    (By Mr. Goldhamer) So to this 11-4-15
7   email, November 4th, '15, email that you testified
8   you received --
9     A    Right.
10    Q    -- and then Mr. Cudney says he's attaching
11  personal financial statements to --
12    A    Okay.
13    Q    -- did he, in fact, attach a personal
14  financial statement for Jeff and Merrie Wycoff?
15    A    Yes.
16    Q    And was that the personal financial
17  statement and the Bob Henke cover letter that we
18  looked at in the last two pages of Exhibit 51
19  earlier with Mr. Abelman?
20    A    Yes.
21    MR. ABELMAN:  Objection.  The document is
22  Statement of Financial Condition.
23    Q    (By Mr. Goldhamer) Okay.  So the
24  attachment that Mr. Cudney had to -- to this email
25  that we're looking at on Exhibit 70 was the last two

**Page 68**

1   pages of Exhibit 51; is that correct?
2     A    Yes.
3     Q    And that was the Statement of Financial
4   Condition, correct?
5     A    Yes.
6     Q    Of both Jeff and Merrie Wycoff, correct?
7     A    Yes.
8     Q    Okay.  So do you see in this email from
9   Kevin Cudney in Exhibit 70 that he says, The
10  attached documents are provided to you on a strictly
11  confidential basis for your eyes only, and are
12  solely for the purpose of evaluating the support for
13  the Midlab's-ZAP! Products contracts?  Do you see
14  that?
15    A    Yes.
16    Q    And do you see where it says, These
17  documents may not be shared with any other person,
18  including any other employee of Midlab?  Do you see
19  that?
20    A    Yes.
21    Q    Did you honor that request in 2015?
22    A    Yes.
23    Q    Why?
24    A    Because he asked me to.
25    MR. GOLDHAMER:  Can we get -- you know

*AB Litigation Services*

1   what, it may just be cleaner to have this as a
2   separate, freestanding exhibit as well.
3          THE COURT REPORTER:  So you're marking 71?
4          MR. GOLDHAMER:  Yes, please.  This is
5   going to be 71.
6          (Exhibit 71 marked.)
7      Q   (By Mr. Goldhamer) Do you see this email
8   thread, Mr. Hoffman, that I'm screen sharing?
9      A   Yes.
10     Q   And was this the email thread that
11  Mr. Abelman was asking you about before?
12     A   Yes.
13     Q   And you had been emailing around
14  internally the document that Kevin Cudney had sent
15  you, correct?
16     A   Yes.
17     Q   The Statement of Financial Condition for
18  Jeff and Merrie Wycoff, correct?
19         MR. ABELMAN:  Objection.  Form.
20     A   Would you repeat what you said?  Not --
21  Mr. Goldhamer.
22     Q   (By Mr. Goldhamer) Okay.  Let me -- let me
23  try again.  Do you see -- in this email thread in
24  Exhibit 71, we were talking about this email thread
25  with Mr. Abelman, correct?

1      A   Correct.
2      Q   And in this -- or to this document you
3   attached -- to this email thread you attached the
4   Robert Henke cover letter and the Statement of
5   Financial Condition for Jeffrey and Merrie Wycoff
6   that we've been looking at -- or that -- that
7   Mr. Cudney had sent you earlier, correct?
8      A   I don't follow.  I didn't send the email
9   to anyone.  I'm not following.  I can't see the
10  whole email.
11     Q   Okay.
12     A   I'm -- I'm getting confused.
13     Q   I'm just trying to clarify that the last
14  two pages of this Exhibit 71 is the Henke cover
15  letter and the Statement of Financial Condition that
16  Mr. Cudney had sent you previously.
17     A   Correct.
18     Q   Okay.  And, you know, on this third page
19  it indicates that Jeff and Merrie Wycoff are
20  responsible for the accompanying Statement of
21  Financial Condition as of October 31, 2015, in
22  accordance with the accounting principles generally
23  accepted in the United States of America.  Do you --
24  do you see that?
25     A   All I see is the email language that

1   K. Cudney wrote to me.
2      Q   I'm looking at what's on the screen that
3   I'm sharing right now.
4      A   I'm sorry?
5      Q   I'm -- I'm sorry.  Did -- do you see --
6      A   All I see is my email.  It says, Kevin,
7   attached is a draft of a personal guaranty of Jeff
8   Wycoff for your review.
9      Q   Okay.  I'm sorry.  I may have the wrong
10  screen share up.  Is this coming up as the Henke
11  cover letter on the screen share?
12         THE COURT REPORTER:  It's not.  Do you
13  want to send your exhibits to Roger and he can help
14  you share them?
15         MR. GOLDHAMER:  I think I've got it now.
16     Q   (By Mr. Goldhamer) How about now?
17     A   Okay.  Now I see it.
18     Q   Okay.  And this is what I'm intending to
19  have marked as Exhibit 71.  Okay.  It's an email
20  that starts with Matt Schenk to Ross Pulkrabek, but
21  involves you sending emails to Matt Schenk with
22  reference to a personal financial statement.  Do you
23  see that?
24     A   Yes.
25     Q   Okay.  And then to that email you had

1   attached the Henke cover letter?
2      A   Yes.
3      Q   And the Statement of Financial
4   Condition, correct?
5      A   Correct.
6      Q   Okay.  And in the Henke cover letter, it
7   refers to, in the first sentence, that Jeffrey and
8   Merrie Wycoff are responsible for the accompanying
9   Statement of Financial Condition as of October 31,
10  2015, in accordance with accounting principles
11  generally accepted in the United States of America.
12  Do you see that?
13     A   Yes.
14     Q   What did that statement mean to you, if
15  anything?
16     A   That -- it means to me that Merrie and
17  Jeff prepared the financial statements.  And like I
18  said previously, the accountant formatted the
19  information and sent it -- and that was the extent
20  of the report.  He didn't provide any type of
21  auditing procedures.
22     Q   Okay.
23     A   He -- he took the information provided by
24  Merrie and Jeff and created the financial -- the
25  format.

*AB Litigation Services*

1   Q   Do you have any reason to believe that
2   Mr. Henke was not authorized to send this
3   information on behalf of Jeff and Merrie Wycoff?
4        MR. ABELMAN:  Objection.  Foundation.
5   A   He was authorized.
6   Q   (By Mr. Goldhamer) And -- and you didn't
7   have any reason to believe otherwise or no?
8   A   No.  I believed that Mr. Henke was their
9   CPA, and he was familiar with their personal
10  financial situation.  And when they told Mr. Henke,
11  Hey, we need to provide a personal financial
12  statement, they gave Mr. Henke the information, and
13  he prepared the financial statement and then sent it
14  on.
15  Q   Let's look at this fourth page.  Do you
16  see at the bottom where it describes net worth over
17  $11 million?  Do you see that?
18  A   Yes.
19  Q   I -- I want to talk about your reliance,
20  if any, on that $11 million figure in the Statement
21  of Financial Condition.  Did you rely on that 11 --
22  A   We relied on --
23  Q   Hold on.  Hold on.  Hold on.  Did you rely
24  on that $11 million figure on the Statement of
25  Financial Condition?

1   A   Yes.
2   Q   How so?
3   A   The purpose of -- of obtaining the
4   Statement of Financial Condition for Jeff and Merrie
5   Wycoff to -- was to lend support for their -- their
6   ability to pay on the guaranty, if necessary.  And
7   we not only relied on the net worth, but the
8   specific assets, the cash, the residence, the real
9   estate.  And Jeff and Merrie held themselves out to
10  be high net worth individuals, and their financial
11  statement supported that.
12  Q   Did you rely on the Statement of Financial
13  Condition to determine that there were sufficient
14  assets to cover the $1 million guaranty?
15  A   Correct.
16  Q   Do you see on the statement that there's a
17  line for estimated incomes taxes $2 million?
18  A   Yes.
19  Q   If there was an indication on the personal
20  financial statement that reflected a much larger tax
21  liability, would you have drawn the same conclusion
22  about the personal financial statement that you did?
23  A   We would have extended our investigation.
24  Q   Would you have extended your investigation
25  if there was an indication on the personal financial

1   statement that reflected some unknown or potential
2   tax liability?
3        MR. ABELMAN:  Objection.  Form.
4   A   Sure.  We would have to quantify it.
5   Q   (By Mr. Goldhamer) Well, can you describe
6   what your investigation or quantification may have
7   involved?
8        MR. ABELMAN:  Objection.  Form and
9   foundation.
10  A   Well, if you look at their ability to
11  liquidate assets, you had $904,000 of cash, you had
12  equity in the residence, you have equity in the
13  farm.  And any -- and then you have the liabilities
14  associated with those assets.  Any other obligations
15  that would stand in front of Midlab getting paid
16  would impact our decision making.
17  Q   (By Mr. Goldhamer) Is it fair to say that
18  you would have done things differently if the
19  Wycoffs had disclosed their pending tax issues?
20       MR. ABELMAN:  Objection.
21  A   Yes.
22       MR. ABELMAN:  Form and foundation.
23  A   Yes.
24  Q   (By Mr. Goldhamer) And if the financial
25  statement had revealed the Wycoffs actual tax

1   liabilities, would that have changed your view of
2   the financial statement?
3        MR. ABELMAN:  Objection.  Form and
4   foundation.
5   A   Yes.
6   Q   (By Mr. Goldhamer) Now, if the -- this
7   financial statement had indicated that, in fact, the
8   farm was held by, say, Wycoff Financial LLC, and not
9   Jeffrey and Merrie Wycoff individually, would that
10  have changed anything that you would have done?
11  A   We would have gotten guaranties from those
12  entities also.
13  Q   Okay.  Same thing if the house was held in
14  a different entity?
15  A   We would have gotten guaranties from those
16  entities.
17  Q   Now, I want to talk to you about the --
18  the next steps that you took with this personal
19  financial statement.  What did you do with respect
20  to this Statement of Financial Condition after you
21  received it?
22  A   I reviewed it in summary form with Vince
23  Keller.
24  Q   Do you know if he relied on this Statement
25  of Financial Condition as part of the Jeff Wycoff

AB Litigation Services

**Page 77**

1  guaranty?

2     A    I presume he did.

3     Q    And why do you say that?

4     A    We continued to do business with ZAP!.  I

5  told Vince, in summary form, the nature of the

6  assets, the nature of the liabilities, the net

7  worth, and that, and then Vince made a decision to

8  continue to do business with ZAP!.

9     Q    After the guaranty was signed?

10    A    Did you ask me a question?

11    Q    So there was -- there was more business

12 after the guaranty was signed, correct?

13    A    Yes.

14    Q    And if this financial statement had

15 revealed that the Wycoffs were actually worth far

16 less than the approximately 11-1/2 million dollars

17 of net worth on the Statement of Financial

18 Condition, do you know if Midlab would have entered

19 into the deal with ZAP! under the terms that it did?

20    A    I wouldn't think so.

21    Q    Why do you say that?

22    A    Because the ability to pay on the guaranty

23 could have been impaired if the -- especially if

24 there were obligations that would come in front of

25 Midlab's obligation.

**Page 78**

1     Q    And if, in fact, there were obligations

2  that came in front of Midlab's guaranty, would you

3  have recommended that Midlab engage in the deal with

4  ZAP! under the terms that it did?

5          MR. ABELMAN:  Objection.  Form and

6  foundation.

7     A    Midlab was relying on the -- Midlab was

8  relying on the guaranty to make -- to pay in the

9  event (inaudible.)  I need about 10 minutes.  Can

10 you-all give me 10 minutes?

11    Q    (By Mr. Goldhamer) Sure.

12         (Interruption by the court reporter.)

13    A    I said Midlab relied on the guaranty to

14 pay the obligation in the event that ZAP! wasn't

15 able to.  And any other obligations that stood in

16 front of Midlab that would impact that ability to --

17 to -- to recover on the guaranty would be -- could

18 have impacted their decision.

19         I need just five minutes.

20         (Break taken.)

21    Q    (By Mr. Goldhamer) Okay.  Mr. Hoffman,

22 we're back on the record.  Now, if this Statement of

23 Financial Condition that we've been looking at had

24 revealed any significant additional liabilities at

25 all, regardless of whether or not they were in front

**Page 79**

1  of Midlab and its collection activities, even if

2  they were side by side alongside Midlab, if you had

3  seen those -- any other significant liabilities on

4  this Statement of Financial Condition, would that

5  have changed your recommendation with respect to its

6  support for the guaranty?

7     A    Yes.

8     Q    And then are you aware of whether the

9  Wycoffs had any additional liabilities that were not

10 reflected on the Statement of Financial Condition?

11    A    No.

12    Q    Well, ultimately you did learn about tax

13 liabilities, correct?

14    A    I did.  Matt Schenk told me about it.

15    Q    And those, you know, personal IRS

16 liabilities are not reflected on this statement,

17 were they?

18    A    No.

19    Q    Did it surprise you to learn about those

20 liabilities?

21    A    Yes.

22    Q    Would knowing about those liabilities have

23 changed your conclusion about the Statement of

24 Financial Condition?

25    A    Yes.

**Page 80**

1          MR. ABELMAN:  Objection.  Form and

2  foundation.

3     Q    (By Mr. Goldhamer) Would knowing about

4  those liabilities have -- have changed your

5  recommendations with respect to proceeding with the

6  guaranty?

7     A    Yes.

8     Q    And if those tax liabilities had been

9  disclosed, do you know if Midlab would have entered

10 the deal with ZAP! under the terms that it did?

11         MR. ABELMAN:  Objection.  Form and

12 foundation.

13    A    I wouldn't think so, but that was not my

14 decision.

15    Q    (By Mr. Goldhamer) But you wouldn't have

16 recommended it if those tax liabilities had been

17 disclosed?

18    A    Correct.

19    Q    So now I want to skip ahead a bit to

20 discuss what happened after Jeff Wycoff died.  Are

21 you aware that Mr. Wycoff died on March 31st, 2018?

22    A    I was told soon after that that he had

23 committed suicide.  I was told by either Vince

24 Keller or Matt Schenk.  I can't recall who told me

25 first.  But when one or the other learned of the

*AB Litigation Services*

**Page 81**

1   event, they told me.

2   Q    Would you explain what you did after he

3   died with respect to the guaranty that he had

4   signed?

5   A    I reviewed the Colorado probate laws to

6   try to determine time frames and when creditors

7   would need to file claims, and did some

8   investigation, made some calls to various probate

9   courts trying to determine if a will had been filed

10  in probate.  And I was not able to discover any

11  probate of the estate of Jeff Wycoff.

12       After that I recommended we send a letter

13  to Merrie Wycoff and her lawyers, and that's what we

14  did, giving notice of Midlab's claim on the estate.

15  Q    And I just want to direct you to a couple

16  of documents.  This first one we'll mark as

17  Exhibit 72.

18       (Exhibit 72 marked.)

19  Q    (By Mr. Goldhamer) Can you identify this

20  document?  Or let me just ask you, did you send this

21  email?

22  A    I did.

23  Q    And you were asserting the claim on behalf

24  of Midlab against the estate of Jeff Wycoff?

25  A    Yes.

**Page 82**

1   Q    And to this email you -- you attached some

2   of the limited guaranty and a listing of accounts

3   receivable for Midlab and ZAP!; is that right?

4   A    Yes.

5   Q    And then I'll direct you to what will be

6   marked as Exhibit 73.

7        (Exhibit 73 marked.)

8   Q    (By Mr. Goldhamer) Did you send this email

9   as well?

10  A    I did.

11  Q    And to this email you attached the full

12  signed guaranty; is that right?

13  A    Yes.

14  Q    And I'll show you what will be marked as

15  Exhibit 74.

16       (Exhibit 74 marked.)

17  Q    (By Mr. Goldhamer) Did you send this

18  letter?

19  A    I did.

20  Q    And in this letter you included the signed

21  guaranty and the ZAP! statement of accounts

22  receivable, correct?

23  A    Yes.

24  Q    Okay.  So let's talk about whether you

25  received a response to those communications you

**Page 83**

1   sent.  Can you look at this next document that we'll

2   label Exhibit 75.

3        (Exhibit 75 marked.)

4   A    Okay.

5   Q    (By Mr. Goldhamer) Did you forward an

6   email that you received from Zoe Almy at Brownstein

7   Hyatt Farber Schreck to Vince Keller, Matt Schenk

8   and Ken Bodie?

9   A    I did.

10  Q    And to that letter -- or to that email was

11  attached the letter on the second page of this

12  exhibit; is that correct?

13  A    Correct.

14  Q    And was this in response to the claims you

15  had sent?

16  A    Correct.

17  Q    Can you describe the response?

18  A    It says, At the request of our client,

19  Merrie Pisano Wycoff, I am writing in response to

20  your letter dated August 3rd, 2018.  This

21  communication serves as notice to you and your

22  client that we have been advised that no probate

23  estate has been opened for the estate of Jeffrey

24  Wycoff and that no personal representative has been

25  appointed.

**Page 84**

1        Miss Wycoff has also advised us that the

2   assets of the decedent subject to the administration

3   have been determined to be insufficient to warrant a

4   probate proceeding.  It is not anticipated by

5   Miss Wycoff that a probate estate will be required

6   in the future.

7   Q    Can you describes what your reaction was

8   to this response?

9   A    My reaction was, that, well, don't look

10  like we have a very good chance of getting paid.

11  Sounds like the estate's insolvent and there's not

12  assets laying around anywhere.  Didn't look good for

13  Midlab at that point.

14  Q    Did you rely on that understanding in your

15  conversations with other Midlab employees and

16  decision makers?

17  A    Say that again.  You -- you're not clear.

18  Q    Well, with -- did -- did you rely on -- on

19  what was stated in the response?

20  A    Oh, yeah.  Yeah.  I communicated it -- to

21  Matt Schenk and Vince Keller that an estate -- that

22  the will was not going to be probated, that there

23  weren't sufficient assets to go through probate.

24  And so then we had to consider other alternatives.

25  Q    Thanks so much, Mr. Hoffman.  That's all I

*AB Litigation Services*

1  have for you.

2          EXAMINATION

3  BY MR. ABELMAN:

4      Q    Mr. Hoffman, we've opened up a whole

5  'nother set of questions.  So let's go.

6          You looked at the Limited Continuing

7  Guaranty, which is marked as Exhibit 51.  Would you

8  agree that that guaranty is a continuing guaranty?

9  Are you familiar with that terminology?

10         MR. GOLDHAMER:  Object to form and

11 foundation.

12     Q    (By Mr. Abelman) Go ahead, Mr. Hoffman.

13     A    It's -- it's titled a continuing guaranty.

14     Q    And what is -- in your mind, what does

15 continuing guaranty mean?

16     A    I would have to read the language of the

17 guaranty to determine what -- what obligations are

18 contained in the guaranty that make it a continuing

19 guaranty.

20         MR. GOLDHAMER:  Foundation.

21     Q    (By Mr. Abelman) Mr. Hoffman, that's not

22 really the question.  The question is what does

23 continuing mean?  And if you -- if you want to

24 review the -- the guaranty, you're free to do so.  I

25 didn't ask you what obligations are continuing.  I

1  asked you what is the meaning of continuing in

2  continuing guaranty.

3      A    And my response is I'm not relying on the

4  title of the document without understanding the body

5  of the document.  In order to answer your question

6  about what a continuing guaranty is, I cannot answer

7  that based on the title of the document without

8  reading through the body and determining what

9  language is included in the body of the document

10 that makes it a continuing guaranty.

11     Q    Okay.  Well, let's have at it.

12         MR. ABELMAN:  Please pull up Exhibit 51 so

13 that Mr. Hoffman can review the Limited Continuing

14 Guaranty.

15         DOCUMENT TECHNICIAN:  Just let me know if

16 you need to have me scroll up or down or I can give

17 you control of it.

18         THE DEPONENT:  Let me have control of it.

19         DOCUMENT TECHNICIAN:  There you go.

20     A    Okay.  It says, This is a continuing

21 guaranty -- whoops.  Lost it.  Hold on.  This --

22 golly, it won't -- okay.  This is a continuing

23 guaranty and shall remain in full force and effect

24 until lender receives written notice of its

25 revocation signed by the undersigned, lender has

1  actual notice of the death of the undersigned or,

2  guarantor has paid the guaranty limit.  Upon

3  revocation by written notice or actual notice of

4  death, this guaranty shall continue in full force

5  and effect as to all obligations contracted for or

6  incurred before revocation, and as to them lender

7  shall have the rights provided by this guaranty as

8  if no revocation has occurred.  Any renewal,

9  extension or increase in the interest rate of any

10 such obligation, whether made before or after

11 revocation, shall constitute an obligation

12 contracted for or incurred before revocation.

13 Obligations contracted for or incurred before

14 revocation shall also include credit extended after

15 revocation pursuant to commitments.

16         So what that means, in my opinion, is that

17 the obligation before the death of Jeffrey Wycoff

18 was covered by the guaranty, and any obligations

19 created after the death of Jeffrey Wycoff were not

20 covered by the guaranty.

21     Q    (By Mr. Abelman) Okay.  And -- and you

22 testified that at the time of this guaranty, which

23 is dated November 11th of 2015, you and Midlab

24 relied upon this guaranty in order to continue to do

25 business with ZAP!.

1      A    The guaranty and the financial statements

2  of Merrie and Jeffrey Wycoff.

3      Q    And let's turn the page and get to the

4  Statement of Financial Condition.  It's 000013.

5  Now, we went over this before.  What's the date on

6  this financial condition -- Statement of Financial

7  Condition?

8      A    October 31st, 2015.

9      Q    And I think you agreed that this was a --

10 this -- this is a snapshot of -- of -- of the

11 Wycoffs' financial condition -- or you construed

12 this as a snapshot of the Wycoffs' financial

13 condition as -- as of October 31, 2015.

14     A    A snapshot being the assets that they

15 owned and the liabilities they were obligated to on

16 that day and time.

17     Q    That's right.  And you said that Midlab

18 relied upon this -- or that you relied upon it in --

19 in advising Midlab when you received this, which was

20 apparently in the first week of November 2015.

21     A    Correct.

22     Q    Okay.  Did you ask the Wycoffs to update

23 this Statement of Financial Condition in January of

24 2016?

25     A    I never had any communications with the

*Colman Brodksy Hoffman  - 08/09/2021*

se

*AB Litigation Services*

se

**Page 89**

1   Wycoffs other than the receipt of the email from
2   Jeffrey Wycoff to me with his signed guaranty.
3   **Q    To the best of your knowledge, did anybody**
4   **from -- from Midlab ask the Wycoffs to update the**
5   **Statement of Financial Condition in January of 2016?**
6   A    I don't -- I can't answer that. I don't
7   know.
8   **Q    Have you ever seen an updated Statement of**
9   **Financial Condition from Jeffrey and Merrie Wycoff**
10  **dated as of January 2016?**
11  A    I haven't seen it. But, again, my comm --
12  communication was with Kevin Cudney. And the
13  communication with Jeffrey Wycoff and the project
14  and his financial situation was between him, Vincent
15  Keller, and Matt Schenk. They were talking to
16  Jeffrey Wycoff on an ongoing basis. I don't know
17  about daily or weekly, but ongoing. They may and
18  they may not have had additional information. If
19  they did, I would -- or didn't I wouldn't know.
20  **Q    Well, you're correct in that Mr. Miller**
21  **testified he obtained financial information from**
22  **ZAP! on a monthly basis throughout 2016 and 2017.**
23  **However, he also testified he never received any**
24  **updated personal financial information from either**
25  **Jeffrey or Merrie Wycoff. Does that surprise you?**

**Page 90**

1          MR. GOLDHAMER: Object to form.
2   Foundation.
3   A    It doesn't surprise me or not surprise me.
4   It is what it is.
5   **Q    (By Mr. Abelman) Well, Mr. Hoffman, we**
6   **were talking about reliance, so I want to know**
7   **when -- when you relied upon this Statement of**
8   **Financial Condition. What dates did you rely upon**
9   **this when advising Midlab to continue to do business**
10  **with ZAP!?**
11  A    The day it was received.
12  **Q    And what about in January of 2016?**
13         MR. GOLDHAMER: Object to form.
14  **Q    (By Mr. Abelman) Were you personally**
15  **relying upon this Statement of Financial Condition**
16  **in advising Midlab to continue to do business with**
17  **ZAP! in January of 2016?**
18  A    After the guaranty was signed --
19         MR. GOLDHAMER: Hold on. Hold on. Hold
20  on, Colman. Object to form.
21  A    After the guaranty was signed, my
22  involvement in the day-to-day operation in Midlab
23  and the relationship between Midlab and ZAP! was
24  infrequent. My role had been to negotiate and draft
25  the Manufacturing Agree -- Agreement, negotiate and

**Page 91**

1   draft the continuing guaranty. I received in
2   confidence the personal financial statement. And
3   then I wasn't involved in the relationship with ZAP!
4   after that.
5   **Q    I understand that, Mr. Hoffman. You were**
6   **the keeper of this -- of this Statement of Financial**
7   **Condition dated October 31, 2015. So if -- if there**
8   **were additional personal statements of financial**
9   **condition, you would probably be involved in those,**
10  **too, weren't you -- wouldn't you?**
11  A    No. I was in -- I was in receipt because
12  Kevin Cudney sent it to me. If Jeffrey Wycoff, in
13  conversations with Vince Keller, or Matt Schenk or
14  Steve Miller, said, Here's my updated financial
15  statement, and please hold it in confidence, that
16  wouldn't involve me at all. I was not designated by
17  Midlab's -- by Keller Group or Midlab to be the
18  keeper of this record. Kevin Cudney sent it to me,
19  requested I keep it in confidence, I did so. That
20  was unilateral on his part. It didn't involve an
21  offer by me. He could have sent the personal
22  financial statement to Vince or Matt Schenk or Steve
23  Miller. He sent it to me, and I said I'd hold it in
24  confidence. I did.
25  **Q    Of course he could have, but you know that**

**Page 92**

1   he didn't because it was never discussed with you,
2   was it?
3   A    What?
4          MR. GOLDHAMER: Object to form.
5   **Q    (By Mr. Abelman) An updated Statement of**
6   **Financial Condition.**
7   A    I never discussed Jeffrey Wycoff's
8   financial condition with Kevin Cudney after I
9   received this financial statement.
10  **Q    And you never discussed any updated**
11  **Statement of Financial Condition with Vince Keller,**
12  **Steve Miller, Matt Schenk, did you?**
13         MR. GOLDHAMER: Object to the extent that
14  this calls for an attorney-client communication.
15  So --
16         MR. ABELMAN: I'm not asking for content.
17  I'm asking if he had a discussion about the subject
18  matter.
19         MR. GOLDHAMER: You're asking him --
20  **Q    (By Mr. Abelman) Please proceed and answer**
21  **the question.**
22         MR. GOLDHAMER: The question implies the
23  content.
24         MR. ABELMAN: The question does not imply
25  the content. I asked if he had any conversation

EXHIBIT R

*Colman Brodksy Hoffman - 08/09/2021*

*AB Litigation Services*

1  about a statement of financial -- an updated
2  Statement of Financial Condition.  That's a subject
3  matter.  That's not the content.
4      Q    (By Mr. Abelman) Mr. --
5           MR. GOLDHAMER:  Which is distinguishable
6  from the content.  If the answer is no, then, you
7  know, it -- it implies what the content was.  If --
8  if the answer is yes, it implies what the content
9  was.  You know, it -- it's a -- you're asking a
10  lawyer for his conversations with his client.
11          MR. ABELMAN:  I'm asking a lawyer about
12  his conversation about a subject.  You cannot claim
13  that a general subject is subject to attorney-client
14  privilege.
15          MR. GOLDHAMER:  Well --
16      Q    (By Mr. Abelman) Mr. Hoffman --
17          MR. GOLDHAMER:  -- no.  I think --
18      Q    (By Mr. Abelman) -- I'm going to ask you
19  to answer that question.  Did you have any
20  conversations with Mr. Schenk, Mr. Miller, or
21  Mr. Keller which involved an updated Statement of
22  Financial Condition of -- from Jeff and Merrie
23  Wycoff, without revealing the contents of that
24  conversation?
25          MR. GOLDHAMER:  Well, if he's going to

1  answer the question, it's going to reveal the
2  contents of the conversation.
3          THE DEPONENT:  Are you waiting on me?
4          MR. ABELMAN:  You can reserve your
5  objection to attorney client privilege on this.
6      Q    (By Mr. Abelman) It's a yes or no --
7          MR. GOLDHAMER:  Yeah.
8      Q    (By Mr. Abelman) -- a yes or no answer.
9          MR. GOLDHAMER:  Steve, let me -- let me
10  take a moment to confer with Mr. Hoffman offline to
11  determine the extent to which my client's
12  attorney-client privilege is implicated, and then I
13  can give you an informed decision about whether or
14  not we're instructing the witness not to answer.
15  All right?
16          MR. ABELMAN:  That's fine, Aaron.  And you
17  and I both know you haven't produced any updated
18  Statement of Financial Condition.  So take your
19  time.
20          MR. GOLDHAMER:  I'm focused on trying to
21  answer the question.  So, Colman, I will call you on
22  your cell phone in a second.  All right?
23          THE DEPONENT:  Okay.
24          MR. GOLDHAMER:  If you can mute your end
25  of the line, Colman...

1          (Break taken.)
2          (Page 93, Line 19 through Line 24, read.)
3      A    I can't recall.
4      Q    (By Mr. Abelman) Did you -- did you see an
5  updated Statement of Financial Condition at -- for
6  Jeff -- Jeffrey and Merrie Wycoff at any time in
7  2016?
8      A    The only financial statement of Jeff and
9  Merrie Wycoff I ever saw was the one that's in the
10  record.
11      Q    Now, when you were going through the
12  guaranty, you -- you read a sentence that said, This
13  is a continuing guaranty and shall remain in full
14  force and effect until lender receives written
15  notice of its revocation signed by the undersigned.
16          Is there any such similar language that
17  was appended to either Mr. Henke's letter or this
18  Statement of Financial Condition?
19      A    I don't understand the question.
20      Q    Do you see any language similar to what I
21  read which was appended to either Mr. Henke's letter
22  or this Statement of Financial Condition?
23      A    Well, the continuing guaranty, the -- the
24  continuing -- reference to the continuing guaranty
25  in the financial statement?

1      Q    No.  Let me rephrase this.  Is there
2  anything in this -- Mr. Henke's letter or the
3  Statement of Financial Condition that is analogous
4  to the language contained in the guaranty that
5  somehow this Statement of Financial Condition shall
6  remain in full force and effect?
7          MR. GOLDHAMER:  Object to form.
8      A    I don't understand the question, but the
9  guaranty is the guaranty, the letter is the letter,
10  and the financial statement's the financial
11  statement.  I don't see why the guaranty would be
12  incorporated into the other documents.
13      Q    (By Mr. Abelman) Of course not,
14  Mr. Hoffman.
15      A    The answer is no -- the answer is no, it's
16  not in any other document.  But I don't think --
17      Q    The -- the -- the -- the guaranty is
18  continuing, which means, as you said, it remains in
19  effect.  The Statement of Financial Condition is
20  temporal.  It's a -- it's a time -- it's effective
21  as a time and date.  Is that accurate?
22          MR. GOLDHAMER:  Object to form.
23      A    The continuing -- the language about
24  continuing the guaranty relates to the guaranty.
25  That paragraph -- the paragraph that discusses the

*AB Litigation Services*

1  continuing guaranty relates to the guaranty.
2  There's nothing about the continuing guaranty in the
3  CPA letter, and there's nothing referring to the
4  continuing guaranty in the personal financial
5  statement of Merrie and Jeffrey.  Is that what
6  you're asking?  No, they don't mention -- the -- the
7  letter and the -- and the personal financial
8  statement do not mention, incorporate, or refer to
9  the continuing guaranty.
10     Q   (By Mr. Abelman) So let's -- let's break
11  this down step by step.  Did you regard in the --
12  when you read the Statement of Financial Condition
13  dated October 31, 2015, the first line item is cash
14  and cash equivalents.  Did you construe this as a --
15  as -- as the Wycoffs' commitment that in January of
16  2016 there would still be cash and cash equivalents
17  of $904,000?
18     A   On October 31st, 2015, they had cash of
19  $904,000.
20     Q   Were they required to maintain that level
21  of cash and cash equivalents in January of 2016?
22     A   There was no --
23         MR. GOLDHAMER:  Object to form.
24     A   There was no -- there was no --
25         THE DEPONENT:  Are you waiting for my

1  answer?
2         MR. GOLDHAMER:  I'm sorry.
3     Q   (By Mr. Abelman) Yes, please.
4         MR. GOLDHAMER:  I was just trying to say,
5  Object to form.
6     A   There was no loan agreement other than the
7  Manufacturing Agreement that restricted Jeffrey and
8  Merrie Wycoff's use of their assets.
9     Q   (By Mr. Abelman) What loan agreement -- to
10  what loan agreement are you referring?
11     A   I said there wasn't a loan agreement.
12     Q   Okay.
13     A   The use of their assets was unrestricted.
14  They could liquidate assets, purchase assets, incur
15  debt, pay debt however they so chose.  They gave us
16  a representation on that day this is what our
17  financial situation is.
18     Q   And that day meaning October 31, 2015?
19     A   Yes.
20     Q   Are you familiar with owns -- who owns the
21  building that Midlab is headquartered?
22     A   Yes, I am familiar.
23     Q   Who owns the building?
24     A   Exit 49 LLC.
25     Q   And who owns Exit 49 LLC?

1     A   At one point it was Vince and his dad.  I
2  don't know who owns it now.  They could have had
3  some transactions.  I don't know.
4     Q   Okay.  So the last you knew it was owned
5  by Vince and his dad?
6     A   Exit 49 LLC?
7     Q   Right.
8     A   Yes.
9     Q   So would -- if there was equity in the
10  building owned by Exit 49 LLC, and the only two
11  owners of Exit 49 LLC were Vince and his dad, would
12  they be able to utilize the value of any equity in
13  that building when they are calculating their net
14  worth?
15         MR. GOLDHAMER:  Object to form and
16  foundation.
17     A   They would be able to list the asset as an
18  interest in an LLC.
19     Q   (By Mr. Abelman) And would that value
20  carry through to their net worth if they were
21  preparing a financial statement?
22         MR. GOLDHAMER:  Object to form and
23  foundation.  Form and foundation.
24     A   It would -- it would depend on what else
25  was in the LLC.

1     Q   (By Mr. Abelman) Sure.  But if there were
2  a million dollars of equity in the building, and it
3  was owned by Vince and his father, then whatever the
4  percentage of ownership would inure to -- a million
5  dollars would inure to their net worth.  Is that --
6  is that right as a matter of -- of -- of math?
7     A   No.
8         MR. GOLDHAMER:  Form and foundation.
9     A   An LLC is like any company.  It can have
10  single assets, it can have multiple assets, it can
11  have no liabilities, it can have several
12  liabilities.  And the interest in that LLC shown on
13  the financial statement would have to take into
14  account all assets and all liabilities that that --
15  that -- that were owned and owed by the LLC.
16     Q   (By Mr. Abelman) Fair enough.  Is Exit 49
17  LLC a special purpose entity?
18         MR. GOLDHAMER:  Form and foundation.
19     A   I'm not sure.  I don't know.
20     Q   (By Mr. Abelman) Okay.
21     A   I know what a special purpose entity is.
22  I don't know if that's what it is.
23     Q   Okay.  So if Wycoff Financial is -- is
24  owned by Jeff and Merrie Wycoff, and, as happens to
25  be, the only indebtedness that Wycoff Financial had

*AB Litigation Services*

1  was the mortgage on the farm, if there was equity in
2  the farm, would -- would that be properly included
3  in the net worth of Jeff and Merrie Wycoff?
4        MR. GOLDHAMER:  Object to form and
5  foundation.
6     A    It should be properly disclosed as an
7  interest in an LLC because ownership of assets
8  individually and by man and wife have different
9  legal implications than ownership of assets in an
10 LLC.  And to evaluate their financial condition, a
11 creditor or a potential creditor needs to know that.
12    Q    (By Mr. Abelman) I'm not sure I understand
13 that.  Would you explain that to me?
14    A    Sure.  If me and my wife own our residence
15 jointly, there are certain rights of spouses in the
16 property of another, as you well know.  If it's
17 owned by an LLC, that property, then those rights of
18 ownership have different implications.  It's like
19 owning stock in a company rather than an interest in
20 a -- real estate.  And it's -- it's a different form
21 of ownership.  That's why in business transactions
22 you use LLCs, whether special purpose or otherwise.
23 The liability to creditors is different.  You get
24 the so-called corporate shield.
25        There's all kinds of ramifications of

1  owning property in a legal entity such as a
2  corporation or LLC, even different, again, than a
3  general partnership.  You know this.  I don't know
4  why I have to repeat it for you.  But it's much
5  different than owning property individually.
6     Q    Actually, I disagree with you.  If -- if
7  Jeff owned 50 percent of Wycoff LLC, and Merrie
8  owned 50 percent of Wycoff LLC, the LL -- the LLC is
9  a pass-through entity, how does that change whether
10 Midlab has a claim against Merrie's portion or not?
11        MR. GOLDHAMER:  Object to form and
12 foundation.
13    A    Because the interest is in a legal entity,
14 not in the real estate.  And a potential creditor to
15 accurately evaluate the financial condition needs to
16 know how the property is held.
17    Q    (By Mr. Abelman) Why is that, Mr. Hoffman?
18 If -- if Midlab were to obtain a judgment against
19 Jeffrey Wycoff, they could attach the 50 percent
20 membership interest with that judgment.  Isn't that
21 true?
22        MR. GOLDHAMER:  Object to --
23    A    No.
24        MR. GOLDHAMER:  Object to form and
25 foundation.

1     Q    (By Mr. Abelman) Isn't that true,
2  Mr. Hoffman?
3        MR. GOLDHAMER:  Same objections.
4     A    That's -- I don't know.  I'll take your
5  word for it.
6     Q    (By Mr. Abelman) Well, I'm trying to
7  find -- you're -- you're -- you suggested earlier
8  that ownership -- the fact that the farm was owned
9  in a solely-owned -- a wholly-owned LLC by Jeff and
10 Merrie Wycoff somehow created an impediment for
11 Midlab, I'm just trying to figure out what
12 impediment that created.
13    A    Well, I don't know if I said --
14        MR. GOLDHAMER:  Hold on.  Hold on.  Hold
15 on.  Hold on.  Hold on.  Object to form and
16 foundation if there is, in fact, a question pending.
17    Q    (By Mr. Abelman) What impediment did that
18 create, if any, Mr. Hoffman?
19    A    I just said it's information that a
20 potential creditor would want to know.
21    Q    Why?  I'm trying to understand why that's
22 important.
23        MR. GOLDHAMER:  Object to form and
24 foundation.
25    A    I consider the form of ownership of an

1  asset to be important.
2     Q    (By Mr. Abelman) Okay.
3     A    You're not going to change my mind.  Maybe
4  I'm not going to change yours.  But when -- when I
5  look at a financial statement, if property is held
6  individually, it's different than property held --
7  than an interest in an LLC or corporation.
8     Q    Okay.  Mr. Hoffman, here's another
9  question for you.  You -- you -- you read the -- the
10 complaint yesterday, did you say?
11    A    This morning.
12    Q    This morning.  Okay.  Well, there's
13 really -- there's really no dispute that Midlab was
14 owed the money it claims it was owed and that it was
15 not paid.  My question for you is the complaint
16 raises allegations of fraud and fraudulent transfer
17 and conspiracy to commit fraud.  Describe for me the
18 fraud that you believe occurred here.
19        MR. GOLDHAMER:  Object to form and
20 foundation.
21    A    Do you want me to answer now?
22    Q    (By Mr. Abelman) I do, please.
23    A    Jeff Wycoff, and then Merrie Wycoff after
24 Jeff Wycoff's death, indicated to Midlab, as it was
25 relayed to me from Matt Schenk and Vince Keller,

*AB Litigation Services*

**Page 105**

1    that there were sufficient personal assets that
2    could be liquidated and pay the obligation -- and
3    pay the obligation.
4        Q    I'm sorry, what date was this?  I'm
5    just -- I -- I want you to -- I'm sorry for
6    interrupting.
7        A    This is over time, after -- after the AR
8    went into arrears and through the time the complaint
9    was filed.  It was always considered that first Jeff
10   and then Merrie would make efforts to liquidate
11   personal assets and pay the debt.  And what we found
12   out after investigation is that assets were
13   transferred to -- seemingly -- seemingly -- I don't
14   have any other proof other than what I read in the
15   complaint, that seemingly assets were transferred to
16   the fraud creditors, including Midlab.
17       If Merrie, and before Merrie Jeff, would
18   have done what they said they were going to do and
19   and sell the farm, sell the residence, pay Midlab,
20   we wouldn't be here.  They not only did not do that,
21   they transferred assets to keep them away from
22   Midlab, if -- if you believe the complaint.  And I
23   have no reason not to.  I have no -- I have no
24   knowledge otherwise.  So what fraud do I think was
25   perpetrated?  All I know is what I read in the

**Page 106**

1    complaint.  I have no --
2        Q    So you don't -- you don't know whether
3    the -- the farm was sold at fair market value?
4        MR. GOLDHAMER:  Object to form.
5        A    How would I know?  I don't even know if
6    the farm was sold.
7        (Interruption by the court reporter.)
8        Q    (By Mr. Abelman) And you don't know if the
9    residence was sold at fair market value, do you?
10       MR. GOLDHAMER:  Object to form.
11       A    They were -- the complaint said -- I guess
12   the Amended Complaint might have made reference to
13   it.  I can't recall.  But other than mentioning that
14   document, I don't have any idea what was sold and
15   for what it was sold and whether it was fair market
16   value.  As far as all those allegations, I have no
17   knowledge, personal or otherwise, other than reading
18   the complaint.
19       Q    (By Mr. Abelman) So other than reading the
20   complaint, you're not aware of any fraud perpetrated
21   upon Midlab?
22       MR. GOLDHAMER:  Object to form.  This
23   misstates his testimony about the personal financial
24   statement.
25       Q    (By Mr. Abelman) Mr. Hoffman --

**Page 107**

1        A    Yes, sir.
2        Q    -- would you answer that question?
3        A    Say it again.
4        MR. ABELMAN:  Would you read it back,
5    Shar.
6        (Page 106, Line 19 through Line 21, read.)
7        MR. GOLDHAMER:  My objection is to form,
8    and that it misstates the testimony with respect to
9    the statement of financial condition.
10       MR. ABELMAN:  I didn't question him about
11   his testimony.  I asked a question.
12       MR. GOLDHAMER:  I think it misstates the
13   question.  I've noted my objection.  You can ask --
14       You can answer the question, Mr. Hoffman --
15       A    I do know that they misstated their
16   financial statement by not including the obligation
17   to the IRS.  They misstated their financial
18   statement, after reading the complaint, by not
19   identifying the true ownership of their assets.  And
20   that's just what I know about.  There's no telling
21   what other shenanigans they were engaged in.
22       Q    (By Mr. Abelman) I'm asking you about your
23   knowledge, not your speculation, Mr. Hoffman.  So --
24   so -- so you said that there were two -- two things.
25   What were those two things?

**Page 108**

1        A    The IRS obligation.  But that was after
2    the fact, too.  The -- the IRS obligation, we didn't
3    find out about that for months or years.  We didn't
4    find out about the -- transferring the assets for
5    months or years.  We didn't find out about the --
6    how those assets were held for months or years.
7    It -- it's --
8        Q    So -- so --
9        A    -- it's all information that we did not
10   have at the time the guaranty was executed, the
11   personal financial statement was tendered, and
12   Midlab continued to manufacture for ZAP!.  All that
13   information --
14       Q    And how -- how, if at all, did the IRS
15   debt impede Midlab's ability to get paid its -- what
16   it was owed?
17       MR. GOLDHAMER:  I'll object to the extent
18   that Mr. Hoffman seemed to be continuing to answer
19   his question, the previous question, but ask that he
20   have an opportunity to finish his answer.  I would
21   also object to the form and foundation of the
22   question that's pending.
23       Q    (By Mr. Abelman) Mr. Hoffman, if I cut you
24   off, please -- please take this opportunity --
25       A    You're fine.  Ask me the next one.  I --

*AB Litigation Services*

**Page 109**

1    I -- I lost my train of thought.

2    Q    So how, if at all, did the IRS debt impede

3    Midlab's ability to get its debt paid?

4          MR. GOLDHAMER:  Object to the form and

5    foundation.

6    A    The information on the IRS debt would --

7    may have -- may not have, but probably would have

8    been considered -- affected Midlab's continuing to

9    do business with ZAP!.  If Midlab knew, if Vince

10   Keller knew, if Matt Schenk knew that Jeff Wycoff

11   intended to -- or that Jeff Wycoff had incurred a

12   5-plus million dollar obligation to the IRS, they

13   very well might have decided that they didn't want

14   to do business with Jeff Wycoff and ZAP! anymore.

15   Q    And how did the use of Wycoff Financial as

16   a special purpose entity impede, if at all, Midlab's

17   ability to recover its outstanding debt?

18         MR. GOLDHAMER:  Object to form.  Object to

19   form and foundation.

20   A    I don't know anything about -- I don't

21   know anything about -- what was the name of the

22   entity?

23   Q    (By Mr. Abelman) Wycoff Financial.

24   A    I don't know who owns Wycoff Financial,

25   what assets are in Wycoff Financial, what

**Page 110**

1    obligations are in Wycoff Financial, what Wycoff

2    Financial does.  I do know that it was represented

3    to Midlab that Merrie and Jeff Wycoff owned the farm

4    individually, and that farm would be liquidated and

5    the equity in the farm used to pay Midlab off in the

6    event ZAP! was unwilling or unable to.

7    Q    So Midlab should -- is it your opinion

8    that Midlab should have been paid from the proceeds

9    of the farm ahead of the secured -- the party that

10   was secured by the farm?

11   A    I don't know anything about that.

12         MR. GOLDHAMER:  Object to form and

13   foundation.

14   Q    (By Mr. Abelman) What do you mean you

15   don't know anything about it.  It's in the statement

16   of financial affairs.

17   A    I --

18         MR. GOLDHAMER:  Mr. Abelman, if you can

19   ask a question politely, we'd prefer it, rather than

20   raising your voice with your incredulity.  I'll

21   object to the form, foundation for the question.

22         MR. ABELMAN:  I object to the

23   characterization that I was raising my voice.

24   Q    (By Mr. Abelman) I'm sorry, Mr. Hoffman.

25   A    I don't know anything about -- anything

**Page 111**

1    abaout the details of their secured interest.

2    Q    Well, it's -- on the Statement of

3    Financial Condition it shows a mortgage payable for

4    $3,650,000.

5    A    So -- so -- okay.  But they indicated that

6    they had additional equity in the property, and if

7    they sold the farm, they would have enough money to

8    pay Midlab.

9    Q    Mr. Hoffman, I thought we established that

10   the value that they set forth in the farm as of

11   October 31, 2015, was $4,750,000.

12   A    Okay.

13   Q    Did we do that?

14   A    Yeah.

15   Q    Okay.  So when the farm was sold in the

16   summer of 2018, why would you -- do you believe it

17   should have still been worth or it was worth

18   $4,750,000?

19         MR. GOLDHAMER:  Object to form and

20   foundation.

21   A    I don't know who it was sold to, whether

22   it was a related party, whether it was an

23   arm's-length transaction, whether it was a

24   fraudulent sale.  I don't know any of the details

25   about the sale.

**Page 112**

1    Q    (By Mr. Abelman) Then why are you assuming

2    that?

3    A    I'm not assuming anything.

4          MR. GOLDHAMER:  Object to form.

5    A    I'm just telling you that when we received

6    the personal financial statement, we considered the

7    equity in the farm to be support for the guaranty.

8    And, in fact, Jeffrey Wycoff emphasized to Midlab

9    and Matt Schenk and Vince Keller in conversations

10   that were relayed to me that he was relying on the

11   value in his farm to pay his creditors in the event

12   the business did not survive.  That's all I'm

13   saying.

14         I don't know what -- what else to -- to

15   say about it.  It was stated, it was relied on, the

16   values in the personal financial statement.  That

17   was the expectation, that the farm would be sold,

18   the equity would be used to pay creditors.

19   Q    (By Mr. Abelman) And if there was no

20   equity, does that constitute fraud, in your mind?

21         MR. GOLDHAMER:  Object to form and

22   foundation.

23   A    I'm not going to speculate on the --

24   whether there was fraud.  He -- Jeffrey Wycoff

25   associated a value to the farm.  I don't know what

Page 113

he used as criteria to establish that value, but Midlab relied on it.

**Q (By Mr. Abelman) Would it interest you to know that the farm was put up for sale at approximately $5 million and was -- no offers were received?**

MR. GOLDHAMER: Object to form and foundation.

A No, I'm not interested in that. I really don't care. But if you want me to respond to a question, I'll be glad to.

MR. ABELMAN: I have no further questions. Thank you for your time.

MR. GOLDHAMER: Thank you so much, Colman.

(The deposition concluded at 1:04 p.m. on August 9, 2021.)

Page 114

I, COLMAN BRODSKY HOFFMAN, do hereby certify that I have read the foregoing transcript and that the same and accompanying amendment sheets, if any, constitute a true and complete record of my testimony.

____________________________

SRD Signature of Deponent

( ) No amendments

( ) Amendments attached

Acknowledged before me this ____day of _________________________, 20_______.

Notary Public: _________________________

My commission expires __________________

Seal:

Page 115

STATE OF COLORADO )
) SS. REPORTER'S CERTIFICATE
COUNTY OF DENVER )

I, Sharon R. Dobson, do hereby certify that I am a Registered Professional Reporter and Notary Public within the State of Colorado; that previous to the commencement of the examination, the deponent was duly sworn to testify to the truth.

I further certify that this deposition was taken in shorthand by me at the time and place herein set forth, that it was thereafter reduced to typewritten form, and that the foregoing constitutes a true and correct transcript.

I further certify that I am not related to, employed by, nor of counsel for any of the parties or attorneys herein, nor otherwise interested in the result of the within action.

In witness whereof, I have affixed my signature on August 17, 2021.

My commission expires January 8, 2023.

____________________________
Sharon R. Dobson, RPR
216 - 16th Street, Suite 600
Denver, Colorado 80202

Page 116

AB LITIGATION SERVICES
216 - 16th Street, Suite 600
Denver, Colorado 80202
August 17, 2021
Aaron D. Goldhamer, Esq.
Keating Wagner Polidori & Free, PC
1290 Broadway, Suite 600
Denver, CO 80203

Re: Deposition of COLMAN BRODSKY HOFFMAN
Midlab, Inc., vs. Wycoff, et. al.
Civil Action No. 1:20-cv-03142-KLM

The aforementioned deposition is ready for reading and signing. Please attend to this matter by following BOTH of the items indicated below:

_____ Call 303-296-0017 and arrange with us to read and sign the deposition in our office

_XXX_ Have the deponent read your copy and sign the signature page and amendment sheets, if applicable; the signature page is attached

_____ Read the enclosed copy of the deposition and sign the signature page and amendment sheets, if applicable; the signature page is attached

_XXX_ WITHIN 30 DAYS OF THE DATE OF THIS LETTER

_____ By ___________________ due to a trial date of

Please be sure the original signature page and amendment sheets, if any, are SIGNED BEFORE A NOTARY PUBLIC and returned to AB Litigation Services for filing with the original deposition. A copy of these changes should also be forwarded to counsel of record. Thank you.

AB LITIGATION SERVICES
cc: All Counsel

EXHIBIT R

Page 117

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
 3
 4
 5            COLMAN BRODSKY HOFFMAN
               August 9, 2021
 6        Midlab, Inc., vs. Wycoff, et. al.
          Civil Action No. 1:20-cv-03142-KLM
 7
 8
 9   The original deposition was filed with Steven E.
     Abelman, Esq., on approximately the 17th day of
10   August, 2021.
11   _____ Signature waived
12   _____ Signature not requested
13   _____ Unsigned; signed signature page and
           amendment sheets, if any, to be filed at
14         trial
15   _XXX_ Unsigned; amendment sheets and/or
           signature pages should be forwarded to
16         AB Litigation Services to be filed in the
           envelope attached to the sealed original.
17
     Thank you.
18
     AB LITIGATION SERVICES
19
     cc:  All Counsel
20
21
22
23
24
25
```

Page 118

```
          - AMENDMENT SHEET -

     Deposition of COLMAN BRODSKY HOFFMAN

               August 9, 2021

        Midlab, Inc., vs. Wycoff, et. al.

        Civil Action No. 1:20-cv-03142-KLM

The deponent wishes to make the following changes

in the testimony as originally given:

Page  Line        Should Read        Reason
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____
____  ____  _____  _____

Signature of Deponent: _____

Acknowledged before me this ____ day of _____,

20___.

(seal)     Notary's signature _____

           My commission expires_____
```

EXHIBIT R

*AB Litigation Services*

## Exhibits

**EXHIBIT 70** 3:2 62:20,21 63:16 67:25 68:9

**EXHIBIT 71** 3:4 69:6,24 70:14 71:19

**EXHIBIT 72** 3:6 81:17,18

**EXHIBIT 73** 3:8 82:6,7

**EXHIBIT 74** 3:10 82:15,16

**EXHIBIT 75** 3:12 83:2,3

## $

**$1** 26:16,19 74:14

**$1,000,000** 33:25

**$1,900,000** 44:8

**$11** 73:17,20,24

**$11,582,000** 47:11

**$2** 45:5,9 74:17

**$2,000** 43:17

**$2,080,000** 47:8

**$3,650,000** 46:6 111:4

**$4,750,000** 44:13 111:11,18

**$4,754,000** 46:25

**$49,000** 45:18

**$5** 45:1 113:5

**$55,000** 45:23

**$75,000** 44:17

**$841,121.90** 19:18

**$900,000** 38:25

**$904,000** 43:14 75:11 97:17,19

## 0

**000012** 36:23

**000013** 88:4

**000025** 33:3

## 1

**1.5** 44:23

**10** 78:9,10

**106** 107:6

**11** 60:15 73:21

**11,900,000** 39:2

**11-1/2** 77:16

**11-4-15** 67:6

**114** 5:23

**11:25** 60:25 61:3

**11th** 25:4,14 34:12 87:23

**13th** 26:24 27:2,4

**15** 7:8 10:13 13:8 60:17,20 67:7

**15th** 20:15 21:2

**16** 10:13

**16th** 32:21

**18,416,000** 45:14

**19** 95:2 107:6

**1971** 8:10

**1975** 8:10,13

**1977** 8:13

**1978** 8:15

**1979** 8:15

**1981** 8:22

**1986** 8:22 9:4

**1991** 9:4

**1992** 9:11

**19th** 26:22

**1:04** 113:15

## 1st 18:15 19:11

## 2

**20** 7:8 60:17 61:1

**200,000** 44:5

**2004** 10:2

**2015** 26:22,24 27:3,4 28:10 32:21 34:12,18 37:8 38:1 43:2,4 47:12,16 51:5 54:13 56:3 68:21 70:21 72:10 87:23 88:8,13, 20 91:7 97:13,18 98:18 111:11

**2016** 19:22,23 25:5, 14 63:20 88:24 89:5, 10,22 90:12,17 95:7 97:16,21

**2017** 48:7 51:11 89:22

**2018** 18:13 19:12 20:15 21:2,8 80:21 83:20 111:16

**2020** 10:3 13:1 18:19,22 53:15,17

**2021** 113:16

**21** 107:6

**21st** 18:19

**24** 95:2

## 3

**3** 34:5

**3,650,000** 46:11,22

**3-11** 63:20

**30** 33:21

**31** 32:9,10,25 33:9 47:12,15 51:5 54:13 56:2 70:21 72:9 88:13 91:7 97:13 98:18 111:11

**31st** 38:1 43:2,4 80:21 88:8 97:18

**37205** 5:24

## 3rd 18:10 21:8 37:8 83:20

## 4

**401(k)** 13:22

**49** 53:7,9 98:24,25 99:6,10,11 100:16

**4th** 67:7

## 5

**5-plus** 109:12

**50** 102:7,8,19

**51** 33:15,17,21,22 36:23 67:18 68:1 85:7 86:12

**5th** 19:23

## 6

**68** 61:6,8 62:10

**69** 62:11,18

**6th** 19:22

## 7

**70** 62:20,21 63:16 67:25 68:9

**71** 69:3,5,6,24 70:14 71:19

**72** 81:17,18

**73** 82:6,7

**74** 82:15,16

**74,000** 44:1

**75** 83:2,3

## 9

**9** 113:16

**91** 19:21

**92** 9:5,14

**93** 95:2

*AB Litigation Services*

**98** 9:14,18

**99** 9:18

---

**A**

**Aaron** 60:18 94:16

**abaout** 111:1

**Abelman** 4:9,11,20, 22 5:4,10,13 7:17 16:17,20 17:2,9 21:25 23:1,25 24:7, 14 28:17 29:20 30:14 31:20 32:8,11,24 33:2,6,14,16 34:4,6 35:11 36:21,24 37:10,12 40:2 41:6 43:12 46:24 48:12,25 49:9,24 50:9,25 51:10,18 52:2,18,24 53:6,8,21 56:7 57:3, 16,25 59:18,22 60:10,18,21,23 61:2, 5,7 62:3,11 63:15,24 65:1,22 66:6,16 67:2, 19,21 69:11,19,25 73:4 75:3,8,20,22 76:3 78:5 80:1,11 85:3,12,21 86:12 87:21 90:5,14 92:5, 16,20,24 93:4,11,16, 18 94:4,6,8,16 95:4 96:13 97:10 98:3,9 99:19 100:1,16,20 101:12 102:17 103:1, 6,17 104:2,22 106:8, 19,25 107:4,10,22 108:23 109:23 110:14,18,22,24 112:1,19 113:3,12

**ability** 34:22 39:5 42:22 48:17 49:19 51:8,12,13 57:9 74:6 75:10 77:22 78:16 108:15 109:3,17

**Accent** 9:25

**accepted** 38:3 40:7 70:23 72:11

**access** 27:20

**accommodations** 34:2

**accompanied** 37:1

**accompanying** 37:25 39:13 70:20 72:8

**accordance** 38:2,4 70:22 72:10

**account** 6:16 100:14

**accountant** 72:18

**accounting** 38:2,5,6 40:7 70:22 72:10

**accounts** 82:2,21

**accuracy** 38:10

**accurate** 6:22 35:1 42:11 46:19 96:21

**accurately** 6:15 50:1 54:11 102:15

**acknowledge** 20:3

**acquisitions** 9:9

**acronym** 11:5

**action** 22:24 23:21 55:5

**actions** 53:23

**activities** 79:1

**actual** 75:25 87:1,3

**additional** 29:1,2,4 32:5 50:15 78:24 79:9 89:18 91:8 111:6

**address** 5:21 34:1

**adjoined** 16:2

**administration** 21:14 84:2

**adverse** 48:6

**advised** 21:10,13 83:22 84:1

**adviser** 10:7

**advising** 88:19 90:9, 16

**affairs** 110:16

**affect** 48:17

**affected** 109:8

**Afghanistan** 12:6

**aged** 28:23 29:1

**agenda** 13:14,16,18, 20,23

**agendas** 14:17

**agented** 64:24

**agree** 26:8 43:3 50:10 85:8 90:25

**agreed** 4:4 88:9

**agreement** 16:13, 15,16 26:15 32:1,3, 20 33:10 34:17 35:4 63:9 66:19 90:25 98:6,7,9,10,11

**agrees** 26:18

**ahead** 65:24 80:19 85:12 110:9

**AICPA** 38:7 41:14,24

**Alaska** 44:17

**allegations** 104:16 106:16

**Almy** 20:19 83:6

**alongside** 79:2

**aloud** 37:23 40:4

**alternatives** 84:24

**Amazon** 31:15

**Amended** 61:11,19 62:1 106:12

**America** 38:3 40:8 70:23 72:11

**amount** 19:17 22:9 46:13 47:7

**amounts** 47:6

**analogous** 96:3

**answers** 6:13,17 52:3

**anticipated** 21:16 84:4

**anymore** 109:14

**apologize** 25:11

**apparently** 88:20

**appears** 34:14 53:16

**appended** 95:17,21

**appointed** 21:12 83:25

**appraisal** 59:23,25

**approval** 61:25

**approve** 13:20,21,22

**approximately** 77:16 113:5

**AR** 19:19 28:23 29:1 32:6 35:2,5 39:6 40:21 55:1 105:7

**area** 9:6 11:18,20 23:19

**areas** 11:16 23:16

**arm's-length** 111:23

**arrears** 105:8

**articulately** 41:11

**Arts** 8:11

**assert** 5:8

**asserting** 81:23

**asset** 59:5,6 99:17 104:1

**assets** 21:13 38:24 39:24 40:20 41:1 42:19 43:10,13 44:21 45:13 47:5 51:8,23 54:21 55:1,8,17 58:22 74:8,14 75:11, 14 77:6 84:2,12,23 88:14 98:8,13,14 100:10,14 101:7,9 105:1,11,12,15,21 107:19 108:4,6 109:25

**assistant's** 15:16

**assuming** 112:1,3

**assurance** 38:14

**ataching** 67:10

**attach** 66:24 67:13 102:19

**attached** 19:3,18,23 20:9,22 25:7,23 26:2,

*Colman Brodksy Hoffman  - 08/09/2021*

*AB Litigation Services*

11 27:5,8 65:10
68:10 70:3 71:7 72:1
82:1,11 83:11

**attaching** 64:6,13

**attachment** 18:2,17
19:3 20:9,13,18,25
24:23 25:1,3,15,17
26:9 53:13 67:24

**attachments** 24:16,
19

**attend** 13:2,5

**attended** 8:9,12

**attorney** 94:5

**attorney-client**
7:12,15,18 23:10,19
92:14 93:13 94:12

**atypical** 30:15,19

**audio** 63:13

**audit** 38:8 41:14,15,
17

**audited** 41:20,21

**auditing** 39:21 72:21

**August** 18:10,15,19,
22 19:11,23 21:8
83:20 113:16

**authorized** 64:24
65:17 73:2,5

**Auto** 11:8

**automobile** 13:25

**avoid** 6:14

**aware** 15:21 16:11
52:9 57:1 58:2,7 79:8
80:21 106:20

**B**

**Bachelor** 8:11

**back** 9:15 16:21,22
17:13 26:13,17,21
34:19 56:13 66:2
78:22 107:4

**background** 12:10
17:5

**Baker** 9:13

**balance** 19:19,20

**balls** 11:24

**bank** 9:8

**Banking** 8:19,24

**Bar** 8:14,15

**bare** 44:17

**based** 4:4 39:14
49:9,10 57:23 86:7

**bases** 47:7

**basis** 26:3 66:14
68:11 89:16,22

**Bates** 33:3 36:23

**Bath** 31:14

**bathroom** 60:20

**bear** 43:25

**Bearman** 9:13

**Bed** 31:14

**begin** 4:18

**beginning** 53:15

**behalf** 33:11,12
38:21 64:21 65:7,17
73:3 81:23

**believed** 73:8

**bills** 30:10

**binder** 15:13

**binders** 15:15

**bit** 66:3 80:19

**board** 13:2,3,11
14:5,7 15:24 16:9

**Bob** 67:17

**Bodie** 17:20 18:25
19:6 20:16 83:8

**body** 18:20 24:21
86:4,8,9

**boilerplate** 13:18
41:23

**books** 29:1

**bottom** 25:21 37:8
63:24 73:16

**branded** 30:25

**brands** 30:24

**break** 59:17,18
60:13,20 61:4 78:20
95:1 97:10

**briefly** 5:3

**bring** 30:12

**BRODSKY** 4:13

**Brownstein** 21:1
83:6

**building** 11:15
98:21,23 99:10,13
100:2

**business** 10:11
16:4,7 28:13 30:6,8,
13 31:1,2,5 40:22
52:8,13,17 77:4,8,11
87:25 90:9,16 101:21
109:9,14 112:12

**businesses** 10:22
30:9

**businessman** 57:17

**Byrider** 11:6,7

**C**

**cabinet** 15:18

**calculating** 99:13

**call** 63:16 94:21

**called** 9:19,22,25
11:2,9 29:7 55:25

**calls** 60:22 81:8
92:14

**capitalization** 30:10

**capped** 26:16,19

**care** 113:10

**carry** 29:1 99:20

**case** 31:17

**cash** 39:1 41:2 43:13
55:4,7,10,11,22 74:8
75:11 97:13,14,16,
18,21

**catch** 18:5

**cater** 11:19

**caution** 23:8

**cell** 94:22

**Centcom** 12:5

**center** 11:10,14,15,
20

**certified** 21:2

**chain** 25:22 27:16

**challenge** 4:4

**chance** 53:3 84:10

**change** 13:23 57:18
102:9 104:3,4

**changed** 76:1,10
79:5,23 80:4

**characterization**
110:23

**chose** 98:15

**claim** 17:24 18:1
19:16 48:1,4,14,16
49:25 50:3 51:4,22,
24,25 52:8 53:24
54:14,17,19 55:2,7,
12 56:19 81:14,23
93:12 102:10

**claims** 81:7 83:14
104:14

**clarification** 20:11

**clarify** 70:13

**classes** 8:17 11:21

**cleaner** 31:9 69:1

**clear** 84:17

**client** 21:6,9 83:18,
22 93:10 94:5

**client's** 94:11

**clients** 42:2

**close** 9:17

**Cody** 53:10

**collect** 52:6

**collecting** 22:11

**collection** 22:8
53:23 79:1

**collectively** 35:21

*AB Litigation Services*

College 8:12

Colman 4:13 20:17, 19,21 22:16 23:7 25:13,22 26:13,22 53:3 63:20 90:20 94:21,25 113:14

Colman.hoffman@ - 21:3

color 16:23

Colorado 57:22 61:14,15,16 81:5

comanaging 11:4

comm 89:11

commercial 40:20

commit 104:17

commitment 97:15

commitments 87:15

committed 54:6 80:23

Committee 38:7

communicate 36:3, 11

communicated 22:2,10 36:11 41:1 54:7 84:20

communicating 29:14 36:13

communication 17:22 18:6 19:14 20:3 21:8 35:14 36:14,15 42:12 83:21 89:12,13 92:14

communications 16:3 22:4,6 36:17 54:8 57:10 82:25 88:25

company 9:19,21, 22,24,25 10:21 11:2, 9,25 12:1,11 13:24, 25 14:3,21 31:10,16, 17 41:15 52:14,16 61:15,16,17 100:9 101:19

compilation 38:4

compiled 38:20 42:2

complaint 17:6 61:11,19,22,25 62:1 104:10,15 105:8,15, 22 106:1,11,12,18,20 107:18

completeness 38:10

complicated 62:14

comport 46:15

concern 28:21 34:22

concerned 58:18

concluded 113:15

conclusion 38:13 41:5 63:17 74:21 79:23

conclusions 40:11

condition 32:6 35:9, 13 36:2,9 38:1,21 39:13 40:10,11 42:25 48:24 50:20 54:12 56:17 58:1,12 67:22 68:4 69:17 70:5,15, 21 72:4,9 73:21,25 74:4,13 76:20,25 77:18 78:23 79:4,10, 24 88:4,6,7,11,13,23 89:5,9 90:8,15 91:7,9 92:6,8,11 93:2,22 94:18 95:5,18,22 96:3,5,19 97:12 101:10 102:15 107:9 111:3

conditions 41:16 57:24

confer 94:10

confidence 91:2,15, 19,24

confidential 26:3 68:11

confirm 26:8

confused 25:11 70:12

connection 56:13 57:4

considered 105:9 109:8 112:6

consistent 51:13,14

consists 25:3

conspiracy 104:17

constitute 87:11 112:20

construe 97:14

construed 40:16 88:11

contact 20:24

contained 14:17 39:22 54:13 85:18 96:4

content 92:16,23,25 93:3,6,7,8

contents 93:23 94:2

contested 56:8

context 63:3,6

contingent 48:16 49:25 50:3,7,8,16,17 51:3 54:14 56:18

continue 25:25 34:2 35:4 40:22 54:22 65:13 77:8 87:4,24 90:9,16

continued 66:20 77:4 108:12

continuing 19:24 33:24 34:24 35:6,17 85:6,8,13,15,18,23, 25 86:1,2,6,10,13,20, 22 91:1 95:13,23,24 96:18,23,24 97:1,2,4, 9 108:18 109:8

contract 26:5

contracted 87:5,12, 13

contracts 68:13

control 86:17,18

conversation 15:24 16:22 25:23 42:10 92:25 93:12,24 94:2

conversations 16:9 22:21 84:15 91:13 93:10,20 112:9

copied 17:19

copies 14:8

copy 14:9 17:15 20:16,20 21:19 25:7, 8 26:1 27:1 65:14

copying 18:24

corporate 9:9,10 15:13,14 28:4 101:24

corporation 102:2 104:7

correct 4:7,8,10 28:20 31:24 34:18 37:16 47:12,13 53:9, 20 54:17 56:11,19 62:2 63:14 64:16,19 68:1,4,6 69:15,18,25 70:1,7,17 72:4,5 74:15 77:12 79:13 80:18 82:22 83:12, 13,16 88:21 89:20

correspondence 19:8 63:4,7

counsel 10:20,24 11:1 12:8 28:3

counter 33:5

country 30:24

couple 9:24 10:1 13:4 33:17 60:22 62:6 81:15

court 4:2,5,9,12,17, 24 6:12,15 62:17 63:21 69:3 71:12 78:12 106:7

courts 81:9

cover 67:17 70:4,14 71:11 72:1,6 74:14

covered 87:18,20

CPA 73:9 97:3

create 13:14 48:23 103:18

created 13:16 72:24 87:19 103:10,12

credit 34:1,2 45:18 87:14

creditor 101:11 102:14 103:20

*AB Litigation Services*

creditors 59:11 81:6
101:23 105:16
112:11,18

criteria 113:1

Cudney 16:14 17:19
18:24 20:20,23
21:18,21 25:7,22
26:11,13,22,25 27:13
29:12,13 33:12 36:12
63:1,25 64:5,17,20,
23 65:6,16,20 66:4,
24 67:10,24 68:9
69:14 70:7,16 71:1
89:12 91:12,18 92:8

Cudney's 20:22

culminated 48:6

current 35:3 47:5,6
51:21,22

customer 15:20
31:23,25 34:16

customers 30:4,15,
25

cut 108:23

―――――

D

D-U-N-H-A-M 5:23

dad 14:14 99:1,5,11

Daehnick 62:14

daily 89:17

damaged 54:19,23

Darhnick 62:14

dash 44:13 46:1

date 12:25 14:2 18:8,
10,11,15 19:7,22
32:16,19 34:10 43:1
88:5 96:21 105:4

dated 18:19 19:11
20:14 21:2,7 27:4
32:20 37:7 54:12
63:20 83:20 87:23
89:10 91:7 97:13

dates 90:8

day 19:13 20:6 28:7,
8 34:12 43:11 88:16
90:11 98:16,18

day-to-day 28:2
90:22

days 19:21

deal 77:19 78:3
80:10

Dear 19:13 21:5

death 49:13 87:1,4,
17,19 104:24

debt 49:3,19 52:20
55:15 98:15 105:11
108:15 109:2,3,6,17

decedent 21:13 84:2

decided 31:21
34:15,24 35:21
109:13

decision 24:1,8
75:16 77:7 78:18
80:14 84:16 94:13

defendants 4:22
61:17

deferred 43:21

degree 8:11,13

demand 57:23

demise 52:14 53:25
54:4

Denver 22:10

Department 8:19,
20,24

departure 12:24

depend 28:4 99:24

deponent 4:5 17:1
22:18 23:18 32:22
37:17 53:5 86:18
94:3,23 97:25

deposed 5:1,14 7:22
17:4

deposition 4:3 6:11
7:2,3,25 8:2,5 62:16
113:15

describe 6:6 8:8
13:10,12 75:5 83:17
104:17

describes 73:16
84:7

describing 24:17

designated 91:16

designed 40:13

detail 17:8 19:19
53:13

details 111:1,24

determine 28:12
74:13 81:6,9 85:17
94:11

determined 21:14
29:3 84:3

determining 58:24
86:8

developing 31:3

development 9:23
10:11 16:4

died 80:20,21 81:3

differences 47:4

differently 75:18

diligence 60:3

direct 17:14 22:23
24:19 81:15 82:5

director 11:5

dis 30:23

disagree 102:6

disclaimer 41:22

disclosed 48:13
50:20 51:4,9 75:19
80:9,17 101:6

disclosure 41:23

disclosures 40:6,9
41:18

discover 81:10

discuss 7:9 80:20

discussed 16:8
28:24 60:12 63:23
92:1,7,10

discusses 96:25

discussion 16:19
29:3 92:17

discussions 29:23
30:1

disposed 15:1

dispute 104:13

disputing 57:16

distinguishable
93:5

distributors 30:23

document 26:20
33:20 37:14 42:4,14
46:16 67:21 69:14
70:2 81:20 83:1 86:4,
5,7,9,15,19 96:16
106:14

documents 6:2 15:6
17:10,12 26:2,6
27:11,19 33:18 34:15
68:10,17 81:16 96:12

dollar 109:12

dollars 19:25 39:1
46:2,11,21 48:2
77:16 100:2,5

Donelson 9:13

draft 26:11,23 71:7
90:24 91:1

drafted 29:11

drafting 16:16 61:25

drawn 74:21

driving 11:16

due 22:9 32:6 35:2
40:21 60:3

duly 4:14

Dunham 5:23

―――――

E

earlier 19:13 25:23
67:19 70:7 103:7

East 12:4

economic 57:24

education 8:8

effect 26:1 65:13
86:23 87:5 95:14
96:6,19

effective 96:20

*Colman Brodksy Hoffman  - 08/09/2021*                    5

*AB Litigation Services*

effort 28:14 30:7

efforts 105:10

elect 13:22

elected 40:5

electronic 21:3

electronically 13:6

email 17:13,15,18 18:4,7,9,11,15,18,23 19:1,5,11,12 20:4,5, 6,7,14 21:3 24:21 25:1,4,6,13,20,21 26:8,10,25 27:3,4,6, 16,19 62:18 63:17, 20,24,25 64:3 65:8 66:25 67:7,24 68:8 69:7,10,23,24 70:3,8, 10,25 71:6,19,25 81:21 82:1,8,11 83:6, 10 89:1

emailing 69:13

emails 27:13,21 71:21

emphasized 112:8

employed 8:18 10:5 27:21

employee 26:7 68:18

employees 84:15

encourage 54:22

end 32:22 94:24

ended 23:23

engage 30:7 78:3

engaged 23:3,20,22 31:3 107:21

engagement 38:4

ensued 54:9

entered 31:25 51:11 77:18 80:9

entire 56:16

entities 11:12 76:12, 16

entity 59:1 76:14 100:17,21 102:1,9,13 109:16,22

entrepreneur 31:4

entrepreneurial 30:7 31:8,18

entry 47:3

equipment 11:17

equity 58:7 75:12 99:9,12 100:2 101:1 110:5 111:6 112:7, 18,20

equivalents 43:13 97:14,16,21

establish 113:1

established 31:10 111:9

estate 9:23 17:24 19:17 20:18,23 21:10,11,17 44:13,17 52:7 55:6 57:18,21, 22 58:3,21 74:9 81:11,14,24 83:23 84:5,21 101:20 102:14

estate's 84:11

estimated 47:3,5,6 74:17

Europe 12:3

evaluate 101:10 102:15

evaluating 26:4 28:11 68:12

event 26:2 48:18,22 59:7 78:9,14 81:1 110:6 112:11

events 51:25

eventually 23:21

evidence 35:22

evidencing 19:19

evolved 10:17

exam 17:15 24:20

EXAMINATION 4:19 62:4 85:2

examined 4:15

Excel 53:13

executed 32:23 34:7,8,10,16,25 108:10

exercise 22:17

exhibit 32:9,10,12, 17,18,19,25 33:6,9, 15,17,19,21,22 34:5 36:23 53:7,9 61:6,8 62:9,18,20,21 63:16 67:18,25 68:1,9 69:2, 6,24 70:14 71:19 81:17,18 82:6,7,15, 16 83:2,3,12 85:7 86:12

exhibits 32:7,15 71:13

Exit 98:24,25 99:6, 10,11 100:16

expectation 112:17

explain 30:17,19 50:2 81:2 101:13

express 38:12

extend 34:1

extended 74:23,24 87:14

extension 87:9

extent 7:14 12:11,13 23:11 72:19 92:13 94:11 108:17

eyes 26:3 68:11

F

facility 11:23 16:1

fact 52:18 66:24 67:13 76:7 78:1 103:8,16 108:2 112:8

faded 67:4

failed 19:2 20:8

failure 56:18

fair 75:17 100:16 106:3,9,15

Fairways 11:9 13:25

familiar 32:18 33:8 57:21 73:9 85:9

98:20,22

Family 61:13

family-owned 10:20,22

Farber 21:1 83:7

farm 39:1 41:2 44:13 46:6,22 48:19,23 55:4,9,19 57:12 58:3, 8,16 59:11,23 60:4,9, 11 75:13 76:8 101:1, 2 103:8 105:19 106:3,6 110:3,4,5,9, 10 111:7,10,15 112:7,11,17,25 113:4

fashion 34:23

father 100:3

figure 73:20,24 103:11

file 15:17 24:8 53:13 81:7

filed 24:7 52:1 61:11 81:9 105:9

files 22:17 42:13

final 50:6,7,16

financial 8:20 10:7 14:4 17:16,17 18:21 25:2,24 28:11 29:5 35:9,12 36:1,9 37:1, 25 38:8,14,21,25 39:13,19,21,22 40:1, 10,11,13,25 41:3,19, 21 42:3,22,25 48:24 49:2 50:20,21 54:12, 16 56:16 58:1,12 61:14 64:6,14 65:11 66:21,24 67:11,14, 16,22 68:3 69:17 70:5,15,21 71:22 72:3,9,17,24 73:10, 11,13,21,25 74:4,10, 12,20,22,25 75:24 76:2,7,8,19,20,25 77:14,17 78:23 79:4, 10,24 88:1,4,6,11,12, 23 89:5,9,14,21,24 90:8,15 91:2,6,8,14, 22 92:6,8,9,11 93:1, 2,22 94:18 95:5,8,18, 22,25 96:3,5,10,19 97:4,7,12 98:17

EXHIBIT R

*AB Litigation Services*

99:21 100:13,23,25 101:10 102:15 104:5 106:23 107:9,16,17 108:11 109:15,23,24,25 110:1,2,16 111:3 112:6,16

**financials** 28:12

**find** 20:22 22:15,25 40:23 103:7 108:3,4,5

**fine** 6:20 94:16 108:25

**finish** 6:19 59:19 108:20

**fireproof** 15:17

**firm** 9:1,7,12

**fitness** 11:15,18

**floor** 31:9

**focused** 94:20

**follow** 70:8

**follow-up** 62:6

**Food** 12:3

**force** 86:23 87:4 95:14 96:6

**foregoing** 26:9

**forgive** 16:21

**form** 5:5,6 15:3,4 16:25 21:22 24:5,12 28:16 30:20 38:13 39:16 40:17 43:9 46:17,18 48:10,15 49:8,20,22 50:4,24 51:6,15,20 52:11,22 53:18 54:1 56:4,21,23 57:6 60:6 65:1,22 66:6,16 67:2 69:19 75:3,8,22 76:3,22 77:5 78:5 80:1,11 85:10 90:1,13,20 92:4 96:7,22 97:23 98:5 99:15,22,23 100:8,18 101:4,20 102:11,24 103:15,23,25 104:19 106:4,10,22 107:7 108:21 109:4,18,19 110:12,21 111:19 112:4,21 113:7

**format** 39:21,25 40:1 72:25

**formatted** 72:18

**forward** 20:16 22:8 26:23 83:5

**forwarded** 25:17 27:6

**found** 48:3 105:11

**foundation** 5:7,8 29:18 30:5,21 35:10 39:17 43:9 46:18 48:11,15 49:8,22 50:4,24 51:6,15,16,20 52:11,23 53:19 54:2 56:5,24 57:7,20 60:7 65:2,23 66:7,17 67:3 73:4 75:9,22 76:4 78:6 80:2,12 85:11,20 90:2 99:16,23 100:8,18 101:5 102:12,25 103:16,24 104:20 108:21 109:5,19 110:13,21 111:20 112:22 113:8

**fourth** 73:15

**frames** 81:6

**fraud** 104:16,17,18 105:16,24 106:20 112:20,24

**fraudulent** 104:16 111:24

**free** 85:24

**freestanding** 69:2

**Friday** 6:10 7:1

**front** 75:15 77:24 78:2,16,25

**full** 82:11 86:23 87:4 95:13 96:6

**future** 21:17 84:6

### G

**gave** 39:19 73:12 98:15

**GCS452** 61:16

**general** 9:9 10:19,23

11:1 12:7 13:10 28:3 57:23 93:13 102:3

**generally** 13:24 38:2 40:7 57:22 70:22 72:11

**give** 9:15 17:8,14 19:7 22:15 53:3 63:6 78:10 86:16 94:13

**giving** 81:14

**glad** 113:11

**Goldhamer** 4:7,8 5:3 6:8 7:1,10 16:25 17:3,9 21:22 22:16 23:7,24 24:5,11 28:16 29:18,21 30:5, 20 35:10 39:16 40:17 43:9 46:17 48:10,15 49:8,20,22 50:4,24 51:6,15,20 52:11,22 53:2,18 54:1 56:4,21, 23 57:6,20 59:15,21 60:6,17,19 61:1 62:5, 8,13,19,22 63:12,19, 22 65:3,24 66:9,23 67:6,23 68:25 69:4,7, 21,22 71:15,16 73:6 75:5,17,24 76:6 78:11,21 80:3,15 81:19 82:8,17 83:5 85:10,20 90:1,13,19 92:4,13,19,22 93:5, 15,17,25 94:7,9,20, 24 96:7,22 97:23 98:2,4 99:15,22 100:8,18 101:4 102:11,22,24 103:3, 14,23 104:19 106:4, 10,22 107:7,12 108:17 109:4,18 110:12,18 111:19 112:4,21 113:7,14

**golf** 11:10,14,16,17, 20,24

**golly** 86:22

**good** 84:10,12

**gosh** 9:14

**graduated** 8:17 10:8

**Great** 42:24

**greater** 49:6

**Greens** 11:10 13:25

**group** 10:2,12,16,20, 21 11:13 12:25 16:1 27:22 44:21 53:15 91:17

**guaranties** 20:1 30:2 76:11,15

**guarantor** 87:2

**guaranty** 18:1 19:2, 3,24 20:8,9 25:9,10, 16 26:12,16,18 27:1, 8 28:19 29:5,7,9,11, 17,25 31:22 33:24,25 34:7,24 35:6,17,22 36:16 37:19 39:6 40:23,24 41:3 42:23 48:19,21 51:14 54:5, 21 55:3,11,15,16,25 56:6 66:20 71:7 74:6, 14 77:1,9,12,22 78:2, 8,13,17 79:6 80:6 81:3 82:2,12,21 85:7, 8,13,15,17,18,19,24 86:2,6,10,14,21,23 87:2,4,7,18,20,22,24 88:1 89:2 90:18,21 91:1 95:12,13,23,24 96:4,9,11,17,24 97:1, 2,4,9 108:10 112:7

**guess** 28:4 63:16 106:11

### H

**handouts** 14:24

**handwrite** 15:8

**happened** 23:4 55:10 80:20

**headquartered** 98:21

**hear** 44:11

**heard** 52:12,13 65:3

**Heiskell** 9:12

**held** 39:3 55:23 74:9 76:8,13 102:16 104:5,6 108:6

**Henke** 36:18 37:4, 15,21 38:20 39:20,25

*Colman Brodksy Hoffman  - 08/09/2021*

*AB Litigation Services*

41:22 42:10,12 67:17
70:4,14 71:10 72:1,6
73:2,8,10,12

**Henke's** 38:23 39:9
42:15 95:17,21 96:2

**hereto** 19:18

**Hey** 73:11

**high** 74:10

**hired** 10:10

**hit** 11:24

**hitting** 11:16

**Hoffman** 4:13,21
5:1,11,13,17 7:13,17
8:7 14:16 16:20
20:17,19,21 21:5
25:14 32:11 34:6
37:13 48:25 53:8
54:11 55:18 60:14,16
61:7 62:22 63:20,23
69:8 78:21 84:25
85:4,12,21 86:13
90:5 91:5 93:16
94:10 96:14 102:17
103:2,18 104:8
106:25 107:14,23
108:18,23 110:24
111:9

**hold** 36:5 73:23
86:21 90:19 91:15,23
103:14,15

**Holdings** 9:23

**home** 5:19

**honor** 68:21

**hours** 59:16

**house** 76:13

**Housley** 53:10

**Hyatt** 21:1 83:7

**I**

**idea** 29:16 35:8 53:1
106:14

**identify** 32:14,15
33:22 36:24 61:8
81:19

**identifying** 33:17
107:19

**III** 62:19

**impact** 41:4,9 48:24
50:19 51:7,11 75:16
78:16

**impacted** 57:8 78:18

**impaired** 77:23

**impede** 108:15
109:2,16

**impediment** 103:10,
12,17

**implicate** 23:15,17

**implicated** 94:12

**implicates** 7:14
23:12

**implicating** 7:18

**implications** 101:9,
18

**implies** 92:22 93:7,8

**imply** 92:24

**important** 6:13
103:22 104:1

**impression** 38:20
39:12

**inability** 35:2 54:20
57:5

**inaccurate** 43:15,
19,23 44:3,6,9,15,19,
24 45:3,7,11,15,20,
24 46:3,8 47:1,9

**inaudible** 78:9

**Inc.'s** 19:19

**include** 54:16 56:18
87:14

**included** 19:4 40:9
82:20 86:9 101:2

**including** 10:22
20:10 26:7 38:25
68:18 105:16 107:16

**income** 47:4

**incomes** 74:17

**incorporate** 97:8

**incorporated** 96:12

**increase** 87:9

**incredulity** 110:20

**incur** 98:14

**incurred** 87:6,12,13
109:11

**indebtedness** 56:9,
10 100:25

**indication** 46:12
74:19,25

**individual** 12:9

**individually** 61:12
76:9 101:8 102:5
104:6 110:4

**individuals** 25:18
39:4 74:10

**induce** 34:1

**influence** 40:10

**infomercials** 31:4

**information** 14:3,4,
5,6 18:3 22:2 29:6
38:11 39:15,20,22
42:6 51:18,24 65:6
72:19,23 73:3,12
89:18,21,24 103:19
108:9,13 109:6

**informed** 40:14
94:13

**infrequent** 30:8
90:24

**initially** 32:6

**inquiring** 17:25

**inquiry** 27:14

**insolvent** 84:11

**instance** 31:8

**Institutions** 8:20,24

**instructing** 94:14

**insufficient** 21:15
84:3

**intended** 43:4,6
109:11

**intending** 5:8 71:18

**intensive** 11:22

**interest** 19:18 43:21
87:9 99:18 100:12
101:7,19 102:13,20
104:7 111:1 113:3

**interested** 113:9

**internal** 12:12,18

**internally** 69:14

**interpretation** 28:5

**interrupted** 20:12

**interrupting** 105:6

**interruption** 78:12
106:7

**Intertrade** 11:3

**interview** 6:8

**inure** 100:4,5

**investigation**
74:23,24 75:6 81:8
105:12

**investments** 44:22

**invoices** 19:22 20:1
34:23

**involve** 91:16,20

**involved** 12:21
16:15 23:25 24:8
28:2,7 29:22,25
54:24 75:7 91:3,9
93:21

**involvement** 62:23
90:22

**involves** 71:21

**Iraq** 12:6

**irrespective** 52:8

**IRS** 47:22 48:2,4,14
50:1,19 51:3,10 52:6,
8 53:23,24 54:14,17,
19 56:19 79:15
107:17 108:1,2,14
109:2,6,12

**issue** 35:21

**issues** 7:15 75:19

EXHIBIT R

*AB Litigation Services*

**item** 43:13 97:13

**iteration** 61:21

---

**J**

**J.D.** 11:6,7

**janitorial** 30:23

**January** 13:1 88:23 89:5,10 90:12,17 97:15,21

**JD** 8:13

**Jeff** 17:16,25 25:6, 17,24 26:12,14 27:2, 3,9 28:19,23 29:5,14 30:11,14 32:4 34:25 35:6,15,23 36:4,8,11 37:2 38:11 39:3,14, 15,18,23 40:19,24 42:7,18 49:12,18 51:12 52:7,14 54:6, 20,23 55:20,21,23 56:7,10 57:11 59:8,9 62:23 64:7,14,18,21, 24 65:7,11,12,17,21 66:4,5,13,22,25 67:14 68:6 69:18 70:19 71:7 72:17,24 73:3 74:4,9 76:25 80:20 81:11,24 93:22 95:6,8 100:24 101:3 102:7 103:9 104:23, 24 105:9,17 109:10, 11,14 110:3

**Jeff's** 17:17 33:4 55:6,16 58:20

**Jeffrey** 19:15,17,25 20:18,24 21:11 34:8 37:24 38:11 40:5,11 49:4 70:5 72:7 76:9 83:23 87:17,19 88:2 89:2,9,13,16,25 91:12 92:7 95:6 97:5 98:7 102:19 112:8,24

**jog** 37:3

**Johnston** 28:6

**jointly** 101:15

**judgment** 47:22 48:1,7 50:6,7,14,16 51:10 53:24 102:18, 20

---

**K**

**keeper** 91:6,18

**Keller** 7:3 10:2,12, 16,20,21 11:12 12:25 13:17 14:13 16:1,23, 24 17:20 18:25 19:6 20:15 22:3,5,22 25:5, 14 27:7,21 28:7,25 29:24 35:20 36:13 39:4 49:7,11 52:13 53:15 57:11 76:23 80:24 83:7 84:21 89:15 91:13,17 92:11 93:21 104:25 109:10 112:9

**Keller's** 15:16 62:15

**Kellergroup.net.** 21:4

**Kelsan** 10:25 12:8 13:3,25

**Ken** 17:20 18:25 19:6 20:16 83:8

**Kerry** 25:5,15 27:7

**Kevin** 21:18 25:7,22 26:11,13,17,21,25 27:13 33:12 36:12 62:25 63:25 65:6,16 68:9 69:14 71:6 89:12 91:12,18 92:8

**kind** 46:11

**kinds** 101:25

**King** 9:2

**knew** 41:20 99:4 109:9,10

**knowing** 47:21 79:22 80:3

**knowledge** 89:3 105:24 106:17 107:23

---

**L**

**label** 83:2

**land** 44:17

**Lane** 5:24

**language** 70:25 85:16 86:9 95:16,20 96:4,23

**laptop** 15:9

**larger** 74:20

**latest** 62:10

**law** 8:13,18 9:1,7,10, 12 10:8,9

**laws** 81:5

**lawsuit** 4:23 24:7,9

**lawyer** 22:10,13,24 62:25 65:21 66:4,10, 12 93:10,11

**lawyers** 23:23 81:13

**laying** 84:12

**Leadingham** 34:9

**learn** 79:12,19

**learned** 80:25

**learning** 11:10,14,20

**led** 35:23 54:3

**left** 9:4 53:14 62:9

**legal** 12:10,12,18 22:23 50:1 101:9 102:1,13

**legible** 32:12

**legitimate** 56:11

**lend** 74:5

**lessons** 11:24

**letter** 18:10 20:17, 18,20,22 21:7,21 22:1 36:25 37:1,7 38:24 39:10,18 40:4 42:1,3,11 67:17 70:4, 15 71:11 72:1,6 81:12 82:18,20 83:10,11,20 95:17,21 96:2,9 97:3,7

**letterhead** 18:7 21:1

**level** 36:4 97:20

**Lewis** 9:1,2

**liabilities** 39:24 42:19 43:10 45:17,22 46:25 47:6 51:7 75:13 76:1 77:6 78:24 79:3,9,13,16, 20,22 80:4,8,16 88:15 100:11,12,14

**liability** 26:15 48:22 61:14,16,17 74:21 75:2 101:23

**liable** 56:2

**limit** 87:2

**limited** 19:23,24 33:24,25 34:24 36:22 61:14,15,17 82:2 85:6 86:13

**liquidate** 48:19 51:8 54:21 75:11 98:14 105:10

**liquidated** 58:8 105:2 110:4

**liquidity** 48:23

**list** 24:17,18 44:1 45:13 99:17

**listed** 38:24 45:1,5,9 46:25

**listing** 82:2

**litigation** 48:5 50:15 54:9

**live** 11:19

**LL** 102:8

**LLC** 61:14,15,16 76:8 98:24,25 99:6, 10,11,18,25 100:9, 12,15,17 101:7,10,17 102:2,7,8 103:9 104:7

**LLCS** 101:22

**loan** 98:6,9,10,11

**located** 5:22 11:4

**locations** 4:6

**long** 7:7,24 8:21

**looked** 50:13 67:18 85:6

**lost** 86:21 109:1

---

*Colman Brodksy Hoffman  - 08/09/2021*

*AB Litigation Services*

**lot** 9:8 16:3,5 17:4,8

**Lowe** 53:10

**Lynch** 10:4,6

**M**

**M&m** 9:22

**made** 14:18 30:22 41:11 49:6,18 55:12 77:7 81:8 87:10 106:12

**Magnus** 61:15

**mail** 21:2,3

**maintain** 97:20

**maintained** 17:24

**maintains** 19:16

**maintenance** 12:4

**majoring** 8:11

**make** 5:4,6 14:1 34:13 41:18 50:11 53:3 78:8 85:18 105:10

**makers** 84:16

**makes** 86:10

**making** 31:10,16 75:16

**man** 101:8

**managed** 10:21 11:12

**management** 10:21 27:24 28:2,5

**manufacture** 30:9 31:7 35:5 54:23 108:12

**manufactured** 54:4

**manufacturers** 31:11

**manufacturing** 16:1,12,15 32:1,3,20 34:17 35:3 63:8 66:19 90:25 98:7

**March** 25:4,14 53:17 80:21

**mark** 81:16

**marked** 32:25 33:9 36:22 61:8 62:21 69:6 71:19 81:18 82:6,7,14,16 83:3 85:7

**market** 30:12 106:3, 9,15

**Marketable** 43:17

**marking** 69:3

**material** 14:20 56:14,15

**math** 100:6

**Matt** 8:1 15:22,24 17:20 18:18,21,24 19:6 20:15 22:3,4 25:7 26:14,18 28:6 29:13,23 35:15 36:10,13 39:3 48:18 49:7 52:13 57:11 59:9 60:8 71:20,21 79:14 80:24 83:7 84:21 89:15 91:13,22 92:12 104:25 109:10 112:9

**matter** 41:8 58:23 92:18 93:3 100:6

**matters** 40:14

**Matthew** 22:21

**meaning** 86:1 98:18

**means** 41:7,8,12,13 72:16 87:16 96:18

**Mechanically** 15:7

**meeting** 13:18,19 15:1,24 16:10

**meetings** 13:2,3,11

**meetings'** 13:19

**meets** 41:16

**member** 14:7

**members** 11:23

**membership** 102:20

**memo** 53:10

**memory** 37:3

**mention** 97:6,8

**mentioned** 6:25 11:25 56:15

**mentioning** 27:13 106:13

**mergers** 9:9

**Merrie** 17:17,19 18:23 19:8,9 21:6,19 22:5,22 25:24 28:23 29:14 32:4 35:14 36:4 37:2,24 38:12 39:3,19,23 40:5,12, 19,24 42:6,17 49:4, 12 52:7 54:7,20,24 55:5,9,14,17,20,21, 23 56:1,6,8 58:20 61:12 62:24 64:7,14, 18,21,24 65:7,11,12, 18,21 66:5,13,22,25 67:14 68:6 69:18 70:5,19 72:8,16,24 73:3 74:4,9 76:9 81:13 83:19 88:2 89:9,25 93:22 95:6,9 97:5 98:8 100:24 101:3 102:7 103:10 104:23 105:10,17 110:3

**Merrie's** 102:10

**Merrill** 10:4,6

**met** 49:13

**Middle** 12:4

**Midlab** 10:22,24 12:8 13:24 17:23 19:16,19,21 20:2,17, 19,21,23 22:19 23:10 24:7 27:25 28:1,3,5, 11,22,24,25 29:2,19 30:3,4,6,15,22,24 31:10,19,21,24 32:3 33:5,12 34:1,15,23 35:4 48:23 49:3,19 51:4,8,13 52:19 54:4, 5,6,8,19,22,23,25 55:3,15,24 56:2,9,10 57:10,14 58:9,11 59:7,22 61:11 63:11 68:18 75:15 77:18 78:3,7,13,16 79:1,2 80:9 81:24 82:3 84:13,15 87:23

88:17,19 89:4 90:9, 16,22,23 91:17 98:21 102:10,18 103:11 104:13,24 105:16,19, 22 106:21 108:12 109:9 110:3,5,7,8 111:8 112:8 113:2

**Midlab's** 15:19 21:20 26:5,7 30:8,13 31:5 55:12 57:5 77:25 78:2 81:14 91:17 108:15 109:3, 8,16

**Midlab's-zap** 68:13

**military** 11:3 12:3

**Miller** 8:4 16:12,16 17:20 18:25 25:5,15 27:7 28:6,10 33:11 53:11 89:20 91:14,23 92:12 93:20

**million** 19:24 26:16, 19 39:1 44:23 45:1,5, 9 46:2,11,20 48:2 73:17,20,24 74:14,17 77:16 100:2,4 109:12 113:5

**mind** 33:16 37:22 85:14 104:3 112:20

**mine** 16:2

**minute** 16:18 17:14

**minutes** 7:8 13:13, 19 15:7,10,12 27:11 59:19 60:17,20 61:1 78:9,10,19

**misconstrue** 50:10

**misrepresented** 47:15,18,25

**misrepresenting** 47:23

**missed** 13:7,9

**misstated** 107:15, 17

**misstates** 106:23 107:8,12

**moment** 94:10

**money** 22:12 104:14 111:7

*AB Litigation Services*

monthly 89:22

months 43:7 108:3, 5,6

morning 4:21 7:6 61:20 104:11,12

mortgage 10:1 46:1, 5,6,20,21 101:1 111:3

Morton 9:1

moved 15:25

multiple 43:8 100:10

mute 94:24

**N**

named 8:19 9:1,13 62:25

Nashville 5:19,24

nature 77:5,6

NDA 25:25 26:1 27:14 65:12,14

needed 32:5 35:17, 22 48:18 55:6 59:7

negative 50:19

nego 29:13

negotiate 90:24,25

negotiated 29:12 33:11 66:19

negotiating 63:8 66:18

net 35:16,18,23 36:4 39:2,5,24 42:20 47:11,15,18 58:24 73:16 74:7,10 77:6, 17 99:13,20 100:5 101:3

normal 30:8,13 31:1, 5

note 32:24

notebook 14:6,9,22, 25

notebooks 14:8,12, 13,16 15:11

noted 107:13

notes 6:2,4,5,7 62:15

nother 85:5

notice 17:23 19:14 21:9 81:14 83:21 86:24 87:1,3 95:15

noticed 6:12

November 26:22,24 27:2,4 34:12,25 37:8 67:7 87:23 88:20

number 43:15,18,22 44:2,6,9,14,18,24 45:2,6,10,15,19,24 46:3,7,14 47:1,9 50:14 62:9

numbers 46:12,19

**O**

oath 4:2,4

object 7:10 16:25 24:5,11 30:20 39:16 40:17 43:9 46:17,18 48:10 52:22 53:18 54:1 56:4,23 57:6,20 60:6 85:10 90:1,13, 20 92:4,13 96:7,22 97:23 98:5 99:15,22 101:4 102:11,22,24 103:15,23 104:19 106:4,10,22 108:17, 21 109:4,18 110:12, 21,22 111:19 112:4, 21 113:7

objection 29:21 53:2 65:1,22 66:6,16 67:2,21 69:19 73:4 75:3,8,20 76:3 78:5 80:1,11 94:5 107:7, 13

objections 5:5,7,9 53:4 103:3

obligated 88:15

obligation 55:2 57:9 77:25 78:14 87:10, 11,17 105:2,3 107:16 108:1,2 109:12

obligations 32:2 75:14 77:24 78:1,15 85:17,25 87:5,13,18 110:1

obtain 29:16 34:24 41:15 102:18

obtained 54:5 89:21

obtaining 28:18,19 74:3

occasion 31:7

occurred 52:25 87:8 104:18

October 20:15 21:2 38:1 43:2,4 47:12,15 48:7 51:5,11 54:13 56:2 70:21 72:9 88:8, 13 91:7 97:13,18 98:18 111:11

offer 91:21

offers 113:5

office 5:19 15:17,25 16:2

officer 11:6,11 12:16 28:1

officers 13:23

offline 94:10

omission 54:13,18 56:14,15,17,22,25 57:5

omit 40:6

omitted 40:8

one's 57:16

ongoing 16:2 89:16, 17

open 20:25

opened 21:10 83:23 85:4

opening 26:9

operating 13:24

operation 14:3 90:22

operational 14:4

operations 12:4

14:1

opinion 38:13 50:23 51:9 87:16 110:7

opportunities 16:7

opportunity 15:23 16:13 108:20,24

order 28:25 35:4 40:21 41:14 51:19,25 58:13,15 59:22,25 86:5 87:24

original 61:21

outline 17:15 24:20

outstanding 17:24 19:16,20 20:1 35:5 47:22 55:1 109:17

overdue 19:21,22

owed 19:21 20:2 46:13,21,23 56:9,10 100:15 104:14 108:16

owned 10:24 55:19, 21 58:21,24 59:5 88:15 99:4,10 100:3, 15,24 101:17 102:7,8 103:8 110:3

owners 99:11

ownership 55:9 100:4 101:7,9,18,21 103:8,25 107:19

owning 101:19 102:1,5

owns 55:9 98:20,23, 25 99:2 109:24

**P**

p.m. 113:15

pages 33:20,22 67:18 68:1 70:14

paid 22:19 23:5,20 28:22 51:23 54:5,7,9 55:3,13,24 57:5 75:15 84:10 87:2 104:15 108:15 109:3 110:8

papers 63:13

*AB Litigation Services*

Paradigm 45:9

paragraph 37:23
39:12 40:3,16 41:4,7,
12,13,22 96:25

part 14:20 27:24
28:14 31:21 76:25
91:20

parties 4:3

partnership 102:3

party 22:6 110:9
111:22

pass-through 102:9

passed 8:14,15

past 7:1 13:19 32:6
40:21

patience 60:14

paused 64:9

pay 29:6 30:10 32:2
34:23 39:6 40:24
42:23 48:18,20,23
51:8,13,23 54:21
55:1,7 59:7,11 74:6
77:22 78:8,14 98:15
105:2,3,11,19 110:5
111:8 112:11,18

payable 46:1,5,20,
22 111:3

payment 20:1

pending 75:19
103:16 108:22

people 11:19,21

percent 102:7,8,19

percentage 100:4

perform 38:9

performed 38:4

Periodically 13:21

perpetrated 105:25
106:20

person 26:6 29:24
68:17

person's 12:19

personal 17:16,17
18:21 21:11 25:10,

15,16,23 26:12,15,18
27:8 28:18,19 29:4,9,
11,17 30:2 39:19
40:23 42:21 64:6,14
65:10 66:21,24
67:11,13,16 71:7,22
73:9,11 74:19,22,25
76:18 79:15 83:24
89:24 91:2,8,21 97:4,
7 105:1,11 106:17,23
108:11 112:6,16

personally 29:6
58:2 90:14

Personalty 44:5

phone 60:22 94:22

physical 11:18

Pisano 21:6,19
61:12 83:19

pivot 16:21,22

place 25:25 65:12

plan 13:22

plans 43:21

plant 16:6

point 15:25 22:8
41:10 84:13 99:1

pointed 54:11

politely 110:19

portion 102:10

position 10:16 50:2,
22 51:2,3

positions 10:18

post-secondary
8:8

potential 30:3 50:19
75:1 101:11 102:14
103:20

potentially 7:11

Powerpoint 14:19
15:3,5

practice 9:7 10:8
23:22

pre-deposition 6:8

precise 46:13

precisely 50:11

prefer 110:19

premise 53:21

prepared 39:14
72:17 73:13

preparing 99:21

present 13:20 14:4

presentation 14:18

presentations 14:1
15:2,5

presented 14:7
16:13

presenting 14:21

presently 5:18,22

president 10:19,23
11:1,11 28:3

presume 77:2

prevail 40:3

previous 19:1 20:7
108:19

previously 70:16
72:18

primarily 9:10 10:11
12:5

primary 16:3

principles 38:2 40:7
41:14 70:22 72:10

prior 15:20 19:8
49:12

privilege 7:12,15,19
23:10,12,15,19 93:14
94:5,12

privy 22:22

probate 21:10,15,16
81:5,8,10,11 83:22
84:4,5,23

probated 84:22

procedures 38:10
41:14,17 72:21

proceed 5:11 7:21
22:23 28:24,25 40:21
92:20

proceeding 21:15
50:18 80:5 84:4

proceeds 48:20
59:11 110:8

produce 6:16

produced 94:17

producing 52:9

product 12:1 30:12
31:3,11,16,18 52:15

products 19:20 20:2
26:5 30:9,22,25 31:8
33:13 34:2 44:22
45:1 52:10 53:11
54:4,23 62:23 65:21
66:5 68:13

project 89:13

projection 43:6

projections 28:12

promulgated 38:6

proof 105:14

properly 101:2,6

properties 57:14
58:19

property 101:16,17
102:1,5,16 104:5,6
111:6

pros 11:16

prospective 14:2

provide 5:11 6:22
11:21,23 14:2 16:23
26:1 38:13 58:9
65:13 72:20 73:11

provided 14:20 26:2
38:11 39:15 42:6,21
68:10 72:23 87:7

providing 12:12
65:6 66:21

psychology 8:11

public 57:1

Pulkrabek 18:19
71:20

pull 32:10 33:14 53:6
61:5 86:12

*AB Litigation Services*

purchase 98:14

purpose 59:1 68:12
74:3 100:17,21
101:22 109:16

purposes 26:4
58:23

pursuant 20:21
87:15

put 39:20,25 113:4

puts 42:3

## Q

quantification 75:6

quantify 75:4

quarterly 14:2

question 5:5,7 6:19
21:22 23:9 24:6,12
47:17 51:19 58:6
65:5,25 77:10 85:22
86:5 92:21,22,24
93:19 94:1,21 95:19
96:8 103:16 104:9,15
107:2,10,11,13,14
108:19,22 110:19,21
113:11

questions 6:13,17,
23 7:23,24 23:14
59:20 62:3,7 85:5
113:12

## R

raised 35:21

raises 104:16

raising 110:20,23

ramifications
101:25

range 11:16 19:22

rate 87:9

reached 26:14

reaction 84:7,9

read 17:5,7 19:13
32:11 38:18,19 40:3,
15 61:18,22 85:16
95:2,12,21 97:12

104:9 105:14,25
107:4,6

reading 37:22 38:15,
17 39:11 86:8
106:17,19 107:18

real 9:23 44:13,17
57:18,21,22 58:3,21
74:8 101:20 102:14

reason 6:21,24
43:14,18,22 44:2,6,9,
14,18,24 45:2,6,10,
14,19,23 46:3,7 47:1,
8 52:5 65:16 73:1,7
105:23

recall 5:15,16 15:23
16:8 21:20,24 27:12
29:10,16,22 36:6,7,
19 37:5 38:15,17
49:5,16,21,23 52:24
80:24 95:3 106:13

receipt 20:3 89:1
91:11

receivable 82:3,22

receive 33:4 36:3
64:3

received 8:10,13
20:4 25:16 33:25
38:16,18 40:25 57:25
58:12 67:8 76:21
82:25 83:6 88:19
89:23 90:11 91:1
92:9 112:5 113:6

receives 86:24
95:14

recollection 34:22
46:15

recommendation
79:5

recommendations
80:5

recommended 78:3
80:16 81:12

reconvene 60:15

record 5:4 14:9
16:17,19 57:1 61:3
78:22 91:18 95:10

recording 6:12

recover 78:17
109:17

recruiting 12:22

recycling 9:20

refer 17:13 97:8

reference 71:22
95:24 106:12

referring 48:6,8
64:18 97:3 98:10

refers 72:7

reflected 74:20 75:1
79:10,16

reflects 6:16 49:25
50:1

regard 13:11 22:8
29:9 30:3 36:1 42:10
50:2 58:13,15 60:4
97:11

region 12:5

regulatory 9:8

related 28:18 111:22

relates 96:24 97:1

relating 18:1 25:1

relationship 15:19
90:23 91:3

relayed 104:25
112:10

reliance 73:19 90:6

relied 38:24 39:7
41:2 42:6,7,17,23
55:3 58:20 73:22
74:7 76:24 78:13
87:24 88:18 90:7
112:15 113:2

rely 38:23 39:9 42:5
59:6 73:21,23 74:12
84:14,18 90:8

relying 40:18 78:7,8
86:3 90:15 112:10

remain 86:23 95:13
96:6

remains 96:18

remember 9:15
22:11,13

remotely 4:3

renamed 9:3

renewal 87:8

repair 12:4

repay 49:3,19 57:9,
14 58:9

repayment 55:20,
22,24

repeat 66:1 69:20
102:4

rephrase 51:2 96:1

replaced 12:7

report 41:15 72:20

reported 15:22 16:9

reporter 4:2,5,9,12,
17,24 6:12,15 62:17
63:21 69:3 71:12
78:12 106:7

represent 4:22 23:3
66:20

representation
39:10,23 42:5,18
49:7 53:22 58:21
59:4 98:16

representations
49:18

representative
21:12 83:24

represented 39:2
54:25 55:19,21,22
57:12 59:8,9,14
110:2

request 20:22 21:6
31:22 35:8,12 36:12
68:21 83:18

requested 22:23
36:8 91:19

require 41:21

required 21:17 35:5
38:9 40:6,22 41:23
84:5 97:20

reserve 94:4

residence 44:8 46:2
55:5,10,21 57:13

EXHIBIT R

58:3,8,13 60:1,4 74:8 75:12 101:14 105:19 106:9

**resources** 49:2

**respect** 76:19 79:5 80:5 81:3 107:8

**respected** 23:11

**respond** 24:3 28:21 113:10

**responding** 20:4 27:14

**response** 21:7,20, 23,24 82:25 83:14, 17,19 84:8,19 86:3

**responses** 6:22

**responsibility** 16:4

**responsible** 37:24 70:20 72:8

**restrict** 48:22

**restricted** 98:7

**result** 54:8

**resulted** 23:21

**retainer** 23:5,20

**retired** 10:10

**retirement** 10:11

**retrospect** 48:12

**return** 26:8 60:22

**reveal** 94:1

**revealed** 75:25 77:15 78:24

**revealing** 93:23

**review** 13:19 26:12 29:11 36:3 38:6,7,8 41:9 46:16 71:8 85:24 86:13

**reviewed** 76:22 81:5

**revise** 26:19

**revised** 26:23

**revision** 26:20

**revocation** 86:25 87:3,6,8,11,12,14,15 95:15

**revolving** 45:18

**rights** 87:7 101:15, 17

**Robert** 36:18 37:4, 15,21 39:20 41:22 70:4

**Roger** 32:9 33:2,14 34:4 36:21 37:10 53:6 61:5 71:13

**role** 13:11 22:7 28:18,21 29:8 61:24 90:24

**roles** 12:11

**room** 5:25

**Ross** 18:19 71:20

**round** 46:11,14

**Russell** 34:9

---

**S**

**S-P-R-I-N-G-S** 5:24

**Sabelman** 17:19 18:24

**safe** 15:17

**sale** 30:9 31:3 111:24,25 113:4

**sat** 8:14,15

**savvy** 57:17

**scan** 19:3 20:8 25:8 26:25

**Schenk** 8:1 15:22,25 17:20 18:18,24 19:6 20:15 22:3,5,21 25:7 26:14 28:6 29:13,23 35:15 36:10,13 39:4 49:7,13 52:13 57:11 59:9 60:8 71:20,21 79:14 80:24 83:7 84:21 89:15 91:13,22 92:12 93:20 104:25 109:10 112:9

**school** 8:18

**Schreck** 21:1 83:7

**screen** 63:16 64:9 69:8 71:2,10,11

**scroll** 64:8 86:16

**search** 22:24 27:15, 18

**searching** 22:17

**secretary** 28:4

**secured** 110:9,10 111:1

**securities** 43:17

**security** 29:2,4 32:5

**seemingly** 105:13, 15

**sell** 11:17 57:13 59:10 105:19

**selling** 12:2 48:23 55:4

**send** 17:10,12 25:8 26:20,25 70:8 71:13 73:2 81:12,20 82:8, 17

**sending** 64:21 71:21

**sentence** 72:7 95:12

**separate** 69:2

**September** 32:21 34:17

**series** 51:24

**served** 10:23 11:11 28:1

**serves** 12:16 19:14 21:8 83:21

**services** 12:12 38:6, 7

**serving** 17:23

**set** 14:12,13,14,15 15:14 41:16 85:5 111:10

**settled** 51:23

**shame** 42:8

**Shar** 107:5

**share** 63:15 71:10, 11,14

**shared** 26:6 35:15 68:17

**sharing** 64:9 69:8 71:3

**Shark** 31:9,13

**Sharp** 31:9

**shenanigans** 107:21

**shield** 101:24

**show** 82:14

**shown** 100:12

**shows** 21:19 45:18, 22 46:6 47:7,11 111:3

**sic** 17:19 32:19

**side** 79:2

**sign** 56:6

**signature** 19:2,4,10 20:8,10 21:18 33:1,2, 4,5

**signatures** 37:13, 18,20

**signed** 25:8 27:1,9 33:5 36:16 77:9,12 81:4 82:12,20 86:25 89:2 90:18,21 95:15

**significant** 35:16,24 39:5 41:1 42:20 78:24 79:3

**similar** 95:16,20

**Simplicity** 45:5

**simply** 5:6,8

**single** 56:15 100:10

**sir** 107:1

**Sirius** 44:22

**sister** 9:22

**situation** 73:10 89:14 98:17

**skip** 80:19

**Smart** 11:8

**snapshot** 43:4 88:10,12,14

**so-called** 101:24

*AB Litigation Services*

**sold** 30:23,24,25 31:9 106:3,6,9,14,15 111:7,15,21 112:17

**solely** 26:4 68:12

**solely-owned** 103:9

**sort** 11:21

**sought** 30:2

**sound** 28:17

**Sounds** 84:11

**source** 48:20 55:20, 22,23

**speak** 7:2,7 8:1,4 65:17

**speaking** 6:14

**special** 58:25 100:17,21 101:22 109:16

**specific** 25:3 28:9 74:8

**specifically** 7:23

**specificity** 49:6,16

**specifics** 9:16

**speculate** 112:23

**speculation** 107:23

**speed** 5:6

**spelled** 4:23

**spend** 16:5

**spent** 17:5

**Speth** 25:5,15 27:7,8

**spoke** 6:25 26:17 36:6 49:11

**spouse** 19:15

**spouses** 101:15

**Springs** 5:23

**SR2** 9:20

**stand** 75:15

**standards** 38:5 41:17,24

**standpoint** 50:1

**start** 25:12,20 32:8

62:20

**started** 10:2 28:11 62:25 63:8

**starts** 71:20

**state** 32:16 67:4

**stated** 84:19 112:15

**statement** 17:17,18 18:21 25:2 35:9,12 36:1,7,9 37:2,25 38:9,14,21,25 39:13, 21,22 40:1,9,13,25 41:3,19,21 42:22,25 50:21 54:12,16 56:16 58:1,12 64:6 66:25 67:14,17,22 68:3 69:17 70:4,15,20 71:22 72:3,9,14 73:12,13,20,24 74:4, 11,12,16,20,22 75:1, 25 76:2,7,19,20,24 77:14,17 78:22 79:4, 10,16,23 82:21 88:4, 6,23 89:5,8 90:7,15 91:2,6,15,22 92:5,9, 11 93:1,2,21 94:18 95:5,8,18,22,25 96:3, 5,11,19 97:5,8,12 99:21 100:13 104:5 106:24 107:9,16,18 108:11 110:15 111:2 112:6,16

**statement's** 96:10

**statements** 25:24 38:5 42:3 64:14 65:11 66:21 67:11 72:17 88:1 91:8

**States** 38:3 40:8 70:23 72:11

**status** 51:22

**step** 97:11

**steps** 76:18

**Steve** 4:21 7:10 16:12,16 17:20 18:25 25:5,15 27:7 28:6 33:11 53:11 59:15 62:8 63:12 91:14,22 92:12 94:9

**Steven** 8:4

**stock** 101:19

**stood** 78:15

**stop** 23:18 65:15

**stopped** 52:9

**strictly** 26:3 31:18 68:10

**subject** 20:16,20 21:14 27:4 48:5 50:15 51:25 53:11 84:2 92:17 93:2,12, 13

**subsidiary** 10:25

**substance** 14:18

**substantially** 40:6

**successful** 59:10

**successor** 12:22

**sue** 24:1

**sufficient** 30:10 54:25 74:13 84:23 105:1

**suggested** 103:7

**suicide** 54:6 80:23

**summary** 76:22 77:5

**summer** 28:10 111:16

**supply** 32:20 34:17 57:23

**support** 12:5 26:4 31:22 32:5 41:3 42:22 68:12 74:5 79:6 112:7

**supported** 29:5 35:6,17,22 74:11

**surface** 30:18

**surmise** 61:24

**surprise** 79:19 89:25 90:3

**survive** 52:15 112:12

**survived** 55:11

**surviving** 19:15

**survivor** 55:6,17

**Swiss** 11:25 12:1

**Switzerland** 11:4

**sworn** 4:14

---

**T**

**taking** 31:22

**talk** 15:19 58:10 62:22 73:19 76:17 82:24

**talked** 17:7 23:2

**talking** 69:24 89:15 90:6

**task** 35:25

**tax** 47:7 74:20 75:2, 19,25 79:12 80:8,16

**taxes** 47:4 74:17

**teach** 11:17

**team** 27:25 28:5 31:21

**TECHNICIAN** 86:15,19

**telling** 59:12,13 107:20 112:5

**temporal** 96:20

**tendered** 108:11

**Tennessee** 5:20,24 8:9,12,14,18,19,23

**term** 49:24

**terminology** 85:9

**terms** 26:9 29:12 32:3 35:3 77:19 78:4 80:10

**testified** 4:15 28:10 49:11,13 67:7 87:22 89:21,23

**testimony** 17:8 53:14 54:15 106:23 107:8,11

**Texas** 8:15

**Theodor** 11:2

EXHIBIT R

*AB Litigation Services*

thing 24:19 76:13

things 75:18 107:24, 25

thought 26:14 50:5 109:1 111:9

thoughtfulness 52:3

thread 19:5 63:25 67:1 69:8,10,23,24 70:3

Thursday 6:10 7:1

Tim 14:13 15:16

time 14:25 16:6 17:5 22:4 29:13 30:11 32:2 38:15 42:2 46:13 47:19 48:3 57:19 60:5,15,16,25 61:18 62:9,24 81:6 87:22 88:16 94:19 95:6 96:20,21 105:7, 8 108:10 113:13

timely 34:23

times 13:4

title 58:13,15 86:4,7

titled 58:19 85:13

today 6:22 39:12 63:18

told 7:22 12:9 16:24 19:12 32:4 48:21 49:1,10,16 56:17 73:10 77:5 79:14 80:22,23,24 81:1

top 24:18 42:3

totaled 45:14

touched 30:18

train 109:1

training 11:22

transaction 40:20 111:23

transactions 99:3 101:21

transcript 6:16

transfer 104:16

transferred 105:13, 15,21

transferring 108:4

transmitted 17:16

traveled 16:5

trial 19:19

troops 12:6

true 55:14 102:21 103:1 107:19

Trust 61:13

trustee 61:13

truth 59:12

truthful 42:7

truthfulness 40:18

turn 36:21 37:11 42:24 88:3

TWI 11:5

type 12:18 15:8 23:22 31:2 72:20

typed 15:9

types 7:24

**U**

ultimately 55:2 79:12

unable 6:22 20:24 32:2 39:7 55:2 110:6

undersigned 86:25 87:1 95:15

understand 31:20 34:14 41:10 47:17 64:17,20,23 65:20 91:5 95:19 96:8 101:12 103:21

understanding 37:20 57:15 66:3,10, 12,15 84:14 86:4

understood 5:10 50:11

unilateral 91:20

United 38:3 40:8 70:23 72:11

University 8:9,12

unknown 75:1

unpaid 35:5

unrestricted 98:13

unwilling 39:6 110:6

update 88:22 89:4

updated 89:8,24 91:14 92:5,10 93:1, 21 94:17 95:5

user's 40:10

utilize 99:12

**V**

vacation 13:5

values 47:5 57:22 112:16

Vance 53:10

vehicles 44:1 45:22

vendor 11:3

venture 59:10

veracity 40:19

verbal 6:18

verify 38:10

Verits 61:15

Vested 43:21

vice 10:19,23,25 11:11 28:3

view 60:11 76:1

Vince 7:22 13:17 14:12 17:20 18:24 19:6 20:15 22:21 25:5,14 27:6 28:7,25 29:24 36:13 39:4 48:18 49:7 52:13 57:11 59:9 76:22 77:5,7 80:23 83:7 84:21 91:13,22 92:11 99:1,5,11 100:3 104:25 109:9 112:9

Vince's 14:14

Vincent 22:2,5 35:20 89:14

virtually 13:3

visit 60:8

voice 110:20,23

volumes 41:17

**W**

wait 6:18

waiting 94:3 97:25

Waldrop 9:2

Walmart 31:14

wanted 22:19 40:23 50:10

warrant 21:15 84:3

week 6:10 7:2,23 88:20

weekly 89:17

well-established 31:15

wholly 10:24

wholly-owned 103:9

whoops 86:21

wife 101:8,14

Wille 11:3

witnessed 34:8

word 34:20 103:5

words 5:9

work 8:21 9:8,9,12, 19 10:4 12:18 58:13, 15

worked 8:22 9:4,14, 24,25 10:1,3,12 16:12,14

working 9:7 30:11

works 64:11

worth 35:16,18,23 36:4 39:2,5,24 42:21 47:11,15,18 58:24 73:16 74:7,10 77:7, 15,17 99:14,20 100:5 101:3 111:17

*AB Litigation Services*

**writing** 14:7 21:7 83:19

**written** 15:6 53:12, 16 86:24 87:3 95:14

**wrong** 71:9

**wrote** 25:22 26:13, 17,21 52:19 64:5 65:8 71:1

**Wycoff** 17:16,23,25 18:3 19:1,8,9,12,14, 15,17,25 20:7,18,24 21:6,11,12,16,19 25:6,17 26:12,14 27:2,3,9 28:19 29:5, 14,15 30:11,15 32:4 34:8,25 35:7,15 36:4, 8,11 37:2,24 38:12 39:3,14,15,19,24 40:5,12,19 49:4,12, 18 52:7 54:6,7,20,23, 24 55:14 56:1,6,7,8, 10 57:11 59:9 61:12, 13 62:24 64:18,21,24 65:7,11,18,21 66:5, 13,25 67:14 68:6 69:18 70:5,19 71:8 72:8 73:3 74:5 76:8, 9,25 80:20,21 81:11, 13,24 83:19,24 84:1, 5 87:17,19 88:2 89:2, 9,13,16,25 91:12 93:23 95:6,9 100:23, 24,25 101:3 102:7,8, 19 103:10 104:23 109:10,11,14,15,23, 24,25 110:1,3 112:8, 24

**Wycoff's** 18:21 35:23 42:18 49:12 51:12 52:7,14 92:7 98:8 104:24

**Wycoffs** 35:16 36:14,15 38:22 42:13 47:14 48:4,7,13 49:17 50:2,18 52:6 66:20 75:19,25 77:15 79:9 88:22 89:1,4

**Wycoffs'** 51:12 88:11,12 97:15

**Y**

**year** 13:21,22 14:1 18:12 43:7

**years** 5:15 8:10 9:24 10:1,13 13:8 43:8 50:14 108:3,5,6

**yesterday** 104:10

**you-all** 78:10

**Z**

**ZAP** 15:20,21 16:8, 11 19:20 20:2 22:9 26:5 28:13,22 29:1 30:7,14 31:2,23,25 32:1,4 33:12 34:2,16 39:6 40:22 45:1 52:7, 9,20 53:11,12,16 54:24 55:1 56:9 62:23 63:10 65:21 66:4,18 77:4,8,19 78:4,14 80:10 82:3, 21 87:25 89:22 90:10,17,23 91:3 108:12 109:9,14 110:6

**ZAP!'s** 28:11 31:17 34:22 35:2 53:25 54:3

**Zoe** 20:19 83:6