*Midlab Inc*

*VS.*

*Wycoff*

---

MATTHEW JON SCHENK

August 03, 2021

---



AB Litigation
SERVICES

216 16th Street, Suite 600
Denver, CO 80202
303-296-0017

EXHIBIT S

AB Litigation Services

**Page 1**

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Civil Action No. 1:20-cv-03142-KLM

_____

REMOTE VIDEO DEPOSITION OF MATTHEW JON SCHENK
August 3, 2021

_____

PLAINTIFF:
MIDLAB, INC., a Tennessee Corporation
vs.
DEFENDANTS:
MERRIE PISANO WYCOFF individually and as trustee of
The Wycoff Family Trust; WYCOFF FINANCIAL, LLC, a
Colorado limited liability company; MAGNUS VERITAS
LLC, a Colorado limited liability company; and
GCS452, LLC, a Colorado limited liability company

_____

APPEARANCES:
    KEATING WAGNER POLIDORI & FREE, PC
        By Ross W. Pulkrabek, Esq.
        1290 Broadway, Suite 600
        Denver, Colorado  80203
            Appearing on behalf of Plaintiff.
            (Via Zoom videoconference.)
    BROWNSTEIN HYATT FARBER SCHRECK, LLP
        By Steven E. Abelman, Esq.
        410 Seventeenth Street, Suite 2200
        Denver, Colorado  80202
            Appearing on behalf of Defendants.
            (Via Zoom videoconference.)
    Also present: Genie Passow, Aaron Nelson, CLVS

**Page 2**

1       Pursuant to Notice and the Federal
2   Rules of Civil Procedure, the video deposition of
3   MATTHEW JON SCHENK, called by Defendants, was taken
4   on Tuesday, August 3, 2021, commencing at 9:59 a.m.,
5   via Zoom videoconference, before Sharon R. Dobson,
6   Registered Professional Reporter and Notary Public
7   within and for the State of Colorado.
8
9
10              I N D E X
11   DEPOSITION OF MATTHEW JON SCHENK
12   EXAMINATION BY:                    PAGE
13     Mr. Goldhamer                     --
14     Mr. Abelman                        6
15
16
17
18
19
20
21
22
23
24
25

**Page 3**

1   EXHIBITS                 INITIAL REFERENCE
2   Exhibit 60  Email to Schenk, et. al.,     46
                from J. Wycoff, 10/19/16
3
    Exhibit 61  Email to Schenk from          47
4               J. Wycoff, 11/19/16
5   Exhibit 67  Second Amendment to           45
                Manufacturing and Supply
6               Agreement
7   EXHIBITS PREVIOUSLY MARKED   INITIAL REFERENCE
8   Exhibit 31  Manufacturing and Supply      15
                Agreement
9
    Exhibit 32  FY 2017 1Q Board Meeting,     35
10              July 14, 2016
11  Exhibit 33  November 10, 2015 Meeting     16
12
    Exhibit 36  FY 2016 4Q Board Meeting,     33
13              April 20, 2016
14  Exhibit 45  Email to Schenk and Miller    40
                from J. Wycoff, 8/15/16
15
    Exhibit 46  Email chain, including email  44
16              to V. Keller, et. al. from
                Miller, 9/2/16
17
    Exhibit 50  Amendment to Manufacturing    32
18              and Supply Agreement
19  Exhibit 51  Limited Continuing Guaranty   20
                (Guaranty Limited to $1,000,000)
20
21
22
23
24
25

EXHIBIT S

**Page 4**

1          P R O C E E D I N G S
2       THE VIDEOGRAPHER:  We are on the record at
3   9:59 a.m.  Today is August 3rd, 2021.  This begins
4   the video deposition of Matt Schenk, taken by the
5   defendant, in the matter of Midlab, Inc., versus
6   Merrie Pisano Wycoff, et. al.
7       We are on by Zoom videoconference.  The
8   court reporter is Shar Dobson.  The videographer is
9   Aaron Nelson.
10      Counsel, will you please introduce
11  yourself beginning with plaintiff's.
12      MR. PULKRABEK:  Yes.  This is Ross
13  Pulkrabek for Midlab, Inc.
14      Just a preliminary note, I don't believe
15  that this deposition was noticed for video.  And
16  Mr. Abelman can correct me if I'm wrong, but we
17  object to videotape of (inaudible.)
18      THE COURT REPORTER:  I'm sorry, Ross,
19  you're almost unhearable.  ""Mr. Abelman can correct
20  me if I'm wrong, but"...
21      MR. ABELMAN:  That's correct, he's -- I
22  didn't understand anything beyond the second or
23  third word.
24      MR. PULKRABEK:  Let me -- can you hear me
25  at all now?

*AB Litigation Services*

**Page 5**

1    THE COURT REPORTER:  Yes.
2    MR. PULKRABEK:  Okay.  I said I'm -- I'm
3 Ross Pulkrabek.  I'm here on behalf of Plaintiff
4 Midlab.
5    I'm sure Mr. Abelman will correct me if
6 I'm -- I'm wrong about this, but I don't think the
7 video was noticed in this case.  I think it was only
8 noticed for stenographic means.  So to the extent
9 that the method of reporting varies from the notice,
10 we just note that objection for the record.
11    THE COURT REPORTER:  I got that.
12    Okay.  Excuse me.  The oath for this
13 deposition is being given remotely, and the parties
14 have agreed not to challenge the oath based on the
15 deponent and court reporter being in different
16 locations.
17    Is that correct, Mr. Pulkrabek?
18    MR. PULKRABEK:  That's correct.
19    THE COURT REPORTER:  And, Mr. Abelman?
20    MR. ABELMAN:  Indeed.
21       MATTHEW JON SCHENK,
22 being first duly sworn in the above cause, was
23 examined and testified as follows:
24    THE COURT REPORTER:  Thank you.  Please
25 begin.

**Page 6**

1       EXAMINATION
2 BY MR. ABELMAN:
3    **Q    Mr. Schenk, this is Steve Abelman.  I**
4 **represent the defendants in this case.  I didn't**
5 **hear when you announced your location.  Are you**
6 **currently in the -- in -- in the Midlab office**
7 **building?**
8    A    No, I'm not in Midlab.  I'm in a building
9 called Fairways and Greens.  It's a golf training
10 facility.  I'm in an office in that building.
11    **Q    And is there anybody in the room with you?**
12    A    There is not, and the door is closed.
13    **Q    Okay.  And do you have any notes or**
14 **documents with you?**
15    A    No, I do not.
16    **Q    Have -- with whom have you discussed**
17 **this -- your deposition?**
18    A    I've discussed it with my attorney.
19 That's it -- basically it.
20    **Q    Did you talk to Mr. Miller about his**
21 **deposition yesterday?**
22    A    I asked how it went, and he said it went
23 well and took a long time.
24    **Q    We'll try and keep your deposition**
25 **shorter.**

**Page 7**

1    **Have you ever been deposed before?**
2    A    Long time ago.  Eight, 10 years ago.
3    **Q    And what was that related to?**
4    A    A property dispute between myself and a
5 neighbor.
6    **Q    So I'll just briefly address the rules**
7 **here.  This is a video deposition.  You're also**
8 **being recorded through a stenographer, which makes**
9 **it imperative for all your responses to my questions**
10 **to be verbal.**
11    A    Okay.
12    **Q    In the normal course of conversation, we**
13 **all have the tendency to start speaking before the**
14 **other person is done.  And what we have to do, and I**
15 **remind myself as well, is to not talk over one**
16 **another because the stenographer can't a -- scribe**
17 **who is saying what when two people are talking at**
18 **the same time.  Does that make sense to you?**
19    A    It does.
20    **Q    Is there any reason that today you are**
21 **unable to give truthful and accurate answers to my**
22 **questions?**
23    A    No.
24    **Q    Good.  Tell me your home address.**
25    A    Home address is 13031 Lady Slipper Lane,

**Page 8**

1 Knoxville, Tennessee, 37934.
2    **Q    And what is your post secondary-education?**
3    A    I have a degree from the University of
4 Tennessee, Bachelor of Arts in economics.
5    **Q    I didn't catch the name of the university.**
6    A    University of Tennessee.
7    **Q    So you're a Vol.**
8    A    Um-hum.
9    **Q    And you're currently the president of**
10 **Midlab?**
11    A    I am.
12    **Q    How long have you been the president?**
13    A    Oh, memory, seven years, maybe, I think.
14 Somewhere in that ti -- time period.
15    **Q    And what was your position prior to**
16 **joining Midlab?**
17    A    I've been with Midlab for 31 years.  Prior
18 to that I was -- I worked -- I worked, like, as a
19 supervisor at another company.
20       (Interruption by the court reporter.)
21       THE DEPONENT:  You got my answer?
22       THE COURT REPORTER:  Yes.
23    **Q    (By Mr. Abelman) So pr -- prior to you**
24 **being president at Midlab, what was your position at**
25 **Midlab?**

*AB Litigation Services*

1    A    I've held multiple positions at Midlab,
2  from plant manager to general manager to VP of
3  operations.  There's been several positions
4  throughout the years.
5    Q    And give me a brief job description.  How
6  would you describe what your job encompasses?
7    A    My job would encompass strategy for the
8  organization, leadership, making sure the team is
9  aligned with our strategy.  A lot of top to top
10 relationships with our customers.  And -- and then
11 also over -- oversight of -- of other operating
12 departments.
13   Q    And to whom do you report?
14   A    I report to Ken Bodie, the president of
15 the Keller Group.
16   Q    Do you report to a board of directors as
17 well?
18   A    I do.
19   Q    And what board of directors do you report
20 to?
21   A    The Keller Group board of directors.
22   Q    I'm sorry.  Would you say that again?
23   A    The Keller Group board of directors.
24   Q    And do you know the names of the board of
25 directors for the Keller Group, the members of the

1  board?
2    A    I know several of them, but I don't have
3  the names of a couple of them off the top of my
4  head.  But, you know, there is Vince Keller.  There
5  is Tim Keller.  Kyle Kirchhofer, Charles Cowart,
6  Mike Sims, I believe, and Ken Bodie.
7    Q    And how often does -- does that board
8  convene?
9    A    Quarterly.
10   Q    And are you a regular attendee at -- at --
11 at board meetings?
12   A    I am.
13   Q    Let's discuss the ZAP! account, in
14 particular.  When did you first become aware of ZAP!
15   A    I don't have the exact date.  The first
16 time I became aware of it is when a friend of mine,
17 who was working with Jeff, called me around the
18 holidays.  And he was working on a project with
19 Walmart called Simplicity.  I'm guessing that was
20 probably around 2006 or '7, I guess, but I can't
21 remem -- memory doesn't serve me.
22   Q    Does Steve Miller report to you?
23   A    No, he does not.
24   Q    Do you work closely with Mr. Miller?
25   A    I do.

1    Q    He testified that there were numerous
2  conversations over the years about ZAP! and Midlab
3  doing business, but it really started to come to
4  fruition in the summer of 2015.  Does that comport
5  with your recollection?
6         MR. GOLDHAMER:  Form and foundation.
7    A    So there have been a number of -- yes
8  and -- I guess that there's been a number of
9  conversations over the years about doing business
10 with Jeff Wycoff.  Doing business with ZAP! products
11 did not happen until 2015.
12   Q    (By Mr. Abelman) And what was your role in
13 2015 with regard to ZAP! as a potential customer?
14   A    Conversations with Jeff about his needs,
15 our capabilities and, you know, how we could work
16 together.
17   Q    So did you know Jeff personally in 2015?
18   A    We had done business prior, and so I knew
19 Jeff professionally, but not personally.
20   Q    And did you get to know him personally in
21 2015?
22   A    I don't know if I'd say that I got to know
23 him personally.  I had several phone call
24 conversations, you know, mainly business related.
25 There may have been some personal small talk in

1  between there, but for the most part I would say,
2  no, I only knew him professionally.
3    Q    So describe what transpired in the summer
4  of 2015 while the discussions occurred between Jeff
5  and Midlab.
6         MR. GOLDHAMER:  Form.
7    A    I'm not sure there's a lot of things that
8  transpired.  Can you be more specific?
9    Q    (By Mr. Abelman) Well, tell me how the
10 relationship evolved in 2015.
11        MR. GOLDHAMER:  Form.
12   A    I would say the relationship involved
13 (sic) with Jeff reaching out to us saying, Hey, I'm
14 putting together a project, I'm putting together a
15 sales team, I'm going to relaunch ZAP! products,
16 which I had a lot of success in the early 2000s
17 doing.  And we're going to run the same playbook
18 that we were successful with earlier, and that he
19 needed a manufacturing partner.
20   Q    (By Mr. Abelman) And then what happened?
21   A    Then we engaged in normal business
22 discussions about needs and opportunities and timing
23 and that type of thing.  And my team worked with him
24 on sourcing -- sourcing materials and stuff to set
25 the specifications up for manufacturing and to

*AB Litigation Services*

1  prepare for his launch.

2      Q    Mr. Miller testified that there's an

3  evaluation that Midlab performs on potential

4  customers.  Was that performed on ZAP!

5          MR. GOLDHAMER:  Form and foundation.  Go

6  ahead.

7      A    I -- I would say that would fall under

8  Mr. Miller's purview.  I -- I could not testify

9  accurately whether it was or it wasn't.  It should

10 have been done, but that would have been under

11 Mr. Miller's area.

12     Q    (By Mr. Abelman) So what was your role

13 in the summer of 2015 with regard to the ZAP!

14 relationship?

15     A    My role would be having -- would be a

16 liaison between my team and Jeff Wycoff and his

17 team.

18     Q    Okay.  Mr. Miller indicated that at the

19 end of the evaluation he performed, the management

20 team at Midlab approved ZAP! as a customer.  Does

21 that resonate with you?

22         MR. GOLDHAMER:  Form and foundation.

23     A    It does.

24     Q    (By Mr. Abelman) Are you part of the

25 management team?

1      A    I am.

2      Q    And who are the other members of the

3  management team?

4      A    At the time it would have been Matt

5  Johnston, Mike Ridley, Vince Keller and Ken Bodie, I

6  believe.

7      Q    How -- how did the management team convene

8  to make a decision with regard to customer approval?

9      A    I don't recollect that specific meeting,

10 so I can't speak to it.

11     Q    Okay.  How does -- how does it generally

12 work?

13     A    Generally there would be a -- a -- a

14 meeting where everybody would say -- would be around

15 the table, and during normal staff meeting or

16 something along those lines, and say, This customer

17 is interested in doing business with us, here is

18 the -- their fin -- you know, this is -- their --

19 their credit report looks good, and we recommend

20 that we move forward with it, or something along

21 those lines, and we all say we agree or disagree.

22     Q    Now, you said a normal staff meeting.  Did

23 you mean a normal management team meeting?

24     A    Yes.

25     Q    And are the management team meetings

1  weekly, monthly, quarterly?

2      A    I cannot remember 2015 at what point we

3  started or what we didn't start.  We currently have

4  a weekly staff meeting.  I'm not sure if in 2015 we

5  did or we did not.

6          MR. ABELMAN:  Aaron, I'd like to -- I'd

7  like you to pull up Exhibit 31 so Mr. Schenk can see

8  that.

9          THE VIDEOGRAPHER:  Let me get that up for

10 you.

11     Q    (By Mr. Abelman) Mr. Schenk, can you

12 identify what's been marked as Exhibit 31?

13     A    It appears to be a Manufacturing and

14 Supply Agreement between ZAP! and Midlab, ZAP!

15 products.

16     Q    And do you see a date on it?

17     A    I don't.  I cannot see the bottom of the

18 document.

19     Q    I think the date's on the first -- in the

20 first paragraph.

21     A    Okay.  Looks like September 16th, 2015.

22         MR. ABELMAN:  Aaron, if you could go to

23 Bates No. 000025.

24     Q    (By Mr. Abelman) Mr. Schenk, do you see

25 who executed this document?

1      A    Looks like Jeff Wycoff.

2      Q    And are you able to read what his title

3  was when executed?

4      A    Looks like president.

5      Q    So after the management team approved ZAP!

6  as a customer, did -- did -- was this -- was ZAP!

7  taken to the board of directors for approval as a

8  customer or was that not required?

9      A    I do not believe it was required --

10     Q    Okay.

11     A    -- but I cannot answer definitively.

12         MR. ABELMAN:  Aaron, would you pull up

13 Exhibit 33.

14         THE VIDEOGRAPHER:  There we go.  Nope.

15         MR. ABELMAN:  Is that -- yeah, this is 33.

16         THE VIDEOGRAPHER:  I've got 32 up there.

17 Hold on real quick.

18         MR. ABELMAN:  And in particular I'm

19 looking at Bates No. 014687.

20         THE VIDEOGRAPHER:  014867 or 687?

21         MR. ABELMAN:  014687.

22         THE VIDEOGRAPHER:  Okay.  There you go.

23     Q    (By Mr. Abelman) Mr. Schenk, can you

24 identify what's been -- what -- what you're looking

25 at currently?

**Page 17**

1    A   I -- it says November 10th, 2015, meeting

2  notes.  I'm assuming it's notes from the board

3  meeting.  Says he reviewed the -- the -- with the

4  board the ZAP! business.

5    Q   I'm sorry.  Read -- read what it says.

6    A   It says, Mr. Schenk then reviewed with the

7  board the ZAP! business.

8    Q   Okay.  Let's start with who recorded the

9  minutes at board meetings.

10    A   I do not know.

11    Q   Who at Midlab supplied these minutes

12  responsive to my discovery request?

13    A   I don't believe Midlab has access to the

14  minutes.  Keller Group has the minutes, keeps the

15  minutes.

16    Q   Okay.  Do you know who procured these

17  minutes from the Keller Group?

18    A   I do not know for sure who procured them.

19    Q   Okay.  So do you recall what transpired at

20  this November 10th board meeting?

21    A   Memory would be we would typically

22  review -- we would go over -- with any -- any new

23  piece of business, big, large piece of business, we

24  would talk about that in terms of what the potential

25  is, what services we're providing and, you know,

**Page 18**

1  just kind of a general overview of the business.

2    Q   And did you present any materials at this

3  meeting?

4    A   I -- I can't remember at this particular

5  time.

6    Q   Did you look through your notes, emails,

7  and computer records for any materials presented at

8  this meeting?

9    A   Yes.  I'm sure we had a board presentation

10  that we probably forwarded about this, but I don't

11  remember.  I typically do not take notes during the

12  meeting that -- you know, while I'm presenting.

13    Q   So -- but you -- it sounds like you would

14  have presented or you did present about ZAP! as a

15  customer.

16    A   Yes.

17    Q   Okay.  Do you -- when you present on

18  something like this, do you have handouts, do you do

19  a PowerPoint?  What's your -- what's your normal

20  process?

21    MR. PULKRABEK:  Form.

22    A   Typically there's a PowerPoint.

23    Q   (By Mr. Abelman) Did you look for the

24  PowerPoint?

25    A   I personally, no.  But that would have

**Page 19**

1  been in the possession of Steve Miller, so I'm sure

2  that he did.

3    Q   Do you recall if -- well, did anyone ask

4  you to look for the PowerPoint?

5    A   I do recall that we were reque -- quested

6  to get any documentation that we had in our

7  possession via email, notes, you know, anything

8  concerning ZAP! to provide to -- to provide, so,

9  yes.  But I -- since I don't have access to those, I

10  prob -- I did not look for those PowerPoints.

11    Q   Your -- your response was a little

12  garbled.  I'm not sure why.  Would you mind getting

13  a little closer to the microphone.

14    A   My response was yes, I was asked to

15  provide any -- any details that we would have on --

16  can you ask the question again so I make sure I'm

17  answering it properly?

18    MR. ABELMAN:  Shar, could you read back

19  the question, please.

20    THE COURT REPORTER:  Would you like me to

21  read the answer that I got to -- the first time?

22    MR. ABELMAN:  Please.

23    (Page 19, Line 3 through Line 10, read.)

24    THE COURT REPORTER:  Did you want me to

25  continue?

**Page 20**

1    Q   (By Mr. Abelman) Did you want to

2  supplement your answer all, Mr. Schenk?

3    A   No.  I think that answers the question.

4    Q   Okay.  Do you recall what kind of

5  information you presented to the board and the

6  duration of -- of any presentation regarding ZAP!

7    A   I do not recall.

8    Q   Would you have provided financial

9  information such as sales projections?

10    A   At this point, probably some pretty dis --

11  probably some just high level numbers, potential --

12  potential.  Not -- not any real numbers but, like,

13  that says ZAP! were to do X amount.  Not a million

14  dollars or whatever.  But I don't recall what those

15  numbers are.

16    Q   And would we -- would the presentation

17  involve internally prepared projections or

18  projections prepared by ZAP!?

19    MR. GOLDHAMER:  Form and foundation.

20    A   You know, I don't know the answer to that

21  question.

22    MR. ABELMAN:  Aaron, would you pull up

23  Exhibit 51, please.

24    Q   (By Mr. Abelman) Mr. Schenk, can you

25  identify what's been marked as Exhibit 51?

*AB Litigation Services*

1    A    Looks like a Limited Continuing Guaranty.
2   I'm assuming this is the ZAP! guaranty of a million
3   dollars, personal guaranty.
4    Q    Go ahead and read it, and -- and tell me
5   what it is.  And -- and you can ask Aaron to advance
6   the pages if -- if -- if that's your inclination.
7    A    Okay.
8         THE DEPONENT:  I need you to scroll down.
9   Continue to scroll.  Okay.  Further.  Keep going.
10  Okay.  Keep going further.  No.  That's far enough.
11        THE VIDEOGRAPHER:  Okay.
12   A    It looks like a guarantied limited
13  letter -- guarantied letter of credit from Jeff
14  Wycoff.
15   Q    (By Mr. Abelman) And Jeff Wycoff executed
16  the guaranty?
17   A    It appears that he did.
18   Q    Do you know whose idea it was to procure a
19  guaranty from Jeff Wycoff?
20   A    I would say it came from Vince Keller or
21  Steve Miller.
22   Q    And why did Midlab require a guaranty for
23  Jeff Wycoff?
24        MR. GOLDHAMER:  Foundation.
25   A    When doing business with anybody, you want

1   to secure your -- secure your credit.  Right?  So
2   when -- so on a business like this, you would need
3   to have a guaranty of payment because you're going
4   to be making significant investments in inventory
5   and personnel and that type of thing.  So that's why
6   they would ask for it.
7    Q    (By Mr. Abelman) And there was no guaranty
8   requested from Merrie Wycoff, was there?
9    A    I do not believe it was directly requested
10  from Merrie, no.
11   Q    And that's because Midlab was not re --
12  relying upon Merrie Wycoff to pay off the ZAP! debt?
13   A    That is not correct.
14        MR. PULKRABEK:  Form and -- form and
15  foundation.
16   A    That is not correct.
17   Q    (By Mr. Abelman) Why isn't it correct?
18  Explain -- explain what is correct.
19   A    What is correct is that we anticipated
20  that Jeff Wycoff and ZAP! products, and Merrie
21  Wycoff being part of that, the whole organization
22  would be responsible for payment.
23   Q    Okay.  So you're saying that Merrie Wycoff
24  would be responsible for paying the Midlab
25  obligation because of her association with ZAP!?

1         MR. PULKRABEK:  Form and foundation.
2    A    You know, I don't know the answer to that
3   question because I wasn't involved in the
4   preparation of this document, so it's hard to speak
5   to the, oh, spirit of the agreement.  But the spirit
6   of the agreement was, Hey, the Wy -- that ZAP!
7   products, Jeff Wycoff stood behind this project and
8   we -- we were going to get paid for our -- our
9   efforts.
10   Q    (By Mr. Abelman) Understood.  But how did
11  that implicate, in your mind, Merrie Wycoff's
12  responsibilities?
13        MR. PULKRABEK:  Form.
14   A    In -- in my mind Merrie and Jeff are one,
15  and that that's why they -- they would -- she would
16  be responsible for -- for those parties also as a --
17  I believe -- yeah, in my mind it's -- it's just part
18  of the organization, it's part of -- of the Wycoff
19  family, she was -- well, not family, but marriage,
20  and she's responsible.
21   Q    (By Mr. Abelman) And why didn't you
22  have -- why didn't Midlab have her sign a guaranty?
23   A    I did not --
24        MR. PULKRABEK:  Foundation.  Sorry.  Form
25  and foundation.  Go ahead.

1    A    I did not prepare this document, so I
2   cannot answer that question.
3    Q    (By Mr. Abelman) Do you think it makes a
4   difference if someone signs a guaranty?
5         MR. PULKRABEK:  Form and foundation.
6    A    I think as a representative of a
7   comp -- officer of the company, any other members
8   of that -- or officers of the company are re --
9   are -- are ob -- obligated to -- to that guaranty.
10   Q    (By Mr. Abelman) I'm sorry.  They're
11  obligated to what?
12   A    That guaranty.
13        MR. PULKRABEK:  Form and foundation.  Go
14  ahead.
15   Q    (By Mr. Abelman) Repeat that answer,
16  please.
17   A    I believe that she is obligated.
18   Q    Okay.  What -- what do you believe she's
19  obligated -- what do you believe she was obligated
20  to do?
21        MR. GOLDHAMER:  Form and foundation.  Go
22  ahead.
23   A    To honor this guaranty.
24   Q    Are you married, Mr. Schenk?
25   A    I am.

*Matthew Jon Schenk - 08/03/2021*                    21-24

1    Q    So if you sign a guaranty, do you think
2 your wife is obligated to pay the amount guarantied?
3         MR. PULKRABEK:  Form and foundation.
4    A    Yes.
5    Q    (By Mr. Abelman) And what's your basis for
6 that conclusion?
7         MR. GOLDHAMER:  Form and foundation.
8    A    My assets are her assets.
9    Q    (By Mr. Abelman) I'm sure she's glad to
10 hear that.
11        MR. ABELMAN:  Okay.  Let's go to Bates
12 No. -- it's part of the same exhibit.  It's Bates
13 No. 000012.
14    Q    (By Mr. Abelman) Can you identify this
15 page, what's on this page, Mr. Schenk?
16    A    I can.
17    Q    Please do so.
18    A    It looks like a -- a letter from Jeff
19 and Merr -- Merrie Wycoff's personal accountant
20 that is -- that says that their financial statements
21 are -- are put together in accordance with good
22 accounting principles, and did -- did not audit or
23 review the financial statements nor was I required.
24    Q    Well, we'll -- we'll get into the contents
25 of it.  I'm just asking you if you can identify

1 this.
2    A    I -- I said earlier yes, I can identify
3 it.
4    Q    Okay.  Have you seen this before?
5    A    You know, the first time I saw this was
6 about a week ago.
7    Q    That's interesting because Mr. Keller said
8 he'd never seen it.  So -- and you hadn't seen it
9 until a week ago?
10    A    Yeah.
11        MR. PULKRABEK:  Form and foundation.
12    Q    (By Mr. Abelman) Who was responsible for
13 procuring this?
14        MR. PULKRABEK:  Foundation.
15    A    I really don't know the answer to that
16 question.
17    Q    (By Mr. Abelman) Now, when you say that
18 you saw this for the first time a week ago, does
19 that include the following page?
20        MR. ABELMAN:  Aaron, if you wouldn't mind
21 flipping it.
22    A    It does, to the best of my knowledge.
23    Q    (By Mr. Abelman) Again, Mr. Miller
24 testified he didn't see either one of these, he had
25 never seen either one of these before.  Does that

1 surprise you?
2         MR. PULKRABEK:  Form and foundation.
3    A    I can't answer to my level of surprise on
4 that, so I don't know how to answer that question.
5    Q    (By Mr. Abelman) Well, I'm trying to find
6 out who, if anybody at Midlab, evaluated this letter
7 from Mr. Henke and the following page, the Statement
8 of Financial Condition.  Do you know?
9         MR. PULKRABEK:  (Inaudible.)
10    A    No.  I -- I do not.
11        THE COURT REPORTER:  Was there an
12 objection?
13    Q    (By Mr. Abelman) Who do you think would
14 know?
15        THE COURT REPORTER:  I'm sorry.  Was there
16 an objection?
17        MR. PULKRABEK:  Yeah, there was an
18 objection to form and foundation.
19        THE COURT REPORTER:  Thank you.
20    Q    (By Mr. Abelman) Mr. Schenk, who do you
21 think would know?  Who at Midlab evaluated this
22 letter from Mr. Henke and the Statement of Financial
23 Condition appended to the letter?
24    A    My guess would be no one at Midlab.  It
25 would have probably been Colman Hoffman with the

1 Keller Group.
2    Q    Could you spell that name, please?
3    A    Colman, C-o-l-m-a-n, Hoffman,
4 H-o-f-f-m-a-n.  But that is not a statement of fact.
5 That is a supposition.
6    Q    And his position is general counsel of the
7 Keller Group?
8    A    It was.
9    Q    It was when?
10    A    At the time of this, in 2015.
11    Q    So if -- is -- is -- is Col -- in 2015,
12 was Colman Hoffman involved in the management team?
13    A    I would say he would be an adviser to the
14 team but, no, not a mem -- not a member.
15    Q    So it's safe to say that if -- if
16 Mr. Miller had never seen this document before
17 yesterday, and you hadn't seen the letter and the
18 Statement of Financial Condition before a week ago,
19 that neither one of these was considered when the
20 management team approved ZAP! as a customer for
21 Midlab?
22        MR. PULKRABEK:  Form and foundation.
23    A    I would say it is not safe to say that,
24 because if Colman had -- and I say if Colman had
25 done this, and I'm -- then we would have been aware

**Page 29**

1 that he had reviewed that and felt confident, and we
2 would have been acting on his recommendation.  So
3 it's not safe to say that.
4     Q    Well, do you recall him giving that
5 recommendation?
6     A    I do not recall.
7     Q    Mr. Miller testified that Midlab required
8 ZAP! to regularly update its financial disclosures
9 during the duration of the business relationship
10 between ZAP! and Midlab.  Do you agree with that
11 statement?
12         MR. PULKRABEK:  Foundation and form.
13     A    I -- I can't agree or disagree with that
14 statement because I don't have a memory of that, and
15 that would have not have been in my role in this
16 relationship.
17     Q    (By Mr. Abelman) Do you recall when you
18 met Merrie Wycoff for the first time?
19     A    I do.
20     Q    When was that?
21     A    It was a meeting in Jeff Wycoff's office,
22 up in the yellow barn in -- upstairs.
23     Q    And was that on November 4th of 2015?
24     A    I believe it was.
25     Q    Had you ever had a conversation with

**Page 30**

1 Merrie Wycoff prior to that date?
2     A    I can't say whether I did or I didn't.  I
3 may have had one, but I can't recollect at this
4 point.
5     Q    Between that meeting on November 4th and
6 Jeff Wycoff's death in March of 2017, did you ever
7 have any additional conversations with Merrie
8 Wycoff?
9     A    I do not believe so.
10     Q    You visited the farm on November 14th --
11 on November 4th of 2015, and you received a tour of
12 the -- of the farm?
13     A    A brief tour, yes.
14     Q    How -- how long was the tour?
15     A    It was really Jeff kind of standing
16 there pointing out different things on it, but it
17 wasn't -- I can't remember exactly.  It wasn't...
18     Q    Okay.  Well, you clearly had the address
19 of the farm at that time, didn't you?
20     A    Of course.
21     Q    Did Midlab ever conduct an appraisal of
22 the farm prior to its lawsuit?
23     A    I -- I can't answer that question.  I
24 don't believe we did, but I can't answer that
25 question.

**Page 31**

1     Q    Did Midlab ever employ a broker to prepare
2 an analysis of the value of the farm?
3     A    Again, I don't know the answer to that
4 question since I would not have been involved in the
5 financial side.
6     Q    Who would have been involved on the
7 financial side?
8     A    That would have probably been -- probably
9 been Steve, Colman and Vince.
10     Q    When you say Steve, Colman and Vince, do
11 you mean all of them working together or possibly
12 one working separately?
13         MR. PULKRABEK:  Foundation.
14     A    I can't speak to that.  I mean, how they
15 conducted that, you know, five, you know, six years
16 ago, I can't answer that question with accuracy.
17     Q    (By Mr. Abelman) Okay.  So let's go back
18 to this meeting on November 4th at the farm.  What
19 was discussed?
20     A    Oh, from memory -- and I can't find notes
21 from that meeting, so -- but from memory, I went out
22 there, and Jeff showed me a few products that he had
23 set up downstairs in one of the stalls, of different
24 things he was thinking about doing.  And that we
25 were waiting for Merrie, because she was an officer

**Page 32**

1 of the company, to come.  And then when she came
2 over, we sat down at the table and then did
3 introductions.  And then we -- he briefly kind of
4 talked about how he had -- how he was successful
5 last time and what -- how he did it and how he was
6 doing the same thing now.
7     Q    And who else was at this meeting?
8     A    I believe it was just the three of us.
9     Q    So as precisely as possible, tell me what
10 you remember Merrie Wycoff said at that meeting.
11     A    Very little.  I don't remember anything
12 except for hello type of thing.  Just cordial
13 salutations.  I do not remember any details of the
14 business discussion.
15         MR. ABELMAN:  Aaron, could you pull up
16 Exhibit 50.
17     Q    (By Mr. Abelman) Would you identify what's
18 been marked as Exhibit 50, Mr. Schenk?
19     A    It is an amendment to the Manufacturing
20 and Supply Agreement.
21     Q    (By Mr. Abelman) And when I ask you to
22 identify something, would you please note the date
23 if it's apparent?
24     A    On the 1st of April, 2016.
25     Q    And were you involved in -- in negotiating

AB Litigation Services

**Page 33**

1  the terms of this amendment?
2      A    I don't believe that I was.  I can't
3  remember -- I can't answer the -- can't answer that.
4      Q    You -- what -- you can't answer it?  Why
5  can't you answer it or you don't remember?
6      A    I don't re --
7      MR. PULKRABEK:  Form and foundation.
8      A    I -- I can't -- I cannot recall the
9  specific details of how this agreement was
10 negotiated.
11     MR. ABELMAN:  Okay.  Aaron, would you mind
12 pulling up what's been marked as Exhibit 36.
13     THE VIDEOGRAPHER:  There you go.
14     Q    (By Mr. Abelman) Can you identify what's
15 been marked Exhibit 36, Mr. Schenk?
16     A    I can.  It is a board meeting presentation
17 dated April 20th, 2016.
18     MR. ABELMAN:  Would you -- Aaron, would
19 you scroll down to Bates -- to Page 23 of this
20 document.  I don't know, is -- is it easier for you
21 to use page numbers or the Bates numbers, Aaron?
22     THE VIDEOGRAPHER:  Page numbers on the
23 document.  But this one?
24     MR. ABELMAN:  Yes.
25     Q    (By Mr. Abelman) Mr. Schenk, does this --

**Page 34**

1  do you recall seeing this chart at the -- at the
2  board meeting on April 20th, 2016?
3      A    I don't recall seeing this chart, but I
4  don't -- I believe it was presented at that board
5  meeting.
6      Q    Okay.  Do -- would you describe what's
7  being presented with regard to Page 23?
8      A    It would appear that we have extended the
9  terms, and that we have collected $698,000 to --
10 cash, and it's current up until, looks like,
11 May 1st, and there's an outstanding AR of $934,000.
12     Q    So does that jog your memory at all about
13 what the purpose of the Amendment to Manufacturing
14 and Supply Agreement was?
15     A    It -- it does not jog my memory on that.
16 I would assume it would be to cover our extended
17 terms with -- with Jeff, but it does not really jog
18 my memory.
19     Q    Well, do you want to go back to the -- go
20 back at Exhibit 50 and take -- take a look at it?
21     A    We can.  Again, I would not have been
22 involved in the financial negotiations.  It really
23 wasn't my role.  So, I mean, we can look at it again
24 if you want to.  But that would have prob -- that
25 would have definitely been negotiated by somebody

**Page 35**

1  else.
2      Q    And who would that be?
3      A    Again, that would be either Steve Miller,
4  Colman Hoffman or Vince Keller.
5      Q    Okay.  Okay.
6      MR. ABELMAN:  Aaron, would you pull up
7  Exhibit 32, please.
8      Q    (By Mr. Abelman) Can you identify what's
9  been marked as Exhibit 32?
10     A    It looks like a board meeting presentation
11 dated July 14th, 2016.
12     Q    Was it likely you attended this board
13 meeting?
14     A    It is.
15     Q    Who prepared the agendas for these board
16 meetings?
17     A    I believe it would have been Steve Miller.
18     Q    And do you get the agendas in advance of
19 the board meeting?
20     A    I do.
21     Q    Do you review them in advance of the board
22 meeting?
23     A    I do.
24     Q    Do you ever suggest changes to the
25 presentation?

**Page 36**

1      A    I can.
2      Q    I know you can, but have you done so?
3      A    Yes.
4      Q    And so when you get a -- a copy of the
5  agenda, what -- what kind of form is it in?  Is
6  it -- is it in a PowerPoint or is it in a paper
7  form?
8      A    I would say it was probably reviewed on a
9  screen in a PowerPoint form.  We probably take this
10 format and review it on the screen.
11     MR. ABELMAN:  Aaron, would you go to
12 Page 23.
13     Q    (By Mr. Abelman) Now, I know you're not
14 vice -- I -- I know you're not a finance guy, but
15 the bottom of this page it shows net total net
16 margins.  Do you see where those numbers are?
17     A    I do.
18     Q    Do you have an opinion as to whether these
19 margins fit within the expectation of Midlab?
20     MR. PULKRABEK:  Form and foundation.
21     A    I don't know how to, I mean, answer that
22 question in terms of -- what do you mean how they
23 fit within the foun -- foun -- can -- can you reask
24 that question?  I really don't understand.
25     Q    (By Mr. Abelman) Well, the margin is the

Page 37

1   profit made by Midlab, and at least --
2       A    Well, the margin is the net margin, which
3   is sales, less cost of goods sold, which is just
4   materials and la -- la -- direct labor inputs.
5            It does not cover overhead, depreciation,
6   shipping, any of those op -- overhead operating
7   costs that a manufacturer would -- would incur.  So
8   it does not cover general overhead and -- and all
9   the other business expenses that you would incur.
10  That is just your margin on the cost of goods sold.
11      Q    Fair enough.  Is that -- so is this --
12  does this fit within the characterization of gross
13  profit?
14      A    No.  This would be net margin.  Gross
15  profit would come -- would have sales and general
16  overhead expenses taken out before gross profit in
17  there, I guess is -- depending on your definition of
18  gross profit.  But this would be margin contribution
19  to SG&A, so to speak, depending on your accounting
20  terms you're using.
21      Q    Okay.  And it seems to me this reflects
22  that Midlab was closely monitoring ZAP!'s
23  performance or the performance of the ZAP! products.
24  Is that fair to say?
25      A    Yes.

Page 38

1       Q    And if you go to Page 24, would you
2   describe what you see on Page 24.
3       A    Looks like what -- I would say it is an
4   update of what current sales activities or the
5   projected sales activities were that quarter or the
6   future quarter.  I don't -- looks like some of it's
7   current and some of it is projected in the second
8   quarter.  So what's going on, it looks like a sales
9   update (inaudible.)
10           THE COURT REPORTER:  "It looks like a
11  sales update" what?
12      A    What -- I guess I said it looks like a
13  sales update, what Jeff has going on in terms of
14  sales activity.
15      Q    (By Mr. Abelman) And why was this being
16  presented -- why was this information being
17  presented to the board in July of 2016?
18      A    Well, anytime you present something to the
19  board, you want to prove -- you want to show what
20  you've been working on for the last quarter and as a
21  business update.  So this would be, you know, just
22  supplemental information to the board about what was
23  going on with the program and our belief that the
24  program had legs.
25           MR. ABELMAN:  Would you -- Aaron, would

Page 39

1   you go to Page 25.
2       Q    (By Mr. Abelman) Now, Mr. Schenk, I'm
3   going to ask you to describe what this chart
4   reflects.  But before I do, let me advise you that
5   Mr. Miller upon review of this yesterday concluded
6   that the horizontal line at the bottom of the page
7   has -- the years -- the years are -- are inaccurate.
8       A    Okay.
9       Q    So 12-26 of 2016 should be 2015, and then
10  the references to 2017 should all be 2016.
11      A    Okay.
12           MR. PULKRABEK:  Form and foundation.  Go
13  ahead.
14      Q    (By Mr. Abelman) So would you describe
15  what this chart reflects?
16      A    Looks like it reflects the AR balance
17  versus past due as of July 6th, 2016.
18      Q    And under the column on the far left it
19  says, ZAP! update.  Would you read those entries?
20      A    Initial extension of 510,000 on 4-1, 2016.
21  Initial extension --
22      Q    So tell me -- tell me what that means.
23      A    Me -- to me it means on 4-1 we extended
24  credit of $510,000 additional credit, like we
25  extended his terms.

Page 40

1       Q    Okay.  Please read the next entry.
2       A    Says, Initial extension paid in full,
3   2000 -- or 5-20, 2016.
4       Q    And what does that mean?
5       A    You know, I don't know.  To me it would
6   mean -- but since I was not involved in the
7   financial side, I don't really know the answer to
8   this.  It would appear to mean the initial
9   investment was paid in full.
10      Q    Okay.  The next entry says what?
11      A    Request for an extension of the renewal.
12  So it appears that he reque -- paid some off and
13  needed some more extension.
14      Q    And do you recall whether that extension
15  was granted?
16      A    I think it was, but, again, I did not deal
17  with that financial side of it.  So I believe the
18  answer is yes, but I cannot testify definitively one
19  way or another.
20      Q    Okay.
21           MR. ABELMAN:  Let's move to Exhibit 45,
22  please.
23      Q    (By Mr. Abelman) Would you identify this
24  email.
25      A    Okay.  Email to myself and Steve Miller

*AB Litigation Services*

1  dated 8-15, 2016.

2      Q     What was the purpose of this email?

3            MR. PULKRABEK:  Foundation.

4      A     Hmm, I think it's -- the purpose of --

5  Jeff's purpose was -- it's hard to say what Jeff's

6  purpose was, but I think his plan was to share with

7  us his ability to pay -- pay what was -- what he

8  owed.

9      Q     (By Mr. Abelman) And what -- what was your

10 reaction to this e-mail?

11     A     I don't remember.

12     Q     Do you know who Keith is?

13     A     I don't know who Keith is off the top of

14 my head.

15     Q     Do you think you knew at the time?

16     A     I'm sure I did.

17     Q     Do you know who Andy Eisen is?

18     A     I do.

19     Q     Who is he?

20     A     Andy was an employee of Jeff Wycoff's.

21 And he worked with Jeff to facilitate the ZAP!

22 program.  I don't know exactly what Andy's role was,

23 but he worked with Jeff to roll out the ZAP!

24 program.

25     Q     So this is August of -- well, would it jog

1  your memory if I told you that -- that Keith is with

2  Tristar?

3      A     Okay.

4      Q     Do you know who Tristar is?

5      A     Yes, I do.

6      Q     Do you recall what Jeff was trying to do

7  with Tristar?

8      A     He was trying to run the program through

9  Tristar.  And I believe he was trying to get them to

10 finance the program.

11     Q     And wasn't Tri -- didn't he also set up a

12 relationship where Tristar would buy ZAP! products

13 directly from Midlab?

14     A     He did.

15     Q     Okay.  So this is dated August 15 of 2016.

16 Were you satisfied that Jeff Wycoff was putting

17 forth sufficient effort to try and get Midlab paid

18 at this time?

19           MR. PULKRABEK:  Form and foundation.

20     A     I can't speak to what I felt like at this

21 particular time because there's been such a distance

22 between that.  So I can't really answer that.  I

23 believe Jeff was trying to figure out a way to pay

24 everybody, yes.  But I can't really speak whether or

25 not I was satisfied with it or not.

1      Q     (By Mr. Abelman) What about the management

2  team, was the management team satisfied that Jeff

3  was putting forth suf -- sufficient effort?

4            MR. PULKRABEK:  Form and foundation.

5      A     Again, it's hard to speak to how people

6  felt at the time, so I can't -- I don't really -- I

7  can't really answer that question.

8      Q     (By Mr. Abelman) Well, you had weekly

9  management meetings.  And was ZAP! discussed at

10 management meetings?

11     A     This was six years ago, so what we

12 discussed on a weekly management meeting about ZAP!

13 I don't know.  How -- I can't talk to how everybody

14 felt.  If I was going to ask how we felt about

15 Tristar, we would say an established company with a

16 good line of credit, we felt probably pretty good

17 about Tristar.  How we felt about Jeff trying to do

18 what he could to pay for the meetings, I think we

19 would be hopeful that he was doing what he could to

20 pay for stuff.

21     Q     Okay.  Do you recall anything -- any

22 suggestions that you made or the management team

23 made on -- about how ZAP! could improve its business

24 that Jeff didn't follow?

25     A     I do not recall.

1      Q     Okay.

2            MR. ABELMAN:  Okay.  Let's move to

3  Exhibit 46, please.

4      Q     (By Mr. Abelman) Please identify what's

5  been marked as Exhibit 46.

6      A     This looks like a notification of Steve

7  Miller completing a task of getting the Second

8  Amendment to the ZAP! Manufacturing Agreement --

9  Supply Agreement executed.

10     Q     Mr. Schenk, what's the date of this?

11     A     Looks like September 2nd, 2016.

12     Q     And who's the author?

13     A     Steve Miller.

14     Q     And you're one of the recipients?

15     A     I am.

16     Q     So if you're not involved in the financial

17 end of this, why are you getting these -- this email

18 and some of the others we've discussed?

19           MR. PULKRABEK:  Foundation.

20     A     I would say I get copied on a lot of

21 things that would just be for informational

22 purposes.

23           MR. ABELMAN:  Aaron, could you flip over

24 to the next two pages.

25     Q     (By Mr. Abelman) What -- what's appended

1   to this email, Mr. Schenk?
2       A    Looks -- it -- I can't see the bottom of
3   it, but it looks like the second amendment to the
4   Manufacturing Agreement.
5           MR. PULKRABEK:  Just note for the record
6   that the entire exhibit is not available for him to
7   review.  We're doing this remotely.  (Inaudible.)
8       A    (Inaudible) on the second day of --
9           THE COURT REPORTER:  Wait.  I'm sorry.
10  Your attorney was still speaking.
11      Q    (By Mr. Abelman) What's missing,
12  Mr. Schenk?  What's --
13      A    I don't know what's missing.
14          MR. PULKRABEK:  Form and foundation.
15      Q    (By Mr. Abelman) Mr. Schenk, do you
16  believe this is the entire Second Amendment to
17  Manufacturing and Supply Agreement?
18      A    From what -- from my purview of what I can
19  see, it's not the entire because I can only see down
20  to about halfway through, down to 3.
21          MR. ABELMAN:  Okay.  Let's pull up
22  Exhibit 67.
23      Q    (By Mr. Abelman) It's -- it's odd because
24  my copy shows all of 3.
25      A    Yeah, I'm just saying my view of my

1   screen.
2       Q    I get it.
3       A    I did not see the whole thing.
4           (Exhibit 67 marked.)
5       Q    (By Mr. Abelman) Does this look like the
6   entire Second Amendment to Manufacturing and Supply
7   Agreement?
8       A    It does appear to be.
9           THE COURT REPORTER:  So this is a new
10  exhibit --
11          MR. ABELMAN:  Okay.
12          THE COURT REPORTER:  -- No. 67.  You're
13  marking this now?
14          MR. ABELMAN:  Yes.
15          THE COURT REPORTER:  Thank you.
16          MR. ABELMAN:  Aaron, would you pull up
17  Exhibit 60, please.  It's premarked as 60.
18          (Exhibit 60 marked.)
19          THE VIDEOGRAPHER:  Yep.
20          THE COURT REPORTER:  And you say
21  "premarked."  I have to make it clear for the
22  record, this is a new exhibit being marked today.
23          THE VIDEOGRAPHER:  Correct.
24      Q    (By Mr. Abelman) Mr. Schenk, can you
25  identify this email?

1       A    It is an email from -- it is an email from
2   Jeff Wycoff dated, looks like, 10-19, 2016.  It was
3   sent to me, Mr. Miller, Andy Eisen.  It says,
4   Update.  It's an update where we're at with the AR
5   and Tristar deal.  He's saying he needs to finish
6   the Tristar deal before he could give us any more
7   money.  He says he was up there working with them to
8   provide them rights and to try to gain access to
9   more capital money, is what it says.
10      Q    Okay.  Thank you.
11          MR. ABELMAN:  And the next exhibit, Aaron,
12  we've premarked as 61.
13          (Exhibit 61 marked.)
14          THE VIDEOGRAPHER:  Okay.
15      Q    (By Mr. Abelman) I'll have you examine --
16  identify that as well, Mr. Schenk.
17      A    It's an email from Jeff Wycoff, dated
18  11-19, 2016, to me and to Steve Miller.  Subject is
19  ZAP!.
20      Q    (By Mr. Abelman) Again, do you have any
21  idea why you were included in these emails?
22      A    I would say that since I worked with Jeff
23  on a -- you know, setting up, you know, him as a
24  customer at Midlab or -- that he would be -- and I
25  was his main point of contact in a lot of

1   situations, he was trying to keep me in the loop, as
2   well as Steve.
3       Q    Do you know when this --
4       A    (Inaudible.) Go ahead.
5       Q    I'm sorry.
6       A    No.  No.
7       Q    I didn't mean to --
8       A    Go ahead.
9       Q    In -- in -- in the summer and fall of
10  2016, were you having regular communications with
11  Jeff Wycoff?
12          MR. PULKRABEK:  Form.  Go ahead.
13      A    It says, It's been a while since we spoke,
14  so I would say depending on what you define as
15  "regular."  But it clearly states here that it had
16  been a while since the last time we spoke.  So I'm
17  sure that by this time we were all -- all very
18  concerned about whether we were going to get paid or
19  not.
20      Q    (By Mr. Abelman) So to the best of your
21  recollection, were you speaking once -- were you
22  communicating once a week, once a month, once a
23  quarter?
24      A    I would say I can't really answer that
25  question.  So I don't know the answer whether it was

Page 49

```
 1   once a week, once a quarter, once a month.  I don't
 2   know.  But I would say --
 3        Q    Why -- why can't you answer the question?
 4        A    Because it was six years ago.  And I don't
 5   remember whether we spoke weekly or biweekly or --
 6   or -- but we did speak, you know, on a regular
 7   basis.  But I don't know at this point in time --
 8   you know, over a long relationship with Jeff, I
 9   can't remember at this point in time how often we
10   spoke.
11             MR. ABELMAN:  I have no further questions
12   for you, Mr. Schenk.  Thank you for your time.
13             MR. PULKRABEK:  And I have no -- no
14   questions for Mr. Schenk.
15             THE VIDEOGRAPHER:  All right.  Then this
16   is going to conclude the deposition at 11:21.
17             (The deposition concluded at 11:21 a.m. on
18   August 3, 2021.)
19
20
21
22
23
24
25
```

Page 50

```
 1             I, MATTHEW JON SCHENK, do hereby certify
 2   that I have read the foregoing transcript and that
 3   the same and accompanying amendment sheets, if any,
 4   constitute a true and complete record of my
 5   testimony.
 6
 7
 8
 9             _____
     SRD              Signature of Deponent
10
11                    (  ) No amendments
                       (  ) Amendments attached
12
13        Acknowledged before me this ____day
14   of _____, 20_____.
15
16        Notary Public: _____
17        My commission expires _____
18        Seal:
19
20
21
22
23
24
25
```

Page 51

```
 1   STATE OF COLORADO  )
                        ) SS. REPORTER'S CERTIFICATE
 2   COUNTY OF DENVER   )
 3             I, Sharon R. Dobson, do hereby certify
 4   that I am a Registered Professional Reporter and
 5   Notary Public within the State of Colorado; that
 6   previous to the commencement of the examination, the
 7   deponent was duly sworn to testify to the truth.
 8             I further certify that this deposition was
 9   taken in shorthand by me at the time and place
10   herein set forth, that it was thereafter reduced to
11   typewritten form, and that the foregoing constitutes
12   a true and correct transcript.
13             I further certify that I am not related
14   to, employed by, nor of counsel for any of the
15   parties or attorneys herein, nor otherwise
16   interested in the result of the within action.
17             In witness whereof, I have affixed my signature
18   on August 10, 2021.
19   My commission expires January 8, 2023.
20             _____
               Sharon R. Dobson, RPR
21             216 - 16th Street, Suite 600
               Denver, Colorado  80202
22
23
24
25
```

Page 52

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
 3   August 10, 2021
 4   Ross W. Pulkrabek, Esq.
     Keating Wagner Polidori & Free, PC
 5   1290 Broadway, Suite 600
     Denver, CO  80203
 6
     Re:  Deposition of MATTHEW JON SCHENK
 7        Midlab, Inc., vs. Wycoff, et. al.
          Civil Action No. 1:20-cv-03142-KLM

 8   The aforementioned deposition is ready for reading
 9   and signing.  Please attend to this matter by
     following BOTH of the items indicated below:
10
     _____  Call 303-296-0017 and arrange with us to
11          read and sign the deposition in our office
12   _XXX_  Have the deponent read your copy and sign
            the signature page and amendment sheets,
13          if applicable; the signature page is
            attached
14
     _____  Read the enclosed copy of the deposition
15          and sign the signature page and amendment
            sheets, if applicable; the signature page
16          is attached
17   _XXX_  WITHIN 30 DAYS OF THE DATE OF THIS LETTER
18   _____  By _____ due to a trial
            date of
19
     Please be sure the original signature page and
20   amendment sheets, if any, are SIGNED BEFORE A NOTARY
     PUBLIC and returned to AB Litigation Services for
21   filing with the original deposition.  A copy of
     these changes should also be forwarded to counsel of
22   record.  Thank you.
23   AB LITIGATION SERVICES
24   cc:  All Counsel
25
```

*AB Litigation Services*

```
 1   AB LITIGATION SERVICES
     216 - 16th Street, Suite 600
 2   Denver, Colorado  80202
 3
 4
 5              MATTHEW JON SCHENK
                  August 3, 2021
 6        Midlab, Inc., vs. Wycoff, et. al.
          Civil Action No. 1:20-cv-03142-KLM
 7
 8
 9   The original deposition was filed with Steven E.
     Abelman, Esq., on approximately the 10th day of
10   August, 2021.
11   _____ Signature waived
12   _____ Signature not requested
13   _____ Unsigned; signed signature page and
            amendment sheets, if any, to be filed at
14          trial
15   _XXX_ Unsigned; amendment sheets and/or
            signature pages should be forwarded to
16          AB Litigation Services to be filed in the
            envelope attached to the sealed original.
17
     Thank you.
18
     AB LITIGATION SERVICES
19
     cc:  All Counsel
20
21
22
23
24
25
```

- AMENDMENT SHEET -

Deposition of MATTHEW JON SCHENK

August 3, 2021

Midlab, Inc., vs. Wycoff, et. al.

Civil Action No. 1:20-cv-03142-KLM

The deponent wishes to make the following changes
in the testimony as originally given:

| Page | Line | Should Read | Reason |
|------|------|-------------|--------|
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |
| ____ | ____ | _____ | ____ |

Signature of Deponent: _____

Acknowledged before me this _____ day of _____,

20____.

(seal)       Notary's signature _____

             My commission expires_____

*AB Litigation Services*

**Exhibits**

**Exhibit 60** 3:2 46:17,18

**Exhibit 61** 3:3 47:13

**Exhibit 67** 3:5 45:22 46:4

**$**

**$510,000** 39:24

**$698,000** 34:9

**$934,000** 34:11

**0**

**000012** 25:13

**000025** 15:23

**014687** 16:19,21

**014867** 16:20

**1**

**10** 7:2 19:23

**10-19** 47:2

**10th** 17:1,20

**11-19** 47:18

**11:21** 49:16,17

**12-26** 39:9

**13031** 7:25

**14th** 30:10 35:11

**15** 42:15

**16th** 15:21

**19** 19:23

**1st** 32:24 34:11

**2**

**2000** 40:3

**2000s** 12:16

**2006** 10:20

**2015** 11:4,11,13,17, 21 12:4,10 13:13 15:2,4,21 17:1 28:10, 11 29:23 30:11 39:9

**2016** 32:24 33:17 34:2 35:11 38:17 39:9,10,17,20 40:3 41:1 42:15 44:11 47:2,18 48:10

**2017** 30:6 39:10

**2021** 4:3 49:18

**20th** 33:17 34:2

**23** 33:19 34:7 36:12

**24** 38:1,2

**25** 39:1

**2nd** 44:11

**3**

**3** 19:23 45:20,24 49:18

**31** 8:17 15:7,12

**32** 16:16 35:7,9

**33** 16:13,15

**36** 33:12,15

**37934** 8:1

**3rd** 4:3

**4**

**4-1** 39:20,23

**45** 40:21

**46** 44:3,5

**4th** 29:23 30:5,11 31:18

**5**

**5-20** 40:3

**50** 32:16,18 34:20

**51** 20:23,25

**510,000** 39:20

**6**

**60** 46:17,18

**61** 47:12,13

**67** 45:22 46:4,12

**687** 16:20

**6th** 39:17

**7**

**7** 10:20

**8**

**8-15** 41:1

**9**

**9:59** 4:3

**A**

**a.m.** 4:3 49:17

**Aaron** 4:9 15:6,22 16:12 20:22 21:5 26:20 32:15 33:11, 18,21 35:6 36:11 38:25 44:23 46:16 47:11

**Abelman** 4:16,19,21 5:5,19,20 6:2,3 8:23 11:12 12:9,20 13:12, 24 15:6,11,22,24 16:12,15,18,21,23 18:23 19:18,22 20:1, 22,24 21:15 22:7,17 23:10,21 24:3,10,15 25:5,9,11,14 26:12, 17,20,23 27:5,13,20 29:17 31:17 32:15, 17,21 33:11,14,18, 24,25 35:6,8 36:11, 13,25 38:15,25 39:2, 14 40:21,23 41:9 43:1,8 44:2,4,23,25 45:11,15,21,23 46:5, 11,14,16,24 47:11, 15,20 48:20 49:11

**ability** 41:7

**access** 17:13 19:9 47:8

**accordance** 25:21

**account** 10:13

**accountant** 25:19

**accounting** 25:22 37:19

**accuracy** 31:16

**accurate** 7:21

**accurately** 13:9

**acting** 29:2

**activities** 38:4,5

**activity** 38:14

**additional** 30:7 39:24

**address** 7:6,24,25 30:18

**advance** 21:5 35:18, 21

**advise** 39:4

**adviser** 28:13

**agenda** 36:5

**agendas** 35:15,18

**agree** 14:21 29:10, 13

**agreed** 5:14

**agreement** 15:14 23:5,6 32:20 33:9 34:14 44:8,9 45:4,17 46:7

**ahead** 13:6 21:4 23:25 24:14,22 39:13 48:4,8,12

**aligned** 9:9

**amendment** 32:19 33:1 34:13 44:8 45:3, 16 46:6

**amount** 20:13 25:2

**analysis** 31:2

**Andy** 41:17,20 47:3

*Matthew Jon Schenk  - 08/03/2021*                1

*AB Litigation Services*

**Andy's** 41:22

**announced** 6:5

**answering** 19:17

**answers** 7:21 20:3

**anticipated** 22:19

**anytime** 38:18

**apparent** 32:23

**appears** 15:13 21:17 40:12

**appended** 27:23 44:25

**appraisal** 30:21

**approval** 14:8 16:7

**approved** 13:20 16:5 28:20

**April** 32:24 33:17 34:2

**AR** 34:11 39:16 47:4

**area** 13:11

**Arts** 8:4

**assets** 25:8

**association** 22:25

**assume** 34:16

**assuming** 17:2 21:2

**attended** 35:12

**attendee** 10:10

**attorney** 6:18 45:10

**audit** 25:22

**August** 4:3 41:25 42:15 49:18

**author** 44:12

**aware** 10:14,16 28:25

**B**

**Bachelor** 8:4

**back** 19:18 31:17 34:19,20

**balance** 39:16

**barn** 29:22

**based** 5:14

**basically** 6:19

**basis** 25:5 49:7

**Bates** 15:23 16:19 25:11,12 33:19,21

**begin** 5:25

**beginning** 4:11

**begins** 4:3

**behalf** 5:3

**belief** 38:23

**big** 17:23

**biweekly** 49:5

**board** 9:16,19,21,23, 24 10:1,7,11 16:7 17:2,4,7,9,20 18:9 20:5 33:16 34:2,4 35:10,12,15,19,21 38:17,19,22

**Bodie** 9:14 10:6 14:5

**bottom** 15:17 36:15 39:6 45:2

**briefly** 7:6 32:3

**broker** 31:1

**building** 6:7,8,10

**business** 11:3,9,10, 18,24 12:21 14:17 17:4,7,23 18:1 21:25 22:2 29:9 32:14 37:9 38:21 43:23

**buy** 42:12

**C**

**C-O-L-M-A-N** 28:3

**call** 11:23

**called** 6:9 10:17,19

**capabilities** 11:15

**capital** 47:9

**case** 5:7 6:4

**cash** 34:10

**catch** 8:5

**challenge** 5:14

**characterization** 37:12

**Charles** 10:5

**chart** 34:1,3 39:3,15

**clear** 46:21

**closed** 6:12

**closely** 10:24 37:22

**closer** 19:13

**Col** 28:11

**collected** 34:9

**Colman** 27:25 28:3, 12,24 31:9,10 35:4

**column** 39:18

**communicating** 48:22

**communications** 48:10

**comp** 24:7

**company** 8:19 24:7, 8 32:1 43:15

**completing** 44:7

**comport** 11:4

**computer** 18:7

**concerned** 48:18

**conclude** 49:16

**concluded** 39:5 49:17

**conclusion** 25:6

**Condition** 27:8,23 28:18

**conduct** 30:21

**conducted** 31:15

**confident** 29:1

**considered** 28:19

**contact** 47:25

**contents** 25:24

**continue** 19:25 21:9

**Continuing** 21:1

**contribution** 37:18

**convene** 10:8 14:7

**conversation** 7:12 29:25

**conversations** 11:2,9,14,24 30:7

**copied** 44:20

**copy** 36:4 45:24

**cordial** 32:12

**correct** 4:16,19,21 5:5,17,18 22:13,16, 17,18,19 46:23

**cost** 37:3,10

**costs** 37:7

**counsel** 4:10 28:6

**couple** 10:3

**court** 4:8,18 5:1,11, 15,19,24 8:20,22 19:20,24 27:11,15,19 38:10 45:9 46:9,12, 15,20

**cover** 34:16 37:5,8

**Cowart** 10:5

**credit** 14:19 21:13 22:1 39:24 43:16

**current** 34:10 38:4,7

**customer** 11:13 13:20 14:8,16 16:6,8 18:15 28:20 47:24

**customers** 9:10 13:4

**D**

**date** 10:15 15:16 30:1 32:22 44:10

**date's** 15:19

**dated** 33:17 35:11 41:1 42:15 47:2,17

**day** 45:8

**deal** 40:16 47:5,6

*AB Litigation Services*

**death** 30:6

**debt** 22:12

**decision** 14:8

**defendant** 4:5

**defendants** 6:4

**define** 48:14

**definition** 37:17

**definitively** 16:11 40:18

**degree** 8:3

**departments** 9:12

**depending** 37:17,19 48:14

**deponent** 5:15 8:21 21:8

**deposed** 7:1

**deposition** 4:4,15 5:13 6:17,21,24 7:7 49:16,17

**depreciation** 37:5

**describe** 9:6 12:3 34:6 38:2 39:3,14

**description** 9:5

**details** 19:15 32:13 33:9

**difference** 24:4

**direct** 37:4

**directly** 22:9 42:13

**directors** 9:16,19, 21,23,25 16:7

**dis** 20:10

**disagree** 14:21 29:13

**disclosures** 29:8

**discovery** 17:12

**discuss** 10:13

**discussed** 6:16,18 31:19 43:9,12 44:18

**discussion** 32:14

**discussions** 12:4, 22

**dispute** 7:4

**distance** 42:21

**Dobson** 4:8

**document** 15:18,25 23:4 24:1 28:16 33:20,23

**documentation** 19:6

**documents** 6:14

**dollars** 20:14 21:3

**door** 6:12

**downstairs** 31:23

**due** 39:17

**duly** 5:22

**duration** 20:6 29:9

———————

**E**

**e-mail** 41:10

**earlier** 12:18 26:2

**early** 12:16

**easier** 33:20

**economics** 8:4

**effort** 42:17 43:3

**efforts** 23:9

**Eisen** 41:17 47:3

**email** 19:7 40:24,25 41:2 44:17 45:1 46:25 47:1,17

**emails** 18:6 47:21

**employ** 31:1

**employee** 41:20

**encompass** 9:7

**encompasses** 9:6

**end** 13:19 44:17

**engaged** 12:21

**entire** 45:6,16,19 46:6

**entries** 39:19

**entry** 40:1,10

**established** 43:15

**evaluated** 27:6,21

**evaluation** 13:3,19

**evolved** 12:10

**exact** 10:15

**EXAMINATION** 6:1

**examine** 47:15

**examined** 5:23

**Excuse** 5:12

**executed** 15:25 16:3 21:15 44:9

**exhibit** 15:7,12 16:13 20:23,25 25:12 32:16,18 33:12,15 34:20 35:7,9 40:21 44:3,5 45:6,22 46:4, 10,17,18,22 47:11,13

**expectation** 36:19

**expenses** 37:9,16

**explain** 22:18

**extended** 34:8,16 39:23,25

**extension** 39:20,21 40:2,11,13,14

**extent** 5:8

———————

**F**

**facilitate** 41:21

**facility** 6:10

**fact** 28:4

**fair** 37:11,24

**Fairways** 6:9

**fall** 13:7 48:9

**family** 23:19

**farm** 30:10,12,19,22 31:2,18

**felt** 29:1 42:20 43:6, 14,16,17

**figure** 42:23

**fin** 14:18

**finance** 36:14 42:10

**financial** 20:8 25:20, 23 27:8,22 28:18 29:8 31:5,7 34:22 40:7,17 44:16

**find** 27:5 31:20

**finish** 47:5

**fit** 36:19,23 37:12

**flip** 44:23

**flipping** 26:21

**follow** 43:24

**form** 11:6 12:6,11 13:5,22 18:21 20:19 22:14 23:1,13,24 24:5,13,21 25:3,7 26:11 27:2,18 28:22 29:12 33:7 36:5,7,9, 20 39:12 42:19 43:4 45:14 48:12

**format** 36:10

**forward** 14:20

**forwarded** 18:10

**foun** 36:23

**foundation** 11:6 13:5,22 20:19 21:24 22:15 23:1,24,25 24:5,13,21 25:3,7 26:11,14 27:2,18 28:22 29:12 31:13 33:7 36:20 39:12 41:3 42:19 43:4 44:19 45:14

**friend** 10:16

**fruition** 11:4

**full** 40:2,9

**future** 38:6

———————

**G**

**gain** 47:8

**garbled** 19:12

**general** 9:2 18:1 28:6 37:8,15

**generally** 14:11,13

*AB Litigation Services*

give 7:21 9:5 47:6

giving 29:4

glad 25:9

GOLDHAMER 11:6 12:6,11 13:5,22 20:19 21:24 24:21 25:7

golf 6:9

good 7:24 14:19 25:21 43:16

goods 37:3,10

granted 40:15

Greens 6:9

gross 37:12,14,16, 18

Group 9:15,21,23,25 17:14,17 28:1,7

guarantied 21:12,13 25:2

guaranty 21:1,2,3, 16,19,22 22:3,7 23:22 24:4,9,12,23 25:1

guess 10:20 11:8 27:24 37:17 38:12

guessing 10:19

guy 36:14

**H**

H-O-F-F-M-A-N 28:4

halfway 45:20

handouts 18:18

happen 11:11

happened 12:20

hard 23:4 41:5 43:5

head 10:4 41:14

hear 4:24 6:5 25:10

held 9:1

Henke 27:7,22

Hey 12:13 23:6

high 20:11

Hmm 41:4

Hoffman 27:25 28:3, 12 35:4

Hold 16:17

holidays 10:18

home 7:24,25

honor 24:23

hopeful 43:19

horizontal 39:6

**I**

idea 21:18 47:21

identify 15:12 16:24 20:25 25:14,25 26:2 32:17,22 33:14 35:8 40:23 44:4 46:25 47:16

imperative 7:9

implicate 23:11

improve 43:23

inaccurate 39:7

inaudible 4:17 27:9 38:9 45:7,8 48:4

inclination 21:6

include 26:19

included 47:21

incur 37:7,9

information 20:5,9 38:16,22

informational 44:21

initial 39:20,21 40:2, 8

inputs 37:4

interested 14:17

interesting 26:7

internally 20:17

interruption 8:20

introduce 4:10

introductions 32:3

inventory 22:4

investment 40:9

investments 22:4

involve 20:17

involved 12:12 23:3 28:12 31:4,6 32:25 34:22 40:6 44:16

**J**

Jeff 10:17 11:10,14, 17,19 12:4,13 13:16 16:1 21:13,15,19,23 22:20 23:7,14 25:18 29:21 30:6,15 31:22 34:17 38:13 41:20, 21,23 42:6,16,23 43:2,17,24 47:2,17, 22 48:11 49:8

Jeff's 41:5

job 9:5,6,7

jog 34:12,15,17 41:25

Johnston 14:5

joining 8:16

JON 5:21

July 35:11 38:17 39:17

**K**

Keith 41:12,13 42:1

Keller 9:15,21,23,25 10:4,5 14:5 17:14,17 21:20 26:7 28:1,7 35:4

Ken 9:14 10:6 14:5

kind 18:1 20:4 30:15 32:3 36:5

Kirchhofer 10:5

knew 11:18 12:2 41:15

knowledge 26:22

Knoxville 8:1

Kyle 10:5

**L**

la 37:4

labor 37:4

Lady 7:25

Lane 7:25

large 17:23

launch 13:1

lawsuit 30:22

leadership 9:8

left 39:18

legs 38:24

letter 21:13 25:18 27:6,22,23 28:17

level 20:11 27:3

liaison 13:16

limited 21:1,12

lines 14:16,21

location 6:5

locations 5:16

long 6:23 7:2 8:12 30:14 49:8

loop 48:1

lot 9:9 12:7,16 44:20 47:25

**M**

made 37:1 43:22,23

main 47:25

make 7:18 14:8 19:16 46:21

makes 7:8 24:3

making 9:8 22:4

management 13:19,25 14:3,7,23, 25 16:5 28:12,20 43:1,2,9,10,12,22

*Matthew Jon Schenk  - 08/03/2021*

*AB Litigation Services*

manager 9:2

manufacturer 37:7

manufacturing 12:19,25 15:13 32:19 34:13 44:8 45:4,17 46:6

March 30:6

margin 36:25 37:2, 10,14,18

margins 36:16,19

marked 15:12 20:25 32:18 33:12,15 35:9 44:5 46:4,18,22 47:13

marking 46:13

marriage 23:19

married 24:24

materials 12:24 18:2,7 37:4

Matt 4:4 14:4

matter 4:5

MATTHEW 5:21

means 5:8 39:22,23

meeting 14:9,14,15, 22,23 15:4 17:1,3,20 18:3,8,12 29:21 30:5 31:18,21 32:7,10 33:16 34:2,5 35:10, 13,19,22 43:12

meetings 10:11 14:25 17:9 35:16 43:9,10,18

mem 28:14

member 28:14

members 9:25 14:2 24:7

memory 8:13 10:21 17:21 29:14 31:20,21 34:12,15,18 42:1

Merr 25:19

Merrie 4:6 22:8,10, 12,20,23 23:11,14 25:19 29:18 30:1,7 31:25 32:10

met 29:18

method 5:9

microphone 19:13

Midlab 4:5,13 5:4 6:6,8 8:10,16,17,24, 25 9:1 11:2 12:5 13:3,20 15:14 17:11, 13 21:22 22:11,24 23:22 27:6,21,24 28:21 29:7,10 30:21 31:1 36:19 37:1,22 42:13,17 47:24

Mike 10:6 14:5

Miller 6:20 10:22,24 13:2,18 19:1 21:21 26:23 28:16 29:7 35:3,17 39:5 40:25 44:7,13 47:3,18

Miller's 13:8,11

million 20:13 21:2

mind 19:12 23:11,14, 17 26:20 33:11

mine 10:16

minutes 17:9,11,14, 15,17

missing 45:11,13

money 47:7,9

monitoring 37:22

month 48:22 49:1

monthly 15:1

move 14:20 40:21 44:2

multiple 9:1

### N

names 9:24 10:3

needed 12:19 40:13

negotiated 33:10 34:25

negotiating 32:25

negotiations 34:22

neighbor 7:5

Nelson 4:9

net 36:15 37:2,14

normal 7:12 12:21 14:15,22,23 18:19

note 4:14 5:10 32:22 45:5

notes 6:13 17:2 18:6,11 19:7 31:20

notice 5:9

noticed 4:15 5:7,8

notification 44:6

November 17:1,20 29:23 30:5,10,11 31:18

number 11:7,8

numbers 20:11,12, 15 33:21,22 36:16

numerous 11:1

### O

oath 5:12,14

ob 24:9

object 4:17

objection 5:10 27:12,16,18

obligated 24:9,11, 17,19 25:2

obligation 22:25

occurred 12:4

odd 45:23

office 6:6,10 29:21

officer 24:7 31:25

officers 24:8

op 37:6

operating 9:11 37:6

operations 9:3

opinion 36:18

opportunities 12:22

organization 9:8 22:21 23:18

outstanding 34:11

overhead 37:5,6,8, 16

oversight 9:11

overview 18:1

owed 41:8

### P

pages 21:6 44:24

paid 23:8 40:2,9,12 42:17 48:18

paper 36:6

paragraph 15:20

part 12:1 13:24 22:21 23:17,18 25:12

parties 5:13 23:16

partner 12:19

past 39:17

pay 22:12 25:2 41:7 42:23 43:18,20

paying 22:24

payment 22:3,22

people 7:17 43:5

performance 37:23

performed 13:4,19

performs 13:3

period 8:14

person 7:14

personal 11:25 21:3 25:19

personally 11:17, 19,20,23 18:25

personnel 22:5

phone 11:23

piece 17:23

Pisano 4:6

Plaintiff 5:3

plaintiff's 4:11

plan 41:6

*Matthew Jon Schenk - 08/03/2021*

*AB Litigation Services*

plant 9:2

playbook 12:17

point 15:2 20:10 30:4 47:25 49:7,9

pointing 30:16

position 8:15,24 28:6

positions 9:1,3

possession 19:1,7

possibly 31:11

post 8:2

potential 11:13 13:3 17:24 20:11,12

Powerpoint 18:19, 22,24 19:4 36:6,9

Powerpoints 19:10

pr 8:23

precisely 32:9

preliminary 4:14

premarked 46:17,21 47:12

preparation 23:4

prepare 13:1 24:1 31:1

prepared 20:17,18 35:15

present 18:2,14,17 38:18

presentation 18:9 20:6,16 33:16 35:10, 25

presented 18:7,14 20:5 34:4,7 38:16,17

presenting 18:12

president 8:9,12,24 9:14 16:4

pretty 20:10 43:16

principles 25:22

prior 8:15,17,23 11:18 30:1,22

prob 19:10 34:24

process 18:20

procure 21:18

procured 17:16,18

procuring 26:13

products 11:10 12:15 15:15 22:20 23:7 31:22 37:23 42:12

professionally 11:19 12:2

profit 37:1,13,15,16, 18

program 38:23,24 41:22,24 42:8,10

project 10:18 12:14 23:7

projected 38:5,7

projections 20:9,17, 18

properly 19:17

property 7:4

prove 38:19

provide 19:8,15 47:8

provided 20:8

providing 17:25

Pulkrabek 4:12,13, 24 5:2,3,17,18 18:21 22:14 23:1,13,24 24:5,13 25:3 26:11, 14 27:2,9,17 28:22 29:12 31:13 33:7 36:20 39:12 41:3 42:19 43:4 44:19 45:5,14 48:12 49:13

pull 15:7 16:12 20:22 32:15 35:6 45:21 46:16

pulling 33:12

purpose 34:13 41:2, 4,5,6

purposes 44:22

purview 13:8 45:18

put 25:21

putting 12:14 42:16 43:3

**Q**

quarter 38:5,6,8,20 48:23 49:1

quarterly 10:9 15:1

quested 19:5

question 19:16,19 20:3,21 23:3 24:2 26:16 27:4 30:23,25 31:4,16 36:22,24 43:7 48:25 49:3

questions 7:9,22 49:11,14

quick 16:17

**R**

reaching 12:13

reaction 41:10

read 16:2 17:5 19:18, 21,23 21:4 39:19 40:1

real 16:17 20:12

reask 36:23

reason 7:20

recall 17:19 19:3,5 20:4,7,14 29:4,6,17 33:8 34:1,3 40:14 42:6 43:21,25

received 30:11

recipients 44:14

recollect 14:9 30:3

recollection 11:5 48:21

recommend 14:19

recommendation 29:2,5

record 4:2 5:10 45:5 46:22

recorded 7:8 17:8

records 18:7

references 39:10

reflects 37:21 39:4, 15,16

regard 11:13 13:13 14:8 34:7

regular 10:10 48:10, 15 49:6

regularly 29:8

related 7:3 11:24

relationship 12:10, 12 13:14 29:9,16 42:12 49:8

relationships 9:10

relaunch 12:15

relying 22:12

remem 10:21

remember 15:2 18:4,11 30:17 32:10, 11,13 33:3,5 41:11 49:5,9

remind 7:15

remotely 5:13 45:7

renewal 40:11

Repeat 24:15

report 9:13,14,16,19 10:22 14:19

reporter 4:8,18 5:1, 11,15,19,24 8:20,22 19:20,24 27:11,15,19 38:10 45:9 46:9,12, 15,20

reporting 5:9

represent 6:4

representative 24:6

reque 19:5 40:12

request 17:12 40:11

requested 22:8,9

require 21:22

required 16:8,9 25:23 29:7

resonate 13:21

*AB Litigation Services*

response 19:11,14

responses 7:9

responsibilities 23:12

responsible 22:22, 24 23:16,20 26:12

responsive 17:12

review 17:22 25:23 35:21 36:10 39:5 45:7

reviewed 17:3,6 29:1 36:8

Ridley 14:5

rights 47:8

role 11:12 13:12,15 29:15 34:23 41:22

roll 41:23

room 6:11

Ross 4:12,18 5:3

rules 7:6

run 12:17 42:8

**S**

safe 28:15,23 29:3

sales 12:15 20:9 37:3,15 38:4,5,8,11, 13,14

salutations 32:13

sat 32:2

satisfied 42:16,25 43:2

Schenk 4:4 5:21 6:3 15:7,11,24 16:23 17:6 20:2,24 24:24 25:15 27:20 32:18 33:15,25 39:2 44:10 45:1,12,15 46:24 47:16 49:12,14

screen 36:9,10 46:1

scribe 7:16

scroll 21:8,9 33:19

secondary-education 8:2

secure 22:1

sense 7:18

separately 31:12

September 15:21 44:11

serve 10:21

services 17:25

set 12:24 31:23 42:11

setting 47:23

SG&A 37:19

Shar 4:8 19:18

share 41:6

shipping 37:6

shorter 6:25

show 38:19

showed 31:22

shows 36:15 45:24

sic 12:13

side 31:5,7 40:7,17

sign 23:22 25:1

significant 22:4

signs 24:4

Simplicity 10:19

Sims 10:6

situations 48:1

Slipper 7:25

small 11:25

sold 37:3,10

sounds 18:13

sourcing 12:24

speak 14:10 23:4 31:14 37:19 42:20,24 43:5 49:6

speaking 7:13 45:10 48:21

specific 12:8 14:9

33:9

specifications 12:25

spell 28:2

spirit 23:5

spoke 48:13,16 49:5, 10

staff 14:15,22 15:4

stalls 31:23

standing 30:15

start 7:13 15:3 17:8

started 11:3 15:3

statement 27:7,22 28:4,18 29:11,14

statements 25:20, 23

states 48:15

stenographer 7:8, 16

stenographic 5:8

Steve 6:3 10:22 19:1 21:21 31:9,10 35:3, 17 40:25 44:6,13 47:18 48:2

stood 23:7

strategy 9:7,9

stuff 12:24 43:20

Subject 47:18

success 12:16

successful 12:18 32:4

suf 43:3

sufficient 42:17 43:3

suggest 35:24

suggestions 43:22

summer 11:4 12:3 13:13 48:9

supervisor 8:19

supplement 20:2

supplemental 38:22

supplied 17:11

Supply 15:14 32:20 34:14 44:9 45:17 46:6

supposition 28:5

surprise 27:1,3

sworn 5:22

**T**

table 14:15 32:2

talk 6:20 7:15 11:25 17:24 43:13

talked 32:4

talking 7:17

task 44:7

team 9:8 12:15,23 13:16,17,20,25 14:3, 7,23,25 16:5 28:12, 14,20 43:2,22

tendency 7:13

Tennessee 8:1,4,6

terms 17:24 33:1 34:9,17 36:22 37:20 38:13 39:25

testified 5:23 11:1 13:2 26:24 29:7

testify 13:8 40:18

thing 12:23 22:5 32:6,12 46:3

things 12:7 30:16 31:24 44:21

thinking 31:24

ti 8:14

Tim 10:5

time 6:23 7:2,18 8:14 10:16 14:4 18:5 19:21 26:5,18 28:10 29:18 30:19 32:5 41:15 42:18,21 43:6 48:16,17 49:7,9,12

*Matthew Jon Schenk  - 08/03/2021*                    7

*AB Litigation Services*

**timing**  12:22

**title**  16:2

**today**  4:3 7:20 46:22

**told**  42:1

**top**  9:9 10:3 41:13

**total**  36:15

**tour**  30:11,13,14

**training**  6:9

**transpired**  12:3,8 17:19

**Tri**  42:11

**Tristar**  42:2,4,7,9,12 43:15,17 47:5,6

**truthful**  7:21

**type**  12:23 22:5 32:12

**typically**  17:21 18:11,22

**U**

**Um-hum**  8:8

**unable**  7:21

**understand**  4:22 36:24

**Understood**  23:10

**unhearable**  4:19

**university**  8:3,5,6

**update**  29:8 38:4,9, 11,13,21 39:19 47:4

**upstairs**  29:22

**V**

**varies**  5:9

**verbal**  7:10

**versus**  4:5 39:17

**vice**  36:14

**video**  4:4,15 5:7 7:7

**videoconference**  4:7

**videotape**  4:17

**view**  45:25

**Vince**  10:4 14:5 21:20 31:9,10 35:4

**visited**  30:10

**Vol**  8:7

**VP**  9:2

**W**

**Wait**  45:9

**waiting**  31:25

**Walmart**  10:19

**week**  26:6,9,18 28:18 48:22 49:1

**weekly**  15:1,4 43:8, 12 49:5

**wife**  25:2

**word**  4:23

**work**  10:24 11:15 14:12

**worked**  8:18 12:23 41:21,23 47:22

**working**  10:17,18 31:11,12 38:20 47:7

**wrong**  4:16,20 5:6

**Wy**  23:6

**Wycoff**  4:6 11:10 13:16 16:1 21:14,15, 19,23 22:8,12,20,21, 23 23:7,18 29:18 30:1,8 32:10 42:16 47:2,17 48:11

**Wycoff's**  23:11 25:19 29:21 30:6 41:20

**Y**

**years**  7:2 8:13,17 9:4 11:2,9 31:15 39:7 43:11 49:4

**yellow**  29:22

**yesterday**  6:21

28:17 39:5

**Z**

**ZAP**  10:13,14 11:2, 10,13 12:15 13:4,13, 20 15:14 16:5,6 17:4, 7 18:14 19:8 20:6,13, 18 21:2 22:12,20,25 23:6 28:20 29:8,10 37:23 39:19 41:21,23 42:12 43:9,12,23 44:8 47:19

**ZAP!'s**  37:22

**Zoom**  4:7