# MANUFACTURING AND SUPPLY AGREEMENT

This Manufacturing and Supply Agreement (this "Agreement") is made and entered into this September 16, 2015 (the "Effective Date") by and between ZAP! Products, Inc., with its principal place of business located at 9417 N. Foothills Highway, Longmont CO, 80503 ("Buyer"), and Midlab, Inc., with its principal place of business located at 140 Private Brand Way, Athens, Tennessee 37303 ("Supplier") (hereinafter referred to individually as a "Party" and collectively as "the Parties").

WHEREAS, Buyer is engaged in the marketing and sales of retail proprietary cleaning products and is seeking a manufacturer to produce units of a specific product;

WHEREAS, Supplier is in the business of formulating, blending, manufacturing and supply of cleaning products;

WHEREAS, Buyer desires to have Supplier produce units of the said product and supply them to Buyer, and Supplier is willing to manufacture and supply such product units to Buyer;

NOW, THEREFORE, the Parties hereby agree as follows:

## 1.  **Definitions**

In this Agreement, the following terms shall have the following respective meanings:

(a)     "Agreement" means this Manufacturing and Supply Agreement and Exhibit A and Exhibit B hereto.

(b)     "Business Day" means Monday through Friday except for public holidays. A public holiday is a day that is a public holiday in the United States of America.

(c)     "Confidential Information" means any and all information that is disclosed by one Party to the other Party and that relates to the Parties' business relationship hereunder, including, but not limited to, information relating to the manufacturing, testing, labeling, packaging, storing or supply of Product and any and all information exchanged between the Parties pursuant to Article 4 (c) hereof. Confidential Information shall not include information which (i) is in or comes into the public domain without breach of this Agreement by the receiving Party; (ii) was in the possession of the receiving Party prior to receipt from the disclosing Party, as evidenced by the written records of the receiving Party, and was not acquired by the receiving Party from the disclosing Party under an obligation of confidentiality or non-use; (iii) is acquired by the receiving Party from a third party not under an obligation of confidentiality or non-use to the disclosing Party; or (iv) is independently developed

by the receiving Party without use of any Confidential Information of the disclosing Party, as evidenced by the written records of the receiving Party.

(d)    "Effective Date" means the date first written above.

(e)    "General Terms and Conditions of Sale" means the General Terms and Conditions of sale, which are attached under Exhibit A hereto.

(f)    "Product" means the Buyer's proprietary products, including, Porcelain Restorer, Porcelain Maintainer, Wood Restorer and [Foaming Sprayers-to be determined], as more fully described in the Specifications. Additional products may be added to the Specifications upon the mutual agreement of Buyer and Supplier.

(g)    "Raw Materials" means any and all raw materials and components needed by Supplier to manufacture, label or package Product according to the terms and conditions of this Agreement.

(h)    "Specifications" means the specifications for the Product, including, but not limited to, product specifications, manufacturing, testing, labeling, packaging and storing instructions, and standards of quality, which are attached under Exhibit B hereto.

(i)    "Term" means the period commencing on the Effective Date and terminating as set forth in Article 11 hereof.

**2.    Scope of Agreement**

On and subject to the terms and conditions of this Agreement, including the General Terms and Conditions of Sale and the Specifications, Supplier shall manufacture, test, label, package, store and supply the Product to Buyer, and Buyer shall purchase the Product from Supplier from time to time.

**3.    Specifications**

Supplier shall manufacture, test, label, package and store the Product in accordance with the Specifications and in compliance with all applicable laws, rules and regulations. Buyer shall deliver to Supplier written notice of any required changes to the Specifications, and Supplier will accommodate such Specification changes unless doing so would adversely affect Supplier's business in Supplier's reasonable judgment. If any Specification change requested by Buyer increases Supplier's costs of manufacturing, testing, labeling, packaging or storing Product, the Parties will negotiate in good faith an adjustment to the pricing set forth in Article 6 hereof. Any changes to the Specifications shall be incorporated in this Agreement as a written amendment to Exhibit B hereto.

EXHIBIT T

**MIDLAB_000020**

4.    **Compliance**

(a)    Product shall be manufactured in Supplier's facilities located at 140 Private Brand Way, Athens, Tennessee 37030 unless otherwise agreed by the Parties. Supplier shall, at its expense, maintain its facilities at such location (or any alternative location agreed by the Parties) used for the manufacture of Product in compliance with all applicable laws, rules and regulations, including, but not limited to, any applicable environmental, health and safety laws.

(b)    Buyer shall, at its expense, be responsible for obtaining and maintaining any permits or approvals from government authorities which are required in connection with Buyer's performance of its obligations hereunder.

(c)    Supplier shall permit representatives of Buyer to visit Supplier's facilities for the purpose of observing the manufacturing, testing, labeling, packaging and storing of Products. Buyer agrees to give Supplier reasonable notice of any proposed visit to the facilities. Any such visits shall be during normal business hours on Business Days, and any information gathered during such visits shall be kept confidential in accordance with the provisions of Article 10 hereof.

5.    **Order Forecasts**

Prior to the beginning of each calendar quarter, Buyer shall use its best efforts to provide to Supplier a written forecast of the number of Products expected to be ordered in the following ninety day (90) period. Based on the forecast, Supplier shall purchase Raw Materials for the manufacturing, labeling and packaging of Products, in such quantities, in Supplier's reasonable judgment, as are required to fill forecasted orders during such period. Buyer shall reimburse Supplier for any Raw Materials, finished goods inventory and packaging which remain in Supplier's possession: (i) for a period exceeding one hundred eighty (180) days, (ii) following the termination of this Agreement, or (iii) following a decision of Buyer or an agreement of the Parties which render such Raw Materials, finished goods inventory and packaging obsolete or not useable by Supplier hereunder. Reimbursement shall be made at actual cost, including an overhead allowance equal to three percent (3%) of the price Supplier paid for any finished goods inventory over one hundred eighty (180) days old.

6.    **Price**

Supplier shall charge Buyer, and Buyer shall pay for Product, as specified in the Specifications. Such prices shall be fixed during the Term, except that Supplier may pass through and otherwise charge Buyer for any cost increases for Raw Materials, labor or as a result of changes in the Specifications or applicable laws, rules and regulations.

EXHIBIT T    **MIDLAB_000021**

7. **Intellectual Property Rights**

(a)    Representation and Warranty. Buyer represents and warrants that it owns or controls all the intellectual property rights necessary to manufacture, test, label, package, store and supply the Product in accordance with the terms of this Agreement and that, to its knowledge, the Supplier's fulfillment of the terms of this Agreement will not infringe the intellectual property rights of any third party.

(b)    License. Buyer hereby grants to Supplier a license for the Term to use the intellectual property rights described in Article 7 (a) hereof required for Supplier to fulfill the terms of this Agreement.

8.    **Indemnification**

(a)    Buyer shall indemnify and hold Supplier harmless from and against any and all losses, liabilities, costs, claims and expenses, including reasonable attorneys' fees, resulting from (i) a claim brought by any third party that Supplier's manufacturing, testing, labeling, packing, storing or supply of the Product infringes any patent, utility model, design, copyright, trademark or other intellectual property right of such third party, or (ii) a claim brought by any third party against Supplier for any loss, damage, cost, expense or liability arising from defects in the Product, in either case, if such infringement or defect arises from compliance by Supplier with Buyer's instructions, including the Specifications.

(b)    Supplier shall indemnify and hold harmless Buyer from and against any and all losses, liabilities, costs, claims and expenses, including reasonable attorneys' fees, resulting from claims arising from, or related to, any negligent acts or omissions of Supplier in the manufacturing of the Products or any Product component, bottling, packaging, storage or delivery of the Products.

(c)    Any indemnification liability under this Section 8 shall be limited to actual compensatory damages and shall not include punitive, special or consequential damages for delay, lost profits, retailer penalties etc.

(d)    Each of the Parties shall provide prompt, written notice to the other in the event that either Party receives information or notice of an incident with any Product or claim that has been made, or has substantial likelihood of being made, which may entitle a Party to indemnification, insurance or warranty rights, protection or benefits pursuant to this Agreement.

(e)    The indemnifying Party shall make payment to the indemnified Party of any and all costs, losses and expenses incurred by the indemnified Party as and when they are incurred (and/or reimbursed by insurance as applicable) and promptly following a claim made by the indemnified Party, provided that each Party acknowledges its

016989\0001\12639602. 34                    EXHIBIT T                    **MIDLAB_000022**

commitment to refund any such payment if it is ultimately determined that the indemnified Party was not entitled to indemnification hereunder.

## 9.    Insurance

During the Term and for a period of two (2) years after the last delivery of Product to Buyer hereunder, each Party shall maintain an adequate insurance program which is sufficient to adequately protect against the risks associated with its ongoing business, including the risks which might possibly arise in connection with the transactions contemplated by this Agreement.

## 10.    Confidentiality

This Agreement is subject to the confidentiality provisions of the agreement entered into by the Parties a copy of which is included in Exhibit C.

## 11.    Term and Termination

(a)    Initial Term. This Agreement shall commence on the Effective Date and shall continue for five (5) years (the "Initial Term").

(b)    Termination. During the Initial Term, this Agreement may not be terminated unless there is a Material breach by the other Party. Following the Initial Term, this Agreement shall be automatically extended for an additional one (1) year term (any such period, an "Extension Term") unless thirty (30) days prior to the end of the Initial Term or any Extension Term, either Party shall give the other Party notice that the prices, terms and conditions of this Agreement no longer remain competitive in the market, that is, there is a substantial material difference between market items and those imposed by Supplier on Buyer and performance by Supplier, and quality of the Products, continues to comply with the terms and Specifications of this Agreement. In the event such notice is given, this Agreement shall be terminated at the end of the thirty (30) day period.    In addition, in the event of a Material breach by the other Party, either Party may terminate this Agreement by giving thirty (30) calendar days written notice of such termination to the other Party. "Material breach" shall include: (i) any violation of the terms of Articles 7 (a), 8, 10 and 13, (ii) any other breach that a Party has failed to cure within thirty (30) calendar days after the giving of notice by the other Party, (iii) an act of gross negligence or willful misconduct of a Party, or (iv) the insolvency, liquidation or bankruptcy of a Party.

(c)    Effect of Termination. Upon the effective date of termination of this Agreement, all legal obligations, rights and duties arising out of this Agreement shall terminate, except for such legal obligations, rights and duties as shall have accrued prior to the effective date of termination and except as otherwise expressly provided in

EXHIBIT T

**MIDLAB_000023**

this Agreement. In the event that this Agreement is terminated, or thirty (30) days pass without a purchase order for Product being received by Supplier from Buyer, Buyer agrees to purchase all Raw Materials, finished goods inventory and packaging held by Supplier upon receipt of notice in writing, in accordance with the terms set forth in Article 5.

## 12.   Independent Contractors

It is understood that both Parties hereto are independent contractors and engage in the operation of their own respective businesses. Neither Party is to be considered the agent of the other Party for any purpose whatsoever, and neither Party has any authority to enter into any contract or assume any obligation for the other Party or to make any warranty or representation on behalf of the other Party. Each Party shall be fully responsible for its own employees, servants and agents, and the employees, servants and agents of one Party shall not be deemed to be employees, servants and agents of the other Party for any purpose whatsoever.

## 13.   Non-Publicity

Each of Buyer and Supplier agree not to disclose the existence or contents of this Agreement to any third party without the prior written consent of the other Party except: (i) to its advisors, attorneys or auditors who have a need to know such information, (ii) as required by law or court order, (iii) as required in connection with the reorganization of a Party, or its merger into any other corporation, or the sale by a Party of all or substantially all of its properties or assets, or (iv) as may be required in connection with the enforcement of this Agreement. In the event of any conflict or inconsistency between this Article 13 and Exhibit C, this Article 13 shall control.

## 14.   Assignment

Neither Party may without written approval of the other assign this Agreement or transfer its interest or any part thereof under this Agreement to any third party, except that a Party may assign its rights or obligations to a third party in connection with the merger, reorganization or acquisition of stock or assets affecting all or substantially all of the properties or assets of the assigning Party.

## 15.   Governing Law and Dispute Resolution

This Agreement shall be governed by and construed in accordance with the laws of the State of Tennessee, without giving effect to any choice of law or conflict of law provisions. The Parties consent to the exclusive jurisdiction and venue in the State and federal courts of the State of Delaware.

## 16.   General

EXHIBIT T                **MIDLAB_000024**

This Agreement constitutes the entire agreement of the Parties on the subject hereof and supersedes all prior understandings and instruments on such subject. In the event of any discrepancy between the provisions of this Agreement and the provisions of Exhibit A or Exhibit B, the terms and conditions of this Agreement shall control. This Agreement may not be modified other than by a written instrument executed by duly authorized representatives of the Parties.

**17.    Survival of Provisions**

The following provisions shall survive the termination of this Agreement: Articles 8, 9, 10, 11 (c), 13 and 17 of this Agreement, and the General Terms and Conditions of Sale.

IN WITNESS WHEREOF, and intending to be legally bound, the Parties have duly executed this Agreement by their authorized representatives as of the effective Date.

MIDLAB, INC.

By: _____
Name:
Title:

ZAP! PRODUCTS, INC.

By: _____
Name:
Title:

016989\0001\12639602. 37                          EXHIBIT T                          **MIDLAB_000025**