Robert Henke
August 11, 2021

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:20-cv-03142-DDD-KLM

—

REMOTE VIDEOTAPED DEPOSITION OF:
ROBERT HENKE - August 11, 2021


MIDLAB, INC., a Tennessee Corporation,

Plaintiff,

v.

Merrie Pisano Wycoff, individually and as trustee of
The Wycoff Family Trust; Wycoff Financial, LLC, a
Colorado Limited Liability Company; Magnus Veritas,
LLC, a Colorado Limited Liability Company; and
GCS452LLC, a Colorado Limited Liability Company,

Defendants.


        PURSUANT TO NOTICE, the Videotaped Deposition
of ROBERT HENKE was taken on behalf of the Plaintiff on
August 11, 2021, at 10:00 a.m., Mountain Time, via
RemoteDepo, before Jacquelyn R. Gallo, Registered
Professional Reporter and Notary Public within
Colorado, appearing remotely from Adams County,
Colorado.

Robert Henke
August 11, 2021

Page 2

```
 1              REMOTE APPEARANCES
 2
     For the Plaintiff:
 3
              ROSS PULKRABEK, ESQ.
 4            Keating Wagner Polidori Free, P.C.
              1290 Broadway, Suite 600
 5            Denver, Colorado  80203
              rpulkrabek@keatingwagner.com
 6
 7   For the Defendants:
 8            STEVEN ABELMAN, ESQ.
              Brownstein Hyatt Farber Schreck, LLP
 9            410 17th Street, Suite 2200
              Denver, Colorado  80202
10            sabelman@bhfs.com
11
     Also present:
12
              Bill Hartley, Videographer
13
14
15
16
17
18
19
20
21
22
23
24
25
```

Page 4

```
 1   Exhibit 89  5/31/2016 Statement of Financial    123
                 Condition
 2
     Exhibit 90  11/28/16 email To:  Bob Henke       125
 3               Fr:  Jeff Wycoff
                 Subject:  Invested
 4
     Exhibit 91  7/28/2017 Statement of Financial    138
 5               Condition
 6   Exhibit 92  6/6/18 email To:  Bob Henke          --
                 Fr:  Merrie Wycoff
 7               Subject:  IRS Assessment
 8   Exhibit 93  7/9/2018 Statement of Assets and    146
                 Liabilities
 9
     Exhibit 94  Settlement Agreement and Mutual     162
10               General Release
11   Exhibit 95  2/26/19 email To:  Bob Henke        149
                 Fr:  Merrie Wycoff
12               Subject:  Settlements
13   Exhibit 96  6/18/18 email To:  Bob Henke        152
                 Fr:  Merrie Wycoff
14               Subject:  Jeff and Merrie Wycoff
                 2003 Trust Letter
15
16
17
18
19
20
21
22
23
24
25
```

Page 3

```
 1              I N D E X
 2   EXAMINATION OF ROBERT HENKE              PAGE
     August 11, 2021
 3
     By Mr. Pulkrabek                        6, 189
 4
     By Mr. Abelman                            164
 5
 6                                         INITIAL
     DEPOSITION EXHIBITS:                   REFERENCE
 7
     Exhibit 76  Defendants' Responses to Plaintiff's  29
 8               First Set of Written Discovery
 9   Exhibit 77  Subpoena                              56
10   Exhibit 78  11/3/15 email To:  Bob Henke          64
                 Fr:  Jeff Wycoff Subject:  PF
11
     Exhibit 79  11/3/15 email To:  Bob Henke          71
12               Fr:  Jeff Wycoff Subject:  Re:
                 Personal Financial Statement
13
     Exhibit 80  11/4/15 email To:  Jeff Wycoff        75
14               Fr:  Bob Henke
                 Subject:  Re:  Executed docs
15
     Exhibit 81  Engagement Letter                     76
16
     Exhibit 82  Representation Letter                 90
17
     Exhibit 83  Compilation Letter                    99
18
     Exhibit 84  6/16/21 email To:  Steve Abelman     109
19               Fr:  Bob Henke
                 Subject:  Re:  Another one
20
     Exhibit 85  1/28/16 letter To:  Jeff Wycoff      118
21               Fr:  Karen Bernardi
22   Exhibit 86  1/28/16 letter To:  Jeff Wycoff      119
                 Fr:  Karen Bernardi
23
     Exhibit 87  6/20/16 email To:  Bob Henke         119
24               Fr:  Merrie Wycoff
25   Exhibit 88  6/20/16 letter To:  Robert Henke     121
                 Fr:  Jeffrey and Merrie Wycoff
```

Page 5

```
 1        WHEREUPON, the following proceedings were
 2   taken pursuant to the Federal Rules of Civil Procedure.
 3        *    *    *    *    *    *
 4        THE VIDEOGRAPHER:  Today is August 11th, the
 5   year 2021.  We are going on the record at 11:04 am.  We
 6   are here for the deposition of Robert Henke for a case
 7   filed in the United States District Court District of
 8   Colorado.  Can the counsels please introduce themselves
 9   and who they represent?
10        MR. PULKRABEK:  Yes, it's Ross Pulkrabek, on
11   behalf of Midlab, Inc., plaintiff.
12        MR. ABELMAN:  This is Steve Abelman on behalf
13   of the defendants.
14        THE REPORTER:  Okay.  I will read my
15   statement into the record and we can get going,
16   Counsel.
17        The attorneys participating in this
18   deposition acknowledge that I am not physically present
19   in the deposition room and that I will be reporting
20   this deposition remotely.  They further acknowledge
21   that, in lieu of an oath administered in person, the
22   witness will verbally declare his testimony in this
23   matter is under penalty of perjury.  The parties and
24   their counsel consent to this arrangement and waive any
25   objections to this manner of reporting.  Please
```

Robert Henke
August 11, 2021

Page 6

1  indicate your agreement by stating your name and your
2  agreement on the record.
3        MR. PULKRABEK:  Ross Pulkrabek, I agree.
4        MR. ABELMAN:  Steve Abelman, I contend.
5              ROBERT HENKE,
6  having verbally declared his testimony in this matter
7  is under penalty of perjury, testified as follows:
8        (Deponent's reply to oath:  "I do.  Yes.")
9        THE REPORTER:  Thank you.
10              EXAMINATION
11 BY MR. PULKRABEK:
12    Q.   Mr. Henke, can you state your full name,
13 please?
14    A.   Robert Howard Henke.
15    Q.   And your date of birth?
16    A.   December 30, 1948.
17    Q.   Where are you physically located today?
18    A.   Physically today, I am located in my office
19 in Santa Ana, California.
20    Q.   And what is the address?
21    A.   12341 Newport Avenue, Suite C-201, Santa Ana,
22 California, 92705.
23    Q.   And you're a certified public accountant,
24 correct?
25    A.   That's correct.

Page 7

1     Q.   You have worked as a certified public
2  accountant over the years for Jeffrey and Merrie
3  Wycoff?
4     A.   That's correct.
5     Q.   And for legal entities that they are
6  affiliated with?
7     A.   That's correct.
8     Q.   Have you ever given testimony under oath in
9  the past?
10    A.   Yes.
11    Q.   How many times?
12    A.   I would guesstimate maybe a half a dozen
13 times.
14    Q.   And do you recall the cases or the parties in
15 those instances?
16    A.   I recall a couple of them because I have been
17 divorced twice, and two of them at least had to do with
18 depositions regarding the divorce.  As far as clients
19 go, probably, oh, gosh, 19 -- late 1980s.  I had a
20 client who made furs, and his wife was trying to get
21 the business and his daughter was trying to get the
22 business, so I was deposed.  That would have been
23 30-odd years ago.
24    Q.   Okay.  Go ahead, if you can tell me the other
25 cases that you can recall.

Page 8

1     A.   You mean specifically as to my divorces or
2  otherwise?
3     Q.   I don't need to hear about your divorces.
4  You mentioned those as well as the fur client.  If you
5  can tell me the other cases that you recall testifying
6  in, that is what I am asking about.
7     A.   I don't recall right now, but it would have
8  been over 20 years ago.  I have not done speaking under
9  oath for at least 20 years.
10    Q.   Have you ever testified as a witness in any
11 lawsuit involving Jeffrey or Merrie Wycoff or any
12 entity that they are affiliated with?
13    A.   Not that I recall, no.
14    Q.   Are you familiar with the fact that Jeffrey
15 and Merrie Wycoff had a lawsuit before the United
16 States Tax Court?
17    A.   I am very familiar with that, yes.
18    Q.   Okay.  Did you testify at all in that
19 lawsuit?
20    A.   I did not.
21    Q.   And are you aware of the case Simplicity
22 International v. GenLabs Corporation that was filed in
23 the United States District Court for the Central
24 District of California?
25    A.   I am not recalling that I am familiar with

Page 9

1  that.
2     Q.   All right.  You recognize the name Simplicity
3  International?
4     A.   Yeah, yes, I do.
5     Q.   Do you recall ever giving any testimony in
6  that case?
7     A.   I do not recall that.
8     Q.   All right.  Do you recall giving an affidavit
9  in that case?
10    A.   I am trying to think back.  You know
11 regarding GenLabs, they're in Chino, are they not?
12 That was a lot of years ago, but I may have done a
13 deposition, or I may have provided an affidavit.
14    Q.   Okay.  If you remember during the course of
15 this deposition whether you did give a deposition in
16 the Simplicity International versus GenLabs case, would
17 you please let me know that?
18    A.   I would, yes.  I am just recalling that I --
19 at one time, I went down to Laguna Niguel to meet with
20 Barry Marlin, Jeff's attorney, and I did testify to
21 something, and I don't recall the details of it, but it
22 could have been GenLabs.  It could have been the IRS on
23 the case.  That, too, would have been 15 or 16 or
24 17 years ago maybe.
25    Q.   All right.  Just to go over a few basics with

Robert Henke
August 11, 2021

Page 10

1  respect to this deposition today, and maybe this will
2  just be a refresher to you from past depositions.
3       The way this is going to work is I will ask
4  questions, I will try to finish my question completely,
5  and then you can answer.  And we will try to avoid
6  talking over one another.  That will help our court
7  reporter take down a clear record.  Okay?
8       A.   Okay.
9       Q.   And if you need to take a break at any point
10 in time, use the bathroom or whatever, just let us
11 know, that is fine.  The only caveat to it is if I have
12 asked you a question, I will want you to answer the
13 question before we take a break.  All right?
14      A.   That is fine.
15      Q.   If you don't understand any question that I
16 ask or if you don't hear it completely, will you let me
17 know that and ask me to re-ask the question?
18      A.   Fine.
19      Q.   Let's go ahead and get started then.  What,
20 if anything, did you do to prepare for giving testimony
21 today?
22      A.   I brought out all the exhibits that I
23 provided you as requested per your subpoena, so I
24 really haven't done much to prepare for today other
25 than bring all those exhibits out and set them next to

Page 11

1  me.
2       Q.   All right.  Did you look at any documents
3  that were not included in the materials that you sent
4  to us under the subpoena?
5       A.   Not to my knowledge.
6       Q.   Did you speak at all with Merrie Wycoff in
7  advance of the deposition?
8       A.   I did not.
9       Q.   What about Azuraye Wycoff?
10      A.   I did not.
11      Q.   What about Devon Wycoff?
12      A.   I did not.
13      Q.   Did you speak with Steve Abelman at all in
14 advance of the deposition?
15      A.   I have only spoken to Steve with regards to
16 the deposition, not the content.
17      Q.   So the fact of the deposition?
18      A.   Yeah.  He advised me that you guys wanted a
19 deposition and what dates were available or convenient,
20 and it was not really discussed what I provided you.
21      Q.   Have you talked to anybody else from
22 Mr. Abelman's office to prepare for the deposition?
23      A.   No.
24      Q.   All right.  Is there anybody else that you
25 have spoken with about the deposition -- giving

Page 12

1  deposition testimony today that we haven't already
2  covered?
3       Q.   Who would be relevant to it, or my wife?
4       Q.   I don't need to hear about conversations with
5  your wife.
6       A.   No.
7       Q.   Other than your wife, is there anybody?
8       A.   No.
9       Q.   Okay.  All right.  Where are you licensed as
10 a certified public accountant?
11      A.   California.
12      Q.   And are you licensed in any other states?
13      A.   No.
14      Q.   And how long have you been licensed in
15 California?
16      A.   March of 1977.
17      Q.   And have you held your license in good
18 standing continuously since then?
19      A.   Yes.
20      Q.   Have there ever been any interruptions in
21 your licensure at all?
22      A.   No.
23      Q.   Okay.  Do you have any other professional
24 licenses?
25      A.   I have a California insurance -- life

Page 13

1  insurance license, and I have a Series 6 and 63
2  security license, and 65 also.
3       Q.   Okay.  Anything else?
4       A.   Professionally, no.
5       Q.   All right.  Are you -- are you an enrolled
6  agent with the IRS?
7       A.   No.
8       Q.   Do you have any credentials to appear before
9  the United States Tax Court and represent clients?
10      A.   No.
11      Q.   And I think you have already given us your
12 business office address; is that correct?
13      A.   That's correct, that is where I am at.
14      Q.   How long have you been at that address?
15      A.   Roughly since about 2002.
16      Q.   What was your address before?
17      A.   Before that, I was in Studio City.
18      Q.   Do you recall the address?
19      A.   13063 Ventura Boulevard, Suite -- you would
20 ask -- I want to say Suite 202.  I don't remember the
21 suite, but that was in Studio City, California, 91604.
22      Q.   How long were you at that office?
23      A.   Approximately 14 years.
24      Q.   All right.  So would it be fair to say that
25 any work you did for Jeff and Merrie Wycoff or any of

Robert Henke
August 11, 2021

Page 14

1 their entities would have been done either at your
2 current office or at the Studio City office address you
3 just gave me?
4      A.    Yes, but between Studio City in '94 and this
5 office in 2002, for two years, I worked out of my
6 office at home.  So for the year 1999 and 2000, I was
7 actually working out of my home here, and then I took
8 the office here in Santa Ana.
9      Q.    And are you still living at the same address?
10     A.    I am not.
11     Q.    Do you remember the home address in '99 and
12 2000?
13     A.    Yeah.  Let me take a step back.  We were in a
14 rental house from 1994 to 1997, late into 1997.  I
15 would have only been doing Jeff's work out of my home,
16 which is my current home address, 2200 Palmer Place,
17 Tustin, California, 92782.  And we were there from
18 November of '97 -- we're still there -- so between '97,
19 I worked out of my home until I took the office here in
20 2002.
21     Q.    Do you have any partners in your accounting
22 practice?
23     A.    No.
24     Q.    Do you have any employees?
25     A.    I have one contract employee currently.  She

Page 15

1 was an employee of mine for about five years, and then
2 her time has been significantly reduced and she has her
3 own business, so I contract with her.  She works about
4 two days a month roughly.
5      Q.    All right.  Are you primarily a tax
6 accountant?
7      A.    Primarily.
8      Q.    Do you do any auditing work?
9      A.    I do no audits.
10     Q.    Okay.  Do you do any business valuation work?
11     A.    I do no business valuation work.  That said,
12 are you referring to Jeff Wycoff?
13     Q.    No, I am just asking generally, in your
14 practice, you don't -- you're not an auditor and you're
15 not a business valuation accountant?
16     A.    That's correct.
17     Q.    Okay.  You're not a forensic accountant
18 either.  Am I right about that?
19     A.    No.  Correct, correct.
20     Q.    Other than assisting clients with preparation
21 of tax filings, what, if anything, do you do in your
22 practice?
23     A.    I have a few clients that I do compile
24 financials for.  I will do some financial planning,
25 some estate planning, usually in conjunction with an

Page 16

1 attorney.  But ongoing, I have mostly a tax practice.
2 I have several fiscal year clients, and, otherwise, I
3 have a really vigorous tax season.
4      Q.    Okay.  So you mentioned that you have a few
5 clients who you do compiled financials for.  Can you
6 give me an estimate of how many clients you have that
7 you do that kind of work for?
8      A.    A few.  I have three that I do regularly, a
9 fourth one, fifth one, sixth one periodically.  So I
10 may do the bookkeeping for those clients in conjunction
11 with a tax return that I would prepare.  But the
12 three -- three that I do monthly, we do -- do their
13 bookkeeping, and then I will, with those three, I issue
14 periodic financial statements compiled.
15     Q.    Okay.  So let me see if I understand this
16 correctly.  You have three clients who you keep the
17 books for, you actually enter the information into the
18 books and keep that up to date, and then you will
19 prepare monthly compiled financial statements for those
20 particular clients?
21     A.    Two of them are quarterly and one of them is
22 monthly.
23     Q.    And then there were about maybe three more
24 clients who you have compiled financial statements for
25 irregularly?

Page 17

1      A.    Generally speaking, the other ones I am
2 referring to will bring their materials in at the end
3 of their year, and then we will bookkeep that material
4 to prepare a tax return.
5      Q.    Okay.  And then as part of that, you would
6 compile financial statements as well?
7      A.    If requested, not generally.
8      Q.    All right.  In this case, one of the things
9 that we are looking at are compilations of personal and
10 financial statements for Jeffrey and Merrie Wycoff.
11 Are you familiar with that?
12     A.    I am.
13     Q.    So in terms of your practice, how often did
14 you do the equivalent of that work, compiling a
15 personal financial statement for clients?
16     A.    I mean, I want to say that I have done it
17 before the Wycoffs, but I would have to go look at my
18 files to see where I have done it before the Wycoffs,
19 otherwise, it has been only the Wycoffs because Jeff is
20 my only client who asked for them.
21     Q.    Okay.
22     A.    With that said, I know I have prepared other
23 personal financial statements, so that was not the
24 first one I did for them.
25     Q.    All right.  Let me see if I can drill down on

Robert Henke
August 11, 2021

1  this a little bit more and make sure that I understand.
2       So prior to the Wycoffs asking for compiled
3  personal financial statements, you had done that at
4  some point in time for a client, but you cannot,
5  sitting here today, recall when or who that was done
6  for?
7       A.    That is correct.
8       Q.    And then the Wycoffs did ask you to prepare
9  multiple personal financial statements for them, right?
10      A.    I was requested by Jeff, yes.
11      Q.    And the Wycoffs are the only client that you
12 have prepared personal financial statements for during
13 the period of time since the Wycoffs started asking you
14 to do that?
15      MR. ABELMAN:  Objection, foundation.  He said
16 Jeff Wycoff, not Wycoffs.
17      MR. PULKRABEK:  Okay.  Mr. Abelman, just a
18 reminder, please limit your objections to form and
19 foundation.  Thanks.
20      Q.    (BY MR. PULKRABEK)  Mr. Henke, if you can
21 answer the question, please.
22      A.    I want to say that during this period of
23 time, and I believe we're talking about 2015 and 2016,
24 maybe through 2018, to my recollection, the Wycoffs
25 were the only personal financial statements I prepared.

1       Q.    Okay.  So to put it -- put it another way, at
2  least during the period 2015 to 2018, you were not
3  preparing personal financial statements for any clients
4  other than Jeffrey and Merrie Wycoff?
5       A.    I believe that is correct.
6       Q.    So it's not something that you do regularly.
7  Would you agree with that?
8       A.    No, that is correct.
9       Q.    Okay.  Let me turn to some more specific
10 questions about work that you have done for Jeffrey and
11 Merrie Wycoff.  Can you tell me, when was the first
12 time that you met either one of them?
13      A.    I believe I met Jeff Wycoff first in about
14 the year 2000.
15      Q.    And how did you meet him?
16      A.    I was introduced to him by a friend of mine,
17 an attorney, Barry Marlin.
18      Q.    And how long have you known Mr. Marlin?
19      A.    When did I meet Barry Marlin?  I am fuzzy on
20 that, but I would say somewhere in the latter '90s.  So
21 I might have known him for three or four or five years
22 before he introduced me to Jeff.
23      Q.    And is Mr. Marlin one of your clients?
24      A.    No.
25      Q.    Has Mr. Marlin referred other clients to you

1  over the years?
2       A.    Only himself.  He had me as trustee on his
3  wife's trust for a while.
4       Q.    What period of time was that?
5       A.    It would have been in the latter '90s or the
6  early 2000s.
7       Q.    Okay.  So other than Jeff Wycoff, you can't
8  recall any client being referred to you by Mr. Marlin;
9  is that fair?
10      A.    That's correct.
11      Q.    And what is your understanding of Mr. Marlin
12 and his profession or occupation?
13      A.    He -- you learned a lot as time went on, but
14 he practiced law here in California, was a licensed
15 attorney.  He was an attorney friend of one of my
16 long-time clients from the early '80s who started an
17 Internet business, and I was actually out at his shop
18 out in Santa Clarita when he introduced me to Barry
19 Marlin.
20      So my understanding was he was a licensed
21 California attorney, and he introduced me to Jeff
22 because he was Jeff's counsel, I believe.
23      Q.    Okay.  A couple of follow-up questions on
24 that.  Who was -- what was the friend's name?
25      A.    Pardon me?

1       Q.    You mentioned that you got introduced to
2  Barry Marlin by a friend.  Who was that?
3       A.    Well, that was a client of mine, Jeff
4  Klankman (phonetic).
5       Q.    Okay.  And you had said something to the
6  effect of you learned a lot as time went on about Barry
7  Marlin.  What did you mean by that?
8       A.    I mean, I guess he actually did some time in
9  federal prison for something that he was involved with
10 many years before.
11      Q.    And do you know what that was?
12      A.    I don't recall the particulars, but it was --
13 according to Barry, he had been set up and then he was
14 the fall guy in some financial something or other.  But
15 this actually all came to light probably in the last
16 few years -- for me anyway, the last few years before
17 Jeff committed suicide.
18      It really distressed him that he never knew,
19 and it was like he sent me something on Barry -- I
20 probably have it somewhere -- but on basically what the
21 case was and how it went down.
22      Q.    So it's -- is it your understanding that
23 Mr. Marlin is still in federal prison or is he --
24      A.    No, Mr. Marlin is not in federal prison.  I
25 think he got out of prison and he moved to England for

Robert Henke
August 11, 2021

Page 22

1  some period of time.  His wife is English.  They moved
2  back, he got re-licensed, whatever that process
3  involves.  And this all happened before I met him, and
4  I was unaware until I want to say 2015 maybe that any
5  of this had transpired.  I always thought he was a very
6  knowledgeable guy.
7          But I referred one of my clients to him once,
8  and he was quite adept at setting up foreign bank
9  accounts.  And one of my clients that is related to me,
10  when it came time to get his money, found it very
11  difficult to get his money.  So basically there were
12  some threats and Barry had to go over to Europe and
13  make a personal appearance for my client to get his
14  money.
15          They like to take people's names off of bank
16  accounts and do something in foreign countries with it.
17  That is great going in.  It's sometimes difficult then
18  to get your money out.  So anyway, Barry was quite well
19  connected in Europe.
20      Q.   Knowing what you know about Barry Marlin now,
21  would you refer a client to him?
22      A.   No.
23      Q.   Okay.  So getting back to your first meeting
24  Jeff Wycoff, tell me what you recall about the first
25  time you met him.

Page 23

1      A.   My first impression of him was he was --
2  well, what was my first impression?  My first
3  impression was that he was a contractor who figured out
4  how to formulate a product that he could mass market.
5  And he was kind of -- kind of a hard ass, but he knew
6  how to market so --
7      Q.   Did he engage you to do accounting work for
8  him at that time?
9      A.   He did.
10      Q.   And for him personally or for legal entities?
11  Do you recall?
12      A.   I was doing corporate tax returns for his
13  corporations, and I was doing his personal tax return.
14  And I also did an audit, a backward audit for '97, '98,
15  '99, as I recall, because in 2000, when I met him, he
16  was doing pretty large sales, we're talking, you know,
17  40, 60 million worth of sales.
18          And he actually engaged another firm to do a
19  current audit for him, and he was talking to some
20  marketing management company about putting together a
21  package for him to sell the business.  And at the time,
22  he actually was -- at the time, he was looking at maybe
23  a hundred million dollars being the payday.
24      Q.   Which legal entities did you do work for?
25      A.   I worked for Sirius Products, which was at

Page 24

1  the time the Zap! Products, which was his retail, and I
2  worked for Restore 4, which was his infomercial
3  marketing of the same product but packaged differently,
4  it was Restore 4; in retail, it was Zap!.
5      Q.   Any others, any other legal entities
6  affiliated with Jeff or Merrie Wycoff that you did work
7  for?
8      A.   He bought -- he bought a company called Soap
9  Works, and I think he then changed the name to
10  Simplicity.  I did work for them and tax returns.
11      Q.   What about Albion Management?
12      A.   I did Albion Management books after Barry did
13  it initially, and then I took over the bookkeeping of
14  it.
15      Q.   When did you take over bookkeeping -- I am
16  sorry.  When did you take over bookkeeping for Albion
17  Management?
18      A.   I have to look.  I think Barry did it for a
19  year or two, which would have been maybe when I picked
20  it up, it was 2003 maybe, maybe 2004.
21      Q.   Okay.  Are you familiar with a notice of
22  deficiency that the Internal Revenue Service had issued
23  to Jeff and Merrie Wycoff that was related to Albion
24  Management?
25      A.   I am familiar with it, yes.

Page 25

1      Q.   And that notice of deficiency, as I recall,
2  covered the tax years for 2001 and 2002.  Did you take
3  over the bookkeeping after the years at issue in the
4  notice of deficiency?  Or were you doing bookkeeping
5  during any years at issue in the notice of deficiency?
6      A.   I was doing bookkeeping before the notice of
7  deficiency.
8      Q.   Okay.  And whenever -- go ahead.  I missed
9  that.
10      A.   I should say I don't know that I was doing
11  Albion at the time, but I was doing Sirius and
12  Simplicity at the time they were formed.  And actually,
13  I just want to qualify that.  I -- they had a
14  bookkeeper.  So I was making journals and doing tax
15  returns at the time.  I wasn't really doing the
16  bookkeeping.
17      Q.   All right.  What other legal entities have
18  you done work for that affiliated in any way, shape, or
19  form with Jeff and Merrie Wycoff?
20      A.   They had an LLC for their farm called Autumn
21  Hill.  Let's see.  What else did I do for them.  You
22  know, I don't recall right now.  I think I provided a
23  list of all of the entities that I did to maybe Steve.
24  Somebody asked and I provided a list of all of the
25  entities and the years that I had worked on those

Robert Henke
August 11, 2021

Page 26

1  entities.
2      Q.    Okay.  We will get to that in a bit.  When
3  did you first meet Merrie Wycoff?
4      A.    Wow, that is a good question.  I am trying to
5  think if I met her actually at their office at some
6  point in time, which is probably where I first met her,
7  at their office.  I was -- in the year 2001, I was
8  going up to North Ridge three days a week in 2000 --
9  yeah, in 2000 and 2001.  And especially in 2001, Jeff
10 was marketing his business.  He was -- he was doing, as
11 I say, something on the order of 40 to 60 million in
12 sales and was winding up the sale of those businesses
13 for something like a hundred million dollars.
14      So I was up there a lot, and I am just
15 guessing that one day I must have been introduced to
16 her at the office.  I was at the office more often than
17 she was.
18      Q.    Okay.  Do you know if Jeff and Merrie Wycoff
19 were living in California at the time that you met her
20 or were they --
21      A.    Yeah, they were living in Northridge.  And
22 then I want to say shortly thereafter, they bought
23 their home in Boulder.  And for the most part, Jeff was
24 here working and Merrie was living there for some
25 period of time, and I don't know exactly what that

Page 27

1  period was, but he was doing the business and she was
2  doing the household.
3      Q.    From your work for the various entities that
4  are affiliated with the Wycoffs, do you have an
5  understanding of what the ownership of those entities
6  was?
7      A.    If I didn't initially, I would find that out,
8  because I generally needed that for tax preparation.
9  If I had a Sub-S corporation and I am issuing K-1s, I
10 need to know who the owners are and for what
11 percentage.
12      Q.    Okay.  So what was your understanding of the
13 ownership of Sirius Products, for example?
14      A.    I mean, I want to say without looking that it
15 was community properties, so probably 50 percent Jeff
16 and 50 percent Merrie.
17      Q.    How about Restore 4?
18      A.    Same thing.
19      Q.    How about Soap Works and Simplicity?
20      A.    Same thing.
21      Q.    And what about Albion Management?
22      A.    Albion Management, I did have -- I almost
23 have to research, excuse me, the ownership of that
24 because it involved an ESOP.  There were one or two
25 years where the ESOP actually distributed money into a

Page 28

1  pension plan, actually, Albion became the employer of
2  the employees of Sirius Products for a year or two.
3  And then those employees -- and this had to do with the
4  ESOP -- they had to be employees of Albion.  Albion was
5  really just a management company, not an operating
6  company, but it was quite involved.
7      Q.    Okay.  So you are not -- sitting here right
8  now, you can't testify to what the ownership of Albion
9  Management was?
10     A.    That's correct.
11     Q.    Okay.  What about Autumn Hill?
12     A.    Autumn Hill was an LLC that was owned by Jeff
13 and Merrie, I believe again 50/50.
14     Q.    Okay.  And then are you familiar with a
15 company called Zap! Products, Inc.?
16     A.    Yes.
17     Q.    And that -- that is a second name for that
18 company.  It had an earlier name, am I right about
19 that?
20     A.    That's correct.
21     Q.    And what is the earlier name?
22     A.    It was Antares, Inc.
23     Q.    Do you know what the ownership of
24 Antares/Zap! Products was?
25     A.    Again, I would believe 50/50, Merrie and

Page 29

1  Jeff.
2      Q.    When did you start preparing tax returns for
3  Jeff and Merrie Wycoff?
4      A.    Personally?  2000, 2001.
5      Q.    Did they always file married, filing jointly?
6      A.    That's correct.
7      Q.    Okay.  Let me refer you to what I have
8  already sent you.  It's marked Exhibit 76 in the file.
9  I am going to pull this up and see if I can share the
10 screen as well.  You can feel free to peruse the
11 document, but I am going to have some specific
12 questions about some of the information in here.
13      So the first thing, I will just represent to
14 you, this is Defendant's Responses to Plaintiff's First
15 Set of Written Discovery.  You can see that from the
16 cover page, correct?
17     A.    Yes, uh-huh.
18     Q.    All right.  And I am going to scroll down
19 here to Interrogatory Number 5.  It's on page 13 of the
20 document, and you can also see it.  I am going to share
21 the screen so that you can see it here.
22     A.    I see Number 5.
23     Q.    All right.  And are you able to see that on
24 the screen, Interrogatory Number 5?  Is that sharing?
25     A.    I am, yes, uh-huh.

Robert Henke
August 11, 2021

Page 30

1    Q.    Okay, good.  So let me ask you.  You referred
2  a moment ago to having provided a list of companies
3  that you had done accounting work for.  Do you remember
4  that?
5    A.    I do.
6    Q.    And so did you help in any way with the
7  response to Interrogatory Number 5 on Exhibit 76?
8    A.    Well, what I am looking at on the screen is
9  what I was referring to earlier that those are the
10  entities and roughly for precisely the periods that I
11  have worked for the Wycoffs and their entities.
12    Q.    Okay.  And can you -- and so it sounds like
13  the answer is you provided the information that we're
14  seeing here on page 13 of Exhibit 76 and that it does
15  carry over -- I am sorry, it doesn't carry over.  So
16  it's just on page 13.  You provided that information?
17    A.    That's correct.
18    Q.    And can you tell us, how did you go about
19  figuring out the dates and the complete list of
20  entities?
21    A.    I looked back at my tax programs for years
22  that I had done tax returns for them.
23    Q.    Okay.  And on this response, there is a
24  section here that says, "Compiled financial statements
25  (irregularly rendered)."  Do you see that?

Page 31

1    A.    I do.
2    Q.    And then for Jeff and Merrie Wycoff, it says
3  2006 to 2017.  Do you see that?
4    A.    I see that.
5    Q.    So earlier, I had asked you some questions
6  about how common it was to prepare personal financial
7  statements for clients, and we were trying to zero in
8  on a date range during which Jeff and Merrie Wycoff
9  were the only clients that you were doing that for.  Do
10  you remember that?
11    A.    Yes.
12    Q.    All right.  So here the date range for
13  irregularly rendered compiled financial statements is
14  2006 to 2007 for Jeff and Merrie Wycoff, do you see
15  that?
16    A.    I see that.
17    Q.    Is that accurate?
18    A.    I am guessing as I sit here that it is, which
19  means that I must have quite possibly a financial
20  statement for '06.  And then the next thing I guess --
21  well, okay.
22    Q.    All right.  So with this further information,
23  would it be correct to say that Jeff and Merrie Wycoff
24  were the only individual clients for whom you prepared
25  compiled financial statements during the period 2006 to

Page 32

1  2017?
2    A.    I don't think that would be a fair statement.
3    Q.    You think that would be inaccurate?
4    A.    I think that would probably -- possibly be
5  inaccurate.
6    Q.    Okay.
7    A.    Because the only thing I am addressing here
8  is Jeff and Merrie Wycoff.  And if I had done another
9  personal financial for someone else, it would not be
10  indicated here.
11    Q.    All right.  I guess what I am trying to get
12  at is this.  You -- my understanding from your
13  testimony earlier was that you had done -- you had
14  prepared personal financial statements for at least
15  some client who you couldn't remember prior to doing
16  any of them for Jeff and Merrie Wycoff.  And then once
17  you started doing them for Jeff and Merrie Wycoff, they
18  were the only ones you were doing them for on that
19  individual basis.  Is that -- did I understand that
20  incorrectly?  Can you elaborate on that for me, please?
21    MR. ABELMAN:  Objection to the form of the
22  question.
23    A.    I would say that is generally correct.  But
24  in the back of my mind, I am just -- I don't prepare
25  personal financials often, and when I do, I don't know,

Page 33

1  it's like I have in my mind that I have done personal
2  financials other than them back during that period of
3  time back to '06, but I am relatively certain I didn't
4  do anybody else between 2015 and 2017 for Jeff and
5  Merrie and for 2018 for Merrie.
6    Q.    (BY MR. PULKRABEK)  During this period, 2006
7  to 2007, can you describe for me how infrequent it was
8  for you to prepare a personal financial statement for
9  an individual?
10    A.    I would say very infrequent.
11    Q.    Was it something that you did even on a like
12  once-a-year basis, or was it less frequent than that
13  even?
14    A.    It was probably less frequent than that.
15    Q.    Okay.  All right.  Still looking at the
16  response to Interrogatory Number 5 on Exhibit 76, let
17  me ask you a few questions about some of these
18  companies.  There is one that is called Devraye, Inc.
19  Do you see that?
20    A.    I see that.
21    Q.    What, if anything, do you remember about
22  Devraye, Inc.?
23    A.    Jeff, I believe, had a product or two
24  products or something on a smaller scale that he was
25  selling through Devraye.  And Devraye was actually

Robert Henke
August 11, 2021

Page 34

1  named for his daughters, and I don't know that that has
2  anything to do with anything.  But he used it for a
3  while and wrapped it up.  And I don't recall the sales
4  were much, if anything, very small.
5      Q.    Okay.  What about Zap 2 International?  What
6  do you recall about that company, if anything?
7      A.    Not much.  I did apparently a tax return for
8  them for two years, but I don't recall that they had
9  anything going on.  I think the company was formed for
10  a purpose, and it didn't serve the purpose, so they
11  opened it and closed it.
12      Q.    And what about Paradigm, Inc.?  What do you
13  remember about that company, if anything?
14      A.    Paradigm, Inc., I believe that again there he
15  had a product or two that he used Paradigm to sell, and
16  what is sticking in my mind was maybe Herplex.  His
17  Herplex products was Paradigm.
18      Q.    And do you remember the structure of that
19  company?
20      A.    I am, again, going as to say 50/50 Jeff and
21  Merrie.
22      Q.    One entity that I don't see on this list is
23  an entity called Wycoff Financial, LLC.  Did you ever
24  do any accounting work for Wycoff Financial, LLC?
25      A.    Not that I recall.  And actually, I am not

Page 35

1  familiar with that name.
2      Q.    So you have never heard the name Wycoff
3  Financial, LLC, before?
4      A.    Not until we got started on this.
5      Q.    Only in connection with this lawsuit you have
6  heard it?
7      A.    Correct.
8      Q.    Okay.  Do you have an understanding sitting
9  here today of what Wycoff Financial, LLC, was or what
10  its purpose was?
11      A.    I do not.
12      Q.    Do you have any understanding of what the
13  ownership structure was?
14      A.    No.
15      Q.    Have you ever seen a tax return for Wycoff
16  Financial, LLC?
17      A.    I have not, no.
18      Q.    Have you ever seen a -- pardon me -- any set
19  of books or records for Wycoff Financial, LLC?  I am
20  sorry.  I just missed your answer.
21      A.    No, I have not.
22      Q.    Okay.  Have you ever seen any K-1s issued by
23  a Wycoff Financial, LLC?
24      A.    Not that I recall.
25      Q.    When you prepared the tax returns, the

Page 36

1  individual tax returns for Jeff and Merrie Wycoff,
2  would you receive copies of K-1s for any of the
3  entities that they were owners of?
4      A.    I would, yes.
5      Q.    And is that typical that if somebody owns an
6  interest in an LLC, is that a K-1 that the LLC would
7  issue?
8      A.    Generally, yes.
9      Q.    Okay.  And did you ever see any K-1s in the
10  course of preparing tax returns for Jeff and Merrie
11  Wycoff that were related to Wycoff Financial, LLC?
12      A.    No, not that I recall.
13      Q.    Sitting here today, are you aware that there
14  was a period of time during which the farm property
15  located in Boulder, Colorado, was titled in the name of
16  Wycoff Financial, LLC?
17      A.    I was not.
18      Q.    Okay.  So you are learning that for the first
19  time sitting here right now?
20      A.    Yes.
21      Q.    You -- do you recall that you prepared some
22  personal financial statements that identified the farm
23  as one of the assets of the Wycoffs?
24      A.    Yes, uh-huh.
25      Q.    And then you also would list their ownership

Page 37

1  interest in various entities on the personal financial
2  statements; is that correct?
3      A.    I don't recall that the entities had a
4  percentage ownership indicated, but they would all have
5  been 100 percent.
6      Q.    Between Jeff and Merrie, they were a hundred
7  percent?
8      A.    Correct.
9      Q.    Okay.  All right.  And I guess just to
10  clarify this, I think it's pretty clear from your
11  testimony already, but let me just clarify it, Jeff and
12  Merrie Wycoff never explained to you that that farm
13  property was titled in Wycoff Financial in connection
14  with any engagement of you to prepare a financial
15  statement?
16      A.    That's correct.
17      Q.    Now, one of the entities that I didn't see on
18  the list that is under the response to Interrogatory
19  Number 5 is Albion Management.  Is there a reason why
20  that one wasn't listed in this list of entities in the
21  response?
22      A.    Again, I don't know as I sit here what the
23  ownership was.  I mean, it's a long story and it began
24  in 2000, 2001, when a lot of money went into the not-
25  qualified deferred plan.  But there was an ESOP.  That

Robert Henke
August 11, 2021

Page 38

1  ESOP then was undone, and I don't know, to my
2  knowledge, Jeff and Merrie did not own Albion
3  Management.
4      Q.   I have -- in connection with Albion
5  Management, I have heard something called a -- I think
6  it's a Rabbi trust or Rabbi trust?
7      A.   Rabbi trust, uh-huh.
8      Q.   Okay.  What is a -- do you know what a Rabbi
9  trust is?
10     A.   Well, a Rabbi trust was a trust.  It was a
11  mechanism used to handle the funds.  The operating
12  companies, Zap, which was Sirius Products and Restore
13  4, made a lot of money in 2000, the first part of 2001,
14  and they deducted the monies that were put in to the
15  Rabbi trust, and that was a part of the not-qualified
16  deferred plan.
17         So the ESOP actually owned -- I believe ESOP
18  owned Albion Management, and then that was undone.
19  Sometime, I want to say 2009 maybe, the IRS came out
20  with regulations, and we had to move -- what did we do,
21  we changed Albion from an S Corp. to a C Corp., I
22  believe, but the ownership of Albion at the time was a
23  nontaxable entity.  So any income that came off of
24  Albion went to this nontaxable entity, and the Rabbi
25  trust was just the holder of the funds.  It was --

Page 39

1  let's say it was a complicated arrangement to allow
2  large pension contributions and a deferred plan.
3      Q.   So the money went into the Rabbi funds?
4      A.   The money was in the Rabbi trust, yes.
5      Q.   And do you -- is there still a Rabbi trust
6  today, do you know?
7      A.   You know, you're breaking up on -- can you
8  ask that again?
9      Q.   My question was is there still a Rabbi trust
10  in existence today, if you know?
11     A.   I don't believe so, but I don't know that for
12  a fact.
13     Q.   When is the last time you had any awareness
14  of the Rabbi trust being in existence?
15     A.   You know, excuse me, I don't know if it's my
16  connection or yours, but I am not understanding.
17         THE VIDEOGRAPHER:  Yeah, Attorney Ross, maybe
18  if you could just scoot back a little bit from your
19  microphone.
20         MR. PULKRABEK:  Let's see if I can come
21  through any more clearly.  Can you hear me?
22         THE VIDEOGRAPHER:  It's definitely glitched
23  out right now.  It's like a -- maybe your output is too
24  high or something.
25         MR. PULKRABEK:  You were hearing me fine

Page 40

1  before?
2         THE VIDEOGRAPHER:  Do you all want to go off
3  the record for a moment?
4         MR. PULKRABEK:  Go off the record.
5         THE VIDEOGRAPHER:  Okay.  We are going off the
6  record, 11:58.
7         (Discussion off the record.)
8         THE VIDEOGRAPHER:  We are going back on the
9  record, 11:59.
10     Q.   (BY MR. PULKRABEK)  All right.  We are back
11  from technical difficulties.
12         Okay.  Mr. Henke, I was asking you, when was
13  the last time that you knew of the Rabbi trust being in
14  existence?
15     A.   Yeah, I am really fuzzy on when it went out
16  of existence.  I believe a number of years ago, maybe
17  five years ago, maybe eight years ago.  And I am not
18  sure, I didn't do any accounting for that, so I don't
19  know what happened to it.  There was a long period of
20  time, I believe, where Jeff was taking loans from it,
21  whether those loans were paid back or not, I don't
22  know.
23     Q.   And I guess part of what I am trying to
24  figure out is if there was a Rabbi trust that held some
25  substantial amount of money, maybe in the hundreds of

Page 41

1  thousands or millions of dollars, that was still around
2  at or about the time that Jeff Wycoff passed away.  Now
3  do you have any information about that one way or the
4  other?
5         MR. ABELMAN:  Object to form and foundation.
6     A.   I don't have any information on when
7  specifically it was depleted or stopped operating.  I
8  don't know.
9     Q.   (BY MR. PULKRABEK)  Do you know who the
10  custodian of the Rabbi trust was the last time you were
11  aware of it?
12     A.   The last time I was aware of it, I believe it
13  had a trustee, and I think that was Barry Marlin.  The
14  custodian was whatever firm Paul Thompson is with, I
15  don't know, Dean Witter or whoever the brokerage that
16  he was with was the custodian.
17     Q.   Okay.  We talked a little bit about
18  Antares/Zap! Products.  Did you ever do any of the
19  bookkeeping for that company?
20     A.   No.  And the reason I had to think, Antares
21  did very little business, and then around 2015 or '16,
22  it ramped up big time and Jeff took it out of my hands
23  for about a year and then he came back.  And I never
24  did the bookkeeping for it anyway, but I was given --
25  they had a controller person, a bookkeeper person.  I

Robert Henke
August 11, 2021

Page 42

1  was given the books back in like 2017.  Again, I didn't
2  do the bookkeeping.  They had a person doing the
3  bookkeeping.  I was doing the tax return.
4      Q.    So let me see if I can ask you for some more
5  detail on this.  Antares was a company that you were
6  doing bookkeeping for up until about 2015.  Do I have
7  that right?
8      A.    Well, I never did bookkeeping for Antares.  I
9  prepared tax returns.
10     Q.    Okay.  And then you said it was doing very
11 little business before 2015.  Did I understand you
12 correctly on that?
13     A.    I believe that is correct.
14     Q.    And do you know what business, if any, it was
15 doing up until 2015?
16     A.    I would have to look, but I just -- I don't
17 recall Antares doing a lot of business.
18     Q.    All right.  And then you said that Jeff
19 Wycoff took something out of your hands starting around
20 2015, and then you got it back starting in 2017.  So
21 what was it that it was taken out of your hands during
22 that time?
23     A.    The preparation of the tax return.  I had
24 done Antares for a number of years, and then he had me
25 not doing it.  And when it came back, it was Zap!

Page 43

1  International, Inc., formerly Antares.
2      Q.    Do you know why or did Jeff Wycoff explain
3  why he was taking the tax return out of your hands?
4      A.    Not at the time, but later he was doing some
5  financing or something and he needed whoever was
6  helping him with the financing to do whatever was going
7  on with the company.  I just figured I didn't have the
8  company anymore.  It was no great loss because I didn't
9  see a lot going on there.
10     Q.    All right.  Do you know who the officers of
11 Antares/Zap! Products were?
12     A.    Not definitely.  I would guess they were
13 shareholders, but I don't know that.
14     Q.    Do you know if there was a board of
15 directors?
16     A.    I, again, would guess that it would be the
17 shareholders.  The officers and directors would
18 probably be the same.  I did do Zap!'s tax returns, but
19 I don't recall that we ever had an officer scheduled
20 for compensation.  So I don't -- you know, I don't know
21 what I have or what I don't have there.
22     Q.    When you got information to prepare tax
23 returns for Zap! Products, at least when you got it
24 back in 2017, how did you get the financial books of
25 account?

Page 44

1      A.    I got it from the Zap! employee, I think.
2  What was her name?  Lindsey Kulwicki, I believe,
3  originally, and then I think there was another woman
4  who was doing the books after her.
5      Q.    And how were they kept?  In other words, were
6  they kept using a software program or --
7      A.    Yeah, they were kept on QuickBooks, and they
8  used Enterprise.  So originally, I asked for a portable
9  copy of the QuickBooks, but then I had to buy
10 Enterprise at like $600.  So I asked them after that
11 just to provide me the reports that I needed, trial
12 balance and balance sheet, you know.
13     Q.    Okay.  So at some point in time, you got the
14 QuickBooks portable file for Zap! Products?
15     A.    Yes.
16     Q.    Do you still have that?
17     A.    I do.
18     Q.    And have you continued preparing tax returns
19 for Zap! Products since 2017?
20     A.    Yes.
21     Q.    What years have you prepared tax returns for?
22     A.    Currently up through 2020.
23     Q.    Okay.  And have you continued preparing tax
24 returns for Merrie Wycoff since Jeff Wycoff's passing?
25     A.    Yes.

Page 45

1      Q.    And through what year have you prepared
2  those?
3      A.    2020.
4      Q.    Has Merrie Wycoff ever asked you to send her
5  a copy of the QuickBooks file for Zap! Products?
6      A.    No.
7      Q.    If she asked you that, is there any reason
8  why you wouldn't provide her the QuickBooks copy that
9  you have?
10     A.    If she asked me, would I have reason for not
11 providing it?  I don't think so.
12     Q.    All right.  So let's go back to deposition
13 Exhibit 76.  I am going to try to share this again.
14 Hopefully, this is not what was causing the glitch, but
15 I am going to try it again.  Okay.  Can you see the
16 screen again, Mr. Henke?
17     A.    Yes, I can.
18     Q.    Great.  All right.  So getting back to the
19 phrase compiled financial statements under
20 Interrogatory Number 5, can you tell me, what is a
21 compiled financial statement?
22     A.    A compiled financial statement generally is
23 my taking information provided by the client and
24 putting it in the form of financial statements.
25     Q.    Okay.  So how does that differ from an audit?

Robert Henke
August 11, 2021

Page 46

1     A.    An audit, you're attesting to those figures;
2  in a compilation, you're not.
3     Q.    So there is a term attestation services.  Are
4  you familiar with that?
5     A.    Yes.
6     Q.    What are attestation services?
7     A.    Attestation services are, to my knowledge,
8  either review or not or actually attesting to the
9  figures that you have independently verified.  I think
10 possibly what you are getting at is attestation for a
11 compilation.  It may technically be an attestation, but
12 you're not independently confirming the figures on
13 those financial statements.
14    Q.    Okay.  So it sounds to me like there are
15 three levels that we're talking about here, audit,
16 review, and compilation?
17    A.    Correct.
18    Q.    And let's just kind of go through each one of
19 those to your understanding if we can.  So let's start
20 with audit services.  That would be the highest level
21 of review and attestation?
22    A.    Correct.
23    Q.    And what goes in to doing an audit, if you
24 can just kind of briefly summarize it for us, if you
25 know?

Page 47

1     A.    And what was the question?
2     Q.    If you know what an audit is and can briefly
3  summarize what an audit is for us, go ahead.
4     A.    An audit would be a financial statement or a
5  set of statements that had used third-party
6  confirmation to allow you to attest to the figures.
7  You -- well, for us accountants, that is the highest
8  standard we're held to, if you are actually auditing
9  the financial statements.  You are independently
10 verifying pretty much that everything is material on
11 that financial statement.  You have -- you're attesting
12 to it because you have checked it independently from
13 what you have been given from your client so --
14    Q.    Okay.  So would it be correct in your opinion
15 that with an audit, the accountant's role is to conduct
16 independent verification of financial information
17 received from the client?
18    A.    Through testing, yes.
19    Q.    And the level of reliance upon the
20 information provided by the client is lowest in an
21 audit situation?
22    A.    Correct.
23    Q.    All right.  Then what is a review?
24    A.    A review is a step up from a compilation and
25 a step down from an audit.  You do a lot more analysis

Page 48

1  for a review, some of which or much of which you might
2  do in an audit, but much of it requires doing an
3  analysis that are not required by compilation.
4     Q.    Okay.  So with a review, we could say that
5  the level of independent verification and analysis by
6  the accountant would be intermediate between an audit
7  and a compilation?
8     A.    Yes.
9     Q.    And the level of reliance on representations
10 being made by the client would be intermediate as
11 between an audit and a compilation?
12    A.    Generally, I would say yes.
13    Q.    Okay.  What kind of analysis, if any, does an
14 accountant do as part of a review?
15    A.    Well, when I did reviews, I had to subscribe
16 to an outside service that did a series of analyses,
17 current ratios, quick ratios, all kinds of ratios.  And
18 then you are comparing prior periods to see if those
19 ratios were in sync with what you had before, and if
20 you were not in sync, then you had to do further
21 analyses, but it was much more involved than a
22 compilation.
23    Q.    All right.  And then when you do a
24 compilation, what is the accountant's role with respect
25 to the compilation?

Page 49

1     A.    In a compilation, I am taking information
2  provided by the client and putting it in the form of
3  financial statements.
4     Q.    So would it be fair to say that the
5  accountant's degree of reliance on information provided
6  by the client is greatest when it comes to a
7  compilation?
8     A.    Absolutely.
9     Q.    And as an accountant doing a compilation, do
10 you -- are you careful not to tread into the water of
11 doing a review or an audit?
12    A.    Yes.
13    Q.    I mean, if you start to go down the road of
14 auditing instead of sticking at the compilation level,
15 are you kind of in for a penny, in for a pound?  Is
16 that a concern?
17    A.    I would say yes, it is a concern.  In fact, I
18 think we're really instructed not to go certain places
19 so that we do maintain a compilation rather than moving
20 into the review or the audit.  And similarly, with a
21 review, you don't go into the audit areas for the same
22 reason.
23    Q.    So when you are doing a compilation for a
24 client, do you try to avoid any kind of independent
25 analysis or opinion as to what should or should not be

Robert Henke
August 11, 2021

Page 50

1  included on the financial statement?

2      A.   I don't know if I would say that.  If

3  something to me was clearly obviously what I considered

4  to be wrong, I would have some further inquiry or want

5  to know about it before I put it on a financial

6  statement.

7      Q.   All right.  With the compiled financial

8  statements, do you rely on the client to provide

9  accurate information?

10     A.   As accurate as is possible.  Financial

11 statements are estimates, so, you know, accuracy is

12 part of function of materiality and part a function

13 of -- I don't want to say it's a wet finger stuck up in

14 the air, but sometimes it gets a little fuzzy as to,

15 you know, whether something is worth 1 million or 3

16 million or 5 million or 20 million.

17          We're not going to do a lot of test

18 evaluation -- and you asked earlier if I was a forensic

19 accountant or an evaluator, and I am not.  But I have

20 seen -- with the Wycoffs, for example, I have seen Jeff

21 selling his businesses for upwards of a hundred million

22 dollars when he was doing 40 or $60 million worth of

23 sales.  So I don't question so much if he thinks that

24 something is worth 2 million that it might well be

25 worth 2 million.

Page 51

1      Q.   Now, let me see if I can ask the question a

2  different way.  When you are doing a compilation, do

3  you rely on the client to act in good faith?

4      A.   Yes.

5      Q.   And is it your role as an accountant doing a

6  compilation to second-guess the figures that are being

7  provided by the client?

8      A.   Generally, no.

9      Q.   So do you generally take information that you

10 receive from the client at face value?

11     A.   I generally would, yes.

12     Q.   Okay.  Separate from the client providing

13 accurate information or information in good faith, do

14 you rely on the client to provide complete information

15 to you when you are doing a compilation?

16     A.   I have to rely on the client to provide

17 complete information.  I don't have any way of not.

18     Q.   Okay.  So if the client doesn't provide you

19 with all of the information that may be material to the

20 financial statement, you actually have no way of

21 knowing it because you're not going to be doing your

22 own independent investigation?

23     A.   That's correct.

24     Q.   Do you have any kind of a custom and practice

25 when you -- on the rare instances that you do this --

Page 52

1  prepare a financial statement for individual clients?

2      A.   What is the question?

3      Q.   Do you have any kind of a custom and practice

4  as to how you go about preparing a financial statement

5  for an individual client on those instances when you do

6  that?

7      A.   I have templates that I work from.  We

8  address the different types of assets and the different

9  types of liabilities that may be reportable on a

10 financial statement.

11     Q.   And what are the different templates that you

12 have?

13     A.   It is an Excel sheet that would list

14 something like I am going to say 30 or 40 different

15 items that may be applicable to the personal financial

16 statement.

17     Q.   And in preparing the financial statement

18 itself, do you have any steps that you go through with

19 the client before you give them a financial statement?

20     A.   Well, what I would would call a cover my ass.

21 I would have to have an engagement letter from them.

22     Q.   Okay.  So you have an engagement letter with

23 the client.  Is there anything else?

24     A.   Anything else regarding?

25     Q.   Are there any other steps that you take

Page 53

1  before you issue a financial statement for a client?  I

2  am just trying to understand what the typical process

3  would be.

4      A.   The typical process would be I would have a

5  conversation with them to see if we have included

6  everything and the reasonableness of it.

7          Where it comes to cash, I would want a bank

8  statement or something indicating where, you know, the

9  money is that we're talking about, a brokerage

10 statement.  I would want to see a brokerage statement.

11     Q.   Okay.  Anything else?

12     A.   I might periodically pull a general report on

13 a piece of property, but that would be for my own

14 information, not for anything published.

15     Q.   Okay.  Have we covered it?  Is that

16 everything you do in connection with preparing a

17 personal financial statement just in terms of the big

18 picture work?

19     A.   Yes, in terms of the big picture, I am trying

20 to put in the financial statement what reality is, and

21 that I am getting from the client.

22     Q.   What is the purpose from your perspective of

23 a financial statement?

24     A.   The purpose of a financial statement,

25 personal financial statement, is that what you are

Robert Henke
August 11, 2021

Page 54

1  asking?
2      Q.    Yes.
3      A.    It's basically a balance sheet at a point in
4  time to indicate what the person's assets are at fair
5  value versus what their debts are at current value and
6  then leading to a net worth.
7      Q.    All right.  And who are the users of
8  financial statements?
9      A.    The users could be attorneys for estate
10  planning, could be attorneys for financial planning,
11  could be accountants for financial planning.  I know
12  they're used for securing loans.  I suppose there are
13  other purposes, too, but I am not familiar with other
14  ones that might have been used.
15      Q.    In accounting, is there a concept that a
16  financial statement could fairly present the financial
17  condition of whoever is being reported on to the user
18  of that statement?
19      A.    I think, yes.
20      Q.    Okay.  And can you elaborate on that?  What
21  is the idea there?
22      A.    The idea there is that you're putting in
23  forms of a financial statement information that someone
24  will act upon.  That is the idea of the financial
25  statement.

Page 55

1      Q.    And so is part of the idea with the financial
2  statement that it should fairly present financial
3  information to the person who is going to be using it?
4      A.    I would say yes, definitely.
5      Q.    Okay.  Do you require your clients to sign a
6  new engagement -- sorry, I have this cough I can't get
7  over.  Let me start again.
8            Do you require your clients to sign a new
9  engagement letter with you each time you do a compiled
10  financial statement?
11      A.    Yes.
12      Q.    Why do you require them to sign a new
13  engagement letter each time?
14      A.    Because the engagement letter for a personal
15  financial segment is very targeted.  It's very
16  specific, and it deals with a date.  And the next one
17  you do, I don't know when I do one that I am going to
18  do another one for them.
19      Q.    Is your engagement letter, you referred to it
20  maybe a little tongue in cheek as a CYA letter, but is
21  there a component of your engagement letter that lays
22  out responsibilities that the client will be
23  undertaking?
24      A.    Yes.
25      Q.    Why do you do that?

Page 56

1      A.    So that the client understands what their
2  obligations are versus what my obligations are.
3      Q.    And maybe you can describe it generally here,
4  but what are your obligations with respect to a
5  compilation versus the client's obligations?
6      A.    I think we have touched on them.  The
7  client's obligations are to provide me complete
8  information, correct to their knowledge information,
9  accurate to their knowledge information.  And my
10  obligation is to take that information and put it in
11  the form of a financial statement.
12            MR. PULKRABEK:  Okay.  Let me -- I am going to
13  ask you a few questions about the subpoena that we sent
14  to your office.  And then I am going to suggest maybe
15  we just take a quick restroom break if that would work
16  for everyone, okay?  So I have got probably about five
17  minutes of questions on the subpoena, maybe we can take
18  a break, and then get back to it.  Does that sound
19  workable to you, Mr. Abelman?
20            MR. ABELMAN:  It does.
21            MR. PULKRABEK:  All right.
22      Q.    (BY MR. PULKRABEK)  So the subpoena,
23  Mr. Henke, I just want to -- you should have that as
24  Exhibit 77.  I am going to see if I can get that up on
25  my screen here.

Page 57

1            Okay.  Are you seeing the subpoena?
2      A.    Yes, I have it open.
3      Q.    Okay.  Now this is Exhibit 77 on the screen
4  now.  This is the subpoena that we sent to your office;
5  is that accurate?
6      A.    I believe so.
7      Q.    Okay.  And we asked you to go through and
8  locate different categories of documents.  Do you
9  recall that?
10      A.    I do.
11      Q.    What was your -- what was your process for
12  gathering documents that you then provided to our
13  office?
14      A.    My process was to pull out what folders I
15  still had in files for these documents, and then I
16  have -- the process was quite involved because I have a
17  computer that most of my emails and documents for this
18  time frame, the computer is out of service and, for the
19  most part, has died.  So I jumped through a lot of
20  hoops just to try to pull what I could pull, which I
21  thought was applicable to your case.
22      Q.    Okay.  Were there any documents that you
23  chose not to provide to us for any reason that we were
24  asking for in the subpoena?
25      A.    None that I could find.  I have a number of

Robert Henke
August 11, 2021

Page 58

1  things that I thought were rather flimsy, but it was
2  all I had.  I have a lot of documents that I do not
3  have access to anymore.  So I don't have anything to
4  answer your question that I saw that I don't want you
5  to see.
6      Q.    Okay.  That gets to my question.  Do you
7  think you made a thorough search of your records that
8  you have available to you at this time?
9      A.    Well, let me say within, you know, a
10 reasonable amount of time, which happened to be two
11 days of my time, yes.
12     Q.    Are there places where you think you may
13 still have records that you haven't looked already?
14     A.    I have a couple of external hard drives that
15 I suppose had some information on it if I wanted to
16 hire somebody to extract them.
17     Q.    Okay.
18     A.    I think if, you know, if I might, anything
19 that would be there would be just in further support of
20 what you are looking at as to the product.
21     Q.    What do you mean by in further support of
22 what I am looking at as the product?
23     A.    Well, I have more bank statement copies and
24 maybe brokerage statements and things that I have not
25 been able to pull, but I believe I have them.

Page 59

1      Q.    Okay.  And maybe you're anticipating one of
2  my questions, but do you recall working on a question
3  involving $904,000 in cash/cash equivalents?
4      A.    Yes.
5      Q.    And that was a figure that we will see on one
6  of the personal financial statements, correct?
7      A.    Correct.
8      Q.    And I had sent an interrogatory to the
9  defendants in this case asking essentially for
10 substantiation of that figure.  Do you recall that?
11     A.    I do.
12     Q.    And did you spend some time working on trying
13 to substantiate that figure?
14     A.    I did.
15     Q.    Were you ever able to substantiate that
16 figure?
17     A.    I cannot find the statement.
18     Q.    Okay.  So you haven't been able to
19 substantiate the $904,000 yet; is that fair?
20     A.    Correct.  I did ask Merrie -- if that is
21 where you're going with your question -- as to what she
22 thought.  She thought it had to do with a loan that was
23 taken just prior to the statement date.  So there is
24 more to this story.  And I may have actually the
25 financial -- the bank statement in another place so --

Page 60

1      Q.    Well, so with respect to -- with respect to
2  that, I think maybe we're getting a little bit ahead of
3  ourselves, but Merrie Wycoff thought that perhaps the
4  $904,000 related to a loan from a company called
5  BC24, LLC?
6      A.    I think that is what she referred to, yes.
7      Q.    All right.  And did you see in your records
8  that with respect to the loan from BC24, LLC, Jeff
9  Wycoff and Merrie Wycoff received $300,000 of that
10 money?
11     A.    I don't have that record.
12     Q.    Okay.  So you're not recalling that one way
13 or the other?
14     A.    No.
15          MR. PULKRABEK:  All right.  Why don't we go
16 ahead and take our break?  Does ten minutes work?
17          THE VIDEOGRAPHER:  Going off the record,
18 12:32.
19          (Recess taken, 11:32 a.m. until 11:42 a.m.)
20          THE VIDEOGRAPHER:  Okay.  We're back on the
21 record, 12:42 p.m.
22     Q.    (BY MR. PULKRABEK)  Mr. Henke, just during
23 the break, I looked up Mr. Marlin a little bit further,
24 and it looked like he was convicted in a Ponzi scheme.
25 Does that ring a bell for you?

Page 61

1      A.    Yeah, something like that.
2      Q.    Okay.  And was that before you knew
3  Mr. Marlin, or was that after you knew Mr. Marlin?
4      A.    No, that was way before.
5      Q.    Okay.  All right.  Okay.  So let's talk a
6  little about one of the statements of financial
7  condition, and that is one that is dated October 31,
8  2015.  Are you familiar with that one?
9      A.    I am.
10     Q.    Okay.  And before we throw it up on the
11 screen and start talking about it in detail, can you
12 just give me your best recollection as to how you came
13 to prepare that particular statement of financial
14 condition?
15     A.    How I came to prepare it was I was requested
16 by Jeff Wycoff to prepare one.
17     Q.    And do you remember anything about the
18 circumstances?
19     A.    You know, honestly, I do not.
20     Q.    Okay.  Do you remember if you had any phone
21 calls with Jeff Wycoff about that particular financial
22 statement?
23     A.    I am certain that I did.
24     Q.    And why are you certain?
25     A.    Because we would have talked about various

Robert Henke
August 11, 2021

Page 62

1   numbers that I was putting on the statement.
2       Q.   All right.  What do you -- what, if anything,
3   do you actually recall discussing with Jeff Wycoff
4   sitting here today?
5       A.   I recall talking about the balance of the
6   bank account, the cash in the bank, and then we
7   probably touched on the various entities and, you know,
8   the value of such.
9       Q.   Okay.  And when you say the various entities
10  and the value of such, you're talking about things like
11  Zap! Products, Paradigm, Simplicity?
12      A.   Correct.
13      Q.   Okay.  Do you recall any other parts of your
14  conversation with Mr. Wycoff?
15      A.   Not specifically, no.
16      Q.   All right.  Can you -- before we start
17  looking at documents, can you give me any further
18  detail on any communications that you had with either
19  Jeffrey or Merrie Wycoff in connection with that
20  financial statement as of October 31, 2015?
21      A.   No, except to say that I never spoke to
22  Merrie about any of these statements.  It would all
23  have been with Jeff.
24      Q.   Do you recall anybody explaining to you who
25  the recipient of the financial statement would be?

Page 63

1       A.   No, as a matter of fact, no.
2       Q.   Do you recall anything about the purpose of
3   obtaining the financial statement at that time?
4       A.   I don't recall that I was given a specific
5   reason at that time.  Even as I look back at it, I
6   don't know the significance of the timing of it.
7       Q.   Do you have any recollection of either
8   Jeffrey or Merrie Wycoff providing you with any detail
9   about the reasons why a financial statement was being
10  requested?
11      A.   I don't, except probably it was for something
12  he needed to provide to somebody.  And I don't have the
13  details.  In fact, looking back at the other ones, I
14  didn't even know until I had an email there suggesting
15  they were going to see Costco or Wal-Mart or one of the
16  big vendors that he did business with that are his
17  customers.  I didn't know where he was using the
18  financial statements.
19      Q.   All right.  Do you recall hearing the name
20  Midlab, Inc., at any point in time from Jeff or Merrie
21  Wycoff?
22      A.   I do not.
23      Q.   So you don't recall Midlab coming up in
24  connection with this particular financial statement
25  back in 2015?

Page 64

1       A.   Not at all.
2       Q.   Do you recall whether you prepared other
3   financial statements for the Wycoffs in 2015?
4       A.   I have no knowledge of any other financials I
5   prepared in 2015 for them.
6       Q.   Okay, all right.  So sitting here today,
7   would it be fair to say that what you can recall of
8   your conversations with Jeff Wycoff surrounding the
9   2015 financial statement was discussion of the balance
10  of cash in the bank account and the values of the
11  various entities?
12      A.   I am certain that we discussed that on the
13  phone, yes.
14      Q.   Okay.  Do you have any recollection of
15  talking about any liabilities?
16      A.   Well, I would have had to ask him about the
17  liabilities in order to get the liabilities that are
18  indicated here.
19      Q.   Okay.  Do you -- other than being able to
20  tell me that you would have had to ask him about it, do
21  you have any specific recollection of discussing any
22  liability or potential liability?
23      A.   No.
24      Q.   Okay.  Let's -- let me show you the next
25  exhibit.  It's going to be Exhibit 78.  Okay.  Do you

Page 65

1   have Exhibit 78 on the screen in front of you?
2       A.   I do.
3       Q.   And is this one of the documents that you
4   provided to us in response to the subpoena that we sent
5   to you?
6            Mr. Henke, let me ask my question again,
7   because I am not sure if you heard it.  Is Exhibit 78
8   one of the documents that you provided us from your
9   files in response to the subpoena?
10      A.   Yes, I believe it is.
11      Q.   Okay.  And so this is an email that Jeffrey
12  Wycoff sent to you, subject PF, date November 3, 2015,
13  12:31:41 p.m.  Do you see that?
14      A.   I see that.
15      Q.   And then he provided a list of what appear to
16  be assets and debts.  Do you see that?
17      A.   I see that.
18      Q.   So was -- to the best of your recollection,
19  was this the initiation of Mr. Wycoff's request for
20  preparation of the statement of financial condition, or
21  did you have a conversation before that?
22      A.   I would suggest there had to have been
23  something before that.  He wouldn't have just sent me
24  an email saying here is this.  We would have had a
25  conversation before that.

Robert Henke
August 11, 2021

Page 66

1    Q.    Okay.  So does this email refresh your memory
2    as to any specifics of the conversation you would have
3    had with him?
4    A.    Pardon me?
5    Q.    Does seeing Exhibit 78 help refresh your
6    memory as to the specifics of the conversation you had
7    with Jeff Wycoff before --
8    A.    Yes, in part.  We would have asked about
9    those items amongst others, yes.
10   Q.    Okay.  So do you have any specific recall of
11   what you discussed with Mr. Wycoff in that initial
12   conversation?
13   A.    I do not.
14   Q.    And do you recall when that conversation
15   would have been?  Would it have been November 3rd or
16   some other date?
17   A.    Are you waiting for a response?
18   Q.    Yeah.  My question is do you recall when you
19   first talked to Jeff Wycoff about getting a personal
20   financial statement in 2015?
21   A.    I would guess it was fairly close to the end
22   of the month that the financial statement was actually
23   issued.  It might have been a day.  It might have been
24   a week in front of this email.
25   Q.    If you go to the second page of this exhibit,

Page 67

1    it's the same email, but it has some handwritten notes
2    on it.  Do you see that?
3    A.    I see that, yes.
4    Q.    Do you recognize the handwriting?
5    A.    I do.
6    Q.    Whose handwriting is that?
7    A.    I would think it's mine.
8    Q.    Okay.  Can you interpret what we see on here
9    in terms of the handwriting?
10   A.    I would -- well, obviously credit card is
11   50,000.  Vehicles, we have some values there which I
12   had, and then maybe we discussed them and I changed
13   them as I wrote them down.
14   Q.    And it looks like there is a notation above
15   farm that says Vectra 900K.  Am I reading that
16   correctly?
17   A.    That is correct.
18   Q.    Can you provide an explanation of what that
19   was?
20   A.    That would have been reference to where the
21   money was for the 904,000 that is on the financial
22   statement.
23   Q.    And so with that information, is it your best
24   recollection that all of the $904,000 in the financial
25   statement was in a Vectra bank account?

Page 68

1    A.    If not in one, in more than one.  But, yes,
2    at the time, I would have guessed that it was all in
3    Vectra bank.
4    Q.    Okay.  And then was that information that
5    Jeff Wycoff was providing to you over the phone, or was
6    that information that you were pulling off of bank
7    statements?  Or do you have any recollection one way or
8    the other?
9    A.    I would guess that this email notation is off
10   the phone.  And then hopefully, he would have followed
11   it up with the facts of the financial statement or
12   something like -- or the bank statement.
13   Q.    But in looking through your files, you have
14   not found any support for the $904,000 figure?
15   A.    I do not have that I can find.
16   Q.    What would you need as support in order to
17   see whether that was accurate or inaccurate?
18   A.    A copy of a current bank statement.
19   Q.    Or it could be multiple bank statements?
20   A.    Well, it could be because they had many
21   statements.  But that amount of money, well, it was
22   primarily in one account, so I wouldn't be looking at a
23   lot of accounts to find the 904,000.
24   Q.    What makes you think that it was primarily in
25   one account?

Page 69

1    A.    Pardon me?  Was that a question?
2    Q.    Yeah, the question is what is it that makes
3    you think it was primarily in one account?
4    A.    Hello?
5    Q.    Are you hearing me?  Or am I --
6    A.    I heard you, and then it cut off.
7    Q.    Okay.  Yeah, it's Zoom.
8    A.    Hello?
9    MR. PULKRABEK:  Do I need to log out and come
10   back in, Ms. Court Reporter?
11   THE REPORTER:  I am hearing you fine.
12   MR. PULKRABEK:  Okay.  Mr. Abelman, are you
13   hearing me?
14   MR. ABELMAN:  Relatively well.  I mean, there
15   is some garbling, but I can discern what you are
16   saying, yes.
17   MR. PULKRABEK:  Okay.  Then maybe the -- maybe
18   the glitch is on Mr. Henke's end this time.  Mr. Henke,
19   are you able to hear us?
20   THE DEPONENT:  I am hearing you.  I had a
21   popup there for a second that said unstable connection.
22   Maybe that was at my end, I don't know.
23   MR. PULKRABEK:  Yep, it sounds like it.  Okay.
24   Q.    (BY MR. PULKRABEK)  Okay.  So let me ask my
25   question again.  I think you had suggested that the

Robert Henke
August 11, 2021

Page 70

1  $904,000 would be primarily held in one bank account.
2  And my question was what makes you think it would have
3  been primarily in one bank account?
4      A.   And the reason I would think it was in one
5  bank account was because I don't see them with the
6  amount of money they had disbursing it in other
7  accounts, and I have the Vectra bank notation on there.
8  I know as a matter of fact, they have many Vectra bank
9  accounts, but they use them for various purposes, so I
10  would expect to see primarily most of that money in one
11  bank account, and I believe that is how it came.  But I
12  cannot document that.
13     Q.   Okay.  On the handwritten notations here, I
14  don't see anything one way or the other about any
15  liabilities either to the Internal Revenue Service or
16  to the California Franchise Board or any other tax
17  authority.  So my question is do you have any specific
18  recollection one way or the other of discussing any of
19  those liabilities at this time with Mr. Wycoff?
20     A.   I do not have a recollection of discussing
21  those liabilities at that time.
22     Q.   Okay.  And so would it be fair to say that
23  you didn't give any kind of proactive advice to Jeff
24  Wycoff or to Merrie Wycoff on this financial statement
25  saying you do not have to report any potential

Page 71

1  liability to the Internal Revenue Service or to the
2  California Franchise Board?
3      A.   I do not recall having that conversation, but
4  had I, that is exactly what I would have said.
5      Q.   You would have advised them not to -- not to
6  report things?  Is that what you are telling us?
7      A.   I would have advised them that the
8  contingency, which is what that liability at the time
9  was, was a contingency and not reportable on this
10  financial statement.
11     Q.   All right.  So just getting back to the
12  facts, you don't recall having a conversation with them
13  about it one way or the other, though?
14     A.   No, that is correct, I do not.
15     Q.   All right.  Now, let me show you Exhibit --
16  let me go to what the next exhibit here is, Exhibit 79.
17          Okay.  Mr Henke, is Exhibit 79 one of the
18  documents that you provided to us in response to the
19  subpoena?
20     A.   It looks like, yes.  Was that a question?
21     Q.   Yes.  And this is a -- it's an email chain
22  between you and Jeff Wycoff on November 3, 2015,
23  correct?
24     A.   Correct.
25     Q.   All right.  And so you -- it starts out with

Page 72

1  you sending an email to Jeff Wycoff on November 3,
2  2015, at 5:26 p.m., with subject personal financial
3  statement.  You write, "Hi, Jeff, pursuant to earlier
4  telecom, please find attached."  Do you see that so
5  far?
6      A.   I see that.
7      Q.   Okay.  And then you say, "1.  My compilation
8  engagement letter requiring you and Merrie to sign and
9  date and return to me (my letter to you)."  Do you see
10  that?
11     A.   I see that.
12     Q.   And then, "2.  Your representation letter
13  requiring you and Merrie to sign and date and return to
14  me (your letter to me)."  Do you see that?
15     A.   I see that.
16     Q.   And then, "3.  The resultant statement of
17  financial condition for you and Merrie at October 31,
18  2015."  Do you see that?
19     A.   I see that.
20     Q.   Okay.  So those were three attachments that
21  you were providing to Mr. Wycoff in this email,
22  correct?
23     A.   I would assume that, although, I don't see it
24  yet indicated as an attachment, but yes.
25     Q.   All right.  And then Mr. Wycoff's reply was,

Page 73

1  "Thanks, Bob."  Correct?
2      A.   Correct.
3      Q.   So he got your email, right?
4      A.   Yes.
5      Q.   Okay.  Now let's look at -- before -- I am
6  sorry.  There was one question that I wanted to ask you
7  about a previous exhibit, Exhibit 70 -- I believe it
8  was this one, this is Exhibit 78, with the handwritten
9  notations and list of assets and debts.  Do you see
10  that on your screen?
11     A.   Yes, I do.
12     Q.   The question I wanted to ask you was that
13  this email identified an asset called Alaska land.  Do
14  you see that?
15     A.   Yes.
16     Q.   What is your understanding of the Alaska land
17  asset?
18     A.   My understanding was that he bought a piece
19  of land in Alaska.
20     Q.   And he listed a value of 75,000?
21     A.   Yes.
22     Q.   And did you receive any kind of verification
23  one way or the other on the value of that land?
24     A.   No.
25     Q.   Now on -- under debt, it says Alaska, zero,

Robert Henke
August 11, 2021

Page 74

1  do you see that?
2       A.   Yes.
3       Q.   Is it your understanding that there was no
4  debt on the Alaska land?
5       A.   Yes.
6       Q.   All right.  All right.  Getting back to
7  Exhibit 79 here.  Sending the -- the engagement letter,
8  we already talked about that as being part of your
9  practice when you would -- whenever you would do a
10  compilation of a personal financial statement; is that
11  right?
12       A.   I got a popup again that says my Internet
13  connection is unstable.  I didn't hear a question if
14  you asked.
15       Q.   I will ask again.  All right.  So looking at
16  Exhibit 79 on the screen, when it refers to you sending
17  a compilation engagement that Merrie Wycoff and Jeff
18  Wycoff have to sign, that was part of your routine
19  practice with compilations, right?
20       A.   Yes.
21       Q.   Okay.  And then what about the second page in
22  there, your representation letter, "...requiring you
23  and Merrie to sign and date and return to me your
24  letter to me"?  Was that something that you always
25  requested?

Page 75

1       A.   With regards to a personal financial, yes.
2       Q.   Okay.  What was -- what was the purpose of
3  that second letter, if you recall?
4       A.   They're making representations to me that
5  they understand what is in it and that the numbers, to
6  their knowledge, are accurate.
7       Q.   And why is that important?
8       A.   It's similar to the engagement letter, it's
9  just you're dotting an I or crossing a T.  They now see
10  the financial and they can tell you, yes, that is what
11  we believe we have provided you and it's accurate.
12       Q.   Okay.  Now let's move on to Exhibit 80.  So
13  Exhibit 80, do you have that in front of you now?
14       A.   I do.
15       Q.   And is that a document that you provided to
16  us in response to the subpoena?
17       A.   I believe it is, yes.
18       Q.   All right.  And this is an email from Jeff
19  Wycoff to you with the subject executed docs dated
20  November 4, 2015, at 8:46 a.m.  Do you see that?
21       A.   I do.
22       Q.   And Jeff Wycoff writes, "Morning, Bob, please
23  see the attached.  Thanks, Jeff."  Right?
24       A.   Correct.
25       Q.   And then you have a response, you say,

Page 76

1  "Thanks, Jeff.  Sorry state of the profession, I think,
2  that the mandated paperwork for doing something
3  outweighs the thing being done...we continue..."  What
4  did you mean by that?
5       A.   I am just guessing we probably had a phone
6  conversation in between his email and my email back.
7       Q.   What do you recall, if anything, about that
8  conversation?
9       A.   Probably why all the paperwork for the
10  financial statement.
11       Q.   And what did you explain to him, if anything?
12       A.   Just what I said there, that it is the state
13  of the profession, that it's mandated, so that is why
14  we're doing it.
15       Q.   All right.  So you explained to Mr. Wycoff
16  that it was required that you get this paperwork back
17  from him in connection with the personal financial
18  statement?
19       A.   I think that is what the point was.
20       Q.   Okay.  Let's look at the engagement letter,
21  Exhibit 81.  Do you recognize Exhibit 81 as the
22  engagement letter that you sent to Jeffrey and Merrie
23  Wycoff dated November 3, 2015?
24       A.   Yes.
25       Q.   And if we go to the third page -- rather the

Page 77

1  fourth page of this exhibit, do you recognize the
2  signatures on this page?
3       A.   Yes, I do.
4       Q.   And who all signed this engagement letter?
5       A.   I signed the engagement letter.  It looks
6  like Jeff and Merrie signed the engagement letter.
7       Q.   Okay.  Can you tell from the dates, when did
8  Jeff and Merrie Wycoff sign the engagement letter?
9       A.   It is indicated as November 3, 2015.
10       Q.   Okay.  Well, let's go through some of the
11  details of this.  On the first page, again, we have
12  already mentioned it, but you have addressed the letter
13  to both Jeffrey and Merrie Wycoff; is that correct?
14       A.   That's correct.
15       Q.   Why did you address it to both Jeffrey and
16  Merrie Wycoff?
17       A.   It is the personal financial statement of
18  both of them.
19       Q.   All right.  And then in the second paragraph,
20  you write, "I will prepare the statement of financial
21  condition of Jeffrey and Merrie Wycoff as of
22  October 31, 2015, and perform a compilation engagement
23  with respect to the financial statements."  Do you see
24  that?
25       A.   I see that.

Robert Henke
August 11, 2021

Page 78

1    Q.    All right.  So you were informing Jeff and
2    Merrie Wycoff that the scope of your engagement was
3    going to be to prepare a statement of financial
4    condition for both of them?
5    A.    Correct.
6    Q.    Is that accurate?
7    A.    Yes.
8    Q.    And that it was going to be a compilation,
9    not an audit?
10   A.    Correct.
11   Q.    Then in the next paragraph, one of the things
12   you wrote is, "The performance of these additional
13   accounting services does not alter the fact that you
14   are responsible for the content of the financial
15   statements, including the estimated current value of
16   assets and the estimated current amounts of
17   liabilities."  Do you see that?
18   A.    Yes.
19   Q.    So you are communicating to Jeff and Merrie
20   Wycoff that they were responsible for the content of
21   the financial statement that you were preparing?
22   A.    Correct.
23   Q.    And on the next page of the first paragraph,
24   you say, "I am not required to, and will not, verify
25   the accuracy of completeness of the information you

Page 79

1    will provide to me for the engagement or otherwise
2    gather evidence for the purpose of expressing an
3    opinion or conclusion."  Correct?
4    A.    Correct.
5    Q.    I am sorry.  You were just a little bit quiet
6    on the other end, Mr. Henke.
7    A.    Yes, that is correct.
8    Q.    Okay.  Thank you.  You also say,
9    "Accordingly, I will not express an opinion or a
10   conclusion nor provide any assurance on the financial
11   statements."  Do you see that?
12   A.    Yes.
13   Q.    So would it be fair to say that what you were
14   communicating to Jeff and Merrie Wycoff was you -- the
15   two of you are responsible for what is going to be on
16   this financial statement and whether that is accurate
17   or not?
18   A.    That's correct.
19   Q.    And the two of them were going to be
20   responsible for whether it was complete or not?
21   A.    Correct.
22   Q.    And if there was some material misstatement
23   on the financial condition -- on the statement of
24   financial condition, that was going to be their
25   responsibility, not yours?

Page 80

1    A.    Correct.
2    Q.    And if there was a material omission on the
3    financial statement, that was going to be their
4    responsibility, and not yours?
5    A.    That's correct.
6    Q.    And what you were communicating to them was
7    they needed to review it?
8    A.    That's correct.
9    Q.    Because they were the ones that were going to
10   take responsibility for it?
11   A.    Yes.
12   Q.    And the reason why you address this to both
13   Jeff and Merrie Wycoff and had both Jeff and Merrie
14   Wycoff sign it was they were both responsible for the
15   contents of it?
16   A.    Correct.
17   Q.    All right.  Now let's look at -- under Your
18   Responsibilities, you write, in part, "You have the
19   following overall responsibilities that are fundamental
20   to my undertaking the engagement in accordance with
21   SSARS."  Do you see that?
22   A.    I do.
23   Q.    And one of those responsibilities was, "The
24   preparation and fair presentation of financial
25   statements in accordance with accounting principles

Page 81

1    generally accepted in the United States of America and
2    inclusion of all informative disclosures that are
3    appropriate for accounting principles generally
4    accepted in the United States of America, if
5    applicable."  Do you see that?
6    A.    I see that.
7    Q.    Now, one of the things that we have talked
8    about earlier was that financial statements ultimately
9    are being prepared for an intended user or set of
10   users, correct?
11   A.    Yes.
12   Q.    And the purpose is that the financial
13   statement needs to fairly present the financial
14   condition of the individual or entity to that intended
15   user; is that accurate?
16   A.    That would be accurate.
17   Q.    So that the intended user can make informed
18   decisions in reliance upon that financial statement,
19   right?
20   A.    Yes.
21   Q.    And we also have discussed that you did not
22   even hear of Midlab, Inc., at the time that Jeff Wycoff
23   was requesting this financial statement, right?
24   A.    Yes.
25   Q.    And, in fact, you didn't really know what the

Robert Henke
August 11, 2021

Page 82

1  intended purpose of the financial statement was going
2  to be, correct?
3      A.   Correct.
4      Q.   So only -- only Jeff and Merrie Wycoff knew
5  what they were going to do with the financial statement
6  once it was provided to them by you?
7          MR. ABELMAN:  Object to foundation.
8      A.   I didn't understand the question.
9      Q.   (BY MR. PULKRABEK)  Well, let me ask you
10 this.  You're providing a personal financial statement
11 to Jeff and Merrie Wycoff, correct?
12     A.   Yes.
13     Q.   And they know what they're going to do with
14 it, you don't?
15     A.   Correct.
16     Q.   So for all you know, this could be just for
17 their own informational purposes.  Maybe they just
18 wanted to see what their balance sheet would look like
19 as of October 31, 2015?
20     A.   Could be.
21     Q.   Okay.  If they are going to provide this to
22 the Federal Bureau of Investigation under penalty of
23 perjury versus for their own informational purposes,
24 you would expect them to exercise whatever degree of
25 diligence was appropriate under the circumstances,

Page 83

1  correct?
2      A.   I would say yes.
3      Q.   All right.  If they're going to be providing
4  the financial statement for purposes of borrowing $10
5  million versus just sticking it in their files, that
6  would warrant a different degree of diligence on their
7  end.  Would you agree with that?
8      A.   I don't have any reference to say yes or no
9  to that.
10     Q.   All right.  One of the things that was Jeff
11 and Merrie Wycoff's responsibility as part of your
12 engagement letter was item number 6 on page 3, quote,
13 "The accuracy and completeness of the records,
14 documents, explanations and other information including
15 significant judgments you provide to me for the
16 engagement."  Do you see that?
17     A.   I do.
18     Q.   So it was up to Jeff and Merrie Wycoff to
19 make sure that you had all of the information that
20 would be needed for a full compilation of their
21 financial statement?
22     A.   That's correct.
23     Q.   And if they weren't providing you with all of
24 the information, it wasn't going to show up on the
25 financial statement that you were compiling for them,

Page 84

1  right?
2      A.   Correct.
3      Q.   So, for instance, we have talked about your
4  awareness that Jeff and Merrie Wycoff had an ownership
5  interest in different companies, including Paradigm,
6  Simplicity, Zap! Products, and so forth.  And those
7  entities were reflected ultimately on the statement
8  that you compiled, correct?
9      A.   Yes, uh-huh.
10     Q.   But we have also talked about your
11 unawareness of Wycoff Financial, LLC, and the fact that
12 the farm had been titled in Wycoff Financial, LLC.
13 Correct?
14     A.   Correct.
15     Q.   And so because they didn't provide you with
16 any information saying we have an ownership interest in
17 Wycoff Financial, LLC, and that has X, Y and Z assets,
18 for that reason, Wycoff Financial, LLC, is not listed
19 anywhere on the statement of financial condition.
20 Correct?
21     A.   As to form, correct.  In other words, the
22 real estate does indicate the farm and evaluation.  Had
23 it been in Wycoff Financial, LLC, it might have been
24 presented differently, but I don't think it would have
25 changed the number.

Page 85

1      Q.   It may not have changed the number, but it
2  may have changed the presentation of how the farm was
3  held, correct?
4      A.   Yes, definitely, it would have.  Well,
5  actually, I say I believe it would have if -- I don't
6  know Wycoff Financial, LLC, if that was an LLC that
7  they set up just to hold the farm and it was 50/50 with
8  them, I am not sure it would have changed this at all.
9      Q.   Well, you -- you're looking at it in
10 hindsight at this point, and you don't -- you just
11 never got the information so you haven't formed an
12 opinion one way or the other on it?
13     A.   Correct.
14         MR. ABELMAN:  Object to the form of the
15 question.
16     Q.   (BY MR. PULKRABEK)  All right.  Now another
17 one of Jeff and Merrie Wycoff's responsibilities in
18 connection with the financial statement was to provide
19 you with access to all information of which you are
20 aware is relevant to the preparation of -- to the
21 preparation and fair presentation of the financial
22 statements, such as records, documentation, and other
23 matters.  Do you see that?
24     A.   I see that.
25     Q.   All right.  And so the statement or the

Robert Henke
August 11, 2021

Page 86

1   phrase there, fair presentation, I want to focus on
2   that for a moment.  Fair presentation means fair
3   presentation to the recipient of the financial
4   statement.  Correct?
5       A.    Correct.
6       Q.    All right.  Going on, you charged them for
7   these services.  You say, "I estimate that my fees for
8   these services will range from 450 to $650."  Is that
9   right?
10      A.    That's correct.
11      Q.    Do you recall what you actually billed them
12  for this?
13      A.    Something in that range, I would guess.  I
14  don't know.
15      Q.    All right.  Going back up to this final
16  paragraph, I meant to ask you about this.  The last
17  paragraph under the eight enumerated responsibilities
18  includes this language.  It says, "You are responsible
19  for evaluating the adequacy and results of services
20  performed and accepting responsibility for such
21  services."  Do you see that?
22      A.    I see that.
23      Q.    All right.  And that was one of the
24  conditions of you providing this financial statement to
25  Jeff and Merrie Wycoff, right?

Page 87

1       A.    Correct.
2       Q.    And it was incumbent on them to either agree
3   with your terms or not, they could choose, right?
4       A.    Correct.
5       Q.    And they chose to agree to these terms,
6   right?
7       A.    To my knowledge.
8       Q.    And Merrie Wycoff and Jeff Wycoff signed your
9   engagement letter and returned it to you, right?
10      A.    Correct.
11      Q.    And if we go back to this paragraph, it
12  wasn't only Jeff Wycoff who was taking responsibility
13  for evaluating the adequacy of the financial statement
14  that you were preparing, it was also Merrie Wycoff,
15  right?
16      A.    Right, yes.
17      Q.    Okay.  And it wasn't only Jeff Wycoff who
18  accepted responsibility for the statement of financial
19  condition, it was Merrie Wycoff, correct?
20      A.    Correct.
21      Q.    Now, did you hear anything from Merrie Wycoff
22  at all in connection with this 2015 statement of
23  financial condition?
24      A.    Not to my knowledge.
25      Q.    Did Merrie Wycoff indicate any interest

Page 88

1   whatsoever in making sure that the statement was
2   accurate and complete?
3       A.    Of me?
4       Q.    With -- yeah, with you.
5       A.    No.
6       Q.    If Merrie Wycoff wanted to review the
7   statement of financial condition to ensure that it was
8   accurate and complete and fairly presented her and Jeff
9   Wycoff's condition, would you have taken the time to
10  talk to her about that?
11      A.    Yes.
12      Q.    Would you have gone line by line through the
13  entire financial statement if she had asked you to do
14  that?
15      A.    Yes.
16      Q.    Mr. Henke, we talked a little bit earlier
17  about whether you had any credentials to appear before
18  the United States Tax Court or whether you were an
19  enrolled agent with the IRS, and I think you answered
20  answered both of those in the negative.  Am I right
21  about that?
22      A.    Yes.
23      Q.    Okay.  Have you ever read the rules of the
24  United States Tax Court?
25      A.    No.

Page 89

1       Q.    And so would it be fair to say that you are
2   not familiar with Rule 142 of the United States Tax
3   Court?
4       A.    That would be fair to say.
5       Q.    Okay.  Have you ever read the United
6   States -- United States Supreme Court's opinion in
7   Welch versus Helvering?  It's a 1933 opinion.
8       A.    Not that I recall.
9       Q.    And so would it be fair to say you're not
10  knowledgeable about the holding of that case?
11      A.    That would be fair to say.
12      Q.    Would it also be fair to say that you haven't
13  had any personal conversations with Jeff Wycoff or
14  Merrie Wycoff about Rule 142 of the United States Tax
15  Court or with respect to the Welch versus Helvering?
16      A.    That would be correct.
17      Q.    Separate from Merrie Wycoff ever expressing
18  any concerns to you about this 2015 financial
19  statement, did Jeff Wycoff ever express any concerns to
20  you?
21      A.    No.
22      Q.    And you never learned how Jeff and Merrie
23  Wycoff had used the financial statement that you
24  prepared for them, did you?
25      A.    No, I did not.

Robert Henke
August 11, 2021

Page 90

1     Q.    All right.  Let's look at the next exhibit,
2   which is 82.  Mr. Henke, do you have Exhibit 82 in
3   front of you?
4     A.    I do.
5     Q.    And can you verify this is another one of the
6   documents you provided to us from your files?
7     A.    Yes, it is.
8     Q.    And this is what would be called the
9   representation letter that you sent in 2015?
10    A.    Yes, that they provided me.
11    Q.    Okay.  And so this representation letter, at
12  least the copy that you provided to me, it's dated
13  November 3, 2015, and addressed to both Jeffrey and
14  Merrie Wycoff.  Do you see that?
15    A.    Correct.
16    Q.    Now the copy that we got from your files,
17  this one is not a signed copy.  Do you see that?
18    A.    I see that.
19    Q.    Do you know one way or the other whether Jeff
20  Wycoff and Merrie Wycoff did or did not sign the
21  representation letter in 2015?
22    A.    I believe they did.
23    Q.    Okay.  And you would have required them to
24  sign that as part of the services you were providing?
25    A.    Yes, I would have requested that they provide

Page 91

1   it to me.
2     Q.    And again, that was one of the things that
3   you specifically discussed with Jeff Wycoff during the
4   phone call that you had after you sent the paperwork
5   and -- you know, related to the amount of paperwork
6   that is required in the profession, correct?
7     A.    As I recall, yes.
8         MR. ABELMAN:  Hey, Ross, what exhibit are we
9   looking at?  Is this still 81?
10        MR. PULKRABEK:  No.  We are on Exhibit 82.
11        MR. ABELMAN:  Does 81 have signatures on it?
12        MR. PULKRABEK:  81 does have signatures.  This
13  is 81, and it's got the signatures.
14    Q.    (BY MR. PULKRABEK)  Okay.  All right.
15  Mr. Henke, moving on with Exhibit 82 here.  The second
16  paragraph says, "Certain representations in this letter
17  are described as being limited to matters that are
18  material.  Items are considered material, regardless of
19  size, if they involve an omission or misstatement of
20  accounting information that, in light of surrounding
21  circumstances, makes it probable that the judgment of a
22  reasonable person using the information would be
23  changed or influenced by the omission or misstatement."
24  Do you see that?
25    A.    I do.

Page 92

1     Q.    Now did you personally write that paragraph?
2     A.    Did I personally write that paragraph?  Most
3   of this is boilerplate, so yes, I did, but from a
4   template.
5     Q.    Okay.  So this is a template that is
6   available to accountants or was at the time?
7     A.    Yes, I am sure it was.
8     Q.    All right.  And so you didn't -- you're not
9   the person who invented this language, but you adopted
10  it?
11    A.    I adopted it from one of my services, yes.
12    Q.    And do you think it's a fair -- a fair
13  statement of what it means for information to be
14  material?
15    A.    Yes.
16    Q.    Okay.  And, again, we have talked about the
17  concept already, but this definition of materiality
18  incorporates the idea that there will be a person using
19  the information making decisions based on that.  Do you
20  see that?
21    A.    I would suggest that is true.
22    Q.    And so materiality needs to be assessed in
23  light of who is going to be using the information and
24  making decisions, right?
25        MR. ABELMAN:  Object to form.

Page 93

1     A.    I am looking at the wording of it to see that
2   that is --
3         MR. ABELMAN:  Foundation.
4     A.    I don't know that that is true or not based
5   on what the paragraph says.
6     Q.    (BY MR. PULKRABEK)  Okay.  You don't have an
7   opinion on that one way or the other?
8     A.    I do not, no, I do not.
9     Q.    All right.  Regardless of whether you have an
10  opinion on it, this is the information that you
11  communicated to Jeff and Merrie Wycoff on November 3,
12  2015, correct?
13    A.    Correct.
14    Q.    And on November 3, 2015, you told Jeff and
15  Merrie Wycoff that items are considered material
16  regardless of their size if they involve an omission or
17  misstatement of accounting information that, in light
18  of surrounding circumstances, makes it probable that
19  the judgment of a reasonable person using the
20  information would be changed or influenced by the
21  omission or misstatement.  Correct?
22    A.    That's correct.
23    Q.    And it was up to them to take the information
24  you provided to them about what was material and they
25  had to make some decisions about what would be included

Robert Henke
August 11, 2021

Page 94

1  or not included in their personal financial statement.
2  Correct?
3      A.    Yes, correct.
4      Q.    All right.  Jeff and Merrie Wycoff then
5  represent to you in this letter, quote, "We confirm, to
6  the best of our knowledge and belief, as of November 3,
7  2015, the following representations made to you during
8  your compilation."  Do you see that?
9      A.    I do.
10     Q.    And one of the representations that they made
11 to you in connection with you doing your work was, "We
12 have made available to you all financial records and
13 related data."  Correct?
14     A.    That is what it says, yes.
15     Q.    Another thing that they represented to you
16 was, "All material transactions have been reported and
17 have been properly reflected in the financial
18 statements."  Correct?
19     A.    Correct.
20     Q.    And they represented to you that, "There are
21 no uncorrected misstatements."  Right?
22     A.    Yes.
23     Q.    And you relied on the truth of those
24 representations in preparing the compilation, right?
25     A.    Yes.

Page 95

1      Q.    Another representation that they made to you
2  that appears on the second page of this exhibit under
3  paragraph 10 is, "There are no violations or possible
4  violations of laws or regulations whose effects should
5  be considered or disclosed during the financial
6  statements or as a basis for recording a loss
7  contingency."  Do you see that?
8          MR. ABELMAN:  Object to foundation.
9      A.    I do.
10     Q.    (BY MR. PULKRABEK)  Okay.  So that is what is
11 put in the letter to Jeff and Merrie Wycoff, that
12 paragraph 10-A, right, Mr. Henke?
13     A.    Yes, it is.
14     Q.    And did you prepare your compilation in
15 reliance on Jeff and Merrie Wycoff representing to you
16 that there had been no violations or possible
17 violations of laws or regulations whose effect should
18 be considered for disclosure in the financial
19 statements or as a basis for reporting a loss
20 contingency?
21     A.    That's correct.
22     Q.    What's a loss contingency?
23     A.    A loss contingency is -- it's a potential
24 liability based on the outcome of something that we
25 don't know yet.  That said -- oh, no, my connection is

Page 96

1  unstable again.  Can you hear me?  Can you hear me?
2      Q.    Yes, I can hear you, Mr. Henke, okay?
3      A.    Okay.  So a loss contingency is a potential
4  liability that isn't yet a liability because we don't
5  know the outcome of whatever is making it contingent
6  upon.
7      Q.    Okay.
8      A.    I, you know, I want to say one more thing,
9  but I am not sure it's appropriate.  The loss
10 contingency for purposes of personal financial
11 statements, I do not believe where there are no notes
12 that it needs to be disclosed.  Specifically, we're
13 talking about the IRS assessment and Franchise Tax
14 Board assessments.
15     Q.    Okay.  So you don't know?
16     A.    I don't know what?
17     Q.    You said you don't know if they need to be
18 disclosed.  Is that what you just said?
19     A.    Well --
20         MR. ABELMAN:  Objection, foundation.
21     A.    Well, I -- my understanding is that
22 contingencies for purposes of the personal financial
23 statement do not have to be disclosed.  Does that
24 answer your question?
25     Q.    (BY MR. PULKRABEK)  No, it didn't, because I

Page 97

1  didn't ask you that question.  My question was just
2  what was a loss contingency, and I think you answered
3  that question.
4          Another representation that Jeff and Merrie
5  Wycoff made to you was in paragraph 11, "We have
6  satisfactory title to all owned assets, and there are
7  no liens or encumbrances on such assets nor has any
8  asset been pledged."
9          Did you rely on that representation?
10     A.    Yes.
11     Q.    Okay.  Another representation was that, "We
12 have complied with all aspects of contractual
13 agreements that would have a material effect on the
14 financial statements in the event of noncompliance."
15         Did you rely on that representation?
16     A.    Yes.
17     Q.    And in paragraph 13, they said, "The
18 following have been properly reported or disclosed in
19 the financial statements.  And then it says, "A,
20 related party transactions, including sales, purchases,
21 loans, transfers, leasing arrangements and guarantees."
22 Correct?
23     A.    Correct.
24     Q.    And did you rely on that representation?
25     A.    Yes.

Robert Henke
August 11, 2021

1  Q.   All right.  Another thing that they said they
2  were disclosing were guarantees, whether written or
3  oral, under which the land is contingency liable to a
4  bank or other lending institution.
5         Do you know, what is that exactly?  Can you
6  explain that one to me?
7  A.   "Guarantees, whether written or oral, under
8  which the land is contingency liable to a bank."  My
9  understanding of that paragraph would be if they have
10 assigned something as collateral to a bank or a lending
11 institution or if they have guaranteed to a bank that
12 it could be used to satisfy some debt with the bank or
13 lending institution.
14 Q.   Okay.  And then finally in paragraph 18, the
15 representation made is that, "In regards to the
16 financial statement preparation of services performed
17 to you, we have evaluated the adequacy and results of
18 the services performed and accepted responsibility for
19 the results of the services."  Do you see that?
20 A.   I see that.
21 Q.   And that information we have already saw as
22 part of your engagement letter as well.  Correct?
23 A.   Yes.
24 Q.   But you relied on Jeff and Merrie Wycoff to
25 have evaluated the adequacy and results of the

1  financial statement and take responsibility for them,
2  right?
3  A.   Yes.
4  Q.   All right.  Let's go ahead and look at that
5  statement of financial condition, and I will ask you
6  some questions about that and then we can take a break
7  for lunch.  Okay.
8         So let's look at what has been marked
9  Deposition Exhibit 83.  Do you have that in front of
10 you, Mr. Henke?
11 A.   I have the -- yeah, the compilation letter.
12 Q.   So there is a compilation letter on page 1 of
13 Exhibit 83, and then the next is the Jeffrey and Merrie
14 Wycoff, Statement of Financial Condition, October 31,
15 2015, on the second page.  You have that, right?
16 A.   Yes, uh-huh.
17 Q.   Okay.  And these were documents you provided
18 to us out of your files?
19 A.   Yes.
20 Q.   What is the purpose of this cover letter from
21 your perspective?  Why have a cover letter at all?
22 A.   To tell anybody who is using the financial
23 statements as to how much reliance they can put on the
24 financial statements.
25 Q.   Okay.  So basically you're saying that you

1  didn't do an audit, correct?
2  A.   Correct.
3  Q.   And so you are not taking responsibility for
4  the information on the financial statements, Jeff and
5  Merrie Wycoff are, right?
6  A.   Correct.
7  Q.   And, in fact, you also say that -- right here
8  in the letter, you say, "Jeffrey and Merrie Wycoff are
9  responsible for the accompanying statement of financial
10 condition as of October 31, 2015, in accordance with
11 accounting principles generally accepted in the United
12 States of America."  Right?
13 A.   Yes.
14 Q.   Did you understand that you were authorized
15 by Jeff Wycoff and Merrie Wycoff to write that
16 sentence?
17 A.   I would assume that, yes.
18 Q.   And just to tease it out, why do you assume
19 that they had authorized to you say that they were
20 responsible for the accompanying statement of financial
21 condition?
22 A.   Why would they authorize me to do that?
23 Q.   No, why was it your understanding that they
24 had authorized you to -- to write in this letter that
25 they were responsible?

1  A.   I think that is what the engagement letter
2  indicates as responsibilities and probably the
3  representation letter also indicates that they're
4  responsible for them.
5  Q.   And did you assume -- did you have an
6  understanding as to whether this letter was likely to
7  be provided to a third party?
8  A.   I would assume that, yes, normally.
9  Q.   Okay.  All right.  Let's look at the second
10 page.  It's titled Jeffrey and Merrie Wycoff's
11 Statement of Financial Condition, October 31, 2015.
12 Correct?
13 A.   Correct.
14 Q.   And I would like to just hit what we have
15 already been saying.  You titled it Jeffrey and Merrie
16 Wycoff's Statement of Financial Condition because it
17 was a statement of both of their financial conditions?
18 A.   Yes.
19 Q.   And they were both responsible for it?
20 A.   Yes.
21 Q.   While we're on this subject, can you tell me,
22 is there any difference between a statement of
23 financial condition and a personal financial statement,
24 or is it just semantics?
25 A.   I think it's semantics, but I think statement

Page 102

1  of financial condition is the preferred title, or was
2  at the time.
3      Q.    All right.  Under cash and cash equivalents,
4  you have listed on the compilation here $904,000.  We
5  have talked about that some already.  But can you tell
6  us what does cash/cash equivalents mean?
7      A.    It would mean cash being in a checking
8  account or a savings account or an equivalent, which I
9  think there are certain treasury obligations that are
10  considered cash equivalents because of their liquidity
11  and marketability.  But generally, and I believe
12  specifically here, it's all cash in the bank in
13  checking or savings accounts.
14      Q.    All right.  Are marketable securities ever
15  included within cash equivalents?
16      A.    I wouldn't say never, but generally, if they
17  can be broken out, in this case that marketable
18  securities account was a separate brokerage account
19  that they had, so I don't know what securities were in
20  that account, but marketable securities would not be
21  cash and cash equivalents generally.
22      Q.    Okay.  Going on to personalty valued at
23  $200,000, that was something that Jeff Wycoff and
24  Merrie Wycoff had took responsibility for as part that
25  statement of financial condition; is that right?

Page 103

1      A.    Yes, uh-huh.
2      Q.    And sitting here today, can you tell us what
3  the basis of the $200,000 of personalty was?
4      A.    It's an estimated value of virtually all of
5  the assets you don't see indicated otherwise.  So it
6  would be furnishings, jewelry, furs, kitchenware,
7  clothing, whatever.
8      Q.    Okay.  Jeff and Merrie Wycoff took
9  responsibility for the real estate Alaska bare land
10  representation of $75,000?
11      A.    Correct.
12      Q.    They took responsibility for the
13  representation that the farm was worth $4,750,000?
14      A.    Correct.
15      Q.    They took responsibility for the
16  representation that the residence was worth
17  $1.9 million?
18      A.    Correct.
19      Q.    All right.  And then under the section of
20  liabilities, there is a -- estimated income taxes on
21  the difference between the estimated current values of
22  assets and the estimated amounts of current liabilities
23  and their tax bases.  Do you see that section?  Do you
24  see that section, Mr. Henke?
25      A.    I see the section that you have highlighted,

Page 104

1  yes.
2      Q.    Right, and so part of what Jeff and Merrie
3  Wycoff take responsibility for on this statement of
4  financial condition is the representation of estimated
5  income taxes of $2,080,000, correct?
6          MR. ABELMAN:  Object to form and foundation.
7      Q.    (BY MR. PULKRABEK)  Is that right, Mr. Henke?
8      A.    That's correct.
9      Q.    Now, am I correct in understanding that the
10  particular estimated income taxes that are listed by
11  Jeff and Merrie Wycoff on this financial statement are
12  not -- they're taxes that are not yet owed?
13      A.    That's correct.
14      Q.    Okay.  So this would be a -- this would be
15  contingent on liquidating assets at estimated current
16  values, if that were to occur; is that what is a
17  contingency?
18      A.    Yes.
19      Q.    Okay.  So we kind of talked about loss
20  contingency.  This would be a contingent liability?
21      A.    Yes.
22      Q.    All right.  So one of the contingent
23  liabilities that Jeff and Merrie Wycoff listed on their
24  statement of financial condition was estimated income
25  taxes of 2,080,000?

Page 105

1      A.    Yes, by definition, yes.
2      Q.    Okay.  So they chose to list estimated income
3  taxes that were contingent and not yet realized in the
4  amount of $2,080,000.  Correct?
5          MR. ABELMAN:  Objection, foundation.
6      A.    Yes.
7      Q.    (BY MR. PULKRABEK)  Is that right?
8      A.    Yes.
9      Q.    And they took responsibility for that choice
10  to list contingent estimated income taxes of
11  $2,080,000, right?
12      A.    That contingency is mandated for the personal
13  financial statement.
14      Q.    Okay.  Finally, they make a representation as
15  to their net worth.  Do you see that?
16      A.    I see that.
17      Q.    And that is sort of -- it is literally the
18  bottom line on the statement of financial condition,
19  right?
20      A.    Yes.
21      Q.    Okay.  And so they took joint responsibility
22  for representing their net worth on this statement of
23  financial condition to be $11,582,000?
24      A.    Yes, uh-huh.
25      Q.    Now, Mr. Henke, I am not going to ask for

Robert Henke
August 11, 2021

Page 106

1  your opinions on whether or not things are material or
2  should have been listed on this financial statement,
3  but I am going to ask you some questions that they kind
4  of get into that area a little bit.
5       So I want you to listen to my questions
6  carefully here and try to answer to the best of your
7  ability.  To the extent that the statement of cash/cash
8  equivalents of $904,000 was a misstatement, is it
9  correct that Jeff and Merrie Wycoff are responsible for
10 the misstatement?
11      A.   That is the question?
12      Q.   Yes.
13      A.   The answer is yes.
14      Q.   Okay.  To the extent that the statement of
15 financial condition would be considered to contain an
16 omission of how the farm was titled because the farm
17 was titled in Wycoff Financial, Jeff and Merrie Wycoff
18 would be responsible for that?
19      MR. ABELMAN:  Objection, form.
20      A.   I have no opinion because I am not sure if
21 what you stated would cause a different presentation or
22 not.
23      Q.   (BY MR. PULKRABEK)  Okay.  And that is why
24 I -- that is why I prefaced all of this with I need you
25 to listen very carefully, because I am not asking you

Page 107

1  for an opinion on whether anything is an opinion or
2  omission.  What I am asking you about is who is
3  responsible at the end of the day.  Okay?
4       A.   Okay.
5       Q.   So let me say that again and re-ask the
6  question one more time.
7       To the extent that the statement of financial
8  condition contains an omission because the farm was
9  titled in Wycoff Financial and not Jeff and Merrie
10 Wycoff personally, it would be Jeff and Merrie Wycoff
11 who would be responsible for that?
12      MR. ABELMAN:  Objection, calls for a legal
13 conclusion -- or I am sorry, objection to form, because
14 it calls for a legal conclusion.
15      Q.   (BY MR. PULKRABEK)  Go ahead, Mr. Henke.  You
16 can answer the question.
17      A.   Assuming that it was an omission, Jeff and
18 Merrie would be responsible for it.
19      Q.   Okay.  And then finally, two other things.
20 To the extent that franchise taxes owed to the
21 California Franchise Board should have been listed on
22 this financial statement but were omitted, Jeff and
23 Merrie Wycoff would be responsible for that omission?
24      MR. ABELMAN:  Objection, form.
25      Q.   (BY MR. PULKRABEK)  You can go ahead and

Page 108

1  answer the question.
2       A.   Do I answer?
3       Q.   Yes.
4       A.   Assuming that was an omission, Jeff and
5  Merrie would be responsible for the omission.
6       Q.   And then finally, assuming for the sake of
7  argument that the tax liability to the IRS on the
8  notice of deficiency in 2009 should have been
9  identified on the statement of financial condition and
10 was omitted, Jeff and Merrie Wycoff would be the ones
11 responsible for that omission?
12      MR. ABELMAN:  Objection.
13      A.   Assuming that was an omission, it would be
14 Jeff and Merrie's responsibility.
15      MR. PULKRABEK:  All right.  Why don't we go
16 ahead and take a break for lunch.  It's about 1 o'clock
17 here.  Mr. Abelman, how long would you like for a
18 break?  Mr. Henke has already said he doesn't eat
19 lunch.
20      (Discussion off the record.)
21      THE VIDEOGRAPHER:  We are off the record.
22      (Recess taken, 12:56 p.m. until 1:41 p.m.)
23      THE VIDEOGRAPHER:  Back on the record,
24 2:41 p.m.
25      Q.   (BY MR. PULKRABEK)  Okay.  Mr. Henke, I put

Page 109

1  up on the screen Exhibit 84.  And I would like you to
2  verify that this is another one of the documents that
3  you provided out of your files in response to the
4  subpoena.
5       A.   My screen just changed.  Am I looking at an
6  email to Steve?
7       Q.   Yes.
8       A.   Yes, that looks like one of my documents.
9       Q.   Okay.  And you -- you and Mr. Abelman had a
10 communication by email on June 16, 2021, correct?
11      A.   Yes.  Uh-huh, yes.
12      Q.   And then if we scroll further down in this
13 exhibit, we can see that the -- the entire email chain
14 that actually starts out with Merrie Wycoff emailing
15 on February 5, 2021, correct?
16      A.   Correct.
17      Q.   All right.  And then we -- this email that
18 Merrie Wycoff sends you on February 5, 2021, this
19 relates back to Interrogatory Number 8, do you see
20 that?
21      A.   I see that, yes.
22      Q.   And so we already have discussed this to some
23 extent, but let's go back, if we can, to what was
24 earlier marked Deposition Exhibit 76, and we can look
25 at Interrogatory 8.  You can see the Interrogatory 8

Robert Henke
August 11, 2021

Page 110

1  matches the text that Merrie Wycoff had sent you in
2  that email.  Do you see that?
3       A.    Yes, uh-huh.
4       Q.    And the response from the defendants was, "In
5  addition to their general objections, defendants object
6  to this request as it requests information of a non-
7  party, subject to and without waiving their objections,
8  defendants state that they are without information or
9  knowledge sufficient to answer this interrogatory."  Do
10  you see that?
11       A.    Yes.
12       Q.    Do you see that line?
13       A.    I see that, yes.
14       Q.    Okay.  And that answer is consistent with the
15  fact that you had been unable to validate the $904,000
16  yourself, correct?
17       A.    That's correct.
18       Q.    Okay.  Now we get back to the email exchange.
19  You had responded to Merrie Wycoff on February 8, 2021.
20  Again, we're back to Deposition Exhibit 84.  You had
21  responded to Merrie Wycoff that you have to go back
22  into a computer out of service.  So that is kind of
23  what you told me earlier.  You had a computer, it died
24  on you, maybe the records would be in there.
25       A.    Correct.

Page 111

1       Q.    Now alternatively, the bank statements could
2  be obtained from the bank if you believe that it is all
3  cash in the bank, correct?
4       A.    Correct.
5       Q.    Are you aware of any effort that has been
6  made to just get the bank statements from October to
7  November of 2015 to just check with the bank itself?
8       A.    I am not aware of any efforts, no.
9       Q.    Do you know from working on the Wycoffs'
10  matters whether they have online access to their
11  records at Vectra bank?
12       A.    I do not know that.
13       Q.    Now one thing you wrote in response to Merrie
14  Wycoff, "The amount of cash is obviously high
15  compared to your normal balances."  What do you recall,
16  if anything, as to what a normal balance would have
17  been for the Wycoff's cash back in 2015?
18       A.    I would guesstimate anywhere from 40 to a
19  hundred thousand.
20       Q.    Okay.  And then you said here, "...could be
21  anything including inheritance, Albion draws, stock
22  sales or question mark."  What do you mean by that?
23       A.    That means that I could not -- I didn't know
24  what the source of the amount of money was.
25       Q.    Okay.  Then on the second page of this

Page 112

1  Exhibit, 84, Merrie Wycoff speculates, "I think it's
2  because he took a loan on the farm from Bloomfield."
3  We talked about that earlier in the deposition, right?
4       A.    Uh-huh, yes.
5       Q.    And then you responded to her again, "I
6  didn't find any reference in my files to where the
7  substantial increase in cash balance came from.  Could
8  well be from Bloomfield Financing, but I can't confirm
9  that."  Correct?
10       A.    Correct.
11       Q.    And then you suggested to her, "For purposes
12  of the interrogatory, probably best to document for
13  them the bank/brokerage account balances at the
14  October 31, 2015, date.  One or more accounts should
15  have substantial balances."  Do you see that?
16       A.    Yes.
17       Q.    All right.  So you saw what the defense
18  response to Interrogatory Number 8 was.  And you had
19  suggested just look at the bank account balances.  Do
20  you have any information as to why Merrie Wycoff hasn't
21  just looked at bank account balances?
22       A.    I have no information as to that.
23       Q.    And in the next paragraph, you write,
24  "Separately, regarding Zap! Products, Inc., is the
25  entirety of the operations included in the banking

Page 113

1  activity for the year?  This includes an odd deposit of
2  16.47 and otherwise all deposits are from you to pay
3  Anthem, Gusto, a couple FedEx's and some bank charges.
4  Let me know, please."  Do you see that?
5       A.    I see that.
6       Q.    All right.  So what year are you referring to
7  in this paragraph when you ask whether this was the
8  entirety included in the banking activity for the year?
9       A.    Given the date of the email, I would be
10  guessing that I was talking about 2020.
11       Q.    All right.  So when you looked at the Zap!
12  Products activity for 2020, what do you recall seeing?
13       A.    What do I recall seeing regarding my request
14  for information or --
15       Q.    Well --
16       A.    I probably had seen something provided by her
17  or the person who was keeping the books as to probably
18  a trial balance or something like.
19       Q.    Let me ask it a different way.  Since you did
20  the 2020 income tax return for Zap! Products, what do
21  you recall about that tax return and what it showed as
22  to Zap!'s activities in 2020?
23       A.    Little to no activity.
24       Q.    Okay.  Do you know what Gusto is?
25       A.    Do I know what what is?

Robert Henke
August 11, 2021

Page 114

1    Q.    Gusto, referred to in this paragraph.
2    A.    Gusto, what is Gusto?  Gusto is -- I don't
3  know.  Is that a payment processor?  I would have to
4  look it up.
5    Q.    If I told you --
6    A.    Yeah, go ahead.
7    Q.    If I told you it was a payroll processor,
8  would that sound right to you?
9    A.    It could be, yes, uh-huh.
10   Q.    Okay.  And do you know, who was on Anthem?
11   A.    I don't know specifically, but I believe it
12  is Merrie and possibly the girls.
13   Q.    Can you explain, if you know, what is going
14  on with Zap! Products in regard to Merrie Wycoff making
15  deposits into Zap! to pay Anthem and Gusto?
16   A.    I believe that she makes deposits into Zap!
17  to maintain the health insurance plan that they have
18  with Anthem.  I don't know if Gusto is a method of
19  keeping track of that or -- I don't know that but --
20   Q.    All right.  Is there any tax advantage to
21  Merrie Wycoff, Azuraye Wycoff and/or Devon Wycoff if
22  Merrie Wycoff is paying their insurance through Zap!?
23   A.    Is there any tax advantage?  I suppose if you
24  went out to the point where they got to use the benefit
25  of whatever net operating loss is being accumulated

Page 115

1  there, then yes, there would be some benefit, not
2  currently.
3    Q.    All right.  Further up on this same email, on
4  June 16, 2021, you send an email to Steve Abelman,
5  where you say, "I am collecting the various years'
6  information relative to Zap! Products, Inc.  I have
7  attached a copy of the federal income tax return for
8  2017, which you mentioned you did not have."  And then,
9  "It appears that Zap! had no sales beyond 2016 and any
10  recognized income beyond that year was apparently a
11  result of payables or loans being forgiven."  Do you
12  see that?
13   A.    Yes, uh-huh.
14   Q.    So based on your review, is it correct that
15  Zap! has had no sales since sometime in 2016?
16   A.    Correct.
17   Q.    And would it be correct to say that, based on
18  your review, it hasn't been operating since 2016?
19   A.    Yeah, it's -- I suppose the technical answer
20  is it's not had sales.
21   Q.    Okay.  Has it had any revenues since 2016?
22   A.    Well, that is what I was asking about in the
23  previous part of one of these emails as to a small
24  deposit that was not a deposit from Merrie, whether
25  that was income or not.  I don't know that.  I don't

Page 116

1  believe they had any sales beyond 2016.
2    Q.    You're familiar having reviewed the
3  financials of Zap! with its income, expenses, assets
4  and liabilities, at least in a broad sense, would that
5  be fair?
6    A.    That would be fair to say.
7    Q.    When, if ever, has -- have the assets of Zap!
8  exceeded its liabilities, if you know?
9    A.    I don't know that.
10   Q.    By 2017, would it be fair to say that Zap!'s
11  liabilities exceeded its assets?
12   A.    Yes.
13   Q.    How about in 2016?
14   A.    I think, from what I recall, that would be a
15  fair statement.
16   Q.    All right.  Are you aware that Zap! has a
17  number of unpaid liabilities?
18   A.    I am aware of some unpaid liabilities, yes.
19   Q.    Do you know when the last time Zap! was able
20  through income to service its liabilities in a timely
21  manner?
22   A.    I don't know that, but I would speculate it
23  was 2016.
24   Q.    Is -- today is Zap! insolvent, to your
25  knowledge?

Page 117

1    A.    I would suggest yes.
2    Q.    Do you -- was it insolvent in 2020?
3    A.    I would suggest yes.
4    Q.    What about in 2019?
5    A.    Yes.
6    Q.    What about in 2018?
7    A.    Yes.
8    Q.    What about in 2017?
9    A.    I am not sure there.
10   Q.    Okay.  What about 2016?
11   A.    I am not sure there either.
12   Q.    All right.  So considering -- you would agree
13  that it's been insolvent since 2018, and perhaps
14  earlier than that?
15   A.    Yeah, I think, by definition, you're calling
16  insolvency assets that don't exceed liabilities.
17   Q.    That would be one definition.
18   A.    That is the one I am using.
19   Q.    Okay.  So on assets less than
20  liabilities, Zap! has been insolvent at least since
21  2018?
22   A.    I believe so, yes.
23   Q.    What about Zap!'s ability to service its
24  debts in the due course, if you use that definition of
25  insolvency, do you know when the last time Zap! was

Page 118

1  solvent?

2      A.   I, again, would be speculating it was 2016.

3      Q.   Okay.  Let me switch gears here.  I am going

4  to ask you about a couple other documents, starting

5  with 85.  I don't have a lot of questions about this,

6  but I would like you to confirm that Exhibit 85 is a

7  document from your files that you produced in response

8  to our subpoena.

9      A.   Yes, that looks like something I provided.

10     Q.   All right.  Do you have -- can you just

11 explain how this particular letter came to be in your

12 files?  Why do you have it, if you know?

13     A.   I am going to read the letter.  I think I

14 surprised myself when I found it in the file.  I am not

15 sure why I have it, except for perhaps the market value

16 was something that we were changing on the financial

17 statement.  I don't know.  I might have been provided

18 that just to confirm something we had used or would be

19 using for valuation on the form.

20     Q.   Have you ever spoken with Karen Bernardi?

21     A.   No.

22     Q.   Or anybody from the Bernardi Real Estate

23 Group?

24     A.   No.

25     Q.   All right.  Same questions with respect to

Page 119

1  Exhibit 86, let me pull that one up for you.  Is this

2  also a document out of your files that you produced in

3  response to the subpoena?

4      A.   Yes, it looks like something I have seen.

5      Q.   And would it be reasonable to say that since

6  you don't know Karen Bernardi, you must have obtained

7  Exhibits 85 and 86 from the Wycoffs?

8      A.   Yes.

9      Q.   All right.  Do you recall in 2016 the Wycoffs

10 asked you to prepare another statement of financial

11 condition?

12     A.   Yes.

13     Q.   All right.  Let me show you Deposition

14 Exhibit 87, and can you confirm for me that this also

15 is a document out of your files?

16     A.   That looks like a document out of my files,

17 yes.

18     Q.   So in this instance, you see that Merrie

19 Wycoff is sending you an email on June 20, 2016, and

20 the subject is Wycoff, J&M Statement of Financial

21 Conditions 2016?

22     A.   Uh-huh, yes.

23     Q.   Okay.  Do you recall the circumstances of

24 Merrie Wycoff contacting you about a statement for

25 financial conditions for 2016?

Page 120

1      A.   I don't recall her ever asking about a

2  financial statement of condition, but I can't really

3  tell you what the email means.

4      Q.   All right.  Do you know why the Wycoffs were

5  asking you for a statement of financial condition in

6  2016?

7      A.   I would just suggest probably to update what

8  had been provided to them in October 2015.

9      Q.   Okay.  Well, I am not asking you to guess.  I

10 am asking you, do you know why they were asking?  Let

11 me ask it a different way.  Did they tell you why they

12 wanted a statement of financial condition in 2016?

13     A.   I don't recall them telling me that.

14     Q.   And do you have any other independent basis

15 of knowing why they were asking for a statement of

16 financial condition in 2016?

17     A.   Unless it's something I provided you, I do

18 not.

19     Q.   Okay.  Have you ever -- do you know what the

20 details are behind Merrie Wycoff's indication that she

21 has a Ph.D.?

22     A.   Do I know the details?  No, I don't.

23     Q.   Do you know where she has a Ph.D. from or

24 what it's in?

25     A.   I do not.

Page 121

1      Q.   Or when she received it?

2      A.   I do not.

3      Q.   Okay.  Have you ever had any conversations

4  with her about her Ph.D.?

5      A.   I have not.

6      Q.   All right.  Let's look at what -- before I

7  move on, do you see that there were three attachments

8  to Merrie Wycoff's email to you?

9      A.   Yes, I see that.

10     Q.   All right.  Let's look at the next exhibit

11 here.  All right.  So this is Exhibit 88.  And do you

12 recognize Exhibit 88 as a letter out of your files that

13 you provided to us in response to our subpoena?

14     A.   It looks like it's from my files, yes.

15     Q.   Okay.  And you can see this is a three-page

16 letter.  It's one of what we call the representation

17 letters, correct?

18     A.   Correct.

19     Q.   And do you see that -- on page 3, can you

20 identify the signatures on that?

21     A.   They look like Jeff and Merrie's signatures.

22     Q.   Okay.  We don't need to go through all of the

23 details, but is there any material difference between

24 the representation letter here in Deposition Exhibit 88

25 and the one that we looked at earlier with respect to

Robert Henke
August 11, 2021

Page 122

1  the 2015 statement of financial conditions?
2      A.    Without reading it all right now, I would say
3  probably no, that they would be the same or close to it
4  with dates changed.
5      Q.    During this period of time, were you only
6  using this form of representation letter with Jeffrey
7  and Merrie Wycoff, or did you use that with any other
8  clients?
9      A.    I believe in this period of time, you're
10  talking October through June of -- October '15 through
11  June of '16, I would have only been using it with them,
12  I believe.
13      Q.    Do you know when you first started using this
14  form of representation letter?
15      A.    I can't recall if I issued any other personal
16  financials prior to the October 2015.  Had there been
17  some proximity to one that I issued prior to that
18  October 2015, it's possible that the letter could have
19  been different.  But I don't recall any differences
20  between October '15 and the 2016 year.  I would say
21  most of this is boilerplate.
22          So I have a service I use, and if they had a
23  change, I didn't note any changes.  So I would guess as
24  I sit here that the letters are very similar, if not
25  exactly similar, except for dates.

Page 123

1      Q.    And did you rely on Jeff and Merrie Wycoff's
2  representations in this representation letter in
3  preparing a financial statement for them in 2016?
4      A.    Yes.
5      Q.    Let's go ahead and look at Exhibit 89 here.
6  So Exhibit 89 is another document that you produced to
7  us from your files.  This would be the cover letter as
8  well as the financial -- statement of financial
9  condition for 2016; is that correct?
10      A.    Correct.
11      Q.    And the cover letter is substantially the
12  same as the cover letter that we saw for the 2015 --
13      A.    Yes.
14      Q.    -- statement?
15      A.    Yes, it is.
16      Q.    And one of the differences here would be that
17  it says, "Jeffrey and Merrie Pisano Wycoff are
18  responsible for the accompanying statement of financial
19  condition of May 31, 2016, in accordance with
20  accounting principles generally accepted in the United
21  States of America."  Do you see that?
22      A.    Yes.
23      Q.    Now it's a small change perhaps, but do you
24  see that Merrie Pisano Wycoff is identified here, not
25  Merrie Wycoff?

Page 124

1      A.    Yes.
2      Q.    Do you have any --
3      A.    I don't know why the change.
4      Q.    Yeah, I mean, do you have any recollection as
5  to why the Pisano got added in 2016?
6      A.    She generally goes by Merrie Pisano Wycoff.
7  So I am not sure why the October statement did not have
8  the Pisano in there, her maiden name.
9      Q.    Did you request that you add Pisano?
10      A.    I am sure that I added it for whatever
11  reason, and as I look at it now, I am guessing more the
12  October statement having been an omission rather than
13  the May of 2016.
14      Q.    Okay.  Do you know if the Wycoffs provided
15  this cover letter and the 2016 statement of financial
16  condition to anybody else?
17      A.    I have no knowledge of that.
18      Q.    Now do you see that the real estate farm
19  value here is being identified as $6,500,000?
20      A.    That's correct.
21      Q.    And where did you get that information from?
22      A.    I am guessing it came from the letter that we
23  just looked at from the broker.
24      Q.    All right.  Well, let's just go back and look
25  at that.  Okay.  So you're referring I think to --

Page 125

1      A.    This one.
2      Q.    Yeah, that was Deposition Exhibit 85.  So
3  you -- I should say the Wycoffs went with the upper end
4  of the estimated market value by Karen Bernardi.
5      A.    Yes.
6          MR. ABELMAN:  Objection, foundation.
7      Q.    (BY MR. PULKRABEK)  Okay.  And the Wycoffs
8  were responsible for the representations on the 2016
9  statement of financial condition; isn't that right?
10      A.    Yes.
11      Q.    All right.  Let me show you -- let me show
12  you Exhibit 90.  Do you recognize Exhibit 90 as one of
13  the documents out of your files that you provided in
14  response to the subpoena?
15      A.    Yes.
16      Q.    Okay.  So this Exhibit 90 starts off with an
17  email from Jeff Wycoff to you dated Monday,
18  November 28, 2016, at 7:41 a.m.  And he writes, "Hi,
19  Bob, if you have time today could you please let me
20  know a rough idea of the total amount of money I am in
21  for all of my projects, Zap!, Simplicity Minute Groom,
22  the cube, Herplex, Dermafina and Skin Tool.  I don't
23  know if the names of the products help you --" or
24  "-- help of you need the names of the companies which
25  you have them all."  Do you see that?

Robert Henke
August 11, 2021

Page 126

1    A.    I see that.
2    Q.    Okay.  And then later that afternoon at
3    5:46 p.m., you respond to Jeff Wycoff.  You see that,
4    correct?
5    A.    Yes.
6    Q.    And your response says, "Hi, Jeff, pulling
7    hair out trying to gather figures that make sense.  The
8    amounts of money you're in is a moving target as the
9    loans to the various entities is disguised as earnings
10   wherever they might then have been lent to the other
11   entities."  Can you explain that to me in further
12   detail, please?
13   A.    The problem I was having was pulling numbers
14   for him that could tell him the answer to his question.
15   And Jeff very often for many years would take cash from
16   one business and lend it to another business.  I think
17   maybe disguised is not a good word for earnings.  We
18   weren't stating earnings, but his amount of investment
19   in any given company was very difficult for me to
20   ascertain with the number of accounts that might have
21   been loans to or loans from or infusion of his own
22   money.
23   Q.    And so -- yeah, let me ask some further
24   questions about this.
25         So as I understand it, what you observed over

Page 127

1    the years was that there would be money loaned from one
2    Wycoff-affiliated entity to another Wycoff-affiliated
3    entity.
4    A.    Correct.
5    Q.    And whether -- whether those were booked as
6    loans or were -- those were capital contributions, was
7    that clear or unclear to you?
8    A.    It was -- it was unclear often.
9    Q.    And did you ever see promissory notes to
10   document loans between different Wycoff-affiliated
11   entities?
12   A.    Yes, I did, many years ago.
13   Q.    All right.  Typically was that the case, that
14   every time there was a loan being made, you would see a
15   promissory note documenting the loan?
16   A.    Typically, 15 years ago, yes.  More recently,
17   no.
18   Q.    Okay.  So when -- when would you say things
19   changed in terms of the propriety of the documentation
20   of any loans if they were loans?
21   A.    Barry Marlin, for as long as he worked with
22   Jeff, I think he kept a lot of those things in sync so
23   we had notes between and amongst the entities.  In, I
24   want to say, 2008, 2009, whenever the financial crisis
25   was, they kind of had a falling out in ways.  And I

Page 128

1    don't think I saw any notes after that that I recall.
2    Q.    So the last time you saw promissory notes
3    between Wycoff-affiliated entities, to the best of your
4    recollection, would have been the 2008-2009 time frame?
5    A.    That is what I am recalling, yes.
6    Q.    All right.  And just to take a moment to
7    detour from the topic at hand, you mentioned a falling
8    out or parting of ways between Barry Marlin and Jeff
9    Wycoff in 2009 or so.  Do you know the details of that?
10   A.    I think at one time the Albion trust, the
11   deferred income, had something like 11 or $13 million
12   in it, and much of that was being managed by Paul
13   Thompson.  I am fuzzy on the firm that he was with, but
14   Dean Witter, Merrill Lynch, whoever it was, in the
15   '08-'09 crisis, I think Jeff's account balances went
16   down to about 8 million.  I think he lost something
17   like $5 million.
18         And he had been paying Barry for a number of
19   years 30,000 a month as financial manager.  And Paul
20   Thompson -- it was never clear to me how he got paid
21   because his firm didn't charge fees.  But anyway, the
22   falling out was because Jeff saw so much money being
23   lost, because he was in equity, so when the stock
24   market went down significantly, he had significant
25   loss.

Page 129

1    And I remember vividly him telling me about
2    making a call to Paul Thompson saying you will
3    liquidate everything I have today or your firm will be
4    on the short side if I lose money.
5          And I have a story, it has nothing to do with
6    this per se, but interesting that the firm -- and it
7    was one of the big brokerages, he had a bond for like a
8    hundred thousand dollar face value that had already
9    been carried at a hundred thousand face value.  Well,
10   when it came time to liquidate it, I think it was
11   garnishing 20 cents on the dollar, and Jeff threatened
12   suit against the firm if they didn't make him whole,
13   and they suggested we don't price those things as an
14   independent firm prices them.
15         So anyway, just as an aside, he and Barry I
16   don't think were ever as close after that as they had
17   been before that.
18   Q.    Do you have any understanding as to why
19   Mr. Wycoff would blame Barry Marlin for the 2008
20   financial crisis impacting his stock values?
21         MR. ABELMAN:  Objection, foundation.
22   A.    Well, I would offer that I don't think Jeff
23   blamed Barry for the crisis, but Barry commented
24   something to the effect like how could we know that
25   that was coming?  And Jeff's posture was, I pay you

Robert Henke
August 11, 2021

Page 130

1  $30,000 a month to maybe know something that other
2  people don't know.
3          So anyway, long story short, I don't think
4  Jeff blamed Barry, but the fact that, you know, I
5  looked at the time at the brokerage accounts to see
6  what was happening.  And what the brokerage was doing
7  was liquidating positions today and buying other
8  positions today also, which for that continuing to go
9  down, when you see the market spiraling down, you
10 probably should have a contingency plan in place and
11 they did not.
12         So I think what upset Jeff was the fact that
13 he was paying a large amount of money on a regular
14 basis for, quote, management.  He did not want to hear
15 that this couldn't be seen anymore than anybody else
16 could see it.
17     Q.     (BY MR. PULKRABEK)  All right.
18     A.     So what was the question?  I was rambling.
19     Q.     The original question was that there had been
20 a falling out between Barry Marlin and Jeff Wycoff in
21 about 2008, 2009, and I just asked you why.  That was
22 the question.
23     A.     That is what I remembered is that it was
24 because of the financial crisis.  There were other
25 things, too, but personalities.

Page 131

1      Q.     Okay.  So getting back to -- getting back to
2  where we were before I asked about Barry Marlin, we
3  were talking about how the record keeping of any intra-
4  corporate loans had dropped off in or around about the
5  2009 time frame, you know, intra-corporate loans
6  between Wycoff-affiliated entities.
7          Let me ask you, kind of backing away from
8  just the topic of were there promissory notes, would
9  you say that more generally, the quality of the record
10 keeping also declined around 2009 with respect to
11 Wycoff-affiliated entities?
12     MR. ABELMAN:  Objection to form and
13 foundation.
14     A.     I would say that I can't speak to anything
15 other than what I was provided.  And if I was provided
16 a trial balance and worked from that, I may not know
17 what all was behind it.  You know, generally speaking,
18 I would say yes, but I don't have any particular
19 reference for stating that.
20     Q.     (BY MR. PULKRABEK)  Well, let me ask a
21 slightly narrower question than the one I asked just
22 now.
23         At least with respect to the financial
24 information that you were being provided to do your
25 engagements, did the quality of the supporting

Page 132

1  documentation decline in or around the 2009 time frame?
2      A.     No, but there was a lot less information than
3  there had been prior.
4      Q.     Okay.  And what do you mean -- what
5  distinction are you drawing here between the quality
6  and the quantity of information?
7      A.     The sales would decline, so the number of
8  transactions were declining.
9      Q.     Getting back to the email in Exhibit 90 where
10 you say you were pulling your hair, so you were pretty
11 frustrated with the time that you had been spending on
12 this particular project on November 28th.  Would you
13 agree with that?
14     A.     I would agree with that.
15     Q.     And so what is the root of the frustration
16 that you were experiencing on November 20, 2016, when
17 you were trying to work on this project for Mr. Wycoff?
18     A.     Well, I think I was not exactly sure what he
19 was looking for, so I tried to give him something that
20 was meaningful to him.  And when I look back at tax
21 returns or the books as I had them looking at the
22 amounts of money, I -- years ago, probably in that '08,
23 '09, '10 frame, I had spreadsheets on all of the
24 companies and tracked all of the deposits from this one
25 into the deposits in that one, and that had not been

Page 133

1  kept for a number of years.
2          When I was keeping it, I could tell him by
3  entity basically what he had invested in that or what
4  he was owed or what he owed.  So as to this one that I
5  am looking at, Sirius Products, net, net, net, he had
6  taken more out than he had in income and deposits in.
7      Q.     Okay.  So what does that -- let me just stop
8  you there.  What does that mean, that he had taken more
9  out than deposits he had in?
10     A.     That means that -- and I am speculating
11 only -- that means that Sirius Products had draws paid
12 into it maybe from Albion, which Jeff then drew out,
13 and because it was a loan between Sirius and Albion, it
14 was not recognized as income anywhere, but it went in
15 directly from Albion, I believe to Sirius, then to
16 Jeff.  That is the only way legitimately he could have
17 a negative balance like that.
18     Q.     As the accountant working on these projects
19 for the Wycoffs and different Wycoff-affiliated
20 entities, have you ever found yourself having
21 difficulty following the flow of cash?
22     A.     Yes.
23     Q.     And explain that for me, please.
24     A.     Well, specifically, I would say it had to do
25 with when Barry was managing Albion and deposits were

Robert Henke
August 11, 2021

Page 134

1  coming out of Albion, some of them designated as Wycoff
2  and some of them designated as Sirius Products where we
3  had deposits, my concern with an S corporation is that
4  I don't have deposits that I pick up as income when it
5  is something else alone, so money was flowing on a
6  monthly basis between Albion and Jeff or Sirius or
7  wherever else they needed it, and, yes, it was
8  difficult to track for some period of time, and that
9  period of time was years.
10     Q.   Even more recently with respect to Zap!
11  Products, have you had any difficulty teasing out
12  what -- where money was coming and going?
13     A.   That wasn't mine to do.  I wasn't keeping the
14  books.  So Zap! Products has an officer loan account
15  and that was the balance in it.
16     Q.   Uh-huh.
17     A.   And most of what I had -- when I had the
18  books handed back to me in '17, I believe, there wasn't
19  much going on between the Wycoffs other than I think
20  they were still putting in money to settle whatever
21  could be settled, but most of that balance, I don't --
22  you know, it's on the books.  I don't know -- I do have
23  a ledger from '16, so I could probably document, you
24  know, the dates and the amounts, but that is the
25  balance that is carried on the balance sheet.

Page 135

1     Q.   Okay.  That leads to the next question I have
2  for you.  The next couple questions may be a little
3  difficult to answer because they involve Wycoff
4  Financial, and I understand you're just hearing about
5  that company really for the first time in the
6  deposition.
7     But I think at the -- I think what the
8  evidence shows is that in 2015, Wycoff Financial
9  entered into a borrowing transaction with this lender
10  BC24, LLC.  Okay.  Are you with me so far?
11     A.   Uh-huh.
12     Q.   And then some of that money appears to have
13  been invested into Zap! Products.
14     A.   Okay.
15     Q.   Are you following me so far?
16     A.   Yes.
17     Q.   Okay.  Now, you have seen the -- you have
18  seen the trial balance for Zap! Products, correct?
19     A.   Correct.
20     Q.   And you have seen entries where money being
21  invested into the company is reflected as a --
22  essentially as an investment by Jeff Wycoff
23  individually, correct?
24     A.   Correct.
25     Q.   And so if I were to suggest to you that what

Page 136

1  happened here was the source of the money was Wycoff
2  Financial borrowing from BC24 and that money then
3  somehow makes its way into Zap! Products, what would
4  you expect to see as the correct bookkeeping treatment
5  of that or the record-keeping treatment of that?
6     A.   The way it's presented, I would --
7     Q.   Well, what would be the records of it?  How
8  would it be documented if you were going to dot the I's
9  and cross the T's, so to speak?
10     A.   Well, on Jeff's part, he would have a loan
11  from BC24 and he would have cash.  He then spends the
12  cash into Zap! Products, so he would have no more cash.
13  Zap! Products would have the cash and Jeff would have a
14  note theoretically from Zap! Products.  So Jeff's
15  balance sheet would look like on the asset side note
16  receivable from Zap!, and owing to BC24.  Is that
17  simple?
18     Q.   Okay.  Now if that happened was Wycoff
19  Financial borrowed money from BC24 in a lump sum --
20     A.   What is the question?
21     Q.   -- and then a portion of that money flows
22  into Zap! Products, I mean, how do you -- what is the
23  correct bookkeeping for that if you are able to
24  describe it for me?
25     A.   Well, you're looking at two sets of books.

Page 137

1  One is Jeff and Merrie.  On their books, they have a
2  loan from BC24.  So the downside is they have money,
3  cash, and the credit side is they owe BC24.  If they
4  take part of the cash, however much cash, now they have
5  less cash, but they're replacing it with a note
6  receivable from Zap! Products.
7     Q.   Let me just stop you, because what I am not
8  hearing any reference to is Wycoff Financial, and I am
9  kind of wondering why.
10     So is it your testimony that in all of this,
11  Wycoff Financial should be just disregarded, or are
12  there some steps that do involve documenting loans from
13  BC24 to Jeff Wycoff, who then loans the money into
14  Zap!?  Explain that to me, if you can.
15     MR. ABELMAN:  Objection, both form and
16  foundation.
17     A.   I would -- again, I am not familiar with
18  Wycoff Financial.  But if Wycoff Financial was Jeff and
19  Merrie, I would look at the substance over the form;
20  you suggest that Wycoff Financial is Jeff and Merrie.
21  So where I am speaking Jeff and Merrie, you could
22  substitute Wycoff Financial if it's owned by them.  I
23  am guessing from what you are saying is that the loan,
24  the BC24 made to Jeff and Merrie was to Wycoff
25  Financial.

Robert Henke
August 11, 2021

Page 138

1    Q.   (BY MR. PULKRABEK)  BC24 loan went into
2    Wycoff Financial so --
3    A.   So Wycoff Financial then was an LLC formed by
4    Jeff and Merrie to hold that property?
5    Q.   Right.
6    A.   But I am asking, I am not stating.  I don't
7    know.
8    Q.   That is correct.  Wycoff Financial is formed
9    to hold the property.
10   A.   Then I would -- from my standpoint, I -- what
11   I am saying, and I don't have any basis for even saying
12   it, but Wycoff Financial is Jeff and Merrie.  So in
13   disregarding it, I didn't know about it, so I could
14   easily disregard it.
15   Q.   And as far as you can tell from the work that
16   you have done, it was disregarded because you have
17   never heard of it before?
18   A.   Correct.
19   Q.   Okay.  All right.  Let me move on to the next
20   document here.  This will be Exhibit 91.  Okay.  Now do
21   you recognize Exhibit 91 as a compilation that you
22   prepared for the Wycoffs in 2017?
23   A.   Yes, that looks like my document.
24   Q.   Okay.  Can you tell me, what were the
25   circumstances, if you recall, surrounding preparation

Page 139

1    of the compilation in 2017 for the Wycoffs?
2    A.   I don't recall, but, again, it would be, I
3    believe, an update of whatever had last been published.
4    Q.   Did the Wycoffs ever explain to you what the
5    purpose of this financial statement would be or how it
6    would be used?
7    A.   I don't recall that we discussed it, except
8    that -- well, somewhere in one of these emails, I have
9    a note from Jeff that he was going to go visit, I don't
10   know, a Wal-Mart or a Costco or somebody, one of the
11   biggies, and he needed to take it with him, and I don't
12   know if it was this one or the prior one.
13   Q.   Okay.  On page 2 of the exhibit, we have
14   Jeffrey and Merrie Wycoff's Statement of Financial
15   Condition, February 28, 2017.  Do you see that?
16   A.   I see that.
17   Q.   And this says in February of 2017, Jeff and
18   Merrie Wycoff were representing the farm to be worth
19   $6 million on the statement of financial condition,
20   correct?
21   A.   Yes.
22   Q.   And they were representing their personal
23   property to be worth $200,000?
24   A.   That is the personal, yes.
25   Q.   And they were representing the residence to

Page 140

1    be worth $1.85 million?
2    A.   Yes.
3    Q.   And they were representing that they had
4    $160,000 in cash and cash equivalents?
5    A.   Yes.
6    Q.   Did you ever -- are you able to verify the
7    $160,000 in cash and equivalents, or did you just take
8    that number from something they gave you?
9    A.   I took that number from something they gave
10   me that I would then ask them to provide me a copy of
11   the bank -- or bank statements to approximate that
12   amount.
13   Q.   All right.  They were representing the Alaska
14   land to be worth $75,000 as of February 2017?
15   A.   Yes, that's correct.
16   Q.   Are you aware that -- are you aware that Jeff
17   Wycoff signed a personal guarantee of Zap!'s obligation
18   to Midlab up to $1 million?  Did you know that?
19   A.   I am not familiar with that.
20   Q.   So Jeff Wycoff never told you that he had a
21   guarantee that he had signed to Midlab?
22   A.   No, no.
23   Q.   Did Jeff Wycoff or Merrie Wycoff ever inform
24   you that they had signed a limited personal guarantee
25   of Zap! Products' debt to Blue Water Media?

Page 141

1    A.   They did not tell me that.
2    Q.   All right.  And because Jeff Wycoff and
3    Merrie Wycoff didn't inform you of Jeff Wycoff's
4    personal guarantee to Midlab or their joint personal
5    guarantee to Blue Water Media, would it be fair to say
6    you had never had any conversations with them one way
7    or the other as to whether those guarantees should be
8    reflected under liabilities?
9    A.   That is correct.
10   Q.   And you were relying on Merrie Wycoff to
11   provide you with all of the information necessary to
12   compile their financial statements in a manner that
13   would provide a fair presentation; is that fair to say?
14   A.   That's fair.
15   MR. ABELMAN:  Objection, foundation.
16   Q.   (BY MR. PULKRABEK)  Mr. Henke, what was your
17   answer?
18   A.   I would say that is correct.
19   Q.   In connection with this February 28, 2017,
20   financial statement, did either Jeff or Merrie Wycoff
21   inform you as to debt that they had incurred to any law
22   firms?
23   A.   That they had what to any law firms?
24   Q.   Did Jeff and Merrie Wycoff inform you of debt
25   that they owed to any law firms in connection with the

Robert Henke
August 11, 2021

Page 142

1  compilation in 2017?
2      A.   I am going to say no, no.
3      Q.   And did you rely on Jeff and Merrie Wycoff to
4  explain to you all of their debts -- or inform you of
5  all of their debts in preparing the statement of
6  financial condition?
7      A.   Yes.
8      Q.   All right.  Let me ask you some questions
9  about a case that was brought by Jeff Wycoff against
10 the law firm Mitchell, Silberberg & Knupp.
11     Q.   Have you ever heard of that firm?
12     Q.   Have you ever heard of that firm?
13     A.   Yes.
14     Q.   Are you familiar with that lawsuit?
15     A.   I haven't read it, but I am familiar with
16 what it was about.
17     Q.   And what is your understanding of what it was
18 about?
19     A.   Back in the 2001, 2002 area, Roland
20 Attenborough, who is with Mitchell, Silberberg & Knupp,
21 I don't want to say he was pedaling, but he was an
22 attorney that was the expert, he was the guy with
23 regards to the Rabbi trust and the nonqualified
24 deferred plans, using an ESOP, which would allow
25 someone like Jeff to put away $13 million in deductions

Page 143

1  into a deferred compensation plan.
2           Fast forward to tax court, and I am not sure
3  exactly of the year, but when Jeff went into tax court,
4  he was advised that Roland could not represent him
5  because Roland had a conflict of interest.  And Jeff
6  had paid Roland and Mitchell, Silberberg in excess of,
7  as I recall, I want to say 900,000, maybe a million
8  dollars to get him from 2001 up to tax court.
9           So he hired another attorney, and I forget
10 his name right now, but at the same time he sued Roland
11 and Mitchell, Silberberg for fees that they paid in
12 damages that he had incurred.  So up until Jeff went
13 into tax court and had the decision go against him, I
14 mean, I believed, I believe Jeff believed also that he
15 was going to win that case and the court case, and
16 tragically, it ended in him committing suicide.
17          But Roland Attenborough I met with many times
18 at Jeff's office and at his place of business in West
19 LA, and right up until the decision went against him on
20 at the tax case, we all believed that we had followed
21 everything by the book.
22     Q.   And Mr. Henke, I will just note for the
23 record that I think your response was nonresponsive to
24 the question that I had asked you.
25          Really, I was just focused on whether you

Page 144

1  know about the lawsuit.  And I think what -- if I
2  understand correctly, what you have told me is that the
3  lawsuit was a lawsuit to recover legal fees paid to the
4  Mitchell, Silberberg & Knupp law firm because in the
5  midst of the tax court case, Attenborough was
6  determined to have a conflict of interest necessitating
7  Mr. Wycoff hiring new counsel.  Do I have that right?
8      A.   You have that right.
9      Q.   And so if I understand correctly, Jeff Wycoff
10 had a claim against this law firm at the time of his
11 death; is that true?
12     A.   I don't know that.  I have no idea what the
13 disposition has been or if it's even still alive.
14     Q.   All right.  So that anticipated my next
15 question.  Did you know there was a settlement of that
16 lawsuit?
17     A.   No.
18     Q.   Okay.  Did you know that Merrie Wycoff,
19 acting as the successor in interest to Jeff Wycoff, had
20 settled that lawsuit for $475,000?
21     A.   I didn't know that.
22     Q.   In preparing tax returns for Merrie Wycoff,
23 have you ever seen any information about the $475,000
24 settlement?
25     A.   No.

Page 145

1      Q.   And I will represent to you that the
2  settlement occurred in 2019.  Have you already prepared
3  Merrie Wycoff's tax return for 2019?
4      A.   I have, yes.
5      Q.   In connection with preparing tax returns for
6  Merrie Wycoff in 2019, did you ever receive any
7  information pertaining to a settlement with the
8  Mitchell Silberberg law firm for $475,000?
9      A.   I don't recall.
10     Q.   Are you familiar with how settlements in
11 lawsuits brought by individuals are taxed in the U.S.
12 and under the Internal Revenue Code?
13     A.   Let's say somewhat.  I look at the
14 settlement, and then I research whether or not it would
15 qualify as a nontaxable or whether it's a taxable
16 event.  So in regard to this settlement, I don't know
17 whether it would be taxable or not.
18     Q.   So some settlements are taxable, some are
19 not.  Is that a fair statement?
20     A.   Yes.
21     Q.   And if you are doing the taxes for somebody,
22 you kind of need to know the details of the settlement
23 in order to make any kind of determination as to
24 whether it's taxable or not, correct?
25     A.   Correct.

Robert Henke
August 11, 2021

Page 146

1    Q.    And so does it give you any concern when I am
2    telling you right now that Merrie Wycoff settled the
3    case for $475,000 in 2019?
4    A.    Are you asking me if it is cause for concern?
5    Q.    Yeah.  If you were not aware of it, does it
6    give you any cause for concern as the tax preparer?
7    A.    It does, yes.
8    Q.    Okay.  Now let me look at Exhibit 95 here.
9    Oh, I am sorry.  I skipped over something I wanted to
10   ask you.  Let me pull up Exhibit 93.
11         All right.  Exhibit 93 is the document you
12   provided to us in response to the subpoena; is that
13   right?
14   A.    That's correct.
15   Q.    This is your cover letter dated July 9, 2018,
16   for a statement of assets and liabilities as of July 9,
17   2018, and then the second page is the Merrie Pisano
18   Wycoff's statement of assets of liabilities, July 9,
19   2019, correct?
20   A.    Correct.
21   Q.    And this is another compilation you did, but
22   this time, it was solely at Merrie Pisano Wycoff's
23   request?
24   A.    Correct.
25   Q.    What were the circumstances, to the best of

Page 147

1    your recollection, for this compilation?
2    A.    Same as the other ones subsequent to October
3    '15, and it was an update for her reflecting obviously
4    some significant liability and some diminution of the
5    asset values that had been reported prior.
6    Q.    Did you have any conversation with Merrie
7    Wycoff about any of the values that are reflected on
8    the second page of Exhibit 93?
9    A.    Did I have any conversation with Merrie?  I
10   want to say yes, briefly.  I actually do think I was
11   speaking with Steve Abelman at the time about the
12   valuations on here.
13   Q.    Okay.  And so had you ever spoken with the
14   Wycoff's legal counsel when preparing other
15   compilations?
16   A.    No.
17   Q.    Was it Mr. Abelman primarily who related to
18   you financial information to be included on the
19   compilation?
20   A.    Yes.
21   Q.    And did Mr. Abelman explain to you who the
22   recipient of this financial statement would be?
23   A.    Not that I recall.
24   Q.    Who gave you the figure of $40,000 as the
25   value for the real estate Alaska bare land, if you

Page 148

1    recall?
2    A.    What was the question?
3    Q.    Do you recall who provided you with the value
4    of $40,000 for real estate, Alaska bare land?
5    A.    I don't know as I sit here.  It would have
6    been Steven or it would have been Merrie.
7    Q.    Do you recall who gave you the value of $2.5
8    million for the real estate - farm?
9    A.    Again, it was Steve or it was Merrie.
10   Q.    Do you recall who gave you the value of
11   $79,000 for the personalty?
12   A.    Steve or Merrie.
13   Q.    Do you recall who gave you the value of $1.1
14   million dollars for the residence?
15   A.    Again, Steve or Merrie.
16   Q.    All right.  There is a liability listed,
17   IRS/California Franchise Tax Board in the amount of
18   $11,542,000.  Do you see that?
19   A.    I see that.
20   Q.    And the IRS and the California Franchise Tax
21   Board, those are two completely different taxing
22   authorities; is that true?
23   A.    That's correct.
24   Q.    Is there a reason why they're consolidated on
25   this line?

Page 149

1    A.    They're consolidated because they both relate
2    to the assessment made by the IRS, and we actually
3    never got an assessment from the Franchise Tax Board,
4    so that is an estimate.  I suppose they could be
5    differentiated.
6    Q.    And what do you mean you never got an
7    estimate from the California Franchise Tax Board?
8    A.    When we got the final assessment from the
9    IRS, it was, I believe, 9 million and something.  So I
10   extrapolated what the Franchise Tax Board would have
11   been based on that.  Somewhere around 2006, I want to
12   say, the Franchise Tax Board said we will base our
13   assessment on whatever the Feds come up with.  So that
14   was pretty much the end of what we heard from the
15   Franchise Tax Board.
16   Q.    Are you aware of the Internal Revenue Service
17   taking any steps to date to collect its assessment
18   against the Wycoffs?
19   A.    I am not.
20   Q.    What about the California Franchise Tax
21   Board?
22   A.    I am not.
23   Q.    Okay.  Let me show you Exhibit 95.  Is
24   Exhibit 95 another one of the documents out of your
25   files that you provided us in response to the subpoena?

Robert Henke
August 11, 2021

Page 150

1   A.   Yes, it looks like it's out of my files.
2   Q.   Okay.  And this is an email that Merrie
3   Wycoff sent to you on February 26, 2019.  Do you see
4   that?
5   A.   I see that.
6   Q.   What was the purpose, if you can recall, of
7   this email?
8   A.   I think the purpose was for her to show me
9   what liabilities might have been recognized earlier
10  that had been paid off.  And I am guessing the amounts
11  are what she actually paid to pay off or to settle
12  whatever debts there were.
13  Q.   Do you have an understanding of this line
14  that says, "Brownstein Hyatt - 249,735.68 (personal
15  credited to Zap!) Plus $250,000 (personal) equals
16  499,735.68"?  Can you articulate what your
17  understanding of that is?
18  A.   My understanding of that would have been that
19  they had with Brownstein and Hyatt a payable of
20  249,000.  Credited to Zap!, I am guessing they paid out
21  of Zap! 249,000 and they paid 250,000 out of their
22  personal.
23  Q.   Okay.  So what does personal credited to Zap!
24  mean to your understanding?
25  A.   Well, you know, as I sit here, I don't know.

Page 151

1   It could be one of two things the way I read it.
2   Either they transferred the liability from Zap! over to
3   Jeff and Merrie for a similar amount or Brownstein and
4   Hyatt credited them on Zap! and then they paid a
5   similar amount personally.  That is probably saying the
6   same thing.  But what that would tell me is if I am
7   preparing the Zap! tax return, then I have 249,000 less
8   in accounts that plus in accounts payable than I had
9   the year prior.
10  Q.   Do you have any information about the
11  Nextwave settlement here?  Do you know anything about
12  that?
13  A.   I do not.
14  Q.   Do you know when that liability first was
15  owed?
16  A.   I do not.
17  Q.   What about GenLabs?  Do you know when that
18  liability first was owed?
19  A.   I do not know that.
20  Q.   We have talked a little bit earlier about the
21  GenLabs lawsuit.  Do you remember my asking you about
22  that GenLabs lawsuit at the beginning of the
23  deposition?
24  A.   Yes, and I was fuzzy on it because it was a
25  long time ago, and I believe it was to do not with

Page 152

1   Zap!, but with Simplicity.
2   Q.   Okay.  So do you have an understanding of
3   what $45,943 (personal) means here?
4   A.   As I sit here, no.
5   Q.   What was -- how did you use this information,
6   if at all, in preparing Merrie Wycoff's tax returns for
7   2019?
8        MR. ABELMAN:  Objection, foundation.
9   A.   The information I am looking at, if it had to
10  do with Zap!, if there was a forgiveness of debt, it
11  might have generated income.  If it was a payment, then
12  it might have increased her capital in Zap! or officer
13  loan or however it was -- if it was a company liability
14  being paid by them personally.  So I would have looked
15  at each line item to see the applicability.  And where
16  there was something that was indicated as personal, it
17  probably had no -- to me, no tax consideration.
18  Q.   (BY MR. PULKRABEK)  Okay.
19  A.   I think the personal is indicating how it was
20  paid.  I am guessing all of these liabilities were
21  Zap!'s, and correct me if I am wrong.
22  Q.   Let me move on to the next exhibit.  This
23  will be Exhibit 96.  Do you recognize Exhibit 96 as a
24  document out of your files?
25  A.   Yes, it looks like it's out of my files.

Page 153

1   Q.   Okay.  So Exhibit 96 is an email that Merrie
2   Wycoff sent to you on June 18, 2018.  Do you see that?
3   A.   I see that.
4   Q.   And the subject was Jeff and Merrie Wycoff,
5   2003 Trust Letter, correct?
6   A.   Correct.
7   Q.   And then attachment, Wycoff Trust PDF,
8   correct?
9   A.   Yes.
10  Q.   All right.  And then the second page is a
11  letter from someone named Edward J. Certisimo, and it's
12  addressed to you, dated June 15, 2018.  Do you see
13  that?
14  A.   I see that.
15  Q.   That was the attachment that Merrie Wycoff
16  sent you?
17  A.   I am going to say yes.
18  Q.   The subject in the letter from Mr. Certisimo
19  is Jeffrey and Merrie Wycoff 2003 Insurance Trust,
20  Merrie Wycoff 2003 Insurance Trust, correct?
21  A.   Correct.
22  Q.   You mentioned earlier that you had a license
23  to sell insurance.  Do I have that right?
24  A.   I do have, yes.
25  Q.   And did you sell or market insurance products

Robert Henke
August 11, 2021

Page 154

1  to the Wycoffs at all?
2      A.   No.
3      Q.   Okay.  So you are not -- if there were
4  insurance policies related to these insurance trusts,
5  you weren't the one that originated those?
6      A.   Correct.
7      Q.   What, if anything, do you know about the
8  Jeffrey and Merrie Wycoff 2003 insurance trust?
9      A.   What do I know?  I know back from that time
10 frame that they formed a trust, and I know there was
11 quite the competition amongst the -- the broker and a
12 couple other persons who were trying to sell Jeff and
13 Merrie some really large policies.  And when I got -- I
14 didn't actually get this letter, but I did get it in an
15 attachment, and I wasn't really sure why I got it.  But
16 I don't know much about it, and I don't know, if there
17 is an insurance trust, I don't know what it is.
18     Q.   Do you know how much life insurance was
19 insuring Jeff Wycoff's life?
20     A.   I believe 10 million, but I think that number
21 was higher sometime ago.  And the only reason I know
22 it's 10 million is because Merrie told me that they got
23 10 million when he committed suicide.
24     Q.   And tell me, to the best of your
25 recollection, exactly what did she say to you about

Page 155

1  that?
2      A.   She said that Jeff had felt it was better for
3  his world for him not to be here and with all of the
4  problems financially, that she and the kids would be
5  better off with him not being here.  So he had this $10
6  million dollars policy that paid off, and my
7  understanding was she got a third and the two daughters
8  each got a third.  And that was the conversation.  It
9  was short, and Merrie is very fragile right now so --
10     Q.   What was your understanding of what, if
11 anything, you were expected to do with this letter from
12 Mr. Certisimo?
13     A.   I don't know.  I had it in my emails, which
14 is why you have it, but I never had any conversation
15 with him or with anybody else regarding the insurance
16 or the trust.  So I don't know if he had to put me on
17 notice for some reason, I don't know.
18     Q.   All right.  The letter says, "Please be
19 advised as trustee of the subject trust that the only
20 assets put in trust was an insurance policy in each
21 trust of the two policies.  The 10,000 term policy has
22 previously expired.  The second TransAmerica policy was
23 collaterally assigned to Bloomfield Capital, and
24 subsequently been surrendered.  At this point no assets
25 reside in either trust.  I certify the above to be

Page 156

1  true."  Do you see that?
2      A.   I see that.
3      Q.   At the end of the day, did you take any
4  action one way or the other on this letter?
5      A.   No.
6      Q.   And are you aware sitting here today that
7  Mr. Certisimo agrees that this letter is not completely
8  accurate?
9      A.   I have no knowledge of that.
10     Q.   Are you aware that Ed Certisimo signed this
11 letter anyway because Merrie Wycoff asked him to do so
12 and because he, quote, believed that what she was
13 telling him to put in the letter was correct?
14         MR. ABELMAN:  Objection, foundation.
15     A.   I have no knowledge of that.
16     Q.   (BY MR. PULKRABEK)  Okay.  Did you know that
17 shortly after the Wycoffs received the ruling from the
18 United States Tax Court in October 2017, Merrie Wycoff
19 and Jeff Wycoff transferred the life insurance policy
20 ownership out of the life insurance trust?  Did you
21 know that?
22         MR. ABELMAN:  Objection, foundation.
23     A.   I have no knowledge of that.
24     Q.   (BY MR. PULKRABEK)  Did Jeff Wycoff or Merrie
25 Wycoff ever consult with you before transferring

Page 157

1  ownership of the life insurance policies that had been
2  kept in the life insurance trust?
3      A.   No.
4      Q.   Were you aware that the -- were you aware
5  that the life insurance trust had guaranteed Wycoff
6  Financial's debt to BC24, LLC?
7      A.   No.
8      Q.   Did the Wycoffs ever explain any of that to
9  you?
10     A.   No.
11     Q.   Can you tell me, when was the last time you
12 spoke with Jeff Wycoff, to your recollection?
13     A.   My recollection would be within a month of
14 when he committed suicide.
15     Q.   And do you recall what you talked about?
16     A.   Politics, state of the world.
17 Philosophically and politically, we were on the same
18 side of the fence so -- we don't talk as long as we
19 used to, but we would talk socially.
20     Q.   Did you talk at all about the debt that he
21 owed or how that was weighing upon him as Merrie Wycoff
22 later related to you?
23     A.   Yes, to some extent, but I never understood
24 the magnitude of it.
25     Q.   And what do you recall Jeff Wycoff telling

Robert Henke
August 11, 2021

Page 158

1  you about the debts that were owed the last time you
2  spoke with him?
3      A.    I don't think he mentioned the debts
4  specifically.  He just -- he was in a bad place because
5  of the IRS case going against him.  And probably the
6  last conversation we had, he was reminiscing about the
7  trial date and his distress in having a bunch of suits
8  in the back of the courtroom who were the IRS people
9  and the outcome kind of being predetermined against
10  him.  Anyway, it's -- you know, I am not a counselor.
11  I wouldn't have seen that he was suicidal, but it was
12  shocking to me that he would do that.
13      Q.    Were you friends with Jeff Wycoff?
14      A.    Yes, I was.
15      Q.    What about Merrie Wycoff?  Did you ever
16  consider Merrie Wycoff to be a friend?
17      A.    I considered her to be Jeff's wife, and as
18  such, yes, she would be my friend.
19      Q.    Did Jeff Wycoff at any time ever express to
20  you any kind of suicidal ideation?
21      A.    Only philosophically.  He had chronic pain,
22  and he mentioned that chronic pain was a real factor in
23  his life.  I didn't read that as him being suicidal,
24  but, you know, in retrospect, he was probably telling
25  me something more.  Did I answer the question?

Page 159

1      Q.    Yeah.  Yeah.  When you say that you -- you
2  were kind of philosophically on the same page as
3  Mr. Wycoff, can you expound on that a little bit?  What
4  do you mean by that?
5      A.    I think we're both laissez-faire capitalists,
6  antisocialism, anticommunism, you know, do what is
7  right and enjoy the fruits of what this country has to
8  offer.
9      Q.    Have you -- were you and Jeff Wycoff ever
10  members of the same -- of any like organization,
11  whether it was formally constituted or not?
12      A.    No, not at all.
13      Q.    Okay.  Has anybody -- let me back up.  Are
14  you still doing work for Merrie Wycoff or any of the
15  Wycoff entities today?
16      A.    What was the question?
17      Q.    Currently, as we sit here today, are you
18  still doing accounting work for Merrie Wycoff or any of
19  the Wycoff-affiliated entities?
20      A.    No, except for the preparation of tax
21  returns.
22      Q.    Okay.  And when is the next tax return that
23  you are going to prepare, if you have an expectation of
24  that?
25      A.    The next one I would be preparing in the

Page 160

1  upcoming tax season for the 2021 year.
2      Q.    So April 2022?
3      A.    Would be a due date, yeah.
4      Q.    Okay.  Do you do any tax work for Azuraye
5  Wycoff?
6      A.    No.
7      Q.    Or any accounting work whatsoever?
8      A.    No.
9      Q.    What about for Devon Wycoff?
10      A.    No.
11      Q.    Have you ever heard of Magnus Veritas, LLC?
12      A.    I want to say no until it came up somewhere
13  here.
14      Q.    So it's fair to say Magnus Veritas is not a
15  client of yours?
16      A.    No.
17      Q.    What about GCS452, LLC?  Have you ever heard
18  of that entity?
19      A.    No, I have not.
20      Q.    Has anybody asked if you would provide expert
21  testimony in this case?
22      A.    No.  You mean before I was subpoenaed?
23      Q.    Well, at any point in time, has anybody ever
24  asked you whether you would provide expert testimony in
25  this case?

Page 161

1      A.    No.
2      Q.    Do you keep track of the amount of fees that
3  the Wycoffs or any of their affiliated entities have
4  paid you over time?  Do you have any kind of a sense of
5  that?
6      A.    I probably could develop that, but it would
7  take me a couple of days.
8      Q.    On an annual basis, was there a -- kind of an
9  average?
10      A.    Well, in the earlier days, the numbers were
11  much larger than the more recent days.  There was a lot
12  more work to do in the early 2000s than there is today.
13  But I don't know that I am answering your question, but
14  I am not sure where we're going with it.
15      Q.    Have you ever spoken at all to Azuraye
16  Wycoff?
17      A.    I have never spoken to Azuraye nor Devon.
18      MR. PULKRABEK:  Okay.  Could I have five
19  minutes to kind of go through my notes, collect my
20  thoughts?  I may be done.
21      THE VIDEOGRAPHER:  Okay.  Going off the
22  record, 4:15 p.m.
23      (Recess taken, 3:15 p.m. until 3:30 p.m.)
24      THE VIDEOGRAPHER:  We are back on the record
25  at 4:29.

Robert Henke
August 11, 2021

Page 162

1    Q.    (BY MR. PULKRABEK)  Mr. Henke, have you ever
2   at any time spoken with anybody about questions that
3   you might be asked in this deposition?
4    A.    No.
5    Q.    You have -- and Mr. Abelman has never gone
6   over any questions that he might ask you?
7    A.    Not that I recall.
8    Q.    Okay.  And neither has Merrie Wycoff, she has
9   never talked to you about any testimony that she might
10  want you to offer in this case?
11   A.    No.
12   Q.    And another follow-up on the Mitchell
13  Silberberg lawsuit.  Let me show you the settlement
14  agreement.  This is Exhibit 94.  It's a document that
15  was produced to us by the Wycoff defendants in this
16  case.  And you'll see it says Settlement Agreement and
17  Mutual General Release and it says it's between
18  Plaintiff Jeffrey Wycoff, including his
19  successor-in-interest Merrie Pisano Wycoff, on the one
20  hand, Defendants Mitchell Silberberg & Knupp, MSK, and
21  it goes on, effective as of February 19, 2019.  Do you
22  see that?
23   A.    I see that.
24   Q.    Have you ever seen this document before
25  today?

Page 163

1    A.    No.
2    Q.    Okay.  Have you ever done or been involved in
3   any estate planning for the Wycoffs?
4    A.    No.
5    Q.    You had mentioned I think at the beginning of
6   the deposition that some part of your accountancy
7   practice involved maybe some degree of estate planning,
8   and I just wanted to clarify that that never involved
9   the Wycoffs in any way?
10   A.    That's correct.
11   Q.    And then finally, can you -- what lawsuits
12  involving the Wycoffs or their entities are you aware
13  of?  Can you tell me just about the ones that you know
14  of that have occurred over the years?
15   A.    Well, we have talked about the Mitchell,
16  Silberberg with Roland Attenborough.  I believe I
17  recall was something to do with GenLabs, again many
18  years ago, and perhaps not Zap! Products but another
19  entity.  What sticks in my mind was that was to do with
20  Simplicity.  Other lawsuits.  I am just drawing a blank
21  right now.  I don't have anything else in mind.
22       MR. PULKRABEK:  Okay.  Mr. Henke, I appreciate
23  your time.  Thank you.  Those are all the questions I
24  have.
25       THE DEPONENT:  Thank you.

Page 164

1
2                    EXAMINATION
3   BY MR. ABELMAN:
4    Q.    Mr. Henke, it's my turn, and I appreciate
5   your patience today.
6         Do you consider yourself honest?
7    A.    Yes.
8    Q.    Do you consider yourself a man of high
9   integrity?
10   A.    Yes.
11   Q.    Do you think that it is important for a CPA
12  to have honesty and integrity?
13   A.    Yes.
14   Q.    Would you ever be party to preparing a
15  financial statement if what you knew or had good reason
16  to know was fraudulent or contained material omissions?
17   A.    No.
18   Q.    I am sorry.  I did not hear your answer.
19   A.    No, I would not.
20   Q.    Would you work for someone who you consider
21  to be dishonest or you could not trust?
22       THE REPORTER:  I am sorry.  I didn't hear the
23  last part.
24   Q.    (BY MR. ABELMAN)  I said would you work for
25  someone who you considered to be dishonest or not

Page 165

1   trustworthy?
2        MR. PULKRABEK:  Form.
3    A.    You're asking me if I would work for them?
4    Q.    (BY MR. ABELMAN)  Yeah.  Would you prepare
5   financial records or submit financial records for
6   someone who you consider to be dishonest or
7   untrustworthy?
8        MR. PULKRABEK:  Same objection.
9    A.    I would not if I knew that.
10   Q.    (BY MR. ABELMAN)  When you worked for Jeff
11  Wycoff for, it looks about over 16 years, you provided
12  tax reporting and other financial services to Jeff and
13  his -- Jeff and Merrie Wycoff and their business
14  entities.  Is that accurate?
15   A.    I missed how many years you said.  It would
16  be something like 20, yes.
17   Q.    Okay.  And with regard to just Jeff, did you
18  ever receive any financial reporting from Merrie
19  Wycoff?
20   A.    Merrie would provide me with certain things
21  that went along with their tax returns.  Is that what
22  you are asking?
23   Q.    Well, I am just asking general questions.
24  For instance, what, if any, financial materials did you
25  rely upon Merrie Wycoff to provide you?

Page 166

1    MR. PULKRABEK:  Object to the form.

2    A.    She would provide me typically forms 1099,

3    forms W-2.  She annually would provide me with

4    copies -- actually originals of all of their bank

5    statements.  She had little things, maybe a 1099 from

6    Rosa Mystica, which was her little side thing.  She

7    would provide me annually most of the documents that I

8    was provided for their tax return.  She sent them in a

9    folder and I got them from her.

10    Q.    Did you get the sense that she was -- that

11    she compiled these materials as opposed to acting as a

12    messenger for them?

13    MR. PULKRABEK:  Foundation.

14    A.    Much of what she sent, bank statements, for

15    example, the envelopes were not even open.  So I am not

16    sure who was managing what.

17    Q.    (BY MR. ABELMAN)  Okay.  Do you believe that

18    Jeff and Merrie Wycoff considered you a trusted

19    advisor?

20    A.    Yes.

21    Q.    Do you have any opinion about whether Jeff

22    Wycoff was an honest person?

23    MR. PULKRABEK:  Form and foundation.

24    A.    I never considered him a dishonest person.

25    Q.    (BY MR. ABELMAN)  In the 20 years that you

Page 167

1    worked with Jeff, did you ever have any experience with

2    Jeff asking you to cut corners?

3    A.    I, you know, it's -- cutting corners is a

4    term that I really couldn't apply here.  If you mean

5    cutting corners, could I economize on my fees by doing

6    something lesser?  Yes.  But cutting corners like doing

7    something illegal or unethical or immoral, no.

8    Q.    Did you ever experience Jeff Wycoff providing

9    you with inaccurate financial information?

10    A.    I only caught the back and front of that

11    question, Steve.  What was the question again?

12    Q.    I asked if you had any experience or you have

13    any knowledge about Jeff Wycoff or Merrie Wycoff

14    providing you with inaccurate financial information.

15    A.    No.

16    Q.    Do you have any knowledge about Jeff Wycoff

17    or Merrie Wycoff purposely making any material

18    omissions from important financial information?

19    A.    Intentionally?  No.

20    Q.    Would you say that Jeff Wycoff suffered from

21    dyslexia?

22    A.    Jeff had dyslexia, yes.

23    Q.    How did you know that?  How did you learn

24    that?

25    A.    I think Barry Marlin told me originally, and

Page 168

1    Jeff told me any number of times in later years that he

2    was dyslexic.

3    Q.    And did you ever have occasion to notice how

4    that condition may have manifested itself to you?

5    A.    I think over the years sometimes if we were

6    reading something, he would read it backwards or

7    transpose numbers or the like, and I just understood

8    that was his dyslexia.  I think he managed it during

9    his adult life, but it was a real problem for him when

10    he was a kid.

11    Q.    Let's talk about the IRS issues that were

12    raised earlier.  In response to a question that was

13    raised from Mr. Pulkrabek, you mentioned that there was

14    a communication from the California Franchise Board in

15    2006.  Did I remember that accurately?

16    A.    Something like that, yes.

17    Q.    What was the nature of that communication?

18    A.    The nature of the communication was that they

19    were not going to be in any further touch with us, that

20    they would base their assessment on the findings with

21    the Feds.

22    Q.    When did you first learn about the dispute

23    that the Wycoffs had with the IRS?

24    A.    I want to say the audit started like in 2003

25    maybe.

Page 169

1    Q.    And did Jeff Wycoff inform you about the

2    audit?

3    A.    Yes.

4    Q.    And what did he tell you at that time?

5    A.    Well, I probably got the information more

6    from Barry Marlin.  But the IRS assigned an auditor, so

7    they were auditing the books of the company and the tax

8    returns that I had prepared, and there was an auditor

9    at their office for -- literally for years.

10    Q.    At whose office are you referring to?

11    A.    Jeff's office in Northridge.

12    Q.    In Northridge?

13    A.    That is where I would meet the auditor.  I

14    had the auditor come to my office once or twice on the

15    back end of it because it was easier for him to look at

16    my records here than for me to drive up to Northridge

17    and go through their records.

18    Q.    So you were interacting directly with the

19    auditor starting -- do you recall, was it starting in

20    2003 or shortly thereafter?

21    A.    I am sorry, Steve.  You're breaking up.

22    Q.    I said were you interfacing with the auditor

23    starting in 2003 or shortly thereafter?

24    A.    I missed the first part of the question.  I

25    am sorry.

Robert Henke
August 11, 2021

Page 170

1    MR. PULKRABEK:  Steve, you are breaking up to
2  such a degree that I can't imagine we're getting all of
3  your questions here.
4    MR. ABELMAN:  Let's see.  Maybe I need to move
5  closer or further?  Is this better?  No?  Is this
6  better?
7    THE DEPONENT:  Maybe further back.
8    MR. PULKRABEK:  I don't know if it's a
9  proximity issue, Steve.  I am not sure.
10    THE VIDEOGRAPHER:  It could be like if you
11  logged off and re-logged on like Attorney Ross did
12  earlier and it was able to improve it.
13    MR. ABELMAN:  Okay.  Let me try that.
14    THE VIDEOGRAPHER:  We are off the record,
15  4:44.
16    (Recess taken, 3:44 p.m. until 3:47 p.m.)
17    THE VIDEOGRAPHER:  Okay.  We are going back on
18  the record, 4:57 p.m.
19    THE REPORTER:  Counsel, I am not hearing
20  anything.
21    THE VIDEOGRAPHER:  Okay.  We are back off the
22  record, 4:58.
23    MR. ABELMAN:  Okay.  Finally.
24    THE VIDEOGRAPHER:  Okay.  We are on the record
25  now, 4:59 p.m.

Page 171

1    Q.    (BY MR. ABELMAN)  Okay.  Take 7.
2    So I think where we left off was, Mr. Henke,
3  I was asking you if -- it seems like you were
4  interfacing with the auditor for the IRS sometime
5  around 2003, 2004?
6    A.    Yes.
7    Q.    And would you describe what your interaction
8  with the IRS auditor encompassed?
9    A.    The audit issue was, as I recall, the
10  deduction of a very large pension contribution to the
11  Rabbi trust, which was part of Albion Management, and
12  the authority we had in tax law to actually do that.
13    So we spent, as I recall, way too many hours
14  looking at the books and the income and how we got to
15  arrive at this deduction that we claimed on the tax
16  return.  So basically, I was --
17    Q.    Were you working with tax counsel at this
18  time?
19    A.    With what counsel?
20    Q.    Tax counsel.
21    A.    Yes, but I was -- I was -- I don't know what
22  I would call myself.  I was the detail guy.  I was out
23  there taking him through the books.  They weren't just
24  looking at the pension, but they were looking at other
25  items in the books, maybe travel and entertainment,

Page 172

1  having to document the advertising.  Jeff had a
2  significant amount of advertising.  So they were
3  auditing a number of areas, but it all came back to the
4  result of all of this was the pension contribution, the
5  nonqualified deferred plan.  But I spent days out there
6  with the auditor.
7    Q.    Who was the Wycoff's tax counsel at the time?
8    A.    Well, he used Barry Marlin and he used Roland
9  Attenborough when the nonqualified plan became the
10  issue.
11    Q.    Were you familiar with Mr. Attenborough's
12  reputation?
13    A.    Yes.
14    Q.    And would you describe what you understood
15  about Mr. Attenborough's reputation?
16    MR. PULKRABEK:  Form.
17    A.    I believed it was stellar.  And the reason I
18  say that, there were very few attorneys who were
19  familiar with what we had done, which was having a non-
20  qualified deferred plan using a Rabbi trust in an ESOP.
21  And so there was not much of a selection as to who you
22  could use for counsel.
23    Q.    (BY MR. ABELMAN)  What was Mr. Attenborough's
24  position about the Wycoffs' likelihood for success in
25  this claim brought by the IRS?

Page 173

1    MR. PULKRABEK:  Foundation and form.
2    A.    My -- my belief was until the adjudication
3  went against Wycoff, that he would win the case.  I
4  think counsel supported that position all the way up
5  until tax court when he was basically disqualified for
6  having a conflict of interest.
7    Q.    (BY MR. ABELMAN)  Please elaborate the basis
8  for your belief.  Did you have interactions with
9  Mr. Attenborough?  Were you privy to Mr. Attenborough's
10  view of the strength of the Wycoff case?
11    MR. PULKRABEK:  Form, foundation.  Go ahead,
12  Mr. Henke.  You can proceed.
13    A.    Okay.  I had -- I don't know if you would
14  call it access to what he had access to, but I was
15  familiar with the issues at the time.  And without
16  making legal opinions, I was confident that what we
17  were doing was within the law and by the law.
18    And Mr. Attenborough was -- we weren't his
19  only client.  My understanding was he had six or eight
20  other substantial nonqualified deferred plans with the
21  Rabbi trust and ESOP.  So from my point, I am the
22  mechanic.  I mean, I am actually filing tax returns and
23  claiming these deductions and whatnot, relying on his
24  position and believing that his position is a good
25  position legally.

Robert Henke
August 11, 2021

Page 174

1    Q.    (BY MR. ABELMAN)  Now Midlab has filed a
2  complaint alleging that the financial statement, which
3  is dated October 31, 2015, contains a material
4  omission, including for the reason that there is no
5  reference to the IRS claim.  Do you believe that the
6  failure to include the IRS claim constitutes a material
7  omission in the financial statement?
8          MR. PULKRABEK:  Form, foundation.
9    A.    Well, I don't believe that, and that is not
10  what I believed at the time.
11    Q.    (BY MR. ABELMAN)  Would you explain your
12  position at the time?
13          MR. PULKRABEK:  Same objections.
14    A.    My position at the time was it was a
15  contingency with the likelihood that it would be
16  resolved in the Wycoffs' favor and did not require
17  disclosure.
18    Q.    (BY MR. ABELMAN)  So we established that Jeff
19  Wycoff knew about the claim of the IRS starting around
20  2003.  What about the claim of the California Franchise
21  Tax Board, if I have that name correct?  When did
22  Mr. Wycoff, to the best of your knowledge, become aware
23  of a claim from that taxing authority?
24          MR. PULKRABEK:  Foundation.
25    A.    I -- the Franchise Tax Board was provided

Page 175

1  information by the IRS, to my knowledge, and we knew
2  that the Franchise Tax Board, while not coming out and
3  doing the audit, was going to abide by whatever the
4  Feds came up with.  So when the IRS adjudicated it, the
5  Franchise Tax Board said that is fine, we will take
6  those numbers from that time period and this is how
7  much you owe us.
8          So I don't know exactly when that was, but my
9  recollection is it was sometime around the 2005, 2006
10  neighborhood when the Franchise Tax Board said we're
11  not going to be monitoring this ongoing, but when the
12  Feds adjudicate, we will piggyback on whatever that
13  result is.
14    Q.    (BY MR. ABELMAN)  The statement of financial
15  condition dated October 31, 2015, also does not
16  reference the California Franchise Tax Board.  In your
17  opinion, was that a material omission at the time this
18  was -- this financial -- statement of financial
19  condition was prepared?
20          MR. PULKRABEK:  Foundation, form.
21    A.    At the time I prepared the statements, that
22  was not my opinion that the Franchise Tax Board nor the
23  IRS determinations, number one, had been made, so we
24  weren't sure what those were; and, number two, to the
25  extent that we anticipated a favorable outcome, that

Page 176

1  there were contingencies that were not needing to be
2  disclosed.
3          MR. ABELMAN:  Bill, are you able to put
4  Exhibit 83 back on -- to share that document?  Bill,
5  you are on mute.
6          THE VIDEOGRAPHER:  Yes, sir, did you need me
7  to share the document for you?
8          MR. ABELMAN:  Yes.  It's Exhibit -- I believe
9  it's 83.
10          THE VIDEOGRAPHER:  Okay.  I haven't received
11  any of the -- I haven't received any of the exhibits or
12  documents.
13          MR. ABELMAN:  I thought all of the exhibits
14  were sent to you and to the court reporter just by
15  Mr. Pulkrabek, plus this is an exhibit that we have
16  used in prior depositions.
17          THE VIDEOGRAPHER:  Yes, if you want to put it
18  into the chat box, I will retrieve it and put it on the
19  share screen.
20          MR. ABELMAN:  Okay.  How do I do that?
21          THE VIDEOGRAPHER:  You click on the file.  You
22  open the chat, and you click on the file.
23          MR. ABELMAN:  These documents were sent
24  earlier today.
25          THE VIDEOGRAPHER:  Yes, sir.  I will get the

Page 177

1  reporter to send it to me.
2          MR. ABELMAN:  Sure.
3          THE VIDEOGRAPHER:  Go off the record,
4  5:11 p.m.
5          (Recess taken, 4:11 p.m. until 4:13 p.m.)
6          THE VIDEOGRAPHER:  We are back on the record,
7  5:13 p.m.
8    Q.    (BY MR. ABELMAN)  Mr. Henke, you covered part
9  of the first paragraph in your cover letter.  Would you
10  read aloud the second paragraph of your cover letter?
11    A.    The second paragraph reads, "Jeffrey and
12  Merrie Wycoff have elected to omit substantially all
13  the disclosures required by accounting principals
14  generally accepted in the United States of America.  If
15  the omitted disclosures were included in the statements
16  of financial condition, they might influence the user's
17  conclusions about the financial condition of Jeffrey
18  and Merrie Wycoff.  Accordingly, the financial
19  statement is not designed for those who are not
20  informed about such matters."
21    Q.    So would you explain -- you mentioned earlier
22  that much of this letter is a boilerplate provision.
23  Would you explain to a layman what that -- the purpose
24  of the second paragraph and what it means?
25          MR. PULKRABEK:  Form, foundation.

Robert Henke
August 11, 2021

Page 178

1    A.    What it means is that we are not including as
2  a part of the financial statement disclosures which
3  could influence the user of the financial statement
4  conclusions about what they're looking at.
5    Q.    (BY MR. ABELMAN)  And what is the purpose of
6  including this kind of provision?  What message are you
7  trying to -- are you sending to a recipient of the
8  statement of financial condition?
9    A.    I think the message is don't rely on what you
10  are looking at to make significant decisions.
11    Q.    Would you expect that someone with a
12  sophisticated financial background would understand
13  that language?
14        MR. PULKRABEK:  Form.
15    A.    I believe someone who is sophisticated would
16  take this financial statement and understand that it is
17  what it is and it's not definitive necessarily for
18  making your decisions.
19    Q.    (BY MR. ABELMAN)  Did anyone ever call you
20  with regard to information or ask questions with regard
21  to information on the statement of financial condition
22  which accompanied this letter?
23    A.    Never.
24    Q.    Okay.  I am going to change topics for a
25  minute.

Page 179

1        You referenced -- there was a term bantered
2  about earlier that I would like to focus on, and that
3  is disregarded entity.  Isn't disregarded entity a term
4  of art?
5    A.    Isn't disregarded entity a term of what?
6    Q.    Art.  Let me rephrase that.
7    A.    Please.
8    Q.    Explain to me if you -- do you -- have you --
9  are you familiar with the term disregarded entity?
10    A.    Yes.
11    Q.    Tell me what you understand it to mean.
12    A.    Primarily what I see here in California is a
13  disregarded entity is an LLC that is owned by an
14  individual, so it's not a partnership.  It's actually
15  an LLC in a legal form, but it's disregarded, and a
16  person who has an LLC, single member, will report the
17  income and expense of that entity on their personal
18  return on whichever schedule is appropriate on their
19  personal return.
20        So the fact that you are an LLC, if you are
21  singularly owned, at least in California, here it is a
22  disregarded entity.  We do not file a federal tax
23  return for a disregarded entity.
24    Q.    Does a disregarded entity prepare or is a K-1
25  prepared for a disregarded entity?

Page 180

1    A.    No, not in California.  I don't know about
2  other states.
3    Q.    Okay.  So there is -- there is some confusion
4  about Wycoff Financial.  I am going to give you what I
5  believe to be as the basis for Wycoff Financial, and
6  for purposes of my questions, you can assume that the
7  information I am giving you is true, although I
8  understand you don't have -- you don't have direct
9  knowledge of this.
10    A.    Okay.
11    Q.    So Wycoff Financial was a special purpose
12  entity that was created at the behest of BC24 as part
13  of a loan transaction.  Do you know -- are you familiar
14  with the term as to what is a special purpose entity?
15    A.    I would only be speculating.
16    Q.    So you don't -- I am not asking you whether
17  Wycoff Financial was a special purpose entity.  I am
18  asking you if you are familiar with that term.
19    A.    I am somewhat familiar with the term.
20    Q.    So the idea behind a special purpose entity
21  is that with regard to real property, the real
22  property, a single piece of real property is the only
23  asset of that special purpose entity, hence, it's
24  called a special purpose entity.  Does that comport
25  with your understanding?

Page 181

1    A.    That would, yes.
2        MR. PULKRABEK:  Foundation.  I don't know if
3  you got that objection.
4    Q.    (BY MR. ABELMAN)  And a lender who is taking
5  real estate as collateral will often require the
6  collateral be owned by a special purpose entity; isn't
7  that correct?
8        MR. PULKRABEK:  Foundation.
9    A.    I don't know that it's --
10    Q.    (BY MR. ABELMAN)  In your experience?
11    A.    In my experience, it's not frequent, but,
12  again, I don't know the circumstance here, and I don't
13  know Colorado versus California.  But in my experience
14  with my clientele, that is not a common occurrence.
15    Q.    Okay.  Assuming that the Wycoffs were the
16  sole owners of Wycoff Financial and the only asset of
17  Wycoff Financial was the farm, would it be correct to
18  refer to Wycoff Financial as a passthrough entity?
19        MR. PULKRABEK:  Foundation.
20    A.    I believe, yes.
21    Q.    (BY MR. ABELMAN)  Would it be better to
22  refer to -- would you feel more comfortable referring
23  to Wycoff Financial as a disregarded entity in those
24  circumstances?
25        MR. PULKRABEK:  Same objection, form.

Robert Henke
August 11, 2021

Page 182

1    A.    Yeah, I really don't know the answer to that.
2    Q.    (BY MR. ABELMAN)  Okay.  For purposes of
3    determining the Wycoffs' net worth, would it matter to
4    you whether the farm was owned by a disregarded entity
5    which they owned 100 percent of or whether it was owned
6    directly by the Wycoffs?
7           MR. PULKRABEK:  Foundation.
8    A.    No as to substance, possibly as to form.
9    Q.    (BY MR. ABELMAN)  Okay.  Would you elaborate
10   what you mean?
11   A.    I am not sure as I sit here that I would call
12   it, you know, the Wycoff farm or whatever it was
13   referred to in the financial statement real estate
14   form.
15   Q.    Okay.
16   A.    I might be required to refer to it as Wycoff
17   Financial, LLC, dash farm or not farm, I really don't
18   know.  But as to the substance, the opinion would be
19   the same, so it would have no bearing on the
20   bottom-line net worth or otherwise.
21   Q.    And in the liability section of the
22   October 31, 2015, statement of financial condition,
23   there is a line item that says mortgage payable-farm.
24   And the number ascribed to that line item is
25   $3,650,000.

Page 183

1    A.    Yes.
2    Q.    If that were -- if the $3,650,000 were only
3    an -- only a guaranteed obligation by the Wycoffs,
4    would the way that it was characterized in this
5    statement of financial condition be different?
6           MR. PULKRABEK:  Form.
7    A.    I don't know, but I would suggest possibly.
8    I am not familiar with any transactions that involve a
9    loan that is not a loan, but a guarantee on a piece of
10   real estate.
11   Q.    (BY MR. ABELMAN)  So what I am asking is is
12   this line item for $3,650,000 designed to reflect a
13   liability attendant to ownership of the farm?
14   A.    Yes.
15          MR. ABELMAN:  Okay.  Jackie, would you be so
16   kind as to share Exhibit 90 on the screen?
17          THE REPORTER:  Yes, give me just a moment,
18   please.
19   Q.    (BY MR. ABELMAN)  Mr. Henke, do you remember
20   answering questions related to this document?
21   A.    Yes.
22   Q.    So I want to be very careful with our
23   language here, because I think some things might have
24   got lost during the prior discussions.
25          Let's look at Sirius Products.  There is a

Page 184

1    negative $764,276 ascribed to Sirius Products.  That
2    means that more money was taken out of Sirius Products
3    than was put in to Sirius Products?
4    A.    Basically.
5    Q.    And for Zap! Products, the number is
6    $1,960,852.  That means -- well, tell me what that
7    means.
8    A.    That means that Jeff and Merrie have put in
9    $1,960,000, which is owed to them by Zap! Products.
10   Q.    Okay.  And that is an important distinction,
11   because earlier, the language used -- and I am not -- I
12   am not suggesting that this is your fault, but there
13   was reference made to -- that that $1,968,852 is all
14   attributable to intra-company transfers, but in fact,
15   it includes monies that the Wycoffs personally put in
16   to Zap!, doesn't it?
17          MR. PULKRABEK:  Foundation.
18   A.    That is exactly what it means.  The other
19   entities were more problematic than Zap! was as to what
20   information I collected here.
21   Q.    (BY MR. ABELMAN)  So this is November of
22   2016.  Did you know why the Wycoffs had to put money
23   into Zap!, or why the Wycoffs did put money into Zap!?
24   A.    Do I -- excuse me, do I know why?
25   Q.    Yes.

Page 185

1           MR. PULKRABEK:  Foundation.
2    A.    Generally if the entity required money, it
3    was because of operationally they were losing money or
4    it was what I would call seed money where they had to
5    invest to ramp up the business in the first place.
6    Q.    (BY MR. ABELMAN)  So you were talking about
7    Zap!'s revenues earlier.  Do you know if Zap! was
8    losing money in 2016?
9    A.    I didn't know in 2016.  I probably knew by
10   the end of 2017.  2016, when they were losing the
11   money, I really didn't have anything to do with Zap!.
12   Q.    And have you had occasion to look at
13   reporting materials that show how much money the
14   Wycoffs contributed personally to Zap!'s products in
15   2016?
16   A.    Not 2016, per se.  But the date on this email
17   was November 2016 and that would have been what was
18   reflected on their books at that time.
19   Q.    Okay.  Did you ever look at the entries that
20   supported this $1,960,000?
21   A.    Yes, and they did not look unusual to me.
22   Again, I wasn't doing the bookkeeping so --
23   Q.    Would it be fair to say that, to the best of
24   your knowledge, the Wycoffs dumped a lot of money into
25   Zap! over the years?

Robert Henke
August 11, 2021

Page 186

```
1           MR. PULKRABEK: Foundation.
2      A.    Well, again, to the date of this email, which
3  approximates when I was looking at it, I would say they
4  had a 1,960,000 and change in Zap! Products.
5      Q.    (BY MR. ABELMAN)  And that number is net of
6  monies they may have paid themselves through Zap!
7  Products?
8           MR. PULKRABEK: Foundation.
9      A.    I don't recall that they paid themselves
10 anything from Zap! Products, but had they paid
11 themselves money, it would have reduced this figure,
12 unless they took that money as salary, in which case it
13 would have been an expense of the business and not
14 affected their investment in the business.  I also
15 don't recall them taking salaries from Zap! Products,
16 but that is -- I think this figure is more a net number
17 in versus a net number out.
18     Q.    (BY MR. ABELMAN)  Now, I thought -- I thought
19 I heard you say, and please correct me if I am wrong,
20 that in 2017 -- well, describe -- describe for me your
21 understanding of the -- of the sales of Zap! in 2016,
22 if you know.
23     A.    I would have to look.  I think they were
24 fairly substantial.
25     Q.    And then what were the sales in 2017?
```

Page 187

```
1      A.    I want to say, without looking, they were
2  substantially less.
3      Q.    And how much of the -- okay.  What about
4  2018?
5      A.    Well, from my memory, 2018 forward, there
6  were little to no sales.
7      Q.    You talked to Jeff frequently, you said
8  earlier.  Did Jeff keep you apprised as to the status
9  of Zap!'s ongoing business venture?
10     A.    What Jeff told me regarding Zap! was that he
11 had wrapped up sales and had done significant sale,
12 and he didn't find out until later that his controller
13 person, whoever that was, had priced all of his
14 products inappropriately and he lost a lot of money.
15 And I think --
16     Q.    Do -- I am sorry.  I didn't mean to cut you
17 off.
18     A.    I believe in 2016, they had a significant
19 loss, like $4 million or something of the like, but he
20 suggested that he wasn't aware of the pricing of the
21 products.  So even though they had good sales, they
22 lost a lot of money on every sale.  But as to the
23 ongoing how was Zap!, we didn't have much to say about
24 it.  He is a salesman.  He was very -- always very
25 optimistic about ramping up and doing whatever he had
```

Page 188

```
1  done in the past.  So I don't know why Zap! sales
2  stopped and didn't continue.
3      Q.    Is it because of the IRS claim?
4           MR. PULKRABEK: Foundation.
5      A.    I don't know that.
6      Q.    (BY MR. ABELMAN)  Are you aware of any
7  collection activities by the IRS?
8      A.    I am not familiar with any collection
9  activities of the IRS.
10     Q.    Did Jeff ever tell you that the IRS was
11 engaging in collection activities?
12     A.    Well, any conversations we had after they
13 came out with their adjudication of the case, he was
14 depressed about it.  But --
15     Q.    And, in fact, I think you testified that the
16 adverse tax ruling came out in October of 2017; is that
17 right?
18     A.    Attorney Ross mentioned that.  I have
19 somewhere a piece of paper that shows what it was and
20 when it was, but that sounds about right, late in 2017.
21     Q.    So by that time, the IRS would have had no
22 right to collect the outstanding -- its outstanding
23 claim prior to the final adjudication, as far as you
24 know, right?
25           MR. PULKRABEK: Foundation.
```

Page 189

```
1      A.    As far as I know, that is correct.
2      Q.    (BY MR. ABELMAN)  So at least prior to
3  October 2017, you don't know any reason why the IRS
4  claim would have contributed to the demise of Zap!?
5      A.    That is correct.
6           MR. ABELMAN: Mr. Henke, I don't have any
7  further questions.  Thank you so much.
8           THE DEPONENT: Thank you.
9           MR. PULKRABEK: All right.  I have a few
10 follow-up questions for Mr. Henke.
11                EXAMINATION
12 BY MR. PULKRABEK:
13     Q.    Can you hear me okay, Mr. Henke?
14     A.    I can hear you, yes.
15     Q.    Okay.  So Mr. Abelman asked you a few
16 questions about your opinion on the merits of the tax
17 litigation between the Wycoffs and the IRS.  Do you
18 recall those questions?
19     A.    Yes.
20     Q.    And it sounded to me like, in part, your
21 opinions were influenced by some of what you were
22 hearing from this attorney, Mr. Attenborough.  Did I
23 understand that correctly?
24     A.    I think you would better direct that to a
25 time frame.
```

Robert Henke
August 11, 2021

Page 190

1    Q.   Okay.  During the period of time that you
2  were working with Mr. Attenborough, whatever his
3  opinions were were something that you were listening to
4  and forming your own opinions?
5    A.   That's correct.
6    Q.   Okay.  And Mr. Attenborough is the same
7  lawyer who got disqualified because of conflict of
8  interest representing the Wycoffs; is that right?
9    A.   That's correct.
10   Q.   The tax court threw him out of court because
11 of a conflict of interest?
12   A.   Yes.
13   Q.   And Mr. Attenborough is the same lawyer who
14 represented a number of clients with respect to this --
15 what turned out to be a very aggressive tax strategy
16 that did not work out for those clients?
17   A.   To my knowledge, yes.
18   Q.   And Mr. Attenborough is the same attorney
19 Jeff Wycoff sued and filed a lawsuit against in 2014
20 because of the enormous amount of legal fees that had
21 been charged by the firm?
22   A.   To my knowledge, yes.
23   Q.   And this is the same Mr. Attenborough and his
24 firm who ended up paying a $475,000 legal settlement to
25 Merrie Wycoff?

Page 191

1    A.   As you have indicated, yes.
2    Q.   The legal settlement that you only learned
3  about today?
4    A.   Correct.
5    Q.   Mr. Marlin was also an advocate of this
6  aggressive tax strategy.  Do I have that right?
7    A.   Yes.
8    Q.   And Mr. Marlin is the same attorney who you
9  now know was a convicted Ponzi schemer?
10   A.   Yes.
11   Q.   All right.  Now you were asked some questions
12 about -- well, and I should add, Jeff Wycoff knew he
13 was a convicted Ponzi schemer as well, right?
14   A.   When Jeff found out, he advised me.
15   Q.   And when was that?
16   A.   Give or take 2016 or '17 is the time frame of
17 these statements.  He did not know for a long time.
18   Q.   All right.  I want to ask you some questions
19 about Exhibit 83, if I can.  This was the -- this was
20 the financial statement from 2015.  And let me bring
21 that up, if I can, and share the screen just one more
22 time.  Bear with me one moment, please.
23        Okay.  And are you able to see the screen
24 that I am sharing at this point, Mr. Henke?
25   A.   Yes.

Page 192

1    Q.   Okay.  Now I recall Mr. Abelman asked you
2  some questions about the second paragraph in your
3  letter dated November 3, 2015.  Do you recall those
4  questions?
5    A.   Yes.
6    Q.   And so let me ask you a few follow-ups.  Did
7  you have any understanding that this letter and the
8  accompanying financial statement were being used to
9  induce people to do business with the Wycoffs?
10   A.   I was not advised of that specifically, but I
11 would have assumed that, yes.
12   Q.   Isn't the whole purpose of this letter and
13 financial statement to induce somebody to do business
14 with the Wycoffs?
15   A.   That could be one reason.
16   Q.   And so then let me turn to the second page.
17 Can you tell me, how is anybody receiving this
18 financial statement as of October 31, 2015, supposed to
19 know that the farm is not actually owned by Jeff and
20 Merrie Wycoff, but it is also owned by another company,
21 Wycoff Financial, based on anything in this financial
22 statement?
23   A.   The question is how would they know?
24   Q.   Right.
25   A.   They would not.

Page 193

1    Q.   Okay.  How would anybody looking at this
2  financial statement know that the contingent liability
3  for income taxes is not actually $2,080,000, it is
4  something more on the order of $10 million?  How would
5  anybody know that?
6        MR. ABELMAN:  Objection, foundation.
7    A.   They would not know that from this statement.
8    Q.   (BY MR. PULKRABEK)  Okay.  How could they
9  deduce -- how would a reasonable person deduce that the
10 contingent liability for taxes is not actually
11 $2,080,000, it is something closer to $10 million?
12       MR. ABELMAN:  Objection, foundation.  Not an
13 accurate statement.
14   A.   I don't know.
15   Q.   (BY MR. PULKRABEK)  Okay.  Maybe it's not an
16 accurate statement because it's too low.  $2,080,000,
17 plus what was the actual tax liability, Mr. Henke?
18   A.   The actual tax liability was as stated, which
19 assumes that every asset was being liquidated currently
20 and what tax would be appropriately associated with
21 those sales.
22   Q.   Okay.  Now let me re-ask my question.  We're
23 talking about a contingent tax liability that is listed
24 on this sheet of $2,080,000.  Do you see that?
25   A.   I see that.

Page 194

1    Q.   Okay.  But then there was also a contingent
2  tax liability based on the outcome of the litigation
3  with the tax court.  What did that turn out to be?
4    A.   That contingency, if it were reportable,
5  turned out to be 11 million, as I recall, and change.
6    Q.   Okay.  So thank you.  So, in fact, it's
7  closer to $13 million.  So how does any reasonable
8  person looking at the statement of financial condition
9  know that the contingent tax liability is not
10  $2,080,000, it is, in fact, on the order of
11  $13 million?
12    A.   I would take you back to the cover letter
13  where it suggests if you are not familiar with such
14  things then you should not rely on this contingent
15  liability, which, by definition, is the tax associated
16  with the liquidation of the assets currently.
17    Q.   Yeah, but how does a reasonable person ferret
18  out that there is actually $13 million in contingent
19  liabilities when Jeff and Merrie Wycoff have just sent
20  them a statement showing $2,080,000 in contingent
21  liabilities?
22    A.   Anyone using the statement I would assume
23  would have knowledge that there might be something
24  outside of these financial statements and further would
25  understand exactly what that contingent liability for

Page 195

1  taxes is associated with.
2    Q.   Yeah, but how is somebody supposed to figure
3  out another $11 million in taxes when this has been
4  reported?  I mean, I am curious what the steps are.
5    A.   If we take the position --
6         MR. ABELMAN:  Wait, wait, wait, objection to
7  foundation.  Okay.  Go on.
8    A.   If we assume that there are things that are
9  not on this financial statement, we may have something
10  on the asset side, too, it's not reportable based on my
11  opinion.
12         Again, I think you want to take this
13  liability for taxes which is associated by definition,
14  if somebody asks the question how did you get that
15  number, that number comes from liquidating all of the
16  assets on the statement at current values and the tax
17  that would be associated with those gains.
18    Q.   (BY MR. PULKRABEK)  That is not my question.
19  Mr. Henke, that is not my question.  My question is
20  this:  Jeff and Merrie Wycoff report on this financial
21  statement that they had $2,080,000 in contingent
22  liability related to income tax, correct?
23    A.   Correct, as associated with the assets being
24  liquidated at this time.
25    Q.   Okay.  So how are they -- how is any

Page 196

1  reasonable person looking at this supposed to know that
2  really, there are additional contingent liabilities
3  that are unreported also relating to income taxes?
4    A.   Without disclosures, they would not.
5    Q.   Okay.  If the $904,000 in cash is actually
6  incorrect because it was $160,000, is it reasonable to
7  say the user of the financial statement should have
8  known that maybe there was just an undisclosed error to
9  the tune of $740,000 and shouldn't have relied on the
10  $904,000?  Is that --
11    A.   I would suggest that that would be an omission --
12    Q.   Okay.
13    A.   -- on the part of the persons responsible for
14  preparing the statement and not the same as a
15  contingency that is not necessarily reportable.
16    Q.   All right.  Let me ask you some questions
17  about Exhibit 90, and then I will be done.  Let me see
18  if I can put that up on the screen here.
19         Okay.  Do you recall being asked some
20  questions by Mr. Abelman regarding Exhibit 90?
21    A.   Yes.
22    Q.   And Mr. Abelman asked you some questions
23  about Jeff and Merrie Wycoff putting in $1.9 million.
24  Do you recall those questions?
25    A.   Yes.

Page 197

1    Q.   Okay.  You don't know what the source of that
2  $1.9 million was at all, do you?
3    A.   I do not.
4    Q.   So, in fact, it may not have been, you know,
5  their savings.  It may have just been money that they
6  borrowed from other people, correct?
7    A.   Correct.
8    Q.   And then money that they didn't repay other
9  people for all you know, right?
10    A.   Correct.
11         MR. PULKRABEK:  Okay.  Thank you.  I have no
12  further questions.
13         MR. ABELMAN:  Thank you, Mr. Henke.  You have
14  been very patient with us today.
15         THE DEPONENT:  You're welcome.  Am I finished?
16         MR. PULKRABEK:  Yes.  You can go now,
17  Mr. Henke.
18         THE DEPONENT:  Thank you, gentlemen, have a
19  good day.
20         THE VIDEOGRAPHER:  Off the record, 5:50.
21         MR. PULKRABEK:  We will go ahead and do the
22  same order with the marked exhibits, if you would,
23  please.
24         THE REPORTER:  Is that both of you?
25         MR. ABELMAN:  Yes.

Robert Henke
August 11, 2021

**Page 198**

1       THE REPORTER:  And how about reading and
2   signing?
3       MR. PULKRABEK:  Why don't you send it to the
4   deponent?
5       MR. ABELMAN:  Yeah, neither one of us
6   represent him.
7       WHEREUPON, the within proceedings were
8   concluded at the approximate hour of 4:50 p.m. on the
9   11th day of August, 2021.
10                 *    *    *    *    *
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**Page 199**

1       I, ROBERT HENKE, hereby certify that I have
2   read the above and foregoing deposition and that the
3   same is a true and accurate transcription of my
4   testimony, except for attached amendments, if any.
5       Amendments attached   (  ) Yes  (  ) No
6
                        —
7              ROBERT HENKE
8
9       The signature above of ROBERT HENKE was
10  subscribed and sworn to or affirmed before me in the
11  county of_____, state of Colorado, this___ day
12  of_____, 20___.
13
14   _____
                Notary Public
15            My Commission expires:
16
17
18
19
20
21
22
23
24
25   Midlab, Inc., 8/11/2021 (jg)

**Page 200**

1              REPORTER'S CERTIFICATE
2   STATE OF COLORADO      )
                           ) ss.
3   CITY AND COUNTY OF DENVER  )
4       I, JACQUELYN R. GALLO, a Registered
    Professional Reporter and a Notary Public ID
5   20034039981, State of Colorado, do hereby certify that
    previous to the commencement of the examination, the
6   said ROBERT HENKE verbally declared his testimony in
    this matter is under penalty of perjury; that the said
7   deposition was taken in machine shorthand by me at the
    time and place aforesaid and was thereafter reduced to
8   typewritten form; that the foregoing is a true
    transcript of the questions asked, testimony given, and
9   proceedings had.
10      I further certify that I am not employed by,
    related to, nor of counsel for any of the parties
11  herein, nor otherwise interested in the outcome of this
    litigation.
12
        IN WITNESS WHEREOF, I have affixed my
13  signature this 20th day of August, 2021.
14      My commission expires November 24, 2023.
15  _X_ Reading and Signing was requested.
16  ___ Reading and Signing was waived.
17  ___ Reading and Signing is not required.
18  _____
19          JACQUELYN R. GALLO
            Registered Professional Reporter
20
21
22
23
24
25

**Page 201**

1   Errata Sheet
2
3   NAME OF CASE: MIDLAB vs MERRIE PISANO WYCOFF
4   DATE OF DEPOSITION: 08/11/2021
5   NAME OF WITNESS: Robert Henke
6   Reason Codes:
7       1. To clarify the record.
8       2. To conform to the facts.
9       3. To correct transcription errors.
10  Page _____ Line _____ Reason _____
11  From _____ to _____
12  Page _____ Line _____ Reason _____
13  From _____ to _____
14  Page _____ Line _____ Reason _____
15  From _____ to _____
16  Page _____ Line _____ Reason _____
17  From _____ to _____
18  Page _____ Line _____ Reason _____
19  From _____ to _____
20  Page _____ Line _____ Reason _____
21  From _____ to _____
22  Page _____ Line _____ Reason _____
23  From _____ to _____
24
25   _____